JEREMY TALCOTT
Cal. Bar No. 311490
Pacific Legal Foundation
1212 West Amerige Avenue
Fullerton, CA 92833-2709
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
JTalcott@pacificlegal.org

STEVEN M. SIMPSON
Cal. Bar No. 336430
CALEB KRUCKENBERG*
Va. Bar No. 97609
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
SSimpson@pacificlegal.org
CKruckenberg@pacificlegal.org

* Pro Hac Vice Pending

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, | Case No. 5:22-cv-00855 |
| & | |
| THE ALLIANCE FOR CONSTITUTIONAL SEX OFFENSE LAWS, | **MOTION FOR PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF JUSTICE, | |
| & | |
| MERRICK B. GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, in his official capacity, | |
| Defendants. | |

Plaintiffs, John Doe and the Alliance for Constitutional Sex Offense Laws (ACSOL), move for a preliminary injunction against Defendants, U.S. Dept. of Justice and A.G. Merrick B. Garland, to stop enforcement of the rule, *Registration Requirements Under the Sex Offender Registration and Notification Act*, 86 Fed. Reg. 69,856 (Dec. 8, 2021). The rule is the product of a Congressional attempt to improperly grant the Attorney General the power to write federal criminal laws. And even if Congress hadn't unconstitutionally tried to delegate away its exclusive power to create federal crimes, the rule is unlawful in its own right, because it adopts a definition of "conviction" at odds with statutory text and common law tradition, imposes an unconstitutional presumption of criminal liability, and improperly restricts protected speech.

Mr. Doe and ACSOL's members represent just some of the hundreds of thousands of Americans who face irreparable harms from the rule. More than 25 years ago Mr. Doe pled no contest to a a misdemeanor sex offense, but because of his remarkable rehabilitation, today he has no criminal convictions under California law. California does not even allow him to register as a sex offender. Yet the new rule says otherwise—demanding he register based on a decades-old, expunged, misdemeanor offense, and presuming him guilty of a federal crime despite the DOJ's own acknowledgement that it is "impossible" for him to comply with the rule. And even if Mr. Doe could register, the rule's provisions foreclose his ability to speak freely, and anonymously, about anything and everything. Many of ACSOL's members are in the same position—ordered to register even without extant "convictions," presumed guilty of federal offenses and directed to surrender their First Amendment freedoms without a legitimate basis. This Court must therefore enjoin the rule pending further proceedings in this case.

## I. FACTS AND PROCEDURAL HISTORY

### A. Legal Background

The Sex Offender Registration and Notification Act (SORNA) conditions federal funding on a state's implementation of a registry for those convicted of certain sex offenses. *See* 34 U.S.C. § 20913. To enforce SORNA, Congress passed 18 U.S.C. § 2250, which makes it a federal crime, punishable by up to 10 years in prison, for anyone to fail to register as directed. SORNA contains a number of delegations of authority to the Attorney General to decide

its implementation and scope. In Section 20912(b) the Attorney General is directed to "issue guidelines and regulations to interpret and implement" SORNA. In Section 20913(d), the Attorney General is given "the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter."[1] In Section 20914(a)(7) and (8) the Attorney General can decide what information a registrant must provide to their local jurisdiction, including "any . . . travel-related information required by the Attorney General," or "[a]ny other information required by the Attorney General." Finally, the Attorney General may direct a registrant to "provide and update information" in whatever "time and manner" he prescribes. 34 U.S.C. § 20914(c).

## B. The New Rule

The Attorney General has now issued regulations, which became effective on January 7, 2022, implementing new SORNA requirements. *Registration Requirements Under the Sex Offender Registration and Notification Act*, 86 Fed. Reg. 69,856 (Dec. 8, 2021). In the rule, the Attorney General invoked his authority under 34 U.S.C. §§ 20912(b), 20913(d), and 20914(a)(7), (8), (b) to create much more burdensome registration requirements, and even alter who must register at all. *Id.* at 69,856. According to the rule, SORNA applies to "all sex offenders," even if their convictions were expunged, as "only pardons on the grounds of innocence terminate registration obligations under SORNA." *Id.* at 69,866; *see also* Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking, *National Guidelines*, 73 Fed. Reg. 38,030, 38,050 (July 2, 2008) ("SMART Guidelines") (registration is

---

[1] In *Gundy v. United States*, the Supreme Court addressed a non-delegation challenge only to 34 U.S.C. § 20913(d). 139 S. Ct. 2116, 2123 (2019). While the statute on its face allowed the Attorney General to determine whether SORNA would apply to pre-enactment convictions, according to a plurality of the Court, the Court had "already interpreted § 20913(d) to say something different—to require the Attorney General to apply SORNA to all pre-Act offenders as soon as feasible." *Id.* (citing *Reynolds v. United States*, 565 U.S. 432, 442–43 (2012)). The plurality therefore avoided the delegation question entirely. Four justices concluded that "because § 20913(d) does not give the Attorney General anything like the 'unguided' and 'unchecked' authority that Gundy says" there was no need to wade into any difficult delegation questions. *Id.* The plurality noted, however, that if the statute had granted the discretion Gundy had argued, "we would face a nondelegation question." *Id.*

excused only "if the predicate conviction is reversed, vacated, or set aside, or if the person is pardoned for the offense on the ground of innocence," and "an adult sex offender is 'convicted' for SORNA purposes if the sex offender remains subject to penal consequences based on the conviction, however it may be styled").

The rule also sets out the information a registrant must provide to a local jurisdiction, which now includes a social security number, his "remote communication identifiers" (e.g., internet usernames), his work or school information, and information concerning any international travel, passport, and vehicle registration or professional licenses. *Id*. at 69,885.

The registrant must also appear "in-person" at least yearly in his local jurisdiction, and verify all information. *Id*. at 69,885–86. Depending on his predicate offense, the registrant may be required to appear as many as four times per year. *Id*. He must also report, in person, changes in address within three days, give advance notice if he plans to change residences jobs or school, report changes in remote communication identifiers within three days, and international travel plans prior to any trip. *Id*. at 69,886.

