UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 22-855 JGB (SPx)** | Date | January 13, 2023 |
|---|---|---|---|
| Title | ***John Doe, et al. v. U.S. Department of Justice, et al.*** | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:     **Order GRANTING Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 44) (IN CHAMBERS)**

Before the Court is a Motion for Preliminary Injunction filed by Plaintiffs. ("Motion," Dkt. No. 44.) On September 26, 2022, the Court held a hearing on the first motion for preliminary injunction filed by Plaintiffs. (Dkt. No. 39.) Accordingly, the Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motion, as well as the previous oral argument of the parties, the Court GRANTS the Motion.

## I.   BACKGROUND

### A.  Procedural Posture

On May 24, 2022, Plaintiffs John Doe [#1] ("Mr. Doe #1") and the Alliance for Constitutional Sex Offense Laws ("ACSOL") filed a complaint against the United States Department of Justice and Merrick Garland, Attorney General of the United States, in his official capacity (collectively, "Defendants"). ("Complaint," Dkt. No. 2.)

On June 3, 2022, Plaintiffs filed a motion for preliminary injunction. ("First Motion for Preliminary Injunction," Dkt. No. 13.) The same day, Plaintiffs filed a motion for leave to proceed using a pseudonym. (Dkt. No. 14.) Plaintiffs also filed a Declaration of Janice Bellucci (Dkt. No. 16) and Declaration of John Doe [#1] (Dkt. No. 14-1). On June 24, 2022, Defendants filed an opposition. ("Opposition to First Motion for Preliminary Injunction," Dkt. No. 21.) On July 1, 2022, Plaintiffs replied. ("Reply ISO First Motion for Preliminary Injunction," Dkt. No.

22.)  On July 11, 2022, the parties filed a stipulation for an extension of time for Defendants to answer the Complaint.  (Dkt. No. 23.)  On July 12, 2022, the Court approved the stipulation.  (Dkt. No. 25.)  On July 15, 2022, the Court continued the hearing on the First Motion for Preliminary Injunction from July 18, 2022 to August 1, 2022.  (Dkt. No. 27.)  On July 25, 2022, the parties filed a stipulation to continue the hearing on the First Motion for Preliminary Injunction to August 8, 2022.  (Dkt. No. 29.)  On July 27, 2022, the Court approved the stipulation.  (Dkt. No. 30.)  On August 5, 2022, the Court continued the hearing on the First Motion for Preliminary Injunction from August 8, 2022 to August 15, 2022.  (Dkt. No. 32.)  On August 12, 2022, the Court continued the hearing on the First Motion for Preliminary Injunction from August 15, 2022 to August 29, 2022.  (Dkt. No. 33.)  On August 16, 2022, the parties filed a stipulation to continue the hearing on the First Motion for Preliminary Injunction.  (Dkt. No. 34.)  The same day, the Court approved the stipulation, continuing the hearing on the First Motion for Preliminary Injunction from August 29, 2022 to September 12, 2022.  (Dkt. No. 35.)  On September 9, 2022, the Court continued the hearing on the First Motion for Preliminary Injunction from September 12, 2022 to September 26, 2022.  (Dkt. No. 36.)  On September 26, 2022, the Court held a hearing on the First Motion for Preliminary Injunction.  (Dkt. No. 39.)

On September 28, 2022, the Court denied the First Motion for Preliminary Injunction without prejudice.  ("Order Denying First Motion for Preliminary Injunction," Dkt. No. 40.)  The Court denied the First Motion for Preliminary Injunction for lack of standing and granted Plaintiffs leave to file an amended complaint by October 11, 2022.  (Id.)

On October 11, 2022, Plaintiffs John Doe #1, John Doe #2 ("Mr. Doe #2"), John Doe # 3 ("Mr. Doe #3"), John Doe #4 ("Mr. Doe #4"), and ACSOL (collectively, "Plaintiffs") filed a first amended complaint.  ("FAC," Dkt. No. 41.)  The FAC alleges four causes of action: (1) violation of the U.S. Constitution—non-delegation doctrine and separation of powers; (2) violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(c)—rule in excess of statutory authority; (3) violation of the U.S. Constitution—due process; and (4) violation of the U.S. Constitution—First Amendment.  (See FAC.)  On October 17, 2022, the parties filed a stipulation for an extension of time for Defendants to answer the FAC.  (Dkt. No. 42.)  On October 18, 2022, the Court approved the stipulation.  (Dkt. No. 43.)

On October 19, 2022, Plaintiffs filed the Motion.  (Motion.)  In support of the Motion, Plaintiffs filed the following documents:

- Declaration of John Doe #1 ("Doe #1 Decl.," Dkt. No. 44-2, Ex. A);
- Declaration of John Doe #2 ("Doe #2 Decl.," Dkt. No. 44-3, Ex. B);
- Declaration of John Doe #3 ("Doe #3 Decl.," Dkt. No. 44-4, Ex. C);
- Declaration of John Doe #4 ("Doe #4 Decl.," Dkt. No. 44-5, Ex. D); and
- Declaration of Janice Bellucci ("Bellucci Decl.," Dkt. No. 44-6, Ex. E).

The same day, Plaintiffs filed a motion for leave to proceed using pseudonyms.  (Dkt. No. 45.)  On October 20, 2022, the Court approved the motion for leave to proceed using pseudonyms.  (Dkt. No. 46.)  On November 3, 2022, the parties filed a stipulation to continue the

hearing on the Motion. (Dkt. No. 48.) On November 4, 2022, the Court approved the stipulation, continuing the hearing on the Motion from December 5, 2022 to December 21, 2022. (Dkt. No. 49.)

Defendants filed an opposition to the Motion on November 30, 2022. ("Opposition," Dkt. No. 50.) On December 7, 2022, Plaintiffs replied. ("Reply," Dkt. No. 51.)

On December 7, 2022, the parties filed a stipulation to continue the hearing on the Motion. (Dkt. No. 52.) On December 8, 2022, the Court approved the stipulation, continuing the hearing on the Motion from December 21, 2022 to January 13, 2022. (Dkt. No. 53.) On January 12, 2023, the Court vacated the hearing on the Motion set for January 13, 2023. (Dkt. No. 54.)

**B. Statutory Background**

In 2006, Congress enacted the Sex Offender Registration and Notification Act ("SORNA") as part of the Adam Walsh Child Protection and Safety Act. Pub. L. No. 109-248, §§ 102-155, 120 Stat. 587 (codified in part at 42 U.S.C. §§ 16901 et seq.); see H.R. Rep. 109-218(I), at 27 (emphasizing "gaps and problems with existing Federal and State laws" due to "lack of uniformity" in state registration requirements and notification obligations); see also Nichols v. U.S., 578 U.S. 104, 111-12 ("We are mindful that SORNA's purpose was to make more uniform what had remained a patchwork of federal and 50 individual state registration systems with loopholes and deficiencies that had resulted in an estimated 100,000 sex offenders becoming 'missing' or 'lost.'") (internal quotations and citation omitted).

SORNA "requires those convicted of certain sex crimes to provide state governments with (and to update) information, such as names and current addresses, for inclusion on state and federal sex offender registries." Reynolds v. U.S., 565 U.S. 432, 434 (2012). SORNA is spending clause legislation and sets forth standards for states and territories to follow, and conditions federal funding on the jurisdictions' substantial implementation of its requirements. 34 U.S.C. §§ 20912(a), 20927(a), 20913. It provides that "each jurisdiction shall maintain a jurisdiction-wide sex offender registry conforming to the requirements" of the statute. 34 U.S.C. § 20912(a). It also directs the Attorney General to "issue guidelines and regulations to interpret and implement" its provisions. 34 U.S.C. § 20912(b). SORNA delegates to the Attorney General "the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with" the requirement to register with an applicable jurisdiction. 34 U.S.C. § 20913(d); see also Gundy v. United States, 139 S. Ct. 2116 (2019). In addition to a list of specific requirements set forth by Congress, 34 U.S.C. § 20914(a)(1-6), SORNA states that a sex offender "shall provide . . . to the appropriate official for inclusion in the sex offender registry" "[a]ny other information required by the Attorney General." Id. (a)(8). It also requires the registrant to provide "[i]nformation relating to intended travel of the sex offender outside the United States, including any anticipated dates and

places of departure, arrival, or return, carrier and flight numbers for air travel, destination country and address or other contact information therein, means and purpose of travel, and any other itinerary or other travel-related information required by the Attorney General." Id. (a)(7). Congress dictated that a registrant must provide and update the information required under 34 U.S.C. § 20914(a) "in conformity with any time and manner requirements prescribed by the Attorney General." Id. (c).

SORNA defines a "sex offender" as "an individual who was convicted of a sex offense." 34 U.S.C. § 20911(1). The law makes it a crime for a person who is "required to register" under the Act and who "travels in interstate or foreign commerce" to knowingly fail to register or update a registration. Id. (citing 18 U.S.C. § 2250(a)). The crime is punishable by up to 10 years of imprisonment and a fine. 18 U.S.C. § 2250(a)(3). The same provision establishes an affirmative defense where "uncontrollable circumstances prevented the individual from complying" with registration requirements, "the individual did not contribute to the creation of such circumstances in reckless disregard of the requirements to comply," and "the individual complied as soon as such circumstances ceased to exist." Id. § 2250(c).

On October 13, 2008, Congress, through the Keeping the Internet Devoid of Sexual Predators ("KIDS") Act, Pub. L. No. 110-400, 122 Stat. 4224, provided that the Attorney General "shall require that each sex offender provide to the sex offender registry those Internet identifiers the sex offender uses or will use of any type that the Attorney General determines to be appropriate" under SORNA. See 34 U.S.C. § 20916(a). The Attorney General "shall specify the time and manner for keeping current information required to be provided[.]" Id. § 20916(b). In a provision entitled "[n]ondisclosure to general public," Congress directed that the Attorney General "shall exempt from disclosure all information provided by a sex offender under subsection (a)," namely the registrants' internet identifiers. Id. § 20916(c).

## C. Regulatory Background

Pursuant to SORNA, 34 U.S.C. § 20912(b), the Attorney General first issued guidelines regarding registration requirements in 2008. National Guidelines for Sex Offender Registration and Notification ("2008 Guidelines"), 73 Fed. Reg. 38030 (July 2, 2008). The Attorney General issued supplemental guidelines in 2011. Supplemental Guidelines for Sex Offender Registration and Notification ("2011 Supplemental Guidelines"), 76 Fed. Reg. 1630 (Jan. 11, 2011).

The 2008 Guidelines state regarding the definition of a "sex offender," "[b]ecause the SORNA registration requirements are predicated on convictions, registration (or continued registration) is normally not required under the SORNA standards if the predicate conviction is reversed, vacated, or set aside, or if the person is pardoned for the offense on the ground of innocence. This does not mean, however, that nominal changes or terminological variations that do not relieve a conviction of substantive effect negate the SORNA requirements." 73 F.R. at 38050. The 2008 Guidelines declare that "an adult sex offender is 'convicted' for SORNA purposes if the sex offender remains subject to penal consequences based on the conviction, however it may be styled. Likewise, the sealing of a criminal record or other action that limits the

publicity or availability of a conviction, but does not deprive it of continuing legal validity, does not change its status as a 'conviction' for purposes of SORNA." Id.

As it relates to internet identifiers, the 2008 Guidelines require jurisdictions to collect "all designations used by sex offenders for purposes of routing or self-identification in Internet communications or postings." Id. at 38055. It "permitted and encouraged" jurisdictions "to provide public access to remote communication address information included in the sex offender registries" through "a function that allows checking whether specified addresses are included in the registries as the addresses of sex offenders." Id. at 38059-60. The 2011 Supplemental Guidelines did not change the definition of internet identifiers. See 76 F.R. at 1630-37. It noted that, "while the [2008] Guidelines discouraged the inclusion of sex offenders' Internet identifiers on the public Web sites, they did not adopt a mandatory exclusion of this information from public Web site posting, which the KIDS Act now requires." Id. at 1637. Accordingly, "jurisdictions cannot, consistent with SORNA, include sex offenders' Internet identifiers (such as e-mail addresses) in the sex offenders' public Web site postings or otherwise list or post sex offenders' Internet identifiers on the public sex offender Web sites." Id. Notwithstanding this change, the 2011 Supplemental Guidelines stated that jurisdictions could retain and use internet identifiers "for purposes other than public disclosure," including submission of the information to the national (non-public) databases of sex offender information, sharing of the information with law enforcement and supervision agencies, and sharing of the information with registration authorities in other jurisdictions. Id. The change "also does not limit the discretion of jurisdictions to include on their public Web sites functions by which members of the public can ascertain whether a specified e-mail address or other Internet identifier is reported as that of a registered sex offender . . . or to disclose Internet identifier information to any one by means other than public Web site posting." Id. Moreover, "[t]he exemption of sex offenders' Internet identifiers from public Web site disclosure does not override or limit the requirement that sex offenders' names, including any aliases, be included in their public Web site postings." Id.

## D. The Rule

In December 2021, the Attorney General adopted a final rule ("the Rule") that specifies various registration requirements, which went into effect on January 7, 2022. Registration Requirements Under the Sex Offender Registration and Notification Act, 86 Fed. Reg. 69856 (Dec. 8, 2021). The Rule states that it was promulgated pursuant to the Attorney General's authority under 34 U.S.C. § 20912(b), as well as other provisions authorizing the Attorney General "to take more specific actions in certain contexts," including 34 U.S.C. §§ 20913 and 20914. Id. at 69856. The Rule declares, "[t]he Attorney General has exercised these authorities in previous rulemakings and issuances of guidelines under SORNA, as detailed in the rulemaking history and section-by-section analysis below, and the interpretations and policy decisions in this rule follow those already adopted in existing SORNA-related documents. The present rule provides a concise and comprehensive statement of what sex offenders must do to comply with SORNA's requirements." Id. The Rule claims it "is not innovative in terms of policy" in that "[m]any of the requirements it articulates reflect express SORNA requirements." Id. at 69856-57. Accordingly, it declares the following:

Other features of the rule reflect exercises of the Attorney General's powers to implement SORNA's requirements. These include additional specifications regarding information sex offenders must provide, how and when they must report certain changes in registration information, and the time and manner for complying with SORNA's registration requirements by sex offenders who cannot comply with SORNA's normal registration procedures. On these matters, however, the rule embodies the same policies as those appearing in the previously issued SORNA guidelines and prior rulemakings under SORNA.

The rule also makes no change in what registration jurisdictions need to do to substantially implement SORNA in their registration programs, a matter that will continue to be governed by the previously issued guidelines for SORNA implementation.

While this rule does not make new policy, as discussed above, it is expected to have a number of benefits. The rule will facilitate enforcement of SORNA's registration requirements through prosecution of noncompliant sex offenders under 18 U.S.C. 2250. By providing a comprehensive articulation of SORNA's registration requirements in regulations addressed to sex offenders, it will provide a more secure basis for prosecution of sex offenders who engage in knowing violations of any of SORNA's requirements. It will also resolve a number of specific concerns that have arisen in past litigation or could be expected to arise in future litigation, if not clarified and resolved by this rule. For example, as discussed below, the amendment of § 72.3 in the rule will ensure that its application of SORNA's requirements to sex offenders with pre-SORNA convictions is given effect consistently, resolving an issue resulting from the decision in United States v. DeJarnette, 741 F.3d 971 (9th Cir. 2013).

Id. at 69857.

The Rule states:

A comment proposed adding to § 72.5 a provision requiring that a sex offender be removed from the sex offender registry if he receives a pardon, and that the offense be expunged from all court and law enforcement records. However, only pardons on the ground of innocence terminate registration obligations under SORNA, [citing 2008 Guidelines], and the Attorney General has

> no authority to require registration jurisdictions to expunge the
> records of sex offenders who are pardoned in those jurisdictions.

Id. at 69866.  The Rule "expands" 28 C.F.R. § 72.3 to "provide a full statement of the registration requirements for sex offenders under SORNA," revises the statement of purpose and definitional sections of that regulation, "maintains [an] existing provision . . . stating that SORNA's requirements apply to all sex offenders, regardless of when they were convicted, and incorporates additional language . . . to reinforce that point."  Id.  It also "adds . . . provisions . . articulating where sex offenders must register, how long they must register, what information they must provide, how they must register and keep their registrations current to satisfy SORNA's requirements, and the liability they face for violations, following SORNA's express requirements and the prior articulation of standards for these matters in the SORNA Guidelines and the SORNA Supplemental Guidelines."  Id. at 69866-67.  Accordingly, "sex offenders can be held liable for violating any requirement stated in the [Rule], regardless of when they were convicted, and regardless of whether the jurisdiction in which the violation occurs has adopted the requirement in its own law."  Id. at 69868.

Among other things,  the Rule requires registrants to provide their remote communication identifiers, defined as "[a]ll designations the sex offender uses for purposes of routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers."  Id. at 69885.  They must also provide their social security number, work or school information, and information concerning any international travel, passport, vehicle registration or professional licenses.  Id.  The Rule provides that a registrant must appear "in person" in his local jurisdiction at least once annually if he is a tier I sex offender, every six months if he is a tier II sex offender, and every three months if he is a tier III sex offender, to verify, update or correct this information.  Id. at 69885-86.  The Rule requires that a registrant report (in person) changes in address within three days, changes in remote communication identifiers within three days, and international travel plans at least 21 days in advance of the trip.  Id. at 69886.

The Rule provides that a registrant who does not comply with a requirement of SORNA "in conformity with the time and manner specifications" it sets forth "must comply with the requirement in conformity with any applicable time and manner specifications of a jurisdiction in which the offender is required to register."  Id.  Nonetheless, "[i]n a prosecution under 18 U.S.C. 2250, [that provision] does not in any case relieve a sex offender of the need to establish as an affirmative defense an inability to comply with SORNA because of circumstances beyond his control as provided in 18 U.S.C. 2250(c) and § 72.8(a)(2)."  Id.  Because impossibility remains an affirmative defense, the Rule "does not relieve sex offenders of the obligation to comply fully with SORNA if able to do so or shift the burden of proof to the government to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA."  Id. at 69882.  The Rule reiterates that, as a condition of liability under 18 U.S.C. § 2250, "a sex offender must have been aware of the requirement he is charged with violating, but need not have been aware that the

requirement is imposed by SORNA." Id. at 69886-87. It then provides an example regarding the application of this defense:

> A sex offender cannot register in a state in which he resides because its registration authorities will not register offenders on the basis of the offense for which the sex offender was convicted. The sex offender would have a defense to liability because the state's unwillingness to register sex offenders like him is a circumstance beyond his control. However, if the sex offender failed to register after becoming aware of a change in state policy or practice allowing his registration, the 18 U.S.C. 2250(c) defense would no longer apply, because in such a case the circumstance preventing compliance with the registration requirement would no longer exist.

Id. at 69887.