If a local jurisdiction does not comply with SORNA registration requirements, then a registrant is guilty of the crime of failing to register unless he proves at trial that registration was, in essence, *impossible*. That is, the new rule provides individuals who live in non-compliant states with an affirmative defense to Section 2250, but that defense is only available if they can prove at trial that "uncontrollable circumstances prevented the sex offender from complying with SORNA, [that] the sex offender did not contribute to the creation of those circumstances in reckless disregard of the requirement to comply and complied as soon as the circumstances preventing compliance ceased to exist." *Id*.

### C. The Effect on Plaintiffs

Mr. Doe enlisted in the U.S. Marine Corps at age 17 and was honorably discharged in 1996. Ex. A at ¶ 3 (Doe Decl.). In 1994, while he was 23 and still serving in the Marines, Mr. Doe engaged in an otherwise-consensual encounter with a 16-year-old girl, which did not involve sexual intercourse. *Id.* at ¶ 4.

In 1996, Mr. Doe pled no contest to a single misdemeanor count of sexual battery under

California Penal Code § 243.4(a) and was sentenced to no jail time and three years' probation. *Id.* at ¶ 5. He was then required to register with the State of California as a sex offender. *Id.*

After the conviction Mr. Doe obtained his bachelor's degree, followed by a master's degree, and rose through the ranks of various companies. *Id.* at ¶ 7.

In 2005, Mr. Doe was engaged to be married and rented a second home for him and his future wife. *Id.* at ¶ 8. Mr. Doe did not move into the home and, not recognizing that he was required to notify the state of this home, did not register his rental address, where he did not yet live, as an additional residence address. *Id.* In 2006, Mr. Doe pled no contest to a misdemeanor count of failing to register under Cal. Penal Code § 290(g)(1), and was sentenced to three years' probation. *Id.* at ¶ 9.

Mr. Doe subsequently got married and had two children. *Id.* at ¶ 10. He became an involved father, active in his church and community, and continued to advance his career. *Id.* at ¶ 11. At present Mr. Doe is a successful businessman residing in California. *Id.*

Under California law, Mr. Doe is no longer required to register as a sex offender and has no criminal convictions. *Id.* at ¶ 15. Because of his rehabilitation, a state court expunged his original conviction in 2002 pursuant to Cal. Penal Code § 1203.4. *Id.* at ¶ 12. In 2010 a state court expunged Mr. Doe's failure to register conviction, also pursuant to Cal. Penal Code § 1203.4. *Id.* at ¶ 13. Then in 2012, a state court issued a "Certificate of Rehabilitation" to Mr. Doe, under Cal. Penal Code § 4852.01, which California law recognizes as a "judicial recommendation for a pardon." *People v. Ansell*, 25 Cal. 4th 868, 891 (Cal. 2001). *Id.* at ¶ 14.

Under the new rule, despite his conviction having been expunged, Mr. Doe is required to re-register as a sex offender in California. 86 Fed. Reg. at 69,866. In addition, he is directed to provide information such as his social security number, his "remote communication identifiers" (e.g., internet usernames), his work or school information, and information concerning any international travel, passport, and vehicle registration or professional licenses in person to local authorities. *Id.* at 69,885–86. Mr. Doe must also report, in person, changes in address within three days, give advance notice if he plans to change residences, jobs or school, report changes in remote communication identifiers within three days, and

international travel plans prior to any trip. *Id*.

Mr. Doe *can't* comply with the rule though because he has no criminal history under California law. Ex. A. at ¶ 15. Yet because the new rule makes impossibility of registration only an affirmative defense to prosecution, Mr. Doe faces potential criminal liability at any time. *See* 86 Fed. Reg. at 69,886.

Even if he could comply, merely being required to register as a sex offender would likely result in the loss of Mr. Doe's job, potentially require him to move to avoid being near public schools and parks, prevent him from going to his children's schools, and result in ostracization from his community. Ex. A at ¶ 20.

The rule has also curtailed Mr. Doe's speech. Mr. Doe also seeks to engage in anonymous speech on the internet using anonymous remote communication identifiers, such as email addresses and social media usernames. *Id*. at ¶ 21. He wishes to remain anonymous to preserve his privacy, and to avoid adverse reputational and other risks related to his past offenses. *Id.* He also wishes to speak anonymously about issues of public concern, including sex offender registration requirements and the unfairness of the new SORNA rule. *Id.* But the new rule demands he at least attempt to disclose his remote communication identifiers, which could be accessible by members of the public. *Id*. at ¶ 22. Because of this disclosure requirement Mr. Doe worries that he cannot speak freely about issues of public concern, particularly the new SORNA rule, without jeopardizing his reputation, privacy and the safety of his family. *Id.* at ¶¶ 21–22. Mr. Doe has thus refrained from speaking on these matters of public concern using his anonymous remote communication identifiers, because of the new rule. *Id.*

ACSOL is a nonprofit organization "dedicated to protecting the Constitution by restoring the civil rights of people listed on the public registries and their families." Ex. B at ¶ 6 (Bellucci Decl.). ACSOL is based in California and has more than 100,000 California registrants among its membership, including Mr. Doe. *Id.* at ¶ 7. One of ACSOL's central purposes is limiting unlawful registration requirements for its membership in order to help its members live law-abiding and productive lives as a part of their communities. *Id.* at ¶ 9.

ACSOL's membership includes individuals convicted of sex offenses and required to

6

register as sex offenders under both California and federal law. *Id.* at ¶ 11. These members are required to comply with the rule, even though California does not provide avenues for them to provide all of the required information to California authorities. *Id.* ACSOL's membership also includes individuals convicted of California crimes that are sex offenses who are putatively required to register as sex offenders under federal law, but have had their convictions expunged under Cal. Penal Code § 1203.4 or have been granted relief from registration under Cal. Penal Code § 290.5 and have no other convictions. *Id.* at ¶¶ 12–15. These ACSOL members have no obligation to register under California law, yet are presumed to be in non-compliance with the new rule. *Id.*

ACSOL members who will be forced to re-register, despite having no registration requirement under California law, face significant collateral consequences, such as loss of career opportunities and professional licensing, adverse reputation harms, inability to travel freely, and residency restrictions. *Id.* at ¶ 16.