## II.  FACTUAL ALLEGATIONS

### A.  John Doe #1

Mr. Doe #1 is a resident of California. (Doe #1 Decl. ¶ 1.) Mr. Doe #1 enlisted in the U.S. Marine Corps when he was seventeen years old and was honorably discharged in 1996. (Id. ¶ 3.) In 1994, when he was twenty-three years old and still serving in the Marines, he engaged in an "otherwise-consensual encounter" with a sixteen-year-old girl. (Id. ¶ 4.) The incident did not involve sexual intercourse. (Id.) In 1996, he pled no contest to a single misdemeanor count of sexual battery under California Penal Code section 243.4(a). (Id. ¶ 5.) He was sentenced to three years of probation and served no jail time. (Id.) He was required to register as a sex offender in California. (Id.)

In 1998, the California Department of Probation requested an early termination of Mr. Doe #1's probation and the court agreed. (Id. ¶ 6.) After the conviction, he obtained his bachelor's degree, then a master's degree, and rose through the ranks of various companies. (Id. ¶ 7.) In 2005, he rented a second home to live in with his fiancée but did not move into the home. (Id. ¶ 8.) He did not understand that his sex offender status required that he register a rental home address where he did not live. (Id.) He did not immediately update his registration information to include the rental home as an additional residence address. (Id.) In 2006, he was charged with a misdemeanor count for failure to register under California Penal Code section 290(g)(1). (Id. ¶ 9.) Mr. Doe #1 pled no contest and was sentenced to three years' probation. (Id.)

Mr. Doe #1 later got married and had two children. (Id. ¶ 10.) He is now a successful businessman, an involved father and husband, and a dedicated member of his church. (Id. ¶ 11.) A state court expunged his original conviction in 2002 pursuant to Cal. Penal Code section

1203.4, which set aside his conviction and replaced it with a plea of not guilty.  (<u>Id.</u> ¶ 12.)  In 2010, a state court expunged his failure to register conviction, also pursuant to Cal. Penal Code section 1203.4.  (<u>Id.</u> ¶ 13.)  In 2012, a state court issued a "Certificate of Rehabilitation" to Mr. Doe #1 pursuant to Cal. Penal Code section 4852.01, which officially recommended him for an unqualified pardon.  (<u>Id.</u> ¶ 14.)  Under California law, he is no longer required to register as a sex offender and has no record of criminal convictions.  (<u>Id.</u> ¶ 15.)  He alleges that, if not vacated, his original offense of conviction "likely requires lifetime registration under SORNA."  (<u>Id.</u> ¶ 16.)

Mr. Doe #1 states that the Rule requires him to register as a sex offender in California because his original conviction was expunged rather than set aside for factual innocence.  (<u>Id.</u> ¶ 18.)  The Rule orders him to provide information in person to California officials, including his social security number, "remote communication identifiers" (internet usernames), his work and school information, information concerning any international travel, passport information, vehicle registration, and professional licenses.  (<u>Id.</u> ¶ 19.)  He is obligated to report this information to local authorities, in person, on an annual basis at minimum.  (<u>Id.</u>)  He also must report changes of address, jobs, schools, or "remote communication identifiers" within three days, and international travel plans prior to any trip.  (<u>Id.</u> ¶ 20.)

If Mr. Doe #1 is forced to register as a sex offender, he states he will no longer be allowed to freely visit his children at their schools, will lose out on work and career opportunities, and will likely face ostracization from his community and church.  (<u>Id.</u> ¶ 21.)   When previously forced to register, he suffered harassment and adverse employment and social consequences, including rescinded job offers.  (<u>Id.</u>)  The consequences were part of his motivation to seek expungement and certification of rehabilitation, and he fears the resurgence of those consequences if he is forced to re-register.  (<u>Id.</u>)

Mr. Doe #1 also wishes to engage in anonymous speech on the internet through the use of anonymous remote communication identifiers, such as email addresses and social media usernames.  (<u>Id.</u> ¶ 22.)  He wishes to remain anonymous to preserve his privacy and avoid adverse reputational risks related to his past offenses.  (<u>Id.</u>)  He also wishes to speak anonymously about issues of public concern, including sex offender registration requirements and his opinions on the Rule.  (<u>Id.</u>)  He contends that the Rule requires him to disclose his remote communication identifiers as part of the registration, which could be accessible to the public.  (<u>Id.</u> ¶ 23.)  He has not spoken on these topics through his anonymous usernames because of the Rule.  (<u>Id.</u>)  Even though Mr. Doe currently cannot register under California law, he is concerned that California may force compliance with the Rule at any time.  (<u>Id.</u> ¶ 24.)

Mr. Doe #1 regularly travels outside of California and intends to do so in the future.  (<u>Id.</u> ¶ 25.)  Because of his travel and current inability to register in California as required by the Rule, he is concerned that he may be subject to federal criminal liability at any time.  (<u>Id.</u> ¶ 25.)  Because of this concern, he has attempted to register as a sex offender in California.  (<u>Id.</u> ¶ 26.)  He has been unable to do so and was "told by local law enforcement that [he] cannot register as required."  (<u>Id.</u>)  He remains concerned that he could be arrested and prosecuted by federal authorities, despite assurances from local law enforcement.  (<u>Id.</u> ¶ 27.)

## B.  John Doe #2

Mr. Doe #2 is a resident of California.  (Doe #2 Decl. ¶ 1.)  He was convicted in 2005 of one count of sexual battery under California Penal Code section 243.4(a), for conduct involving a child under 10.  (Id. ¶ 3.)  The conviction was a felony "wobbler" and was reduced to a misdemeanor in 2012, for which he was sentenced to 60 days in jail and three years' probation.  (Id. ¶ 4.)  He was required to register as a sex offender for life in California.  (Id.)  That remains his sole criminal conviction.  (Id.)

After his conviction, Mr. Doe #2 began intensive treatment, almost all of it voluntary, including completion of an inpatient residential sex offender treatment program, more than 600 hours of individual psychotherapy, and undertaking a leadership role in a local chapter of Sex Addicts Anonymous.  (Id. ¶ 5.)  While attending an intensive inpatient program, he experienced an epiphany about his prior behavior.  (Id.)  Nearly every one of his fellow patients participating in a group session reported suffering prior abuse.  (Id.)  At that moment, he realized the "devastating, life-altering toll" of his behavior on his victim.  (Id.)

Mr. Doe #2 then devoted his personal and professional life to helping others suffering from addictions and preventing future instances of sexual abuse.  (Id. ¶ 7.)  He obtained a certification for alcohol and drug addiction counseling from the State of California in 2010, a bachelor's degree in psychology in 2012, and a master's degree in clinal forensic social work in 2015.  (Id.)  He currently holds a provisional license with the California Board of Behavioral Sciences as an associate social worker.  (Id.)  From 2016 until 2020, he worked full-time as a case manager and substance abuse counsel for a nonprofit serving chronically homeless individuals in Los Angeles.  (Id.)  In 2021, he began treating patients with sexual addictions full-time and started organizing volunteer support groups for registrants and their families.  (Id. ¶ 8.)  "Recognizing that [he] can never make direct amends to [his] victim without causing further harm, [he] hope[s] to help [his] patients recognize and stop their own destructive and harmful behaviors before they offend, and help those who have offended to repair the damage they have caused."  (Id.)

Because of his rehabilitation, a California court expunged his conviction in 2012.  (Id. ¶ 9.)  In 2016, the court issued a Certificate of Rehabilitation pursuant to Cal. Penal Code section 4852.01.  (Id.)  Under California law, he is no longer required to register as a sex offender.  (Id.)  He alleges that, if not vacated, his original offense of conviction likely requires a registration period of 25 years under SORNA.  (Id. ¶ 10.)  He states that the Rule requires him to register as a sex offender in California because his original conviction was expunged, instead of being set aside.  (Id. ¶ 12.)

If forced to register as a sex offender, Mr. Doe #2 alleges he will likely lose his license to practice therapy and will be forced to cease his practice.  (Id. ¶ 15.)  He will also likely face ostracization from his community.  (Id.)  He alleges similar facts to Mr. Doe #1 regarding his previous experiences with the social consequences of registration and fear of the return of those consequences if forced to register again.  (See id.)

Mr. Doe #2 faces the same requirements under the Rule as Mr. Doe #1.  (See id. ¶¶ 13-14.)  He alleges similar harms under the First Amendment as Mr. Doe #1 regarding use of the internet and speaking on issues of public concern.  (See id. ¶¶ 16-17.)  Like Mr. Doe #1, he is concerned that California may attempt to comply with the Rule at any time.  (Id. ¶ 18.)  He alleges identical facts to Mr. Doe #1 regarding travel, attempting to register as a sex offender in California, denial of registration by local law enforcement, and his fear of federal prosecution.  (See id. ¶¶ 20-22.)

## C.  John Doe #3

Mr. Doe #3 is a resident of California.  (Doe #3 Decl. ¶ 1.)  He was convicted in 1997 of Cal. Penal Code section 288(a), lewd and lascivious acts with a minor under the age of 14.  (Id. ¶ 3.)  His original offense involved unlawful contact with a 13-year-old.  (Id.)  He was imprisoned for two years and then served a period of parole supervision.  (Id. ¶ 4.)  He was then required to register as a sex offender for life in California.  (Id. ¶ 5.)

While in prison, he completed intensive sex offender treatment, which he continued after release.  (Id. ¶ 6.)  After his release from prison in 1999, he started a business and married.  (Id. ¶ 7.)  He has two stepsons and two grandchildren.  (Id.)  He is 62 years old.  (Id.)

In 2011, he was convicted of a misdemeanor for failure to register under Cal. Penal Code section 290(g)(1).  (Id. ¶ 8.)  He has no other convictions since the 1997 conviction.  (Id.)  In 2015, his 2011 misdemeanor conviction was expunged pursuant to Cal. Penal Code section 1203.4.  (Id. ¶ 9.)

Mr. Doe #3 has aspirations to travel interstate and internationally.  (Id. ¶ 10.)  In 2021, he petitioned to be removed from the California registry under Cal. Penal Code section 290.5, which was granted.  (Id. ¶ 11.)  He is no longer required to register as a sex offender under California law.  (Id.)  He alleges that DOJ has asserted that his original offense of conviction likely requires him to register for life under SORNA.  (Id. ¶ 12.)

He alleges similar facts to Mr. Doe #1 and Mr. Doe #2 regarding the requirements of the Rule, the burdens it imposes on internet usage and public speech, the consequences of registration and re-registration, his desire to travel, and his fear of federal prosecution.  (See id. ¶¶ 14-22, 25.)  Like Mr. Doe #1 and Mr. Doe #2, he attempted to register as a sex offender in California but was told that he could not register as required.  (Id. ¶ 22.)

In September 2020, with the assistance of counsel, Mr. Doe #3 inquired with his local sex offender registry office about whether they could register him to satisfy his obligations under SORNA or whether they could direct him to any other location where federal registration could be accomplished.  (Id. ¶ 23.)  A detective with his local County Sheriff's Office responded in an email, "Due to the conviction being in CA and his obligation to register is terminated, Mr. [Doe #3] would not need to register federally. . . . The federal sex offender registry is just a database of

---

**CIVIL MINUTES—GENERAL**

State records.  The requirement to register is handled on the state side[,] not the federal side, so we do not offer federal registration and I do not know of any agency that offers it." (Id. ¶ 24.)

## D.  John Doe # 4

Mr. Doe #4 is a resident of California.  (Doe #4 Decl. ¶ 1.)  He was convicted in 1997 for lewd and lascivious conduct with a child under 16, in violation of Florida Statute § 800.04.  (Id. ¶ 3.)  The victim was a 15-year-old male.  (Id.)

His conviction required him to register for life in Florida.  (Id. ¶ 4.)  He subsequently moved to California, where he is also required to register for life under state law.  (Id. ¶ 5.)  He has registered as a sex offender in California since moving to California over 15 years ago.  (Id. ¶ 6.)  As a lifetime registrant in Florida, he also remains on that state's registry.  (Id.)  He is currently registered with both states.  (Id. ¶ 6.)

He currently works as an auditor.  (Id. ¶ 7.)  Mr. Doe #4 has had no criminal convictions since his original offense.  (Id.)  He alleges that his original offense of conviction likely requires him to register for life under SORNA.  (Id. ¶ 8.)

He alleges similar facts to Mr. Doe #1 and Mr. Doe #2 regarding the requirements of the Rule, the burdens it imposes on internet usage and public speech, his desire to travel, and his fear of federal prosecution.  (See id. ¶¶ 10-16.)  He has attempted to provide the information required by the Rule to the State of California as part of his registration.  (Id. ¶ 14.)  He has not been allowed to comply fully with the Rule, however, because California does not collect all of the information required under the Rule, such as remote communication identifiers.  (Id. ¶¶ 14-15.)

## E.  ACSOL

ACSOL is a nonprofit organization "dedicated to protecting the constitution by restoring the civil rights of people listed on the public registries and their families." (Bellucci Decl. ¶ 6.)  ACSOL is based in California and has more than 100,000 California registrants among its membership.  (Id. ¶ 7.)  ACSOL's membership includes individuals convicted of sex offenses who reside in the Central District of California.  (Id. ¶ 8.)  One of ACSOL's central purposes is to limit unlawful registration requirements for its membership in order to help its members live law-abiding and productive lives as a part of their communities.  (Id. ¶ 9.)

ACSOL's membership includes individuals convicted of sex offenses, as described by federal law, who are required to register as sex offenders under both California and federal law.  (Id. ¶ 11.)  These members are required to comply with the Rule, even though California does not have avenues for them to provide all the required information to California authorities.  (Id.)  In ACSOL co-founder Janice Bellucci's experience, California does not currently collect remote communication identifier information, or collect information about anticipated travel by registrants, despite the Rule's directions that registrants must provide such information to local authorities.  (Id.)

**CIVIL MINUTES—GENERAL**

ACSOL's membership also includes individuals convicted of sex crimes in California who are required to register as sex offenders under federal law but have had their "conviction expunged under California Penal Code [section] 1203.4 or have been granted relief from registration under California Penal Code section 290.5 and have no other convictions." (Id. ¶ 12.) "These ACSOL members have no obligation to register under California law, yet are presumed to be in non-compliance with the new rule." (Id.)

One ACSOL member includes an individual who was convicted of California Penal Code section 243.4(a) with a victim younger than thirteen years old, which is likely a Tier III offense under SORNA. (Id. ¶ 13.) The offense likely requires the individual to maintain federal registration for life. (Id.) However, the conviction was expunged pursuant to California Penal Code section 1203.4 and the individual is no longer required to register under California law. (Id.) According to the Rule, the member must re-register in California, but California authorities will not allow this member to register as a sex offender. (Id.)

Ms. Bellucci has personally accompanied an individual who has an expunged sex offense conviction while he attempted to register with local law enforcement in California. (Id. ¶ 14.) He was denied the ability to register by local police. (Id.)

Another ACSOL member includes an individual who was convicted of California Penal Code section 288(a), lewd and lascivious acts with a minor under the age of 14, and is required to register under SORNA. (Id. ¶ 15.) That member was granted relief from registration under California Penal Code section 290.5 and is no longer required to register under California law. (Id.) According to Ms. Bellucci, while under the Rule this member must re-register in California, California authorities will not allow him to. (Id.)

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689 (2008) (citations omitted). An injunction is binding only on parties to the action, their officers, agents, servants, employees, and attorneys and those "in active concert or participation" with them. Fed. R. Civ. P. 65(d)(2).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Under the Ninth Circuit's "sliding scale" approach to preliminary injunctions, the four "elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." All. For the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1132 (internal quotations omitted).

## IV.   DISCUSSION

Plaintiffs present four challenges to the Rule in the Motion.  (See Motion.)  They argue the Rule is unconstitutional in three ways: "(1) It is an exercise of an unconstitutional delegation of lawmaking authority; (2) It unlawfully limits protected speech in violation of the First Amendment; and (3) It violates due process by presuming Plaintiffs' guilt of a federal crime." (Motion at 8.)  Plaintiffs also argue that the Rule contradicts statutory text regarding its definition of "conviction."  (Id. at 20-22.)  The Court addresses these arguments in turn.  Before it does so, it addresses the threshold issues raised by Defendants: standing and ripeness.  (See Opposition at 7, 13, 18.)

### A.  Standing and Ripeness

#### 1.  Legal Standard

"A jurisdictional challenge under Rule 12(b)(1) may be made either on the face of the pleadings or by presenting extrinsic evidence."  Warren v. Fox Fam. Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003).  Thus, a jurisdictional challenge can be either facial or factual.  White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).

In a facial attack, the moving party asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction.  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  When evaluating a facial attack, the court must accept the factual allegations in the plaintiff's complaint as true.  Comm. for Immigrant Rights of Sonoma Cnty. v. Cnty. of Sonoma, 644 F. Supp. 2d 1177, 1189 (N.D. Cal. 2009).

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  Safe Air for Everyone, 373 F.3d at 1039.  In resolving a factual challenge, the court "need not presume the truthfulness of the plaintiff's allegations" and "may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment."  White, 227 F.3d at 1242. "Where jurisdiction is intertwined with the merits, [the Court] must 'assume the truth of the allegations in the complaint . . . unless controverted by undisputed facts in the record.'"  Warren, 328 F.3d at 1139 (quoting Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987)).

To establish Article III standing, (1) "the plaintiff must have suffered an injury in fact— an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical," (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and (3) "it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).  A plaintiff must establish standing with respect to each claim and form of relief.  See Wildearth Guardians v. United States EPA, 759 F.3d 1064,

1070–1072 (9th Cir. 2014) (organization had standing to challenge only certain EPA decisions); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000) (requiring plaintiff to show standing separately for injunctive relief and civil penalties).

"Ripeness and standing are closely related because they originate from the same Article III limitation." Montana Envtl. Info. Ctr. v. Stone-Manning, 766 F.3d 1184, 1188 (9th Cir. 2014) (citing Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 n.5 (2014)). In fact, "in many cases, ripeness coincides squarely with standing's injury in fact prong." Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing. . . . Indeed, because the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline."). "If a case is not ripe for review, then there is no case or controversy, and the court lacks subject-matter jurisdiction." Principal Life Ins. Co. v. Robinson, 394 F.3d 665, 669 (9th Cir. 2005). A dispute is ripe when it presents concrete legal issues in actual cases. Colwell v. HHS, 558 F.3d 1112, 1123 (9th Cir. 2009).

To satisfy Article III's standing requirements in the context of a pre-enforcement challenge, a plaintiff must show that they face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt v. United Farm Workers National Union, 442 U.S. 289, 298 (1979). A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." Id. (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593) (1923)). "When contesting the constitutionality of a criminal statute, it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" Id. (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)). "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" Id. (quoting Doe v. Bolton, 410 U.S. 179, 188 (1973)). However, where the feared prosecution is too "imaginary" or "speculative," there is no standing. Id. (quoting Younger v. Harris, 401 U.S. 37, 42 (1971)). "In evaluating the genuineness of a claimed threat of prosecution," courts "look to whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." Thomas, 220 F.3d at 1139. The severity of the potential penalty (whether, for example, the feared enforcement would be civil or criminal) is also relevant. See, e.g., id. at 1141.