ACSOL's membership includes individuals whose speech has been curtailed. *Id.* at ¶ 17. These members wish to engage in anonymous speech on the internet through the use of anonymous remote communication identifiers, and wish to preserve their privacy to avoid adverse publicity. *Id.* at ¶ 17–18. They hope to comment about issues of public concern, including sex offender registration requirements and the unfairness of the SORNA rule. *Id.* at ¶ 17. Yet the rule orders these ACSOL members to disclose their remote communication identifiers when they register, which could be accessible by members of the public. *Id.* Even to the extent that California does not yet collect remote identifier information, because the state is in noncompliance with the rule, these ACSOL members have refrained from speaking on matters of public concern using their anonymous remote communication identifiers because they fear that this information could become public and that they will be subject to negative consequences to their reputation, privacy and the safety of their families. *Id.* at ¶ 18.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction if they show: (1) a likelihood of success on the merits; (2) a likelihood that they will suffer irreparable harm in the absence of preliminary

relief; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 21 (2008). They satisfy each element of this test.

**I. Plaintiffs Are Likely To Succeed on the Merits**

### A. The Rule Is Unconstitutional in Three Ways

A court must set aside agency action that is "contrary to [a] constitutional right." 5 U.S.C. § 706(2)(B). Plaintiffs are likely to succeed in their challenge because the rule is unconstitutional in three ways: (1) It is an exercise of an unconstitutional delegation of lawmaking authority; (2) It unlawfully limits protected speech in violation of the First Amendment; and (3) It violates due process by presuming Plaintiffs' guilt of a federal crime.

### i. The Rule Is the Result of an Unconstitutional Delegation of Legislative Power

Article I, Section1, of the U.S. Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424 (1985). Thus, agencies may not declare "what circumstances . . . should be forbidden" by criminal laws. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 418–19 (1935).

When Congress leaves policy decisions up to another branch, it unlawfully divests itself of power. *See A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). What constitutes a policy decision was illustrated as far back as 1825, when the Court upheld a statute that instructed the federal courts to borrow state-court procedural rules but allowed them to make certain "alterations and additions." *Wayman v. Southard*, 23 U.S. 1, 1 (1825). Writing for the Court, Chief Justice Marshall distinguished between those "important subjects, which must be entirely regulated by the legislature itself," and "those of less interest, in which a general provision may be made, and power given to those who are to act . . . to fill up the details." *Id*. at 21.

Traditionally the Court has allowed agencies to exercise authority so long as Congress set out an "intelligible principle to which the person or body authorized to [exercise the

authority] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). But that test lacks clear contours and five of the current members of the Court have expressed interest in reconsidering that standard. *See Gundy*, 139 S.Ct. at 2131–42 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.); *id.* at 2130–31 (Alito, J., concurring in the judgment); *Paul v. United States*, 140 S. Ct. 342 (2019) (mem.) (Kavanaugh, J., statement respecting the denial of certiorari).

Still, even under the "intelligible principle" standard, the Court has suggested that it presents "a nondelegation question" to give the DOJ "unguided" or "unchecked" authority to define a crime. *Gundy*, 139 S. Ct. at 2123 (plurality op.). "Administrative" rules implementing a statute are one thing, but rules creating new crimes are quite another. *See id.* at 2129.

Moreover, as Justice Gorsuch highlighted in his dissenting opinion in *Gundy*, a delegation that "purports to endow the nation's chief prosecutor with the power to write his own criminal code" "scrambles th[e] design" of the Constitution, which "promises that only the people's elected representatives may adopt new federal laws restricting liberty." *Id.* at 2131. While Congress might authorize another branch to fill in certain factual details, it cannot lawfully divest this type of core "policy decision[]." *Id.* at 2136.

The Court provided a concrete example of this distinction in *United States v. Eaton*, 144 U.S. 677 (1892). There, the Court struck down a series of federal tax regulations that purported to impose criminal liability even though Congress had not set out a penalty provision. *Id.* at 688. As there were "no common-law offenses against the United States," it was up to Congress to provide criminal punishment for violation of a regulation. *Id.* at 687. The decision of whether to punish something as a crime could not be wholly delegated to an agency, because "[i]t would be a very dangerous principle" to allow an agency to issue regulations that, themselves, carried criminal penalties under the general rubric of being "a needful regulation" to enforce a statute. *Id.* at 688. Thus, the Court held that "[i]t is necessary that a sufficient statutory authority should exist for declaring any act or omission a criminal offense," even if the agency could otherwise issue binding regulations. *Id.*

The Court has also questioned whether "something more than an 'intelligible principle'

is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions." *Touby v. United States*, 500 U.S. 160, 165–66 (1991). Indeed, the Court assumed so where it allowed the Attorney General to temporarily add a substance to a list of prohibited drugs if he determined that doing so was "necessary to avoid an imminent hazard to the public safety." *Id.* at 166. But, importantly, the Court blessed the scheme under review in that case because it delegated a fact-finding role, instead of the policy question of whether something should be a crime. *See id.* As described by Justice Gorsuch, "In approving the statute, the Court stressed all the[] constraints on the Attorney General's discretion and, in doing so, seemed to indicate that the statute supplied an 'intelligible principle' because it assigned an essentially fact-finding responsibility to the executive." *Gundy*, 139 S.Ct. at 2141.

The delegations in Section 20912 and 20914 allow the Attorney General to create a range of new crimes by unilaterally defining what acts constitute crimes under 18 U.S.C. § 2250. Section 2250 penalizes the "fail[ure] to register or update a registration as required." But Sections 20912 and 20914 allow the Attorney General the sole discretion to define what is "required." The Attorney General says his "power to implement SORNA's requirements," includes making "additional specifications regarding information sex offenders must provide, how and when they must report certain changes in registration information, and the time and manner for complying with SORNA's registration requirements by sex offenders who cannot comply with SORNA's normal registration procedures." 86 Fed. Reg. at 69,857. Perhaps more significantly, the Attorney General has also interpreted his statutory authority to allow him to decide who must register at all, by re-defining the word "conviction" to encompass those with expunged adjudications *See* 86 Fed. Reg. at 69,866. The only thing "guiding" the Attorney General is his own gut feelings as Sections 20914(a)(7), (a)(8), and (c) do not include any qualification on "information required by the Attorney General," or "time and manner requirements prescribed by the Attorney General." Section 20912(b) just says he "shall issue guidelines and regulations to interpret and implement" SORNA. What information is required, who must register, or how the Attorney General interprets and implements SORNA are

10

standardless directives, and lack even an intelligible principle. Indeed, it would even appear to be statutorily permissible for the Attorney General to require information that he concluded was detrimental to the goals of SORNA, as the statute includes absolutely no limiting factors.