### 2. Application

Defendants reassert their standing argument concerning Mr. Doe #1, albeit seemingly just to preserve the issue. (See Opposition at 1, 7.) Defendants note, "As Defendants previously argued, Doe #1 lacks standing because, based on Plaintiffs' allegations, his SORNA registration period has expired. Because Does #2-4 assert facts that suggest they may still be required to

register under SORNA, Defendants do not rely on Doe #1's lack of standing in response to Plaintiffs' PI motion but reserve the right to raise this defense at a later stage." (Id. at 7.)

The Court previously ruled that Mr. Doe #1 lacked standing. (Order Denying First Motion for Preliminary Injunction.) Because Mr. Doe #1 did not allege this essential fact in the Complaint, the Court was forced to infer whether he was categorized as a tier I, II or III sex offender and accordingly how long he would be required to register under SORNA. (See id. at 6-7.) Given his misdemeanor conviction, the Court inferred that Mr. Doe #1 would be categorized as a tier I sex offender and that his registration period would be 15 years. (Id. at 7.) Accordingly, it found that he "does not appear to be required to register under SORNA" and thus "he does not demonstrate that he is subject to the Rule." (Id.)

The FAC, unlike the Complaint, spells out a different theory of standing than the one the Court considered in its Order Denying First Motion for Preliminary Injunction. The FAC alleges that the Department of Justice (DOJ) has asserted that a violation of California Penal Code § 243.4(a), Mr. Doe #1's original offense of conviction from 1996, is at a minimum a tier II offense. (FAC ¶ 18) (citing DOJ, *SORNA Substantial Implementation Review: State of California*, at 17 (Jan. 2016)). The Court observes that, according to the guidance cited by Plaintiffs, DOJ does not appear to distinguish between misdemeanor and felony convictions of section 243.4(a), a "wobbler" under California law. See id. Plaintiffs also allege, "DOJ has previously argued, and some courts have agreed, that the failure to register is a generic "sex offense." See United States v. Tang, 718 F.3d 476, 484 (5th Cir. 2013) ("Tang's failure to register qualifies as a sex offense."), not followed as dicta by United States v. Segura, 747 F.3d 323, 329-30 (5th Cir. 2014)." (FAC ¶ 21.) Therefore, Plaintiffs allege that "Mr. Doe #1 thus may be subject to a lifetime requirement under SORNA because he was convicted in 1996 of Cal. Penal Code § 234.4(a) and was subsequently convicted in 2006 of failing to register under Cal. Penal Code § 290(g)(1)." (Id. ¶ 22.)

Defendants appear to concede that Mr. Doe #2, Mr. Doe #3 and Mr. Doe #4 would have standing, notwithstanding the claim-specific standing issues address below. (See Opposition at 7.) Even if Defendants did not so concede, the Court would have little trouble finding that Mr. Doe #2, Mr. Doe #3 and Mr. Doe #4 do have standing: based on the nature and timing of their convictions, each are required to register under SORNA and are subject to the Rule. As noted in more detail below, each allege a concrete injury, actual or imminent harm, a causal connection between the conduct of Defendants and the injury they complain of, and redressability in the form of injunctive relief. See Lujan, 504 U.S. at 560-61. Because the Court is satisfied that these Plaintiffs have standing, it need not reach the question of whether Mr. Doe #1 alleges standing in the FAC. See Leonard v. Clark, 12 F.3d 885, 888 (9th Cir. 1993), as amended (Mar. 8, 1994) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others.").

¹ ² Where, as here, Plaintiffs are "challenging the legality of government action or inaction . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." <u>Lujan</u>, 504 U.S. at 561-62.  "[A] plaintiff is presumed to have constitutional standing to seek injunctive relief when it is the direct object of regulatory action challenged as unlawful." <u>Los Angeles Haven Hospice, Inc. v. Sebelius</u>, 638 F.3d 644, 655 (9th Cir. 2011).  Since the "allegedly unlawful regulation . . . directly applie[s]" to Mr. Does 2-4 and "expose[s] [them] to individual liability," they demonstrate Article III standing. <u>Id.</u>

Defendants argue that Plaintiffs' nondelegation and statutory claims (and perhaps the others as well) fail for lack of standing because, in essence, the Rule does not actually create any "new" law or policy. (<u>See</u> Opposition at 8, 21, 25.)  That is, at least, the charitable way of characterizing the argument; Plaintiffs summarize it as follows: "In a remarkable exercise in denying reality, DOJ insists that its rule, which went into effect on Jan. 7, 2022, after notice and comment, and which DOJ described as 'implement[ing]' novel requirements, and adding new 'specifications regarding information sex offenders must provide,' 86 Fed. Reg. at 69,857, doesn't actually do anything." (Reply at 2.)  Specifically, Defendants claim that Plaintiffs lack standing to challenge the Rule on nondelegation grounds because the Rule "primarily repeats express statutory requirements" and "Plaintiffs identify no injury relating in any way to the[] limited exercises" of delegated authority within the Rule. (Opposition at 8.)  Regarding Plaintiffs' statutory claim, Defendants argue that the interpretation Plaintiffs challenge was originally set forth in the 2008 Guidelines, not the Rule. (<u>Id.</u> at 21.)  As such, "Plaintiffs can claim no injury regarding this issue that is fairly traceable to the Rule, and setting aside the Rule would not redress any injury because Plaintiffs would remain subject to the Attorney General's interpretation of the term in the 2008 Guidelines." (<u>Id.</u> at 21-22.)  Elsewhere, Defendants appear to argue that these standing arguments extend to all Plaintiffs' claims. (<u>See id.</u> at 25) ("Indeed, Plaintiffs identify nothing in the challenged Rule that changes in any way the regime to which they and other California sex offenders have been subject for over a decade.  Enjoining the

---

¹ Because Defendants only obliquely challenge standing, Plaintiffs do not attempt to rebut any argument regarding Mr. Doe #1's standing. (<u>See</u> Reply.)  In contrast, Plaintiffs appear content to conclude that, "[n]ow that DOJ has made its position clear, and is estopped from making a contrary argument in future proceedings, Mr. Doe #1 agrees that he is relieved of the obligation of registering." (<u>Id.</u> at 1.)  If the Court did reach the issue, it would likely find that Plaintiffs therefore concede Mr. Doe #1 lacks standing.  But even if they did not, assuming the clearest authority Plaintiffs can muster in their favor is the dicta referenced in the FAC, <u>Tang</u>, 718 F.3d. at 484, because the Fifth Circuit declined to follow <u>Tang</u> in <u>Segura</u>, 747 F.3d at 393-30, the Court would likely find that Mr. Doe #1 again fails to demonstrate standing.

² Defendants do not challenge ACSOL's organizational standing and the parties do not brief the issue. (<u>See</u> Motion; Opposition; Reply.)  Accordingly, the Court does not have occasion to address it here, but if it were contested, the Court would find that ACSOL demonstrates the requirements to show standing on behalf of its membership. <u>See</u> <u>Ecological Rights Found. v. Pac. Lumber Co.</u>, 230 F.3d 1141, 1147 (9th Cir. 2000); <u>La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest</u>, 624 F.3d 1083, 1088 (9th Cir. 2010).

Rule would in no way alter Plaintiffs' obligations under SORNA and prior Guidelines—which would remain in effect.")

The Court considers Defendants' argument but is disinclined to follow their logic. For example, even if the Rule does not technically create new law, it explicitly promulgates more specific definitions and requirements that likely expose Plaintiffs to liability. The following paragraph illustrates the Court's understanding:

> While this rule does not make new policy, as discussed above, it is expected to have a number of benefits. The rule will facilitate enforcement of SORNA's registration requirements through prosecution of noncompliant sex offenders under 18 U.S.C. [section] 2250. By providing a comprehensive articulation of SORNA's registration requirements in regulations addressed to sex offenders, it will provide a more secure basis for prosecution of sex offenders who engage in knowing violations of any of SORNA's requirements. It will also resolve a number of specific concerns that have arisen in past litigation or could be expected to arise in future litigation, if not clarified and resolved by this rule. For example, as discussed below, the amendment of [section] 72.3 in the rule will ensure that its application of SORNA's requirements to sex offenders with pre-SORNA convictions is given effect consistently, resolving an issue resulting from the decision in United States v. DeJarnette, 741 F.3d 971 (9th Cir. 2013).[3]

86 F.R. 69856.

Further, although Defendants argue that the Rule does not create new policy (or at least that any new policy is not meaningful), the Rule explicitly acknowledges that the Rule includes:

> [S]pecification of requirements which, wholly or in part, do not appear expressly in SORNA . . . includ[ing] requirements to provide information about actual and purported dates of birth and Social Security numbers, temporary lodging away from residence, passports and immigration documents, and professional licenses . . . [and] requirements adopted by the Attorney General to keep registration information up to date. These include requirements to report in advance departure from a jurisdiction, the requirement to

---

[3] In DeJarnette, the Ninth Circuit found that the Attorney General had not made all of SORNA's requirements applicable to all sex offenders, holding that SORNA did not impose an obligation on a criminal defendant to register in the jurisdiction of his sex offense conviction when he resided in a different jurisdiction.

> report within three business days changes relating to remote
> communication identifiers, temporary lodging and vehicle
> information . . .

Id. at 69859.  The Rule thus unmistakably communicates that the Government intentionally amended its regulations to pursue criminal prosecution for failure to register or update registration under SORNA.

While Defendants frame their argument as one of standing, not timeliness under the APA, the Court would agree with Plaintiffs that "even if DOJ were correct that its new rule merely codifies old guidelines, that isn't a defense" to the claims raised here.  (Reply at 2.)  A plaintiff may only challenge "final agency action" under the APA.  5 U.S.C. § 704; Bennett v. Spear, 520 U.S. 154, 177-78 (1997).  "Rulemaking through the notice and comment process is, of course, one way to engage in 'agency action' that can, in turn, lead to 'final agency action' challengeable in court."  San Francisco Herring Ass'n v. Dep't of the Interior, 946 F.3d 564, 579 (9th Cir. 2019).  "Where agencies merely issue[] preliminary guidance or opinions restating the law" agency action is unlikely to be "final."  See id. at 581.  Defendants do not argue that the Rule is not final or that it is not reviewable under the APA, nor does the Court see how they could.  (See Opposition.)  Defendants do claim, however, that the 2008 Guidelines have the force of law, a proposition for which they cite United States v. Mattix, 694 F.3d 1082, 1084 (9th Cir. 2012).  (Opposition at 4, 22.)  That is an accurate statement, at least in that the Ninth Circuit affirmed dicta from United States v. Valverde, 628 F.3d 1159 (9th Cir. 2010), holding SORNA became effective against pre-enactment offenders 30 days after publication of the 2008 Guidelines and that the 2008 Guidelines "fulfilled the requirements of the APA."  Mattix, 694 F.3d at 1084-85.  But Plaintiffs are correct that the issue is not so simple.  Courts appear divided in determining whether certain provisions of the 2008 Guidelines create a basis for criminal liability under 18 U.S.C. § 2250.  See United States v. Belaire, 480 F. App'x 284, 287 (5th Cir. 2012) (unpublished) (holding that failure to provide or update "temporary lodging information" promulgated under the Attorney's General authority that is now codified at 34 U.S.C. § 20914(a)(8) does not create a basis for criminal liability.)  As the parties agree, and the text of the Rule makes unmistakably clear, "sex offenders can be held liable for violating *any* requirement stated in the [Rule]."  86 F.R. at 69868 (emphasis added).  Thus, whatever else it does, the Rule definitively resolves any doubt as to the Government's ability to impose *criminal* liability on the basis of SORNA *regulations*, not just those provisions codified by statute.

Moreover, even if Defendants were right that the 2008 Guidelines constituted final agency action and carried the force of law, the reopening doctrine would seem to allow Plaintiffs to challenge the Rule.  "The reopening doctrine allows an otherwise stale challenge to proceed because 'the agency opened the issue up anew,' and then 'reexamined . . . and reaffirmed its [prior] decision.'"  P & V Enterprises v. U.S. Army Corps of Engineers, 516 F.3d 1021, 1023 (D.C. Cir. 2008) (citation omitted) (overruling on other grounds recognized by Jackson v. Modly, 949 F.3d 763 (D.C. Cir.), cert. denied sub nom. Jackson v. Braithwaite, 141 S. Ct. 875 (2020).  The doctrine applies "where the entire context . . . demonstrates that the agency . . . has undertaken a serious, substantive reconsideration of the existing rule."  Id. (citation, internal

quotations and brackets omitted).  Courts within the Ninth Circuit have applied the reopening doctrine.  See, e.g., Oceana, Inc. v. Bryson, 940 F. Supp. 2d 1029, 1045 (N.D. Cal. 2013) (applying doctrine and collecting cases doing so).  The Court finds that the Rule constitutes a lengthy, substantive reconsideration of, and amendment to, previous agency regulation.  Even if many of its provisions previously existed and the Rule largely reaffirms them, the Attorney General opened its (previous) decisions up to legal challenge when he promulgated the Rule through notice and comment rulemaking.  Plaintiffs accordingly bring a timely and proper challenge to the lawfulness of the Rule.

Defendants next argue that Plaintiffs lack standing for their First Amendment claim because "California does not currently collect identifiers, making it impossible for Plaintiffs to provide this information or to assert a certainly impending prospect of a chill as a result." (Opposition at 13.)  Defendants claim that Plaintiffs' "speculation that California might in the future collect such identifiers is not enough to confer standing to raise this claim[.]"  (Id.)

Defendants raise a related standing argument regarding Plaintiffs' due process claim.  In Defendants' view, because Plaintiffs fear prosecution under 18 U.S.C. § 2250 and attack the fundamental fairness of its impossibility affirmative defense, "Plaintiffs' due process claim thus necessarily relates to a potential criminal prosecution, but any criminal charge, and any affirmative defense thereto, must be brought under the statute, not the Rule."  (Id. at 18.) Because Plaintiffs have (yet) to be prosecuted, Defendants argue that their pre-enforcement challenge is unripe and "the notion that Plaintiffs face prosecution under § 2250(a) in a manner that would violate their due process rights" is purely hypothetical.  (Id. at 19.)

The Court rejects these arguments.  Far from an imaginary or speculative injury, Plaintiffs allege that they are already suffering serious injuries, not least because they are already presumed to be in violation of the law by the Government.  Moreover, because "there exists a credible threat of prosecution," the Court finds that Plaintiffs "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."  Babbitt, 442 U.S. at 298.  Plaintiffs allege far more than a "concrete plan" to violate the law.  Thomas, 220 F.3d at 1139.  As noted at length below, it is undisputed that it is impossible for Plaintiffs to comply with SORNA's requirements because California will not allow them to.  (See Exs. A-E, Opposition.) As such, the Government presumes that they are guilty of a crime, one that could send Plaintiffs to a federal prison for a decade.  At its core, Defendants' argument is that this is acceptable, because Plaintiffs may not be prosecuted, and even if they are, they can always try to convince a jury that they lack the requisite *mens rea* or meet their burden to demonstrate impossibility under the affirmative defense in 18 U.S.C. § 2250.  On the merits of Plaintiffs' due process claim, the Court is unpersuaded by Defendants' argument.  But even if it were not, it is easy to see why Plaintiffs have standing to bring the claims they do here.  The Rule "forces [Plaintiffs] to register, or attempt to do so, with California authorities, and provide all of the information set out in the [R]ule. . . . If, however, Plaintiffs fail to heed the rule, they will be sent to prison."  (Reply at 2.) For individuals like Plaintiffs, at least some of whom allege a remarkable record of rehabilitation and positive contributions to society following convictions in the distant past, the prospect of being returned to prison for up to 10 years due to circumstances beyond their control is a

particularly disturbing one.  See 18 U.S.C.  § 2250(a)(3).  Moreover, Plaintiffs allege that the Rule has already changed their behavior, including burdening their freedom of speech.  (See Mr. Doe #1 Decl. ¶¶ 22-24; Mr. Doe #2 Decl. ¶¶ 16-18; Mr. Doe #3 Decl. ¶¶ 18-20; Mr. Doe #4 Decl. ¶¶ 12-15.)  As they explain, "Plaintiffs have refrained from speaking because they fear, quite reasonably, that California will comply with DOJ's rule, which conditions federal funding on California's collection of [remote communication] identifiers."  (Reply at 8-9.)  Further, the Government has issued an indictment for failure to register under SORNA, even though the defendant's predicate sex offense convictions in California had been set aside under California Penal Code section 1203.4(a).  See U.S. v. Hardeman, 597 F. Supp. 2d 1040, 1047-49 (N.D. Cal. 2009)).[4]  In light of the specificity and gravity of the current and potential injuries Plaintiffs allege, the clear nexus to the conduct they complain of, and the potential for redress in the form of injunctive relief, Plaintiffs establish standing for all their claims.  The Court also finds each ripe for resolution.

Having rejected Defendants' threshold arguments, the Court turns to the merits of the Motion.

## B.  Preliminary Injunction

For the Court to issue a preliminary injunction, Plaintiffs must show that (1) they are likely to succeed on the merits of their claim; (2) they are likely to suffer irreparable harm in the absence of emergency relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  Winter, 555 U.S. at 20.  The Court addresses these factors in turn.

### 1.  Likelihood of Success on the Merits

The Court considers in turn each of Plaintiffs' four claims.

//

---

[4] Subsequent to that indictment, the Government dismissed the case with prejudice. United States v. Hardeman, 2011 WL 1496048, at *2 (N.D. Cal. Apr. 20, 2011).  In doing so, the Government stated it had evidentiary issues, and "emphasized that the reason driving dismissal was unrelated to" the issue of the predicate convictions having been set aside.  Id.  The United States initially attempted to dismiss the indictment without prejudice.  Id.  It also tried to persuade the district court to leave in place its order denying a motion to dismiss the indictment, in which the defendant argued that SORNA did not apply to him because his convictions had been set aside.  Id.  The district court instructed the Government to either dismiss the indictment with prejudice or proceed to trial.  Id.  The Government elected to dismiss the indictment with prejudice.  Id.  However, it subsequently indicted the defendant again, this time relying upon registration obligations imposed by California, not SORNA.  Id.  The Court agrees with Plaintiffs that "[w]hat remains is a decision opining that an expunged conviction may serve as the basis for prosecution, and the government's history of attempting to bring such a case."  (Reply ISO First Motion for Preliminary Injunction at 3.)