In the rule, the Department dismissed these concerns by noting, irrelevantly, that the *Gundy* plurality sustained a rule issued under Section 20913(d). *See* 86 Fed. Reg. 69,858. But that was a very different delegation than the ones the Department invokes now. As the plurality noted, the kind of "unchecked" delegations that are implicated here squarely present the constitutional question. *See Gundy*, 139 S.Ct. at 2123 (plurality op.).

DOJ also claims that some of its new requirements "further[]" SORNA's "public safety objectives," which might suggest a related limit on its authority. 86 Fed. Reg. at 69,871. But the delegations themselves contain no such limitation on the Attorney General's discretion. *See* 34 U.S.C. §§ 20912(b), 20914(a). And the Supreme Court has already rejected the premise that "an agency can cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001). Thus, there's nothing limiting the Attorney General's ability to create new crimes at will, and the delegation here unlawfully "scramble th[e] design" of the Constitution. *See Gundy*, 139 S. Ct. at 2131 (Gorsuch, J., dissenting).[2]

### ii. The Remote Communication Identifiers Provision Violates the First Amendment

"A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen[.]" *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). The "most important place[] (in a spatial sense) for the exchange of views" today is "cyberspace . . . and social media in particular." *Id*. This applies in equal measure to those

---

[2] The Ninth Circuit has previously rejected a non-delegation challenge to SORNA, but only with respect to Section 16913(d), and only prior to the *Gundy* decision. *See United States v. Richardson*, 754 F.3d 1143, 1145 (9th Cir. 2014) ("Richardson's specific contention is that Congress violated the non-delegation doctrine when it delegated its authority to the Attorney General to determine the applicability of SORNA's registration requirements to pre-SORNA sex offenders. *See* [34] U.S.C. § [20]913(d)."). The lawfulness of the delegations in Sections 20912 and 20914 remain issues of first impression in this circuit.

previously convicted of sex offenses. *Id*. Because people who have completed their sentences in full now only live with "collateral consequences of conviction rather than [] a restraint on liberty," and are thus "no longer subject to formal punishment," they "enjoy the full protection of the First Amendment." *Doe v. Harris*, 772 F.3d 563, 572 (9th Cir. 2014) (citations omitted).

As the Ninth Circuit has held in striking down a nearly identical registration requirement, when the government requires those convicted of sex offenses to provide law enforcement with their remote communication identifiers it unlawfully "imposes a substantial burden on sex offenders' ability to engage in legitimate online speech, and to do so anonymously[.]" *Id*. at 574, 578. Merely being required to make the "affirmative act of sending written notice to the police" imposes a "substantial" burden in itself, "[a]nd if that was not enough of a burden, the Act's reporting requirement carries with it the threat of criminal sanctions." *Id*. at 573; *see also Doe 1 v. Marshall*, 367 F.Supp.3d 1310, 1329 (M.D. Ala. 2019) (internet identifier reporting requirement "chills speech and deters expressive activity," and where it required in-person reporting, it was "not only psychologically chilling, but physically inconvenient") (citation omitted). Separately, such reporting requirements also have "the inevitable effect of burdening sex offenders' ability to engage in anonymous online speech[,]" so long as their information has even the potential for public dissemination. *Harris*, 772 F.3d at 574, 580.

Remote communications reporting requirements fail relevant scrutiny. *Id*. at 578. Even if the government has a legitimate interest in preventing crime through the measure, reporting requirements "unnecessarily chills protected speech." *Id*. The "concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions." *Id*. Furthermore, short registration windows impermissibly burden speech. *Id*. at 581. In *Harris* a 24-hour reporting obligation by mail "undeniably impede[d] protected First Amendment activity," because "anytime registrants want to communicate with a new identifier, they must assess whether the message they intend to communicate is worth the hassle of filling out a form, purchasing stamps, and locating a post office or mailbox. The mail-in requirement is not only psychologically chilling, but physically inconvenient, since whenever a registered sex offender obtains a new ISP or Internet identifier, he must go somewhere else

within 24 hours to mail that information to the State." *Id*. at 582. In-person requirements are even worse. *Marshall*, 367 F.Supp.3d at 1329. When these reporting requirements are "applied in an across-the-board fashion" "regardless of [a person's] offense, their history of recidivism (or lack thereof), or any other relevant circumstance," they also plainly bear little relation to their putative purpose. *Harris*, 772 F.3d at 582.

The new rule is virtually indistinguishable from the law enjoined in *Harris*, and likewise fails First Amendment scrutiny. First, the rule burdens protected speech because it "imposes a substantial burden on sex offenders' ability to engage in legitimate online speech, and to do so anonymously." *See Harris*, 772 F.3d at 574. The rule's definition of "remote communication identifiers," is nearly identical to the Internet identifiers definition used in *Harris*, and is equally vague and expansive. Just like the statute in *Harris*, the rule requires registrants to provide up-to-date "remote communication identifiers," which are "[a]ll designations the sex offender uses for purposes of routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers." *See* 86 Fed. Reg. at 69,885. A registrant therefore cannot maintain anonymity in any "internet or telephonic communications or postings," which is a blanket restriction on anonymous speech. *See id*. The rule also imposes a "substantial" burden on speech that is greater than the one in *Harris*, by requiring registrants to disclose this information in person within 3 days of any changes. *See id*. As Mr. Doe and ACSOL's members have attested, these requirements have already chilled their exercise of protected speech. *See* Ex. A at ¶¶ 21–23; Ex. B at ¶¶ 17–18.