---

### a. Due Process

According to Plaintiffs, constitutional due process does not allow the Rule, in conjunction with 18 U.S.C. § 2250, "to presume that someone is guilty of a federal crime when he has no obligation to register in the first place or when he can't provide the 'required' information." (Motion at 18.)  Put another way, the Rule is unconstitutional because it "penalizes people who have no obligation to register in the first place for failing to do the *impossible*."  (Id. at 19.)  Mr. Doe #1, Mr. Doe #2, and Mr. Doe #3 allege that they face this exact predicament.  Because of the post-conviction relief they have been granted, they are no longer required to register as sex offenders under California law.  (See Doe #1 Decl. ¶ 16; Doe #2 Decl. ¶ 9; Doe #3 Decl. ¶ 11.)  According to the Rule, however, they are required to register with California, as well as to provide certain information to the State.  (Doe #1 Decl. ¶¶ 18-20; Doe #2 Decl. ¶¶ 12-14; Doe #3 Decl. ¶¶ 14-16.)  As they fear arrest and prosecution from federal authorities, they attempted to register in California.  (Doe #1 Decl. ¶¶ 26-27; Doe #2 Decl. ¶¶ 21-22; Doe #3 Decl. ¶¶ 22-24.)  But California refused to let them: they were each told by local law enforcement that they could not be registered.  (Doe #1 Decl. ¶ 26; Doe #2 Decl. ¶ 21; Doe #3 Decl. ¶¶ 22, 24.)  In other words, they allege that it is impossible for them to comply with the Rule.  Defendants do not dispute these allegations, or the conclusion that it is impossible for them to comply.  (See Opposition.)  On the merits, Defendants raise two arguments in response: that SORNA's scienter requirement mitigates any due process concerns, and that even if it does not, the availability of the affirmative defense codified at 18 U.S.C. § 2250(c) does.  (See id. at 19-20.)  Because the Court rejects the former argument, as explained below, it must consider the latter.

Accordingly, the due process question is this: may the Government attempt to imprison California registrants like Plaintiffs for up to a decade for failing to do the impossible, unless *they*, not the Government, prove impossibility?  This Court holds that the answer is no.

Before turning to the requirements of SORNA and the Rule, the Court briefly reviews the steps Plaintiffs took to attempt to (unsuccessfully) comply with them.  Mr. Doe #3 provides the clearest details.  Like Mr. Doe #1 and Mr. Doe #2, Mr. Doe #3 tried to register with California authorities but was told that he could not.  (Doe #3 Decl. ¶ 22.)  Specifically, in September 2020, with the help of a lawyer, Mr. Doe #3 inquired with his local sex offender registry office about whether they could register him to satisfy his obligations under SORNA or whether they could direct him to any other location where federal registration could be accomplished.  (Id. ¶ 23.)  A detective with his local County Sheriff's Office responded in an email, "Due to the conviction being in CA and his obligation to register is terminated, Mr. [Doe #3] would not need to register federally. . . . The federal sex offender registry is just a database of State records.  The requirement to register is handled on the state side[,] not the federal side, so we do not offer federal registration and I do not know of any agency that offers it."  (Id. ¶ 24.)  As this detective's statement that Mr. Doe # 3 "would not need to register" appears to be erroneous, or at least overstated, in light of the clear directive of the Rule, Mr. Doe # 3 remains understandably "concerned that [he] could be arrested and prosecuted by federal authorities, despite these assurances from local law enforcement."  (Id. ¶ 25.)

SORNA defines a "sex offender" as "an individual who was convicted of a sex offense." 34 U.S.C. § 20911(1). The Act requires a sex offender to "register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student." 34 U.S.C. § 20913(a). To keep his registration current, "[a] sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved . . . and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry." Id. § 20913(c). Under SORNA, a "sex offender registry" is a "registry of sex offenders, and a notification program, maintained by a jurisdiction," which includes each state. Id. § 20911(9), (10).

Pursuant to 18 U.S.C. § 2250, it is a crime (one entitled "Failure to Register") for a person who is "required to register" under SORNA to "travel[] in interstate or foreign commerce" and who "knowingly fails to register or update a registration as required by" SORNA. 18 U.S.C. § 2250(a); see also Gundy, 139 S. Ct. at 2121 (2019) ("Any person required to register under SORNA who knowingly fails to do so (and who travels in interstate commerce) may be imprisoned for up to ten years."). As Plaintiffs explain, the *actus reus* of the offense is the failure to register "as required," while the *mens rea* rests on knowledge of that requirement. (See Motion at 17) (citing Carr v. United States, 560 U.S. 438, 447 (2010)). The offense is punishable by up to 10 years of imprisonment and a fine. 18 U.S.C. § 2250(a)(3). The statute establishes an affirmative defense, in which a defendant would be found not guilty at trial if he proves that "(1) uncontrollable circumstances prevented the individual from complying; (2) the individual did not contribute to the creation of such circumstances in reckless disregard of the requirement to comply; and (3) the individual complied as soon as such circumstances ceased to exist." Id. § 2250(c).

The Rule recognizes the existence of such circumstances, indeed contemplating the situation at issue here. It describes "situations in which a sex offender has failed to do something SORNA requires because it is impossible for him to do so." 86 F.R. at 69868. For example,

> [A] jurisdiction with laws that do not require registration based on the particular offense for which a sex offender was convicted may nevertheless be willing to register him in light of his Federal law (SORNA) registration obligation. But alternatively, the jurisdiction's law or practice may constrain its registration personnel to register only sex offenders whom its own laws require to register. In such a case, it is impossible for the sex offender to register in that jurisdiction, though subject to a registration duty under SORNA. This is so because registration is by its nature a two-party transaction, involving a sex offender's providing information about where he resides and other matters as required, and acceptance of that information by the jurisdiction for inclusion in the sex offender registry. If the jurisdiction is unwilling to carry out its side of the transaction, then the sex offender cannot register.

Id.  While acknowledging this reality, the Rule is careful to send as clear a message as possible: the Government will strictly enforce the litany of registration requirements and, in every circumstance, hold a registrant to his burden of demonstrating impossibility if he fails to abide by them.

The Rule declares that "sex offenders can be held liable for violating any requirement stated in the [Rule], regardless of when they were convicted, and regardless of whether the jurisdiction in which the violation occurs has adopted the requirement in its own law."  Id. at 69868.  The Rule enacts a new provision at 28 C.F.R. § 72.7(g)(1), which provides, "[a] sex offender who does not comply with a requirement of SORNA in conformity with the time and manner specifications of [the Rule] must comply with the requirement in conformity with any applicable time and manner specifications of a jurisdiction in which the offender is required to register."  86 F.R. at 69886-87.  In stating so, the Rule carefully reiterates that, "[i]n a prosecution under 18 U.S.C. 2250, [this provision] does not in any case relieve a sex offender of the need to establish as an affirmative defense an inability to comply with SORNA because of circumstances beyond his control as provided in 18 U.S.C. 2250(c) and § 72.8(a)(2)."  Id.  Because impossibility remains an affirmative defense, the Rule "does not relieve sex offenders of the obligation to comply fully with SORNA if able to do so or shift the burden of proof to the government to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA."  Id. at 69882.  The Rule states, as a condition of liability under 18 U.S.C. § 2250, "a sex offender must have been aware of the requirement he is charged with violating, but need not have been aware that the requirement is imposed by SORNA."  Id.  at 69886-87.  In sum, the Rule recognizes a "concern about fairness," id. at 69868, and tells Plaintiffs and others similarly situated that it is addressed through 18 U.S.C. § 2250(c)'s affirmative defense.

In U.S. v. Elkins, 683 F.3d 1039, 1046 (9th Cir. 2012), the Ninth Circuit briefly addressed the question of whether SORNA could be applied to an individual if the state (there, Washington) in which he resides has not implemented SORNA.  The court "continue[d] to hold that the federal government's prosecution of an alleged violation of SORNA is not dependent on the individual state's implementation of the administrative portion of SORNA.  As noted by the Sixth Circuit, the circuit courts are in accord on this issue."  (Id.) (citing United States v. Felts, 674 F.3d 599, 603); see also United States v. Crowder, 656 F.3d 870, 877 (9th Cir. 2011).  The instant case addresses the scenario that Felts explicitly left open:

> The second, potentially more problematic, circumstances, occurs where the requirements under the non-compliant state registry are less onerous than the requirements under SORNA, and the offender may thus lack fair notice of what federal law requires.  This is what Felts alleges.  For example, 42 U.S.C. [section] 16915(a) lists different durations of the registration requirement based on the severity of the offense.  For a Tier III sex offender, registration is required for life.  Id. § 16915(a)(3). If a non-

implementing state were to require registration for a period less than that mandated by SORNA, and a state official only informed an offender of the state requirement, would an offender who stopped registering after the state-proscribed period violate SORNA?

Felts raises an alternate scenario: "A defendant in a State that has not implemented SORNA and does not require that its sex offenders provide all of the listed categories . . . would naturally assume that 'registration' meant providing more information that the State required or even permitted." Felts contends that such a state would be unable to process the additional information, leaving an offender subject to SORNA without fair notice and unable to fulfill the registration requirements, through no fault of his own.

The precedents from other circuits largely fail to address circumstances where an inconsistency between federal and non-complying state regimes would render it impractical, or even impossible, for an offender to register under federal law. The other courts that have addressed this issue have seemed to assume that the federal and state requirements in non-compliant jurisdictions are identical, or perhaps simply similar enough. This may not always be the case.

However, we need not reach this argument with respect to due process, as Felts's own conduct renders this defense unavailable. Under any conceivable definition of the word "register," Felts did not register . . . Felts cites no specific inconsistencies between Tennessee law and SORNA that would have rendered it "impossible for [him] to comply with SORNA in Tennessee." Failing to actually register lies at the core of all sex-offender registry offenses, whether the state is SORNA-compliant or not. Felts clearly did not comply with the Tennessee law in effect at the time, which was consistent with SORNA insofar as it provided for and required registration with a registry, and thus there is no due process problem . . .

Felts, 674 F.3d at 605 (internal citations omitted). The case here, based on Felts, clearly implicates due process, and does not appear to have been squarely addressed by other courts. The parties do not dispute that California's registry laws are "less onerous," id., than those under SORNA. Plaintiffs declare that it is impossible for them to comply with SORNA in California, which puts them in the position that Felts described: living in a state that is "unable to process the additional information, leaving an offender subject to SORNA without fair notice and unable to fulfill the registration requirements, through no fault of his own." Id.

Defendants' first line of defense is that the Government retains its burden to prove the elements of failing to register, particularly the statute's scienter requirement. "Regardless of whether a defendant asserts an affirmative defense under § 2250, the government still must prove the elements of the crime set forth in § 2250(a)," which includes a knowledge element. (Opposition at 20.) According to Defendants, "SORNA's 'knowingly' *mens rea* obviates any due process concerns by ensuring that 'a sex offender is not held liable for failing to provide a type of information if he is unaware of a requirement to provide that information, as may be the case if a jurisdiction does not request that information.'" (Id.) (citing 86 F.R. at 69859). But a careful review of the practicalities of any prosecution under § 2250 reveals why that is not so. Perhaps some cases may turn on whether the defendant did or did not register, or update his registration, or whether he really did violate some provision codified within SORNA or promulgated by the Attorney General, such as the internet identifier issue addressed later. But in many cases, it may be unlikely that these would be hotly disputed facts, for they do not appear particularly difficult for the Government to prove. In the Court's view, a central question in many failure to register cases is likely not whether the defendant failed to do so, but why. In such a situation, a defendant appears to have two major defenses to liability under § 2250. The first is that the defendant did not know he had to register. The second is that it was impossible for him to do so. The former is the offense's *mens rea*, an element that the government must prove beyond a reasonable doubt. The latter is an affirmative defense, the burden of which rests with the defendant. According to Defendants, because the former is available, the Court need not consider the due process implications of the latter.

The Court disagrees. In support of their *mens rea* argument, Defendants cite Crowder, 656 F.3d at 875, in which the Ninth Circuit stated, "[b]ecause state registration schemes have been around for years in all 50 states, . . . and convicted sex offenders know (or should know) of their own state registration requirements, a convicted sex offender who 'knowingly fails to register or update a registration' is on notice or chargeable with notice of the facts constituting the offense." (See Opposition at 20.) It is unclear how Crowder helps Defendants' argument; if anything, it undermines it. The Crowder panel made this observation in justifying its agreement with the Government's argument that "'knowingly' applies only to 'fails to register or update a registration' and not to the phrase 'as required by [SORNA].'" Id. Accordingly, the Ninth Circuit held that the Government need not prove that a defendant knew that registration was required by SORNA, or, put another way, "that the failure to register violates SORNA." Id. at 866-87. A more recent Sixth Circuit case, which follows the direction of the Ninth Circuit in Crowder and Elkins, illustrates why this reasoning may be problematic as it relates to Plaintiffs' situation. In Willman v. Att'y Gen. of United States, 972 F.3d 819, 821 (6th Cir. 2020), cert. denied sub nom. Willman v. Wilkinson, 141 S. Ct. 1269 (2021), reh'g denied sub nom. Willman v. Garland, 141 S. Ct. 1731 (2021), the Sixth Circuit held that SORNA applies to individuals who are not required to register under state law. Id. at 823. In doing so, it joined other circuit courts holding that "federal SORNA obligations are independent of state-law sex offender duties." Id. at 824. Though it did so in the context of a void for vagueness challenge, the Willman court essentially found the notice argument that Defendants claim Plaintiffs may rely upon so unconvincing it was inherently implausible and subject to dismissal under Rule 12(b)(6). See id. at 827. The defendant argued that "because Michigan removed him from its registry," he would

not be required to register under SORNA.  Id.  Accordingly, "if the government nevertheless prosecuted him, plaintiff asserts that he would lack fair notice that he was 'required to register under' the statute."  Id.  The court held, "a person of ordinary intelligence would know if he had been convicted of a sex offense, and he would know that being removed from his state sex offender registry—on its own—would not change whether he had been convicted."  Id.  Albeit in a related context, the court's summary rejection of the notion that a state's decision to remove an offender from its registry (and presumably subsequent decision not to notify him that he was still required to register under SORNA) would not deprive him of "fair notice" that he could be prosecuted federally is a strong indication that a defendant cannot count on *mens rea* alone.  Of course, the question here is not whether Willman was right or wrong on that precise issue. Although it must be said that the panel's framing of the notice issue and conclusory analysis leaves much to be desired, a parallel vagueness challenge is not before the Court.  The point is simply that the very Government that now seeks to convince this Court that Plaintiffs can rely upon a lack of notice to defend themselves in any criminal prosecution urged a different court to find that an ordinary person would know that he must register under SORNA, even if the state removed him from its registry.  That court agreed, unanimously, and apparently with little hesitation.  See id.[5]  Doubtless, a jury may be less inclined to accept such arguments than three esteemed jurists on a federal court of appeal.  But this Court cannot conclude that Plaintiffs can count on that.

There is a simpler reason that the knowledge requirement does not save Defendants: Plaintiffs, and surely many others like them, *know* they must register, but allege merely that it is impossible for them to do so.  Each allege they are aware of the Rule and the associated

---

[5] Defendants cite Willman for another proposition: that, in Willman, the Sixth Circuit reached the issue it declined to reach in Felts, and "cited the availability of the affirmative defense as ameliorating any concerns."  (Opposition at 20.)  That argument misreads Willman, and badly at that.  Plainly, the plaintiff in Willman did not raise a due process argument like the one previewed in Felts or that presented here; the only due process claim he brought was the vagueness challenge discussed above.  Because the due process issue was never *presented* in Willman, the Sixth Circuit certainly could not have reached the issue it declined to reach in Felts, as Defendants claim.  Moreover, the Willman court hardly found that the affirmative defense "ameliorat[ed] any concerns" regarding due process.  It simply observed in dicta, "we agree with the federal government that the affirmative defense is available to Willman if Michigan does not permit him to register."  972 F.3d at 824.  That was in response to the plaintiff's argument that the court's "interpretation of the statute would lead to the absurd result of him having an affirmative defense to a prosecution predicated on failure to register if he offered to register in Michigan and the state declined his offer," which the court rejected in part because it found it speculative.  Id.  That is not Plaintiffs' argument.  It is immaterial that in Willman and here, DOJ acknowledges the availability of the affirmative defense; it is hard to see how it could not.  The plaintiff in Willman did not argue what Plaintiffs argue here.  The Court does not find the Sixth Circuit's passing reference in Willman to an obvious proposition—the availability of the affirmative defense to people who it plainly applies to under the statute— relevant to the instant analysis.

requirements of SORNA; each allege they believe these authorities require them to register; each tried to register with the State of California; each failed; and each are understandably unwilling to take local law enforcement at their word that they have nothing to worry about from the federal government.  (See Doe #1 Decl. ¶¶ 16-27; Doe #2 Decl. ¶¶ 9-22; Doe # 3 Decl. ¶¶ 11-24.)  The Court might be inclined to accept Defendants' argument if the *mens rea* Congress had specified in § 2250 was *intent*, not *knowledge*, for that more accurately characterizes the dispositive issue separating Plaintiffs from more culpable individuals.  The Government presumably has an interest in prosecuting a sex offender who willfully evades registration requirements.  The Government presumably has no interest in prosecuting individuals who, like Plaintiffs, genuinely wish to comply with the law, but cannot.  If Congress required the Government to prove beyond a reasonable doubt that Plaintiffs intentionally failed to register, Plaintiffs may not have to rely on an impossibility affirmative defense at all.  Indeed, if intent were the standard, it might have been sensible for Congress to have disposed of the affirmative defense altogether, for likely any defendant who could plausibly claim that it was impossible for him to register might raise a reasonable doubt that he intended to do so.  But that is not the decision Congress made.  By writing SORNA as it did, and the Attorney General interpreting it as it has in the Rule and elsewhere, the Government has clearly exposed people like Plaintiffs to potential federal criminal liability.  The only recourse the Government has left them is to argue impossibility, and it has absolved itself of its usual burden on the critical issue.  In doing so, it presumes that Plaintiffs are guilty of a federal crime unless they prove their lack of culpability at trial.  The sole remaining question is whether that state of affairs comports with due process.

It does not.  Defendants observe that the Supreme Court recognized in Patterson v. New York, 432 U.S. 197, 210 (1977), that "[p]roof of the nonexistence of all affirmative defenses has never been constitutionally required."  (Opposition at 19.)  They note that the "[o]ther cases cited by Plaintiffs . . . also fail to suggest that the government must prove the unavailability of any affirmative defense identified in the statute."  (Id.)  That is surely an accurate statement of law, but it is also not Plaintiffs' argument.  Plaintiffs, and the Court, acknowledge that the government may constitutionally require a defendant to carry the burden of persuasion on certain issues.  In Patterson, for example, the Supreme Court held that the government may require a defendant to prove an affirmative defense of extreme emotional disturbance.  423 U.S. at 201.  There, the Supreme Court "decline[d] to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused."  Id. at 210.