The rule fails relevant scrutiny because it is not narrowly tailored to serve a significant government interest. To start, the Attorney General's only justification for this provision is that there are an unstated "number of reasons" supporting past efforts to require a person to provide his phone number in his registration information, "including facilitating communication between registration personnel and sex offenders, and addressing the potential use of telephonic communication by sex offenders in efforts to contact or lure potential victims." 86 Fed. Reg. at 69,872. For this rule, though, there's no justification, much less explanation for why remote communication identifiers *must* be disclosed. *See id*.

Even if one assumes that DOJ's goal is legitimate crime prevention, the rule is hardly narrowly tailored. It is first overbroad because it "unnecessarily chills protected speech," with the threat of criminal sanctions. *See Harris*, 772 F.3d at 578. The rule's requirement to disclose "all Internet identifiers" will impermissibly "lead registered sex offenders either to overreport their activity or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report." *See id.* at 568, 579.

Second, this risk is exacerbated by the potential for dissemination of the relevant information to the public. Just like in *Harris*, the new rule allows that these identifiers can be disseminated to the public at will. Indeed, the California provision in *Harris* provided that the information "shall not be open to inspection by the public," unless "necessary to ensure public safety." *Id.* at 579. Registrants' "fear of disclosure in and of itself chills their speech. If their identity is exposed, their speech, even on topics of public importance, could subject them to harassment, retaliation, and intimidation." *Id.* at 581. The new rule doesn't say precisely when this information would be disclosed to the public, instead referencing 34 U.S.C. § 20916, and two prior guidelines, the SMART Guidelines, and *Supplemental Guidelines for Sex Offender Registration and Notification*, 76 Fed. Reg. 1630 (Jan. 11, 2011) ("Supplemental Guidelines"). *See* 86 Fed. Reg. at 69,859. The Supplemental Guidelines had "discouraged the inclusion of sex offenders' Internet identifiers on the public Web sites, [but] they did not adopt a mandatory exclusion of this information from public Web site posting[.]" 76 Fed. Reg. at 1637. Section 20916 in turn "does not limit jurisdictions' retention and use of sex offenders' Internet identifier information for purposes other than public disclosure, including submission of the information to the national (non-public) databases of sex offender information, sharing of the information with law enforcement and supervision agencies, and sharing of the information with registration authorities in other jurisdictions." *Id*. Moreover the statute "does not limit the discretion of jurisdictions to include on their public Web sites functions by which members of the public can ascertain whether a specified e-mail address or other Internet identifier is reported as that of a registered sex offender, or to disclose Internet identifier information to any one by means other than public Web site posting." *Id*. States are also *encouraged* to allow

members of the public to check specific identifiers to see if they belong to a registrant and jurisdictions are *encouraged* to share it with law enforcement agencies. *See id.* Plaintiffs therefore have a well-founded fear that this information will be disclosed publicly, and have already changed their behavior accordingly. *See* Ex. A at ¶¶ 21–23; Ex. B at ¶¶ 17–18. Thus, Plaintiffs' "fear of disclosure in and of itself chills their speech. If their identity is exposed, their speech, even on topics of public importance, could subject them to harassment, retaliation, and intimidation." *See Harris*, 772 F.3d. at 581.

Next, the 3-day reporting requirement is also overbroad. Registrants must update any changes in person within 3 days. 86 Fed. Reg. at 69,885. If a 24-hour reporting requirement by mail "undeniably impedes First Amendment activity," then requiring registrants to physically report to police goes much farther. *See Harris*, 772 F.3d at 581–82.

But these serious restrictions are not narrowly tailored. DOJ hasn't even bothered to articulate a rationale for these requirements, which dooms its rule out of the gate. *See* 86 Fed. Reg. at 69,872. DOJ certainly hasn't "demonstrate[d] that the recited harms are real . . . and that the regulation will in fact alleviate these harms in a direct and material way," or that registrants have ample alternative means of communication. *See Harris*, 772 F.3d at 577 (citation omitted). The rule also applies to all registrants, regardless of risk or prior conviction. *See* 86 Fed. Reg. at 69,859. That means that it restricts protected speech for any number of registrants without any legitimate need, and leaves them completely without any means of speaking anonymously on the internet. Thus, for instance, Mr. Doe, who has never used the internet for any impermissible purpose, and has not committed an offense against another person for more than 25 years, is forbidden from speaking anonymously on the internet about anything and everything. *See* Ex. A at ¶¶ 15, 21–23.

### iii. The Presumption of Guilt for All California Registrants Violates Due Process

18 U.S.C. § 2250(c) creates a statutory "affirmative defense" for failure to register or update registry information if a defendant proves at trial that "(1) uncontrollable circumstances prevented the individual from complying; (2) the individual did not contribute to the creation of

such circumstances in reckless disregard of the requirement to comply; and (3) the individual complied as soon as such circumstances ceased to exist."

The new rule expands upon that statutory provision and presumes registrants guilty for failing to register when they reside in states that don't adequately implement SORNA. The rule restates the requirements almost verbatim, and includes new Section 72.7(g), saying, in part, that a registrant "who does not comply with a requirement of SORNA in conformity with the time and manner specifications of [the rule] must comply with the requirement in conformity with any applicable time and manner specifications of a jurisdiction in which the offender is required to register." 86 Fed. Reg. at 69,886–87. According to the DOJ, this emphasizes that a registrant always must prove "an inability to comply with SORNA as an affirmative defense to liability." *Id*. at 69,886. "Section 72.7(g) does not, in any case, relieve sex offenders of the obligation to comply fully with SORNA if able to do so or shift the burden of proof to the government to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA." *Id*.

The rule recognizes that there are "situations in which a sex offender has failed to do something SORNA requires because it is impossible for him to do so," as a "jurisdiction's law or practice may constrain its registration personnel to register only sex offenders whom its own laws require to register." *Id*. at 69,868. "[I]t is impossible for the sex offender to register in that jurisdiction, though subject to a registration duty under SORNA" "because registration is by its nature a two-party transaction, involving a sex offender's providing information about where he resides and other matters as required, and acceptance of that information by the jurisdiction for inclusion in the sex offender registry. If the jurisdiction is unwilling to carry out its side of the transaction, then the sex offender cannot register." *Id*. But the DOJ directs these "[c]oncerns" simply to the "affirmative defense" in 18 U.S.C. § 2250. *Id.*

18 U.S.C. § 2250(a) and (b) make it a crime for an individual "required to register under" SORNA to travel in interstate commerce or internationally and "knowingly fail[] to register or update a registration as required." It is thus an element of the offense that a defendant both be (1) "required to register" and (2) "knowingly fail[] to register as required." *Id*.; *accord Carr v.*

*United States*, 560 U.S. 438, 447 (2010). The *actus reus* is the failure to register "as required," while the *mens rea* turns on knowledge of that requirement.