Plaintiffs argue, and the Court agrees, that the proper test is to what extent "the defendant is required to prove the critical fact in dispute."  Mullaney v. Wilbur, 421 U.S. 684, 701 (1975).  Five years before Mullaney, to eradicate "any doubt about the constitutional nature of the reasonable-doubt standard," the Supreme Court taught, "we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  Patterson did not "disturb the balance struck in previous cases holding that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."  432

U.S. at 210.  In essence, <u>Patterson</u> distinguished between an (unconstitutional) affirmative defense that would "serve to negative any facts of the crime which the State is to prove in order to convict" and a "separate issue on which the defendant is required to carry the burden of persuasion."  <u>Id.</u> at 207.  The Supreme Court urges courts to be "concerned with substance rather than" the formalism of how a statute is codified.  <u>Mullaney</u>, 421 U.S. at 699.  It has "require[d] an analysis that looks to the 'operation and effect of the law as applied and enforced by the state,' . . . and to the interests of both the State and the defendant as affected by the allocation of the burden of proof."  <u>Id.</u> (quoting <u>St. Louis S.W.R. Co. v. Arkansas</u>, 235 U.S. 350, 362 (1914)).  The Supreme Court has poured cold water on arguments regarding "the difficulties of meeting . . . an exacting burden" for the government in "negating" certain contentions raised by the defense, for "[t]he same may be said of the requirement of proof beyond a reasonable doubt of many controverted facts in a criminal trial."  <u>Id.</u> at 701.  The Supreme Court has "discern[ed] no unique hardship on the prosecution that would justify requiring the defendant to carry the burden of proving a fact . . . critical to criminal culpability" because "the requirement of proving a negative" is not "unique in our system of criminal jurisprudence."  <u>Id.</u> at 702.  These rules are designed to minimize "the likelihood of an erroneous . . . conviction" and reduce the "margin of error" at trial.  <u>Id.</u> at 701 (citing <u>Speiser v. Randall</u>, 357 U.S. 513, 525-26 (1958)).

While the legislative branch may define the elements of an offense, and the Constitution requires the prosecution to prove beyond a reasonable doubt those elements, "[i[t is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime." <u>Patterson</u>, 432 U.S. at 210 (quoting <u>McFarland v. American Sugar Rfg. Co.</u>, 241 U.S. 79, 86 (1916)).  "[A] State must prove every ingredient of an offense beyond a reasonable doubt, and . . . may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense."  <u>Id.</u> at 215 (citing <u>Mullaney</u>, 421 U.S.)  Because California has not fully implemented SORNA, Mr. Doe #1, Mr. Doe #2 and Mr. #3 are not able to register, while Mr. Doe #4 is not able to prove all the required information under the Rule.  (<u>See</u> Doe # 1 Decl. ¶ 26; Doe #2 Decl. ¶ 21; Doe #3 Decl. ¶¶ 22-24; Doe #4 Decl. ¶ 14.)  The Court agrees with Plaintiffs that the practical effect of the Rule, in conjunction with 18 U.S.C. § 2250, has done exactly what is forbidden by the Constitution: "to declare an individual guilty or presumptively guilty of a crime."  <u>Patterson</u>, 432 U.S. at 210.  In the Rule, the Government disavows any obligation or burden "to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA" before prosecuting the individual for failure to do what it acknowledges is impossible.  86 F.R. at 69867.  Doing so subverts the procedural safeguards deeply rooted in our history and constitutional framework.

As Plaintiffs observe, it has "long been a feature of the common law that a person cannot be held criminally responsible for things over which he has no control."  (Motion at 19) (citing <u>United States v. Willing</u>, 4 U.S. 376 (D. Pa.), <u>aff'd sub nom.</u> <u>Willing v. U.S</u>, 4 U.S. 374 (C.C.D. Pa. 1804), <u>aff'd sub nom.</u> <u>United States v. Willings</u>, 8 U.S. 48 (1807) ("the law does not compel parties to impossibilities (*lex non cogit ad impossibilia*)"); <u>Dr. Bonham's Case</u>, 8 Co. Rep. 113b, 118a (1610) ("when an act of parliament is against common right and reason, or repugnant, or impossible to be performed, the common law will controul it, and adjudge such act to be void").

"In the criminal law, both a culpable *mens rea* and a criminal *actus reus* are generally required for an offense to occur." United States v. Apfelbaum, 445 U.S. 115, 131 (1980); see also Morissette v. United States, 342 U.S. 246, 251 (1952) (crime generally stems "only from concurrence of an evil-meaning mind with an evil-doing hand"). "[E]ven where the evidence is sufficient to show the necessary *mens rea*, the government still must always 'meet its burden of proving the *actus reus* of the offense.'" United States v. Zhen Zhou Wu, 711 F.3d 1, 18 (1st Cir. 2013) (quoting United States v. Whiteside, 285 F.3d 1345, 1353 (11th Cir. 2002)). Without exception, due process forbids criminalizing "entirely passive and innocent nonconduct with no *mens rea* or guilty mind." State v. Blake, 197 Wash. 2d 170, 182–83 (2021). "Accordingly, an accused cannot be held criminally liable in a case where the *actus reus* is absent because the accused did not act voluntarily, or where *mens rea* is absent because the accused did not possess the necessary state of mind when he committed the involuntary act." United States v. Torres, 74 M.J. 154, 156–57 (C.A.A.F. 2015) (discussing automatism defense).

It is difficult to conclude that the "critical fact in dispute," Mullaney, 421 U.S. at 701, in a prosecution under 18 U.S.C. § 2250(a) is something other than a defendant's failure to register "as required." When individuals like Plaintiffs either cannot register or cannot (fully) comply with registration requirements, the Government presumes they are guilty of the *actus reus* of the offense. Though the statute contains a *mens rea* element, it provides no defense for individuals who, like Plaintiffs, assert impossibility, not a lack of knowledge. The Government thus criminalizes their "entirely passive and innocent nonconduct," Blake, 197 Wash. 2d at 1982-83, imposing on Plaintiffs "a perpetual state of criminal liability for failing to do the impossible." (Motion at 20.) It is not enough that Plaintiffs might rely upon DOJ to exercise its prosecutorial discretion to decline to bring cases against them, for staking one's liberty on the hope that federal prosecutors will always do the right thing may not be a sound legal strategy, let alone a valid substitute for the firm guarantees supplied by the Constitution. It is also not enough that Plaintiffs might successfully carry their burden to persuade a jury of impossibility. Perhaps some could, and others could not. "There is always in litigation a margin of error, representing error in factfinding[.]" Speiser, 357 U.S. at 525. "The accused during a criminal prosecution has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt." In re Winship, 397 U.S. at 363–64. In inverting the "bedrock" principle of the burden of proof on a critical issue in any prosecution of Plaintiffs, the Government has eliminated the "prime instrument for reducing the risk of convictions resting on factual error." Id. at 363. The risk of erroneous deprivation of liberty stemming from that decision violates due process.

The question of what *would* satisfy due process is not before the Court, nor is it this Court's role to (re)write the law. But to speak clearly on the matter at hand it is useful to say this: whether a defendant registered "as required," and accordingly whether it was possible for him to do so, is an essential element of the offense codified at 18 U.S.C. § 2250. However it might be alternately written, the Government violates due process when it relieves itself of the burden of proving that essential element, i.e. that it was possible to register under state law, or

not impossible.  Because the Rule, in conjunction with 18 U.S.C. § 2250, fails to provide the minimum procedural safeguards required by the Constitution, it violates due process.  Plaintiffs demonstrate a likelihood of success on the merits of their due process claim.

### b. First Amendment

Plaintiffs argue that the provision of the Rule requiring registrants to provide law enforcement with their remote communication identifiers violates the First Amendment. (Motion at 12.)  The Rule defines a remote communication identifier as "[a]ll designations the sex offender uses for purposes of routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers."  86 F.R. at 69885.  The Rule requires a registrant to "report within three business days to his residence jurisdiction (by whatever means the jurisdiction allows) any change in remote communication identifiers information[.]"  Id. at 69886.  Congress has defined "internet identifiers" as "electronic mail addresses and other designations used for self-identification or routing in Internet communication or posting."  34 U.S.C. § 20916(e)(2).

Plaintiffs' core argument is that the provision is "nearly identical" to one the Ninth Circuit struck down in Doe v. Harris, 772 F.3d 563 (9th Cir. 2014).  The parties appear to agree on the background principles of law and applicable First Amendment test.  As the Supreme Court recognized in Packingham v. North Carolina, 137 S. Ct. 1730, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more."  Id. at 1735.  Today one of the "most important places . . . for the exchange of views . . . is cyberspace—the 'vast democratic forums of the Internet' in general, . . . and social media in particular."  Id. (quoting Reno v. American Civil Liberties Union, 521 U.S. 844, 868 (1997)).  "[A]s a general rule, the Government 'may not suppress lawful speech as the means to suppress unlawful speech.'"  Id. at 1738 (quoting Ashcroft v. Free Speech Coalition, 535 U.S. 234, 255 (2002)).

Sex offenders who are not "prisoners, parolees, or probationers" anymore "are no longer on the 'continuum' of state-imposed punishments."  Harris, 772 F.3d at 572.  "Sex offender registration 'is more properly characterized as a collateral consequence of conviction rather than as a restraint on liberty.'"  Id. (quoting Williamson v. Gregoire, 151 F.3d 1180, 1181 (9th Cir. 1998)).  "While registered sex offenders suffer from the effects of their crimes, they are no longer subject to formal punishment."  Id.  Accordingly, "registered sex offenders who have completed their terms of probation and parole enjoy the full protection of the First Amendment."  Id. (internal quotations omitted).  Because requirements like those imposed by the Rule "impose[] a substantial burden on sex offenders' ability to engage in legitimate online speech, and to do so anonymously . . . First Amendment scrutiny is warranted."  Id. at 574.  Such requirements are considered content neutral regulations that impose an incidental burden on speech, triggering intermediate scrutiny.  Id. at 575-76.

Content-neutral restrictions on protected speech satisfy immediate scrutiny as long as they are (1) narrowly tailored to (2) serve a significant government interest and (3) leave open

ample alternative channels for communication of the information.  Id. at 576-77.  "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests."  Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 662 (1994).  "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989) (quoting United States v. Albertini, 472 U.S. 675, 689 (1985).  "Narrow tailoring in this context requires, in other words, that the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'"  Turner, 512 U.S. at 662 (quoting Ward, 491 U.S. at 799).  "The government must also 'demonstrate that the recited harms are real . . . and that the regulation will in fact alleviate these harms in a direct and material way.'"  Harris, 772 F.3d at 577 (quoting Turner, 512 U.S. at 664).

     In Harris, the Ninth Circuit affirmed a preliminary injunction issued against the Californians Against Sexual Exploitation ("CASE") Act.  Id. at 567-78.  The court found "that the CASE Act unnecessarily chills protected speech in at least three ways: the Act does not make clear what sex offenders are required to report, there are insufficient safeguards preventing the public release of the information sex offenders do report, and the 24–hour reporting requirement is onerous and overbroad."  Id. at 578.  Plaintiffs argue that the Rule presents these same problems.  (Motion at 13.)  Defendants claim that the Rule "shares none of the features deemed problematic in Harris."  (Opposition at 13.)  The Court agrees with Defendants that the Rule does not appear to be as burdensome as the unconstitutional provisions of the CASE Act.  Still, Plaintiffs raise a substantial question as to whether the Rule violates the First Amendment.

     The first significant problem identified by the Ninth Circuit in Harris concerned ambiguities as to what the CASE Act required registered sex offenders to provide.  772 F.3d at 578.  The Harris court noted the district court's "valiant effort at applying narrowing constructions" of the statute but declined to adopt them.  Id.  The CASE Act required individuals to provide information including "a list of any and all Internet identifiers established or used by the person" and "list of any and all Internet service providers used by the person." Id. at 568 (internal brackets omitted).  The Ninth Circuit found the meanings of "internet identifier" and "internet service provider" [ISP] ambiguous.  Id. at 578.  The district court construed the CASE Act to require only reporting of internet identifiers used to engage in "'interactive communication,' not those used for shopping or reading content."  Id.  It also construed the CASE Act to require that a sex offender only report a new identifier once he actually used the identifier for a communicative purpose.  Id.  Finally, it construed the Act to require disclosure of only the ISPs with which registrants "have an open account, and not friends' or family members' accounts or publicly available WiFi that does not require an account."  (Id.)  The Ninth Circuit found that the Act was not "readily susceptible" to these limitations, in part because language in the Act was inconsistent.  Id. at 578-79.  Moreover, "whether narrowly construed or not, the ambiguities in the statute may lead registered sex offenders either to overreport their activity or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report."  Id. at 579.  Those ambiguities made it less likely that the statute was narrowly tailored and would inevitably lead citizens to

"steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." <u>Id.</u> (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 109 (1972) (internal quotations and ellipses omitted). Finally, the Ninth Circuit rejected the government's argument that, even if the Act were unclear, "registrants have the opportunity to ask questions when annually registering in person, and if a registrant makes an honest mistake, he or she will not be prosecuted because the law only penalizes knowing failure to register." <u>Id.</u> Notwithstanding these assurances, the <u>Harris</u> court declined to "assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights." <u>Id.</u> (quoting <u>NAACP v. Button</u>, 371 U.S. 415, 438 (1963)).

Here, the Rule appears somewhat clearer than the statute at issue in <u>Harris</u>, though some uncertainty remains as to its precise contours. Defendants argue the Rule does not contain the ambiguities at issue in <u>Harris</u> in that the Rule clearly applies only to identifiers used for internet "communications or postings" and does not require ISPs. (Opposition at 15.) The Court agrees that the Rule does appear more tailored to "interactive communication" than the provision at issue in <u>Harris</u>. However, the scope of "communications or postings" remains somewhat ambiguous, especially in conjunction with the broad language of "routing or self-identification." Take, for example, the question identified by the district court in <u>Harris</u> as to whether identifiers used for "shopping or reading content" were covered. 772 F.3d at 578. Does the Rule cover identifiers used for online chats with, say, customer service representatives of a merchant from which a covered individual has purchased, or is considering purchasing, a product? Such communications would presumably have no connection with any identifiable government interest, but are arguably covered by the Rule. Moreover, Defendants argue that the Rule "does not require ISPs" (Opposition at 15), but nowhere does the Rule say that exactly; what it clearly *does* require are identifiers regarding "routing." The Court cannot find any applicable definition of "routing" codified by statute or promulgated by the Attorney General. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) (quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001)). Accordingly, whatever the word "routing" means, the Court must construe it to mean *something*; it cannot simply require the same identifiers used for "self-identification" in "communications or postings," which clearly includes "email addresses and telephone numbers" and almost certainly includes social networking usernames. The Court also agrees with Plaintiffs that the statutory and regulatory background indicate a potentially broader scope than Defendants claim. The 2008 Guidelines at once sought to require offenders to comply with a similar (ambiguous) provision while also observing, "[i]n the context of Internet communications there may be no clear line between names or aliases that are required to be registered under SORNA § 114(a)(1) and addresses that are used for routing purposes." 73 F.R. at 38055. The 2008 Guidelines nonetheless provide "email and instant messaging addresses" as examples of designations used "for purposes of routing or self-identification in Internet communications." <u>Id.</u> The Rule adds new, broader language, defining remote communication identifiers as "*all* designations . . ." (emphasis added) and includes "telephonic communications or postings" within its reach. Plaintiffs are thus right that the Rule "strongly suggests that the scope is broader" (Reply at 8) than previous definitions, but is unclear as to how. Indeed, there

may be many more ambiguities, only some of which the Court can contemplate on its own.  Are identifiers regarding internet, console or mobile games included, many of which have some interactive function?  What about virtual reality or augmented reality platforms?  Messaging applications like WhatsApp or Signal?  Defendants' contention that "other courts have concluded that similar languages raises no chilling concerns" (Opposition at 15) actually serves to highlight some of the ambiguity at issue here.  The case Defendants cite for that proposition, Doe v. Shurtleff, 628 F.3d 1217 (10th Cir. 2010), concerned a Utah statute clearer, and seemingly narrower, than the Rule: it "defined 'online identifier' as 'any electronic mail, chat, instant messenger, social networking, or similar name used for Internet communication.'"  Id. at 1221 n.1.  Therefore, although perhaps a bit clearer than the statute at issue in Harris, the Court finds that "the ambiguities in the [Rule] may lead registered sex offenders either to overreport their activity or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report."  Harris, 772 F.3d at 579.

The second problem identified by the Ninth Circuit in Harris was that the CASE Act "chills anonymous speech because it too freely allows law enforcement to disclose sex offenders' Internet identifying information to the public."  Id. at 579-80.  The Act provided that the information supplied by registrants generally "shall not be open to inspection by the public" but "to allow members of the public to protect themselves and their children from sex offenders" it permitted law enforcement to "provide information to the public about a person required to register as a sex offender . . . by whatever means the entity deems appropriate, when necessary to ensure the public safety[.]"  Id. at 580.  The Ninth Circuit found that the language of "necessary to ensure the public safety" afforded law enforcement "unbridled discretion" and accordingly deterred sex offenders from engaging in anonymous online speech.  Id.

Plaintiffs initially argued that the Rule allows identifiers to be "disseminated to the public at will."  (Motion at 14.)  In acknowledgement of the other limitations on public disclosure cited by Defendants, the Reply appear to make a narrower argument, in that the limited ways in which identifiers may be disclosed still chills their speech.  (See Reply at 9-10.)  The Court agrees with Defendants that SORNA has prohibited the inclusion of internet identifiers on public websites since 2011.  34 U.S.C. § 20916(c); 76 F.R. at 1637.  In accordance with SORNA, and following the Harris litigation, California has prohibited public disclosure of internet identifiers.  See Cal. Penal Code § 290.45(b) ("Information that may be provided [to the public] . . . shall not include any Internet identifier[.]").  Plaintiffs are correct that the Rule "adopts prior guidelines that allow the 'sharing of the information with law enforcement and supervision agencies, and sharing of the information with registration authorities in other jurisdictions,' or 'disclos[ing] Internet identifier information to any one by means other than public Web site posting.'"  (Reply at 10) (citing 86 F.R. at 69859; 76 F.R. at 1637).  The Court accepts Plaintiffs' representation that these exceptions may have some chilling effect on their speech.  (See Reply at 10.)  However, the implications for anonymous speech appear less significant than the corresponding provision in Harris.

The third problem identified in Harris concerned the CASE Act's 24-hour update requirement, under which registrants need not register before they communicated online, but

must register within 24 hours of using a new identifier. 772 F.3d at 581. The <u>Harris</u> court observed that 24 hours was a "shorter time than is given by registration laws in other jurisdictions," citing to a Georgia statute with a 72-hour requirement. <u>Id.</u> The court found this burden "particularly onerous for sex offenders who live in remote areas or who, like other citizens, have multiple Internet identifiers." <u>Id.</u> It also found the "mail-in requirement . . . not only psychologically chilling, but physically inconvenient, since whenever a registered sex offender obtains a new ISP or Internet identifier, he must go somewhere else within 24 hours to mail that information to the State." <u>Id.</u> at 582.