SORNA in turn defines what is "required" of a registrant. A person must "register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." 34 U.S.C. § 20913(a). In order to keep his registration current, a person must "appear in person in at least 1 jurisdiction . . . and inform that jurisdiction of all changes in the *information required* for that offender in the sex offender registry." *Id*. § 20913(c) (emphasis added). A "sex offender registry" is defined in SORNA as "a registry of sex offenders, and a notification program, maintained by a jurisdiction," which includes any state. 34 U.S.C. § 20911(9), (10).

The Ninth Circuit has held that "the federal government's prosecution of an alleged violation of SORNA is not dependent on the individual state's implementation of the administrative portion of SORNA." *United States v. Elkins*, 683 F.3d 1039, 1046 (9th Cir. 2012). Thus, as the Department recognized, even if state law prevents registration, a registrant is presumed criminally liable if he has not registered as required by SORNA.

The Sixth Circuit has recognized the lurking constitutional problem, but not addressed it directly. In *United States v. Felts*, 674 F.3d 599, 605 (6th Cir. 2012) a defendant noted that states that failed to fully implement SORNA "would be unable to process the additional information" required by the federal government, "leaving an offender subject to SORNA without fair notice and unable to fulfill the registration requirements, through no fault of his own." In such circumstances, "an inconsistency between federal and non-complying state regimes would render it impractical, or even impossible, for an offender to register under federal law." The court said, however, that it "need not reach this argument with respect to due process" because Felts failed to provide information that his jurisdiction did require. *Id*.

The government bears the burden of proving beyond a reasonable doubt all of the elements of a crime. *See In re Winship*, 397 U.S. 358, 361–62 (1970). This forbids shifting "the burden of proof to the defendant" to "prove the critical fact in dispute." *Mullaney v. Wilbur*, 421 U.S. 684, 701 (1975). While legislatures have the power to define the elements of

offenses, "[i]t is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime." *Patterson v. New York*, 432 U.S. 197, 210, (1977) (citation omitted). Due process requires that the government "must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense." *Id.* at 215; *see also Dixon v. United* States, 548 U.S. 1, 6 (2006) (due process does not allow shifting the burden to the defense to disprove "any of the elements of the offense itself").

Due process therefore does not allow the rule (or even the statute) to presume that someone is guilty of a federal crime when he has no obligation to register in the first place or when he can't provide the "required" information. California has not fully implemented SORNA, and it does not require Mr. Doe, and many of ACSOL's members, to register *at all*. The Department insists, however, that this does not excuse them from the new rule's registration requirements, and, indeed, new Section 72(g)(1) asserts that the government has *no obligation* "to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA" before it prosecutes him for failing to do the "impossible." 86 Fed. Reg. at 69,867, 69,886. But the effect of this rule is to impermissibly "declare an individual guilty or presumptively guilty of a crime." *See Patterson*, 432 U.S. at 210. Mr. Doe, like all registrants in California, such as ACSOL's members, are presumed to be guilty of the *actus reus* of Section 2250 because the state does not provide any means for them to comply with the rule's registration requirements. This gets constitutional imperatives precisely backward.

But DOJ's rule goes even further and penalizes people who have no obligation to register in the first place for failing to do the *impossible*. It has also long been a feature of the common law that a person cannot be held criminally responsible for things over which he has no control. *See, e.g.*, *Willing v. United States*, 4 U.S. (4 Dall.) 374, 376 (1804) (ruling in favor of defendants, who had argued in the district court that "the law does not compel parties to impossibilities (*lex non cogit ad impossibilia*)"); *Dr. Bonham's Case*, 8 Co.Rep. 113b, 118a (1610) ("when an act of parliament is against common right and reason, or repugnant, or

impossible to be performed, the common law will controul it, and adjudge such act to be void").

This means, in modern practice, that "[i]n the criminal law, both a culpable *mens rea* and a criminal *actus reus* are generally required for an offense to occur." *United States v. Apfelbaum*, 445 U.S. 115, 131 (1980). Or as the Court said in *Morissette v. United States*, 342 U.S. 246, 251 (1952), in order for an accused to be held criminally responsible, the government must prove the "concurrence of an evil-meaning mind with an evil-doing hand."

"But even where the evidence is sufficient to show the necessary *mens rea*, the government still must always 'meet its burden of proving the *actus reus* of the offense.'" *United States v. Zhen Zhou Wu*, 711 F.3d 1, 18 (1st Cir. 2013) (quoting *United States v. Whiteside*, 285 F.3d 1345, 1353 (11th Cir. 2002)). For instance, it violates due process to "criminalize[] wholly innocent and passive nonconduct[.]" *State v. Blake*, 481 P.3d 521, 533 (Wash. 2021). "Accordingly, an accused cannot be held criminally liable in a case where the *actus reus* is absent because the accused did not act voluntarily, or where *mens rea* is absent because the accused did not possess the necessary state of mind when he committed the involuntary act." *United States v. Torres*, 74 M.J. 154, 156–57 (C.A.A.F. 2015). "At trial the burden always [must] rest with the Government to prove beyond a reasonable doubt that [a defendant] had committed each element of the offense, and one of those elements pertained to the issue of whether [the defendant's] actions were voluntary[.]" *Id*. at 157.

Mr. Doe and many of ACSOL's members face a perpetual state of criminal liability for failing to do the impossible. They cannot register in California and they cannot follow the rule's commands. *See* Ex. A at ¶¶ 15, 17; Ex. B at ¶¶ 12–15. Thus, they have no control, over whether they are prosecuted for "wholly innocent and passive nonconduct." *See Black*, 481 P.3d at 533. That means the government has been relieved of its basic obligation to prove any *actus reus* at all. Due process cannot allow such burden-shifting. *See Torres*, 74 M.J. at 156–57.