The Court finds that the Rule is less burdensome than the problematic 24-hour update provision in <u>Harris</u> in multiple respects. The Rule's requirement that a registrant report an identifier within three business days is obviously less strict than the 24-hour requirement in <u>Harris.</u> That is not to say that it imposes <em>no</em> burden; the impact on the First Amendment analysis is one of degree, not of kind. The Rule also requires a registrant to report changes "by whatever means the jurisdiction allows." 86 F.R. at 69886. While the Court has no information regarding the "means" employed by other jurisdictions, Plaintiffs concede that California does not collect this information at this time. (Reply at 10.) Accordingly, while California may seek to (re)impose in the future a relatively onerous requirement such as the mail-only provision at issue in <u>Harris</u>, the Court cannot conclude here that the Rule has the same "psychologically chilling" and "physically inconvenient" effects of the mail-in requirement. <u>Harris</u>, 772 F.3d at 582. However, the Rule does share at least one meaningful similarity to the CASE Act with regard to the reporting and update requirement. The Ninth Circuit found the following in <u>Harris</u>:

> The 24–hour reporting requirement is not only onerous, it is also applied in an across-the-board fashion. The requirement applies to all registered sex offenders, regardless of their offense, their history of recidivism (or lack thereof), or any other relevant circumstance. And the requirement applies to all websites and all forms of communication, regardless of whether the website or form of communication is a likely or even a potential forum for engaging in illegal activity. (If for example a sex offender establishes a username on a news outlet's website for purposes of posting comments to news articles, it is hard to imagine how speedily reporting that identifier will serve the government's interests.) In short, we have a hard time finding even an attempt at narrow tailoring in this section of the Act. <u>See</u> [<u>White v. Baker</u>, 696 F. Supp. 2d 1289, 1309 (N.D. Ga. 2010)] ("A regulatory scheme designed to further the state's legitimate interest in protecting children from communication enticing them into illegal sexual activity should consider how and where on the internet such communication occurs.").

<u>Id.</u> at 582. The Rule, like the provision in <u>Harris</u>, "applies to all registered sex offenders, regardless of their offense, their history of recidivism (or lack thereof), or any other relevant

circumstance . . . [and] . . . applies to all websites and all forms of communication, regardless of whether the website or form of communication is a likely or even a potential forum for engaging in illegal activity." Id. The example provided by the Ninth Circuit of a username used for posting comments to news articles applies equally here, especially as Plaintiffs allege that they are chilled from "speak[ing] anonymously about issues of public concern, including sex offender registration requirements and the unfairness of the [Rule]." (Doe # 1 Decl. ¶ 22; Doe #2 Decl. ¶ 16; Doe #3 Decl. ¶ 18; Doe #4 Decl. ¶ 12.) The same might be said of a "vast democratic forum," Reno, 521 U.S. at 868, such as Reddit: a highly unlikely place for "enticing [children] into illegal sexual activity," Harris, 772 F.3d at 582, but a vital location "for the exchange of views" on matters of public interest. Packingham, 137 S. Ct. at 1735.

Because Harris found that the CASE Act was not narrowly tailored, it did not reach the issues of whether the statute "actually advances the government's legitimate interests" or whether there are "ample alternative channels available for registered sex offenders to speak." 772 F.3d at 582 n.8. It did, however, find that California's "interest in preventing and responding to crime, particularly crimes as serious as sexual exploitation and human trafficking, is legitimate." Id. at 577. Harris held that "California has a substantial interest in protecting vulnerable individuals, particularly children, from sex offenders, and the use of the Internet to facilitate that exploitation[.]" Id. (collecting cases holding similarly). Plaintiffs argue that Defendants cannot meet their burden because the Rule does not "articulate *any* governmental interest," merely referencing the 2008 Guidelines. (Reply at 9.) The Court is concerned that the Rule does not provide any clear explanation of why and how the identifier disclosure provision advances a governmental interest, at least on its own terms. One possible explanation is that the Rule claims that "[t]he conditions for disclosure of sex offender information by registration jurisdictions are beyond the scope of this rulemaking[.]" 86 F.R. at 69865. The Rule then refers to separate statutory provisions and the 2008 Guidelines and 2011 Supplemental Guidelines. Id. (citing 34 U.S.C. § 20916(c); 73 F.R. at 38059-60; 76 F.R. at 1633, 1637). In the context of a discussion of whether remote communication identifiers should be disclosed to the public, the 2008 Guidelines, for example, provide some explanation of the public safety objectives of requiring this reporting, enabling actors such as law enforcement, parents and social networking websites to "prevent sex offenders from using their services as avenues for Internet luring of children for purposes of sexual abuse." 73 F.R. at 38059. The Court therefore finds that Defendants can likely meet their burden of demonstrating a substantial government interest in preventing sex offenders from using the internet to exploit vulnerable individuals. Of course, as the Harris court noted, that does not solve the narrow tailoring concerns addressed above. If, for example, one of the Plaintiffs wanted to post an anonymous comment on an article on the *New York Times* website criticizing the Rule, this Court would find it unlikely that disclosure of his username would help the government protect children. That is especially so because, on the record before the Court, Plaintiffs have "never used the internet for any impermissible purpose [] and have decades-old convictions[.]" (Motion at 16.) On the other hand, such a requirement would likely have some chilling effect on speech. See Harris, 772 F.3d at 582.

On balance, the Court finds that Plaintiffs raise a substantial question as to whether the Rule imposes an impermissible burden under the First Amendment. Nonetheless, on the sparse

record before it, as the current procedural posture demands, the Court is unable to conclude that Plaintiffs demonstrate a likelihood of success on the merits. The primary authority on which Plaintiffs rely, <u>Harris</u>, is distinguishable in at least some meaningful respects. While the Rule appears to present narrow tailoring issues, it is difficult for the Court to meaningfully assess the extent of any burdens imposed on Plaintiffs and similarly situated individuals without a more detailed factual record. Accordingly, if Plaintiffs had challenged the Rule solely on First Amendment grounds, the Court would likely not find they had met their heavy burden to justify the extraordinary relief of a preliminary injunction. In light of the Court's ruling on their due process claim, however, the ongoing burdens on free speech Plaintiffs allege and the meaningful chance that they prevail on their First Amendment claim further tips in favor of granting the Motion.

### c. Legislative Delegation

Plaintiffs argue that the Rule is an unconstitutional delegation of legislative power. (Motion at 8.) According to Plaintiffs, the delegations pursuant to 34 U.S.C. §§ 20912 and 20914 are unconstitutional, allowing the Attorney General to "create a range of new crimes by unilaterally defining what acts constitute crimes under 18 U.S.C. § 2250." (<u>Id.</u> at 10.) The Court finds that Plaintiffs do not demonstrate a likelihood of success on the merits of their nondelegation claim.

34 U.S.C. § 20912 provides that "each jurisdiction shall maintain a jurisdiction-wide sex offender registry conforming to the requirements of this subchapter." <u>Id.</u> (a). It states that the "Attorney General shall issue guidelines and regulations to interpret and implement this subchapter." <u>Id.</u> (b). 34 U.S.C. § 20914 states that a sex offender "shall provide to the appropriate official for inclusion in the sex offender registry" a series of specific pieces of information, such as his name, social security number, residential address, etc. <u>Id.</u> (a)(1-6). It also requires "[i]nformation relating to intended travel of the sex offender outside the United States, including any anticipated dates and places of departure, arrival, or return, carrier and flight numbers for air travel, destination country and address or other contact information therein, means and purpose of travel, and any other itinerary or other travel-related information required by the Attorney General." <u>Id.</u> (a)(7). The statute finally requires an offender to supply "[a]ny other information required by the Attorney General." <u>Id.</u> (a)(8). Plaintiffs challenge the specific delegations codified at 34 U.S.C. §§ 20912(b), 20194(a)(7) and 20914(a)(8). (<u>See</u> Motion at 10-11.)

Predictably, the parties debate the import of <u>Gundy</u>, 139 S. Ct. 2116, in which the Supreme Court, in a fractured opinion, upheld a different provision of SORNA against a nondelegation challenge. In <u>Gundy</u>, the Supreme Court addressed 34 U.S.C. § 20913(d), which provides, "The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with [initial registration requirements.]" <u>Id.</u> at 2121. The plurality opinion written by Justice Kagan

construed that provision as requiring the Attorney General to "apply SORNA's registration requirements as soon as feasible to offenders convicted before the statute's enactment" and found that the "delegation easily passes constitutional muster." Id. In doing so, the plurality found that Reynolds v. United States, 565 U.S. 432 (2012) "effectively resolved the case before [it]" because it held that SORNA's registration requirements applied to pre-Act offenders only once the Attorney General said they did, rather than of their own force. Id. at 2124. Thus construed, the plurality went on to find that, under its precedents, Congress's instruction to apply SORNA's registration requirements to pre-Act offenders as soon as feasible did not constitute an impermissible delegation. Id. at 2129.

Justice Alito supplied the fifth vote, concurring only in the judgment. See id. at 2130 (Alito, J., concurring in the judgment). Justice Alito wrote, "[i]f a majority of this Court were willing to reconsider the approach we have taken for the past 84 years, I would support that effort. But because a majority is not willing to do that, it would be freakish to single out the provision at issue here for special treatment." Id. at 2131. Accordingly, he voted to affirm, given that, "since 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards." Id. at 2130-31.

Justice Gorsuch, writing for himself, the Chief Justice and Justice Thomas, dissented. Id. at 2131 (Gorsuch, J., dissenting, joined by Roberts, C.J., and Thomas, J.) The dissent criticized the approach the Court had taken on such matters for decades, finding such an "understanding of the Constitution at war with its text and history[.]" Id. Justice Gorsuch then explained his disagreements with the plurality's analysis of the question presented. See id. at 2143-48. The dissent summarized its concerns as follows:

> The Constitution promises that only the people's elected representatives may adopt new federal laws restricting liberty. Yet the statute before us scrambles that design. It purports to endow the nation's chief prosecutor with the power to write his own criminal code governing the lives of a half-million citizens. Yes, those affected are some of the least popular among us. But if a single executive branch official can write laws restricting the liberty of this group of persons, what does that mean for the next?

Id. at 2131. Justice Gorsuch concluded with his hope that the Court "may yet recognize that, while Congress can enlist considerable assistance from the executive branch in filling up details and finding facts, it may never hand off to the nation's chief prosecutor the power to write his own criminal code." Id. at 2148.

Relying in large part on Gundy, Plaintiffs question the continued validity of the intelligible principle test, which the Supreme Court has repeatedly set forth as the governing standard in nondelegation inquiries. Plaintiffs argue that the test "lacks clear contours and five of the current members of the Court have expressed interest in reconsidering that standard." (Motion at 9.)

Elsewhere, Plaintiffs argue that the Supreme Court "has also questioned whether 'something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions." (Id.) (quoting <u>Touby v. United States</u>, 500 U.S. 160, 165–66 (1991)).  Defendants argue that the "intelligible principle" test remains the standard by which this Court is bound.  (Opposition at 9.)

      The Court agrees with Defendants that it is bound to apply the "intelligible principle" test unless and until the Supreme Court teaches otherwise.  Recent guidance from the Ninth Circuit suggests as much.  <u>See</u> <u>United States v. Motamedi</u>, 2022 WL 101951, at *1 n.1 (9th Cir. Jan. 11, 2022), <u>cert. denied</u>, 143 S. Ct. 116 (2022) (unpublished) ("Defendants argue that we should dispense with the traditional 'intelligible principle test' for determining whether a statute violates the non-delegation doctrine, and adopt the stricter test proposed by Justice Gorsuch in his dissent in [<u>Gundy</u>.] . . . We are bound to follow a controlling Supreme Court precedent until it is explicitly overruled by that Court . . . and the intelligible principle test remains the standard for determining whether the delegation of legislative power is constitutional.") (internal quotations and citation omitted).  It is certainly possible, perhaps even likely, that the Supreme Court will revisit its nondelegation precedents soon, supplying a stricter test that would guide the analysis here.  After all, the current Court has demonstrated a willingness to overrule foundational decisions and responsiveness to challenges to administrative authority.  <u>See, e.g.</u>, <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct. 2228, 2319-20 (2022) (Breyer, J., Sotomayor, J., and Kagan, J., dissenting) (criticizing the majority's "cavalier approach" to *stare decisis* and arguing that "the Court reverses course today for one reason and one reason only: because the composition of this Court has changed"); Mark A. Lemley, *The Imperial Supreme Court*, 136 Harv. L. Rev. F. 97, 97-99 (2022) (arguing that, "[a]rmed with a new, nearly bulletproof majority, conservative Justices on the Court have embarked on a radical restructuring of American law across a range of fields and disciplines" and observing that "[c]onservatives have long sought to rein in the power of the administrative state"); Jeffrey L. Fisher, *The Other Way the Supreme Court is Nullifying Precedent*, POLITICO (Sep. 16, 2022), https://www.politico.com/news/magazine/2022/09/16/supreme-court-cases-precedent-00056689 ("The Supreme Court's recent overruling of <u>Roe v. Wade</u> and other foundational decisions makes clear that key precedents are no longer safe.").  But it is this Court's duty to say what the law is *today*, not to speculate as to how the Supreme Court may rewrite the law tomorrow.  When the Supreme Court breathes new life into the nondelegation doctrine by overruling or limiting its earlier decisions, this Court will be bound by that new precedent as well.  But until then, like the Ninth Circuit, "even if recent Supreme Court jurisprudence has perhaps called into question the continuing viability of its precedent," this Court is "bound to follow a controlling Supreme Court precedent until is it explicitly overruled by that Court."  <u>Nunez-Reyes v. Holder</u>, 646 F.3d 684, 692 (9th Cir. 2011) (internal quotations and citation omitted).

      Any nondelegation inquiry must acknowledge the following reality: while the doctrine never died, and <u>Gundy</u> shows it may yet have a pulse, it has been in something like a coma for over 80 years.  "Only twice in this country's history (and that in a single year)," 1935, has the Supreme Court "found a delegation excessive."  <u>Gundy</u>, 139 S. Ct. at 2129.  In each case, that was "because 'Congress had failed to articulate *any* policy or standard' to confine discretion."

Id. (quoting Mistretta v. United States, 488 U.S. 361, 373 n.7 (1989)); see also A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935); Panama Refining Co. v. Ryan, 293 U.S. 388 (1935).  Put another way, "[i]n the history of the [Supreme] Court we have found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'"  Whitman v. Am. Trucking Associations, 531 U.S. 457, 474 (2001).  Since 1935, "over and over" again the Supreme Court has upheld "even very broad delegations." Gundy, 139 S. Ct. at 2129.  For example, the Supreme Court has "approved delegations to various agencies to regulate in the 'public interest'"; "sustained authorizations for agencies to set 'fair and equitable' prices and 'just and reasonable' rates"; and "more recently affirmed a delegation to an agency to issue whatever air quality standards are 'requisite to protect the public health.'"  Id. (citations omitted).

For better or for worse, the Supreme Court's guidance to the lower courts has been clear: by "uniformly reject[ing] nondelegation arguments and . . . up[holding] provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards," it has been all but impossible for nondelegation challenges like Plaintiffs' to succeed.  Gundy, 139 S. Ct. at 2130 (Alito, J., concurring in the judgment).  Plaintiffs' best argument is that the statutes they challenge do not contain any express textual limitations on the Attorney General's discretion.  (See Motion at 11.)  That argument may one day carry the day, for members of the current Supreme Court have expressed an unwillingness to consider other sources of authority, such as legislative history, to find Congressional guidance unstated in the text.  See id. at 2146-48 (Gorsuch, J., dissenting) (noting that "broad and sweeping statements" from a statute's statement of purpose are "inadequate to overcome the words of its text regarding the specific issue under consideration," "legislative history is not the law," and that committee reports or statements of individual legislators cannot be used "to muddy clear statutory language").  But for now, the Supreme Court has endorsed in the nondelegation context an approach to statutory interpretation of a "'holistic endeavor' which determines meaning by looking not to isolated words, but to text in context, along with purpose and history."  Id. at 2126 (citations omitted). Accordingly, the Court looks to "context and structure" and "history and purpose" to "define the scope of delegated authority."  Id.  The Ninth Circuit has followed this approach, one in which "context matters" and courts look to "all the tools of statutory construction."  In re Nat'l Sec. Agency Telecommunications Recs. Litig., 671 F.3d 881, 897 (9th Cir. 2011) (citations omitted).

Applying these tools, the Court finds that there is an "intelligible principle" guiding the Attorney General's discretion.  The Gundy plurality's analysis largely decides the question before the Court.  To "begin at the beginning," Congress provided in SORNA's declaration of purpose that it was "establishing a comprehensive national system" for the registration of "sex offenders and offenders against children" in order "to protect the public."  Gundy, 139 S. Ct. at 2126 (citing 34 U.S.C. § 20901).  Other provisions of SORNA, as well as its legislative history, underscore this broad principle of protecting the public from sex offenders.  See id. at 2127-28 (highlighting, among other sources of authority, a House Report describing a "strong public

interest . . . in having [. . . offenders] register with current information to mitigate the risks of additional crimes against children."). Does Congressional guidance to the Attorney General "to protect the public from sex offenders and offenders against children," 34 U.S.C. § 20901, provide much direction at all? No. But is it *something*? The answer is yes. It is thus the kind of "broad general directive[]," Mistretta, 488 U.S. at 372, that the Supreme Court has routinely blessed, no broader than regulating in the "public interest" or doing what is "fair and equitable" or "just and reasonable." Gundy, 139 S. Ct. at 2129.

That intelligible principle guides the Attorney General's broad discretion under 34 U.S.C. § 20912 to "issue guidelines and regulations" to interpret and implement SORNA. Because binding precedent requires upholding even that delegation, the narrower delegations codified at 34 U.S.C. § 20914 easily survive. For some curious reason, Plaintiffs appear to challenge Section 20914(a)(7), which, following a list of travel-related requirements such as "anticipated dates and places of departure," affords the Attorney General the discretion to require "any other itinerary or other travel-related information required by the Attorney General." If that "delegation is unconstitutional, then most of Government is unconstitutional—dependent as Congress is on the need to give discretion to executive officials to implement its programs." Gundy, 139 S. Ct. at 2130. For such "narrow, interstitial delegations of authority, Congress need not provide any direction to the Executive because a certain degree of discretion, and thus of lawmaking, inheres in most executive or judicial action[.]" United States v. Melgar-Diaz, 2 F.4th 1263, 1267 (9th Cir. 2021), cert. denied, 142 S. Ct. 813 (2022) (internal quotations and citation omitted). And while its neighboring provision at (a)8) appears on its face to be unbounded (requiring "[a]ny other information required by the Attorney General"), the Court agrees with Defendants that, properly read in context, it only "confers authority on the Attorney General to make registration effective and protect public safety by requiring information relating to offenders' identities, locations, and primary activities." (Opposition at 10.) That is because (a)(8) follows seven explicit requirements, some written at a far lower level of generality than would be required by the Constitution, even under a far stricter test than the "intelligible principle" standard, e.g. a requirement that a registrant provide his "license plate number." 34 U.S.C. § 20914(a)(6). "[U]nder the established interpretative canons of *noscitur a sociis* and *ejusdem generis*, where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar to those enumerated by the specific words." Washington State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler, 537 U.S. 371, 384 (2003) (internal quotations and citations omitted). Plaintiffs dismiss Defendants' argument as simply affording the Attorney General the discretion to decide "who must register and then what they must do, . . . but that's the same as saying they merely delegate the power to decide all the requirements of the statute." (Reply at 5.) That is surely overstated. Even the Gundy dissenters noted the specificity of SORNA's provisions "explain[ing] when and how offenders must update their registrations" in service of an argument contrasting the provision at issue in that case, in which they believed "Congress simply passed the problem to the Attorney General." Id. at 2131 (Gorsuch, J., dissenting).