### B. The Rule Contradicts Statutory Text

Aside from the constitutional violations discussed above, the final rule also runs afoul of the statutory text in SORNA and is invalid for that reason as well.

The APA requires a court to set aside a rule that is "not in accordance with the law," or

"in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). A rule thus can't conflict with statutory text—if "Congress has directly spoken to the precise question at issue," and "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43 (1984).

"The term 'sex offender' means an individual who was convicted of a sex offense." 34 U.S.C. § 20911(1). As relevant here, "'sex offense' means—a criminal offense that has an element involving a sexual act or sexual contact with another[.]" *Id.* at § 20911(5)(A)(i). The term "convicted" is defined only in the sense that it "includes adjudicated delinquent as a juvenile for that offense," in certain circumstances. *Id.* at § 20911(8).

Invoking Section 20912(b), the rule creates 28 C.F.R. § 72.2, which says, "All terms used in this part have the same meaning as in SORNA." 86 Fed. Reg. at 69,884. In the explanation for the rule, DOJ elaborated that, notwithstanding a comment asking "that a sex offender be removed from the sex offender registry if he receives a pardon," it believed that "only pardons on the ground of innocence terminate registration obligations under SORNA[.]" *Id.* at 69,866. It also cited to the SMART Guidelines, which were a prior regulatory action that had purported to define the terms found in SORNA. *Id.* at 69,866–67.

The SMART Guidelines had said that "an adult sex offender is 'convicted' for SORNA purposes if the sex offender remains subject to penal consequences based on the conviction, however it may be styled." 73 Fed. Reg. at 38,050. "[N]ominal changes or terminological variations that do not relieve a conviction of substantive effect [do not] negate the SORNA requirements," such as a procedure "under which the convictions of such sex offenders may nominally be 'vacated' or 'set aside,' but the sex offender is nevertheless required to serve what amounts to a criminal sentence for the offense." *Id.* "Likewise, the sealing of a criminal record or other action that limits the publicity or availability of a conviction, but does not deprive it of continuing legal validity, does not change its status as a 'conviction' for purposes of SORNA." *Id.* Only "if the predicate conviction is reversed, vacated, or set aside, or if the person is pardoned for the offense on the ground of innocence," is he exempted from registration. *Id.*

20

The new rule thus appears to define the term "conviction" to include Mr. Doe's expunged conviction, and the expunged convictions of other ACSOL members. *See* Ex. A at ¶ 17; Ex. B at ¶¶ 12–15. That interpretation, however, conflicts with the statutory language.[3]

A "conviction" implies the "act or process of judicially finding someone guilty of a crime," evinced by the "judgment (as by a jury verdict) that a person is guilty of a crime." CONVICTION, Black's Law Dictionary (11th ed. 2019). As the Supreme Court said nearly a century ago, "A plea of guilty . . . is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence." *Kercheval v. United States*, 274 U.S. 220, 223 (1927). But sometimes a "court will vacate a plea of guilty shown to have been unfairly obtained or given through ignorance, fear or inadvertence. Such an application does not involve any question of guilt or innocence. . . . [Yet] [t]he effect of the court's order permitting the withdrawal was to adjudge that the plea of guilty be held for naught." *Id.* at 224. Or, as the Ninth Circuit has put it, "Legally, [a] plea no longer ha[s] the effect of a conviction after [a court] ha[s] permitted its withdrawal." *Standen v. Whitley*, 994 F.2d 1417, 1422 (9th Cir. 1993). Thus, for the term "conviction," the "plain meaning is that the fact of a [] conviction" is operative "until the conviction is vacated or the felon is relieved of his disability by some affirmative action, such as a qualifying pardon[.]" *Lewis v. United States*, 445 U.S. 55, 60–61 (1980); *see also Deal v. United States*, 508 U.S. 129, 132 (1993) ("'conviction' refers to the finding of guilt by a judge or jury that necessarily precedes the entry of a final judgment of conviction").

If a defendant satisfies its conditions, Section 1203.4(a)(1) results in him being "permitted by the court to withdraw their plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if they have been convicted after a plea of not guilty, the court shall set aside the verdict of guilty[.]" "[T]he defendant shall thereafter be released from all penalties

---

[3] It is also illogical. Why does the Department think that Congress defined "conviction" in such an unnatural and punitive way? It certainly provides no good reason to think this was Congress's aim. Of course, this further illustrates the non-delegation problem—the Attorney General apparently believes there is no limit, much less any policy, guiding his rulemaking.

and disabilities resulting from the offense of which they have been convicted," except "in any subsequent prosecution of the defendant for any other offense, the prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed[.]" Section 1203.4 "enable[s a] defendant to truthfully represent to friends, acquaintances and private sector employers that he has no conviction." *People v. Arata*, 151 Cal. App. 4th 778, 788 (Cal. Ct. App. 2007) (citation omitted).

Because an expungement under Section 1203.4 "withdraws" and "set[s] aside" the plea of guilty, it is not a "conviction." DOJ disagrees, though, because an expungement is not a finding of innocence or a pardon. 86 Fed. Reg. at 69,866. The new rule thus improperly defines a "conviction" to encompass criminal convictions that no longer exist. It requires Mr. Doe and other ACSOL members, who can all "truthfully represent to friends, acquaintances and private sector employers that [they have] no conviction," to nevertheless register as sex offenders. *See Arata*, 151 Cal. App. 4th at 788. The rule conflicts must be set aside. [4]

---

[4] To the extent DOJ might rely on deference to its interpretation of the statutory term, such an argument would fail. In resolving "statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself. Where, as here, that examination yields a clear answer, judges must stop." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (citations omitted). There simply is no ambiguity in the statutory term "conviction," as the term has a settled meaning. Without an ambiguity in the term, there's nothing left for DOJ to do, and deference is inappropriate. *See Chevron*, 467 U.S. at 842–43.