None of this is to say that Plaintiffs have not identified significant, even disturbing, public policy issues, one with "profound consequences for the people they affect." Id. at 2133 (Gorsuch, J., dissenting). It should make no difference to the constitutional analysis that Congress has targeted "one of the most disfavored groups in our society" within the sweeping ambit of SORNA, for the rule that constrains Congress here "is the same rule that protects everyone else." Id. "Nor is it hard to imagine how the power at issue in this case . . . could be abused in other settings," id.: the Attorney General has aggressively interpreted his own authority to "issue guidelines and regulations" to further expand the requirements imposed on individuals by a statute, while the line prosecutors who answer to him pursue the discipline and punishment of regulated individuals who fall outside the letter of the law with remarkable zeal. Indeed, "[t]o allow the nation's chief law enforcement officer to write the criminal laws he is charged with enforcing—to unite the legislative and executive powers . . . in the same person— would be to mark the end of any meaningful enforcement of our separation of powers and invite the tyranny of the majority that follows when lawmaking and law enforcement responsibilities are united in the same hands." Id. at 2144-45 (internal brackets, quotations and citation omitted). Plaintiffs argue that "'it would be a very dangerous principle' to allow an agency to issue regulations that, themselves, carried criminal penalties under the general rubric of being 'a needful regulation' to enforce a statute." (Motion at 10) (quoting United States v. Eaton, 144 U.S. 677, 688 (1892)). But dangerous or not, the Supreme Court has permitted this very practice in modern times, finding that Eaton "turned on its special facts" and emphasizing that it did not "state a fixed principle that a regulation can never be a 'law' for purposes of criminal prosecutions." Singer v. United States, 323 U.S. 338, 345 (1945). The modern rule is that courts will uphold "delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal, so long as Congress makes the violation of regulations a criminal offense and fixes the punishment, and the regulations 'confin[e] themselves within the field covered by the statute.'" Loving v. United States, 517 U.S. 748, 768 (1996) (citation omitted). Accordingly, "Congress has passed thousands of federal criminal statutes and has allowed federal agencies . . . to make thousands upon thousands more rules that carry criminal penalties," with criminal rules "cover[ing] everything from how runny ketchup can be to . . . just how friendly you can get with a pirate." MIKE CHASE, HOW TO BECOME A FEDERAL CRIMINAL: AN ILLUSTRATED HANDBOOK FOR THE ASPIRING OFFENDER 2 (2019). Remarkably, no one, not even the Government, knows how many federal crimes there are; the federal government has stopped even trying. See id.; Gary Fields and John R. Emshwiller, *Many Failed Efforts to Count Nation's Federal Criminal Laws*, THE WALL STREET JOURNAL (July 23, 2011), https://www.wsj.com/articles/SB10001424052702304319804576389601079728920. This Court is sympathetic to arguments challenging such a state of affairs, which has eroded some of "the most vital procedural protections of individual liberty found in our Constitution." Gundy, 139 S. Ct. at 2145 (Gorsuch, J., dissenting). But the Court is also bound to follow controlling precedent, and until the Supreme Court provides a new directive, Plaintiffs are unlikely to succeed on the merits of their nondelegation claim.

//
//
//

### d. Conflict with Statutory Text

Plaintiffs finally argue that the Rule contradicts statutory text, in violation of the APA.  5 U.S.C. § 706.  According to Plaintiffs, because the Rule appears to define the term "conviction" "to include the expunged convictions" of Mr. Doe #1, Mr. Doe #2 and other ACSOL members, the Attorney General's interpretation conflicts with the statutory language. (Motion at 21.)  Put another way, Plaintiffs claim that the Rule "improperly defines a 'conviction' to encompass criminal convictions that no longer exist." (Id. at 22.)  While the equities may favor Plaintiffs, and the Court might have been inclined to rule in their favor if this were a matter of first impression, the weight of statutory and precedential authority cuts against the interpretation Plaintiffs seek.  Accordingly, the Court cannot conclude that Plaintiffs are likely to succeed on the claim.

SORNA defines a "sex offender" as "an individual who was convicted of a sex offense." 34 U.S.C. § 20911(1).  As relevant here, "'sex offense' means[] a criminal offense that has an element involving a sexual act or sexual contact with another[.]"  Id. § 20911(5)(A)(i).  SORNA simply notes that "the term 'convicted' or a variant thereof, used with respect to a sex offense, includes adjudicated delinquent as a juvenile for that offense" in certain circumstances. Id. § 20911(8).  The Rule establishes 28 C.F.R. § 72.2, entitled "Definitions," which states that "[a]ll terms used in this part have the same meaning as in SORNA."  86 F.R. at 69884.  In response to a comment proposing that a "sex offender be removed from the sex offender registry if he receives a pardon," the Rule states that "only pardons on the ground of innocence terminate registration obligations under SORNA, see 73 FR at 38050, and the Attorney General has no authority to require registration jurisdictions to expunge the records of sex offenders who are pardoned in those jurisdictions." 86 F.R. at 69886.  In that statement, the Rule cites to the 2008 Guidelines, which stated the following:

> Because the SORNA registration requirements are predicated on convictions, registration (or continued registration) is **normally not required under the SORNA standards if the predicate conviction is reversed, vacated, or set aside, or if the person is pardoned for the offense on the ground of innocence.**  This does not mean, however, that nominal changes or terminological variations that do not relieve a conviction of substantive effect negate the SORNA requirements.  For example, the need to require registration would not be avoided by a jurisdiction's having a procedure under which the convictions of sex offenders in certain categories (e.g., young adult sex offenders who satisfy certain criteria) are referred to as something other than "convictions," or under which the convictions of such sex offenders may nominally be "vacated" or "set aside," but the sex offender is nevertheless required to serve what amounts to a criminal sentence for the offense.  Rather, an adult sex offender is "convicted" for SORNA purposes if the sex offender **remains subject to penal**

> **consequences based on the conviction, however it may be styled.**  Likewise, the sealing of a criminal record or other action that limits the publicity or availability of a conviction, but does not deprive it of continuing legal validity, does not change its status as a "conviction" for purposes of SORNA.

73 F.R. at 38030 (emphasis added).

Plaintiffs argue that grants of relief under Cal. Penal Code § 1203.4 "withdraw" and "set aside" guilty pleas, which means that they no longer constitute a "conviction" within the meaning of SORNA.  (Motion at 22.)  While the argument finds some support in certain clauses of text of the statute, at least from a literal reading of it, the statute, read together with other provisions of the statutory scheme, is far more limited than Plaintiffs allow.  It states:

> In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation, or in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under this section, the defendant shall, at any time after the termination of the period of probation, if they are not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw their plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if they have been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in either case, the court shall thereupon dismiss the accusations or information against the defendant and **except as noted below**, the defendant shall thereafter be released from all penalties and disabilities resulting from the offense of which they have been convicted, **except as provided in Section 13555 of the Vehicle Code. . . . However, in any subsequent prosecution of the defendant for any other offense, the prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed.**  The order shall state, and the probationer shall be informed, that the order **does not relieve them of the obligation to disclose the conviction in response to any direct question contained in any questionnaire or application for public office, for licensure by any state or local agency, or for contracting with the California State Lottery Commission.**

Cal. Penal Code § 1203.4(a)(1) (emphasis added).  The exceptions "noted below" state that the relief "does not permit a person to own, possess, or have custody or control of any firearm," to

hold public office if the underlying conviction prevents the individual from doing so, or that the individual granted relief would be released from the terms and conditions of an unexpired criminal protective order.  Id. § 1203.4(a)(2-4).  Individuals who were sentenced to state prison are not eligible for Section 1203.4 relief (unless their offense is one for which an individual could be sentenced to a county jail sentence); the law also does not apply to individuals who committed certain serious felony sex offenses, such as Cal. Penal Code § 286(c) (sodomy with a minor), Cal. Penal Code § 288 (lewd and lascivious acts with a minor) and Cal. Penal Code § 287(c) (oral copulation with a minor).  See id. § 1203.4(b).

Defendants argue that, "[i]n general, the meaning of 'was convicted' is clear: someone 'was convicted' of a sex offense if they have a prior conviction for a sex offense."  (Opposition at 20.)  Defendants note that Plaintiffs themselves refer to their "convictions" for sex offenses. (Id.) (citing FAC ¶¶ 6, 13, 25).  This is a sensible, but not inevitable, interpretation of the text. The Gundy plurality noted "Congress's use of the past tense" in defining a "sex offender," 139 S. Ct. at 2127, and it cannot be assumed that Congress might have used the present perfect tense ("has been convicted of a sex offense") interchangeably.  But the Gundy plurality also provided an explanation for Congress's choice of verb tense.  It found that "Congress's use of the past tense to define the term 'sex offender' shows that SORNA was not merely forward-looking.  The word 'is' would have taken care of all future offenders.  The word 'was' served to bring in the hundreds of thousands of persons previously found guilty of a sex offense, and thought to pose a current threat to the public."  Id.  The temporal dimensions of SORNA may thus explain the use of "was convicted" instead of language Congress has used in analogous criminal provisions.  For example, 18 U.S.C. § 922(g) makes it unlawful for an individual to ship, transport, possess or receive (in interstate or foreign commerce) a firearm or ammunition when that individual "has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" or "has been convicted in any court of a misdemeanor crime of domestic violence[.]"  The definitions section of that chapter demonstrates that "Congress has included exemptions for predicate convictions that were expunged or set aside, but Congress provided no such carve-out in SORNA."  Hardeman, 598 F. Supp 2d at 1048.  That section provides,

> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held.  Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(20).  The Court does not "place undue weight on the 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation[.]"  Huisha-Huisha v. Mayorkas, 27 F.4th 718, 728 (D.C. Cir. 2022).  Because the Court is not comparing sections within the same statute, the familiar canon of construction that "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another," Dep't of Homeland Sec. v.

MacLean, 574 U.S. 383, 391 (2015), does not directly apply.  Nonetheless, that it would have been fairly easy for Congress to carve out from SORNA convictions that have been "expunged, or set aside or for which a person has been pardoned or has had civil rights restored," 18 U.S.C. § 921(a)(20), and that Congress evidently knows how to write such provisions, counsels against reading into the Act the language Plaintiffs seek to.

Plaintiffs rely on cases involving the withdrawal or vacatur of guilty pleas in support of their argument that a conviction expunged under Section 1203.4 does not count as a "conviction" under SORNA.  (See Motion at 21.)  The legal principles set forth in the cases Plaintiffs cite are correct; the problem for Plaintiffs is that they do not compel the result they seek.  The following is widely accepted, black letter law: A court has the authority to vacate a guilty plea on certain grounds, which need not "involve any question of guilt or innocence." Kercheval v. United States, 274 U.S. 220, 224 (1927).  The effect of an order permitting withdrawal of the plea is "to adjudge that the plea of guilty be held for naught."  Id.  In modern parlance, a "plea no longer ha[s] the effect of a conviction after [a court] . . . ha[s] permitted its withdrawal."  Standen v. Whitley, 994 F.2d 1417, 1422 (9th Cir. 1993).  Construing a statutory provision directed at any person who "has been convicted by a court of the United States or of a State . . . of a felony," the Supreme Court found its plain meaning to be "that the fact of a felony conviction imposes a firearm disability until the conviction is vacated or the felon is relieved of his disability by some affirmative action, such as a qualifying pardon[.]"  Lewis v. United States, 445 U.S. 55, 60–61 (1980).

But it does not follow from these principles that Cal. Penal Code § 1203.4 relief means that the "convictions no longer exist," as Plaintiffs claim.  (Motion at 22.)  Plaintiffs concede, as they must, that Section 1203.4 does not prevent the prior conviction from being used as an enhancement or predicate "in any subsequent prosecution,"  Cal. Penal Code § 1203.4(a)(1).  (See Motion at 22.)  Absent additional relief, offenders must still register as sex offenders under California law.  Cal. Penal Code § 290.007.  As noted above, the statute does not restore rights to drive a vehicle, possess a firearm, or hold public office, if the underlying conviction deprived the individual of such rights.  Cal. Penal Code § 1203.4(a)(1-3).   It does not affect the suspension of a medical license, Meyer v. Bd. of Med. Examiners, 34 Cal. 2d 62, 66-67 (1949); or a license to practice law, In re Phillips, 17 Cal. 2d 55, 60-61 (1941); or a liquor license, Copeland v. Dep't of Alcoholic Beverage Control, 241 Cal. App. 2d 186, 188-89 (1966).  It does not affect qualifications for employment as a peace officer or the regulation of participants in "parimutuel wagering." People v. Hamdon, 225 Cal. App. 4th 1065, 1071 (2014).  The conviction may still be considered for moral character determinations in adjudicating naturalization petitions.  In re Paoli, 49 F. Supp. 128, 130-31 (N.D. Cal. 1943).  A conviction "set aside" under Section 1203.4 still qualifies as relevant criminal history under the Federal Sentencing Guidelines.  United States v. Hayden, 255 F.3d 768, 772 (9th Cir. 2001); United States v. Stoterau, 524 F.3d 988, 1001 (9th Cir. 2008). Expungement under Section 1203.4 does not change a conviction's status as an aggravated felony rendering someone deportable, subject to a narrow exception not at issue here.  Lopez v. Sessions, 901 F.3d 1071, 1075 (9th Cir. 2018).

Plaintiffs' argument is further undermined by a body of California case law construing Penal Code § 1203.4. The California Supreme Court characterized the statute as follows in 1949:

> As the release of the "penalties and disabilities" clause of the probation statute has been so qualified in its application, it does not appear that it was thereby intended to obliterate the record of conviction against a defendant and purge him of the guilt inherent therein . . . or to "wipe out absolutely" and for all purposes the dismissed proceeding as a relevant consideration and "to place the defendant in the position which he would have occupied in all respects as a citizen if no accusation or information had ever been presented against him." . . . From this standpoint, appellant's theory that the import of the probation statute and the dismissal proceeding is to expunge the record of the crime . . . cannot prevail.

Meyer, 34 Cal. 2d 62, 67 (1949). "[Penal Code] section 1203.4 does not, properly speaking, 'expunge' the prior conviction. The statute does not purport to render the conviction a legal nullity. . . . The limitations on this relief are numerous and substantial[.]" People v. Vasquez, 25 Cal. 4th 1225, 1230 (2001) (citations omitted). "[W]hile section 1203.4 may operate to free the convicted defendant from penalties and disabilities 'of a criminal or like nature,' it does not 'obliterate the fact that the defendant has been 'finally adjudged guilty of a crime'' for purposes of protecting public welfare." People v. Gross, 238 Cal. App. 4th 1313, 1320 (2015). Section 1203.4 relief "does not apply to provisions designed to protect the public." Danser v. Pub. Employees' Ret. Sys., 240 Cal. App. 4th 885, 895 (2015).

True enough, Section 1203.4 relief allows a defendant to "truthfully represent to friends, acquaintances and private sector employers that he has no conviction." People v. Arata, 151 Cal. App. 4th 778, 788 (2007). The statute "is intended to reward an individual who successfully completes probation by mitigating some of the consequences of his conviction and, with a few exceptions, to restore him to his former status in society to the extent the Legislature has the power to do so[.]" People v. E.B., 51 Cal. App. 5th 47, 54 (2020), review denied (Sept. 16, 2020) (citation omitted). The statute facilitates an individual's rehabilitation and reintegration into society by helping him obtain employment from private employers and restore his public reputation. But it does not prevent the *government*, state or federal, from continuing to treat his conviction as such in certain important respects.

As far as Plaintiffs' argument that Section 1203.4 relief is "equivalent to the vacation of a conviction," People v. E.B., 51 Cal. App. 5th at 58, the courts that addressed the claim most directly have rejected it. The E.B. court held that "nothing about section 1203.4 is ambiguous. To the contrary, the plain language of the statute, as well as numerous cases construing that statute, make clear that the nature of the relief available under section 1203.4 does not vacate or void a conviction." Id. "It does not, in other words, act to nullify, annul, cancel, or make void a conviction." Id. at 57. As noted above, Hardeman essentially rejected an almost identical formulation to the one Plaintiffs advance here, denying a motion to dismiss an indictment based

on the argument that a defendant's conviction later dismissed under Section 1203.4 did not qualify him as a "sex offender" under SORNA.  598 F. Supp. 2d at 1047-48.

While the Court cannot adopt Plaintiffs' reasoning, it does find at least one aspect of the Attorney General's interpretation of SORNA puzzling.  The Court cannot discern how the Attorney General decided that  "only pardons on the ground of innocence terminate registration obligations under SORNA," 73 F.R. at 69886, as opposed to simply "pardons," or at least "full" or "unqualified" pardons.  Neither SORNA, the Rule, the 2008 Guidelines, the 2011 Supplemental Guidelines, nor any authority cited by the parties, explain this distinction.  This is problematic, because it has long been the law that,

> A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and **when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence.**  If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.  **There is only this limitation to its operation:** it does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment.

Ex parte Garland, 71 U.S. 333, 380–81 (1866) (emphasis added).  However, that issue is not before the Court.  California issued both Mr. Doe #1 and Mr. Doe #2 a "Certificate of Rehabilitation" pursuant to Cal. Penal Code § 4852.01, which relieved them of any obligation to register as sex offenders under state law.  (Doe #1 Decl. ¶ 14; Doe #2 Decl. ¶ 9; see Cal. Penal Code § 290.007.)  Plaintiffs acknowledge that a Certificate of Rehabilitation is considered a "judicial recommendation for a pardon" under California law, not a pardon itself or its equivalent.  People v. Ansell, 25 Cal. 4th 868, 891 (2001).  (See Motion at 5.)  Since none of the named Plaintiffs appear to have been pardoned, and Plaintiffs do not allege that any ACSOL member has been pardoned, the issue of  whether the Attorney's General interpretation of a pardon limited to grounds of "innocence" conflicts with the statutory text is not a live controversy before the Court.

Because the Court cannot conclude that the Attorney General erred in his interpretation that, under Section 1203.4, "convictions of such sex offenders may nominally be 'vacated' or 'set aside,' but the sex offender is nevertheless required to serve what amounts to a criminal sentence for the offense," 73 F.R. at 38050, it does not find that Plaintiffs are likely to succeed on the merits of their statutory claim.

//
//

**CIVIL MINUTES—GENERAL**

### 2. Irreparable Harm

A plaintiff must demonstrate he is likely to suffer irreparable harm in the absence of a preliminary injunction.  See Winter, 555 U.S. at 20.  The Ninth Circuit cautions that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."  Caribbean Marine Servs. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  A plaintiff seeking injunctive relief must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate" for the injury.  Herb Reed Enters., LLC v. Fla. Entm't Mgmt., 736 F.3d 1239, 1249 (9th Cir. 2013).  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  "[W]here parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable."  E. Bay Sanctuary Covenant v. Biden, 993 F.3d 640, 677 (9th Cir. 2021).  "Intangible injuries may also qualify as irreparable harm, because such injuries 'generally lack an adequate legal remedy.'"  Id. (citation omitted).  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  Warsoldier v. Woodford, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod, 427 U.S. at 373; accord Harris, 772 F.3d at 583; Associated Press v. Otter, 682 F.3d 821, 826 (9th Cir. 2012).  "A 'colorable First Amendment claim' is 'irreparable injury sufficient to merit the grant of relief[.]"  Harris, 772 F.3d at 583 (quoting Warsoldier, 418 F.3d at 1001).