Even if there was an ambiguity, moreover, this Court should apply the rule of lenity to resolve any uncertainty against DOJ. "[W]hen liberty is at stake," deference "has no role to play." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement regarding denial of certiorari). "The critical point is that criminal laws are for courts, not for the Government, to construe." *Abramski v. United States*, 573 U.S. 169, 191 (2014). Instead, a court should apply the rule of lenity. *Guedes*, 140 S. Ct. at 790 (Gorsuch, J., statement regarding denial of certiorari). Lenity is just one of the "traditional tools of statutory construction," that a court must apply at step one, to determine if there is any ambiguity in the first place. *Chevron*, 467 U.S. at 843 n.9. But "lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality op.). And "[w]here, as here, the canons [of construction] supply an answer, *Chevron* leaves the stage." *Epic Sys. Corp. v. Lewis*,

## II. Plaintiffs Are Suffering Irreparable Harm

Plaintiffs must show they are "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter*, 555 U.S. at 22 (citation omitted). "Irreparable harm is harm for which there is no adequate legal remedy, such as an award for damages." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (citation omitted). "But where parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable." *Id*. Indeed, as the APA grants sovereign immunity from monetary damages any economic burdens imposed because of a rule creates irreparable harm. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

"Intangible injuries may also qualify as irreparable harm, because such injuries generally lack an adequate legal remedy." *E. Bay Sanctuary Covenant*, 993 F.3d at 677. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quotation omitted). Thus, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Harris*, 772 F.3d at 583 (cleaned up). A plaintiff need only show a "colorable First Amendment claim" to

---

138 S. Ct. 1612, 1630 (2018).

If the term "conviction" were truly uncertain, this Court should simply apply the rule of lenity and reject a reading that imposes additional potential criminal liability on people like Mr. Doe who have no "convictions" under state law. Otherwise, Mr. Doe, and many of ACSOL's members, have no reasonable notice that they can be criminally punished for failing to register despite the absence of any criminal convictions.

To be sure, the Ninth Circuit has sometimes questioned whether the rule of lenity should take precedence over *Chevron* deference. *See Mujahid v. Daniels*, 413 F.3d 991, 999 (9th Cir. 2005). But the court also recognized that Supreme Court precedent "supports that the rule of lenity can play an important role in statutory construction" even if "it does not address when the rule of lenity takes priority over *Chevron* deference." *Id*. Since that decision in 2005, moreover, the Supreme Court has emphasized that every canon of construction applies at step one, and other courts have recognized that this includes the rule of lenity. *See Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1158, 1161 (11th Cir. 2021) (noting that rule of lenity is one canon of construction that applies to discern if there is a statutory ambiguity and citing *Epic Sys. Corp.*, 138 S. Ct. at 1630).

23

demonstrate "irreparable injury sufficient to merit the grant of relief." *Id.* (cleaned up).

Plaintiffs will suffer irreparable harm until this Court enters an injunction. Most significantly, they are suffering ongoing constitutional harms, including First Amendment harms that are more onerous than those enjoined in *Harris* and the unconstitutional presumption that they are guilty of federal crimes. As discussed, the rule violates the separation of powers, unlawfully chills speech, and violates the due process rights of those registrants in states like California who face an "impossible" requirement to register and a presumption of guilt. *See* Ex. A at ¶¶ 20, 22–23; Ex. B at ¶¶ 16–18. As the Department sees it, Mr. Doe and ACSOL's members could, at any moment, be arrested and criminally charged under the unlawful rule. Thus, as a preliminary injunction was warranted when the State of California tried *only* to impose disclosure requirements for remote communication identifiers that were less onerous than the ones at issue here, these combined constitutional violations warrant an injunction here. *See Harris*, 772 F.3d at 583.

Plaintiffs also face intangible harms and economic losses from the rule that they cannot recover because of sovereign immunity. Plaintiffs have burdensome requirements to register in person (or attempt to do so) as many as four times a year, and within 3 days after any change in their information, even though, for Mr. Doe and certain ACSOL members, they have no qualifying convictions. *See* Ex. A at ¶¶ 18-20; Ex. B at ¶¶ 11, 14, 16. These requirements impose significant costs for registrants who must take time off work, travel, and, in many cases, retain counsel so that they can prove that it is impossible for them to register as directed. Even though the rule is invalid, these losses can never be repaid and thus Plaintiffs suffer irreparable harm from these losses as well. *See E. Bay Sanctuary Covenant*, 993 F.3d at 677.

**III. The Equities Favor an Injunction**

Finally, Plaintiffs must demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Beverage Ass'n v. San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019). Indeed, "the

24

fact that a plaintiff has raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in the plaintiff's favor." *Id.* (cleaned up). Thus, in *Harris*, the Ninth Circuit concluded that the balance of equities concerning the less onerous remote communications identifiers provision imposed by California favored the plaintiffs, particularly because "a prosecution is a likely possibility, yet only an affirmative defense is available, [and thus] speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." 772 F.3d at 583.

On the other side of the equation, when an agency acts unlawfully, this Court must not "weigh [] tradeoffs" between putative benefits of an invalid rule and harms to a plaintiff. *NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022). "In our system of government, that is the responsibility of those chosen by the people through democratic processes." *Id.* Thus, if a rule is unlawful, a court just looks to the harm facing a plaintiff and asks whether it warrants an injunction. *Id.*

The equities clearly warrant an injunction here, as the rule violates Plaintiffs' constitutional rights, including First Amendment rights that the Ninth Circuit already held warranted an injunction. *See Harris*, 772 F.3d at 583. Recognizing that this Court should not "weigh [] tradeoffs" between the rule's purported benefits and these constitutional injuries, an injunction must issue. *See NFIB*, 142 S. Ct. at 666.

DATED: June 3, 2022.

Respectfully submitted,

JEREMY TALCOTT
By s/ *Jeremy Talcott*
　　　JEREMY TALCOTT

STEVEN M. SIMPSON
By s/ *Steven M. Simpson*
　　　STEVEN M. SIMPSON

CALEB KRUCKENBERG
By s/ *Caleb Kruckenberg*
　　　CALEB KRUCKENBERG*

*\*Pro Hac Vice Application Forthcoming*
 *Attorneys for Plaintiffs*