The Court finds that Plaintiffs are likely to suffer irreparable harm absent an injunction.  As noted above, Plaintiffs are presumed guilty of an offense that could send them to prison for a decade, while they demonstrate a likelihood of success that the Rule, in conjunction with 18 U.S.C. § 2250, violates their due process rights.  They raise a "colorable First Amendment claim," Harris, 772 F.3d at 583, and allege with specificity the ways in which the Rule chills their speech.  "Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial.  There is a potential for extraordinary harm and a serious chill upon protected speech."  Id. (quoting Ashcroft v. Am. Civil Liberties Union, 542 U.S. 656, 664–65 (2004)).  Plaintiffs "could, at any moment, be arrested and criminally charged" (Motion at 24), which constitutes a serious intangible harm.  The Court also finds that Plaintiffs are likely to suffer economic losses, not least from being forced to "retain counsel so that they can prove that it is impossible for them to register."  (Motion at 24.)

Lest the legal analysis here obfuscate why the Court finds the injuries Plaintiffs allege "irreparable," it is worth stepping back to frame the issues in human terms.  Take, for example, Mr. Doe #2.  He was convicted of a sex offense 17 years ago.  (Doe #2 Decl. ¶ 3.)  Far from minimizing the harms flowing from his offense, he acknowledges the "devasting, life-altering toll" of his behavior on his victim.  (Id. ¶ 5.)  Since 2005, he has not been convicted of another crime.  (Id. ¶ 4.)  Not content simply to rehabilitate himself, which he did in part through more than 600 hours of individual psychotherapy and a leadership role with Sex Addicts Anonymous

(id. ¶ 5), he has devoted his life to preventing future instances of sexual abuse.  (Id. ¶ 7.)
Provisionally licensed as a social worker, he now treats patients with sex addictions full-time.  (Id.
¶¶ 7-8.)  California has recognized his extraordinary accomplishments by issuing him a
Certificate of Rehabilitation; he is no longer required to register as a sex offender under state law.
(Id. ¶ 9.)  Yet for Mr. Doe #2, and many individuals like him, the Rule threatens to destroy
everything he has worked towards.  Every passing day, he faces the reality that an armed agent of
the state may knock on his door, or find him at work, and arrest him for something completely
outside of his control—for failing to do what the very Government that seeks to prosecute him
concedes may be impossible.  Should this happen, Mr. Doe #3 would be deprived of liberty,
ostracized by his community, and face the loss of his license to practice therapy and the closure of
his practice.  (See id. ¶ 15.)  The eventual dismissal of criminal charges or an acquittal would not
redress these harms; even if he were to ultimately prevail in a criminal case, the Government
would have caused him irreparable injury.

       As the Court has already explained, the only "remedy" at Plaintiffs' disposal is the
affirmative defense codified at 18 U.S.C. § 2250(c).  That provision is inadequate to protect the
due process rights of Plaintiffs even if criminal proceedings were initiated, but it is certainly
inadequate because it cannot be used preemptively to avoid prosecution in the first place:
Plaintiffs' rights will be violated at the time they are arrested for violating a law they cannot
comply with, even though they have attempted to comply.  It is not enough that Plaintiffs, or the
counsel they are provided after criminal charges are brought, might try to appeal to the
sympathies of law enforcement officers or prosecutors.  If liberty depended on a defendant
attempting to convince an officer or prosecutor that he lacked the requisite *mens rea* or could
present a valid affirmative defense, he would be deprived of his freedom far more often than not.
Simply put, members of law enforcement tend not to take those they suspect of committing
crimes at their word, let alone convicted sex offenders.  Besides, once such an individual is
deprived of his liberty, even if the charges are dropped shortly thereafter, he has already suffered
an intolerable injury.  For purposes of the issuance of a preliminary injunction, the affirmative
defense available to Plaintiffs is no remedy at all.

       The Court cannot hold that Plaintiffs are not required to register under SORNA simply
because they are not required to register under state law; that argument appears foreclosed by the
statute and precedent to the contrary.  But it can offer Plaintiffs some peace of mind that they will
not suddenly be arrested by enjoining the Government from prosecuting them under 18 U.S.C. §
2250 unless and until any such criminal proceedings would comport with due process.  This
factor weighs in favor of injunctive relief.

### 3.  Public Interest & Balancing of Harms

       Where the government is the opposing party, balancing of the harm and the public interest
merge.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  Thus, the Court asks whether any
significant "public consequences" would result from issuing the preliminary injunction.  Winter,
555 U.S. at 24.

The balance of equities and public interest sharply tilt in Plaintiffs' favor.  As a general rule, "it is always in the public interest to prevent the violation of a party's constitutional rights." Melendres, 695 F.3d at 1002 (quotation omitted); accord Am. Beverage Ass'n v. San Francisco, 916 F.3d 749, 758 (9th Cir. 2019); see also Preminger v. Principi, 422 F.3d 815, 826 ("[A]ll citizens have a stake in upholding the Constitution.").  On the other hand of the ledger, the most Defendants can muster is that enjoining the Rule would "create confusion regarding longstanding registration obligations under SORNA and in jurisdictions across the country." (Opposition at 25.)  That is not so.  As the Court notes below, the instant Order will not affect states beyond California.  Even as it relates to individuals within this state, the Court has endeavored to set forth its reasoning clearly and to tailor relief narrowly to the individuals immediately affected by the Rule and the harms from which they need emergency relief.  The Court does not find that granting the Motion will cause any more "confusion" than whatever is inherent in any necessary development in the state of the law.

The more fundamental point is this: neither the public nor the Government has a legitimate interest in subjecting citizens to criminal prosecution when it is impossible to comply with the law.  Defendants do not argue, and the Court would not accept, that the federal government has an interest in punishing an individual when it agrees that his state government made it impossible for him to register or comply with SORNA.  After all, in accordance with a prosecutor's ethical duties, if she genuinely believes that an individual did not know he had to register, or genuinely believes that it was impossible for him to do so, she knows she could not prove the case beyond a reasonable doubt, and accordingly may not continue criminal proceedings.  But the dispute, as in so many criminal cases, would be this: the defendant says he did not know he had broken the law or that he would have complied with it, but it was impossible for him to do so.  The Government does not believe him.  As noted below, all that an injunction here would require is that the federal government perform its due diligence before initiating criminal proceedings against California residents.  It will give individuals some peace of mind that the federal government will not suddenly come after them for failing to do what California law says they cannot.  The public interest and balance of equities support injunctive relief.

Because all factors weigh in favor of a preliminary injunction, the Court GRANTS the Motion.

## C.  Scope of Injunction

The Court turns to the proper scope of injunctive relief.  "The general rule regarding the scope of preliminary injunctive relief is that it 'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court.' " Regents of the Univ. of California v. U.S. Dep't of Homeland Sec., 908 F.3d 476, 511 (9th Cir. 2018), rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California, 140 S. Ct. 1891 (2020) (quoting Los Angeles Haven Hospice, 638 F.3d at 664).  "This rule applies with special force where there is no class certification."  Los Angeles Haven Hospice, 683 F.3d at 664.  Nonetheless, "[t]here is no general requirement that an injunction affect only the parties in the suit."  Bresgal v. Brock, 843 F.2d 1163, 1169 (9th Cir. 1987).  "Where relief can be structured

on an individual basis, it must be narrowly tailored to remedy the specific harm shown." Id. at 1170. "On the other hand, an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." Id. at 1170-71.

The Ninth Circuit will only uphold a nationwide injunction "where such breadth was necessary to remedy a plaintiff's harm." E. Bay Sanctuary Covenant v. Barr, 934 F.3d 1026, 1029 (9th Cir. 2019); see also California v. Azar, 911 F.3d 558, 582 (9th Cir. 2018) ("Although there is no bar against nationwide relief in federal district court . . . such broad relief must be *necessary* to give prevailing parties the relief to which they are entitled."). "These are, however, 'exceptional cases.'" Id. (quoting City & Cnty. of San Francisco v. Trump, 897 F.3d 1225, 1244 (9th Cir. 2018). "To permit such broad injunctions as a general rule, without an articulated connection to a plaintiff's particular harm, would unnecessarily 'stymie novel legal challenges and robust debate' arising in different judicial districts." Id. (citation omitted). "The Supreme Court has repeatedly emphasized that nationwide injunctions have detrimental consequences to the development of law and deprive appellate courts of a wider range of perspectives." Azar, 911 F.3d at 583. "[Nationwide class actions may have a detrimental effect by foreclosing adjudication by a number of different courts and judges[.]" Califano v. Yamasaki, 442 U.S. 682, 702 (1979).

In the context of an APA challenge, "'when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" Regents, 908 F.3d at 511 (quoting Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). "Justice Blackmun . . . writing in dissent but apparently expressing the view of all nine Justices on this question," Nat'l Mining Ass'n, 145 F.3d at 1409, explained,

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court. On the other hand, if a generally lawful policy is applied in an illegal manner on a particular occasion, one who is injured is not thereby entitled to challenge other applications of the rule.

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting).

With these principles in mind, the Court must strike a delicate balance in ordering injunctive relief. The parties do not brief the proper scope of an injunction, with only Plaintiffs briefly touching upon it in their Reply. (See Motion; Opposition; Reply.) In the FAC, Plaintiffs

pray for "[t]he issuance of a preliminary injunction prohibiting Defendants from enforcing the [Rule] pursuant to 5 U.S.C. § 705 and 28 U.S.C. § 2201[.]" (FAC, Prayer for Relief.) In the Reply, Plaintiffs appear to extend their request for injunctive relief somewhat, arguing that the Rule "codifies old guidelines and implements new requirements, and a declaration of its invalidity would redress the harm Plaintiffs face. Plaintiffs also request relief against the statute, which is within this Court's power to issue. . . . Because the [R]ule, and parts of the underlying statute, are unlawful, they should be enjoined." (Reply at 10.)

The Court begins with the easiest questions of scope. First, the Court has held that Plaintiffs are likely to succeed on the merits of their due process claim, have raised a substantial question as to the lawfulness of the Rule under the First Amendment, and have not demonstrated a likelihood of success on their remaining claims. Since any relief must be tailored to that which is "necessary to give prevailing parties the relief to which they are entitled," Bresgal, 843 F.2d at 1170-71, it must follow that Plaintiffs would not be "entitled" to relief redressing harms flowing from their nondelegation and conflict with statutory text claims. Moreover, while the Court is mindful of the present and future chilling effects Plaintiffs allege under their First Amendment claim, the Court has found that that claim alone would be insufficient to justify granting the Motion. Accordingly, injunctive relief must be tailored closely to Plaintiffs' due process claim.

Second, the Court considers the geographical bounds of any injunctive relief. The heart of the dispute here concerns how the Rule, in conjunction with 18 U.S.C. § 2250, affects residents of California. The Court presumes that analogous arguments might be made by residents of other states, who may face similar "impossibility" problems. But since the ways in which the Rule may affect residents of, say, Washington is not the case or controversy before the Court, it would be inappropriate to extend relief to individuals in states other than California. To be sure, the First Amendment arguments Plaintiffs raise likely apply equally to out-of-state residents. But the Court declines to extend the scope of an injunction beyond California's borders on that basis. This Court must not "stymie novel legal challenges and robust debate arising in different judicial districts," E. Bay Sanctuary Covenant, 934 F.3d at 1029, or "foreclose[e] adjudication by a number of different courts and judges." Califano, 442 U.S. at 702. If there are similar issues outside of California, residents of other states should file their own challenges. Those cases, like this one, may filter up to higher courts, affording "appellate courts . . . a wider range of perspectives." Azar, 911 F.3d at 583. The injunctive relief awarded here is limited to California.

The remaining questions are more difficult. Plaintiffs bring their due process and First Amendment claims under the APA, in so far as a court must set aside agency action that is "contrary to [a] constitutional right." 5 U.S.C. § 706(2)(B). (See FAC ¶¶ 136, 151.) Accordingly, the Court must consider whether it should invalidate or vacate the Rule, or to "forbid[] its application to a particular individual." Lujan, 497 U.S. at 913 (1990) (Blackmun, J., dissenting). As noted above, the "ordinary result" is likely that the agency's "rules are vacated—not that their application to the individual petitioners is proscribed." Regents, 908 F.3d at 511. And, should the Court have found a likelihood of success on the merits of Plaintiffs' nondelegation claim, vacating the Rule may have been required, for the Attorney General cannot

lawfully promulgate a rule with authority delegated to him in violation of the separation of powers. But considering the merits here, vacating the entire Rule, and only the Rule, would be at once over and underinclusive. It may be underinclusive in that "[e]njoining the Rule would in no way alter Plaintiffs' obligations under SORNA and prior Guidelines—which would remain in effect," or at least that is the position that DOJ indicates it would take in subsequent litigation. (Opposition at 24.) Plaintiffs also acknowledge that the Rule "codifies old guidelines and implements new requirements[.]" (Reply at 10.) More importantly, they "request relief against the statute," arguing that, because the Rule "and parts of the underlying statute[] are unlawful, they should be enjoined." (Id.) Vacating the Rule would also be overinclusive because it contains numerous provisions that Plaintiffs do not challenge here, and doing so may create the kind of uncertainty regarding "longstanding registration obligations" Defendants fear. (See Opposition at 25.) The Court thus finds that vacating the Rule would be inappropriate.

A related question is whether to award relief that would affect only the "plaintiffs before the court." Regents, 908 F.3d at 511. That this is not a class action counsels in favor of doing so. See Los Angeles Haven Hospice, 683 F.3d at 664. On the other hand, "[t]here is no general requirement that an injunction affect only the parties in the suit." Bresgal, 843 F.2d at 1169. The central question here is workability: to what extent "relief can be structured on an individual basis[.]" Id. at 1170. Beyond the named Plaintiffs, the parties here include ACSOL, which is an organization based in California with more than 100,000 California registrants among its membership. (Bellucci Decl. ¶ 7.) As the Bellucci Declaration explains, and which is uncontested by Defendants, numerous ACSOL members are similarly situated to the named Plaintiffs, including members who "have no obligation to register under California law, yet are presumed to be in non-compliance with the [Rule.]" (Id. ¶ 12.) The Court considered whether it could properly limit the scope of relief to ACSOL members. While the Court does not have before it facts regarding how one becomes a member of ACSOL, it is troubled by the notion that meaningful equitable relief might be contingent on whether an individual had filled out a form, given a donation or signed up for a mailing list of a nonprofit. Besides, ACSOL's membership appears so numerous that it would be bizarre to exclude perhaps a relatively small number of California registrants who do not count themselves members of the organization, even though they would otherwise be equally entitled to relief. Accordingly, the Court concludes that it is "not necessarily over-broad [to] extend[] benefit or protections to persons other than prevailing parties in the lawsuit," Bresgal, 843 F.2d at 1170, which here would mean awarding relief to all residents of California who have been convicted of a sex offense, regardless of ACSOL membership.

The final question is this: if the Court does not vacate the Rule, what is "necessary to provide complete relief"? Regents, 908 F.3d at 511. Bearing in mind the need to tailor relief to the due process issue, the simplest solution might be to order that any enforcement of SORNA must be contingent upon California requiring, and thus enabling, an individual to register and provide the relevant information. But, sensible as that arrangement would be to this Court, that is evidently not how Congress decided to write SORNA and how courts have subsequently interpreted it. See Elkins, 683 F.3d at 1046 ("[W]e continue to hold that the federal government's prosecution of an alleged violation of SORNA is not dependent on the individual

state's implementation of the administrative portion of SORNA. . . . [T]he circuit courts are in accord on this issue."). The Court's award of injunctive relief cannot contradict binding authority. But, as noted below, while the Court cannot prohibit the federal government from making it unlawful to fail to provide to an individual's state something his state will not accept, it can at least preliminarily enjoin the federal government from attempting to punish any California resident for failing to do so under an unconstitutional burden of proof.

At first glance, it might also appear simple to enjoin the federal government from prosecuting any California resident convicted of a sex offense who is not required to register under California law or for whom compliance with any provision of the Rule or SORNA is "impossible." But that simply begs the key question: who decides? Requiring individuals like Plaintiffs to prove impossibility during federal criminal proceedings would be to deny them *any* relief; that is, after all, the fundamental issue raised by the due process claim. On the other hand, the Court cannot bar the federal government from prosecuting *any* California registrant simply because he might have a viable defense. Surely there are some individuals in California who, "under any conceivable definition of the word 'register,' [] did not register," <u>Felts</u>, 674 F.3d at 605, even though *California*, not just the federal government, required him to.

The Court's solution, imperfect as it is, is the following. The federal government is ENJOINED from prosecuting any California resident under 18 U.S.C. § 2250 for any violation of SORNA, the Rule, or any other regulation, without first abiding by the following requirements:

(1) In all such prosecutions, the federal government must seek and obtain certification from the State of California that the individual was required to register under California law.

(2) In a prosecution concerning a failure to provide specific information required by statute or regulation (as opposed to a failure to register altogether), the federal government must seek and obtain certification from the State of California that California law allows the individual to furnish that information to state authorities.

The Court will leave it to the sound discretion of the Department of Justice how to accomplish this in practice. It may seek the opinion of the California Department of Justice and/or an individual's local law enforcement entity handling registration, such as a sheriff's department. One important implication of the Court's Order is that the Department of Justice is enjoined from prosecuting any California resident who obtained a Certificate of Rehabilitation and was granted relief from registration under California Penal Code section 290.5, as that individual would no longer be required to register under California law. <u>See</u> Cal. Penal Code § 290.007. As it relates to any alleged violation arising under SORNA, only once the Department of Justice has consulted with California authorities, and thus achieved certainty that an individual was (1) required to comply with state law, (2) could have complied with state law, and (3) failed to, may the federal government authorize the arrest or initiation of criminal proceedings against any resident of California, or deprive any such individual of liberty in any respect.

The Court is aware that this arrangement may impose some burdens to our system of federalism and dual sovereignty. But surely the same may be said of SORNA, in which Congress apparently sought to criminalize federally that which the states say an individual cannot do. Congress, not this Court, chose to write the law this way. In the view of this Court, the relatively minimal cost to federal supremacy is a small price to pay for a far greater benefit to another bedrock constitutional principle, that individuals like Plaintiffs are entitled to due process of law.

## V.    CONCLUSION

For the reasons above, the Court **GRANTS** Plaintiffs' Motion. Defendants are hereby **ORDERED AND ENJOINED**, pending final judgment herein or further order of the Court, from taking any action inconsistent with this Order and the issuance of injunctive relief set forth above.


**IT IS SO ORDERED.**