and consultation requirements of E.O. 13175 do not apply and a Tribal summary impact statement is not required.

**Paperwork Reduction Act**

Under the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501 *et seq.*), Federal agencies must obtain approval from the Office of Management and Budget for each collection of information they conduct, sponsor, or require through regulations. The FHWA has determined that this proposed rule does not contain collection of information requirements for the purposes of the PRA.

**National Environmental Policy Act**

The Agency has analyzed this proposed rulemaking action pursuant to the National Environmental Policy Act of 1969 (42 U.S.C. 4321 *et seq.*) and has determined that it is categorically excluded under 23 CFR 771.117(c)(1), which applies to activities that do not involve or lead directly to construction. Categorically excluded actions meet the criteria for categorical exclusions under the Council on Environmental Quality regulations (40 CFR 1508.4) and under 23 CFR 771.117(a) and normally do not require any further NEPA approvals by FHWA. This rulemaking proposes to include in FHWA regulations the coordination, registration, and notification requirements of 47 U.S.C. 1504 that are applicable to States that receive Title 23 Federal-aid highway funds. This rulemaking does not involve and will not lead directly to construction. The FHWA does not anticipate any environmental impacts, and there are no unusual circumstances present under 23 CFR 771.117(b).

**Regulation Identification Number**

A RIN is assigned to each regulatory action listed in the Unified Agenda of Federal Regulations. The Regulatory Information Service Center publishes the Unified Agenda in April and October of each year. The RIN contained in the heading of this document can be used to cross reference this action with the Unified Agenda.

**List of Subjects in 23 CFR Part 645**

Grant Programs-transportation, Highways and roads, Reporting and recordkeeping requirements, Utilities.

Issued under authority delegated in 49 CFR 1.81 and 1.85.

**Nicole R. Nason,**

*Administrator, Federal Highway Administration.*

In consideration of the foregoing, FHWA proposes to amend Part 645 of Title 23 of the CFR as set forth below:

■ 1. Revise the authority citation for part 645 to read as follows:

**Authority:** 23 U.S.C. 101, 109, 111, 116, 123, and 315; 47 U.S.C. 1504; 23 CFR 1.23 and 1.27; 49 CFR 1.48(b); and E.O. 11990, 42 FR 26961 (May 24, 1977).

■ 2. Add subpart C to read as follows:

**Subpart C—BROADBAND INFRASTRUCTURE DEPLOYMENT**

Sec.
645.301   Purpose.
645.303   Applicability.
645.305   Definitions.
645.307   General requirements.
645.309   Limitations.

**§ 645.301   Purpose.**

To prescribe additional requirements to facilitate the installation of broadband infrastructure pursuant to 47 U.S.C. 1504.

**§ 645.303   Applicability.**

This subpart applies to each State that receives funds under Chapter 1 of Title 23 of the U.S.C. and only to activities for which Federal obligations or expenditures are initially approved on or after the effective date of this subpart.

**§ 645.305   Definitions.**

For purposes of this subpart, the terms defined in 47 U.S.C. 1504(a) shall have the same meaning where used in these regulations, notwithstanding other provisions of this part or Title 23 of the U.S.C.

**§ 645.307   General requirements.**

(a) A State department of transportation, in consultation with appropriate State agencies, shall:
(1) Identify a broadband utility coordinator, whether in the State department of transportation or in another State agency, that is responsible for facilitating the broadband infrastructure right-of-way efforts within the State. The broadband utility coordinator may have additional responsibilities.
(2) Establish a process for the registration of broadband infrastructure entities that seek to be included in those broadband infrastructure right-of-way facilitation efforts within the State.
(3) Establish a process to notify electronically broadband infrastructure entities identified under subsection (2) of the State transportation improvement program on an annual basis and provide additional notifications as necessary to achieve the goals of this subpart; and
(4) Coordinate initiatives carried out under this subpart with other statewide telecommunication and broadband plans and State and local transportation and land use plans, including strategies to minimize repeated excavations that involve the installation of broadband infrastructure in a right-of-way.

(b) If a State chooses to provide for the installation of broadband infrastructure in the right-of-way of an applicable Federal-aid highway project under this section, the State department of transportation shall carry out any appropriate measures to ensure that any existing broadband infrastructure entities are not disadvantaged, as compared to other broadband infrastructure entities, with respect to the program under this section.

**§ 645.309   Limitations.**

Nothing in this subpart establishes a mandate or requirement that a State install or allow the installation of broadband infrastructure in a highway right-of-way. Nothing in this subpart authorizes the Secretary to withhold or reserve funds or approval of a project under Title 23 of the U.S.C.

[FR Doc. 2020–17525 Filed 8–12–20; 8:45 am]

**BILLING CODE 4910–22–P**

---

**DEPARTMENT OF JUSTICE**

**Office of the Attorney General**

**28 CFR Part 72**

[Docket No. OAG 157; AG Order No. 4759–2020]

**RIN 1105–AB52**

**Registration Requirements Under the Sex Offender Registration and Notification Act**

**AGENCY:** Department of Justice.

**ACTION:** Proposed rule.

**SUMMARY:** The Department of Justice is proposing a rule that specifies the registration requirements under the Sex Offender Registration and Notification Act (''SORNA''). The rule in part reflects express requirements of SORNA and in part reflects the exercise of authorities SORNA grants to the Attorney General to interpret and implement SORNA's requirements. SORNA's requirements have previously been delineated in guidelines issued by the Attorney General for implementation of SORNA's requirements by registration jurisdictions.

**DATES:** Written and electronic comments must be sent or submitted on or before October 13, 2020. Comments received by mail will be considered timely if they are postmarked on or before the last day of the comment period. The electronic Federal Docket Management System will accept electronic comments until midnight Eastern Time at the end of that day.

**ADDRESSES:** Comments may be mailed to Regulations Docket Clerk, Office of Legal Policy, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Room 4234, Washington, DC 20530. To ensure proper handling, please reference Docket No. OAG 157 on your correspondence. You may submit comments electronically or view an electronic version of this proposed rule at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** David J. Karp, Senior Counsel, Office of Legal Policy, U.S. Department of Justice, Washington, DC, 202–514–3273.

**SUPPLEMENTARY INFORMATION:** Posting of Public Comments. Please note that all comments received are considered part of the public record and made available for public inspection online at *http:// www.regulations.gov.* Such information includes personal identifying information (such as your name, address, etc.) voluntarily submitted by the commenter.

You are not required to submit personal identifying information in order to comment on this rule. Nevertheless, if you still want to submit personal identifying information (such as your name, address, etc.) as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONAL IDENTIFYING INFORMATION" in the first paragraph of your comment. You also must locate all the personal identifying information you do not want posted online in the first paragraph of your comment and identify what information you want redacted.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment. You also must prominently identify confidential business information to be redacted within the comment. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *http:// www.regulations.gov.*

Personal identifying information and confidential business information

identified and located as set forth above will be placed in the agency's public docket file, but not posted online. If you wish to inspect the agency's public docket file in person by appointment, please see the **FOR FURTHER INFORMATION CONTACT** paragraph.

**Overview**

The Sex Offender Registration and Notification Act ("SORNA"), which is title I of the Adam Walsh Child Protection and Safety Act of 2006, Public Law 109–248, 34 U.S.C. 20901 *et seq.,* establishes national standards for sex offender registration and notification in the United States. SORNA has a dual character, imposing registration obligations on sex offenders as a matter of Federal law that are federally enforceable under circumstances supporting Federal jurisdiction, *see* 18 U.S.C. 2250, and providing minimum national standards that non-Federal jurisdictions are expected to incorporate in their sex offender registration and notification programs, subject to a reduction of Federal funding for those that fail to do so, *see* 34 U.S.C. 20912(a), 20926–27.

The Justice Department's Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking ("SMART Office") administers the national standards for sex offender registration and notification under SORNA and assists all jurisdictions in implementing the SORNA standards in their programs. *See id.* 20945. As provided by SORNA, the Department of Justice also (i) prosecutes SORNA violations by sex offenders committed under circumstances supporting Federal jurisdiction, *see* 18 U.S.C. 2250; (ii) assists in the enforcement of sex offender registration requirements through the activities of the U.S. Marshals Service, *see* 34 U.S.C. 20941; (iii) operates, through the Federal Bureau of Investigation, the National Sex Offender Registry, which compiles the information obtained through the sex offender registration programs of the states and other registration jurisdictions and makes it available on a nationwide basis for law enforcement purposes, *see id.* 20921; and (iv) operates the Dru Sjodin National Sex Offender Public website, *www.nsopw.gov,* which provides public access through a single national site to the information about sex offenders posted on the public sex offender websites of the various registration jurisdictions, *see id.* 20922.

SORNA generally directs the Attorney General to "issue guidelines and regulations to interpret and implement [SORNA]." *Id.* 20912(b). SORNA also

authorizes the Attorney General to take more specific actions in certain contexts.

One such provision is 34 U.S.C. 20913. That section states in subsection (b) that sex offenders are generally to register initially before release from imprisonment, or within three business days of sentencing if not sentenced to imprisonment, but it provides further in subsection (d) that the Attorney General has "the authority to specify the applicability of the requirements of [SORNA] to sex offenders convicted before the enactment of [SORNA] or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)." As discussed below in connection with 28 CFR 72.3, section 20913(d) is not a constitutionally impermissible delegation of legislative authority. Rather, it enables the Attorney General to effectuate the legislative intent that SORNA apply to all sex offenders, regardless of when they were convicted.

Another relevant provision lists several types of information that sex offenders must provide for inclusion in sex offender registries, and states that sex offenders must also provide "[a]ny other information required by the Attorney General." *Id.* 20914(a)(8). This provision as well is not an impermissible delegation of legislative authority, but rather is instrumental to the Attorney General's effectuating the legislative objective to "protect the public from sex offenders and offenders against children" by "establish[ing] a comprehensive national system for the registration of those offenders." *Id.* 20901; *see* 73 FR at 38054–57; 76 FR at 1637. The Attorney General's exercise of the authority under section 20914(a)(8) is limited to requiring additional information that furthers the legislative public safety objective or the implementation or enforcement of SORNA's provisions. How that has been done is explained below in connection with proposed 28 CFR 72.6 and 72.7.

The Attorney General has exercised these authorities in previous rulemakings and issuances of guidelines under SORNA, as detailed in the rulemaking history and section-by-section analysis below, and the interpretations and policy decisions in this proposed rule follow those already adopted in existing SORNA-related documents. The present rule provides a concise and comprehensive statement of what sex offenders must do to comply with SORNA's requirements.

In addition to SORNA's original provisions, described above, this rulemaking draws on and implements provisions of the International Megan's Law to Prevent Child Exploitation and Other Sexual Crimes Through Advanced Notification of Traveling Sex Offenders ("International Megan's Law"), Public Law 114–119. Section 6 of International Megan's Law amended SORNA by (i) redesignating, in 34 U.S.C. 20914(a), former paragraph (7) as paragraph (8) and adding a new paragraph (7) that requires a sex offender to provide for inclusion in the sex offender registry information relating to intended travel outside the United States, including several specified types of information "and any other itinerary or other travel-related information required by the Attorney General"; (ii) adding a new subsection (c) to 34 U.S.C. 20914 that requires sex offenders to provide and update registration information required by SORNA "in conformity with any time and manner requirements prescribed by the Attorney General"; and (iii) adding a new subsection (b) to SORNA's criminal provision, 18 U.S.C. 2250, that specifically reaches international travel reporting violations.

This rulemaking is not innovative in terms of policy. Many of the requirements it articulates reflect express SORNA requirements. These include, inter alia, statutory specifications about (i) where and when sex offenders must register; (ii) several categories of required registration information; (iii) how long sex offenders must continue to register, including different registration periods for sex offenders in different tiers and lifetime registration for those in the highest tier; and (iv) a requirement to appear periodically to verify the registration information. *See* 34 U.S.C. 20911(2)–(4), 20913, 20914(a)(1)–(7), 20915, 20918.

Other features of the rule reflect exercises of the Attorney General's powers to implement SORNA's requirements. These include additional specifications regarding information sex offenders must provide, how and when they must report certain changes in registration information, and the time and manner for complying with SORNA's registration requirements by sex offenders who cannot comply with SORNA's normal registration procedures. On these matters, however, the proposed rule embodies the same policies as those appearing in the previously issued SORNA guidelines and prior rulemakings under SORNA.

The rule also makes no change in what registration jurisdictions need to do to substantially implement SORNA in their registration programs, a matter that will continue to be governed by the previously issued guidelines for SORNA implementation. While this rule does not make new policy, as discussed above, it is expected to have a number of benefits. The rule will facilitate enforcement of SORNA's registration requirements through prosecution of non-compliant sex offenders under 18 U.S.C. 2250. By providing a comprehensive articulation of SORNA's registration requirements in regulations addressed to sex offenders, it will provide a more secure basis for prosecution of sex offenders who engage in knowing violations of any of SORNA's requirements. It will also resolve a number of specific concerns that have arisen in past litigation or could be expected to arise in future litigation, if not clarified and resolved by this rule. For example, as discussed below, the amendment of § 72.3 in the rule will ensure that its application of SORNA's requirements to sex offenders with pre-SORNA convictions is given effect consistently, resolving an issue resulting from the decision in *United States* v. *DeJarnette,* 741 F.3d 971 (9th Cir. 2013).

Beyond the benefits to effective enforcement of SORNA's requirements, the rule will benefit sex offenders by providing a clear and comprehensive statement of their registration obligations under SORNA. This statement will make it easier for sex offenders to determine what they are required to do and thus facilitate compliance.

By facilitating the enforcement of, and compliance with, SORNA's registration requirements, the rule will further SORNA's public safety objectives. *See* 34 U.S.C. 20901. More consistent adherence to these requirements will enable registration and law enforcement authorities to better track and monitor released sex offenders in the community and enhance the basis for public notification regarding registered sex offenders that SORNA requires. *See id.* 20920, 20923.

Effective September 1, 2017, the provisions of SORNA, formerly appearing at 42 U.S.C. 16901 *et seq.,* were recodified in a new title 34 of the United States Code, and now appear at 34 U.S.C. 20901 *et seq. See http:// uscode.house.gov/ editorialreclassification/t34/index.html.* United States Code citations of SORNA provisions in this proposed rule accordingly differ from the corresponding citations in earlier sources and documents.

**Rulemaking History**

This proposed rule is the ninth document the Attorney General has published pursuant to the statutory directive to the Attorney General to issue guidelines and regulations to interpret and implement SORNA. *See* 34 U.S.C. 20912(b). The previous SORNA-related documents are as follows:

(1) Interim rule entitled, "Applicability of the Sex Offender Registration and Notification Act," published at 72 FR 8894 (Feb. 28, 2007). The interim rule solicited public comments, and the comment period ended on April 30, 2007. The interim rule added a new part 72 to title 28 of the Code of Federal Regulations, entitled "Sex Offender Registration and Notification." The interim rule provided that "[t]he requirements of the Sex Offender Registration and Notification Act apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act." 28 CFR 72.3.

(2) Proposed guidelines, published at 72 FR 30210 (May 30, 2007), whose general purpose was to provide guidance and assistance to registration jurisdictions in implementing the SORNA standards in their sex offender registration and notification programs. The proposed guidelines solicited public comment, and the comment period ended on August 1, 2007.

(3) Final guidelines for registration jurisdictions regarding SORNA implementation entitled, "The National Guidelines for Sex Offender Registration and Notification" (the "SORNA Guidelines"), published at 73 FR 38030 (July 2, 2008).

(4) Proposed supplemental guidelines for SORNA implementation, published at 75 FR 27362 (May 14, 2010), whose general purpose was to address certain issues arising in SORNA implementation that required that some aspects of the SORNA Guidelines be augmented or modified. The proposed supplemental guidelines solicited public comment, and the comment period closed on July 13, 2010.

(5) Final rule entitled, "Applicability of the Sex Offender Registration and Notification Act," published at 75 FR 81849 (Dec. 29, 2010). This rule finalized the February 28, 2007, interim rule providing for SORNA's applicability to all sex offenders, including those with pre-SORNA convictions.

(6) Final supplemental guidelines for SORNA implementation entitled, "Supplemental Guidelines for Sex

Offender Registration and Notification'' (the ''SORNA Supplemental Guidelines''), published at 76 FR 1630 (Jan. 11, 2011).

(7) Proposed supplemental guidelines, published at 81 FR 21397 (Apr. 11, 2016), whose general purpose was to afford registration jurisdictions greater flexibility in their efforts to substantially implement SORNA's juvenile registration requirement. These proposed supplemental guidelines solicited public comment, and the comment period closed on June 10, 2016.

(8) Final supplemental guidelines regarding substantial implementation of SORNA's juvenile registration requirement entitled, ''Supplemental Guidelines for Juvenile Registration Under the Sex Offender Registration and Notification Act,'' published at 81 FR 50552 (Aug. 1, 2016).

**Section-by-Section Analysis**

The present proposed rule expands part 72 of title 28 of the Code of Federal Regulations to provide a full statement of the registration requirements for sex offenders under SORNA. It revises the statement of purpose and definitional sections in 28 CFR 72.1 and 72.2. It maintains the existing provision in 28 CFR 72.3 stating that SORNA's requirements apply to all sex offenders, regardless of when they were convicted, and incorporates additional language in § 72.3 to reinforce that point. It also adds to part 72 provisions—§§ 72.4 through 72.8—articulating where sex offenders must register, how long they must register, what information they must provide, how they must register and keep their registrations current to satisfy SORNA's requirements, and the liability they face for violations, following SORNA's express requirements and the prior articulation of standards for these matters in the SORNA Guidelines and the SORNA Supplemental Guidelines.

**Section 72.1—Purpose**

Section 72.1(a) states part 72's purpose to specify SORNA's registration requirements and their scope of application. It further notes that the Attorney General has the authority pursuant to provisions of SORNA to specify these requirements and their applicability as provided in part 72.

Section 72.1(b) states that part 72 does not preempt or limit any obligations of or requirements relating to sex offenders under other laws, rules, or policies. It further notes that states and other governmental entities may prescribe requirements, with which sex offenders must comply, that are more extensive or

stringent than those prescribed by SORNA. This reflects the fact that SORNA provides minimum national standards for sex offender registration. It is intended to establish a floor rather than a ceiling for the registration programs of states and other jurisdictions, which can prescribe registration requirements binding on sex offenders under their own laws independent of SORNA. Jurisdictions accordingly are free to adopt more stringent or extensive registration requirements for sex offenders than those set forth in this part, including more stringent or extensive requirements regarding where, when, and how long sex offenders must register, what information they must provide, and what they must do to keep their registrations current. *See* 73 FR at 38032–35, 38046.

**Section 72.2—Definitions**

Section 72.2 states that terms used in part 72 have the same meaning as in SORNA. Hence, for example, references in the part to registration ''jurisdictions'' mean the 50 states, the District of Columbia, the five principal U.S. territories, and Indian tribes qualifying under 34 U.S.C. 20929. *See id.* 20911(10); 73 FR at 38045, 38048. Likewise, where the part uses such terms as sex offender (and tiers thereof), sex offense, convicted or conviction, sex offender registry, student, employee or employment, and reside or residence, the meaning is the same as in SORNA. *See* 34 U.S.C. 20911(1)–(9), (11)–(13); 73 FR at 38050–57, 38061–62.

**Section 72.3—Applicability of the Sex Offender Registration and Notification Act**

Section 72.3 carries forward in substance current 28 CFR 72.3, which states that SORNA's requirements apply to all sex offenders, including those whose sex offense convictions predate SORNA's enactment. This section was initially adopted on February 28, 2007, and amended on December 29, 2010. The section and its rationale are explained further in the interim and final rulemakings that adopted it. *See* 72 FR 8894; 75 FR 81849.

Section 72.3, and its modification by this rulemaking, are constitutionally sound. In *Smith* v. *Doe,* 538 U.S. 84 (2003), the Supreme Court upheld the retroactive application of sex offender registration requirements against an ex post facto challenge, in reviewing a state registration system whose major features paralleled SORNA's in many ways. The commonalities between SORNA and the state registration program upheld in *Smith* include required registration

before release from imprisonment; provision of name, address, employment, vehicle, and other registration information; continued registration and periodic verification of registration information for at least 15 years; lifetime registration and quarterly verification for certain registrants convicted of aggravated or multiple sex offenses; and public internet posting of information about registrants. *See id.* at 90–91. The Federal courts have consistently rejected ex post facto challenges to SORNA itself. *See, e.g., United States* v. *Felts,* 674 F.3d 599, 605–06 (6th Cir. 2012).

Section 72.3 also is not premised on any constitutionally impermissible delegation of legislative authority to the executive branch of government. Congress intended that SORNA apply to all sex offenders, regardless of when they were convicted. *See Reynolds* v. *United States,* 565 U.S. 432, 442–45 (2012); *id.* at 448–49 & n. (Scalia, J., dissenting) (agreeing that Congress intended for SORNA to apply to all sex offenders). Congress authorized the Attorney General to specify the applicability of SORNA's requirements to sex offenders with pre-SORNA and pre-SORNA-implementation convictions, *see* 34 U.S.C. 20913(d), in order to effectuate that intent while enabling the Attorney General to address transitional issues presented in integrating the existing sex offender population into SORNA's comprehensive nationwide registration system. *See Reynolds,* 565 U.S. at 440–42; 72 FR at 8895–97; 73 FR at 38035–36, 38046, 38063–64; 75 FR at 81850–52. In adopting § 72.3, the Attorney General implemented the relevant legislative policy—that SORNA's requirements should apply to all sex offenders—to the maximum, having found no reason to delay or qualify its implementation. Consequently, as an articulation of a legislative policy embodied in SORNA, the issuance of § 72.3 pursuant to 34 U.S.C. 20913(d) involved no exercise of legislative authority and did not contravene the non-delegation doctrine. *See Gundy* v. *United States,* 139 S. Ct. 2116, 2123–30 (2019) (plurality opinion); *id.* at 2130–31 (Alito, J., concurring in the judgment); *id.,* Brief for the United States at 22–38.

Moreover, regardless of any question concerning the validity of 34 U.S.C. 20913(d), § 72.3 is adequately supported on the basis of the Attorney General's authority to issue guidelines and regulations to interpret and implement SORNA, appearing in 34 U.S.C. 20912(b). In § 72.3, the Attorney General interpreted SORNA as intended by

Congress to apply to all sex offenders regardless of when they were convicted—an interpretation endorsed by the Supreme Court, *see Reynolds,* 565 U.S. at 440–45; *see also Gundy,* 139 S. Ct. at 2123–31—and he implemented that legislative policy by embodying it in a clearly stated rule.

The same considerations apply to the amended version of § 72.3 proposed here, which effectuates more reliably the legislative policy judgment that SORNA's requirements should apply to all sex offenders by restating the current rule with additional specificity, but which involves no change in substance. In comparison with the current formulation of § 72.3, this proposed rule adds a second sentence stating that (i) all sex offenders must comply with all requirements of SORNA, regardless of when they were convicted; (ii) this is so regardless of whether a registration jurisdiction has substantially implemented SORNA or any particular SORNA requirement; and (iii) this is so regardless of whether a particular requirement or class of sex offenders is mentioned in examples in the rules or guidelines issued by the Attorney General.

The first part of the added sentence reiterates § 72.3's specification of SORNA's applicability to all sex offenders in the form of an affirmative direction to sex offenders, and it states explicitly that all of SORNA's requirements so apply.

The added sentence further states that the registration duties SORNA prescribes for sex offenders are not conditional on registration jurisdictions' having adopted SORNA's requirements in their own registration laws or policies. For example, SORNA requires sex offenders to register in the states (and other registration jurisdictions) in which they reside, work, or attend school. *See* 34 U.S.C. 20913(a). All of the states have sex offender registration programs, which were initially established long before the enactment of SORNA. Hence, sex offenders are able to register in these existing state programs. The fact that a particular state has not modified its registration program at this time to incorporate the full range of SORNA requirements does not prevent a sex offender required to register by SORNA from registering in the state or excuse a failure to do so. *See, e.g., Felts,* 674 F.3d at 603–05.

The same principle applies in situations in which a jurisdiction's law does not track or incorporate a particular SORNA requirement affecting a sex offender. Consider a situation of this nature in which SORNA requires a sex offender to register but the law of the state in which he resides does not. This may occur, for example, because state law does not require registration based on the particular sex offense for which the offender was convicted, or because state law requires registration by sex offenders for shorter periods of time than SORNA, or because state law does not apply its registration requirements "retroactively" as broadly as § 72.3 applies SORNA's requirements to sex offenders with pre-SORNA convictions. Notwithstanding the absence of a parallel state law, the registration authorities in the state may be willing to register the sex offender because Federal law (*i.e.,* SORNA) requires him to register. *Cf. Doe* v. *Keathley,* 290 SW3d 719 (Mo. 2009) (state constitutional prohibition of retrospective laws does not preclude registration based on SORNA). If the state registration authorities are willing to register the sex offender, he is not relieved of the duty to register merely because state law does not track the Federal law registration requirement.

Hence, sex offenders can be held liable for violating any requirement stated in this rule, regardless of when they were convicted, and regardless of whether the jurisdiction in which the violation occurs has adopted the requirement in its own law. This does not mean, however, that SORNA unfairly holds sex offenders liable for failing to comply with its requirements, where the requirement is unknown to the sex offender or impossible for him to carry out. *Cf. Felts,* 674 F.3d at 605 (noting concern). Federal enforcement of SORNA's requirements occurs primarily through SORNA's criminal provision, 18 U.S.C. 2250. That provision makes it a Federal crime for a person required to register by SORNA to knowingly fail to register or update a registration as required by SORNA under circumstances supporting Federal jurisdiction, such as conviction of a Federal sex offense or interstate or foreign travel. As discussed below, section 2250 holds sex offenders liable only for violations of known registration obligations, and it excuses failures to comply with SORNA under certain conditions if the non-compliance results from circumstances beyond the sex offenders' control.

Consider first the concern that sex offenders may lack notice regarding registration obligations. Under the procedures prescribed by SORNA, and under standard procedures that have generally been adopted by registration jurisdictions whether or not they have implemented SORNA's requirements, the registration of sex offenders normally involves (i) informing sex offenders of their registration duties, (ii) obtaining from sex offenders signed acknowledgments confirming receipt of that information, and (iii) having sex offenders provide the required registration information. *See* 34 U.S.C. 20919(a); 73 FR at 38062–63.

Registration procedures of this nature inform sex offenders of what they must do, and the acknowledgments obtained from them provide evidence that they were so informed. *See* 76 FR at 1638. If a jurisdiction that registers a sex offender has not fully revised its processes for conformity to SORNA, then it may not tell the sex offender about some of the registration requirements imposed by SORNA, such as those that the jurisdiction has not incorporated in its own laws. If the jurisdiction fails to inform a sex offender about some of SORNA's registration requirements, the sex offender then does not know about some of his registration obligations under SORNA based on the information received from the jurisdiction, and may not learn of them from other sources. In such cases, the possibility of liability under 18 U.S.C. 2250 continues to be limited to cases in which a sex offender "knowingly fails to register or update a registration as required by [SORNA]." The limitation to "knowing[ ]" violations provides a safeguard against liability based on unwitting violations of SORNA requirements of which a sex offender was not aware. Section 72.8(a)(1)(iii) of this rule, and the accompanying discussion below, provide further explanation about the limitation of liability under 18 U.S.C. 2250 to cases involving violation of known registration obligations.

The second concern about fairness involves situations in which a sex offender has failed to do something SORNA requires because it is impossible for him to do so. For example, as noted above, a jurisdiction with laws that do not require registration based on the particular offense for which a sex offender was convicted may nevertheless be willing to register him in light of his Federal law (SORNA) registration obligation. But alternatively, the jurisdiction's law or practice may constrain its registration personnel to register only sex offenders whom its own laws require to register. In such a case, it is impossible for the sex offender to register in that jurisdiction, though subject to a registration duty under SORNA. This is so because registration is by its nature a two-party transaction, involving a sex offender's providing information about where he resides and other matters as required, and acceptance of that

information by the jurisdiction for inclusion in the sex offender registry. If the jurisdiction is unwilling to carry out its side of the transaction, then the sex offender cannot register.

Concerns of this nature are also addressed in SORNA's criminal provision, 18 U.S.C. 2250. Subsection (c) of section 2250 provides an affirmative defense to liability for SORNA violations if ''(1) uncontrollable circumstances prevented the individual from complying; (2) the individual did not contribute to the creation of such circumstances in reckless disregard of the requirement to comply; and (3) the individual complied as soon as such circumstances ceased to exist.'' A registration jurisdiction's law or practice that precludes registration of a sex offender, as described above, is a circumstance that the sex offender cannot control and to which he did not contribute, so he cannot be held liable for failure to register with that jurisdiction as SORNA requires.

The defense in section 2250(c) comes with the proviso that the defendant must comply with SORNA ''as soon as [the preventing] circumstances cease[ ] to exist.'' For example, consider the case posed above of a jurisdiction that refuses to register sex offenders based on a particular offense for which SORNA requires registration, so that a sex offender residing in the jurisdiction who was convicted of that offense cannot register there. Suppose that the jurisdiction later progresses in its implementation of SORNA and becomes willing to register offenders who have been convicted for that sex offense. In light of the proviso, the sex offender's obligation to register revives once the jurisdiction becomes willing to register him. That is fair, because the circumstance preventing his compliance with the SORNA registration requirement no longer exists.

Section 72.8(a)(2) of this rule, and the accompanying discussion below, provide further explanation about the contours of the impossibility defense under 18 U.S.C. 2250(c).

Returning to the text of proposed § 72.3, the added sentence states at the end that sex offenders must comply with SORNA's requirements ''regardless of whether any particular requirement or class of sex offenders is mentioned in examples in this regulation or in other regulations or guidelines issued by the Attorney General.'' In conjunction with the earlier statement in the provision that all sex offenders must comply with all SORNA requirements, the added language responds to a judicial decision that did not give full effect to the current regulation.

Section 72.3, as currently formulated, states that SORNA's ''requirements . . . apply to all sex offenders,'' exercising the Attorney General's ''authority to specify the applicability of the requirements of [SORNA] to sex offenders convicted before the enactment of [SORNA] or its implementation in a particular jurisdiction.'' 34 U.S.C. 20913(d); *see Reynolds,* 565 U.S. at 441–45 (explaining Congress's decision to give the Attorney General authority to apply SORNA's requirements to sex offenders with pre-SORNA convictions). Nevertheless, in *United States* v. *DeJarnette,* 741 F.3d 971 (9th Cir. 2013), the court believed that the Attorney General had not made all of SORNA's requirements applicable to all sex offenders. The case concerned the applicability of SORNA's requirement that a sex offender register initially in the jurisdiction in which he is convicted, if it differs from his residence jurisdiction, *see* 34 U.S.C. 20913(a) (second sentence), where the sex offender's conviction predated SORNA's enactment. Notwithstanding 28 CFR 72.3, the court concluded that the Attorney General had not made this SORNA requirement applicable to sex offenders with pre-SORNA convictions, if they were already subject to state law registration requirements. *DeJarnette,* 741 F.3d at 982. The decision was largely premised on the fact that the particular SORNA requirement at issue was not mentioned in relation to that particular class of sex offenders in the examples of sex offenders subject to SORNA's requirements in 28 CFR 72.3 and the SORNA Guidelines. *DeJarnette,* 741 F.3d at 976–80.

The sentence added to § 72.3 by this rulemaking will foreclose future decisions of this nature and ensure that § 72.3's application of SORNA's requirements to all sex offenders is given effect consistently.

The proposed rule includes one further change in § 72.3, affecting the first example in the provision. The example as currently formulated describes a sex offender convicted in 1990 and released following imprisonment in 2007, and says that the sex offender is subject to SORNA's requirements. In *Reynolds,* the Supreme Court held that SORNA's requirements did not apply to sex offenders with pre-SORNA convictions prior to the Attorney General's exercise of the authority under 34 U.S.C. 20913(d) to specify SORNA's applicability to those offenders. 565 U.S. at 434–35. It follows that SORNA's requirements did not apply to such sex offenders before the Attorney General's original issuance of

28 CFR 72.3 on February 28, 2007. Example 1 in § 72.3 might be misunderstood as suggesting the contrary, *i.e.,* that a sex offender with a pre-SORNA conviction released from imprisonment at any time in 2007 was immediately subject to SORNA's requirements. Hence, to avoid any possible inconsistency or apparent inconsistency with the Supreme Court's decision in *Reynolds,* the rule proposes to change the example by substituting a later year for 2007.

### Section 72.4—Where sex offenders must register

Section 72.4 tracks SORNA's express requirement that a sex offender must register and keep the registration current in each jurisdiction in which the sex offender resides, is an employee, or is a student, and must also initially register in the jurisdiction in which the offender was convicted if that jurisdiction differs from the jurisdiction of residence. *See* 34 U.S.C. 20913(a); 73 FR at 38061–62.

### Section 72.5—How long sex offenders must register

Section 72.5 sets out SORNA's requirements regarding the duration of registration. SORNA classifies sex offenders into three ''tiers,'' based on the nature and seriousness of their sex offenses and their histories of recidivism. *See* 34 U.S.C. 20911(2)–(4); 73 FR at 38052–54. The tier in which a sex offender falls affects how long the offender must continue to register under SORNA. The required registration periods are generally 15 years for a tier I sex offender, 25 years for a tier II sex offender, and life for a tier III sex offender. *See* 34 U.S.C. 20915(a); 73 FR at 38068. Paragraph (a) in § 72.5 reproduces these requirements.

Paragraph (a) of § 72.5 provides an exception ''when the sex offender is in custody or civilly committed,'' incorporating in substance an express proviso appearing in SORNA, 34 U.S.C. 20915(a). The exception and proviso mean that SORNA does not require a sex offender to carry out its processes for registering or updating registrations during subsequent periods of confinement, *e.g.,* when imprisoned because of conviction for some other offense following his release from imprisonment for the sex offense. This reflects that ''the SORNA procedures for keeping up the registration . . . generally presuppose the case of a sex offender who is free in the community'' and that ''[w]here a sex offender is confined, the public is protected against the risk of his reoffending in a more direct way, and more certain means are available for tracking his whereabouts.''

73 FR at 38068. However, registration jurisdictions may see incremental value in requiring sex offenders to carry out their processes for registering and updating registrations during subsequent confinement and are free to do so, though SORNA does not require it.

The proviso relating to custody or civil commitment does not pertain to or limit SORNA's requirement that initial registration is to occur while the sex offender is still imprisoned following conviction for the predicate sex offense. *See* 34 U.S.C. 20913(b)(1), 20919(a). Rather, as indicated above, it affects a sex offender's registration obligations under SORNA if he is later reincarcerated after his release. The proviso relating to custody or civil commitment also does not mean that the running of the SORNA registration period is suspended during such subsequent confinement, and does not otherwise affect the commencement or duration of a sex offender's registration period under SORNA.

For example, consider a sex offender, released in 2010 from imprisonment for a sex offense conviction, whom SORNA requires to register for 25 years as a tier II sex offender, and suppose the sex offender is subsequently convicted during the registration period for committing a robbery and imprisoned for three years for the latter offense. SORNA's registration requirement for that sex offender terminates in 2035, although he was incarcerated for three years of the 25-year SORNA registration period. Sex offenders should keep in mind, however, that their registration jurisdictions are free to impose more extensive requirements than SORNA, including longer registration periods. Hence, the basic registration period under the law of a jurisdiction in which such a sex offender is registered may be longer than 25 years. And even if the basic registration period under the jurisdiction's law is the same as the 25 years required by SORNA, the jurisdiction may choose not to credit the three years the sex offender spent in prison for the robbery towards the running of the registration period under state law. *See* 73 FR at 38032–35, 38046, 38068. Expiration of the SORNA registration period accordingly does not obviate the need for sex offenders to check with registration jurisdictions whether they remain subject to registration requirements under the jurisdictions' laws.

As provided in paragraph (b) of § 72.5, the registration period under SORNA begins to run upon release from imprisonment following a sex offense conviction, or at the time of sentencing

for a sex offense where imprisonment does not ensue. *See* 73 FR at 38068. The sex offender's release from imprisonment, which marks the start of the registration period for an incarcerated sex offender, may occur later than the end of the sentence imposed for the sex offense itself. For example, suppose that a sex offender is convicted for a fatal sexual assault upon a victim, resulting in a sentence of three years of imprisonment for the sexual assault and a concurrent or consecutive sentence of 25 years of imprisonment for murder. Or consider a case in which a sex offender is sentenced to three years of imprisonment for a sexual assault and at a later time he is sentenced to 25 years of imprisonment for an unrelated murder, while still imprisoned for the sex offense. Or suppose that a sex offender is already serving a 25-year prison term for an unrelated murder, when he is sentenced to three years of imprisonment for a sexual assault. In all such cases, the registration period under SORNA starts to run when the sex offender actually completes his imprisonment and is released. It does not start to run while the sex offender is still imprisoned but has completed the portion of the sentence attributable to the sex offense.

This conclusion follows from the general design and specific requirements of SORNA's registration procedures. SORNA provides that incarcerated sex offenders must initially register "before completing a sentence of imprisonment with respect to the [registration] offense." 34 U.S.C. 20913(b)(1). SORNA further states that the correlative responsibilities of registration officials in effecting the initial registration are to be carried out "shortly before release of the sex offender from custody." *Id.* 20919(a); *see* 73 FR at 38063 (explaining requirement to register shortly before release from custody). Thereafter, sex offenders must "keep the registration[s] current" for specified periods of time, depending on their "tier[s]." 34 U.S.C. 20915(a). In light of these provisions, the registration period is logically understood as being framed at the start by the release from custody and at the end by the termination of the specified time period.

Considering specifically cases in which a sex offender is serving an aggregate prison term for multiple crimes, 34 U.S.C. 20913(b)(1) requires registration "before completing a sentence of imprisonment *with respect to* the offense giving rise to the registration requirement." (Emphasis added). It does not require registration "before completing a sentence of

imprisonment *for* the offense giving rise to the registration requirement." The broader "with respect to" language is best understood to mean that the relevant prison term under section 20913(b)(1) is not the specific sentence imposed for the predicate sex offense alone, but rather is the full related sentence of imprisonment, including any prison time imposed for other crimes. The corresponding language in section 20919(a) supports this understanding, requiring initial registration of the sex offender "shortly before release of the sex offender from custody." This language does not signify that initial registration is to occur when the sex offender is about to complete the portion of an aggregate sentence attributable specifically to the sex offense, though the sex offender will remain in custody because he is serving additional time for another offense or offenses. Rather, by its terms, section 20919(a) contemplates that initial registration will occur shortly before the sex offender is actually released, and section 20913(b)(1) must be understood in the same way, because section 20913(b)(1) and section 20919(a) describe the same transaction (initial registration) from different perspectives.

For example, consider the case of a sex offender convicted and sentenced for a fatal sexual assault, resulting in a three-year prison term for the sexual assault and a concurrent or consecutive 25-year sentence for murder. Suppose that the sexual assault involved was a sexual contact offense against an adult victim, resulting in the classification of the sex offender as a tier I sex offender and a registration period of 15 years. *See* 34 U.S.C. 20911(2)–(4), 20915(a)(1). If the registration period started to run at the end of the first three years of the sex offender's incarceration, then the 15-year registration period would expire long before the sex offender's release, because of the extension of his imprisonment by the murder sentence. This result would be at odds with section 20919(a)'s direction that sex offenders are to be initially registered "shortly before release . . . from custody," because the sex offender's registration obligation under SORNA would be a thing of the past by that time, and also with the requirements under sections 20913 and 20915(a)(1) that the sex offender register and keep the registration current for 15 years, because his registration period would be over before he registered in the first place.

In addition to the inconsistency with the statutory provisions discussed above, starting the running of the registration period upon the conclusion

of the portion of a sentence attributable to the registration offense would result in arbitrary differences in registration requirements, depending on fortuities in the structuring of criminal sentences or their descriptions in judgments. For example, considering again the case of a fatal sexual assault, suppose that the resulting sentence involves a three-year prison term for the sexual assault, followed by a consecutive 25-year prison term for murder. As discussed above, the assumed 15-year registration period for the sexual assault would then run out long before the sex offender's release, and he would never have to register at all. But suppose the sentence is cast instead as a 25-year prison term for murder, followed by a consecutive three-year prison term for the sexual assault. The completion of the prison term for the sexual assault would then coincide with the sex offender's release from prison, and he would have to register and keep the registration current for 15 years. Because the ordering of the sexual assault and murder sentences has no relevance to the public safety purposes served by sex offender registration, the discrepancy between the two cases as to resulting registration requirements would be irrational. For this reason as well, the registration period under SORNA starts to run when the sex offender is actually released, and not at an earlier time upon completion of the portion of an aggregate sentence specifically attributable to the predicate sex offense.

By way of comparison, an offender's term of post-imprisonment supervised release for a sex offense does not start to run until he is released from prison, including in cases in which the offender's release is delayed by his serving additional prison time for another offense or offenses. This is not unfair or illogical; it rationally reflects the nature of supervision as a measure designed for overseeing and managing offenders following their release. While sex offender registration differs from supervision in being a non-punitive, civil regulatory measure, *see, e.g., Smith,* 538 U.S. at 92–106; *Felts,* 674 F.3d at 605–06, it is likewise concerned with the post-release treatment of sex offenders in the community. Hence, as with periods of supervision, it is rational for an offender's registration period for a sex offense to begin to run when he is released from prison, including in cases in which the offender's release is delayed by his serving additional prison time for other criminal conduct. This reflects the nature of registration as a measure

designed for tracking and monitoring sex offenders following their release.

The principle that the registration period under SORNA commences on release also applies to cases in which the sex offender is not imprisoned for the sex offense per se but is imprisoned because of conviction for another offense. For example, suppose that a sex offender is convicted of sexually assaulting and robbing a victim, resulting in a sentence of probation for the sexual assault and a sentence of five years of imprisonment for the robbery. Considering the relevant statutory provisions, section 20913(b)(2) makes applicable an alternative time for initial registration—three business days after sentencing—only "if the sex offender is not sentenced to a term of imprisonment." Correspondingly, section 20919(a) provides for initial registration immediately after sentencing, rather than shortly before release from custody, only "if the sex offender is not in custody." These provisions, by their terms, do not apply to a sex offender who remains in custody, though on the basis of an offense other than the predicate sex offense. Hence, cases of this nature must fall under the requirement of sections 20913(b)(1) and 20919(a) to effect initial registration shortly before the sex offender's release, and the consequences are the same as in the cases discussed above involving aggregate prison terms for the registration offense and other crimes. Where the sex offender receives a non-incarcerative sentence for the registration offense and a prison term for another offense, the registration period starts upon the sex offender's release, so that once registered and out in the community he must keep the registration current for the full registration period specified in 34 U.S.C. 20915, and not just for a truncated period reduced by his incarceration for another offense.

In terms of registration policy, registration is by definition concerned with tracking sex offenders in the community following their release. *See* 73 FR at 38044–45. The tiers and the associated registration periods under SORNA reflect categorical legislative judgments as to how long sex offenders should be tracked following release for public safety purposes. These judgments do not come into play until the sex offender is released. When that happens may be affected by many factors—such as the length of the prison term the sex offender receives for the sex offense; whether the sex offender makes parole (in a state system having parole) or gets good-conduct credit; whether the jurisdiction adopts an early release

program because of prison crowding; and whether the sex offender gets additional prison time because of sentencing for other offenses, related or unrelated to the sex offense.

Whatever the reasons may be, it is logical to start a post-release tracking regime—*i.e.,* registration—when the sex offender is actually released. Initial registration is to occur "shortly before" that, as 34 U.S.C. 20919(a) requires, "in light of the underlying objectives of ensuring that sex offenders have their registration obligations in mind when they are released, and avoiding situations in which registration information changes significantly between the time the initial registration procedures are carried out and the time the offender is released." 73 FR at 38063.

Hence, the registration period under SORNA starts to run when a sex offender is released from imprisonment, and not at an earlier time when the specific sentence for the registration offense has been served, if the two times differ. This follows from the features of the statutory provisions discussed above, from the absurdities entailed by a different interpretation, and from the basic character of registration as a post-release tracking measure. To the extent that there might be any uncertainty or argument to the contrary, the Attorney General in this rule exercises his authority under 34 U.S.C. 20912(b) to interpret and implement SORNA's provisions affecting the duration of registration in the manner stated.

Paragraph (c) in § 72.5 sets out SORNA's reduction of its registration period for certain sex offenders who maintain a "clean record" in accordance with statutory standards. The specific "clean record" conditions are that the sex offender not be convicted of any felony or any sex offense, successfully complete any period of supervision, and successfully complete an appropriate sex offender treatment program (certified by a registration jurisdiction or the Attorney General). The SORNA registration period is reduced by five years for a tier I sex offender who maintains a clean record for 10 years, and reduced to the period for which the clean record is maintained for a tier III sex offender required to register on the basis of a juvenile delinquency adjudication who maintains a clean record for 25 years. *See* 34 U.S.C. 20915(a), (b); 73 FR at 38068–69.

## Section 72.6—Information Sex Offenders Must Provide

Section 72.6 sets out the registration information sex offenders must provide. Much of the specified information is

expressly required by SORNA, *see* 34 U.S.C. 20914(a)(1)–(7), and the remainder reflects SORNA's direction that sex offenders must provide ''[a]ny other information required by the Attorney General,'' *id.* 20914(a)(8).

In general terms, the required information comprises (i) name, birth date, and Social Security number; (ii) remote communication identifiers (including email addresses and telephone numbers); (iii) information about places of residence, non-residential lodging, employment, and school attendance; (iv) international travel; (v) passports and immigration documents; (vi) vehicle information; and (vii) professional licenses. By providing basic information about who a sex offender is, where he is, how he gets around, and what he is authorized to do, these requirements implement SORNA and further its public safety objectives.

Paragraph (a)(1) of § 72.6 requires that a sex offender provide his name, including any alias, which is an express SORNA requirement. *See* 34 U.S.C. 20914(a)(1); 73 FR at 38055.

Paragraph (a)(2) of § 72.6 requires a sex offender to provide date of birth information, a requirement the Attorney General has adopted in the SORNA Guidelines and this rule because date of birth information is regularly utilized as part of an individual's basic identification information and hence is of value in helping to identify, track, and locate registered sex offenders. The paragraph requires that any date that the sex offender uses as his or her purported date of birth must be provided, in addition to the actual date of birth, because sex offenders may, for example, provide false date of birth information in seeking employment that would provide access to children or other potential victims. *See* 73 FR at 38057.

Paragraph (a)(3) of § 72.6 requires that a sex offender provide his Social Security number, which is an express SORNA requirement. *See* 34 U.S.C. 20914(a)(2). The paragraph further requires provision of any number that a sex offender uses as his purported Social Security number. The Attorney General has adopted the latter requirement—already appearing in the SORNA Guidelines in 2008—because sex offenders may, for example, attempt to use false Social Security numbers in seeking employment that would provide access to children or other potential victims. *See* 73 FR at 38055.

Paragraph (b) of § 72.6 requires a sex offender to provide all remote communication identifiers that he uses in internet or telephonic communications or postings, including

email addresses and telephone numbers. A provision of the Keeping the internet Devoid of Sexual Predators Act of 2008 (KIDS Act), Public Law 110–400, directed the Attorney General to use the authority under paragraph (7) of 34 U.S.C. 20914(a) [now designated paragraph (8)] to require sex offenders to provide internet identifiers. The Attorney General has previously exercised that authority to require the specified information in the SORNA Guidelines. *See* 34 U.S.C. 20916(a); 73 FR at 38055; 76 FR at 1637. The Attorney General has exercised the same authority to require telephone numbers—a requirement also already appearing in the SORNA Guidelines—for a number of reasons, including facilitating communication between registration personnel and sex offenders, and addressing the potential use of telephonic communication by sex offenders in efforts to contact or lure potential victims. *See* 73 FR at 38055.

Paragraph (c)(1) of § 72.6 requires a sex offender to provide residence address information or other residence location information if the sex offender lacks a residence address. Providing residence address information is an express SORNA requirement. *See* 34 U.S.C. 20914(a)(3). In the SORNA Guidelines, and now in this rule, the Attorney General has adopted the requirement to provide other residence location information for sex offenders who do not have residence addresses, such as homeless sex offenders or sex offenders living in rural areas that lack street addresses, because having this type of location information serves the same public safety purposes as knowing the whereabouts of sex offenders with definite residence addresses. *See* 73 FR at 38055–56, 38061–62.

Paragraph (c)(2) of § 72.6 requires a sex offender to provide information about temporary lodging while away from his residence for seven or more days. In the SORNA Guidelines, and now in this rule, the Attorney General has adopted this requirement because sex offenders may reoffend at locations away from the places in which they have a permanent or long-term presence, and indeed could be encouraged to do so to the extent that information about their places of residence is available to the authorities but information is lacking concerning their temporary lodgings elsewhere. The benefits of having this information include facilitating the successful investigation of crimes committed by sex offenders while away from their normal places of residence and discouraging sex offenders from

committing crimes in such circumstances. *See* 73 FR at 38056.

Paragraph (c)(3) of § 72.6 requires a sex offender to provide employer name and address information, or other employment location information if the sex offender lacks a fixed place of employment. Providing employer name and address information is an express SORNA requirement. *See* 34 U.S.C. 20914(a)(4). The Attorney General has adopted, in the SORNA Guidelines and this rule, the requirement to provide other employment location information for sex offenders who work but do not have fixed places of employment—*e.g.*, a long-haul trucker whose ''workplace'' is roads and highways throughout the country, a self-employed handyman who works out of his home and does repair or home improvement work at other people's homes, or a person who frequents sites that contractors visit to obtain day labor and works for any contractor who hires him on a given day. The Attorney General has adopted this requirement because knowing where such sex offenders are in the course of employment serves the same public safety purposes as knowing the whereabouts of sex offenders who work at fixed locations. *See* 73 FR at 38056, 38062.

Paragraph (c)(4) of § 72.6 requires a sex offender to provide the name and address of any place where the sex offender is or will be a student, an express SORNA requirement. *See* 34 U.S.C. 20914(a)(5); 73 FR at 38056–57, 38062.

Paragraph (d) of § 72.6 requires a sex offender to provide information about intended travel outside of the United States. This is an express SORNA requirement, added by International Megan's Law. *See* 34 U.S.C. 20914(a)(7); Public Law 114–119, sec. 6(a)(1). A related provision in § 72.7(f) of this rule requires sex offenders to report international travel information at least 21 days in advance. Exercising the general authority under paragraph (8) of 34 U.S.C. 20914(a) [then designated paragraph (7)] to expand the required range of registration information, the Attorney General initially adopted these requirements in the SORNA Supplemental Guidelines, *see* 76 FR at 1637–38, even before the enactment of International Megan's Law, for a number of reasons:

(i) Realizing SORNA's public safety objectives requires that registered sex offenders be effectively tracked as they leave and return to the United States, and that other sex offenders who enter the United States be identified, so that domestic registration and law enforcement authorities know about the

sex offenders' presence in the United States and can ensure that they register while here as SORNA requires. To that end, SORNA directs the Attorney General to establish and maintain a system for informing relevant registration jurisdictions about persons entering the United States whom SORNA requires to register. *See* 34 U.S.C. 20930. Sections 72.6(d) and 72.7(f) of this rule are part of that system, requiring registered sex offenders to inform their registration jurisdictions about travel abroad, including information that encompasses both their departure from and return to the United States. Beyond this direct benefit, learning about sex offenders' entry into the United States may depend on notice from the authorities of the countries they come from—authorities who may expect reciprocal notice about sex offenders traveling to their countries from the United States. Having U.S. sex offenders inform their registration jurisdictions of travel abroad provides information that is used by U.S. authorities, including the U.S. Marshals Service and INTERPOL Washington-U.S. National Central Bureau, to notify the authorities in the destination countries about sex offenders traveling to their areas. These foreign authorities may in return advise U.S. authorities about sex offenders traveling to the United States from their countries, facilitating the notification of domestic registration jurisdictions about the sex offenders' presence that section 20930 contemplates. *See* 73 FR at 38066; 76 FR at 1637.

(ii) Sex offenders traveling abroad may remain subject in some respects to U.S. jurisdiction, *e.g.,* because a sex offender intends to go to an overseas U.S. military base or to work as or for a U.S. military contractor in another country. In such cases, the intended travel of the sex offender may implicate the same public safety concerns in relation to communities abroad for which the United States has responsibility as it does in relation to communities within the United States. *See* 73 FR at 38067; 76 FR at 1637–38.

(iii) More broadly, for a sex offender disposed to reoffend, it may be attractive to travel to foreign countries where law enforcement is weaker (or perceived to be weaker), where sexually trafficked children or other vulnerable victims may be more readily available, and where the registration and notification measures to which the sex offender is subject in the United States are inoperative. The United States does not wish to export the public safety threat posed by its sex offenders to other countries. Requiring sex offenders in the

United States to inform their registration jurisdictions about international travel provides a basis for notifying foreign authorities in the destination countries, which helps to reduce the resulting risks. If these sex offenders do reoffend in other countries, the resulting human harm to victims is no less because it occurs in a foreign country, and the United States' image and foreign relations interests may be adversely affected as well. Sex offenders from the United States who commit sex offenses in other countries may be subject to prosecution under various Federal laws, which reflect the United States' policy of, and commitment to, combating the commission of crimes of sexual abuse and exploitation internationally as well as domestically. *See, e.g.,* 18 U.S.C. 1591, 2251(c), 2260, 2423. Consistent tracking of international travel by sex offenders helps to deter and prevent such crimes, and to facilitate their investigation if they occur.

Beyond creating a general requirement to report travel outside of the United States at least 21 days in advance, the SORNA Supplemental Guidelines authorized the requirement of more definite information about international travel plans. 76 FR at 1638 (additional directions may be issued by the SMART Office ''concerning the information to be required in sex offenders' reports of intended international travel, such as information concerning expected itinerary, departure and return dates, and means and purpose of travel''); *see Information Required for Notice of International Travel, http://ojp.gov/smart/ international_travel.htm* (providing such directions). Section 72.6(d) in this rule specifically directs sex offenders traveling abroad to report information regarding any anticipated itinerary, dates and places of departure, arrival, or return, carrier and flight numbers for air travel, destination countries and address or contact information therein, and means and purpose of travel. More detailed information of this type is needed because notice only that a sex offender intends to travel somewhere outside of the United States at some time three weeks or more in the future would be inadequate to realize the objectives of international tracking of sex offenders—objectives that include, as discussed above, notification as appropriate of U.S. and foreign authorities in destination countries for public safety purposes, preventing and detecting the offenders' commission of sex offenses in other countries, and reliably tracking sex offenders as they leave and enter the United States for

purposes of enforcing registration requirements. Requiring the specified information concerning international travel is justified by its value in furthering these objectives. *See* 73 FR at 38066–67; 76 FR at 1634, 1637–38.

Congress endorsed these objectives and the stated conclusion in International Megan's Law, whose purposes include ''[t]o protect children and others from sexual abuse and exploitation, including sex trafficking and sex tourism, by providing advance notice of intended travel by registered sex offenders outside the United States to the government of the country of destination [and] requesting foreign governments to notify the United States when a known sex offender is seeking to enter the United States.'' Public Law 114–119; *see* 162 Cong. Rec. H390–94 (Feb. 1, 2016) (explanation in House floor debate on passage). As noted above, the measures adopted by International Megan's Law in support of its international notification system include an express requirement that sex offenders report intended international travel, making this requirement a permanent feature of SORNA that exists independently of regulatory action. *See* 34 U.S.C. 20914(a)(7); Public Law 114–119, sec. 6(a)(1).

Section 72.6(d) in this rule follows the new SORNA travel information provision added by International Megan's Law, which states that sex offenders must provide ''[i]nformation relating to intended travel of the sex offender outside the United States, including any anticipated dates and places of departure, arrival, or return, carrier and flight numbers for air travel, destination country and address or other contact information therein, means and purpose of travel, and any other itinerary or other travel-related information required by the Attorney General.'' 34 U.S.C. 20914(a)(7). A sex offender must report all anticipated information in these categories in relation to both the United States and destination countries as the language of § 72.6(d) makes clear. For example, a sex offender who is leaving the United States must report any anticipated date and place of departure from the United States, and also any anticipated date and place of return to the United States if the sex offender expects to return. Likewise, with respect to each foreign country to be visited, the sex offender must report any anticipated date and place of arrival in that country and any anticipated date and place of departure from that country.

Paragraph (e) of § 72.6 requires a sex offender to provide information concerning any passport or passports he

has, and concerning documents establishing his immigration status if he is an alien. The passports referenced in the paragraph include passports of all types and nationalities, not just U.S. passports. Where the sex offender has multiple passports, as may occur, for example, in cases involving dual citizenship, the paragraph's reference to "each passport" the sex offender has means that the sex offender must report all of his passports. The Attorney General has included information about passports and immigration documents as required registration information in the SORNA Guidelines and in this rule because having this type of information in the registries serves various purposes. These include locating and apprehending registrants who may attempt to leave the United States after committing new sex offenses or registration violations, facilitating the tracking and identification of registrants who leave the United States but later reenter while still required to register, *see* 34 U.S.C. 20930, and crosschecking the accuracy and completeness of other types of information that registrants are required to provide—*e.g.,* if immigration documents show that an alien registrant is in the United States on a student visa but the registrant fails to provide school attendance information as required by 34 U.S.C. 20914(a)(5). *See* 73 FR at 38056.

Paragraph (f) of § 72.6 requires a sex offender to provide information concerning any vehicle owned or operated by the sex offender, information concerning the license plate number or other registration number or identifier for the vehicle, and information as to where the vehicle is habitually kept. In part, the paragraph reflects the express SORNA requirement in 34 U.S.C. 20914(a)(6) that a sex offender provide "[t]he license plate number and a description of any vehicle owned or operated by the sex offender." This includes, in addition to vehicles registered to the sex offender, any vehicle that the sex offender regularly drives, either for personal use or in the course of employment. *See* 73 FR at 38057. The remainder of the paragraph reflects the Attorney General's requirement (previously adopted in the SORNA Guidelines) of additional vehicle-related information that serves similar purposes or may be useful to help prevent flight, facilitate investigation, or effect an apprehension if the sex offender commits new offenses or violates registration requirements. *See id.*

Paragraph (g) of § 72.6 requires a sex offender to provide information concerning all licensing of the offender that authorizes him to engage in an occupation or carry out a trade or business. The Attorney General has adopted this requirement, initially in the SORNA Guidelines and now in this rule, because information of this type (i) may be helpful in locating a registered sex offender if he absconds, (ii) may provide a basis for notifying the responsible licensing authority if the offender's conviction of a sex offense may affect his eligibility for the license, and (iii) may be useful in crosschecking the accuracy and completeness of other information the offender is required to provide—*e.g.,* if the sex offender is licensed to engage in a certain occupation but does not provide name or place of employment information as required by 34 U.S.C. 20914(a)(4) for such an occupation. *See* 73 FR at 38056.

## Section 72.7—How Sex Offenders Must Register and Keep the Registration Current

SORNA requires sex offenders to register and keep the registrations current in jurisdictions in which they reside, work, or attend school. Section 72.7 sets out the procedures for doing so, addressing the timing requirements for registering and updating registrations, the jurisdictions to which changes in registration information must be reported, and the means for reporting such changes. In general terms, the section requires (i) initial registration before release from imprisonment, or within three business days after sentencing if the sex offender is not imprisoned; (ii) periodic in-person appearances to verify and update the registration information; (iii) reporting of changes in name, residence, employment, or school attendance; (iv) reporting of intended departure or termination of residence, employment, or school attendance in a jurisdiction; (v) reporting of changes relating to remote communication identifiers, temporary lodging information, and vehicle information; (vi) reporting of international travel; and (vii) compliance with a jurisdiction's rules if a sex offender has not complied with the normal time and manner specifications for carrying out a SORNA requirement.

The requirements articulated in this section in part appear expressly in SORNA and in part reflect exercises of the powers SORNA confers on the Attorney General to further specify its requirements. The authorities relied on include the following: SORNA directs the Attorney General to issue rules and guidelines to "interpret and implement" its provisions, which include the basic requirement that each sex offender must "register . . . and keep the registration current." 34 U.S.C. 20912(b), 20913(a). Previously in the SORNA Guidelines, *see* 73 FR at 38062–67, and now in this rule, the Attorney General interprets his authority to "interpret and implement" SORNA as including the authority to articulate a comprehensive, gap-free set of procedural requirements for registering and updating registrations. Authority of this nature is needed to implement SORNA in conformity with the legislative objective of protecting the public from sex offenders by establishing a comprehensive national system for their registration. 34 U.S.C. 20901. Beyond the public safety need, this understanding of section 20912(b) "takes Congress to have filled potential lacunae" in SORNA in a manner consistent with fair notice concerns, empowering the Attorney General to eliminate any "vagueness and uncertainty" regarding how sex offenders are to comply with SORNA's registration requirements. *Reynolds,* 565 U.S. at 441–42.

The Attorney General's authority to interpret and implement SORNA includes in particular the authority to adopt additional specifications regarding the time and manner in which its requirements must be carried out. For example, SORNA expressly requires that sex offenders must appear in person to report changes of name, residence, employment, and student status within three business days of such changes. 34 U.S.C. 20913(c). But SORNA does not expressly require the reporting within a particular timeframe of changes relating to other types of registration information that also bear directly and importantly on the identification, tracking, and location of sex offenders. These include remote communication identifiers (such as email addresses), temporary lodging information, international travel information, and vehicle information, as described in § 72.6(b), (c)(2), (d), and (f) of this rule. Absent a requirement that changes in these types of information be reported promptly, the information in the registries about these matters could become seriously out of date, which would in turn impair SORNA's basic objective of effectively tracking and locating sex offenders in the community following their release. *See* 73 FR at 38044–45, 38066–67. The Attorney General accordingly has adopted definite timing requirements for reporting changes in these types of information, previously in the guidelines for SORNA implementation, and now in § 72.7(e)–(f) in this rule.

Adopting such rules reflects an exercise of the Attorney General's authority to "interpret and implement"

SORNA, 34 U.S.C. 20912(b), and more specifically to interpret and implement SORNA's requirement that sex offenders must "keep the registration current," *id.* 20913(a). While the heading of subsection (c) of section 20913 is "[k]eeping the registration current," the heading only signifies that the subsection sets out an updating rule for the most basic types of registration information. It does not signify that nothing more can be required to keep the registration current. The contrary is evident from section 20915(a), which specifies the duration of required registration under SORNA. Section 20915(a) uses the same terminology, stating that a sex offender "shall keep the registration current" for the relevant period of time. Obviously, in providing that a sex offender must "keep the registration current" for a specified period, section 20915(a) defines the period of time during which a sex offender must continue to comply with all of SORNA's requirements, given the absence of any other provision in SORNA specifying how long sex offenders must comply with its various requirements. Among other consequences, this means that sex offenders must appear in person periodically to verify and update their registration information, as required by section 20918, for the specified period of time—not just that they must report changes in name, residence, employment, and school attendance, as provided in section 20913(c), for the specified period of time. That consideration alone demonstrates that section 20913(c) does not exhaust SORNA's requirements for "keep[ing] the registration current."

Regarding other matters, such as changes in registration information relating to remote communication identifiers, temporary lodging, vehicles, and international travel, the Attorney General has understood the authority to interpret and implement SORNA's requirement to keep the registration current as including the authority to adopt specific time and manner requirements for the reporting of such changes. Congress ratified this understanding in the KIDS Act. In that Act, Congress provided that (i) "[t]he Attorney General, using the authority provided in [34 U.S.C. 20914(a)(8)], shall require that each sex offender provide to the sex offender registry those internet identifiers the sex offender uses or will use" and (ii) "[t]he Attorney General, using the authority provided in [34 U.S.C. 20912(b)], shall specify the time and manner for keeping current information required to be

provided under this section." 34 U.S.C. 20916(a)–(b).

Notably, Congress did not find it necessary to make new grants of authority to the Attorney General for these purposes and instead directed the Attorney General to utilize the pre-existing authorities under SORNA to require internet identifier information and specify the time and manner for keeping it current. This confirms that the section 20912(b) authority includes the authority to adopt additional time and manner requirements in the rules and guidelines the Attorney General issues.

SORNA directs sex offenders to provide for inclusion in the sex offender registry several expressly described types of registration information and, in addition, "[a]ny other information required by the Attorney General." *Id.* 20914(a)(8). The section 20914(a)(8) authority underlies the specification of required types of registration information in § 72.6 in this rule beyond those expressly set forth in section 20914(a)(1)–(7). The section 20914(a)(8) authority also provides an additional, independent legal basis for various requirements in § 72.7, including a number of timing rules it incorporates.

In relation to some types of required registration information under this rule, which may be based wholly or in part on the exercise of the Attorney General's authority under section 20914(a)(8), a timing requirement is inherent in the nature of the information that must be reported. This is true of the requirement under § 72.7(d) to report if a sex offender will be commencing residence, employment, or school attendance elsewhere or will be terminating residence, employment, or school attendance in a jurisdiction. It is likewise true of the requirement under § 72.7(f) to report intended international travel. Because these provisions constitute requirements to report present intentions regarding expected future actions, the information they require necessarily must be reported in advance of the expected actions.

Section 20914(a)(8) also provides an additional, independent legal basis for more specific timeframe requirements appearing in § 72.7 of this rule. One of these requirements is that intended international travel is to be reported at least 21 days in advance of the travel, as provided in § 72.7(f). In substance, this is a requirement that a sex offender report to the residence jurisdiction an intention to travel outside of the United States at some time 21 days or more in the future. Viewing the expected timing of the travel as an aspect of the required information, it is within the Attorney

General's authority under 34 U.S.C. 20914(a)(8) to require sex offenders to provide "[a]ny other information"—and following the adoption of section 20914(a)(7) by International Megan's Law, within the Attorney General's more specific authority under the latter provision to require "any other . . . travel-related information." Essentially the same point applies to the rule's specification that sex offenders must report within three business days changes relating to certain types of registration information the Attorney General has required. Section 72.7(e) directs reporting of changes in information within that timeframe relating to remote communication identifiers, temporary lodging, and vehicles. Viewed as requirements to report the information that certain actions or occurrences have taken place within the preceding three business days, these requirements are within the Attorney General's authority under 34 U.S.C. 20914(a)(8).

Turning to another SORNA provision supporting time and manner requirements, 34 U.S.C. 20913(d) authorizes the Attorney General to specify the applicability of SORNA's requirements to sex offenders convicted before the enactment of SORNA or its implementation in a particular jurisdiction "and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)." The cross-referenced "subsection (b)" is the SORNA provision that requires sex offenders to register initially before release from imprisonment, or within three business days of sentencing if the sex offender is not imprisoned. As discussed below in connection with § 72.7(a)(2) of this rule, sex offenders released from Federal or military custody and sex offenders convicted in foreign countries generally are unable to register prior to release. The section 20913(d) authority to prescribe registration rules for sex offenders "unable to comply with subsection (b)" accordingly provides one of the legal bases for the alternative timing rules in § 72.7(a)(2), which direct registration by sex offenders in the affected classes within three business days of entering a jurisdiction following release.

The authorities described above— under 34 U.S.C. 20912(b), 20913(d), and 20914(a)(8)—provided the basis for the Attorney General's adoption of time and manner specifications for complying with SORNA's registration requirements in previously issued guidelines under SORNA. More recently, International Megan's Law added an express, general

grant of authority to the Attorney General to make such specifications. The relevant provision is 34 U.S.C. 20914(c), which reads as follows: ''(c) TIME AND MANNER.—A sex offender shall provide and update information required under subsection (a), including information relating to intended travel outside the United States required under paragraph (7) of that subsection, in conformity with any time and manner requirements prescribed by the Attorney General.''

The cross-referenced ''subsection (a)'' is SORNA's list of all the registration information that sex offenders must provide. Hence, the new section 20914(c) requires sex offenders to comply with the Attorney General's directions regarding the time and manner for providing and updating all registration information required by SORNA. In addition to empowering the Attorney General to specify the time and manner for reporting particular types of registration information, this provision enables the Attorney General to specify the time and manner for registration. This is so because registration on the part of a sex offender consists of providing required registration information to the registration jurisdiction for inclusion in the sex offender registry. Given that the Attorney General has the authority under section 20914(c) to specify the time and manner for a sex offender's provision of each required type of registration information, it follows that the Attorney General has the authority under section 20914(c) to specify the time and manner for a sex offender's provision of the required types of information collectively, which constitutes registration under SORNA.

*Paragraph (a)—Initial Registration*

Paragraph (a)(1) of § 72.7 tracks SORNA's general rule that a sex offender must initially register—that is, register for the first time based on a sex offense conviction—before release from imprisonment, or within three business days of sentencing in case of a non-incarcerative sentence. *See* 34 U.S.C. 20913(b) (initial registration by sex offenders); *id.* 20919(a) (complementary duties of registration officials); 73 FR at 38062–65 (related explanation in guidelines).

Paragraph (a)(2)(i) of § 72.7 addresses the situation of sex offenders who are released from Federal or military custody or sentenced for a Federal or military sex offense. There is no separate Federal registration program for such offenders. Hence, Federal authorities cannot register these offenders prior to their release from custody or near the time of sentencing. This is in contrast to the authorities of the SORNA registration jurisdictions—the states, the District of Columbia, the five principal U.S. territories, and qualifying Indian tribes—who may register their sex offenders prior to release or near sentencing as provided in 34 U.S.C. 20913(b), 20919(a). SORNA instead enacted special provisions under which Federal correctional and supervision authorities (i) are required to inform Federal (including military) offenders with sex offense convictions that they must register as required by SORNA and (ii) must notify the (non-Federal) jurisdictions in which the sex offenders will reside following release or sentencing so that these jurisdictions can integrate the sex offenders into their registration programs. *See* 18 U.S.C. 4042(c); Public Law 105–119, sec. 115(a)(8)(C), as amended by Public Law. 109–248, sec. 141(i) (10 U.S.C. 951 note); 73 FR at 38064; *see also* 18 U.S.C. 3563(a)(8); *id.* 3583(d) (third sentence); *id.* 4209(a) (second sentence) (mandatory Federal supervision condition to comply with SORNA); 34 U.S.C 20931 (requiring the Secretary of Defense to provide to the Attorney General military sex offender information for inclusion in the National Sex Offender Registry and National Sex Offender Public website).

The timing rule adopted for such situations is that sex offenders released from Federal or military custody or convicted of Federal or military sex offenses but not sentenced to imprisonment must register within three business days of entering or remaining in a jurisdiction to reside, *see* 73 FR at 38064, which parallels SORNA's normal timeframe for registering or updating a registration following changes of residence, *see* 34 U.S.C. 20913(c). Section 72.7(a)(2)(i) refers to a sex offender entering ''or remaining'' in a jurisdiction to reside because, for example, a Federal sex offender released from a Federal prison located in a state may remain in that state to reside, rather than relocating to some other state. In such a case, the three-business-day period for registering with the state runs from the time of the sex offender's release.

In terms of legal authority, the requirement of § 72.7(a)(2)(i) is supported by the Attorney General's authority to interpret and implement SORNA's requirement to register in the jurisdiction of residence, 34 U.S.C. 20912(b), 20913(a); the Attorney General's authority under section 20913(d) to prescribe rules for the registration of sex offenders who are unable to comply with section 20913(b)'s timing rule for initial registration; and the Attorney General's authority under section 20914(c) to adopt time and manner specifications for providing and updating registration information, which includes the authority to adopt time and manner specifications for registration as discussed above. Viewing a sex offender's being released from Federal or military custody and taking up residence in a jurisdiction as a change of residence, this requirement is also supportable as a direct application of section 20913(c).

Paragraph (a)(2)(ii) of § 72.7 addresses the situation of persons required to register on the basis of foreign sex offense convictions. Registration by the convicting state is not an available option under SORNA in such cases because foreign states are not registration jurisdictions under SORNA. *See* 34 U.S.C. 20911(10). Also, there may be no domestic jurisdiction in which SORNA requires such offenders to register—if they are not residing, working, or attending school in the United States at the time they are released from custody or sentenced in the foreign country—but SORNA's requirements will apply if they travel or return to the United States. The rule adopted for foreign conviction situations is that the sex offender must register within three business days of entering a domestic jurisdiction to reside, work, or attend school, *see* 73 FR at 38050–51, 38064–65, which parallels SORNA's normal timeframe for registering or updating a registration following changes of residence, employment, or student status, *see* 34 U.S.C. 20913(c).

In terms of legal authority, this requirement is supported by the Attorney General's authority to interpret and implement SORNA's requirement to register in jurisdictions of residence, employment, and school attendance, 34 U.S.C. 20912(b), 20913(a); the Attorney General's authority under section 20913(d) to prescribe rules for the registration of sex offenders who are unable to comply with section 20913(b)'s timing rule for initial registration; and the Attorney General's authority under section 20914(c) to adopt time and manner specifications for providing and updating registration information, which includes the authority to adopt time and manner specifications for registration as discussed above. Insofar as a sex offender's travel or return to the United States following a foreign conviction involves a change of residence, employment, or student status, this

requirement is also supportable as a direct application of section 20913(c).

*Paragraph (b)—Periodic In-Person Verification*

Paragraph (b) of § 72.7 sets out the express requirement of 34 U.S.C. 20918 that sex offenders periodically appear in person in the jurisdictions in which they are required to register, allow the jurisdictions to take current photographs, and verify their registration information, with the frequency of the required appearances determined by their tiering. *See* 73 FR at 38067–68.

The second sentence of paragraph (b), exercising the Attorney General's authority under 34 U.S.C. 20912(b), interprets and implements section 20918's requirement of verifying the information in each registry to include correcting any information that is out of date or inaccurate and reporting any new registration information. With respect to most types of registration information, other provisions of § 72.7 require reporting of changes within shorter timeframes than the intervals between periodic in-person appearances for verification. Hence, a sex offender who has complied with SORNA's requirements is likely to have reported changes in most types of registration information prior to his next verification appearance. But § 72.7 does not specially address the time and manner for reporting changes in some types of registration information. *See* § 72.6(a)(2)–(3), (e), (g) (requiring as well information concerning actual and purported dates of birth and Social Security numbers, passports and immigration documents, and professional licenses). Sex offenders can keep their registrations current with respect to the latter categories of information by reporting any changes in their periodic verifications. *See* 73 FR at 38067–68.

*Paragraph (c)—Reporting of Initiation and Changes Concerning Name, Residence, Employment, and School Attendance*

Paragraph (c) of § 72.7 is based on SORNA's express requirement that "[a] sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to [34 U.S.C. 20913(a)] and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry." 34 U.S.C. 20913(c); *see* 73 FR at 38065–66.

While SORNA provides a definite timeframe for reporting these changes (within three business days), specifies a means of reporting (through in-person appearance), and requires reporting of a change in "at least 1 jurisdiction," it does not specify the particular jurisdiction in which each kind of change—*i.e.,* change in name, residence, employment, or school attendance—is to be reported. As discussed earlier, the Attorney General's authority under 34 U.S.C. 20912(b) to interpret and implement SORNA includes the authority to further specify the manner in which changes in registration information are to be reported where there are such gaps or ambiguities in SORNA's statutory provisions. In addition, the Attorney General now has express authority under 34 U.S.C. 20914(c) to prescribe the manner in which all required registration information is to be provided and updated. Exercising those authorities in paragraph (c) in § 72.7, the Attorney General interprets and implements the requirement of section 20913(c), and prescribes the manner in which sex offenders must provide and update information about name, residence, employment, or student status, by specifying the particular jurisdiction in which a sex offender must appear to report the changes section 20913(c) describes—in the residence jurisdiction to report a change of name or residence, in the employment jurisdiction to report a change of employment, and in the jurisdiction of school attendance to report a change in school attendance. *See* 73 FR at 38065.

For example, suppose that a sex offender resides in state A and commutes to work in state B. Pursuant to 34 U.S.C. 20913(a), the sex offender must register in both states—in state A as his residence state, and in state B as his employment state. Suppose that the sex offender changes his place of residence in state A and continues to work at the same place in state B. Logically, the sex offender should carry out his in-person appearance in state A to report his change of residence in state A, rather than in state B, where his contact with the latter state (employment) has not changed. Conversely, varying the example, suppose that the sex offender changes his place of employment from one employer to another in state B, but continues to reside in the same place in state A. The sex offender should carry out his in-person appearance in state B to report his change of employment in state B, rather than in state A, where his contact with the latter state (residence) has not changed.

These conclusions follow from the underlying policies of SORNA's in-person appearance requirements, which aim to provide opportunities for face to face encounters between sex offenders and persons responsible for their registrations in the local areas in which they will be present. Such encounters may help law enforcement personnel to familiarize themselves with the sex offenders in their areas, thereby facilitating the effective discharge of their protective and investigative functions in relation to those sex offenders, and helping to ensure that their responsibilities to track those offenders are taken seriously and carried out consistently. Likewise, from the perspective of sex offenders, face to face encounters with officers responsible for their monitoring in the local areas where they are present may help to impress on them that their identities, locations, and past criminal conduct are known to the authorities in those areas. Hence, there is a reduced likelihood of their avoiding detection and apprehension if they reoffend, and this may help them to resist the temptation to reoffend. *See* 73 FR at 38065, 38067.

These policies are furthered by sex offenders appearing in person to report changes in residence, employment, and school attendance in the jurisdictions in which the changes occur, rather than in other jurisdictions where they may be required to register, but within whose borders there has been no change in the location of the sex offender. Section 72.7(c) in the rule accordingly provides that changes in the most basic types of location information—residence, employment, school attendance—are to be reported through in-person appearances in the jurisdictions in which they occur. Section 72.7(c) also provides definiteness regarding the reporting of name changes under 34 U.S.C. 20913(c), providing that such changes are to be reported in the residence jurisdiction, as the jurisdiction in which a sex offender is likely to have his most substantial presence and contacts.

*Paragraph (d)—Reporting of Departure and Termination Concerning Residence, Employment, and School Attendance*

Paragraph (d) of § 72.7 requires sex offenders to inform the jurisdictions in which they reside if they will be commencing residence, employment, or school attendance in another jurisdiction or outside of the United States, and to inform the relevant jurisdictions if they will be terminating residence, employment, or school attendance in a jurisdiction. The Attorney General has previously articulated these requirements in the SORNA Guidelines. *See* 73 FR at

38065–67. These requirements are not part of the requirement under 34 U.S.C. 20913(c) to report certain changes through in-person appearances and they may be reported by any means allowed by registration jurisdictions in their discretion. *See* 73 FR at 38067.

Paragraph (d)(1) of § 72.7, relating to notice about intended commencement of residence, employment, or school attendance outside of a jurisdiction, and paragraph (d)(2), relating to notice about termination of residence, employment, or school attendance in a jurisdiction, are complementary, each applying in certain situations that may be outside the scope of the other. For example, § 72.7(d)(1) requires a sex offender to inform his residence jurisdiction if he will be starting a job in another jurisdiction, even if he will continue to reside where he has resided and will not be terminating any existing connection to the residence jurisdiction. Section 72.7(d)(2) requires a sex offender to inform a jurisdiction of his intended termination of residence, employment, or school attendance in that jurisdiction "even if there is no ascertainable or expected future place of residence, employment, or school attendance for the sex offender." 73 FR at 38066. Regarding the underlying legal authority for § 72.7(d), its informational requirements overlap with types of information 34 U.S.C. 20914(a) expressly requires sex offenders to provide, which include information as to where a sex offender "will reside," "will be an employee," or "will be a student." *Id.* 20914(a)(3)–(5). To the extent § 72.7(d) goes beyond the registration information that SORNA expressly requires, it is a straightforward exercise of the Attorney General's authority under 34 U.S.C. 20914(a)(8) to require any additional registration information.

Even before the enactment of International Megan's Law, the Attorney General's implementation authority under 34 U.S.C. 20912(b) was understood to include the authority to specify time and manner requirements for providing and updating registration information, as discussed above. Currently, section 20914(c) confers express authority on the Attorney General to adopt the time and manner requirements set forth in § 72.7(d)—*i.e.,* that (i) intended commencement of residence, employment, or school attendance in another jurisdiction or outside the United States is to be reported to the residence jurisdiction (by whatever means it allows) prior to any termination of residence in that jurisdiction and prior to commencing residence, employment, or school

attendance in the other jurisdiction or outside of the United States; and (ii) intended termination of residence, employment, or school attendance in a jurisdiction is to be reported to the jurisdiction (by whatever means it allows) prior to the termination of residence, employment, or school attendance in the jurisdiction. Section 72.7(d)'s requirement that the intended actions or changes are to be reported prior to the termination of residence, employment, or school attendance in the relevant jurisdiction ensures that the reporting requirement applies while the sex offender is still subject to the requirement to register and keep the registration current in the jurisdiction pursuant to 34 U.S.C. 20913(a). This approach avoids any question about the validity of requiring a sex offender to provide or update information in a jurisdiction in which he is no longer required to register under SORNA.

The exercise of the authorities described above in § 72.7(d) furthers SORNA's objective of creating a "comprehensive national system for the registration of [sex] offenders," 34 U.S.C. 20901, which reliably tracks sex offenders as they move away from and into registration jurisdictions. A sex offender's departure from a jurisdiction in which he is registered may eventually be discovered—*e.g.,* because he fails to appear for the next periodic verification of his registration, *see id.* 20918—even if he does not affirmatively notify the jurisdiction that he is leaving. But considerable time may elapse before that happens, leaving a cold trail for law enforcement efforts to locate the sex offender, if he does not register in the destination jurisdiction as SORNA requires.

For example, for a sex offender who decides to change his residence from one state to another, § 72.7(d) requires the sex offender to inform the state he is leaving prior to his departure, and § 72.7(c) requires him to inform the destination state within three business days of his arrival there. Under SORNA's procedures for information sharing among registration jurisdictions, the state of origin in such a case directly notifies the identified destination state. *See* 34 U.S.C. 20921(b), 20923(b)(3); 73 FR at 38065; 76 FR at 1638. If the sex offender then fails to appear and register as expected in the destination state, appropriate follow-up ensues, which may include investigative efforts by state and local law enforcement and the U.S. Marshals Service to locate the sex offender, issuance of a warrant for his arrest, and entry of information into national law enforcement databases reflecting the sex offender's status as an

absconder or unlocatable. *See* 34 U.S.C. 20924; 73 FR at 38069. In the context of this system, the requirement of § 72.7(d) for a sex offender to notify the residence jurisdiction concerning his departure is an important element. It helps to ensure that agencies and officials responsible for sex offender registration and its enforcement are promptly made aware of major changes in the location of sex offenders, and thereby reduces the risk that sex offenders will disappear in the interstices between jurisdictions.

In so doing, § 72.7(d) resolves certain potential problems in the operation of SORNA's registration system following the Supreme Court's decision in *Nichols* v. *United States,* 136 S Ct. 1113 (2016), and a similar earlier decision by the Eighth Circuit Court of Appeals, *United States* v. *Lunsford,* 725 F.3d 859 (8th Cir. 2013). *Nichols* involved a sex offender who abandoned his residence in Kansas and relocated to the Philippines, without informing the Kansas registration authorities of his departure. The issue in the case was whether Nichols had violated 34 U.S.C. 20913(c), which requires a sex offender "not later than three business days after each change of name, residence, employment, or student status" to "appear in person in at least 1 jurisdiction involved pursuant to subsection (a) and inform that jurisdiction of all changes" in the required registration information.

The Court noted that subsection (a) of section 20913 mentions three jurisdictions as possibly "involved"— "where the offender resides, where the offender is an employee, and where the offender is a student"— which would not include the state of Kansas after Nichols had moved to the Philippines. *Nichols,* 136 S Ct. at 1117 (quoting 34 U.S.C. 20913(a)). The Court further noted that section 20913(c) requires appearance and registration within three business days *after* a change of residence, and Nichols could not have appeared in Kansas after he left the state. *Id.* at 1117–18. The Court accordingly concluded that Nichols' failure to inform Kansas of his departure was not a violation of section 20913(c), since Kansas was no longer an "involved" jurisdiction in which section 20913(c) may require a sex offender to report changes in residence. *Id.* at 1118. Applying the same reasoning to the domestic context, if a sex offender terminates his residence in a state and thereafter takes up residence in another state, he cannot violate section 20913(c) by failing to inform the state he is leaving. For, following the termination of residence in that state, it

is no longer a ''jurisdiction involved'' for purposes of section 20913(c).

There is no comparable problem, however, with § 72.7(d)'s requirement that a sex offender inform a jurisdiction in which he resides of his intended departure from the jurisdiction, because § 72.7(d) does not depend on the requirements of section 20913(c). Rather, § 72.7(d) is grounded in the requirement of section 20914(a) that sex offenders provide certain information, including ''[a]ny other information required by the Attorney General,'' and the requirement of section 20914(c) that they report the required information in the ''time and manner . . . prescribed by the Attorney General.''

The Attorney General's exercise of his authorities under section 20914(a) and 20914(c) to require sex offenders to inform their registration jurisdictions that they will be going elsewhere in no way conflicts with *Nichols'* conclusion that section 20913(c) does not require such pre-departure notice of intended relocation. Section 20914(a)(8) says that sex offenders must provide ''[a]ny other information required by the Attorney General.'' The statute does not say that sex offenders must provide ''[a]ny other information required by the Attorney General, *except for information about intended departure from the jurisdiction.*'' *Nichols'* interpretation of section 20913(c) provides no basis for reading such an unstated limitation into section 20914(a)(8). Likewise, *Nichols* provides no basis for reading unstated limitations into the Attorney General's authority—now expressly granted by section 20914(c)—to prescribe time and manner requirements for providing and updating registration information, which adequately supports § 72.7(d)'s requirement that a sex offender inform the jurisdiction in which he resides about intended departure prior to any termination of residence and before going elsewhere.

The Attorney General's adoption of the § 72.7(d) requirements is also consistent with the Supreme Court's analysis of particular arguments and issues in *Nichols.* The salient points are as follows:

First, the Court in *Nichols* noted that the predecessor Federal sex offender registration law (the ''Wetterling Act'') required a sex offender to ''report the change of address to the responsible agency in the State the person is leaving,'' while SORNA contains no comparable provision that expressly requires sex offenders to notify jurisdictions they are leaving. 136 S Ct. at 1118 (quoting 42 U.S.C. 14071(b)(5) (2000)). However, SORNA does not attempt to articulate all the particulars

of its registration requirements for sex offenders, instead authorizing the Attorney General to complete the regulatory scheme through interpretation and implementation of SORNA. *See, e.g.,* 34 U.S.C. 20912(b), 20913(d), 20914(a)(8), 20914(c). Given the extent of the Attorney General's powers under SORNA, it was not necessary for Congress to include an express provision in SORNA requiring sex offenders to notify jurisdictions they are leaving. Nor can there be any doubt that requiring such notification is now within the terms of the Attorney General's powers under SORNA, as discussed above. Indeed, 34 U.S.C. 20923(b)(3)—which provides that a jurisdiction's officials are to inform each jurisdiction ''from or to which a change of residence, employment, or student status occurs''— contemplates the Attorney General's adoption of requirements like those appearing in § 72.7(d). For if sex offenders were not required to advise the jurisdictions they leave of their departure and destination, those jurisdictions could not inform the jurisdictions ''to which'' sex offenders relocate.

Second, the Court in *Nichols* rejected an argument that a jurisdiction necessarily remains ''involved'' for purposes of section 20913(c) if the sex offender continues to appear on the jurisdiction's registry as a current resident. The Court responded that section 20913(a) gives jurisdictions where the offender resides, is an employee, or is a student as the only possibilities for an ''involved'' jurisdiction, and does not include a jurisdiction ''where the offender appears on a registry.'' 136 S Ct. at 1118. The Court said ''[w]e decline the . . . invitation to add an extra clause to the text of § [20]913(a).'' *Id.* In contrast, § 72.7(d) in this rule does not require the addition of an extra clause to section 20913(a). It involves the exercise of the Attorney General's authorities under SORNA to include the information described in § 72.7(d) in the information that a sex offender must provide to the jurisdictions described in the actual clauses of section 20913(a)—*i.e.*, those in which he resides, is an employee, or is a student.

Third, the Court rejected an argument that Nichols was required to inform Kansas of his intended departure based on 34 U.S.C. 20914(a)(3)'s direction to sex offenders to provide information about where they ''will reside.'' The Court noted that ''§ [20]914(a) merely lists the pieces of information that a sex offender must provide if and when he updates his registration; it says nothing about whether the offender has an

obligation to update his registration in the first place.'' 136 S Ct. at 1118. In context, the Court's point was that section 20914(a)(3) just specifies a type of information sex offenders must provide, and does not say when they must provide it, so section 20914(a)(3) does not in itself require sex offenders to provide change of residence information in advance when they leave a jurisdiction. For example, without more, section 20914(a)(3) might be taken to entail that sex offenders must advise where they ''will reside'' when initially registering before release from imprisonment, *see* 34 U.S.C. 20913(b)(1), but not necessarily that they give advance notice to their registration jurisdictions of expected future residence on subsequent relocations.

However, this understanding of section 20914(a)(3) does not imply any limitation on the Attorney General's authority to require a sex offender to ''update his registration in the first place,'' *Nichols*, 136 S Ct. at 1118, on the basis of 34 U.S.C. 20914(c), which directs that ''[a] sex offender shall provide and update information required under subsection (a) . . . in conformity with any time and manner requirements prescribed by the Attorney General.'' Nor does it imply any limitation on the Attorney General's authority under SORNA to require sex offenders to report the full range of information described in § 72.7(d). In § 72.7(d), as discussed above, the Attorney General exercises these authorities to require sex offenders to inform jurisdictions of intended departure and expected future residence prior to any termination of residence in a jurisdiction.

Finally, the Court in *Nichols* rejected an argument that Nichols had to notify Kansas of his departure on the theory that he engaged in two changes of residence—the first when he abandoned his residence in Kansas, and the second when he checked into a hotel in the Philippines. 136 S Ct. at 1118–19. Section 72.7(d) in this rule, however, does not assume any such multiplicity in changes of residence. Rather, it establishes a freestanding requirement to inform registration jurisdictions in advance of termination of residence and commencement of intended future residence.

At the end of the *Nichols* decision, the Court noted that—considering the International Megan's Law amendments to SORNA—''[o]ur interpretation of the SORNA provisions at issue in this case in no way means that sex offenders will be able to escape punishment for leaving the United States without

notifying the jurisdictions in which they lived while in this country.'' 136 S. Ct. at 1119. The Court noted the addition of a new subsection (b) to 18 U.S.C. 2250, which ''criminalized the 'knowin[g] fail[ure] to provide information required by [SORNA] relating to intended travel in foreign commerce,' '' and the addition of 34 U.S.C. 20914(a)(7), which requires sex offenders to provide information about intended international travel. 136 S. Ct. at 1119 (brackets in original) (quoting 18 U.S.C. 2250(b)(2)). The Court concluded: ''We are thus reassured that our holding today is not likely to create 'loopholes and deficiencies' in SORNA's nationwide sex-offender registration scheme.'' *Id.* (quoting *United States* v. *Kebodeaux,* 570 U.S. 387, 399 (2013)).

Section 72.7(d) in this rule similarly helps to ensure that the interpretation of 34 U.S.C. 20913(c) in *Nichols* and *Lunsford* does not create ''loopholes and deficiencies'' in the operation of SORNA's tracking system, in relation to both domestic and international relocations. For example, consider a sex offender who terminates his residence in a state without informing the state. Suppose the sex offender is later found elsewhere in the United States, but he cannot be shown to have taken up residence—or to have been employed or a student—in another jurisdiction after leaving the original state of residence. In light of *Nichols,* section 20913(c) does not require the sex offender to report his relocation to the original state because it is no longer an ''involved'' jurisdiction after he leaves, and there may be no other relevant jurisdiction in which he must report the change, *i.e.,* one in which he presently resides, is employed, or is a student. However, with § 72.7(d) in effect, a sex offender in this circumstance will have violated 34 U.S.C. 20914(a) and (c)'s requirements to provide registration information, including ''[a]ny other information'' prescribed by the Attorney General, in the time and manner prescribed by the Attorney General. At a minimum, in the case described, the sex offender would have failed to provide the information that he is terminating his residence in the original state of residence prior to his termination of residence in that state, contravening § 72.7(d).

Hence, § 72.7(d) provides an additional safeguard against registered sex offenders' simply disappearing without informing anyone about their relocation. The consequences for non-compliant sex offenders include potential prosecution by registration jurisdictions, which have been encouraged to adopt departure notification requirements similar to

§ 72.7(d) in their registration laws by the Attorney General's prior articulation of those requirements in the SORNA Guidelines. *See* 73 FR at 38065–66. The consequences of noncompliance with § 72.7(d) will also include potential Federal prosecution under 18 U.S.C. 2250 for violations committed under circumstances supporting Federal jurisdiction.

Sex offenders must comply both with the requirements of § 72.7(c) and with the requirements of § 72.7(d). For example, suppose a sex offender changes residence from state A to state B. It is not sufficient if (i) the sex offender complies with § 72.7(d) by telling state A that he is leaving and going to state B, but (ii) he fails to appear in state B and register there as required by § 72.7(c), and then (iii) he attempts to excuse his failure to comply with § 72.7(c) on the ground that state A could have told state B about his relocation. Likewise, it is not sufficient if the sex offender in such a case (i) complies with § 72.7(c) by registering in state B, but (ii) he fails to inform state A about the intended relocation prior to his departure, and then (iii) he attempts to excuse his failure to comply with § 72.7(d) on the ground that state B could have told state A about his relocation. As discussed above, appearance and registration by sex offenders in jurisdictions in which they commence residence, employment, or school attendance, as required by § 72.7(c), and notification by sex offenders to jurisdictions in which they terminate residence, employment, or school attendance, as required by § 72.7(d), both serve important purposes in SORNA's registration system as articulated in this rule and the previously issued SORNA guidelines. Compliance with both requirements is necessary to the seamless and effective operation of that system for the reasons explained above.

*Paragraph (e)—Reporting of Changes in Information Relating to Remote Communication Identifiers, Temporary Lodging, and Vehicles*

Paragraph (e) requires sex offenders to report to their residence jurisdictions within three business days changes in remote communication identifier information, temporary lodging information, and vehicle information. In terms of legal authority, as discussed earlier, these requirements are supportable on the basis of the Attorney General's authority to interpret and implement SORNA's requirement to keep the registration current, the Attorney General's authority to expand the information that sex offenders must

provide to registration jurisdictions, and the Attorney General's authority to prescribe the time and manner for providing and updating registration information. *See* 34 U.S.C. 20912(b), 20913(a), 20914(a)(8), (c), 20916(b); 73 FR at 38066; 76 FR at 1637. (The SORNA Guidelines state that such changes are to be reported ''immediately'' and explain at an earlier point that ''immediately'' in the context of SORNA's timing requirements means within three business days, *see* 73 FR at 38060, 38066.) SORNA does not require that these changes be reported through in-person appearances and they may be reported by any means allowed by registration jurisdictions in their discretion. *See id.* at 38067.

*Paragraph (f)—Reporting of International Travel*

Paragraph (f) of § 72.7 requires sex offenders to report intended travel outside of the United States to their residence jurisdictions. The expected travel must be reported at least 21 days in advance and, if applicable, prior to any termination of residence in the jurisdiction. Reporting of information about intended international travel is an express SORNA requirement following SORNA's amendment by International Megan's Law. *See* 34 U.S.C. 20914(a)(7); Public Law 114–119, sec. 6(a). The underlying reasons for requiring reporting of international travel are explained above in connection with § 72.6(d) of this rule.

The 21-day advance notice requirement is designed to provide relevant agencies, including the U.S. Marshals Service and INTERPOL Washington-U.S. National Central Bureau, sufficient lead time for any investigation or inquiry that may be warranted relating to the sex offender's international travel, and for notification of U.S. and foreign authorities in destination countries, prior to the sex offender's arrival in a destination country. The requirement that the intended international travel be reported prior to any termination of residence in the jurisdiction— potentially an issue in cases in which the sex offender is terminating his U.S. residence and relocating to a foreign country—ensures that a SORNA violation has occurred in case of noncompliance while the sex offender is still residing in the jurisdiction and hence required by 34 U.S.C. 20913(a) to register and keep the registration current in that jurisdiction. The requirement to report intended international travel at least 21 days in advance applies in relation to all international travel, including both cases in which the sex

offender is temporarily traveling abroad while maintaining a domestic residence and cases in which the sex offender is terminating his residence in the particular jurisdiction or the United States.

The rule recognizes, however, that reporting of intended international travel 21 days in advance is not possible in some circumstances. Section 72.8(a)(2) of the rule generally addresses situations in which sex offenders cannot comply with SORNA requirements because of circumstances beyond their control, and it specifically addresses inability to comply with the timeframe for reporting of international travel in Example 3 in that provision.

In terms of legal authority, the requirement to report intended international travel to the residence jurisdiction at least 21 days in advance and prior to any termination of residence is supportable as an exercise of the express authority of the Attorney General under 34 U.S.C. 20914(c), which states in part that ''[a] sex offender shall provide and update . . . information relating to intended travel outside the United States . . . in conformity with any time and manner requirements prescribed by the Attorney General.'' As discussed above, the international travel reporting requirement, including its associated timeframe requirement, is also supportable on the basis of other SORNA authorities of the Attorney General, which were relied on in SORNA guidelines preceding the addition of 34 U.S.C. 20914(a)(7), (c) by International Megan's Law. These authorities include the Attorney General's authority under 34 U.S.C. 20914(a)(8) to expand the range of required registration information and the Attorney General's authority under 34 U.S.C. 20912(b) to issue rules to interpret and implement SORNA's requirement to keep the registration current.

*Paragraph (g)—Compliance With Jurisdictions' Requirements for Registering and Keeping the Registration Current*

Paragraph (g) of § 72.7 requires sex offenders to register and keep the registration current in conformity with the time and manner requirements of their registration jurisdictions, where they have not done so in the time and manner normally required under SORNA.

SORNA generally requires sex offenders to register initially before release from imprisonment or within three business days of sentencing, but it recognizes that sex offenders may be unable to comply with these requirements in some circumstances. The difficulty can arise in cases in which a jurisdiction has no provision for registering certain sex offenders as required by SORNA at the time of their release—or even no registration program at all at that time—but the jurisdiction can register them later as it progresses in its implementation of SORNA's requirements. The SORNA Guidelines provide guidance to registration jurisdictions about integrating previously excluded sex offenders into their registration programs in such circumstances and ensuring that these sex offenders fully comply with SORNA's requirements. *See* 73 FR at 38063–64; *see also Smith,* 538 U.S. 84 (application of new sex offender registration requirements to previously convicted sex offenders does not violate the constitutional prohibition on ex post facto laws).

Because the normal timeframe for initial registration under SORNA may be past in these situations, SORNA authorizes the Attorney General to prescribe rules for registration. Specifically, 34 U.S.C. 20913(d) gives the Attorney General the authority to specify the applicability of SORNA's requirements to sex offenders with pre-SORNA or pre-SORNA-implementation convictions, ''and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with'' SORNA's initial registration requirements. More broadly, as discussed above, the Attorney General's general authority under 34 U.S.C. 20912(b) to interpret and implement SORNA includes the authority to fill gaps in SORNA's time and manner requirements for registering and keeping the registration current, and 34 U.S.C. 20914(c) expressly requires sex offenders to provide and update registration information required by SORNA in the time and manner prescribed by the Attorney General.

In section 72.7(g) in this rule, the Attorney General proposes to exercise his authorities under 34 U.S.C. 20912(b), 20913(d), and 20914(c) to require sex offenders to register and keep their registrations current in the time and manner specified by their registration jurisdictions, where the sex offenders have not registered or kept the registrations up to date in the time and manner normally required by SORNA as articulated in the earlier portions of § 72.7. This proposal complements the directions to registration jurisdictions in the SORNA Guidelines about integrating previously excluded sex offenders and previously omitted SORNA

requirements into their registration programs, with suitable timeframes and procedures, as the jurisdictions progress with SORNA implementation. *See* 73 FR at 38063–64. Of course sex offenders are independently required by the laws of their registration jurisdictions to comply with the jurisdictions' time and manner specifications for registering and updating their registrations. The effect of § 72.7(g) is to adopt the jurisdictions' time and manner specifications as SORNA requirements in the situations it covers.

Section 72.7(g)(1) includes four examples. The first example concerns a situation in which a state does not register sex offenders before release, but a sex offender can register soon after release in conformity with the state's procedures. The second example concerns a situation in which a jurisdiction does not register certain sex offenders at all at the time of their release or entry into the jurisdiction, but a sex offender in the excluded class becomes able to register at a later time and is directed by the jurisdiction to do so after it extends its registration requirements.

As the Supreme Court noted in *Reynolds,* SORNA, in section 20913(b), ''says that a sex offender must register before completing his prison term, but the provision says nothing about when a pre-Act offender who completed his prison term pre-Act must register. . . . Pre-Act offenders . . . might on their own, reach different conclusions about whether, or how, the new registration requirements applied to them. A ruling from the Attorney General [under section 20913(d)], however, could diminish or eliminate those uncertainties . . . .'' 565 U.S. at 441–42. In § 72.7(g), the Attorney General exercises his authorities under sections 20912(b), 20913(d), and 20914(c) to ''eliminate those uncertainties'' in conformity with Congress's intent concerning the filling of ''potential lacunae'' in SORNA, 565 U.S. at 441–42. Section 72.7(g) fills the gaps in such cases by adopting the timing rules and procedures of the relevant registration jurisdictions. This applies in relation to sex offenders who do not register initially in conformity with SORNA because they were convicted and released before SORNA's enactment, as described by the Court in *Reynolds,* and in relation to all other sex offenders who do not register in accordance with the normal time and manner requirements under SORNA, *e.g.,* because of shortfalls in a jurisdictions' registration requirements that may later be corrected or that allow registration in some variant way.

The third example in § 72.7(g)(1) concerns a sex offender in a jurisdiction that initially does not provide for sex offenders' periodically updating registrations through verification appearances as required by SORNA, but the jurisdiction later directs the sex offender to do so after it incorporates this aspect of SORNA into its registration program. Since the periodic verification appearances required by 34 U.S.C. 20918 fall under SORNA's requirement to keep the registration current and involve updating the registration information required by SORNA, it is within the Attorney General's authority under 34 U.S.C. 20912(b) and 20914(c) to specify the time and manner for the verifications where SORNA's verification requirement or normal timeframes for verifications have not been followed. Section 72.7(g)(1) directs sex offenders to comply with the jurisdiction's requirements for periodic verification in such situations.

The fourth example in § 72.7(g)(1) concerns a sex offender who does not provide particular information within the time required by SORNA because a jurisdiction's informational requirements fall short of SORNA's requirements but are later brought into line. The example illustrates the point by reference to email addresses. As provided in § 72.6(b), sex offenders must include this information when they register and, as provided in § 72.7(e), they must report any subsequent changes within three business days. Where the normal reporting time is past when a jurisdiction decides to include a type of information in its sex offender registry, § 72.7(g)(1) requires sex offenders to comply with the jurisdiction's directions to provide the information at a later time.

Section 72.7(g)(2) provides that, in a prosecution under 18 U.S.C. 2250, § 72.7(g)(1) does not relieve a sex offender of the need to show an inability to comply with SORNA as an affirmative defense to liability. The situations described in § 72.7(g)(1), which may involve noncompliance with SORNA's requirements because of deficits in registration jurisdictions' requirements or procedures, overlap with situations in which a sex offender may have a defense under 18 U.S.C. 2250(c) because he was prevented from complying with SORNA by circumstances beyond his control. However, the purpose and effect of § 72.7(g)(1) are to hold sex offenders to compliance with the registration rules and procedures of registration jurisdictions in the situations it covers.

Section 72.7(g) does not, in any case, relieve sex offenders of the obligation to comply fully with SORNA if able to do so or shift the burden of proof to the government to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA. Rather, the defense under 18 U.S.C. 2250(c) is an affirmative defense, as that provision explicitly provides, and as §§ 72.7(g)(2) and 72.8(a)(2) in this rule reiterate.

## Section 72.8—Liability for Violations

Section 72.8 of the rule explains the liability of sex offenders for SORNA violations and limitations on that potential liability.

*Paragraph (a)(1)—Offense*

SORNA's criminal provision, 18 U.S.C. 2250, provides criminal liability for sex offenders based on SORNA violations.

Section 72.8(a)(1)(i) in the rule refers to potential criminal liability under 18 U.S.C. 2250(a). Section 2250(a) authorizes imprisonment for up to 10 years based on a knowing failure to register or update a registration as required by SORNA. Federal criminal liability may result under this provision when the violation occurs under circumstances supporting Federal jurisdiction as specified in the statute. These jurisdictional circumstances include (i) violation of SORNA by sex offenders convicted of sex offenses under Federal (including military) law, the law of the District of Columbia, Indian tribal law, or the law of a U.S. territory or possession; or (ii) travel in interstate or foreign commerce or entering, leaving, or residing in Indian country. Section 2250(a) reaches all types of SORNA violations, including failure to register or keep the registration current in each jurisdiction of residence, employment, or school attendance, as required by 34 U.S.C. 20913; failure to provide or update registration information required by 34 U.S.C. 20914; or failure to appear periodically and verify the registration information, as required by 34 U.S.C. 20918.

Section 72.8(a)(1)(ii) in the rule refers to potential criminal liability under 18 U.S.C. 2250(b), which was added by International Megan's Law. *See* Public Law 114–119, sec. 6(b). Section 2250(b) defines an offense that specifically reaches violations of SORNA's international travel reporting requirement. The provision authorizes imprisonment for up to 10 years for a sex offender who (i) knowingly fails to provide information required by

SORNA relating to intended travel in foreign commerce and (ii) ''engages or attempts to engage in the intended travel in foreign commerce.'' The jurisdictional language in section 2250(b) reaches cases in which the contemplated travel is not carried out, in addition to those in which the sex offender does travel abroad. For example, consider a sex offender who (i) purchases a plane ticket to a foreign destination but (ii) fails to report the intended international travel as required by SORNA and (iii) does not actually leave the country because the unreported travel is detected by the authorities who arrest him at the airport. The attempted travel in foreign commerce provides a sufficient jurisdictional basis for Federal prosecution under section 2250(b).

Section 72.8(a)(1)(iii) in the rule explains the condition for liability under 18 U.S.C. 2250(a)–(b) that the defendant ''knowingly'' fail to comply with a SORNA requirement. The ''knowingly'' limitation ensures that sex offenders are not held liable under section 2250 for violations of registration requirements they did not know about. However, this does not require knowledge that the requirement is imposed by SORNA. State sex offenders, for example, are likely to be instructed in the registration process regarding many of the registration requirements appearing in SORNA, which are widely paralleled in state registration laws, such as the need to report changes in residence, employment, internet identifiers, and vehicle information; the need to report intended international travel; and the need to appear periodically to update and verify registration information. The acknowledgment forms obtained from sex offenders in registration often provide a means of establishing their knowledge of the registration requirements in later prosecutions for violations. *See* 76 FR at 1634–35, 1638. But sex offenders may not be informed that the registration requirements they are subject to are imposed by a particular Federal law, SORNA. This does not impugn the fairness or propriety of holding sex offenders liable under 18 U.S.C. 2250 for knowingly violating a registration requirement that is in fact imposed by SORNA, so long as they are aware of an obligation from some source to comply with the requirement. *See, e.g., United States* v. *Elkins,* 683 F.3d 1039, 1050 (9th Cir. 2012); *United States* v. *Whaley,* 577 F.3d 254, 261–62 (5th Cir. 2009). Section 72.8(a)(1)(iii) makes these

points about 18 U.S.C. 2250's knowledge requirement in the rule.

*Paragraph (a)(2)—Defense*

Subsection (c) of 18 U.S.C. 2250 provides an affirmative defense to liability under certain conditions where uncontrollable circumstances prevented a sex offender from complying with SORNA, so long as the sex offender complied as soon as the preventing circumstances ceased. Section 72.8(a)(2) in the rule reproduces this affirmative defense provision and provides examples of its operation.

Registration is a reciprocal process, involving the provision of registration information by sex offenders, and the registration jurisdiction's acceptance of the information for inclusion in the sex offender registry. The circumstances preventing compliance with SORNA under section 2250(c) accordingly may be a registration jurisdiction's failure or refusal to carry out the reciprocal role needed to effect registration, or the updating of a registration, as required by SORNA.

Example 1 in § 72.8(a)(2) illustrates this type of situation, describing a case in which a sex offender cannot appear and report an inter-jurisdictional change of residence within three business days because the office with which he needs to register will not meet with him for a week. The case implicates both 34 U.S.C. 20913(a)'s requirement that a sex offender register in each jurisdiction in which he resides and 34 U.S.C. 20913(c)'s requirement that sex offenders report changes of residence within three business days. These provisions' net effect is that a sex offender establishing residence in a new jurisdiction must register there but with a three-business-days grace period. In the case described, 18 U.S.C. 2250(c) would excuse the failure to report within the three-business-day timeframe. However, the inability to meet section 20913(c)'s specific timeframe does not obviate the need to comply with section 20913(a)'s requirement to register in each state of residence. Nothing prevents the sex offender from complying with this registration requirement once the office is willing to meet with him, so he will need to appear and carry out the registration at the appointed time in order to have the benefit of the 18 U.S.C. 2250(c) defense.

Example 2 in § 72.8(a)(2) also illustrates a situation in which the circumstance preventing compliance with SORNA is a failure by the registration jurisdiction to carry out a necessary reciprocal role. The specific situation described in the example is a

state's refusal to register sex offenders based on the offense for which the sex offender was convicted. For example, SORNA requires registration based on conviction for child pornography possession offenses, *see* 34 U.S.C. 20911(7)(G), but some states that have not fully implemented SORNA's requirements in their registration programs may be unwilling to register a sex offender on the basis of such an offense. Section 2250(c)'s excuse of the failure to register terminates if the state subsequently becomes willing to register the sex offender, because the circumstance preventing compliance with SORNA no longer exists. However, liability based on a continuing failure by the sex offender to comply with SORNA in such a case—following a change in state policy or practice allowing compliance—depends on the sex offender's becoming aware of the change since, as discussed above, 18 U.S.C. 2250 does not impose liability for violation of unknown registration obligations. *Cf.* 73 FR at 38063–64 (direction to registration jurisdictions to instruct sex offenders about new or additional registration duties in connection with SORNA implementation).

Example 3 in § 72.8(a)(2) describes a situation in which the circumstance preventing compliance with SORNA relates to the situation of the sex offender rather than the registration jurisdiction. The second sentence of § 72.7(f) in the rule requires in part that a sex offender report intended international travel 21 days in advance, which he cannot do if he does not anticipate a trip abroad that far in advance. In such a case, as described in the example, 18 U.S.C. 2250(c) would excuse a sex offender's failure to report the travel 21 days in advance. *Cf.* 76 FR at 1638 ("[R]equiring 21 days advance notice may occasionally be unnecessary or inappropriate. For example, a sex offender may need to travel abroad unexpectedly because of a family or work emergency."). However, inability to comply with the 21-day timeframe in a particular case does not prevent a sex offender from otherwise complying with SORNA's requirements to inform the residence jurisdiction about intended international travel, appearing in 34 U.S.C. 20914(a)(7) and in §§ 72.6(d) and 72.7(f) in this rule. Hence, once the intention to travel exists, the sex offender must inform the registration jurisdiction to avoid liability under 18 U.S.C. 2250.

*Paragraph (b)—Supervision Condition*

Section 72.8(b) recounts that, for sex offenders convicted of Federal offenses,

compliance with SORNA is a mandatory condition of probation and supervised release. *See* 18 U.S.C. 3563(a)(8), 3583(d) (third sentence). Violation of this condition may result in revocation of release. *See* 18 U.S.C. 3565(a)(2), 3583(e)(3). Section 72.8(b) also notes that compliance with SORNA is a mandatory condition of parole for sex offenders convicted of Federal offenses, *see* 18 U.S.C. 4209(a) (second sentence), a requirement of narrow application given the abolition of parole in Federal cases, except for offenses committed before November 1, 1987.

## Regulatory Flexibility Act

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and by approving it certifies that this regulation will not have a significant economic impact on a substantial number of small entities for the purposes of that Act because the regulation only articulates SORNA's registration requirements for sex offenders.

## Executive Orders 12866 and 13563—Regulatory Planning and Review

This regulation has been drafted and reviewed in accordance with Executive Order 12866, "Regulatory Planning and Review," section 1(b), Principles of Regulation, and Executive Order 13563, "Improving Regulation and Regulatory Review." The regulation expands part 72 of title 28 of the Code of Federal Regulations to provide a concise and comprehensive statement of what sex offenders must do to comply with SORNA's requirements, following express requirements appearing in SORNA and previous exercises of authority SORNA grants to the Attorney General to interpret and implement SORNA. The justification of these requirements as means of furthering SORNA's objectives is explained in the preamble to this regulation and in previous SORNA-related documents, including the rulemaking entitled "Applicability of the Sex Offender Registration and Notification Act," 75 FR 81849 (final rule), 72 FR 8894 (interim rule); the SORNA Guidelines, 73 FR 38030; and the SORNA Supplemental Guidelines, 76 FR 1630. The Department of Justice has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), and accordingly this rule has been reviewed by the Office of Management and Budget.

The Department of Justice expects that the proposed rule will not entail new costs and will result in a number

of benefits. For registration jurisdictions, there are no new costs because their requirements under SORNA continue to be those articulated in the previously issued SORNA guidelines. Likewise, for sex offenders, the requirements articulated in the rule either appear expressly in SORNA or have previously been articulated by the Attorney General in the SORNA guidelines. The procedures by which sex offenders register will continue to depend on the registration processes of the jurisdictions that register them, which will not be made more time-consuming or expensive or otherwise changed by this rule.

In terms of benefits, the rule will provide in one place a clear, concise, and comprehensive statement of sex offenders' registration requirements under SORNA. This will reduce any expenditure by sex offenders of time or money required for inquiry with state or Federal authorities or others to resolve uncertainties, or required in attempting to comply with perceived registration requirements under SORNA that go beyond the requirements the Attorney General has actually specified. The clarity provided by this rule will make it easier for sex offenders to determine what SORNA requires them to do and thereby facilitate compliance with SORNA.

There are also expected benefits for the government. As the preamble explains, the rule's comprehensive articulation of SORNA's registration requirements in regulations addressed to sex offenders will provide a secure basis for Federal prosecution of knowing violations of any of SORNA's requirements. It will resolve specific problems that have arisen in past litigation or can be expected to arise in future litigation if not clarified and resolved by this rule, thereby avoiding the expenditure of litigation resources on these matters.

As explained in the existing SORNA guidelines, SORNA aims to prevent the commission of sex offenses, and to bring the perpetrators of such offenses to justice more speedily and reliably, by enabling the authorities to better identify, track, and monitor released sex offenders and by informing the public regarding the presence of released sex offenders in the community. *See* 73 FR at 38044–45. Hence, by facilitating the enforcement of, and compliance with, SORNA's registration requirements, and enhancing the basis for public notification, the rule is expected to further SORNA's public safety objectives and reduce the time and resources required in achieving these objectives.

While the proposed rule is expected to result in cost reductions, as discussed above, additional information would be helpful in determining the extent of these savings. We accordingly seek comment on the extent to which this rule will result in reductions in time, expense, or other costs.

**Executive Order 13132—Federalism**

This regulation will not have substantial direct effects on the states, on the relationship between the national Government and the states, or on the distribution of power and responsibilities among the various levels of government. There has been substantial consultation with state officials regarding the interpretation and implementation of SORNA. The previously issued SORNA Guidelines and SORNA Supplemental Guidelines articulate the requirements for implementation of the SORNA standards by states and other jurisdictions in their sex offender registration and notification programs, requirements that are not changed by this regulation's provision of a separate statement of the registration obligations of sex offenders under SORNA. Therefore, in accordance with Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism assessment.

**Executive Order 12988—Civil Justice Reform**

This regulation meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by state, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. This rule adds provisions to part 72 of title 28 of the Code of Federal Regulations that articulate SORNA's registration requirements for sex offenders, including where, when, and how long sex offenders must register, what information they must provide, and how they must keep their registrations current. The Attorney General has previously addressed these matters and has resolved them in the same way in the SORNA Guidelines, appearing at 73 FR 38030, and in the SORNA Supplemental Guidelines, appearing at 76 FR 1630. Those

previously issued sets of guidelines determine what state, local, and tribal jurisdictions must do to achieve substantial implementation of the SORNA standards in their registration programs. Reiteration of some of these requirements in a concise set of directions to sex offenders in this rule will not change what jurisdictions need to do to implement SORNA or affect their costs in doing so.

**Small Business Regulatory Enforcement Fairness Act of 1996**

This rule is not a ''major rule'' as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996. 5 U.S.C. 804(2). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, or innovation, or on the ability of U.S.-based enterprises to compete with foreign-based enterprises in domestic and export markets.

**List of Subjects in 28 CFR Part 72**

Crime, Information, Law enforcement, Prisoners, Prisons, Probation and parole, Records.

■ Accordingly, for the reasons stated in the preamble, chapter I of title 28 of the Code of Federal Regulations is proposed to be amended by revising part 72 to read as follows:

**PART 72—SEX OFFENDER REGISTRATION AND NOTIFICATION**

Sec.
72.1  Purpose.
72.2  Definitions.
72.3  Applicability of the Sex Offender Registration and Notification Act.
72.4  Where sex offenders must register.
72.5  How long sex offenders must register.
72.6  Information sex offenders must provide.
72.7  How sex offenders must register and keep the registration current.
72.8  Liability for violations.

**Authority:** 34 U.S.C. 20901–45; Pub. L. 109–248, 120 Stat. 587; Pub. L. 114–119, 130 Stat. 15.

**§ 72.1  Purpose.**

(a) This part specifies the registration requirements of the Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. 20901 *et seq.,* and the scope of those requirements' application. The Attorney General has the authority to specify the requirements of SORNA and their applicability as provided in this part pursuant to provisions of SORNA, including 34 U.S.C. 20912(b), 20913(d), and 20914(a)(8), (c).

**Federal Register** / Vol. 85, No. 157 / Thursday, August 13, 2020 / Proposed Rules **49353**

(b) This part does not preempt or limit any obligations of or requirements relating to sex offenders under other Federal laws, rules, or policies, or under the laws, rules, or policies of registration jurisdictions or other entities. States and other governmental entities may prescribe registration requirements and other requirements, with which sex offenders must comply, that are more extensive or stringent than those prescribed by SORNA.

### § 72.2   Definitions.

All terms used in this part have the same meaning as in SORNA.

### § 72.3   Applicability of the Sex Offender Registration and Notification Act.

The requirements of SORNA apply to all sex offenders. All sex offenders must comply with all requirements of that Act, regardless of when the conviction of the offense for which registration is required occurred (including if the conviction occurred before the enactment of that Act), regardless of whether a jurisdiction in which registration is required has substantially implemented that Act's requirements or has implemented any particular requirement of that Act, and regardless of whether any particular requirement or class of sex offenders is mentioned in examples in this regulation or in other regulations or guidelines issued by the Attorney General.

*Example 1.* A sex offender is federally convicted of aggravated sexual abuse under 18 U.S.C. 2241 in 1990 and is released following imprisonment in 2009. The sex offender is subject to the requirements of SORNA and could be held criminally liable under 18 U.S.C. 2250 for failing to register or keep the registration current in any jurisdiction in which the sex offender resides, is an employee, or is a student.

*Example 2.* A sex offender is convicted by a state jurisdiction in 1997 for molesting a child and is released following imprisonment in 2000. The sex offender initially registers as required but relocates to another state in 2009 and fails to register in the new state of residence. The sex offender has violated the requirement under SORNA to register in any jurisdiction in which he resides, and could be held criminally liable under 18 U.S.C. 2250 for the violation because he traveled in interstate commerce.

### § 72.4   Where sex offenders must register.

A sex offender must register, and keep the registration current, in each jurisdiction in which the offender resides, is an employee, or is a student. For initial registration purposes only, a sex offender must also register in the jurisdiction in which convicted if that jurisdiction is different from the jurisdiction of residence.

### § 72.5   How long sex offenders must register.

(a) *Duration.* A sex offender has a continuing obligation to register and keep the registration current (except when the sex offender is in custody or civilly committed) for the following periods of time:

(1) 15 years, if the offender is a tier I sex offender;

(2) 25 years, if the offender is a tier II sex offender; and

(3) The life of the offender, if the offender is a tier III sex offender.

(b) *Commencement.* The registration period begins to run—

(1) When a sex offender is released from imprisonment following conviction for the offense giving rise to the registration requirement, including in cases in which the term of imprisonment is based wholly or in part on the sex offender's conviction for another offense; or

(2) If the sex offender is not sentenced to imprisonment, when the sex offender is sentenced for the offense giving rise to the registration requirement.

(c) *Reduction.* If a tier I sex offender has maintained for 10 years a clean record, as described in 34 U.S.C. 20915(b)(1), the period for which the sex offender must register and keep the registration current under paragraph (a) of this section is reduced by 5 years. If a tier III sex offender required to register on the basis of a juvenile delinquency adjudication has maintained a clean record, as described in 34 U.S.C. 20915(b)(1), for 25 years, the period for which the sex offender must register and keep the registration current under paragraph (a) of this section is reduced to the period for which the clean record has been maintained.

### § 72.6   Information sex offenders must provide.

Sex offenders must provide the following information for inclusion in the sex offender registries of the jurisdictions in which they are required to register:

(a) *Name, date of birth, and Social Security number.*

(1) The name of the sex offender, including any alias used by the sex offender.

(2) The sex offender's date of birth and any date that the sex offender uses as his purported date of birth.

(3) The Social Security number of the sex offender and any number that the sex offender uses as his purported Social Security number.

(b) *Remote communication identifiers.* All designations the sex offender uses for purposes of routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers.

(c) *Residence, temporary lodging, employment, and school attendance.* (1) The address of each residence at which the sex offender resides or will reside or, if the sex offender has no present or expected residence address, other information describing where the sex offender resides or will reside with whatever definiteness is possible under the circumstances.

(2) Information about any place in which the sex offender is staying when away from his residence for seven or more days, including the identity of the place and the period of time the sex offender is staying there.

(3) The name and address of any place where the sex offender is or will be an employee or, if the sex offender is or will be employed but with no fixed place of employment, other information describing where the sex offender works or will work with whatever definiteness is possible under the circumstances.

(4) The name and address of any place where the sex offender is a student or will be a student.

(d) *International travel.* Information relating to intended travel outside the United States, including any anticipated itinerary, dates and places of departure from, arrival in, or return to the United States and each country visited, carrier and flight numbers for air travel, destination country or countries and address or other contact information therein, and means and purpose of travel.

(e) *Passports and immigration documents.* Information about each passport the sex offender has and, if the sex offender is an alien, information about any document or documents establishing the sex offender's immigration status, including passport or immigration document type and number.

(f) *Vehicle information.* The license plate number and a description of any vehicle owned or operated by the sex offender, including watercraft and aircraft in addition to land vehicles. If a vehicle has no license plate but has some other type of registration number or identifier, then the registration number or identifier must be provided. Information must also be provided as to where any vehicle owned or operated by the sex offender is habitually parked, docked, or otherwise kept.

(g) *Professional licenses.* Information concerning all licensing of the sex offender that authorizes the sex offender

to engage in an occupation or carry out a trade or business.

**§ 72.7 How sex offenders must register and keep the registration current.**

(a) *Initial registration*—(1) *In general.* Except as provided in paragraph (a)(2) of this section, a sex offender must register before release from imprisonment following conviction for the offense giving rise to the registration requirement, or, if the sex offender is not sentenced to imprisonment, within three business days after being sentenced for that offense.

(2) *Special rules for certain cases.* The following special requirements apply:

(i) *Federal and military offenders.* A sex offender who is released from Federal or military custody, or who is convicted for a Federal or military sex offense but not sentenced to imprisonment, must register within three business days of entering or remaining in a jurisdiction to reside following the release or sentencing.

(ii) *Foreign convictions.* A sex offender required to register on the basis of a conviction in a foreign country must register within three business days of entering any jurisdiction in the United States to reside, work, or attend school.

(b) *Periodic in-person verification.* A sex offender must appear in person, allow the jurisdiction to take a current photograph, and verify the information in each registry in which the offender is required to register. In carrying out the required verification of information in each registry, the sex offender must correct any information that has changed or is otherwise inaccurate and must report any new registration information. A sex offender must appear in person for these purposes not less frequently than—

(1) Each year, if the offender is a tier I sex offender;

(2) Every six months, if the offender is a tier II sex offender; and

(3) Every three months, if the offender is a tier III sex offender.

(c) *Reporting of initiation and changes concerning name, residence, employment, and school attendance.* A sex offender who enters a jurisdiction to reside, or who resides in a jurisdiction and changes his name or his place of residence in the jurisdiction, must appear in person in that jurisdiction and register or update the registration within three business days. A sex offender who commences employment or school attendance in a jurisdiction, or who changes employer, school attended, or place of employment or school attendance in a jurisdiction, must appear in person in that jurisdiction and register or update the registration within three business days.

(d) *Reporting of departure and termination concerning residence, employment, and school attendance.* (1) A sex offender residing in a jurisdiction must inform that jurisdiction (by whatever means the jurisdiction allows) if the sex offender will be commencing residence, employment, or school attendance in another jurisdiction or outside of the United States. The sex offender must so inform the jurisdiction in which he is residing prior to any termination of residence in that jurisdiction and prior to commencing residence, employment, or school attendance in the other jurisdiction or outside of the United States.

(2) A sex offender who will be terminating residence, employment, or school attendance in a jurisdiction must so inform that jurisdiction (by whatever means the jurisdiction allows) prior to the termination of residence, employment, or school attendance in the jurisdiction.

(e) *Reporting of changes in information relating to remote communication identifiers, temporary lodging, and vehicles.* A sex offender must report within three business days to his residence jurisdiction (by whatever means the jurisdiction allows) any change in remote communication identifier information, as described in § 72.6(b), temporary lodging information, as described in § 72.6(c)(2), and any change in vehicle information, as described in § 72.6(f).

(f) *Reporting of international travel.* A sex offender must report intended travel outside the United States, including the information described in § 72.6(d), to his residence jurisdiction (by whatever means the jurisdiction allows). The sex offender must report the travel information to the jurisdiction at least 21 days in advance of the intended travel and, if the sex offender is terminating his residence in the jurisdiction, prior to his termination of residence in the jurisdiction.

(g) *Compliance with jurisdictions' requirements for registering and keeping the registration current.* (1) A sex offender who does not comply with a requirement of SORNA in conformity with the time and manner specifications of paragraphs (a) through (f) of this section must comply with the requirement in conformity with any applicable time and manner specifications of a jurisdiction in which the offender is required to register.

*Example 1.* A sex offender convicted in a state does not initially register before release from imprisonment, as required by 34 U.S.C. 20913(b)(1) and paragraph (a)(1) of this section, because the state has no procedure for pre-release registration of sex offenders. Instead, the state informs sex offenders that they must go to a local police station within seven days of release to register. The sex offender must comply with the state's requirements for initial registration, *i.e.,* the offender must report to the police station to register within seven days of release.

*Example 2.* A sex offender does not register when he is released from custody, or does not register upon entering a jurisdiction to reside as required by 34 U.S.C. 20913(c) and paragraph (c) of this section, because the jurisdiction, at the time, does not register sex offenders based on the offense for which he was convicted. The jurisdiction later sends the sex offender a notice advising that it has extended its registration requirements to include sex offenders like him and directing him to report to a specified agency within 90 days to register. The sex offender must report to the agency to register within the specified timeframe.

*Example 3.* A sex offender registers as required when released from imprisonment or upon entering a jurisdiction to reside, but the jurisdiction has no procedure for sex offenders to appear periodically in person to update and verify the registration information as required by 34 U.S.C. 20918 and paragraph (b) of this section. The jurisdiction later sends the sex offender a notice advising that it has adopted a periodic verification requirement and directing the sex offender to appear at a designated time and place for an initial update meeting. The sex offender must appear and update the registration as directed.

*Example 4.* A sex offender does not report his email address to the jurisdiction in which he resides when he initially registers, or within three business days of a change as required by paragraph (e) of this section, because email addresses are not among the information the jurisdiction accepts for inclusion in its registry. The jurisdiction later notifies the sex offender that it has extended the registration information it collects to include email addresses and directs him to send a reply within a specified time that provides his current email address. The sex offender must comply with this direction.

(2) In a prosecution under 18 U.S.C. 2250, paragraph (g)(1) of this section does not in any case relieve a sex offender of the need to establish as an affirmative defense an inability to comply with SORNA because of circumstances beyond his control as

provided in 18 U.S.C. 2250(c) and
§ 72.8(a)(2).

**§ 72.8   Liability for violations.**

(a) *Criminal liability*—(1) *Offense.* (i)
A sex offender who knowingly fails
to register or update a registration as
required by SORNA may be liable to
criminal penalties under 18 U.S.C.
2250(a).

(ii) A sex offender who knowingly
fails to provide information required by
SORNA relating to intended travel
outside the United States may be liable
to criminal penalties under 18 U.S.C.
2250(b).

(iii) As a condition of liability under
18 U.S.C. 2250(a)–(b) for failing to
comply with a requirement of SORNA,
a sex offender must have been aware of
the requirement he is charged with
violating, but need not have been aware
that the requirement is imposed by
SORNA.

(2) *Defense.* A sex offender may have
an affirmative defense to liability, as
provided in 18 U.S.C. 2250(c), if
uncontrollable circumstances prevented
the sex offender from complying with
SORNA, where the sex offender did not
contribute to the creation of those
circumstances in reckless disregard of
the requirement to comply and
complied as soon as the circumstances
preventing compliance ceased to exist.

*Example 1.* A sex offender changes
residence from one jurisdiction to
another, bringing into play SORNA's
requirement to register in each
jurisdiction where the sex offender
resides and SORNA's requirement to
appear in person and report changes of
residence within three business days.
*See* 34 U.S.C. 20913(a), (c). The sex
offender attempts to comply with these
requirements by contacting the local
sheriff's office, which is responsible for
sex offender registration in the
destination jurisdiction. The sheriff's
office advises that it cannot schedule an
appointment for him to register within
three business days but that he should
come by in a week. The sex offender
would have a defense to liability if he
appeared at the sheriff's office at the
appointed time and registered as
required. The sex offender's temporary
inability to register and inability to
report the change of residence within
three business days in the new
residence jurisdiction was due to a
circumstance beyond his control—the
sheriff office's refusal to meet with him
until a week had passed—and he
complied with the requirement to
register as soon as the circumstance
preventing compliance ceased to exist.

*Example 2.* A sex offender cannot
register in a state in which he resides

because its registration authorities will
not register offenders on the basis of the
offense for which the sex offender was
convicted. The sex offender would have
a defense to liability because the state's
unwillingness to register sex offenders
like him is a circumstance beyond his
control. However, if the sex offender
failed to register after becoming aware of
a change in state policy or practice
allowing his registration, the 18 U.S.C.
2250(c) defense would no longer apply,
because in such a case the circumstance
preventing compliance with the
registration requirement would no
longer exist.

*Example 3.* A sex offender needs to
travel to a foreign country on short
notice—less than 21 days—because of
an unforeseeable family or work
emergency. The sex offender would
have a defense to liability for failing to
report the intended travel 21 days in
advance, as required by § 72.7(f),
because it is impossible to report an
intention to travel outside the United
States before the intention exists.
However, if the sex offender failed to
inform the registration jurisdiction
(albeit on short notice) once he intended
to travel, 18 U.S.C. 2250(c) would not
excuse that failure, because the
preventing circumstance—absence of an
intent to travel abroad—would no
longer exist.

(b) *Supervision condition.* For a sex
offender convicted of a Federal offense,
compliance with SORNA is a mandatory
condition of probation, supervised
release, and parole. The release of such
an offender who does not comply with
SORNA may be revoked.

Dated: July 15, 2020.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2020–15804 Filed 8–12–20; 8:45 am]

**BILLING CODE 4410–18–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric
Administration**

**50 CFR Part 622**

**[Docket No. 200723–0200]**

**RIN 0648–BJ76**

**Fisheries of the Caribbean, Gulf of
Mexico, and South Atlantic; Shrimp
Fishery Off the South Atlantic States;
Amendment 11**

**AGENCY:** National Marine Fisheries
Service (NMFS), National Oceanic and
Atmospheric Administration (NOAA),
Commerce.

**ACTION:** Proposed rule; request for
comments.

**SUMMARY:** NMFS proposes regulations to
implement Amendment 11 to the
Fishery Management Plan (FMP) for the
Shrimp Fishery of the South Atlantic
Region (Shrimp FMP), as prepared and
submitted by the South Atlantic Fishery
Management Council (Council). This
proposed rule would modify the transit
provisions for shrimp trawl vessels with
penaeid shrimp, *i.e.,* brown, pink, and
white shrimp, on board in Federal
waters of the South Atlantic that have
been closed to shrimp trawling to
protect white shrimp as a result of cold
weather events. The purpose of this
proposed rule is to update the
regulations to more closely align with
current fishing practices, reduce the
socio-economic impacts for fishermen
who transit these closed areas, and
improve safety at sea while maintaining
protection for overwintering white
shrimp.

**DATES:** Written comments must be
received on or before September 14,
2020.

**ADDRESSES:** You may submit comments
on the proposed rule, identified by
"NOAA–NMFS–2020–0066," by either
of the following methods:

• *Electronic Submission:* Submit all
electronic public comments via the
Federal e-Rulemaking Portal. Go to
*www.regulations.gov/
#!docketDetail;D=NOAA-NMFS-2020-
0066,* click the "Comment Now!" icon,
complete the required fields, and enter
or attach your comments.

• *Mail:* Submit written comments to
Frank Helies, Southeast Regional Office,
NMFS, 263 13th Avenue South, St.
Petersburg, FL 33701.

*Instructions:* Comments sent by any
other method, to any other address or
individual, or received after the end of
the comment period, may not be
considered by NMFS. All comments
received are a part of the public record
and will generally be posted for public
viewing on *www.regulations.gov*
without change. All personal identifying
information (*e.g.,* name, address),
confidential business information, or
otherwise sensitive information
submitted voluntarily by the sender will
be publicly accessible. NMFS will
accept anonymous comments (enter "N/
A" in the required fields if you wish to
remain anonymous).

Electronic copies of Amendment 11,
which includes a fishery impact
statement, a Regulatory Flexibility Act
(RFA) analysis, and a regulatory impact
review, may be obtained from the
Southeast Regional Office website at

8/3/23, 4:24 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

As someone who works in risk-mitigation with people who have committed sexual offenses, what about this Act incorporates research about the risk for sexual recidivism? I work primarily in the forensic evaluation of people charged or convicted for sex crimes, and I also work as a counselor in helping to reduce risk of recidivism. All of my work, and much of the work of the supervising agents (e.g. probation, parole, etc.) who manage these offenders in the community, incorporate actuarial risk tools that were developed (and supported by ongoing research) to address actual risk factors, not perceived risk. For example, if we know that juveniles are much less likely to sexually recidivate, then why treat them as high risk adult offenders? It seems to me that this is purely a politically-motivated decision that is lackluster in empirical support and rationale in managing actual risk. At what point is a child able to pay their dues to society after offending? Isn't the lack of appropriate sexual education (e.g. learning about State-specific sex laws and aspects of consent, beyond, "no means no") a large contributing factor to why youths sexually offend? Is there some sort of Sex Offender Policy Board (as there is in Washington State) that offers guidance to lawmakers to make empirically-guided decisions? Who really benefits from this proposed Act? I sincerely hope this does not actually act to degrade individual protective factors or increase risk factors. Think about it, how does life-time registration improve a person's ability to be successful in the community. There are real barriers to housing and employment, among other barriers, that can make any person feel like there's no hope for a better future...to make a person feel like there's no reward for living a healthy and productive life. Please consider reaching out to the leaders in research, especially those involved as in the Association for the Treatment of Sexual Abusers (ATSA; the organization that guides the standard of practice for us forensic evaluators and treatment providers who work with people convicted of sexual offenses). Let's do something that actually helps our society.

Comment ID

DOJ-OAG-2020-0003-0002

AR-00000025

Regulations.gov

 **Tracking Number**

1k4-9idc-mnpm

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 13, 2020



About        Bulk Data Download        Agencies        Learn

(/about)          (/bulkdownload)        (/agencies)      (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000026

8/3/23, 4:20 PM                                                     Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)         Share ▾

---

Comment

State laws have adequately protected the public for many years. This rule change would somehow subject people, whose state convictions no longer require them to register, whom judges have found adequately rehabilitated to permit them not to register under state law, to federal prosecution when they have completely complied with state law. There is no provision to give such people, who may have been convicted as juveniles, notice of this new threat of federal prosecution. This rule change thus violates the due process requirements of notice, and the states' constitutional rights to address the community's needs for protection from sex offenders. It is a bad proposal that will result in unjustly penalizing people who have satisfied their state court sentences and proceeded with their lives without posing a threat to anyone, even while the constitutionality is litigated in many courts. Please do not adopt these changes.

**Comment ID**

DOJ-OAG-2020-0003-0003

⊕ **Tracking Number**

kdu-lcmk-g6dm

| Comment Details | Submitter Info |
|---|---|

**Submitter Name**

Lenell Nussbaum

AR-00000027

Regulations.gov



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000028

8/3/23, 4:02 PM                                    Regulations.gov

An official website of the United States Government.  🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

Comment

Why expand a failed system? Very few states comply with these regulations, and the utility of the entire SORNA program has been proven to be unnecessary, draconian, and unconstitutional. Recidivism rates for these crimes are among the lowest of any, and recontextualization of these laws casts a wider and wider net into an unwitting public. What good does this do to our society but further burden it's citizens with an unbearable albatross? Better to spend time dealing with the massive holes in immigration policy, wasted resources in the BoP, and efforts proven at reintegration

**Comment ID**
DOJ-OAG-2020-0003-0004

 **Tracking Number**
kdv-o4sw-8n7w

| Comment Details | Submitter Info |

**Submitter Name**
Gavin Meany

AR-00000029



About     Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000030

8/3/23, 4:22 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

| Comment |
|---|

As a mother I feel like this is a waste of our time and money. Registeries are feel good laws that dont help. Most sex offenses are not ones done by people already convicted but people as first time offenders.

Registries provide a false sense of security that people not on it are safe.

Please, redirect this money towards education on abuse instead of this.

Thank you.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0005 |

|  **Tracking Number** |
|---|
| 1k4-9if0-fvc0 |

| Comment Details | Submitter Info |
|---|---|
| | |

**Submitter Name**

Cindy Anonymous

AR-00000031

Regulations.gov



Your Voice in Federal Decision Making

About     Bulk Data Download     Agencies     Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000032

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

Comment

Why is it that everyone just assumes and never understands the real facts. Sex offenders are almost the lowest of any criminal who reoffends. If you want to take action do it with drug offenders. Sex offenders already struggle to find a place to live, a job, and their families and children suffer along with them. You punish entire families, not just one person. You already put them on a registry that should be private if anything - all of their data and picture out there for the world to take violent action against them. You put a target on them when it is not deserved.

I see a number of folks in my son's aftercare group who have truly abused kids and they didn't get prison time and because of the crime they negotiate they don't even have to register. Our son did nothing and yet because someone decided to send him a picture and lie, which they did and we had proof that we didn't get to even use because of being stupid about all this - he served 10 years in federal prison and is on supervised release because a judge threw the book at him because he wanted to in a plea deal that was just a rip off of our money.

He is a brilliant young man with so much ahead of him - lost 10 years of his life in his 20's and early 30's and while he finished his Master's in prison - he can't get a job - he was fortunate his house was grandfathered in or he would not have a place to live. We have to live with him in order to pay bills and he would never harm a child, and certainly after all this just wants his freedom and his life back. But these laws limit that from happening. He can't ever have normal.

A drug offender can go in and out of prison like a revolving door and is on no registry and has no issues with his life that he can do whatever. A person who commits a DWI and even kills someone has no limits on his life - he also is not on a registry and can do whatever. These people are not watched or stalked and yet the chances of them hurting a child, or adult is 100 times greater.

IF you really want to help get rid of the public registry - at least make it private - stop ruining lives that could truly be good citizens and just wants to have the chance that supposedly they should be given. A second

AR-00000033

chance at life. Yes just like all criminals there are a few Sex offenders who are truly bad and yes that should be easy to identify and provide extra efforts on their part as you would someone who is a serious offender.

Stop the nonsense and media hype just because you are labeled a sex offender does not mean you are - and you are the only ones who can allow families to be able to live their lives again. Allow the children of these people to have normal lives and not also be labeled in school or made fun of, to not have ugly signs in yards, to not separate them and ruin their lives also. Please allow that second chance.

**Comment ID**

DOJ-OAG-2020-0003-0006



**Tracking Number**

1k4-9if1-djaw

| Comment Details | Submitter Info |
|---|---|

**Submitter Name**

Human Being



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000034

8/3/23, 4:22 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

My son who lives with me is a RSO. His crime was to be in the wrong place at the wrong time. He was living with a bunch of drug addicts and the youngest of these who was 17 at the time made the allegations of my son exposing himself to a 2-year-old. When I wanted the character of the drug addicts who made the allegations be brought up since he had not only been detained by authorities but also had the house he lived in raided by the police for drugs. I was told because he was under 18 he record were sealed and we could not show the character of the person who made the original allegations. My son was pressured to take a plea bargain even though he wanted to fight the charges in court and was told if he lost he would spend 15 years in prison. After all, it is easier to get them to take a plea bargain to get it off your plate and move on then to fight this in the court system. He is a tier 1 yet Florida has everyone at tier 3 he is on the rolls for his life and has to register every 6 months I have a deputy come to the house every 60 days to make sure he lives here. When I went to purchase a home I had to check with the sheriff's department to make sure he could live there and the house I so wanted in my price range we could not have because it was too close to a daycare. This man has served time for a crime he never committed and as I said before pressured to take a plea deal because he was frightened by a thought of 15 years in prison. Florida must do a tier system and stop its flagrant abuse of this law. This man should have been off the rolls long ago he is not 14 years on the rolls and Florida and the GOP state representative should be ashamed of themselves for not following the rule of law which they so willing shout they are for.

**Comment ID**
DOJ-OAG-2020-0003-0007

⦿ **Tracking Number**
1k4-9if3-62pa

AR-00000035

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 16, 2020



About (/about)        Bulk Data Download (/bulkdownload)        Agencies (/agencies)        Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)        FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000036

8/3/23, 4:25 PM                                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

**PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

Because of these laws, death on a massive scale, has taken place. Waves of fires in California, waves of mud, waves of hurricanes, waves of US military crashes (cruisers crashing into boats, sunken submarines, and aircraft), waves of plagues (locus/famine/virus) now.

God's wrath is upon the earth for no other reason than Megan's law, it has been judges evil.

I promise you, as the only true servant of the Lord God Jehovah, like my brother Moses once told a king, this goes though, something horrible, something very bad will happen. What? I have no idea, perhaps your super volcano at Yellowstone will turn USA into an atoll.

Stop this insanity and outlaw Megan's law. The FBI will tell you, that when I say something, it WILL happen.

Who am I? I am the "most dangerous" man on this list according to the Megan's law enforcement, for I am innocent, and the FBI/Police know it.

This is not a threat, this is the warning from the Archangel Ishmael.

**Comment ID**
DOJ-OAG-2020-0003-0008

 **Tracking Number**
1k4-9if4-h6iq

AR-00000037

Regulations.gov

## Comment Details          Submitter Info

**Received Date**

Aug 16, 2020



About        Bulk Data Download        Agencies        Learn

(/about)            (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000038

8/3/23, 4:09 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

Ex post facto as well as due process are greatly ignored for sex offender registry. There are a number of disproportional impacted people with mental health as well as youth on the registry. I personally have a cousin who dated a slightly older person consensual and they had a child together. The two families didn't file charges nor did anyone get placed on the registry. They are racing their families and they are living normal lives. The idea of youth being charged for 2nd degree statutory when they consensual is sickening and hypocritical. Too many states are forcing non-violent and no contact human beings to be treated as violent or repeat offenders. The children and family members are forced to take up firearms to defend theirselves from neighbors who seek to assault their relatives simply because that no contact or first-time, non-violent SIS registrant is on the registry. Too many states go further than the federal government in not allowing American voters to ever be allowed to be removed from the registry. It's understandable if it is a repeat or violent offense but the mere notion of a low level, first time or no contact registrant affirms the concept of non-violent and that person should always have the opportunity be removed from the registry in 25 years or less automatically barring that there are no reoffenses. Failure to not register in time is not a qualifying re-offense since it is paperwork and not a human being being offended. There are scores of unhoused Americans who are on the registry and they are living in shelters or on the streets. Many are former foster care or group homes youth that have aged out of the system. There are alot of veterans on the registry with PTSD or simply for public indecency such as public urination from being intoxicated which is similar to college students getting drunk at a fraternal group party as Supreme Court Justice Kavanaugh indicated that he experienced in his college years. So if federal judges can be shown liency for their youthful or mishaps that are considered nonviolent or no contact offenses, then American veterans and college age voters can be removed from the registry for dating a 16 or 17 year old consensual.

| **Comment ID** |
| DOJ-OAG-2020-0003-0009 |

AR-00000039

Regulations.gov

 **Tracking Number**

1k4-9if5-3jm0

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 16, 2020



About    Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000040

8/3/23, 4:26 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

There has been substantial data provided that registration and the rules involved do more harm than good. The majority of sex offenders affected are not pedophiles or rapists. Though this is what the public believes. The registry and laws makes it near impossible for a sex offender to ever become a public asset. It makes it more likely they will go back to prison for a technical offense. It's hard to find a place to live and extremely hard to get a job. Both these issues make a reoffense more likely. Data has shown that between 1.5 and 4 percent sexually re-offend. The data on those offenders shows who to concentrate on. The 96-98.5 percent and their family members don't deserve the life long punishment as they would never re-offend. We are destroying too many lives unnecessarily.

**Comment ID**

DOJ-OAG-2020-0003-0010

 **Tracking Number**

1k4-9if7-g931

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 16, 2020

AR-00000041

Regulations.gov



Your Voice in Federal Decision Making

About   Bulk Data Download      Agencies    Learn

(/about)        (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)    |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000042

8/3/23, 4:08 PM                                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

The Registry is an absolute bureaucratic system. It tangles and snags any chance of redemption.
registration handicaps rehabilitation and damages families, children are bullied when parents are listed.
Publicly. There's little value to the public safety for this costly process that may cause more harm than good.
I am 100% against sexual abuse and 100% against perpetual punishment to people with chance for
rehabilitation. Families are getting killed, passed for advancement, children stigmatized, parents are
suffering and living in fear. There's got to be a more human way for this. Family circles in oppression. We as
American can do so much better.

---

**Comment ID**

DOJ-OAG-2020-0003-0011

---

⊙ **Tracking Number**

1k4-9if8-h10q

---

|                    Comment Details                    |                    **Submitter Info**                    |
| ---------------------------------------------------- | -------------------------------------------------------- |

**Submitter Name**

Anonymous Anonymous

AR-00000043



About     Bulk Data Download     Agencies     Learn

(/about)         (/bulkdownload)    (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000044

8/3/23, 4:11 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)    / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

Comment

I am greatly concerned about the change regarding how a registrant is to update work and/or school information. While it may work for someone whose employer or school is nearby, it fails to take into account those who telework and distance learn. For example, suppose I'm born and raised in Hawaii (HI), have never left the State, and have no desire to ever leave the State. Further suppose I get hired to telework for a company wholly based in Minnesota (MN), and I enroll for online-only courses with a university in Florida (FL). Under the current rules, I report the MN employer and FL enrollment to the HI officials and I'm done. Easy, simple, and done.

Under this proposal, I'll now be required to fly from HI to MN report in-person that I've been hired by a MN company. I'll also then have to travel (probably by air again) to FL to report in-person that I have enrolled at a FL university. Aside from the expense this will incur, there's a pretty good chance I may miss the reporting deadline of MN and/or FL. Beyond that, now that I've made a physical presence in FL, I will have to register with FL and be on its registry--for life. All I wanted to do was live my life out in HI while earning money (from MN) and getting an education (from FL) online. Instead, these rules impose an affirmative disability on me and compel me to make transcontinental travels to accomplish...what?

In addition to all of the above, the compulsion to travel to MN and FL will put many unsuspecting people in the proximity of an ex-sex-offender who previously has self-isolated in HI! Assuming, arguendo, I truly am a risk, these rules will now take me from HI, place me in MN and FL where nobody knows me and I can sneak around mostly unnoticed, just to accomplish an administrative task that's currently managed by HI. This is completely counterproductive to the stated purpose of SORNA and its ilk. There is no gain in information by my reporting it in person in MN and FL versus HI reporting it electronically. If I'm going to choose not to report employment and/or schooling now, what makes anyone think I report them if I have to spend money and travel to do it? This makes no sense. All that happens is a (now disgruntled) registrant will be temporarily roaming undetected in communities who have no knowledge of him.

A similar example: suppose I live WA and work for a trucking company in WA. My employer gets bought by

AR-00000045

a Houston, TX, firm and moves all operations to Houston. As this is now a change in employment information, this proposal will now compel me to hie myself to Houston to report the information in-person. What is the benefit of this? Right now I can simply provide WA, WA tells TX and the Feds, and all is fine and done. I cannot for the life of me comprehend how forcing a registered offender to make long interstate travels does anything for further the stated goals of SORNA. It actually does the opposite!

While I applaud the clarifications this proposal accomplishes, the reporting requirements regarding employment and schooling are onerous, burdensome, and perhaps unconstitutionally disabling. These in-person employment and schooling reporting requirements seem designed purely 1) to trip up registrants, and/or 2) dissuade registrants from working or going to school anywhere beyond a short commute. That's both wrong and shameful.

**Comment ID**

DOJ-OAG-2020-0003-0012

 **Tracking Number**

1k4-9if9-bfy5

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 16, 2020



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

AR-00000046

Regulations.gov

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000047

8/3/23, 4:23 PM                                                            Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ⌄ |

---

| Comment |

See attached file(s)

Additionally, a shortened plain text version excluding background historical comments follows (for a complete background see the attached pdf's):

Think of the Sex Offender Registry as another divisive. This is a call to abolish SORNA and SMART Office entirely.

Most people feeling the effects of afflictive emotions that often lead to sexual offending may never ask for help for fear of being accused of a sexual offense, arrested, and targeted by the Sex Offender Registry;

The Sex Offender Registry endangers and fosters afflictive emotions in targeted persons, promotes public hysteria and unreasonable stereotypes, is no cure for sexual offending, nor is it a prevention;

Many people who otherwise would benefit from seeking a cure are being caught up in the Sex Offender Registry, and perhaps because of over-criminalization of sex behaviors many are arrested and prevented from carrying on with their lives.

Laws have been in place for a long time to fairly prosecute offenders. Fair trials of fact determine punishment for crimes and considering the mitigating circumstances determine an end of the punishment. SORNA exceeds those factual determinations by implementing additional punishment that did not exist at the time of an offense. SORNA's rules are outside the purview of our legal system, and therefore unlawful.

Our criminal justice courts have the authority within each state jurisdiction to determine fair judgments, often bargaining with defendants to accept the verdict and ruling of the court with full disclosure of the consequences. With SORNA no such transparency exists when year after year the requirements of registration can be changed on a whim.

AR-00000048

The victims of SORNA are grouped together under a label that does not acknowledge dynamic risk levels that consider mitigating circumstances nor the facts that can change affecting the individual. Yet, the same stigma is forced upon all those who are labeled sex offenders regardless of the seriousness of the act, whether that act was ongoing, or the progress toward restoration of the individual who seeks to return to a normal existence.

Since so few states have come into compliance with SORNA and are not likely to implement consistent state regulation there can be no equity in the implementation of rules.

SORNA at the International Level?

Domestically, the sex offender registry, SORNA and the SMART Office offer little more than redundancy for law enforcement for those few states that have implemented AWA rules. Internationally, a Sex Offender jacket could bring disastrous results where US citizens are not protected by our rule of law.

Adult Education

An Alternative to "Stranger Danger" Relatively Speaking

How did so many politicians so easily come to the false assumption that there are sexual predators waiting on every corner for innocent children to prey upon? All adults need to fully understand the real risks for children and the vulnerable, the cause of sexual offending, and the cure for sexual offending. SORNA is ineffective and perhaps harmful because it publicly and punitively labels, shames and blames those who will never offend again and provides no education for those trusted who may be unaware of their own potential for offending.

Cause and Cure of Sexual Offending What every adult needs to know.

CAUSE

Chain of thoughts feelings behaviors with an underlying motivation to find an opportunity for sexual gratification.
Afflictive emotions arise from issues of self-interest. Reason becomes clouded, boundaries fade, hurt-for-hurt mood results.
Unfulfilled needs and uncontrolled thought processes and other thinking errors become the focus of attention.
Selfish motivations from attachments, desires, wants, issues and errors block empathy for other setting up final step:
Exclusion of the victim from the empathy pool.

CURE

Choose a different path, knowing the outcome of habitual causal chains, by planning an alternative way to sexual gratification.
Understand your motivations, emotions and thinking errors. Deal with issues of self-interest, focus on fulfilling real needs.
Restore all the ethical boundaries that have eroded over time. Respect and value yourself as you respect and value others.

AR-00000049

Regulations.gov

Empathize at every opportunity. Identify your selfish motivations that formerly blocked empathy and deal with them.

The longer you entertain the thought the more difficult it is to stop. Always plan ahead to interrupt inappropriate thoughts, feelings and behaviors.

For all of the reasons above, and the additional problems already existing in OAG 121, SORNA should be abolished. In particular the name of the act, Adam Walsh Act, should be removed for lack of a connection to a sex offender on a national registry.

Attachments  2

📄 Comment on OAG 157 Cover Letter to Clerk

⬇ Download ▾

📄 Comment on OAG 157a

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0013/attachment_2.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0013

**Tracking Number**

1k4-9ifh-353g

| Comment Details | Submitter Info |
|---|---|

**Submitter Name**

Larry Francis

Regulations.gov



Your Voice in Federal Decision-Making

About   Bulk Data Download   Agencies   Learn
(/about)      (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000051

8/3/23, 4:10 PM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

When i was working on the murder of Tiffany Jenks they stoped my travel to Manila by making fake claims upon my name and now magically no one in the US Government has time to find the corrupt police who set me up on murder.

Plan some money for what to do when its a lie ... it ruined my life and corruption does that

**Comment ID**
DOJ-OAG-2020-0003-0014

 **Tracking Number**
1k4-9ifl-603s

| Comment Details | Submitter Info |

**Received Date**
Aug 17, 2020

AR-00000052



About    Bulk Data Download       Agencies      Learn

(/about)         (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000053

8/3/23, 4:14 PM                                             Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

Comment

See attached file(s)

Attachments ( 1 )

📄 Comment

⬇ Download ▾

**Comment ID**
DOJ-OAG-2020-0003-0015

◎ **Tracking Number**
1k4-9ifo-5adl

**Comment Details**                          **Submitter Info**

AR-00000054

**Submitter Name**

Andrew Osmun

**Organization Name**

Restorative Action Alliance



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000055

Written Comment by Andrew G. Osmun

When laws are passed, they are passed with good intentions, but some do not always produce good results such as the Sex Offender Registry (SOR).  With all its restrictions, originally created for dangerous sexual offenders, the registry has now evolved into a "one-size-fits-all" system where nonviolent, first-time offenders with no criminal records and do not jeopardize public safety are subjected to the same rules and regulations as violent sexual offenders because the registry involves everyone and anyone who commits any type of contact or non-contact sexual crime and must automatically register, some for years and others for life whether it's indecent exposure, public urination, child pornography (C.P.), Romeo and Juliet crimes and for being curious about their bodies without knowing or understanding the consequences

1) ineffective
The registry costs taxpayers millions without preventing public safety … but counterproductive for it gives the public a false sense of security since new sexual crimes are committed by people NOT on the registry … but known to their victims for they are family members, friends, people in authority and many times other juveniles. lead healthy, productive lives.

We all want the same outcome … prevention of sexual abuse and treatment to prevent future abuse which will greatly reduce the number of victims … for everyone … victims, offenders and family … so all can lead healthy, productive lives.  This is what we all should be striving for… instead failed policies continue to exist creating new victims and offenders every day.

A lot of research and surveys have been done on this topic which show the recidivism rate ranges between 3 to 7% compared to non-sexual offenses which are in the double-digit numbers.

These sentences should fit the crime but they do not … they served their time and are the only ones singled out by being chastised endlessly and relentlessly time and again … not for what they already did but for what they MIGHT do the future … costing taxpayers millions instead of using cost-saving alternatives such as probation, treatment programs and rehabilitation so they can have a second chance a … instead they are being reprimanded continuously and their punishment and retribution is endless.

2) shaming/punishment/punitive
Finding e*mployment* and *housing* becomes very difficult if not impossible for no one wants to be associated with them. With restriction requirements, many can't participate in family activities and lack community support.  Instead, they and their families are subjected to harassment, vigilantism, vandalism and even murdered for being on the registry. These factors contribute to recidivism rather than reduce it and yet some fortunate ones are taxpayers still with life-time sentences.

Unfortunately, they are rejected by their communities but still expected to reintegrate without tools needed to become self-sufficient contributing to recidivism rather than reducing it.  This makes it difficult if not impossible for them to become productive members of society … that is productive members of their home Town, City, State.

They can't attend any family functions such as any of their children's school or sports activities, graduations, picnics, family gatherings, etc. Is it fair that their children suffer because of a poor choice their parent made years ago.

3) expensive

The Federal Government and individual States spend millions every year on the registry in which the majority are low-risk who are NOT a threat to the public instead of using these resources on prevention and treatment programs that will reduce the # of victims and prevent future potential people from offending in the first place.  If we want to prevent this abuse, children must know how not to become victims …
however, treatment programs must also be available to potential offenders to prevent future victims … this is what the U.S. should be aiming for ... instead failed policies continue to punish this undesirable group.  However, today too many people's livelihood depends on this industry that has destroyed so many lives and continues to every day with inaccurate and misleading information instead of educating the public on myths and facts about sex offenders.

Millions of tax dollars are used on the registry which protects no one for new SEXUAL crimes are committed by first-time offenders who are not on the registry but known to their victims. These funds should be allocated for treatment programs to help victims become survivors but also prevent potential future abusers from offending which would greatly reduce the number of future victims.  Some don't need treatment while others with sexual problems/addictions do … but none are available as there are for non-sexual offenders with addictions … so how can the abuse stop.  There are some organizations that provide treatment for offenders that would prevent future crimes and prevent future victims … but because of our mandated sexual laws, how many are willing to risk that chance??

4) collateral damage
The registry was implemented to protect children … but are children being protected when the majority of victims are abused *within the family circle by people they know and trust* … along with the innocent and unfortunate children of registrants who also suffer physical and emotional trauma because the registry brings shame, humiliation, bulling and threats and their only crime is that a parent is on the registry… so the registry does little to protect any child but places many low-risk offenders and their families in constant danger. *This is life threatening!!  Please let them live in safety instead of living in constant fear.*

The registry is also a prison … one without bars; however, the individual is not the only one on it, we all are on it, registrants, parents, spouses, children, siblings, even relatives, friends, and neighbors, therefore, we are also being punished along with them. This is what the registry does to people convicted of sexual offenses and they are the only group after serving their sentences are continually and relentlessly punished with punitive life sentences even though their recidivism rates are lower than non-sexual offenders who are NOT under such strict restrictions and supervision for the rest of their lives!

5) vigilantism
However, what is unconscionable is that the registry allows potential lunatics and fanatics to use the list as a *vigilante tool that targets all sex offenders as child molesters* damaging or destroying properties, others were robbed, beaten, mugged and even murdered including family members ... only because they were on the registry.

6) Summary: Registries
-are not a safety tool
-costs Federal and State budgets millions
-do not prevent sexual abuse
-does not stop new sexual crimes committed by people not on registry
-causes people on it to become jobless, homeless, without family and community support making them hopeless

The DOJ should focus on creating a system that works, not further codifying a system that doesn't.

AR-00000057

8/3/23, 4:06 PM                                                    Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 17, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | | Share ▾ |

---

| Comment |

I can't describe how unfairly and destructively these laws have affected our family. How can laws possibly treat each offender as a group without any consideration of the true circumstances?

My son, at a young age was victim to an internet sting operation. He was pursued for NINE MONTHS by local police who tried in every way possible to lure him into a trap. Yes, he was online looking for a sexual encounter. NO, he was not looking for an encounter with anyone underage, yet for NINE MONTHS, the police consistently sent him emails after he said NO to the offer several times. How is that fair?? He was apprehended in his car - MY SON DID NOT COMMIT ANY CRIME, but he was grouped with those that perhaps did horrible things.

Of course, law enforcement was delighted that they had "clean" evidence on him and convicted him as a level II offender for 25 years. How is entrapment fair?

My son never committed a previous crime; WAS a contributing citizen to society; nothing was found on his hard drive that was incriminating; his psychological evaluation came back "clean" without doubt; he has mounds of education debt for which he worked hard for jobs he now cannot get because he is on the sex offender's registry that, according to every study, does not allow any type of rehabilitation for an offender to repent and have a chance to heal; a chance to move forward; a chance to rebuild a respectable life.

My son thinks about taking his own life everyday. It has become my full-time job to keep him alive. He is reminded everyday of one bad life-choice that law enforcement provided which changed his goals for success, for living and the view of his self-worth. He doesn't want to live anymore. THAT IS WHAT YOUR LAW IS DOING.

Where is the support for healing? I know that society does not care about registrants. They are viewed as animals; because the way the law is written makes it so. There are tens of thousands of examples similar to this one. Is it possible that everyone victimized on this registry are unable to change? Or are all of them

AR-00000058

going to re-offend? I don't think so and if they want to they will and no list is going to stop them...the data proves this.

Please help my son to care about his life again. Allow him to become a respected citizen in his community. Please do something good for those that have remorse so they don't have to hide anymore. Please don't make his punishment more painful. I beg you.

**Comment ID**

DOJ-OAG-2020-0003-0016

 **Tracking Number**

1k4-9ifp-n45z

| Comment Details | Submitter Info |
|---|---|

**Submitter Name**

Anonymous Anonymous



Your Voice in Federal Decision Making

About     Bulk Data Download     Agencies     Learn

(/about)        (/bulkdownload)     (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000059

8/3/23, 4:31 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 18, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
| --- | --- |

---

| Comment |
| --- |

We created a registry that has made families of registrant's victims of colleterial consequences. Children are bullied, harassed, and targeted for attacks; these are the children of offenders as well as children on registries. Children as young as 8 years old, registered for life, restricted from parks, playgrounds, and schools. How can we expect a child to develop fully with these restrictions? Each and every state has different rules, and in some cases each county. My family has been affected in every way by these laws from victims, to parents of victims, to parents of offender, to registrant. My son was convicted of a non-contact offense against a child at 18, ten years ago, he is not the same. He is un-employable, and now he, his father and I are forced to move in with one of his sisters. He had a job, a vehicle, and was getting ready to buy a house then his employer found out he was on the registry, fired within 48 hours. The registry does not work, it does destroy lives, and create a second class of citizens. It allows vigilantes to stalk and target you. We live in fear, we're not allowed a weapon to defend ourselves, we are sitting ducks. It would seem like it would be better to have a law that includes forgiveness, and healing for all concerned, instead of never-ending punishment. Prison should be enough punishment, it should also rehabilitate, and teach is that not what it is supposed to be? My youngest daughter was groomed for two years, and raped at 15, she used to wake up screaming for Mommy at night. She also walked out of her Civics class in protest of the Sex Offender Registry Laws, I was so proud of her, she said that they are unjust, they treat all the same but crimes are not the same. At 15 she had the wisdom to understand that ongoing endless punishment does not fix problems. We have to teach people to heal, we have to educate in order to prevent, the registry does none of this, it just punishes. It's time we stop the "tough on crime" and start the "smart on crime", we have to allow forgiveness for that. Patricia Wetterling has come out to advocate for changes, stating we have gone too far. Every year new laws are introduced to punish sex offenders, laws like sexting. Laws that punish for life those that had consensual sex with their b/f or g/f, its enough. Laws against sex dolls, and humiliating women who are prostitutes. Not only the people who commit current crimes but to go back and retroactively destroy lives, when is it enough?! We have seen more than enough hate, and violence this year it's time for positive changes. Its just like the failed war on drugs. My son used to have hopes and dreams, friends, and family. Now he has no hopes, or dreams, no friends, no hopes of his own family, he exists, his father and I exist. The American dream is gone for us. He knows he did something terrible; he is

AR-00000060

sorry for that and the pain it has brought, but he is not 17/18 years old now, but he will pay for life. He had CP on his computer, and through LimeWire it was shared, terrible I know, but it was 10 years ago, and he served 4 years in prison. It should have ended with prison, but at least by now 10 years is enough. The human brain, the frontal cortex, does not fully develop until 25 or even 30, so why are we holding 8,10,14,18-year old's accountable for life? It also has been shown that residency restrictions have no effect on crimes, they do however make people homeless. For me personally I live in fear of people I work with finding out, I live in fear of a person showing up and killing my son, of killing us all. My youngest used to love Halloween, she loved to decorate, now we can't. She wasnt really allowed to have friends spend the night, because we didnt want her classmates to know, we wanted her to have friends. My grandchildren dont understand why their Uncle cant go with them to the park, or to their school plays, or games, theyre too young to understand. My son is only 28, and has no life. I read recently of a 93-year-old man on the registry, in WV, 93, he cant go into assisted living, or a nursing home, so what does he do? We didnt think of the consequences of the Registry, only punishing, its time to stop. People change, we need to as well. The data shows recidivism at between 1.5% and 4%, with isolation being a main factor, so we have taken away homes, jobs, friends and family from these people. We have shoved them into abandoned buildings, woods, empty lots, street corners, and under bridges. We have seen where lists, and rules on stamping passports, and special ID's lead, the US condemned this behavior as human rights violations against Germany. But now we think it's ok to use it? It's ironic Germany has condemned it as a human rights violation and the registry violates right to privacy, against the US per German courts. We have become the monsters.

**Comment ID**

DOJ-OAG-2020-0003-0017

 **Tracking Number**

1k4-9ifv-g3ge

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 17, 2020



AR-00000061

Regulations.gov

About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000062

8/3/23, 4:28 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 18, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

This is a Joke .... Bill Barr you should be ashamed of your self , People are human you are giving our children and young adults a life sentence with a stoke of your pen in their blood , for the rest of their lives , in most cases people have already served their time and have families & lives that they have worked very hard too over come their mistakes , You Bill Barr are the Monster that needs to be added to a list of corrupt left wing misfits who are tearing this country apart. , When are you people going too allow the people of this country to live their lives normally after a sentence has been served ?? Think of the families you are retroactively destroying with these rules . Retroactive punishment in this country is Unconstitutional Stop Playing God with Millions of Peoples Lives ! Our country has suffered enough from you and your corrupt gang of misfits .

**Comment ID**

DOJ-OAG-2020-0003-0018

 **Tracking Number**

ke0-694e-a8i7

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 18, 2020

AR-00000063

Regulations.gov



Your Voice in Federal Decision-Making

About  Bulk Data Download    Agencies    Learn

(/about)      (/bulkdownload)  (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000064

8/3/23, 4:28 PM                                   Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 18, 2020

View More Comments ⬭724⬭ (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ⬭724⬭ (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

Comment

I have been working with sexual offenders for over 40 years, and I have seen the impact on sex offender registration with hundreds, if not thousands, of clients. Juveniles who have committed sexual offenses and have to register have increased difficulty finding employment, housing, and social partners. I have had the personal experience of one adolescent client who chose suicide over having to register for life as a sexual offender. Current research is very consistent and clear that juvenile sexual offenders as a group pose minimal risk to the community as a whole. Study after study shows sexual re-offense rates for juvenile sex offenders as between 3% and 8%. I think it is time to recognize that adolescents change dramatically during their teen years, and imposing a lifetime sentence of public humiliation and shame is simply not necessary with this group, and will cause more harm than good. There should be some differentiation between offenders, not simply on the basis of being over 14 at the time of the offense and the victim being under age 12. It is my opinion that only the worst of the worst offenders should be subject to sex offender registration, and at a minimum that should exclude first-time offenders unless the crime involved death of a victim.

**Comment ID**
DOJ-OAG-2020-0003-0019

◎ **Tracking Number**
1k4-9igh-aex2

**Comment Details**                              **Submitter Info**

AR-00000065

**Received Date**

Aug 18, 2020



About    Bulk Data Download        Agencies      Learn
(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000066

8/3/23, 4:30 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 18, 2020

| View More Comments    724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments    724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |
| --- | --- |

| Comment |
| --- |

I was victim to an internet sting operation. I was pursued for nearly a year by the FBI to be lured into a trap. Yes, I was online looking at pornography and in a chat room. And no, I was not looking for an encounter with anyone underage. I did not meet or arrange to meet anyone EVER. My actions were strictly on line. I knew it was immoral but I did not know it was illegal. The website strictly outlined that you must be 18 to enter and participate in conversations and exchange photos. That said, I was arrested and charged with possessing child pornography. For that mistake I was sent to prison for 5 years and am listed as a Tier III on the Sex Offender registry.
My home has been vandalized. My wife and children are ostracized in our community. My bank cancelled all my accounts that I had in good standing for over 15 years. I was only able to purchase a home in my neighborhood because everything is in my wife's name and there is no clause about excluding sex offenders. There has to be a better way. The laws we currently have do not protect the public, they are merely punitive. The last time I checked that is unconstitutional. The recidivism rate for non violent, first time offenders is less than 1%. Politician are unfortunately the ones to change the laws affecting the registry and NONE of them want to be accused of being pro sex offender.

In the state of Missouri it is nearly impossible to rent an apartment, get an education or hold a decent paying job. The Registry puts fear in the heart of the public and makes it impossible to live a meaningful life. PLEASE PLEASE Change this system

| **Comment ID** |
| --- |
| DOJ-OAG-2020-0003-0020 |

AR-00000067

8/3/23, 4:30 PM                                                          Regulations.gov



**Tracking Number**

ke0-8b8y-anw6

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 18, 2020



Your Voice in Federal Decision Making

About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000068

8/3/23, 4:29 PM                                      Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 18, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)         Share ▾

---

Comment

I have a son who is intellectually and developmentally disabled. He is on the registry because he was taken advantage of, abused and told to expose himself to a minor. He has a misdemeanor. I am submitting a formal comment because the registry in general has put a destructive strain on our whole family since we are advocates and caretakers for my son. We live in a prison of rules and regulations. It has caused damage to my son. The registry puts him in grave danger from the real predators and it has destroyed our whole family.

I am also cofounder and Vice President of Strategic Planning for the nonprofit LRIDD, Legal Reform for the Intellectually and Developmentally Disabled. Please see our webpage. There are many families in our Organization suffering from the registry.

**Comment ID**

DOJ-OAG-2020-0003-0021

 **Tracking Number**

1k4-9igk-ovbs

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**

Aug 18, 2020

AR-00000069



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000070

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

💬 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 19, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) | View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

Here are some basic facts about registrants:

No other group of offenders, including murderers, arsonists, those who commit violent assaults, etc., is subjected to the draconian restrictions of being placed on a public list. No other country (with the exception of North Korea) has a public list, although many countries' law enforcement agencies maintain nonpublic lists.
•       Over 95% of new sexual crime is committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notificatio
•       Public urination, sexting, underage sex, and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
•       Many registrants face unemployment, homelessness, instability, and personal danger.
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja ; https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9
•       Only a small fraction of those on registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11
•       "Stranger-danger" is rare; 90% or more of victims know their attackers, higher for children.
https://www.rainn.org/statistics/perpetrators-sexual-violence https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
•       Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
•       Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
•       Sex offender registries put innocent family members of registrants in harm's way.
https://link.springer.com/article/10.1007/s12103-008-9055-x https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
•       Registrants are frequently denied special housing such as nursing home care and section 8 housing.
https://www.theatlantic.com/health/archive/2017/06/aging-sex-offenders/528849/ http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1386&context=elders
•       Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf
•       Current sexual offense laws create conditions that lead to increased crime.
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/
https://repository.law.umich.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1078&context=articles

---

**Comment ID**

DOJ-OAG-2020-0003-0022

---

◎ **Tracking Number**

ke0-j1mj-3ozd

---

| **Comment Details** | **Submitter Info** |

**Received Date**

Aug 18, 2020

---

AR-00000071

8/3/23, 4:36 PM                                        Regulations.gov



| About | Bulk Data Download | Agencies | Learn | | Reports | FAQ |
|---|---|---|---|---|---|---|
| (/about) | (/bulkdownload) | (/agencies) | (/learn) | (https://resources.regulations.gov/public/component/main?main=Reports) | | (/faq) |

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |
Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000072

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 19, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

For the last 20 years or so, the Legislature has taken the same approach that it did unsuccessfully in the 1980's with the Drug War, i.e. "get tough on Sex Offenders" while the research and even the recidivism rate of sex offenders speaks an entirely different alternative.

After spending 10 years in prison myself for a sex offense and spending the last 20 years working to change ineffective and harmful laws I would urge you to think outside the box and focus on programs that strength therapueticv interventions, help strngthen instead of destroy families and support groups of those who have committed sex offenses and provide needed services and assistance in helping former offenders find comfortable and affordable housing and jobs that suit their needs and skill level.

For the last 20 years I have volunteered as a contact point for NARSOL and WAR (Women Against Registry) groups fighting for a paradigm change in SO related laws. There are few weekes that go by that I do not receive letters from people being released from prison who have no prospects of housing or employment and are either held longer in prison or placed in low in hotel in shady areas of town with no assistance from parole or probation agents to find housing or employment. Rther than rewarding or funding agencies and programs that merely make things more difficult for returning offenders why not reward agencies for actively helping parolees to successfully reintegrate, build and reestablish familiar relationships and set realistic and attainable goals which will help boast self esteem.

Additionally in my work as a therapist referral point person for B4U-ACT I receive numerous monthly requests from people struggling with attraction to minors, many of them barely adults themselves. They are afraid to reach out for the help they need for fear of the potentuial social or legal consequences.... may have not offended but the social concerns tax their often already fragile emotions putting them at a higher risk of some sort of non-productive behavior... why not institute programs such as Dunkerfeldt project in Germany and help those who are seeking a means of dealing with their struggles a much more accessible path to do so rather than laying on punishment layer upon punishment layer.

AR-00000073

As a senior citizen foreseeing my eventual need for a home with less maintenance and perhaps eventually a nursing facility and hopefully before that day desiring to visit some of the many places around t he world I have dreamed of visiting since I was a child, I find the prospects for any of these activities to have been severely impacted in the negative by many of the laws that continue to be imposed on former offenders.

And worst of all the research shows that these "tougher on crime" measures actually create more problems and often have the exact opposite impact that they are proposed to offer. Using credible research and the wisdom of those orgamnizations who work with former offensers daily makes so much more sense.

Please note... in my home state of Indiana... a state that is not even fully compliant under the current scheme, the rate of recidivism according to the Indiana DOC is a very low 1.05% Hardly justifying the ever growing regime of laws. this rate has been consistent for an extended period of time.

I urge you to reject the current logic and seek for impactful, fact based changes that can help change the course of the prison nation which poor legislation and administrative decision foster. Please think outside of the bos and seek help form organizations like Women Against Registry (WAR), NARSOL, and ACSOL.

**Comment ID**

DOJ-OAG-2020-0003-0023

 **Tracking Number**

1k4-9igo-6no0

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 18, 2020



Your Voice in Federal Decision-Making

About    Bulk Data Download    Agencies    Learn

(/about)    (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

AR-00000074

8/3/23, 4:34 PM                                                    Regulations.gov

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000075

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 19, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

**Comment**

The registry does not work, it does destroy lives, and has created a second class of citizens. It allows vigilantes to stalk and target you. We live in fear, we're not allowed a weapon to defend ourselves, we are sitting ducks. It would seem like it would be better to have a law that includes forgiveness, and healing for all concerned, instead of never-ending punishment. Prison should be enough punishment, it should also rehabilitate, and teach is that not what it is supposed to be?

We have to teach people to heal, we have to educate in order to prevent, the registry does none of this, it just punishes. It's time we stop the "tough on crime" and start the "smart on crime", we have to allow forgiveness for that. Patricia Wetterling has come out to advocate for changes, stating we have gone too far. Every year new laws are introduced to punish sex offenders, laws like sexting. Laws that punish for life, those that had consensual sex with their b/f or g/f, its enough. Laws against sex dolls, and humiliating women who are prostitutes. Not only the people who commit current crimes but to go back and retroactively destroy lives, when is it enough?! We have seen more than enough hate, and violence this year it's time for positive changes. Its just like the failed war on drugs.

It also has been shown that residency restrictions have no effect on crimes, they do however make people homeless. For me personally I live in fear of people I work with finding out, I live in fear of a person showing up and killing me, or my girlfriend.

We didn't think of the consequences of the Registry, only punishing, its time to stop. People change, we need to as well. The data shows recidivism at between 1.5% and 4%, with isolation being a main factor, so we have taken away homes, jobs, friends and family from these people. We have shoved them into abandoned buildings, woods, empty lots, street corners, and under bridges.

There has to be a better way. The laws we currently have do not protect the public, they are merely punitive. The last time I checked that is unconstitutional. The recidivism rate for non violent, first time offenders is

AR-00000076



less than 1%. Politician are unfortunately the ones to change the laws affecting the registry and NONE of them want to be accused of being pro sex offender.

**Comment ID**

DOJ-OAG-2020-0003-0024

**Tracking Number**

1k4-9igq-iz7d

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 18, 2020



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000077

8/3/23, 4:35 PM                                           Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 19, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

Comment

My husband is a sex offender in Colorado, it was a internet based offense to which he was basically in the wrong place at the wrong time. He was on an app talking to someone who, on there profile, said they were between 19-25 years old. During the conversation this person said oh by the way I'm 14 is that ok, my husband stopped all communication! He did everything right (never talked about meeting up, never sent photos, never had inappropriate conversations and stopped the conversation when they said they were 14) but he is now labeled a sex offender and has to register for 10 years all because it was a undercover cop. So we have 3 kids one of which is a baby, my husband can't go to any school functions for 10 years, he will miss our babies first day of school. We can't find anywhere to live because of this and now have to live apart because the only place we have found is low income but he can't live here so he has to live in a small RV away from his family! The registry has screwed him and our family!

**Comment ID**
DOJ-OAG-2020-0003-0025

 **Tracking Number**
ke1-ffn8-46d7

**Comment Details**                                    **Submitter Info**

**Received Date**
Aug 19, 2020

AR-00000078

Regulations.gov



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000079

8/3/23, 4:54 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

Comment

I am not surprised by all the comments that oppose this important life saving legislation.YES WE DO NEED A NATIONAL DATABASE. If everyone could check out new people they meet at a national level rather than needing to search every state we would not have the systemic disaster we are now facing. Sex abuse is so prevent in our society that we are being forced to take drastic action to protect our children. And now they want it to be just another life choice? Because children can choose to have sex with a disgusting old fat person? And the ignorant therapists that are pushing this nonsense that we can fix these people? Obviously THEY have never been victimized. This is not fixable. This is not ok. This will give children the best chance they have to be protected.

I believe we do need to remove registration for peeing and other offenses like that but EVERY CRIME AGAINST A CHILD SHOULD BE FORBIDDEN TO PLEA DOWN THE OFFENSES INTO LESSER CRIMES AND A NATIONAL MANDATORY SENTENCE SHOULD BE IMPOSED. Probation for someone who harms a child should never be allowed.

Thank you Attorney General Barr for taking the time to protect our children.

| **Comment ID** |
| DOJ-OAG-2020-0003-0026 |

| ◎ **Tracking Number** |
| ke1-sgd8-x32r |

AR-00000080

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 19, 2020



About          Bulk Data Download          Agencies          Learn

(/about)          (/bulkdownload)          (/agencies)          (/learn)

Reports          FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)          (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000081

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|---|---|

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |
|---|---|---|

Share ▾

---

Comment

This is not even right , These laws do nothing but hold down people who have served their time for their crime in most cases of people of this registry they never even had a court of law judge who applied this kind of punishment too them as myself , I was sentenced in 1992 to 1 to 3 years by a judge 5 years before even a state registry was ever created, 13 years before this federal registry was enacted , a politicians / attorney general as since retro activated now over 25 years more to my sentence , My judge has long retired and the punishment is still being added year after year retroactively not just to me but my entire family , my daughter suffers , my wife suffers , my life is a complete HELL, because of the internet and because of renegade politicians & attorney generals from state too federal , i CANNOT provide for my family , No one will hire a person on a public sex offender registry, EVERYONE knows this . You people are so wrong , i was 19 years old when i received 1 to 3 years on pure he says she says B.S you have since retroactively unconsitutanaly destroyed my life and my families , I will tell you this much KEEP pushing these SO called Rules , Knowsing damn well its abuse of power to people and you will soon understand the destruction and evil you will bring out of someone who has NOTHING to loose or to Live for , This has gone way too far and it will cause more harm then it does good STOP holding people down who have already served their time for their crimes, no matter if they did it or NOT ! They have the right to live equal , not allowing them too will only hurt our community's and cause more harm then good. Retroactive Registries Will Not Survive ! You know damn well these registries are disabilitating and punitive at he highest levels. Mr Bill Barr.. Who gives you & the politicians the power to write law ??? You are NOT a Judge , Jury or a Executioner . WAKE UP !
.The fear monger lies must END ! PLEASE ! TAKE YOUR FOOT OFF OUR NECKS ! ENOGH IS ENOUGH !

| Comment ID |
|---|
| DOJ-OAG-2020-0003-0027 |

AR-00000082

8/3/23, 4:37 PM                                                Regulations.gov

 **Tracking Number**

ke1-uytf-xanq

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 19, 2020



About          Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)      (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000083

8/3/23, 4:42 PM                                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments | 724 (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 (/docket/DOJ-OAG-2020-0003/comments) |   | Share ▾ |

---

| Comment |

THESE RIGISTRIES ARE PROVEN TO DO MORE HARM THEN GOOD ! STOP ADDING MORE RULES OR PUNISHMENT WHAT EVER YOU CALL IT TO PEOPLE WHO HAVE SERVED THEIR SENTENCES .

**Comment ID**
DOJ-OAG-2020-0003-0028

 **Tracking Number**
ke1-vejf-ngkt

| **Comment Details** | **Submitter Info** |

**Received Date**
Aug 19, 2020

AR-00000084

Regulations.gov



Your Voice in Federal Decision Making

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000085

8/3/23, 4:54 PM                                       Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

**Comment**

This is a steaming pile of waste, corruption, and abuse heaped onto an already marginalized and endlessly punished group in violation of scientific evidence. That evidence was gathered and posted by your own department proving malicious intent to segregate and eliminate a group of people for political reason in an election your administration is losing.

Per 2018 Update on Prisoner Recidivism: A 9-Year Follow-up Period (2005-2014) posted by ojp.usdoj.gov
The 401,288 state prisoners released in 2005 had 1,994,000 arrests during the 9-year period, an average of 5 arrests per released prisoner. Sixty percent of these arrests occurred during years 4 through 9.
An estimated 68% of released prisoners were arrested within 3 years, 79% within 6 years, and 83% within 9 years.
Eighty-two percent of prisoners arrested during the 9-year period were arrested within the first 3 years.
Almost half (47%) of prisoners who did not have an arrest within 3 years of release were arrested during years 4 through 9.
Forty-four percent of released prisoners were arrested during the first year following release, while 24% were arrested during year-9

Per Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14) posted by ojp.usdoj.gov
Rape and sexual assault offenders were less likely than other released prisoners to be arrested, but they were more likely than other released prisoners to be arrested for rape or sexual assault.
Released sex offenders were more than three times as likely as other released prisoners to be arrested for rape or sexual assault (7.7% versus 2.3%).
About two-thirds (67%) of released sex offenders were arrested for any crime, compared to about five-sixths (84%) of other released prisoners.
Half of released sex offenders had a subsequent arrest that led to a conviction.
Released sex offenders accounted for 5% of releases in 2005 and 16% of arrests for rape or sexual assault during the 9-year follow-up period.

AR-00000086

If registries are a good idea and work why only use them for the group with the SECOND LOWEST (only murder is lower)recidivism only?
END THE HATE AND DISCRIMINATION! END THE SEX OFFENDER REGISTRY!

**Comment ID**

DOJ-OAG-2020-0003-0029

 **Tracking Number**

ke2-30zm-142l

**Comment Details**                                      **Submitter Info**

**Received Date**

Aug 19, 2020



About  Bulk Data Download     Agencies    Learn

(/about)      (/bulkdownload)  (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000087

8/3/23, 4:50 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)            Share ▾

---

Comment

I am appalled in so many personal, constitutional, and societal ways as to the juggernaut our legislators have created, (SORNA). It is nothing more than another form of many forms throughout the history of our nation of a witch hunt. My wife and I never could have imagined that our nation founded on liberty and freedom for all could create such a form of lifelong banishment, and systematically promote fabricated fears of the so called "sex offender". Our son who is now 34 was born in 1986. By the age of 8 he was diagnosed with Tourette's Syndrome, (All statements herein are well documented). By the age of 11 he was diagnosed with Asperger's Syndrome, (ASD level 1). Before our son was arraigned he had seen a developmental pediatrician, a neurologist, a psychiatrist, and four psychologists by the age of 25. He was making progress,was a law abiding citizen, never in trouble with the law. Like everyone else he has hormones but did not have the developmental capacity or understanding of how to socialize with the opposite sex. So, as many on the spectrum do he went inward,(see attached). He later accidentally found pornography on the internet. Later, he discovered child pornography on a P2P website that he was using to find free movies and music. What parent could ever have imagined that such horrid material is available to anyone in the world. Mom and dad were SHOCKED to discover that this illicit material is free on the internet, readily available 24/7/365, and without warnings. No other illicit material, illegal drugs, firearms, is more easily available, in the privacy of one's own home than CP. Almost one million citizens on our registries and no end in sight! Our developmentally disabled son was just released from three years in prison and is now on a public registry. We ask you how do you think it makes any sense to put the responsibilities of law enforcement into the hands of the ill informed public. All the registries do is incite unwarranted fears in our citizens. Citizens who have no idea that many on the registries are not only intellectually and developmentally disabled but that there are many children on our registries as well! Also, that many on our registries have not engaged in touch offenses. We ask you, why have we abandoned all logic here? You're not rendering our son to the "sidelines" of our society. No, what the registry does is renders our son a NONPERSON, (See attachment).

---

**Comment ID**

AR-00000088

DOJ-OAG-2020-0003-0030

 **Tracking Number**

1k4-9ihe-nydg

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 19, 2020



Your Voice in Federal Decision Making

About   Bulk Data Download   Agencies   Learn

(/about)   (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000089

8/3/23, 4:39 PM                                     Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

Much of this type of legislation is forgetting the impact it can have on people FALSELY ACCUSED AND CONVICTED of sex offenses. In the pursuit of justice let's not forget what the system is capable of doing to the innocent and their families. Let us also try to remember that ANY community or institutional form of "rehabilitation" achieves NOTHING of the sort if it is built out of punitive measures that facially only appear administrative. With how easy social media can be distorted and manipulated the Megan's Law website is no longer serving a legitimate purpose and instead is putting information in the hands of vigilantes and predators of a new kind.

Again, now imagine that done to someone falsely accused and convicted and their family.

**Comment ID**

DOJ-OAG-2020-0003-0031

◉ **Tracking Number**

ke2-fo2y-tjni

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 20, 2020

AR-00000090



About   Bulk Data Download    Agencies    Learn

(/about)       (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000091

8/3/23, 4:41 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

| Comment |

The registry is as wrong as hanging someone in the middle of time square , These so called rules, as we see as laws over our lives have too end this has gone way to far these people have serve their sentences in a constitutional court of law , Most decades ago years before this retroactive SORNA punishment registry was ever even thought of by a false monger advocate driven power abusive politician. People make mistakes, People are caught up in the web of unconstitutional laws that hold little too no need for "PROOF OR SCIENTIFIC EVIDENCE" to support a conviction ,in some cases not even a day or a time too convict the young men of our Country , Then to think most NEVER even had the right to INECENT UNTIL PROVEN GUILITY WITH OUT A RESONABLE DOUBT. Americans need too wake up to these lies & false studies this state uses too Fear Monger them to gain power over the People , Scientific Studies Prove these facts Not a Rouge Attorney General Abusing his Powers as this one does QUIET often, as most Americans already have witnessed first hand in this Country . MR BILL BARR THESE ARE NOT JUST YOUR CORRUPT POWERS AT WORK AGAIN , THESE ARE PEOPLES LIVES YOU ARE DESTROYING IN MOST CASES FOR A ENTIRE LIFE TIME , YOU ARE NOT A FEDERAL JUDGE OR A JURY BUT YOU ARE NOW PLAYING THE EXECUTIONER AS CHIEF JUSTICE ROBERTS HAS PRODUCTED . RETROACTIVE LIFE SENTENCES TO PEOPLE AFTER A SENTENCE , IS NOT AMERICAN ! THESE RULES SUCK & YOU KNOW IT ! It starts with sex offenders and ends with EVERYONE ! These Rules are Wrong ! Enough is Enough ! You know Damn well these registries are not only punitive to the ones on them but DESTROYS ENTIRE FAMLIES , NOW FOR LIFE ??? STOP !

| **Comment ID** |
| DOJ-OAG-2020-0003-0032 |

AR-00000092

Regulations.gov

 **Tracking Number**

ke2-zhzt-6a7n

---

**Comment Details**                                    **Submitter Info**

**Received Date**

Aug 20, 2020



About    Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/3/23, 4:59 PM                                             Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾   |

---

| Comment |

Sexual registries are unconstitutional. There are no enumerated powers for the federal government or state governments to require any American to register for anything unless they are under state custody of a sentence. Under the 13th Amendment, prisoners can be slaves but once that sentence period ends, Americans do not have to talk to the government nor comply with unconstitutional dictates like SORNA. It illustrates how incompetent government officials are that they do not know how Constitution enumerated power function or the limits of government power. End this abomination immediately.

**Comment ID**
DOJ-OAG-2020-0003-0033

 **Tracking Number**
ke3-1xmw-bjx7

| **Comment Details** | **Submitter Info** |

**Received Date**
Aug 20, 2020

AR-00000094

8/3/23, 4:59 PM                                                    Regulations.gov



About    Bulk Data Download      Agencies      Learn
(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000095

8/3/23, 4:47 PM                                              Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|---|---|

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |
|---|---|---|

Share ▾

---

Comment

See attached file(s) Due to my comment being lengthy, I have attached a document. It describes by SORNA should be abolished and a sensible plan enacted, in order to give those released from prison a real chance to become productive citizens, without being harassed and discriminated against due to the obviously punishment intended acts of SORNA. My name has been withheld for the safety of my family.

Attachments  1

📄 My Sex offender situation

⬇ Download ▾

**Comment ID**

DOJ-OAG-2020-0003-0034

◎ **Tracking Number**

ke3-nqjf-kpsd

AR-00000096

Regulations.gov

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 20, 2020



About      Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000097

After being convicted of sexual offences in December 2000, I was given a Bad conduct discharge while in the Us Army and sentences to prison. While in prison, I was told I would have to register as a sex offender and due to the charges would be considered a tier III, which in Indiana and most places I would be considered a Sexually Violent Predator (SVP). After release from prison late 2007, I found a job working as a Server at a local Sushi restaurant in Indianapolis and decided that I should use my GI bill to go to school in order to better myself professionally (I obtained an Associate's degree in Computer Networking Systems and a Bachelors in Information Systems Security). Years later, I met a woman whom I would eventually marry and have children with. We have a total of five children (two biological and three stepchildren) whom I love with all my heart. Since release from Prison, I have done nothing but try to improve myself, and have always made sure I'm compliant with the sex offender registry. My family has faced numerous problems due to my mandatory registration status, which is something my wife and I have hoped to eventually suppress. Some of our problems have been the following:

1. While working at the sushi restaurant, numerous people would call and tell the manager they were looking at the sex offender registry for the downtown area and noticed a sex offender worked there. They would ask him why he allows such an individual to work at the restaurant.

2. I went into the Information Technology field and got approved for a contract at Eli Lilly. After a few weeks, my information concerning my job was posted to the sex offender registry and once again people wondered why a sex offender was working at Eli Lilly and I was fired.

3. I applied to work at Bell Techlogix and the recruiter was eager to get me hired due to my educational background. I filled out the paperwork he sent via Fedx and eventually explained to him I was on the registry and that I wasn't under probation or parole. I told him I wanted to report this due to the trouble I had with employment in the past. He then said he'd call back, and when he did, they decided they didn't want me working at the company.

4. At one point, someone didn't like the fact a sex offender was married to my wife and thought my stepchildren were in danger, so they called child protection services and lied about my interactions with my stepdaughter. I fully cooperated with CPS and even attended sex offender classes at their suggestion while the investigation took place. They found everything to be a lie and dropped the investigation. While I was innocent, it still caused problems for my family, and this is something I hope to prevent from happening again.

5. I agreed to a contract with Teksystems and they sent me to work at Eli Lilly again. While in training, my old manager at Eli Lilly saw me and the very next day I received a phone call saying I was fired.

6. My wife and I have been denied housing due to myself being on the registry. I personally have been told due to the convictions age, they would allow us to rent, but the fact I'm on the registry prevents them from allowing us to lease an apartment.

Due to these problems, I suggested we moved to another state (California) since it was obvious, I would not be allowed to provide for my family in the state of Indiana. We moved to Moreno Valley, California in the summer of 2012 and I quickly found a job where I worked at a Data Center for a company called

PCM. I made sure to always be compliant with the sex offender registry and loved the fact the police never came by my home even once for a compliance check. It allowed my family to feel as if we were a family like everyone else. Gone was the embarrassment for myself and my family to have the Police showing up on the weekend for a compliance check, neighbors peeking through windows or coming out to investigate. The major differences I face in Indiana verse California were:

1. Indiana (registration every three months) California (Once a year within a week of my birthday)
2. Indiana (monthly compliance checks at home) California (no compliance checks at home)

In 2017 my wife suggested we move back east in order to be closer to family and we chose Georgia where I had applied and interviewed for a Data center position at a company named Peak10. I was told I was approved for the position and was sent a offer letter, but once again, after they saw I was on the registry the job offer was rescinded. Due to Georgia laws, the company never saw my conviction, but could see I was on the registry, and it was enough to refuse me. Having lost out on the job, and needing to find a realistic place to stay (All apartments told us they won't rent to anyone on the registry), I decided we should move back to Indiana to move in with my  Mother until we found housing for the sake of our children. I applied for a Desktop support position with a company and was approved after a interview to support Ball Memorial hospital. Once again, it was discovered I was on the registry during the background check and my job offer was rescinded.


Some time went by and I couldn't find work, which put great stress on my family. I eventually found a job that I could work from home that's based out of California. While the job paid a lot lower than the position I had while living in California, I was grateful to have work. As of now, considering I'm on the sex offender registry, and listed as a sexually violent person, my family was forced to leave Indiana again (due to my perceived ostracism concerning employment and everyday life) in order for myself to obtain a good job to support my family.


We moved to Las Vegas where after some time, I was able to obtain contract work in my professional field, working at Caesars Entertainment. After about a year, I was laid off (to include many other employees) and have had trouble finding work, due to my status of being listed on the registry.

Being released from the registry would be a God send for myself to include my family for some of the following reasons:

1. Professional Employment would be easier for myself to obtain, which would mean a better quality of life for my family.
2. I would be able to support my children in their daily activities (my 15-year-old son has shown interest in sports, and in no way can I go to his games or ceremonies to support him).
3. We would not be forced to live out of state and far away from family for myself to seek a decent wage for my family.
4. I would be released from the daily stress of fearing someone will find out about my registration status, only to get me fired, or harass myself or my family.

In the last 12+ years (post confinement), I have had 0 contact with LEO besides compliance checks. At each check I have been found to be fully compliant. In the state of California, the police did zero compliance checks on my home for five years, and I continued to conduct myself in a responsible manner, by working, taking care of my family, and registering once a year as ordered.

Currently in Las Vegas, Nevada, I conduct my quarterly registrations as required, but now the police will conduct compliance checks on my home, due to a change in law, which gives me stress that my children and wife will once again be exposed to harassment, with neighbors looking and gossiping, causing undue stress in my family. I highly request that SORNA be changed to reflect how someone is post confinement and not a blanket "one size fits all" approach. I also request that Tier III Offenders have a chance to get off the registry as well since it makes zero sense to say someone is more dangerous due to the age of their victim, and thus must be on the registry for life, regardless of their future conduct. My post confinement behavior in itself shows I am no threat and there are thousands of other people in my position who are being held back for no other reason than personal bias when it comes to passing SORNA and other laws similar to it.

Thank you for your time and consideration

8/3/23, 4:45 PM                                          Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

Comment

These Registries and the Rules need to end , This is not Ok in anyway it effects so many families and young adults for a life time of shaming, humiliation, struggles they can never be equal, it is very disabilitating it hold the people on them back from ever having a reason to live normal and equal. Please do not keep adding these so called rules to millions of Americans to hold them down. Whit what is going on in this country today we should be focusing on love, compassion, and forgiveness. I hope that these rules are not enacted these people on these registries have endured enough suffering. Each case is different this is why they should not be all tiered as all being dangerous by levels together, These registries were enacted for the most dangerous in our society the politician has used it to hold down millions of unprivileged Americans to create revenue. During a pandemic this kind of sneaky under ground move is unexpectable at all levels . It starts with the sex offenders and ends with every American .

**Comment ID**
DOJ-OAG-2020-0003-0035

 **Tracking Number**
ke4-dfz0-ja2p

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Aug 21, 2020

AR-00000101

8/3/23, 4:45 PM                                              Regulations.gov



About    Bulk Data Download     Agencies     Learn
(/about)        (/bulkdownload)     (/agencies)   (/learn)

Reports    FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000102

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

It seems to me that this lengthy document imposes additional regulation, obligation, and limitation for those who have to register. It appears to be an organization tool of sorts; a way to equalize and centralize registration requirements. It also seems like a veiled attempt to force the states into compliance with the Adam Walsh Act. After all this time, only 17 states have substantially complied; I'm not sure if any are in full compliance. For me, this is an indication that the law has a wide range of potential problems.

From my perspective, the registration system does not need to be modified, improved or organized (although changing it to a police-only registry would help). My very strong belief is that the sex offense registries across this country need to be dismantled, eliminated and forever abolished. The registry has been shown not to improve neighborhood safety or recidivism rates (which are already among the lowest of any crime category).

Sex offense registration is a terrible program that continues to survive because of fear, ignorance, bias, self-serving job-preservation decisions made by legislators, and the tough-on-crime attitudes of prosecutors and judges. It hurts not only the million-or-so people who must register but also another 2-4 million family members. The registry creates unemployment, it increases homelessness, it does not protect our children, it offers a false sense of security for parents, it is costly in terms of dollars and manpower, and it invites vigilanteism. And worst, it takes away any chance of redemption, renewal, or societal reintegration for those who must register, many of whom have already paid their debt in prison.

I do not have a legal background but I do have a son who was caught up in an ugly legal situation. I believe this gives me credentials that (I can only guess) the framers of this new rule don't possess. The FBI sting operation in which my son became involved was tantamount to entrapment. He didn't have a criminal record, there was no violence, and there was no contact of any kind. This was a crime he would have been unlikely or unwilling to commit without the grooming and prodding of the FBI. He was given 14 years in federal prison followed by lifetime on the registry and lifetime probation. The scales of justice are way out of balance!

This DOJ document goes to great lengths to explain previous court decisions. They do this, I believe, to argue against the constitutional challenges that have been raised in the past and are being raised again as these arguments are finding new life in the courts across this country. Despite the legal wrangling and court

AR-00000103

decisions to the contrary, I believe that many of the unconstitutionality arguments about the registry are in fact valid; including arguments that cite the prohibitions of Non-delegation, Ex Post Facto, Double Jeopardy, Cruel and Unusual Punishment and the promise of Due Process of law. I believe these arguments will eventually win out and the registry will be defeated. For a parent whose child is caught up in this nightmare, change cannot happen soon enough. But the changes offered in this proposed DOJ rule will not improve the laws to make them constitutional and more humane. I strongly oppose the adoption of this rule.

**Comment ID**

DOJ-OAG-2020-0003-0036

 **Tracking Number**

ke4-fkx0-as8l

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 21, 2020



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000104

8/3/23, 4:55 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |
| --- |

This is contrary to what some states (I am most familiar with Washington) that have not adopted SORNA because they have a better system, using actuarial risk assessments to determine notification levels. Furthermore, these systems allow for some persons, previously on the registry, to be relieved of the duty to register based on solid, public-policy standards. This rule would over-ride state statutes which are based on far more research-based standards.

**Comment ID**

DOJ-OAG-2020-0003-0037

 **Tracking Number**

1k4-9iil-dmsl

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**

Aug 21, 2020

AR-00000105



About        Bulk Data Download        Agencies        Learn
(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000106

8/3/23, 4:40 PM                                   Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

View More Comments    724    (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments    724    (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

Comment

1st off I have never met anyone who has been on the registry who was not changed. Also not one person on these lists are a threat to society. Before the inmate leaves prison to be able to enter back into society they must successfully complete a psychological evaluation. People on the registry are normal people who served their time and are trying to move on with their life in a positive manner. Trust me I know tons of them as I worked in prison ministry and kept in contact. I mean why don't they have registration for thieves and arsonists....I mean I would rather know who would steal and burn my property. I have always believed in second chance if they want to work for it. No one is perfect...and if people say well what about the victims......I was a victim.....and as such I know that if the media keeps spreading fear of sex offenders and the registry which is all a lie like I said it will keep u in those chains. I have justification on this as someone who was a victim. My offender was not on the registry and still isn't and I have met so many people who are on it that are not a threat to anyone. There are also laws against using the registry to cause harm or harassment even though that is the reason people use it, trust me I know. Off the record I am not a sex offender. But also know this that I am against actual people who kidnap and rape little children. But people who kidnap and rape little children and rape babies and all that disturbing shit are never getting out of prison remember that. Honestly the media and government has been for decades causing fear over this thing called the registry when in fact 99.95 % of those on the registries are not even a threat to anyone. They use this as a ploy to keep themselves out of the spotlight. Honestly the ones u should fear are the ones NOT ON THE REGISTRY. I was a child victim of someone who never got on the registry. I was also someone who would look up just for the FUN OF IT TO GET MYSELF WORKED UP AND FEARFUL. BUT I HAVE ALSO MET TONS OF THEM THROUGH PRISON MINISTRIES AND THEY ARE NORMAL PEOPLE WHO SERVED THEIR TIME, STAY CRIME FREE AND JUST TRY THEIR HARDEST EVRYDAY TO DO GOOD AND LIVE THEIR LIFE IN A POSITIVE MANNER AND WOULD ALSO TRY TO BE THE BEST PARENTS, SPOUSES, FRIENDS AND EMPLOYEES THEY CAN BE. But if they can't make friends or employers want to hire them or their kids are outcasts because their parent is on the registry then THAT IS NOT OK. See what good it is not doing? They served their time yet they are FOREVER A PRISONER BECAUSE OF THE REGISTRY. I BELIEVE IN A 15 YEAR MAX. NO PERSON WHO HAS PAID THEIR DEBT TO SOCIETY SHOULD HAVE TO BE CONDEMNED FOR THE REST OF THEIR LIVES. ANY

AR-00000107

OFFENDER WILL REOFFEND WITHIN 1-5 YEARS AND NO REAL PREDATOR COULD LAST 10 YEARS WITHOUT A VICTIM. 15 YEARS BUT THE REGISTRY SHOULD ONLY BE LAW ENFORCEMENT ACCESSIBLE. MEANING PUBLIC SHOULD NOT HAVE ACCESS AS IT IS A HARASSMENT AND VIGILANTE SYSTEM. IF PEOPLE ARE WORKING HARD TO DO BETTER WITH THEIR LIFE THEN THEY SHOULD BE ABLE TO BE FREE AS WITH "ANY OTHER CRIME" I WAS A VICTIM, THEN A HATER, NOW A COMPASSIONATE LAW ABIDING CITIZEN WHO KNOWS THE CONSTITUTION AND CIVIL RIGHTS. FREE THEM AND REMOVE THE REGISTRY FROM PUBLIC ACCESS. EDUCATION OVERRIDES FEAR AND JUDGMENT.

LAW ABIDING CITIZEN / VICTIM / EMT
Nicole R.

**Comment ID**

DOJ-OAG-2020-0003-0038



**Tracking Number**

1k4-9iip-xqve

Comment Details | Submitter Info

**Received Date**

Aug 21, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

AR-00000108

Regulations.gov

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000109

8/3/23, 4:45 PM                                  Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

The sex offender registry came about as a product of several horrific, high-profile child abductions and murders.

After two and a half decades, there has NEVER been a shred of evidence that the sex offender registry has ANY effect on the crimes that it was instituted to prevent. And despite this, rules and regulations surrounding the registry on both federal and state levels have become more and more restrictive -- likely because of a combination of politics and social panic. Even Patty Wetterling - the mother of Jacob Wetterling, one of the murdered children that prompted the creation of the registry - has come out and said that the sex offender registry has gone too far.

The reality is that the overwhelming majority of sexual offenses against children happen in private settings - usually homes - and are perpetrated by close friends and family members. One neglected statistic is that 35-40% of sex offenses against children are committed by other children. Another neglected statistic is that the majority of new sex offense convictions are against people who have no prior record of sexual offenses. Recidivism rates for offenders who have been through treatment range from the low single digits to the mid-teens, depending on the "type" of offender and the length of the study.

The horrible crimes that prompted the creation of the sex offender registry account for a very tiny fraction of sex crimes against children. A child is far more likely to be sexually assaulted in their own home by somebody they trust than by a stranger at a park. This is irrefutable fact. The registry does nothing but prevent people who might have made terrible mistakes in the past from repairing their lives and moving on and being productive citizens.

AR-00000110

8/3/23, 4:45 PM                                                Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0039

 **Tracking Number**

1k4-9iis-aqkw

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 22, 2020



About     Bulk Data Download     Agencies     Learn
(/about)          (/bulkdownload)   (/agencies)   (/learn)

Reports     FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000111

8/3/23, 4:57 PM                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

I oppose this proposed regulation.

The addition of more regulations to an already overly burdensome, punitive, and ineffectual sex offender registry system will not protect children, but instead ensure that more people are placed on the registry and given additional criminal charges for administrative offenses related to non-compliance with the registry system.

Sex offender registry systems have no substantial evidence supporting their proposed effect of reducing sex offense commission and recidivism. Additionally, a substantial and growing body of law is showing that sex offender registry systems are in fact used as punishment, which runs contrary to several basic elements of our legal system and a citizens' right not to be abused by the legal system.

The extant registry has negatively affected not only my ability to pursue happiness, but has hampered my ability to rehabilitate and avoid recidivism. Specifically:

- The daunting amount of registration requirements and the uncertainties of knowing if I have met all of them, combined with the making public of my most shameful moment online, contributed to my suicide attempt in 2013.

- The need to double and triple check regulations around my ability to travel domestically and internationally have made it hard for me to plan trips to visit loved ones and has made me anxious that I missed an arcane regulation while I was visiting, resulting in my isolation.

- Regulations surrounding my ability to travel abroad have forced me to give up on my dream of a career doing aid work in the Middle East

- I constantly have a low-grade fear that I have forgotten one of the myriad registration requirements and

AR-00000112

Regulations.gov

am subject to punishment

- I have fears of forming relationships with other people because I am worried that my status on the registry, and the fact that my information is publicly available, will result in being despised by people I meet

- The isolation that results from the effects of these regulations has made my rehabilitation process arduous and difficult

---

**Comment ID**

DOJ-OAG-2020-0003-0040

---

 **Tracking Number**

1k4-9ij7-lwsu

---

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 22, 2020

---



About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

AR-00000113

8/3/23, 4:38 PM                                     Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

Comment

The sex offender registry is a complete failure. The intention behind it may have had some good intentions but the registry is ineffective in meeting and providing improved public safety. Instead it provides a false sense of security to the naive and foolish while increasing risk to public safety. It is abused by politicians for cheap points with the uneducated voter which is exactly what this proposal is. There is a significant amount of empirical evidence to support the dissolution of the registry while there is little to support its continuation. In consequence to the registry there have been multiple homicides unnecessary and needless all as a result of the existence of the registry. Not all the victims were actual registrants but completely innocent victims of uncontrolled wrath encouraged and enabled by the existence of the registry. Can the family and friends of these victims press charges against the creators and maintainers of the registry?
The registry prevents employment, creates homelessness, breaks up family, and spreads fear based on myth not science. Please do not intensify an already existing problem by making it worse but do the right thing and dissolve the registry and use the money wasted on its maintenance to help victims of abuse and apprehend those guilty of committing such acts instead.

**Comment ID**
DOJ-OAG-2020-0003-0041

◎ **Tracking Number**
1k4-9ija-izh7

Comment Details                          Submitter Info

AR-00000114

Regulations.gov

**Received Date**

Aug 22, 2020



About     Bulk Data Download       Agencies     Learn

(/about)        (/bulkdownload)     (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000115

8/3/23, 4:43 PM                                      Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001) / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

This entire document -- in fact, the entire sex offender registration system -- is predicated on the false assumption that an individual who has previously committed a sex-based offense at some point in their history is more likely than others to commit a similar offense at some unspecified future time. This false assumption has been rebutted time and again by numerous scientific studies, including studies done by the federal Department of Justice, which show that sex offenders have one of the LOWEST rates of re-offense, yet politicians and law enforcement officers continue to ignore that empirical information in favor of measures that provide no measurable increase in public safety but are only a feel-good measure during election time. Politicians refuse to address these studies, dismissing anything that contradicts what their election speech teleprompters tell them to say. Until people are willing to address these factual issues in an even-handed manner, there will be no such thing as justice in America.

| **Comment ID** |
| DOJ-OAG-2020-0003-0042 |

|  **Tracking Number** |
| ke6-fsgb-0oxi |

| **Comment Details** | **Submitter Info** |

**Received Date**

Aug 22, 2020

AR-00000116

Regulations.gov



About     Bulk Data Download     Agencies     Learn
(/about)        (/bulkdownload)     (/agencies)   (/learn)

Reports     FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000117

8/3/23, 4:51 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

**Comment**

This proposal is an unfortunate set of circumstances. It has Epstein written all over it! To begin with this is ALL political and will get passed, for sure. Yes its wrong, yes IT IS UNCONSTITUTIONAL but will take many lives to rectify. Who knows what this Country or this World will look like but maybe someday it will be looked back upon as Discrimination once was and we are still fighting that! For years I followed the straight and Narrow. Did ALL that was demanded. Went to hundreds of hours of Therapy and eventually made it through to the other side only to find new and more onerous hurdles are being presented everyday! You call SORNA and IML a scheme? Not punitive! Its in the Publics interest. What about the best interest for individuals and families that struggle with doing the right thing ! Making amends, being descent TAX paying citizens. So the answer is to put MORE Citizens in Federal Prison? How much does that cost? And dont think as in just dollars, think about the collateral damage, the Domino effect. And this proposal captures ALL Registered Citizens, not just the heinous but the Sexters, the marginal indecent exposers, the Internet Sting people, the Thousands who WILL NEVER REOFFEND! This proposal looks good on paper, has a great sound bite but the only bite it has is to the backsides of those who are trying to do the right thing! In several places it says; Will benefit the Sex Offender. Really! How disingenuous. It only wants to PUNISH, not help! This proposal will place some many traps in place that it will basically prevent a Registered Citizens from ever traveling, anywhere. The hurdles are too high, the risk is too great. Congratulations, you have finally conquered us. Put us in dungeons.

| **Comment ID** |
| DOJ-OAG-2020-0003-0043 |

|  **Tracking Number** |
| 1k4-9ije-lqky |

https://www.regulations.gov/comment/DOJ-OAG-2020-0003-0043                                    1/2

AR-00000118

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 22, 2020



About    Bulk Data Download    Agencies    Learn
(/about)       (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000119

8/3/23, 4:56 PM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

How is of this "Justice" The justice departments own studies shows that " sexoffenders" the lowest rates of recitism of any other type of "criminal". I was convicted in Alabama. for RAPE 2nd.. ( sounds bad if you have no idea) where the girl lied about her age. ( so it was really statutory rapebut people know what that means and is not shocking) . She admitted that I was mislead , she admitted she was the one who come on to me.( so really she commited the crime) yet none of that matters. All that matters is i really believed she was of age when she wasnt and that she came on to me and we had consentual intercourse. So Im guilty. I have to register for life. My one and only "sexoffence". I have not had as much as a parking ticket in 15 years but every year new laws are passed that keep me from being able to find a job, have a place to live or even go on a vaction without being able to have one day of peace. Please stop this oppression. This piling on has to stop. If you want to do something to REALLY HELP FUTHER PULIC SAFETY . Remove those registrants that do not pose a risk to public safety .If some one poses such a risk they cannot be trusted to live as everyone else lives keep them in prison. Everyone would be better off. The public would be safer and the "sexoffender" would not live a life of total opression that gets worse evryday not matter how hard they try.......One has nothing to fear of the man that has a job, a family, and a home. he has nothing to lose. BUT one should fear the man that has nothing to lose. there are one million people on the list. I just do understand why this keeps happening.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0044 |

|  **Tracking Number** |
|---|
| ke7-1ei3-q1mw |

AR-00000120

8/3/23, 4:56 PM                                                                Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 23, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/3/23, 4:52 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

As a U.S. citizen being forced to register for a misdemeanor offense, I find the entire registration and notification act laughable. Posting someone's face, notifying the world that this person " might be a danger to others", marking their passport, and denying them the freedoms that SHOULD come with the completion of all requirements of their offense ( incarceration, fines, probation, etc ) is tantamount to the Nazis marking the Jewish community in the 1940s. And as a descendant of a relative that experienced that, I can tell you the stigma never leaves the person's mind.
I have loved ones I may never get to see in person again. Family members that can't understand why I am still being punished, and don't think for one second that this is not punishment. You can argue that is for public safety all you want, but the purpose is clear to whomever experiences this farce of justice.

Dangerous persons need to be supervised. And yes, some will never change their ways. But why are so many having to pay the price for what a few have done. Drug dealers kill and abuse more people In a single city in a yr than all sex offenders have done nationally since the laws were enacted. Stop believing ( and I honestly think you don't) that there is a high recidivism rate among registrants, because there isn't.
Time has come to tailor back these unjust laws to allow those that never committed a violent act to be allowed to continue with their lives. Without the threat of vigilantes assaulting them, or law enforcement harassing them and their families.

We have paid our debt, so allow us our peace.

| **Comment ID**
DOJ-OAG-2020-0003-0045 |

AR-00000122

Regulations.gov

 **Tracking Number**

ke7-tul8-7mab

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 23, 2020



About     Bulk Data Download      Agencies      Learn

(/about)       (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/3/23, 4:44 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 24, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

These Rules are no more then a way to control our young men of this country, Enough be Enough ? Not expectable to keep applying more and more rules year after year , people deserve a chance . Life on a registry is unacceptable . The people deserve better, stop holding them down.

---

**Comment ID**

DOJ-OAG-2020-0003-0046

---

 **Tracking Number**

ke7-wjxs-7kxm

---

**Comment Details**                          **Submitter Info**

**Received Date**

Aug 23, 2020

---

AR-00000124



About     Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000125

8/3/23, 5:00 PM                                                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 25, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

Comment

I have grave concerns with SORNA and the proposed rule changes.

First, this proposal implies you are giving the Attorney General unlimited powers to alter the rules as he/she seems fit. No single government agent should have such control over a million US Citizens.

Second, the proposal implies that recent court rulings that SORNA is punishment should be ignored and be applied retroactively in spite of the US Constitution.

Third, the proposal requires public disclosure of employment info. A 2016 Job and Welfare Survey found the following:

"Registrants living in AWA-compliant states were MORE likely than those living in non-AWA states to report being currently homeless (4.05% AWA vs 2.6% non), being unemployed (47.97% AWA vs 36.36% non), being denied a job (61.86% AWA vs 54.61% non), being harassed at work (53.57% AWA vs 47.66% non), and being forced to rely on public assistance (57.43% AWA vs. 50% non). Registrants living in AWA-compliant states were LESS likely than non-AWA states to have been on the registry 10 years or more (39.19% AWA vs 46.75% non), experienced homelessness (21.52% AWA vs 29.22% non), or consider themselves anti-registry activists (48.3% AWA vs 55.84 non). Registrants in AWA-compliant states are more likely to experience numerous residence and employment hardships but are less likely to speak out against these hardships." (See http://www.oncefallen.com/files/Once_Fallen_Job_and_Welfare_Survey_Results.pdf)

A survey conducted by the same organization found Alabama's adult public registrant unemployment rate in May 2017 was 57% (See http://reformalabama.blogspot.com/2017/06/the-unemployment-rate-for-registered.html). Compare that with Alabama's May 2017 unemployment rate at 4.9% (See https://www.timesdaily.com/may-2017-alabama-number-unemployed-and-unemployment-rate/pdf_2c1fa36e-8459-5a29-9999-f80de7382656.html). The unemployment rate is just over eleven and a

AR-00000126

8/3/23, 5:00 PM                                      Regulations.gov

half times for Registered Persons as it is for the average Alabamian.

At the time, Alabama posted employer data on the website, which has contributed to the higher unemployment rate, as evidenced by the 2016 Jobs and Welfare Survey.

Fourth, the regulation requirement when traveling for seven days or longer is an unrealistic and onerous proposal. Many people who choose to take road trips may not be able to make a detailed itinerary; I've taken a number of trips where I decided to alter plans at a destination, and there have been times travel issues forced an alteration in plans. It is unreasonable to expect someone to know all the details of travel, especially in the event of an event like a family emergency or personal disaster like a house fire. The IML passport provisions added to the AWA have given US travelers the reputation of only traveling for sexual tourism, which is bad for American businesses.

Interestingly, The NCMEC has stopped counting Registrants as we were on the cusp of having a million entries to the registry. With nearly a million names on the Public Registry, we should start looking at this registry a bit more closely and deciding whether this is worth the billions spent annually to keep the registry going. It is not influencing sex crime rates. It increases unemployment and welfare dependence. Three times the amount of funds given to the SMART Office have been spent on the US Marshals to conduct compliance checks than for funding the other programs it offers.

This money could be better spent on effective legislation. We are in the midst of the COVID-19 pandemic and numerous protests to de-fund the police. These events have led to a huge budget shortfall in many US States, and the registry would be a good place to trim the budget.

The sex offense registry is a product of fears stemming from debunked conspiracy theories like Satanic Ritual Abuse and overblown fears about missing children. While these laws may have been well-intentioned, they've had disastrous consequences, including violent acts committed by those who used the registry to plan heinous crimes, including harassment, vandalism, assaults, and murders.

If anything, SORNA should be eliminated, not expanded.

---

**Comment ID**

DOJ-OAG-2020-0003-0047

---

 **Tracking Number**

1k4-9iki-woeo

---

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 24, 2020

---

AR-00000127



About      Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000128

8/3/23, 4:59 PM                                                      Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 25, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |    Share ▾

---

| Comment |

The proposed changes will increase the number of people on the registry by mostly adding many people back on to the registry who in some cases haven't been on a registry for decades and haven't committed any new sex offenses that would create justifiable grounds or any real need to place them back on and identify them to the public. The Smith V. Doe (2003) decision incorrectly stated that the recidivism rate is "frightening and high" as justification for calling the registry non-punitive (giving it a legitimate purpose outside of punishment). While research has indicated the recidivism rate to be quite low and that this language is completely wrong, those spending over a decade off the registry without new offenses have also already proven that they are not a risk to the public any more than some other random person in the public because if they were such a risk and not even on a registry they would have re-offended again. This is especially true for someone without a registration requirement that allows them to live freely in their jurisdiction where people can not use the registry to help identify them. Yet, that person who has been off the registry has still not recidivated. These cases in particular don't seem to pass the test outlined in Smith v Doe which would would make this sort of retroactive application non-punitive because they have already proven that their rate of recidivism is neither frightening or high.

I therefore strongly oppose any effort to retroactively add people back to the registry who have not recidivated to trigger this requirement. There has been enough time since the adoption of the previous rules for retroactive additions to the registry under AWA and as such those not yet added back to the registry retroactively under the previous rules are not high enough risk to be able to justify any such application to them where this makes sense unless the goal is to punish them for something that happened many decades ago.

While I believe the registry is useless and should be completely abolished, if it is to remain, any new retroactive application is nonsensical and can not be properly justified as a non-punitive regulatory scheme as authorized by the Smith v. Doe case law. Even if you disagree, it serves no purpose except to make it more expensive to operate the SORNA scheme. As such the powers delegated to you as Attorney General

AR-00000129

Regulations.gov

in relation to the AWA, should be used only to make more appropriate changes to the regulations such as removing retroactive application of the AWA in its entirety.

**Comment ID**

DOJ-OAG-2020-0003-0048

 **Tracking Number**

1k4-9ikl-m4h7

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 24, 2020



Your Voice in Federal Decision Making

| About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) |
| --- | --- | --- | --- |
| | Reports (https://resources.regulations.gov/public/component/main?main=Reports) | | FAQ (/faq) |

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

This registry is unjust and very punitive to those who must ,report, not allowed in many zones in the community, They can not find shelter because they are shunned upon , They can not find work , everyone knows anyone of these registries and disabled and are not equal citizens , This must end the retroactive ness applied to people who have already served their sentences is cruel and unjust , No matter if you call them rules or just abuse of power it is wrong to apply this type of punishment with out a judge or a jury in this country. No matter if you diss like the word "sex offender" it does not give you the right too keep rewriting rules to apply retroactive punishment after a offender has served their debt to society is not expectable . NO MORE RETROACTIVE RULES , you are applying retroactive life sentences . You are not a judge or a jury . I am with holding my name because i fear this type of government .

**Comment ID**

DOJ-OAG-2020-0003-0049

 **Tracking Number**

kea-jjgk-uju0

**Comment Details**                              **Submitter Info**

**Received Date**

Aug 25, 2020

AR-00000131

Regulations.gov



Your Voice in Federal Decision-Making

About   Bulk Data Download     Agencies    Learn
(/about)          (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000132

8/3/23, 5:02 PM                                                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

| Comment |
|---|

See attached file(s) regarding in-person registration violates Ex Post Facto

| Attachments  1 |
|---|

| 📄 arguement |
|---|
| ⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0050/attachment_1.pdf) |

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0050 |

| ⊙ **Tracking Number** |
|---|
| kea-r4ap-065z |

| **Comment Details** | **Submitter Info** |
|---|---|

AR-00000133

**Received Date**

Aug 25, 2020



About     Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000134

Question presented: Is the in-person appearance requirement for sex offender registration an affirmative disability violating Ex Post Facto.

The argument is based on a single paragraph from Smith v. Doe, 538 U.S. 84 (2003) :

"The Court of Appeals reasoned that the requirement of periodic updates imposed an affirmative disability. In reaching this conclusion, the Court of Appeals was under a misapprehension, albeit one created by the State itself during the argument below, that the offender had to update the registry in person. Id., at 984, n. 4. The State's representation was erroneous. The Alaska statute, on its face, does not require these updates to be made in person. And, as respondents conceded at the oral argument before us, the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act. Tr. of Oral Arg. 26–28."

Where "n. 4." is from the lower Court's footnote, Doe v. Otte  259 F.3d 979,984 (2001):

"[4] The Alaska statute, on its face, does not clearly specify that these registrations must be made in person at local police stations. However, the government represented at oral argument that periodic in-person registration at local police stations is required by the Act. When specifically asked whether registrants must "go to the police station" for their annual or quarterly registrations, the government answered "under the current law, yes.".."

From Smith above, "...Court of Appeals was under a misapprehension…" this misapprehension is referenced from 259 F.3d 986  II. EX POST FACTO CLAIM :

"1. Affirmative disability or restraint
The Alaska Sex Offender Registration Act imposes an affirmative disability on the plaintiffs. First, its registration provisions impose a significant affirmative disability by subjecting offenders to onerous conditions that in some respects are similar to probation or supervised release. Like Washington's sex offender registration statute, Alaska's requires offenders being released from confinement to register. Alaska Code § 12.63.010(a); Russell, 124 F.3d at 1082. However, unlike the Washington statute, Alaska's requires sex offenders such as the plaintiffs to reregister at police stations four times each year every year of their lives. Alaska Code § 12.63.010(d). Moreover, in order to do so, they must appear in person at a police station on each occasion, and provide, under oath, a wide variety of personal information, including address, anticipated change of address, employer address, vehicle description, and information concerning mental health treatment for any "mental abnormality or personality disorder." § 12.63.010(b)."

See footnote 1 where the 9th circuit created a conflicting opinion of the above (3 years later).

The analysis of the above:

CASE NO. 15-2346/2486 UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT, DOES -vs-SNYDER, BRIEF OF LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS

"First, the Court emphasized that the Alaska statute required only calling the police once a year or, in some cases, once a quarter. "The Alaska statute, on its face, does not require these updates to be made in person. And…the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act." Id. The Court noted that the lower court had factually erred in finding that the statute had in-person reporting requirements, but the Court's language strongly suggests that if such requirements *had* existed, they would have constituted affirmative disabilities and restraints. The Alaska law is a first-generation registration requirement, imposing comparatively minor burdens: offenders did not need to register in person."

The argument centers around, "…Court's language strongly suggests that if such requirements *had* existed…" which answers the question presented, "**the in-person appearance requirement for sex offender registration is an affirmative disability**"

As the footnote indicated, **the in-person appearance requirement** actually did exist, just not on the "face" at the time. ("under the current law, yes.") And 3 years later, in-person appearance was made Federal law:

"34 U.S. Code § 20918, Periodic in person verification.
A sex offender shall appear in person, allow the jurisdiction to take a current photograph, and verify the information in each registry in which that offender is required to be registered not less frequently than—
(1) each year, if the offender is a tier I sex offender; (2) every 6 months, if the offender is a tier II sex offender; and (3) every 3 months, if the offender is a tier III sex offender. (Pub. L. 109–248, title I, § 116, July 27, 2006, 120 Stat. 595.)"

Which put the Supreme Court's finding back into question. The Amici Curiae was the only authority I could find that " strongly suggests" my question has merit.

And, as relevant to the matter here, Nevada law mirrors Federal law:

"NRS 179D.480.
When offender or sex offender is required to appear in person and provide certain information to local law enforcement agency; duties of Central Repository if offender or sex offender fails to comply.
1.  Except as otherwise provided in subsection 3, an offender convicted of a crime against a child or a sex offender shall appear in person in at least one jurisdiction in which the offender or sex offender resides or is a student or worker: (a) Not less frequently than annually, if the offender or sex offender is a Tier I offender; (b) Not less frequently than every 180 days, if the offender or sex offender is a Tier II offender; or (c) Not less frequently than every 90 days, if the offender or sex offender is a Tier III offender, and shall allow the appropriate local law enforcement agency to collect a current set of fingerprints and palm prints, a current photograph and all other information that is relevant to updating the offender or sex offender's record of registration, including, but not limited to, any change in the offender or sex offender's name, occupation, employment, work, volunteer service or driver's license and any change in the license number or description of a motor vehicle registered to or frequently driven by the offender or sex offender."

AR-00000136

I note that when I have to appear for registration bi-annually, during that time, I am in custody, although it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in a cumulative violation of my "constitutionally protected interest in liberty" as the above dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment.

I have to be there, that is restraint, under penalty of a crime. I am restrained by the obligation, completely out of my control, although it would appear brief, one hour of restraint is no different than a year in custody. It is not a sliding scale, or something that is balanced against other liberty interests or public safety. Restraint must be measured independently, it is not contextual. Ex Post Facto is absolute, not something negotiable.

Footnote 1:

356 F.3d 955 (2004) HATTON v. BONNER, No. 02-15586. United States Court of Appeals, Ninth Circuit : "It is true that, unlike the Alaska statute, § 290 requires Petitioner to register in person. Although this fact is important, when balanced against the other facts highlighted above, it is simply not enough to turn § 290 into an affirmative disability or restraint. Thus, this factor weighs in favor of the state court's conclusion that application of § 290 to Petitioner does not violate the Ex Post Facto Clause."

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

I feel/believe my son-in-law has paid his debt and should be removed. It's been 8 years for him, time served, probation complete, therapy complete, no other offenses. But the minimum is 10 years regardless of what he has done. What I ask is that people be assessed of their risk and if they are no longer a risk to public safety, have them removed or at least taken off the public registry.

**Comment ID**

DOJ-OAG-2020-0003-0051

 **Tracking Number**

keb-gjby-7gj2

| Comment Details | Submitter Info |

**Received Date**

Aug 26, 2020

AR-00000138



About     Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000139

8/3/23, 5:04 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

Continuation of a previous post. Lost the PG & would not allow me to return?
Sor is being called everything but what it is? Simply put it is punishment, nothing else, it can never be anything else no matter call it! It has also been said repeatedly this is clearly a human rights violation! It is my understanding the sor was put in place to protect the children? Some states have children on the registry, how exactly does that protect them?
What happened to the idea that you are sentenced by a Judge you do your time & then move with your life and not going every so often to register & register & register, etc! Murderers, arsonists, drug sellers to kids & any other crime doesn't. Seems a lot one sided, if you think about it?

---

**Comment ID**

DOJ-OAG-2020-0003-0052

 **Tracking Number**

kea-92d6-wq08

---

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 25, 2020

AR-00000140

Regulations.gov



About     Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000141

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

To the reviewer, this yet another submission of mine. I am compelled to submit because I keep finding more issues I need to get on the record.

Page 49335: (center column, last paragraph), the DOJ calls out the US Supreme Court case law, Smith v. Doe, 538 U.S. 84 (2003),

In Smith v. Doe, , the Court stated, "The Court of Appeals reasoned that the requirement of periodic updates imposed an affirmative disability. In reaching this conclusion, the Court of Appeals was under a misapprehension, albeit one created by the State itself during the argument below, that the offender had to update the registry in person. Id., at 984, n. 4. The State's representation was erroneous. The Alaska statute, on its face, does not require these updates to be made in person. And, as respondents conceded at the oral argument before us, the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act."

However, 3 years later in 2006, the federal code made the requirement "update the registry in person" imposed, stating in 34 U.S. Code § 20918, "Periodic in person verification A sex offender shall appear in person, allow the jurisdiction to take a current photograph, and verify the information in each registry in which that offender is required to be registered not less frequently than— (1) each year, if the offender is a tier I sex offender; (2) every 6 months, if the offender is a tier II sex offender; and (3) every 3 months, if the offender is a tier III sex offender. (Pub. L. 109–248, title I, § 116, July 27, 2006, 120 Stat. 595.) "

The 2003 Court relied on the fact that no in person verification was required that would have demonstrated an "affirmative disability". But Federal law did add an in person verification requirement 3 years later. So the question is: would the Court now admit, because there is an in-person requirement that 34 U.S. Code § 20918 can be now considered an affirmative disability, affirmative, meaning an active act to appear rather than to verify by other passive, non-affirmative means?

AR-00000142

Regulations.gov

And if so, the Court would say, that because there now is an in person requirement, which is deemed as an unconstitutional affirmative disability, then that specific part of the registration statute is unconstitutional, and therefore 34 U.S. Code § 20918 must be removed.

Obviously the critical purpose for in person verification is for photographs and fingerprints. Removing that certainly compromises the efficacy of registration, too bad, it goes to the overall punitive unconstitutional nature of the stature as the 3 dissenting opinions of the Court had determined.

The matter above qualifies as a civil case I may present in Federal court.

**Comment ID**

DOJ-OAG-2020-0003-0053

 **Tracking Number**

ke7-pwur-8b1p

**Comment Details**                                        **Submitter Info**

**Received Date**

Aug 23, 2020



Your Voice in Federal Decision Making

About    Bulk Data Download    Agencies    Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020



| Comment |
| --- |

To the reviewer, I have one more comment to add regarding the topic:

Pursuant to Nevada's wrongful conviction statute, I believe they "accidentally" confirmed sex offender registration is punitive as follows:

NRS 41.950   Award of damages and other relief.
    1.   In an action brought pursuant to NRS 41.900 which results in the court entering a certificate of innocence pursuant to NRS 41.910, the court shall award the person:
    (a) If the person was imprisoned for:
    (1) One to 10 years, $50,000 for each year of imprisonment;
    (2) Eleven to 20 years, $75,000 for each year of imprisonment; or
    (3) Twenty-one years or more, $100,000 for each year of imprisonment; and
    (b) Not less than $25,000 for each year the person was on parole or not less than $25,000 for each year the person was required to register as a sex offender, whichever period of time was greater.

Here, parole is compensated, certainly, as parole is custody and punishment. However, sex offender registration is also included, and with the same amount of compensation as parole. That equates parole-punishment to registration. That is a clear admission, not even intentionally, that sex offender registration IS punishment. Therefore, as a its supposed to be considered a non-punitive collateral consequence of conviction, Nevada has admitted sex offender registration is punishment, and therefore admitting registration is unconstitutional.

I ask the panel to recognize that sex offender registration is so obviously punitive to the average person, it written into law subconsciously.

AR-00000144

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0054

 **Tracking Number**

ke6-avne-o2ee

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 22, 2020



About    Bulk Data Download    Agencies    Learn

(/about)    (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000145

8/3/23, 5:01 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

Comment

To the reviewer: I am resubmitting, because I believe my previous submission (ke2-4fqx-wird) is not going to be posted because I am providing personal identifying information. The following is to avoid adding attachments, but the whole comment exceeds 5000 characters, therefore it is done in two parts, but I am attaching whole document in case.

Part two of two parts

5) Page 49335: (center column, last paragraph), the DOJ calls out the US Supreme Court case law, Smith v. Doe, 538 U.S. 84 (2003), conveniently failing to mention that 3 of the 9 justices, or 33% of the US Supreme Court dissented - contradicted the DOJ's statement; "Section 72.3, and its modification by this rulemaking, are constitutionally sound." Where the dissenting Court stated: "The registration and reporting duties imposed on convicted sex offenders are comparable to the duties imposed on other convicted criminals during periods of supervised release or parole. And there can be no doubt that the "[w]idespread public access," ante, at 99 (opinion in No. 01-729), to this personal and constantly updated information has a severe stigmatizing effect. See Brief for the Office of the Public Defender for the State of New Jersey et al. as Amici Curiae 7–21 (providing examples of threats, assaults, loss of housing, and loss of jobs experienced by sex offenders after their registration information was made widely available). In my judgment, these statutes unquestionably affect a constitutionally protected interest in liberty. Cf. Wisconsin v. Constantineau, 400 U. S. 433 (1971). It is also clear beyond peradventure that these unique consequences of conviction of a sex offense are punitive. They share three characteristics, which in the aggregate are not present in any civil sanction. The sanctions (1) constitute a severe deprivation of the offender's liberty , (2) are imposed on everyone who is convicted of a relevant criminal offense, and (3) are imposed only on those criminals. Unlike any of the cases that the Court has cited, a criminal conviction under these statutes provides both a sufficient and a necessary condition for the sanction."

The majority opinion concluded registration is "not sufficiently punitive", "not an affirmative disability" go to footnote 1.

AR-00000146

"severe stigmatizing effect", "punitive", "severe deprivation of the offender's liberty" This is precisely what the other comments demonstrate through their stories. (and certainly my own experience) The collateral consequence of a collateral consequence of a conviction, i.e. the public's view of registration, results in punishment. But the government will say it is not responsible for the public's reaction to registration, citing registration is required for "public safety". I challenge the government to provide the statistical evidence for the effectiveness of registration, it is never produced.

I note that when I have to appear for registration bi-annually, during that time, I am in custody, even though it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in an accumulative violation of my "constitutionally protected interest in liberty" as the above dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment.

footnote 1:
This in opposition to the same Courts"s decision in Carafas v. LaVallee, 391 U.S. 234 (1968), stating: "It is clear that petitioner's cause is not moot. In consequence of his conviction, he cannot engage in certain businesses; [Footnote 4] he cannot serve as an official of a labor union for a specified period of time; [Footnote 5] he cannot vote in any election held in New York State; [Footnote 6] he cannot serve as a juror. [Footnote 7] Because of these "disabilities or burdens [which] may flow from" petitioner's conviction, he has "a substantial stake in the judgment of conviction which survives the satisfaction of the sentence imposed on him." Fiswick v. United States, 329 U. S. 211, 329 U. S. 222 (1946). On account of these "collateral consequences," [Footnote 8] the case is Page 391 U. S. 238 not moot."

"Collateral consequences" are" disabilities or burdens", and all this was written long before registration became a new controversial collateral consequence of a conviction. This demonstrates the majority's ruling is in conflict with its earlier ruling.



Attachments  1

Attachment1_prejudicial_statements_by_the_DOJ_80192020

Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0055/attachment_1.pdf)

**Comment ID**
DOJ-OAG-2020-0003-0055

**Tracking Number**
ke5-46gn-dtr9

AR-00000147

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 21, 2020



About   Bulk Data Download       Agencies      Learn

(/about)         (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

The following are prejudicial statements made in the proposed rule:

1) Page 49340, (left column, page center), : "....because sex offenders may, for example, ***provide false date of birth information*** in seeking employment that would provide access to children or other potential victims. See 73 FR at 38057."

Where are the statistics to support that example? Because registrants are more likely to commit fraud by falsifying a document more than the rest of the population? Falsifying a document is a separate crime. The DOJ is illegally trying to enforce fraud through registration.

2) Page 49340 (left column, 2nd paragraph) : "...By providing basic information about who a sex offender is, where ***he*** is, how ***he*** gets around, and what ***he*** is authorized to do, these requirements implement SORNA and further its public safety objectives.".

"He" is stated 3 times.That's obvious sex discrimination, the pronouns must be corrected. And, specifically what are these "public safety objectives" that are supported by statistics?

3) Page 49340 (center column, 1st paragraph) : "...The Attorney General has exercised the same authority to require telephone numbers—a requirement also already appearing in the SORNA Guidelines—for a number of reasons, including facilitating communication between registration personnel and sex offenders, and addressing the potential use of ***telephonic communication by sex offenders in efforts to contact or lure potential victims*** . See 73 FR at 38055."

"Telephonic communication by sex offenders in efforts to contact or lure potential victims", again, what statistics support that registrants are more likely than the rest of the population to do this? More unfounded prejudice.

4) Page 49340 (center column, last paragraph) "...Paragraph (c)(2) of § 72.6 requires a sex offender to provide information about temporary lodging while away from his residence for seven or more days. In the SORNA Guidelines, and now in this rule, the Attorney General has adopted this requirement because ***sex offenders may reoffend*** at locations away from the places in which they have a permanent or long-term presence, and indeed ***could be encouraged*** to do so to the extent that information about their places of residence is available to the authorities but

information is lacking concerning their temporary lodgings elsewhere. The benefits of having this information include facilitating the successful investigation of **crimes committed by sex offenders** while away from their normal places of residence and **discouraging sex offenders from committing crimes** in such circumstances. See 73 FR at 38056."

"... because sex offenders may reoffend...", "could be encouraged ", "...crimes committed by sex offenders..." Registration was specifically intended to be purely an administrative - civil function. Now, making a blatant prejudicial statement like those are outside the jurisdiction of the DOJ.

"...discouraging sex offenders from committing crimes..." the prejudice continues; "discouraging"; law takes care of discouraging, but the DOJ just has to go further by admitting in the open that it is not just registration but a vehicle of "discouragement". Discouragement is an element of punishment which is unconstitutional for a collateral consequence of a conviction. The DOJ enforces law, it is not in the business of "discouraging", that is specifically in the jurisdiction of the legislature and the Justice department (sentencing) to provide that function.

_____

All this points to the DOJ exceeding its jurisdiction to impose its prejudicial biased position, appealing to general public prejudice. The DOJ has to be put in check. Separation of powers is required.

Recommendation:

I ask that the DOJ's rules be revised and instructed to remove the above noted prejudicial unconstitutional comments regarding motivation and tendencies, unless they provide specific statistics to support their prejudicial statements.

_____

AR-00000150

5) Page 49335: (center column, last paragraph), the DOJ calls out the US Supreme Court case law, Smith v. Doe, 538 U.S. 84 (2003), conveniently failing to mention that 3 of the 9 justices, or 33% of the US Supreme Court dissented - contradicted the DOJ's statement; "Section 72.3, and its modification by this rulemaking, are constitutionally sound." Where the dissenting Court stated:

"The registration and reporting duties imposed on convicted sex offenders are comparable to the duties imposed on other convicted criminals during periods of supervised release or parole. And there can be no doubt that the "[w]idespread public access," ante, at 99 (opinion in No. 01-729), to this personal and constantly updated information has a *severe stigmatizing effect*. See Brief for the Office of the Public Defender for the State of New Jersey et al. as Amici Curiae 7–21 (providing examples of threats, assaults, loss of housing, and loss of jobs experienced by sex offenders after their registration information was made widely available). In my judgment, these statutes unquestionably affect a constitutionally protected interest in liberty. Cf. Wisconsin v. Constantineau, 400 U. S. 433 (1971). It is also clear beyond peradventure that these unique consequences of conviction of a sex offense are *punitive*. They share three characteristics, which in the aggregate are not present in any civil sanction. The sanctions (1) constitute a *severe deprivation of the offender's liberty* , (2) are imposed on everyone who is convicted of a relevant criminal offense, and (3) are imposed only on those criminals. Unlike any of the cases that the Court has cited, a criminal conviction under these statutes provides both a sufficient and a necessary condition for the sanction."

The majority opinion concluded registration is "not sufficiently punitive", "not an affirmative disability" [1]

**"severe stigmatizing effect", "punitive", "severe deprivation of the offender's liberty"** This is precisely what the other comments demonstrate through their stories. (and certainly my own experience) The <u>collateral consequence of a collateral consequence</u> of a conviction, i.e. the public's view of registration, results in punishment. But the government will say it

---

[1] This in opposition to the same Courts"s decision in Carafas v. LaVallee, 391 U.S. 234 (1968), stating: "It is clear that petitioner's cause is not moot. In consequence of his conviction, he cannot engage in certain businesses; [Footnote 4] he cannot serve as an official of a labor union for a specified period of time; [Footnote 5] he cannot vote in any election held in New York State; [Footnote 6] he cannot serve as a juror. [Footnote 7] *Because of these "disabilities or burdens* [which] may flow from" petitioner's conviction, he has "a *substantial stake* in the judgment of conviction which survives the satisfaction of the sentence imposed on him." *Fiswick v. United States,* 329 U. S. 211, 329 U. S. 222 (1946). On account of these "*collateral consequences*," [Footnote 8] the case is Page 391 U. S. 238 not moot."

"Collateral consequences" are" disabilities or burdens", and all this was written long before registration became a new controversial collateral consequence of a conviction. This demonstrates the majority's ruling is in conflict with its earlier ruling.

is not responsible for the public's reaction to registration, citing registration is required for "public safety". I challenge the government to provide the statistical evidence for the **_effectiveness of registration_**, it is never produced.

I note that when **_I have to appear_** for registration bi-annually, during that time, I am in custody, even though it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in an accumulative violation of my "constitutionally protected interest in liberty" as the above dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment.

Douglas Warenback          8/19/2020

AR-00000152

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)   Share ▾

---

Comment

To the reviewer: I am resubmitting, because I believe my previous submission (ke2-4fqx-wird) is not going to be posted because I am providing personal identifying information. The following is to avoid adding attachments, but the whole comment exceeds 5000 characters, therefore it is done in two parts, but I am attaching whole document in case.

This part one of two parts:

The following are prejudicial statements made in the proposed rule:

1) Page 49340, (left column, page center), : "....because sex offenders may, for example, provide false date of birth information in seeking employment that
would provide access to children or other potential victims. See 73 FR at 38057."

Where are the statistics to support that example? Because registrants are more likely to commit fraud by falsifying a document more than the rest of the population? Falsifying a document is a separate crime. The DOJ is illegally trying to enforce fraud through registration.

2) Page 49340 (left column, 2nd paragraph) : "...By providing basic information about who a sex offender is, where he is, how he gets around, and what he is
authorized to do, these requirements implement SORNA and further its public safety objectives.".

"He" is stated 3 times.That's obvious sex discrimination, the pronouns must be corrected. And, specifically what are these "public safety objectives" that are
supported by statistics?

3) Page 49340 (center column, 1st paragraph) : "...The Attorney General has exercised the same authority to require telephone numbers—a requirement also

AR-00000153

already appearing in the SORNA Guidelines—for a number of reasons, including facilitating communication between registration personnel and sex offenders,
and addressing the potential use of telephonic communication by sex offenders in efforts to contact or lure potential victims . See 73 FR at 38055."

"Telephonic communication by sex offenders in efforts to contact or lure potential victims", again, what statistics support that registrants are more likely than the rest of the population to do this? More unfounded prejudice.

4) Page 49340 (center column, last paragraph) "...Paragraph (c)(2) of § 72.6 requires a sex offender to provide information about temporary lodging while away from his residence for seven or more days. In the SORNA Guidelines, and now in this rule, the Attorney General has adopted this requirement because sex offenders may reoffend at locations away from the places in which they have a permanent or long-term presence, and indeed could be encouraged to do so to the extent that information about their places of residence is available to the authorities but information is lacking concerning their temporary lodgings elsewhere. The benefits of having this information include facilitating the successful investigation of crimes committed by sex offenders while away from their normal places of residence and discouraging sex offenders from committing crimes in such circumstances. See 73 FR at 38056."

"... because sex offenders may reoffend...", "could be encouraged ", "...crimes committed by sex offenders..." Registration was specifically intended to be purely an administrative - civil function. Now, making a blatant prejudicial statement like those are outside the jurisdiction of the DOJ.

"...discouraging sex offenders from committing crimes..." the prejudice continues; "discouraging"; law takes care of discouraging, but the DOJ just has to go further by admitting in the open that it is not just registration but a vehicle of "discouragement". Discouragement is an element of punishment which is unconstitutional for a collateral consequence of a conviction. The DOJ enforces law, it is not in the business of "discouraging", that is specifically in the jurisdiction of the legislature and the Justice department (sentencing) to provide that function.

_____

All this points to the DOJ exceeding its jurisdiction to impose its prejudicial biased position, appealing to general public prejudice. The DOJ has to be put in check. Separation of powers is required.

Recommendation:

I ask that the DOJ's rules be revised and instructed to remove the above noted
prejudicial unconstitutional comments regarding motivation and tendencies, unless they provide specific statistics to support their prejudicial statements.

Go to my part two

| Attachments  1 |



AR-00000154

Attachment1_prejudicial_statements_by_the_DOJ_80192020

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0056/attachment_1.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0056

**Tracking Number**

ke5-3nc5-6qir

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 21, 2020



About   Bulk Data Download      Agencies      Learn

(/about)         (/bulkdownload)      (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

The following are prejudicial statements made in the proposed rule:

1) Page 49340, (left column, page center), : "....because sex offenders may, for example, **provide false date of birth information** in seeking employment that would provide access to children or other potential victims. See 73 FR at 38057."

Where are the statistics to support that example? Because registrants are more likely to commit fraud by falsifying a document more than the rest of the population? Falsifying a document is a separate crime. The DOJ is illegally trying to enforce fraud through registration.

2) Page 49340 (left column, 2nd paragraph) : "...By providing basic information about who a sex offender is, where **he** is, how **he** gets around, and what **he** is authorized to do, these requirements implement SORNA and further its public safety objectives.".

"He" is stated 3 times.That's obvious sex discrimination, the pronouns must be corrected. And, specifically what are these "public safety objectives" that are supported by statistics?

3) Page 49340 (center column, 1st paragraph) : "...The Attorney General has exercised the same authority to require telephone numbers—a requirement also already appearing in the SORNA Guidelines—for a number of reasons, including facilitating communication between registration personnel and sex offenders, and addressing the potential use of **telephonic communication by sex offenders in efforts to contact or lure potential victims** . See 73 FR at 38055."

"Telephonic communication by sex offenders in efforts to contact or lure potential victims", again, what statistics support that registrants are more likely than the rest of the population to do this? More unfounded prejudice.

4) Page 49340 (center column, last paragraph) "...Paragraph (c)(2) of § 72.6 requires a sex offender to provide information about temporary lodging while away from his residence for seven or more days. In the SORNA Guidelines, and now in this rule, the Attorney General has adopted this requirement because **sex offenders may reoffend** at locations away from the places in which they have a permanent or long-term presence, and indeed **could be encouraged** to do so to the extent that information about their places of residence is available to the authorities but

information is lacking concerning their temporary lodgings elsewhere. The benefits of having this information include facilitating the successful investigation of ***crimes committed by sex offenders*** while away from their normal places of residence and ***discouraging sex offenders from committing crimes*** in such circumstances. See 73 FR at 38056."

"... because sex offenders may reoffend...", "could be encouraged ", "...crimes committed by sex offenders..." Registration was specifically intended to be purely an administrative - civil function. Now, making a blatant prejudicial statement like those are outside the jurisdiction of the DOJ.

"...discouraging sex offenders from committing crimes..." the prejudice continues; "discouraging"; law takes care of discouraging, but the DOJ just has to go further by admitting in the open that it is not just registration but a vehicle of "discouragement". Discouragement is an element of punishment which is unconstitutional for a collateral consequence of a conviction. The DOJ enforces law, it is not in the business of "discouraging", that is specifically in the jurisdiction of the legislature and the Justice department (sentencing) to provide that function.

_____

All this points to the DOJ exceeding its jurisdiction to impose its prejudicial biased position, appealing to general public prejudice. The DOJ has to be put in check. Separation of powers is required.

Recommendation:

I ask that the DOJ's rules be revised and instructed to remove the above noted prejudicial unconstitutional comments regarding motivation and tendencies, unless they provide specific statistics to support their prejudicial statements.

_____

AR-00000157

5) Page 49335: (center column, last paragraph), the DOJ calls out the US Supreme Court case law, Smith v. Doe, 538 U.S. 84 (2003), conveniently failing to mention that 3 of the 9 justices, or 33% of the US Supreme Court dissented - contradicted the DOJ's statement; "Section 72.3, and its modification by this rulemaking, are constitutionally sound." Where the dissenting Court stated:

"The registration and reporting duties imposed on convicted sex offenders are comparable to the duties imposed on other convicted criminals during periods of supervised release or parole. And there can be no doubt that the "[w]idespread public access," ante, at 99 (opinion in No. 01-729), to this personal and constantly updated information has a *severe stigmatizing effect*. See Brief for the Office of the Public Defender for the State of New Jersey et al. as Amici Curiae 7–21 (providing examples of threats, assaults, loss of housing, and loss of jobs experienced by sex offenders after their registration information was made widely available). In my judgment, these statutes unquestionably affect a constitutionally protected interest in liberty. Cf. Wisconsin v. Constantineau, 400 U. S. 433 (1971). It is also clear beyond peradventure that these unique consequences of conviction of a sex offense are *punitive*. They share three characteristics, which in the aggregate are not present in any civil sanction. The sanctions (1) constitute a *severe deprivation of the offender's liberty* , (2) are imposed on everyone who is convicted of a relevant criminal offense, and (3) are imposed only on those criminals. Unlike any of the cases that the Court has cited, a criminal conviction under these statutes provides both a sufficient and a necessary condition for the sanction."

The majority opinion concluded registration is "not sufficiently punitive", "not an affirmative disability" [1]

**"severe stigmatizing effect", "punitive", "severe deprivation of the offender's liberty"** This is precisely what the other comments demonstrate through their stories. (and certainly my own experience) The <u>collateral consequence of a collateral consequence</u> of a conviction, i.e. the public's view of registration, results in punishment. But the government will say it

---

[1] This in opposition to the same Courts"s decision in Carafas v. LaVallee, 391 U.S. 234 (1968), stating: "It is clear that petitioner's cause is not moot. In consequence of his conviction, he cannot engage in certain businesses; [Footnote 4] he cannot serve as an official of a labor union for a specified period of time; [Footnote 5] he cannot vote in any election held in New York State; [Footnote 6] he cannot serve as a juror. [Footnote 7] *Because of these "disabilities or burdens* [which] may flow from" petitioner's conviction, he has "a *substantial stake* in the judgment of conviction which survives the satisfaction of the sentence imposed on him." *Fiswick v. United States,* 329 U. S. 211, 329 U. S. 222 (1946). On account of these "*collateral consequences*," [Footnote 8] the case is Page 391 U. S. 238 not moot."

"Collateral consequences" are" disabilities or burdens", and all this was written long before registration became a new controversial collateral consequence of a conviction. This demonstrates the majority's ruling is in conflict with its earlier ruling.

is not responsible for the public's reaction to registration, citing registration is required for "public safety". I challenge the government to provide the statistical evidence for the **_effectiveness of registration_**, it is never produced.

I note that when **_I have to appear_** for registration bi-annually, during that time, I am in custody, even though it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in an accumulative violation of my "constitutionally protected interest in liberty" as the above dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment.

Douglas Warenback          8/19/2020

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 26, 2020



| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

**Comment**

Note to reviewer: This replaces my two previous submissions, to removal "personal identifying information", id numbers are: ke0-aynl-nrg0 and 1k4-9ig2-9b4z, Please remove those submissions, thank you. Note: for the last submission, redaction was not secure, pdf required "flattening" to embed redactions into document. The current submission is secure.

"Attachment1" is my argument regarding the DOJ's proposed rules.

"Attachment2" is my criminal conviction appeal. Last stage of my appeal; the US Supreme Court. Instead of telling my story only from my point of view, I have created a court record that attempts to demonstrate my conviction is not only wrongful, but infact illegal. I admit committing a misdemeanor, that is not subject to registration and to be labeled as a sex offender.

**Attachments  1**



📄 Attachment1_prejudicial_statements_by_the_DOJ_80192020

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0057/attachment_1.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0057

AR-00000160

Regulations.gov

 **Tracking Number**

ke2-4fqx-wird

---

**Comment Details**                              **Submitter Info**

---

**Received Date**

Aug 19, 2020

---



About    Bulk Data Download        Agencies       Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

The following are prejudicial statements made in the proposed rule:

1) Page 49340, (left column, page center), : "....because sex offenders may, for example, ***provide false date of birth information*** in seeking employment that would provide access to children or other potential victims. See 73 FR at 38057."

Where are the statistics to support that example? Because registrants are more likely to commit fraud by falsifying a document more than the rest of the population? Falsifying a document is a separate crime. The DOJ is illegally trying to enforce fraud through registration.

2) Page 49340 (left column, 2nd paragraph) : "...By providing basic information about who a sex offender is, where ***he*** is, how ***he*** gets around, and what ***he*** is authorized to do, these requirements implement SORNA and further its public safety objectives.".

"He" is stated 3 times.That's obvious sex discrimination, the pronouns must be corrected. And, specifically what are these "public safety objectives" that are supported by statistics?

3) Page 49340 (center column, 1st paragraph) : "...The Attorney General has exercised the same authority to require telephone numbers—a requirement also already appearing in the SORNA Guidelines—for a number of reasons, including facilitating communication between registration personnel and sex offenders, and addressing the potential use of ***telephonic communication by sex offenders in efforts to contact or lure potential victims*** . See 73 FR at 38055."

"Telephonic communication by sex offenders in efforts to contact or lure potential victims", again, what statistics support that registrants are more likely than the rest of the population to do this? More unfounded prejudice.

4) Page 49340 (center column, last paragraph) "...Paragraph (c)(2) of § 72.6 requires a sex offender to provide information about temporary lodging while away from his residence for seven or more days. In the SORNA Guidelines, and now in this rule, the Attorney General has adopted this requirement because ***sex offenders may reoffend*** at locations away from the places in which they have a permanent or long-term presence, and indeed ***could be encouraged*** to do so to the extent that information about their places of residence is available to the authorities but

information is lacking concerning their temporary lodgings elsewhere. The benefits of having this information include facilitating the successful investigation of ***crimes committed by sex offenders*** while away from their normal places of residence and ***discouraging sex offenders from committing crimes*** in such circumstances. See 73 FR at 38056."

"... because sex offenders may reoffend...", "could be encouraged ", "...crimes committed by sex offenders..." Registration was specifically intended to be purely an administrative - civil function. Now, making a blatant prejudicial statement like those are outside the jurisdiction of the DOJ.

"...discouraging sex offenders from committing crimes..." the prejudice continues; "discouraging"; law takes care of discouraging, but the DOJ just has to go further by admitting in the open that it is not just registration but a vehicle of "discouragement". Discouragement is an element of punishment which is unconstitutional for a collateral consequence of a conviction. The DOJ enforces law, it is not in the business of "discouraging", that is specifically in the jurisdiction of the legislature and the Justice department (sentencing) to provide that function.

_____

All this points to the DOJ exceeding its jurisdiction to impose its prejudicial biased position, appealing to general public prejudice. The DOJ has to be put in check. Separation of powers is required.

Recommendation:

I ask that the DOJ's rules be revised and instructed to remove the above noted prejudicial unconstitutional comments regarding motivation and tendencies, unless they provide specific statistics to support their prejudicial statements.

_____

5) Page 49335: (center column, last paragraph), the DOJ calls out the US Supreme Court case law, Smith v. Doe, 538 U.S. 84 (2003), conveniently failing to mention that 3 of the 9 justices, or 33% of the US Supreme Court dissented - contradicted the DOJ's statement; "Section 72.3, and its modification by this rulemaking, are constitutionally sound." Where the dissenting Court stated:

"The registration and reporting duties imposed on convicted sex offenders are comparable to the duties imposed on other convicted criminals during periods of supervised release or parole. And there can be no doubt that the "[w]idespread public access," ante, at 99 (opinion in No. 01-729), to this personal and constantly updated information has a *severe stigmatizing effect*. See Brief for the Office of the Public Defender for the State of New Jersey et al. as Amici Curiae 7–21 (providing examples of threats, assaults, loss of housing, and loss of jobs experienced by sex offenders after their registration information was made widely available). In my judgment, these statutes unquestionably affect a constitutionally protected interest in liberty. Cf. Wisconsin v. Constantineau, 400 U. S. 433 (1971). It is also clear beyond peradventure that these unique consequences of conviction of a sex offense are *punitive*. They share three characteristics, which in the aggregate are not present in any civil sanction. The sanctions (1) constitute a *severe deprivation of the offender's liberty* , (2) are imposed on everyone who is convicted of a relevant criminal offense, and (3) are imposed only on those criminals. Unlike any of the cases that the Court has cited, a criminal conviction under these statutes provides both a sufficient and a necessary condition for the sanction."

The majority opinion concluded registration is "not sufficiently punitive", "not an affirmative disability" [1]

**"severe stigmatizing effect", "punitive", "severe deprivation of the offender's liberty"** This is precisely what the other comments demonstrate through their stories. (and certainly my own experience) The collateral consequence of a collateral consequence of a conviction, i.e. the public's view of registration, results in punishment. But the government will say it

---

[1] This in opposition to the same Courts"s decision in Carafas v. LaVallee, 391 U.S. 234 (1968), stating: "It is clear that petitioner's cause is not moot. In consequence of his conviction, he cannot engage in certain businesses; [Footnote 4] he cannot serve as an official of a labor union for a specified period of time; [Footnote 5] he cannot vote in any election held in New York State; [Footnote 6] he cannot serve as a juror. [Footnote 7] *Because of these "disabilities or burdens* [which] may flow from" petitioner's conviction, he has "a *substantial stake* in the judgment of conviction which survives the satisfaction of the sentence imposed on him." *Fiswick v. United States,* 329 U. S. 211, 329 U. S. 222 (1946). On account of these "*collateral consequences,*" [Footnote 8] the case is Page 391 U. S. 238 not moot."

"Collateral consequences" are" disabilities or burdens", and all this was written long before registration became a new controversial collateral consequence of a conviction. This demonstrates the majority's ruling is in conflict with its earlier ruling.

is not responsible for the public's reaction to registration, citing registration is required for "public safety". I challenge the government to provide the statistical evidence for the **effectiveness of registration**, it is never produced.

I note that when ***I have to appear*** for registration bi-annually, during that time, I am in custody, even though it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in an accumulative violation of my "constitutionally protected interest in liberty" as the above dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment.

Douglas Warenback        8/19/2020

AR-00000165

8/4/23, 10:55 AM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001) / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 27, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

Comment

The rules that are being applied are very punitive, retroactive punishment is not ok in this country , to retroactive a life of shunning and debilitating rules are not American. Our country is built on compaction and the ability to forgive. How can a person provide for their families when people have the internet to look up anyone's entire life to use it against them to hold them down , that is punishment at the highest level to retroactive a life sentence by a attorney general is not ok. I know people make mistakes, you should leave the powers of sentencing to a court of law.Thats what these rules are you are going behind law makers backs with this move, Millions of Americans have already served their time. What makes it ok to punish them even more & more , Change is a must , these registries are as punitive as it comes. Please do not enact retroactive life long rules to destroy not only the people these rules apply too, but so many families suffer because of this registry . Two wrongs will never make a right . I hope the Supreme Court will correct the powers you have chosen too abuse .

**Comment ID**
DOJ-OAG-2020-0003-0058

◎ **Tracking Number**
keb-wb8s-ps5z

**Comment Details**                              **Submitter Info**

**Received Date**

AR-00000166

Aug 26, 2020



About    Bulk Data Download      Agencies    Learn

(/about)         (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000167

8/4/23, 10:56 AM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 28, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

Who distills this for the supervising release officer?

Where is a list of the new requirements in a condensed for for the public?

Why are these laws continually enlarged to burden people?

Who originates these new requirements that are fear based an not evidence based?

Why do you continue to punish people that have been imprisoned and have completed treatment?

Who encourages these extreme requirements to be continually expanded?

And why do I have to consider my son being killed by vigilantes because of public notification of residence?

Has any one of you put yourselves in the shoes of these people being continually punished?

Fair and smart justice will go much farther for people that need to heal and become positive contributors to their communities .

These easily created laws are harmful, always unconstitutional as any rational person can see, and should be abolished.

AR-00000168

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0059

 **Tracking Number**

1k4-9imj-hrwg

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 27, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000169

8/4/23, 10:58 AM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

  **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 28, 2020

| View More Comments  ( 724 )  (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments  ( 724 )  (/docket/DOJ-OAG-2020-0003/comments) | Share ⌄ |

---

| Comment |
| --- |

AG Barr,

I am writing to voice my opinion AGAINST the proposed regulations. To go further, I think SORNA and IML should be completely repealed as it is an ineffective use of resources and taxpayer funds. Sex offender registration based upon risk management used by the individual State is a much better way to work to protect the public.

The defense of sex offender laws based on the false premise used by SCOTUS many years ago stating when Justice Kennedy states sex offender recidivism risk is "frightening and high" has been scientifically proven to be incorrect and unjustly taken as a false fact. This has been used many times since then to justify a punitive set of laws that have been applied retroactively to a class of US citizens which is contrary to the US constitution. How can requirements changing over time be interpreted any other way when they cause great psychological harm not only on the offender but the offender's family, spouse and children? It is used as a form of vindication of the sex offenders in the general population with no basis for this continued oversight. A study by the DOJ, your department, in 2019 shows the recidivism from sex offenders is lower than that of other offenders to be rearrested (http://www.bjs.gov/index.cfm?ty=pbdetail&iid=6566) which should lead to reason that this regulation may be overstated at the federal level of government.

Besides being ineffective due to the low rate of recidivism among convicted sex offenders, a 2003 study in New York (Sandler, Jeffrey C, et. Al., Does a Watched Pot Boil? A Time-Series Analysis of New York States Sex Offender Registration and Notification Law. Psychology, Public Policy, and Law, 2008 Vol. 14, No. 4, 290) quantitatively shows that 95.94% of rapes and 94.12% of child molestation arrests are persons with no prior criminal history, thus outside the scope of SORNA from the start. In most instances, child molestation cases, the victim is known by the sex offender prior to the molestation, so the registry serves to purpose to begin with.

There have been many new studies done over the past decade which show a myriad of statistics, but most

AR-00000170

Regulations.gov

notably, they are done more scientifically with a larger population over a longer length of time to discredit
some of the early notions about recidivism rates found in sex offenders.

SORNA is a tool being used by the federal government as a tool that does not promote criminal justice
reform based on science, but rather making rules and regulations based on fear and misinformation.
President Trump during the RNC showed he agrees with second chances through a pardon shown on
national television as part of the event, but creating regulations based on fear and not based on science
show a sense of vindication rather than offering a chance of redemption for those with a sex offense in their
past.

Attachments   2

IDOCRecidivism

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0060/attachment_1.pdf)

sex_offender_recidivism_2012_final

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0060/attachment_2.pdf)

**Comment ID**
DOJ-OAG-2020-0003-0060

◎ **Tracking Number**
1k4-9imo-j1ed

**Comment Details**                                              Submitter Info

**Received Date**
Aug 27, 2020

AR-00000171

Regulations.gov



Your Voice in Federal Decision-Making

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000172

# Indiana Department of Correction Recidivism Rates Decrease for 3rd Consecutive Year

The Indiana Department of Correction (IDOC) defines recidivism as a return to incarceration within three years of the offender's date of release from a state correctional institution. A recent study by the IDOC calculated the 2008 recidivism rate for offenders released from IDOC during 2005. This study found that:

- 2008 recidivism rates indicate a decrease for the third consecutive year.  Of those offenders released in 2005, 37.4% were recommitted to the IDOC within three years of their release date.



- Male offenders had a higher recidivism rate when compared to female offenders. Of male offenders released in 2005, 38.4% returned to the IDOC, versus 31.1% of female releases.

- The recidivism rate for African American offenders increased from the prior year to 46.6%, while recidivism rates for Caucasian offenders decreased to 33.9%.

- The younger the offender is at the time he/she is released, the more likely they are to return to the IDOC.  Also, offenders serving less than 2 years with IDOC represent over 80% of all recidivists.

- Of all offenders who recidivated, nearly 58% returned to IDOC for the commission of a new crime, compared to approximately 42% of returns for a technical rule violation of post-release supervision.

- Nearly 50% of all offenders released for a weapons related crime as their most serious offense returned to incarceration within three years of release.

- Offenders identified as sex offenders who were released in 2005 returned to IDOC at a higher rate than all other offenders.   This is attributed to the fact that nearly 70% returned for a technical rule violation.  However, *only* **1.05%** of identified sex offender's recidivated for a new sex crime within 3 years.

AR-00000173



# Recidivism among sex offenders in Connecticut

State of Connecticut
Office of Policy and Management
Criminal Justice Policy & Planning Division
February 15, 2012

AR-00000174

## Introduction

Each February 15 the Criminal Justice Policy and Planning Division of the Office of Policy and Management issues two criminal justice reports:

Annual Recidivism Report
Correctional Population Forecast Report

These reports provide policy makers and front-line professionals with the information they need to continue the progress our state has experienced in recent years. Governor Dannel P. Malloy has set two goals for our state's criminal justice system: reduce crime and maximize efficiency. Recidivism and changes in the correctional population are two important indicators of progress in this regard.

This year our report puts the focus on sex offenders.  You will see in this analysis a new and somewhat unique perspective.  For the first time, we measure offenders with previous sex offense convictions as well as convicted offenders who were originally charged as sex offenders but who were ultimately convicted of other offenses.  We believe this will provide policy makers and practitioners with the data and analysis they need to identify offenders with a high risk for committing new sex offenses following release from prison.  At the end of the day, our goal is public safety by reducing the level of recidivism.  Based on our analysis, post-release supervision focused on the high-risk sex offenders appears to be a cost-effective strategy to prevent crime.

Please feel free to share your ideas about how we can best accomplish these goals going forward. With your help, I am confident that our state can continue to achieve better outcomes with offenders who are incarcerated or who are being supervised by parole or probation officers.  As the prison population continues to decline, it is my hope that some of the consequent budgetary savings will be reinvested in the supervision and treatment programs that have demonstrated success.

Thank you for taking the time to read this report. Please visit our website for more information on current trends in Connecticut's criminal justice system.

*Mike Lawlor*
*Under Secretary*
*Criminal Justice Policy and Planning Division*
*State Office of Policy and Management*
*450 Capitol Avenue*
*Hartford, CT 06106-1365*
*(Office) 860-418-6394*
*www.ct.gov/opm/cjppd*

AR-00000175

# Acknowledgements

This report could not have been produced without the help and assistance of many people. First and foremost, the research published here reflects the guidance, advice and feedback of an advisory panel of experts who work on the front lines of State efforts to manage, supervise and treat Connecticut's population of sex offenders. The analysis could not have been accomplished without the data and support provided by the Department of Correction and the Judicial Branch's Court Support Services Division. Without them, it would have been impossible to collect complete criminal histories on 14,398 offenders within the time that was available. The Office of the State Public Defender and the Board of Pardons and Parole provided invaluable access to their staff who explained their important roles in the process. In addition, there are dozens of people from various State criminal justice agencies that helped to move this project forward in one way or another.

Finally, it is necessary to acknowledge that this report is funded, in part, through a grant awarded by the Bureau of Justice, Office of Justice Programs at the U.S. Department of Justice. The opinions, findings and conclusions expressed here are those of the contributors and do not necessarily represent the views of the U.S. Department of Justice.

Ivan Kuzyk, Author


Director, CT Statistical Analysis Center
Office of Policy and Management
Criminal justice Policy & Planning Division

AR-00000176

# Table of Contents

**Introduction by Under Secretary Mike Lawlor**                           1
**Acknowledgements**                                                       2
**Table of Contents**                                                      3
**Executive Summary**                                                      4

**Findings**

Sex offenders in Connecticut                                               6
Recidivism among 746 sentenced sex offenders                              8
Recidivism among sex offender subgroups                                   14
Releases and discharges in 2005                                           17
The Sex Offender Registry                                                  18
A final caveat                                                             19

**Appendices**

Advisory panel                                                             20
Methodological questions                                                   21
Sex offender typologies, chart                                            25
Recidivism – 1,395 offenders with a prior arrest for a sex crime          26
Recidivism – 896 offenders with a prior conviction for a sex crime        28
Recidivism – 746 offenders with a sentence history for a sex crime        29
Recidivism – 423 offenders whose last sentence was for a sex crime        31
Recidivism – 1,229 offenders w/Sex Treatment Scores higher than 2         33
Summary of new prison sentences for sex crimes                            36
General criminality among offenders who were released in 2005             37
Sex offenders, parole and special parole                                  38
Age at first arrest for a sex crime                                        39
Age at first sex offense resulting in a prison sentence                   40
The Connecticut Risk Assessment Board                                      41
Special Management Unit – DOC Community Services Division                  42
The Collaborative Model in Connecticut                                     43

**Glossary**                                                               45

AR-00000177

# Executive Summary

- Although the term "sex offender" is commonly used to describe anyone who has been convicted of sex-crimes, it is important to recognize that individuals who have committed sex offenses do not constitute a single, homogenous population.  Together they exhibit a wide range of criminal behaviors that may or may not include violence or contact with other persons.  As a consequence, the risk, or likelihood, of committing new sex crimes is not consistent across all sex offender types.

- This study tracked 14,398 men for a five-year period following their 2005 release or discharge from a CT prison in 2005.  Every subsequent arrest, criminal conviction or reincarceration event was captured and analyzed to produce the 5-year recidivism rates for the group.

- In addition to analyzing recidivism among all offenders released or discharged during 2005, the study identified five subgroups from the total cohort who were either convicted for sex offenses or thought to have been involved in criminal sexual crimes but not convicted.  The five subgroups were:
    - 1,395 men who had had a prior arrest for a sex-related offense
    - 896 men who had a prior conviction for a sex-related offense
    - 746 men who had served a prison sentence for a sex-related offense before being released in 2005
    - 423 men, a subset of the 746, whose last prison sentence before release was for a sex-related offense, and
    - 1,229 men who were assigned Sex Treatment Scores of 2 or higher by the Department of Correction prior to their 2005 release or discharge.

- In 2005, 746 offenders who had served a prison sentence for a least one sex-related offense were released or discharged from prison.  Over the next five years:
    - 27 (3.6%) of these men were arrested and charged with a new sex crime.
    - 20 (2.7%) were convicted for new sex offense, and
    - 13 (1.7%) were returned to prison to serve a sentence for a new sex crime.

- The sexual recidivism rates for the 746 sex offenders released in 2005 are much lower than what many in the public have been led to expect or believe.  These low re-offense rates appear to contradict a conventional wisdom that sex offenders have very high sexual re-offense rates.  The real challenge for public agencies is to determine the level of risk which specific offenders pose the public.

4

AR-00000178

- Recidivism data for each sex-offenders subgroup is presented in the Appendix.

- In 2005, 37% of non-sex offenders completed their sentences in prison.  In contrast, 79% of the 746 sex offenders who had served a prison sentence for a new sex crime were discharged directly from a prison facility at the end of their sentences (EOS).  The reason the EOS discharge rate was so high for sex offenders reflects two facts: 1) the DOC did not release TS-eligible sex offenders into the community and 2) sex offenders were not accepted in most of the DOC's residential, halfway house network.  Almost 50% of sex offenders were sentenced to probation at the completion of their sentences compared to 33% for non-sex offenders.

- According to this analysis, arrest on a prior sex charge was the single best predictor of being sentenced to prison for a new sex crime in the five years following release from prison.  Of the 1,395 offenders who had been arrested on sex charges before 2005, 2.4% were sentenced to prison for new sex offenses within 5 years.  This compares with a 1.9% rate among offenders who had a prior conviction for a sex crime, and a 1.7% rate for offenders who had served a prison sentence for a prior sex crime.  This finding warrants further study.  It suggests that conviction and incarceration for a sex crime exerts a positive impact on reducing future sex crimes.

- The DOC-Sex Treatment Score was the 2nd best predictor of sexual recidivism.  Among the 1,229 offenders with Sex Treatment Scores of 2 or higher, 2.3% were sentenced to prison for new sex offenses.

- Connecticut employs a unique collaborative approach in supervising and treating sex offenders in the community.  The approach links parole officers and probation officers, victim advocates and a non-profit provider of sex offender treatment and programming.  Together these organizations design oversight and supervision plans for every offender.

- Some sex offenders have extensive, violent non-criminal histories.  Among the 195 offenders who had been convicted for Sex Assault 1 prior to 2005, 29.2% had also served a prison sentence for a burglary related crime; 13.3% had served a sentence for robbery.  The high incidence of burglaries and robberies among this group indicates both a heightened willingness to use force and overstep boundaries.  Among the entire population of male prisoners released in 2005, only 16% had been convicted of burglary-related charges and less than 8% had been convicted for a robbery.

AR-00000179

## Sex offenders in Connecticut

- The following table contains data supplied by the CT State Police, the Department of Correction, CSSD Adult Probation and the Special Offender Management Unit at the DOC Division of Parole.  It is published here to provide readers with an appreciation for the size of the sex offender population in CT.

**Sex offender counts in CT on January 1, 2012**

|  | Offenders |
|---|---|
| Offenders on the Connecticut Sex Offenders Registry | 5,397 |
| Offenders out of compliance with registry requirements | 929 |
| Offenders supervised by Probation's Sex Offender Management Unit | 2,273 |
| Offenders supervised by Parole's Sex Offender Management Unit | 223 |
| Inmates w/DOC Sex Treament Score of S2 to S5 | 3,117 |
| Sex treatent score: S2, non-contact offender | 184 |
| Sex treatent score: S3, contact offender, one victim | 2,266 |
| Sex treatent score: S4, contact offender, more than one victim | 636 |
| Sex treatent score: S5, contact offender, gratuitous or sadistic violence | 31 |

- Although the term "sex offender" is commonly used to describe anyone who has been convicted of sex-crimes, it is important to recognize that individuals who have committed sex offenses do not constitute a single, homogenous population.  Together they exhibit a wide range of criminal behaviors that may or may not include violence or contact with other persons.  Sex offenders vary by age, ethnicity and social background.  They also vary by their motivations, the nature of their crimes and by the extensiveness of their non-sex-related criminal histories.  As a consequence, the risk, or likelihood, of committing new sex crimes is not consistent across all sex offender types.

- This study tracked 14,398 sentenced male offenders for a five year period following their discharges from prison in 2005.  Prior to their 2005 releases, almost one-in-ten of these men (1,395) had been arrested and charged with a sex-related crime.  Eight hundred ninety-six (896) of these men had been convicted for a sex-related offense and 746 had served a prison sentence for a sexual offense prior to their 2005 release.

- The following chart was produced, with the assistance of this study's advisory panel, to help readers recognize some of the typologies that are observed among the population of sex offenders.  The illustration identifies three broad groups:  1) Child molesters 2) Rapists, and 3) Non-contact offenders.  It also distinguishes between offenders who have committed contact crimes and those whose crimes have involved no physical contact with a victim.  A more comprehensive chart appears in the appendices.

AR-00000180



- During the course of this study, it was not possible to assign a definitive sex-offender typology to any of the sex offenders who were released in 2005.  That information is not currently available in a manner that would allow us to study recidivism outcomes by sex offender typology.  The Department of Correction assigns a Sex Treatment (Needs) Score to every offender who is sentenced to prison.  These scores, however, were designed as population management tools, i.e., to assist staff in placing offenders in appropriate prison facilities.  The scores were not designed for diagnostic risk assessment.  As no coding scheme has been implemented that provides an accurate method of differentiating typologies or risk among sex offenders, the Sex Treatment Score is sometimes used as a *de facto* measure for differentiating risk among incarcerated sex offenders.

AR-00000181

## Recidivism among 746 sentenced sex offenders

- In 2005, 14,398 sentenced, male offenders were released or discharged from a Connecticut prison.  Over the next five years, 286 of these men were arrested and charged with sex offenses committed after they were released from prison.  One hundred thirty-four (134) of these men were convicted for new sex offenses after they were released and 99 were returned to the prison to begin a new prison sentence for a sex crime[1].  Of the 99 men who received prison sentences for new sex crimes, only 13 had ever served a prior prison sentence for a sexual offense.

- Within the population of 14,398 men released from prison in 2005, 746 had served either their last sentence - or a previous prison sentence - for a sex- related offense.  In this section of the report the rearrest, reconviction and reincarceration histories of these men will be highlighted.  It is important for readers to recognize, however, that these men were not the only men released from prison in 2005 who had been involved in prior crimes in which a significant, criminal sexual component had been present.  These 746 men were the only ones who had actually been convicted for specific sexual offenses and sentenced to prison.  Within the total population of men released in 2005, this study was able to identify several hundred men who almost certainly were involved in a sex crime but had been able to avoid a conviction on a sex-related offense.  Because their numbers were so significant, this study evaluated recidivism among four additional sex offender subgroups, in addition to the 746.  Data on these sex offender groups are contained in the Appendices.

- The following table contains a summary of all sexual offenses that resulted in a prior prison sentence for the 746 sex offenders highlighted in this section of this report.  The data contains counts for both offenses and offenders.  Almost one quarter of these men had been sentenced to prison for Sex Assault 1.  Twenty-six percent of these men had been sentenced to prison for Risk of Injury to a Minor, the most common child molestation charge.  A small percentage of men had been incarcerated for prostitution related offenses.  Prostitution-related offenses were included here even though it could be argued that these are morals offenses and not strictly sex offenses.  Prior sentences related to Sex Registry non-compliance were also included since they indicated a prior conviction for a sex crime.

---

[1] It is widely acknowledged that sex crimes are among the least-reported serious crimes.  As a result not all sex offenses result in an arrest.

8

AR-00000182

**Aggregate sex-related sentence history for 746 offenders released in 2005**

| DOC Statute | Offense | Sentences imposed | Offenders sentenced | Percent of 746 offenders with sex-related prison sentence |
|---|---|---|---|---|
| **Sex assault 1** | | | | |
| 53A070 | SEXUAL ASSAULT, 1ST DEGREE         F | 203 | 181 | 24.3% |
| 53A072 | RAPE, FIRST DEGREE          BF | 9 | 9 | 1.2% |
| 53A070B | SEX ASLT, SPOUSE/COHAB RELATIONSHIP BF | 8 | 8 | 1.1% |
| 53A070A | SEXUAL ASSAULT 1ST DEGREE - AGGRVTD  F | 7 | 7 | 0.9% |
| 53-238 | RAPE                    F | 1 | 1 | 0.1% |
| **Sex assault 2** | | | | |
| 53A071 | SEX ASSAULT, SECOND DEGREE   F | 231 | 201 | 26.9% |
| 53A073 | RAPE, SECOND DEGREE          CF | 3 | 3 | 0.4% |
| **Other sexual assault** | | | | |
| 53A073A | SEXUAL ASSAULT, 4TH DEGREE | 106 | 91 | 12.2% |
| 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF | 72 | 67 | 9.0% |
| **Crimes against minors** | | | | |
| 53-021* | INJURY OR RISK OF INJURY TO MINOR    F | 216 | 194 | 26.0% |
| 53A196A | EMPLOY MINOR IN OBSCENE PERFORMANCE AF | 1 | 1 | 0.1% |
| 53A090A | ENTICING A MINOR | 1 | 1 | 0.1% |
| **Registry offenses** | | | | |
| 54-252 | REG PERSON WHO COMM SEX VIOL OFF  DF | 21 | 20 | 2.7% |
| 54-251 | REG OF PERSON COMMIT CRIM OFF MINOR DF | 4 | 4 | 0.5% |
| **Prostitution related** | | | | |
| 53A082 | PROSTITUTION               AM | 46 | 21 | 2.8% |
| 53A083 | PATRONIZING A PROSTITUTE      AM | 14 | 14 | 1.9% |
| 53A088 | PROMOTING PROSTITUTION, 3RD DEGREE  DF | 7 | 8 | 1.1% |
| 53A087 | PROMOTING PROSTITUTION, 2ND DEGREE CF | 5 | 5 | 0.7% |
| 53A086 | PROMOTING PROSTITUTION, 1ST DEGREE BF | 4 | 4 | 0.5% |
| **Child pornography** | | | | |
| 53A196D | POSSESSING CHILD PORNOGRAPHY  F | 12 | 7 | 0.9% |
| 53A196C | IMPORTING CHILD PORNOGRAPHY  F | 1 | 1 | 0.1% |
| **Indecency/voyeurism** | | | | |
| 53A186 | PUBLIC INDECENCY            BM | 58 | 35 | 4.7% |
| 53A189A | VOYEURISM | 1 | 1 | 0.1% |

- In 2005, 746 sentenced offenders who had served a prison sentence for a least one sex-related offense were released or discharged from prison.  Over the next five years, 27 (3.6%) of these men were arrested and charged with a new sex crime.  Twenty (20), 2.7%, were convicted for new sex offense, and 13, 1.7%, were returned to prison to serve a sentence for a new sex crime.

**5-year sex-crime recidivism - 746 offenders with a DOC sentence history for a sex crime**

| Offender group | Males | Any new sex crime arrest | New sex crime arrest rate | New sex crime conviction | New sex crime conviction rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|
| No sex sentence history | 13652 | 259 | 1.9% | 114 | 0.8% | 86 | 0.6% |
| Sex sentence  history | 746 | 27 | 3.6% | 20 | 2.7% | 13 | 1.7% |
| Total cohort | 14398 | 286 | 2.0% | 134 | 0.9% | 99 | 0.7% |

AR-00000183

- The recidivism rates for new sex crimes, shown here for the 746 sex offenders released in 2005, are much lower than what many in the public have been led to expect or believe. These low re-offense rates appear to contradict the conventional wisdom that sex offenders have very high recidivism rates. In reality, the picture is considerably more complex. While some sex offenders certainly pose an extremely high risk for committing new offenses, this does not appear to be the case for the majority of offenders. The real challenge for public agencies is to determine the level of risk specific offenders pose to the public.

- While only 27 of the 746 sex offenders observed here were arrested on new sex-related charges, the new arrest rate for non-sex crimes was significantly higher. In fact, of the 746 sex offenders in the study, 76%, or 567, were rearrested within 5 years. This high rearrest rate was surpassed, barely, by the 13,652 offenders who did not have a prior sex-related sentence history. Of this larger group, 78.8% were rearrested.

**New arrest rate - 746 offenders with a DOC sentence history for a sex crime**

| Offender group | Males | Any new arrest | Any new arrest, rate | Any VOP arrest | VOP arrest rate | Any registry arrest | Registry arrest rate | Any new sex crime arrest | New sex crime arrest rate |
|---|---|---|---|---|---|---|---|---|---|
| No sex sentence | 13652 | 10751 | 78.8% | 5182 | 38.0% | 30 | 0.2% | 259 | 1.9% |
| Sex sentence history | 746 | 567 | 76.0% | 369 | 49.5% | 212 | 28.4% | 27 | 3.6% |
| total | 14398 | 11318 | 78.6% | 5551 | 38.6% | 242 | 1.7% | 286 | 2.0% |

- Of the 567 sex offenders who were rearrested, 369 (65%) were arrested for Violation of Probation (VOP). Among the 10,751 offenders without prior sex sentence histories who were arrested, only 48% were arrested for violating the terms of their probation. It is not clear, at this point, whether the difference in VOP-arrest rates reflects tighter oversight of sex offenders on probation, or the higher proportion of sex offenders sentenced to probation.

- Sex offenders were more likely than others to be sentenced to serve terms of probation once they had completed their prison sentences. In 2005, 47.9% of the 746 sex offenders in the study were sentenced to probation. That figure compares with just 33% for all offenders who were released.

AR-00000184

**Offenders sentenced to probation following the completion of their 2005 prison sentence**

| Probation to follow | All males | No sex-related sentence history | Sex-related sentence history | Last sentence not sex-related | Last sentence was sex-related | Sex treatment score: 0 or 1 | Sex treatment Score >1 | DOC sex treatment score: 2 | DOC sex treatment score: 3 | DOC sex treatment score: 4 | DOC sex treatment score: 5 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| No | 9652 | 9263 | 389 | 9520 | 132 | 8916 | 736 | 76 | 583 | 75 | 2 |
| Yes | 4746 | 4389 | 357 | 4455 | 291 | 4253 | 493 | 24 | 400 | 69 | |
| Total | 14398 | 13652 | 746 | 13975 | 423 | 13169 | 1229 | 100 | 983 | 144 | 2 |
| Probation to follow, % | 33.0% | 32.1% | 47.9% | 31.9% | 68.8% | 32.3% | 40.1% | 24.0% | 40.7% | 47.9% | 0.0% |

- In the five years following their 2005-releases from prison, 20 of the 746 sex offenders identified here were convicted for new sex offenses. This rate was over three times higher than the rate for non-sex offenders. Overall conviction patterns appeared similar to overall rearrest patterns. Once again, the non-sex crime group had a slightly higher recidivism rates for overall convictions. In the five years following their release in 2005, 69.3% of all offenders were convicted on new criminal charges. Among the 746 offenders with prior sex sentence histories the rate was slightly lower, 66.1%.

**New conviction rate - 746 offenders with a DOC sentence history for a sex crime**

| Offender group | Males | Any conviction | Any conviction rate | Any VOP conviction | VOP conviction rate | Any registry conviction | Registry conviction rate | New sex crime conviction | New sex crime conviction rate |
|---|---|---|---|---|---|---|---|---|---|
| No sex sentence | 13652 | 9489 | 69.5% | 4772 | 35.0% | 18 | 0.1% | 114 | 0.8% |
| Sex sentence history | 746 | 493 | 66.1% | 338 | 45.3% | 128 | 17.2% | 20 | 2.7% |
| total | 14398 | 9982 | 69.3% | 5110 | 35.5% | 146 | 1.0% | 134 | 0.9% |

- Within five years of release, 493 of the 746 sex offenders released in 2005 were convicted for a wide range of new offenses. One quarter of these 493 men were convicted for violating the conditions of the CT Sex Offender Registry. While is not clear whether the high rate of registry-related arrests and convictions had any impact on reducing the number of sex crimes that were, or might have been, committed, it is apparent that the conditions attached to sex offender registration have a significant impact on the overall recidivism rate of sex offenders in the state.

- Three hundred (300) of the 746 sex offenders featured here were returned to prison to serve new sentences within five years of their releases. These offenders were sentenced to prison at a significantly lower rate (40.2%) than the 13,652 offenders who had no prior sex sentence history (50.3%). The rate at which the sex offenders were sentenced to prison for new sex crimes, however, was considerably higher than the rate for non-sex offenders, 1.7% compared to 0.6%.

11

AR-00000185

**Return to prison with a new sentence - 746 offenders with a prior DOC sentence for a sex-related crime**

| Offender group | Males | Any new prison sentence | Any new prison sentence, rate | Any new VOP sentence | Any new VOP sentence, rate | Any registry-related sentence | Any registry-related sentence, rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|---|---|
| No history | 13652 | 6864 | 50.3% | 1513 | 11.1% | 10 | 0.1% | 86 | 0.6% |
| Prior history | 746 | 300 | 40.2% | 70 | 9.4% | 69 | 9.2% | 13 | 1.7% |
| Total cohort | 14398 | 7164 | 49.8% | 1583 | 11.0% | 79 | 0.5% | 99 | 0.7% |

- The 13 sex offenders who were sentenced to prison for new sex crimes were convicted on a range of charges. Five of the thirteen were sentenced for crimes against children. All of these sex offenders had DOC Sex Treatment Scores indicating that they had committed contact crimes with their victims prior to being released in 2005. Four of the 13, those with scores of 4, had prior criminal sexual histories involving more than one victim.

**New prison sentences - 746 offenders with a prior sex-related prison sentence**

| Offender | DOC Sex Treatment Score | Statute | Sentence Offense |
|---|---|---|---|
| Offender 1 | 4 | 53A196D | POSSESSING CHILD PORNOGRAPHY  F |
| Offender 2 | 3 | 53A186 | PUBLIC INDECENCY  BM (2 Counts) |
| Offender 3 | 3 | 53A186 | PUBLIC INDECENCY       BM |
| Offender 4 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR    F (2 counts) |
| Offender 5 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 6 | 4 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 7 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR    F |
| Offender 8 | 3 | 53A071 | SEX ASSAULT, SECOND DEGREE    F |
| Offender 9 | 3 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 10 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 11 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR    F |
|  |  | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 12 | 3 | 53A196E | ILL POSSESS CHILD PORN 2ND DEG     F |
|  |  | 53A196 | OBSCENITY AS TO MINORS         F |
| Offender 13 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR    F |
|  |  | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |

- In addition to tracking new arrests, convictions and prison sentences, this study also looked at 5-year recidivism rates for any new reincarceration. Most reincarceration events fall into three categories:  1) readmissions as pre-trial detainees facing new charges   2) remands for technical violations and criminal violations while on community supervision, and 3) returns to prison to begin a new prison sentence.  Within 5 years of release, more than two-thirds of all offenders released in 2005 had been readmitted to prison, for at least one night.

12

AR-00000186

**Return to prison within 5 years**

| Offender group | Males | Returned to prison w/in 5 years | Returned to prison, rate |
|---|---|---|---|
| No sex sentence history | 13652 | 9270 | 67.9% |
| Sex sentence  history | 746 | 513 | 68.8% |
| Total cohort | 14398 | 9783 | 67.9% |

- While the overall recidivism rate of both groups was remarkably similar, the initial pathway back into prison for the 746 sex offenders was significantly different than the pattern for the larger, non-sex group.  The following table contains the 5-year recidivism rates for both groups.  The table also identifies the type of readmission event associated with that first prison return.  Among the 746 sex offenders, 77% returned to prison as pre-trial detainees, i.e., facing new charges.  In contrast, only 57% of non-sex offenders were readmitted to prison as pre-trial defendants.  The higher rate of pre-trial detentions among sex offenders may have been driven by higher rates of arrest for Violations of Probation and higher bonds levied against former sex offenders.

**Return readmission, by type, to prison within 5 years**

| Readmit reason | Entire cohort | No sex sentence history | No sex sentence history, rate by type | Sex sentence history | Sex sentence history, rate by type |
|---|---|---|---|---|---|
| New charges, unsentenced | 5697 | 5301 | 57% | 396 | 77% |
| Technical violation, remand | 1348 | 1303 | 14% | 45 | 9% |
| New prison sentence | 1028 | 993 | 11% | 35 | 7% |
| Criminal violations, remand | 940 | 921 | 10% | 19 | 4% |
| All other admit types | 770 | 752 | 8% | 18 | 4% |
| Total readmitted | 9783 | 9270 | 100% | 513 | 100% |
| Offenders in group | 14398 | 13652 | | 746 | |
| Rate returing to prison, % | 67.9% | 67.9% | | 68.8% | |
| Offenders not readmitted | 4615 | 4382 | | 233 | |

- Among non-sex offenders returning to prison, 24% first returned for a technical or criminal violation.  Among the 513 sex offenders who were returned to prison within 5 years, only 13% were remanded for criminal or technical violations.  The low remand rate for sex offenders is certainly related to the fact that only a low percentage of sex offenders, compared to other offenders, were released to community supervision programs in 2005.

- In 2005, only 37% of non-sex offenders completed their sentences in prison.  In contrast, 79% of the 746 sex offenders featured here were discharged directly from a prison facility at the end of their sentences (EOS).  The reason the EOS discharge rate was so

13

high for sex offenders reflects two simple facts: 1) the DOC did not release TS-eligible sex offenders into the community and 2) sex offenders were not accepted in most of the DOC's residential, halfway house network.

● Although the reasons that offenders in both groups were first readmitted to prison varied considerably, the rate at which they were readmitted was remarkably consistent. By the 22nd month following their 2005 releases, 50% of all members of either group had been readmitted to prison for at least one night.



## Recidivism among sex-offender subgroups

● The appendices, at the back of this report, contain recidivism findings for five sex offender sub-groups that were identified during the course of this research.  These groups, like the 746 offenders featured in the previous section, were culled from the 14,398-man cohort that was released from prison in 2005.  There were solid methodological reasons for evaluating the recidivism rates for five over-lapping sex offender groupings.  Perhaps most importantly, it provided an opportunity to test whether different criteria used in the identification of sex offenders would produce different recidivism outcomes.

● The vast majority of criminal cases disposed in state courts each year are the product of a near-ubiquitous plea-negotiation process.  Prosecutors and defense attorneys wrestle over evidence, charges, dispositions and sanctions, each seeking to maximize the interests of public safety on one side and the interests of the defendant on the other. One unpleasant consequence of this system is that a significant but undetermined number of men who have committed sex crimes avoid convictions on sex-related charges each and every year.  As described later (see Appendix, page A-22), there is some evidence that some of these men present a high risk of committing new sex

AR-00000188

crimes although they are not required to register with the state's sex offender registry. Nor are they compelled to participate in sex offender treatment programs.

- In order to test the intersection between actual offender outcomes and court-disposition outcomes, five sex offender subgroups were isolated in a manner that allowed the study to test whether criminal, sexual recidivism rates varied by group criteria.  The five subgroups that were created were:
  - o  1,395 men who had had a prior arrest for a sex-related offense
  - o  896 men who had a prior conviction for a sex-related offense
  - o  746 men who had served a prison sentence for a sex-related offense before being released in 2005
  - o  423 men, a subset of the 746, whose last prison sentence before release was for a sex-related offense, and
  - o  1,229 men who were assigned Sex Treatment Scores of 2 or higher by the Department of Correction prior to their 2005 release or discharge.

- Because of overlaps, a total of 1,712 offenders, in the 14,398-man cohort, met at least one sex offender criterion.  Differentiating different groupings of sex offenders allowed the study to compare outcomes for offenders who were a) charged with sex crimes but not convicted, b) convicted for sex offenses but not incarcerated, and c) identified by the DOC as sex offenders but had no conviction history for a sex offense.  If the criminal justice system operated in an ideal way, we would expect that criminal, sexual recidivism rates of persons arrested for sex crimes but not convicted would be lower than the rates for offenders who were convicted of sex crimes.  Further, we would expect that that the criminal sexual recidivism rates for, both, arrested and conviction groups would be lower still than for groups of offenders who had been convicted and sentenced to prison for sex-related offenses.

- The following table contains data that compares the 5-year recidivism data for offenders receiving new prison sentence for new offenses.  The 746-man sex offender group, highlighted in the previous section, is included here for the sake of continuity.  The last column on the right contains the recidivism rate for offenders who received prison sentences for new sex-crimes committed after they were released form prison in 2005.

15

AR-00000189

**Return to prison with a new sentence - by sex offender flag group**

| Offender group | Males in group | Any new prison sentence | Any new prison sentence, rate | Any new VOP sentence | Any new VOP sentence, rate | Any registry-related sentence | Any registry-related sentence, rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|---|---|
| Prior arrest, sex-related | 1395 | 637 | 45.7% | 172 | 12.3% | 68 | 4.9% | 33 | 2.4% |
| Prior conviction, sex-related | 896 | 371 | 41.4% | 94 | 10.5% | 63 | 7.0% | 17 | 1.9% |
| Sentence history, sex-related | 746 | 300 | 40.2% | 70 | 9.4% | 69 | 9.2% | 13 | 1.7% |
| Last sentence, sex-related | 423 | 120 | 28.4% | 30 | 7.1% | 34 | 8.0% | 9 | 2.1% |
| Sex treatment score: 2 - 5 | 1229 | 542 | 44.1% | 138 | 11.2% | 73 | 5.9% | 28 | 2.3% |
| STS = 1 | 12904 | 6563 | 50.9% | 1437 | 11.1% | 6 | 0.0% | 71 | 0.6% |
| STS = 2 | 100 | 55 | 55.0% | 12 | 12.0% | 0 | 0.0% | 6 | 6.0% |
| STS = 3 | 983 | 431 | 43.8% | 113 | 11.5% | 65 | 6.6% | 18 | 1.8% |
| STS = 4 | 144 | 56 | 38.9% | 13 | 9.0% | 8 | 5.6% | 4 | 2.8% |
| Total cohort | 14398 | 7164 | 49.8% | 1583 | 11.0% | 79 | 0.5% | 99 | 0.7% |

- According to this analysis, arrest on a prior sex charge was the single best predictor of being sentenced to prison for a new sex crime.  Of the 1,395 offenders who had been arrested on sex charges before 2005, 2.4% were sentenced to prison for sex offenses within 5 years.  This compares with a 1.9% rate among offenders who had been convicted for a sex crime in the past, and a 1.7% rate for offenders who had served a prison sentence for sex crimes in the past.  This finding warrants further study.  It suggests that conviction and incarceration for a sex crime exert a positive impact on reducing future sex crimes.

- Among the sex offender grouping criteria, the DOC's Sex Treatment Score was the 2nd best predictor of sexual recidivism.  Among the 1,229 offenders with Sex Treatment Scores of 2 or higher, 2.3% were sentenced to prison for new sex offenses.  The Sex Treatment Score's predictive capacity is certainly related to the fact that scoring is based not only on conviction history but also on assessments of police reports, pre-sentence investigations and other information that can provide a more complete and thorough understanding of the nature and context of an offender's crimes.

- A comparison of the recidivism rates among sex offenders with different Sex Treatment Scores revealed significant variability in rates between sex offender groups.  Six percent (6%) of offenders with Sex Treatment Scores of 2 were returned to prison within 5 years on new sex charges.  A treatment score of 2 indicates a non-contact sex offender.  Many of these offenders had been charged, in the past, with public indecency, i.e., a crime associated with exhibitionists.  The next highest recidivism rate, 2.8%, was found among prisoners with Treatment scores of 4, an indication that they had a prior sexual criminal history involving more than one victim.

AR-00000190

## Releases and discharges in 2005

- Most inmates leaving prison in Connecticut undergo a period of DOC supervision in the community prior to completing of their sentences.  In 2005, only 39% of offenders completed their prison sentences while in a prison facility.  Most were released to community-based programs, like parole and transitional supervision (TS), where they could be observed and supervised as they re-acclimated to life outside prison walls.  Among sex offenders, the pattern was much different.  In 2005, 79% of 746 sex offenders who has served a prison term for a sex crime left prison at the completion of their sentences (EOS).  In other words, these offenders were discharged directly into the community without any further DOC engagement.   Almost 50% of the sex offenders who left prison at the end of their sentences were placed on probation.

**Major release and discharge types in 2005, males**

| Releases and discharges | All offenders | No sex sentence | No sex sentence, % | Sex sentence history | Sex sentence history, % |
|---|---|---|---|---|---|
| End of sentence (EOS) | 5631 | 5045 | 37% | 586 | 79% |
| Release to TS | 2033 | 2030 | 15% | 3 | 0% |
| Release to Parole | 1778 | 1672 | 12% | 106 | 14% |
| Release to Furlough | 1752 | 1748 | 13% | 4 | 1% |
| Release to HWH | 1543 | 1540 | 11% | 3 | 0% |
| Discharge to Special Parole | 256 | 236 | 2% | 20 | 3% |
| All others | 1405 | 1381 | 10% | 24 | 3% |
| Total | 14398 | 13652 | 100% | 746 | 100% |

- In the wake of the Cheshire murders in 2007, significant structural changes were implemented at the Board of Pardons and Parole.  Today, every parole-eligible offender, who does not waive the right to parole, has their case heard by a three-person panel from the Board of Pardons and Parole.  The panel interviews every offender and reviews prison records, police reports and pre-sentence investigation reports before deciding when or if the offender will be released, and what conditions and restrictions will be applied to the offender's community supervision plan.

- Anecdotal evidence suggests that a significant number of parole eligible sex-offenders who have been granted parole complete their sentence in prison because they lack sponsors and/or appropriate housing.  The evidence also suggests that some offenders, with long sentences and parole-eligibility at 85%, waive parole because they prefer to complete their entire prison sentences and avoid the restrictions and stipulations that would be placed on them as parolees.

AR-00000191

- Among all the cases that members of the Board of Pardons and Parole (BOPP) consider for release to parole, sex offender cases weigh most heavily on them.  Despite the fact that BOPP members are provided with packets of information that include evidence-based actuarial assessments of offender risk, given the nature of the sex crimes they review, Board members often find it difficult to decide cases solely on actuarial assessments.  Board members also expressed an interest in seeing evidence concerning the efficacy of prison- and community-based treatment programs for parole-eligible sex offenders.

- Correctional Managed Health Care (CMHC), at UConn, has been the sole provider of programs to treat sex-offenders incarcerated by the Department of Correction for over a decade.  At the time of this analysis, it could not be determined where the data on offender participation in these programs resides.  As a result, the state cannot make any determination about the efficacy of the programming provided to sex offenders in Connecticut prisons.

## The Sex Offender Registry

Offenders who are included on the state's Sex Offender Registry (SOR) appear there because they have been convicted for specific criminal offenses.  The impact of the Registry on preventing new sex crimes is unknown.  By statute (CGS §§ 54-250-54-261), the Registry, which is maintained by the Department of Emergency Services & Public Protection, does not consider or assess the risk of re-offense for individuals that it lists. Nor does the Department make any determination that an individual included on the Registry is currently dangerous.  According to the Department's website, "individuals listed on the registry are included solely by virtue of their conviction record and state law.  The Department's main purpose is to make the information more accessible to the public but not to warn about any specific individual threat or risk."

- Connecticut does not have a reliable mechanism to distinguish its high-risk sex offender population from the low-risk population on the registry.  Although static and dynamic assessments are performed on many sex offenders, this information is not collected and synthesized in a manner that can be used to track or evaluate the quality of the treatment, management and supervision of the state's sex offender population.

AR-00000192

- In recent years, surrounding states have adopted tiered registry-system based on assessments of offender risk in addition to conviction histories.

- Relying solely on criminal conviction histories does not guarantee that all offenders who pose a risk of committing new sex-related crime are identified and managed appropriately.  In the state's criminal justice system, where negotiated plea agreements are the norm, significant numbers of defendants who are charged with sex offenses are able to "plead out" to other, non-sexual charges and thus avoid the SOR requirements. In this study, we identified 1,410 men, out of 14,398 offenders who were released from prison in 2005, who had been arrested and charged with a sex-related crime prior to their 2005 release.  1,395 of these offenders faced a court disposition on a docket containing at least one sex-related charge.  In those dispositions, 1,150 offenders were convicted: 896 for a sex-related offense, 254 for a non-sexual crime that appeared on the same docket (See Appendix page A-4).

- In 2007, the CT Legislature established a Risk Assessment Board (HB 7408) to assign "weights to various risk factors including, but not limited to, the seriousness of the offense, the offender's prior offense history, the offender's characteristics, the availability of community supports, whether the offender has indicated- or credible evidence in the record indicates -that the offender will reoffend if released into the community and whether the offender demonstrates a physical condition that minimizes the risk of reoffending, and specifies the risk level to which offenders with various risk assessment scores shall be assigned."  (See Appendix page A-22)

## A final caveat

- This study is based on data for offenders released from prison during 2005.  Two years later, in July 2007, two parolees committed one of the most infamous crimes in recent state history, the murderous home invasion at the Petit-family home in Cheshire.  As anyone familiar with Connecticut knows, the Petit case cast a tremendous shadow over the criminal justice system.  In the months following those crimes, the state's parole system stopped functioning, the prison system grew by almost 1,000 inmates and remand rates soared.  This study did not attempt to relate its findings with changes in the state's criminal justice system in the months and years following the crimes in Cheshire.

AR-00000193

## Advisory Panel

**William Anselmo** is a Chief Probation Officer with the Judicial Branch's Court Support Services Division (CSSD) where he oversees sex offender supervision units.  He is responsible for policy development, adherence and implementation and provides support and training to line staff and personnel.

**Charles Barber** is Director of The Connection Institute for Innovative Practice and a Lecturer in Psychiatry at the Yale University School of Medicine.  He has written two widely recognized books on mental health, and co-wrote a chapter in *What is Criminology* published in 2011 by Oxford University Press.

**Sergeant Joseph Biela** is a 24 year veteran of the Connecticut State Police and Commanding Officer of the Sex Offender Registry Unit.  Sergeant Biela has been assigned to the Sex Offender Registry Unit since November 2007 and supervises the operational and administrative functions of the SOR Unit.  The Sex Offender Registry Unit is responsible for the State of Connecticut's Sex Offender Registry public website and for the monitoring and compliance of registry requirements for over 5,400 active registered sex offenders.

**Laura Cordes** is the Executive Director of the Connecticut Sexual Assault Crisis Services, a statewide non-profit coalition of nine community-based sexual assault crisis programs, which provide pre- and post-conviction services to victims of sexual assault and their families.  CONNSACS employs a specialized team of advocates who represent victims' interests in the state's sex offender supervision and parole special management units.  Ms. Cordes serves on Connecticut's Office of Victim Services Advisory Council, the Commission on the Standardization of the Collection of Evidence in Sexual Assault Investigations, and the Criminal Justice Policy Advisory Commission.

**Eric Ellison** is a Parole Manager and he has served with the Department of Correction since 1989.  He currently oversees the Parole and Community Services Division's Special Management Unit.  The Unit consists of 10 parole officers and has statewide responsibility for the supervision of 225 sex offenders.

**Patrick Hynes** was appointed as director of the DOC's Best Practices Unit, which was established July 1, 2011.  He was previously Director of Programs and Treatment.  His responsibility is to assist the DOC to improve the utilization of evidence-based practice.

**David Rentler** is the supervising psychologist at the Board of Pardons and Parole.  He conducts clinical and forensic risk assessments, case reviews, and consults with Board Members, the parole community and Board officers and managers on matters relating to the parole decision making process.

**Randall Wallace** is the Program Director for the Center for the Treatment of Problem Sexual Behaviors where he oversees adult sexual offender outpatient treatment and evaluation services, the Day Reporting program for adult sexual offenders transitioning back into the community, Post Conviction Sexual Offender polygraph services, home-based treatment services for juveniles with problem sexual behavior, and the January Center.  Dr. Wallace, Psy.D., is a licensed Psychologist and a certified polygraph examiner.  He has provided sexual offender treatment and evaluation services for over 20 years.

AR-00000194

## Methodological questions

Each year, The Criminal justice Policy & Planning Division at OPM (CJPPD) is mandated to produce an annual study of recidivism among Connecticut prisoners.  In October 2011, Mike Lawlor, OPM Under-Secretary decided that the Division would produce an analysis of recidivism rates of sex offenders leaving Connecticut prisons.

Within a month, an advisory panel of experts was convened to provide guidance over the project.  In short order, it was determined that, at a minimum, the study would need to produce an analysis that tracked sex offenders released from prison for at least a five year period.  In order to meet the five years criteria, the study chose to gather criminal justice records on 14,398 male offenders who were released or discharged from a sentence at a Connecticut prison during 2005.

In recent years, CJPPD has produced annual studies that track four measures of recidivism among former sentenced prisoners.  These measures are 1) new arrests 2) new reincarceration events 3) new convictions, and 4) subsequent returns to prison with a new prison sentence.  The analysis has proved to be helpful by establishing baseline recidivism data for the state and by providing insight into some of the factors that contribute to higher rates of recidivism among certain offender sub-groups.  In 2009, Department of Correction was able to validate its static assessment instrument, the TPAI, using benchmark recidivism data on 30,000 offenders released in 2004 and 2005.

**The Data**

Since the number of female sex offenders is so small, and because the pattern of their criminality is so different from males, female prisoners were not included in the study.

The Department of Correction identified all inmates who were released or discharged during 2005 and provided electronic data on each offender's DOC movement history, sentence history, classification and need scores, and general demographic information. Using this data, the first 2005 prison release or discharge date was identified for each 14,398 offender in the study.  This date became the start date against which all subsequent recidivism events would be calculated.

Connecticut is fortunate to have an excellent network that connects state criminal justice agencies.  Each month, researchers, information specialists and operations personnel from all state criminal justice agencies meet to share information and discuss opportunities for collaborative research.[2]  Because of this network, Department of Correction data for the 14,398 offenders was easily linked with State Police and Judicial Branch data.  The Judicial Branch's Court Support Services Division employed probabilistic matching software to

---

[2]Research Workgroup of the state's Criminal Justice Policy and Advisory Commission meets monthly drawing together a select group of IT, research, and operations staff from the Department of Correction, Court Support Services Division, Court Operations, the Board of Pardons and Parole, the State Police, Parole, the Office of the State Public Defender and the Office of Policy and Management.  The group is a key component in insuring smooth communications and substantive collaboration between various criminal justice agencies.

AR-00000195

produce complete arrest and conviction histories every offender in the study cohort. This data was matched, assembled and delivered within two weeks.

**Research questions**

With the data in hand, several methodological questions quickly emerged. The first question concerned the types of events that would be counted as genuine recidivism events. The second question centered on the criteria that would be used to identify who, among the 14,398 offenders released in 2005, would be considered as a sex offender. The final major question concerned what criminal charges would be considered as sex crimes.

For the first question, it was recognized that calculating recidivism rates for sex offenders required a significantly different approach from the one that would be used in calculating general recidivism rates for all prisoners. With sex offenders, in addition to knowing when or if they return to the system, it is also critical to identify the circumstances associated with each new arrest or conviction. While the public may not be concerned if a sex offender commits a new drug or property offense, they are certainly concerned about any new sex-related offenses. As a result, it was necessary for the study to differentiate sex-related recidivism events from non-sex-related events. To do so, recidivism events were identified in each of four ways 1) general recidivism for all types of offenses 2) recidivism related to non-compliance with the sex offender registry 3) recidivism related to violations of probation, and 4) recidivism related to new sex offenses.

Defining who would be considered as a sex offender for the purposes of the study posed a different set of challenges. The narrowest legal view would have restricted sex-offenders to individuals who been convicted for a sex offense that required registration on the state's sex-offender registry (SOR). It was clear, however, that significant numbers of offenders, who had participated in sex crimes, had been able to avoid conviction on a sex-related charge through the plea negotiation process. The state's defense attorneys are well aware that their clients are often best served by pleading guilty to substantive non-sexual charges to avoid conviction for a sexual offense that would require special supervision and inclusion on the state's Sex Offender Registry. From their perspective, prosecutors cite the difficulty of taking sex cases to trial as a reason why some defendants avoid conviction for sex crimes. The trade-off for prosecutors is that many defendants who avoid a conviction for a sex charge do plead guilty to non-sexual offenses that carry significant sentences.

For the purposes of this study, five sex offender subgroups were selected from the general population based on relatively simple criteria. All persons who were arrested and charged with a sex offense prior to their 2005 release from prison constituted the largest group. This group of 1,395 offenders included several hundred men who had been arrested and charged but not convicted for sex offenses. The second group was composed of 896 men, a subset of the 1,395, who had been convicted for a sex offense prior to 2005. Not all of these men were incarcerated for their sex-related crimes. The third group consisted of 746 men who had served a prison sentence for a sex crime prior to being released in 2005. The fourth group, a subgroup of the third group, contained 423 men whose last sentence before they were released in 2005 was for a sex-related offense. The final group consisted of 1,229

22

men who had been classified as sex offenders by the CT Department of Correction because they had a Sex Treatment Score of 2 or higher when they were released in 2005.

The following chart illustrates the relationships between each of the five sex offenders groups that were identified by the study.  Of the 1,395 men who were arrested on sex-related offences, only 896 were convicted for sexual offenses.



Significant overlaps existed between offenders in each group.  Out of 14,398 offenders that were released or discharged from prison in 2005, 1,712 met at least one criterion as a presumed, though not-necessarily convicted sex offender.  The following table illustrates the overlaps.

23

AR-00000197

**Sex offender membership, by criteria**

| Criteria met | Sex treatment score > 1 | Prior arrest for a sex crime | Prior conviction for a sex crime | Any sentence for a sex offense | Last sentence sex related | Offenders meeting criteria |
|---|---|---|---|---|---|---|
| 5 | X | X | X | X | X | 406 |
| 4 | X | X | X | X | | 232 |
| 4 | X | X | | X | X | 7 |
| 4 | | X | X | X | X | 5 |
| 3 | X | X | X | | | 86 |
| 3 | | X | X | X | | 18 |
| 3 | X | X | | X | | 10 |
| 3 | X | | | X | X | 3 |
| 2 | X | X | | | | 179 |
| 2 | | X | X | | | 149 |
| 2 | X | | | X | | 55 |
| 2 | | X | | X | | 2 |
| 1 | | X | | | | 301 |
| 1 | X | | | | | 251 |
| 1 | | | | X | | 6 |
| 1 | | | | X | X | 2 |
| | 1229 | 1395 | 896 | 323 | 423 | 1712 |

The final major methodological question centered on what offenses would be considered as sex crime in computing sexual recidivism rates.  There was no consensus on whether arrests and convictions for offenses like PATRONIZING A PROSTITUTE (53A-083) or PROSTITUTION (53A-082) should be included in calculating sexual recidivism.  Although there were good, solid arguments for excluding these charges from consideration, the study continued to include prostitution-related crimes as sex offenses that counted as recidivism triggers.  In subsequent analyses, CJPPD may reconsider using these charges in calculating sexual recidivism rates.

A significant percentage of the sex offenders in the study were rearrested and convicted on charges relating to non-compliance with the state's Sex Offenders Registry.  Although the original charges that required inclusion on the registry were no doubt sexual, this study does not include these registry-compliance offenses as sex offenses in computing sexual recidivism.  The large number of registry-related arrests and convictions that appeared in the data made it necessary to break these events out separately.

Prior CJPPD recidivism studies contained survival curves for released offenders that showed the rates at which offenders returned to the criminal justice system.  In contrast, the recidivism rates reported here were designed to capture any single trigger event that occurred within 5 years (1,826 days) of an offender's 2005 release from prison.  All trigger events that occurred within 5 years were used in summary tables.

AR-00000198

**Sex offender typologies chart**



Chart produced by Dr. Randall Wallace, Center for the Treatment of Problem Sexual Behaviors

AR-00000199

## Recidivism -1,395 offenders with a prior arrest for a sex crime

### New arrest rate - 1,395 offenders with a prior arrest history for a sex offense regardless of conviction status

| Offender group | Males | Any new arrest | Any new arrest, rate | Any VOP arrest | VOP arrest rate | Any registry arrest | Registry arrest rate | Any new sex crime arrest | New sex crime arrest rate |
|---|---|---|---|---|---|---|---|---|---|
| No prior arrest for sex | 13003 | 10229 | 78.7% | 4905 | 38% | 26 | 0.2% | 218 | 1.7% |
| Prior sex arrest history | 1395 | 1089 | 78.1% | 646 | 46% | 216 | 15.5% | 68 | 4.9% |
| total | 14398 | 11318 | 78.6% | 5551 | 39% | 242 | 1.7% | 286 | 2.0% |

### New conviction rate - 1,395 offenders with any prior (pre-2005 release) arrest history for a sex crime

| Offender group | Males | Any conviction | Any conviction rate | Any VOP conviction | VOP conviction rate | Any registry conviction | Registry conviction rate | New sex crime conviction | New sex crime conviction rate |
|---|---|---|---|---|---|---|---|---|---|
| No prior sex arrests | 13003 | 9014 | 69.3% | 4516 | 34.7% | 17 | 0.1% | 86 | 0.7% |
| Priior sex arrest history | 1395 | 968 | 69.4% | 594 | 42.6% | 129 | 9.2% | 48 | 3.4% |
| total | 14398 | 9982 | 69.3% | 5110 | 35.5% | 146 | 1.0% | 134 | 0.9% |

### Return to prison with a new sentence - 1,395 offenders with a prior arrest for a sex-related crime

| Offender group | Males | Any new prison sentence | Any new prison sentence, rate | Any new VOP sentence | Any new VOP sentence, rate | Any registry-related sentence | Any registry-related sentence, rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|---|---|
| No history | 13003 | 6527 | 50.2% | 1411 | 10.9% | 11 | 0.1% | 66 | 0.5% |
| Prior history | 1395 | 637 | 45.7% | 172 | 12.3% | 68 | 4.9% | 33 | 2.4% |
| Total cohort | 14398 | 7164 | 49.8% | 1583 | 11.0% | 79 | 0.5% | 99 | 0.7% |

### Readmissions to prison w/in 5 years, 1,395 offenders with a prior arrest for a sex offense

| Readmit type | Total | No prior arrest for a sex crime | No prior arrest for a sex crime, % | Prior sex-related arrest history | Prior sex-related arrest history, % |
|---|---|---|---|---|---|
| NEW CHARGES | 5,697 | 5,006 | 38.5% | 691 | 49.5% |
| TECH VIOL | 1,348 | 1,260 | 9.7% | 88 | 6.3% |
| NEW SENT | 1,028 | 947 | 7.3% | 81 | 5.8% |
| CRIM VIOL | 940 | 888 | 6.8% | 52 | 3.7% |
| READMIT CIVIL OR FINE | 216 | 196 | 1.5% | 20 | 1.4% |
| RTN ABSCOND | 194 | 184 | 1.4% | 10 | 0.7% |
| RTN ESC CHARGES | 163 | 158 | 1.2% | 5 | 0.4% |
| OTHER | 83 | 71 | 0.5% | 12 | 0.9% |
| RTN W/O PREJ | 55 | 53 | 0.4% | 2 | 0.1% |
| RTN ESC | 36 | 35 | 0.3% | 1 | 0.1% |
| RTN ESC SENT | 23 | 21 | 0.2% | 2 | 0.1% |
| NO PRISON READMIT | 4,615 | 4,184 | 32.2% | 431 | 30.9% |
|  | 14,398 | 13,003 | 100.0% | 1,395 | 100.0% |

AR-00000200

**Sex charges associated w/new prison sentences for the 33 offenders in the 1,395-offender group with a prior sex-related arrest**

| Offender | DOC Sex Treatment Score | Statute | Sentence Offense |
|---|---|---|---|
| Offender 1 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
| Offender 2 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
| Offender 3 | 4 | 53A196D | POSSESSING CHILD PORNOGRAPHY  F |
| Offender 4 | 1 | 53A082 | PROSTITUTION           AM |
| Offender 5 | 1 | 53A082 | PROSTITUTION    AM (4 counts) |
| Offender 6 | 3 | 53A186 | PUBLIC INDECENCY         BM |
| Offender 7 | 3 | 53A186 | PUBLIC INDECENCY         BM |
| Offender 8 | 2 | 53A186 | PUBLIC INDECENCY         BM |
| Offender 9 | 3 | 53A186 | PUBLIC INDECENCY  BM (2 Counts) |
| Offender 10 | 2 | 53A186 | PUBLIC INDECENCY  BM (2 Counts) |
| Offender 11 | 2 | 53A186 | PUBLIC INDECENCY  BM (3 Counts) |
| Offender 12 | 1 | 53A071 | SEX ASSAULT, SECOND DEGREE    F |
| Offender 13 | 3 | 53A071 | SEX ASSAULT, SECOND DEGREE    F |
| Offender 14 | 1 | 53A071 | SEX ASSAULT, SECOND DEGREE    F |
| Offender 15 | 3 | 53A071 | SEX ASSAULT, SECOND DEGREE    F |
| Offender 16 | 3 | 53A070 | SEXUAL ASSAULT, 1ST DEGREE       F |
| Offender 17 | 1 | 53A070 | SEXUAL ASSAULT, 1ST DEGREE       F |
| Offender 18 | 3 | 53A070 | SEXUAL ASSAULT, 1ST DEGREE       F |
| Offender 19 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE    DF |
| Offender 20 | 3 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE    DF |
| Offender 21 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE    DF |
| Offender 22 | 1 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 23 | 1 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 24 | 1 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 25 | 1 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 26 | 4 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 27 | 1 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 28 | 2 | 53A196F | ILL POSSESS CHILD PORN 3RD DEG     DF |
|  |  | 53A070 | SEXUAL ASSAULT, 1ST DEGREE       F |
|  |  | 53A196A | EMPLOY MINOR IN OBSCENE PERFORMANCE AF |
|  |  | 53A072 | SEXUAL ASSAULT, 3RD DEGREE    DF |
| Offender 29 | 1 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
|  |  | 53A070 | SEXUAL ASSAULT, 1ST DEGREE       F |
| Offender 30 | 3 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
|  |  | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
| Offender 31 | 3 | 53A196E | ILL POSSESS CHILD PORN 2ND DEG       F |
|  |  | 53A196 | OBSCENITY AS TO MINORS         F |
| Offender 32 | 1 | 53A186 | PUBLIC INDECENCY         BM |
|  |  | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 33 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
|  |  | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |

AR-00000201

# Recidivism data for 896 offenders with a prior conviction for a sex crime

### New arrest rate - 896 offenders with a prior conviction a sex-related offense

| Offender group | Males | Any new arrest | Any new arrest, rate | Any VOP arrest | VOP arrest rate | Any registry arrest | Registry arrest rate | Any new sex crime arrest | New sex crime arrest rate |
|---|---|---|---|---|---|---|---|---|---|
| No prior arrest for sex | 13502 | 10636 | 78.8% | 5124 | 38% | 38 | 0.3% | 250 | 1.9% |
| Prior sex arrest history | 896 | 682 | 76.1% | 427 | 48% | 204 | 22.8% | 36 | 4.0% |
| total | 14398 | 11318 | 78.6% | 5551 | 39% | 242 | 1.7% | 286 | 2.0% |

### New conviction rate - 896 offenders with any prior (pre-2005 release) conviction for a sex-releated crime

| Offender group | Males | Any conviction | Any conviction rate | Any VOP conviction | VOP conviction rate | Any registry conviction | Registry conviction rate | New sex crime conviction | New sex crime conviction rate |
|---|---|---|---|---|---|---|---|---|---|
| No prior conviction (sex) | 13502 | 9390 | 69.5% | 4719 | 35.0% | 26 | 0.2% | 106 | 0.8% |
| Prior sex-rel. conviction | 896 | 592 | 66.1% | 391 | 43.6% | 120 | 13.4% | 28 | 3.1% |
| total | 14398 | 9982 | 69.3% | 5110 | 35.5% | 146 | 1.0% | 134 | 0.9% |

### Return to prison with a new sentence - 896 offenders with a prior conviction for a sex-related crime

| Offender group | Males | Any new prison sentence | Any new prison sentence, rate | Any new VOP sentence | Any new VOP sentence, rate | Any registry-related sentence | Any registry-related sentence, rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|---|---|
| No history | 13502 | 6793 | 50.3% | 1489 | 11.0% | 16 | 0.1% | 82 | 0.6% |
| Prior history | 896 | 371 | 41.4% | 94 | 10.5% | 63 | 7.0% | 17 | 1.9% |
| Total cohort | 14398 | 7164 | 49.8% | 1583 | 11.0% | 79 | 0.5% | 99 | 0.7% |

### Readmissions to prison w/in 5 years, 896 offenders with a prior conviction for a sex offense

| Readmit type | Total Of Inmate No 2005 | No prior conviction for a sex crime | No prior conviction for a sex crime, % | Prior sex-related conviction history | Prior sex-related conviction history, % |
|---|---|---|---|---|---|
| NEW CHARGES | 5697 | 5245 | 38.8% | 452 | 50.4% |
| TECH VIOL | 1348 | 1294 | 9.6% | 54 | 6.0% |
| NEW SENT | 1028 | 981 | 7.3% | 47 | 5.2% |
| CRIM VIOL | 940 | 911 | 6.7% | 29 | 3.2% |
| READMIT CIVIL OR FINE | 216 | 205 | 1.5% | 11 | 1.2% |
| RTN ABSCOND | 194 | 188 | 1.4% | 6 | 0.7% |
| RTN ESC CHARGES | 163 | 162 | 1.2% | 1 | 0.1% |
| OTHER | 83 | 73 | 0.5% | 10 | 1.1% |
| RTN W/O PREJ | 55 | 55 | 0.4% | | 0.0% |
| RTN ESC | 36 | 36 | 0.3% | | 0.0% |
| RTN ESC SENT | 23 | 23 | 0.2% | | 0.0% |
| NO PRISON READMIT | 4615 | 4329 | 32.1% | 286 | 31.9% |
| | 14398 | 13502 | 100.0% | 896 | 100.0% |

28

**Sex charges associated w/new prison sentences for the 17 offenders in the 896-offender group with a prior sex-related conviction**

| Offender | DOC Sex Treatment Score | Statute | Sentence Offense | |
|---|---|---|---|---|
| Offender 1 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR | F |
| Offender 2 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR | F |
| Offender 3 | 4 | 53A196D | POSSESSING CHILD PORNOGRAPHY | F |
| Offender 4 | 1 | 53A082 | PROSTITUTION | AM |
| Offender 5 | 1 | 53A082 | PROSTITUTION   AM (4 counts) | |
| Offender 6 | 3 | 53A186 | PUBLIC INDECENCY | BM |
| Offender 7 | 2 | 53A186 | PUBLIC INDECENCY | BM |
| Offender 8 | 3 | 53A186 | PUBLIC INDECENCY   BM (2 Counts) | |
| Offender 9 | 2 | 53A186 | PUBLIC INDECENCY   BM (2 Counts) | |
| Offender 10 | 3 | 53A071 | SEX ASSAULT, SECOND DEGREE | F |
| Offender 11 | 1 | 53A070 | SEXUAL ASSAULT, 1ST DEGREE | F |
| Offender 12 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE | DF |
| Offender 13 | 3 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE | DF |
| Offender 14 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE | DF |
| Offender 15 | 4 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE (2 counts) | |
| Offender 16 | 3 | 53A196E | ILL POSSESS CHILD PORN 2ND DEG | F |
| | | 53A196 | OBSCENITY AS TO MINORS | F |
| Offender 17 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR | F |
| | | 53A073A | SEXUAL ASSAULT, 4TH DEGREE | |

## Recidivism - 746 offenders with a sentence history for a sex crime

**New arrest rate - 746 offenders with a DOC sentence history for a sex crime**

| Offender group | Males | Any new arrest | Any new arrest, rate | Any VOP arrest | VOP arrest rate | Any registry arrest | Registry arrest rate | Any new sex crime arrest | New sex crime arrest rate |
|---|---|---|---|---|---|---|---|---|---|
| No sex sentence | 13652 | 10751 | 78.8% | 5182 | 38.0% | 30 | 0.2% | 259 | 1.9% |
| Sex sentence  history | 746 | 567 | 76.0% | 369 | 49.5% | 212 | 28.4% | 27 | 3.6% |
| total | 14398 | 11318 | 78.6% | 5551 | 38.6% | 242 | 1.7% | 286 | 2.0% |

**New conviction rate - 746 offenders with a DOC sentence history for a sex crime**

| Offender group | Males | Any conviction | Any conviction rate | Any VOP conviction | VOP conviction rate | Any registry conviction | Registry conviction rate | New sex crime conviction | New sex crime conviction rate |
|---|---|---|---|---|---|---|---|---|---|
| No sex sentence | 13652 | 9489 | 69.5% | 4772 | 35.0% | 18 | 0.1% | 114 | 0.8% |
| Sex sentence  history | 746 | 493 | 66.1% | 338 | 45.3% | 128 | 17.2% | 20 | 2.7% |
| total | 14398 | 9982 | 69.3% | 5110 | 35.5% | 146 | 1.0% | 134 | 0.9% |

AR-00000203

**Return to prison with a new sentence - 746 offenders with a prior DOC sentence for a sex-related crime**

| Offender group | Males | Any new prison sentence | Any new prison sentence, rate | Any new VOP sentence | Any new VOP sentence, rate | Any registry-related sentence | Any registry-related sentence, rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|---|---|
| No history | 13652 | 6864 | 50.3% | 1513 | 11.1% | 10 | 0.1% | 86 | 0.6% |
| Prior history | 746 | 300 | 40.2% | 70 | 9.4% | 69 | 9.2% | 13 | 1.7% |
| Total cohort | 14398 | 7164 | 49.8% | 1583 | 11.0% | 79 | 0.5% | 99 | 0.7% |

**Readmissions to prison w/in 5 years, 746 offenders with a sentence history for a sex offense**

| Readmit type | Total | No sentence history for sex offenses | No sentence history for sex offenses, % | Offenders w/a sentence history for sex offenses | Offenders w/a sentence history for sex offenses, % |
|---|---|---|---|---|---|
| NEW CHARGES | 5697 | 5301 | 38.8% | 396 | 53.1% |
| TECH VIOL | 1348 | 1303 | 9.5% | 45 | 6.0% |
| NEW SENT | 1028 | 993 | 7.3% | 35 | 4.7% |
| CRIM VIOL | 940 | 921 | 6.7% | 19 | 2.5% |
| READMIT CIVIL OR FINE | 216 | 211 | 1.5% | 5 | 0.7% |
| RTN ABSCOND | 194 | 189 | 1.4% | 5 | 0.7% |
| RTN ESC CHARGES | 163 | 163 | 1.2% | | 0.0% |
| OTHER | 83 | 75 | 0.5% | 8 | 1.1% |
| RTN W/O PREJ | 55 | 55 | 0.4% | | 0.0% |
| RTN ESC | 36 | 36 | 0.3% | | 0.0% |
| RTN ESC SENT | 23 | 23 | 0.2% | | 0.0% |
| NO PRISON READMIT | 4615 | 4382 | 32.1% | 233 | 31.2% |
| | 14398 | 13652 | 100.0% | 746 | 100.0% |

**Sex charges associated w/new prison sentences for the 13 offenders in the 746-offender group with a sex-related sentence history**

| Offender | DOC Sex Treatment Score | Statute | Sentence Offense |
|---|---|---|---|
| Offender 1 | 4 | 53A196D | POSSESSING CHILD PORNOGRAPHY  F |
| Offender 2 | 3 | 53A186 | PUBLIC INDECENCY  BM (2 Counts) |
| Offender 3 | 3 | 53A186 | PUBLIC INDECENCY      BM |
| Offender 4 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F (2 counts) |
| Offender 5 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE  DF |
| Offender 6 | 4 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 7 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
| Offender 8 | 3 | 53A071 | SEX ASSAULT, SECOND DEGREE     F |
| Offender 9 | 3 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE    DF |
| Offender 10 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE  DF |
| Offender 11 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
| | | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 12 | 3 | 53A196E | ILL POSSESS CHILD PORN 2ND DEG     F |
| | | 53A196 | OBSCENITY AS TO MINORS        F |
| Offender 13 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
| | | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |

AR-00000204

## Recidivism - 423 offenders whose last sentence was for a sex crime

**New arrest rate - 423 offenders whose last sentence was a sex crime**

| Offender group | Males | Any new arrest | Any new arrest, rate | Any VOP arrest | VOP arrest rate | Any registry arrest | Registry arrest rate | Any new sex crime arrest | New sex crime arrest rate |
|---|---|---|---|---|---|---|---|---|---|
| No sex sentence | 13975 | 11026 | 78.9% | 5341 | 38.2% | 133 | 1.0% | 270 | 1.9% |
| Sex sentence history | 423 | 292 | 69.0% | 210 | 49.6% | 109 | 25.8% | 16 | 3.8% |
| total | 14398 | 11318 | 78.6% | 5551 | 38.6% | 242 | 1.7% | 286 | 2.0% |

**New conviction rate - 423 offenders whose last sentence was sex-related**

| Offender group | males | Any conviction | Any conviction rate | Any VOP conviction | VOP conviction rate | Any registry conviction | Registry conviction rate | New sex crime conviction | New sex crime conviction rate |
|---|---|---|---|---|---|---|---|---|---|
| No sex sentence | 13975 | 9742 | 69.7% | 4919 | 35.2% | 91 | 0.7% | 123 | 0.9% |
| Sex sentence history | 423 | 240 | 56.7% | 191 | 45.2% | 55 | 13.0% | 11 | 2.6% |
| | 14398 | 9982 | 69.3% | 5110 | 35.5% | 146 | 1.0% | 134 | 0.9% |

**Return to prison with a new sentence - 423 offenders whose last sentence prior to release was for a sex-related crime**

| Offender group | Males | Any new prison sentence | Any new prison sentence, rate | Any new VOP sentence | Any new VOP sentence, rate | Any registry-related sentence | Any registry-related sentence, rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|---|---|
| No history | 13975 | 7044 | 50.4% | 1553 | 11.1% | 45 | 0.3% | 90 | 0.6% |
| Prior history | 423 | 120 | 28.4% | 30 | 7.1% | 34 | 8.0% | 9 | 2.1% |
| Total cohort | 14398 | 7164 | 49.8% | 1583 | 11.0% | 79 | 0.5% | 99 | 0.7% |

**Readmissions to prison w/in 5 years, 423 offenders whose last sentence was sex-related**

| Readmit type | Total | Last sentence not sex-related | Last sentence not sex-related, % | Last sentence was sex-related | Last sentence was sex-related, % |
|---|---|---|---|---|---|
| NEW CHARGES | 5697 | 5480 | 39.2% | 217 | 51.3% |
| TECH VIOL | 1348 | 1327 | 9.5% | 21 | 5.0% |
| NEW SENT | 1028 | 1013 | 7.2% | 15 | 3.5% |
| CRIM VIOL | 940 | 934 | 6.7% | 6 | 1.4% |
| READMIT CIVIL OR FINE | 216 | 213 | 1.5% | 3 | 0.7% |
| RTN ABSCOND | 194 | 193 | 1.4% | 1 | 0.2% |
| RTN ESC CHARGES | 163 | 163 | 1.2% | | 0.0% |
| OTHER | 83 | 78 | 0.6% | 5 | 1.2% |
| RTN W/O PREJ | 55 | 55 | 0.4% | | 0.0% |
| RTN ESC | 36 | 36 | 0.3% | | 0.0% |
| RTN ESC SENT | 23 | 23 | 0.2% | | 0.0% |
| NO PRISON READMIT | 4615 | 4460 | 31.9% | 155 | 36.6% |
| | 14398 | 13975 | 100.0% | 423 | 100.0% |

AR-00000205

**Sex charges associated w/new prison sentences for the 9 offenders in the 423-offender group whose last sentence in 2005 was for a sex-related offense**

| Offender | DOC Sex Treatment Score | Statute | Sentence Offense |
|---|---|---|---|
| Offender 1 | 4 | 53A196D | POSSESSING CHILD PORNOGRAPHY  F |
| Offender 2 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 3 | 4 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 4 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
| Offender 5 | 3 | 53A071 | SEX ASSAULT, SECOND DEGREE   F |
| Offender 6 | 3 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 7 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 8 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F (2 counts) |
| Offender 9 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR   F |
| | | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |

## Recidivism - 1,229 offenders with Sex Treatment Score of 2 or higher

**New arrest rate - 1,229 offenders with DOC sex treatment scores of S-2 or higher**

| Sex treatment score | Males | Any new arrest | Any new arrest, rate | Any VOP arrest | VOP arrest rate | Any registry arrest | Registry arrest rate | Any new sex crime arrest | New sex crime arrest rate |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 265 | 136 | 51.3% | 48 | 18.1% | | 0.0% | 4 | 1.5% |
| S-1 | 12904 | 10222 | 79.2% | 4937 | 38.3% | 12 | 0.1% | 225 | 1.7% |
| S-2 | 100 | 81 | 81.0% | 38 | 38.0% | 2 | 2.0% | 10 | 10.0% |
| S-3 | 983 | 766 | 77.9% | 448 | 45.6% | 195 | 19.8% | 42 | 4.3% |
| S-4 | 144 | 113 | 78.5% | 80 | 55.6% | 33 | 22.9% | 5 | 3.5% |
| S-5 | 2 | | 0.0% | | 0.0% | | 0.0% | | 0.0% |
| Treatment Sscore >1 | 1229 | 960 | 78.1% | 566 | 46.1% | 230 | 18.7% | 57 | 4.6% |
| total | 14398 | 11318 | 78.6% | 5551 | 38.6% | 242 | 1.7% | 286 | 2.0% |

**New conviction rate - 1,229 offenders with DOC sex treatment scores of S-2 or higher**

| Sex treatment score | males | Any conviction | Any conviction rate | Any VOP conviction | VOP conviction rate | Any registry conviction | Registry conviction rate | New sex crime conviction | New sex crime conviction rate |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 265 | 107 | 40.4% | 45 | 17.0% | | 0.0% | | 0.0% |
| S-1 | 12904 | 9040 | 70.1% | 4537 | 35.2% | 7 | 0.1% | 97 | 0.8% |
| S-2 | 100 | 71 | 71.0% | 34 | 34.0% | 1 | 1.0% | 8 | 8.0% |
| S-3 | 983 | 660 | 67.1% | 420 | 42.7% | 116 | 11.8% | 26 | 2.6% |
| S-4 | 144 | 104 | 72.2% | 74 | 51.4% | 22 | 15.3% | 3 | 2.1% |
| S-5 | 2 | | 0.0% | | 0.0% | | 0.0% | | 0.0% |
| STS>1 | 1229 | 835 | 67.9% | 528 | 43.0% | 139 | 11.3% | 37 | 3.0% |
| total | 14398 | 9982 | 69.3% | 5110 | 35.5% | 146 | 1.0% | 134 | 0.9% |

AR-00000206

**Return to prison with a new sentence - 1,229 offenders with 2005 sex treatment scores higher than 1**

| Offender group | Males | Any new prison sentence | Any new prison sentence, rate | Any new VOP sentence | Any new VOP sentence, rate | Any registry-related sentence | Any registry-related sentence, rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|---|---|
| STS = 0 or 1 | 13169 | 6622 | 50.3% | 1445 | 11.0% | 6 | 0.0% | 71 | 0.5% |
| STS = 2 through 5 | 1229 | 542 | 44.1% | 138 | 11.2% | 73 | 5.9% | 28 | 2.3% |
| Total cohort | 14398 | 7164 | 49.8% | 1583 | 11.0% | 79 | 0.5% | 99 | 0.7% |

**Return to prison with a new sentence - offenders by sex treatment score**

| Offender group | Males | Any new prison sentence | Any new prison sentence, rate | Any new VOP sentence | Any new VOP sentence, rate | Any registry-related sentence | Any registry-related sentence, rate | New sentence, sex crime | New sentence, sex crime, rate |
|---|---|---|---|---|---|---|---|---|---|
| No score | 265 | 59 | 22.3% | 8 | 3.0% | | 0.0% | | 0.0% |
| STS = 1 | 12904 | 6563 | 50.9% | 1437 | 11.1% | 6 | 0.0% | 71 | 0.6% |
| STS = 2 | 100 | 55 | 55.0% | 12 | 12.0% | | 0.0% | 6 | 6.0% |
| STS = 3 | 983 | 431 | 43.8% | 113 | 11.5% | 65 | 6.6% | 18 | 1.8% |
| STS = 4 | 144 | 56 | 38.9% | 13 | 9.0% | 8 | 5.6% | 4 | 2.8% |
| STS = 5 | 2 | 0 | 0.0% | | 0.0% | | 0.0% | | 0.0% |
| Total cohort | 14398 | 7164 | 49.8% | 1583 | 11.0% | 79 | 0.5% | 99 | 0.7% |
| STS = 2 through 5 | 1229 | 542 | 44.1% | 138 | 11.2% | 73 | 5.9% | 28 | 2.3% |

**Readmissions to prison w/in 5 years, 1,229 offenders with sex treatment scores above 1**

| Readmit type | Total Of Inmate No 2005 | Sex treatment score lower than 2 | Sex treatment score lower than 2, % | Sex treatment scores: 2 through 5 | Sex treatment scores: 2 through 5, % |
|---|---|---|---|---|---|
| NEW CHARGES | 5697 | 5043 | 38.3% | 654 | 53.2% |
| TECH VIOL | 1348 | 1292 | 9.8% | 56 | 4.6% |
| NEW SENT | 1028 | 971 | 7.4% | 57 | 4.6% |
| CRIM VIOL | 940 | 908 | 6.9% | 32 | 2.6% |
| READMIT CIVIL OR FINE | 216 | 199 | 1.5% | 17 | 1.4% |
| RTN ABSCOND | 194 | 179 | 1.4% | 15 | 1.2% |
| RTN ESC CHARGES | 163 | 163 | 1.2% | | 0.0% |
| OTHER | 83 | 71 | 0.5% | 12 | 1.0% |
| RTN W/O PREJ | 55 | 55 | 0.4% | | 0.0% |
| RTN ESC | 36 | 36 | 0.3% | | 0.0% |
| RTN ESC SENT | 23 | 23 | 0.2% | | 0.0% |
| NO PRISON READMIT | 4615 | 4229 | 32.1% | 386 | 31.4% |
| | 14398 | 13169 | 100.0% | 1229 | 100.0% |

33

AR-00000207

**Readmissions to prison w/in 5 years, by sex treatment score**

| Readmit type | Total | Treatment score null or S1 | Treatment score: S2 | Treatment score: S3 | Treatment score: S4 | Treatment score: S5 |
|---|---|---|---|---|---|---|
| NEW CHARGES | 5697 | 5043 | 54 | 519 | 81 | |
| TECH VIOL | 1348 | 1292 | 7 | 42 | 7 | |
| NEW SENT | 1028 | 971 | 5 | 47 | 5 | |
| CRIM VIOL | 940 | 908 | 1 | 27 | 4 | |
| READMIT CIVIL OR FINE | 216 | 199 | 1 | 16 | | |
| RTN ABSCOND | 194 | 179 | 2 | 11 | 2 | |
| RTN ESC CHARGES | 163 | 163 | | | | |
| OTHER | 83 | 71 | 1 | 9 | 2 | |
| RTN W/O PREJ | 55 | 55 | | | | |
| RTN ESC | 36 | 36 | | | | |
| RTN ESC SENT | 23 | 23 | | | | |
| NO PRISON READMIT | 4615 | 4229 | 29 | 312 | 43 | 2 |
| Total | 14398 | 13169 | 100 | 983 | 144 | 2 |
| | % | % | % | % | % | % |
| NEW CHARGES | 39.6% | 38.3% | 54.0% | 52.8% | 56.3% | 0.0% |
| TECH VIOL | 9.4% | 9.8% | 7.0% | 4.3% | 4.9% | 0.0% |
| NEW SENT | 7.1% | 7.4% | 5.0% | 4.8% | 3.5% | 0.0% |
| CRIM VIOL | 6.5% | 6.9% | 1.0% | 2.7% | 2.8% | 0.0% |
| NO PRISON READMIT | 32.1% | 32.1% | 29.0% | 31.7% | 29.9% | 100.0% |

34

AR-00000208

**Sex charges associated w/new prison sentences for the 28 offenders in the 1,229-offender group whose sex treatment score were higher than S1**

| Offender | DOC Sex Treatment Score | Statute | Sentence Offense |
|---|---|---|---|
| Offender 1 | 4 | 53A196D | POSSESSING CHILD PORNOGRAPHY  F |
| Offender 2 | 3 | 53A186 | PUBLIC INDECENCY  BM (2 Counts) |
| Offender 3 | 3 | 53A070 | SEXUAL ASSAULT, 1ST DEGREE       F |
| Offender 4 | 3 | 53A186 | PUBLIC INDECENCY          BM |
| Offender 5 | 3 | 53A088 | PROMOTING PROSTITUTION, 3RD DEGREE  DF |
| Offender 6 | 3 | 53A070 | SEXUAL ASSAULT, 1ST DEGREE  F  (2 counts) |
| Offender 7 | 3 | 53A186 | PUBLIC INDECENCY          BM |
| Offender 8 | 2 | 53A186 | PUBLIC INDECENCY  BM (3 Counts) |
| Offender 9 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR  F (2 counts) |
| Offender 10 | 3 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 11 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 12 | 2 | 53A196D | POSSESSING CHILD PORNOGRAPHY  F |
| Offender 13 | 2 | 53A186 | PUBLIC INDECENCY          BM |
| Offender 14 | 3 | 53A070 | SEXUAL ASSAULT, 1ST DEGREE        F |
| Offender 15 | 2 | 53A186 | PUBLIC INDECENCY          BM |
| Offender 16 | 3 | 53A070 | SEXUAL ASSAULT, 1ST DEGREE        F |
| Offender 17 | 2 | 53A186 | PUBLIC INDECENCY  BM (2 Counts) |
| Offender 18 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR  F |
| Offender 19 | 4 | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 20 | 3 | 53A071 | SEX ASSAULT, SECOND DEGREE    F |
| Offender 21 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR    F |
| Offender 22 | 3 | 53A071 | SEX ASSAULT, SECOND DEGREE    F |
| Offender 23 | 3 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 24 | 4 | 53A072A | SEXUAL ASSAULT, 3RD DEGREE   DF |
| Offender 25 | 2 | 53A072 | SEXUAL ASSAULT, 3RD DEGREE   DF |
|  |  | 53A070 | SEXUAL ASSAULT, 1ST DEGREE        F |
|  |  | 53A196F | ILL POSSESS CHILD PORN 3RD DEG    DF |
|  |  | 53A196A | EMPLOY MINOR IN OBSCENE PERFORMANCE AF |
| Offender 26 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR  F |
|  |  | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |
| Offender 27 | 3 | 53A196E | ILL POSSESS CHILD PORN 2ND DEG      F |
|  |  | 53A196 | OBSCENITY AS TO MINORS        F |
| Offender 28 | 3 | 53-021* | INJURY OR RISK OF INJURY TO MINOR  F |
|  |  | 53A073A | SEXUAL ASSAULT, 4TH DEGREE |

AR-00000209

## Summary of new prison sentences for sex crimes, by sex offender sub group

Sex-offenses, by crime type, resulting in new prison sentences

| Crime group | Offense | No prior sex arrest | Sex arrest history | No prior sex conviction | Sex conviction history | No sex-related DOC sentence | DOC sex releated sentence history | Last DOC sentence not sex-related | Last DOC sentence sex-related | Sex treatment score <2 | Sex treatment scores: 2 through 5 | All males |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sex assault 1 | SEXUAL ASSAULT, 1ST DEGREE  F | 17 | 5 | 21 | 1 | 22 | | 22 | | 16 | 6 | 22 |
| | SEXUAL ASSAULT 1ST DEGREE - AGGRVTD  F | 2 | | 2 | | 2 | | 2 | | 2 | | 2 |
| | RAPE, FIRST DEGREE  BF | | 1 | 1 | | 1 | | 1 | | | 1 | 1 |
| | Sub-total | 19 | 6 | 24 | 1 | 25 | 0 | 25 | 0 | 18 | 7 | 25 |
| Sex assault 2 | SEX ASSAULT, SECOND DEGREE  F | 19 | 4 | 22 | 1 | 22 | 1 | 22 | 1 | 21 | 2 | 23 |
| | RAPE, SECOND DEGREE  CF | 1 | | 1 | | 1 | | 1 | | 1 | | 1 |
| | Sub-total | 20 | 4 | 23 | 1 | 23 | 1 | 23 | 1 | 22 | 2 | 24 |
| Other sex assault | SEXUAL ASSAULT, 3RD DEGREE  DF | 2 | 3 | 2 | 3 | 2 | 3 | 2 | 3 | 2 | 3 | 5 |
| | SEXUAL ASSAULT, 4TH DEGREE | 11 | 9 | 17 | 3 | 17 | 3 | 18 | 2 | 16 | 4 | 20 |
| | Sub-total | 13 | 12 | 19 | 6 | 19 | 6 | 20 | 5 | 18 | 7 | 25 |
| Crimes against minors | INJURY OR RISK OF INJURY TO MINOR  F | 10 | 5 | 12 | 3 | 10 | 5 | 11 | 4 | 9 | 6 | 15 |
| | EMPLOY MINOR IN OBSCENE PERFORMANCE  AF | | 1 | 1 | | 1 | | 1 | | | 1 | 1 |
| | OBSCENITY TO MINORS  F | | 1 | | 1 | | 1 | 1 | | | 1 | 1 |
| | Sub-total | 10 | 7 | 13 | 4 | 11 | 6 | 13 | 4 | 9 | 8 | 17 |
| Prostitution related | PROSTITUTION  AM | 2 | 5 | 2 | 5 | 7 | | 7 | | 7 | | 7 |
| | PATRONIZING A PROSTITUTE  AM | 1 | | 1 | | 1 | | 1 | | 1 | | 1 |
| | PROMOTING PROSTITUTION, 2ND DEGREE  CF | 1 | | 1 | | 1 | | 1 | | 1 | | 1 |
| | PATRONIZING A PROSTITUTE FROM A MV | 1 | | 1 | | 1 | | 1 | | 1 | | 1 |
| | PROMOTING PROSTITUTION, 3RD DEGREE  DF | 4 | | 4 | | 4 | | 4 | | 3 | 1 | 4 |
| | Sub-total | 9 | 5 | 9 | 5 | 14 | 0 | 14 | 0 | 13 | 1 | 14 |
| Child pornography | POSSESSING CHILD PORNOGRAPHY  F | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | | 2 | 2 |
| | ILL POSSESS CHILD PORN 3RD DEG  DF | 3 | 1 | 4 | 1 | 4 | | 4 | | 3 | 1 | 4 |
| | ILL POSSESS CHILD PORN 2ND DEG  F | | 1 | | 1 | | 1 | 1 | | | 1 | 1 |
| | Sub-total | 4 | 3 | 5 | 2 | 5 | 2 | 6 | 1 | 3 | 4 | 7 |
| Indecency/voyeurism | PUBLIC INDECENCY  BM | 6 | 11 | 11 | 6 | 14 | 3 | 17 | | 6 | 11 | 17 |
| | Sub-total | 6 | 11 | 11 | 6 | 14 | 3 | 17 | | 6 | 11 | 17 |
| Total | | 81 | 48 | 104 | 25 | 111 | 18 | 118 | 11 | 89 | 40 | 129 |
| Offenders in group | | 13,003 | 1,395 | 13,502 | 896 | 13,652 | 746 | 13,975 | 423 | 13,169 | 1,229 | 14,398 |

AR-00000210

## General criminality among offenders who were released in 2005

Slightly more than 5% of the 14,398 male sentenced offenders who left Connecticut prisons in 2005 had ever served a prison sentence in the state for a sex-related offense.  Among the prisoners who left prison in 2005, 49.4% had served at least one sentence for violating the terms of their probation.  Forty-six percent (46%) of offenders had served time in prison for a drug charge.   Nineteen percent (19%) of

| Sentences by major offense type, 2005 release cohort | | |
|---|---|---|
| | Males | Rate: |
| Sentenced offender | 14398 | 100.0% |
| Violation of probation | 7,108 | 49.4% |
| Drug offenders | 6,622 | 46.0% |
| DUI offenses | 2,802 | 19.5% |
| Burglary charges | 2,304 | 16.0% |
| Robbery 1 or Robbery 2 | 1,101 | 7.7% |
| Viol. of a restrain. or prot. order | 747 | 5.2% |
| Any sex-related offense | 746 | 5.2% |
| Sex assault 1 or Rape | 195 | 1.4% |
| Illegal sexual contact - minor | 196 | 1.4% |

offenders released in 2005 had served a prior sentence for driving under the influence of alcohol or drugs.  Among the 746 offenders who had ever served a sentence for a sex-related offense, 195 had been convicted for Sexual Assault 1 or Rape.  One hundred ninety-six (196) had been convicted for Illegal sexual contact with a minor (Risk of Injury 53-021*).

The sentence histories of offenders that had ever been convicted for one of three specific sex crimes (Sex Assault 1, Risk of Injury to a Minor (sexual), and Public Indecency) were analyzed to determine whether significant differences could be detected in the general pattern of non-sexual criminal activity between different sex offender types.  Conviction for one of these offenses was used as a proxy to distinguish rapists from child molesters and non-contact exhibitionists.  The analysis did identify significant differences in the overall pattern of criminality for different offender types.

Among the 35 offenders who had been convicted for public indecency (exhibitionists) the incidence of drug- or alcohol-related offenses was much higher than for the other two groups.  Exhibitionists also had the highest rates of sentencing for Violations of Probation (80%).  Among the 195 offenders who had been convicted for Sex Assault 1 (rapists), 29.2% had also served a prison sentence for a burglary-related crime; 13.3% had served a sentence for robbery.  The high incidence of burglaries and robberies among this group indicates both a heightened willingness to use force and overstep boundaries.  Among

| Offenses in common among 746 offenders with a sentence history invoving a sex crime | | | | | | |
|---|---|---|---|---|---|---|
| | Risk of injury to a minor (sexual) | Risk of injury to a minor (sexual), % | Sexual assault 1 | Sexual assault 1, % | Public indecency | Public indecency, % |
| Offenders with sentence histories for | 196 | 100.0% | 195 | 100.0% | 35 | 100.0% |
| Drug offenses | 24 | 12.2% | 53 | 27.2% | 11 | 31.4% |
| DUI offenses | 13 | 6.6% | 20 | 10.3% | 5 | 14.3% |
| Burglary offenses | 8 | 4.1% | 57 | 29.2% | 6 | 17.1% |
| Robberies | 5 | 2.6% | 26 | 13.3% | 0 | 0.0% |
| Violation of probation | 68 | 34.7% | 115 | 59.0% | 28 | 80.0% |
| Court order violation* | 4 | 2.0% | 5 | 2.6% | 2 | 5.7% |

offenders convicted for Risk of Injury to a Minor (sexual), only 4.1% had served sentences for burglary and only 2.6% has been convicted of a robbery.  Among the entire population of male prisoners released in 2005, 16% had been convicted of burglary-related charges and less than 8% had been convicted for a robbery.

37

AR-00000211

## Sex offenders, parole and special parole

**The use of special parole for sex offenders in 2005**

| | Offenders in group | Offenders discharged to special parole in 2005 | Sex offenders discharged to special parole in 2005 | Sex offenders as a percent of offenders discharged to special parole | Percentage of sex offenders discharged to special parole |
|---|---|---|---|---|---|
| Prior arrest on a sex-related charge | 1395 | 358 | 38 | 10.6% | 2.7% |
| Prior conviction on a sex-related charge | 896 | 358 | 31 | 8.7% | 3.5% |
| Any prior sex-related sentence | 746 | 358 | 31 | 8.7% | 4.2% |
| Last sentence on a sex-related charge | 423 | 358 | 15 | 4.2% | 3.5% |
| Sex Treatment score 2 through 5 | 1229 | 358 | 43 | 12.0% | 3.5% |
| Any Sex offender flag | 1712 | 358 | 52 | 14.5% | 3.0% |

In 2005, 1,776 offenders were released from prison to parole.  Less than 10% of all offenders release to parole had sex treatment scores higher than 1.  The following table shows the remand rates for offenders by their DOC Sex treatment scores.

**Parolee prison readmits by DOC Sex Treatment Score, first prison readmission**

| | | DOC Sex treatment score | | | | |
|---|---|---|---|---|---|---|
| First prison readmit | Released to parole in 2005* | S:1 | S:2 | S:3 | S:4 | S:2 through S:4 |
| Technical violation | 413 | 370 | 5 | 34 | 4 | 43 |
| Criminal violation | 388 | 364 | 1 | 21 | 2 | 24 |
| Readmit - pre-trial | 359 | 324 | 3 | 24 | 8 | 35 |
| Absconder returned | 115 | 106 | 1 | 7 | 1 | 9 |
| New prison sentence | 47 | 45 | | 1 | 1 | 2 |
| No readmission w/in 5 years | 424 | 384 | 1 | 29 | 10 | 40 |
| All other retuns | 30 | 27 | 0 | 2 | 1 | 3 |
| Total | 1776 | 1620 | 11 | 118 | 27 | 156 |
| First prison readmit, % | | | | | | |
| Technical violation | 23.3% | 22.8% | 45.5% | 28.8% | 14.8% | 27.6% |
| Criminal violation | 21.8% | 22.5% | 9.1% | 17.8% | 7.4% | 15.4% |
| Readmit - pre-trial | 20.2% | 20.0% | 27.3% | 20.3% | 29.6% | 22.4% |
| Absconder returned | 6.5% | 6.5% | 9.1% | 5.9% | 3.7% | 5.8% |
| New prison sentence | 2.6% | 2.8% | 0.0% | 0.8% | 3.7% | 1.3% |
| No readmission w/in 5 years | 23.9% | 23.7% | 9.1% | 24.6% | 37.0% | 25.6% |
| All other retuns | 1.7% | 1.7% | 0.0% | 1.7% | 3.7% | 1.9% |
| Total, % | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

*Two offenders released to parole had no sex treatment scores. Neither was readmitted.*

AR-00000212

## Age at first arrest for a sex crime

All prior arrest records for the entire 2005-release cohort was collected and analyzed to determine whether any relationship existed between the offender's age and the crime type.  The data was used to identify the first sex offense-related arrest in each offender's criminal history.  The data was then grouped comparing the age distribution of offenders by offense type.

**Age at first arrest for a sex crime, by arrest charge**

| Age at first sex crime arrest | Arrest charge | | | | | |
|---|---|---|---|---|---|---|
| | Sex Assault 1 | Sex assault 2 | Sex Assault 4 | Ill. Sexual Contact | Sex crimes against minors, grouped* | Public Indecency |
| 10 to 14 | 7 | 1 | 4 | 5 | 6 | 0 |
| 15 to 19 | 81 | 80 | 78 | 91 | 149 | 16 |
| 20 to 24 | 90 | 61 | 60 | 56 | 100 | 18 |
| 25 to 29 | 63 | 23 | 34 | 28 | 53 | 22 |
| 30 to 34 | 66 | 18 | 41 | 31 | 60 | 33 |
| 35 to 39 | 48 | 17 | 35 | 30 | 52 | 17 |
| 40 to 44 | 19 | 8 | 25 | 20 | 39 | 18 |
| 45 to 49 | 4 | 4 | 11 | 6 | 9 | 6 |
| 50 to 54 | 5 | 4 | 9 | 10 | 17 | 1 |
| 55 to 59 | 2 | 0 | 4 | 5 | 7 | 1 |
| 60 to 64 | 2 | 1 | 2 | 4 | 8 | 0 |
| 65 and older | 0 | 1 | 3 | 3 | 5 | 2 |
| Total | 387 | 218 | 306 | 289 | 505 | 134 |
| Under 25 | 178 | 142 | 142 | 152 | 255 | 34 |
| Under 25, % | 46% | 65% | 46% | 53% | 50% | 25% |
| 25 to 39 | 177 | 58 | 110 | 89 | 165 | 72 |
| 25 to 39, % | 46% | 27% | 36% | 31% | 33% | 54% |
| Over 39 | 32 | 18 | 54 | 48 | 85 | 28 |
| Over 39, % | 8% | 8% | 18% | 17% | 17% | 21% |

*\* Includes illegal sexual contact,  sex assault 1- minor, sex assault 2 - minor, sex assault 4 - minor, enticing a minor & promoting or employing a minor in an obscene performance*

Public Indecency was the only sexual offense where men under the age of 25 made up less that 45% of the offenders.  Sixty-five percent of men accused of Sexual Assault 2 were under the age of 25.  The data is based on the criminal arrest histories of the 1,395 offenders who had a prior arrest for a sex-related offense.

Among offenders arrested for Sexual Assault 1, the peak age group was between the ages of 20 to 24.  Among offenders arrested for Sexual Assault 2, the peak age group was 15 to 19.  The 15 to 19 age group was also the peak age group among offenders arrested for crimes against children.  Among offenders arrested for public indecency – the peak age group was 30 to 34.

AR-00000213

## Age at first sex offense resulting in a prison sentence

Seven hundred forty-six men (746) left prison in 2005 who had served at least one sentence for a sex offense in their past.  Almost half (47%) had committed the offense as young men under the age of 25.  Only 8% were over the age of 39 when they committed the crime that resulted in a prison sentence.

While most sentenced sex-offenders were sentenced to prison for their sex offenses as young men, the sentenced sex offenders who left prison in 2005 were significantly older.  Only 20% percent of sex offenders who left prison in 2005 were younger than 25.  There are two reasons for this disparity 1) men who commit serious sexual crimes generally receive long sentences, and 2) many offenders with a sex sentence history continue to return to prison for new, non-sexual crimes.  Among the 746 offenders identified here, only 423 were completing a sentence for a sex crime when they were released in 2005.

**Age at first sex offense resulting in a prison sentence and age at 2005 release, 746 sex offenders**

|            | Age at first offense | Age at first offense, % | Age at 2005 release | Age at 2005 release, % |
|------------|------|------|------|------|
| 10 to 14   | 9    | 1%   | 0    | 0%   |
| 15 to 19   | 182  | 24%  | 24   | 3%   |
| 20 to 24   | 164  | 22%  | 125  | 17%  |
| 25 to 29   | 106  | 14%  | 89   | 12%  |
| 30 to 34   | 106  | 14%  | 81   | 11%  |
| 35 to 39   | 77   | 10%  | 120  | 16%  |
| 40 to 44   | 47   | 6%   | 129  | 17%  |
| 45 to 49   | 23   | 3%   | 90   | 12%  |
| 50 to 54   | 12   | 2%   | 38   | 5%   |
| 55 to 59   | 9    | 1%   | 24   | 3%   |
| 60 to 64   | 4    | 1%   | 11   | 1%   |
| 65 and olde| 5    | 1%   | 15   | 2%   |
| No data    | 2    | 0%   |      | 0%   |
|            | 746  | 100% | 746  | 100% |



Age at first sex offense resulting in a prison sentence
746 offenders with a sex-related sentence history



Age at 2005 release, 746 offenders with a sex-related sentence history

40

AR-00000214

## The Connecticut Risk Assessment Board

**Sec. 54-259a. Risk Assessment Board. Development and use of risk assessment scale. Report.** (a) There is established a Risk Assessment Board consisting of the Commissioner of Correction, the Commissioner of Mental Health and Addiction Services, the Commissioner of Public Safety, the Chief State's Attorney, the Chief Public Defender, the chairperson of the Board of Pardons and Paroles, the executive director of the Court Support Services Division of the Judicial Department and the chairpersons and ranking members of the joint standing committees of the General Assembly having cognizance of matters relating to the judiciary and public safety, or their designees, a victim advocate with experience working with sexual assault victims and sexual offenders appointed by the Governor, a forensic psychiatrist with experience in the treatment of sexual offenders appointed by the Governor and a person trained in the identification, assessment and treatment of sexual offenders appointed by the Governor.

(b) The board shall develop a risk assessment scale that assigns weights to various risk factors including, but not limited to, the seriousness of the offense, the offender's prior offense history, the offender's characteristics, the availability of community supports, whether the offender has indicated or credible evidence in the record indicates that the offender will reoffend if released into the community and whether the offender demonstrates a physical condition that minimizes the risk of reoffending, and specifies the risk level to which offenders with various risk assessment scores shall be assigned.

(c) The board shall use the risk assessment scale to assess the risk of reoffending of each person subject to registration under this chapter, including incarcerated offenders who are within one year of their estimated release date, and assign each such person a risk level of high, medium or low.

(d) The board shall use the risk assessment scale to determine which offenders should be prohibited from residing within one thousand feet of the real property comprising a public or private elementary or secondary school or a facility providing child day care services, as defined in section 19a-77.

(e) Not later than October 1, 2007, the board shall submit a report to the joint standing committee of the General Assembly on the judiciary in accordance with section 11-4a setting forth its findings and recommendations concerning: (1) Whether information about sexual offenders assigned a risk level of high, medium or low should be made available to the public through the Internet; (2) the types of information about sexual offenders that should be made available to the public through the Internet which may include, but not be limited to, (A) the name, residential address, physical description and photograph of the registrant, (B) the offense or offenses of which the registrant was convicted or found not guilty by reason of mental disease or defect that required registration under this chapter, (C) a brief description of the facts and circumstances of such offense or offenses, (D) the criminal record of the registrant with respect to any prior convictions or findings of not guilty by reason of mental disease or defect for the commission of an offense requiring

41

registration under this chapter, and (E) the name of the registrant's supervising correctional, probation or parole officer, and contact information for such officer; (3) whether any of the persons assigned a high risk level by the board pursuant to subsection (c) of this section meets the criteria for civil commitment pursuant to section 17a-498; (4) whether additional restrictions should be placed on persons subject to registration under this chapter such as curfews and intensive monitoring on certain holidays; (5) whether persons convicted of a sexual offense who pose a high risk of reoffending should be required to register under this chapter regardless of when they were convicted or released into the community; and (6) whether persons determined to be guilty with adjudication withheld in any other state or jurisdiction of any crime the essential elements of which are substantially the same as any of the crimes specified in subdivisions (2), (5) and (11) of section 54-250 should be required to register under this chapter.

## Special Management Unit – DOC Community Services Division

The Parole and Community Services Division's Special Management Unit (SMU) is responsible for the statewide supervision of approximately 225 paroled sex offenders.  The unit employs a comprehensive multidisciplinary approach to manage this population with a mission to protect the public and increase the likelihood of successful reintegration for offenders requiring specialized supervision and treatment for problem sexual behavior.  Since 2005, the unit has experienced a doubling of its supervised sex offender population, primarily due to a steady increase in special parole cases.  In response, the unit's staffing levels were also doubled over the past five years from five parole officers to the current compliment of ten.

These specially trained parole officers collaborate closely with key stakeholders to form supervision teams to advance collective public safety goals.  These stakeholders include sex offender treatment providers and polygraph examiners from The Connection Inc., Center for the Treatment of Problem Sexual Behavior; victim advocates from Connecticut Sexual Assault Crisis Services; state police from the Connecticut State Police Sex Offender Registry Unit and Computer Crime Unit; and local law enforcement responsible for matters relating to registered sex offenders and sexual assault investigations.

The specialized techniques and interventions utilized by SMU include the use of validated sex offender risk assessments; individualized case management plans; offense specific cognitive-behavioral sex offender treatment; intensive supervision strategies including frequent compliance checks, search and seizure, GPS monitoring, and surveillance; toxicology testing; registration and notification; victim advocacy; computer monitoring and computer forensic examinations.

SMU officers routinely conduct compliance checks with local law enforcement in jurisdictions throughout the state to monitor adherence to sex offender registration requirements, parole conditions, and sex offender treatment restrictions.  Parole officers and police visit sex offenders at

AR-00000216

their residence and place of employment.  During these compliance checks, SMU officers assess offenders for the presence or absence of dynamic risk factors related to sexual offending.

Cognitive-behavioral sex offender treatment is an empirically validated intervention required of the offenders supervised by SMU.  This approach has been shown to produce favorable reductions in sexual and general recidivism when combined with parole supervision.  Groups are held in numerous locations throughout the state including district parole offices in Hartford, New Haven, Waterbury, and Bridgeport.

SMU's intensive supervision model includes monitoring an average of 90 sex offenders with Global Positioning System (GPS) technology.  Active GPS units are used exclusively to enhance supervision and afford parole officers the ability locate offenders in a timely manner.  GPS tracking information is routinely shared with law enforcement for investigations.

  Stable housing is recognized by SMU as critical to the successful reintegration of sex offenders.  Housing instability has been widely shown to increase general and sexual recidivism.  While the placement of sex offenders remains a constant challenge for this unit, no sex offenders have been placed in homeless shelters in the past five years while under SMU supervision.

## The Collaborative Model in Connecticut

Connecticut has become a national leader in developing and implementing a systemic, collaborative approach to the management and treatment sexual offenders in the community.  This approach links state supervising agencies (CSSD's Office of Adult Probation and DOC's Office of Parole), victim advocates (CONNSACS) and a non-profit provider of sex offender treatment and programming (The Connection, Inc.) in the design and oversight of a supervision plan for each offender.

The primary parties in this collaborative approach include: the supervising officer, the evaluator/treatment provider, a polygraph examiner and a victim advocate.  Each of the party brings unique expertise and perspective to the collaboration, which greatly helps enhance offender supervision and community safety.

**Supervising Officers:**  Probation and Parole officers have special training and experience in supervising sexual offenders.  Some of their roles include regular office and field visits, social support meetings, employment and residency approvals, monitoring compliance with sex offender registry and imposing of alternative sanctions when needed.

**Evaluator/Therapist:**  The evaluators provide risk assessments using the most advanced risk assessment tools and protocols.  This information is then used by the treatment providers to decide on the intervention that will address the risk factors specific to each client.

**Polygraph Examiners:**  Polygraph examiners are trained in Post Conviction Sex Offender Testing (PCSOT).  The typical sexual offender receives a minimum of one polygraph every six months in one of the three types of exams, which include: 1) Sexual Offense History; 2) Denial of convicted sexual crime; and 3) Compliance with supervision standards (called a Maintenance exam).

43

**Victim Advocates:** Victim Advocates provide beneficial information to the victim and victim's family.  Some examples include: notification and support services to victims when offenders are released onto parole and/or probation and appropriate referrals for services for victims and offender family members.

While it is the sole authority of the supervising officer to make decisions regarding housing placement, offender employment, appropriate social contacts, etc., each team member contributes information that contributes to the decision making process.

44

# Glossary

**CMHC** – Correctional Managed Health Care, the CT DOC contracts with the University of Connecticut to provide health service for its prisoners.  For over a decade CMHC has provided sex-offenders treatment and assessment services in Connecticut's prisons.

**The Connection** – The Connection, Inc. is a Connecticut non-profit organization that provides a wide range of programs and services in the state.  The agency provides assessments, treatment and programs for sex offenders under the supervision of the offices of adult probation and parole.

**CONNSACS** – Acronym for Connecticut Sexual Assault Crisis Services, a statewide coalition of individual sexual assault crisis programs.  In addition to providing victim assistance, community education and public policy advocacy, CONNSACS works closely with the offices of Parole and Probation to insure the voice of the victim is present in issues relating to sex offenders in the state.

**Discharge from prison** – Prisoners "discharge" from prison at the completion of their prison sentence.  Prisoners who leave prison but remain under the supervision of Department of Correction, in a community program, are said to have been released.

**EOS** – Acronym for end-of-sentence.  Prisoners who reach the end of their sentences are discharged.

**Paraphilias** – Conditions where an individual becomes sexually aroused or gratified by fantasizing about or engaging in behavior that is atypical or extreme.  Common paraphilias include exhibitionism, fetishism, frotteurism and necrophilia.  In the past paraphilias were referred to as perversions.

**Parole** – Parole is a discretionary release program available to most prisoners serving sentences greater than two years.  Depending on the crime, parole-eligible offenders must serve at least 50% or, in the case of a violent offense, 85% of their sentence.  Perspective parolee cases are considered by three-member panels conducted by the Board of Pardons and Parole.  Offenders on parole are supervised by parole officers who have the authority remand them to prison for violating the conditions of their release.

**Probation** – Probation is a court-mandated and court-supervised form of community supervision for offenders.  An offender may be sentenced to a term of probation in lieu of a prison sentence or the court may order a split-sentence, which involves a term of incarceration followed by a period of probation.  Unlike parole officers, probation officers are required to return the offender to court before a probationer can be remanded to prison.  Violation of Probation (53a-032) is the most common charge among prisoners incarcerated in the state's prisons.

**Public indecency (Sec. 53a-186: Class B misdemeanor)** A person is guilty of public indecency when he performs any of the following acts in a public place:
1. An act of sexual intercourse as defined in subdivision (2) of section 53a-65; or
2. a lewd exposure of the body with intent to arouse or to satisfy the sexual desire of the person; or

AR-00000219

   3.  a lewd fondling or caress of the body of another person. For the purposes of this section, "public place" means any place where the conduct may reasonably be expected to be viewed by others.

**Recidivism** – for the purposes of this study, four general measures of recidivism will be considered: 1) new arrests 2) new convictions 3) any reincarceration, and 4) returns to prison with a new prison sentence.  For arrests, convictions and new prison sentences, separate recidivism rates will be considered for any new offenses, VOP-related offenders, SOR-related offenses, and new sex offenses.

**Release from prison** – Prisoners who leave prison but remain under the supervision of Department of Correction, in a community program, are said to have been released.  Prisoners who have completed their prison sentences are said to have discharged.

**Remand** – Offenders who are completing their prison sentences in the community, under the supervision of the DOC Parole Division, are required to abide by a variety of general and specific conditions governing their community release.  Violation of these conditions can result in an immediate return to prison, potentially, until the end of the offender's prison sentence. Offenders who are returned t prison in this way are said to be remanded.

**Injury or risk of injury to, or impairing morals of, children. Sale of children ( Sec. 53-21.)** Any person who

1. willfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or
2. has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child, or
3. permanently transfers the legal or physical custody of a child under the age of sixteen years to another person for money or other valuable consideration or acquires or receives the legal or physical custody of a child under the age of sixteen years from another person upon payment of money or other valuable consideration to such other person or a third person, except in connection with an adoption proceeding that complies with the provisions of chapter 803, shall be guilty of a class C felony for a violation of subdivision (1) or (3) of this subsection and a class B felony for a violation of subdivision (2) of this subsection In the criminal justice system, the Risk of Injury charge has two parts: one (Subsection 2) contains a sexual criminal component.  Persons convicted on for subsection 2 are required to register with the Sex Offender Registry.  In DOC data systems, subsection 2 of this statute is coded as 53-021* - Injury or Risk of Injury to Minor.

**Sexual assault in the first degree (Sec. 53a-70: Class B felony)** A person is guilty of sexual assault in the first degree when such person

1. compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or

AR-00000220

against a third person which reasonably causes such person to fear physical injury to such person or a third person, or

2. engages in sexual intercourse with another person and such other person is under 13 years of age and the actor is more than two years older than such person, or
3. commits sexual assault in the second degree as provided in section 53a-71 and in the commission of such offense is aided by two or more other persons actually present, or
4. engages in sexual intercourse with another person and such other person is mentally incapacitated to the extent that such other person is unable to consent to such sexual intercourse.

**Sexual assault in the second degree (Sec. 53a-71: Class C felony)** A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and:

1. Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person; or
2. such other person is mentally defective to the extent that such other person is unable to consent to such sexual intercourse; or
3. such other person is physically helpless; or
4. such other person is less than eighteen years old and the actor is such person's guardian or otherwise responsible for the general supervision of such person's welfare; or
5. such other person is in custody of law or detained in a hospital or other institution and the actor has supervisory or disciplinary authority over such other person; or
6. the actor is a psychotherapist and such other person is (A) a patient of the actor and the sexual intercourse occurs during the psychotherapy session, (B) a patient or former patient of the actor and such patient or former patient is emotionally dependent upon the actor, or (C) a patient or former patient of the actor and the sexual intercourse occurs by means of therapeutic deception; or
7. the actor accomplishes the sexual intercourse by means of false representation that the sexual intercourse is for a bona fide medical purpose by a health care professional; or
8. the actor is a school employee and such other person is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor.

**Sexual assault in the third degree (Sec. 53a-72a: Class D felony)** A person is guilty of sexual assault in the third degree when such person

1. compels another person to submit to sexual contact (A) by the use of force against such other person or a third person, or (B) by the threat of use of force against such other person or against a third person, which reasonably causes such other person to fear physical injury to himself or herself or a third person, or
2. engages in sexual intercourse with another person whom the actor knows to be related to him or her within any of the degrees of kindred specified in section 46b-21.

**Sexual assault in the fourth degree (Sec. 53a-73a.: Class A misdemeanor)** A person is guilty of sexual assault in the fourth degree when:

1. Such person intentionally subjects another person to sexual contact who is (A) under fifteen years of age, or (B) mentally defective or mentally incapacitated to the extent that he is unable to consent to such sexual contact, or (C) physically helpless, or (D) less than eighteen years old and the actor is such person's guardian or otherwise responsible for the general

AR-00000221

supervision of such person's welfare, or (E) in custody of law or detained in a hospital or other institution and the actor has supervisory or disciplinary authority over such other person; or

2. such person subjects another person to sexual contact without such other person's consent; or

3. such person engages in sexual contact with an animal or dead body; or

4. such person is a psychotherapist and subjects another person to sexual contact who is (A) a patient of the actor and the sexual contact occurs during the psychotherapy session, or (B) a patient or former patient of the actor and such patient or former patient is emotionally dependent upon the actor, or (C) a patient or former patient of the actor and the sexual contact occurs by means of therapeutic deception; or

5. such person subjects another person to sexual contact and accomplishes the sexual contact by means of false representation that the sexual contact is for a bona fide medical purpose by a health care professional; or such person is a school employee and subjects another person to sexual contact who is a student enrolled in a school in which the actor works or a school under the jurisdiction of the local or regional board of education which employs the actor.

**Sex crimes statutes in CT –** Descriptions of state criminal statutes and jury instructions for sex crimes are available on the Judicial Branch website at: *http://jud.ct.gov/ji/Criminal/part7/Default.htm*

**SOR - Sex Offender Registry** - The Department of Emergency Services & Public Protection maintains the internet-based registry.  Offenders are required to register with the State Police if they have been convicted for offenses identified by the CT Legislature.  More information on CT's SOR is available on-line at: *http://www.ct.gov/dps/cwp/view.asp?Q=471430&A=11*

**Sex Treatment Scores** - The DOC assigns a sex treatment score to each sentenced prisoner in the system.  Scores range from 1 to 5.  Sex treatment scores were developed to assist the DOC in managing offenders while they are incarcerated.  Scores are based on the offender's sexual criminal history including conviction records, police reports, pre-sentence investigation reports and DOC sources.  The scores are not intended for use as diagnostic scores.  For a full explanation of DOC Sex treatment Scores can be viewed on page 35 of the DOC Classification Manual available on-line at the CT DOC website.

**Sex Treatment Score: S1** – A sex treatment score of S1 means that the offender has no current conviction, pending charges or identified history of sexual offenses.

**Sex Treatment Score: S2** – Offender has a current conviction, pending charges or a known history of non-contact sexual offenses.  These behaviors may include: exhibitionism; use, sale or possession of child pornography; promoting the prostitution of a minor, obscene telephone calling, voyeurism, or other paraphilias.

**Sex Treatment Score: S3** – Offender has a current conviction, pending charges or a known history of sexual offenses involving physical contact with the victim.  Offenses may include coercion, manipulation and exploitation.  An inmate who engages in predatory sexual behavior while incarcerated will be given a score of S3.

AR-00000222

**Sex Treatment Score: S4** – Offender has a current conviction, pending charges or a known history of two or more sexual offenses involving physical contact.  This score is assigned to offenders who have perpetrated two or more assaults on two or more victims.  Physical violence may or may not have played a role in the sexual assaults.

**Sex Treatment Score: S5** – Offender has a current conviction, pending charges or a known history of a contact sexual offenses involving gratuitous or sadistic violence.  An offender may also be classified with an S-5 score based on a clinical assessment using the HARE Psychopathy Scale.

**SMU** – Sex Offender Management Unit at the DOC Office of Parole and Community Services oversees the supervision of sex offenders who are released to parole in the state.  SMU parole officers have reduced caseloads that allow for enhanced oversight.

**Static-99** – is a 10-item actuarial assessment instrument that is widely used to assess risk among adult male sex-offenders.  As a static assessment instrument offender scores do not change significantly over time.  Dynamic assessment tools are critical in monitoring changes in the specific factors that may drive criminal behavior.

**TS** – An acronym for Transitional Supervision, a discretionary community supervision program for offenders serving sentences of two years or less.  A TS-eligible offender can be released from prison after completing 50% of their sentence if they have an approved sponsor and an appropriate residence to return to.

**VOP** – Violation of probation (See Probation)

49

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Aug 28, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |          Share ▾

---

Comment

The Issue of The OAG's Interpretation of SORNA proposal OAG 157. 1. Expressly OAG by a summary statement improperly assumes continuous authority to change the law because the Act (Legislative Branch) "gave" the OAG (Executive Branch) the authority to interpret (Judiciary Branch) and implement the law.i 2. In the Overview, OAG restates the "dual" purpose of SORNA (SORNA has a dual character, imposing registration obligations on sex offenders as a matter of Federal law that are federally enforceable under circumstances supporting Federal jurisdiction, see 18 U.S.C. 2250, and providing minimum national standards that non-Federal jurisdictions are expected to incorporate in their sex offender registration and notification programs, subject to a reduction of Federal funding for those that fail to do so, see 34 U.S.C. 20912(a), 20926–27.) in order to improperly assert and extend authority of OAG to impose and enforce registration obligations in both Federal and non-Federal jurisdictions.ii 3. OAG further improperly assumes or extends the authority to create Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking ("SMART Office") to administer the national standards for sex offender registration and notification under SORNA and assists all jurisdictions in implementing the SORNA standards in their programs, operates the Dru Sjodin National Sex Offender Public website, www.nsopw.gov, which provides public access through a single national site to the information about sex offenders posted on the public sex offender websites of the various registration jurisdictions, regardless those jurisdiction's rejection of SORNA or non-compliance with SORNA expectations for their jurisdictions.iii 4. Other than the basic flaws cited above rising to the level of Constitutional violations of division of powers and improper extension of authority over non-Federal jurisdictions that have not agreed to comply with SORNA, the following comments are made regarding the punitive nature of SORNA and SMART Office, the heavy burden without added value upon non-Federal noncomplying jurisdictions, and the lack of restorative justice objectives. a. The OAG's interpretation of SORNA proposes that persons previously convicted of a criminal offense that included a sexual component have no expectation of privacy neither during nor following a punishment judgment, particularly by the requirement to involuntarily register publicly, b. Nor have a liberty interest which could not be taken without due process, particularly residency restrictions, travel restrictions, and employment or business restrictions. c. The OAG's interpretation of SORNA proposes minimum national "standards" that create an additional heavy burden on individual states, often in

AR-00000224

conflict with that jurisdiction's own determinations for terms of punishment considering mitigating circumstances, and rehabilitation of offenders. d. The OAG's interpretation of SORNA provides no added value to non-complying jurisdictions because the national sex offender registry contains effectively only a list of persons least likely to reoffend. A better solution for the benefit of protection is a restorative justice approach that deals directly with the root causes of sexual offending, and a public education system to teach the cure and limit motivations to offend. iFederal Register / Vol. 85, No. 157 / Thursday, August 13, 2020 / Proposed Rules 49332, DEPARTMENT OF JUSTICE, Office of the Attorney General, 28 CFR Part 72 [Docket No. OAG 157; AG Order No. 4759– 2020] RIN 1105–AB52, Registration Requirements Under the Sex Offender Registration and Notification Act AGENCY: Department of Justice. ACTION: Proposed rule. SUMMARY ii Federal Register / Vol. 85, No. 157 / Thursday, August 13, 2020 / Proposed Rules 49332, DEPARTMENT OF JUSTICE, Office of the Attorney General, 28 CFR Part 72 [Docket No. OAG 157; AG Order No. 4759– 2020] RIN 1105–AB52, Registration Requirements Under the Sex Offender Registration and Notification Act AGENCY: Department of Justice. ACTION: Proposed rule. Overview iii Federal Register / Vol. 85, No. 157 / Thursday, August 13, 2020 / Proposed Rules 49332, DEPARTMENT OF JUSTICE, Office of the Attorney General, 28 CFR Part 72 [Docket No. OAG 157; AG Order No. 4759– 2020] RIN 1105–AB52, Registration Requirements Under the Sex Offender Registration and Notification Act AGENCY: Department of Justice. ACTION: Proposed rule. Overview

**Comment ID**

DOJ-OAG-2020-0003-0061

 **Tracking Number**

ked-llsf-p651

**Comment Details**                                    Submitter Info

**Received Date**

Aug 27, 2020



AR-00000225

Regulations.gov

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000226

8/4/23, 11:00 AM                                                           Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 1, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

Comment

Murders of Registered Person Directly Attributed to the Public Registry/ SORNA:

There have been nearly 200 Registrants, loved ones of Registrants, or people mistaken for Registrants murdered by vigilantes who used the registry as motivation for murder. Here are just a few of them murdered by the registry:

7/2/20, Lebanon, MO: Dustin Lee Combs murdered Mark Pitts; Combs' brother told investigators that in the past, Combs said, all child molesters should be killed.

5/6/20, Omaha NE: James Fairbanks murdered Mattieo Condoluci; Fairbanks used registry info and egged on me Facebook vigilante group to choose his victim.

8/10/19, Modesto CA: Samuel Cervantes, Matthew Arguello, and Ruben Rosales beat an innocent homeless man to death after mistaking him for a registered person.

4/30/18, Sabine Co LA: Blake Joseph Kendall murdered Jerry W. Scott and Adam Jeter, 34. The state charged him with a hate crime because he targeted the men for being Registered Persons.

12/26/17, Las Vegas NV: Michael Thompson killed Alfred Wilheim because he hated Registered Persons; he killed Wilheim's girlfriend Rhonda Ballow because she was dating a Registrant.

6/7/17, Russellville KY: Lance D'Artagnan Lear killed Jerry Caudill by setting Caudell's house on fire. One of the juveniles interviewed told detectives that Lear had spoken of shooting or stabbing the man or burning down the house, and made reference to the victim being a pedophile.

8/29/16, Mt Pleasant UT: Raul Francisco Vidrio "confronts" Wesley Dee Nay about "being a pedophile" before killing him, then cut up and burned the body to conceal his crime.

AR-00000227

Regulations.gov

4/26/16, Doniphan MO: Matthew Brandon Bruce and Michael G "Mick" Harris murdered Jonathan Tarvin after one of their kids found Tarvin's info on the registry; they burned the body to conceal the crime.

6/8/14, Cullman AL: Jay Maynor attacked and murdered Raymond Brooks in his own home; Brooks had served time for a sex offense against Maynor's relative years ago but Maynor attacked Brooks only Maynor shot into a building full of kids after a spat with his daughter's boyfriend, who implied Maynor was a coward for not going after Brooks.

5/26/14, Fostoria OH: Charles Schaeffer, Shey L. Weiker, and Timothy D Hall used a road flare to state a fire that killed Daniel Marker Jr and his non-registrant girlfriend Tara Vance. The murderers tried justifying the crime by falsely accusing Marker of molesting one of their children.

4/3/14, Fresno CA: David Barrera and Patricia Perez murdered a longtime friend, Lawrence Ballesteros, after seeing the victim in the local media as part of a US Marshals compliance check operation.

7/22/13, Columbia SC: Neo-Nazi skinhead duo Jeremy and Christine Moody used the registry to select their murder victims Charles Parker and his non-registrant wife, Gretchen. The Moodys wrote a manifesto in which they stated, ""The only cure for child abusers and molesters is to have every member of their immediate family killed. These nefarious crimes and people should not be allowed to procreate. By destroying their immediate family members, you purify the blood line. This is the only way to ensure that they (the pervert or family) cannot ever hurt a child again… I don't think my suggestion is immature, I think it's the only answer, and if you don't agree, then you two should be destroyed."

3/12/13, Augusta ME: Bruce King aka Bruce Heal murders registrant Lawrence J Lewis in an attempt to hide accusations of sexual abuse against him. King tried to claim it was Lewis who was molesting children and not him.

6/2/12, Port Angeles WA: Patrick Drum ambushed 2 registrants; when police caught him, he had plans to kill two more. Drum was a career criminal; one of his cellmates was Michael Anthony Mullen, who murdered two Registrants in 2005 in Bellingham WA.

12/2/11, San Juan Capistrano CA: Robert Eugene Vasquez bragged to police he ambushed Bobby Rainwater after his mother saw the registry flier and bragged he heard the victim's lungs pop when stabbing his back.

12/17/10, Las Vegas NV: George Casanova and James Fragala decided to murder David Morrison after they found a card left by the registry compliance officer, and later bragged about taking out a "chomo."

8/10/09, North Palm Springs CA: Steven Banister and Travis Martin Cody, self-avowed white supremacists, bragged about using the registry to target Edward Keeley and wanted to kill "homos and pedos."

6/2/2009, Pascagoula MS: Lee Craig confessed to police he hated Registrants and didn't consider his victim, Silas Miller, a human being; Craig has already shot Silas in a separate incident.

11/20/07, Lakeport CA: Ivan Garcia Oliver stabbed Michael Dodele 65 times because Oliver saw a registry flier and assumed Dodele was a child molester.

4/16/06          , Maine: Stephen A Marshall, a Canadian national, drove to the US and murdered 2 registrants;

AR-00000228

one of his victims was a teenager convicted for mutual relations with a classmate.

Repeal SORNA now!

**Comment ID**

DOJ-OAG-2020-0003-0062

 **Tracking Number**

kee-t4e9-owod

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 28, 2020



Your Voice in Federal Decision Making

About          Bulk Data Download          Agencies          Learn

(/about)          (/bulkdownload)          (/agencies)          (/learn)

Reports          FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)          (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/4/23, 12:08 PM                                        Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 1, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

Comment

it is absolutely unecessary to further punish sex offenders by substituting federal law for state statutes. The current statutes are already explicit enough to regulate and punish sex offenders without any additional regulation from the federal government. I also see this as an interference with the states rights to regulate and establish laws for the citizens of the state. So far the federal legisltion has not been retroactive and I have a ruling in the state court that declares it unconstitutional to enact any law that is retroactive to the time it is enacted, so this legislation my not stand the test of judicial review as written, therefore being a waste of time and resources when other pressing matters need your attention.

With the sincere hope that this argument find credance with all involved,

P.J.Bunty

**Comment ID**
DOJ-OAG-2020-0003-0063

 **Tracking Number**
1k4-9ino-o0om

**Comment Details**                                          Submitter Info

**Received Date**

AR-00000230

Regulations.gov

Aug 29, 2020



About   Bulk Data Download       Agencies     Learn

(/about)       (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000231

8/4/23, 11:02 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 1, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

I'm a pedophile and I would like to be able to vontarley request to be placed on the registered sex offender registry and I would like to be able to do that, you should have a way for pedophiles to voluntary request to be placed on the registered sex offender registry so pedophiles like me can voluntary be placed on the registered sex offender registry.

**Comment ID**

DOJ-OAG-2020-0003-0064

 **Tracking Number**

keg-k8kr-mc11

**Comment Details**                              **Submitter Info**

**Received Date**

Aug 29, 2020

AR-00000232



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000233

8/4/23, 12:10 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 1, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

Have you considered the innocent people that are on the registry ? You don't get it right every time. I know this for a fact. Over abusing your power has gotten way out of hand. Death threats to my ex wife who has done nothing . Stop the madness. This could all be ended if you kept the registry but made it private.

If you want to play fair, please lets make registry for every offense.
Every dirty cop / sheriff/ fbi agents / and the worst of the worst prosecutors.

Give me a break

It time we take America Back again.

**Comment ID**
DOJ-OAG-2020-0003-0065

 **Tracking Number**
1k4-9iof-sa60

**Comment Details**                                **Submitter Info**

**Received Date**
Aug 30, 2020

AR-00000234



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/4/23, 11:04 AM                                                     Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 1, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

Comment

These rule changes, as they pertain to the jurisdictions in which a registrant must report school attendance fails to take into account the vagaries of online learning and, as such, creates a catch-22. In today's learning environment it is not uncommon for individuals to attend college in an entirely online setting, never setting foot on campus or in a class room.

However colleges that offer these services do maintain physical campuses with physical addresses that fall under physical jurisdictions.

Many if not most of these jurisdictions require a registrant to appear in person to update place of education.

This creates a catch-22 nightmare in which registrant students attending online classes in a state they have never been to and do not intend to travel to must now travel to that state to register school attendance, even if they have no other reason to be in that state.

If the purpose of these guidelines are to know where a registrant will be present, then requiring a registrant to update registration in jurisdictions where he or she will not be physically present is counter productive to the purpose of the registry by crowding it with useless information.

For the sake of simplicity and to avoid the kafkaesque "gotcha" situations that these guidelines claim to want to avoid, it is in the best interest of public safety and tax dollar allocation to create an exception to jurisdiction in the case of online only education in which, if a registrant attends school ONLY via distant/online/correspondence learning, that location is not considered a jurisdiction for the purpose of these guidelines and the registrant is not required to update registration unless he or she attends classes in person.

AR-00000236

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0066

 **Tracking Number**

keh-uux6-ywtk

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Aug 30, 2020



Your Voice in Federal Decision Making

About | Bulk Data Download | Agencies | Learn
(/about) | (/bulkdownload) | (/agencies) | (/learn)

Reports | FAQ
(https://resources.regulations.gov/public/component/main?main=Reports) | (/faq)

Privacy & Security Notice (/privacy-notice)  |  User Notice (/user-notice)  |
Accessibility Statement (/accessibility)  |  Developers (https://open.gsa.gov/api/regulationsgov/)  |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000237

8/4/23, 12:09 PM                                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 1, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

Abolish the registry. It does not work, end of story.

I am a former victim of forcible rape at 15 years of age, and I am completely against the public registry. I welcome longer prison sentences, but the registry is destructive to the community and society as a whole. It is the very definition of cruel and unusual punishment, and it's collateral damage on our country is broad. The registry is the greatest travesty of our generation. The registry only exists and thrives upon fear, hate, and public hysteria. It does not create safety, just as studies have shown over the years, and has no ability to act as a deterrent. It serves to create a new class of individuals and oppress them, many of them innocent and pushed into plea deals due to the nearly unlimited power given to DAs to convict. The vast majority of registrants are considered low-risk, with most crimes being committed by those who were never on the registry. Ironically, those released from the registry show an even lower rate of recidivism than those who are kept on it. Use the facts. End the madness.

**Comment ID**
DOJ-OAG-2020-0003-0067

◎ **Tracking Number**
1k4-9ip2-ejwg

Comment Details                              Submitter Info

AR-00000238

**Received Date**

Aug 31, 2020



About   Bulk Data Download     Agencies     Learn

(/about)     (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 1, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

| Comment |
| --- |

My state released me from "any further duty to register" in 1989. Having to re-register will ruin my life after all these years! I have led an exemplary life since then. Please don't do this!

**Comment ID**
DOJ-OAG-2020-0003-0068

 **Tracking Number**
kej-5516-vzyj

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**
Aug 31, 2020

AR-00000240

Regulations.gov



Your Voice in Federal Decision Making

About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000241

8/4/23, 12:12 PM                                   Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 2, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

Comment

It is a miscarriage of justice that juveniles are forced to be on registries by certain States (Michigan) OUTSIDE OF FEDERAL GUIDELINES for LIFE. Michigans standards for lifetime registry go over and above federal guidelines. Scientific study after scientific study shows that juvenile offenders recidivism rates the lowest of any crime.

What a child does as a child, does not reflect what kind of man or woman they will become.

Do not allow States to force juvenile offenders on lifetime registries with no way off, especially when the crime doesnt fit the Federal Government registration requirements.

**Comment ID**
DOJ-OAG-2020-0003-0069

 **Tracking Number**
1k4-9iqe-mwee

**Comment Details**                                         **Submitter Info**

**Received Date**
Sep 2, 2020

AR-00000242



About   Bulk Data Download      Agencies      Learn
(/about)          (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000243

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

Comment

I am ashamed to say that I am an American citizen as I watch my government persecute a class of citizens know as Sex Offenders! Your laws are draconian and unconstitutional. The Doe v. Smith ruling stating that registration is civil and not punitive is just insane. Is it punitive to be put on a public shaming site like the registry? Yes. Is it punitive to be barred from gaining professional licences? Yes. Is it punitive to not register your car and be charged with a felony? Yes! I could go on but the list is too long. There are approx one million people on the registry and if you take into consideration families impacted by this draconian scheme the numbers rise to multi millions. The rate of reoffence for registered citizens is less that 5%. The lowest of all felons excluding murderers. The registry protects no one. It just ruins lives.

Stop this insanity now! Do not enact these new punishments!

Mr. Barr. Take a good look in the mirror and ask yourself. What would Jesus do? Do you think you are above him? Think about it!

**Comment ID**
DOJ-OAG-2020-0003-0070

◎ **Tracking Number**
1k4-9ips-3342

**Comment Details**                                    **Submitter Info**

AR-00000244

**Received Date**

Sep 1, 2020



About   Bulk Data Download     Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000245

Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

Comment

The Government's boot is on my neck and i can't breath.
This is straight up Nazi type crap that the United States Government is engaging in. Some of my relatives escaped the Nazis and some did not, and now i feel persecuted and trapped in a Nazi type regime myself with no chance to escape.
I have been in the community for over twenty years with not even so much as a parking ticket. There is scientific evidence that shows that i am no more likely to commit another sex offense than any other citizen, so why is it necessary for me to continue to be held down by the United States Nazi boot.
I keep trying to love this country but this country keeps hating me, and keeps putting me and my family at great danger from vigilantes and nut cases that would like to kill me and my family. This is nothing more than State sponsored doxing, and you can not justify it any longer as these laws were passed and continue to passed and upheld based on false, incorrect, and outright lies that are continually proven so by scientific data and facts. Forcing someone to register for life based on a decades old conviction with no due process or not basing it on scientific data is absolutely cruel, and serves no purpose other than punishment and revenge.
Please take your boot off my neck and let me breath. Please stop acting like Nazis. You can not make America great again by sponsoring these type of Nazi rules, so please stop thinking like a Nazi and like Hitler used to think.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0071 |

|  **Tracking Number** |
|---|
| 1k4-9iq0-9hm4 |

AR-00000246

Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 1, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000247

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

The proposed changes are no better than the state law. The law is very retrictive and I have suffered on good housing because I can not live in seerton area's that I can afford to pay for rent

**Comment ID**
DOJ-OAG-2020-0003-0072

 **Tracking Number**
kel-fpb3-q8e1

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 2, 2020

AR-00000248

Regulations.gov



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000249

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

Comment

DOJ DOCKET NOTE: PERSONAL IDENTIFYING INFORMATION OF THE COMMENTER REDACTED AT THE COMMENTER'S REQUEST. The SOR has impacted me personally at home and in work. My sentence was in 1993 and slowly over the years more and more regulation and restriction have been added to me even though I have had no trouble withe the law after this incident. I have been gain fully employed and started a family with four children. The SOR has publicly added my name for all neighbors to see, and then interferes with how families interact with my children. I have also been a victim of fraud with someone using the online public information to verify my information and address. When traveling for work I was not allowed to enter Brazil, and when traveling with family i get stopped at each border and go through all the questions. The quarterly in person registration is also a constant permanent reminder of the issue (not that it will eve be forgotten) but how can one move past it when feeling constantly penalized and the threat of further legal action if failing to register.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0073 |

| ◎ **Tracking Number** |
|---|
| kel-fy28-bdge |

| **Comment Details** |
|---|
| **Received Date** |

AR-00000250

Sep 2, 2020



About   Bulk Data Download      Agencies    Learn

(/about)      (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000251

8/4/23, 1:10 PM                                      Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
| --- | --- |

---

| Comment |
| --- |

The fact is that the government doesn't realize that people CAN change and this list is creating moral lepers. Making it hard for people to get jobs and housing, in fact it creates more crime because people need money to survive.

I'm not saying get rid of it all together, just make a way were people can graduate from the list.

Sex offenders also have a very low rate of recidivism.
https://www.prisonpolicy.org/blog/2019/06/06/sexoffenses/

As you can see in this article rearrest is lower than other crimes. This is also taxpayer money that is being wasted on people who may not commit a crime, especially people that are low risk according to their state.

Also, the court is not inerrant and gets stuff wrong. What if someone appears to be doing something sexual but it was taken out of context.

If the government is supposed to serve the people, they should be objective and use a risk based registry, but instead they don't listen to logic and research, but instead they just make decisions based on what will advance their own political career. That does not sound like a serving government.

| **Comment ID** |
| --- |
| DOJ-OAG-2020-0003-0074 |

AR-00000252

Regulations.gov

 **Tracking Number**

1k4-9iqe-9p3z

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 2, 2020



About       Bulk Data Download       Agencies       Learn

(/about)          (/bulkdownload)       (/agencies)    (/learn)

Reports       FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000253

8/4/23, 12:51 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  ( 724 )  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  ( 724 )  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

Studies have shown SORN has not been proven to be an effective deterrent. In fact, it is doing more harm than good. Families are negatively impacted by not being able to live near their work or school. Plus the stress and embarrassment and it causes the rest of the family.

And I dont understand how its constitutionally legal to pass sentence on someone after they have already been convicted and sentenced. People that were scheduled to come off it after a certain amount of time have been switched to a lifetime of registering. I dont understand how its legal to change someones sentence on a whim. Where does it stop?

As long as someone has not repeated the offense, once they have paid their dues that should be it. This should not be a life sentence.

| **Comment ID**
| DOJ-OAG-2020-0003-0075 |

|  **Tracking Number**
| 1k4-9iqe-n43m |

| **Comment Details**                          **Submitter Info** |

**Received Date**

AR-00000254

Regulations.gov

Sep 2, 2020



About   Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000255

8/4/23, 12:48 PM                                           Regulations.gov

An official website of the United States Government.  

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

I have been a registered sex offender since 2004. I was 23 years old when I committed my crime. At that time I struggled with the choice of going to court and facing a greater sentence for my mistake, yet being able to present my mitigating circumstances, or taking a plea agreement for a minimum sentence and compliance with the Michigan Sex Offender Registration Act. I signed documents prior to my sentencing placing me on this registry for 25 years... (That was part of the deal!) - The deal was that I would eventually be able to put this all behind me instead of dragging my case through the court system.

I made my mistakes, and I have done my time. Other than my offense in 2004, I have never even been charged with any other serious crime... Either before or after. I was fortunate enough to find a job and buy a home (although renting was about impossible when I attempted to, due to my SOR status.) I even own a business now that is considered essential and is a big part of the community.

I have been fortunate enough that I feel like I have been less affected by the SOR requirements but these requirements and their affect is ridiculously bad for society and the country.

I have been through a lot of therapy... As I needed... I made mistakes and needed to learn from them in order to never make the same mistakes again... I also learned that others who committed offenses had similar things going on in their lives... Bad things, whether struggling to find work, a parent died, they were being evicted, etc.

By no means are any of those an excuse. Nobody has a right to hurt somebody because they are having a rough day, week, month, year.. However, to put more people in that situation that have already coped with this bad situation poorly is a bad idea...

If you tell someone their future is hopeless, you will get a desperate response out of people and desperation never leads to anything positive, in fact it usually leads to something toxic.

AR-00000256

Regulations.gov

I know it will likely fall on deaf ears, which is fine, however I would like to know that I said my part...

PLEASE do not keep people on the registry for like unless it is an extreme case.. The public is safer if people are at least given a hope of normalcy in their future.

Additionally, please do not tear family's further apart by including ANY kind of exclusion zone... Murderer's can go anywhere they want as can Armed Robbers and Thieves. It would be ridiculous to have a registry of Thieves and no longer allow them in stores...

Just please use sense.. Everything is about science and research when it comes to the Coronavirus, please use the same sense with SORNA - the science shows that lifetime registrations, etc.. do not work..

On a more personal note - USA / STATE OF MICHIGAN - Uphold your end of the deal you made in October 2004 and end my registration in 2029 when it is supposed to, otherwise allow me to withdraw my plea from 16 years ago... Do not keep changing the rules after I held up my end of the bargain.

Thank you for your time.

---

**Comment ID**

DOJ-OAG-2020-0003-0076

---

 **Tracking Number**

1k4-9iqe-pja5

---

**Comment Details**                    **Submitter Info**

**Received Date**

Sep 2, 2020

---



Regulations.gov

About    Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)


Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000258

8/4/23, 1:02 PM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

My name is Jose Torres, I have been placed on the sex offender registry in the state of Michigan without any due process of the law. I was never formally charged nor sentenced in any way by any governing agency that enforces the sorna regulations. Police came to my house and threatened me with death if I did not comply with their demands to submit my name to the register. This action by saint clair shores police is in direct violation of the laws of this country. As a direct result of the actions of saint clair shores police department, being on the registry has made me into a social leper. You will however find a Japanese case against me while I served in the military. I was only charged by civilian Japanese authorities not by the military. However the laws in America directly stipulate that only three (3) nations convictions of rape can be upheld by American law. Japan is not one of these states. I have researched this for over a decade and have been suffering for nearly 2 decades. I've lost my family, my standing in the community,my military career and any possibility of attaining a job. This has destroyed my life.

**Comment ID**
DOJ-OAG-2020-0003-0077

⊕ **Tracking Number**
kel-gx95-438e

**Comment Details**                                    **Submitter Info**

**Received Date**

AR-00000259

8/4/23, 1:02 PM                                            Regulations.gov

Sep 2, 2020



About    Bulk Data Download      Agencies    Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000260

8/4/23, 1:06 PM                                         Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

I am the parent of a registrant in Michigan.

As you are already aware, studies that have shown that the SOR is not achieving its intent, and in fact is causing more harm than good. Registries are an impediment to securing housing and gainful employment, thus making the communities of registrants less safe. The impact of SOR also extends to families of registrants. I can't be on our neighborhood watch because my son is a registrant living with me. My grandson can't experience the happiness of having his father participate in school activities. There are many many more adverse effects.

Registries do nothing to affect recidivism rates, and ignore the fact that recidivism rates for sex offenses are already lower than almost any other crime. Interestingly, the State of Michigan suspended enforcement of its SOR in April, and this has had NO reported effect on the occurrence of sex crimes.

In regards to the tiers, no one should be subject to lifetime on a registry regardless of tier, especially if the offense occurred when the registrant was a juvenile. Given that the effectiveness of SOR is questionable and that the tier is not an accurate predictor of recidivism, shorter times on the SOR for all tiers seems appropriate. There should also be path off the SOR for compliance and no further sex offenses.

---

**Comment ID**

DOJ-OAG-2020-0003-0078

---

 **Tracking Number**

1k4-9iqe-gf5y

---

AR-00000261

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 2, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/7/23, 12:13 PM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

**Comment**

I am against this for so many reasons. When I married my husband 20 years ago, I had in mind that the list was only a minimal part of our lives and would eventually be gone. Unfortunately, that is not how things have gone. We have lived in a constant state of fear, anxiety, harassment, and continued underemployment as the laws have been continually been changed and added to. The restrictions are so unreasonable for most of the circumstances of the people on the registry. My husband had one mistake as a juvenile and it has followed him ever since. Making amends, receiving forgiveness, serving his sentence, and doing all of the other requirements should be enough for a second chance. I have lived all of the negative twists and turns of this registry every step of the way. It limits my rights, freedom, security, and right to my pursuit of happiness. I didnt commit any crimes. We have 4 teenage children who have also been negatively impacted by all of the restrictions. What about their right to the pursuit of happiness? Please think this through!!

**Comment ID**
DOJ-OAG-2020-0003-0079

**Tracking Number**
1k4-9iqe-m9cw

| **Comment Details** | **Submitter Info** |

**Received Date**

AR-00000263

Sep 2, 2020



About   Bulk Data Download      Agencies    Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000264

8/7/23, 12:10 PM                                                                Regulations.gov

An official website of the United States Government.  🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

📄 PUBLIC SUBMISSION

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)      View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

I have been on the registry for 5 years. In that time I have had my rules changed multiple times. Because it's what's in the best interest of the community to punish me with new and changing requirements after the fact. Especially when it was from an incident 10+ years prior, when I was hunted down, treated as I was guilty before a trial and bullied into a plea deal or face additional charges. I took multiple polygraphs and still the defense was not enough then I ran out of money for a lawyer because my bail was double that of other offenders. Then I pay my debt in jail get out and am on a public website that has cost me jobs, places to live, allowed me to be verbally and physically abused. Had my truck and residence vandalized. My family threatened. I have tried asking law enforcement for help, bit they take a report and nothing ever comes of it. Sex offenders on a public list are treated like they do not matter, to the point where I have battled with suicide, as there is no way to be redeemed to society. But someone who is a murderer can do 10 years in prison and come out with no additional requirements or be plastered as a monster to the community. I deal with all of this bcause of an indecent exposure conviction.

I will provide references as to why the laws are not working and hope you truly see that not everyone who commits a sexual offense is a monster. Yes there are some, bit the vast majority of those listed and treated as second class citizens are just trying to live normal lives and have a chance to live a peaceful life.

No other offenders, including murderers, arsonists, those who commit violent assaults are subjected to the restrictions of being placed on a public list.

•Over 95% of new sexual crimes are committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notificatio

•low level incidents such as public urination, sexting, and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
•Many registrants face unemployment, homelessness, instability, and personal danger.
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja ; https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9

•very few offenders on the registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11

•90% or more of victims know their attackers, higher for children.
https://www.rainn.org/statistics/perpetrators-sexual-violence https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7

•Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7

•Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41

•Sex offender registries put innocent family members of registrants in harm's way.
https://link.springer.com/article/10.1007/s12103-008-9055-x https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10

•Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf

The current laws and inability to be redeemed and make amends for offenses coupled with the demonization of offenders on a public registration create conditions that lead to increased crime.
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/
https://repository.law.umich.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1078&context=articles

I truly hope than you look into these resources and find that the vast majority of these restrictions are contrary to scientific data and begin to look at ways to prevent offenses than try to punish offenders for term periodd that at times far exceed the maximum sentence of the offense. Increasing prevention programs, focusing on mental health, job opportunities and creating ways for redemption and returning to society without being labeled an outcast.

AR-00000265

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0080

**Tracking Number**

kel-k8bb-0zzo

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 2, 2020

About   Bulk Data Download   Agencies   Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)   (https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Reports   FAQ

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |

Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000266

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

Comment

I believe the sex offender registry act is a waste of money the recidivism rate for sex offenders is very low and there's also put sex offenders in danger of being harmed by people that hate sex offenders and a lot of people that are in the sex offender register are on their for crimes that on adults the sex offender registry was designed to protect children so if your crime has nothing to do with the children why should you be on there and there should be a way off the sex offender registry everybody should get a second chance I was wrongfully convicted now I got to suffer the rest of my life on a sex offender registry for a crime I didn't even commit I feel like sex offenders see no other way than all they're going to be as a sex offender their whole life so what what motive do they have to ever change to be a person that won't commit another sex crime when they got their community harassing them and telling them that they're sex offender pedophile I think the sex offender registry there's just something that is forever placing the title on somebody and it gives them no hope to ever want to change because of people figure hell on the sex offender for life I might as well be a sex offender when has the sex offender registry ever saved a victim from being assaulted is there any facts or case laws that can justify the sex offender registry

**Comment ID**
DOJ-OAG-2020-0003-0081

◎ **Tracking Number**
kel-k993-02t7

**Comment Details**                                    **Submitter Info**

AR-00000267

**Received Date**

Sep 2, 2020



About     Bulk Data Download        Agencies      Learn

(/about)          (/bulkdownload)     (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000268

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

The sex offender registry is supposed to protect children, yet children are more often harmed by ot than helped. Because people on the sex offender registry have children too. A registrant cannot take their children to the park, be involved in their children's education, and in many cases the children of a registrant are harrassed and bullied, driving a wedge between the offender and their children.

Other than murderers sex offenders have the lowest recodivism rate of all criminals. There's no murder registry, or arson, or drug offense registry. Meth runs rampant in this country and a large part of crime is meth related. Its definitely a public health and safety issue, yet there is no registry for people who have been convicted of meth production, possession, or distribution.

The sex offender registry is a public hit list and the children of registrants are often the collateral consequences of vigilantism.

When a person pays their debt to society they are free to continue their lives and be productive citizens without any restrictions, except in the case of those convicted of sex offenses. We should focus on preventing crime, and offering help to those who have inappropriate thoughts and tendencies, rather than perpetual punishment of people who commit crimes.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0082 |

|  **Tracking Number** |
|---|
| kel-kesn-9tw7 |

AR-00000269

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 2, 2020



About      Bulk Data Download      Agencies      Learn

(/about)      (/bulkdownload)      (/agencies)      (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/4/23, 1:09 PM                                          Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724 (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724 (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

If you put this much effort into DWI/DUI drivers, drug dealers AND users, gang members, husband/wife beatetrs ect. you could make the streets a much safer place for everyone.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0083 |

|  | **Tracking Number** |
|---|---|
| | kel-kovk-n649 |

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**
Sep 2, 2020

AR-00000271

8/4/23, 1:09 PM                                     Regulations.gov



About     Bulk Data Download        Agencies      Learn

(/about)         (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000272

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

The Registry fails to protect those it is intended to protect, not because it is implemented improperly, but because it would fail to protect the public even if the policy was followed to a T by every registrant and law enforcement agency out there. Consider these points:

While there certainly are individuals who may remain dangerous after their incarceration and supervision, there is a large proportion of non-violent / non-forcible / non-contact / rehabilitated offenders who are on the Registry. Example offenses/offenders include: teens close in age who engaged in consensual sexual activity below the age of consent, teens who were caught sexting images of each other, consenting adults who were caught having sex in public, public urinating while intoxicated, viewing/possessing readily available online child pornography, sex worker/customer activity, etc. These individuals pose very little threat to the general public based on these activities alone, yet they fall under the scary umbrella term, Sex Offender.

The rationale for having the Registry to begin with: that sex offenders have a high recidivism rate and are hard-wired to reoffend, is entirely inaccurate. Department of Justice statistics and a large body of peer-reviewed, scientific criminology/psychology literature have routinely concluded that next to murder, sex offenses have the lowest recidivism rate of any category of crime. Even for the high-risk/violent contact offenders, by 5 years post-release, their recidivism rate is 5%. Further, the recidivism rates include non-sexual crimes and probation/parole/Registry violations, which makes the true repeat sex offense rate around 2-3%

The common perception that sex offenders pose a continuous sociopathic risk to the community stems from a phrase uttered by then SCOTUS Justice, Antony Kennedy in McKune v. Lile, where he stated that sex offenders have a frighteningly high rate of recidivism (80%+). The events leading up to and the aftermath of this false proclamation are highlighted by Jacob Sullum's article: https://reason.com/2017/09/14/im-appalled-says-source-of-pseudo-statis/

AR-00000273

Regulations.gov

90% of children are sexually abused by someone known to them, not some masked stranger hiding in the playground bushes, waiting to pounce

Focusing on the extreme/outlier cases is a great disservice to the public. Doing so with SORNA stokes panic and perpetuates misconceptions. From a policy-making perspective, it uses the horrific actions of a few, along with the public's fear as a basis for flawed and punitive policies that crush the lives of thousands who are just trying to recover from their past mistakes and redeem themselves.I

Many sex offenders fail to register or keep in compliance because their life is in upheaval, or they are rendered homeless by residency restrictions and/or an inability to obtain employment as a result of the stigma associated with the sex offender label. Further, once a check-point has been missed (like an annual in-person update, a new car registration, reporting a new email, etc.), many are afraid to go to the authorities, thinking they will be apprehended onsite because of their lapse in complianceNOT because they are not avoiding detection for the purpose of preying upon unsuspecting citizens.

It should also be pointed out that since 1,000s of registrants are unaccounted for and most are only discovered when there is a run-in law enforcement, it illustrates that even if registrants are out of compliance, they are otherwise staying out of trouble. If anything, this observation underscores why the current Registry and SORNA is unnecessary and ineffectivethe overwhelming majority of sex offenders do not recidivate. It also provides an explanation as to why law enforcement often chooses not to devote their resources towards tracking down every last sex offender: they know (as well as many other officials who are forced to work within the system) that most registrants pose very little risk; making additional funding towards enforcement of this policy a further waste of money.

---

**Comment ID**

DOJ-OAG-2020-0003-0084

---

 **Tracking Number**

1k4-9iqg-5g6i

---

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 2, 2020

---



AR-00000274

Regulations.gov

About (/about)     Bulk Data Download (/bulkdownload)     Agencies (/agencies)     Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)     FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000275

8/4/23, 1:07 PM                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020



| View More Comments ⟨724⟩ (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments ⟨724⟩ (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

Comment

It is time to correct the misery and ongoing punishment of offendors caused by public shaming using the SORNA facility. The act not only punishesb theperpertrator but causes undue mental and finaciial hardships on families and victims alike. I believe what is called for is:

Limited time on the registry that realistically reflects the eceptionally low recidivism rates of most offense categories and offenders.

A Path to be removed from the registry that includes treatment, demonstrable compliance with the laws, and, in the case of inter-family crimes, victim input.

Elimination of Tiering ( havent we learned anything about mass judgment)

Victim input into SORNA dispositions

Innocent individuals, families and communities are not served by this political theater ad are even endangered. Please, do more investigation into the facts and make positive changes to the registration system.

| **Comment ID** |
| DOJ-OAG-2020-0003-0085 |

|  **Tracking Number** |
| 1k4-9iqh-lsq6 |

AR-00000276

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 2, 2020



About    Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020



| View More Comments  724 (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724 (/docket/DOJ-OAG-2020-0003/comments) | Share ⌄ |

---

Comment

My name is Jonathan Meyer, and I am a 40-year old man living in West Michigan. In 2012, I was convicted of Criminal Sexual Conduct, for having an inappropriate relationship with a teenage employee of my old company. I served six years in prison, and paroled in 2018. I finished parole in 2020, and am trying to move on with my life. The current SOR is basically punishment in perpetuity for the rest of my life, and does nothing to protect the citizens of Michigan. I do not support SORNA as it is currently written. The Michigan legislature can do a much better job on the revised SOR.

A.      Current State of the Michigan Sex Offender Registry.
The current Sex Offender Registry (SOR) is a faade. It gives false security to the public, while actually making it easier for predators to assault our children. Here are some more issues with the current SOR:
1.      An offender has to report to law enforcement, in person, up to 4-times per year, even if there are no changes to their situation.
2.      The police can check-in on offenders whenever they want.
3.      It prevents a registrant from getting a quality job opportunity.
4.      It prevents a registrant from living in normal society, or even renting an apartment.
5.      It prevents a registrant from attending worship services at certain churches.
6.      It prevents a registrant from buying a house in a good neighborhood.
7.      The offender must publicly register their current house and other property.
8.      The offender must publicly register their car, boat, plane, or motorhome.
9.      The offender must publicly register their home, cell phone, fax, etc
10.     The offender must publicly register their email(s) and social media accounts.
11.     The offender must publicly register their job, and notify their employer.
12.     The offender must publicly register any/all of their volunteer opportunities.
13.     The offender must publicly register any/all of their educational opportunities.
14.     The offender must register their vacations or business trips.
15.     Vigilantes have access to offenders personal information.
16.     Offenders information can be used for blackmail & extortion.

AR-00000278

17.     Offenders cannot participate in neighborhood social networks like nextdoor.com.

18.     Offenders cannot participate in social media like Facebook.


B.     The FACTS

Only 4% of CSC crimes in Michigan are committed by someone on the SOR.

About 90% of children who are victims of sexual abuse know their abuser.

Only 10% of sexually abused children are abused by a stranger.

Approximately 30% of children who are sexually abused are abused by family members.

The younger the victim, the more likely it is that the abuser is a family member. Of those molesting a child under six, 50% were family members. Family members also accounted for 23% of those abusing children ages 12 to 17.9

About 60% of children who are sexually abused are abused by people the family trusts.

The Stranger Danger theme is a hoax.

The recidivism rate for CSC is 3.2%, which is among the lowest of any crime.

Offenders are deemed safe enough to parole by State psychiatrists.

Offenders participate in mandatory counseling while on parole.

Parole agents monitor the offender for signs of relapse.


C.     Proposed Solution:

Any parolee or probationer would be on the public SOR list, in harmony with the OTIS system. Once the offender has satisfied their obligation with the State, they can be removed from the SORA public view. Only law enforcement, municipalities, and volunteer organizations may access offender information. This system is already in place, and is used for special cases, such as an offender being a minor. Offenders would still maintain a yearly check-in on their birth month with their local law enforcement agency. The revised SOR also allow electronic updates for any other required information. If the authorized therapist for the State of Michigan deems the offender is no longer a threat, they can petition to be removed from the registry.


D.     Conclusion

I do not support the SORNA as it is currently written. I am more than willing to testify about my experience with SOR and what does / doesnt work. I know that the Michigan legislature can do a much better job with this issue.


Respectfully Submitted,


Jonathan K Meyer
228 N. State Street
Zeeland, Michigan 49464
616-510-0106
jonkmeyer@charter.net

---

**Comment ID**

DOJ-OAG-2020-0003-0086

---

 **Tracking Number**

1k4-9iqh-sosd

---

AR-00000279

8/7/23, 12:16 PM                                        Regulations.gov

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 2, 2020



About      Bulk Data Download        Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000280

8/7/23, 12:31 PM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

The sex offender registry does not work. It does do what it was intended to do and does more harm than good. Recidivisim rates among those required to register statistically among numerous studies is well below 8 percent showing new sex offenses are committed by those who have never committed sex offense prior not among those required to register. Therefore, it provides no public safety. Statistically those required to register do not commit further sex offenses. There should be shorter tiers with clearly defined means for offenders to be removed entirely from the requirement to register. There should be no lifetime registry requirement and the registry needs to be removed from public access. Offenders are targeted and the restrictions imposed by this make it next to impossible for them to live their life and to successfully reentry to regain being responsible, productive members of society.

**Comment ID**

DOJ-OAG-2020-0003-0087

 **Tracking Number**

1k4-9iqh-7pqc

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 2, 2020

AR-00000281



About   Bulk Data Download      Agencies    Learn
(/about)         (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000282

8/7/23, 12:19 PM                                                                 Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |    Share ▾    |

---

| Comment |

I believe that changing the rules and applying them retroactively is not only wrong but unconstitutional. I believe the tier system is broadly applied with no risk assessment what so ever, also being applied retroactively. I don't believe changing the length of time to life after the fact is right or constitutional, also being applied retroactively. The research I've done show registries do little if nothing to stop sexual assault.

**Comment ID**

DOJ-OAG-2020-0003-0088

 **Tracking Number**

1k4-9iqj-92dm

| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 2, 2020

AR-00000283

Regulations.gov



About   Bulk Data Download      Agencies      Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000284

8/4/23, 1:15 PM                                            Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

SORNA needs individual risk assessment and a path to be removed early as a reward for good behavior. Also, time on the registry should be reduced for all tiers. Recidivism rates for sex crimes are about about 5% and drops to 3.5% after three years. After ten years the risk is about the same as for non-offenders. Very few former offenders are truly high risk and 95% of new sex crimes are committed by those not on a registry. Please don't make registration harder than it already is. Thank you.

**Comment ID**
DOJ-OAG-2020-0003-0089

 **Tracking Number**
kel-v6bu-23ot

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 2, 2020

AR-00000285



About      Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000286

8/4/23, 1:08 PM                                                  Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

SORNA requirements should serve as a ceiling and not a floor. For the same offense, someone can be subjected to lifetime punishment and ostracism in one state and be free from punishment in 15 years in another. The disparity of rules and requirements from state to state and now the Federal requirements, create a tripwire-loaded maze which people who are trying to return to a law abiding life will get trapped. Registration, as a general concept, has been proven ineffective as more than 95% of sexual offenses are committed by someone not on a registry. Not only is it ineffective, but it instills a false sense of security in those who use the registry and believe they will keep their children safe by avoiding the people least likely to violate them, but it also serves as a huge barrier to reentry for those who are trying to live productive lives.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0090 |

|  **Tracking Number** |
|---|
| 1k4-9iqn-o4rm |

| **Comment Details** | **Submitter Info** |
|---|---|
| **Received Date** | |
| Sep 2, 2020 | |

AR-00000287

8/4/23, 1:08 PM                                                    Regulations.gov



About   Bulk Data Download      Agencies    Learn

(/about)        (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000288

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

📧 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) | | View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

I was 13 years old when I "offended". I won't ever be able to apologize enough, and the other person and I have a very close bond because I wasn't a predator. I was a kid that did wrong.
I was a kid from a really horrible situation of abuse that went unchecked by everyone- my teachers ignored my swollen face, my bruised arms.
I was a kid that 2 years later would be raped, and suffer a miscarriage during drivers training.. but I never told because I felt like I deserved it.
I have never reoffended because I wasn't a predator then- and I'm not one now.

What I am is a college graduate that fears the day state cops show up on my door stoop to make sure I'm not lying about where I live, what I drive, where I work, what my email address is.

Because I wear a scarlet letter.

I was a 13 year old. They made me do probation at an office where I was bullied by middle aged women because I didn't want to tell them why I was on probation.

But my probation officer fed me sometimes.

They made me have a pelvic exam- I was a Virgin. Do you know what it's like to have a speculum forced up you at 13? I remember Donald Duck on the ceiling while I begged them to stop.

I could go on and on, but they're just my facts. They're my crosses to bear.

Below are the facts of so many others.

Here are some basic facts about registrants:

No other group of offenders, including murderers, arsonists, those who commit violent assaults, etc., is subjected to the draconian restrictions of being placed on a public list. No other country (with the exception of North Korea) has a public list, although many countries' law enforcement agencies maintain nonpublic lists.
•Over 95% of new sexual crime is committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notificati
•Public urination, sexting, underage sex, and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
•Many registrants face unemployment, homelessness, instability, and personal danger.
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja ; https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9
•Only a small fraction of those on registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11
•"Stranger-danger" is rare; 90% or more of victims know their attackers, higher for children.
https://www.rainn.org/statistics/perpetrators-sexual-violence https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
•Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
•Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
•Sex offender registries put innocent family members of registrants in harm's way.
https://link.springer.com/article/10.1007/s12103-008-9055-x https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
•Registrants are frequently denied special housing such as nursing home care and section 8 housing.
https://www.theatlantic.com/health/archive/2017/06/aging-sex-offenders/528849/ http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1386&context=elders
•Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf
•Current sexual offense laws create conditions that lead to increased crime.
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/
https://repository.law.umich.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1078&context=article

AR-00000289

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0091

**Tracking Number**

kem-15w6-xcy9

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 2, 2020

About   Bulk Data Download   Agencies   Learn                                              Reports   FAQ

(/about)        (/bulkdownload)   (/agencies)   (/learn)   (https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |

Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/7/23, 12:20 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001) / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

I do not think that lifetime registry is necessary for anyone. It is not fair to make people who got in trouble in 1984 or 1985 and did time in prison, then got out and completed their parole, and then had to be on the registry. They went from prison, to parole, to 25 years on the registry to life on the registry. That is not fair, nor is it right. Once a person has done their time, they shouldn't be allowed to add more to it. I had sole physical custody of my children when they were growing up. I raised them and supported them without their dad. My crime happened before they were born. My kids, now adults, went through all kinds of problems because I was/am on the registry. Now I can't go to the school for my grandchildren. If I had went to prison for manslaughter, I would have been free and clear right now. This is definitely cruel and unusual punishment. If a person was convicted before 1990 they shouldn't have to deal with this if they haven't been in any more trouble. Thank you.

**Comment ID**
DOJ-OAG-2020-0003-0092

 **Tracking Number**
kem-5upn-3ub3

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**
Sep 2, 2020

AR-00000291

8/7/23, 12:20 PM                                                    Regulations.gov



Your Voice in Federal Decision Making

About     Bulk Data Download     Agencies     Learn
(/about)        (/bulkdownload)     (/agencies)    (/learn)

                                                      Reports     FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

                                                      Support (/support)   Provide Site Feedback

AR-00000292

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

📧 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)       View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

Please use the factual statistical data on this and other related issues dealing with public registries and regulations. As we look at the "facts" and not the ideal of continual punitive actions we should be using other means that are actually effective in reducing these types of crime.

No other group of offenders, including murderers, arsonists, those who commit violent assaults, etc., is subjected to the draconian restrictions of being placed on a public list. No other country (with the exception of North Korea) has a public list, although many countries law enforcement agencies maintain nonpublic lists.
Over 95% of new sexual crime is committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notificatio
Public urination, sexting, underage sex, and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
Many registrants face unemployment, homelessness, instability, and personal danger.
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja ; https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9
Only a small fraction of those on registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11
Stranger-danger is rare; 90% or more of victims know their attackers, higher for children.
https://www.rainn.org/statistics/perpetrators-sexual-violence https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
Sex offender registries put innocent family members of registrants in harms way.
https://link.springer.com/article/10.1007/s12103-008-9055-x https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
Registrants are frequently denied special housing such as nursing home care and section 8 housing.
https://www.theatlantic.com/health/archive/2017/06/aging-sex-offenders/528849/ http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1386&context=elders
Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers-sex-offender-laws-us http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf
Current sexual offense laws create conditions that lead to increased crime.
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/
https://repository.law.umich.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1078&context=articles

---

**Comment ID**
DOJ-OAG-2020-0003-0093

**Tracking Number**
1k4-9iqs-hij3

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 3, 2020

AR-00000293



About    Bulk Data Download    Agencies    Learn                                    Reports    FAQ

(/about)       (/bulkdownload)   (/agencies)   (/learn)   (https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |

Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000294

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

📰 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) | View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

SORNA along with all its rules and regulations was no doubt created with good intent. Horrendous but rare acts involving children are a tremendous motivator. However, SORNA was created based on fear and emotion not facts and evidence, What was the intent of SORNA? Hopefully, public safety was its clear motivation and intent.. laws should aid in preventing horrendous acts. With that intent in mind, what research, evidence and professional information was used to create this massive act? Evidence suggest that emotion was the main criteria used since virtually all available research, evidence and professional opinion agree that SORNA does not provide for public safety. SORNA is a massive, high cost, act that is not based on the ever growing evidence and research that does not support its effectiveness. It appears that lawmakers did not research the issue. Valuable time and resources have been wasted for years because these laws were not based on facts. Neither are the new proposals. Had those proposing this act and all its changes done even a little research they would be aware of even a very small portion of the research that verifies that:

95% of new sexual crime is committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York's_Sex_Offender_Registration_and_Notification
Many minor, non violent acts such as underage sex and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
Very few off those on registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11
Stranger-danger is rare; 90% or more of victims know their offender..
https://www.rainn.org/statistics/perpetrators-sexual-violence https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
Sex offender registries harm innocent family members..
https://link.springer.com/article/10.1007/s12103-008-9055-x https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf

Changes do need to be made to SORNA but not as proposed. SORNA must be based on facts if it is going to be of any benefit to public safety. To continue in its current form with even more additions not based on fact, is extremely costly in dollars, time and safety. Please use the facts to create a useful act that will be of benefit to our nations safety. Helpful, factual resources are readily available.

Defend the truth, knowing that at times it may challenge the views you hold. At times it may not be public opinion. But hold yourself to the truth even if you stand alone. Facts do not lie. (Martin Baron)

---

**Comment ID**

DOJ-OAG-2020-0003-0094

◎ **Tracking Number**

1k4-9iqu-n691

| Comment Details | Submitter Info |

**Received Date**

Sep 3, 2020

AR-00000295



About   Bulk Data Download   Agencies   Learn                                    Reports   FAQ

(/about)         (/bulkdownload)   (/agencies)   (/learn)   (https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |
Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000296

8/7/23, 12:32 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

Comment

I am commenting as the father of a young man who is required to register every 90 days for the rest of his life. He is required to do this even though two evaluations, one by the state and one independent, found him to represent a very low chance of reoffending. However, due to the arbitrary and non-objective tiering used in Ohio, my son faces a lifetime of state surveillance, with no opportunity for removal from the registry. We know that these registries do not work as purported. We know that over 90% of sexual offenses are committed by someone not on the registry. We know that the recidivism rate for people on the registry is around 5%, which is remarkable when one considers all of obstacles that registrants must overcome. We know that maintaining these registries are costly to local authorities and that many of them resent the additional burden of insuring compliance with something that doesn't work.

When reading these proposed rules, I get the feeling that the authors don't see the registrant as a human being. They don't seem to recognize that when that human being pays their price to society, that they should not be subject to an inhumane,invasive and ineffective system of state surveillance. We claim to be a country of second chances and new beginnings, but regulations such as these show that to be a hollow promise when it comes to human beings required to register.

| | **Comment ID** |
| | DOJ-OAG-2020-0003-0095 |

|  | **Tracking Number** |
| | 1k4-9iqz-8bud |

AR-00000297

Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020



About    Bulk Data Download      Agencies    Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000298

8/7/23, 12:22 PM                                                Regulations.gov

An official website of the United States Government.  🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

There's no need to do this! It makes no sense too! It's basically like double jeopardy I feel too. Come on being on two registries is even more cruel punishment the state registry is a unfair punishment as it is. Causing harm to the registrants families they stay or live with, many share the same cars with they need to put their vehicles on the registry too!
If their must be a State registry it can be put in a private data base, not one that prevents a company not to give the person a job, just to shame them and put a Scarlet- A to society, trying to shame them, for a past they had more than likely did prison time for! Where is the fair justice in that, people already care the felony's too that's enough which as of now can't be expunged! We need to focus on a Registered S.O. not being ashamed to live among their neighbors and communities not as a harmful Leper.

This extra Federal registry is being used as a tool to try to confuse current S.O' to put more stress on them, and set them up for failure while already living back in society and while with having the least recidivism rate type of offense! You tell me where the fair justice is in that! We need to get real and not have tyrants not making these decisions at the federal and states levels too.

**Comment ID**
DOJ-OAG-2020-0003-0096

 **Tracking Number**
1k4-9iqz-nerh

AR-00000299

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020



About    Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000300

8/4/23, 1:14 PM                                                    Regulations.gov

An official website of the United States Government.  🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |     Share ▾ |

---

| Comment |

These guidelines are yet another example of a missed attempt to enact smart justice reform. The SORNA registry has only increased the cost and burden to the government while providing a false illusion of security. We have not seen a verified decrease in this type of crime, and the unintended consequences that result from being on this registry only make it harder for those who have completed their sentence to assimilate into society as a productive, rehabilitated member of their community.

**Comment ID**

DOJ-OAG-2020-0003-0097

 **Tracking Number**

1k4-9ir0-c7zv

| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 3, 2020

AR-00000301



About       Bulk Data Download       Agencies       Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports       FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000302

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

📧 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) | View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

As a family member of a registrant I can only tell you that these laws and registries are just an extension of a sentence and do not allow these folks to get on with their lives, they are not allowed to rejoin society regardless of the crime and continue to be punished forever.

Drug offenders who do just as much harm to a child and are in and out of prison and go right back to it, and DWI drivers who also can harm children neither face a registry - people can live right now door selling drugs to kids daily and yet that is ok - but people who have one of the lowest rates of recidivism - those people you want to punish forever - I can understand if there is a multiple arrest rate on someone to add on a private registry - but to punish those folks who are either caught in something without knowing - or who have a one time offense they deserve a chance to get their lives back - and you just want to punish them forever.

No other group of offenders, including murderers, arsonists, those who commit violent assaults, etc., is subjected to the draconian restrictions of being placed on a public list. No other country (with the exception of North Korea) has a public list, although many countries law enforcement agencies maintain nonpublic lists.
Over 95% of new sexual crime is committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notificati
Public urination, sexting, underage sex, and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
Many registrants face unemployment, homelessness, instability, and personal danger.
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja ; https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9
Only a small fraction of those on registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11
Stranger-danger is rare; 90% or more of victims know their attackers, higher for children.
https://www.rainn.org/statistics/perpetrators-sexual-violence https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
Sex offender registries put innocent family members of registrants in harms way.
https://link.springer.com/article/10.1007/s12103-008-9055-x https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
Registrants are frequently denied special housing such as nursing home care and section 8 housing.
https://www.theatlantic.com/health/archive/2017/06/aging-sex-offenders/528849/ http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1386&context=elders
Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf
Current sexual offense laws create conditions that lead to increased crime.
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/
https://repository.law.umich.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1078&context=articles

| **Comment ID** |
| DOJ-OAG-2020-0003-0098 |

| ◉ **Tracking Number** |
| 1k4-9ir1-7zgy |

| **Comment Details** | **Submitter Info** |

**Received Date**

AR-00000303

Regulations.gov

Sep 3, 2020

About   Bulk Data Download   Agencies   Learn                                                              Reports   FAQ

(/about)        (/bulkdownload)   (/agencies)   (/learn)   (https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |
Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000304

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

Comment

The SO Registry is both unconstitutional and a violation of human rights. It had been denounced by several countries. It is barbaric to single out one crime to publish offender information to the world. Originally was for public safety. Proponents claim it is not punishment yet many counties and cities use it to impose restrictions on where people can live. Employers and property management use it to restrict where people can work or live. Residency restrictions are 1,000 feet and more from child safety areas. This is longer than a football field. ALL OF THIS IS PUNISHMENT AND GOES FAR BEYOND PUBLIC SAFETY. There are many studies that show that the registry is ineffective. Most sex offenses are committed by someone that knows the victim. Stranger danger is rare. Sex offenses have the lowest recidivism rate of all major crimes. Only murder is lower. Lifetime registration suggests that rehabilitation is not possible but that is far from the truth. It is unconstitutional to dictate where people can live after they have paid for their crimes. The registry hurts more kids than it helps. Children of people on the registry are shamed and bullied. Not to mention the kids forced into homelessness or poverty because finding employment and housing has become so difficult. This feeding frenzy based on unfounded fear instead of hard data must stop.

**Comment ID**
DOJ-OAG-2020-0003-0099

◉ **Tracking Number**
kem-tpkd-bk36

Comment Details                              Submitter Info

AR-00000305

**Received Date**

Sep 3, 2020



About      Bulk Data Download      Agencies      Learn

(/about)         (/bulkdownload)    (/agencies)   (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000306

8/4/23, 1:14 PM

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

Comment

I understand there needs to be a registry but there has been multiple times where I've been told I'm finally getting off. What happened to the the doe 2 now there saying that the doe 1 have to still register. I'm confused. What's the since of all these classes we take and having a second chance at life? I have epilepsy and this is totally killing me. I really had hope that the judge would have not allowed this. This isn't fair I paid my debt and I feel like some people should get a second chance. There's killers out here and they have no registration or nothing and it's just as bad. Make this make since. Because I'm still young and have a life and a family? WOW. I was already told I was off. then I was told to wait until things reopened, now this. I feel this keeps people on for those reasons I OPPOSE. For those who oppose we need to speak out this is are life! Are family's life's

**Comment ID**

DOJ-OAG-2020-0003-0100

 **Tracking Number**

kem-uf03-1prs

| Comment Details | Submitter Info |

**Received Date**

Sep 3, 2020

AR-00000307

8/4/23, 1:14 PM                                                          Regulations.gov



About    Bulk Data Download      Agencies     Learn

(/about)          (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000308

8/7/23, 12:01 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

Please, I beg of you, stop throwing thousands upon thousands of citizens in to one bucket. Though the victim and her mother begged the court not to punish my son for a Romero and Juliet relationship (that thirty years ago would have received a stern warning and nothing more), though the judge ruled that my son and his girlfriend be permitted to write their own ending to their relationship, and though he completed 6 months in jail and 10 years of probation...*still he is required to live out his life in shame and exceptional hardship. Now 46 I do not know if he will ever marry as this sentence asks so much of the family members, few will take it on. Do your work, quit lumping marginal risk people in with those who indeed pose a threat to society. Who is going to stand up for these people? Who is going to read the statistics and say Enough? I pray these thousands of marked citizens know that God knows their hearts even if politicians do not.

**Comment ID**

DOJ-OAG-2020-0003-0101

 **Tracking Number**

1k4-9ir1-xuwu

Comment Details                                          Submitter Info

**Received Date**

Sep 3, 2020

AR-00000309

Regulations.gov



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000310

8/7/23, 12:27 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

The sex offender registration is nothing more than extended punishment to those convicted. I Know for sure that not all that are convicted are guilty. There are a lot of innocent men and women who face threats because of the registry. The registry does not help keep anyone safe. It is only punishment of the convicted person. These people have done their time and have the second lowest recidivism rate. The lies that those convicted of a sex crime are always a danger to society is just that a LIE. Most sex crimes are committed by people that are not on the registry. The registry only puts the people on it at risk of threats, attacks, denial of work, denial of worship. If you were honest it is a violation of the retroactive law that was to protect people from corrupt government, because this was only a way to punish those convicted of a sex crime to be punished for the rest of their life. Is prison only a warehouse to put people or are these people put in prison to rehabilitate themselves and come out a productive citizen of this country. Abolish the registry and use the money and police time for active crimes, instead of wasting this money putting those on the registry in danger from people who know nothing about the real stats. You only put lives in danger.

| **Comment ID** |
| DOJ-OAG-2020-0003-0102 |

| ◎ **Tracking Number** |
| 1k4-9ir1-48w7 |

| **Comment Details** | **Submitter Info** |

AR-00000311

**Received Date**

Sep 3, 2020



About      Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000312

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments ⟨724⟩ (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ⟨724⟩ (/docket/DOJ-OAG-2020-0003/comments?filter=DOJ-OAG-2020-0003-0103)

Share ▾

---

Comment

The registry is nothing more than a tool to instill fear in he public that has no real value. There is no registry for murderers, no registry for people who've been convicted of assaults', no registry for any other convicted offense, except for sexual assaults'. All persons who have a conviction for sexual assault are judged by the worst of worst when the facts are they are not all on the same level of offense. A person who lands on the registry for urinating in public, sexting, having underage sex because they themselves are barely of legal age or even someone who has a conviction of indecent exposure, is not at the high risk level of someone who is considered a very high risk serial rapist. There is much research and facts on this very thing. The registry causes homelessness, unemployment, danger not just to the registrant but to their families, their children. Look at the facts of how hard it is for someone who is required to registry to find a house to live in when cities are allowed to put ridiculous parameters on where they can reside. They are basically forced out to a bridge or a car over this kind of fear mongering. Recidivism rates are extremely low for a sex offense. Read the facts please. No one should ever have a lifetime of punishment for a mistake, a mistake they've already been legally punished for. No one should have to live in fear because all their personal information is available for public viewing and public shaming. No family should have to live in fear because their loved ones personal information is available for public viewing and public shaming. Read the facts!
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja ;
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11
https://www.rainn.org/statistics/perpetrators-sexual-violence
https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
http://psycnet.apa.org/record/2008-18509-003

AR-00000313

Regulations.gov

https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
https://link.springer.com/article/10.1007/s12103-008-9055-x
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
https://www.theatlantic.com/health/archive/2017/06/aging-sex-offenders/528849/
http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1386&context=elders
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us
http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/r
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/ https://repository.law.umich.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1078&context=articles

**Comment ID**

DOJ-OAG-2020-0003-0103



**Tracking Number**

1k4-9ir2-7307

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020



Your Voice in Federal Decision-Making

About    Bulk Data Download    Agencies    Learn

(/about)      (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

AR-00000314

Regulations.gov

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000315

8/7/23, 12:33 PM                                         Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

Comment

Please consider NOT enacting these or any new regulations for sex offender registrants to follow. New restrictions will not significantly increase public safety. Studies have shown that over 95% of all new sex crimes are committed by people who are not currently required to register.

Do sex offender registries prevent sex abuse? According to research, no. See the quote below from psychologytoday.com.

"As with most things, the answer is complicatedbut researchers overwhelmingly agree that in general, the answer is "no." While some evidence suggests that registries may act as a deterrent for new sex crimes, the overall research has demonstrated that these laws do little to nothing to reduce reoffending"

Typically, as with this proposed requirement, the additional restrictions and regulations are political knee jerk reactions to outcry from those who are uneducated or under informed about the subject.

Additionally, individual state requirement are often overly restrictive and exposing, leaving those who often had one minor offense numerous years ago at risk of harm to unprovoked attacks by those who wish to generalize to the worst possible scenario what all registrants have done, then seek to dish out vigilanty justice.

Registration Rules are often complicated and difficult to follow. They put those who wish to simply move forward with their life at legal risk for no reason or benefit to society. New restrictions would only serve to exaserbate this complexity and risk. New unnecessary restrictions will undoubtedly add more futile legal cases to federal, state, and local prosecutors budgets with no safety benefit to the public.

Also the additional cost of these restrictions on already strained law enforcement budgets would be exorbitant and with little to no effect or benefit.

AR-00000316

If anything, our legal system should be looking for ways to simplify the registration process and reduce costs and complexity, reduce registration terms/time and not add more restrictive layers to an already proven ineffective system.

Thank you for your consideration of my comments. Please feel free to contact me for clarification as needed.

**Comment ID**

DOJ-OAG-2020-0003-0104

 **Tracking Number**

1k4-9ir2-frmo

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



Your Voice in Federal Decision Making

About          Bulk Data Download          Agencies          Learn

(/about)          (/bulkdownload)          (/agencies)          (/learn)

Reports          FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)          (/faq)

Privacy & Security Notice (/privacy-notice)     |     User Notice (/user-notice)     |
Accessibility Statement (/accessibility)     |     Developers (https://open.gsa.gov/api/regulationsgov/)     |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)     Provide Site Feedback

AR-00000317

8/4/23, 1:05 PM                                                   Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020



| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

Comment

I think sex offenders that have been on the list for a long time should been tooken off the list



**Comment ID**
DOJ-OAG-2020-0003-0105

◎ **Tracking Number**
kem-wowb-5tyf

**Comment Details**                              **Submitter Info**

**Received Date**
Sep 3, 2020

AR-00000318

Regulations.gov



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000319

8/7/23, 12:02 PM                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

Comment

Sex offender registration is compelled speech (speak or go to prison). Not sure how this has been allowed for so long. Goes against first amendment and any concept of freedom and liberty our country was founded on.

Registration does not make anyone safer. Sex offender registration breaks up families, causes people to lose jobs (unless if your law enforcement, but they can be placed elsewhere), lose housing, and other damages.

Please stop the witch hunt.

**Comment ID**

DOJ-OAG-2020-0003-0106

 **Tracking Number**

1k4-9ir2-1glv

**Comment Details**                                              **Submitter Info**

**Received Date**

Sep 3, 2020

AR-00000320

Regulations.gov



About   Bulk Data Download     Agencies     Learn

(/about)          (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000321

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

📃 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

As someone who has been on the registry in Texas for twenty years, I can attest that the registry is in fact punitive. Regardless of what the courts and others in law enforcement believe, we need to start listening to those that are affected by SORNA.

I've been fired from three jobs in the last twenty years. Yes, I say fired as their requirements stated "convicted in the last x number of years." I was hired and worked for said companies for 3-5 years and then someone finds out that I'm on the sex offender registry. After this "finding", even though it was public knowledge during the hiring process, I was terminated simply because I was on the sex offender registry.

Regarding the jobs, these have been with the federal government where I had to have a background review (2.5 years), local municipality (5 years), Fortune 500 company in the energy sector (2 years). If this is not a definition of punitive (based on how the public and employers see it, not how the government envisions it) then I'm not sure what the intent of this term is.

Texas just removed employment information from the public registry as some employers were feeling the negative feedback for giving people a second chance and hiring sex offenders. Now, we have the Federal government stepping in and wanting to make this a requirement.

No other group of offenders, including murderers, arsonists, those who commit violent assaults, etc., is subjected to the draconian restrictions of being placed on a public list. No other country (with the exception of North Korea) has a public list, although many countries law enforcement agencies maintain nonpublic lists.
Over 95% of new sexual crime is committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notificatio
Public urination, sexting, underage sex, and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
Many registrants face unemployment, homelessness, instability, and personal danger.
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9
Only a small fraction of those on registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11
Stranger-danger is rare; 90% or more of victims know their attackers, higher for children.
https://www.rainn.org/statistics/perpetrators-sexual-violence
https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003
https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
Sex offender registries put innocent family members of registrants in harms way.
https://link.springer.com/article/10.1007/s12103-008-9055-x
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
Registrants are frequently denied special housing such as nursing home care and section 8 housing.
https://www.theatlantic.com/health/archive/2017/06/aging-sex-offenders/528849/
http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1386&context=elders
Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us
http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf
Current sexual offense laws create conditions that lead to increased crime.
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/
https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1078&context=articles

AR-00000322

8/4/23, 12:14 PM                                                Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0107

 **Tracking Number**

1k4-9ir2-8bk8

| Comment Details | Submitter Info |
|---|---|

**Submitter Name**

John Doe

About   Bulk Data Download   Agencies   Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)   (https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Reports   FAQ

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |
Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000323

8/4/23, 1:11 PM                                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
   / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ⌄ |

---

| Comment |

I hope and pray that you will not pass these amendments. The registry itself is way to much punishment already. Your laws continue to hurt my grandkids along with their dad. Maybe you lawmakers could find a way to create positive criminal justice reform to include reforming the HUGE registry. Maybe we could remove those that ARE NOT dangerous, that have not gotten into trouble again. Why don't you lawmakers do something positive for the CITIZENS for a change.

**Comment ID**
DOJ-OAG-2020-0003-0108

 **Tracking Number**
kem-yi6a-8svs

| **Comment Details** | **Submitter Info** |

**Received Date**
Sep 3, 2020

AR-00000324

Regulations.gov



About     Bulk Data Download     Agencies     Learn

(/about)        (/bulkdownload)     (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000325

8/4/23, 12:18 PM

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

People on the registry are already confused enough about what they can and cannot do without having to report it to authorities. Please stop this nonsense and spend the peoples money on healing and prevention.

**Comment ID**

DOJ-OAG-2020-0003-0109

 **Tracking Number**

1k4-9ir3-bjg9

**Comment Details**                              Submitter Info

**Received Date**

Sep 3, 2020

AR-00000326

8/4/23, 12:18 PM
Regulations.gov



Your Voice in Federal Decision-Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000327

8/4/23, 12:55 PM                                       Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

No one should have to spend a life time on this registry , It is not Ok ..... People deserve a way off i do not care its not Ok , I am a tax payer and a citizen of this country. This registry should NOT be retroactively applied to those whos convictions were prior to the registry even existing. This is NOT ok to let the countries top law enforcement official to be able to write so called rules and retroactively apply life sentences this is law makers jobs not attorney generals gone wild . This is very very dangerous . Please rethink these changes Americans deserve a way off this type of Punitive Punishment .

Comment ID
DOJ-OAG-2020-0003-0110

 Tracking Number
kem-zwvx-1lt9

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 3, 2020

AR-00000328



Your Voice in Federal Decision Making

About     Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)     (/agencies)    (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000329

8/7/23, 12:12 PM                                      Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |    Share ▾

---

| Comment |

There is no other group of people in the United States subject to these type of restrictions after completing a prison sentence. No other group of people in the United States that have continued punishment for an offense that has been paid for through parole, probation or prison term. I have always believed in second chances but it seems that our legislators do not have my same beliefs. Actually the registry is a selling point for being 'tough on crime and protecting the citizens' for our elected officials. Most people think that these are good laws until they are caught up in the laws. When one of our elected officials past or present or one of their family members gets caught up in a sex crime, I feel sorry for them because of the horrible laws they passed are laws that they have to live with. (not really, if you have power and money, you can get away from your crimes) Laws with unintended consequences. Their lives forever ruined like so many caught in the registry web.

My son, at 16 made a horrible mistake. He is not the only 16 year old to make a mistake in life, but he will pay for his mistake with a 12 year prison sentence and a lifetime on the registry. Shame on our government for damning so many good people to lives like leapers. Unable to find employment, places to live, education; life, liberty and the pursuit of happiness? Not for you.

Our government - those writing these laws, know the research. You know that the chance to offend again is the lowest next to murder. You know the victims generally know their offender. Those writing the laws seem not to believe in second chances. The registry does not do the job the government intended. The government has a big mess and instead of dismantling you continue to pile on more bad decisions on top of bad decisions. Stop it! These laws do not work, the entire criminal justice system is a mess that needs reform.

My home with be on the registry, not because of anything I did, but because my son will live here when prison is over. He is more fortunate that others to have a great deal of support and education. The more involved the government is in our lives the less freedom we have. This madness needs to end.

AR-00000330

8/7/23, 12:12 PM                                                        Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0111

 **Tracking Number**

kem-zxwj-kw2l

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020



About     Bulk Data Download     Agencies     Learn

(/about)          (/bulkdownload)     (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000331

8/4/23, 12:57 PM                              Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

Research shows time and time again that state registries are not effective in combatting crime.No registry will prevent crime on it's own merit. State registries were originally meant for local law enforcement to keep track of offenders. Registration rules and registries in general only produce community paranoia.Paranoia adds more burden to the local government and offenders and their families. Whatever happened to the Land of the Free? What about, Life, Liberty and the Pursue of Happiness? Are we not that same America that was founded in godly principles?
I have a suggestion for Barr and the DOJ people, if we want to reduce the overwhelming and nonsensical registries, let try this plan:
Remove offenders who are age 60+ from the register if they have NOT committed further crime in the past 20+ years and who have been reporting to local authorities for the past 15+ years without incident. Studies show that this cohort will not recidivate and have began looking at life through different lenses.
Finally, lets help offenders who want help in seeking employment, fair housing and education. Helping the former offenders will help their families and children to.Instead of being a DOJ of " punishment only" let's be a DOJ of rehabilitation and concern for families.

**Comment ID**

DOJ-OAG-2020-0003-0113

 **Tracking Number**

1k4-9ir4-tt2c

AR-00000332

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



About       Bulk Data Download       Agencies       Learn

(/about)        (/bulkdownload)      (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000333

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

I have followed the rules for the past 11 years on the registry. I have 14 years left and have been hoping for a way off in some way shape or form. I have not committed any new crimes, I have a good job, own my own home, and have a wife and children. Not providing a way off the registry for those of us who have been model citizens and constantly moving the goal posts with new rules and regulations is ridiculous. I not only have to live in fear of losing my job any day because of the registry (not forced to disclose that information), but the constant posting of the list on local social media could subject my wife and children to harassment they do not deserve. It's one thing if I have to pay for the mistake I made, but I draw the line at my family being harassed. No other type of offender is punished the way sex offenders are. There is no list of drunk drivers, child abusers, spousal abusers, murderers, etc. I'm not asking for a registry for those individuals either as being on the registry is just as bad as being in prison/probation/parole. It's constantly parroted that the registry isn't punishment, but it is. If it isn't, why are the penalties for non compliance jail/prison time? People lose their lives, jobs, homes, and families because of this list. The list doesn't do anything but cause more pain, suffering, and anxiety. Who is being protected by the list? The list doesn't prevent any crime(s) from occurring. There are many like me who had a clean record prior to my offense, and have had a clean record since. We learned our lesson. We are not going to reoffend. If you look at the data, sex offenders have the lowest recidivism rate out of any class of offender, but yet we're subjected to 25 years to life on a list saying we're dangerous. I ask that you please reconsider these new proposed rules and provide those of us who have committed no new crimes or violations a way off the registry so we can move on with our lives like everyone else.

**Comment ID**

DOJ-OAG-2020-0003-0114

AR-00000334

 **Tracking Number**

1k4-9ir4-7gcr

**Comment Details**                                    **Submitter Info**

**Received Date**

Sep 3, 2020



About    Bulk Data Download      Agencies      Learn

(/about)      (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000335

8/4/23, 1:12 PM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

To make a long story short these new rules seem to require anyone convicted of a sexual offense (many of which are non-contact), and regardless if they are required to register as a sex offender, to inform the state of their international travel which may often result in travel denial.

In other words those who have shown the state they have rehabilitated or otherwise are no threat and the state agreed by allowing them to discontinue sex offender registration, now will retroactively and negatively be affected. For example, they will likely be denied foreign travel, e.g. to the Philippines for purposes such as visiting family or to other countries for work or other purposes. This is because this federal rule requires informing the receiving countries of the offenders travel and many countries have adopted a practice of denying entry to all who they receive such information. It does not make sense to employ such blanket restrictions on foreign travel on those who have paid their dues and even de-registered in their state. The negative consequences of these travel restrictions (ultimately) will devastate those related to those who have rehabilitated and does not seem to follow any logic aimed at public safety protection given the blanket nature of the restrictions.

|  **Comment ID** |
|  DOJ-OAG-2020-0003-0115 |

|  **Tracking Number** |
|  1k4-9ir5-fzfm |

AR-00000336

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020



About    Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724 (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724 (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

Comment

I am writing to voice my opinion AGAINST the proposed regulations. To go further, I think SORNA and IML should be completely repealed as it is an ineffective use of resources and taxpayer funds. Sex offender registration based upon risk management used by the individual State is a much better way to work to protect the public.

The defense of sex offender laws based on the false premise used by SCOTUS many years ago stating when Justice Kennedy states sex offender recidivism risk is "frightening and high" has been scientifically proven to be incorrect and unjustly taken as a false fact. This has been used many times since then to justify a punitive set of laws that have been applied retroactively to a class of US citizens which is contrary to the US constitution. How can requirements changing over time be interpreted any other way when they cause great psychological harm not only on the offender but the offender's family, spouse and children? It is used as a form of vindication of the sex offenders in the general population with no basis for this continued oversight. A study by the DOJ, your department, in 2019 shows the recidivism from sex offenders is lower than that of other offenders to be rearrested (http://www.bjs.gov/index.cfm?ty=pbdetail&iid=6566) which should lead to reason that this regulation may be overstated at the federal level of government.

Besides being ineffective due to the low rate of recidivism among convicted sex offenders, a 2003 study in New York (Sandler, Jeffrey C, et. Al., Does a Watched Pot Boil? A Time-Series Analysis of New York States Sex Offender Registration and Notification Law. Psychology, Public Policy, and Law, 2008 Vol. 14, No. 4, 290) quantitatively shows that 95.94% of rapes and 94.12% of child molestation arrests are persons with no prior criminal history, thus outside the scope of SORNA from the start. In most instances, child molestation cases, the victim is known by the sex offender prior to the molestation, so the registry serves no practical purpose to begin with.

There have been many new studies done over the past decade which show a myriad of statistics, but most notably, they are done more scientifically with a larger population over a longer length of time to discredit some of the early notions about recidivism rates found in sex offenders.

AR-00000338

For the last 20 years or so, the Legislature has taken the same approach that it did unsuccessfully in the 1980's with the Drug War, i.e. "get tough on Sex Offenders" while the research and even the recidivism rate of sex offenders speaks an entirely different alternative.

And worst of all the research shows that these "tougher on crime" measures actually create more problems and often have the exact opposite impact that they are proposed to offer. Using credible research and the wisdom of those orgamnizations who work with former offensers daily makes so much more sense.

SORNA is a tool being used by the federal government as a tool that does not promote criminal justice reform based on science, but rather making rules and regulations based on fear and misinformation. President Trump during the RNC showed he agrees with second chances through a pardon shown on national television as part of the event, but creating regulations based on fear and not based on science show a sense of vindication rather than offering a chance of redemption for those with a sex offense in their past.

This entire document -- in fact, the entire sex offender registration system -- is predicated on the false assumption that an individual who has previously committed a sex-based offense at some point in their history is more likely than others to commit a similar offense at some unspecified future time. This false assumption has been rebutted time and again by numerous scientific studies, including studies done by the federal Department of Justice, which show that sex offenders have one of the LOWEST rates of re-offense, yet politicians and law enforcement officers continue to ignore that empirical information in favor of measures that provide no measurable increase in public safety but are only a feel-good measure during election time.

Sex offender registry systems have no substantial evidence supporting their proposed effect of reducing sex offense commission and recidivism. Additionally, a substantial and growing body of law is showing that sex offender registry systems are in fact used as punishment, which runs contrary to several basic elements of our legal system and a citizens' right not to be abused by the legal system.

The addition of more regulations to an already overly burdensome, punitive, and ineffectual sex offender registry system will not protect children, but instead ensure that more people are placed on the registry and given additional criminal charges for administrative offenses related to non-compliance with the registry system.



Attachments  1

📄 Comments

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0116/attachment_1.txt)

**Comment ID**
DOJ-OAG-2020-0003-0116

AR-00000339

8/4/23, 12:19 PM                                                                    Regulations.gov

 **Tracking Number**

ken-237p-yfmc

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**

Sep 3, 2020



About     Bulk Data Download        Agencies      Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

I am writing to voice my opinion AGAINST the proposed regulations. To go further, I think SORNA and IML should be completely repealed as it is an ineffective use of resources and taxpayer funds. Sex offender registration based upon risk management used by the individual State is a much better way to work to protect the public.

The defense of sex offender laws based on the false premise used by SCOTUS many years ago stating when Justice Kennedy states sex offender recidivism risk is "frightening and high" has been scientifically proven to be incorrect and unjustly taken as a false fact. This has been used many times since then to justify a punitive set of laws that have been applied retroactively to a class of US citizens which is contrary to the US constitution. How can requirements changing over time be interpreted any other way when they cause great psychological harm not only on the offender but the offender's family, spouse and children? It is used as a form of vindication of the sex offenders in the general population with no basis for this continued oversight. A study by the DOJ, your department, in 2019 shows the recidivism from sex offenders is lower than that of other offenders to be rearrested (http://www.bjs.gov/index.cfm?ty=pbdetail&iid=6566) which should lead to reason that this regulation may be overstated at the federal level of government.

Besides being ineffective due to the low rate of recidivism among convicted sex offenders, a 2003 study in New York (Sandler, Jeffrey C, et. Al., Does a Watched Pot Boil? A Time-Series Analysis of New York States Sex Offender Registration and Notification Law. Psychology, Public Policy, and Law, 2008 Vol. 14, No. 4, 290) quantitatively shows that 95.94% of rapes and 94.12% of child molestation arrests are persons with no prior criminal history, thus outside the scope of SORNA from the start. In most instances, child molestation cases, the victim is known by the sex offender prior to the molestation, so the registry serves no practical purpose to begin with.

There have been many new studies done over the past decade which show a myriad of statistics, but most notably, they are done more scientifically with a larger population over a longer length of time to discredit some of the early notions about recidivism rates found in sex offenders.

For the last 20 years or so, the Legislature has taken the same approach that it did unsuccessfully in the 1980's with the Drug War, i.e. "get tough on Sex Offenders" while the research and even the recidivism rate of sex offenders speaks an entirely different alternative.
And worst of all the research shows that these "tougher on crime" measures actually create more problems and often have the exact opposite impact that they are proposed to offer. Using credible research and the wisdom of those orgamnizations who work with former offenser daily makes so much more sense.

SORNA is a tool being used by the federal government as a tool that does not promote criminal justice reform based on science, but rather making rules and regulations based on fear and misinformation. President Trump during the RNC showed he agrees with second chances through a pardon shown on national television as part of the event, but creating regulations based on fear and not based on science show a sense of vindication rather than offering a chance of redemption for those with a sex offense in their past.

This entire document -- in fact, the entire sex offender registration system -- is predicated on the false assumption that an individual who has previously committed a sex-based offense at some point in their history is more likely than others to commit a similar offense at some unspecified future time. This false assumption has been rebutted time and again by numerous scientific studies, including studies done by the federal Department of Justice, which show that sex offenders have one of the LOWEST rates of re-offense, yet politicians and law enforcement officers continue to ignore that empirical information in favor of measures that provide no measurable increase in public safety but are only a feel-good measure during election time.

Sex offender registry systems have no substantial evidence supporting their proposed effect of reducing sex offense commission and recidivism. Additionally, a substantial and growing body of law is showing that sex offender registry systems are in fact used as punishment, which runs contrary to several basic elements of our legal system and a citizens' right not to be abused by the legal system.

The addition of more regulations to an already overly burdensome, punitive, and ineffectual sex offender registry system will not protect children, but instead ensure that more people are placed on the registry and given additional

criminal charges for administrative offenses related to non-compliance with the registry system.

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

📧 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

[ View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) ]       [ View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) ]

[ Share ▾ ]

---

Comment

Representative Perlmutter,

I met you at one of your townhall/open forums at a Safeway on south Federal a few years ago sharing my experience on the Sex Offender registry. Currently DOJ-OAG-2020-0003 is being proposed and is in the open comment period.

The reason we need to be concerned are the consequences if someone doesn't comply. There is no notification process and if there a lapse in compliance be knowing or intentional the consequences of a registration violation under the federal laws are MUCH harsher than the already harsh sentence. In Colorado a failure to register is a felony if the underlying conviction was for a felony.

A first-time failure to register for a felony conviction is a Colorado class 6 felony. Consequences include:
1 – 2 years in prison, and/or a fine of $1,000-$100,000. A second or subsequent failure to register for a felony sex offense is a Colorado class 5 felony. Penalties include:
1 – 4 years in prison, and/or a fine of $1,000-$100,000.,

The federal change there is a mandatory minimum term of supervised release of five years but up to lifetime! (18 U.S.C. § 3583(k)).

For those who have never committed a federal offense to begin with, the potential of spending 10 years in a federal prison and a lifetime on probation for a technical violation of a set of laws that are not crimes for anyone else (other than someone on this registry that's not even supposed to be punitive to begin with), for which no notice is given and which can change at any time and be applied retroactively, should scare the crap out of anybody reading this! ...or, come to think of it, how about the people who are not reading this and have no clue what's going on?

No other group of offenders, including murderers, arsonists, those who commit violent assaults, etc., is subjected to the draconian restrictions of being placed on a public list. No other country (with the exception of North Korea) has a public list, although many countries' law enforcement agencies maintain nonpublic lists.
•Over 95% of new sexual crime is committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notificatio
•Public urination, sexting, underage sex, and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
•Many registrants face unemployment, homelessness, instability, and personal danger.
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja ; https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9
•Only a small fraction of those on registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 11
•"Stranger-danger" is rare; 90% or more of victims know their attackers, higher for children.
https://www.rainn.org/statistics/perpetrators-sexual-violence https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
•Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
•Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
•Sex offender registries put innocent family members of registrants in harm's way.
https://link.springer.com/article/10.1007/s12103-008-9055-x https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
•Registrants are frequently denied special housing such as nursing home care and section 8 housing.
https://www.theatlantic.com/health/archive/2017/06/aging-sex-offenders/528849/ http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1386&context=elders
•Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf
•Current sexual offense laws create conditions that lead to increased crime.
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/
https://repository.law.umich.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1078&context=articles
Thank you for your time on this matter.

Sincerely,

AR-00000343

Brian Garrett

**Comment ID**
DOJ-OAG-2020-0003-0117

**Tracking Number**
ken-313l-f7gu

**Comment Details** **Submitter Info**

**Received Date**
Sep 3, 2020

About (/about) Bulk Data Download (/bulkdownload) Agencies (/agencies) Learn (/learn) Reports (https://resources.regulations.gov/public/component/main?main=Reports) FAQ (/faq)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) | Accessibility Statement (/accessibility) |
Developers (https://open.gsa.gov/api/regulationsgov/) | FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support) Provide Site Feedback

8/7/23, 12:30 PM                                                Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾  |

---

**Comment**

This rule will make it completely impossible for a registrant to be able to follow. As a registered citizen, I already have to "magically" know every rule and requirement of the sex offender registry, from the Federal level, state level, county level all the way to the city level and even private businesses level. All of these entities have different requirements and rules which if violated are usually felonies leading to years in prison and more years of probation for violations that are not even criminal but regulatory in nature.

If I travel to another city, county or even State, I have to "magically" be aware of all of these rules and restrictions all over again and if I am traveling for business or vacation I am supposed to know the myriad of rules for every jurisdiction I visit.

These rules and restrictions are constantly changing and being added with no notice to registrants from the state, county and city level at all times in all jurisdictions.

Now I will need to be aware of new Federal registry levels, even though the Federal Justice Dept. does not even maintain a registry, but piggybacks a list through the state registries. But, seemingly I am supposed to know all the new federal registry requirements and register through the federal registry, even thought there is NO federal registry.

This goes on and on in the life of a registrant. It is time to end the useless registry and pay attention to the myriad of studies showing the registry does no good for public safety and is simply a naming and shaming tool of punishment to make the life of a registrant impossible to comply with and destroy any chance of becoming a contributing and useful member of society once his sentence is fully completed.

AR-00000345

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0118

 **Tracking Number**

ken-34ia-vtxr

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



About    Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000346

8/4/23, 12:53 PM                                            Regulations.gov

An official website of the United States Government.  🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

Comment

As the spouse of a registered sex offender I am appalled at the constant vilification of sex offenders by the government. Politicians play on public emotion through fear mongering and misinformation. Studies show that sex offenders are the least likely to re-offend, after murderers, yet they are the only ones required to serve both a prison sentence and a lifetime public sentence due to registration. SOR is not working and in fact causes more harm than good. Public registration affects entire families and makes living in a community and trying to move forward with life almost impossible. There is also the constant threat of re-arrest due to non-compliance, such as failing to report a new job within 7 days, or providing out of state travel info three-weeks in advance. These should not be considered crimes worthy of reincarceration, All sex offenders are lumped into a one-size fits all category. The 18 year old boy who got his 15 year old girlfriend pregnant and a child predator are both labeled with the tag "sexual assault of a child." It's an outrage! The majority of sex offenders should have a path off the SOR for compliance and no further arrest for sex crimes. Not everyone who convicted of a sex offence is a monster, and once they've served their time they, like all other formerly incarcerated, should be allowed to live in peace.

---

**Comment ID**

DOJ-OAG-2020-0003-0119

---

◎ **Tracking Number**

ken-38cu-8qo1

---

| **Comment Details** | **Submitter Info** |

AR-00000347

**Received Date**

Sep 3, 2020



About       Bulk Data Download        Agencies      Learn

(/about)          (/bulkdownload)     (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/7/23, 12:35 PM                              Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 4, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

SORNA and registration schemes are contrary to the Constitution and without purpose. Study after study after study, even those by government agencies, all point to the same conclusion: Recidivism rates are low among those convicted of sex offenses; registrations schemes do nothing to prevent crime or protect the public and may in fact increase harm to the public; registration schemes alienate and several impede reintegration and rehabilitation; registration schemes hurt families and children. Your child is more likely to be put on the sex offender registry than they are to be hurt by someone on it.

If these laws are contrary to American ideals and the Constitution, serve no purpose to and may in fact harm the public, and cost the taxpayer, why are they pushed for so fervently by politicians?

**Comment ID**

DOJ-OAG-2020-0003-0120

 **Tracking Number**

ken-5bh5-sesg

Comment Details                                    Submitter Info

**Received Date**

Sep 3, 2020

AR-00000349



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000350

8/8/23, 12:51 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ⬭724⬭ (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments ⬭724⬭ (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

Even your own statistics say people who commit sex crimes have a low rate to reoffend. Most sex crimes are committed by people not on a registry and experts have never supported this useless law that's based on fear and cheap political points. How many innocent kids have to be bullied, assaulted or killed to get you to open up your eyes? How much more harm will you do to people that have paid their debt to society? This government is out of control. Enough is enough of this modern day slavery!!!

**Comment ID**

DOJ-OAG-2020-0003-0121

 **Tracking Number**

ken-3dx0-3d1w

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020

AR-00000351

Regulations.gov



About     Bulk Data Download      Agencies      Learn

(/about)         (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)


Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000352

8/8/23, 11:59 AM                                        Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

SORN is ineffective: the Department of Justice itself has published the Sex Offender Management and Assessment Initiative that the results are mixed whether SORN prevents crime or deters sexual offenders.
SORN is costly: these regulations, together with the 6th Circuit case, will place the burden on states to register individuals who may not otherwise have an obligation to register.
SORN creates a false sense of security and the illusion of control: 95% of sexual offenses are committed by persons NOT on the registry.
SORN is counterproductive: the unintended consequences of SORN make SORN counterproductive.
As a result, SORN makes society less safe.

When will the punishment stop for those with this horrible label. The SORN treats sex offenders worse than any other person that has committed a crime. A person who has killed someone is treated better. We need rational SO laws. I implore you to stop this. It will not help you or anyone in the public. This is more harm than good

Sincerely
Mary Nesper

**Comment ID**
DOJ-OAG-2020-0003-0122

 **Tracking Number**
1k4-9ir5-z9f1

AR-00000353

Regulations.gov

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



About   Bulk Data Download      Agencies    Learn

(/about)      (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000354

8/8/23, 11:09 AM                                                Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

Comment

How are these laws not considered punishment? Is not probation and parole a part of your stipulations and punishment for commiting a crime? Than these laws are exactly the same even if one was never given probation or parole. Instead it is a forced form of probation with equally punishing consequences, when one isn't even on probation or parole. Punishment by law mandates prison time or jail time, for which these laws carry for an indefinite period of. No other crime carries such regulations to even 1% of these kinds of regulations accept in regards to sex offenses. You can commit any other crime in the world, and not face these kinds of laws if upon release from the crime committed. It's beyond ridiculous to the extent of tyranny.

**Comment ID**

DOJ-OAG-2020-0003-0123

**Tracking Number**

ken-3lud-khmf

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020

AR-00000355



About        Bulk Data Download        Agencies        Learn

(/about)            (/bulkdownload)     (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000356

8/8/23, 2:56 PM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

It's so unfortunate that our justice system is so faltered and unjust. There is non differentiation between crimes. I had consensual sex with an 18 year old, who was not coerced in any way and he fully admitted to authorities that he was in love with me. Now, I'm m required to register for life because he was a few months pre high school graduation. I know it was immoral and a bad decision on my part but to now be so ostracized and considered a threat to the public... doesn't even make sense. There is plenty of documents showing that sex offender registries do not work, they waste tax payer dollars and majority of those on the registry do not re offend. Why aren't murderers or drug addict required to register? What make a sex offender more likely to reoffend then a drug addict? Will this ever end. It needs to or it needs to be narrowed down to the most dangerous offenders because someone who had sexual contact with a consensual 18 year old does not constitute a serious danger to society.

**Comment ID**
DOJ-OAG-2020-0003-0124

 **Tracking Number**
ken-4w4n-m5jq

| **Comment Details** | **Submitter Info** |

**Received Date**
Sep 3, 2020

AR-00000357

Regulations.gov



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000358

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)  /  Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  /  Comment

💬 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) | View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

I am outraged that our country is punishing a subgroup of people like no other. Here are some basic facts about registrants:

No other group of offenders, including murderers, arsonists, those who commit violent assaults, etc., is subjected to the draconian restrictions of being placed on a public list. No other country (with the exception of North Korea) has a public list, although many countries' law enforcement agencies maintain nonpublic lists.
•Over 95% of new sexual crime is committed by persons NOT on a registry.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 15
https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_TimeSeries_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notificatic
•Public urination, sexting, underage sex, and indecent exposure can trigger a requirement to register.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us third section
•Many registrants face unemployment, homelessness, instability, and personal danger.
http://journals.sagepub.com/doi/abs/10.1177/1043986204271704?journalCode=ccja ; https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 9
•Only a small fraction of those on registries are truly high-risk.
https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 14
•"Stranger-danger" is rare; 90% or more of victims know their attackers, higher for children.
https://www.rainn.org/statistics/perpetrators-sexual-violence https://www.innovations.harvard.edu/sites/default/files/105361.pdf page 7
•Re-offense is rare. The DOJ has reported a 5.3% re-arrest rate, and a 3.5% reconviction rate after 3 years.
https://www.bjs.gov/content/pub/press/rsorp94pr.cfm https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf page 7
•Research studies have found no relationship between having a registry and a decrease in sex offenses.
http://psycnet.apa.org/record/2008-18509-003 https://www.ncjrs.gov/pdffiles1/nij/grants/225370.pdf pp. 7, 41
•Sex offender registries put innocent family members of registrants in harm's way.
https://link.springer.com/article/10.1007/s12103-008-9055-x https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf pages 9-10
•Registrants are frequently denied special housing such as nursing home care and section 8 housing.
https://www.theatlantic.com/health/archive/2017/06/aging-sex-offenders/528849/ http://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1386&context=elders
•Former sex offenders are less and less likely to reoffend the longer they live offense-free.
https://www.hrw.org/report/2007/09/11/no-easy-answers/sex-offender-laws-us http://journals.sagepub.com/doi/abs/10.1177/0886260514526062
https://ofm.wa.gov/sites/default/files/public/legacy/sgc/sopb/meetings/board/2015/10/research_outline.pdf
https://www.eff.org/files/filenode/024_hanson_decl_11.7.12.pdf
•Current sexual offense laws create conditions that lead to increased crime.
https://qz.com/869499/new-evidence-says-us-sex-offender-policies-dont-work-and-are-are-actually-causing-more-crime/
https://repository.law.umich.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1078&context=articles

---

| **Comment ID** |
| DOJ-OAG-2020-0003-0125 |

| ◎ **Tracking Number** |
| ken-4zza-363b |

| **Comment Details** | **Submitter Info** |
|---|---|
| **Received Date** | |
| Sep 3, 2020 | |

AR-00000359

Regulations.gov



About   Bulk Data Download   Agencies   Learn                                                     Reports   FAQ

(/about)      (/bulkdownload)   (/agencies)   (/learn)   (https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)


Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |

Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000360

8/8/23, 1:01 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ⟨724⟩ (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments ⟨724⟩ (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

The bottom line is the Sex Offender offense is WAY OUT OF CONTROL! There are no base ground rules that take each offense individually (like every other offense such as murder, burglary, etc.) It has been PROVEN (not opinionated, but proven) that there is only a 3.5% recidivism rate of an SO, however, burglary or grand theft are 80% and murder is higher too. Why is the SO offense so discriminated against? It's all based on FEARS FEARS FEARS that really do NOT exist - are phantoms/ghosts - figment of someone's imagination - NOT FACT! It's been PROVEN - IT IS NOT OPNINON!! Why are these laws based on imagination and fears INSTEAD of facts? NOT FAIR - NOT FAIR - UNCONSTITUTIONAL!! It's no wonder the US is so screwed up with the prison facilities, homeless, disfunctional families, bcuz the Judicial System is LAZY LAZY LAZY - instead of actually caring for all involved and really making the punishment fit the crime -they just put a punishment on a crime that UNNECESSARILY RUINS everyone's life involved. US law makers are not the brightest, and most are committing the same or very similar offense THEY THEMSELVES are setting the punsihment for........stupid and ridiculous - very immature!!

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0126 |

| ⊕ **Tracking Number** |
|---|
| 1k4-9ir7-iw0r |

| **Comment Details** | **Submitter Info** |
|---|---|

AR-00000361

Regulations.gov

**Received Date**

Sep 3, 2020



About    Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000362

8/8/23, 12:52 PM                                                    Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

I have a good friend who has to register for something he did many years ago. He has worked hard to better himself and be someone anyone could trust. He has worked with me professionally for five years and has gone through tremendous growth, sadness and acceptance... knowing there were deeper reasons why this happened, and he was willing to go there.

In my eyes, because of him and many other stories I have heard, sexual offense registration does not seem to work as is intended and might do more harm than good. It's like labeling placing a scarlet letter on someone versus knowing the whole story, working on betterment, being a whole society where we are all responsible for the good and bad.

Also, I am not saying there are situations where this could be warranted, but a blanket registration? Seems like there needs to be more investigation and limitation.

In addition, I am a white woman and mother of two teenage daughters. I say this because I understand that my demographic may be more pro-registration. Not me.

**Comment ID**
DOJ-OAG-2020-0003-0127

 **Tracking Number**
1k4-9ir7-84kf

AR-00000363

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020



About   Bulk Data Download       Agencies     Learn

(/about)       (/bulkdownload)   (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000364

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001) / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

As a psychologist who has worked with individuals who sexually offend, as well as with victims of sexual abuse for over 30 years, I urge the government to incorporate the evidence which addresses true safety issues, the best prediction of sexual offending recidivism risk, and the analysis of when and how registration requirements may facilitate community safety, versus the ways that registration may actually increase the risk of sexual recidivism. I am a member of the Association for the Treatment of Sexual Abusers at the national level, as well as a member of ATSA chapters in Minnesota and South Dakota and my colleagues and I want there to be policies based on the best science available. If this issue is allowed to be politicized, public policy may contribute to the problem of sexual recidivism as opposed to helping to reduce recidivism.

Scott Pribyl, Ed.D.
Licensed Psychologist

| **Comment ID** |
| DOJ-OAG-2020-0003-0128 |

|  **Tracking Number** |
| 1k4-9ir7-4k8b |

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

AR-00000365

Regulations.gov

Sep 3, 2020



About     Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000366

8/8/23, 2:13 PM                                       Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

Comment

First, I'm a proud supporter of AG Barr and so grateful for his steadfastness, especially considering the daily difficulties constantly hurled his way from the folks on the other side of the aisle.

I do, however, have concerns about the proposed registration requirements as depicted within the document. I made a mistake many years ago, did not know the alleged victim had lied to me about her age, and have been punished ever since. Yes, the registry is punishment as threats are made against you and your family, jobs are difficult to find, finding a place to live is almost impossible, and the list goes on and on. I have two years remaining on the registry and really just want to get on with my life once my duty to register expires.

If you will research the recidivism rates, it will be obvious that it is extremely low. In my case, I have been totally compliant and have not -nor will I ever have- any arrests for sex crimes. I feel that over all the SOR has not been effective and has caused more harm than good, and will continue to do so.

My prayer is that you will give this serious consideration before adding more restrictions to an already failed system. As for myself-and my family, who have stuck with me through this entire ordeal- I would ask that consider folks like us. People who have owned up to their mistake and have been compliant, and just want to get on with their lives and be accepted back in to society as human beings and not the monsters that a lot of the media portrays.

I am writing this with animosity, as I have mentioned before, along with my name being published comes a lot of bad towards me and my innocent family. I pray you read this and that it will touch your heart and you will give consideration to the additional pain that would be caused if enacted as proposed.

Comment ID

AR-00000367

Regulations.gov



DOJ-OAG-2020-0003-0129

**Tracking Number**

1k4-9ir8-mryf

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



Your Voice in Federal Decision Making

About      Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)      (/agencies)      (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000368

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)

/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

I am writing this as a registrant, a father, a son, a brother, an uncle, a friend and a citizen of the United States of America. I would like to ask that you do not move forward with enacting the proposed legislation, and instead, look to repeal the requirements currently defined in SORNA due to the impact of the requirements on those beyond the registrant, but to the family and friends of the registrant who in turn are punished, reputed, and treated like lepers for something they had nothing to do with. This antiquated form of punishment, regardless of how courts have defined it, impacts a larger swatch of the public than just the offender. It takes away the dream of second chances which is one of the founding principles of this great nation, and snuffs the torch of opportunity for those who associate by being family or friend with an ex-offender because of the public shame and humiliation brought about by the registry and the additional sex offender requirements. My children have been attacked verbally and family ostracized which impacts the psychological and social development of my children and wife. My extended family is tormented verbally due to the blood connection to me. Friends are hard to come by as they do not want the harassment due to association to someone on a registry which has been proven many times to be ineffective at crime prevention by those within the DOJ and other scientifically-based research. Sex offenders, especially those with treatment while incarcerated or after, have very low chances of recidivism, so the registry is not a tool for public safety, but rather a wall of shame that inhibits the ability to live a free and happy life, a second chance. Because of my life on the registry, I have been threatened bodily, experiences vandalism of property which is not taken so seriously, because after all, this is a sex offender and he must pay for what he did, right? I'm asking you to use science and common sense about this to get your direction and I hope you'll agree that this is just an extension of an already bad system of regulations that target a specific group of people known as sex offenders. I ask that you give us that chance to thrive, becoming constructive members of society as repayment for the harm that we caused others in the past.

AR-00000369

8/8/23, 2:15 PM                                          Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0130

 **Tracking Number**

ken-a74x-8wb7

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



About   Bulk Data Download       Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000370

8/8/23, 2:37 PM
Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

Comment

I strongly oppose this expansion of SORN. If enacted, this measure will result in more people being required to register, and requiring more information such as vehicle and boat registration and foreign travel data, to be collected and not used. Registering more people and collecting more information both will result in increased cost, both financial and to society, with no benefit.

Registries do not keep society safe, so adding people and requirements will add to the cost of implementing. Research studies have found no relationship between having a registry and a decrease in sexual offenses.

The current system is not an accurate predictor of risk. Over 95% of new sexual crime is committed by people not on the registry. Registries do not take into account recidivism rates or individual risk factors pertaining to crimes the registry is seeking to prevent. Only a small fraction of those on registries are truly high-risk.

Adding people and requirements to the current broken system is only going to make the situation worse for registrants, their families, and a misinformed public. Efforts should put into evaluating individuals to determine people who are truly high-risk, then designing programs aimed at these specific individuals. For low-risk people, money should be spent on rehabilitation to help them become productive members of society.

|  **Comment ID** |
|  DOJ-OAG-2020-0003-0131 |

|  **Tracking Number** |
|  1k4-9ir9-d47o |

AR-00000371

Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020



About    Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000372

8/8/23, 12:01 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

As someone heavily involved with the sex-offender registry, I am both dismayed and disheartened with the changes proposed in the Adam Walsh Act. As you know,research clearly shows that the recidivism rate for sex-offenders are among the lowest of any criminal category. A majority of these registrants (over 90%)have committed non-violent, non-contact crimes for which they served their sentence and only want to get on with their lives. They also must adhere to many municipal, city and state restrictions which can be both overwhelming and stifling....many times, even law officials don't know what the requirements are for each particular area. Adding more requirements for registering and traveling will certainly add to this confusion for everyone...not just the offenders. If the hopes are to integrate offenders into society, this will absolutely make this extremely difficult. In conclusion, I am asking that these new harsh regulations for offenders not be instituted. I feel that,given the current situation in our country with violence, police killings, protests, cities in ruins, the government would be much better served putting their resources elsewhere,

| **Comment ID** |
| DOJ-OAG-2020-0003-0132 |

| ◎ **Tracking Number** |
| ken-b5b7-n8aj |

| **Comment Details** | **Submitter Info** |

**Received Date**

AR-00000373

Regulations.gov

Sep 3, 2020



About    Bulk Data Download      Agencies    Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)


Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020



| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

Comment

Several years ago my 16 year old son was skateboarding with several of his friends in a parking lot. DENTON COUNTY TEXAS SHERIFF rolled up. Before exiting his vehicle he apparently ran the license plate of the truck which I had given him. The TRUCk was still registered in my name.
The cop exited his vehicle and yelled across the parking lot "who's fucking truck is this?"
My son and his friends were petrified. My son said it was "his".
The cop said "are you Robert Huling?"
My son responded no, he's my dad.
The cop then responds "Did you know your dad's a fucking sex offender?"
My son responded " I do".
The cop responded "Good, now all your fucking friends know too.'
Cop got back in his car and drove away.

It has bwem20 years since my offense. My victim was my stepdaughter. This past weekend my wife and I spent the weekend with her, her husband and my give grandchildren.

There are offenders who need monitoring and there are those that don't.
There are ZERO studies that show the effectiveness of registries benefiting public safety.
There are extensive studies that show there ineffectiveness .
I have filled several hundreds of applications over the years. Have not worked in 20.
Your registrey is flawed.
You only serve to demonize and ostracize a group of people.
You will be judged.

AR-00000375

8/8/23, 3:00 PM                                                      Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0133

 **Tracking Number**

1k4-9ira-1u1a

|  Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



Your Voice in Federal Decision Making

About         Bulk Data Download        Agencies        Learn

(/about)           (/bulkdownload)       (/agencies)      (/learn)

                                                           Reports      FAQ

              (https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

                                                    Support (/support)    Provide Site Feedback

AR-00000376

8/8/23, 11:10 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments ⟨724⟩ (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ⟨724⟩ (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

Why does the judicial system feel the need to keep punishing people that have paid their dues, served their time and are trying to move on? Evidence has shown time and again that sex offenders have a very low re-offense rate, yet you choose to keep on punishing them and their families. The new regulations will do nothing to help anyone and in fact will push registrants and their families farther away from society and the help they truly need. It is time for politicians to quit pandering for votes on the backs of the registrants. Please do not go forward with these terrible new regulations!

**Comment ID**
DOJ-OAG-2020-0003-0134

 **Tracking Number**
ken-cyzs-uv4v

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 3, 2020

AR-00000377



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000378

8/8/23, 11:23 AM                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

The Docket No. OAG 157. Name,address,email address,phone number and any other personal identifying information pleas keep confidential.
I was previously convinced of a sex crime and had to register for 10 years. Fortunately I am also a alcoholic and found 12 step fellowship for alcohol and sex. I can tell you first hand that contact with other people and being able to tell the truth and talk about the past is vital to become a productive citizen again. The sex offender registry alienates Individuals that desperately need to participate with the community. I have been able to accept responsibility for my past and move on through interaction and acceptance from the community. In 12 step meetings and the people I meet that arent addicts and understand and forgive. I can talk to people in AA about my Previous sexual conduct. This is vital to integrating back into society. The registry and all the confusion with understanding the rules and the negative impact it has on the people that it affects makes life unmanageable. It isolates the people that have to get out there and start over. Its negative impact on people that I have meet in recovery is terrible. Most sex offenders cant make it back due to the shame they have to endure. Most sex offenders think everyone around them knows about their past and judges them. Even though a lot of people dont even know them or what they have done. Any added regulatory requirements would only have more of a negative impact on people who have made a mistake in their past. Please consider no new regulations. Thank you for your time.

**Comment ID**

DOJ-OAG-2020-0003-0135

⌖ **Tracking Number**

1k4-9irb-ttxh

AR-00000379

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000380

8/8/23, 2:25 PM                                           Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

As a Grandmother 0f a registered sex offender who offended when he was 17, never touched anyone, I have watched this young man who is 25 now go from being everything to a castaway by society. He cant work, has to live on the street, no medical care and physically and mentally abused. He has paid for his offense legally but the notifications and restrictions are so harsh already and now the Federal Govmt wants to make the restrictions even harsher. If these new laws are passed the prisons will be full of offenders who are not able to abide by them or even keep up with them. Please reconsider.

**Comment ID**

DOJ-OAG-2020-0003-0136

 **Tracking Number**

ken-gd52-4938

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 3, 2020

AR-00000381



About    Bulk Data Download    Agencies    Learn

(/about)         (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000382

8/8/23, 11:11 AM                                              Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |          Share ▾

---

Comment

In my family's case- my husband is on the registry for life for a false accusation and wrongful conviction. Our entire extended family and numerous friends and family members came to support him and testify for him and filled the court room during his trial. The female's own friends- four of them- testified against her and refuted her testimony. This trial and all the defense, bail, testing, investigation and everything involved cost our family A MILLION DOLLARS in legal fees and court expenses too numerous to list. He has to go to counseling 4 times a month to repent of this and see a probation officer 3 times a month. He cannot be around anyone in his family who is under 18- so he hasn't seen some for 11 years, so far. My daughter and I have had to go to counseling and take medication due to the physical, emotional, spiritual and financial devastation this has caused our family.

We have had the DPS come by when we weren't home and so they left a big red sign on our door "Sex Offender Enforcement Notice" requesting a call from my husband. The probation officer parks in front of our home with a big sign on their squad car "Sex Offender Enforcement Unit".

We have lost jobs and have retreated into our home for fear of being harassed or ever in a situation where someone else will hurt us this horrifically again.

Our heartache is beyond repair..
Is it appropriate to shame and punish the entire family into perpetuity for the rest of their lives? Must we be banished from every town due to residency restrictions?

He can never travel internationally. He can't leave our county, where we live, unless it is for work. He can't go to church or the gym because they have babysitting there.

He has missed weddings, graduations, funerals, and meeting the babies born into the family.

Our daughter got married and we couldn't have children at the wedding, and so her husband's parents and

AR-00000383

Regulations.gov

family refused to come to the wedding. She didn't want to tell them about my husband's registration. ( She told her husband before they were married.) They've waited to have children.

I don't have friends- we don't let anyone in because we have to explain that he can't drink alcohol or go to certain restaurants, and we can't be around anyone who has children.
We can't do anything.
We hide because we are afraid.

We can't leave home on Halloween- we have to sit inside in the dark and wait for the sheriff to come by and make sure we are home and aren't giving out candy. In addition, we can't decorate our home for Halloween or Christmas because that may "attract" children.

I'm sick of it all - to death.
I'm sick and tired of being hurt.
Every time I have told anyone it lets them in a little, and just spreads grief.
Which never ends.
My husband is on the registry- he was falsely accused and convicted.
We have never been anything but good citizens, Christians, very charitable and generous people who would do anything to help anyone.

---

**Comment ID**

DOJ-OAG-2020-0003-0137

---

 **Tracking Number**

ken-ka22-zj48

---

**Comment Details**                                              **Submitter Info**

**Received Date**

Sep 3, 2020



AR-00000384

Regulations.gov

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000385

8/8/23, 11:02 AM                                            Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

There is an abundance of evidence that registrants have extremely low recidivism rates and there is NO
evidence that registries or residency restrictions are effective in lowering crime rates or increasing public
safety.

This is a bill with NO RESEARCH OR EVIDENCE TO SUPPORT IT!

These laws cause endless harassment to registrants, who already have a abundance of restrictions, and
their innocent families. Do you know that there are many people on the registry who are on there for viewing
porn, making a foolish mistake at a young age, or for teenage consensual sex- Romeo and Juliet offenses-
where she was 16 and he was 19 - and they went on to get married?? Did you know that Texas has over
88,000 registrants?

Can anyone ever be forgiven after they have done their sentence, paid their fines, done their community
service, completed probation or parole, done their counseling for years dutifully, and never have a single
infraction or offense of any kind? Why is it that these registrants must be punished into perpetuity?
Is it appropriate to punish the entire family for the rest of their lives? Must they be banished from every
town?
What is next? Having online listings of convicted drug dealers and those who have had a DWI, so we can
watch out for when they are on the road and publicly shame them and and their family?
When is punishment enough?
Polygraphs, public shaming, and residency restrictions are based on fear mongering are not an effective
deterrent- having a supportive family, a job and a place to live create stability and reduce isolation in those
who have been convicted-THOSE things will reduce the already very low risk of recidivism.
These registries and residency restrictions have NO research or empirical support. They hurt families and
cost the areas that enact them money to enact, and research shows they do nothing to reduce sex offenses
or re- offense.

AR-00000386

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0138

 **Tracking Number**

ken-key9-d71n

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



About   Bulk Data Download      Agencies     Learn

(/about)          (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |   User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |   Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000387

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

Registrants are punished into perpetuity- despite all of the evidence that registrants have extremely low recidivism rates and there is NO evidence that registries are effective in lowering crime rates or increasing public safety.

These laws cause endless harassment to registrants and their innocent FAMILIES. There have been registrants and innocent family members KILLED because of hysteria such as Ms. Shapiro has caused based on her made up claims and personal opinions. Charles and Gretchen Parker in South Carolina, who were shot and stabbed multiple times by a local resident just because he was a registrant. In 2013 there was a serial killer in New Hampshire going through the registry and pinpointing where registrants lived and killed 3 registrants. While some people may not have much sympathy for these registrants subject to harassment, or worse, innocent people have also been hurt due to mistakes or misunderstandings of the registry, such as one 78 year old man in Orange County, Florida, who was beaten to death with a baseball bat because his name was similar to a registrant.

Did lawmakers care or consider that some registrants may have children? What if this was THEIR family member? Did they know there are many people on the registry who are on there for viewing porn, making a foolish mistake at a young age, or for teenage consensual s3x- Romeo and Juliet offenses- where she was 16 and he was 19 - and they went on to get married??

Can anyone ever be forgiven after they have done their sentence, paid their fines, done their community service, completed probation or parole, done their counseling for years dutifully, and never have a single infraction or offense of any kind?

| **Comment ID** |
| DOJ-OAG-2020-0003-0139 |

AR-00000388

8/8/23, 11:08 AM                                                    Regulations.gov

 **Tracking Number**

ken-kj9c-qln8

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 3, 2020



Your Voice in Federal Decision-Making

About      Bulk Data Download        Agencies      Learn

(/about)       (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000389

8/8/23, 2:14 PM                                                        Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

https://gritsforbreakfast.blogspot.com/2016/07/we-are-programmed-to-receive-entry-to.html?
utm_source=feedblitz&utm_medium=FeedBlitzEmail&utm_content=79553&utm_campaign=0&m=1

**Comment ID**
DOJ-OAG-2020-0003-0140

 **Tracking Number**
ken-ku7r-xaim

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 3, 2020

Regulations.gov



Your Voice in Federal Decision-Making

About (/about)     Bulk Data Download (/bulkdownload)     Agencies (/agencies)     Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)     FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/8/23, 2:08 PM                                      Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

The judiciary needs to be removed from the deregistration process. I filed a motion to deregister. I underwent a deregistration evaluation, where I tested in a way that was consistent with being allowed to deregister. Yet, the judge in my district court refused to allow my deregistration.

I don't think the judge should've been able to make the decision. I believe the decision should've been left up to the licensed sex offender treatment provider, whom the council on sex offender treatment approved to conduct deregistration evaluations and whom conducted mine. She is the professional. She also doesn't hold a public, political office and therefore doesn't have to go up for reelection.

My offense was committed twelve and a half years ago. I'm now thirty years old, and am the sole provider for my wife and our three children.

There must be an obtainable way to deregister for persons like me, who clearly no longer pose any threat to the community and just want to move on with their lives.

| **Comment ID**
DOJ-OAG-2020-0003-0141 |

| ◎ **Tracking Number**
1k4-9irf-3107 |

AR-00000392

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 3, 2020



About     Bulk Data Download     Agencies     Learn

(/about)     (/bulkdownload)     (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000393

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

This new rule will unfairly re-capture people who committed their offenses long ago and have already spent decades subject to the immense burdens of registries. In the early days of registries, registrants were only required to register for up to 25 years. Now, many of those that were originally given 25 years on the registry as part of their sentence have been retroactively forced to comply for life.

SORNA's lifetime requirement for certain offenders is unnecessary. Bloated registries make it harder for law enforcement agencies to know how to focus their limited resources. There needs to be a path off the registry for those offenders who can demonstrate that they are no longer a threat to public safety.

**Comment ID**

DOJ-OAG-2020-0003-0142

 **Tracking Number**

ken-qblw-ji1r

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 4, 2020

AR-00000394



About       Bulk Data Download       Agencies       Learn
(/about)         (/bulkdownload)      (/agencies)      (/learn)

Reports       FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/8/23, 11:03 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

Comment

Everything about this is inhumane. You aren't only punishing my husband, you are punishing my two children and myself. It's bad enough he has to register for life in a state with NO tiered system at all, but to add more requirements? I already live in fear of my husband being "non-compliant" I don't need to worry about him going to prison after abiding by every rule he has had to for 7 years now. He has served his time and paid his debt to society but you all just want more from him... Let me ask some questions here..After a person has murdered someone and manages to be released from prison, are they listed on a public registry to make you feel safer? What about people who have DUI's? Are they publicly listed to make you feel safer on the road? How about drug dealers or users? Are they listed on a registry showing you if they're dealing or buying in your neighborhood? No. After someone has paid their debt to society they should have access to every basic human right just like anyone else. The registry is keeping people from having access to gainful employment, housing, the ability to take care of their families, and more. It also causes collateral damage. You aren't making anyone feel safer putting these people on a list... you're doing nothing more than just instilling mass paranoia. It breaks my heart that the families aren't taken into consideration after their loved ones have served their sentences. The registry has absolutely ruined our lives.

|     | **Comment ID** |
|     | DOJ-OAG-2020-0003-0143 |

|  | **Tracking Number** |
|     | ken-xrri-yqkr |

AR-00000396

Regulations.gov

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 4, 2020



About     Bulk Data Download     Agencies     Learn

(/about)     (/bulkdownload)     (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000397

8/8/23, 2:59 PM                                         Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |
|---|---|

| Comment |
|---|

As a Trump supporter. And person tangled up in this mess. I urge the powers that be. Please reconsider these decisions. Especially with Juvenile offenders. Placing kids on a registry, For life is frankly absurd. 13 at the time of my offense. I'm 35 now, have a good career. And have done everything I can to move on. Not for a second does the thought of commiting crimes cross my mind. Just becoming a contributing member of society is mostly what ex offenders care about. We know recidivism statistics and data don't lie. Unlike many members of our government. And the chances of almost all offenders re offending is basically zero. People make mistakes. Because we are people. Please stop treating these groups of people as though they can't be helped. Because most of them can. And most of them will do whatever it takes to correct their wrongs.

Thank you.

**Comment ID**

DOJ-OAG-2020-0003-0144

 **Tracking Number**

keo-1wkg-6qd7

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 4, 2020

AR-00000398

Regulations.gov



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/8/23, 2:12 PM                                              Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

This injustice needs to stop. The registry does not work and it's shown that most offenders on this registry do not reoffend. Why the need to continue to make someone life harder once they've served their time? It not only effects the individual but it also effects the loved one of that person. It not only makes people anxious but also makes it hard to find a job, housing, healthcare etc. At what point is enough enough??

**Comment ID**

DOJ-OAG-2020-0003-0145

 **Tracking Number**

keo-53vm-vsyi

**Comment Details**                                      Submitter Info

**Received Date**

Sep 4, 2020

AR-00000400

8/8/23, 2:12 PM                                                    Regulations.gov



About      Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)


Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000401

8/8/23, 2:09 PM                                      Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

Comment

Sex offender registries have been proven nationwide repeatedly to be ineffective against preventing sexual crimes. The registries only serve to further stigmatize and greatly hamper the efforts of registrants to integrate into society and function as stable, productive taxpayers. Most people who are convicted of sex crimes, about 94% of them, will never reoffended sexually. This has been proven over and over, for decades, in every study made, and is proven in reality. The registries should be done away with altogether, as they are ineffective, and they are a waste of the taxpayers money, as well as a waste of law enforcements time and efforts.

**Comment ID**
DOJ-OAG-2020-0003-0146

 **Tracking Number**
1k4-9irn-7qse

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 4, 2020

AR-00000402

Regulations.gov



About     Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)   (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000403

8/8/23, 10:57 AM                                        Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

Comment

We all agree that our laws should contribute to the public safety and peace of our communities and society. Evidence and facts compiled from years of analyses all point to the reality that extended sex offender registration has not increased public safety, but has created a whole new set of social and financial collateral damages to our society.

As you know from researching the extremely low recidivism rates, the overwhelming majority of sex-related crimes are NOT committed by ex-offenders, or even in the child safety zones, but by family members or friends of the family. Ex-offenders are statistically 95% less likely to commit a sex crime than the general population. Please check the statistics. To impose an ongoing SOR registration on the least likely demographic to re-offend is counter-productive, cruel, unnecessary, and does not increase the goal of public safety.

Extended sex-offender registration creates an ongoing culture of public humiliation and shame that harms the families, children, and relatives of ex offenders that are trying to live productive lives and function as part of our community. Instead, ex offenders are labeled, subjected to isolation, shaming, public humiliation for many years after they have completed their debt to society. Please, these people, their families and children deserve a chance to establish a normal life.

Additionally, the financial and social cost of monitoring, policing, and enforcing these ex-offender regulations diverts resources that should be being used to actually make our communities safer. Please, do not saddle our law-enforcement community and society with further harmful, wasteful, and unproductive SOR monitoring.

Please, let us de-escalate the political/emotional hype and fear-mongering of these harmful laws, and instead turn our efforts to creating a path off of SOR for ex-offenders compliance and those who have no further sex offense convictions. Perpetual registration and monitoring is counter productive, does not increase public safety, and is harmful to all of us.

AR-00000404

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0147



**Tracking Number**

1k4-9irp-hh7k

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 4, 2020



About   Bulk Data Download   Agencies   Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000405

8/8/23, 2:30 PM                                              Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ⟨724⟩ (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments ⟨724⟩ (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

| Comment |

Please show me where these laws have protected one person! All they have done is break up families, make folks homeless and prevent them from finding a good job. Not all are rapist or child predators, fact that most these types are not on the list, to sly have gotten away with their crimes for years. The majority are teens and adults that had consented under age sex partners. A simple tickling of a minor can be turned into Indecently with a child by contact by a DA. The true victim is the accused as now they are a convicted felon and an RSO!! No one wants to protect the rapist or child predators, they need to be put away and on this list. With over 1 million Registered Sex Offenders in this country today, something is wrong with this system. No one is protected by these unjust laws that need a total over haul.

**Comment ID**

DOJ-OAG-2020-0003-0148

 **Tracking Number**

1k4-9irp-aotu

| Comment Details | Submitter Info |

**Received Date**

Sep 4, 2020

AR-00000406



About   Bulk Data Download   Agencies   Learn

(/about)   (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000407

8/8/23, 11:25 AM                                                   Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

Please show me where these laws have saved one person! All they have done is break up families, make folks homeless and prevent them from finding a good job. Not all RSO are rapist or child predator's. Fact that most these type are not on this list, to sly, they gotten away with their crimes for years. The majority are teens and adults that had consented sex with under age partners. A simple tickling of a minor can be turned into "Indecency with a child by contact" by a over zealous DA. The true victim is the accused as now they are a convicted felon and now a RSO!! No one wants to protect the rapist or child predator's, they need to be put away and on this list. With over 1 Million listed Registered Sex Offenders in this country today, something is very wrong with this system. No one is protected by these laws, they need a total over haul!

**Comment ID**

DOJ-OAG-2020-0003-0149

 **Tracking Number**

1k4-9irq-cwqv

| Comment Details | Submitter Info |

**Received Date**

Sep 4, 2020

AR-00000408

Regulations.gov



About   Bulk Data Download      Agencies    Learn

(/about)        (/bulkdownload)  (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000409

8/8/23, 10:58 AM                                                   Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

Sex Offenders have so many restrictions that others people that have committed offenses do not have. why is this group being singled out ? It is difficult for them to find jobs,housing. I wounder how many of them become unemployed and homeless and then add another burden to society. They have to register for the rest of their lives and cannot go places or live where children are. why add more to their troubled lives.If they have been compliant for a number of years , why cant the rules for them be relaxed slightly not adding more.

**Comment ID**
DOJ-OAG-2020-0003-0150

◎ **Tracking Number**
keo-csda-uofa

**Comment Details**                                **Submitter Info**

**Received Date**
Sep 4, 2020

AR-00000410

Regulations.gov



About   Bulk Data Download       Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000411

8/8/23, 11:21 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

Comment

My offense took place in 1998. I was convicted of third degree attempted CSC (750.520D1A) and was sentenced to 1 year in the county jail following 4 more years of probation with the first year on electronic tether. I was also released with a 25 year requirement to register as a sex offender. I never violated once during my probationary period. My children were never removed from my care.

Please note* I was never convicted of a crime prior to this offense nor have I committed any subsequent crimes. During the past 22 years I missed one required registration date due to a mental breakdown which caused me to be hospitalized. I went to court for the violation and the judge dismissed the case citing the evidence that I was incapacitated and unable to register during the month in question. I don't wish sympathy from you but the facts are, being required to be on the SOR has contributed to a diagnosis of major depressive disorder, agoraphobia and panic disorder.

With all this said I believe the registry needs to be adjusted accordingly for the following reasons:

1. It is unfair that a 25 year register requirement was changed to lifetime after the sentence was already handed down.

2. For offenders that have not re-offended (statistics show that the recidivism rate for re-offense is very very low). 3. Being on the registry leaves a hardship that affects the family of the offender as you are unable to attend certain events or enjoy going certain places.

4. Being a registered offender for life leaves little room for hope to ever pursue certain goals in life, as the public looks on and sees your name on list stereotyping you as a monster shutting certain doors of opportunity.

5. To go along with number 4, as you are aware, your address, place of employment, vehicle description, school you attend (IF you are allowed to attend, some do NOT allow anyone on the SOR on their campuses) makes all this information public and leaves you open to a life of fear that a disgruntled member of society may take action to harm you and potentially your family.

6. People DO have the ability to be rehabilitated.

7. Without dismissing the victim, people are infallible. Poor choices are made during times in ones life that when looking back the same choice would have not been made.

8. If the offender successfully serves their sentence I believe justice is therefore served for the victim.

AR-00000412

Regulations.gov

9. Lifetime registration has been a death sentence for some as they have committed suicide due to the loss of hope because of the inability to ever find proper employment, housing and the such.

With all this said I pray that you would PLEASE consider making adjustments to the registry as it is needed so desperately.

Thank you for your time.

Sincerely,
Rebecca Schroeder

I believe each offense needs to be carefully looked at and the decision to properly sentence the individual at the time of sentencing needs to occur.
These are just some of the reasons I believe the SOR needs to be looked at and adjusted according to the offenses commiteed

---

**Comment ID**

DOJ-OAG-2020-0003-0151

---

 **Tracking Number**

1k4-9irr-8qsj

---

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 4, 2020

---



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

AR-00000413

Regulations.gov

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000414

8/8/23, 12:01 PM                                                                  Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

As always never seem to amaze people all that matters is the politicians job, no matter how cutthroat they have to be. I myself believe that it's a cheap sleezy way of getting recognition . The only difference between that registrant and the man with the pen is you haven't been caught yet . With as many new laws and rules as you propose each one more menacing and detrimental to our society these people are husbands ,children , fathers , parents , and friends. Many have become pillars in community, help community with shirts off they own back. Every single person that supports to dehumanize and just all out witch hunt people to satisfy a sick desire to just be recognized should first educate themselves on impact to community putting many families on the street putting registrants on the street just to be more "dangerous" as now they have to do things they normally wouldn't .or placing these registrants on lists for everyone to see . It's a soap opera country drama that's it cut dry.registrants don't go back to prison for reoffending most the time as you would like everyone to believe it's the unbeatable laws put upon these people and rules that are sometimes unobtainable to comply with. Quit acting like a bunch of Jr high kids fighting over who's more popular do what's right and be people not unjustifiable animals with no direction other than destruction. Down with public registry allow law enforcement to do job without all these petty hotdog laws please and thank you. You will have more people draining food stamps draining , law enforcement budgets , many states taking from education funds to fund all the crap dropped in they lap . How bout find another dead horse to beat use your secret service to guard borders use law enforcement to know where people are that need to be watched which is way lower than what we currently think . Parents be parents and watch your kids what they do .who they talk to etc... know fact it's the the 80 plus percentile that the victims knew the attacker in the first place . Misplaced hysteria to create a smoke screen thank you for reading good day

| Comment ID |
| --- |
| DOJ-OAG-2020-0003-0152 |

AR-00000415

 **Tracking Number**

keo-ek37-y2x8

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 4, 2020



About      Bulk Data Download       Agencies       Learn

(/about)        (/bulkdownload)       (/agencies)     (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/8/23, 11:07 AM                                              Regulations.gov

An official website of the United States Government.  🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
| --- | --- |

---

| Comment |
| --- |

United States Attorney General, William Barr:

I am disappointed with the proposed rule changes to the "Registration Requirements Under the Sex Offender Registration and Notification Act." The Registry currently fails to protect those it is intended to protect, not because it is implemented improperly or in a non-uniform manner, but because it would fail to protect the public even if the policy was followed to a T by every registrant and law enforcement agency out there. This makes adding complexity and retroactively applying the new rules to those who have been offense-free for decades counter-productive and costly. Consider these points:

•     While there certainly are some individuals who may remain dangerous after their incarceration and supervision, there is a large proportion of non-violent / non-forcible / non-contact / offenders who are on the Registry. Example offenses/offenders include: teens close in age who engaged in consensual sexual activity below the age of consent, teens who were caught "sexting" images of each other, consenting adults who were caught having sex in public, public urinating while intoxicated, viewing/possessing readily available online child pornography, sex worker/customer activity, etc. These individuals pose very little threat to the general public based on these activities alone, yet they fall under the scary umbrella term, "Sex Offender," which creates barriers to housing, employment, parenting, recovery, and reintegration into society.

•     The rationale for having the Registry to begin with: that sex offenders have a high recidivism rate and are "hard-wired" to reoffend, is entirely inaccurate. Department of Justice statistics and a large body of peer-reviewed, scientific criminology/psychology literature have routinely concluded that next to murder, sex offenses have the lowest recidivism rate of any category of crime (for examples, see: https://whidbeynewstimes.wordpress.com/sex-offender-recidivism-conclusions/, https://pubmed.ncbi.nlm.nih.gov/24664250/). Even for the high-risk/violent contact offenders, by 5 years post-incarceration-release, their recidivism rate is 5%. Further, the recidivism rates include non-sexual crimes and probation/parole/Registry violations (which are paperwork infractions not true crimes against a

AR-00000417

new victim yet are counted as sex crimes), which makes the real repeat sex offense rate around 2-3%.

•       The common perception that sex offenders pose a continuous sociopathic risk to the community stems from a phrase uttered by then SCOTUS Justice, Antony Kennedy in McKune v. Lile, where he stated that sex offenders have a "frighteningly high rate of recidivism (80%+)." The events leading up to and the aftermath of this false proclamation are highlighted by Jacob Sullum's article: https://reason.com/2017/09/14/im-appalled-says-source-of-pseudo-statis/

•       90% of children are sexually abused by someone known to them (as I was, when I was little)—not some masked stranger hiding in the playground bushes, waiting to pounce: https://www.d2l.org/wp-content/uploads/2017/01/Statistics_2_Perpetrators.pdf

Many sex offenders fail to register or keep in compliance because their life is in upheaval, or they are rendered homeless by residency restrictions and/or an inability to obtain employment as a result of the stigma associated with the sex offender label. The differences in state requirements also manufacture new "crimes" when people move. It should also be pointed out that since 1,000s of registrants are unaccounted for and most are only discovered when there is a run-in with law enforcement, it illustrates that even if registrants are out of compliance, they are otherwise staying out of trouble. If anything, this observation underscores why the current Registry is unnecessary and ineffective—the overwhelming majority of sex offenders do not recidivate.

The Registry encourages vigilantism as well. Violence and harassment against registrants is an unfortunate reality (see: https://www.prisonlegalnews.org/news/2017/may/5/vigilantes-assault-rob-and-murder-registered-sex-offenders/). This policy, therefore, creates a potential scenario whereby a 45 year-old man receives an extrajudicial death sentence because when he was 19 years-old and had consensual sex with his 16 year-old girlfriend and her parents found out.

If anything, there needs to be work towards limiting what offenses land people on the Registry and a better removal process after enough offense-free years have accumulated, so that focus and resources can be placed on the more high-risk offenders (those with contact/violent offenses recently released from incarceration). If the aim is to reduce human trafficking, then go after human traffickers. What threat does a public-urinator pose to international travel?

Please endorse more rational policies.



Attachments   5

Sex Offender Recidivism Conclusions

⬇  Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0153/attachment_1.pdf)



AR-00000418

Regulations.gov

High-risk sex offenders may not be high risk forever - PubMed

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0153/attachment_2.pdf)

📄 Appalled Says Source of Phony Number Used to Justify Harsh Sex Offender Laws

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0153/attachment_3.pdf)

📄 Statistics 2 Perpetrators

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0153/attachment_4.pdf)

📄 Vigilantes Assault Rob and Murder Registrants

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0153/attachment_5.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0153

◎ **Tracking Number**

keo-fds9-fwp8

**Comment Details**     **Submitter Info**

**Received Date**

Sep 4, 2020



AR-00000419

Regulations.gov

About           Bulk Data Download        Agencies       Learn

(/about)         (/bulkdownload)      (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000420

# <u>Whidbey News Times Slander, Website Forgery and Privacy Violations of State and Federal Law</u>

Gary Woodroffe, Gary L. Woodroffe, Gary Lee Woodroffe, Whidbey News Times, Whidbey Island County Prosecutors Office, Greg Banks, Lynn Lotsey, Lizabeth Lynn Lotsey, Lynn Mahan, Jessie Stensland Jstensland@Whidbeynewstimes.com 360-675-6611

# Sex Offender Recidivism Conclusions

<u>ASR Search Engine</u>

# Recidivism Conclusions

Tags: recidivism, FDLE, Whidbey News Times, Jan Stensland, Whidbey News Times Electioneering, Electioneering, Privacy, Privacy Violations, Greg Banks, Greg Banks Electioneering,



Dept of Justice Recidivism Rate: All Sex Offenders (9,691) by Offense Type – 94.7% did not reoffend; 2.2% reoffended toward new child offense, 3.1% reoffended toward an adult offense.

AR-00000421



Dept. of Justice: RecidivDept. of Justice: Recidivism of Sex Offenders Paroled whose Past Victim was a minor.
The DOJ statistics show 96.7% were not rearrested for a new offense, also show 3.3% were arrested for a new crime against a minor.
ism of Sex Offenders Paroled whose Past Victim was a minor.
The DOJ statistics show 96.7% were not rearrested for a new offense, also show 3.3% were arrested for a new crime against a minor.



Washington State Recidivism Research
Recidivism rate is verified as 97.7% who did not reoffend over four years in Washington State.

AR-00000422



Ohio Dept of Correction: Ten Year Recidivism Follow Up: Recidivism of Sex Ohio Offenders whose Past victim was a minor recidivism is 8.5%.



Arizona Dept of Corrections Sex Offender Recidivism 1998 – 2006 96.8% of sex offenders did not reoffend.

Arizona shows over the twelve year period 1984 – 1998 94.5% did not reoffend.



Washington State Recidivism Research
Recidivism rate is verified as 97.7% who did not reoffend over four years in Washington State.

AR-00000424



Dept. of Justice: RecidivDept. of Justice: Recidivism of Sex Offenders Paroled whose Past Victim was a minor.

The DOJ statistics show 96.7% were not rearrested for a new offense, also show 3.3% were arrested for a new crime against a minor.
ism of Sex Offenders Paroled whose Past Victim was a minor.

The DOJ statistics show 96.7% were not rearrested for a new offense, also show 3.3% were arrested for a new crime against a minor.

Dept of Justice research conclusions verify the total recidivism for sex offenders was 3.5% in 1994.

AR-00000425

AR-00000426

Dept of Justice Research 6.7% Committed by Strangers for 17 Years and Younger



Michigan Recidivism Statisicics All types of crime

AR-00000427



Alaska Sex Offender Recidivism Research

Registered Sex Offenders Murdered

We can draw conclusions when basing those conclusion on the definitions employed by the State of Washington RCW 71.090.020 which then interprets the independent research of the previous 18 independent studies, all of which are found in public record:

1. RCW 71.090.020 provides a framework for which to interpret the data, adopted by the State of Washington in 1990. The statute's definition is clear and unambiguous:

" (10) "Predatory" means acts directed towards: (a) Strangers; (b) individuals with whom a relationship has been established or promoted for the primary purpose of victimization; or (c) persons of casual acquaintance with whom no substantial personal relationship exists."

2. The research verifies the behavior of the predatory and non predatory behavior. The last three studies independently verify that approximately 93% of offenders are non predatory.

3. The math reveals stunning conclusions:

AR-00000428

4. The FDLE states there are approximately 62,000 registered citizens; therefore, 62,000 * 93% = 57660 registered citizens are non predatory.

5. The FDLE subjects the 57660 citizens (not counting their family or friends) to world wide publication on the FDLE web site.

6. When considering family and friends affected the number must, at minimum double the affected people by the FDLE policy to publicly shame the offender and their family.

7.  The 57660 * 2 = 115320 people are now affected by the FDLE policy to publish non predatory offenders who are documented no threat to the public. However, if those victims are friends or family then additional family members will also be affected, so we can conclude the actual number of those affected will more likely be at minimum –

8.  57660 * 3 = 172, 980. We remind ourselves here of the definition of RCW 71.090.020 stating these people had no intention of establish this relation for purposes of victimization anyone. Legally it would be similar to the difference between 1st degree murder and manslaughter; yet, the FDLE lumps the manslaughter equivalent into the same group as the 1st degree murders who get the death penalty.

**7. The FDLE website notification is not community related, it is world wide.** We must ask ourself, even if these citizens were predatory which they are not, why does a person in Montana need to know that any person whether predatory or not in Florida is a sex offender? The answer is obvious. There is no need to know, neither is there any legitimate purpose. The intent here is either based on gross ignorance or is profoundly mean spirited, qualifying as slander. The scope of this slander is neither trivial or harmless.

**8. The publication on the FDLE web site of the non predatory offender is indistinguishable from the predatory offender.** It insidiously misleads the uninformed reader to believe that the non predatory offenders are prowling about the public domain as an out of control sexual automaton to molest the first thing that has any relation to sex whether a child or adult or animal or any absurd ignorant fear based ignorant assumption.

The previous statistics also point out that the affected sub group of non predatory offenders is not a few fringe folk that slipped through the cracks, but 93% of all registered offenders, affecting approximately 172,980 people but likely even more.

**9. Slander.** This misinformation on the FDLE web site is inaccurate. Inaccurate is a whitewashed nice word for a lie. We can conclude according to the previous 19 studies published independently by different states and now public record reveals the FDLE website information publishing the non predatory offender information is a misleading lie. A misleading lie, when published, is legally and biblically classified as slander. Slander is not harmless but highly destructive as additional child suicide, teen suicide, adult suicide, bullying, foreclosure, poverty trigger stigma plus statistics add additional considerations to those helpless children and citizens who live under this crushing burden of slander many of which are harmed for life by the slander, not any sexual abuse or molestation. Here the FDLE cure is worse than the disease itself.

AR-00000429

Create a free website or blog at WordPress.com.

AR-00000430

COVID-19 is an emerging, rapidly evolving situation.                                                    ✕

Get the latest public health information from CDC: https://www.coronavirus.gov.

Get the latest research from NIH: https://www.nih.gov/coronavirus.

Find NCBI SARS-CoV-2 literature, sequence, and clinical content: https://www.ncbi.nlm.nih.gov/sars-cov-2/.

FULL TEXT LINKS



❯ J Interpers Violence. 2014 Oct;29(15):2792-813. doi: 10.1177/0886260514526062.
Epub 2014 Mar 24.

# High-risk sex offenders may not be high risk forever

R Karl Hanson [1], Andrew J R Harris [2], Leslie Helmus [3], David Thornton [4]

Affiliations
PMID: 24664250   DOI: 10.1177/0886260514526062

## Abstract

This study examined the extent to which sexual offenders present an enduring risk for sexual recidivism over a 20-year follow-up period. Using an aggregated sample of 7,740 sexual offenders from 21 samples, the yearly recidivism rates were calculated using survival analysis. Overall, the risk of sexual recidivism was highest during the first few years after release, and decreased substantially the longer individuals remained sex offense-free in the community. This pattern was particularly strong for the high-risk sexual offenders (defined by Static-99R scores). Whereas the 5-year sexual recidivism rate for high-risk sex offenders was 22% from the time of release, this rate decreased to 4.2% for the offenders in the same static risk category who remained offense-free in the community for 10 years. The recidivism rates of the low-risk offenders were consistently low (1%-5%) for all time periods. The results suggest that offense history is a valid, but time-dependent, indicator of the propensity to sexually reoffend. Further research is needed to explain the substantial rate of desistance by high-risk sexual offenders.

**Keywords:** desistance; recidivism; risk assessment; sex offenders.

© The Author(s) 2014.

## Related information

Cited in Books

MedGen

## LinkOut - more resources

**Full Text Sources**

Atypon

**Medical**

MedlinePlus Health Information

AR-00000431

9/4/2020                    'I'm Appalled,' Says Source of Phony Number Used to Justify Harsh Sex Offender Laws – Reason.com

SEX CRIMES

# 'I'm Appalled,' Says Source of Phony Number Used to Justify Harsh Sex Offender Laws

Claims of "frightening and high" recidivism rates, endorsed by the Supreme Court, have no basis in fact.

**JACOB SULLUM** | 9.14.2017 9:15 AM



A *New York Times* "op-doc" posted this week zeroes in on a persistent myth that has helped inspire and sustain harsh policies aimed at sex offenders: the idea that their recidivism rate is "frightening and high," as Supreme Court Justice Anthony Kennedy put it in a pair of cases decided a decade and a half ago. David Feige, a former public defender who directed *Untouchable*, a 2016 documentary about sex offenders, shows how an uncorroborated assertion in a 1986 *Psychology Today* article continues to influence the politicians who pass laws and the judges who uphold them.

In *McKune v. Lile*, a 2002 decision that upheld a mandatory prison therapy program for sex offenders, Kennedy said "the rate of recidivism of untreated offenders has been estimated to be as high as 80%," a number he called "frightening and high." He repeated that claim the following year in *Smith v. Doe*, which upheld retroactive application of Alaska's registration requirements for sex offenders. As of 2015, according to a review published in *Constitutional Commentary*, Kennedy's phrase had been echoed in 91 judicial opinions and the briefs filed in 101 cases.



The New York Times

AR-00000432



Yet there was never any evidence to support Kennedy's assertion, and research conducted during the same period when it was proliferating indicates that it is not even remotely true. As Feige notes in a commentary that accompanies his video, "Nearly every study—including those by states as diverse as Alaska, Nebraska, Maine, New York and California as well as an extremely broad one by the federal government that followed every offender released in the United States for three years—has put the three-year recidivism rate for convicted sex offenders in the low single digits, with the bulk of the results clustering around 3.5 percent." Studies covering longer periods find higher recidivism rates, but still nothing like 80 percent, even for high-risk offenders.

The authors of the *Constitutional Commentary* article, Ira Ellman and Tara Ellman, found that the original source of the 80-percent figure—which Kennedy apparently got from Solicitor General Ted Olson, who cited a 1988 Justice Department handbook—was a 1986 *Psychology Today* article by Robert Longo, a counselor who ran a treatment program at an Oregon prison, and Ronald Wall, a therapist who worked for him. "Most untreated sex offenders released from prison go on to commit more offenses," they wrote, explaining the value of the work from which they earned their livelihoods. "Indeed, as many as 80% do." As Ellman and Ellman pointed out, it was "a bare assertion" with "no supporting reference."

Longo himself repudiated the estimate in a March 2016 interview with Joshua Vaughn, a reporter at the Carlisle, Pennsylvania, *Sentinel*, saying it does not accurately reflect recent research and should not be used as a basis for public policy. In Feige's video, Longo says it is "absolutely incorrect" to suggest that anything like 80 percent of sex offenders commit new crimes after serving their sentences. That number, he says, was the high end of the range indicated by research at the time, although he once again fails to cite any actual studies.

AR-00000433

9/4/2020 'I'm Appalled,' Says Source of Phony Number Used to Justify Harsh Sex Offender Laws – Reason.com



"You don't cite popular psychology magazines" as a basis for upholding laws, Longo says. "It's not a scientific journal. I'm appalled that this could happen. This is not my intent."

Feige also tracked down Barbara Schwartz, the psychologist who wrote the 1988 DOJ manual that cited Longo's article and was in turn cited by Olson. "I couldn't find any" information on sex offenders' recidivism rates, Schwartz says, "so basically I just made up a model." She had a grand total of six references, including a dictionary and "the paper that Rob Longo did for *Psychology Today*." Schwartz adds that "the best we were doing was making a bunch of guesses." Relying on such speculation makes no sense, she says, now that there is "hard-core, scientifically based research." She says ignoring the work that has been done since the 1980s amounts to "deliberate indifference."

All the rulings claiming "frightening and high" recidivism rates, Miami civil rights attorney Valerie Jonas tells Feige, "cite to the Supreme Court, which rested its assumptions on *nothing*." Two cases the Court could soon decide to review give it a chance to do better.

*Snyder v. Doe* is an appeal of the 2016 decision in which the U.S. Court of Appeals for the 6th Circuit concluded that Michigan's Sex Offender Registration Act violates the constitutional ban on ex post facto laws by imposing retroactive punishment. The 6th Circuit noted the lack of evidence to support the claim that sex offenders' recidivism rates are "frightening and high," citing research indicating that sex offenders "are actually less likely to recidivate than other sorts of criminals."

*Karsjens v. Piper* involves a challenge to Minnesota's system of civil commitment for sex offenders who have completed their prison sentences. In 2015 a federal judge said the program, which supposedly is aimed at "curing" its involuntary "patients" but has never succeeded in doing so, amounts to unconstitutional preventive detention, violating the right to due process. Last year the U.S. Court of Appeals for the 8th Circuit overturned that decision. Minnesota's program is based the premise that the state can identify sex offenders who are especially likely to commit new crimes and decide when they no longer pose a threat—impossible tasks, according to Gov. Mark Dayton, who nevertheless defends the policy.

JACOB SULLUM is a senior editor at *Reason*.

SEX CRIMES   SEX OFFENDER REGISTRY   SUPREME COURT   SCIENCE   CONSTITUTION

AR-00000434



# CHILD SEXUAL ABUSE STATISTICS
## Perpetrators

**FACT:**

**Those who molest children look and act just like everyone else.**

There are people who have or will sexually abuse children in churches, schools, and youth sports leagues.

Abusers can be neighbors, friends, and family members. People who sexually abuse children can be found in families, schools, churches, recreation centers, youth sports leagues, and any other place children gather. Significantly, abusers can be and often are other children.

**About 90% of children who are victims of abuse know their abuser.** [12,13]

Only 10% of sexually abused children are abused by a stranger.[12]

Approximately 30% of children who are sexually abused are abused by family members. [12,13]

The younger the victim, the more likely it is that the abuser is a family member. Of those molesting a child under six, 50% were family members. Family members also accounted for 23% of those abusing children ages 12 to 17.[9]

**About 60% of children who are sexually abused are abused by the people the family trusts.** [12,13]



Homosexual individuals are no more likely to sexually abuse than heterosexual individuals.[15]

**FACT:**

**Most adolescent sex offenders are not sexual predators and will not go on to become adult offenders.**

Most adolescent offenders do not meet the criteria for pedophilia and do not continue to exhibit sexually predatory behaviors.[39]

Adolescent sex offenders are more responsive to treatment than adults. They do not appear to continue to re-offend into adulthood, especially when provided with appropriate treatment.[29]

>>>

Updated: 12/22/15

# DARKNESS TO LIGHT

**FACT:**

**Not everyone who sexually abuses children is a pedophile.**

Child sexual abuse is perpetrated by a wide range of individuals with diverse motivations. It is impossible to identify specific characteristics that are common to all those who molest children.

Situational offenders tend to offend at times of stress and begin offending later than pedophilic offenders. They also have fewer victims (often family), and have a general preference for adult partners.[16]

Pedophilic offenders often start offending at an early age, and often have a large number of victims (frequently not family members).[16]

**70% of child sexual offenders have between one and 9 victims, while 20% have 10 to 40 victims.[14]**

**FACT:**

**As many as 40% of children who are sexually abused are abused by older, or more powerful children. [12]**

The younger the child victim, the more likely it is that the perpetrator is a juvenile. Juveniles are the offenders in 43% of assaults on children under age six. Of these offenders, 14% are under age 12.[9]

Juveniles who commit sex offenses against other children are more likely than adult sex offenders to offend in groups, to offend at schools, and to have more male victims and younger victims.[11]

The number of youth coming to the attention of police for sex offenses increases sharply at age 12 and plateaus after age 14. Early adolescence is the peak age for youth offenses against younger children.[14]

A small number of juvenile offenders – one out of 8 – are younger than age 12. Females constitute 7% of juveniles who commit sex offenses.[14]

## References

9   Snyder, H. N. (2000). Sexual assault of young children as reported to law enforcement: Victim, incident, and offender characteristics. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Retrieved January 12, 2009 from *http://www.ojp.usdoj.gov/bjs/pub/pdf/saycrle.pdf*

11  Greenfeld, L.A. (1997). Sex Offenses and Offenders An Analysis of Data on Rape and Sexual Assault. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, NCJ-163392

12  Finkelhor, D. (2012). Characteristics of crimes against juveniles. Durham, NH: Crimes against Children Research Center.

13  Whealin, J. (2007-05-22). "Child Sexual Abuse". National Center for Post Traumatic Stress Disorder, US Department of Veterans Affairs.

14  Finkelhor, D., Ormrod,R., Chaffin, M. (2009) Juveniles who commit sex offenses against minors. Juvenile Justice Bulletin, OJJDP, Office of Justice Programs

15  Jenny, Carole, Roesler, Thomas A. , Poyer, Kimberly L. (1994) Are children at risk for sexual abuse by homosexuals? Pediatrics, Vol. 94 No. 1, pp. 41-44.

16  Abel, G. G., Mittleman, M. S., & Becker, J. V. (1985). "Sex offenders: Results of assessment and recommendations for treatment." In M. H. Ben-Aron, S. J. Hucker, & C. D. Webster (Eds.),Clinical Criminology: The assessment and treatment of criminal behavior (pp. 207–220).

29  Association for the Treatment of Sexual Abusers (ATSA). (2000). The effective legal management of juvenile sex offender. Retrieved from www.atsa.com/ppjuvenile.html

39  McLeer, S. V., Dixon, J. F., Henry, D., Ruggiero, K., Escovitz, K., Niedda, T., & Scholle, R. (1998). Psychopathology in non-clinically referred sexually abused children. Journal of the American Academy of Child and Adolescent Psychiatry, 37, 1326 – 1333.

>>>

# Vigilantes Assault, Rob and Murder Registered Sex Offenders

Loaded on MAY 5, 2017 by Matthew Clarke (/news/author/matthew-clarke/) published in Prison Legal News May, 2017
(/news/issue/28/5/), page 30

Filed under: Sex Offender Registration (/search/?selected_facets=tags:Sex%20Offender%20Registration), Sex Offenders (Discrimination)
(/search/?selected_facets=tags:Sex%20Offenders%20%28Discrimination%29). Location: United States of America (/search/?
selected_facets=locations:998).

## by Matt Clarke

As repeatedly reported in *Prison Legal News,* for over a decade registered sex offenders have been
targeted by vigilantes and assaulted, robbed and murdered due to their past crimes. And as noted in this
issue's cover story, that is part of the dark side of sex offender registries, which allow public access to
offenders' residential addresses and other personal information. Such information not only endangers
registered sex offenders but also those who live with them and, in at least one case in Dallas, Texas, an
innocent victim. That Dallas man, who was beaten with a baseball bat, had simply moved into an
apartment recently vacated by a sex offender.

*PLN* believes these incidents are more widespread and occur with greater frequency than reported in the
mainstream media. [See, e.g.: *PLN,* Sept. 2016, p.49; June 2015, p.63; Feb. 2013, p.50; April 2007, p.18].

In one of the earliest cases of registry vigilantism, two registered sex offenders who were living in the
same home in Bellingham, Washington were murdered in 2005 by a man who gained access to their
residence by claiming to be an FBI agent investigating threats made against sex offenders. Hank Eisses,
49, and Victor Vasquez, 68, were gunned down by Michael Anthony Mullen, who later confessed to the
crime. Mullen was convicted and sentenced to 44 years; he died in prison.

Stephen A. Marshall, 20, a Canadian citizen, used information from online registries to locate two sex
offenders in Maine, killing them in separate incidents in April 2006. William Elliot, 24, and Joseph Gray,
57, were shot to death. Marshall killed himself as police closed in while he was on a bus. Following the
murders, Maine officials stated they did not intend to make any changes to the state's sex offender
registry.

In August 2011, John Joseph Huffmaster, 29, of Hazelwood, Missouri, was charged with assaulting his 74-
year-old neighbor with a hammer because the neighbor was on a sex offender registry. Huffmaster, who
entered the victim's home by asking for a cup of sugar, called police after the attack to claim he was "doing
God's work." Police found the victim, semi-conscious and bleeding, with multiple skull and facial
fractures.

Patrick Drum was sentenced to life in prison in September 2012 for killing two registered sex offenders in
Washington state. His victims were Gary Lee Blanton, 28, and Jerry Wayne Ray, 57, who were fatally shot
in June 2012. Drum reportedly admitted that he was targeting sex offenders and planned to continue
killing them until he was caught.

On July 21, 2013, Jeremy and Christine Moody, husband and wife, murdered Charles "Butch" Parker, 59,
and Gretchen Parker, 51, in South Carolina. Charles was a registered sex offender; both he and Gretchen
had been shot and stabbed multiple times. The Moodys were identified from the Parkers' home

AR-00000437

surveillance video. The video recorded Jeremy Moody telling Charles, "I'm not here to rob you. I'm here to kill you because you're a child molester."

Christine Moody told TV reporters that Charles Parker was a "pedophile" and a "demon." Jeremy Moody confessed to deputies that he had killed Charles because he was a registered sex offender, and murdered Gretchen because she lived with him. He admitted to targeting other registered sex offenders and said he would have killed another on his "hit list" a few days later had he not been arrested. The Moodys pleaded guilty and received consecutive life sentences.

David Ray Mills, 36, his l6-year-old daughter and Andre Edwin Dickerson, 20, were charged in a January 2013 attack on Miguel Esteban Cruz, 21, whom the daughter accused of raping her. They allegedly lured Cruz to a park in Temecula, California, where Dickerson beat him with a baseball bat while the others watched. Cruz suffered skull fractures, broken bones, missing teeth and a lung injury. The three assailants were charged with attempted murder and mayhem, and held on $1 million bail each. Cruz had been charged with sodomy with a minor; he allegedly had sex with the girl after she passed out drunk on his couch.

In July 2015, Nebraska registered sex offender Phillip McDaniel lost his appeal seeking workers compensation for an attack that had occurred two years earlier at the Western Sugar Cooperative, when a co-worker assaulted him with a brass hammer while calling him a "chimo" – slang for "child molester."

The co-worker, Jason Bates, had become enraged after discovering that McDaniel was a registered sex offender. McDaniel suffered injuries to his nose, clavicle and left shoulder. He applied for workers compensation but was denied; after he appealed, the Nebraska Court of Appeals upheld the denial, finding that the attack was due to personal reasons even if the only relationship the two was as co-workers. See: *McDaniel v. Western Sugar Coop.,* 23 Neb. App. 35, 867 N.W.2d 302 (Neb. Ct. App. 2015).

On June 25, 2016, Anchorage, Alaska police arrested Jason Vukovich, 41, for assaulting three registered sex offenders. The first victim, Charles Albee, told police a man with "shoulder-length hair and a black leather jacket" broke into his apartment, assaulted him and robbed him. The man knew his name and told him he was there because Albee was on the registry. He also showed Albee a notebook with a list of additional potential victims.

Two days later, a man matching the same description and carrying a hammer attacked registered sex offender Andres Barbosa. Barbosa said two women accompanied the man, who said he was there because of Barbosa's "past crimes."

Then on June 29, 2016, Wesley Demarest and Stanley Brown reported a man had broken into their home and attacked Demarest with a hammer, severely injuring him.

Vukovich was arrested after a traffic stop near the last crime scene. Police discovered a notebook with other victims' names and items stolen from their homes in his car; he was charged with multiple felonies and faces up to 35 years in prison.

The details of the assault on Demarest are chilling. At one o'clock in the morning, Brown awakened to the sound of glass shattering in the entryway of his home. He ran to Demarest's room to tell him someone was breaking in, but Vukovich was right behind him. Vukovich told Demarest to confirm his name and that he was a registered sex offender – for a crime for which he had served nine months, ten years earlier.

"He told me to lay down on my bed and I said 'no.' He said 'get on your knees' and I said 'no.' He said, 'I am an avenging angel, I'm going to mete out justice for the people you hurt,'" Demarest stated.

AR-00000438

Then Vukovich hit him in the head with the hammer four or five times before Demarest lost consciousness. Vukovich fled and Brown called 911. Weeks later, Demarest was still recovering from a fractured skull and unable to return to work.

Multiple studies have shown registries to be ineffective at reducing sex offender recidivism, which is extremely low – in fact only murderers have lower recidivism rates. Instead registries often serve a more sinister purpose, including as vehicles for public vengeance.

Alaska's Sex Offender Registration law was enacted in 1994 after Megan Kanka, a 7-year-old New Jersey girl, was raped and killed by a man who had previously sexually assaulted two other young girls.

But in a 2008 report, the Alaska Justice Forum (AJF) questioned the law's premise "that sex offenders will inevitably reoffend and ... are not receptive to treatment."

As a result of similar legislative efforts across the country, registries make little attempt to distinguish between types of sex offenders. Under Alaska's system, an 18-year-old who has consensual sex with a 14-year-old faces the same registration requirements as someone convicted of a violent rape and murder: 15 years on the registry after getting out of prison.

"The myth of the incorrigible sex offender, all but guaranteed to reoffend, has been largely refuted," wrote Deborah Periman, who authored the AJF report. "A study by the Alaska Justice Statistical Analysis Center of sex offenders released from Alaska corrections facilities in 2001 found that non-sex offenders were more likely to be rearrested than sex offenders."

The Alaska Civil Liberties Union also thinks the current registry is flawed because "it can lead to vigilante behavior like [Vukovich] allegedly did," said executive director Joshua Decker.

However, Keeley Olson, director of Standing Together Against Rape, does not believe the registry fails entirely as a deterrent, and contends it is worthwhile despite its shortcomings.

 "Perhaps people should think about [the risks] before they become sexual predators and harm children," she noted.

In January 2017, police in Macon County, Illinois finally caught up with Samuel Henson, 19, who is a suspect in the 2015 beating of a 53-year-old registered sex offender. Henson, who was a student at Lincoln College of Technology in Indianapolis, is accused of committing the assault with two other teenagers. His bond was set at $10,000.

"He acknowledged knowing that the [victim] was a sex offender," police said, "and that the three subjects involved had discussed battering him when they saw him walking down the street."

Even absent registration as a sex offender or even a conviction, the mere accusation of a sex offense is sometimes used to justify acts of violence.

In Great Falls, Montana, Tracy Lynn Bossie was charged with one count of assault with a weapon, a felony, for the 2016 stabbing of relative Wallace Bossie, Jr., who had been charged with four felony sex crimes involving other relatives, all minors. Police reported multiple confrontations between the two adult Bossies in the weeks before the stabbing.

And earlier this year, a Bay City, Michigan court sentenced 34-year-old Justin R. Aikens to three years' probation for a July 2016 incident in which he tried to drive over a 40-year-old man because, according to Aikens, he was "a child molester [and] children need someone to defend them." Yet the National Sex Offender Registry did not list the victim as being a sex offender.

AR-00000439

It is doubtful that any lawmakers would publicly support the assaults and murders of registered sex offenders, yet few have objected to those negative consequences of registries, nor do they typically try to curtail registration requirements or include protections for sex offenders whose publicly-posted information puts them at risk of vigilante attacks.

The examples cited above are the tip of a much larger iceberg of violence faced by registered sex offenders, the scope of which is largely unreported and thus unknown.

Sources: *www.adn.com, www.ktva.com, www.stltoday.com, www.businessinsurance.com, www.mirror.co.uk, www.losangeles.cbslocal.com, www.seattletimes.com, www.foxcarolina.com, https://on-vigilantism.blogspot.com, www.nydailynews.com,www.nypost.com*

AR-00000440

8/8/23, 2:04 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

Good after noon,

**Proposed Compromise**

The registry I realize may not entirely go away, however the amount of restrictions implied should be re-evaluated.

The vast majority of offenders on the Michigan Registry are first time offenders and of those, the majority are classed into a tier III classification for life with no way to come off.

Many are classed into Tier III without true evaluation of their risk factor to public, but rather placed in tier III due to very vague wording of laws describing particular crimes or age.This needs to be re-evaluated.

There are of course a small percentage ( less than a half percent) of offenders that are deemed high risk and dangerous. These were serial offenders that murdered their victims. This is what should be reserved for Tier III classification. Many of the vast offenders currently on tier III are not at all high risk, if a risk at all. They have been mis-placed into tier III with no evaluation what so ever.

I propose to the Justice department and 6th district court as a compromise to re-evaluate offenders to assess risk factors. To be done by an approved clinical Psychologist. And paid for by offender. This report then can and should be used by the court jurisdiction to where the offender reports and have tier and time on registry readjusted. Especially for those that are tier III's. ( subsection 72.5 c )

Our current president believes in second chances, and has proven that time and again to a vast majority of crimes. The Sex offender should also be afforded the same rights to a second chance. Not spend a life time registering.

https://www.regulations.gov/comment/DOJ-OAG-2020-0003-0154                                    1/3

AR-00000441

Over time things change, age, disability, health issues that deem an offender not a risk if at all. For example, i know of an offender that lost both legs recently to diabetes, and has dementia. How can he be a high risk tier III offender? I myself fall into that category.

Nearly 30 years is a long time to register, though I did it and I did it by the book, with clean record. But I'm subject to lifetime registration.
I challenge the system and justice department to prove I'm still a threat.

The registry in itself hurts everyone, not just the offender. It hurts family, relatives, children of offender or relatives. Before long each member of justice, and legislation will know someone close, be it a relative, grand child, whom ever, that could be charged as an offender. You wouldn't want them on registry for life would you?

There needs to be ways off the registry, such clean record, consistent reporting, evaluations to determine risks. So I again, state that evaluation of offenders need to take place before making it a lifetime registration.

I come from a law enforcement family, so it is hard on everyone that I have to register. However I am a believer that if you do the crime, you must do the time. Though time should not account to ones entire lifetime.

So if you will please reconsider the consequences this will cause to families, children, their grand children and Etc. for years to come. And Reconsider the Adam Walsh Act. This is not the answer.

---

**Comment ID**

DOJ-OAG-2020-0003-0154

---

 **Tracking Number**

1k4-9irs-pf08

---

**Comment Details** | **Submitter Info**

**Received Date**

Sep 4, 2020

---

AR-00000442

Regulations.gov



About   Bulk Data Download      Agencies    Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000443

8/8/23, 11:22 AM                                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

There is no empirical evidence that supports these regulations. Therefore, the taxpayers are paying millions of dollars for something that reaps no benefit. I do not support such a wasteful use of my hard earned money. The proposed changes only further the waste. Please do not continue this waste and research the truth regarding this issue. It is readily available in thousands of professional and academic evidence. It appears that the lawmakers have not looked at the evidence.

**Comment ID**
DOJ-OAG-2020-0003-0155

 **Tracking Number**
keo-helb-ca33

**Comment Details**                                    **Submitter Info**

**Received Date**
Sep 4, 2020

AR-00000444

Regulations.gov



Your Voice in Federal Decision Making

About  Bulk Data Download    Agencies    Learn

(/about)      (/bulkdownload)  (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000445

8/8/23, 2:12 PM                                    Regulations.gov

An official website of the United States Government.  

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

Comment

According to the Bureau of Justice Statistics persons required to register have a recidivism rate of 7.7%. I do not understand why so much time and money is poured into this registry scheme that by all accounts is ineffective.By adding additional restrictions, or making them stricter, you all are adding to the problem while doing nothing to solve it. Disenfranchising people from homes, communities, jobs, society creates other issues. I beg you to consider what will help reduce sexual offenses without causing new issues like added homelessness, systematic shaming and harassment for entire families, and an inability to make a living for oneself. Please think about all sides of the box instead of just a knee jerk reaction - which is basically the platform this whole scheme was created on. Thank you for reading.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0156 |

| ◎ **Tracking Number** |
|---|
| keo-ipn6-9ygb |

| **Comment Details** | **Submitter Info** |
|---|---|
| **Received Date** | |
| Sep 4, 2020 | |

AR-00000446

8/8/23, 2:12 PM                                        Regulations.gov



Your Voice in Federal Decision Making

About      Bulk Data Download      Agencies      Learn

(/about)      (/bulkdownload)      (/agencies)      (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000447

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

      Registrants lives matter.

Registrants are not "sex offenders", they are ex-offenders, just like anyone else who has committed an offense and served their time. Registrants are not all pedophiles or violent child-molestors. They have not all engaged in a contact offense. They are not all violent.

Anyone can end up on the registry for simple offenses such as public urination, teenage underage sex, mooning, skinny-dipping or inadvertant downloading of child porn (and yes, having CP download to your computer "without" your having requested it, does occur).

Once a registrant has completed their sentence, why shouldn't they have the same freedoms as any other offender who has completed their sentence. Why do you lump all "sex offenders" under one umbrella term as if they are all alike? Why is this class of offenders discriminated against? Why do you have a public "hit-list" called the registry that allows any mentally ill person or vigilantee free access to registrants home and work addresses so they can vandalize,stalk or worse, kill registrants or their family members? Where is the JUSTICE for the registrant and their family?

The registry has no place in our society. The "frightenly high" rate of reciedivism by registrants, that the Supreme Court keeps using to uphold the registry, has even been retracked by the author who wrote it in a "1986 Psychology Today Magazine".

The re-offense rate by those on the registry is 3-5%, the lowest rate of re-offense by any criminal group. Many of those on the registry made one bad choice, why should they be discriminated against, and punished for the rest of their lives?

Do you have any idea what life is like for a registrant? To not be able to find a job, not because you don't have the qualifications but because you are on the registry and deemed "a risk", "a liability", because of one mistake you made years ago?

Do you know what life is like for registrant families? Their kids become victims of verbal abuse and bullying because the registry makes their lives a living hell. Their registrant parent can't attend school functions, or take them trick or treating. Wives of registrants lose their jobs when someone finds out that their husband is on the registry. Families can't find housing, employment. Vacations are things that families of registrants can only dream about. You have no idea the rules and regulations that vary from town to town, state to state,

AR-00000448

Regulations.gov

that registrants have to try to figure out even before they can leave their town for a day trip with their family. And you don't think the registry is punitive? Walk a mile in a registrant's shoes. Spend one frickin day trying to live by all the rules and regulations that a registrant has to live by. Just one day. You will quickly see how your registry punishes not only registrants but their wives, husbands, children, parents, etc.

All Registrants are not all bad people. 5-10-15 years on a registry is a lifetime. It's time to end the fear mongering that the media has foisted on the public and apparently the government as well. The horrific sex offenses make the news, that's all the public hears about. They'd be surprised at the number of non-violent, non-contact offenses that could land them or their child on the registry.

Do the right thing. Take down the registry for all but the most violent offenders. That's what it was initially intended for. Sto adding to it for God's sake. It's gotten way out of hand.

**Comment ID**

DOJ-OAG-2020-0003-0157



**Tracking Number**

1k4-9iru-1isx

**Comment Details**                                                   **Submitter Info**

**Received Date**

Sep 4, 2020



About (/about)

Bulk Data Download (/bulkdownload)

Agencies (/agencies)

Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)

FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

AR-00000449

Regulations.gov

Support (/support)   Provide Site Feedback

AR-00000450

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

Comment

https://m.huffpost.com/us/entry/us_5d2c8571e4b02a5a5d5e96d1

**Comment ID**
DOJ-OAG-2020-0003-0158

◎ **Tracking Number**
keo-n2gz-p5lb

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**
Sep 4, 2020

AR-00000451

Regulations.gov



Your Voice in Federal Decision-Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000452

8/8/23, 11:05 AM                                          Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |    Share ▾

---

Comment

My son, who had never had ANY problems with the law and otherwise was a upstanding citizen is currently on the SORNA registry for 25 years for a non-contact offense. Since his release from prison, it has been difficult for him to get a good job, commensurate with his past work experience and education.

As a public policy researcher, I have studied laws such as SORNA and found them in-effective, costly to implement, harmful to persons trying to get their lives back on track, and of little real use to protect children and the public from sex offenses.

I am attaching a bibliography of studies and reports I have found on line that describe how harmful, in-effective and costly this law is. Also attached is a list of videos, news reports, documentaries and other video content of similar nature. Note that due to the time passed since these lists were compiled, some of the links may no longer work.

The final document is a information sheet regarding an Ohio Study, The Ohio Criminal Justice Recodification Committee (OCJRC) final report, which recommended several reforms of Ohio's sexual offender laws. This study, done in 2016, was part of a broader effort to reform Ohio's criminal justice system. The Ohio Criminal Sentencing Commission came to similar conclusions. The members of the OCJRC included state representatives and senators of both parties, law enforcement persons, judges, prison officials, prosecutors and defense attorneys, case workers and counselors. Unfortunately, Ohio's very conservative legislature has not enacted these reforms.

The effort to impose stricter Federal control over SORNA, is a step backwards. What is needed is MORE flexibility for states to develop their own approaches to this problem. WHAT EVER HAPPENED TO STATES RIGHTS?

AR-00000453

Regulations.gov

Attachments  3

📄 123-Sexual Offender Reform Reference List

⬇ Download ▾

📄 Links to Films and Documentaries on Sex Offender Legislation and Laws

⬇ Download ▾

📄 Ohio RSOL Information Sheet

⬇ Download ▾

**Comment ID**
DOJ-OAG-2020-0003-0159

◎ **Tracking Number**
1k4-9irv-1ly8

**Comment Details**                                    **Submitter Info**

**Received Date**
Sep 4, 2020



AR-00000454

Regulations.gov

About        Bulk Data Download        Agencies        Learn
(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000455

**This is a bibliography of studies, reports, web sites etc. dealing with sexual offenders**

The following link is to a page with several reports compiled by the Colorado Sexual Offender Management Board.  Of particular interest are the following reports:

Report on Safety Issues Raised by Living Arrangements for Location of Sex Offenders in the Community
White Paper on the Use of Residency Restrictions as a Sex Offender Management Strategy
Adam Walsh White Paper
SOMB Position Paper "No Known Cure" with Juveniles Who Have Committed Sexual Offenses
ATSA A Reasoned Approach: Reshaping Sex Offender Policy to Prevent Child Sexual Abuse

http://dcj.somb.state.co.us/research-reports-projects/reports

The following link is an article about formation of a study group to re-examine Illinois sex offender laws as they have been determined to be overly harsh.

http://texasvoices.org/Ilinois-bill-that-forms-a-sex-offenses-and-sex-offender-registration-task-force/

The following link is for a recent report by the Ohio Criminal Sentencing Commission on reforms to sex offender laws.  It is similar to reforms proposed by the Ohio Criminal Justice Recodification Committee.

http://www.supremecourt.ohio.gov/Boards/Sentencing/resources/Publications/AdHocCommSexOffenderReg.pdf

The following link is a ACLU study which makes recommendations for reforms that are consistent and applicable to the sexual offender reforms, particularly in terms of sentencing and limiting collateral consequences.

http://www.acluohio.org/wp-content/uploads/2016/03/LookingForward2016_03.pdf

The following link describes some recent reforms of Oregon's Sexual Offender Registry System

http://www.safetyandjustice.org/news/sex-offender-registration-more-nuanced-approach

The following link is to a paper questioning the effectiveness of earlier sexual offender laws, Since passage of the Adam Walsh Act, this problem has grown even more severe.

https://www.appa-net.org/eweb/docs/appa/pubs/RML.pdf

The following link is a cost benefit study of applying sex offender registration to juveniles.

http://www.rstreet.org/wp-content/uploads/2015/09/RSTREET41.pdf

The following link is a commentary of the above study

https://sosen.org/blog/2015/10/15/what-are-the-costs-and-benefits-of-the-so-registration.html

1

The following link is to a study on the cost of implementing the SORNA sex offender registries

http://www.justicepolicy.org/images/upload/08-08_fac_sornacosts_jj.pdf

The following link is a CATO institute report.  Even this conservative leaning think tank is questioning these laws.

http://object.cato.org/sites/cato.org/files/serials/files/regulation/2012/8/v35n2-1.pdf

The following link is commentary on the problems with sex offender registries.

https://wrongfulconvictionsblog.org/2014/08/16/sex-offender-registries-sors-time-for-a-change/

The following link is more commentary on the problems with sex offender registries.

http://inthesetimes.com/article/18862/rethinking-prisons-rethinking-sex-offender-registries

The following link is to Reform Sex Offender Laws.  I am an Ohio advocate for this group.

http://nationalrsol.org/

The following link is a U.S. Justice Department report on management of sex offenders.

http://www.smart.gov/pdfs/AdultSexOffenderManagement.pdf

The following link is a analysis of sex offender laws by the Economist magazine.

http://www.economist.com/node/14164614

The following studies examine the consequences to offenders from sex offender registry laws

http://www.cjcj.org/uploads/cjcj/documents/frenzel_et_al_collateral_consequences_final_formatted.pdf

http://ilvoices.com/media/DIR_109112/e8cdcb74bf2b54beffff8887ffffe415.pdf

https://www.atsa.com/sites/default/files/ppSORegNotification.pdf

http://ilvoices.com/uploads/3/4/1/6/34164648/79-levenson-2006.pdf

The following study describes the harm caused by ineffective sex offender laws

http://www.ilvoices.com/media/ea99d28960ec776bffff84a6ffffe415.pdf

The following study describes the negative consequences of sex offender residence restriction laws

http://econ.duke.edu/uploads/media_items/kang-songman-jm-paper.original.pdf

AR-00000457

The following study examines whether sex offender laws affect criminal behavior

https://www0.gsb.columbia.edu/faculty/jrockoff/papers/Prescott%20and%20Rockoff%20jle.pdf

The following study is a comparison of the effectiveness of sex offender laws in the United States and
the United Kingdom

http://elibrary.law.psu.edu/cgi/viewcontent.cgi?article=1058&context=jlia

The following link is a story in the Cleveland Plain Dealer on The Cleveland Rape Crisis Centers concerns
about the problems with sex offender registry laws.

http://www.cleveland.com/court-justice/index.ssf/2015/10/advocates_on_both_sides_say_se.html

The following link is to another advocacy group RSOL partners with for reform of sexual offender laws.

http://www.cautionclick.com/

The following is a link to an organization advocating against mandatory sentencing

http://famm.org/

The following is a link to a Human Rights Watch study on sex offender laws.

https://www.hrw.org/reports/2007/us0907/

The following link is to a Columbus Dispatch article on the number of Ohio Prisoners who are sex
offenders.

http://www.dispatch.com/content/stories/local/2015/09/23/sex_offenders.html

The following link is a study on the treatment of sex offenders in Ohio Prisons.

http://www.ohiomemory.org/cdm/ref/collection/p267401ccp2/id/1234

The following link is a study by the California Sex Offender Management Board on changes to their
Registry system

http://www.casomb.org/docs/Tiering%20Background%20Paper%20FINAL%20FINAL%204-2-14.pdf

The following link is a study by the Federal Sentencing Commission on punishment for child pornography

http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-
topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf

The following link is a critique of Ohio's Adam Walsh Act law (SB10)

https://www.pdffiller.com/en/project/66432682.htm?form_id=5453608

3

The following link is a Huffington Post article critiquing Federal child pornography laws.

http://www.huffingtonpost.com/andrew-extein-msw/capitol-punishment-the-tr_b_4756400.html

The following FOX News link is a balanced review of child pornography sentencing laws.

http://www.foxnews.com/us/2012/04/29/debate-rages-over-severity-child-porn-sentences.html

The following link is to a Slate article suggesting treatment for pedophiles instead of focusing primarily on punishment.

http://www.slate.com/articles/health_and_science/medical_examiner/2012/09/stop_childhood_sexual_abuse_how_to_treat_pedophilia_.2.html

The following link is to an Atlantic article on treatment of pedophiles.

http://www.theatlantic.com/health/archive/2013/08/what-can-be-done-about-pedophilia/279024/

The following link is to an American Psychological Association article on treatment of sex offenders.

http://www.apa.org/monitor/julaug03/newhope.aspx

The following link is to a Slate article comparing duration of time on sex offender registries across 50 states.  Note the links to other articles in the series.

http://www.slate.com/articles/news_and_politics/jurisprudence/2014/08/sex_offender_registry_laws_by_state_mapped.html

The following link is a Huffington Post article on Sex Offenders: Recidivism, Re-Entry Policy and Facts

http://www.huffingtonpost.com/paul-heroux/sex-offenders-recidivism_b_976765.html

The following link is an analysis of state residency restrictions for sex offenders.

https://www.cga.ct.gov/2007/rpt/2007-R-0380.htm

The following link is an article in The Daily Beast that questions whether Sex-Offender Laws Gone Too Far

http://www.thedailybeast.com/articles/2010/03/20/have-sex-offender-laws-gone-too-far.html

The following link is a Journal of American Psychiatry and the Law review of book on the effectiveness of sex offender treatment.

http://www.jaapl.org/content/35/1/139.full

4

The following link is to an ACLU article on Ohio's SB 10 law which implemented the Adam Walsh Act.

http://www.acluohio.org/archives/cases/adam-walsh-act-sb-10-sex-offender-registration-and-notification-cases?c=1042

The following link is to a book review of "Prison Break" by David Dagan and Steven Teles.  This book examines the shift in conservative thinking about sentencing and imprisonment.  It suggests how other change in policy might be achieved.

https://books.google.com/books/about/Prison_Break.html?id=C9smDAAAQBAJ

The following link is to Women Against Registry, an advocacy group against sexual offender registries

https://www.womenagainstregistry.org/

The following link is to SOSEN (Sex Offender Solutions and Education Network), an advocacy group.

http://sosen.org/

The following link is to The Center for Sex Offender Management (CSOM) is a national clearinghouse and technical assistance center that supports state and local jurisdictions in the effective management of sex offenders.

http://www.csom.org/index.html

The following link is to an article critical of current sex offender laws.

http://citybeat.com/cincinnati/article-3033-cover_story_next_comes_burning_at_the_stake.html

The following link is to an article at Corrections.com on Facts and Fiction about Sex Offenders.

http://www.corrections.com/articles/24500-facts-and-fiction-about-sex-offenders

The following link is to "Once Fallen", a blog exploring sex offender issues.

http://www.oncefallen.com/

The following link is to a U-Tube video by Amy Borror of the Ohio Public Defenders Office discussing an Ohio Supreme Court decision limiting application of SORNA.  See other videos at this site.

https://www.youtube.com/watch?v=ea04-GBgJt8

The following link describes the cost to Ohio of complying with SORNA (Adam Walsh Act, SB 10)

http://www.vindy.com/news/2011/nov/13/complying-with-walsh-act-costs-ohio--mil/?print

5

The following link is to a Politifact Ohio analysis of a statement by The Ohio Public Defenders Office "The sex-offender registry has been around for a long time, and the research that's out there says that it has no positive impact on the public safety."  It found this statement MOSTLY TRUE.

http://www.politifact.com/ohio/statements/2013/apr/22/ohio-public-defenders-office/ohio-public-defenders-office-says-sex-offender-reg/

The following link is to Association For The Treatment Of Sexual Abusers (ATSA) an international, multi-disciplinary organization dedicated to preventing sexual abuse.

http://www.atsa.com/

The following link is to Citizens United for Rehabilitation of Errants (CURE) that believes that prisons should be used only for those who absolutely must be incarcerated and that those who are incarcerated should have all of the resources they need to turn their lives around.

http://www.curenational.org/

The following link is to a Cleveland Plain Dealer editorial critical of Sex Offender Registries.

http://www.cleveland.com/opinion/index.ssf/2015/11/sex-offender_registry_requires_reboot_in_ohio_and_the_nation_editorial.html

The following link is to the Institute for Psychological Therapies (IPT) paper on treatment of sex offenders.

http://www.ipt-forensics.com/journal/volume3/j3_1_2.htm

The following link is to a study of the costs of the registry in Butler County Ohio.

http://www.journal-news.com/news/news/local/keeping-track-of-sex-offenders-costly-1/nNKq6/

The following link is to an article in Pew Charitable Trusts Stateline blog on Restrictions faced by sex offenders.

http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2016/05/06/despite-concerns-sex-offenders-face-new-restrictions

The following link is to an Inverse Blog critique of sex offender laws.

https://www.inverse.com/article/16109-the-war-on-sex-offenders-is-the-new-war-on-drugs-which-means-it-s-about-race

The following is a link to an article by the Wrongful Convictions Blog on the problems with SO registries

https://wrongfulconvictionsblog.org/2014/08/16/sex-offender-registries-sors-time-for-a-change/

6

The following is an blog article by a law firm questioning the usefulness of registration laws

http://www.johntfloyd.com/sex-offender-registration-laws-beg-reform/

The following is an article about why Child Porn Gets Longer Sentences than Rape, Molestation

https://www.bna.com/child-porn-gets-n73014445352/

The following is an article about Romeo and Juliet and Sexting: 17-Year-Old Faces Child Porn, Assault Charges for Consensual Sex with Girlfriend

http://reason.com/blog/2016/09/13/romeo-and-juliet-and-sexting-17-year-old

The following is an article about ongoing legal battle between the State of Michigan and Federal Courts that the Michigan Registry is un-constitutional

http://congress-courts-legislation.blogspot.com/2016/09/michigan-court-goofed-and-should-reopen.html

The following web site is for Illinois Voices, an advocacy group on behalf of fighting discriminatory laws on sexual offenders.  Note the legal and legislative tabs.

http://www.ilvoices.com/

The following article is a Detroit News editorial on the need to rein in an out of control sex offender registry in Michigan.

http://www.detroitnews.com/story/opinion/editorials/2016/08/28/editorial-court-takes-step-rein-sex-registry/89514702/

The following article describes the barriors for a sexual offender coming out of prison in Milwaukee Wisconsin.

http://fox6now.com/2016/09/11/if-this-is-winning-i-dont-want-it-convicted-sex-offender-talks-about-life-after-being-released-from-prison/

The following article describes the problems ex-convicts face in coming out of prison, with special emphasis on sex offenders.

http://www.thegazette.com/subject/news/public-safety/simulation-exposes-eastern-iowa-employers-officials-to-life-as-ex-offenders-20160912

The following article describes how poverty and lack of basic living needs contributes to young women trading sex for food and other needs.

http://congress-courts-legislation.blogspot.com/2016/09/child-prostitution-in-us-teens-trade.html

7

The following article describes a situation where a dying, wheel chair bound elderly sex offender with Alzheimer's, is being forced out of hospice.

http://sexoffender-disabilities.blogspot.com/2016/09/sex-offender-fights-removal-from-hospice.html

The following article is from an Association for the Treatment of Sexual Abusers (ATSA) editorial on recent revelations about the perpetrator in a high profile child abduction and murder.  The family helped bring into existence some early sex offender registry laws.  They have since indicated that these laws have gone to far.

http://www.atsa.com/wetterling

The following map illustrates how restrictive Illinois sexual offender living restriction laws are in the Chicago area.  I did a similar map for Springfield Illinois.

https://www.google.com/maps/d/viewer?mid=1Yiv5oIPLGmjzSfZwgt3DsKTcluE&ll=41.83288758210642%2C-87.73184249999997&z=10

The following article is about Patty Wetterling, whose son Jacob was abducted, abused and murdered.  She was instrumental in getting early sex registry laws passed.  She has since come to the conclusion that these laws have gone too far.  (See ATSA article above)

http://www.citypages.com/news/patty-wetterling-questions-sex-offender-laws-6766534

The following article is a Washington Post story about the 6th Federal District Court striking down much of Michigan's sexual offender laws such as the registry and living restriction laws.

https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/09/07/sex-offender-laws-and-the-6th-circuits-ex-post-facto-clause-ruling/?utm_term=.4fc8cef5d344#comments

The following article is about changes to a village restrictive ordinance on sex offenders as a result of a law suit filed.

http://www.kenoshanews.com/news/village-revises-sex-offender-residency/article_adb4f7bf-2b39-57eb-8978-a3106cac3764.html

The following article describes neighbor's reaction to a sex offender returning home.

http://www.businessinsider.com/protesters-with-guns-waited-at-brock-turners-house-2016-9

This article contains more information on the 6th circuit court decision that parts of Michigan's sex offender laws are un-constitutional

http://michiganradio.org/post/public-sex-offender-registries-likely-do-societies-more-harm-good#stream/0

8

AR-00000463

This article describes how the FBI operated a "sting" child porn site that was of questionable legality

http://www.seattletimes.com/seattle-news/crime/fbis-massive-porn-sting-puts-internet-privacy-in-crossfire/

This article is a thoughtful exploration of whether mandatory minimum sentences are a good way to deal with rape cases

https://thinkprogress.org/mandatory-minimums-arent-the-right-way-to-fix-rape-culture-3d217f28b911

This article describes the suicide of a young high school student accused of having improper pictures on his phone

http://www.chicagotribune.com/news/local/breaking/ct-naperville-north-suicide-20170522-story.html

This article describes a 2017 Pennsylvania Supreme Court ruling that parts of their registry laws are un-constitutional punishment

http://ccresourcecenter.org/2017/07/20/big-win-for-registrants-as-new-requirements-declared-punishment/

This article affirms the 6th Federal Circuit Court finding that parts of Michigan's Sexual Offender laws are unconstitutional and makes a case for additional reforms of Michigan's Sexual Offender laws.

http://www.detroitnews.com/story/opinion/editorials/2016/08/28/editorial-court-takes-step-rein-sex-registry/89514702/

This article comments on the importance of the 6th Federal Circuit Court finding that parts of Michigan's Sexual Offender laws are unconstitutional

http://blog.simplejustice.us/2016/08/27/the-6th-circuit-finally-said-the-magic-word-punitive/

These articles are more comments on the 6th Federal Circuit Court Michigan decision.

http://mimesislaw.com/fault-lines/andrew-fri-sixth-circuit-sex-offender-registry-is-punitive/12483

http://michiganradio.org/post/michigans-sex-offender-law-unfair-and-probably-unconstitutional#stream/0

http://www.slate.com/blogs/xx_factor/2016/08/26/appeals_court_strikes_down_michigan_sex_offender_penalties.html

https://www.washingtonpost.com/news/morning-mix/wp/2016/08/26/court-mich-treating-sex-offenders-as-moral-lepers-restrictions-struck-down/?utm_term=.90534e7561f5

http://reason.com/blog/2016/08/26/6th-circuit-says-michigans-sex-offender

http://www.mlive.com/news/index.ssf/2016/08/federal_court_michigan_sex_off.html

9

AR-00000464

The following article describes the problems created by local sex offender living restriction ordinances in the Milwaukee Wisconsin area.

http://www.jsonline.com/story/news/local/2016/08/20/sex-offender-ordinance-worked-planned-putting-public-greater-risk/88948028/

The following article describes the problems created by local sex offender living restriction ordinances in a Denver Colorado suburb.

http://www.denverpost.com/2016/08/23/englewoods-sex-offender-law-is-too-restrictive/

http://www.thedenverchannel.com/news/investigations/sex-offenders-fearing-eviction-sue-englewood

http://www.denverpost.com/2016/08/18/sex-offenders-sue-englewood-colorado/

The following article comments on why a Judge was correct in providing alternatives to long term prison sentencing for a sexual offender.

http://www.denverpost.com/2016/08/20/judges-brave-sentence-for-rapist-highlights-need-for-sentencing-change/

The following article describes the problems created by local sex offender living restriction ordinances in Kenosha Wisconsin.

http://www.kenoshanews.com/news/lawsuit-challenges-kenosha-s-sex-offender-residency-restrictions/article_1392a489-a67a-53a0-a5c7-9b797dd36428.html

The following article describes why Ohio needs to pass legislation to reform their sexual offender laws.

http://www.mydaytondailynews.com/news/state--regional-govt--politics/overhaul-could-drop-thousands-from-sex-offender-registry/Vx8yW4iYcPGAdLqTqPvxxJ/

The following article describes how false accusations put a person on the registry

http://www.kansascity.com/news/local/article96788667.html

The following article is a thoughtful analysis of the consequences of a "He said, She said" case of campus rape.  In this case the accused rapist was exonerated.

http://reason.com/blog/2016/08/17/nate-parkers-campus-rape-acquittal-for-t

The following article describes the difficulties faced by another wrongfully convicted person due to the registry.

https://www.nytimes.com/2016/08/03/nyregion/wrongfully-convicted-of-rape-a-new-jersey-man-finds-more-punishment-after-prison.html?_r=0

10

The following article describes a Pennsylvania Supreme Court decision that grants relief from life time registration for some sexual offenders.

http://www.pennlive.com/news/2016/08/supreme_court_ruling_will_redu.html

The following online report about crime survivors views on the criminal justice system indicates they prefer treatment over punishment for offenders.

https://www.allianceforsafetyandjustice.org/crimesurvivorsspeak/

The following article describes a Deleware Supreme Court decision that use of a GPS ankle monitor is not punishment.

http://www.delawareonline.com/story/news/2016/08/12/judge-rejects-aclu-challenge-sex-offender-gps-monitoring/88640922/

The following article describes possible reform of Milwaukee's severe restrictions on where sex offenders can live.

http://www.jsonline.com/story/news/local/milwaukee/2017/07/28/milwaukee-may-dramatically-loosen-sex-offender-residency-restrictions/520901001/

The following article describes alternative methods to treat pedophiles.

 http://www.economist.com/news/international/21704795-understanding-sexual-attraction-children-essential-if-they-are-be-kept?fsrc=scn/tw_ec/shedding_light_on_the_dark_field

The following article describes problems with sexual offender laws.

http://www.economist.com/news/leaders/21704794-punitive-laws-intended-protect-children-sexual-assault-too-often-make-them-less

This article questions "Who are the real monsters?".

http://www.journalscene.com/archives/letter-who-are-the-real-monsters/article_17bf8fd4-b097-5f2d-ae4c-df326a12625e.html

The following article examines the impact of mandatory minimums for sexual offenders.

https://mobile.nytimes.com/2016/08/11/opinion/rape-victims-deserve-better-mandatory-minimums-wont-help.html?emc=edit_th_20160811&nl=todaysheadlines&nlid=72647429&referer=

The following article describes the controversy surrounding the nomination of a Massachusetts Supreme Court Judge who questioned aspects of the sex offender registry.

http://www.masslive.com/politics/index.ssf/2016/08/judge_kimberly_budd_confirmed.html

11

The following article describes some of the issues surrounding the Adam Walsh case and it's impact on sex offender laws.

http://time.com/4437205/adam-walsh-murder/

The following abstract describes problems with sex offender laws and includes an extensive reference list.  The article itself must be purchased.

https://link.springer.com/chapter/10.1007/978-3-319-29406-3_7

The following link is to a blog that keeps tabs on the murder of sex offenders by vigilantes etc.  The first link is an archive blog, the second is the current blog.

http://on-murders.blogspot.com/

http://murders-new.blogspot.com/

The following link describes the problems faced by persons on the registry

https://tftr.narsol.org/

The following article describes efforts at using Restorative Justice as an alternative to traditional prosecution and punishment.

http://www.pbs.org/newshour/rundown/states-consider-restorative-justice-alternative-mass-incarceration/#.V5F5DCLK9cY.facebook

The following article explores the impact of registering juveniles for minor sex offense crimes

https://www.nytimes.com/2016/07/31/opinion/sunday/punishment-that-doesnt-fit-the-crime.html?_r=0

The following article describes how sex offender registries undermine sound sentencing.

http://www.lifeonlist.org/how-sex-registries-undermine-sound-sentencing/

This article describes what can happen to the life of a person viewing child pornography.

http://mimesislaw.com/fault-lines/kopf-how-much-punishment-is-enough-for-kiddie-porn-watchers/12239

This article describes an enlightened approach to the housing needs of sex offenders.

https://narsol.org/2017/08/former-sex-offender-makes-positive-difference-in-others-lives/

This is a link to The National Center for Reason and Justice, a group seeking more rational laws.

https://ncrj.org/why-we-exist/

12

This is a link to an interview by KABF radio station's "It Could Be You" program in Little Rock Arkansas with a representative from the Sexual Law and Policy Center about problems faced by persons on the registry.  It also includes discussion about problems of people in the LGBTQ community.  The latter part of the interview focuses on the registry and living restrictions.

https://www.sexlawandpolicy.org/slap-blog/it-could-be-you

This link describes the draconian nature of sex offender laws when applied to a young man with developmental disabilities.

https://narsol.org/2017/08/simple-exposure-brings-lifetime-of-cruel-and-unusual-treatment-for-disabled-son-family/

This link describes how flawed data has been used to support draconian sexual offender legislation. "Bad Data: How government agencies distort statistics on sex-crime recidivism**"**

http://www.cjcj.org/news/10396#Bad Data

This link describes how the sex offender panic is destroying lives

https://www.washingtonpost.com/news/the-watch/wp/2017/09/19/the-sex-offender-panic-is-destroying-lives/?utm_term=.55154de862a9

This link describes how "Junk Science" has affected Supreme Court and State Court decisions and led to draconian legislation.

https://www.nytimes.com/2017/09/12/opinion/when-junk-science-about-sex-offenders-infects-the-supreme-court.html

This link describes the impact of sex offender laws on a young woman convicted of a consensual sexual offense.

https://www.themarshallproject.org/2017/09/17/shawna-a-life-on-the-sex-offender-registry

13

AR-00000468

Links to Films and Documentaries on Sex Offender Legislation and Laws

## U Tube videos

### Amy Borror

Registry is punishment

https://www.youtube.com/watch?v=ea04-GBgJt8

Juveniles on Registry

https://www.youtube.com/watch?v=7ZJHtL1FvBk

Fighting un-constitutional sex offender laws

https://www.youtube.com/watch?v=75VBmND8A98

Hope for legislative Change

https://www.youtube.com/watch?v=jtfAEjvlf1o

### Norm Pattis

Legal challenges to sex offender laws

https://www.youtube.com/watch?v=SStR524QpwM

### Alex Landon

Finding Answers to Sex Offender Laws

https://www.youtube.com/watch?v=vIYJtcZyCJ4

### Catherine Carpenter

Sex Offender Laws and Constituionality

https://www.youtube.com/watch?v=vIYJtcZyCJ4

The Child Scarlet Letter

**https://www.youtube.com/watch?v=E-bpw5sCFcY**

**Janice Bellucci**

Registration = Punishment

https://www.youtube.com/watch?v=pLPW5No_KrU

Challenging Residency Restrictions

https://www.youtube.com/watch?v=ViFpnd7JHec

How I came to the Issue of fighting for sex offender rights

https://www.youtube.com/watch?v=o2EA4n1sDPA

I have a Dream

**https://www.youtube.com/watch?v=dc67Njm6BtE**

**Judith Levine**

Misguided Sex Offender Laws

https://www.youtube.com/watch?v=GxYxRkhB8Uk

**TED**

Dangerous Myths about Juvenile Sex Offenders

https://www.youtube.com/watch?v=81hy3AZjkr4

**Reason TV**

How Sex Offender Registries Fail Us

https://www.youtube.com/watch?v=PGn4GtkgIPQ

**The Alonya Show**

Sex Offenders Worse Off than Murderers

https://www.youtube.com/watch?v=hVtvItCe20I

**RT America**

Laws Restricting Sex Offenders Don't Work

https://www.youtube.com/watch?v=E6ctWVB6VUE

**Sex Offenders Have it Too Tough**

**https://www.youtube.com/watch?v=J9k6Ibapzp8**

### WLKY News Kentucky

Sex Offender Law Ruled Unconstitutional

https://www.youtube.com/watch?v=b1z7-2SNvzw

### WMTW News

Changes for Sex Offender Registry

https://www.youtube.com/watch?v=vVU9Zb-ryhE

### VSPVIDIOS

Misuse of Sex Offender registries

https://www.youtube.com/watch?v=bAsK_PjjugA

### NationalCURE

Sex Offender Registry is a Human Rights Problem

https://www.youtube.com/watch?v=x7tYnDnmNnU

### Adam Wright 12 News Texas

Sex Offender Registry: Is it Fair?

https://www.youtube.com/watch?v=Av0VAG6Qf5Y

### Our Broken System

The Sex Offender Registry: Its Time for a Discussion

https://www.youtube.com/watch?v=mdQl-fiGfjU

### Now This

What Makes You a Sex Offender?

https://www.youtube.com/watch?v=5vNH_9vzqqo

## Scott Gardner

Sex Offender Shuffle

https://www.youtube.com/watch?v=VfCYZ3pks48

## Innocent Victims

My Dad is a Registrant

https://www.youtube.com/watch?v=1IZy-DiDQfo

### Chrysanthi Leon

**Sex Offender Advocacy as a Social Movement**

**https://www.youtube.com/watch?v=HIB9Eg4FqqU**

## Michael Woodall

How the Sex Offender Registry has Broken my Family

**https://www.youtube.com/watch?v=HD5rV2LDbN4**

## Matt Duhmal

Impact of the Sex Offender Registry on the Family

**https://www.youtube.com/watch?v=y6F4Wb0JPuM**

Solitary Nation: Sex Offenders in the Community

**https://www.youtube.com/watch?v=OU4B9BF0mSg**

## Matamoral Films

**Workable Solutions: Reducing Trauma for sex Offenders and Their Families**

**https://www.youtube.com/watch?v=-oczVV8skzs**

**International Megan's Law IML Protest - Registered Sex Offender's Passports**

**https://www.youtube.com/watch?v=zmacueeHDss**

## OnceFallen.com

**Sex Offender Mythbusters Conference Presentation 2013**

https://www.youtube.com/watch?v=RmGqNA6qrss

## Emily Horowitz

How Sex Offender Laws are Failing Us

**https://www.youtube.com/watch?v=HbgigHvmZnA**

## Sex Offender Treatment Station

**An Overview of Sex Offender Treatment**

**https://www.youtube.com/watch?v=MZ1IDe14L30**

## Branded for Life

**https://www.youtube.com/watch?v=sNk-4GXQT24**

## VICE

**Canada's Original Vigilante Pedophile Hunter**

**https://www.youtube.com/watch?v=rJU_LvwL-Kc**

## USA Today

**See why this town openly welcomes sex offenders**

**https://www.youtube.com/watch?v=0NUdTwZY3y8**

## Sex Offender Registry Myth #1

**https://www.youtube.com/watch?v=IrPR-Zxc5JI**

## Human Rights Watch

US: Raised on the Sex Offender Registry

**https://www.youtube.com/watch?v=ltqTwXoYkWA**

## St Francis College

**Judith Levine on Misguided Sex Offender Laws**

**https://www.youtube.com/watch?v=GxYxRkhB8Uk**

## Ken Kish

Exposing the Truth About the Sex Offender Registry.

**https://www.youtube.com/watch?v=MCywttCRxFY**

## Will Conway

Sex Offender Registry Reform - Michigan

**https://www.youtube.com/watch?v=JnUfiZjIIxs**

## Professor Christopher Dum

**The Consequences of Sex Offender Legislation on Residents and Offenders in a Single Room
Occupancy Motel**

**https://www.marketplace.org/2016/11/02/world/what-happens-when-motel-becomes-home**

## Dark Net – VoActive Films

**Four Ways You Could Land On The Sex Offender Registry**

**https://www.youtube.com/watch?v=tCJK0KwDZVg**

## It Could be You – KABF Radio

This is a link to an interview by KABF radio station's "It Could Be You" program in Little Rock Arkansas
with a representative from the Sexual Law and Policy Center about problems faced by persons on the
registry.  It also includes discussion about problems of people in the LGBTQ community.  The latter part
of the interview focuses on the registry and living restrictions.

https://www.sexlawandpolicy.org/slap-blog/it-could-be-you

**When Junk Science About Sex Offenders Infects the Supreme Court – NY Times**

This is a link to a NY Times article on Junk Science and it's impact on court decisions and legislation

**https://www.nytimes.com/2017/09/12/opinion/when-junk-science-about-sex-offenders-infects-the-
supreme-court.html**

**Shawna:  A Life on the Sex Offender Registry-The Marshal Project**

This is a link to a short documentary on a woman on the sex offender registry

**https://www.themarshallproject.org/2017/09/17/shawna-a-life-on-the-sex-offender-registry**

**Married to a Sex Offender:  The Secret Room, A True Stories Podcast**

A verbal narrative of the problems encountered by a married couple

**https://www.acast.com/secretroom/43-married-to-a-sex-offender**

**Sex Offender:  The Secret Room, A True Stories Podcast**

A verbal narrative about life as a sex offender

https://www.acast.com/secretroom/44-sex-offender

# Documentary Films

## Untouchable

http://www.untouchablefilm.com/

https://tribecafilm.com/filmguide/untouchable-2016

This film was shown at the 2017 Cleveland International Film Festival 3 times, plus a panel discussion.  The producer will make this film available for educational purposes.

## Pervert Park

http://www.rogerebert.com/reviews/pervert-park-2016

http://www.pbs.org/pov/pervertpark/

I've had discussions with Western Reserve Public Media about doing something with the above film.  It was shown on Public TV in July 2016.  Copies of this film can be obtained for free.

## American Sex Offender

http://all4consolaws.org/2012/06/american-sex-offender-a-documentary-project-in-los-angeles/

The status of this film is unclear.  The produce committed suicide before it was finished.

## Registered

https://vimeo.com/191529699

http://www.meganeleanorclark.co/contact/

https://www.gofundme.com/registered

## Faces of Mass Incarceration

https://www.youtube.com/watch?v=PSMynbaGse0

## Sex Offender at 19, Branded for Life

https://www.youtube.com/watch?v=yP4T3wPJWoM

## Among the Sex Offenders

https://www.dailymotion.com/video/x2kbh9c_louis-theroux-s-la-stories-3-of-3-among-the-sex-offenders_tv

## Sex Offender Village

https://www.nytimes.com/video/opinion/100000002235938/sex-offender-village.html

## The Night that Changed Travis's Life Forever

https://www.youtube.com/watch?v=AtLWPslVtEc

## Labeled for Life

http://www.oprah.com/own-our-america-lisa-ling/labeled-for-life-18-months-later

## Americas Youngest Sex Offenders

https://www.youtube.com/watch?v=Zi0GrFgPH9Y

## South West of Salem (Trailer)

https://www.investigationdiscovery.com/tv-shows/southwest-of-salem/videos/the-brief-history-of-the-san-antonio-four-women-wrongfully-convicted-of-a-shocking-crime

## Sex-offender registries: How the Wetterling abduction changed the country

http://www.apmreports.org/story/2016/10/04/sex-offender-registries-wetterling-abduction

This is a report with a short included video

## For Juvenile Sex Offenders, State Registries Create Lifetime Of Problems

http://www.npr.org/2015/05/28/410251735/for-juvenile-sex-offenders-state-registries-create-lifetime-of-problems

This is a NPR audio report

## Sex Offenders in Prison – National Geographic

http://channel.nationalgeographic.com/lockdown/episodes/sex-offenders/

## In the Dark: The Crime Minnesota Public Radio Audio Report

https://www.mprnews.org/story/2017/01/30/mpr_news_presents

**Not For Rent Trailer** (This film is general film about obstacles for felons finding  place to live)

https://www.notforrentfilm.com/

**End of Love**– Trailer (This is a film still in production)

http://endoflovefilm.com/fund-film

### A "Frightening" Myth About Sex Offenders – New York Times Op Ed

David Feige – A documentary Short about the Myth that justified many sex offender laws.

https://www.nytimes.com/video/opinion/100000005415081/a-frightening-myth-about-sex-offenders.html

# OHIO RSOL

### *Advocates and Families to Reform the Public Registry*

Ohio RSOL's mission is to advocate for fair, effective, evidence-based laws and registration requirements.

Ohio RSOL is comprised of advocates and family members who joined together to educate and advocate for changes to Ohio's laws regarding the public registry for individuals convicted of sex-related offenses.

Ohio RSOL commends both the Ohio Criminal Sentencing Commission and the Ohio Criminal Justice Recodification Committee (OCJRC) for studying whether the sex-offender registry is an effective tool for protecting the public and reducing recidivism. The Ohio Criminal Sentencing Commission issued a report in April, 2016 and the OCJRC will issue its recommendations November, 2016.

Ohio RSOL supports a number of changes that the OCJRC has discussed, including:

- ☐ De-criminalization and modification of certain offenses
- ☐ Return to judicial discretion and risk-based assessments
- ☐ Expanded opportunities to petition for de-registration
- ☐ Elimination of residency restrictions
- ☐ Reclassification of registration tiers
- ☐ Centralized system of registration

In addition to these changes, Ohio RSOL would also support:

- ☐ Placing first-time offenders on a registry only available to law enforcement
- ☐ Accelerating opportunities for de-registration

- ☐ Moving all past offenders to the reclassified tiers on the effective date of the legislation
- ☐ Changing public notifications requirements to only apply at initial registration and upon change of address
- ☐ Eliminating employment information on registry

Although the sex offender registry laws in Ohio may have been well-intended, they have proven to be ineffective, costly, remove judicial discretion and do not promote public safety or reduce recidivism.

Since 1994, states have adopted "Megan's Laws" which provide community notice about sex offenders.  Ohio's original SORN (Sex Offender Registration Notification), HB 180, was adopted in 1996, and later amended by SB 175 in 2002.  The law authorized a judge to classify offenders based on their likelihood to committee a sexual offense again, a "risk-based classification."

On June 30, 2007, Senate Bill 10 was signed into law to implement the federal Adam Walsh Child and Safety Protection Act of 2006 (AWA).  The purpose of the AWA is to create stricter requirements for SORN.  In January 2010, Ohio was the only state in compliance with the SORNA, the Title 1 portion of the AWA.  Only 16 other states have passed similar laws that are compliant with the AWA.  A number of states made arguments against implementation because it is an unfunded federal mandate and believe the state can do a better job of protecting its citizens than a system imposed by the federal government.

Ohio RSOL is hopeful that the Ohio General Assembly will support the recommendations of the OCJRC, along with our recommendations, and update the laws in Ohio, so that low tier

offenders and those who have been rehabilitated are able to become productive members of society.

Contact Information:

Dolley Madison, Ohio RSOL Board Member, 419-564-1378, ohiorsol@yahoo.com

Connie Nolder, Ohio RSOL Legislative Agent, 614-329-6100, connie@crnconsulting.org.

AR-00000481

8/8/23, 12:00 PM                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

**Share ▾**

---

| Comment |

Many of the other comments posted here have provided logical arguments, statistics, references, and data to combat even the concept of SORNA. And what is found lacking by the supporters of SORNA is real data, facts, and even just common sense wisdom to support that SORNA and the like is worthwhile and effective.

My belief is that most registrants are not the the monsters that is portrayed in media or by the fearful and angry. There are some that have proven themselves particularly evil yes. But this the few, not the many. Having met many, my belief is that most are simply broken, not unlike the general public is broken. And in their brokenness they may have committed a crime which by our laws demands a punishment, and most understand that. However the ongoing punishment-like nature of a SORNA and all of the other many restrictions and prohibition propagate instability and lack of health, which had lead to the crime to begin with, so wisdom is puzzled at if such a concept isn't counterproductive. And to declare these conditions as non-punitive can only be said by one not under the conditions. If a criminal has paid the time due by law, then we must not continue to lay on blocks to liberty, blocks to becoming healthy, lest we risk further damage.

And one of the saddest aspects of all, is that all of these attempts at criminal management miss the point of justice, which is to restore. Justice is not about continually punishing or promoting a torturous life. The majority of these conditions, laws, and prohibitions do nothing to help the one that was actually injured and it is absolutely debatable whether they are effective in preventing crime. They certainly can't prevent the crime that happens most which is first time offense crimes.

A sign saying "don't commit a crime" only works if the reader is law-abiding. This goes even for those convicted of past crimes. We don't need new 'signs', new hoops to jump through. We need to work at stopping the over-sexualization of all peoples young and old found, that we see has saturated all forms of media & entertainment. We need to work at healthy families. We need to work at helping all individuals (including ex-cons) be healthy and stable members of society. SORNA doesn't contribute to any of this but reinforces fear and a lie that this group of criminals has higher recidivism than other groups. If we really

AR-00000482

were concerned about the welfare of children, and were to apply this SORNA logic, we'd have registries of DUI offenders, domestic assault offenders, drug pushers, murderers, etc.

Do not expand SORNA, if anything, we should rip it down and all other public registries like it. May wisdom guide your direction. Thank you.

**Comment ID**

DOJ-OAG-2020-0003-0160

 **Tracking Number**

1k4-9irv-1hj1

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 4, 2020



Your Voice in Federal Decision Making

About   Bulk Data Download      Agencies      Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000483

8/8/23, 11:23 AM                                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

| Comment |

Enough is enough! The registry IS a lifetime of punishment beyond belief. No other crime has this sort of punishment. The registry does not work! Very rarely does someone on the registry re-commit a new sexual crime. These laws are written for victims that have a rare case, such as Dru Sjodin, her story is very sad, but the registry didn't stop that man from committing a new sexual offense, therefore it doesn't protect as intended. Instead it just harms families like mine, we should have the right to try to heal and move forward with our lives. Please stop adding more restrictions, instead spend the money on education on how to prevent these crimes and providing services for survivors.

| **Comment ID**
DOJ-OAG-2020-0003-0161 |

| ◎ **Tracking Number**
keo-o0jy-frw7 |

| **Comment Details** | **Submitter Info** |

**Received Date**
Sep 4, 2020

AR-00000484

Regulations.gov



About     Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)     (/agencies)    (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000485

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

I understand the proposed rules may be perceived as simply administrative changes to civil code, however, this particular civil code has regulatory ramifications with the potential to affect millions of individuals and collaterally, their household members, which may number in the tens of millions. What other civil statutory scheme in the federal code provides for criminal penalties in excess of a decade or more in prison and up to LIFETIME of supervised release? With such stiff penalties for non-compliance, citizens rightly expect such demanding regulatory schemes to be highly effective at achieving their stated goals. SORNA, and other variants of sex offender registration schemes cannot demonstrate this. The burden that sex offender registration schemes place on US citizens and, subsequently, on law enforcement agencies to ensure technical compliance make this one of the greatest legislative failures ever conceived, perhaps surpassing that of Prohibition.

At its core, any type of registration scheme promotes the objective of pitting neighbor against neighbor. This type of schema is fundamentally flawed and can never further the objectives of public safety. Its only actual effect serves to make communities feel less safe. No DOJ statistic or other independent study can show that SORNA has achieved any of its stated purposes. Therefore, let us not continue to weave a more convoluted web of regulations when even our highly trained law enforcement agencies cannot properly enforce the current regime. Instead, those with the power to enact these statutes should demand evidence-based approaches that can demonstrably reduce the prevalence of sexual crime.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0162 |

AR-00000486

Regulations.gov

 **Tracking Number**

keo-p1vr-delf

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 4, 2020



About     Bulk Data Download     Agencies     Learn

(/about)     (/bulkdownload)     (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)     |     User Notice (/user-notice)     |
Accessibility Statement (/accessibility)     |     Developers (https://open.gsa.gov/api/regulationsgov/)     |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)     Provide Site Feedback

AR-00000487

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

| Comment |

Abstract reprinted with permission by author

By Catherine L. Carpenter . . . Saying something is true does not make it so. And saying it louder does not make it truer. But such is the legislative posture behind modern day sex offense registration laws that punish those who commit sex crimes because of entrenched myths that overstate the laws positive impact on public safety and exaggerate recidivism rates of offenders. And it is not only registration schemes themselves that have been scaffold-ed by these myths, but numerous ancillary laws that exclude benefits to offenders strictly because they have committed sex offenses.

Sadly, this sticky, but false, narrative has provided the animus that galvanized implementation of registration and notification regimes. And in its most recent chapter, the narrative has been formalized into blanket exclusions or what this article calls all except for provisions that have inserted into a myriad of criminal justice reform efforts without much notoriety.

The effect? Registrants and their families have been prohibited from broad-based and important ameliorative changes to the carceral state, many to which they should be entitled, and to which they are denied only because of their status as registrants. Indeed, within comprehensive legislation covering numerous crime and sentencing reforms, these ubiquitous blanket exclusions have the markings of boilerplate language that have been introduced even where the new legislation has no rational relationship to the protection of the publics safety or the prior sex offense conviction.

[T]he moral panic and false data [is] used to buttress blanket exclusion provisions their inflated importance obvious. It concludes that these measures, which are un-tethered to public safety concerns, and only supported by governmental and community animus, violate fourteenth amendment protections.

AR-00000488

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0163



**Tracking Number**

1k4-9irw-u9uo

Comment Details

Submitter Info

**Received Date**

Sep 4, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000489

8/8/23, 11:27 AM                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

Please take a moment to think about this act. This about how would you "feel" if YOU had to follow these rules. SORNA does not make sense. One one of the main people who helped to start the registry is now against the monster it has turned into. I can agree that the registry is needed for those who are the most violent. Lifetime should only be reserved for the worst. Having a tiered system where a person an be released and return to society after completing the term should no longer be on the public list.

Let's work to make the rules have more sense and not just to help a person spread his name and keep making him money. Im looking at you Adam Walsh. No other group has life as hard as Registered People do. If not, then we need to start making list of all the DUI drivers. All the Domestic Violence offenders. All the people who do the crime not one time, but OVER AND OVER again. I hate hearing stories of the guy who got 11 DUIs and still has a license. Or the person who is constantly hurt because the justice system does not care.

Lastly, telling states that funding will be cut is the same as Blackmail.

| **Comment ID** |
| DOJ-OAG-2020-0003-0164 |

|  **Tracking Number** |
| keo-ywk3-pzim |

https://www.regulations.gov/comment/DOJ-OAG-2020-0003-0164

1/2

AR-00000490

Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 4, 2020



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000491

8/8/23, 2:57 PM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments    724    (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments    724    (/docket/DOJ-OAG-2020-0003/comments) |    Share ▾ |

---

| Comment |

See attached file(s)

| **Comment ID** |
| DOJ-OAG-2020-0003-0165 |

| ⊙ **Tracking Number** |
| keo-z1lm-rn3k |

| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 4, 2020

AR-00000492

Regulations.gov



Your Voice in Federal Decision-Making

About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000493

8/8/23, 2:27 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
| --- | --- |

---

| Comment |
| --- |

First consider this not everyone is guilty of the crime they are convicted. If you are going to pass out lifetime punishments like candy then the same legal standards and absolute proof like murder trials, should be used in sex crime trials.

Furthermore The constitution States.

No person shall … be subject for the same offence [sic] to be twice put in jeopardy of life or limb.

No person shall be deprived of life, liberty, or property, without due process of law.

No person can be compelled to speech under threat of punishment.

You are guilty of breaking these laws and 800,000 people know this and their friends and family's know this too.

"When in the Course of human events, it becomes necessary for one people to dissolve the political bands which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which the Laws of Nature and of Nature's God entitle them, a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation….

We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain inalienable rights, that among these are Life, Liberty, and the pursuit of Happiness.— That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed. — That whenever any Form of Government becomes destructive of these ends, it is the right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness… it is their right, it is their duty, to throw off such Government, and to provide new

AR-00000494

Guards for their future security.****"

Thomas Jefferson-

DO NOT TREAD ON ME!

Best Regards

A Mistake they Made

---

**Comment ID**

DOJ-OAG-2020-0003-0166

---

 **Tracking Number**

kep-19kn-6rg9

---

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**

Sep 4, 2020



About   Bulk Data Download   Agencies   Learn

(/about)       (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

AR-00000495

Regulations.gov

Support (/support)   Provide Site Feedback

AR-00000496

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

I support this legislation to amend the Sex Offender Registration and Notification Act. The proposed changes will serve to make the registrar less punitive for past offenders who seek housing and employment. As the Act stands, it actively punishes even those who want, need, and deserve a second chance to rebuild their lives. For example, an acquaintance of mine, a highly skilled carpenter, cannot find a place to live in our small town with encompassing school zones. His illegal act for which he is still paying dearly due to the registration process is consensual sex with a minor when he was one year older than the minority age in his state. This alone is an inconsistency that the DoJ must address; states have varying ages of consent. Therefore the registrar punishes young men disproportionately depending upon state law. Even young men who make this mistake unwittingly must pay for it the rest of their lives. Worse, their families suffer even if the "perpetrator" and the "victim" subsequently marry.

Further, those who cannot find employment or housing face homelessness, in which case the registry process cannot track them. In the example of the acquaintance I wanted to hire as a carpenter cannot work for me as he lost his employment due to the registry, lost his car after losing his job, has no personal or public transportation and no location in our small town where he can live. This highly skilled person has much to contribute to his community and is well respected among those who know him, but this punitive law has so far thwarted him from establishing a normal life.

I concur that a federal registry is needed and a valuable safeguard, especially for families with children. However, the proposed changes are necessary to avoid marginalizing the "offenders" we urgently need to reintegrate into society. The ability to reestablish oneself for non-dangerous "offenders" is essential to families, neighborhoods, and the common good. Please make this possible. I am a seventy-year-old woman who has peed in public and NOT by choice. Although I was unobserved and 'got away' with it, if caught, I would be on the same registry as a pedophile. This cannot be considered justice.

AR-00000497

8/8/23, 3:02 PM                                          Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0167

 **Tracking Number**

kep-sglw-oe1e

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 5, 2020



About     Bulk Data Download       Agencies      Learn

(/about)            (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000498

8/8/23, 12:50 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

Comment

The creation of Tiers is too little too late to fix a broken system. The purpose of the system was to track repeat molesters and abusers, not public urinating, streakers and married couples engaging in martial relation while in public. As it does it invalidates the system, defeats its initial purpose and make it prone to overturning by legal action.

A quote from the attached legal article, "Sex offender is a ubiquitous but misleading and damaging term. It connotes a permanent characteristic of a person who has committed a crime categorized as a sexual offense. It carries demonstrably false connotations and causes irreparable harm to the reputations of those so labeled. See Mary Katherine Huffman, Moral Panic and the Politics of Fear: The Dubious Logic Underlying Sex Offender Registration Statutes and Proposals for Restoring Measures of Judicial Discretion to Sex Offender Management, 4 VA. J. CRIM. L. 241, 247 (2016) (arguing that the term sex offender is a developed stereotype that reflects public opinion rather than evidence-based facts correlated with people that have perpetrated sex offenses). Although this article employs the term within certain contexts, the article frequently uses phrases such as a person who has committed a sexual offense, registrant,or registered citizen.

One problem is that "Sex offender" is not a legally definable term. It is applied as hammer when a surgical scalpel is needed.

I urge you to reform this regulation and legislation both for public safety and the human rights of those inappropriately shunned by society due to this legal action.

Comment ID

DOJ-OAG-2020-0003-0168

AR-00000499

 **Tracking Number**

1k4-9isg-drq0

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 5, 2020



About    Bulk Data Download    Agencies    Learn

(/about)    (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000500

8/8/23, 12:02 PM                                                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

DOJ: Registration Requirements Under the Sex Offender Registration and Notification Act

This is contrary to what some states that have not adopted SORNA are doing because they have a more accurate system, using actuarial risk assessments to determine notification levels. Furthermore, these systems allow for some persons, previously on the registry, to be relieved of the duty to register based on solid, public-policy standards. This rule would over-ride state statutes which are based on far more research-based standards.

**Comment ID**
DOJ-OAG-2020-0003-0169

 **Tracking Number**
1k4-9ish-wnll

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**
Sep 5, 2020

AR-00000501



About     Bulk Data Download        Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000502

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

DearSir/Madam

I am a family member of a registered citizen.I would like to draw your attention to the devastation SORNA registration has caused to our family.

Our family member is a decent human being who made a mistake. He comes from a loving and supportive family who have stood by him throughout this ordeal.

SORNA has prevented him from moving forward successfully with his life. Unlike offenses related to drugs, robbery or any other felonies, including violent offences, SORNA inhibits registered individuals from returning to society after they have served their time and completed their punishment.

Housing and jobs are difficult to obtain.

Our family person is one of the lucky ones who has managed to obtain both housing and a job, albeit a much lesser job for than the one for which he is qualified. It took years of many unsuccessful attempts at both. Without the support of his family he would have been destitute as are so many registered citizens.

SORNA throws so many obstacles at restored citizens. They are set up to fail.

Perhaps public registration should be required for the highest risk individuals only.

Treatment strategies, prevention and restorative justice are some suggestions.

As an incentive for good behavior, registered citizens should be able to request early termination of registration requirements.

AR-00000503

We as tax payers should stop paying for a strategy which has not proven to work.I would like to recommend that states abolish all residency and proximity restrictions.
The Dept of Justice itself has said that these restrictions can lead to increased recidivism, and therefore does not recommend their use.

I hope you will take my letter into consideration.

Thank YOU

**Comment ID**
DOJ-OAG-2020-0003-0170

 **Tracking Number**
1k4-9isi-jea0

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 5, 2020



Your Voice in Federal Decision Making

About         Bulk Data Download        Agencies     Learn

(/about)       (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000504

Regulations.gov

AR-00000505

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

As any lawyer would know, changing rules and applying them retroactively is not only wrong but unconstitutional. This proposed rule says it acts more like a floor than a ceiling, however many states requirements are still below this floor. Why don't you try setting an actual ceiling, or making all states get on the same page instead of nearly every state having different state, county, and sometimes even different local requirements? When can SORNA be based on actual evidence that even the DOJ recently released stating that those listed on the registries do not reoffend at the rate the govt makes everyone else thinks? Changing the length of time to register for those states that CHOOSE not to follow federal guidelines is their right, how can you force someone that has already done ALL of their time - any prison, probation, then registry time - to be put back on a federal register? Think of the people, think of their families. Think of their little kids that had no say in something their parent did 20-30 years ago but continue to lack having that parent at school functions that every murderer and drug dealer gets to go to. Who exactly is the registry protecting? All the latest evidence says it perfectly, it protects NO ONE.

| **Comment ID** |
| DOJ-OAG-2020-0003-0171 |

| ◎ **Tracking Number** |
| keq-1h11-5xjt |

| **Comment Details** | **Submitter Info** |

AR-00000506

Regulations.gov

**Received Date**

Sep 5, 2020



About     Bulk Data Download        Agencies      Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000507

8/7/23, 12:36 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

Lifetime registration for juvenile offenders will do irreparable harm to people with little or no benefit to society. Scientific research on the effects of therapy to treat youth with problem sexual behavior consistently shows positive treatment effects and dramatic reduction in rates of reoffending. Registration has been observed to interfere with the educational, employment, and housing opportunities. Each of these represent protective factors against re-offense. This means that lifetime registration actually increases risk to society. Registration should be reserved for only those individuals who represent high risk based on individual factors and evaluation, not whole classes of people defined broadly by offense behavior. The proposed rule change will harm society while offering the illusion of protection.

**Comment ID**

DOJ-OAG-2020-0003-0172

 **Tracking Number**

1k4-9isk-4ddb

|  Comment Details  |  Submitter Info  |
|---|---|

**Received Date**

Sep 5, 2020

AR-00000508



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000509

8/8/23, 2:29 PM                                                     Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

| Comment |
|---|

Please see attached article.

**Comment ID**
DOJ-OAG-2020-0003-0173

◎ **Tracking Number**
keq-7n9b-l8tk

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**
Sep 5, 2020

AR-00000510

8/8/23, 2:29 PM

Regulations.gov



Your Voice in Federal Decision-Making

About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000511

8/7/23, 12:40 PM                                     Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724 (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724 (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

I am against the proposed rule that is up for becoming law ! First of all each and every person in life is different from each other .. One law does NOT fit all ! People have committed different types of crimes at different levels for different reasons . One may be mentally ill , one may have intellectual disabilities , one may be uneducated ! There are many factors and numerous research on this topic that proves the registry DOES NOT keep the public safe . The people who have committed awful crimes repeatedly need help and yes maybe should be on a registry to keep track of them . Yet the people who NEVER had a physical victim nor ever had any physical contact with a human being should be treated differently and educated ! Not registered - for what ? I do not condone the abuse of children or any human being for that matter ! Treating humans who have made a stupid mistake or didn't understand what they did was wrong ( I am speaking of the lesser action you consider crimes ) should be helped with counseling and whatever else is necessary . How is the registry changing this person . Isolation is a proven factor in causing a human being to do things they normally would not do . Take risk they normally wouldn't take - why because they are all alone with no one to teach them right from wrong ! The registry makes isolation more a part of a persons life . The public has been scared into believing that people on the registry are monsters ! The media hypes up stories because they want them to sell , they neglect to include ALL the facts on the matter which leads the public to be misinformed and at times scared ! Wrong wrong wrong . Many people watch the mews , read the paper and believe it all , when in truth the whole story is never told ! I believe there are 3 sides to a story , your , mine and the truth ! I am Against this proposed bill and will make my voice heard "exercising my freedom of speech" More research and less laws that make no sense is what is needed . Think long and hard on the impact this will have on the human being who don't need this type of treatment ! Thank you !

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0174 |

AR-00000512

Regulations.gov

 **Tracking Number**

keq-b0vl-1mfi

**Comment Details** | **Submitter Info**

**Received Date**

Sep 5, 2020



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000513

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

**Comment**

I do not support these changes.

I do not want my tax dollars being used for this.

I am so tired of politicians pushing bad policy.
Policy that has been proven to not work. And still causes economic harm.

There is 940,000+ people who are forced to register. Or risk lenghty imprisonment.
40,000 are added to the registry every year.
Kids as young as 8 are on the registry.
People whos crime was not sex relate are on the registry.

People on the list are having a hard time finding jobs and a place to live.
And this is because the governments requires this public list.

The list doesn't work.
These changes won't improve the economy.

**Comment ID**
DOJ-OAG-2020-0003-0175

 **Tracking Number**
1k4-9isp-ibml

AR-00000514

Regulations.gov

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 5, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000515

8/8/23, 12:56 PM                                                            Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

In reference to the SORNA, it has been proven through studies that the SOR is not working in the way originally intended. Law enforcement is overrun with having to keep track and check on a registry that grows almost daily. The registry covers a wide range of crimes, but the registry makes no differentiation in regard to the requirements of the registrants. The recidivism rates in this area are proven to be low since the passing of the Adam Walsh Act. Yet there is still no path to get off the SOR for compliance and no further arrest for sex crimes but requires most to lifetime registration no matter what the crime that was originally committed. Rather than add more requirements, please look at facts and base your recommendations on current factual evidence, rather than feel good measures that seem to promote public safety but are, in fact, less safe to our communities

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0176 |

|  **Tracking Number** |
|---|
| 1k4-9isq-g8al |

| **Comment Details** | **Submitter Info** |
|---|---|
| **Received Date** | |
| Sep 5, 2020 | |

AR-00000516



About   Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000517

8/8/23, 11:54 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

This mornings sermon has provided me with more words to say, things that need to be said. Attorney General Barr, you are the DEVIL! YOUR proposal is the work of the Devil and AWA is the word of Satan. This is HELL. What is Hell? Hell is a bottomless Abyss that is full of darkness, has no light and only causes despair. This is what the AWA, ML and IML promotes. THOUSANDS of MEN, WOMEN AND CHILDREN WILL BE HURT! This will not HELP the REGISTER CITIZENS! It will kill make no doubt about it. Yes, there are those that need to be watched but the MAJORITY have and are rebuilding or at least attempting to re-build their lives. Adding to the community, paying TAXES! But YOUR proposal will end that, making it impossible to work, travel, be productive. AG Barr, I pray that GOD will strike this down but I know there are far to many DEVILS in Washington for this to happen, but we can only Pray.

20 years ago I committed a Sin. I was given a chance to repay my debt. I did. I was successful. Was it easy?, of course not but I persevered and each year, POLITICIANS and stiff neck persons like Rep. Chris Smith, the authors of AWA including John Walsh himself and you, AG Barr constantly move the End Zone claiming this is not Punishment, this is not ex post facto. Its Just a regulation. BS I say. Wake up AMERICANS, this CAN happen to you. This is only the start. The DEVIL is rubbing his hands together!

---

**Comment ID**
DOJ-OAG-2020-0003-0177

 **Tracking Number**
1k4-9it4-hwtw

AR-00000518

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 6, 2020



About      Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000519

8/8/23, 2:35 PM                                              Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

This revision of a useless law that has never been shown to provide any increase in safety whatsoever appears to be another waste of American taxpayer's money based on a casual disregard for evidence. Had there been any data provided that SORNA has ever done anything to prevent crime, this might have been a useful exercise. But there is none. Sex Offenders have the lowest recidivism rate of any crime group--this is a fact that has been proven over and over again in the research. But because of public ignorance and fear, deliberately incited and aggravated by actions such as these, people who have served their time and are trying to recreate a life are once again being targeted by a relentlessly unforgiving system and a citizenry verging on vigilatism that gives itself permission to hound, harrass, and attack people on the registry.

Because of this lack of any supportive evidence that SORNA or ANY of the registry laws have done anything whatsoever to prevent sex offenses, I object to the further refinement and expansion of the applicability of SORNA.

https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf

Because registry laws have been shown to be more harmful than helpful, I object strenuously to the further refinement and expansion of SORNA as outlined in this document.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2820068/

**Comment ID**

DOJ-OAG-2020-0003-0178

AR-00000520

 **Tracking Number**

1k4-9it9-fboy

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 6, 2020



About        Bulk Data Download        Agencies        Learn

(/about)              (/bulkdownload)      (/agencies)      (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000521

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

Comment

For me to take out the time to create a comment is a very difficult task but at the same time necessary. I am speaking as a former parole officer that supervised sex offenders and also as a convicted sex offender myself.

While being a parole officer with a sex offender caseload, I had to make sure everyone on my caseload was compliant with the registry along with many other stipulations imposed by the parole board as well as the courts. It was rare that I had major issues with clients on my caseload and as a matter of fact was the easiest caseload to supervise due to the high compliance rate. I had more of the other cases re offend and violate parole than the sex offenders. It is a known fact among probation and parole officers that the sex offenders are the most compliant and has low recidivism rates.

I believe the punishment should fit the crime. NO ONE SHOULD BE SUBJECT TO LIFETIME REQUIREMENTS TO REGISTER ON THE SEX OFFENDER REGISTRY (SOR). No other offenders has to register but has more violent crimes and their recidivism rate is far higher.

I believe that there should be shorter times on the SOR for ALL Tiers as this is a case of over supervising and in fact offenders should be discharged from the SOR for compliance and no further arrests for sex crimes.

The SOR is more dangerous and pose a safety issue for those that are on it. My story is an unique one. I was convicted for a sex offense as my case involved a consensual sexual relationship with a female parolee on my caseload. She was not a minor but because of my position as a parole office, a crime was committed. I accept full responsibility for my terrible judgment but my family has been put at risk due to the SOR and people look my status up not because they are afraid, but because of it being accessible for ridicule. I have been discharged from probation since 2015 and my case actually occurred in 2007. I obtained another college degree while on probation and three others in my household have obtained college degrees since my conviction to date which includes my wife, daughter and son. We all are

AR-00000522

Regulations.gov

employed thus tax paying, law abiding citizens. The problem, every once in awhile a State Trooper will knock on my door to make sure I still live where I say that I'm living. I'm obviously not a threat but those that I have had to supervise like murderers, drug offenders, home invasion and breaking and entering, larceny, felonious assault, etc. do not have to endure this over supervision.

I have lived both sides and along with FACTS, STUDIES, and my personal experience, I believe the SOR should be reduced and registrants should be discharged that have proven they can be crime free so we can be freed from this sentence that DOES NOT fit the crime and be the productive member in society that everyone repeat in their remarks with no intent of helping because of the STIGMA that comes with sex offenders but other criminals have the luxury of being pardoned or forgiven.

Finally, persons convicted by a State should not have to register on a Federal Registry! This only increases the HARM AND DANGER on a NATIONAL level and clearly shows bias, not because there is a need for it. The registry is not working and and in fact a gross percentage of new sex offenders are not on the registry! If the other crimes that I previously listed were offenses that required registering, the statistics would be different.

**Comment ID**
DOJ-OAG-2020-0003-0179

 **Tracking Number**
1k4-9it9-jn2z

**Comment Details**   **Submitter Info**

**Received Date**
Sep 6, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

AR-00000523

Regulations.gov

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000524

8/7/23, 12:40 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

These changes to the Registry rules are outrageous. How much more difficult do you have to make it for these people to start a new life? These offenders have paid a huge price for their mistakes, more so than for any other criminal offense, and now they are having to keep on paying for the rest of their lives. This is nothing more than another prison sentence. What other class of felons is so restricted at every turn? The amount of time they have to be on the registry at the present time is already excessive and now you want to extend it. This is so wrong. It is apparent you want to keep these people crushed under your foot until they die. Everyone deserves a second chance without obstacles being placed in front of every step they take. Please explain the rationale for these changes. I doubt not one single reason will be a rational one.

The families of these people are trying to do everything in their power to help them start a new life and you are only making our job so much harder. I am one such family member and all of this disturbs me greatly. Please rethink what you are doing and heaven forbid, you ever have to deal with a situation like this.

| **Comment ID** |
| DOJ-OAG-2020-0003-0180 |

| ◎ **Tracking Number** |
| 1k4-9itr-yjud |

| **Comment Details** | **Submitter Info** |

AR-00000525

**Submitter Name**

Rose Simiele



About      Bulk Data Download        Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000526

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

Women Against Registry (W.A.R.) is an organization dedicated to the abolition of the sex offender registry. This essay will outline the principal reasons for our stance and why we are resolute in our belief that the registry serves no purpose and is, therefore, a waste of taxpayer's money. Note: we acknowledge that every state operates its own separate registry and that they are sometimes quite different from the registries in other states. For the purpose of this essay, the term "sex offender registry" is a general reference to all registries.

The sex offender registry is ineffective in the prevention of crime, despite the fact that this is one of its primary intentions. Scientific studies have conclusively shown that the registry does not deter crime, it does not decrease the occurrence of sex offenses, and it does not increase public safety. In fact, quite to the contrary, the registry sometimes increases crime because it forces registrants into unemployment, homelessness, and desperation. The registry works to thwart rehabilitation efforts while its supporters fail to recognize recent studies proving that most registrants are at a very low risk of reoffending.

Collateral damage refers to the harm inflicted on the family members of registrants. Collateral damage was almost certainly an unintended consequence of the creation of the registry, but when the sex offender list became available to the public, collateral damage became a very real punishment for those who had not committed a crime. These punishments include verbal abuse, harassment, property damage and physical attack by vigilantes, loss of employment, loss of residence, reprisals for children at school, and public shaming. Sometimes these behaviors are even sanctioned by authorities.1 2 The punishing effect of the registry on innocent family members was one of the primary reasons for the formation of Women Against Registry. This cruelty is unconscionable. Fear and ignorance drive the public outcry for increasingly harsh punishment and for the maintenance of the registry, but as we wait for logic and reason
to win out, families are being torn apart and lives are being destroyed.

Women Against Registry stands strongly in opposition to all sex offender registries for the reasons outlined in this position paper. But we would like to emphasize that a public registry is especially cruel and invites

AR-00000527

Regulations.gov

vigilantism without any benefit whatsoever. The public registry promotes numerous punitive measures against many who have already paid a substantial debt to society.

It is logical, smart, and humane to help incarcerated individuals rebuild their lives after their debt to society has been paid. To do this, we could, and should offer them counseling while incarcerated and various forms of help after their release. At the very least, they deserve not to be hindered in their efforts.

We strongly support the need for public safety however, the current public outrage over the sex offender label is largely misplaced. It is a fallacy to think that all sex offenders fit neatly into a single classification. A disdainful response or a contemptuous look is the normal reaction to almost anyone labelled as a "sex offender" and yet, there are numerous individuals on the registry who are guilty of behavior that many of us would find innocent, silly, stupid, or juvenile; but certainly not criminal.

We believe the registry is a clear violation of the fifth amendment of the United States Constitution and its prohibition against double jeopardy. We believe that lifetime registration is cruel and unusual punishment, and a violation of the Constitution's eighth amendment. And, in far too many cases, we believe that the placement of individuals on the registry violates the Due Process clauses of the fifth and fourteenth amendments to the Constitution.

As a society, aren't we better than this?

---

Attachments  1

---

📄 WOMEN AGAINST REGISTRY

⬇ Download ▾

---

**Comment ID**

DOJ-OAG-2020-0003-0181

---

◎ **Tracking Number**

kes-qw4y-vxnc

---

Comment Details | Submitter Info

**Received Date**

Sep 7, 2020

---

AR-00000528

Regulations.gov



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000529

WOMEN AGAINST REGISTRY
Position Paper on the Sex Offender Registry

Women Against Registry (W.A.R.) is an organization dedicated to the abolition of the sex offender registry. This essay will outline the principal reasons for our stance and why we are resolute in our belief that the registry serves no purpose and is, therefore, a waste of taxpayer's money. Note: we acknowledge that every state operates its own separate registry and that they are sometimes quite different from the registries in other states. For the purpose of this essay, the term "sex offender registry" is a general reference to all registries.

The sex offender registry is ineffective in the prevention of crime, despite the fact that this is one of its primary intentions. Scientific studies have conclusively shown that the registry does not deter crime, it does not decrease the occurrence of sex offenses, and it does not increase public safety. In fact, quite to the contrary, the registry sometimes increases crime because it forces registrants into unemployment, homelessness, and desperation. The registry works to thwart rehabilitation efforts while its supporters fail to recognize recent studies proving that most registrants are at a very low risk of reoffending.

Collateral damage refers to the harm inflicted on the family members of registrants. Collateral damage was almost certainly an unintended consequence of the creation of the registry, but when the sex offender list became available to the public, collateral damage became a very real punishment for those who had not committed a crime. These punishments include verbal abuse, harassment, property damage and physical attack by vigilantes, loss of employment, loss of residence, reprisals for children at school, and public shaming. Sometimes these behaviors are even sanctioned by authorities.1 2 The punishing effect of the registry on innocent family members was one of the primary reasons for the formation of Women Against Registry. This cruelty is unconscionable. Fear and ignorance drive the public outcry for increasingly harsh punishment and for the maintenance of the registry, but as we wait for logic and reason
to win out, families are being torn apart and lives are being destroyed.

Women Against Registry stands strongly in opposition to all sex offender registries for the reasons outlined in this position paper. But we would like to emphasize that a public registry is especially cruel and invites vigilantism without any benefit whatsoever. The public registry promotes numerous punitive measures against many who have already paid a substantial debt to society.

We believe the registry is a clear violation of the fifth amendment of the United States Constitution and its prohibition against double jeopardy. We believe that lifetime registration is cruel and unusual punishment, and a violation of the Constitution's eighth amendment. And, in far too many cases, we believe that the placement of individuals on the registry violates the Due Process clauses of the fifth and fourteenth amendments to the Constitution.

It is logical, smart, and humane to help incarcerated individuals rebuild their lives after their debt to society has been paid. To do this, we could, and should offer them counseling while incarcerated and various forms of help after their release. At the very least, they deserve not to be hindered in their efforts.

We strongly support the need for public safety however, the current public outrage over the sex offender label is largely misplaced. It is a fallacy to think that all sex offenders fit neatly into a single classification. A disdainful response or a contemptuous look is the normal reaction to almost anyone labelled as a "sex offender" and yet, there are numerous individuals on the registry who are guilty of behavior that many of us would find innocent, silly, stupid, or juvenile; but certainly not criminal.

Educating the public about this issue would go a long way toward changing the laws in this country. And in fact, education is W.A.R.'s primary modus operandi to achieving its goals.

AR-00000530

The Supreme Court of the United States, one of the world's most respected legal bodies, played an enormous role in promoting the fear and ignorance that has now become the bane of every sex offender across this country.

In 2002, Justice Anthony Kennedy, a Supreme Court Justice, erroneously wrote that the recidivism rate for sex offenders is as high as 80%, a number that is "frightening and high."4 This statement has plagued American Jurisprudence since that time with seriously consequential results for those who have fallen under the broad umbrella that is defined as sex crimes. This erroneous statement has been used as justification in more than 100 state and federal sex offender cases. Justice Kennedy's statement was traced to a single source in a Psychology Today magazine, however, multiple scientific studies over the years, have conclusively debunked this statement. Actual recidivism rates vary for many reasons however, all of the studies place the value far below the 80% cited by Justice Kennedy. Numerous studies have reported the re-arrest rate of convicted sex criminals at 5% or less, lower than most other crime categories.

Other studies, by individual states reflect similar recidivism rates. Some studies show sex crime and recidivism rates are basically unchanged since the registry began which is yet more evidence of the ineffectiveness of the registry.

Justice Kennedy's pronouncement has, in part, fueled some extreme and unreasonable state legislation that has pushed registrants to the fringes of society. Some states have enacted strict residency restrictions regarding such common facilities as schools, day cares, libraries, museums, parks, swimming pools, and more. Lawmakers are a big part of the problem as they strive to get reelected and to please a fearful public.

But just as the system seems so wildly outside the norms of human decency and justice, there are glimmers of hope. There have been recent litigation wins in Alabama6, Colorado, Indiana, Michigan, North Carolina, and others.

The financial cost of monitoring sex offenders and maintaining the registry is prohibitively high. We can make that statement with absolute confidence because of the other factors stated in this paper. With the complete ineffectiveness of the registry, the threat to the registrant families, and the many pending and future lawsuits regarding constitutionality, any cost would be prohibitively high. When considering the financial burden of this program, we must also consider the high cost of incarceration and the loss of tax revenue from those in prison and from unemployed registrants.

As of this writing, there are more than 912,000 men, women, and children on the sex offender registry in this country, according to the National Center for Missing and Exploited Children; that equates to some very large expenses and some very large revenue losses. Many law enforcement agencies freely admit that they cannot adequately maintain the registry because of a shortage of money and personnel. The registry is clearly not providing a good return on the investment. This money could be better-spent on so many other programs.

Women Against Registry believes, without any hesitation, reservation, or doubt, that the sex offender registry is detrimental to our society and needs to be abolished. We understand that current public opinion, driven largely by fear and ignorance, creates a tremendous obstacle to the achievement of this goal. In lieu of the immediate sweeping changes we seek, W.A.R. would welcome improvements to the registry such as restricting it to law enforcement use only, the removal of juveniles, and the inclusion of only those at high risk of re-offense as determined by a fair process run by independent professionals.

However, despite any short-term victories in this fight for justice, we will continue to work toward the abolition of the registry because:
1. It is completely ineffective
2. It is the direct cause of deplorable and cruel collateral damage
3. It is unconstitutional

AR-00000531

4. In its current form, it is largely the result of fear-mongering and a lack of knowledge about the facts surrounding this issue.

5. It is fiscally irresponsible and wasteful

6. We believe it to be immoral, unethical, and illegal

## As a society, aren't we better than this?

1 https://on-vigilantism.blogspot.com/search/label/Vigilantism%20-%20By%20Police

2 https://with-justiceforall.blogspot.com/2017/11/do-sentenced-sex-offenders-deserve.html

3 www.gainesville.com/opinion/20170104/jean-zeeb-column-misleads-about-sex-offenders

4 https://conservancy.umn.edu/bitstream/handle/11299/188087/30_03_495_Ellman.pdf

5 https://www.womenagainstregistry.org/recidivism

6 https://reason.com/2019/02/13/sex-offenders-are-not-second-class-citiz/

7 mediaassets.thedenverchannel.com/document/2017/09/01/millard knight vega v colorado_65483340_ver1.0.pdf

8 https://www.theindianalawyer.com/articles/50120-th-circuit-rules-doc-sex-offender-program-violatesconstitution

9 www.opn.ca6.uscourts.gov/opinions.pdf/16a0207p-06.pdf

10 https://www.supremecourt.gov/opinions/16pdf/15-1194_08l1.pdf

8/8/23, 12:55 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  ( 724 )  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  ( 724 )  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

Sex offenders should be treated the same as any other offender, once the time has been served.

**Comment ID**
DOJ-OAG-2020-0003-0182

 **Tracking Number**
1k4-9itt-o0c6

**Comment Details**                              **Submitter Info**

**Received Date**
Sep 7, 2020

AR-00000533

Regulations.gov



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000534

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

If you doubt whether we should care about the stress and suffering of someone who committed a sex crime, consider the consequences for society when the ex-offender fails. When nothing works out - job, home, family individuals are more likely to give up and reoffend.

Rather than banishing sex offenders and asking them to succeed in a hostile environment, we should focus resources on programs and policies that will actually reduce the likelihood of sex offenses occurring in the first place. We need to develop and fund public education programs that teach about the effects of sex abuse and the importance of reporting abuse so that it can be stopped.
We need to improve our systems for handling reports of abuse, looking to models like Wynona's House in Essex County, which brings different agencies together to ease the burden on victims reporting abuse. And we need to provide mental health treatment for victims and offenders, in prison and out.

There is no simple fix to the devastating problem of sex abuse. Instead of politically popular measures that make no difference or in fact make us less safe, we need to turn our attention and resources to ways of addressing the epidemic of sex abuse that, while perhaps not as politically popular, will actually work so that more potential victims can be spared.

The issue is not whether our children should be protected from sex offenders, but how to accomplish that in an effective and meaningful way. Our children deserve nothing less.

AR-00000535

Regulations.gov

Attachments  1

Why Sex Offender Laws Don

Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0183/attachment_1.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0183

**Tracking Number**

kes-wo7z-zl6y

**Comment Details**                    **Submitter Info**

**Received Date**

Sep 7, 2020



Your Voice in Federal Decision Making

About        Bulk Data Download        Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000536

Regulations.gov

AR-00000537

# Why Sex Offender Laws Don't Work

By Deborah Jacobs

There are few crimes more heinous than child molestation. Whether violently attacked by a stranger or preyed upon by a trusted adult in the home, school or place of worship, children who survive such assaults are often left to walk a lifelong path of sorrow and pain.

Unfortunately, our government has failed to take steps that will make a meaningful difference in preventing sex offenses. Megan's Law, civil commitment, and the newest trend in anti-sex offender legislation, banishment zones, which restrict sex offenders from living within certain geographic areas, all play to the fears of the public. But when it comes to stopping sex assaults, these measures do more harm than good.

To understand why, one must look at the realities of sex crimes in America today. The vast majority of sex offenses are committed by trusted adults-family members, friends, clergy-and go unreported because of manipulation of the victims, unconscionable decisions by other adults, or both. We saw this most vividly when lawsuits uncovered that the Catholic Church hierarchy had hidden and ignored countless cases of child sexual abuse for decades, choosing to protect its reputation over the children under its care.

Unfortunately, this happens in family hierarchies even more frequently. Because the most common type of sex crime so often goes unreported, most sex offenders never become part of the criminal justice system and therefore are not affected by Megan's Law or banishment zone laws. As a result, these laws give the public a false sense of security, letting us believe that sex offenders have been exiled from their neighborhood, or that if a sex offender does live nearby, we will receive notification of his presence. If we believe that, we are fooling ourselves and, worse, doing our children a disservice. Sex offenders live in every American community, and children need supervision no matter what.

Laws like banishment zone ordinances actually make us less safe, as they impede offender rehabilitation and thereby increase the likelihood of re-offense. People who transition from prison into society face countless challenges, and most have very limited resources, financial or otherwise. People who want to lead law-abiding lives after serving a prison sentence need to establish stability in their homes, jobs and families. Those are difficult things to achieve, but add to this the consequences of Megan's Law and limits to where offenders can live, and few have hope of succeeding. Indeed, the fear of the stigma of Megan's Law can force offenders underground, out of the watchful eye of police and parole officers.

Banishment zone laws may very likely force sexual offenders to move from environments in which they have support networks into other communities in which they have no support, putting residents in their new communities at risk. Further, people who are labeled as sex offenders lose jobs, get evicted, are threatened with death, and harassed by neighbors. Some have had their homes burned down or been beaten in acts of vigilantism. Coping with this kind of stress is almost impossible, and without exceptionally strong support systems, most are doomed to fail.

If you doubt whether we should care about the stress and suffering of someone who committed a sex crime, consider the consequences for society when the ex-offender fails. When nothing works out - job, home, family individuals are more likely to give up and reoffend.

Rather than banishing sex offenders and asking them to succeed in a hostile environment, we should focus resources on programs and policies that will actually reduce the likelihood of sex offenses occurring in the first place. We need to develop and fund public education programs that teach about the effects of sex abuse and the importance of reporting abuse so that it can be stopped.

AR-00000538

We need to improve our systems for handling reports of abuse, looking to models like Wynona's House in Essex County, which brings different agencies together to ease the burden on victims reporting abuse. And we need to provide mental health treatment for victims and offenders, in prison and out.

There is no simple fix to the devastating problem of sex abuse. Instead of politically popular measures that make no difference or in fact make us less safe, we need to turn our attention and resources to ways of addressing the epidemic of sex abuse that, while perhaps not as politically popular, will actually work so that more potential victims can be spared.

The issue is not whether our children should be protected from sex offenders, but how to accomplish that in an effective and meaningful way. Our children deserve nothing less.

Deborah Jacobs is the Executive Director of the American Civil Liberties Union of New Jersey

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

| Comment |

The Eight Amendment of our United States Constitution declares that punishment must not be cruel and unusual – severe or excessive. Thus, Murder, a capital crime before the court system, has four different levels of culpability proscribing four different levels of punishment. First degree murder is not second degree murder, even though both are murder. Likewise, petit theft is not grand theft (though both are theft) and each level of culpability, or as the law designates "intent," mandates the severity of the punishment must equal its culpability.

Then why is Adrian, a registered sex offender who had sex with a girl who said she was 18 years old when they met at an Over 18 Club3, on the same list as Jesse Timmendequas, who forcefully sexually assaulted and murdered a seven-year old girl from his neighborhood? In these cases, and several others we will review, lady justice has been truly blind. Blind to indiscriminate and damaging sociological, psychological, and economic trauma exacted on registered sex offenders as a result of the indiscriminate effects of the notification requirement. Legislature, opting to deal swiftly with the offense, has failed to deal accurately with the offender. The current legislation, though appropriate to the offense has been inappropriately applied to the offender. The same registration that binds the serial rapist (Westley Allan Dodd) murderer, who requested being hanged for his criminal sexual acts AND stated that if he was not put to death he will "kill again and enjoy it," also binds the drug dealer (Equan Yunus) who kidnapped another drug dealers son for ransom and, due to the new law that allows the kidnapping of a minor to be charged as a sex offense even though the crime was not sexually motivated and no sexual deviation was committed. The societal attitude towards sex offenders does not take into consideration the actual culpable offense committed, only the stigmatization that flows with one who has been required to register as a sex offender…even though his actual charge and conviction was simply kidnapping.6 Imagine waking daily to signs posted in your yard and painted in bright red letters on your home, reverberating these two deadly words: "CHILD MOLESTER!" AND you have never molested anyone, yet your name is listed on the registry.

AR-00000540

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0184

 **Tracking Number**

kes-xdef-ui82

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 7, 2020



About   Bulk Data Download     Agencies     Learn

(/about)          (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000541

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724 (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments   724 (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

Our sex offender laws have gone too far. They are unconstitutional and unfair. With no other crime is a person punished for life long after they complete their prison and probation terms. We don't have a registry for the drug dealer who gets kids hooked on drugs. We don't have a list for murders. We don't have a list for robbers or for thieves. We don't have a registry for people who drink and drive or those who abuse their spouses. Our government claims they want people to rehabilitate and become contributing citizens to our society. Yet they create an additional law to punish the accused sex offender for the rest of their lives BEFORE they commit the crime. This is unconstitutional and does nothing to protect children. Children have a greater chance of being put on a sex offender registry than they have being molested by someone on the list.

In most states, a person on the registry has to notify any potential employer, landlord, and neighbors of their registry. Their driver license is labeled so they literally have no chance to find a job or to find a place to live. If they do, in some communities a huge red sign is put in their yard for all to see. Our government treat offenders like lepers or worse. Then if that "leper" can not get to the registration office in time to update, or if they walk on the side of a street not allowed for a registered person, they are thrown in to prison for years and years. They have not committed a sex crime, no, they have just made a mistake over a law that should never have been imposed on them in the first place.

Stop the registry. Get rid of it. Instead give these people counseling and a second chance. The rate of recidivism for them is less than 3%.

https://www.youtube.com/watch?v=eWPtAJS1kro

https://www.youtube.com/watch?v=xMDcNO8vGwU

https://youtu.be/ltqTwXoYkWA

AR-00000542

https://youtu.be/9rEBXYYZKog

**Comment ID**

DOJ-OAG-2020-0003-0185

 **Tracking Number**

kes-y4y7-b2b7

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 7, 2020



Your Voice in Federal Decision Making

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000543

8/8/23, 2:34 PM                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

The passport notification law forces convicted child sex offenders to basically bear a "proverbial Scarlet Letter" on their passports.
This law is just like how the the Nazis treated Jewish people. The Nazis would mark Jewish passports with a "J" and the Soviet Union listed citizens' ethnicities as Jewish while others listed their place of birth. There is no provision for those who are rehabilitated or have had their records expunged to be able to get the mark removed. It also doesn't exempt anyone who was a minor at the time of their offense.

Nicole Pittman, the director of the Impact Justice Center on Youth Registration Reform whose group is trying to eliminate or reduce the placement of children on sex offender registries, states that roughly 200,000 of the nation's approximately 850,000 registered sex offenders were under age 18 (a minor under federal law) when they were placed on these registries following convictions in state courts or adjudications in juvenile courts.

"This [law] is supposed to protect kids and [but it is] actually hurting them," Ms. Pittman told the WalStreet Journal about the new law. "We have kids going on the registry for sending nude pictures of themselves."

The passport label of sex offender violates our constitutional rights of ex post facto, due process, cruel and unusual punishment, equal protection and search and seizure.[1] A study published in fall 2015 found that statistics cited in two U.S. Supreme Court decisions that are often cited in decisions upholding the constitutionality of sex offender policies are unfounded.

Wright, Ph.D Richard G. (2014). Sex offender laws : failed policies, new directions (Second edition. ed.). Springer Publishing Co Inc. pp. 50–65. ISBN 9780826196712.

"Matthew T. Mangino: Supreme Court perpetuates sex offender myths". Milford Daily News. September 4, 2015.

AR-00000544

Wright, Ph.D Richard G. (2014). Sex offender laws : failed policies, new directions(Second edition. ed.). Springer Publishing Co Inc. pp. 50–65. ISBN 9780826196712.

**Comment ID**

DOJ-OAG-2020-0003-0186



**Tracking Number**

kes-zduz-ay2b

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 7, 2020



Your Voice in Federal Decision Making

About       Bulk Data Download       Agencies       Learn

(/about)        (/bulkdownload)      (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000545

8/8/23, 11:57 AM                                                                         Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) |   **Share** ▾ |

---

| Comment |

The registry violates our constitutional rights over and over.

The right to due process can be found in the Fifth and 14th Amendments of our Constitution. Due process is commonly understood to include the presumption of innocence, the right to a fair trial and the right to counsel — ideas that ensure a defendant is treated as fairly as possible in our adversarial criminal justice system. It can be "gauged by its aim to safeguard both private and public rights against unfairness."

Another element of due process known as "double jeopardy" appears in the Fifth Amendment and protects an individual from being prosecuted for the same offense twice. It also bars multiple punishments for the same crime. Individuals convicted of crimes who have faced incarceration and then must begin sex registry-reporting are certainly being punished repeatedly.

SORNA requirements punish ex-offenders by inflicting upon them tangible, secondary punishments, like the inability to qualify for housing and increased difficulties securing employment. These secondary punishments effectively banish ex-offenders to a modern leper colony by not only removing re-entry resources but also by affirmatively ostracizing those attempting to rebuild a life after incarceration.

In addition to violating double jeopardy, repeated punishments violate the Eighth Amendment by imposing cruel and unusual punishment. The government is prohibited from imposing a criminal sentence that is either vindictive or far too harsh for the crime committed. Incarceration is intended to be a punishment and a deterrence, so any subsequent punishment can only be vindictive. After incarceration, an ex-offender's privacy is significantly diminished by the requirement to report one's name, address, photo, employment status and provide a DNA sample.

Last fall, a federal judge found that the Colorado sex offender registry's punitive impact outweighed any value it might have had in protecting the public and concluded that registration violates the prohibition against cruel and unusual punishment. As the judge specifically stated, "This ongoing imposition of a known and uncontrollable risk of public abuse of information from the sex offender registry, in the absence of any link to an objective risk to the public posed by each individual sex offender, has resulted in and continues to threaten [sex offenders] with punishment disproportionate to the offenses they committed."

AR-00000546

As Clarence Darrow famously said, "You can only protect your liberties in this world by protecting the other man's freedom. You can only be free if I am free." Protecting the constitutional rights of everyone, even those convicted of sex offenses, is of the upmost importance for protecting our freedom. Therefore, both legislators — by way of developing and amending laws — and judges — via hearing arguments and creating case law — must re-examine SORNA in order to preserve liberty and uphold the Constitution.

Jesse Kelley (@JessdKelley)

---

Attachments  (4)

📄 The passport label of sex offender violates our constitutional rights of

⬇ **Download** (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0187/attachment_1.pdf)

📄 Matthew T Mangino Supreme Court perpetuates sex offender myths

⬇ **Download** (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0187/attachment_3.pdf)

📄 The Unethical Dilemma of an Offense Based Sex Offender Registration and Notification System and the Indiscriminate Effect on the Low Risk Offender

⬇ **Download** (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0187/attachment_4.pdf)

📄 The Sex Offender Registry Vengeful unconstitutional and due for full repeal

⬇ **Download** (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0187/attachment_5.pdf)

---

**Comment ID**

DOJ-OAG-2020-0003-0187

---

 **Tracking Number**

kes-zvoe-s6cu

---

AR-00000547

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 7, 2020



About  Bulk Data Download  Agencies  Learn

(/about)  (/bulkdownload)  (/agencies)  (/learn)

Reports  FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)  (/faq)

Privacy & Security Notice (/privacy-notice)  |  User Notice (/user-notice)  |
Accessibility Statement (/accessibility)  |  Developers (https://open.gsa.gov/api/regulationsgov/)  |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)  Provide Site Feedback

The passport label of sex offender violates our constitutional rights of <u>ex post facto</u>, <u>due process</u>, <u>cruel and unusual punishment</u>, <u>equal protection</u> and <u>search and seizure</u>.[1] A study published in fall 2015 found that statistics cited in two U.S. Supreme Court decisions that are often cited in decisions upholding the constitutionality of sex offender policies are unfounded.  Several challenges to some parts of state level sex offender laws have been honored after hearing at the state level.

*Wright, Ph.D Richard G. (2014). <u>Sex offender laws : failed policies, new directions</u> (Second edition. ed.). Springer Publishing Co Inc. pp. 50–65. <u>ISBN</u> <u>9780826196712</u>.*

*<u>"Matthew T. Mangino: Supreme Court perpetuates sex offender myths"</u>. Milford Daily News. September 4, 2015.*

Wright, Ph.D Richard G. (2014). *Sex offender laws : failed policies, new directions*(Second edition. ed.). Springer Publishing Co Inc. pp. 50–65. ISBN 9780826196712.

The right to due process can be found in the Fifth and 14th Amendments of our Constitution. Due process is commonly understood to include the presumption of innocence, the right to a fair trial and the right to counsel — ideas that ensure a defendant is treated as fairly as possible in our adversarial criminal justice system. It can be "<u>gauged</u> by its aim to safeguard both private and public rights against unfairness."

Another element of due process known as "double jeopardy" appears in the Fifth Amendment and protects an individual from being prosecuted for the same offense twice. <u>It also bars</u> multiple punishments for the same crime. Individuals convicted of crimes who have faced incarceration and then must begin sex registry-reporting are certainly being punished repeatedly.

SORNA requirements punish ex-offenders by inflicting upon them tangible, secondary punishments, like the inability to qualify for housing and increased difficulties securing employment. These secondary punishments effectively banish ex-offenders to a modern leper colony by not only removing re-entry resources but also by affirmatively ostracizing those attempting to rebuild a life after incarceration.

In addition to violating double jeopardy, repeated punishments violate the Eighth Amendment by imposing cruel and unusual punishment. The government is prohibited from imposing a criminal sentence that is either vindictive or far too harsh for the <u>crime</u> committed. Incarceration is intended to be a punishment and a deterrence, so any subsequent punishment can only be vindictive. After incarceration, an ex-offender's privacy is significantly diminished by the requirement to report one's name, address, photo, employment status and provide a DNA sample.

As Clarence Darrow famously said, "You can only protect your liberties in this world by protecting the other man's freedom. You can only be free if I am free." Protecting the constitutional rights of everyone, even those convicted of sex offenses, is of the upmost importance for protecting our freedom. Therefore, both legislators — by way of developing and amending laws — and judges — via hearing arguments and creating case law — must re-examine SORNA in order to preserve liberty and uphold the Constitution.

*Jesse Kelley ([@JessdKelley](@JessdKelley))*



*The* MILFORD
DAILY NEWS

Opinion

# Matthew T. Mangino: Supreme Court perpetuates sex offender myths

**By Matthew T. Mangino / More Content Now**
Posted Sep 4, 2015 at 9:27 AM
Updated Sep 4, 2015 at 9:27 AM

Onerous sex offender registration laws have pulled together unlikely alliances. Victim advocates have begun standing up for sex offenders in litigation and legislative battles across the country.

Chris Dornin, a former New Hampshire State House reporter, wrote in an article for Corrections Magazine detailing the efforts of Cleveland and Texas rape crisis centers toward dismantling Ohio's residency restriction law. The crisis centers intervened on the side of the plaintiff, a sex offender challenging the law before the Ohio Supreme Court, as an ex post facto punishment.

The centers argued, "More onerous sex offender registration and community notification laws threaten to harm the very people they are intended to protect and to undermine goals of community safety and treatment of offenders. These laws perpetuate myths and create a false sense of security."

How does a myth take hold? When it comes to the law, there is no better place to perpetuate a myth than the U.S. Supreme Court.

In 2002 and 2003, Justice Anthony Kennedy wrote the opinion in two cases that dealt with sex offender restrictions. In one case, McKune v. Lile, Kennedy wrote the recidivism rate "of untreated (sex) offenders has been estimated to be as high as 80%." The following year he wrote in Smith v. Doe, the risk of recidivism posed by sex offenders is "frightening and high."

The problem is, according to a paper recently released by Ira Mark Ellman and Tara Ellman, those statistics cited by Justice Kennedy and repeated over and over again by judges and legislators across the country are not true.

AR-00000551

In McKune, the solicitor general provided a single citation to support its statement "that the recidivism rate of untreated offenders has been estimated to be as high as 80%." The authority for that assertion was the U.S. Department of Justice, National Institute of Corrections, A Practitioner's Guide to Treating the Incarcerated Male Sex Offender released in 1988.

According to the Ellmans, the Practitioner's Guide itself provides only one source for the claim, a 1986 article published in the magazine Psychology Today. The article suggests, "Most untreated sex offenders released from prison go on to commit more offenses–indeed, as many as 80% do." The sentence is a bare assertion by the author--the article contains no supporting reference for it.

A growing body of research calls into question the wisdom of the "tough on crime" campaign to crush sex offenders. According to Dornin, the Canadian Department of Public Safety sponsored numerous studies of sex offender recidivism, including several that followed large groups of offenders over many years. One study found a little more than one in ten sex offenders recidivated within five years, much lower than the national recidivism rate.

Recent American studies suggest even lower rates. One by the Indiana Department of Corrections, entitled "Juvenile Recidivism, 2010," suggested that only two of 71 juvenile sex offenders released in 2007 had committed new sex offenses within three years. That's a 2.8 percent sex offense recidivism rate, reported Dornin. The comparable rate for hundreds of adult sex offenders in Indiana the same year was 1.05 percent three years after release.

No one condones the conduct of sex offenders, especially those who prey on children. The laudable goal of criminal sanctions should be to promote public safety and prevent future victims. Any appropriate civil restrictions should do the same. Legislation that is counter to that goal--legislation that actually puts people in danger--has no place whether or not sanctioned by the U.S. Supreme Court.

Matthew T. Mangino is of counsel with Luxenberg, Garbett, Kelly & George P.C. His book "The Executioner's Toll, 2010" was released by McFarland Publishing. You can reach him at www.mattmangino.com and follow him on Twitter at @MatthewTMangino.

AR-00000552

# The Unethical Dilemma of an Offense Based Sex Offender Registration and Notification System and the Indiscriminate Effect on the Low Risk Offender.

*Kenneth H. Browning\*[1]*

---

[1] *  Law Student, Barry University School of Law. Juris Doctorate Candidate, May 2020.

*For my God, Lord, and King Jesus Christ* who has kept me and strengthened me when I was weak. Who in my weakness HIS strength was made perfect. Who made me to finish my course when I was weary. ALL of my help comes from the Lord. You are my rock. Psalms 62.

*For my Mother.* Who always told me I can be and do anything in life and continues to be my other rock.

*For my siblings,* Kevin and Kristina who told me to stay home and finish my work when I tried to put other things before this course.

*For my Wife Sandra.* who loves me unconditionally.

*For my Children*, Quentin, Chris, Jayla, Emmanuel, Jesse, Eliana, John-Elias, and Kenneth Jr. Studying for law, late nights in the library, pro-bono…all is made worth it when I come home to you.  You are my reason.

*To Professor Eang Ngov.* Professor at Barry, who pushed, encouraged, and pressed with me to pursue the highest levels of possibility. An icon whom I admire and aspire to model my law purpose after.

*To Professor Rossum*…Thank you!!

*To the Registrar's office.* Ms. Bayona, Ms. Hagaman, and Ms. Hawkins. Your open doors at all times where streams of advice, encouragement, and hope. Thank you.

1

<u>TABLE OF CONTENTS</u>

I.     INTRODUCTION
     WHAT IS ETHICS?
     A.  Traditional role of ethics in law
         1.  Law founded on moral-religious principles
         2.  Moral Law the exclusion of other cultures and beliefs.
     B.  Postmodern role of ethics in law
         1.  Decline of moral-religious ethical criminal penalties
         2.  Inclusion: Multi-cultural society and differences
     C.  Fear and society's response to sex offenses
         1.  Indiscriminate effect on all sex offenders
         2.  Offense Based not Offender Based
     D.  Culpability levels of Criminal Acts
         1.  Adrian, consensual sex with a girl under 18 after she lied about her age
         2.  Jesse Timmendequas, forceable sexual assault and murder of a 7-year old girl
     E.  Legislative Responses
         1.  Fear Based
         2.  Indiscriminate


II.    HISTORY, CASES AND CONTROVERSIES
     A.  HISTORY
         1.  Jacob Wetterling: 1994 Wetterling Act Passed
         2.  Megan Kanka: 1996 Megan's Law
         3.  Adam Walsh: 1984 Missing Children's Assistance Act
         4.  Pamela Lychner: 1996 Pamela Lychner Sexual Offender Tracking and Identification Act.
         5.  Jessica Lunsford
         6.  Other Laws that affect the expansion of the scope and role of S.O.R.N.A
            a.  Amie Zyla Law
            b.  Dru's Law
            c.  Sexual Predator Law


     B.  CASES AND CONTROVERIES
         1.  Equan Yunus; A sex offender who is not a sex offender. New York
            a.  Kidnapping not sex motivated
            b.  S.O.R.N.A. – Lifetime sentence after 15 years' incarceration
         2.  Shawna Baldwin; consensual sex on her 19th Birthday Party. Oklahoma
            a.  Level 3 child molester for life
            b.  Banned from public parks – new law passed.

AR-00000554

III.   HARMFUL STIGMATIZATION
    A. COLLATERAL CONSEQUENCES
        1.  Housing
            a.  proximity restrictions
            b.  Public Housing – legislatively denied
        2.  Employment
        3.  Public Assistance
            a.  Denial of Supplemental Nutrition Assistance Program (food stamps)
        4.  Public Outrage
            a.  Violence against sex offenders
            b.  Lack of information on level of offense

IV.   HOW S.O.R.N.A WORKS
    A. RECIDIVISM
        1.  Rule of S.O.R.N.A. is propensity evidence
            a.  Not admissible to point to possibility of re-offense in criminal trial
            b.  Three-Tiered System
        2.  Offense Based
            a.  Triggering event tied to the offense committed
                1.  All who commit the offense sex offenders
                2.  Many crimes not sexual in nature

    B. THE THREE-TIERED SYSTEM
        1.  Tier One – Element of sexual contact or sexual act
            a.  Low risk of re-offense
            b.  No public notification
        2.  Tier Two – Re-offense risk to be moderate
            a.  Convicted of tier one offense
            b.  Requires public notification
        3.  Tier Three – Re-offense risk high.
            a.  Substantial public safety interest
            b.  Mandatory public notification

V.   C.L.A.S.S. (culpability level assessment of sex offender sentencing)
    A. OFFENDER BASED
        1.  Sex Motivated element is a prerequisite
        2.  Assigned to the offenders culpability not to offense indiscriminately
            a.  Fact intensive
            b.  Culpabilities
                1.  Intentional and purposeful
                2.  Knowingly
                3.  Recklessly
                4.  Negligently

3

B. PURPOSE OF C.L.A.S.S.
   1. Use Model Penal Code system of culpability ratings for each offender
   2. Four Questions
   3. Actus Reus
   4. Mens Rea

C. DISTINGUISHING SORNA'S PROBABLE ANALYSIS FROM C.L.A.S.S. PROBABILITY ANALYSIS
   1. Probable – might not happen
      a. Catch-all analysis
      b. Inaccurate and unjustifiable in the legal juris prudence
   2. Probability – statistics based on empirical evidence
      a. Narrows the focus of recidivism with ratio outcomes
      b. Accuracy assessment of possibility to reoffend

VI.   CONCLUSION

4

I.   INTRODUCTION

Ethics can be defined as the "canonization" of morality.  As morality shapes the way a person

views the world, ethics is the process in which one defines that shape, their interaction with the

world, through their morality. In traditional times, as compared to post-modernity, laws were

moral-religious based.  Up until the 1960's, one could not buy alcohol on Sundays and most stores

and places of entertainment were closed on Sundays out of respect for Sabbath Day Worship and

sentiment.  Sodomy, homosexuality, and adultery were pursued and prosecuted as "criminal" acts.

As most of these laws have been set-aside or overturned today, they were known as Moral Laws.

Post-modernity, a genre of time that is epitomized by inclusion of all cultures, beliefs, and

ideologies, determined that moral sentiment within the law does not reflect the multi-cultural

population of the United States. In so doing, ethical considerations found no place in criminal law.

And in the light of heinous and egregious sex offense crimes, fear has all but eliminated the ethical

foundation of human rights that all Americans have to liberty and human dignity. In a rush of fear

and anxiety to formulate a response for the heinous crimes that garnered media attention and

captured our fears, each state, within its own sexual deviant atrocity within its borders, created its

law (Megan's Law, Amie's Law, Wetterling Act, Lunsford Act, etc.), and our government in a

hastened, unreasoned, indiscriminate, "catch-all" response, layered each act to create a

homogenous "soup" that has all the ingredients of goodness and none of fairness. In an attempt to

put a face on our fears, our criminal justice system has painted, with very broad strokes, a picture

that incorporates all alleged acts of sex offense on the same canvas. No discriminating features or

"culpability" distinguishing the LEVEL of one offense from the other. Just one broadly stroked,

definitively displayed, notification system that does not provide for adequate discrimination in the

"malice" of each offense. All offenders, no matter how slight or egregious, equally hanging by the

5

same wire. All punished in the same degree. Doesn't American law, codified or common, in light of fair play and justice, require that the punishment must fit the crime?  The Eight Amendment of our United States Constitution declares that punishment must not be cruel and unusual – severe or excessive.[2] Thus, Murder, a capital crime before the court system, has four different levels of culpability proscribing four different levels of punishment. First degree murder is not second-degree murder, even though both are murder. Likewise, petit theft is not grand theft (though both are theft) and each level of culpability, or as the law designates "intent," mandates the severity of the punishment must equal its culpability. Then why is Adrian, a registered sex offender who had sex with a girl who said she was 18 years old when they met at an Over 18 Club[3], on the same list as Jesse Timmendequas, who forcefully sexually assaulted and murdered a seven-year old girl from his neighborhood?[4] In these cases, and several others we will review, lady justice has been truly blind. Blind to indiscriminate and damaging sociological, psychological, and economic trauma exacted on registered sex offenders as a result of the indiscriminate effects of the notification requirement. Legislature, opting to deal *swiftly* with the offense, has failed to deal *accurately* with the offender. The current legislation, though appropriate to the offense has been inappropriately applied to the offender. The same registration that binds the serial rapist (Westley Allan Dodd) [5] murderer, who requested being hanged for his criminal sexual acts AND stated that if he was not put to death he will "kill again and enjoy it," also binds the drug dealer (Equan Yunus)

---

[2] U.S. Const. amend. XIII; *"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."*

[3] Susie Bright 761: Sex Offender registries are out of control. Audible (2019).

[4] Hope E. Durant, Message to sex offenders: Sex Registration and Notification Laws Do not infringe upon your pursuit of happiness. 26 J. Legis. 293 (2000) https://heinonlineorg.ezproxy.barry.edu/HOL/LuceneSearch?terms=sex+offender+Registration& collection=abajournals&searchtype=advanced&typea=text&tabfrom=&submit

[5] Ed Pilkington; There was a lot of shame: Meet the sex offender who is not a sex offender. The Guardian. Oct 2018.

AR-00000558

who kidnapped another drug dealers son for ransom and, due to the new law that allows the kidnapping of a minor to be charged as a sex offense even though the crime was not sexually motivated and no sexual deviation was committed. The societal attitude towards sex offenders does not take into consideration the actual culpable offense committed, only the stigmatization that flows with one who has been required to register as a sex offender…even though his actual charge and conviction was simply kidnapping.[6] Imagine waking daily to signs posted in your yard and painted in bright red letters on your home, reverberating these two deadly words: "CHILD MOLESTER!" AND you have never molested anyone, yet your name is listed on the registry. Though the conviction and sentencing for the actual charges might have been served with punitive disparity, the stigmatization due to registration is served collectively. Even in correctional institutions worldwide, the stigma of sex offenders, or as incarcerated felons say, "CHOMOS" (CHild MOlesterS), generally carries the penalty of death by fellow inmates and most sex offenders who have actually committed child related sex-offenses have to be separated from the general population or they face a heightened risk of being assaulted and murdered.  This heightened security usually results in being placed in isolation (generally a solitary confinement 8x8 cell) for protective reasons for 95% of their incarceration. Imagine if within the *incarcerated* population, nationwide, the response is merciless, how can the legislature assume that the victim's family, neighborhood, community, employers in that community, would respond BETTER towards a registered sex offender who has been released back into society and placed on community notification? The Marshall Project states that "There are over 800,000 Americans on the sex offender registries. In many states, men and women on the registry are all subject to the same rules

---

[6] See id.

and restrictions, regardless of their crime."[7]   Though the conviction may be just, I propose that the registration and notification process is not. The registry lacks discriminatory substantive measures designed and implemented to discern the culpability factors that will distinguish heinous acts of a sexual nature from minor violations that are not sexual in nature or proclivity. Such lack of discrimination violates the ethical standards of liberty and human dignity. This article is written to address the following concerns; *First*, a survey of the history of scattered state legislative responses to violent sex offenders, that will culminate to the aggregation of legislation into a Federal and National response tied to funding, and will reveal how the progression of these broad sweeping responses will lead to dismal and inappropriate results. *Second*, a peak into the social stigmatization that has affected the legitimate sex offender and the registered sex offender (who is not a sex offender) equally, catastrophically ostracizing and emasculating potentially positive contributors to society. Lastly, I will suggest remedial measures that will advocate the implementation of possible *assignment* to the Sex Offender and Notification Registration Act based on Culpability Level Assessment of Sex Offender Sentencing (C.L.A.S.S.). C.L.A.S.S. is designed to incorporate a progressive evaluation aspect which will delay offenders being placed immediately on S.O.R.N.A., unless they are convicted of a child related or sexually motivated crime.  All other offenses that will legislatively qualify for registration under S.O.R.N.A., such as kidnappings, sexting, mutual copulation of minors, will be subject to progressive evaluation and calculation under the C.L.A.S.S. system.  Each era is simply a revelation of how modern our society has become, but in every generation, legislation is born out of fear and not justice, equity, or reason.  The displacement of the Indian Tribes, Dred Scot Decision (1857), Plessy v. Ferguson

---

[7] David Feige, <u>Shawna: A Life on the Sex Offender Registry</u>. The Marshall Project. September 17, 2017.

AR-00000560

(1896), the Chinese Exclusion Act of 1882 (not repealed until 1943), the rise of nationalism leading to the decision in Buck v. Bell (1927), and in our present generation, the Sex-Offender Registration. These were all societal fear responses to a perceived threat and the measures that arose to "handle" the threat were inappropriate, wide-sweeping, indiscriminate, unjust and a violation of human dignity.  Can we couple fear with reason and produce good? Is it even wise to try to couple fear…ever?  Marie Curie said "Nothing in life is to be feared, it is only to be understood. Now is the time to understand more so that we may fear less."[8] Michel de Montaigne also stated in relation to fear that "A man who fears suffering is already suffering from what he fears."[9] And Patty Wetterling, the mother of Jacob Wetterling, who was a murdered victim of a sex offender, said it best;

> On an intellectual level, when these guys are released from prison, we want them to succeed. That's the goal. Then you have no more victims. That's the goal. All these laws they've been passing make sure that they're not going to succeed. They don't have a place to live; they can't get work. Everybody knows of their crime and they've been vilified. There is too much of a knee-jerk reaction to these horrible crimes...I'm not soft on these guys, but I know they're not all the same. They're not all the same and we can't treat them as such.
>
> —Patty Wetterling, mother of Jacob Wetterling, Wetterling Act (2009)

## II. HISTORY, CASES, AND CONTROVERSIES

Sunday. October 22, 1989. Eleven year old Jacob Wetterling was leaving his home on bike with his ten year old brother and an eleven year old friend.[10] On their way home from the video store, a man wearing a stocking cap mask, came out of a driveway brandishing a gun and ordered the

---

[8] Wisdomquotes.com
[9] See id.
[10] Alan D Scholle, M.S., Sex Offender Registration Community Notification Laws; 69 FBI Enforcement Bulletin. 17 (2000)

AR-00000561

boys to lie face down on the ground.[11] He then asked each boy his age.[12] Jacob's brother was told to run away as the perpetrator demanded to view the faces of the two remaining boys.[13] He picked Jacob and this was the last time Jacob would be seen alive.[14] In 1994, the federal Jacob Wetterling Act was passed and became the first law to institute a state sex-offender registry.[15] This Act gave the states the option of releasing information about registered sex offenders.[16]

*July 30, 1994*. Megan only wanted to see his puppy.[17] Megan Kanka entered her neighbor's home and contrary to his reason for convincing her to come over, Megan did not find a puppy.[18] Jesse Timmendequas, a two time convicted sex offender, strangled her with his belt and then brutally sexually assaulted here.[19] This heinous crime was so shocking to the New Jersey legislature they enacted a sex offender registration and notification law requiring sex offenders to register and to notify local law enforcement of their residence.[20] This law became known as "Megan's Law."[21]

In 1996, Megan's Law required that states disclose sex offender information, conditioning this requirement on receiving federal funding for state law enforcement.[22]

---

[11] See Id.
[12] See Id.
[13] See Id.
[14] See Id.
[15] Ramirez, Jessica The Abductions That Changed America. Newsweek. 149 (5): 54–55. ISSN 0028-9604. January 29, 2007.
[16] Alan D Scholle, M.S., Sex Offender Registration Community Notification Laws; 69 FBI L. Enforcement Bulletin. 17 (2000)
[17] Hope E. Durant, Message to sex offenders: Sex Registration and Notification Laws Do not infringe upon your pursuit of happiness. 26 J. Legis. 293 (2000) https://heinonlineorg.ezproxy.barry.edu/HOL/LuceneSearch?terms=sex+offender+Registration& collection=abajournals&searchtype=advanced&typea=text&tabfrom=&submit
[18] See id.
[19] See id.
[20] See id.
[21] See Id.
[22] See id.

10

AR-00000562

_July 1981_. Adam Walsh, six years old at that time, was abducted from a mall in Hollywood, Florida.[23] His severed head was found two weeks later in a drainage canal alongside Highway 60/Yeehaw Junction in rural St. Lucie County, Florida. His death garnered national interest.[24] In 1984, the U.S. Congress passed the Missing Children's Assistance Act, owing in part to the advocacy of the Walsh's and other parents of missing children. It allowed the formation of the National Center for Missing & Exploited Children (NCMEC).[25]

_In 1990_, Pamela Lychner, a flight attendant bought another house to renovate and sell. Soon after she put it on the market, a man called and asked to see it.[26] Little things about the conversation seemed odd to Pam. He told her that he and his wife planned to pay in cash, and that they'd just gotten into town and didn't have a phone number.[27] After Pam asked his wife's name, he paused -- a bit too long, she thought. "Pamela," he said finally.[28]  A bit unnerved, Pam asked her husband Joe to go with her and while they waited for the couple, a pickup pulled into the driveway.[29] The driver was a workman from a cleaning company Pam had used, and she went to see what he wanted.[30] Joe, who was waiting in the dining room, heard a conversation, then a struggle.[31] He ran towards the noise and saw Pam's feet sticking out of a closet and the workman was trying to pull her clothes off.[32]  Joe lunged, grappled with the man and pinned him into a corner while Pam,

---

[23] David L. Hudson Jr.,   Crime under Fire: Adam Walsh Act Mandates Sex Offender lists, but some say it's Unconstitutional. ABA Journal, Vol. 94, 22 No. I, 2008
[24] See id.
[25] Mission and History. Archived October 29, 2012 at the Wayback Machine. The National Center for Missing & Exploited Children. Retrieved November 4, 2012.
[26] Gray, Lisa. After the Crash. _Houston Press_. October 23, 1997.
[27] See id.
[28] See id.
[29] See id.
[30] See id.
[31] See id.
[32] Gray, Lisa. After the Crash.  _Houston Press_. October 23, 1997.

11

distraught from the attempted rape, ran outside, screaming for help.[33] The police later found that Pam's assailant, William David Kelley, was a convicted rapist and child molester.[34] In addition to carrying a knife and duct tape, William David Kelley had spread a blanket out in the back of his pickup truck.[35] The Pam Lychner Sexual Offender Tracking and Identification Act of 1996 established the sex offender database now maintained by the Federal Bureau of Investigations.[36] The bill also addresses the interstate commerce of sex offenders who travel between states, requiring them to register with the local law enforcement of the they are present in or face fines and possible prison time.[37]

*February 24, 2005*. Jessica Lunsford disappeared from her home in Homosassa, Florida.[38] After approximately three weeks of intense searching for her around the area of her home, John Evander Couey, a convicted child sex offender, a 46-year-old long-time resident of Homosassa with an extensive criminal record, listing dozens of arrests for burglary, was eventually arrested.[39] Laws at that time did not provide for monitoring of offenders and only gave short sentences, despite his record of being an experienced trespasser and his repeated sexual offenses against children.[40]  On March 12, the Citrus County Sheriff's Office requested Couey be arrested in Augusta, Georgia, and for questioning about Lunsford's disappearance since his Florida home in Homosassa was only sixty-five yards from Lunsford's home.[41] On March 14, police, with the consent of Couey's half-

---

[33] See id.
[34] See id.
[35] See id.
[36] Alan D Scholle, M.S., Sex Offender Registration Community Notification Laws; 69 FBI L. Enforcement Bulletin. 17 (2000)
[37] Lisa Gray. After the Crash. *Houston Press*. October 23, 1997.
[38] Mabel Perez. "Judge throws out Couey confession", *The Ocala Star Banner*, July 1, 2006
[39] See id.
[40] See id.
[41] See id.

12

sister searched John's trailer at West Snowbird Court in Homosassa. Couey had lived there during the time Jessica was abducted. And during the search, a blood-stained mattress and pillows were found in Couey's closet in his room.[42] The DNA was Couey's and Jessica's. Couey confessed.

> Couey said that he had previously seen Lunsford playing in her yard and thought she was "about six years old." On the night of the abduction, Couey had intended to just burglarize the Lunsford's home, but saw Jessica and "acted on impulse and he took her." He entered Lunsford's house at about three o'clock in the morning through an unlocked door, awakened Lunsford, told her "Don't yell or nothing", and told her to follow him out of the house.[5] He occupied a trailer along with two women, some 100 yards (91 m) away, at the time of Lunsford's abduction.[6] Couey admitted to raping Lunsford in his bedroom, keeping her in his bed that evening, where he raped her again in the morning. Couey put her in his closet and ordered her to remain there, which she did as he reported for work at "Billy's Truck Lot".[5] Three days after he abducted her, Couey tricked Jessica into getting into two garbage bags by saying he was going to "take her home". He instead buried her alive as he decided he could do nothing else with the girl. He said he "Didn't want people seeing him and Lunsford across the street.[43]

On March 17, Couey was arrested and charged with the murder and on March 19, 2005 the body of Jessica Lunsford was found buried on his residence. She had been buried alive.[44]

Megan Kanka, Jacob Wetterling, Adam Walsh, Pamela Lychner, Jessica Lunsford. These names are familiar to us since the dismay of thier untimely and horrific deaths have shaped, and

---

[42] See id.
[43] See id.
[44] Mabel Perez. Judge throws out Couey confession, The Ocala Star Banner, July 1, 2006

AR-00000565

incrementally strengthened, the registration and notification requirements of the Sex Offender laws
since 1994.[45] The Jacob Wetterling Act gave the states the option of releasing information about
registered sex offenders to the public but did not require it, but in 1996, Congress amended the act
to *require* states to disclose information about registered sex offenders for *public safety purposes.[46]*
When the Violent Crime Control and Law Enforcement Act included the Jacob Wetterling Crimes
Against Children and Sexually Violent Offender Registration Act in 1994, the current legislation
for sex offenders began its era.[47] In 2006, the Adam Walsh Act superseded the Wetterling Act.
The new act, as an aggregate of legislature became known as the Adam Walsh Child Protection
and Safety Act, Public Law 109-248. The following points below were established:

- *a federal requirement that states register juveniles over the age of 14*

- *adjudicated for a sex offense;*

- *a conviction-based scheme distinguishing low, medi um, and high-risk offenders;*

- *an expansion of mandatory sentences for federal sex offenders;*

- *an increasing role for the federal government, specific- cally the U.S.*

- *Marshals, in locating unregistered sex offenders (109th Congress, 2006)."[48]*

---

[45] David L. Hudson Jr. <u>Crime under Fire: Adam Walsh Act Mandates Sex Offender lists, but some say it's Unconstitutional</u>. ABA Journal, Vol. 94, 22, No. I, (2008.) https://heinonlineorg.ezproxy.barry.edu/HOL/LuceneSearch?terms=sex+offender+Registration& collection=abajournals&searchtype=advanced&typea=text&tabfrom=&submit
[46] Alan D Scholle, M.S., <u>Sex Offender Registration Community Notification Laws</u>; 69 FBI L. Enforcement Bulletin. 17 (2000)
[47] See id.
[48] Richard G. Wright, PhD; <u>Sex Offenders Laws: Failed Policies, New Directions</u>. Spring Publishing Company, New York. (2008)

14

- *Making kidnapping and false imprisonment of a child, regardless of sexual intent, a registerable sexual offense;[49]*

- *Requiring registered sex offenders to register in any jurisdiction, not only where they live, but also where they work or attend school;[50]*

- *Requiring sex offenders to verify their addresses once per year for those at tier 1, twice a year for those at tier 2, and 4 times per year for those at tier 3;[51]*

- *Making failure to register a felony offense punishable by a maximum of 10 years in prison;[52]*

- *Giving a registered sex offender 3 days to report a change of address to law enforcement agencies;[53]*

- *Requiring that registered sex offenders' entire criminal history, not just the sexual offense, fingerprints, palm prints, and a DNA sample be reported to law enforcement agencies;[54]*

---

[49] Kelly K Bonnar-Kidd, PhD <u>Sexual Offender laws and Prevention of Sexual Violence or Recidivism,</u> Am J Public Health. 100(3): 412-419. (March 2010)
[50] See id.
[51] See id.
[52] See id.
[53] See id.
[54] See id.

15

- *Mandating that the registry be made available on the Internet and that all tier levels, including tier 1, be subject to such community notification;[55]*

- *Mandating the length of time a registered sexual offender would be required to register; offenders at tier 1 would register for 15 years, offenders at tier 2 for 25 years, and offenders at tier 3 for life; and[56]*

- *Providing additional funds to support offices, software, training, and additional personnel to enforce registered sex offender laws.[57]*

I have intentionally excluded mention of several laws and Acts that affected the expansion of Sexual Offenders Registration and Notification Act (SORNA) because the narrow scope of this paper is not historical but remedial. Yet there are many that currently advocate for addition and amendment to these major four listed above, and future legislative action will expand the law concerning sex offense related crimes to reflect society's apprehension, such as the "***Amie Zyla Law***" which advocates for the inclusion of youth sex offenders on SORNA with public notification and access;[58] ***"Dru's Law"***, which established the Dru Sjodin National Sex Offender Public Registry;[59] The first "***Sexual Predator Law***" adopted in Washington in response to the first-degree rape and assault of seven year old Ryan Alan Hade by Earl Kenneth Shriner, an American criminal

---

[55] Kelly K Bonnar-Kidd, PhD., Sexual Offender laws and Prevention of Sexual Violence or Recidivism, Am J Public Health. 100(3): 412-419. (March 2010)

[56] See id.

[57] See id.

[58] Kelly K Bonnar-Kidd, PhD., Sexual Offender laws and Prevention of Sexual Violence or Recidivism, Am J Public Health. 100(3): 412-419. (March 2010)

[59] See id.

16

AR-00000568

who had an extensive history of sexual assault and sex-related crimes.[60] Current sex offender registry laws have incorporated a tier-system that classify offenders and provide UNIFORM guidelines for registration. There are two problems with this: <u>First</u>, if the offenses are not uniform in nature, culpability and offense, but the punishment is, then the punishment is excessive for the lesser offense violations. <u>Second</u>, the 3-tier system classifies the offender by evaluation of the risk of re-offense, and this risk is accessed on a "propensity theory" that is not viable evidence in any court in the United States.

CONTROVERSIES

Equan Yunus, New York

This is the story about a sex offender who is not a sex offender.[61] In the early nineties, Equan, like most other youths from his community fell into the New York drug trade.[62]  At 15, he began to sell crack cocaine on the streets of Harlem, Washington Heights, and parts of New Jersey and Philadelphia and by the time he was 20, he was making $10,000.00 a day.[63] Wanting more, Equan began to kidnap the family members of other drug dealers and his first kidnapping ransom paid was $60,000. His mistake came when he kidnapped another male drug dealer, the fourteen year old son of a major cocaine distributor on the west side of Harlem.[64] Equan held the boy for less than a day, not knowing the boys age, and when the ransom was paid, the boy was released.[65] The boy's father contacted the police, Equan was arrested, he plead guilty and served 15 years in New

---

[60] See id.
[61] Ed Pilkington., <u>There was A Lot of Shame: Meet the Sex Offender Who is not a Sex Offender</u>.
  The Guardian. October 2018
[62] See Id.
[63] See id.
[64] See Id.
[65] See id.

17

York State's maximum security prison.[66] A month before he was released, Equan received a letter instructing he attend a hearing to evaluate his sex offense risk level and he was stunned! His offense was neither sex-based nor sex motivated so this was a mistake! In New York, ANY adult who kidnapped a child under 17, who was not their own child, is automatically legally determined to be a sex offender even if there is no culpability for a sex motivated act.[67] Though, after 15 years in New York's Maximum Security Prison, Equan had paid severely for his crime, and impliedly all the others he was not convicted of, he will be committed to another lifetime sentence as a sex-offender and be cast under the umbrella of its punitive stigmatization.

Shawna Baldwin, Oklahoma.

On Shawna's 19th birthday, she decided to celebrate by throwing herself a party and inviting friends.[68] At the party, a young man put his arm around her and said he did not want to take advantage of her if she was drunk and she stated it was ok.[69] They had sex.[70] The next day the boy's mother called Shawna and told her that she reported her at the risk of her son hating her forever.[71] Shawna was called to the police station, questioned, arrested, then told that if her case went to trial, she could go to prison for 20 – 25 years, but if she took a plea her sentence will be 4 months jail, lifetime probation, and lifetime registration.[72] The Oklahoma Sex Offender Registry has her listed as a level 3 child molester.[73] Shawna has two beautiful children and takes them to the park often. The Marshall Project accompanies her to the local Oklahoma Park in October 31,

---

[66] See id.
[67] See id.
[68] The Marshall Project. Shawna: A life on the sex offender registry.
    https://www.themarshallproject.org/2017/09/17/shawna-a-life-on-the-sex-offender-registry
[69] See id.
[70] See id.
[71] See id.
[72] See id.
[73] See id.

18

2014, the day before sex offenders are permanently banned from all of Oklahoma's public parks, her last day she will be allowed to step foot in the park, and consequently not be allowed to be within 1,000 feet of it.[74]

III.   HARMFUL STIGMATIZATION OF SEX OFFENDER REGISTRATION AND NOTIFICATION

Collateral Consequences. The result of a felony conviction or offense that extends beyond a persons' term of incarceration and continues to inhibit their personal life, deny them opportunities afforded to others because of their conviction or classification from that conviction, and punishes the felon beyond their conviction.[75] *Joblessness, homelessness, ostracization, limitation academically as well as economically, and most of all, disassociation from ones family, neighbors, and community.* "You judge our society for how it treats the least among us; and I think at this point, sex offenders are the least among us."[76] "It is as if we have taken this entire category and said these are not human beings, we don't care about them. We put all of them on the registry with the same restrictions and that doesn't make sense even as a public safety issue, it doesn't make sense as public policy, and it surely doesn't make any sense in terms of justice."[77]  Our treatment of sex offenders has resulted in the creation of a second class citizen. SORNA requires that sex offenders register within three days of moving to the state, or within three days of their conviction or release. They must provide their names, dates of birth, social

---

[74] See id.

[75] Tracy WP Sohoni. *The Effect of Collateral Consequence Laws on State Rates of Returns to Prison*. University of Maryland, College Park.2013. PhD Dissertation

[76] David Feige, Shawna: A Life on the Sex Offender Registry. Val Jonas, The Marshall Project. September 17, 2017.
https://www.themarshallproject.org/2017/09/17/shawna-a-life-on-the-sex-offender-registry

[77] David Feige, Shawna: A Life on the Sex Offender Registry. Nancy Gertner, The Marshall Project. September 17, 2017.
https://www.themarshallproject.org/2017/09/17/shawna-a-life-on-the-sex-offender-registry

AR-00000571

security numbers, all aliases, work and school addresses, a photograph, physical descriptions,

vehicle information, criminal records, driver's licenses, proof of residency, palm prints, and

DNA samples. This information is required to be updated annually and is made available to the

public on the registration database. If they fail at any time to provide the information listed

above, it is a crime punishable by incarceration.[78] This is only the beginning.

Housing is a problem. Housing prospects are severely limited due to the restrictions placed on sex

offenders.[79] Sex offenders are generally banned from living within a certain number of feet, or

yards, from areas populated with children, such as school bus pick-ups, schools, parks, day care

centers.[80] Continuous relocation and re-registration, since a sex-offender has to register their

address every time they have to move within 3 days, or risk reincarceration.[81] Statistics show that

registered sex offenders were found to be ineligible for 99.7% of residences.[82] If the sex offender

did not have an address before they were released from prison, they would be picked up by the

local sheriff's office and taken to the local jail until they had a valid address that satisfied the

dynamics of their restrictions. Several business savvy organizations took advantage of this and

purchased remote land, placed several mobile homes on these properties and advertised in the

prisons that these properties are available and will meet the sex offender restriction qualifications.

Four to five sex offenders were placed in one mobile home and each charged an average of $400-

$750 a month. Many of the families who desired their sons/daughters to come home from prison

paid the cost. These forced restrictions created a new problem of sex-offender created mobile home

---

[78] Carla Schultz, The Stigmatization of Individuals Convicted of Sex Offenses: Labeling Theory
    and the Sex Offense Registry, Vol 2. Themis: Research Journal of Justice Studies and Forensic
    Science, Spring (2014)
[79] See Id.
[80] See Id.
[81] See Id.
[82] See Id.

20

parks.  These parks became a nuisance for many cities, and several began to place restrictions on the zoning status of these parks. One particular park in St. Petersburg Florida, also known as "Pervert Park," has garnered national attention in a documentary called Pervert Park, filmed by Swedish-Danish filmmakers Frida and Lasse Barkfors.[83]

Employment. Difficulty in finding and maintaining employment has dire effects on the sex offenders ability to register their address. The stigmatization of the registration and notification "collapses" the distinction between the level of act committed. When the employer receives notification that James, whom they hired, was a registered sex offender, they do not care that he is 53 years old and the offense in which he is registered for is peeing in public fifteen years ago. The database makes no distinction in the offense and paints the stigma of egregious sex-offense over all registrants. Publix is aware that Troy is a registered sex-offender but no aware that is because he and his girlfriend were "sexting" in high school two years earlier and he was prosecuted under the new sexting laws. 27% report having lost their jobs once their supervisor found them on the registry.[84]

Public Assistance. The Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), championed by President Bill Clinton as the culmination of his presidential promise to end welfare, was knows to ex-offenders as the welfare ban.[85] After being debated in Congress for two minutes, the ban was imposed on felony offenders and was introduced as an amendment

---

[83] Jen Yamato, Inside 'Pervert Park': Safe Haven for Sex Offenders. Daily Beast, May (2016). https://www.thedailybeast.com/inside-pervert-park-safe-haven-for-sex-offenders?ref=scroll

[84] Carla Schultz, The Stigmatization of Individuals Convicted of Sex Offenses: Labeling Theory and the Sex Offense Registry, Vol 2. Themis: Research Journal of Justice Studies and Forensic Science, Spring (2014)

[85] Rubenstein and Mukamal. Legislative Barriers to Successful Reintegration, US Criminal Justice Police: A Contemporary Reader. 173-174 (2010)

AR-00000573

to the initial welfare reform bill.[86] Though the initial bill only focused on the war on drugs, later

reforms and amendments applied this bill to other felony offenders such as sex offenders. For

example, in April 2019, the Food and Nutrition Service of the Department of Agriculture, in

Section 4008 of the 7 C.F.R. (Code of Federal Regulations) "prohibits anyone convicted of Federal

aggravated sexual abuse, murder, sexual exploitation and abuse of children, sexual assault, or

similar State laws…from receiving SNAP (Supplemental Nutrition Assistance Program)."[87] SNAP

is colloquially referred to as food stamps.  Sex offenders are ineligible to receive public assistance

in the form of food stamps.

Public outrage.  Notification of the current residence of sex offenders is designed to make the

community aware that someone who has committed a sex crime is living in their neighborhood.

This affords the community notice to take necessary precautions to protect their loved ones.  At

least that is the intent. Generally, 73% of sex offenders return home to their families and attempt

to live a quiet life. This is not always the case. Often sex offenders are harassed, assaulted, and on

a few occasions, their roommates were battered as the result of mistaken identity. "This is the dark

side of sex-offender registries, which allow public access to offenders' residential addresses and

other personal information."[88] In 2005, two registered sex offenders living together, due to the

difficulty of obtaining housing because of the restrictions, were murdered by a man posing as an

FBI agent claiming to be investigating threats against sex offenders.[89] Another similar case, an

innocent man from Dallas, Texas had moved into an apartment recently vacated by a sex offender

---

[86] See Id.
[87] Federal Register. Vol 84, No.72 (2019)
[88] Matt Clarke, Vigilantes Assault, Rob and Murder Registered Sex Offenders. Prison Legal
News. (May 2017)
[89] See id.

22

and was beaten with a bat as a result of mistaken identity.[90] Sex offenders live under the terror of imminent danger and assault from being required to have their whole life displayed before any person with a computer or a mailbox, and additionally required to stay only at their residence of address. In some states they must sleep at the place on their driver's license a minimum of 3-4 days a week. If they change residences, they have three days to change their drivers' license, and failure to do so results in reincarceration. Many are violated because they are not employed, cannot receive public assistance, and cannot afford the DMV cost of changing their address on their driver's license. Lack of housing, public assistance, low job potential, no job prospects, social stigmatization that ostracizes them, and restrictions on where to walk, live, eat, does not human dignity make. And to add insult to injury, the designated Officer in charge of their registration is authorized to inform their place of business and community who they are and their designation as a sex offender. Yet, the issue this paper is addressing is not less restriction, better treatment, public assistance, or lack of notification. The problem is the lack of discrimination between the offense, and the collapsing distinction among the culpability level of offenders that would separate the Ted Bundy's and the Wesley Allan Dodd's from Equan Yunus and Shawna Baldwin.  S.O.R.N.A. does not make such a distinction and in so doing, as the old saying goes, "throws the baby out with the bath water." Discrimination amongst the sex-offenders in the level of offense committed will lessen the municipal burden of homelessness, the unemployment rates of the States, make available housing for those who are not mandated for notification due to the extremely low level of culpability and risk of re-offense. When registered low risk sex offenders are afforded human dignity and equal protection of the laws, and are not subject to the denigrating effects of sex offender stigmatization, they can easily reacclimate to society and become a productive part of

---

[90] See id.

their community. As our laws currently stand, they are doing more harm than good, and the cost

outweigh their benefits.

IV.   HOW SEX OFFENDER REGISTRATION AND NOTIFICATION WORKS

Recidivism, and/or potential to re-offend, is the measurement currently used by most states.

This is a hard assessment tool to apply.   This rubric must assess "propensity" and propensity

assessment, in the evidence code is NOT ADMISSIBLE in court or criminal adjudication.[91] So

why is such an abstract, intangible, unquantifiable, nonfigurative, conjectural, theoretical analysis

utilized to evaluate America's current anathema, even though the courts system, federally and

statewide, have determined that propensity determinations to assess if a criminal will reoffend are

not probative and are unfairly prejudicial AND cannot be used in the criminal justice system?

S.O.R.N.A., through Megan's Law, has developed a three-tiered system.[92]  Megan's Law reviews

the criminal and behavioral history of the released sex offender to assess the risk of re-offense.[93]

Thus the current focus of our Sex Offender Registry is primarily to curb recidivism. It does not

address the issues and benefits of rehabilitation and reentry into society. The three-tiered system

is broken down by the classification level of the *offense,* but this is the problem.  The issue is the

focus on the offense-based classification system proposed by our legislation, and how legislature

has included non-sex motivated offenses, such as kidnapping, to be assigned as a sex motivated

crime. The risk assessments is a review of the offense that requires registration and includes the

following: 1) studying the nature of the ***sexual*** acts; 2)whether the offender used force, displayed

or used weapons, or injured the victim during the crime; 3) the age of both the victim and the

---

[91] Charles W. Ehrhardt, Ehrhardt's Florida Evidence. 2017 Edition Volume 1. (2017)

[92] Ryan A. Boland; Note, Sex Offender Registration and Community Notification: Protection,
   not Punishment 30 New Eng. L. Rev. 183 (1995)

[93] See id.

24

offender at the time of the crime; 4) Offender's criminal history and incarceration record; 5) and completed sex offender treatment programs.[94] Under the first element listed above, if the risk assessment studies the nature of the sexual act, then kidnapping, where a sex-crime has not been committed, should in no way trigger S.O.R.N.A. Elements two and three should only be assessed after element one has been established. If Element one has not been established, then S.O.R.N.A. should not be triggered.  Element 4, the criminal history of the offender, already plays a role in future sentencing. Presently the state utilizes the Habitual Felony Offender (HFO) statutes, and the Prison Releasee Reoffender (PRR) sentencing guidelines on all felony offenders or repeat offenders to assess recidivism issues. This is not a novel approach to determine the propensity to recidivate. And, element five is only viable, once element one has been established.

**THE THREE-TIERED SYSTEM**

The US Department of Justice issued the list of sex offenses that require registry, and the tiers that govern the statutory offense levels.   Offenders MUST register if convicted of any of the following:[95]

**Tier 1.** This tier makes a determination that the degree of dangerousness is low and notification information is not a public requirement.[96] *Offenses involve an element of sexual contact or sexual acts and can include*:

1.  Having or receiving child pornography.

2.  Falsely imprisoning a minor.

3.  Video voyeurism of a minor.

---

[94] Alan D Scholle, M.S., <u>Sex Offender Registration Community Notification Laws</u>; 69 FBI L. Enforcement Bulletin. 17 (2000)

[95] Tammy Cohen, PHR, SHRM-CP, <u>Violations That Can Land You on a Sex Offenders Registry</u>?  April (2016). www.infomart-usa.com/blog

[96] See id.

4. Traveling or facilitating others' travel when the intent of the travel is to engage in illicit conduct.

5. The transmission of information about a minor that will further criminal sexual misconduct.

**Tier 2.** Tier 2 determinations assess the risk of re-offense to be moderate. This determination then concludes the danger level to require public notification availability.[97]  *Offenses apply to people who have previously been convicted of a Tier 1 offense and can include:*

1. Minors in prostitution and/or sex trafficking.

2. Enticing minors to engage in criminal sexual activity.

3. Engaging in a non-forced or consensual sexual act with a minor aged 16 or 17 year.

4. The act of producing or distributing child pornography.

5. Utilizing minors to commit sexual performance.

**Tier 3**. Tier 3 assessment makes determinations of offenders at a high risk of reoffending and are quantified as "substantial public interest" and mandates public notification.[98]*Offenses involve people who have been convicted of a Tier 2 offense and can include:*

1. A non-parent **kidnapping** a minor.

2. Having sex or sexual contact with minors under age 13

3. Sexual abuse, aggravated sexual abuse, sexual abuse of a minor, and abusive sexual contact with a minor under age 13.

The three-tier management system provides for a rubric of assessment that establishes degrees of dangerousness and most importantly a discriminatory system that only requires notification when the offense level has been assessed as a high risk of re-offense. Although the three-tier system

---

[97] See id.

[98] See id.

26

currently provides a legitimate basis for an offense-based system and not an offender-based system, which is advocated in this review, it will work equally well, if not better, for the C.L.A.S.S. system which is discussed in detail in chapter five.

V.  CULPABILITY LEVEL ASSESSMENT OF SEX OFFENDER SENTENCING (C.L.A.S.S.)

The CLASS system of assessment is offender-based.  Building a doghouse does not designate you a carpenter.  Likewise, committing a killing does not a murderer make.  An offense-based system such as SORNA assigns the sex motivated element to the offense itself, not the offender or any culpable act of the offender. SORNA considers kidnapping to be construed as a sex-based offense though a sex motivated intent, nor, act was committed. To require all acts of killing to be adjudicated as a capital crime, requiring an indictment by the grand jury with eligibility for the death penalty, will devolve our criminal justice system and eradicate culpability levels that are fact intensive and assign punitive, rehabilitative, or correctional administration in accordance with the culpability of the act.  That is what S.O.R.N.A, an offense-based system, does. C.L.A.S.S. is a culpability level assessment. Culpability is defined as:

> "... *the degree of one's blameworthiness in the commission of a crime or offense. Except for strict liability crimes*, ***the type and severity of punishment often follow the degree of culpability***."[99]

Black Law Dictionary also defines Culpable as:

> *"Blamable; censurable; involving the breach of a legal duty or the commission of a fault. The term is not necessarily equivalent to "criminal," for, in present use…it implies that the act or conduct spoken of is reprehensible or wrong but not that it*

---

[99] Black's Law Dictionary Free 2nd Ed. and The Law Dictionary; Thelawdictionary.org. https://thelawdictionary.org/culpable/" title="CULPABLE">CULPABLE</a>

27

*involves malice or a guilty purpose. **"Culpable" in fact connotes fault rather than***
***guilt.*** *Railway Co. v. Clayberg, 107 111. 051; Bank v. Wright, 8 Allen (Mass.)*
*121."[100]*

Culpability ratings are a prerequisite in order to accurately adjudicate fault, and the level of punishment can be imputed to the criminal and not the crime, unless a crime is one of strict liability. Again, a person can commit the same crime and incur a vastly different culpability assessment.[101] Criminal law recognizes and imputes four different levels of culpability.  "The Model Penal Code defines four levels of culpability: purposely, knowingly, recklessly, and negligently (from highest to lowest)."[102] SORNA utilizes a Tier System to determine the level of notification the public needs and that assessment is derived from the offense and does not take into account the culpability of the offender.  Though the assignment of Tier levels is determined by offense, the ***stigmatization of registration*** and notification as a sex offender bears a heavy penalty...borne by the offender. The sexual offender whose fact intensive criminal act details a consensual act between a minor and an adult, with a culpability level of "negligence" or "recklessness," experiences the same gravity of negative societal stigmatization as a sex offender who stalked, abducted, and raped a twelve year old girl on her way home from school.  The purpose of the CLASS system is to officiate legally used Model Penal Code and common law culpability classifications as the initial rubric for addressing these issues. The questions listed below will serve as the analysis to determine if an offender will be required to notify and/or register as a sex offender.

---

[100] See id.

[101] Steve McCartney and Rick Parent, Moral Culpability versus Legal Culpability, Ethics in Law Enforcement. Chapter 8: The Culture of Law Enforcement; (2015)

[102] https://law.jrank.org/pages/1585/Mens-Rea-Modern-culpability-levels.html

28

1. Was the charge sexually motivated? If the answer to this question is "no", then registration and notification cannot be required. If then answer is "yes", then question two is prompted.

2. If so, what is the culpability of the offense in terms of intentional and purposeful, knowingly, recklessly (with disregard), and negligently. If the culpability level is determined to be high, such as knowingly, then SORNA will be triggered, but whether and the Tier System established by the legislature will be activated to asses registration and notification.   For example, if the culpability level of the offender is negligently, then registration may be required but not public notification.

3. Does THIS offender have prior social and criminal history with sexual deviancy? If this answer is yes, then the highest tier level may be applicable, and registration and notification will be mandatory. Bur for example, if the answer is "yes", but the offender has the habit of urinating in the public park, while there are no children present, at night, then further assessment will be needed. The objective of C.L.A.S.S is to establish first if the offender is truly a sex offender dangerous to society, and second, to assess potential to reoffend.

4. Was it a mistake in judgment or lack of moral turpitude? This question will serve as the basis for a psychological evaluation. It is important to determine if the offender exhibits a deviant nature that lacks moral consideration, or someone who has made an error in judgment and most likely will return to be a productive member of society.

Our criminal justice systems have always had provisions for moral determinations of criminal acts. Included in the culpability assessment alone provides a peek into ascertaining the criminals "state of mind" in evaluating if the act was intentional (did this on purpose), knowingly (committed with full knowledge and awareness), recklessly (knew the possible outcome but with no disregard for it), and negligently (did not know but should have known). For example, Steven Emanuel's

29

Criminal Law Outlines defines the difference between the common law purposely and Model Penal code "Intentionally."[103]

> *"A person acts purposely with respect to a particular element if it his "conscious object" to engage in the particular conduct in question, or to cause the particular result in question. [26-27] ...purposely is not the same as knowingly. If D does not desire a particular result but is aware that the conduct or result is certain to follow, this is not purposely. A person acts recklessly if he consciously disregards a substantial and unjustifiable risk (MPC §2.02(2). Idea is that defendant has behaved in such a way that represents a gross deviation from the conduct of a law-abiding person.  Some statutes make it a crime to behave negligently if certain results follow. For example, the crime of vehicular homicide is sometimes defined to require a mens real of criminal negligence. Defendant does not have to be aware of the risk imposed by his conduct."[104]*

Our CURRENT criminal justice system bears the power to deliver justice tempered with fairness and eliminate the dispassionate indiscriminate reach of the Registration and Notification Act that judges all as one.

The **Actus Reus** of our criminal system is the measurement of the defendant's conduct.[105] What did the defendant do? Was it a voluntary criminal act? Is a sexual criminal act?  If there is not a sexual act or one that has an apparent sexual nature in its commission, then the crime is not a "sexually deviant act" that triggers SORNA (Sex Offenders Registration

---

[103] Steven L. Emanuel, Emanuel Law Outlines: Mens Rea Ch. III Capsule Summary; Wolter Kluwers, Aspen Publishers (2007)
[104] See id.
[105] Steven L. Emanuel, Emanuel Law Outlines: Mens Rea Ch. III Capsule Summary; Wolter Kluwers. Aspen Publishers (2007)

30

and Notification Act). Thus, the defendant will not be eligible for registration as applicable
to sex offenders.

The **Mens Rea**, in our criminal justice system, measures the culpable mental state of the
defendant.[106] Intent, and the level of that intent, becomes the basis of determination as to
the OFFENDER and his/her consciousness towards furthering that intent. Did the
defendant have any culpability level (from Intentional to Negligence) towards a sexual
motive, IF in the ACTUS REUS, a sexual act OR ACT OF A SEXUAL NATURE, has
transpired in the commission of or furtherance of the crime.  For example, one intends to
commit robbery and in the commission of that act, a 16-year-old hostage is taken *with the
intent to secure ones escape or bargain for leniency.* Upon leaving with that hostage the
perpetrator is apprehended and charged with Robbery with a Deadly Weapon and
Kidnapping.  In most states, that kidnapping charge would trigger SORNA, but subject to
a CLASS evaluation, the culpability level for the charge of kidnapping would be
"knowingly" since the material element of the crime was one of robbery and not
kidnapping.  In other words, the perpetrator did not desire to kidnap, but was "aware that
the conduct or result was certain to follow[107] in light of the circumstances and facts
surrounding the criminal act.[108]  *Why kidnapping as a probable sex offense?* The Amber
Alert[109] serves as a beacon to the plight of child kidnappings and abductions with an

---

[106] See id.
[107] See id.
[108] See id.
[109] An amber alert or a child abduction emergency alert (SAME code: CAE) is a message distributed
by a child abduction alert system to ask the public for help in finding abducted children. It
originated in the United States in 1996.  AMBER is officially an acronym for *America's Missing:
Broadcast Emergency Response*, but that is a contrived acronym, originally named after Amber
Hagerman, a 9-year-old girl abducted and murdered in Arlington, Texas, in 1996.

31

AR-00000583

emphasis on the intent behind most juvenile abductions being sex motivated. Again, in response to the uphill battle concerning the sexual abuse of our children, our criminal justice system responds by determining that the criminal act of kidnapping will trigger SORNA, even if the act was not sex motivated. The reasoning is based on the fact that a sexual violation is **probable** if a minor is kidnapped.  If something is probable, then the percentage of it happening <u>or not happening</u> is equal.  A justice system based on a crime happening being probable is reflected in the movie "Minority Report" where in the future, year 2054, a special police unit is able to arrest murderers before they commit their crimes.[110] The movie represents a criminal justice system that arrest and incarcerate individuals on a crime that has not been committed but is probable, depriving an individual of their liberty and freedom…for a crime THEY DID NOT COMMIT. Such is the result when you hold a person criminally liable for a sex-based registration and notification system with a crime that, in its act or nature, is not sex based and no sexual crime was actually committed…but was probable.  A MORE ACCURATE assessment is one based on empirical evidence of "probability." The difference between probable and probability is more distinct than the difference of an adjective and a noun.  Probability is defined as "The ratio of the number of outcomes favorable for the event to the total number of possible outcomes is termed as probability.[111] In laymen terms, to have a ratio, there must be a base number in which to work with, for example if Charlie Defendant, ten out of ten times, went

---

[110] Minority Report (2002). Box Office Mojo. Retrieved December 8, 2010. "Minority Report is a 2002 American cyberpunk action thriller film directed by Steven Spielberg and loosely based on the 1956 short story "The Minority Report" by Philip K. Dick. It is set primarily in Washington, D.C., and Northern Virginia in the year 2054, where Pre-Crime, a specialized police department, apprehends criminals based on foreknowledge provided by three psychics called "precogs."

[111] https://www.chegg.com/homework-help/definitions/simple-probability-67

AR-00000584

to Vicky Victims ice cream shop and bought chocolate ice cream, the probability of Charlie

buying vanilla ice cream the eleventh time is 0. If Equan[112] committed several acts of

kidnapping and not one was sexually motivated and no sex violation occurred, then why is

he being charged with a crime he did not commit? Does our justice system justify taking

away ones liberty because the opportunity to commit an act that you DID NOT commit

made it probable to commit it?  This logic suggest we should arrest every person addicted

to hydrocodone that enters a pharmacy because it's probable they will commit a robbery.

This illogical assertion is rooted in the legal justification of a sweeping offense-based

system. When the system takes an offender based approach, the evaluation will assess the

offender as an individual, and the act he/she has actually committed (actus reus),

accordingly with the level of intent in its commission (mens rea), and accurately adjudicate

according to the crime that was actually committed, not the crime that was probable.  Then

a probability assessment will NARROW THE FOCUS applying the following factors: 1)

How many times has this person committed this crime; 2) how many of these commissions

of criminal behavior were sex-based or had a sexual overtone or nature; 3) the level of

criminal deviancy in the commission of the act (i.e., Ted Bundy[113], Jeffrey Dahmer[114], John

Wayne Gacy[115] versus Equan Yunus, Shawna Baldwin).

---

[112] Ed Pilkington; <u>There was a lot of shame: Meet the sex offender who is not a sex offender</u>. The
Guardian. Oct 2018.

[113] Janet McClellan, Case Study, <u>Project: Serial Murder an Ongoing Analysis</u>. Journal of
Security Education. October (2008)
https://www.researchgate.net/publication/261589036

[114] Don Terry, <u>Jeffrey Dahmer, Multiple Killer is Bludgeoned to Death in Prison</u>, N.Y. Times,
Nov. 29, at A1 (1994)

[115] True Crimes: <u>Serial Killers</u>, Time-Life Books ed., 48-90 (1992)

AR-00000585

VI.     CONCLUSION

It would seem semi reasonable that today we as a nation would have "evolved" beyond knee-jerk reactions to our fears. Our sex laws are expansive and all-encompassing so that many people are unaware that the current of their act will sweep them into the net of SORNA.  Urinating in public years ago was the way to relieve your "pressure" after a long drive on the road with no restrooms in sight. Now, if you are doing so and a police officer (highway patrol) spots you…well, you are a sex-offender and that triggers SORNA.  Sexting, also known as texting sexually explicit content, is now also pulled by the undercurrents of SORNA into the net of sex-offender, and the law, as it stands today, makes no distinction as to whether you sent a racy, provocative photo, meme, emoji, etc., to your spouse of 20 years or to your high school lust crush. They all trigger SORNA and are all stigmatized equally.  It is unethical to place all in one net without distinction since they all have not committed a sexually based triggering event exhibiting a level of criminal culpability. There must be a triggering event that our criminal justice system can empirically identify and utilize to accurately ensure the safety of our youth, and our national dignity, while simultaneously also protecting the rights of each and every citizen alike.  CLASS. Culpability Level Assessment of Sex Offender Sentencing employs a system that engages a method our criminal justice system currently utilizes, distinguishes each offender with empirical evaluations of fact intensive evidence, requires registration and notice only for those who have committed a crime that is sex motivated, under a precedented culpability level,  and who is most likely to reoffend, and liberate those who might have been swept into the net of injustice and unfairness. A friend once told me a joke. He stated:

> "*A woman was praying. God please send a cure for cancer. God please send a cure for cancer. She then falls ill to cancer and yet she continues to pray to God saying,*

34

*"God please send the cure to cancer." She eventually dies of cancer not long after.*

*As she enters heaven, she comes before the Lord. She asks HIM "Lord, I prayed so*

*hard and so long for the cure to cancer! Why did you not answer my prayer?" The*

*LORD responded "I did. You aborted her."*

The lady in the joke above represents society and their benighted response to the sex offender dilemma. Good and productive people, like Adrian who was in his junior year of college, who may have been the next founder, inventor, or doctor who found the cure for dementia or alzheimers, but through his negligent act, was drawn into the indiscriminate nets of SORNA like minnows cast in with the sharks, and goldfish blanketed under the same warning sign as piranhas. Stigmatized under the unforgiving banner of SORNA and ultimately…aborted by society. Its time our legal system exhibits C.L.A.S.S.

35

The Sex Offender Registry: Vengeful, unconstitutional and due f...                    https://thehill.com/opinion/criminal-justice/376668-the-sex-off...



# The Sex Offender Registry: Vengeful, unconstitutional and due for full repeal

BY JESSE KELLEY, OPINION CONTRIBUTOR — 03/05/18 08:00 AM EST
THE VIEWS EXPRESSED BY CONTRIBUTORS ARE THEIR OWN AND NOT THE VIEW OF THE HILL

**262** SHARES

Just In...

**The folly of Cicilline's 'Glass-Steagall for Tech'**
OPINION — 18M 52S AGO

**Five things to watch in talks on massive defense bill**
DEFENSE — 30M 29S AGO

**Italy launching probe into Apple, Google, Dropbox over cloud storage**
TECHNOLOGY — 1H 4M AGO

**Trump pushes back on Atlantic article: 'Only an animal would say that'**
ADMINISTRATION — 1H 6M AGO

**COVID-19-induced 'sophomore medical student syndrome'**
OPINION — 1H 18M AGO

**Trump: DeJoy should be removed if it 'can be proven that he did something wrong'**
ADMINISTRATION — 1H 31M AGO

**Trump blasts Biden, Harris for 'anti-vaccine rhetoric'**
ADMINISTRATION — 1H 34M AGO

**Kamala Harris meets with Jacob Blake's family during visit to Wisconsin**
CAMPAIGN — 1H 42M AGO

VIEW ALL

View Latest Opinions >>



© Getty Images

The Bureau of Justice Statistics reports that at least 95 percent of all state prisoners will be released from prison at some point. However, convicted sex-offenders almost exclusively face the vengeful, additional punishment of registration under the Sex Offender Registry and Notification Act (SORNA).

Generally, under SORNA, an individual who is required to register as a sex offender must register at least once a year; report any change of address within as little as three days; produce vehicle information, a recent photograph and a DNA sample; and abide by stringent residency restrictions, which can force individuals out of urban areas, away from family and into unemployment.

SORNA violates our nation's founding documents by singling out a specific category of offenders for unfair, unconstitutional punishment. While the Department of Justice cites public safety as its rationale for continuing to enforce the overreaching requirements of SORNA, the program has metastasized, defacing some of our most treasured rights: the right to due process, the right to be free from double jeopardy and the right to avoid cruel and unusual punishment.

The right to due process can be found in the Fifth and 14th Amendments of our Constitution. Due process is commonly understood to include the presumption of innocence, the right to a fair trial and the right to counsel — ideas that ensure a defendant is treated as fairly as possible in our adversarial criminal justice system. It can be "gauged by its aim to safeguard both private and public rights against unfairness."

Despite what some courts have found, the current requirements of SORNA violate due process, specifically the tenet of presumption of innocence, or the idea that a person is innocent until proven guilty. Each state differs in how it implements SORNA, so an individual's length of registration varies by state. For example, all sex offenders in California and South Carolina register for life, regardless of the crimes committed. By demanding post-detention reporting for up to a lifetime, the court is presuming that an individual has the propensity to commit a certain type of crime in the future and therefore must be scrupulously supervised.

The Sex Offender Registry: Vengeful, unconstitutional and due f...                    https://thehill.com/opinion/criminal-justice/376668-the-sex-off...



**THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX**
**THE CONTENTS OF THIS SITE ARE ©2020 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.**

9/7/20, 2:25 PM

AR-00000589

8/8/23, 12:54 PM                                           Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

Comment

Alabama case: In Doe v. Marshall, describing the Alabama registration requirement as "the most comprehensive and debilitating sex-offender scheme in the nation," Judge Watkins concluded that because Alabama "denies that ASORCNA is designed to 'punish' offenders…once a person serves his full sentence, he enjoys the full protection of the Constitution."

After a bench trial, Senior District Judge Richard P. Matsch held that Colorado's Sex Offender Registration Act ("SORA") is unconstitutional as applied to the three plaintiffs. Specifically, he held that SORA:

.        constitutes punishment under the Eighth Amendment ("the effect of publication…is to expose the registrants to punishments inflicted…by their fellow citizens");

        is cruel and unusual ("Where the nature of such punishment is by its nature uncertain and unpredictable, the state cannot assure that it will ever be proportionate to the offense");

        violates substantive due process ("plaintiffs have shown that the punitive aspects of Colorado's sex offender registration scheme enter the 'zone of arbitrariness' that violates the due process guarantee of the Fourteenth Amendment"); and

        violates procedural due process as applied to one plaintiff (subjecting him to "Kafka-esque procedure[s]" when he petitioned to de-register).

The Bingham case had also raised potentially significant issues in challenging the defendant's registration obligation under the Due Process Clause. So too does a case currently pending before the Pennsylvania Supreme Court, Commonwealth v. Torsilieri, in which CCRC will also be filing as amicus. (In Commonwealth v. Muniz, Pennsylvania's registration requirement was held to be punishment, and its retroactive application barred on ex post facto grounds.) The day may be at hand when courts begin to raise questions about not only the retroactive—but also the prospective—application of such punitive collateral consequences.

Michigan cases: As the AG's amicus briefs point out, nine state high courts have invalidated registration requirements on the ground that they constitute punishment.

AR-00000590

Regulations.gov

In the second development, U.S. District Judge W. Keith Watkins of the Middle District of Alabama on Monday held that Alabama's sex offender registration law ("ASORCNA") violates the First Amendment by branding state-issued ID cards with "CRIMINAL SEX OFFENDER" and imposing extensive internet-use reporting requirements. Doe v. Marshall, No. 2:15-CV-606-WKW (M.D. Ala. Feb. 11, 2019). This case presents an interesting twist on the now-vulnerable theory espoused by the U.S. Supreme Court and many states that sex offender registration is not "punishment."

First, as noted by Douglas A. Berman at Sentencing Law and Policy, Michigan Attorney General Dana Nessel filed highly significant amicus briefs in two Michigan Supreme Court cases, "arguing that Michigan's sex offender registration and notification requirements are punishment because they are so burdensome and fail to distinguish between dangerous offenders and those who are not a threat to the community." Both of the Michigan cases involve constitutional challenges under the Ex Post Facto Clause to the retroactive application of the state registration requirement. Michigan v Snyder, No. 153696; People v. Betts, No. 148981.

| Attachments | 1 |

| 📄 | Sex offender registration litigation punishment and free speech |
| | ⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0188/attachment_1.pdf) |

**Comment ID**

DOJ-OAG-2020-0003-0188

◎ **Tracking Number**

ket-1j2e-nvi7

| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 7, 2020

AR-00000591



Your Voice in Federal Decision-Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000592

# COLLATERAL CONSEQUENCES RESOURCE CENTER

Collateral Consequences of Criminal Conviction and Restoration of Rights: News, Commentary, and Tools



---

**HOME**     **RESTORATION OF RIGHTS PROJECT**     **COLLATERAL CONSEQUENCES RESOURCES**     **COMMENTARY**     **ABOUT**



## Sex offender registration litigation: punishment and free speech

| February 15, 2019 | CCRC Staff

In the past week, there were two notable developments regarding the constitutionality of state sex offender registration schemes.

First, as noted by Douglas A. Berman at Sentencing Law and Policy, Michigan Attorney General Dana Nessel filed highly significant amicus briefs in two Michigan Supreme Court cases, "arguing that Michigan's sex offender registration and notification requirements are punishment because they are so burdensome and fail to distinguish between dangerous offenders and those who are not a threat to the community." Both of the Michigan cases involve constitutional challenges under the Ex Post Facto Clause to the retroactive application of the state registration requirement. *Michigan v Snyder*, No.



Search

**RESTORATION OF RIGHTS PROJECT (RRP)**

○ Loss & restoration of civil/firearms rights
○ Pardon policy & practice
○ Expungement, sealing & other record relief
○ Criminal record in employment & licensing

**RRP: STATE-BY-STATE GUIDES**

**RRP: 50-STATE**

AR-00000593

153696; *People v. Betts*, No. 148981.

In the second development, U.S. District Judge W. Keith Watkins of the Middle District of Alabama on Monday held that Alabama's sex offender registration law ("ASORCNA") violates the First Amendment by branding state-issued ID cards with "CRIMINAL SEX OFFENDER" and imposing extensive internet-use reporting requirements. *Doe v. Marshall*, No. 2:15-CV-606-WKW (M.D. Ala. Feb. 11, 2019). This case presents an interesting twist on the now-vulnerable theory espoused by the U.S. Supreme Court and many states that sex offender registration is not "punishment."

These two caselaw developments are discussed further below.

Michigan cases: As the AG's amicus briefs point out, nine state high courts have invalidated registration requirements on the ground that they constitute punishment. A case in the Illinois Supreme Court (in which CCRC filed an amicus brief) could have made it ten, but the court dismissed the appeal, finding a lack of jurisdiction to consider the defendant's constitutional challenge to his obligation to register on a direct appeal of his criminal conviction. *People v. Bingham*, 2018 IL 122008 (Ill. 2018).

The *Bingham* case had also raised potentially significant issues in challenging the defendant's registration obligation under the Due Process Clause. So too does a case currently pending before the Pennsylvania Supreme Court, *Commonwealth v. Torsilieri*, in which CCRC will also be filing as amicus. (In *Commonwealth v. Muniz*, Pennsylvania's registration requirement was held to be punishment, and its retroactive application barred on ex post facto grounds.) The day may be at hand when courts begin to raise questions about not only the retroactive—but also the prospective—application of such punitive collateral consequences. At that point, the U.S. Supreme Court will likely take another look at its 2003 rulings upholding the constitutionality of registration requirements in Alaska and

## COMPARISONS

- Civil & Firearms Rights
- Pardon Policy & Practice
- Expungement, Sealing & Other Record Relief
- Marijuana Legalization & Expungement
- Criminal Record in Employment & Licensing
- Relief from Sex Offender Registration
- Legislative report: 2019 reforms

## SUBSCRIBE TO BLOG

Join 2,778 other subscribers

Email Address

Subscribe

## CRIMINAL RECORD REFORMS IN 2019

## WHO MUST PAY TO REGAIN THE VOTE? A 50-STATE SURVEY


AR-00000594

Connecticut on the theory that the registration requirement at issue in those cases constituted regulation not punishment.

A 2017 decision from the District of Colorado provides an example of how courts may approach constitutional challenges to the prospective application of registration requirements, on the understanding that sex offender registration requirements are punishment. *See Millard et al., v. Rankin*, 265 F. Supp. 3d 1211 (D. Colo. 2017). After a bench trial, Senior District Judge Richard P. Matsch held that Colorado's Sex Offender Registration Act ("SORA") is unconstitutional as applied to the three plaintiffs. Specifically, he held that SORA:

- constitutes punishment under the Eighth Amendment ("the effect of publication…is to expose the registrants to punishments inflicted…by their fellow citizens");
- is cruel and unusual ("Where the nature of such punishment is by its nature uncertain and unpredictable, the state cannot assure that it will ever be proportionate to the offense");
- violates substantive due process ("plaintiffs have shown that the punitive aspects of Colorado's sex offender registration scheme enter the 'zone of arbitrariness' that violates the due process guarantee of the Fourteenth Amendment"); and
- violates procedural due process as applied to one plaintiff (subjecting him to "Kafka-esque procedure[s]" when he petitioned to de-register).

Judge Matsch's holding in *Millard* is currently on appeal in the Tenth Circuit, No. 17-1333.

Alabama case: In *Doe v. Marshall*, describing the Alabama registration requirement as "the most comprehensive and debilitating sex-offender scheme in the nation," Judge Watkins concluded that because Alabama "denies that ASORCNA is designed to 'punish' offenders…once a person





MODEL LAW ON NON-CONVICTION RECORDS



COLLATERAL CONSEQUENCES OF CRIMINAL CONVICTION: LAW, POLICY AND PRACTICE, 2018–19 ED.



TWITTER FEED

Tweets by @CCRC_Official

Collateral Consequences Resource Center Retweeted

**Collateral Consequer**
@CCRC_Official

A three-judge North Carolina panel ruled 2-1 that conditioning the vote on

Case 5:22-cv-00855-JGB-SP    Document 86-3    Filed 12/15/23    Page 596 of 1136    Page ID
#:1261
Sex offender registration litigation: punishment and free speech | | CCRC                         9/7/20, 3:30 PM

serves his full sentence, he enjoys the full protection of the Constitution." In other words, if registration requirements are not part of punishment, they must survive the searching scrutiny of First Amendment review. Conducting that review, Judge Watkins determined that branded identification cards are a content-based regulation of speech subject to strict scrutiny; and they do not survive that scrutiny as applied to plaintiffs because using "CRIMINAL SEX OFFENDER" in bold red letters on ID cards, as opposed to a single letter, is not the least restrictive means of allowing law enforcement to identify sex offenders.

Next, he concluded that extensive internet-use reporting requirements are facially overbroad so as to unduly chill a registered person's "ability and willingness to speak on the Internet," and thus are unconstitutional. However, he ruled against the plaintiffs on their Fourteenth Amendment claims, despite their making "several good legal arguments," finding that one claim failed on the merits, and that the plaintiffs lacked standing to pursue the rest.



👤 About the Author    ≔ Latest Posts

### CCRC Staff

Editorial staff of the Collateral Consequences Resource Center

[🐦 Twitter]  [f Facebook]   [≺ More]

| Michigan sex offender registration law held unconstitutional | CCRC files amicus brief in Illinois sex offender case | Michigan sex offender registration amendments held unconstitutional |
|---|---|---|
| On January 24, the Michigan Supreme Court held the state's sex offender | The CCRC has filed an amicus brief in the Illinois Supreme Court in support | A federal appeals court has concluded that Michigan's |
|  | October 25, 2017 |  |



conditioning the vote on payment of money, for people convicted of a felony, violates the state constitution's guarantee of equal protection and ban on property qualifications in voting
ccresourcecenter.org/2020/09/06/nc-…

**CCRC**
COLLATERAL CONSEQUENCES RESOURCE CENTER

NC court rules vote …
On September 4, a No…
ccresourcecenter.org

♡    ↗                    23h

[CCRC] **Collateral Conseq** 🐦
@CCRC_Official

The court held, in a 2-1 ruling, that the state may not withhold the vote from people whose only remaining aspect of their felony sentence–other than regular conditions of probation–is payment of a financial obligation.
ccresourcecenter.org/2020/09/06/nc-…

**CCRC**
COLLATERAL CONSEQUENCES RESOURCE CENTER

NC court rules vote …
On September 4, a No…
ccresourcecenter.org

♡    ↗                    23h

[CCRC] **Collateral Conseq** 🐦
@CCRC_Official

Meanwhile, the questions raised by Florida's "pay-to-vote" system remain under consideration by the federal court of appeals for the 11th Circuit.
ccresourcecenter.org/2020/09/06/nc-…

**CCRC**



January 31, 2018        August 26, 2016

| Caselaw | Due process | Eighth Amendment |
| Ex post facto | First Amendment |
| Sex Offender Registration |



**Collateral Conseq** @CCRC_Official

A three-judge North Carolina panel ruled 2-1 that conditioning the vote on payment of money, for people convicted of a felony, violates the state constitution's guarantee of equal protection and ban on property qualifications in voting ccresourcecenter.org/2020/09/06/nc-…

**NC court rules vote …**
On September 4, a No…
ccresourcecenter.org

23h

**Collateral** Consequences Resource Center Retweeted

**Alessandro Corda** @AleGCorda

Next Friday September 11, 10:30-11:45 am (ECT), @esc_eurocrim: Panel of the Working group on Collateral Consequences of Criminal Records (CCCR) on the Evolution of Criminal Record Policy in times of #COVID—19.  #eurocrim20 #CJreform #collateralconsequences

Sep 6, 2020

Sex offender registration litigation: punishment and free speech | | CCRC

9/7/20, 3:30 PM



Copyright © 2020 Collateral Consequences Resource Center

8/8/23, 12:57 PM                                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

Comment

The internet sex stings concerning the solicitation of a minor are unconstitutional and do nothing more than test the will of average law-abiding males with consensual sex. These stings do not protect anyone because teens do not typically search for adults to have sex with on adult sites. These stings are nothing more than entrapment and the courts do not see the damage nor the rights of all involved. These stings are done on adult websites where age verification is required. Law enforcement posing as minors who are posing as adults on adult websites trap innocent victims usings bait and switch techniques. The men that are arrested are not looking for minors while they are on adult sites. They get tricked after the conversations start and the implied interest (and expressed interest most of the time) in sex is being used against them as well as freedom of speech to talk them into "committing crimes". Many stop conversations and get arrested anyway, others don't believe and have no proof that a minor is involved. Fantasy role-play is all over the internet and you cannot always believe what and who you are talking to so many are curious to see who they really talking to that is so interested in sex. These stings are nothing more than a money scheme to get taxpayers money and waste it instead of using it for better investments. Visit Florida Scandal for proof and examples of the injustice that has been put on us. There you will see "real ads" used in real stings clearly advertising sex with a woman proving that these stings do not target child preditors. Police seem to think when a random person on the internet who is supposed to be an adult looking for sex arbitrarily mentions they are "underage", then the men are supposed to "run away" but are not inclined to and should not have to because of the first amendment and lack of criminal activity.

https://youtu.be/cDESWg1Io7s

| Comment ID |
| DOJ-OAG-2020-0003-0189 |

AR-00000599

Regulations.gov

 **Tracking Number**

ket-23t9-xytp

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 7, 2020



Your Voice in Federal Decision Making

About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000600

8/8/23, 2:33 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

I am not going to write a huge spiel about what the Registry does to the defendants and their families, I'm not even going to ask you to abolish the Registry what I am asking is the you take it away from the public domain and to just keep it exclusivity under the control of the police departments.

**Comment ID**

DOJ-OAG-2020-0003-0190

 **Tracking Number**

ket-477u-xynn

| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 7, 2020

AR-00000601

Regulations.gov



Your Voice in Federal Decision-Making

About (/about)     Bulk Data Download (/bulkdownload)     Agencies (/agencies)     Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)     FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000602

8/7/23, 12:38 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

| Comment |

a federal sex offenders act is not a great idea, they have been challenged in many states especially in michigan for being unconstitutional! the police do not even think its a great idea and it costs them a lot of money to maintain! there is a very low rate in which people put on it reoffend as well. just not a very good idea!

**Comment ID**

DOJ-OAG-2020-0003-0191

 **Tracking Number**

1k4-9iu0-4hko

| Comment Details | Submitter Info |

**Received Date**

Sep 7, 2020

AR-00000603

Regulations.gov



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000604

8/8/23, 10:53 AM                                    Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

Laws across the United States restrict where registrants can both reside and congregate, restrict participation in activities, restrict attendance at school functions for children or grandchildren, restrict travel both national and international, provide employment and licensure restrictions, provide designations on passports and driver's licenses, allow for mandatory minimum sentences, and use a public registry to identify many individuals for life. Such legislation merely serves to create a public that feels safer; these laws do not empirically decrease sexual violence. But does that matter to most Americans?

The American Journal of Public Health that outlines several longitudinal recidivism studies. The article is Sex Offender Laws and Prevention of Sexual Violence or Recidivism. Several of the highlighted statistics point to a 2.1% recidivism rate for a second sex crime over 16 years in New York state, and a 5.5% recidivism rate over 14 years in Ohio. While the article points out methodology issues in recidivism studies, it clearly notes that "most new sexually based crimes are committed by someone not on the registry."

Pedophiles do not comprise all registrants, so banning registrants from an increasing number of places that children gather makes no sense if someone is registered for any number of online or adult offenses. The registry doesn't empirically lower sex crime rates. Just because you know all about your neighbor's business does not keep you safer! Sex crime rates are lowered through treatment, education, outreach. And the recidivism rates are very low. It's unrealistic to make policy based on a small percentage. Offenders need to reintegrate into society with jobs, housing, etc. to help deter a future offense. Someone on this thread said, "Don't question victims based on the 5-ish percent of people that make false allegations." So why monitor, shame, and discard all registrants based on a low recidivism rate? Again, I am pro rational policies that actually, in real life, deter and help prevent sex crimes. The laws we have now do not!"

We live in a society that refers to those who have committed a sex offense as a sexual offender: as if that person is always an offender, as if that person is nothing more than an offender. If you played sports in college, are you forever an athlete? If you shoplifted as a teen, are you considered a thief as an adult? Does/should one bad act label someone for life? Part of understanding the stigma against registrants is

AR-00000605

understanding the power of language and labels in creating public fear which has translated to support of lifetime policies that are not empirically effective at reducing abuse of women and children. Often, it is an individual who committed one bad act, at one period during their life, and there is significant variance in seriousness across registrants. This does not dismiss the powerful and negative impact of a sexual offense on the victim and does not excuse multiple victim/predatory behavior! The purpose is simply to stop and think about the social and psychological impacts of a lifetime scarlet letter on registrant reintegration. The focus should instead be on awareness and prevention, which has been lost in reactionary measures.

Attachments  1

📄  Guilt by Association Labeling Research Based Policy Suggestions as Pro-Offender

⬇  Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0192/attachment_1.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0192

◎  **Tracking Number**

ket-f6bj-ic6v

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 7, 2020

AR-00000606

Regulations.gov

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000607

You have **2** free stories left this month. Sign up and get an extra one for free.

# Guilt by Association: Labeling Research-Based Policy Suggestions as "Pro-Offender"

 Lisa Anne Zilney
Sep 7 · 11 min read ★

In the current political climate, keyboard warriors are out in full force: tossing rude insults, stigmatizing and labeling individuals, and posting adversarial disagreements to almost every social media post that crosses my desk. I recently stumbled across a Facebook post that advocated letters and petition-signing in the hopes of banning those required to register for a sex offense from yet another venue in life. A little more Facebook digging and I found numerous pages dedicated to labeling both convicted individuals and those only suspected of sex crimes. These pages (which do not violate Facebook's Community Standards) are replete with hate, threats, and violence.



AR-00000608

The reactions I read on this Facebook thread were similar to those I hear from students at the start of a semester of my *Sex Crimes* course.What the public repeatedly fails to understand is that someone required to register for a sex offense could be an individual who urinated in public in a school zone, a 20-year-old who had sexual relations with his 15-year-old girlfriend whom he later married, an individual caught viewing online child pornography, or an individual who kidnapped and raped a child (to name only a few). In their impact, these acts are extremely varied, yet each is under the umbrella term *sex offender* and this individual would be required to register.

Laws across the United States restrict where registrants can both reside and congregate, restrict participation in activities, restrict attendance at school functions for children or grandchildren, restrict travel both national and international, provide employment and licensure restrictions, provide designations on passports and driver's licenses, allow for mandatory minimum sentences, and use a public registry to identify many individuals for life. Such legislation merely serves to create a public that *feels* safer; these laws do not empirically decrease sexual violence. But does that matter to most Americans?



The thread seeking to ban registrants from a sport venue was on a private Facebook group with 32,000 members. On average, a post on this page receives approximately 50–70 comments, with some posts receiving only a dozen comments. The thread in question continued to receive comments for well over a week, with a total of more than 1600 comments. The original poster elsewhere commented that: "It is NOT OKAY to mock or abuse people…It is NOT OKAY to be a bully…People need to start acting like civilized adults!" These suggestions apparently did not apply to this thread…

## Free-Flowing Hate & Misinformation

AR-00000609

The post advocated letters and petition-signing to the governing body of a sport, with the goal of banning all registrants from acting as a participant or spectator at sponsored events. After a week online, close to 2,400 people had signed the petition. (As an aside, this venue, often with children present and often in a public greenspace, would likely be restricted by existing laws that target a registrant's movements.) It came to the attention of the original poster that a male registrant involved in this sport was paroled after serving 12-years of a 14-year prison sentence. The registrant pled guilty when he was in his early 30s to 4 counts, including indecency with a child and sexual conduct with a person under the age of 16. The individual was seen participating in an event (apparently permitted by the conditions of his parole as employment). There were indeed minors present and his presence offended majority of individuals on the thread.

While some individuals suggested a professional avenue for addressing this concern rather than Facebook, most posters felt free to direct nasty remarks at both registrants and anyone who suggested anything but the harshest treatment of registrants. Comments about registrants illustrated the media-perpetuated view of sex offenses rather than empirical findings. Some individuals expressed outrage: "Convicted pedophiles need to be banned…period"; "If your behavior is sufficiently deviant to get you on the list, out you should go!"; "It's time to start naming names!"; "Pedos should be banned for life from ANY venue where children even MIGHT happen to be." Some of the comments were too vulgar to repeat but involved suggestions of dismemberment, castration, and death.

**MYTH 1:**

Some individuals expressed variations of myths likely learned from the media: "Pedophiles cannot be rehabilitated which is why they are required to register for the rest of their lives" or "Pedophiles are incapable of reform according to studies. He will continue to prey on young girls." One person commented: "You don't cure pedophiles. That is why the registries exist…." And someone was quick to respond: "You do. With a bullet." Another suggested: "Sex offenders cannot be rehabilitated. This is not my personal opinion it is fact. Guaranteed this little (expletive) WILL do this again and again and again, just give it time…There is no cure!"

**FACT:**

In response to these incorrect assertions, I linked a couple of easy-to-read articles that demonstrate empirical evidence that treatment can reduce the risk of recidivism and advance public safety. One link was to The Effectiveness of Treatment for Sexual Offenders the other to the New Hope for Sex Offender Treatment page. There were no comments to these links.

But posters were not only hateful to registrants, but also toward anyone who suggested anything other than barbaric criminal justice responses. These individuals were viewed as "defenders of child predators and not interested in children's safety," "disgusting,"

AR-00000610

"sex offender apologists," and there were implications that they were themselves sexual offenders.



One individual posted a well-thought out response: "I do not support pedophiles in any way, shape or form but I find this whole thread disturbing. This is not a movement to make anything safer. If it was no names would have been named…Instead it is a direct attack on someone that has already served his time. It has publicly named his relatives. Causing them to have to live through this again. Causing the victim to live through it again. Why? What personal gain are any of you getting from this? It sure isn't going to change anything. It only serves to bring out the villagers with their pitchforks. There

AR-00000611

have been calls to kill him. There are dozens of (armchair) psychologists that assure us all that this behavior WILL continue. No room for debate. Just further crucifying a man that has served his time. And just as horrific is the way anyone that doesn't join in on this vendetta is being treated. Anyone that has dared to disagree has been called horrible names and has had the wrath of the crowd directed at them. I don't think this was the original poster's intent but that has been the result. This "peaceful protest" is a full blown riot….This "riot" does nothing to ensure safety of children…It's the "unknown sex offender," family relative or inner circle member that is the danger. Learn about victim grooming, and about secretive behavior….lists don't keep you safe. Who's next on the list?"

Some of the replies were quite personal: "You are seriously coming off as a pedophile and I wouldn't trust children around you"; "I think I just threw up a little in my mouth reading…your…repeated arguments in defense of pedo participation"; "There are some sex offender apologists in these comments, and it is disgusting. There is no amount of prison or punishment that can negate the fact that they did what they did"; "What is your agenda defending pedos, I'm going to have to go check that registry again….maybe the FBI should check your hard drive. People that defend pedos don't belong anywhere"; "When it comes to pedophile supporters, those people shouldn't even exist….and some opinions are wrong and (expletive) up. You having an opinion doesn't mean it has the same value as mine…Not every "opinion" belongs in polite society"; and "Loving that this post is bringing out the pedophile supporters, gives us names to stay away from…It's terrifying, my unfriend button is ready LOL."

**MYTH 2:**

Many of the posters suggested they were informed about the recidivism rates of registrants: "You are part of the problem. Are you aware that sexual predators have a 90% reoffend rate? That is a 90% KNOWN reoffend rate. That actual data is skewed since most sexual assaults go unreported. It is, more than likely, closer to 99%."

**FACT:**

Wanting to correct this piece of misinformation, I linked an article published in the *American Journal of Public Health* that outlines several longitudinal recidivism studies. The article is Sex Offender Laws and Prevention of Sexual Violence or Recidivism. Several of the highlighted statistics point to a 2.1% recidivism rate for a second sex crime over 16 years in New York state, and a 5.5% recidivism rate over 14 years in Ohio. While the article points out methodology issues in recidivism studies, it clearly notes that "most new sexually based crimes are committed by someone not on the registry."

Some posters suggested a background check for all exhibiting or attending members at this venue's events, and another suggested a "list that holds enablers accountable," referring to anyone not advocating for draconian, lifetime punishment. A more rational suggestion was that the government body in question begin to utilize SafeSport. The

AR-00000612

US Center for SafeSport has the "authority to respond to reports of sexual misconduct within the U.S. Olympic & Paralympic Movement" as per the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017. The legislation permits the Center to serve as an independent organization with jurisdiction over cases of abuse (emotional, physical, and sexual), bullying, and harassment of amateur athletes. While SafeSport is not an option here because the sport is not under the guise of the U.S. Olympic & Paralympic Movement, even this suggestion couldn't be agreed upon. Some suggested that: "SafeSport has wreaked havoc. People are accused and tried by the Committee without any way to defend themselves…and with little evidence. Lives can (and have) been ruined." While others expressed that "SafeSport is an absolute joke. They are overwhelmed, underfunded, and don't do their job 90% of the time."

## Inserting Evidence

As the American criminal justice system continues to strengthen laws against individuals who have committed a sexual offense, it is important to understand how attitudes toward controversial criminological topics can be altered based on scientific understanding rather than a media frenzy. In an unsuccessful attempt to share some of the evidence I have learned from 15-years researching sex offenses, I shared this post:

"I have not read 1500+ comments, and I don't intend to (though the message of brand the offender, and/or kill and dismember him is clear). I study registrants and have for 15 years. Here are some factors of interest. It is never the victim's fault and there should be no victim shaming, anytime, anywhere! The recidivism rate is very low — less than 5%. Someone who is on lifetime registration (as most registrants are) is monitored by law enforcement for life. They are usually not permitted to go to parks or where children gather. All registered offenders are not child offenders! There are many other reasons a person in put on the registry (statutory offenses, viewing illicit material, etc). Treatment is mandatory for those with a sex offense conviction and it works to achieve deterrence in the overwhelming number of offenders. Registrants have extreme difficulty finding work, housing etc., and this extends to their family. Labeling offenders and publicly displaying their information does NOT reduce recidivism. You may feel safer, but you are not. And the impact on the offender and his family is severe. Imagine the impact on a child of a registrant when his/her father's name is plastered everywhere and people comment about killing him? Just because you *think* you have the right to know everyone's business, doesn't mean you do! Lists and public shaming do not reduce sexual violence (this is demonstrated by ALL the research in this area!). Education and outreach reduces sexual violence! Programs that teach good touch/bad touch, grooming techniques, and the importance of telling someone. These facts don't make me pro-offender and/or anti-victim. Researchers reveal what works and what doesn't. Stop the fear-mongering and hysteria!"

And then the backlash of comments began: "If you care more about protecting the offender, rather than making others aware that this person is out on parole, YOU are part of the problem." Another wrote: "Well go buy your buddy a beer then. Can't stand

AR-00000613

a woman who doesn't stand by other women. How does he get away with it? Because people like you come to his rescue time and again. Stop it!" And: "You aren't helping yourself. Your defense is textbook what people say who defend predators. You're really a pathetic human to come on here to defend a sexual predator."

One person requested I link resources to back up my "opinions," so I provided several, including repetition of the information on treatment effectiveness. I linked an article entitled Sex Offender Registries: Common Sense or Nonsense? from *Criminal Legal News* and a government report entitled Sex Offender Laws and Prevention of Sexual Violence or Recidivism. Despite these articles and government statistics, I was still bombard with public posts and personal messages about the use of "my" fake statistics! In frustration, I replied again:

"There is so much misinformation in this thread, I literally don't even know where to start. Pedophiles do not comprise all registrants, so banning registrants from an increasing number of places that children gather makes no sense if someone is registered for any number of online or adult offenses. The registry doesn't empirically lower sex crime rates. Just because you know all about your neighbor's business does not keep you safer! Sex crime rates are lowered through treatment, education, outreach. And the recidivism rates are very low. It's unrealistic to make policy based on a small percentage. Offenders need to reintegrate into society with jobs, housing, etc. to help deter a future offense. Someone on this thread said, "Don't question victims based on the 5-ish percent of people that make false allegations." So why monitor, shame, and discard all registrants based on a low recidivism rate? Again, I am pro rational policies that actually, in real life, deter and help prevent sex crimes. The laws we have now do not!"

The replies were more of the same hate-spewing, knee-jerk reactions fueled by misinformation. But the interesting part was that people didn't want to read the research, they just emotionally reacted. A couple of days after my posts on this thread, someone advised the group that pictures and accusations were being posted on Facebook referring to a completely innocent bystander as the "predator in question." The poster stated: "It is NOT THE SAME PERSON and a post like that could conceivably ruin a person's career and even his life. This is the problem with vigilantism. Suppose the police had been called or some people decided to take matters into their own hands? BE CAREFUL WHAT YOU SAY AND POST. A good man is now forced to turn his life upside down." There were zero responses to this revelation…

We live in a society that refers to those who have committed a sex offense as a *sexual offender*: as if that person is always an offender, as if that person is nothing more than an offender. If you played sports in college, are you forever an athlete? If you shoplifted as a teen, are you considered a thief as an adult? Does/should one bad act label someone for life? Part of understanding the stigma against registrants is understanding the power of language and labels in creating public fear which has translated to support of lifetime policies that are not empirically effective at reducing abuse of women and

AR-00000614

children. Often, it is an individual who committed one bad act, at one period during their life, and there is significant variance in seriousness across registrants. This does not dismiss the powerful and negative impact of a sexual offense on the victim and does not excuse multiple victim/predatory behavior! The purpose is simply to stop and think about the social and psychological impacts of a lifetime scarlet letter on registrant reintegration. The focus should instead be on awareness and prevention, which has been lost in reactionary measures.

Sex Offense Laws      Sex Offender      Sex Offender Registry      Education

About   Help   Legal

Get the Medium app

 

AR-00000615

8/8/23, 12:59 PM                                                         Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020



| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

I find these rules particularly onerous b/c our own government is involved in helping make it more dangerous for us to travel abroad
I do not believe our government should ever be involved in working against its own citizens safety under the assumption of inherent criminality.

This is minority report politics and erodes or erases most of the benefits of citizenship
In conclusion, our laws should make it EASY for people to be law abiding citizens...they should be easy to understand and comply with.

We have created an impenetrable thicket of laws, state, federal, and local (different prosecutors and sheriffs enforce the regs differently)
Most of these laws were created in the middle of a sex panic, have NO evidentiary basis, and become increasingly hard to comply with on an annual basis.

They will stand as a testament to the dangers of passing laws during panics and are enforced daily

| Attachments  1 |

| 📄  Thread Reader App |
| ⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0193/attachment_1.pdf) |

AR-00000616

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0193

 **Tracking Number**

ket-fihr-jkql

Comment Details                                    Submitter Info

**Received Date**

Sep 8, 2020



About   Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000617

9/7/2020                                    Thread by @JoshuaBHoe on Thread Reader App – Thread Reader App



**Joshua B. Hoe**
Follow @JoshuaBHoe   8,895 followers

6 Sep, 18 tweets, 5 min read

Bookmark | Save as PDF | + My Authors

## Thread:

Attorney General Barr released a 24 page memo about new suggested Federal regulations regarding compliance with federal SORNA aka sex offender registration.

I would like to use it to explain how insane, regardless of what you think of registries, these requirements are

1. Most sex crimes occur in states, most people are sentenced for sex offenses in states. People convicted are responsible for a LONG list of state requirements...In addition, even though there is no federal registry, we are theoretically responsible for federal compliance too

In other words, if someone is sentenced in a state and gets off the registry in that state for a crime committed in that state, they might still be responsible for registration FEDERALLY

This is from the AG memo

Follow Us on Twitter!                                                    Tweet | Share

https://threadreaderapp.com/thread/1302647620410773513.html?fbclid=IwAR3SiFK_O3xTr5SNJJZ0LlouHZLW_yhc1z63FrMLr9tROVrbp05JVn9ncAQ        1/6

https://www.federalregister.gov/documents/2020/08/13/2020-15804/registration-requirements-under-the-sex-offender-registration-and-notification-act

**The same principle applies in situations in which a jurisdiction's law does not track or incorporate a particular SORNA requirement affecting a sex offender**. Consider a situation of this nature in which SORNA requires a sex offender to register but the law of the state in which he resides does not. **This may occur, for example, because state law does not require registration based on the particular sex offense for which the offender was convicted, or because state law requires registration by sex offenders for shorter periods of time than SORNA, or because state law does not apply its registration requirements "retroactively" as broadly as** § 72.3 applies **SORNA's requirements** to sex offenders with pre-SORNA convictions. **Notwithstanding the absence of a parallel state law, the registration authorities in the state may be willing to register the sex offender because Federal law** (i.e., SORNA) **requires him to register**. Cf. Doe v. Keathley, 290 SW3d 719 (Mo. 2009) (state constitutional prohibition of retrospective laws does not preclude registration based on SORNA). **If the state registration authorities are willing to register the sex offender, he is not relieved of the duty to register merely because state law does not track the Federal law registration requirement**. Hence, sex offenders can be held liable for violating any requirement stated in this rule, regardless of when they were convicted, and regardless of whether the jurisdiction in which the violation occurs has adopted the requirement in its own law.

In fact, what AG Barr seems to be suggesting is that states - outside of legislative action - choose to notify and enforce federal SORNA even when the state laws do not codify the SORNA requirements

https://www.federalregister.gov/documents/2020/08/13/2020-15804/registration-requirements-under-the-sex-offender-registration-and-notification-act

For example, as noted above, **a jurisdiction with laws that do not require registration based on the particular offense for which a sex offender was convicted may nevertheless be willing to register him in light of his Federal law (SORNA) registration obligation**. But alternatively, the jurisdiction's law or practice may constrain its registration personnel to register only sex offenders whom its own laws require to register. In such a case, it is impossible for the sex offender to register in that jurisdiction, though subject to a registration duty under SORNA.

In fact, imagine someone legally graduated from the state registry and had no legal obligation to register...if years later, the state decides to adopt or notify registrants of a change to complying with SORNA...I am pretty sure that person would have to register again

https://www.federalregister.gov/documents/2020/08/13/2020-15804/registration-requirements-under-the-sex-offender-registration-and-notification-act

For example, consider the case posed above of a jurisdiction that refuses to register sex offenders based on a particular offense for which SORNA requires registration so that a sex offender residing in the jurisdiction who was convicted of that offense cannot register there. **Suppose that the jurisdiction later progresses in its implementation of SORNA and becomes willing to register offenders who have been convicted for that sex offense. In light of the proviso, the sex offender's obligation to register revives once the jurisdiction becomes willing to register him. That is fair, because the circumstance preventing his compliance with the SORNA registration requirement no longer exists.**

This is not theoretical, when I was sentenced I was sentenced on a 20 year registry...after passage of the AWA I was graduated to LIFETIME....in my state that has been found unconstitutional, but now, as a result of a case called Willman and this guidance, I could be lifetime

🐦 Follow Us on Twitter!

🐦 Tweet      f Share

AR-00000619

> Section 72.5 sets out SORNA's requirements regarding the duration of registration. SORNA classifies sex offenders into three "tiers," based on the nature and seriousness of their sex offenses and their histories of recidivism. See 34 U.S.C. 20911(2)-(4); 73 FR at 38052-54. **The tier in which a sex offender falls affects how long the offender must continue to register under SORNA. The required registration periods are generally 15 years for a tier I sex offender, 25 years for a tier II sex offender, and life for a tier III sex offender. See 34 U.S.C. 20915(a); 73 FR at 38068. Paragraph (a) in § 72.5 reproduces these requirements.**

there is NO EVIDENCE suggesting 10 years, 25 years, or lifetime registration is appropriate for protecting public safety...quite the opposite, there is no evidence registries work, NONE, ZERO, and hundreds if not thousands of long-term studies suggesting they = counterproductive

2. Confusion is rampant, a registrant is LEGALLY responsible for understanding state registration law, other states registration laws (if you visit), and federal registration laws

Here is an example of how complicated that is, even for a US AG to explain

> https://www.federalregister.gov/documents/2020/08/13/2020-15804/registration-requirements-under-the-sex-offender-registration-and-notification-act
>
> For example, **suppose that a sex offender resides in state A and commutes to work in state B. Pursuant to** 34 U.S.C. 20913**(a), the sex offender must register in both states—in state A as his residence state, and in state B as his employment state. Suppose that the sex offender changes his place of residence in state A and continues to work at the same place in state B. Logically, the sex offender should carry out his in-person appearance in state A to report his change of residence in state A, rather than in state B, where his contact with the latter state (employment) has not changed. Conversely, varying the example, suppose that the sex offender changes his place of employment from one employer to another in state B, but continues to reside in the same place in state A. The sex offender should carry out his in-person appearance in state B to report his change of employment in state B, rather than in state A, where his contact with the latter state (residence) has not changed.**

The costs of non-compliance are high, at the state level "failure to register" can be a mandatory four year felony...and now, according to this, in addition, the federal government could also charge you with an up to ten year felony (for compliance with a dense thicket of laws)

> https://www.federalregister.gov/documents/2020/08/13/2020-15804/registration-requirements-under-the-sex-offender-registration-and-notification-act
>
> **Section 72.8(a)**(1)(i) in the rule refers to potential criminal liability under 18 U.S.C. 2250(a). Section 2250(a) **authorizes imprisonment for up to 10 years based on a knowing failure to register or update a registration as required by SORNA**.

And let me take this opportunity to also mention that there is NO evidence "failure to register" violations are connected to new crimes....and a large body of research that suggests that "failure to register" violations have nothing to do with new sex crimes (can post if asked)

But over 900,000 people in the United States are responsible for understanding this incredibly complex set of requirements with hundreds of permutations and incredible consequences.

A set of regulations so complicated the AG took 24 pages just to explain this months regulations

3. Our legislators gave MASSIVE discretion to the Attorney General over the lives of people on the registry. It is

🐦 Follow Us on Twitter!

🐦 Tweet    f Share

AR-00000620

Thread by @JoshuaHoe on Thread Reader App – Thread Reader App

Example A

> https://www.federalregister.gov/documents/2020/08/13/2020-15804/registration-requirements-under-the-sex-offender-registration-and-notification-act
>
> Paragraph (e) requires sex offenders to report to their residence jurisdictions within three business days changes in remote communication identifier information, temporary lodging information, and vehicle information. **In terms of legal authority, as discussed earlier, these requirements are supportable on the basis of the Attorney General's authority to interpret and implement SORNA's requirement to keep the registration current, the Attorney General's authority to expand the information that sex offenders must provide to registration jurisdictions, and the Attorney General's authority to prescribe the time and manner for providing and updating registration information.**

Example B

> https://www.federalregister.gov/documents/2020/08/13/2020-15804/registration-requirements-under-the-sex-offender-registration-and-notification-act
>
> **SORNA directs sex offenders to provide for inclusion in the sex offender registry several expressly described types of registration information and, in addition, "[a]ny other information required by the Attorney General.**" Id. 20914(a)(8). The section 20914(a)(8) authority underlies the specification of required types of registration information

4. Part of the new requirements being proposed here include very intrusive new mandates about providing information for international travel.

I find these rules particularly onerous b/c our own government is involved in helping make it more dangerous for us to travel abroad

I do not believe our government should ever be involved in working against its own citizens safety under the assumption of inherent criminality.

This is minority report politics and erodes or erases most of the benefits of citizenship

In conclusion, our laws should make it EASY for people to be law abiding citizens...they should be easy to understand and comply with.

We have created an impenetrable thicket of laws, state, federal, and local (different prosecutors and sheriffs enforce the regs differently)

Most of these laws were created in the middle of a sex panic, have NO evidentiary basis, and become increasingly hard to comply with on an annual basis.

They will stand as a testament to the dangers of passing laws during panics and are enforced daily

FIN

• • •

Missing some Tweet in this thread? You can try to force a refresh



🐦 Follow Us on Twitter!

AR-00000621

9/7/2020
Thread by @JoshuaBHoe on Thread Reader App – Thread Reader App

⚡ **Keep Current with Joshua B. Hoe**



Stay in touch and get notified when new unrolls are available from this author!

+ Add to "My Authors"    ⚆ Read all threads

🚫 **This Thread may be Removed Anytime!**



Twitter may remove this content at anytime! Save it as PDF for later use!

💾 Save this thread as PDF

## Try unrolling a thread yourself!



1. Follow @ThreadReaderApp to mention us!

2. From a Twitter thread mention us with a keyword "unroll"

@threadreaderapp unroll

Practice here first or read more on our help page!

## More from @JoshuaBHoe


**Joshua B. Hoe**
@JoshuaBHoe
                                          31 Aug

Bail reform: * Did not increase crime or recidivism in New Jersey * Did not increase crime or recidivism in DC * Did not increase crime or recidivism in Cali EVEN the NYPD stats corroborate bail reform did not increase crime or recidivism in NYC Can link the studies, easily

1) The idea that ONLY people with money have the right to be presumed innocent is OFFENSIVE and it is what EVERY single one of you is doing when you repeat this idiotic bail talking point about @KamalaHarris Bail funds simply

Read 6 tweets


**Joshua B. Hoe**
@JoshuaBHoe
                                          22 Aug

Tennessee is making a run for worst state in the nation...A few weeks ago they passed a law allowing incarceration for participating in peaceful protests at the capital and now they are threatening to revoke voting rights for people arrested for protesting

How many ways do we have to learn that ANY law you pass to persecute your political opponents will also be USED AGAINST you when power shifts. In addition, protest and assembly are CONSTITUTIONAL RIGHTS for a

Read 4 tweets


**Joshua B. Hoe**
@JoshuaBHoe
                                          16 Jul

Dear @washingtonpost This headline is AWFUL and you should be ashamed of yourself for using it The Supreme Court dealt a blow to PEOPLE with felony convictions...NOT FELONS When is the press going to stop reducing people to ONLY their worst moments in bold print


**Joshua B. Hoe**
@JoshuaBHoe
                                          4 Jul

Let's be honest, what we are really talking about is which version of history dominates: The sanitized "America is awesome in all ways" version which we all know isn't true Or the truth It is time for us to start living up to our ideals instead of pretending we already do

🐦 Follow Us on Twitter!

🐦 Tweet    f Share

9/7/2020                                    Thread by @JoshuaBHoe on Thread Reader App – Thread Reader App

so committed to dehumanization?

Here is an article filled with a lot of reasons why you

Read 20 tweets

Jefferson did write many founding documents, but he ALSO OWNED SLAVES and was unrepentant about it and cruel

Read 4 tweets

 **Joshua B. Hoe**
@JoshuaBHoe
*20 Jun*

A lot of what we are talking about these last few weeks is a failure of imagination We seem willing, as a society, to endlessly double down on 'security theater' despite a lot of evidence over long periods of time suggesting our "security solutions" are counterproductive

By the way, there is no lazier take in the history of Twitter, than showing a picture of some looming threat and challenging social workers to take care of it The assumption being that not having police - as they exist now - includes not

Read 6 tweets

 **Joshua B. Hoe**
@JoshuaBHoe
*16 Apr*

Stop the false narratives media There was recidivism before #Covid_19 There is recidivism AFTER releases You have to compare recidivism rates BEFORE releases with recidivism rates AFTER releases Anecdotes make for TERRIBLE public policy and don't make us safer #LetMIPeopleGO

Think about it like this.... If the recidivism rate is high at certain times and lower at others you try to establish a baseline...then when changes happen, you evaluate the changes OVER TIME against that baseline

Read 5 tweets

---



## Did Thread Reader help you today?

Support us! We are indie developers!

---

This site is made by just two indie developers on a laptop doing marketing, support and development! Read more about the story.

**Become a Premium Member** ($3/month or $30/year) and get exclusive features!

🎁 Become Premium

Too expensive? **Make a small donation** by buying us coffee ($5) or help with server cost ($10)

✉ Donate via Paypal    ⬤ Become our Patreon

💖 💖 Thank you for your support! 💖 💖

✉  🐦                                         Help | About | TOS | Privacy | Covid19 Threads

🐦 Follow Us on Twitter!                                    🐦 Tweet    f Share

AR-00000623

8/8/23, 11:52 AM

Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

Comment

Just so people are aware. Anyone listed as a tier 1 or tier 2 that moves to another state can have there registration period changed to lifetime. It is done specifically by Florida. They have stated that in order to be removed from there registry you would have to have the court you were convicted in send them a letter stating you no longer have to register. And even then, they would still have to decide whether or not to allow the offender to come off their registry. They also have an inflated registry as those who move out of their state are kept on Florida's registry for life, labelled as an out of state offender, which out of state address listed.

Because of this, any other state that has a clause that one must register if required to register in another state, must maintain there registry status there as well. Even if a person is say convicted on Attempt CSC4th (misdemeanor) in Michigan in 1998, is required to register for 25 years, but moves to Florida - must now register for life, moves to Georgia (doesn't require misdemeanors to register) must still register due to requirement in Florida (not conviction) for life.

All registries are punitive. They are used in a criminal background check. They are used to deny employment for life. Changes made to them are made into retroactive enforcement even stated in your own document.

Vigilantes on facebook are also now sharing screenshots of the registry. Sharing full addresses of homes and employers, including half-way houses. They are proactively targeting them and contacting their employers in an effort to get them fired. Simply read the comments. And Facebook is actually allowing and protecting this activity.
https://www.facebook.com/emoffenders/

AR-00000624

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0194

 **Tracking Number**

1k4-9iu9-4i4p

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 8, 2020



About   Bulk Data Download   Agencies   Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000625

8/8/23, 12:53 PM                                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
| --- | --- |

---

| Comment |
| --- |

Good Day,

As a US Citizen, I Strongly Oppose such laws which absolutely Re-Punish people who have already been punished by serving their sentences.

As a 'Free Country' we must stop treating people with sex offenses as 2nd-class citizens who are below every other human in this country, including violent domestic abusers, criminal gang members and all other who have a truly High And Frightening re-offense rate which pose a Real public dangers to all of us.

There are simply No Facts to back-up the requirement of such sex offense registration laws. In the face of science, the Sex Offender Registry falls apart. It began as a 'good idea' in response to a violent murder decades ago, and now encapsulates close to 900,000 Americans, placing them into a system of oppression via a 'Shaming List' that stifles their travels, freedoms of movement, work and business opportunities, as well as prevents them from moving forward with their lives as law-abiding citizens as there is a constant threat of the harshest Felony punishments for failure to keep their registration in the 'civil-purpose' list updated. There is no full Felony with this. It is a form of enslavement despite that not being 'the original intention'. That is what the registry has become.

Please see attached Factual Information that proves that there is no justification for the Registry let alone SORNA, a borderline-unconditional and absolutely Un-American law.

Thank you for your time. I and 900,000 Americans greatly appreciate it.

AR-00000626

Attachments    1

📄 Document (3)

⬇ Download ⌄

**Comment ID**
DOJ-OAG-2020-0003-0195

◎ **Tracking Number**
ket-tt8d-f7kd

**Comment Details**                                          **Submitter Info**

**Received Date**
Sep 8, 2020

About      Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000627

8/8/23, 12:53 PM                                                    Regulations.gov

AR-00000628

According to the NCMEC map there are over 859,500 men, women and children (as young as 6, 8 and 10 in some states) required to register and the "crimes" range from urinating in public (indecent exposure), sexting, incest, mooning, exposure, false accusations by a soon-to-be ex-wife, angry girlfriend, or spiteful student, viewing abusive OR suggestive images of anyone 18 years old or younger, playing doctor, prostitution, solicitation, Romeo and Juliet consensual sexual dating relationships, rape, endangering the welfare of a child, the old bate-n-switch internet stings (taking sometimes 12 months before a person steps over the line) young guys on the autism spectrum or with intellectual disabilities and many others.

If you multiply the number on the registry by 2 or 3 family members you can clearly see there are well over 2 million wives, children, moms, aunts, girlfriends, grandmothers and other family members who experience the collateral damage of being murdered, harassed, threatened, children beaten, have signs placed in their yards, homes set on fire, vehicles damaged, asked to leave their churches and other organizations, children passed over for educational opportunities, have flyers distributed around their neighborhood, wives lose their jobs when someone learns they are married to a registrant....all these things occur when these people try to hold their family together and provide the three things that professionals state are needed for successful re-integration; a job, a place to live and a good support system. Residency restrictions, ranging from 500 ft to 2,500 ft are ludicrous and not supported by the Association for Treatment of Sexual Abusers (ATSA).

A study reviewing sex crimes as reported to police revealed that:

a) 93% of child sexual abuse victims knew their abuser;

b) 34.2% were family members;

c) 58.7% were acquaintances;

d) **Only 7% of the perpetrators of child victims were strangers**;

e) 40% of sexual assaults take place in the victims own home;

f) 20% take place in the home of a friend, neighbor or relative (Jill Levenson, PhD, Lynn University)

The public needs to decide if they want to continue to focus on those who, for the most part, are one time offenders or if they see a greater need to fund programs like "Stop It Now" that teaches about grooming behaviors and other things in their Circles of Safety.

Women Against Registry ~ Fighting the Destruction of Families

Further facts:

https://youtu.be/GBoy2FB27yg

Here are some facts from the leading authorities on this subject which indicate that there is no need or justification for these laws.

California Sex Offender Management Board (CASOMB) End of Year Report 2014. (page 13)

Under the current system many local registering agencies are challenged just keeping up with registration paperwork. It takes an hour or more to process each registrant, the majority of whom are low risk offenders. As a result law enforcement cannot monitor higher risk offenders more intensively in the community due to the sheer numbers on the registry. Some of the consequences of lengthy and unnecessary registration requirements actually destabilize the lives of registrants and those -such as families- whose lives are often substantially impacted. Such consequences are thought to raise levels of known risk factors while providing no discernible benefit in terms of community safety.

The full report is available online at. http://www.casomb.org/index.cfm?pid=231

National Institute of Justice (NIJ) US Department of Justice Office of Justice Programs United States of America.

The overall conclusion is that Megan's law has had no demonstrated effect on sexual offenses in New Jersey, calling into question the justification for start-up and operational costs. Megan's Law has had no effect on time to first rearrest for known sex offenders and has not reduced sexual reoffending. Neither has it had an impact on the type of sexual reoffense or first-time sexual offense. The study also found that the law had not reduced the number of victims of sexual offenses.

The full report is available online at. https://www.ncjrs.gov/app/publications/abstract.aspx? ID=247350

The University of Chicago Press for The Booth School of Business of the University of Chicago and The University of Chicago Law School Article DOI: 10.1086/658483

Conclusion. The data in these three data sets do not strongly support the effectiveness of sex offender registries. The national panel data do not show a significant decrease in the rate of rape or the arrest rate for sexual abuse after implementation of a registry via the Internet. The BJS data that tracked individual sex offenders after their release in 1994 did not show that registration had a significantly negative effect on recidivism. And the D.C. crime data do not show that knowing the location of sex offenders by census block can help protect the locations of sexual abuse. This pattern of non-effectiveness across the data sets does not support the conclusion that sex offender registries are successful in meeting their objectives of increasing public safety and lowering recidivism rates.

The full report is available online at. http://www.jstor.org/stable/full/10.1086/658483

These are not isolated conclusions but are the same outcomes in the majority of conclusions and reports on this subject from multiple government agencies and throughout the academic community.

People, including the media and other organizations should not rely on and reiterate the statements and opinions of the legislators or other people as to the need for these laws because of the high recidivism rates and the high risk offenders pose to the public which simply is not true and is pure hyperbole and fiction. They should rely on facts and data collected and submitted in reports from the leading authorities and credible experts in the fields such as the following.

California Sex Offender Management Board (CASOMB)

Sex offender recidivism rate for a new sex offense is 0.8% (page 30)

The full report is available online at http://www.cdcr.ca.gov/Adult_Research_Branch/Research_Documents/2014_Outcome_Evaluation_Report_7-6-2015.pdf

Document Title: Indiana's Recidivism Rates Decline for Third Consecutive Year BY: Indiana Department of Correction 2009.

The recidivism rate for sex offenders returning on a new sex offense was 1.05%, one of the lowest in the nation. In a time when sex offenders continue to face additional post-release requirements that often result in their return to prison for violating technical rules such as registration and residency restrictions, the instances of sex offenders returning to prison due to the commitment of a new sex crime is extremely low. Findings: sex offenders returning on a new sex offense was 1.05%

Link to Report: http://www.in.gov/idoc/files/RecidivismRelease.pdf

CA 00.8% The California Department of Corrections and Rehabilitation (CDCR) "2014 Outcome Evaluation Report" http://californiarsol.org/2015/08/new-cdcr-report-reduces-rate-of-re-offense-to-less-than-1-percent.

CA figure 11 01.9% California sex offender management Board 2012 in looking at this one I realize that this is another attempt to increase the visual concept of a higher reoffend rate than actually exists you will note in table 11 , that there are 8490 released sex offenders and that 5870 are returned to prison or 69.1% going onto figure 11. The pie chart does not represent the 8490 but rather represents the 5870. When you take this into account and do the math. 1.9% of 5870 comes out to 111 and 111 people involved in the new sex crime, out of 8490 comes out to an actual reoffend rate of 1.3%. This is just another way that the government is using razzle-dazzle techniques. In doing their statistical analysis.

https://onedrive.live.com/view.aspx?resid=A754C96E86E37F71!8943&cid=a754c96e86e37f71&app=WordPdf

More state studies;

CT page 9 01,7% And prisoners with no prior sex crime are six times more likely to be involved in a new sex crime Recidivism among sex offenders in Connecticut, State of Connecticut

Office of Policy and Management, Criminal Justice Policy & Planning Division, February 15, 2012

DE Table 26 03.1% REARREST 6 offenders and on table 27 3 Offenders were not found guilty of a crime that makes the percentage of people convicted of a new sex crime. 01.5%. Rearrests should never be used as a determining factor. Delaware Sex Offenders, Profiles and Criminal Justice System Outcomes, January 2008

https://onedrive.live.com/view.aspx?resid=A754C96E86E37F71!8622&cid=a754c96e86e37f71&app=WordPdf

IA page 7 #4 "With the overall recidivism for sex offenses as low as 2% " Iowa Sex Offender Research Council Report to the Iowa General Assembly January 22, 2009

https://onedrive.live.com/view.aspx?resid=A754C96E86E37F71!8618&cid=a754c96e86e37f71&app=WordPdf

IA ARREST 02.3% page 7 Iowa Department of Corrections Report to the Board of Corrections

Third in a series of reports highlighting issues contributing to corrections population growth April 2006 Sex Offenders

https://onedrive.live.com/view.aspx?resid=A754C96E86E37F71!8616&cid=a754c96e86e37f71&app=WordPdf

IN bottom of page "1.05%of identified sex offender's recidivated for a new sex crime within 3 years." Indiana Department of Correction Recidivism Rates Decrease for 3rd Consecutive Year

https://onedrive.live.com/view.aspx?resid=A754C96E86E37F71!8935&cid=a754c96e86e37f71&app=WordPdf

IA table 4 0.3% new sex crime THE IOWA SEX OFFENDER REGISTRY AND

RECIDIVISM Iowa Department of Human Rights Division of Criminal and Juvenile Justice Planning and Statistical Analysis Center

https://onedrive.live.com/view.aspx?resid=A754C96E86E37F71!8617&cid=a754c96e86e37f71&app=WordPdf

MI 8/10 of 1% three-year study has come out of Michigan looking at the number of people on parole that were returned to prison for new crimes they found that of the sex offenders who were released from prison and found that they were involved in the new sexually related crime at 8/10 of 1%, or in other words, that 99.2% DID NOT Reoffend in the new sex crime. And that they had the lowest reoffend rate of all the criminal classes released.

The full report is here http://nationalrsol.org/wp-content/uploads/2014/12/CAPPS.pdf.

Document Title: SEX OFFENDER SENTENCING IN WASHINGTON STATE: RECIDIVISM RATES BY: Washington State Institute For Public Policy. A study of 4,091 sex offenders either released from prison or community supervision form 1994 to 1998 and examined for 5 years Findings: Sex Crime Recidivism Rate: 2.7%

Link to Report: http://www.oncefallen.com/files/Washington_SO_Recid_2005.pdf


Document Title: Indiana's Recidivism Rates Decline for Third Consecutive Year BY: Indiana Department of Correction 2009.


The recidivism rate for sex offenders returning on a new sex offense was 1.05%, one of the lowest in the nation. In a time when sex offenders continue to face additional post-release requirements that often result in their return to prison for violating technical rules such as registration and residency restrictions, the instances of sex offenders returning to prison due to the commitment of a new sex crime is extremely low. Findings: sex offenders returning on a new sex offense was 1.05%


Link to Report: http://www.in.gov/idoc/files/RecidivismRelease.pdf


Once again, these are not isolated conclusions but are the same outcomes in the majority of reports on this subject from multiple government agencies and throughout the academic community.


Then we have those that are attempting to use under-reporting to justify the existence of the registry which is another myth and misrepresentation of the facts. This type of misinformation that is based on hearsay and not on facts or evidence is also being used in order to create harsher penalties or further punishments.


These laws only effect people who have already paid for their crime by loss of their freedom through incarceration and are now attempting to reenter society as honest citizens. Once again I want to emphasize that these laws only effect innocent family members and those individuals who most just want a second chance to become a respectable, productive and law abiding citizen and have absolutely zero effect on anyone who's interested and intent on committing a crime.


No one can doubt that child sexual abuse is traumatic and devastating. The question is not whether the state has an interest in preventing such harm, but whether current laws are effective in doing so.


Megan's law is a failure and is destroying families and their children's lives and is costing tax payers millions upon millions of dollars. The following is just one study showing examples of the estimated cost just to implement SORNA, which many states refused to do. This list doesn't include the cost to maintain the entire registration processes for the plethora of official state and federal agencies that is a product of these laws.


From Justice Policy Institute. Estimated cost to implement SORNA Here are some of the estimates made in 2009 expressed in 2014 current dollars: California, $66M; Florida, $34M; Illinois, $24M; New York, $35M; Pennsylvania, $22M; Texas, $44M. In 2014 dollars, Virginia's estimate for implementation was $14M, and the annual operating cost after that would be $10M.

For the US, the total is $547M. That's over half a billion dollars – every year – for something that doesn't work.


http://www.justicepolicy.org/images/upload/08-08_FAC_SORNACosts_JJ.pdf.


None of these failed policies have not achieved any positive results in the US and are in fact destroying the lives of thousands upon thousands of innocent children and their families because one of their parents or family members are on such a registry.


There has not been a single incidence in which a person was apprehended or prevented from committing a crime anywhere or anytime in this country because of any of these laws.


Please take the time to research all the real facts and evidence on this subject and all the collateral damages to individuals and thier family members that are being caused by these laws.


Thank you for your time.

8/8/23, 2:32 PM                                   Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)         Share ▾

---

Comment

Be careful of what you say and do, it could come back on you. Just ask Anthony Weiner.
Enough with the Jim Crow Laws.
Michael A. Lewis Sr.
1464 Unahala Creek Road
Bryson City N.C. 28713

**Comment ID**

DOJ-OAG-2020-0003-0196

 **Tracking Number**

ket-urne-xtc1

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 8, 2020

AR-00000635

Regulations.gov



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000636

8/8/23, 2:31 PM                                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

See attached file(s)

| Attachments  1 |

| 🖼️ Gov. Abuse |
| ⬇️ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0197/attachment_1.jpg) |

| **Comment ID** |
| DOJ-OAG-2020-0003-0197 |

| ◎ **Tracking Number** |
| ket-y0sd-v55u |

| **Comment Details** | **Submitter Info** |

AR-00000637

Regulations.gov

**Received Date**

Sep 8, 2020



About     Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000638

*See id.* at 328, 588 S.E.2d at 35.   Although defendant presented evidence to contradict the testimony of C.L. and M.L., upon a

-15-

motion to dismiss, such discrepancies must be resolved in favor of the State.   *Thompson*, 43 N.C. App. at 380, 258 S.E.2d at 800-801.





This is the result of your hit list,(Sex Offender Registry) for a crime that North Carolina Admits never happened. The persons that assaulted me (2 of which have since dropped Dead of Heart Attacks), on 2\14\2010 in Piedmont AL., were NOT prosecuted, but instead the police wanted to prosecute me because one of them hurt themselves assaulting me. Where is my Justice? I'm tired of this abusive system. My Blood is on your hands and YOU will answer to GOD for this abuse of power. Not a threat or promise, just read the bible(KJ Version),Romans 2:21-24,Matthew 23:1-6. (I PRACTICE this one, Romans 12:17-21)Proverbs 28:6. You WILL have to answer for YOUR CRIMES to the ONLY Judge that Matters.

NC Registrant # SRN:012141S8   (I'm NOT a human to you, only a number to you!)

1464 Unahala Creek Road Bryson City NC 28713      Email-
communistusaviolatesrighttodueprocess@mail.com

AR-00000639

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

| Comment |

If you are going to permanently deprive someone of the right to seek employment, find an apartment, or leave the country, they should be immediately classified as 100% permanently disabled with immediate approved access to SSI/Disability income, and they should be housed in Section 8 senior and disabled housing. Either that or let them leave the US and seek a better life elsewhere. In these times of uncertain government funding, it seems pointless to continue to fund even more make-work programs. A blanket pardon on all level one offenders would be a great start to Trump's second term.

**Comment ID**
DOJ-OAG-2020-0003-0198

◎ **Tracking Number**
keu-3af5-kfvy

| **Comment Details** | **Submitter Info** |

**Received Date**
Sep 8, 2020

AR-00000640

8/7/23, 12:42 PM                                                Regulations.gov



About     Bulk Data Download       Agencies      Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000641

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

DOJ DOCKET NOTE: PERSONAL IDENTIFYING INFORMATION OF THE COMMENTER REDACTED AT THE COMMENTER'S REQUEST. Dear Mr Attorney General William Barr, I'm writing in reference to the proposed changes to current registered citizen requirements. First of all, I think this proposal is very lengthy and confusing to the average person and was put in place purposely that people would not respond. I will not enclose the numerous documents as previous documents have, but will lend my support of all the documents provided. The Sex offender registry is a Draconian effort by lawmakers to create a class of people that are considered subhuman. Any other violation of crime in this country allows an offender to pay his debt to society, and continue on with their life. But not someone placed on this registry. It seems every 4 years during election time, that reiterated efforts are placed to make the public more afraid,and that the government is here to protect them. The substantial amount of people who are not familiar with the workings of this registry, only look to see that a person's name is on it. They do not know the background or the circumstance of how a person ended up here. They only see them as bad people. The people and the families of those that are required to register, are really the only ones that need protecting. The endless harassment and threats to those trying to support people who end up on this registry are truely offensive. Especially to the children of these citizens. The whole purpose of this registry was to quote "protect the children", well who is protecting the children of people placed on this registry? I can tell you who, it's the grandparents or other family members who are willing to step in and try to protect these children from the barbaric comments and actions of the general public. This I find repulsive. My husband and I are law-abiding citizens of this country. But yet we find ourselves entrapped in a situation for which we had no part of. Not only is our son required to register, but we as his parents are placed in harm's way because of the effects of this registry. My son's offense is exposure, he did not physically assault anyone or take someone's life. But here he is, condemned to be placed within a pool of people who might be considered the worst of the worst. How is this justice? How is this protecting anyone? As has been stated before by numerous people who have researched this subject, the vast majority of sexual offences are committed by people who are not on the registry; and are known to their victims. The stranger danger that has been inflicted on this country is a farce. Far more resources should be made available to educate our children on awareness and the importance of personal space and boundaries. Instead of being spent on a registry that

1/2

AR-00000642

Regulations.gov

at the end of the day protects no one. If you are unwilling to eliminate this lifetime requirement, then I strongly urge you to reduce the overwhelming type of offenses that place a person on this list to begin with. Respectfully,

**Comment ID**

DOJ-OAG-2020-0003-0199

 **Tracking Number**

1k4-9ira-i57g

**Comment Details**

**Received Date**

Sep 3, 2020



Your Voice in Federal Decision Making

About       Bulk Data Download       Agencies       Learn

(/about)        (/bulkdownload)      (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000643

8/8/23, 2:11 PM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)       Share ▾

---

Comment

Personal Identifying Information. Please don't post my name online.

Hi. I am a wife of previously listed sex offender. We were able to petition off the registry recently. Thank GOD! I'd like to express the big impact of regulations imposed by the government on people in the registry- it's a big cause of stress and restricts family life. My husband was in the registry for a non-contact victimless charge- he chatted with somebody posing as a minor in an adult chatroom. It was a sting operation. The result--- long delay and threat in immigration process because I am from a different country, big challenges in bringing up our son because of housing and social restrictions, and not being able to travel to a different country to meet my FAMILY. We've experienced being kicked out of a motel room and being denied rental to an apartment just because my husband is in the registry.

I hope that before Ohio, and any other state, "play" with these regulations, please study the foundation of the regulations and seriously decide on the implications of it. My personal opinion is that it is not making the youth safe from sex offenders. It's just torturing the people on the registry.

**Comment ID**

DOJ-OAG-2020-0003-0200

◎ **Tracking Number**

1k4-9irt-rqwa

AR-00000644

## Comment Details

**Received Date**

Sep 4, 2020

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000645

8/8/23, 2:26 PM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

Personal Identifying Information, not to be posted, as to my name, phone number or email address. First, sex offender registration requirements under some states law, such as the state I reside in, Texas, as well as under SORNA I assume, is discriminatory in nature. For example, persons employed as city, county jailers, prison guards, likely some other members of law enforcement in Texas, do not have to register in the Texas Sex Offender Registry when committing and prosecuted for sex-related offenses. Such city, county and I believe governmental employees committing such offenses are prosecuted under Section 39.01, et. seq., 29.02, 39.03 or 39.04 of the Texas Penal Code (abuse of office, oppression, civil rights violations, sexual abuse). None of those sections are listed as 'reportable offenses' under the Texas Registration requirements set out in Chapter 62.001(5) of the Texas Code of Criminal Procedure. I have a number of examples of such prosecutions, and who are not required to register. Secondly, news media and other reports over the years report that most jail and prison guards and employees who committed sexual abuse of assaults of incarcerated persons are not prosecuted at all Thirdly, it is now beyond dispute that sex offender registries DO NOT reduce recidivism, but in fact increase the chance of recidivism. The Department of Justice knows this, as do the states. And yet continue to maintain registries, which also directly result in violence against some persons on registries and against their families. Finally, maintaining persons on sex offender registries who may have committed a single sex offense 30, 40 or 50 years in the past, whose determined chance of committing a future sex-related offense is practically zero (0), (when evaluated, or statistically), serves no 'legitimate' governmental interest and continues to subject such persons to the continued unfair stigma associated with registries as well as their families. I would mention here that the 'tier structure' of SORNA, requiring periods of registration and chance of recidivism based on 'technical nature of offense' is fundamentally unfair and at odds with actual, determined chances of recidivism statistically and through evaluations. As stated by the Chairman of the Texas Council on sex offender treatment several years ago, in essence, 'there is no research anywhere that says 'nature of, or technical name of a sex offense' is determinative of chance of recidivism. There are many people on sex offender registries who may have been convicted of a single sex offense involving an adult victim under various and problematic circumstances over 40, 50 years ago. When an unformed member of the public sees their name on a registry the public immediately thinks those particular registrants are child molesters,

AR-00000646

Regulations.gov

which is unfair. I don't mean to demean those convicted of child-related offenses but the public perception has consequences for the registrant. The underlying problem with registries is that they do not serve an intended purpose of public protection, and there is no rational relation to a legitimate governmental purpose in keep so many people on registries, for a lifetime in many cases, who present no chance of recidivism, who have been rehabilitated long ago, and are trying to lead productive lives, with renewed good reputations that are stigmatized by registries that create more public fear that is necessary and that is unfounded in many cases. If registries are to be maintained they should be used only for those determined to be a risk of recidivism. What is so sad is that the Department of Justice knows registries are ineffective in contributing to public safety and cause more recidivism. Take the politics out of the registry issue.

### Comment ID

DOJ-OAG-2020-0003-0201

 **Tracking Number**

keo-lqmo-7bxl

## Comment Details

**Received Date**

Sep 4, 2020



Your Voice in Federal Decision Making

About | Bulk Data Download | Agencies | Learn

(/about) | (/bulkdownload) | (/agencies) | (/learn)

Reports | FAQ

(https://resources.regulations.gov/public/component/main?main=Reports) | (/faq)

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | Developers (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support) | Provide Site Feedback

AR-00000647

AR-00000648

8/8/23, 10:54 AM

Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

Do not use My Personal Identifying Information: Since you intend to go through with this; then you admit and openly declare that People who have served their completed Sentences-as I am in the process of completing mine-still must be under your Supervision. You also admit that Treatment-whether In Prison or Outside of it-does not count and never will. Why bother making me go through with it in the first place, since this is what you intend? By the way; when will you begin Registries for ALL THE OTHER CRIMES? Oh That's right. You're not, because they're 'Special'. Murderers will never be hunted down and killed by your Not-So-Secret-Vigilante-Nazi-Triple-K-Club Troopers. Drug Dealers will not. Arsonists will not. Aggravated Assaulters, and Kidnappers won't. Only WE WILL!! 'White Collar'-No, you mean Wealthy White Prosecutors, Legislators, Judges, and other-you know, 'Good Ole Boys', WON'T EVER have to go through any of this IF THEY, commit any Sex Offenses. You'll Protect them...won't you? Of course you will! You might as well get rid of Treatment Directives altogether, since you don't believe in it's merits. I mean; why have it at all since you don't ever intend to determine if it actually has worked for those who have Served Their Sentences In Prison, and are out on some kind of Supervision AND STILL UNDERGOING COURT-ENFORCED TREATMENT ANYWAY? You obviously don't believe in Treatment, so why bother with Funding it? You intend to continue using Community Notification as well, to ensure the VIGLANTES COME AFTER US TO KILL US!!! I've already told My Family Members to never expect to see me ever again in life, and never to be able to Bury Me, because YOU, are going to ensure that I die from the very first Opportunity you get to use your New Not-So-Secret Vigilante-Nazi-Triple-K-Club Toys, based on the very first 'Plausible Deniability Excuse', you will come up with...which will be just about anything anyway!
Finally; you need to remember this: One Day, ALL OF US, WILL STAND BEFORE GOD ALMIGHTY, AND HE WILL RENDER HIS FINAL JUDGEMENTS ON YOU AND YOUR MERCILESS WAYS!
I don't feel sorry for you on That Day!

AR-00000649

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0202

 **Tracking Number**

1k4-9iu6-uk7d

**Comment Details**

**Received Date**

Sep 8, 2020



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

| Comment |

[**DOJ DOCKET NOTE: Commenters on DOJ Proposed Rules have the option to provide or not to provide their own Personal Identifying Information (PII) such as their names. However, in order to protect the privacy of persons other than the commenter who may not have given their consent for such PII to be posted on www.regulations.gov, it is DOJ's policy to redact third-party PII from a comment. In such instances, the full, un-redacted comment is available for public inspection in person by contacting the For Further Information Contact identified in the Proposed Rule. Accordingly, although DOJ has considered the entire contents of this commenter's comment, that portion which contains third-party PII has been redacted] You're going to be getting comments from pro-sex offender groups. [NAME REDACTED] is one of them. Please Google him. https://www.youtube.com/[REDACTED]

### Comment ID

DOJ-OAG-2020-0003-0203

### ⌖ Tracking Number

1k4-9ir4-9iex

| Comment Details | Submitter Info |

**Received Date**

Sep 3, 2020

AR-00000651



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000652

8/8/23, 1:01 PM                                  Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |
|---|

[**DOJ DOCKET NOTE: PERSONAL IDENTIFYING INFORMATION OF THE COMMENTER REDACTED AT THE COMMENTER'S REQUEST.] I am on the list in Michigan and have been for 23 years. I voluntarily turned myself in to the police because of the misdemeanor crime I committed in 1997. Here we are in 2020 and I am still being punished. It is like being on probation since I have to check in periodically and tell the police I did not move as well as tell them about all my personal belongings and yet have them come to my house each year to make sure I am telling the truth. This is a waste of our resources and the time of our officers. The studies have shown these lists do not reduce the number of sex crimes. I will never re-offend and according to the studies neither will 95% of the other offenders - why because it is wrong for one but secondly for me and the others - we would lose everything we have and be sent to prison as a repeat offender - that is enough for the majority of us. This list does nothing but create fear, anxiety, anger and isolation in the neighborhoods offenders live. When it is written in the papers by officials these lists are designed to make you aware there is a predator in your neighborhood, all that does is make things worse. When we moved from the house where I committed my offense my wife - yes I am still married and have been for 31 years - said we are starting a new life. Yes it was a new life. One filled with despise from our new neighbors, school parents, administration and classmates of our children. A new life where there was vandalism to our property, anonymous letters and phone calls. Even last month a person took the information from the web and posted it on Facebook that I was on the list as well as posted it on LinkedIn. Last week I was the victim of a scam threating that I would be arrested if I did not comply with the officers request for information and that I had to report to the police station immediately or they would send out an officer to my home and arrest me. There are not lists of drunk drivers or those who have lost their license or murderers or wife abusers or disgusting lying politicians. The reason is this subject can stir up voters, it is a favorite of the political "elite" to use to get votes and show what great servants they are because they are "protecting" our children. I cannot even be on the local neighborhood email system or anyone at my address for that matter because I am the one they are all talking about. Because of this list I was not able to attend any of my children's events at school (which was punishment for them) when my actions had nothing to do with a school or a stranger or being predatory. Now as I said 23 years later, no other incidents or even traffic tickets I am not allowed to be able to apply to have my additional sentence reduced. Just about every

AR-00000653

other crime there is the opportunity to reduce the punishment for good behavior, not if you are a sex
offender. Once a sex offender always a sex offender. That is what this list brands me and the others as. But
does anyone care? Nope apparently not. With these new rules all you are doing is repressing more and
more people. Do we not have enough problems in that area already? Nobody cares because we are the
scum of the earth because we are paraded around the internet, some for the rest of their lives. No
opportunity to say hey, yes I was wrong but that is not who I am today, doesn't 20 years, 15 years or 10
years of good and changed behavior with a solid family and job say something? Apparently not. I do agree
there are those that have committed sex crimes who are dangerous but those people are well identified
before they are released. Let's not take a wide brush and continue to put everyone in the same category. At
least give offenders a chance, if not do away with the list, give them incentive to get off the list by living right
and proving they are not who the lists say they are. It is a sad state of affairs we are in today. And these
new rules just make it worse. Thank you very much.

**Comment ID**

DOJ-OAG-2020-0003-0204

 **Tracking Number**

kem-71bl-kgsv

**Comment Details**

**Received Date**

Sep 2, 2020



Your Voice in Federal Decision Making

AR-00000654

Regulations.gov

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000655

8/8/23, 1:00 PM                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020



| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾

---

Comment

See attached the file, asking the question : Does the in-person appearance requirement for sex offender registration an
affirmative disability violating Ex Post Facto?

This is the final version of my argument I will be filing as a 42 U.S.C. 1983 complaint in the Nevada Federal District Court in a few weeks.



Attachments  1

📄  in person registration violates ex post facto

⬇  Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0205/attachment_1.pdf)

**Comment ID**
DOJ-OAG-2020-0003-0205

 **Tracking Number**
1k4-9io4-vwdr

AR-00000656

Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Aug 30, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

Question presented:

## Is the in-person appearance requirement for sex offender registration an affirmative disability violating Ex Post Facto.

The foundation for this complaint is based on the currently controlling US Supreme Court decision in Smith v. Doe, 538 U.S. 84, 101 (2003) which states:

*"...no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act."*

Which comes from :

"The Court of Appeals reasoned that the requirement of periodic updates imposed an affirmative disability. In reaching this conclusion, the Court of Appeals was under a misapprehension, albeit one created by the State itself during the argument below, that the offender had to update the registry in person. Id., at 984, n. 4. The State's representation was erroneous. The Alaska statute, on its face, does not require these updates to be made in person. And, as respondents conceded at the oral argument before us, the record contains *no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act*. Tr. of Oral Arg. 26–28."

Where "n. 4." is from the lower Court's footnote, Doe v. Otte  259 F.3d 979, 995 (Ninth Circuit, 2001) :

"[4] The Alaska statute, on its face, does not clearly specify that these registrations must be made in person at local police stations. However, the government represented at oral argument that periodic in-person registration at local police stations is required by the Act. When specifically asked whether registrants must "go to the police station" for their annual or quarterly registrations, the government answered "under the current law, yes."."

From *Smith* above, "...Court of Appeals was under a misapprehension…" this misapprehension is referenced from I.D. at 987 :

"II. EX POST FACTO CLAIM : 1. Affirmative disability or restraint : The Alaska Sex Offender Registration Act imposes an affirmative disability on the plaintiffs. First, its registration provisions impose a significant affirmative disability by subjecting offenders to onerous conditions that in some respects are similar to probation or supervised release. Like Washington's sex offender registration statute, Alaska's requires offenders being released from confinement to register. Alaska Code § 12.63.010(a); Russell, 124 F.3d at 1082. However, unlike the Washington statute, Alaska's requires sex offenders such as the plaintiffs to reregister at police stations four times each year every year of their lives. Alaska Code § 12.63.010(d). Moreover, in order to do so, they must appear in person at a police station on each occasion, and provide, under oath, a wide variety of personal information, including address, anticipated change of address, employer address, vehicle description, and information concerning mental health treatment for any "mental abnormality or personality disorder." § 12.63.010(b)."

An analysis of the above:

CASE NO. 15-2346/2486, UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT, DOES -vs- SNYDER, BRIEF OF LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS (pdf page 23, page 18 in document) stated :

"First, the Court emphasized that the Alaska statute required only calling the police once a year or, in some cases, once a quarter. "The Alaska statute, on its face, does not require these updates to be made in person. And…the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act." Id. The Court noted that the lower court had factually erred in finding that the statute had in-person reporting requirements, but the Court's language **strongly suggests** that if such requirements **had** existed, they would have constituted affirmative disabilities and restraints. The Alaska law is a first-generation registration requirement, imposing comparatively minor burdens: offenders did not need to register in person."

This argument centers around, "...the Court's language *strongly suggests* that if such requirements *had* existed..." which answers the question presented, "**the in-person appearance requirement for sex offender registration is an affirmative disability**" [only *had* is italicized in the source document]

As the footnote indicated, **the in-person appearance requirement** actually did exist, just not on the "face" at the time. ("under the current law, yes."). And 3 years later in 2006, in-person appearance was made Federal law:

"34 U.S. Code § 20918, Periodic in person verification: A sex offender shall appear in person, allow the jurisdiction to take a current photograph, and verify the information in each registry in which that offender is required to be registered not less frequently than— (1) each year, if the offender is a tier I sex offender; (2) every 6 months, if the offender is a tier II sex offender; and (3) every 3 months, if the offender is a tier III sex offender. (Pub. L. 109–248, title I, § 116, July 27, 2006, 120 Stat. 595.)"

Which has since then left the Supreme Court's finding in question. The Amici Curiae was the only concurring reference I could find that "strongly suggests" my question has merit.

And relevant to this complaint, Nevada law mirrors Federal law:

"NRS 179D.480: When offender or sex offender is required to appear in person and provide certain information to local law enforcement agency; duties of Central Repository if offender or sex offender fails to comply. 1. Except as otherwise provided in subsection 3, an offender convicted of a crime against a child or a sex offender shall appear in person in at least one jurisdiction in which the offender or sex offender resides or is a student or worker: (a) Not less frequently than annually, if the offender or sex offender is a Tier I offender; (b) Not less frequently than every 180 days, if the offender or sex offender is a Tier II offender; or (c) Not less frequently than every 90 days, if the offender or sex offender is a Tier III offender,

and shall allow the appropriate local law enforcement agency to collect a current set of fingerprints and palm prints, a current photograph and all other information that is relevant to updating the offender or sex offender's record of registration, including, but not limited to, any change in the offender or sex offender's name, occupation, employment, work, volunteer service or driver's license and any change in the license number or description of a motor vehicle registered to or frequently driven by the offender or sex offender."

## Circuit Split

One year after the US Supreme Court's landmark decision,, the Ninth Circuit contradicted their previous decision, 259 F.3d 979, 987, in Hatton v. Bonner, 356 F.3d 955, 964 (2004), Stating :

"It is true that, unlike the Alaska statute, § 290 requires Petitioner to register in person. Although this fact is important, when balanced against the other facts highlighted above, it is simply not enough to turn § 290 into an affirmative disability or restraint. Thus, this factor weighs in favor of the state court's conclusion that application of § 290 to Petitioner does not violate the Ex Post Facto Clause."

So, how did this circuit split occur? Although the Court referenced *Smith* 26 times in its decision, I believe the Court abused its discretion by purposely avoiding 538 U.S. 101 because the entire argument here would have had to be addressed, thereby fracturing the whole decision of the Court.

For reference, the above conflict is specifically in the Jurisdiction of the US Supreme Court pursuant to :

"PART III. JURISDICTION ON WRIT OF CERTIORARI Rule 10. "(a) A United States court of appeals has entered a decision in conflict with the decision of another United States court of appeals on the same important matter;". It should be reasonably assumed "another" could also be the same circuit court, as in this case."

## Conclusion

When I have to appear for registration bi-annually, during that time, I am in custody, although it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in a cumulative violation of my "constitutionally protected interest in liberty", 538 U.S. 112, as the Supreme Court's dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment. Appearance, photo, fingerprints, that is precisely the same as being booked into jail, multiple times a year.

AR-00000660

I have to be there, that is restraint, under penalty of a crime. In person is physical, affirmative. Although it would appear brief, one hour of restraint is legally no different than a year in custody. It is not a sliding scale, or something that is balanced against other liberty interests or public safety. Restraint must be measured independently, it is not contextual. Ex Post Facto is absolute, not something negotiable.

And if the in-person requirement is properly found to violate ex post facto, then the government would argue the critical function of the registry is compromised, even rendered useless without in-person verification. Well all that's just too bad, it demonstrates registration is a house of cards.

As of December 2018, the registered sex offender population was 917,771 (see footnote 1). By removing in-person registration essentially dissolves the whole registry, and the justification for the registry erodes with it.

And all that reflects the Framers intent: US Constitution, Article I, Legislative Department, Section 10., Powers *Denied* to the States, Clause 1. Treaties, Coining Money, Impairing Contracts, Etc. :

**No State shall pass any ex post facto law.**

"Any", specifically means no laws with exceptions that say "balanced", "not enough", "weighs". The framers stated an absolute, they did not add qualifiers.

Douglas Warenback  August 29, 2020     Search Google "warenback" to find me.

Footnote 1:

From United States Marshals Service FY 2020 Performance Budget President's Budgetfrom United States Marshals Service FY 2020 Performance Budget President's Budget, page 63,  "NCMEC** reports that eleven years later, in December 2018, the registered sex offender population was 917,771. Despite this 52 percent increase, the USMS has not been allocated additional personnel to combat the prevalence of noncompliant sex offenders. ...USMS collateral duty DUSMs performed 48 percent fewer investigations in FY 2017 as compared to FY 2014."

https://www.justice.gov/jmd/page/file/1143886/download

** I could not find the NCMEC source for this statistic.

I suggest the additional allocation was lacking simply because the non-compliance crime does not have an actual direct victim. It is a passive crime, not doing something. Therefore, when balanced with other matters, investigating non-compliance is predictably a low priority, reflecting this Ex Post Facto law violates the constitution.

8/8/23, 10:55 AM                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ⌄ |

---

| Comment |
| --- |

I ask that you look over this site and read the stories about REAL people you claim you are not punishing. How is the registry NOT punishment. For no other crime other than murder does a person get punished for life.

You do not have a registry for all those drug dealers who get kids hooked on drugs,
you do not have a registry for those who commit domestic violence,
you don't have a registry for those who rob and destroy property,
you do not have a registry for those who have committed more than one felony,
you do not have a registry for cops who get fired for inappropriate behavior,
you do not have a registry for members of congress who commit crimes.
You do not have a registry for lawyers convicted of crimes, you do not have a registry of those who commit fraud.

Don't tell us it's not punishment. It is definently punishment. With the label of sex offender you are treated like a leper. You cannot get jobs, you cannot get degrees, in some places you can not get medical care, you can't find a place to live and you have absolutely no way of ever getting a decent life again. Your kids are bullied and punished by others, your spouse gets fired from their jobs. You are harassed by vigilantes and sometimes killed. You, your family, your employer (if you are lucky enough to have one), any friends, all are punished along with you. How can that be constitutional? You don't do all these things to anyone convicted of any other crime. How is this fair to a child who played doctor at six years old?

If a person serves their time, pays their fines, succeed with probation, that should be enough, just as it is for any other crime. The registry is especially bad for those set up in sex stings. Innocent men not looking for sex with minors, on adult sites, sent a photo of an adult, then arrested for a crime they never intended to commit the punished for life. That would be different if they were actually charged and convicted of trafficking but they are not. This is evil and just wrong. The registry is especially hare for kids who don't even know they are breaking the law. Kids not have the capacity to know they are doing wrong. Or the person

AR-00000662

Regulations.gov

urinating behind a trash barrel. Two teens in love have consensual sex.

How can you justify the registry as even legitimate let alone effect or constitutional? How can you say it doesn't violate constitutional rights? Thousands and thousands of people who have not meant to commit a crime, did not know there was such a law as they were charged with breaking, who have NO priors, and no victim. How can you justify labeling them for life? How can you justify putting them in harms way in a foreign country? How can you justify totally ruining their life when they did not mean to commit crime?

This is supposed to be the land of the free. The most fair and free country in the world. Yet you have over a million people on a registry that totally ruins their live, their future, and their chance at success. You ruin the lives of their families right along with them. Only the ones who have truly committed a horrible sex crime should be on a list and that list should only be seen on a need to know basis. Even if a person made a mistake and has paid their dues to society they should not be kept from traveling and enjoying a natural life. They should not be kept from living a life. Even your department has found that very few ever reoffend after punishment. If fact this group has the lowest rate of re-offense of any crimes yet you think they should be punished for life.



Attachments ( 10 )

### Inside the Endless Nightmare of Indefinite Detention Under "Civil Commitment" - In These Times

⬇ Download (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0206/attachment_1.pdf)

### New Study by Catherine Carpenter

⬇ Download ▾

### Since 2015

⬇ Download ▾

### ONCE AGAIN

⬇ Download (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0206/attachment_4.pdf)

AR-00000663

8/8/23, 10:55 AM                                                Regulations.gov

 **NOT ALL POLICE DEPARTMENT ACT THAT WAY**

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0206/attachment_5.pdf)

 Inside the Endless Nightmare of Indefinite Detention Under _Civil Commitment_ - In These Times

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0206/attachment_6.pdf)

 image

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0206/attachment_7.png)

 child registration

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0206/attachment_8.pdf)

 Florida Sex Offender Registry Double

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0206/attachment_9.pdf)

 THE LADY JUSTICE MYTH

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0206/attachment_10.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0206

 **Tracking Number**

1k4-9io2-meg8

| Comment Details | Submitter Info |
|---|---|

AR-00000664

**Received Date**

Aug 29, 2020



About Bulk Data Download     Agencies     Learn

(/about)     (/bulkdownload)   (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

## SATURDAY, SEPT 12:

Join us for a special online event: "Labor Power in a Time of Crisis" with Sara Nelson

### RSVP NOW

**INVESTIGATION**

# Inside the Endless Nightmare of Indefinite Detention Under "Civil Commitment"

After serving their criminal sentence, these men discover their punishment may never be over.

**SARAH LAZARE**     AUGUST 19, 2020



VICTOR TORRES/SHUTTERSTOCK

In June 2019, after serving more than 29 years in Illinois prisons, Otis Arrington expected to be released to freedom: He had finished his time, which he describes as difficult and traumatic, and his exit date was pending. But three days before he was slated to get out, Arrington says he was informed that he would, instead, be placed under a new form of confinement—one with no end date, meted out after he had already completed the punishment imposed by the criminal courts.

"I was supposed to get out, and they kidnapped me," says Arrington, now 62 years old. He is speaking over the phone from the Treatment and Detention Facility in Rushville—a rural area in western Illi-

AR-00000666

nois—where he is one of roughly 560 men (or, at least, people who the state has deemed men) who are being held indefinitely under a little-known "civil commitment" statute.

Under this legal mechanism, which exists in at least 20 states and the District of Columbia, individuals convicted of certain sexual offenses (or in some instances convicted of nothing), and deemed to have a mental disorder and constitute a danger to society, can be involuntarily committed to "treatment" facilities after they've already served their criminal sentence. While in civil commitment, individuals are supposed to receive mental healthcare and regular examinations, and to be released once it is determined they are no longer dangerous. As the statute that established civil commitment in Illinois in 1998 puts it, individuals are to receive "control, care and treatment until such time as the person is no longer a sexually violent person."

Yet, *In These Times* spoke with people held in civil commitment, rights advocates, scholars and lawyers who say that, instead of receiving effective treatment, people held under civil commitment statutes are subject to prison conditions, inadequate mental healthcare, scientifically dubious evaluations, and homophobic bias; they are deprived of meaningful due process; and they have little hope of getting out anytime soon. Rehabilitation is not the goal, critics charge, but rather, civil commitment is intended to indefinitely detain and punish people whom society has deemed undesirable. This confinement does not rectify the harm individuals have done, and there is no evidence that civil commitment laws reduce sexual violence in society, critics say. Instead, they argue, it unleashes untold new harms: as the site of abuse, trauma and, according to some, sexual violence.

"We served our time, and then they turn our sentence into a life sentence," says Arrington. "There are guys here who have been here over 20 years." He adds, "You would be amazed at how many residents have died here."

Arrington's observations are borne out by evidence. According to information obtained through a Freedom Of Information Act request to the Illinois Department of Human Services, which oversees the Rushville facility, 76 people have died while under the custody of the facility since it opened in 2006. That same FOIA data shows that 288 of the people being held there—slightly more than half of the total population—have been held for 10 years or more. Fifty-one people in Rushville have been held in civil commitment for 20 years or more, and 12 have been in civil commitment for 22 or more years, meaning they've been in civil commitment since the statute was implemented in 1998.

If the Rushville facility is supposed to treat people until they are no longer "sexually violent" and can therefore be released, it appears to be failing on its own terms.

## How civil commitment works

Stefan Vogler, a postdoctoral scholar at the Northwestern Center for Legal studies who specializes in civil commitment, says that these long stretches of confinement can be attributed to the fact that, once held under the civil commitment statute, individuals find themselves trapped in an opaque system that's nearly impossible to escape.

In Illinois, individuals convicted of certain sex crimes—generally those that involve contact, a physical victim, or possession of child pornography—are evaluated by the Department of Corrections at the end of their criminal sentence. If the department finds they meet a certain risk threshold, it will refer them to the attorney general or state's attorney who will then pursue a "sexually violent person" (SVP) case against them. The person then must go before a judge, who has the power to deter-

AR-00000667

mine whether a civil commitment trial is warranted. "Pretty much any time they do that, they find probable cause," says Vogler.

Once probable cause is determined, that person is sent to Rushville where they wait for their SVP trial—something that is supposed to happen quickly but can often take years. While awaiting trial, individuals are given the opportunity to receive treatment, but according to scholars and lawyers interviewed by *In These Times*, the things people say in treatment are not considered confidential and can be used in their SVP trial.

Arrington says he does not know who recommended him for commitment, and his efforts to find out have been fruitless. Held in Rushville since June 21, 2019, he has not had an SVP trial, nor does he have a trial date, and he said his motions to dismiss civil commitment, filed without legal counsel, have been dismissed. As he awaits trial, he says, he spends most of his time "in my cell, on the wing, in this so-called yard they have, which is more of a patio." He explains, "I'm not receiving any treatment while awaiting trial. I don't go to any of the groups. I'm just stuck here." According to Arrington, his entire unit is in quarantine due to the coronavirus pandemic.

"This is punishment after the punishment," says Arrington, adding: "It's worse than prison, because you don't have an out-date and don't have a sentence."

Arrington's odds of getting out may not improve much once he has an SVP trial. The state of Illinois must prove "beyond a reasonable doubt that the offender has a mental abnormality that predisposes him to sexual violence, and that he is substantially probable to recommit a sex crime if released from detention," Vogler explains.

Scholars and lawyers describe an environment that is stacked against the defendant, in which it is almost impossible to win one's freedom. Sara Garber, a lawyer with experience litigating SVP cases in Illinois, tells *In These Times*, "The system is designed so that nearly everyone who is evaluated is found by the state's experts to be SVP, and it is rare that one prevails at trial before a judge or jury, unless the state's experts deem the person to not be SVP."

Garber adds, "The entire SVP process is based on the false premise that we can predict someone's propensity for future criminal conduct based on their alleged past behavior and, even worse, that we as a society are comfortable punishing someone for a future crime they have not and may never commit."

If that individual is found to be an SVP, which, according to Vogler, is "the usual outcome," then they will be held in Rushville until they are deemed less of a risk. But "they don't receive any meaningful treatment," says Vogler, which is why many spend decades—or even life—in the facility.

Trevor Hoppe is an assistant professor of sociology at University of North Carolina—Greensboro and author of *Punishing Disease: HIV and the Criminalization of Sickness* who is working on a new book examining sex offender civil commitment statutes in the United States. He says, "The idea is to put these people away and never let them out. That's how many proponents of these laws will talk about them. There are due process mechanisms to try to get release, but once you are committed, it's really hard to get out."

And, indeed, early proponents of the Act in Illinois described it as a mechanism to lock people away from society. In 1997, former Gov. Jim Edgar said at a news conference before signing the bill, "Sexual predators are among the most dangerous criminals and this legislation will help protect the community from these ticking time bombs."

AR-00000668

Under the U.S. legal system, people are not supposed to be prosecuted twice for the same crime—
what's referred to as "double jeopardy." However, according to Vogler, this standard is violated
when it comes to civil commitment. "After the individual serves a sentence, he is tried again essen-
tially for the same crime," Vogler explains. "The Supreme Court has decided that's okay because
they're not being tried criminally twice, but they're being tried in a civil setting. This is despite the
fact much higher consequences are attached to this civil suit than a normal civil suit. Usually, when
we're talking about civil law, we're talking about suing someone for damages. Usually those aren't
life imprisonment decisions."

## Accusations of negligent treatment

Once civilly committed to Rushville, individuals must progress through a treatment program, over-
seen by the private Liberty Healthcare Corporation, in order to be released. In a 2019–2020 intern-
ship brochure for the Rushville facility, the corporation says its mission is to provide "state of the art,
sex offender specific treatment in a safe, structured residential environment. We focus on the indi-
vidualized needs of the residents and treat each resident respectfully, professionally and with digni-
ty. We believe that all residents can change. We strive to reduce risk to society by facilitating life-
long behavioral change in residents."

Yet, scholars and residents paint a very different picture. "Most of what happens in Rushville is
group therapy," says Vogler. "There are different phases of treatment, and to advance to phases, you
have to participate in certain groups. They get little individual attention. You can't do effective treat-
ment for someone the state has found severely ill by only doing group AA-type treatment."

"As part of those treatments," Vogler continues, "they have to talk about their sex lives in extreme
detail, from how many sex partners they've been with to what types of sexual acts they've done to
what fantasies they masturbate to to how frequently they masturbate."

Arrington says he thinks such a treatment program would be actively harmful for him. "They have
residents running the group," he says. "I can't do the group treatment. I have PTSD from my time in
prison. I can't deal with that. You're dealing with guys talking about all the things they've done...
I can't deal with hearing that stuff."

It's not that Arrington is unwilling to talk about the harm he has caused. He told *In These Times* that
he wants to be open about the rape he committed in 1989. "I wouldn't want to try to sugar coat it or
nothing," he says. "I broke into my neighbor's house and assaulted her." But according to Arrington,
group therapy in a prison-like setting, in which anything he discusses can be used against him in
a trial, is not going to bring accountability or healing for anyone. "I can understand wanting some
kind of atonement," he says. "But we served our time."

Other people held in Rushville seem to share similar concerns about treatment. In the spring of
2019, the civil commitment working group of Black and Pink: Chicago, a prison abolitionist organi-
zation, sent a survey to 569 people being held in Rushville—which the organization says was roughly
the full population at the time. The group received 204 responses, which it began analyzing that
summer. While the organization plans to release a formal report in the coming months, it shared
a one-page summary of preliminary findings with *In These Times*. The conclusions are dire.

Residents complained about "unqualified therapists," some of them students, as well as a high
turnover problem, and the general lack of a "trusting therapeutic relationship" this engenders. They

AR-00000669

also complained about a climate of favoritism, in which residents are "incentivized to kiss ass." Residents say, "Civil commitment is a life sentence, a death sentence; they were sent there to die, believe they will die here." Respondents expressed concern about "homophobia of staff and violation of rights of gay and transgender people." They described an "unfair tier system: no consistency or transparency in application of tier or behavior status systems; difficult to progress, unclear standards for progressive, arbitrary, used for punishment rather than treatment." It's a "scam," "farce," "indefinite," "endless," is not about treatment or public safety, and is "only open for political or financial reasons," the document states.

Allegations of profound negligence and mistreatment have also been aired in lawsuits. In May 2015, five men detained at the Rushville facility waged a lawsuit charging that "mentally ill residents" of Rushville are grossly neglected, mistreated, mocked, abused and unfairly categorized as "uncooperative malingerers." The suit also claims that these individuals are retaliated against for filing grievances or helping others file grievances, and that they cannot get the "sex offender treatment" that they seek.

The lawsuit, which names several defendants, including Liberty Healthcare Corporation and the facility's director, provides grisly anecdotes. "If they try to commit suicide by hanging themselves with a sheet from their beds, they will be written up for destruction of state property," the lawsuit states. It continues, "What limited and erratic care there is, is provided chiefly by medication. A resident with paranoid schizophrenia may see a psychiatrist once a month, to 're-up' his medication, and a social worker once a month." The lawsuit charges, "Residents on suicide watch are neglected, abused or both. They can be stripped naked, placed in a cell with no mattress or blankets."

These conditions violate the constitutional prohibition of cruel and unusual punishment, alleges the lawsuit, which was eventually dismissed.

Erica Meiners, professor of women's and gender studies at Northeastern Illinois University and co-author of the book, *The Feminist and The Sex Offender*, says such complaints are common among people held in civil commitment across the country. "Invariably, the people who work at these places, are usually sort of interns. They get practicum students who are trying to get hours toward their psychotherapy degree. They don't stay long—they stay a year or so. In most of these states, the treatment model is a stage model. You have to pass a polygraph test to move from stage to stage. Then they have to start from square one again, because the psychotherapist left after a year because they got a better job. And then they're in there for another year."

"A lot of the people in these institutions have been institutionalized for decades and have endured incredible harm and done harm. These are intense and complex cases," says Meiners. "If we're saying we're doing treatment, we need the real thing here, not a wide range of practices that are not necessarily proven to be effective."

In 1999, a task force of the American Psychiatric Association strongly criticized civil commitment in its publication, "Dangerous Sex Offenders." It states, "In the opinion of the Task Force, sexual predator commitment laws represent a serious assault on the integrity of psychiatry, particularly with regard to defining mental illness and the clinical conditions for compulsory treatment. Moreover, by bending civil commitment to serve essentially non-medical purposes, sexual predator commitment statues threaten to undermine the legitimacy of the medical model of commitment."

The APA concludes, "In the opinion of the Task Force, psychiatry must vigorously oppose these statutes in order to preserve the moral authority of the profession and to ensure continuing societal confidence in the medical model of civil commitment."

Mental Health America, a non-profit that aims to meet the needs of people living with mental illness, expresses similar concerns about civil commitment. "They focus on punishment rather than treatment, deal with people who often do not have a treatable mental illness, increase stigma, distort civil commitment, risk the safety of other persons in mental health facilities, divert resources from mental healthcare and inappropriately burden the mental health system with a criminal justice function for which it is not funded or equipped," the organization's website states.

## Controversial assessment methods

Critics point out that the tests and evaluation tools used to assess whether an individual can progress through the treatment program at the Rushville facility are not universally accepted as sound science. Lawyers, scholars and residents confirmed to *In These Times* that people held in Rushville have to take polygraph "lie detector" tests, which have been broadly discredited as junk science. In a position statement on this test, the American Psychological Association advises, "although the idea of a lie detector may be comforting, the most practical advice is to remain skeptical about any conclusion wrung from a polygraph."

There is another, more invasive test people held at the Rushville facility must take if they wish to progress, according to lawyers, scholars and residents: The penile plethysmograph. Vogler explains, "A blood pressure test or tube is placed on a man's penis, and then he is either shown pornographic images or presented with audio vignettes of sexual situations, and they gauge his erectile response. This is how they determine if they think someone is sexually dangerous. If someone shows arousal to a scene involving coercion or forced sexual penetration, then they could take that as indication of underlying sexual danger."

In its brochure, the Liberty Healthcare Corporation acknowledges its use of the test, stating, "Detection and measurement of deviant sexual arousal is an important index of response to treatment and treatment effectiveness."

But the penile plethysmograph is a controversial procedure, and numerous experts do not consider it scientifically reliable. For one, it is possible to stifle an erection by focusing one's mind on other, non-arousing thoughts. In addition, becoming aroused by representations or descriptions of violent acts does not prove that an individual will commit sexual violence in the future. Finally, as psychology professor at Beacon College in Florida, Dr. A.J. Marsden, told *VICE*, "A lot of therapists think [the penile plethysmograph is] not the best measure to prove if they are really attracted to the images they show them."

According to Vogler, the test "reflects a poor understanding of how sexuality and anatomy works. This is not a good test." He continues, "People have brought lawsuits saying this is cruel and unusual punishment and invasion of privacy. Often people freeze at those points in treatment, and they can't progress and if they can't progress they can never be released."

Most U.S. courts do not consider evidence obtained by penile plethysmograph to be admissible to determine guilt or innocence. In 2006, the U.S. Ninth Circuit Court of Appeals ruled that the penile plethysmograph violated the civil liberties of the defendant, a man who was convicted of possessing child pornography. The court stated that it "viewed penile plethysmography as an intrusive procedure, both physically and psychologically, likening the procedure to a device from a George Orwell novel," according to a summary of the case published in the Journal of the American Academy of Psychiatry and the Law.

Yet, within the Rushville facility, such a test could play a role in determining whether someone remains confined, lawyers, scholars and residents confirmed.

These are not the only assessment methods that have garnered criticism. Another evaluation tool—the Static-99—came up in numerous interviews, with experts expressing concern that homophobia is baked into its methods. The Static-99 and other updated versions of this tool are broadly used in civil commitment cases—including at Rushville—to evaluate the risk posed by people convicted of sex crimes. One of the questions this tool asks is whether the individuals, who the state deems to be men, had a male victim. If so, they are determined to be more dangerous.

According to Vogler, "There is bias built into the 'objective' actuarial tool we use to evaluate people."

Hoppe puts it succinctly: "They are assigning a higher risk score to gay men necessarily."

## Not the right way to address sexual violence

Civil commitment laws spread throughout the United States during the 1990s-era panic about crime, and the related 1990s and early 2000s expansion of sex offender notification and registry laws. Some vestiges of the tough-on-crime '90s, like the 1994 crime bill and the 1996 Prison Litigation Reform Act, have fallen out of favor in recent years, due to concerns over mass incarceration. Yet, civil commitment laws remain relatively politically unchallenged, in a climate where few want to question laws that target people convicted of sex offenses. "There are very few courageous lawmakers who are going to say, 'Hey, we need to look at this,'" says Tony Thedford, a lawyer with experience litigating SVP cases in Illinois.

Proponents of civil commitment laws cite the need to protect public safety from dangerous sexual predators. "Illinois' Sexually Violent Persons Act and the evaluation by the IDOC is the closest thing we have to a crystal ball when it comes to determining whether an offender will attack again," then-Illinois Attorney General Lisa Madigan said in a 2006 statement announcing an expansion of the law. "This process is designed to identify those offenders for whom it is substantially probable that they will engage in future acts of sexual violence and to keep them out of society for as long as they remain a danger."

But, according to Meiners, "There is no research that shows states with civil commitment have lower incidents of sexual assault than states that don't have civil commitment."

Indeed, a study published in *Brooklyn Law Review* in 2013, based on original data "gathered directly from states with SVP laws," found, "SVP laws have had no discernible impact on the incidence of sex crimes." The article concludes, "These results imply that states could more effectively reduce sex crimes by allocating these resources elsewhere."

Hoppe puts it this way: "These programs don't make us safer in reality. Many would say it makes them feel safer. We're not really tackling the problem, just making a lot of people's lives insufferable."

What's more, critics charge that civil commitment sends the false message that the key to stopping sexual violence is protecting members of the public from dangerous strangers. According to the Rape, Abuse & Incest National Network, an anti-sexual violence group, eight out of 10 rapes are

AR-00000672

"committed by someone known to the victim." Meiners says civil commitment perpetuates the myth that "stranger danger" is the bigger threat. "It's overwhelmingly people that we know, people intimate to the family circle," she says. "We shouldn't be falling for that line."

People held in civil commitment are ostensibly members of the public, so any claims that the laws protect public safety must take their wellbeing into account. Emma Williams is a volunteer for Black and Pink: Chicago who helped run the survey of residents at the Rushville facility, and she became concerned about civil commitment as a result of her years of supporting sexual assault survivors. "A number of people in the system are survivors themselves, particularly of childhood sexual assault," she says. Williams emphasizes that people in civil commitment say it doesn't work, they feel judged and have to recount every sexual trauma they've suffered since childhood. "They're having to do that in a situation where everything you're sharing is shared with a prosecutor."

"If you want to end sexual violence," argues Williams, "you have to end this too. This is a form of sexual violence."

As long as we focus on things like civil commitment as the solution to sexual assault, we are not pursuing actual solutions, critics charge. "As a feminist, I'm someone who has a history of being committed to ending gender and sexual violence," explains Meiners. "What pushes me to continue this work is that the current régime of more punishment of people with convictions is not the path. If we're committed to ending gender and sexual violence, we have to do that work. This system functions as a resource drain and distraction from the real questions that we as communities, families and society need to be addressing."

According to Meiners, a "paradigm shift" is needed. "If we're thinking about child sexual violence, which drives a lot of anxiety around civil commitment and the push for criminalization, approximately one in five young people lives in poverty across the United States," she says. "We have no meaningful childcare, we have no gender-affirming feminist sex education in public schools. We need shifts that would let families, mothers and caregivers have some social safety net that's actually meaningful. Those are just some things that are preventative."

Williams, for her part, emphasizes the need for genuine accountability and restitution for harm done. "While there are likely some wrongfully convicted people inside, for those who truly did cause harm that they must account for, accountability is something that must happen within their community," she says. "When you remove someone from their community indefinitely, they're not going to want to change their behavior because they will no longer feel a sense of accountability to that community. It's a system of punishment and also isolation."

Amid growing calls to defund the police, and the foray of concepts like prison abolition into mainstream discourse, Meiners says now is an important time to take a long, hard look at the civil commitment system. Yet, even as mass incarceration falls further out of political favor, few politicians are willing to expend their political capital protecting the rights of people convicted of sex crimes. There is little to gain from defending those people whom society has determined to be irredeemable and less than human. The result is that places like the Rushville facility operate with little oversight and protection for those held inside.

"It's so depressing here, I'm surprised more people haven't committed suicide," says Arrington. "I considered that when I first got here." Desperate for release, Arrington says over the phone he fears he will spend the rest of his life in the Rushville facility.

"No one," he says, "wants to stand up for people in this kind of program."

AR-00000673

**SARAH LAZARE** is web editor at *In These Times*. She comes from a background in independent journalism for publications including *The Intercept*, *The Nation*, and Tom Dispatch. She tweets at @sarahlazare.

---

*Have thoughts or reactions to this or any other piece that you'd like to share? Send us a note with the Letter to the Editor form.*

---

AR-00000674

# New Study by Catherine Carpenter: BLANKET EXCLUSIONS,ANIMUS,AND THE FALSE POLICIES THEY PROMOTE

Aug 14, 2020 | 0 comments

Saying something is true does not make it so. And saying it louder does not make it truer.

But such is the legislative posture behind modern day sex offense registration laws that punish those who commit sex crimes because of entrenched myths that overstate the laws' positive impact on public safety and exaggerate recidivism rates of offenders. And it is not only registration schemes themselves that have been scaffold-ed by these myths, but numerous ancillary laws that exclude benefits to offenders strictly because they have committed sex offenses.

Sadly, this sticky, but false, narrative has provided the animus that galvanized implementation of registration and notification regimes. And in its most recent chapter, the narrative has been formalized into blanket exclusions – or what this article calls "all except for" provisions – that have inserted into a myriad of criminal justice reform efforts without much notoriety.

The effect? Registrants and their families have been prohibited from broad-based and important ameliorative changes to the carceral state, many to which they should be entitled, and to which they are denied only because of their status as registrants. Indeed, within comprehensive legislation covering numerous crime and sentencing reforms, these ubiquitous blanket exclusions have the markings of boilerplate language that have been introduced even where the new legislation has no rational relationship to the protection of the public's safety or the prior sex offense conviction.

This article examines the moral panic and false data used to buttress blanket exclusion provisions – their inflated importance obvious. It concludes that these measures, which are untethered to public safety concerns, and only supported by governmental and community animus, violate fourteenth amendment protections.

Read the study here: Carpenter, Blanket Exclusions https://floridaactioncommittee.org/wp-content/uploads/2020/08/Carpenter-Blanket-Exclusions.pdf

CONCLUSION Blanket exclusions are but a small piece of a larger tapestry of legislative and community animus targeting registrants. Fueled by inaccurate data and community panic, "all except for provisions" only further punitive measures designed to isolate and marginalize this community. Saying something is true does not make it so. And saying it louder does not make it truer.

**Since 2015, nearly** 300 men in cities and towns across Washington State have been arrested in online-predator stings, most of them run by the State Patrol and code-named Operation Net Nanny. The men range in age from 17 to 77, though about a quarter are 25 or younger. As many as two dozen have been rounded up in a single sting and charged with attempted rape of a child, as Jace Hambrick was, even though no actual children were involved. The emails and texts offering sex are written by undercover officers. The "girls" in the photos are not 13. They are police officers, typically the youngest women on the force.

For law enforcement, stings are an efficient way to make high-profile felony arrests and secure convictions. In June 2016, John Garden, a State Patrol detective, emailed a fellow trooper about joining him on a sting in Spokane. "See if you can come play" and "chat some guys in," he wrote, according to a court filing. The conviction rate in cases that go to trial is about 95 percent, though most don't get that far. There is such shame associated with a sex crime, let alone a child sex crime, that a majority of the defendants plead guilty rather than face a jury. At least five of the men have committed suicide, including a 66-year-old caught in the same operation as Hambrick who then fled to California. As the police there moved to make the arrest, the man shot himself in the head.

An analysis of court records in Washington State stings, as well as interviews with police and prosecutors, reveals that most of the men arrested have no felony record. A strong predictor of predatory behavior is an obsession with child pornography, but at the time of their arrest, according to the State Patrol, 89 percent have none in their possession and 92 percent have no history of violent crime. They are nonetheless sentenced, on average, to more than six years in prison with no chance of parole, according to my analysis of the 271 arrests I was able to confirm. (State police calculate the average is just over five years.)

Once released, the men are listed on the state's sex-offender registry for at least 10 years — and often for life.

https://www.nytimes.com/2020/08/26/magazine/sex-offender-operation-net-nanny.html

AR-00000676

## ONCE AGAIN: Media, please use facts when writing about registered sexual offenders

August 27, 2020

***By Sandy . . . On August 25, National Public Radio – NPR — aired and printed this lengthy story about persons who are registered but are non-compliant. It immediately aroused the ire of advocates across the country due to the way these persons are described and presented. I wrote and sent the following to the journalist who wrote the piece and to the NPR headquarters in Washington, D.C.***

My name is Sandy Rozek, and I am communications director with the National Assc. for Rational Sexual Offense Laws – NARSOL.

I have read "Sex Offender Registries Often Fail Those They Are Designed To Protect" and would like to ask you to consider an alternate point of view.

Your emphasis is that registries fail to protect potential victims because so many who have past convictions for a sexual crime are not registered where they are supposed to be or cannot be located by law enforcement and have "absconded." I put that term, which you use often, in quotes because you are using it in a way not associated with its most common meaning, which is connected with criminal activity. The sex offender registry is a civil regulatory scheme not unlike the requirement to register one's vehicle.

But, unlike vehicle registrations, the consequence of failing to abide by the requirement to register as a sex offender poses serious criminal liability for the individual—sometimes even more severe than the original crime for which he was convicted. And while the term "abscond" aptly describes what happens when a person flees custody, the requirement to register as a sex offender has never been construed as a form of arrest or punishment. So, how is it possible for a person to "abscond" from a civil regulation? Please think about that.

You say, "Some sex offenders commit additional sex crimes after failing to tell police their whereabouts." Yes, they do. The average re-offense rate for those with a sexual crime conviction who are living in the community is 5%. The findings of individual state studies range from below 1% to 12% with the vast majority being between 2 and 5%. Additionally, reference to this study would have provided a more balanced approach to your reporting. Its findings are that those who are in violation of required registry compliance, including "absconding," do not commit additional sexual crimes at any significantly increased rate over those who are in compliance.

You quote both Kelly Socia and Alissa Ackerman, academics, researchers, and experts in sexual offense issues, in explaining negative aspects of the registry, but you use their remarks out of context in such a way that they support your thesis that the public at large is at significant risk of random assaults from non-compliant registrants.

The findings of both Socia and Ackerman are, contrarily, that the registry doesn't work and is an instrument of unnecessary public shaming because the vast majority of sexual crime is

committed by those with no prior sexual crime conviction and therefore are not on the radar created by the registry. Both Socia's and Ackerman's research found the registry and its requirements to be of little to no value in enhancing public safety. As Ackerman phrased it, sex offense registries and their related policies ". . . do nothing to support prevention, are not a deterrent, and do nothing for people who have survived sexual violence."

We at NARSOL appreciate your writing about sexual offense issues. One of our goals is to increase media involvement in educating the public about the facts of sexual offending. It is in this spirit that we ask you to do some research and determine the facts – and include them – in what you may write in the future.

Thank you,

Sandy Rozek, NARSOL communications

www.narsol.org

((NOT ALL POLICE DEPARTMENT ACT THAT WAY))

Forum post on WAR website - I have been trying to be a support system for a sex offender (his crime happened before 1995) and it's difficult, to say the least. A few days ago, I got a text message from someone trying to get his phone number. At the same time, my friend is being harassed and threatened with bodily harm by his new next door neighbor. (I think the two instances are connected--that the neighbor was trying to get his phone number so they could harass him on all accounts-- this person had 5 phone numbers he thought were my friend's, but were actually old numbers of mine--including the current one he texted me at. I can only assume he got my numbers because I used to own the house my friend now owns.)

Anyway, my friend called the police and the police refuse to do anything. They wouldn't make a report--nothing. They claimed that they couldn't do anything until the neighbor actually harms him. They didn't consider the threats a threat or harassment. What kind of world are we living in when they can allow people to harass and threaten sex offenders??? What recourse does the offender have? It has been OVER 20 YEARS since his crime. He shouldn't even be ON the list-- he got grandfathered in when the courts said it was okay to go back before 1995 and put people on a list as far back as the oldest living offender!

How does one in this situation defend themselves against attackers when even the sheriff's website has the disclaimer that you can't use their information to harass anyone? How do they get by with that?

https://ww1.womenagainstregistry.org/community/public-views/new-member-stories/paged/2/?fbclid=IwAR26DE48d_ZC_UhU6bUk4qnzX9j-evvA1JG6hjShTNJri5vLUu5yDIsMUTE#post-154

INVESTIGATION

# Inside the Endless Nightmare of Indefinite Detention Under "Civil Commitment"

After serving their criminal sentence, these men discover their punishment may never be over.

**SARAH LAZARE**     AUGUST 19, 2020



VICTOR TORRES/SHUTTERSTOCK

In June 2019, after serving more than 29 years in Illinois prisons, Otis Arrington expected to be released to freedom: He had finished his time, which he describes as difficult and traumatic, and his exit date was pending. But three days before he was slated to get out, Arrington says he was informed that he would, instead, be placed under a new form of confinement—one with no end date, meted out after he had already completed the punishment imposed by the criminal courts.

"I was supposed to get out, and they kidnapped me," says Arrington, now 62 years old. He is speaking over the phone from the Treatment and Detention Facility in Rushville—a rural area in western Illinois—where he is one of roughly 560 men (or, at least, people who the state has deemed men) who are being held indefinitely under a little-known "civil commitment" statute.

Under this legal mechanism, which exists in at least 20 states and the District of Columbia, individuals convicted of certain sexual offenses (or in some instances convicted of nothing), and deemed to have a mental disorder and constitute a danger to society, can be involuntarily committed to "treatment" facilities after they've already served their criminal sentence. While in civil commitment,

AR-00000680

individuals are supposed to receive mental healthcare and regular examinations, and to be released once it is determined they are no longer dangerous. As the statute that established civil commitment in Illinois in 1998 puts it, individuals are to receive "control, care and treatment until such time as the person is no longer a sexually violent person."

Yet, *In These Times* spoke with people held in civil commitment, rights advocates, scholars and lawyers who say that, instead of receiving effective treatment, people held under civil commitment statutes are subject to prison conditions, inadequate mental healthcare, scientifically dubious evaluations, and homophobic bias; they are deprived of meaningful due process; and they have little hope of getting out anytime soon. Rehabilitation is not the goal, critics charge, but rather, civil commitment is intended to indefinitely detain and punish people whom society has deemed undesirable. This confinement does not rectify the harm individuals have done, and there is no evidence that civil commitment laws reduce sexual violence in society, critics say. Instead, they argue, it unleashes untold new harms: as the site of abuse, trauma and, according to some, sexual violence.

"We served our time, and then they turn our sentence into a life sentence," says Arrington. "There are guys here who have been here over 20 years." He adds, "You would be amazed at how many residents have died here."

Arrington's observations are borne out by evidence. According to information obtained through a Freedom Of Information Act request to the Illinois Department of Human Services, which oversees the Rushville facility, 76 people have died while under the custody of the facility since it opened in 2006. That same FOIA data shows that 288 of the people being held there—slightly more than half of the total population—have been held for 10 years or more. Fifty-one people in Rushville have been held in civil commitment for 20 years or more, and 12 have been in civil commitment for 22 or more years, meaning they've been in civil commitment since the statute was implemented in 1998.

If the Rushville facility is supposed to treat people until they are no longer "sexually violent" and can therefore be released, it appears to be failing on its own terms.

## How civil commitment works

Stefan Vogler, a postdoctoral scholar at the Northwestern Center for Legal studies who specializes in civil commitment, says that these long stretches of confinement can be attributed to the fact that, once held under the civil commitment statute, individuals find themselves trapped in an opaque system that's nearly impossible to escape.

In Illinois, individuals convicted of certain sex crimes—generally those that involve contact, a physical victim, or possession of child pornography—are evaluated by the Department of Corrections at the end of their criminal sentence. If the department finds they meet a certain risk threshold, it will refer them to the attorney general or state's attorney who will then pursue a "sexually violent person" (SVP) case against them. The person then must go before a judge, who has the power to determine whether a civil commitment trial is warranted. "Pretty much any time they do that, they find probable cause," says Vogler.

Once probable cause is determined, that person is sent to Rushville where they wait for their SVP trial—something that is supposed to happen quickly but can often take years. While awaiting trial, individuals are given the opportunity to receive treatment, but according to scholars and lawyers interviewed by *In These Times*, the things people say in treatment are not considered confidential and can be used in their SVP trial.

AR-00000681

Arrington says he does not know who recommended him for commitment, and his efforts to find out have been fruitless. Held in Rushville since June 21, 2019, he has not had an SVP trial, nor does he have a trial date, and he said his motions to dismiss civil commitment, filed without legal counsel, have been dismissed. As he awaits trial, he says, he spends most of his time "in my cell, on the wing, in this so-called yard they have, which is more of a patio." He explains, "I'm not receiving any treatment while awaiting trial. I don't go to any of the groups. I'm just stuck here." According to Arrington, his entire unit is in quarantine due to the coronavirus pandemic.

"This is punishment after the punishment," says Arrington, adding: "It's worse than prison, because you don't have an out-date and don't have a sentence."

Arrington's odds of getting out may not improve much once he has an SVP trial. The state of Illinois must prove "beyond a reasonable doubt that the offender has a mental abnormality that predisposes him to sexual violence, and that he is substantially probable to recommit a sex crime if released from detention," Vogler explains.

Scholars and lawyers describe an environment that is stacked against the defendant, in which it is almost impossible to win one's freedom. Sara Garber, a lawyer with experience litigating SVP cases in Illinois, tells *In These Times*, "The system is designed so that nearly everyone who is evaluated is found by the state's experts to be SVP, and it is rare that one prevails at trial before a judge or jury, unless the state's experts deem the person to not be SVP."

Garber adds, "The entire SVP process is based on the false premise that we can predict someone's propensity for future criminal conduct based on their alleged past behavior and, even worse, that we as a society are comfortable punishing someone for a future crime they have not and may never commit."

If that individual is found to be an SVP, which, according to Vogler, is "the usual outcome," then they will be held in Rushville until they are deemed less of a risk. But "they don't receive any meaningful treatment," says Vogler, which is why many spend decades—or even life—in the facility.

Trevor Hoppe is an assistant professor of sociology at University of North Carolina—Greensboro and author of *Punishing Disease: HIV and the Criminalization of Sickness* who is working on a new book examining sex offender civil commitment statutes in the United States. He says, "The idea is to put these people away and never let them out. That's how many proponents of these laws will talk about them. There are due process mechanisms to try to get release, but once you are committed, it's really hard to get out."

And, indeed, early proponents of the Act in Illinois described it as a mechanism to lock people away from society. In 1997, former Gov. Jim Edgar said at a news conference before signing the bill, "Sexual predators are among the most dangerous criminals and this legislation will help protect the community from these ticking time bombs."

Under the U.S. legal system, people are not supposed to be prosecuted twice for the same crime—what's referred to as "double jeopardy." However, according to Vogler, this standard is violated when it comes to civil commitment. "After the individual serves a sentence, he is tried again essentially for the same crime," Vogler explains. "The Supreme Court has decided that's okay because they're not being tried criminally twice, but they're being tried in a civil setting. This is despite the fact much higher consequences are attached to this civil suit than a normal civil suit. Usually, when

AR-00000682

we're talking about civil law, we're talking about suing someone for damages. Usually those aren't life imprisonment decisions."

## Accusations of negligent treatment

Once civilly committed to Rushville, individuals must progress through a treatment program, overseen by the private Liberty Healthcare Corporation, in order to be released. In a 2019–2020 internship brochure for the Rushville facility, the corporation says its mission is to provide "state of the art, sex offender specific treatment in a safe, structured residential environment. We focus on the individualized needs of the residents and treat each resident respectfully, professionally and with dignity. We believe that all residents can change. We strive to reduce risk to society by facilitating lifelong behavioral change in residents."

Yet, scholars and residents paint a very different picture. "Most of what happens in Rushville is group therapy," says Vogler. "There are different phases of treatment, and to advance to phases, you have to participate in certain groups. They get little individual attention. You can't do effective treatment for someone the state has found severely ill by only doing group AA-type treatment."

"As part of those treatments," Vogler continues, "they have to talk about their sex lives in extreme detail, from how many sex partners they've been with to what types of sexual acts they've done to what fantasies they masturbate to to how frequently they masturbate."

Arrington says he thinks such a treatment program would be actively harmful for him. "They have residents running the group," he says. "I can't do the group treatment. I have PTSD from my time in prison. I can't deal with that. You're dealing with guys talking about all the things they've done... I can't deal with hearing that stuff."

It's not that Arrington is unwilling to talk about the harm he has caused. He told *In These Times* that he wants to be open about the rape he committed in 1989. "I wouldn't want to try to sugar coat it or nothing," he says. "I broke into my neighbor's house and assaulted her." But according to Arrington, group therapy in a prison-like setting, in which anything he discusses can be used against him in a trial, is not going to bring accountability or healing for anyone. "I can understand wanting some kind of atonement," he says. "But we served our time."

Other people held in Rushville seem to share similar concerns about treatment. In the spring of 2019, the civil commitment working group of Black and Pink: Chicago, a prison abolitionist organization, sent a survey to 569 people being held in Rushville—which the organization says was roughly the full population at the time. The group received 204 responses, which it began analyzing that summer. While the organization plans to release a formal report in the coming months, it shared a one-page summary of preliminary findings with *In These Times*. The conclusions are dire.

Residents complained about "unqualified therapists," some of them students, as well as a high turnover problem, and the general lack of a "trusting therapeutic relationship" this engenders. They also complained about a climate of favoritism, in which residents are "incentivized to kiss ass." Residents say, "Civil commitment is a life sentence, a death sentence; they were sent there to die, believe they will die here." Respondents expressed concern about "homophobia of staff and violation of rights of gay and transgender people." They described an "unfair tier system: no consistency or transparency in application of tier or behavior status systems; difficult to progress, unclear standards for progressive, arbitrary, used for punishment rather than treatment." It's a "scam," "farce,"

"indefinite," "endless," is not about treatment or public safety, and is "only open for political or financial reasons," the document states.

Allegations of profound negligence and mistreatment have also been aired in lawsuits. In May 2015, five men detained at the Rushville facility waged a lawsuit charging that "mentally ill residents" of Rushville are grossly neglected, mistreated, mocked, abused and unfairly categorized as "uncooperative malingerers." The suit also claims that these individuals are retaliated against for filing grievances or helping others file grievances, and that they cannot get the "sex offender treatment" that they seek.

The lawsuit, which names several defendants, including Liberty Healthcare Corporation and the facility's director, provides grisly anecdotes. "If they try to commit suicide by hanging themselves with a sheet from their beds, they will be written up for destruction of state property," the lawsuit states. It continues, "What limited and erratic care there is, is provided chiefly by medication. A resident with paranoid schizophrenia may see a psychiatrist once a month, to 're-up' his medication, and a social worker once a month." The lawsuit charges, "Residents on suicide watch are neglected, abused or both. They can be stripped naked, placed in a cell with no mattress or blankets."

These conditions violate the constitutional prohibition of cruel and unusual punishment, alleges the lawsuit, which was eventually dismissed.

Erica Meiners, professor of women's and gender studies at Northeastern Illinois University and co-author of the book, *The Feminist and The Sex Offender*, says such complaints are common among people held in civil commitment across the country. "Invariably, the people who work at these places, are usually sort of interns. They get practicum students who are trying to get hours toward their psychotherapy degree. They don't stay long—they stay a year or so. In most of these states, the treatment model is a stage model. You have to pass a polygraph test to move from stage to stage. Then they have to start from square one again, because the psychotherapist left after a year because they got a better job. And then they're in there for another year."

"A lot of the people in these institutions have been institutionalized for decades and have endured incredible harm and done harm. These are intense and complex cases," says Meiners. "If we're saying we're doing treatment, we need the real thing here, not a wide range of practices that are not necessarily proven to be effective."

In 1999, a task force of the American Psychiatric Association strongly criticized civil commitment in its publication, "Dangerous Sex Offenders." It states, "In the opinion of the Task Force, sexual predator commitment laws represent a serious assault on the integrity of psychiatry, particularly with regard to defining mental illness and the clinical conditions for compulsory treatment. Moreover, by bending civil commitment to serve essentially non-medical purposes, sexual predator commitment statues threaten to undermine the legitimacy of the medical model of commitment."

The APA concludes, "In the opinion of the Task Force, psychiatry must vigorously oppose these statutes in order to preserve the moral authority of the profession and to ensure continuing societal confidence in the medical model of civil commitment."

Mental Health America, a non-profit that aims to meet the needs of people living with mental illness, expresses similar concerns about civil commitment. "They focus on punishment rather than treatment, deal with people who often do not have a treatable mental illness, increase stigma, distort civil commitment, risk the safety of other persons in mental health facilities, divert resources

AR-00000684

from mental healthcare and inappropriately burden the mental health system with a criminal justice function for which it is not funded or equipped," the organization's website states.

## Controversial assessment methods

Critics point out that the tests and evaluation tools used to assess whether an individual can progress through the treatment program at the Rushville facility are not universally accepted as sound science. Lawyers, scholars and residents confirmed to *In These Times* that people held in Rushville have to take polygraph "lie detector" tests, which have been broadly discredited as junk science. In a position statement on this test, the American Psychological Association advises, "although the idea of a lie detector may be comforting, the most practical advice is to remain skeptical about any conclusion wrung from a polygraph."

There is another, more invasive test people held at the Rushville facility must take if they wish to progress, according to lawyers, scholars and residents: The penile plethysmograph. Vogler explains, "A blood pressure test or tube is placed on a man's penis, and then he is either shown pornographic images or presented with audio vignettes of sexual situations, and they gauge his erectile response. This is how they determine if they think someone is sexually dangerous. If someone shows arousal to a scene involving coercion or forced sexual penetration, then they could take that as indication of underlying sexual danger."

In its brochure, the Liberty Healthcare Corporation acknowledges its use of the test, stating, "Detection and measurement of deviant sexual arousal is an important index of response to treatment and treatment effectiveness."

But the penile plethysmograph is a controversial procedure, and numerous experts do not consider it scientifically reliable. For one, it is possible to stifle an erection by focusing one's mind on other, non-arousing thoughts. In addition, becoming aroused by representations or descriptions of violent acts does not prove that an individual will commit sexual violence in the future. Finally, as psychology professor at Beacon College in Florida, Dr. A.J. Marsden, told *VICE*, "A lot of therapists think [the penile plethysmograph is] not the best measure to prove if they are really attracted to the images they show them."

According to Vogler, the test "reflects a poor understanding of how sexuality and anatomy works. This is not a good test." He continues, "People have brought lawsuits saying this is cruel and unusual punishment and invasion of privacy. Often people freeze at those points in treatment, and they can't progress and if they can't progress they can never be released."

Most U.S. courts do not consider evidence obtained by penile plethysmograph to be admissible to determine guilt or innocence. In 2006, the U.S. Ninth Circuit Court of Appeals ruled that the penile plethysmograph violated the civil liberties of the defendant, a man who was convicted of possessing child pornography. The court stated that it "viewed penile plethysmography as an intrusive procedure, both physically and psychologically, likening the procedure to a device from a George Orwell novel," according to a summary of the case published in the Journal of the American Academy of Psychiatry and the Law.

Yet, within the Rushville facility, such a test could play a role in determining whether someone remains confined, lawyers, scholars and residents confirmed.

AR-00000685

These are not the only assessment methods that have garnered criticism. Another evaluation tool—the Static-99—came up in numerous interviews, with experts expressing concern that homophobia is baked into its methods. The Static-99 and other updated versions of this tool are broadly used in civil commitment cases—including at Rushville—to evaluate the risk posed by people convicted of sex crimes. One of the questions this tool asks is whether the individuals, who the state deems to be men, had a male victim. If so, they are determined to be more dangerous.

According to Vogler, "There is bias built into the 'objective' actuarial tool we use to evaluate people."

Hoppe puts it succinctly: "They are assigning a higher risk score to gay men necessarily."

## Not the right way to address sexual violence

Civil commitment laws spread throughout the United States during the 1990s-era panic about crime, and the related 1990s and early 2000s expansion of sex offender notification and registry laws. Some vestiges of the tough-on-crime '90s, like the 1994 crime bill and the 1996 Prison Litigation Reform Act, have fallen out of favor in recent years, due to concerns over mass incarceration. Yet, civil commitment laws remain relatively politically unchallenged, in a climate where few want to question laws that target people convicted of sex offenses. "There are very few courageous lawmakers who are going to say, 'Hey, we need to look at this,'" says Tony Thedford, a lawyer with experience litigating SVP cases in Illinois.

Proponents of civil commitment laws cite the need to protect public safety from dangerous sexual predators. "Illinois' Sexually Violent Persons Act and the evaluation by the IDOC is the closest thing we have to a crystal ball when it comes to determining whether an offender will attack again," then-Illinois Attorney General Lisa Madigan said in a 2006 statement announcing an expansion of the law. "This process is designed to identify those offenders for whom it is substantially probable that they will engage in future acts of sexual violence and to keep them out of society for as long as they remain a danger."

But, according to Meiners, "There is no research that shows states with civil commitment have lower incidents of sexual assault than states that don't have civil commitment."

Indeed, a study published in *Brooklyn Law Review* in 2013, based on original data "gathered directly from states with SVP laws," found, "SVP laws have had no discernible impact on the incidence of sex crimes." The article concludes, "These results imply that states could more effectively reduce sex crimes by allocating these resources elsewhere."

Hoppe puts it this way: "These programs don't make us safer in reality. Many would say it makes them feel safer. We're not really tackling the problem, just making a lot of people's lives insufferable."

What's more, critics charge that civil commitment sends the false message that the key to stopping sexual violence is protecting members of the public from dangerous strangers. According to the Rape, Abuse & Incest National Network, an anti-sexual violence group, eight out of 10 rapes are "committed by someone known to the victim." Meiners says civil commitment perpetuates the myth that "stranger danger" is the bigger threat. "It's overwhelmingly people that we know, people intimate to the family circle," she says. "We shouldn't be falling for that line."

AR-00000686

People held in civil commitment are ostensibly members of the public, so any claims that the laws protect public safety must take their wellbeing into account. Emma Williams is a volunteer for Black and Pink: Chicago who helped run the survey of residents at the Rushville facility, and she became concerned about civil commitment as a result of her years of supporting sexual assault survivors. "A number of people in the system are survivors themselves, particularly of childhood sexual assault," she says. Williams emphasizes that people in civil commitment say it doesn't work, they feel judged and have to recount every sexual trauma they've suffered since childhood. "They're having to do that in a situation where everything you're sharing is shared with a prosecutor."

"If you want to end sexual violence," argues Williams, "you have to end this too. This is a form of sexual violence."

As long as we focus on things like civil commitment as the solution to sexual assault, we are not pursuing actual solutions, critics charge. "As a feminist, I'm someone who has a history of being committed to ending gender and sexual violence," explains Meiners. "What pushes me to continue this work is that the current régime of more punishment of people with convictions is not the path. If we're committed to ending gender and sexual violence, we have to do that work. This system functions as a resource drain and distraction from the real questions that we as communities, families and society need to be addressing."

According to Meiners, a "paradigm shift" is needed. "If we're thinking about child sexual violence, which drives a lot of anxiety around civil commitment and the push for criminalization, approximately one in five young people lives in poverty across the United States," she says. "We have no meaningful childcare, we have no gender-affirming feminist sex education in public schools. We need shifts that would let families, mothers and caregivers have some social safety net that's actually meaningful. Those are just some things that are preventative."

Williams, for her part, emphasizes the need for genuine accountability and restitution for harm done. "While there are likely some wrongfully convicted people inside, for those who truly did cause harm that they must account for, accountability is something that must happen within their community," she says. "When you remove someone from their community indefinitely, they're not going to want to change their behavior because they will no longer feel a sense of accountability to that community. It's a system of punishment and also isolation."

Amid growing calls to defund the police, and the foray of concepts like prison abolition into mainstream discourse, Meiners says now is an important time to take a long, hard look at the civil commitment system. Yet, even as mass incarceration falls further out of political favor, few politicians are willing to expend their political capital protecting the rights of people convicted of sex crimes. There is little to gain from defending those people whom society has determined to be irredeemable and less than human. The result is that places like the Rushville facility operate with little oversight and protection for those held inside.

"It's so depressing here, I'm surprised more people haven't committed suicide," says Arrington. "I considered that when I first got here." Desperate for release, Arrington says over the phone he fears he will spend the rest of his life in the Rushville facility.

"No one," he says, "wants to stand up for people in this kind of program."

AR-00000687

**SARAH LAZARE** is web editor at *In These Times*. She comes from a background in independent journalism for publications including *The Intercept*, *The Nation*, and Tom Dispatch. She tweets at @sarahlazare.

---

*Have thoughts or reactions to this or any other piece that you'd like to share? Send us a note with the Letter to the Editor form.*

---

AR-00000688

**Since 2015, nearly** 300 men in cities and towns across Washington State have been
arrested in online-predator stings, most of them run by the State Patrol and code-named
Operation Net Nanny. The men range in age from 17 to 77, though about a quarter are 25
or younger. As many as two dozen have been rounded up in a single sting and charged
with attempted rape of a child, as Jace Hambrick was, even though no actual children were
involved. The emails and texts offering sex are written by undercover officers. The "girls" in
the photos are not 13. They are police officers, typically the youngest women on the force.

For law enforcement, stings are an efficient way to make high-profile felony arrests and
secure convictions. In June 2016, John Garden, a State Patrol detective, emailed a fellow
trooper about joining him on a sting in Spokane. "See if you can come play" and "chat some
guys in," he wrote, according to a court filing. The conviction rate in cases that go to trial is
about 95 percent, though most don't get that far. There is such shame associated with a sex
crime, let alone a child sex crime, that a majority of the defendants plead guilty rather than
face a jury. At least five of the men have committed suicide, including a 66-year-old caught
in the same operation as Hambrick who then fled to California. As the police there moved to
make the arrest, the man shot himself in the head.

An analysis of court records in Washington State stings, as well as interviews with police
and prosecutors, reveals that most of the men arrested have no felony record. A strong
predictor of predatory behavior is an obsession with child pornography, but at the time of
their arrest, according to the State Patrol, 89 percent have none in their possession and 92
percent have no history of violent crime. They are nonetheless sentenced, on average, to
more than six years in prison with no chance of parole, according to my analysis of the 271
arrests I was able to confirm. (State police calculate the average is just over five years.)

Once released, the men are listed on the state's sex-offender registry for at least 10 years
— and often for life.

https://www.nytimes.com/2020/08/26/magazine/sex-offender-operation-net-nanny.html

Over 200,000 individuals are on sex offender registries for offenses committed when they were children. Registration can be life-long and can be imposed without any inquiry into the child's individual circumstances or progress in treatment. Some states require community notification in addition to registration and reporting requirements. Many young people face registration as a consequence of developmentally normal behavior, including playing doctor, streaking, sexting, and consensual teen romances.

While some youth commit serious sexual harm and should be held accountable for this conduct, they also need support and effective interventions to change their behavior; the vast majority of youth who act out sexually do not recidivate. A meta-analysis reviewing 107 studies found that across behavior type, over 97% of children charged with sexual offenses never harm sexually again. Moreover, after almost 30 years of placing children on registries, empirical research concludes that the practice does not prevent or reduce sexual violence. Rather, placing young people on registries fuels cycles of homelessness, incarceration, and trauma, for both the registrant and survivors.

Although some states have improved youth registration requirements through legislation, the consequence of registration for any period of time is severe. Leading researchers that have studied the impact of registration on young people have empirical data demonstrating the harm caused by registration. Legislative advocacy is needed – in coordination with litigation – to eradicate youth registration. This statutory review demonstrates that regional differences and nuances of state youth registration laws preclude a "one size fits all" approach to reform.

Strategies and research must be based on best practices for both incremental reform and efforts to completely abolish youth registration nationwide. In addition, a federal legislative strategy will be a necessary and fundamental component of these efforts, as many states continue to be constrained by stringent requirements imposed by the Adam Walsh Act. Moreover, states continue to look toward the federal government and changing federal youth registration law would be one way to inspire and lead states to do the same. Most states that require juvenile registration do so without regard to either changing United States Supreme Court caselaw or the emergent research on its effectiveness at promoting public safety or the harm it causes children.

Against this backdrop, the time is now to set a targeted policy reform agenda to roll back these harsh registration laws.

https://jlc.org/sites/default/files/attachments/2020-08/Labeled%20for%20Life%20August%202020.pdf

## Florida Sex Offender Registry Double-Growth

By RENE STUTZMAN

APR 08, 2016 | 4:18 PM

Update
A new state report says that the number of sexual offenders and predators living in Florida has risen by more than 50 percent in the last 13 years since the sex stings started. Legislative auditors reported late last week that nearly 29,000 registered Florida sex offenders and predators now reside in the state. That's an increase of 53 percent since 2005. (REALLY?  HOW IS THAT POSSIBLE?)

**There are:**
**77,000 names on the Florida Registry but here is the break out as of May 2020:**
**27,735 with FL as permanent state and in Communities (probation or released)**
**19,669 with FL as permanent state but not in communities (absconded, deported, deceased, civil commitment, incarcerated)**
**25,856 with permanent state other than FL**
 **4,389 with permanent state other than FL (absconded, deported, deceased, civil commitment, incarcerated)**
*77,649 total now on their registry*

The feds are paying Florida for thousands of people who don't even live in Florida, have died or have been deported.  But they refuse to take anyone off.  The registry has doubled since they started the stings, convenient huh?

A registered person is more apt to spend the rest of their lives in prison or in Community Commitment (a criminal sanitarium just for sex offenders) if they don't register on time or fail to notify their neighbors of their status than they are for the crime they actually committed. Anyone in Florida can be placed in life time civil commitment at the request of the prison or probation officer without a trial or hearing.  THEY NEVER GET OUT.

More than a dozen people a day walk into the Orange County Sheriff's Office and register as sex offenders. The county is home to more than 2,200 of them. The Orange County Sheriff's Office has a dozen people on staff — including four detectives – who do nothing but register and track sex offenders, who are required by law to register.

A recent study by researchers at the Florida Legislature found that the number of registered sex offenders living in Florida communities has increased 44 percent over the past 10 years since the sex stings started. The statewide total is more than 26,000, according to the researchers at the Office of Program Policy Analysis and Government Accountability. If you add in all the other sex offenders that the state is required to register — those who live out of state and those locked up in jail or prison — the number climbs to more than 66,000. They aren't even citizens of Florida but Florida refuses to remove them from their registry and the feds pay them thousands of dollars a year for each of them.

AR-00000691

Experts who treat sex offenders and researchers say people should not be alarmed by the increase in Florida's numbers. "Every single state has seen an increase in the number of people on their registry over time," said Jill Levenson, a researcher, professor of social work at Barry University and counselor who treats sex offenders in Broward County. One of the reasons: "People come onto the registry, but they don't come off," she said. The number will continue to climb, she said, because it's like building a prison from which inmates are never released.

What's important to remember, experts say, is that most registered sex offenders do not commit new sex crimes. "About 95 percent of people who are caught with child pornography never reoffend," said Dr. Alan Grieco, a Winter Park psychologist at Psychological Affiliates who evaluates and treats sex offenders.

The most common registered sex offender in Florida is a middle-aged white man who was accused of trying to or sexually abused a minor, according to a 2013 study by a team of researchers led by Levenson.

Which types of sex offenders are the most dangerous? High on the list, according to researchers, are those who rape adults. They are more likely to reoffend and to use weapons or force, according to the Florida Association for the Treatment of Sex Abusers, a group of professionals who treat sex abusers. People who possess child pornography are among the least likely to molest children, the association reported.

**Sheriffs keep tabs on offenders**
The Florida Department of Law Enforcement is the agency that manages the sex registry, but its job is not to manage sex offenders. Its job is to oversee a system that relies on offenders to self-report. They must register at the local sheriff's office twice a year and fill out paperwork, saying where they live. If they don't, they face possible arrest. In fiscal year 2014-15, 878 were arrested for failing to register, legislative researchers found. And if they fail to register they are **thrown back in prison for years not for a crime but for not registering.** (Not for their crime, but for not registering.  How is that fair? )

Sexual predators, a classification for people who are believed to be a greater threat, must register four times a year. The total living in Florida communities has gone up 145 percent in 10 years, legislative researchers found. Most likely due to the increase activity of sex stings. Except for 6,200 people who are on probation and, thus, are being supervised by the Florida Department of Corrections.

Local sheriffs are required to keep up-to-date addresses for them, even those who are homeless. According to the legislative study, more than 1,700 of Florida's registered sex offenders are transients. Nearly half of them live in Miami-Dade and Broward counties, FDLE numbers show. About 170 of them live in Orange County.

Many registered sex offenders have trouble finding somewhere to live because of exclusion zones, the result of a state law that requires some offenders to live more than 1,000 feet from areas where children congregate. Some communities have ordinances that expand those zones to 2,500 feet. They also require each sex offender to knock on the doors of all neighbors and inform them that they are a sex offender.  They are required to tell their landlord, their boss,

AR-00000692

and all the people they work with.  Needless to say, no one will rent to them, no one will hire them, no one will work with them. Those communities have a higher proportion of homeless sex offenders, according to the treatment association, because offenders have fewer housing options and are blocked from more neighborhoods.

Homeless registered sex offenders are required to check in at the local sheriff's office every 30 days, and the overwhelming majority do, the study found. "If they register an address that's actually a hotel, we see them monthly," said Cpl. Dorothy Rivera, who helps manage the Orange County Sheriff's Office sex registration squad. "We physically go out there every 30 days." In the past, members of her team have trekked to transient camps in the woods. "We'd knock on tents," she said.

Written mostly by By RENE STUTZMAN
Update added by other sources.

AR-00000693

# THE LADY JUSTICE MYTH

- **JACE STORY**

  - Just the Facts
  - Setting
    - Casual Encounters
    - ADHD
    - Gaming Addiction
  - Cast
    - Defendants
    - Police
    - The Media
    - Lawyers
    - Prosecuter
    - The Judge
  - Crime
    - Communicating with a child
    - Attempted Rape of a Child
  - Punishment
    - Arraignment
    - Trial
    - Sentencing
  - Follow the Money
    - Ankle Monitoring
    - What taxpayers pay for prison
    - Prisons
    - Police
    - Communication Vendors
    - Product Vendors
  - Hope

- **BLOG**
- **OTHER RESOURCE SITES**



27 AUG 2020LADYJUSTICEMYTHICAC, INTERNET CRIMES AGAINST CHILDREN, MECTF, O.U.R., OPERATION UNDERGROUND RAILROAD, PROACTIVE STINGS, WASHINGTON STATE

# Ummm…excuse me….Mr. ICAC?



Those of you who read the article know that Jace was arrested through the ICAC task force. Most 'net nanny' stings in WA state are run through MECTF (Missing and Exploited Children Task Force). Different name, same corruption., same focus – money, not children's safety.

I just wrote all 61 ICAC Task Force offices across the U.S. the same letter. I hope to get some responses. But I'm not holding my breath.



"Hello – I am the mother of the man in the times article. I reached out to each and every one of you when my son was first arrested for assistance to understand exactly what the rules are and aren't in your jobs. Few of you bothered to get back to me. I did have a conversation with a woman from Las Vegas Nevada who told me they cannot use a picture of an adult to lure men into their sting. Clearly you all can!

The truth is most of your task forces do not follow the guidelines dictated by the DOJ. And before you say it, I wrote the DOJ too, they also don't care if you follow their rules. At this point

AR-00000695

what you have built is a money machine. For private prisons, prosecutors, judges, courthouse workers, parole officers, registration administrators, prison concessions, SO therapy groups, defense attorneys, experts,  sleazy fundraising companies like O.U.R, QAnon…. the list goes on and on.

It's an empire.

My question to each and every one of you: Is this really what you set out to do? Does it ever bother you that you prosecute every single person caught in these stings? Do none of you believe in decent human beings anymore? That just maybe…someone would have left if they met a child? Someone would have reported the child to the authorities? Someone would have found their parents? Someone was trying to help a child in need? Where did reasonable doubt go? Innocent until proven guilty? Without actual corroborating evidence, missing from the vast majority in these cases in WA state as well as other states, you all are now the 'Thought Police'.

I know most of you have good intentions – but you are now just trading potential innocent victims while creating a new group of wrongly convicted citizens. You are not solving the problem – you just moved it around a little.

But I hope for more. From you, our government, our society. I hope to save children from abuse WHILE NOT prosecuting innocent men in the process.

Thank you for reading, Kathleen Hambrick"

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 8, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

| Comment |

First off it is your office that in 2010 debunked the myth "frightening and high" by stating the recidivism rate is less than 5% which is still not true-it is 6/10 of one percent-and now you want to support new additions to the AWA which is in violation of the ex post facto clause (U.S. Const. Art. I, Section 10) and bill of attainder clause (U.S. Const. Art. 1 Section 9). It is also in violation of equal protection and due process laws of the 14th Amendment. It is also a violation of the 4th and 5th Amendments of the Constitution because of all sorts of things including search and seizure and double jeopardy. It also steps all over the 11th Amendment which gives states their sovereignty and the 13th Amendment which abolished all forms of slavery and involuntary servitude. To tell the states they have to not only add more stipulations to their registry laws but to also add those that are off their registry back on the registry. That is violation of separation of powers in cases that they have been court ordered off and/or have been given relief by the courts because the legislative branch cannot overrule, interfere, or act as a member of the judicial branch. In cases like Doe v Snyder a lot of the aspects of the registry were deemed unconstitutional and overall was deemed unconstitutional because it violated the vague doctrine of the 5th Amendment and the ex post fact clause. Just last week a bill that would have added several more restrictions/punishment for murderers was turned down because it was overbearing but yet they face nowhere near the stigma and difficulties that sex offenders face. I threatened to call DHS and threw my roommate out for selling her daughter for free drugs and alcohol yet I was teh one thrown in jail. A friend was arrested and convicted for a crime that was not even a crime nor was it on the books (bothering a child) that was a misdemeanor 30 years ago. Now not only was his crime changed into a class B felony but the entire definition, cause, and elements were completely changed just so they could hit him with a felony. Another friend was on a social media site ran secretly by the FBI and the FBI planted child pornography pics on his account and when he saw them he asked how to get them off his account. There were over 200 pics but he was charged for one pic and the pic wasn't graphic or nudist. When he went to court even the judge said he could beat the case but when he moved out of state (Tennessee, the state you declared 3rd most corrupt state in 2012) he was sentenced to 6 years and 10 years probation. How is that fair? And you want to support a law that would put innocent people in more jeopardy and hardship? It has been proven time and again sex offenders are the least likely to reoffend but more laws are piled on them while people like murders, child beaters, drunk drivers, and

AR-00000697

terrorists are treated more humanely and with less restrictions/punishment. "If it saves just one child it is worth it" is the slogan used so many times to justify these draconian laws that resemble very closely the Jim Crow laws and the Nuremburg laws under Hitler that EVERYONE condemned. But what about the 10s of thousands of children who are homeless, fatherless, motherless, beat up, murdered, kicked out of school, humiliated to the point of committing suicide, and constantly mocked because their parent is a sex offender or are one themselves because they were "curious" r was thought innocent. How about the autistic boy in Chattanooga who was arrested and charged with a sex crime because he tried to comfort a crying little girl by hugging her and kissing her in a very innocent gesture of friendship. Or how about the 4 year olds who are being arrested, charged, and convicted and forced to register for life because they played "doctor" which was a game we all played as a child. All this while drunk drivers who kill people are allowed to walk free and the father who "accidentally" broke his kid's arm gets to do it again, and again, and again. What has this country become? When did we become so much like China and Russia (the U.S.S.R.)? I have supplied empirical evidence that proves sex offenders should have the least restrictions and in fact have the lowest recidivism out of all felons except those who committed suicide (I wonder why) and that 99% of sex crimes are committed by a trusted family member, friend, or colleague and are NOT on the registry. I have also supplied empirical proof that the registry is in fact punishment in disguise of administrative/civil law. I can also back this up with about 8GB of court cases but I wanted to get more personal with the limited number of attachments allowed. For more info on recidivism and sex offender issues got to https://issuu.com/search?q=recidivism and https://www.bjs.gov/#recidivism.

---

Attachments  ⑨

---

📄 A Sex Law Gone Awry

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0207/attachment_2.pdf)

---

📄 Collateral Damage in America's War on Sex Crimes

⬇ Download ▾

---

📄 Vigilante attacks

⬇ Download ▾

---

📄 Nuremburg Laws

⬇ Download ▾

---

AR-00000698

Weaponizing the Registry

⬇ Download ▾

We are only as Free as the least Free among us (2019_10_18 19_10_55 UTC)

⬇ Download ▾

Who Really Commits New Sex Crimes

⬇ Download ▾

Are GPS ankle bracelets harming the people that are forced to wear them

⬇ Download ▾

Registry is failing

⬇ Download ▾

**Comment ID**
DOJ-OAG-2020-0003-0207

◎ **Tracking Number**
ked-97wg-jew6

**Comment Details**                          **Submitter Info**

**Received Date**
Aug 27, 2020

AR-00000699

Regulations.gov



About     Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000700

**B6** / Sunday, Oct. 21, 2007

# The Atlanta Journal-Constitution

# OUR OPINION

## EDITORIAL: REGISTRY WITHOUT REASON
### FIRST OF A TWO-PART SERIES

# A sex law gone awry

## It's unjust to saddle teens with damning label for life

The state of Georgia regards 28-year-old Wendy Whitaker as such a threat to public safety that it posts her photo and address on the Internet, bans her from living near schools, churches and playgrounds and forbids her from working with children.

What makes Whitaker such a terrible danger?

Eleven years ago, when she had just turned 17, Whitaker engaged in a single act of oral sex with a boy in her sophomore class on school property. That's it.

Though less than two years separated the couple — the boy was about to turn 16 — Whitaker was arrested for sodomy, a charge to which she pleaded guilty and completed five years probation. However, that plea also means that Whitaker will serve a lifetime on the state's sex-offender registry, placing her in the same category as truly dangerous people such as rapists and child molesters. It also imposes severe — some might argue unconscionable — limits on where she can live and work.

Whitaker's case shares many of the same features — and outrages — as that of Genarlow Wilson, the Douglas County man whose 10-year prison sentence for consensual teen sex has recently sparked national condemnation.

Neither Whitaker nor Wilson had a history of sex crimes. Like Whitaker, Wilson was 17 when he engaged in consensual oral sex with a 15-year-old classmate. And like Whitaker, Wilson faces a lifetime



Photos provided by the Southern Center for Human Rights

**Wendy Whitaker:** At age 17, she engaged in an act of oral sex with a 15-year-old while on school property. She pleaded guilty to sodomy and completed five years probation. But, the law requires that she be registered as a sex offender for the rest of her life.

on the sex offender registry, a designation that will follow them anywhere they go in the United States.

In fact, Wilson continues to reject a plea bargain that would considerably shorten his 10-year sentence in large part because he does not want the sex-offender label to cast a shadow over his adult life.

"I don't feel like one mistake should cost me 10 years in prison and a lifetime on the sex-offender registry," Wilson says. "I want to be able to go to school and have kids."

### Severe tag for low-level acts

That concern is understandable. Federal law requires states to create registries of offenders con-

victed of sex crimes or offenses against children. It also requires local law enforcement agencies to provide information to schools, day care centers and parents about sex offenders living in the community. In Georgia, sheriff's offices publish the photos of newly registered offenders in their jurisdictions in their local newspapers,

AR-00000701

and the GBI maintains a registry of all offenders.

However, 22 states, including Georgia, have gone further by imposing residency or work limits on offenders on the registry. Of those, Georgia's law is among the most extreme.

According to a recent count, 14,572 people are now listed on the Georgia registry. While a large number are rapists and child molesters, only 38 are classified by the state as predators, someone "who suffers from a mental abnormality or personality disorder or attitude that places the person at risk of perpetrating any future predatory sexually violent offenses."

Obviously, the public has every reason and right to know the whereabouts of those offenders, 12 of whom are behind bars. Just as obviously, the sex offender registry should include those convicted of rape and child molestation, and place restrictions on their activities.

However, the registry doesn't need to include the lowest level offenders, least of all teenagers punished for sex acts that, unfortunately, are now common among high school students. Half of teens ages 15 to 19 have had oral sex, according to a 2005 Centers for Disease Control and Prevention report. That does not mean that half of teens belong on a sex-offender registry.

Unfortunately, changing state law to remove people such as Whitaker and Wilson is difficult. Instead, the instinct of politicians is always to toughen such restrictions, often without thinking through questions of effectiveness or fairness.

Just last year, the General Assembly again tightened the restrictions. Previous law had barred sex offenders from living or loitering within 1,000 feet of schools, day care centers, parks, rec centers or skating rinks. The 2006 law added churches, swimming pools and school bus stops to that list.

For the first time, the new law also barred sex offenders from holding jobs within 1,000 feet of schools, child care centers or churches.

### Repeatedly forced to move

With those changes, offenders who had previously been in compliance with state law suddenly found themselves in violation. If they didn't move or find new jobs, they faced prison.



**Jeffery York:** The state's sex offender registry law, which restricts where he lives, forced the Polk County resident to move. Then, he had to move again. Now, he lives in a camper van in the woods without running water or electricity.

For Whitaker, a full-time college student studying criminal justice, the law has meant that she and her husband of seven years had to leave their new house in Harlem, Ga., because it was near a mother's morning-out program.

"This is a home we love," she says in a written statement on how the law affected her life. "It has a white picket fence and big American flag outside."

The couple also gave up attending Sunday services for fear of violating the provision against loitering near churches. Whitaker and her husband have now moved twice because of the law, while still paying the mortgage on their original home. She and her husband bunked with her brother-in-law for a time, but Whitaker was concerned that she would eventually be in violation of the law because her niece was about to start school and a school bus would be stopping near the house.

Jeffery York, 23, of Polk County, faces a similar predicament. He, too, was convicted of sodomy for having oral sex with a 15-year-old when he was 17. Because his home was near a school, he moved in with his grandmother last year. When it turned out that she lived within the 1,000-feet limit of a child-care center, York was forced to move again. He now lives in a camper van in the woods without running water or electricity. "I feel like my life is just stuck in the mud because of all the restrictions on me," says York.

The bus-stop provision of the registry law is the most disruptive. Under challenge, the provision is not being enforced now. "There is literally a school bus stop on every corner. The law went way too far — it tried to criminalize people's very existence," says attorney Sarah Geraghty of the Southern Center for Human Rights.

### A change is needed

The Southern Center and the Georgia chapter of the American Civil Liberties Union filed a class-action lawsuit challenging the residency restrictions; Whitaker and York are among those included in the case, which is still in the courts.

"We know that there is not a danger to society from someone like Wendy Whitaker or Jeffery York," says Geraghty. "We need a law that recognizes when people are not a danger to children."

Georgia law should be changed to reflect the difference between the youthful indiscretions of teenagers, such as Whitaker, York and Wilson, and the predatory acts of dangerous deviants. In addition to putting unfair and unnecessary restrictions on their lives, their inclusion on the list complicates the job of law enforcement agencies charged with tracking those listed on the registry.

"By putting everybody on the registry, you are giving a false sense of security to society," says former DeKalb District Attorney J. Tom Morgan, an internationally recognized expert on the prosecution of sex crimes. Morgan says a zealous prosecution of teens for sex crimes can lead to such absurdities as the Oregon case in which two immature 13-year-old boys faced felony sex abuse charges because they ran down their school hall in February and swatted girls on the backsides.

If convicted, the middle school students would have been on Oregon's sex offender registry for life. Although the two boys spent five days in jail and were barred from school for the rest of the year, a judge dropped charges against them in August after they apologized to their classmates.

### Discretion must be allowed

And, unfortunately, it's not hard to imagine similar injustices emerging. In one possible example cited by Morgan, "you've got a 17-year-old who snaps a picture of his girlfriend's breasts using his cell phone, and he's guilty of possessing and distributing child pornography."

Georgia should reserve its sex registry for those who truly pose a danger to others and eliminate those who were involved in consensual, nonviolent acts. It should also create a graduated system that imposes the greatest restrictions on the worst offenders.

The law should also allow sex offenders a greater chance to have their names removed from the registry. Florida, for example, allows teens involved in a consensual sexual encounter with a partner within four years of their age to petition for removal of their names. In Indiana, courts have discretion to rule that young violators found to be in a "dating relationship" with an age difference of four years or less should not be included in the state's sex-offender registry.

This is a complicated and at times highly emotional issue in which flexibility, not hard and fast rules, provide the best balance between justice and public safety.

— **Maureen Downey**, for the editorial board (mdowney@ajc.com)

# Collateral Damage in America's War on Sex Crimes

How Democrats Helped Create an Enemy of the State

On Tuesday in front of Congress, President Trump announced the launch of a new office to track crimes committed by unauthorized immigrants. It will issue quarterly reports "studying the effects of the victimization by criminal aliens present in the United States." Democrats in the chamber audibly groaned.

Trump went on to recognize the family members of three victims of murders by undocumented immigrants–two were the wives of murdered cops, and the other was a father whose son was murdered by a gang member living illegally in the U.S.

That the President has this one wrong–the facts don't justify this policy–is by now well known. As Business Insider reports, a 2009 study found that 'broad reductions in violent crime […] are partially attributable to increases in immigration.'" That is, violent crime has gone down as immigration has gone up. Many other recent studies have come to similar conclusions.

Oh how easy it is to create an enemy of the state. 1. Identify a problem (crime). 2. Falsely imply that one group is disproportionality to blame (immigrants). 3. Highlight sensational cases (dead police officers). 4. Build an apparatus to punish the whole group.

But Democrats thundering at Trump from high up the moral mountaintop should recognize the pattern. That's because they've long colluded, and often led the way in, inventing another enemy–those who've committed sex crimes.

Twenty years of robust studies confirm that those convicted of sex crimes have lower re-offense rates than almost any other group of ex-offenders. Upwards of 90 percent of new sex crimes are committed by someone who's not on a sex offender registry.

No matter–since the mid-nineties, Democrats and Republicans have pitched in to build our dark labyrinth of sex offender laws. Those include not just public registries that list ex-offenders' photos, addresses, and workplaces, but residency restrictions that ban them from living in all but a handful of homes. There are requirements that they send out (and foot the bill for) postcards when they move to a neighborhood, that place warning signs outside their homes, that set restrictions on what they can do on Halloween, and that ban them from places like parks, malls, and museums.

Our politicians seem at their most creative and collaborative when devising new rules to make the lives of this group, and often that of their families, miserable or impossible.

So Democratic New York Governor Andrew Cuomo and Democratic State Senator Jeff Klein compete over who can claim credit for banning sex offenders from playing Pokémon Go. Milwaukee Democratic alderman Tony Zielinkski sponsors a successful bill that bans registrants from living most anywhere in the city (which promptly spikes homelessness rates among those ex-offenders). Democratic New York Suffolk County Executive Steve Bellone and fellow county Democrats, over the objections of Republicans, ram through a program to funnel public money to an advocacy group that ratchets up the number of surprise visits to registrants' homes. All justify their proposals with the false claim that these ex-offenders put their communities at high risk.

So once Democrats get a taste for resisting Trump's attempt to pin our problems on a defenseless target, maybe they'll take a break to look in the mirror. Because they've been equal-opportunity offenders when it comes to beating up the scrawny kid on the playground who just looks like he deserves it.

This entry was posted in Uncategorized on March 3, 2017 by embedmettled.

← More on What Victim Advocates Say About Registries

3 thoughts on "How Democrats Helped Create an Enemy of the State"

http://www.timesunion.com/news/article/1-of-3-Troy-suspects-returns-to-face-charges-in-6313771.php

# 2 suspects go to Troy in fatal arson

2 waive extradition, 3rd to have hearing in North Carolina

By Kenneth C. Crowe II

Updated 9:45 pm, Monday, June 8, 2015

Troy

Two of the three suspects in the fatal May 1 arson have waived extradition from North Carolina while the third will have a hearing next week on returning to Troy, a spokesman for Rensselaer County District Attorney Joel Abelove said Monday.

The three are charged with first-degree arson for allegedly setting the fire, which authorities now believe caused the death of Gladys Halpin, 82.

Halpin was rescued from the 520 Second Ave. apartment building fire, during which she suffered a heart attack. Firefighters were able to revive her and get her to the hospital. She died May 23 at Bay State General Hospital in Massachusetts. Final autopsy results have not yet been released.

On Sunday, David Stanley, 22, of East Greenbush, was arraigned in City Court and sent to the jail without bail, police spokesman Capt. Daniel DeWolf said. He had previously waived extradition in North Carolina before being brought to Troy.

On Monday, Tyler Smith, 24, formerly of Castleton, waived his extradition at a hearing in Raleigh, N.C., and will be back in Troy by the end of the week, said Jonathan Desso, a spokesman for Abelove.

Abby Slaga, 21, of East Greenbush, did not waive extradition because she wanted to consult with an attorney, Desso said. Slaga's hearing will be June 16 in Franklin County, N.C. She will continue to be held on a fugitive from justice warrant in the Franklin County Jail without bail.

Stanley, Slaga and Smith were arrested last week by Raleigh police and Franklin County deputies on fugitive warrants issued in Troy. City detectives took part in the arrests.

AR-00000704

DeWolf said detectives would return to Raleigh to bring back Smith.

According to Stanley's arrest report and criminal complaint, at least two people have given statements to police about what they saw and heard that night.
Those witnesses said Monday that the three defendants and a man who lived on the second floor of 520 Second Ave. had a feud over money that was apparently stolen from the tenant.

"They spray painted 'Rapo' on his door and on the building," said one witness who did not want his name used. "He was a Level 1 sex offender, we were told, but it sounded to me like they were arguing over money. I could smell the gasoline they used to set the fire outside his door."

The target of the flames was convicted of a sex crime in 2004, officials said.
Another witness said she had just come home from work that night and heard the argument and went to see what was going on.

"Then I saw the whole building just go 'boom' and saw the three people run out the door, one on fire. I then rushed around to make sure everyone was getting out."
Smith had been out of state prison for just a week before he allegedly took part in setting the fatal fire, according to authorities and New York state inmate records. He had been in prison for attempted burglary in Rensselaer County.

The three fled to the home in North Carolina of a relative of one of the suspects.
Officials said all three were friends and Slaga was involved in a romantic relationship with one of the men, but they did not specify which one.

Officials declined to say how the fire was set.

A video from the night of the fire appeared to show three people fleeing the building at 520 Second Ave.

The fire spread to neighboring 518 Second Ave. next door. Both buildings were heavily damaged and are now boarded up.

The investigation continues, and authorities have not ruled out additional charges.

The May 1 fire has not been linked to an earlier string of 13 fires set in Lansingburgh between July 2014 and February 2015, police said.

kcrowe@timesunion.com • 518-454-5084 • @KennethCrowe

http://www.thestate.com/news/state/article156734894.html

# SC 'skinhead' said God told him to kill sex offenders, wanted conviction tossed out

BY ANDREW DYS
*adys@heraldonline.com*

YORK, SC
An unapologetic white supremacist serving three life sentences for killing two people in 2013 was denied a new trial Friday. He claimed God told him to kill sex offenders.

Jeremy Moody, 34, of Union County, pleaded guilty in May 2014 to two counts of murder, burglary, kidnapping and other charges. He later filed a post conviction relief lawsuit claiming his court-appointed lawyers should have done more in the case to explore his mental illness.

Moody asked for the convictions to be tossed out.

A hearing was held in April in York at the Moss Justice Center. Judge Thomas Cooper dismissed the lawsuit Friday, said Dorothy Moore, spokesperson for the S.C. Attorney General's Office who argued Moody had competent counsel and should stay in prison for the rest of his life.
Kevin Brackett, 16th Circuit solicitor who prosecuted Moody, called the decision the right one.

"Mr. Moody is right where he belongs," Brackett said.

Moody and wife Christine each pleaded guilty to the killings of Charles and Gretchen Parker, just over the border from York County, and said they would do it again. Moody told police if he hadn't been caught, he would have kept killing. Charles Parker had been registered as a sex offender.
At the time of the 2014 trial, Jeremy Moody had "skinhead" tattoo across his throat and the words "white power" tattooed on the top of his bald head.
Both Moodys had mental illnesses, their lawyers said when each pleaded guilty at the same time in a hearing and aftermath that caught national attention because of the rants and taunts the couple made about being proud of their crimes.

AR-00000707

https://www.prisonlegalnews.org/news/2016/sep/2/registered-sex-offenders-fall-victim-vigilante-justice/

# Registered Sex Offenders Fall Victim to "Vigilante Justice"

Loaded on SEPT. 2, 2016 published in Prison Legal News September, 2016, page 49
Filed under: Sex Offender Registration, Sex Offenders (Discrimination), Sex Offender Residence, Statistics/Trends, Sex Offender Registration and Notification Act.
Location: United States of America.

Share:
Share on Twitter Share on Facebook Share on G+ Share with email

According to prosecutors, an Anchorage man assaulted and robbed three men on Alaska's sex offender registry, keeping a notebook that listed the names of his victims and the items he stole from them. Jason Christian Vukovich, 41, allegedly plotted the attacks as revenge for his victims' "past crimes," and carried out the assaults over a five-day period between June 25 and 29, 2016.

One of sex offenders he targeted, Wesley Demarest, who served time after pleading no contest to sexual abuse of a minor, said Vukovich called him by name and said "I'm an avenging angel. I'm going to mete out justice for the people you hurt," before fracturing his skull with a hammer. Two other victims, sex offenders Charles Albee and Andres Barbosa, recounted that their assailant, a man with "shoulder-length hair and a black leather jacket," told them he found them on the state's sex offender registry. Vukovich was charged with three class A felonies, four class B felonies and 11 class C felonies. A judge set his bail at $100,000.

Attacks against sex offenders are not uncommon. In 2012, a Washington man was sentenced to life without parole for gunning down two registered sex offenders. Patrick Drum, who pleaded guilty to the murders, was unrepentant at his sentencing hearing and admitted he had planned to continue killing sex offenders until he was caught. [See: PLN, Feb. 2013, p.50]. In Maryland, Donald Robinson died in 2014 after a young woman, Latiqwa Mayes, incited a crowd to violence by shouting that he was a sex offender who had raped her. Strangers joined in the beating, which mortally wounded Robinson. Mayes is now serving a six-year prison term; her father, Willie Mayes, who had initially detained Robinson, received a 10-year sentence suspended to two years. [See: PLN, June 2015, p.63].

Sources: *www.ktva.com, www.baltimoresun.com, www.nydailynews.com*

AR-00000708

http://www.nytimes.com/1995/01/11/nyregion/vigilante-attack-in-new-jersey-is-linked-to-sex-offenders-law.html

# 'Vigilante' Attack in New Jersey Is Linked to Sex-Offenders Law

By JON NORDHEIMER,
Published: January 11, 1995

**PHILLIPSBURG, N.J., Jan. 10**— Two men who knew that a recently paroled sex offender was living here because of the community notification provision in "Megan's Law" have been charged with assault in a case that prosecutors are calling the first instance of vigilantism under the new law.

The two men, a father and son, broke into the house where the parolee, Michael Groff, 25, was asleep on a living room floor at 2:47 A.M. Sunday, Warren County authorities said. But several people were staying at the house, at 318 Lincoln Street, and one of the intruders began beating a man he mistook for Mr. Groff, said John J. O'Reilly, the County Prosecutor.

Barbara Keller, 41, who was asleep on the couch at the time of the break-in, said, "All of a sudden this big guy in a black ski mask came in the door and said he was looking for the 'child molester.' " Someone called the police, who arrived within minutes and subdued the attacker before anyone was seriously hurt, the prosecutor said.

Last fall, Gov. Christine Todd Whitman signed the legislation, named after a 7-year-old Hamilton Township girl, Megan Kanka, who was sexually assaulted and murdered on July 29. A neighbor who is a twice-convicted sex offender has been charged in her death. Lawmakers viewed the law's community-notification provisions as a safeguard to children against sexual predators and pedophiles.

Today, as word of the attack spread around the state, it was condemned by law-enforcement officials, who said they would be aggressive about prosecuting "vigilantism," and by civil libertarians, who have opposed the law as an invasion of privacy.

The legal director of the American Civil Liberties Union of New Jersey, Marsha Wenk, said, "This is exactly the concern that we had when the law was being considered for

passage, that it would be used to enable vigilantism rather than for any legitimate community interest."

A Federal judge in Newark issued a preliminary injunction last week barring community notification in the case of a recently released rapist who moved to Passaic. Courts in a handful of states -- California, Illinois, Arizona, New Hampshire and Alaska -- have struck down community notification statutes as unconstitutional. But they have upheld registries, which enable the police to track sex offenders' whereabouts.

Mr. O'Reilly, the prosecutor here, said: "We're not going to tolerate this kind of vigilantism. 'Megan's Law' was never intended to permit or condone harassment or intimidation of individuals who have paid their debt to society."

And Jayne Rebovich, a spokesman for Attorney General Deborah Poritz, who strongly supports the law, released a statement saying: "This type of behavior is totally unacceptable and will be prosecuted to the fullest extent of the law."

Phillipsburg is an old industrial town across the Delaware River from Easton, Pa. Mr. Groff had been staying in the apartment with his aunt and uncle, John and Carol Hanby, Ms. Keller said. They had given him a temporary place to live after his release last month from state prison. He had served 4 years of a 10-year sentence after being convicted of sexually abusing his 1-year-old daughter and a 4-year-old boy, Mr. O'Reilly said.

The intruders were identified by the police as Kenneth Kerkes, 52, and his son, Kenneth Jr., 22, who live a block away in another wood frame row house. The younger man was identified by the police as a corrections officer in the Northampton County, Pa., jail.

Each was charged with second-degree burglary and misdemeanor counts of assault, harassment, malicious damage and conspiracy. They remained in jail today in lieu of individual cash bails of $10,000, the prosecutor said.

Ms. Keller said the attack unfolded quickly once the masked intruder, identified by the police as the elder Mr. Kerkes, entered the living room and awakened them.

Ms. Keller described the following exchange:

"Are you Michael Groff?" the intruder asked Thomas Vicari, a truck driver who had arrived at the apartment a few hours earlier after a long trip.

AR-00000710

"Who wants to know?" Mr. Vicari responded sleepily as he sat up in a sofa bed under a color portrait of Elvis Presley.

"You're the child molester," the man said and started pummeling Mr. Vicari with his fists.

Ms. Keller said the two men fell in a scrambling pile on the floor while the younger Mr. Kerkes stood guard at the door and hurled a beer bottle through the living-room window.

Ms. Keller said she ran to the rear of the house and told Mr. and Mrs. Hanby to telephone the police, who soon arrived.

Mr. O'Reilly said there was no evidence of a wider conspiracy.

He said his office complied with the guidelines accompanying the new law when he directed the police to notify neighbors on Lincoln Street on Dec. 27 that Mr. Groff had been released from prison and had moved to their block. His office also notified local schools, youth organizations and other groups who had been registered to receive information about newly released sex offenders.

The legislation established three tiers of sex offenders in respect to their risk to a community.

Mr. Groff was considered a high risk case because he had previously exhibited a sexual preference for a child outside his immediate family and had committed repeated crimes, Mr. O'Reilly said.

Moreover, there was concern because he had served only 4 years of his 10-year sentence in a prison where he had not received therapy for his problems, the prosecutor said.

http://www.foxcarolina.com/story/22906138/sheriff-2-bodies-found-in-union-county-home

## Homicide suspect calls victim 'pedophile' and 'demon'

*Posted: Jul 22, 2013 10:18 PM CDT*
*Updated: July 29, 2013 11:51 PM*

JONESVILLE, SC (FOX Carolina) -

Two homicide suspects in Union County are facing more charges after a fatal stabbing and shooting in Jonesville.

On July 22, Sheriff David Taylor said a neighbor called 911 about 8:40 p.m. and wanted deputies to check on the residents in a home on Furman L. Fendley Highway.

He identified the victims as Gretchen Parker, 51, and Charles Parker, 59, and said they lived in the home where they were found dead.

The victims were shot with a .380 handgun at close range and stabbed, according to Taylor.

Taylor said surveillance video helped them identify and arrest Christine Moody, 36, and Jeremy Moody, 30, in connection with the Parkers' deaths. Both were arrested and charged with two counts of murder.

On July 29, the sheriff's office announced more charges against the two. In addition to the murder charges, Jeremy Moody and Christine Moody are also charged with two counts of kidnapping, two counts of possession of a firearm during a violent crime and first degree burglary, Taylor said.

In court, Christine Moody told FOX Carolina that Charles Parker was a "pedophile" and a "demon."

The Moodys are being held without bond on the murder charges. The couple will have to see a circuit court judge before bond can be considered on the other charges.

According to the sheriff, Jeremy Moody told deputies he killed Charles Parker because he was a registered sex offender and planned to kill another registered sex offender on his list Wednesday had he not been caught, Taylor said. Taylor said Gretchen Parker was killed because she was with Charles Parker.

According to the State Law Enforcement Division website, Charles Parker is listed as a registered sex offender, convicted in 2003 of third-degree criminal sexual conduct involving a 31-year-old woman.  North Carolina court records show Parker was also convicted in a sexual assault case involving a child in 1991.

### Deputies, neighbor discover bodies in Jonesville home

A neighbor had stopped by a few times Monday, but no one came to the door so he called deputies, Taylor said.

Taylor said in a press conference Tuesday that both victims were shot and also stabbed multiple times, but so far, investigators have no leads and have not made any arrests in the case.

"Anytime you have dead bodies, and you don't know who's done the act, it's a threat," Taylor said.

An autopsy done Monday morning determined that Charles Parker was shot twice, once in the neck and once in the chest, and also suffered from stab wounds, Taylor said. Gretchen Parker was shot once in the chest and stabbed multiple times, according to Taylor.

When deputies arrived, they found the back door open and heard dogs inside the home, Taylor said. He said deputies discovered the bodies of a man and woman in the living room, guarded by several dogs.

Taylor said investigators had to wait for Animal Control to take eight dogs, some puppies, two cats and chickens out of the house and secure warrants before going inside.

State Law Enforcement Division investigators were brought in to help process the crime scene, Taylor said.

Taylor said from everyone investigators have talked to, no one had talked to the Parkers since Saturday. He also said there were no signs of forced entry, though the door was left wide open.

"From everything that we can tell, nothing is missing at this time," Taylor said. "Everything appears to still be intact. The house was not ransacked. So it doesn't appear to be robbery."

**Sheriff: Surveillance video shows suspects at scene of crime**

Jeremy Moody told deputies that he had met Charles Parker a year earlier and they were acquaintances, according to Taylor.

According to Taylor, Jeremy Moody said he wanted to kill Charles Parker a year ago but he "chickened out" and then decided to kill him Sunday. Taylor said Jeremy Moody got the tools necessary to go through with his plans, including a gun, knife, gloves and boots.

Taylor said the Parkers' exterior surveillance cameras showed the Moodys pull up to the home, pop the hood on their vehicle as if it was broken down then encounter Gretchen Parker.

He said Charles Parker came out of the home after his wife for a few minutes before returning inside. That's when the Moodys went inside the home, Taylor said.

According to Taylor, surveillance video shows both of the Moodys walk inside the home. He said Christine Moody appeared to have something in her hand while Jeremy Moody appeared to have a gun in his hand.

Jeremy Moody told deputies that he confronted Charles Parker, telling him he was not there to rob him when they said they did not have any money, according to Taylor.

"He says, 'You think I'm here to rob you, I'm not here to rob you,'" Taylor said Jeremy Moody told deputies. "[He] says, 'I'm here to kill you because you're a child molester.'"

Jeremy Moody admitted to pulling the trigger of the gun and stabbing the victims, according to Taylor.

Because Christine Moody was present during the killings, knew about them and did nothing, Taylor said, she is just as culpable.

Taylor said Jeremy Moody is affiliated with some type of group and is now under investigation in connection with crimes in other counties.

On Friday the sheriff's office said that the FBI was opening its own investigation into Jeremy Moody's activities.

Stay with FOX Carolina and foxcarolina.com for the latest in this developing story.

*Copyright 2013 FOX Carolina (Meredith Corporation). All rights reserved.*

http://www.cbsnews.com/news/did-sex-offender-listing-lead-to-murder/

# Did Sex Offender Listing Lead To Murder?



Megan's Law

**AP**

*The Skinny is **Keach Hagey's** take on the top news of the day and the best of the Internet.*

Megan's Law, which allows the names and addresses of convicted sex offenders to be listed on the Internet, is often criticized for its theoretical ability to facilitate vigilante violence.

The Los Angeles Times reports on a killing in Lake County, Calif., in which prosecutors are investigating the possibility that this very fear may have come true for the first time in the state.

Convicted rapist Michael Dodele had been free just 35 days when sheriff's deputies found him dead from stab wounds last month in his mobile home. They quickly arrested his neighbor, 29-year-old construction worker Ivan Garcia

Oliver, who made "incriminating comments, essentially admitting to his attacking Dodele," police said.

Oliver pleaded not guilty to charges of first-degree murder, burglary and elder abuse on Nov. 30.

A neighbor of Oliver's said that two days before the killing, he "told every house" in the trailer park that he found Dodele's name listed on the Web site of convicted sexual offenders, and was uncomfortable living near him.

In a jailhouse interview with the Los Angeles Times, Oliver said he had a son who was molested in the past and he took action to protect the child.

"Society may see the action I took as unacceptable in the eyes of 'normal' people," Oliver said. "I felt that by not taking evasive action as a father in the right direction, I might as well have taken my child to some swamp filled with alligators and had them tear him to pieces. It's no different."

As it turned out, Dodele was not actually a child molester. His records show he sexually assaulted adult women. But a listing on the Megan's Law Web site could have left Oliver with the impression that he had abused children because of the way that it was written.

A spokesman for the state attorney general said the site described the man's offenses as "rape by force" and "oral copulation with a person under 14 or by force."

Charlene Steen, a psychologist who examined Dodele on behalf of the defense in two 2007 trials about whether he should be recommitted to a state hospital, blamed the messenger. "I think [Oliver and Dodele] are both victims of the Internet," she said.

AR-00000716

http://www.dailymail.co.uk/news/article-2205288/Patrick-Drum-Vigilante-killed-sex-offenders-sentenced-life-prison.html

# 'They deserved to die': Vigilante who gunned down two registered sex offenders is unrepentant as judge sentences him to life in prison

**PUBLISHED:** 18:47 EDT, 18 September 2012 | **UPDATED:** 20:19 EDT, 18 September 2012

A vigilante who gunned down two registered sex offenders in Washington state was unrepentant as he was sentenced to life in prison on Tuesday.

Patrick Drum, 34, told a judge that his victims deserved to die.

Drum, who is himself a convicted felon, admitted to stalking Gary Lee Blanton, 28, and Jerry Wayne Ray, 57, and shooting them multiple times in their homes near Port Angeles, Washington.



Unrepentant: Patrick Drum, 34, told a judge that his victims, both registered sex offenders, deserved to die

Blanton was convicted in 2001 of third-degree rape of a 17-year-old girl. Ray was convicted in 2002 of raping two children, age 4 and 7.

AR-00000717

Blanton's family claims he was put on the sex offender registry after he was caught having sex with his high school girlfriend when he was a senior and she was a freshman.

**RELATED ARTICLES**
Drum's supporters filled the courtroom as authorities admitted some see him as a hero for the premeditated murders.

'It is unfortunate there are those people who admire what he did,' Clallam County Prosecuting Attorney Deb Kelly said, according to the **Sequim Gazette**. 'It is despicable and disgusting.'

The murders in June in rural Washington sparked a massive police manhunt for Drum. After his arrest, Drum told officers who questioned him about the killings that 'it had to be done.'

He also said he would have killed more sex offenders if he had not been caught.
Both Blanton and Ray lived in Drum's neighborhood and he knew them both. Blanton's family says he and Drum were friends for nine years before the murder.
Drum tried to interrupt the prosecutor as she blasted the ex-con for killing two men with families.

Blanton has a wife and two young children. Ray lived with his elderly father and helped care for him.

When it came time for Drum to give a final statement before his sentencing, he refused to apologize for the murders.

'It was never my intent to hurt the families... it's like collateral damage,' he told the court. He asked his supporters to leave the grieving family members alone.

'As for the men themselves, actions speak louder than words,' he added.

Superior Court Judge S Brooke Taylor handed down to two life sentences without parole, plus several years for burglary and unlawful possession of a weapon by a felon.


Read more: http://www.dailymail.co.uk/news/article-2205288/Patrick-Drum-Vigilante-killed-sex-offenders-sentenced-life-prison.html#ixzz4kTpqpiIJ
Follow us: @MailOnline on Twitter | DailyMail on Facebook

http://usatoday30.usatoday.com/news/nation/2006-04-16-maine-shootings_x.htm

# Suspected shooter found sex offenders' homes on website

Updated 4/18/2006 5:43 AM ET

**By Emily Bazar, USA TODAY**

The killings of two convicted child molesters in Maine prompted authorities to briefly remove the state's online sex-offender registry and revived concerns that such websites may encourage vigilante-style justice.

The Maine Sex Offender Registry's online search was taken down Sunday morning after two convicted sex offenders were shot and killed in their towns about 25 miles apart, said Stephen McCausland, spokesman for the Maine Department of Public Safety.

Stephen Marshall, identified by Maine State Police as the only suspect in the shooting, killed himself Sunday night as police boarded the bus he had taken to Boston.

Marshall had logged onto the site sometime before the two men were shot several times, McCausland said. While on the site, Marshall also sought information on 32 other sex offenders.

The site provides photos, names, ages, addresses and conviction histories of about 2,200 registered sex offenders in the state.

"In order to get an individual profile, you have to register," McCausland said. He said Marshall had signed up to get access to the data.

Joseph Gray, 57, of Milo, was shot about 3 a.m. Sunday while sitting on his living room couch. He was convicted in Massachusetts of sexually assaulting a child. About five hours later, William Elliott, 24, of Corinth, was killed when he answered the door. He was convicted of sexual abuse of a minor in Maine.

Marshall, a Canadian from Nova Scotia, had been visiting his father in Maine, McCausland said. Police identified him from a license plate spotted at the scene of the second shooting and traced him to Boston.

"There's no known connection between the three men," McCausland said. "We have a lot more questions than we have answers."

Maine restored its sex-offender website Monday afternoon.

Most states post their sexual-offender registries online, says Charles Onley, a research associate for the Center for Sex Offender Management, a project of the U.S. Department of Justice.

https://fairnj.wordpress.com/tag/vigilante-action-against-sex-offenders/

# Tag Archives: vigilante action against sex offenders

## *In Honor Of Michael*

*The unexpected knock at the door.*

*The crashing sound in the middle of the night.*

*The phone call from the man who make threats.*

*The car following every turn.*

*The internet stalkers that posts lies and put life and limb in jeopardy.*

*The websites that list address, photos and details which in turn invites* <u>*vigilantes*</u> *to* <u>*vandalize*</u>*, attack, beat and kill.*

Every day people live in fear. Fear of being beaten, having their home, vehicles or other property vandalized; even to the point of fearing for their very lives. What country could this describe? What could be causing this kind of anguish? Is their reason to fear, real?

The country, the <u>United States of America</u>. The cause, The <u>Sex Offender Registry</u> and subsequent vigilante actions. Is there reason to fear? Yes!

Vandalism, and stalking are daily occurrences for former offenders, their spouses, family and friends. In one place or another, beatings occur several times a month and even <u>murders</u> happen far to often.

For those who are registered, their spouses, family and friends, the fear of vigilante attacks are a constant worry. A quick search of the internet will bring up such stories as: 'Sex offender's pizza shop vandalized', 'Two sex offenders shot dead in <u>Clallam County</u>', 'Sex Offenders murdered in Maine', '<u>Sex Offender</u> murdered, body burned', 'Proposed House For Sex Offenders Vandalized', 'Parents of Convicted Sex Offender Had Their House Vandalized', 'Rosewood Drive Sex offender's home vandalized, seven cars also spray-painted in large, white lettering' 'Registered Sex Offender beaten', 'Wife of Sex Offender killed in arson fire, registry to blame, murder charges pending.' And on and on.

The original intent of the registry, 'to protect children' has failed. Several studies have brought this fact to the fore-front. However, the unintended consequences of the registry are all too real. The Registry is directly responsible for murder, vandalism and a whole slew of other hate crimes.

Registered offenders, their spouses, families and friend form a disadvantaged group that is unprotected by many of the laws shielding other citizens from vigilante attacks. True,

AR-00000720

the laws seem to be written in a way that they should protect these disenfranchised members of society, however, when an registrant calls and reports a crime such as vandalism, the response they receive from Law Enforcement is less than encouraging as sometimes the police won't even bother to make out a report.

**Escalation**

Since 2003 there has been a sharp increase in the number of vigilante attacks of registrants.

An uniformed or apathetic public, media, and legislators are a major root of the problem. While vigilante elements fill the internet with misinformation and outright lies about registrants, the media continues to perpetuate misinformation and lies. Even in the face of reports that prove conclusively that former offenders are less likely to reoffend than other classes of criminals, the media, some political leaders and vigilante elements continue to promote skewed statistics and data.

At the same time, however, some **government officials** are coming to learn the hard truth, that they themselves were lied to. Some of these courageous people are setting aside strong personal feelings and prejudice and they are digging into the subject and finding something surprising. Not all sex offenders are the same and only a small percentage fall into the clinical category of being a true predator. Current registry laws, including the daftly constructed AWA, fail to properly identify with any accuracy those former offenders who pose a definitive risk to public safety. The cost of the registry is also escalating. Many locations are struggling with an ever increasing workload due to the estimated 8.5% annual expansion of the registry.

After doing research into the above facts and many others not mentioned, many who are in **public office** have come to realize that the registry was a bad, costly, ineffective idea. These officials will affirm that they feel that the public registry should be terminated, however they will say this only in private. The fear of reprisals from the public (votes) is too great for them to take a stand and do something that will, eventually, come to pass. So the question becomes this, how long will the courts and the government allow the murder and terrorizing of United States Citizens (registrants), their spouses, family and their friends?

Is there a way for those in office to move towards deregistering American Citizens? Yes, It starts with two important elements; 1. Run **Public Service Announcements** which present easy to understand facts taken from government sponsored studies regarding; recidivism rates of registrants, the ineffectiveness of the registry and  the growing cost of the registry. This will expose the public to the facts and an informed public will come to the right conclusions, in time.  3. Criminalize vigilante activities against former offenders both online and in the real world. Give former offenders the same protections that gays, Blacks and Jews now enjoy. Add Sex Offenders to the list of hate crime protectees.

Only then will registrants, their spouses, families and friends find security in 'the land of the free'.

https://en.wikipedia.org/wiki/Nuremberg_Laws

# Nuremberg Laws

From Wikipedia, the free encyclopedia

*For the set of guidelines for determining what constitutes a war crime, see [Nuremberg principles](). For the set of research ethics principles for human experimentation, see [Nuremberg Code]().*



Title page of RGB I No. 100 proclaiming the laws, issued 16 September 1935

The **Nuremberg Laws** (German: *Nürnberger Gesetze*) were [antisemitic]() laws in [Nazi Germany](). They were introduced on 15 September 1935 by the [Reichstag]() at a special meeting convened at the annual [Nuremberg Rally]() of the [Nazi Party]() (NSDAP). The two laws were the Law for the Protection of German Blood and German Honour, which forbade marriages and [extramarital intercourse]() between [Jews]() and Germans and the employment of German females under 45 in Jewish households, and the Reich Citizenship Law, which declared that only those of German or related blood were eligible to be Reich citizens; the remainder were classed as state subjects, without citizenship rights. A supplementary decree outlining the definition of who was Jewish was passed on 14 November, and the Reich Citizenship Law officially came into force on that date. The laws were expanded on 26 November 1935 to include [Romani people]() and [Afro-Germans](). This supplementary decree defined Gypsies as "enemies of the race-based state", the same category as Jews.

Out of foreign policy concerns, prosecutions under the two laws did not commence until after the [1936 Summer Olympics](), held in Berlin. After the Nazis [seized power]() in 1933, they began to implement their policies, which included the formation of a *[Volksgemeinschaft]()* (people's community) based on race. [Chancellor]() and [Führer]() (leader) [Adolf Hitler]() declared a [national boycott of Jewish businesses]() on 1 April 1933, and the [Law for the Restoration of the Professional Civil Service](), passed on 7 April, excluded [non-Aryans]() from the legal profession and civil service. Books considered un-German, including those by Jewish authors, were destroyed in a nationwide [book]()

burning on 10 May. Jewish citizens were harassed and subjected to violent attacks. They were actively suppressed, stripped of their citizenship and civil rights, and eventually completely removed from German society.

The Nuremberg laws had a crippling economic and social impact on the Jewish community. Persons convicted of violating the marriage laws were imprisoned, and (subsequent to 8 March 1938) upon completing their sentences were re-arrested by the Gestapo and sent to Nazi concentration camps. Non-Jews gradually stopped socialising with Jews or shopping in Jewish-owned stores, many of which closed due to lack of customers. As Jews were no longer permitted to work in the civil service or government-regulated professions such as medicine and education, many middle class business owners and professionals were forced to take menial employment. Emigration was problematic, as Jews were required to remit up to 90 per cent of their wealth as a tax upon leaving the country. By 1938 it was almost impossible for potential Jewish emigrants to find a country willing to take them. Mass deportation schemes such as the Madagascar Plan proved to be impossible for the Nazis to carry out, and starting in mid-1941, the German government started mass exterminations of the Jews of Europe.

| Contents |
| --- |
| [hide] |

- 1 Background
  - o 1.1 Nazi eugenics and racial belief
- 2 Nazi Germany
  - o 2.1 Reich Gypsy Law
  - o 2.2 "The Jewish problem"
  - o 2.3 Events at Nuremberg
- 3 Text of the laws
  - o 3.1 Law for the Protection of German Blood and German Honour
  - o 3.2 Reich Citizenship Law
- 4 Classifications under the laws
- 5 Impact
- 6 Legislation in other countries
- 7 Existing copies
- 8 See also
- 9 References
- 10 Sources
- 11 Further reading
- 12 External links

# Background[edit]

Prior to the formation of the German Empire in early 1871, the legal status of Jews varied from place to place within the German Confederation and the Kingdom of Prussia.[1] Jews became equal citizens with the creation of the new constitution that May.[2] However, they still faced discrimination and antisemitism. Nationalist sentiments and the idea of Germans as a separate race took hold at the beginning of the 20th century. Jews, with their different culture and ancestry, were viewed (particularly by proponents of the *Völkisch* movement) as being members of a separate and inferior race.[3] Several nationalistic and antisemitic groups (some with memberships of hundreds of thousands of people) formed after the First World War. These groups committed acts of violence against Jews and lobbied for their disenfranchisement and removal from German society.[4]

The National Socialist German Workers' Party (NSDAP; Nazi Party) was one of several far-right political parties active in Germany at the time.[5] The party platform included removal of the Weimar Republic, rejection of the terms of the Treaty of Versailles, radical antisemitism, and anti-Bolshevism.[6] They promised a strong central government, increased *Lebensraum* (living space) for Germanic peoples, formation of a *Volksgemeinschaft* (people's community) based on race, and racial cleansing via the active suppression of Jews, who would be stripped of their citizenship and civil rights.[7] The Nazis proposed national and cultural renewal based upon the *Völkisch* movement.[8]

### Nazi eugenics and racial belief[edit]

*Main articles: Nazi eugenics and Nazism and race*

Nazi racial beliefs arose from earlier proponents of a supremacist conception of race such as Arthur de Gobineau, who published a four-volume work titled *An Essay on the Inequality of the Human Races* (translated into German in 1897).[9] In it, de Gobineau proposed that the Aryan race was superior, and urged the preservation of its cultural and racial purity.[10] Houston Stewart Chamberlain's work *The Foundations of the Nineteenth Century* (1900), one of the first to combine Social Darwinism with antisemitism, describes history as a struggle for survival between the Germanic peoples and the Jews, whom he characterised as an inferior and dangerous group.[11] The two-volume book *Foundations of Human Hereditary Teaching and Racial Hygiene* (1920–21) by Eugen Fischer, Erwin Baur, and Fritz Lenz, used pseudoscientific studies to conclude that the Germans were superior to the Jews intellectually and physically, and recommended eugenics as a solution.[12] Madison Grant's work *The Passing of the Great Race* (1916) advocated Nordicism and proposed using a eugenic program to preserve the Nordic race. After reading the book, Hitler called it "my Bible".[13] The Nazis embraced the concept of Nordicism and wished for the Nordic race to dominate Germany, but they did not discriminate against Aryans who did not have Nordic physical characteristics.[14]

While imprisoned in 1924 after the failed Beer Hall Putsch, Hitler dictated *Mein Kampf* to his deputy, Rudolf Hess.[15] The book is an autobiography and exposition of Hitler's ideology in which he laid out his plans for transforming German society into one based on race. In it he outlined his belief in Jewish Bolshevism, a conspiracy theory that posited the existence of an international Jewish conspiracy for world domination in which the Jews were the mortal enemy of the German people. Throughout his life Hitler never wavered in his world view as expounded in *Mein Kampf*.[16] The NSDAP advocated the concept of a *Volksgemeinschaft* ("people's community") with the aim of uniting all Germans as national comrades, whilst excluding those deemed either to be community aliens or of a foreign race (*Fremdvölkische*).[17]

## Nazi Germany[edit]



Members of the SA picket in front of a Jewish place of business during the Nazi boycott of Jewish businesses, 1 April 1933.

Discrimination against Jews intensified after the NSDAP seized power; following a month-long series of attacks by members of the *Sturmabteilung* (SA; paramilitary wing of the NSDAP) on Jewish businesses, synagogues, and members of the legal profession, on 1 April 1933 Hitler declared

a national boycott of Jewish businesses.[118] By 1933, many people who were not NSDAP members advocated segregating Jews from the rest of German society.[119] The Law for the Restoration of the Professional Civil Service, passed on 7 April 1933, forced all non-Aryans to retire from the legal profession and civil service.[120] Similar legislation soon deprived Jewish members of other professions of their right to practise.[20] In 1934, the NSDAP published a pamphlet titled *"Warum Arierparagraph?"* ("Why the Aryan Law?"), which summarised the perceived need for the law.[21] As part of the drive to remove Jewish influence from cultural life, members of the National Socialist Student League removed from libraries any books considered un-German, and a nationwide book burning was held on 10 May.[22] Violence and economic pressure were used by the regime to encourage Jews to voluntarily leave the country.[23] Legislation passed in July 1933 stripped naturalised German Jews of their citizenship, creating a legal basis for recent immigrants (particularly Eastern European Jews) to be deported.[20] Many towns posted signs forbidding entry to Jews.[24] Throughout 1933 and 1934, Jewish businesses were denied access to markets, forbidden to advertise in newspapers, and deprived of access to government contracts. Citizens were harassed and subjected to violent attacks.[25]

Other laws promulgated in this period included the Law for the Prevention of Hereditarily Diseased Offspring (passed on 14 July 1933), which called for the compulsory sterilisation of people with a range of hereditary, physical, and mental illnesses.[26] Under the Law against Dangerous Habitual Criminals (passed 24 November 1935), habitual criminals were forced to undergo sterilisation as well.[27] This law was also used to force the incarceration in prison or Nazi concentration camps of "social misfits" such as the chronically unemployed, prostitutes, beggars, alcoholics, homeless vagrants, and Romani people.[28]

## Reich Gypsy Law[edit]

The Central Office for Combatting Gypsies was established in 1929.[29] In December 1938 *Reichsführer-SS* Heinrich Himmler issued an order for "combatting the Gypsy plague". Romani people were to be categorised in terms of their Roma ancestry as a racial characteristic, rather than their previous association as 'anti-social' elements of society.[30] This work was advanced by Dr Robert Ritter of the Racial Hygiene and Population unit of the Ministry of Health, who by 1942, had produced a scale of ZM+, ZM of the first and second degree, and ZM- to reflect an individual's decreasing level of Romani ancestry.[31] This classification meant that one could be classified as Roma and subject to anti-Roma legislation on the basis of having two Roma great-great grandparents.[32] Dr Zindel of the Ministry of the Interior prepared a draft of a Reich "Gypsy Law" intended to supplement and accompany the Nuremberg Laws. According to Zindel, the "Gypsy problem" could not be dealt with by forced resettlement or imprisonment within Germany. He recommended identification and registration of all Roma, followed by sterilisation and deportation. In 1938, public health authorities were ordered to register all Roma and Roma *Mischlinge*.[33] Despite Himmler's interest in enacting such legislation, which he said would prevent "further intermingling of blood, and which regulates all the most pressing questions which go together with the existences of Gypsies in the living space of the German nation",[34] the regime never promulgated the "Gypsy Law".[35] In December 1942, Himmler ordered that all Roma were to be sent to Nazi concentration camps.[30]

## "The Jewish problem"[edit]



The SA had nearly three million members at the start of 1934.[36]

Disenchanted with the unfulfilled promise of the NSDAP to eliminate Jews from German society, SA members were eager to lash out against the Jewish minority as a way of expressing their frustrations. A Gestapo report from early 1935 stated that the rank and file of the NSDAP would set in motion a solution to the "Jewish problem ... from below that the government would then have to follow".[37] Assaults, vandalism, and boycotts against Jews, which the Nazi government had temporarily curbed in 1934, increased again in 1935 amidst a propaganda campaign authorised at the highest levels of government.[37] Most non-party members ignored the boycotts and objected to the violence out of concern for their own safety.[38] The Israeli historian Otto Dov Kulka argues that there was a disparity between the views of the *Alte Kämpfer* (longtime party members) and the general public, but that even those Germans who were not politically active favoured bringing in tougher new antisemitic laws in 1935.[39] The matter was raised to the forefront of the state agenda as a result of this antisemitic agitation.[40]

The Interior Minister Wilhelm Frick announced on 25 July that a law forbidding marriages between Jews and non-Jews would shortly be promulgated, and recommended that registrars should avoid issuing licenses for such marriages for the time being. The draft law also called for a ban on marriage for persons with hereditary illnesses.[41]

Dr. Hjalmar Schacht, the Economics Minister and Reichsbank president, criticised the violent behaviour of the *Alte Kämpfer* and SA because of its negative impact on the economy.[40] The violence also had a negative impact on Germany's reputation in the international community.[42] For these reasons, Hitler ordered a stop to "individual actions" against German Jews on 8 August 1935, and the Interior Minister Wilhelm Frick threatened to take legal action against Party members who ignored the order.[40] From Hitler's perspective, it was imperative to quickly bring in new antisemitic laws to appease the radical elements in the NSDAP who persisted in attempting to remove the Jews from German society by violent means.[42] A conference of ministers was held on 20 August 1935 to discuss the question. Hitler argued against violent methods because of the damage done to the economy, and insisted the matter must be settled through legislation.[43] The focus of the new laws would be marriage laws to prevent "racial defilement", stripping Jews of their German citizenship, and laws to prevent Jews from participating freely in the economy.[44]

## Events at Nuremberg[edit]

NSDAP dignitaries at the 1935 Nuremberg Rally

The seventh annual Nazi Party Rally, held in Nuremberg from 10–16 September 1935, featured the only Reichstag session held outside Berlin during the Nazi regime.[45] Hitler decided that the rally would be a good opportunity to introduce the long-awaited anti-Jewish laws.[46] In a speech on 12 September, leading Nazi physician Gerhard Wagner announced that the government would soon introduce a "law for the protection of German blood".[47] The next day, Hitler summoned the Reichstag to meet in session at Nuremberg on 15 September, the last day of the rally.[46] Franz Albrecht Medicus and Bernhard Lösener of the Interior Ministry were summoned to Nuremberg and directed to start preparing a draft of a law forbidding sexual relations or marriages between Jews and non-

Jews. The two men arrived on 14 September.[48] That evening, Hitler ordered them to also have ready by morning a draft of the Reich citizenship law.[44] Hitler found the initial drafts of the Blood Law to be too lenient, so at around midnight Frick brought him four new drafts that differed mainly in the severity of the penalties they imposed. Hitler chose the most lenient version, but left vague the definition of who was a Jew.[49] Hitler stated at the rally that the laws were "an attempt at the legal settlement of a problem, which, if this proved a failure, would have to be entrusted by law to the National Socialist Party for a definitive solution."[50] Propaganda Minister Joseph Goebbels had the radio broadcast of the passing of the laws cut short, and ordered the German media to not mention them until a decision was made as to how they would be implemented.[51]

## Text of the laws[edit]



**Nuremberg Race Laws**

Reich Citizenship Law



Law for the Protection of German Blood and German Honour

The two Nuremberg Laws were unanimously passed by the Reichstag on 15 September 1935.[52] The Law for the Protection of German Blood and German Honour prohibited marriages and extramarital intercourse between Jews and Germans, and forbade the employment of German females under 45 in Jewish households. The Reich Citizenship Law declared that only those of German or related blood were eligible to be Reich citizens; the remainder were classed as state subjects, without citizenship rights.[53] The wording in the Citizenship Law that a person must prove "by his conduct that he is willing and fit to faithfully serve the German people and Reich" meant that

political opponents could also be stripped of their German citizenship.[52] This law was effectively a means of stripping Jews, Roma, and other "undesirables" of their legal rights, and their citizenship.[54] Over the coming years, an additional 13 supplementary laws were promulgated that further marginalised the Jewish community in Germany.[24]

## Law for the Protection of German Blood and German Honour[edit]

Moved by the understanding that purity of German blood is the essential condition for the continued existence of the German people, and inspired by the inflexible determination to ensure the existence of the German nation for all time, the Reichstag has unanimously adopted the following law, which is promulgated herewith:

**Article 1**

1. Marriages between Jews and subjects of the state of German or related blood are forbidden. Marriages nevertheless concluded are invalid, even if concluded abroad to circumvent this law.
2. Annulment proceedings can be initiated only by the state prosecutor.[55]

**Article 2**

Extramarital relations between Jews and subjects of the state of German or related blood are forbidden.[55]

**Article 3**

Jews may not employ in their households female subjects of the state of German or related blood who are under 45 years old.[55]

**Article 4**

1. Jews are forbidden to fly the Reich or national flag or display Reich colours.
2. They are, on the other hand, permitted to display the Jewish colours. The exercise of this right is protected by the state.[55]

**Article 5**

1. Any person who violates the prohibition under Article 1 will be punished with prison with hard labour [Zuchthaus].
2. A male who violates the prohibition under Article 2 will be punished with prison [Gefängnis] or prison with hard labour.
3. Any person violating the provisions under Articles 3 or 4 will be punished with prison with hard labour for up to one year and a fine, or with one or the other of these penalties.[55]

**Article 6**

The Reich Minister of the Interior, in co-ordination with the Deputy of the Führer and the Reich Minister of Justice, will issue the legal and administrative regulations required to implement and complete this law.[55]

**Article 7**

The law takes effect on the day following promulgation, except for Article 3, which goes into force on 1 January 1936.[55]

## Reich Citizenship Law[edit]

The Reichstag has unanimously enacted the following law, which is promulgated herewith:

**Article 1**

1. A subject of the state is a person who enjoys the protection of the German Reich and who in consequence has specific obligations toward it.
2. The status of subject of the state is acquired in accordance with the provisions of the Reich and the Reich Citizenship Law.[55]

**Article 2**

1. A Reich citizen is a subject of the state who is of German or related blood, and proves by his conduct that he is willing and fit to faithfully serve the German people and Reich.
2. Reich citizenship is acquired through the granting of a Reich citizenship certificate.
3. The Reich citizen is the sole bearer of full political rights in accordance with the law.[55]

**Article 3**

The Reich Minister of the Interior, in co-ordination with the Deputy of the Führer, will issue the legal and administrative orders required to implement and complete this law.[55]

# Classifications under the laws[edit]

| | 1935[56] | | |
|---|---|---|---|
| **Classification** | **Translation** | **Heritage** | **Definition** |
| *Deutschblütiger* | German-blooded | German | Belongs to the German race and nation; approved to have Reich citizenship |
| *Deutschblütiger* | German-blooded | 1/8 Jewish | Considered as belonging to the German race and nation; approved to have Reich citizenship |
| *Mischling zweiten Grades* | Mixed race (second degree) | 1/4 Jewish | Only partly belongs to the German race and nation; approved to have Reich citizenship |
| *Mischling ersten Grades* | Mixed race (first degree) | 3/8 or 1/2 Jewish | Only partly belongs to the German race and nation; approved to have Reich citizenship |
| *Jude* | Jew | 3/4 Jewish | Belongs to the Jewish race and community; not approved to have Reich citizenship |
| *Jude* | Jew | Jewish | Belongs to the Jewish race and community; not approved to have Reich citizenship |

| | Special Cases with First Degree Mischlings[56] | |
|---|---|---|
| **Date** | **Decree** | |
| 15 September 1935 | A Mischling will be considered a Jew if they are a member of the Jewish religious community. | |
| 15 September 1935 | A Mischling will be considered a Jew if they are married to a Jew. Their children will be considered Jews. | |
| 17 September 1935 | A mixed-race child that is the issue of a marriage with a Jew that is born after 17 September 1935 will be classified as a Jew. Those already born before 17 September 1935 will still be classified as Mischlings. | |
| 31 July 1936 | A mixed-race child originating from forbidden extramarital sexual intercourse with a Jew that is born out of wedlock after July 31, 1936 will be classified as a Jew. | |

## Impact[edit]

*See also:* [Anti-Jewish legislation in prewar Nazi Germany](#)



1935 chart shows racial classifications under the Nuremberg Laws: German, *Mischlinge*, and Jew.

While both the Interior Ministry and the NSDAP agreed that persons with three or more Jewish grandparents would be classed as being Jewish and those with only one (*Mischlinge* of the second degree) would not, a debate arose as to the status of persons with two Jewish grandparents (*Mischlinge* of the first degree).[57] The NSDAP, especially its more radical elements, wanted the laws to apply to *Mischlinge* of both the first and second degree.[58] For this reason Hitler continued to stall, and did not make a decision until early November 1935. His final ruling was that persons with three Jewish grandparents were classed as Jewish; those with two Jewish grandparents would be considered Jewish only if they practised the faith or had a Jewish spouse.[59] The supplementary decree outlining the definition of who was Jewish was passed on 14 November, and the Reich Citizenship Law came into force on that date. Jews were no longer German citizens and did not have the right to vote.[60] Jews and Gypsies were not allowed to vote in Reichstag elections or

the [Anschluss](#).[61] Civil servants who had been granted an exemption to the Law for the Restoration of the Professional Civil Service because of their status as war veterans were forced out of their jobs on this date.[60] A supplementary decree issued on 21 December ordered the dismissal of Jewish veterans from other state-regulated professions such as medicine and education.[60]

While Frick's suggestion that a citizenship tribunal before which every German would have to prove that they were Aryan was not acted upon, proving one's racial heritage became a necessary part of daily life.[58][62] Non-government employers were authorised to include in their statutes an [Aryan paragraph](#) excluding both *Mischlinge* and Jews from employment.[63] Proof of Aryan descent was achieved by obtaining an [Aryan certificate](#). One form was to acquire an *[Ahnenpass](#)*, which could be obtained by providing birth or baptismal certificates that all four grandparents were of Aryan descent.[64] The *Ahnenpass* could also be acquired by citizens of other countries, as long as they were of "German or related blood".[65]

Under the *Law for the Protection of German Blood and German Honour* (15 September 1935), marriages were forbidden between Jews and Germans; between *Mischlinge* of the first degree and Germans; between Jews and *Mischlinge* of the second degree; and between two *Mischlinge* of the second degree. *Mischlinge* of the first degree were permitted to marry Jews, but they would henceforth be classed as Jewish themselves. All marriages undertaken between half-Jews and Germans required the approval of a Committee for the Protection of German Blood. Few such permissions were granted.[63] A supplementary decree issued on 26 November 1935 extended the law to "Gypsies, Negroes, and their bastards."[66]



Beginning in 1941, Jews were required by law to self-identify by wearing a [yellow badge](#) on their clothing.[67]

Persons suspected of having sexual relations with non-Aryans were charged with *[Rassenschande](#)* (racial defilement) and tried in the regular courts. Evidence provided to the Gestapo for such cases was largely provided by ordinary citizens such as neighbours, co-workers, or other informants.[68] Persons accused of race defilement were publicly humiliated by being paraded through the streets with a placard around their necks detailing their crime.[69] Those convicted were typically sentenced to prison terms, and (subsequent to 8 March 1938) upon completing their sentences were re-arrested by the Gestapo and sent to [Nazi concentration camps](#).[68] As the law did not permit capital punishment for racial defilement, special courts were convened to allow the death penalty for some cases.[70] From the end of 1935 through 1940, 1,911 people were convicted of *Rassenschande*. Over time, the law was extended to include non-sexual forms of physical contact such as greeting someone with a kiss or an embrace.[68]

For the most part, Germans accepted the Nuremberg Laws, partly because Nazi propaganda had successfully swayed public opinion towards the general belief that Jews were a separate race, but also because to oppose the regime meant leaving oneself open to harassment or arrest by the

Gestapo.[71][72] Citizens were relieved that the antisemitic violence ceased after the laws were passed.[73] Non-Jews gradually stopped socialising with Jews or shopping in Jewish-owned stores.[74] Wholesalers who continued to serve Jewish merchants were marched through the streets with placards around their necks proclaiming them as traitors.[75] The Communist party and some elements of the Catholic Church were critical of the laws.[66] Concerned that international opinion would be adversely swayed by the new laws, the Interior Ministry did not actively enforce them until after the 1936 Summer Olympics, held in Berlin that August.[42][71]

The Interior Ministry estimated there were 750,000 *Mischlinge* as of April 1935 (studies done after the war put the number of *Mischlinge* at around 200,000).[66] As Jews became more and more excluded from German society, they organised social events, schools, and activities of their own.[76] Economic problems were not so easily solved, however; many Jewish firms went out of business due to lack of customers. This was part of the ongoing Aryanization process (the transfer of Jewish firms to non-Jewish owners, usually at prices far below market value) that the regime had initiated in 1933, which intensified after the Nuremberg laws were passed.[77] Former middle-class or wealthy business owners were forced to take employment in menial jobs to support their families, and many were unable to find work at all.[78]

Although a stated goal of the Nazis was that all Jews should leave the country, emigration was problematic, as Jews were required to remit up to 90 per cent of their wealth as a tax upon leaving the country.[79] Anyone caught transferring their money overseas were sentenced to lengthy terms in prison as "economic saboteurs".[80] An exception was money sent to Palestine under the terms of the Haavara Agreement, whereby Jews could transfer their wealth and emigrate to that country. Around 52,000 Jews emigrated to Palestine under the terms of this agreement between 1933 and 1939.[81]

By the start of the Second World War in 1939, around 250,000 of Germany's 437,000 Jews had emigrated to the United States, Palestine, Great Britain, and other countries.[82][83] By 1938 it was becoming almost impossible for potential Jewish emigrants to find a country that would take them.[84] After the 1936–39 Arab revolt, the British were disinclined to accept any more Jews into Palestine for fear it would further destabilise the region.[85] Nationalistic and xenophobic people in other countries pressured their governments not to accept waves of Jewish immigrants, especially poverty-stricken ones.[86] The Madagascar Plan, a proposed mass deportation of European Jews to Madagascar, proved to be impossible to carry out.[87] Starting in mid-1941, the German government started mass exterminations of the Jews of Europe.[88] The total number of Jews murdered during the resulting Holocaust is estimated at 5.5 to 6 million people.[89] Estimates of the death toll of Romani people in the Porajmos range from 150,000 to 1,500,000.[90]

## Legislation in other countries[edit]



AR-00000732

Decree of Tsar Boris III for approval of The law for protection of the nation

Some of the allies of the Nazis passed their own versions of the Nuremberg laws. In 1938, Fascist Italy passed the Italian Racial Laws, which stripped Jews of their citizenship and forbade marriages between Jewish and non-Jewish Italians.[91] Hungary passed laws on 28 May 1938 and 5 May 1939 banning Jews from various professions. A third law, added in August 1941, defined Jews as anyone with at least two Jewish grandparents, and forbade sexual relations or marriages between Jews and non-Jews.[92] In 1940 the ruling Iron Guard in Romania passed the Law Defining the Legal Status of Romanian Jews,[93] in 1941 the Codex Judaicus was enacted in Slovakia,[94] in 1941 Bulgaria passed the Law for Protection of the Nation,[95] and in 1941 the Ustasha in Croatia passed legislation defining who was a Jew and restricting contact with them.[96] Imperial Japan did not draft or pass any such legislation.

## Existing copies[edit]

An original typescript of the laws signed by Hitler was found by the US Army's Counter-Intelligence Corps in 1945. It ended up in the possession of General George S. Patton, who kept it, in violation of orders that such finds should be turned over to the government. During a visit to Los Angeles, he handed it over to the Huntington Library, where it was stored in a bomb-proof vault. The library revealed the existence of the document in 1999, and sent it on permanent loan to the Skirball Cultural Center, which placed it on public display. The document was transferred to the National Archives and Records Administration in Washington in August 2010.[97][98]

## See also[edit]

- Anti-miscegenation laws
- Blood quantum laws
- Nazism and race
- Wannsee Conference

## References[edit]

1. **Jump up^** Aly 2014, p. 14.
2. **Jump up^** Gordon 1984, p. 7.
3. **Jump up^** Longerich 2010, p. 12.
4. **Jump up^** Longerich 2010, pp. 13–14.
5. **Jump up^** Evans 2003, pp. 170–171.
6. **Jump up^** Goldhagen 1996, p. 85.
7. **Jump up^** Evans 2003, pp. 179–180.
8. **Jump up^** Kershaw 2008, p. 81.
9. **Jump up^** Aly 2014, p. 154.
10. **Jump up^** Evans 2003, p. 33.
11. **Jump up^** Evans 2003, pp. 33–34.
12. **Jump up^** Aly 2014, p. 157.
13. **Jump up^** Kühl 2002, p. 85.
14. **Jump up^** Stellrecht 1938.
15. **Jump up^** Bullock 1962, p. 121.
16. **Jump up^** Kershaw 2008, pp. 148–150.
17. **Jump up^** Wildt 2012, pp. 96-97.
18. **Jump up^** Shirer 1960, p. 203.
19. **Jump up^** Evans 2005, p. 539.

20. ^ Jump up to:*a* *b* *c* Longerich 2010, p. 40.
21. **Jump up^** Schulz & Frercks 1934.
22. **Jump up^** Longerich 2010, p. 39.
23. **Jump up^** Longerich 2010, pp. 67–69.
24. ^ Jump up to:*a* *b* Shirer 1960, p. 233.
25. **Jump up^** Longerich 2010, p. 41.
26. **Jump up^** Evans 2005, p. 507.
27. **Jump up^** Evans 2005, p. 511.
28. **Jump up^** Longerich 2010, p. 49.
29. **Jump up^** Hilberg 2003, p. 1070.
30. ^ Jump up to:*a* *b* McGarry 2010, p. 21.
31. **Jump up^** Hilberg 2003, pp. 1070–1071.
32. **Jump up^** Wolfe 2014, p. 96.
33. **Jump up^** Grenville 2002, p. 320.
34. **Jump up^** Burleigh & Wippermann 1991, p. 121.
35. **Jump up^** USHMM, "Sinti and Roma".
36. **Jump up^** Evans 2005, p. 22.
37. ^ Jump up to:*a* *b* Kershaw 2008, p. 340.
38. **Jump up^** Kershaw 2008, p. 341.
39. **Jump up^** Marrus 2000, pp. 92–93.
40. ^ Jump up to:*a* *b* *c* Kershaw 2008, p. 342.
41. **Jump up^** Longerich 2010, pp. 57–58.
42. ^ Jump up to:*a* *b* *c* Gordon 1984, p. 122.
43. **Jump up^** Kershaw 2008, p. 343.
44. ^ Jump up to:*a* *b* Longerich 2010, p. 59.
45. **Jump up^** Friedländer 2009, p. 45.
46. ^ Jump up to:*a* *b* Evans 2005, p. 543.
47. **Jump up^** Kershaw 2008, p. 344.
48. **Jump up^** Kershaw 2008, pp. 344–345.
49. **Jump up^** Kershaw 2008, pp. 345–346.
50. **Jump up^** Longerich 2010, p. 60.
51. **Jump up^** Mommsen 1989, p. 225.
52. ^ Jump up to:*a* *b* Evans 2005, p. 544.
53. **Jump up^** Kershaw 2008, p. 345.
54. **Jump up^** Wolfe 2014, p. 94.
55. ^ Jump up to:*a* *b* *c* *d* *e* *f* *g* *h* *i* *j* US Holocaust Memorial Museum.
56. ^ Jump up to:*a* *b* Nuremberg Laws 1935.
57. **Jump up^** Friedländer 2009, p. 49.
58. ^ Jump up to:*a* *b* Mommsen 1989, p. 224.
59. **Jump up^** Kershaw 2008, p. 347.
60. ^ Jump up to:*a* *b* *c* Friedländer 2009, p. 50.
61. **Jump up^** Milton 2001, p. 216.
62. **Jump up^** Friedländer 2009, p. 52.
63. ^ Jump up to:*a* *b* Evans 2005, p. 547.
64. **Jump up^** Ehrenreich 2007, p. 68.
65. **Jump up^** Scheil 2012.
66. ^ Jump up to:*a* *b* *c* Friedländer 2009, p. 51.
67. **Jump up^** Longerich 2010, p. 217.
68. ^ Jump up to:*a* *b* *c* Evans 2005, p. 551.
69. **Jump up^** Evans 2005, p. 540.
70. **Jump up^** Majer 2003, pp. 331–332.
71. ^ Jump up to:*a* *b* Evans 2005, p. 548.
72. **Jump up^** Gordon 1984, p. 180.

73. **Jump up^** Gordon 1984, p. 172.
74. **Jump up^** Evans 2005, pp. 548, 553.
75. **Jump up^** Gellately 1991, p. 105.
76. **Jump up^** Friedländer 2009, p. 55.
77. **Jump up^** Longerich 2010, pp. 65–66.
78. **Jump up^** Longerich 2010, p. 86.
79. **Jump up^** Longerich 2010, pp. 64, 66.
80. **Jump up^** Longerich 2010, p. 66.
81. **Jump up^** Evans 2005, pp. 556–557.
82. **Jump up^** Longerich 2010, p. 127.
83. **Jump up^** Evans 2005, p. 555.
84. **Jump up^** Longerich 2010, p. 67.
85. **Jump up^** Friedländer 2009, p. 57.
86. **Jump up^** Evans 2005, pp. 560, 601.
87. **Jump up^** Longerich 2010, pp. 162–164.
88. **Jump up^** Rhodes 2003, pp. 159–160.
89. **Jump up^** Evans 2008, p. 318.
90. **Jump up^** Hancock 2012, p. 381.
91. **Jump up^** Rodogno 2006, p. 65.
92. **Jump up^** Frojimovics 2012, pp. 250–251.
93. **Jump up^** Fischer 2012, p. 279.
94. **Jump up^** Matić 2002, p. 174.
95. **Jump up^** Dikovski 2000.
96. **Jump up^** Cohen 1999, p. 90.
97. **Jump up^** Allen 2010.
98. **Jump up^** Bradsher 2010.

## Sources[edit]

☐ Allen, Nick (26 August 2010). "Nuremberg Laws handed over to US National Archives". *Daily Telegraph*. Retrieved 7 March 2015.

☐ Aly, Götz (2014). *Why the Germans? Why the Jews? Envy, Race Hatred, and the Prehistory of the Holocaust*. New York: Metropolitan. ISBN 978-0-8050-9700-9.

☐ Bradsher, Greg (Winter 2010). "The Nuremberg Laws: Archives Receives Original Nazi Documents That "Legalized" Persecution of Jews". *Prologue Magazine*. National Archives and Records Administration. **42** (4). Retrieved 7 March 2015.

☐ Bullock, Alan (1962) [1952]. *Hitler: A Study in Tyranny*. London: Penguin Books. ISBN 978-0-14-013564-0.

☐ Burleigh, Michael; Wippermann, Wolfgang (1991). *The Racial State: Germany 1933-1945*. Cambridge; New York: Cambridge University Press. ISBN 978-0-521-39802-2.

☐ Cohen, Philip J. (1999) [1996]. *Serbia's Secret War: Propaganda and the Deceit of History*. College Station: Texas A&M University Press. ISBN 0-89096-688-5.

☐ Dikovski, Antoinette (19 July 2000). "България само администрираше "новите земи"". *Демокрация* (in Bulgarian). Archived from the original on 18 July 2011. Retrieved 11 March 2015.

☐ Ehrenreich, Eric (2007). *The Nazi Ancestral Proof: Genealogy, Racial Science, and the Final Solution*. Indiana University Press. ISBN 978-0-253-11687-1.

☐ Evans, Richard J. (2003). *The Coming of the Third Reich*. New York: Penguin. ISBN 978-0-14-303469-8.

☐ Evans, Richard J. (2005). *The Third Reich in Power*. New York: Penguin. ISBN 978-0-14-303790-3.

☐ Evans, Richard J. (2008). *The Third Reich at War*. New York: Penguin. ISBN 978-0-14-311671-4.

☐ Fischer, Ronit (2012) [2011]. "Transnistria: The Holocaust in Romania". In Friedman, Jonathan C. *Routledge History of the Holocaust*. Abingdon; New York: Routledge. pp. 277–290. ISBN 978-0-415-52087-4.

☐ *Friedländer, Saul* (2009). Nazi Germany and the Jews, 1933–1945. New York: HarperCollins. ISBN 978-0-06-1350276.

☐ Frojimovics, Kinga (2012) [2011]. "Special Characteristics of the Holocaust in Hungary, 1938–45". In Friedman, Jonathan C. Routledge History of the Holocaust. Abingdon; New York: Routledge. pp. 248–263. ISBN 978-0-415-52087-4.

☐ *Gellately, Robert* (1991). The Gestapo and German Society: Enforcing Racial Policy, 1933–1945. Oxford: Clarendon Press. ISBN 0-19-820297-0.

☐ *Goldhagen, Daniel* (1996). *Hitler's Willing Executioners: Ordinary Germans and the Holocaust*. New York: Knopf. ISBN 978-0-679-44695-8.

☐ Gordon, Sarah (1984). Hitler, Germans, and the 'Jewish Question'. Princeton, NJ: Princeton University Press. ISBN 0-691-05412-6.

☐ *Grenville, John* (2002) [1998]. "Neglected Holocaust victims: the Mischlinge, the Judischversippte, and the Gypsies". In *Berenbaum, Michael*; Peck, Abraham J. The Holocaust and History: The Known, the Unknown, the Disputed, and the Reexamined. Bloomington, IN: Indiana University Press. pp. 314–326. ISBN 0-253-33374-1.

☐ *Hancock, Ian* (2012). "The Neglected Memory of the Romanies". In *Friedman, Jonathan C.* The Routledge History of the Holocaust. New York: Taylor & Francis. pp. 375–384. ISBN 978-0-415-52087-4.

☐ *Hilberg, Raul* (2003) [1961]. *The Destruction of the European Jews*. III. New Haven; London: Yale University Press. ISBN 978-0-300-09592-0.

☐ *Kershaw, Ian* (2008). Hitler: A Biography. New York: W. W. Norton & Company. ISBN 978-0-393-06757-6.

☐ Kühl, Stefan (2002). Nazi Connection: Eugenics, American Racism, and German National Socialism. Oxford University Press. ISBN 0195149785.

☐ *Longerich, Peter* (2010). Holocaust: The Nazi Persecution and Murder of the Jews. Oxford; New York: Oxford University Press. ISBN 978-0-19-280436-5.

☐ Majer, Diemut (2003). "Non-Germans" under the Third Reich: The Nazi Judicial and Administrative System in Germany and Occupied Eastern Europe, with Special Regard to Occupied Poland, 1939–1945. Baltimore; London: Johns Hopkins University Press. ISBN 0-8018-6493-3.

☐ *Marrus, Michael* (2000). The Holocaust and History: The Known, the Unknown, the Disputed, and the Reexamined. Toronto: Key Porter.

☐ Matić, Igor-Philip (2002). Edmund Veesenmayer: Agent und Diplomat der nationalsozialistischen Expansionspolitik (in German). München: Oldenbourg Verlag. ISBN 978-3-486-56677-2.

☐ McGarry, Aidan (2010). Who Speaks for Roma?: Political Representation of a Transnational Minority Community. New York; London: Bloomsbury. ISBN 978-0-8264-2880-6.

☐ Milton, Sybil H. (2001). ""Gypsies" as social outsiders in Nazi Germany". In *Gellately, Robert*; *Stoltzfus, Nathan*. *Social Outsiders in Nazi Germany*. Princeton: Princeton University Press. ISBN 0-691-08684-2.

☐ *Mommsen, Hans* (1989). "The Realization of the Unthinkable: The 'Final Solution of the Jewish Question'". In *Marrus, Michael*. The "Final Solution": The Implementation of Mass Murder. The Nazi Holocaust, Part 3. **1**. Westport, CT: Meckler. pp. 217–264. ISBN 0-88736-255-9.

☐ *"Reichsbürgergesetz und Gesetz zum Schutze des deutschen Blutes und der deutschen Ehre ["Nürnberger Gesetze"]"* (in German). Friedrich-Alexander Universität Erlangen-Nürnberg. 14 November 1935.

☐ *Rhodes, Richard* (2003). Masters of Death: The SS-Einsatzgruppen and the Invention of the Holocaust. New York: Vintage. ISBN 978-0-375-70822-0.

☐ Rodogno, David (2006). Fascism's European Empire: Italian Occupation During the Second World War. Cambridge University Press. ISBN 978-0-521-84515-1.

☐ Scheil, Stefan (11 March 2012). *"Arier"*. Junge Freiheit (in German). Retrieved 11 March 2015.

☐ Schulz, Edgar Hans; Frercks, Rudolf (1934). *Warum Arierparagraph? Ein Beitrag zur Judenfrage [Why the Aryan Law? A Contribution to the Jewish Question]* (in German). Berlin: NSDAP Office of Racial Policy. OCLC 802537.

☐ *Shirer, William L.* (1960). *The Rise and Fall of the Third Reich*. New York: Simon & Schuster. ISBN 978-0-671-62420-0.

☐ *"Sinti and Roma: Victims of the Nazi Era"* (PDF). United States Holocaust Memorial Museum. Retrieved 6 September 2016.

- Stellrecht, Helmut (1938). *Glauben und Handeln. Ein Bekenntnis der jungen Nation [Faith and Action]* (in German). Berlin: Zentralverlag der NSDAP. OCLC 459689851.
- *"Translation: Nuremberg Race Laws"*. Holocaust Encyclopedia. United States Holocaust Memorial Museum. Retrieved 6 March 2015.
- Wildt, Michael (2012). Hitler's Volksgemeinschaft and the Dynamics of Racial Exclusion: Violence Against Jews in Provincial Germany, 1919–1939. Berghahn Books. ISBN 085745322X.
- Wolfe, Stephanie (2014). The Politics of Reparations and Apologies. New York: Springer. ISBN 978-1-4614-9184-2.

## Further reading[edit]

- *Bankier, David* (1984). "In Nation and History: Studies in the History of the Jewish People; Based on the Papers Delivered at the Eight World Congress of Jewish Studies". In Ettinger, Samuel. The 'Jewish Question' as a Focus of Conflict Between Trends of Institutionalization and Radicalization in the Third Reich, 1934–1935. **2**. Jerusalem. pp. 357–371.
- Bankier, David (1990). Gutman, Israel, ed. Encyclopedia of the Holocaust. **3**. New York: Macmillan. pp. 1076–1077. ISBN 0-02-864527-8.
- Gruchmann, Lothar (July 1983). "'Blutschutzgestz' und Justiz: Zur Entstehung und Auswirkung des Nürnberger Gesetzes von 15 September 1935". Vierteljahrshefte für Zeitgeschichte (in German). München: Oldenbourg Wissenschaftsverlag GmbH. **31**: 418–442. JSTOR 30196462.(subscription required)
- Longerich, Peter (2000). *"The Wannsee Conference in the Development of the 'Final Solution'"* (PDF). Holocaust Educational Trust Research Papers. London: The Holocaust Educational Trust. **1** (2). ISBN 0-9516166-5-X. Retrieved 11 March 2015.
- Margaliot, Abraham (1977). "The Reaction of the Jewish Public in Germany to the Nuremberg Laws". Yad Vashem Studies. Jerusalem: Yad Vashem. **12**: 193–229.
- *Schleunes, Karl* (1970). The Twisted Road to Auschwitz: Nazi Policy towards German Jews, 1933–1939. Urbana: University of Illinois Press. ISBN 978-0-252-00092-8.

## External links[edit]



Wikimedia Commons has media related to *Nuremberg Laws*.



German Wikisource has original text related to this article:

**Nuremberg Laws**

- Rise of the Nazis and Beginning of Persecution on the Yad Vashem website
- Images of German "J" Jewish passports

"Weaponizing the Registry": The many ways the registry is being used as a weapon

by Derek W. Logue • September 15, 2019 • 3 Comments

Gun-lovers like to say "guns don't kill people, people kill people." But guns are most often used as the weapon of choice when people kill people. Thus, the debate on gun control itself centers on individual rights versus the safety of the populace. The debate over the existence of the public sex offense registry is very similar to the gun control issue. Proponents for the registries use similar arguments touting the alleged impact on public safety, while opponents point to numerous instances of registry misuse.

Unlike gun laws, there are no regulations to even remotely address the misuse of the registry. You don't need a background check to use the registry. Some states do not even have warning labels against the misuse of the registry, but rarely do those who misuse the registry face legal sanctions. (Ironically, one of the worse states for registered citizens – Louisiana – actually prosecutes those who abuse the registry for hate crimes.)

There are many ways the registry can be wielded as a weapon. Allow me to create a definition for weaponizing the registry here:

"Weaponizing the Registry" is an act in which a person misuses the public sex offense registry as a tool to cause harm to anyone, regardless of whether or not that person is on the sex offense registry. Weaponizing the registry can include, but not limited to, using existing registry information to commit crimes, falsely accusing someone of being a "sex offender/ pedophile", making fake registry fliers, claiming someone is a "pedo enabler" or "normalizing pedophilia", and stoking public fears about "sex offenders" to advance a cause.

Using the registry to murder or assault registrants are obvious examples of weaponizing the registry, and those events have been covered on many occasions. This article, however, shows a few examples of weaponizing the registry in other ways:

Stoking Public Fears: In 2009, Republican lawmakers attempted unsuccessfully to derail the Matthew Shepherd Hate Crimes Bill as the "Pedophile Protection Act." In a Fox News interview on May 6, 2009, Rep. Steve King, R-Iowa, said the "sexual orientation" wording would provide "special protection to pedophiles." In 2018, Sen. Tom Cotton (R-AR) used similar tactics in an unsuccessful attempt to derail the First Step Act, designed to reform the federal prison system.

Political Attacks Ads: In 2018, the Judicial Crisis Network (a conservative PAC) funded a series of ad campaigns attacking Arkansas Court of Appeals Judge Kenneth Hixson, who was running for that state's Supreme Court. The PAC ran ads declaring the appellate judge "soft on crime" for overturning a sex crime conviction due to faulty evidence.

Fake Registry Fliers: There have been numerous instances of doctored Megan's Law fliers falsely claiming someone is a registered person; the oldest reported instance found online was in an AP News report dated 19 March 1998. Sixty-three year old Arthur Goldsworthy was falsely accused of being on the sex offense registry through doctored fliers sent in the mail just two months after NJ courts upheld the then-new concept of community notification fliers.

AR-00000738

Extortion Websites: In a high-profile decision, a jury awarded $3.4 Million to only a few of the victims of Chuck Rodrick and Brent Olsterblad, who ran numerous websites under the "Offendex" name. Among the victims was a military veteran not convicted of any sex offense; Rodrick had made fake registry listings of the man and claimed he was funding pedophile groups because the vet was dating Rodrick's ex-wife. However, those who were registered persons (or related to) targeted by the Offendex websites, which were extorting money from registered persons, received no settlement due to their registry status.

Scams: Numerous reports over the past couple of years and across the nation have contacted those listed on the public registry posing as law enforcement agents; they claim there is a an warrant for them that can be cleared up by wiring money with Green Dot or using Bitcoin. These are scammers using fear to defraud registrants from their money.

Use of Registry for criminal activity: Allen Wayne Densen Morgan was arrested in Anniston, AL in 2013 for attempting to hire a hit man to kill a registered person. The FBI agent, posing as a KKK member, was told by Morgan that all the info on his victim could be found on the public sex offense registry.

Identity Theft: In 2005, Matthew Buescher was arrested for identity theft; used the Indiana and Iowa sex offender registry to scam about $20,000 from credit cards and tax refunds in the name of registered persons.

In this age of Internet conspiracy theories, #MeToo, and the evolution of Predator Panic, weaponizing the registry has increased exponentially. Jilted lovers, politicians sliding in the political polls, people losing online debates, scam artists, and people who just really hate someone's guts have weaponized the registry. Society frowns upon the use of racial or sexist epitaphs—we have the N word, the C word, and now the R word (saying "retarded" is now considered an insult on par with the other words known by a single letter). However, the P words – Pervert, Predator, and Pedophile—are all acceptable insults with disastrous consequences. People have been endured harassment, property damage, and assaults due to the weaponization of the registry. Some have even been murdered.

At least with guns, there can be a legitimate argument that guns are useful for hunting and self-defense. The registry has been proven to be useless as a tool for self-defense but useful for vigilantes on the hunt. The argument for abolishing the registry has merit for registered citizens and the public as a whole.

Derek W. Logue of OnceFallen.com

Post navigation

← Misuse of Scientific Information

3 comments for ""Weaponizing the Registry": The many ways the registry is being used as a weapon"

1. Tim in WI

*September 16, 2019 at 3:15 am*

Derek,
Registry=database=weapon. Weaponized by both party's D&R and by all of the people against the whole of the people.

Reply

    2.  Wonderwoman

*September 16, 2019 at 3:56 pm*

So, do I have it right, does the hunter instinct cause people to surf the sex offender database to look for their prey, and then they "kill" by destroying lives?

We believed in bounty hunters, didn't we? Are these the same kind of people except now there is no money, just a one-up win like a trophy?

Reply

    3.  MARK S.

*September 19, 2019 at 6:21 am*

There is absolutely no doubt in my mind that Congress and the state legislators, in enacting these laws – knew full well the consequences of publicizing faces, names, address, convictions and counts of convictions thereto, work (if any), school(s) ad nauseum. If one would only read numerous legislative and congressional records on registration as I have, you will realize the mindset of those persons who enacted these laws believe they are more holy, righteous, than a sexual offender. In short, they all knew, or reasonably know what would happen when all those on the registry were interneted under the guise of "public safety." And many just laugh about it with comments like: well they did it, they get what they deserve and other such comments. And of course prosecutors, and respondent states' and DOJ lawyers run over themselves to get into courts and just blithely announce that SORNA etc. is for "public safety." With this said, with all the advocacy groups, lawyers and such going into courts (or better stated judicially activated forums, hateful courts, fear, terror etc.) I feel it is the law of diminishing returns. I am afraid I am not one to foresee any registry repeals, major ameliorative amendments to registries….. It's a real pity virtually all registry agencies are stuck on "offense" based criteria, and over look any individual dynamics that have changed over the years such as marriage, non-court ordered therapy, age, etc. Instead, virtually all sex crimes are now labeled a "SEXUALLY VIOLENT" offense which now graduates so many into life-time registration and tier level 3's by the truck load. Derek's article above is a prime example of the registry and the congressional, and state back turning about these issues…

https://sosen.org/blog/2019/09/30/we-are-only-as-free-as-the-least-free-among-us.html

# We are only as Free as the least Free among us.

by Robert Wolf • September 30, 2019 • 0 Comments

**When one person loses his constitutionally protected Rights,**

**We are All a little less Free.**

The reasons and justifications for the sex offender laws are supposedly because sex offenders have a high chance of reoffending while this may be true for 1, 2, or 3 out of 10,000. What about the other 9997 people that have been placed on the list who will never reoffend . Those 9997 people are having their lives damaged and their freedoms taken away by legislation. These laws are creating a terrible amount of collateral damage to the lives of the offenders their children and spouses to their bosses and their neighbors and their friends.

Every criminal class has the possibility of reoffending just as every person in the United States has the possibility of creating a new crime even though they have never been convicted of one before.

A person selling drugs including to children is 300 times or likely to reoffend then sex offender, a person who does auto theft the is 400 times more likely to reoffend then sex offender, the person who does burglary is 500 times more likely to reoffend then sex offender, driving offenses without alcohol are almost 1000 times more likely to reoffend and people who drive under the influence of alcohol or narcotics and destroy lives are up to 2000 times more likely to reoffend then sex offender.

Looking at it in the light of the information from the Department of Justice studies even a non-convicted Citizen is 99% more likely to be involved in a sex crime then a convicted sex offender. how can we protect our children if the majority of new sex crimes are coming from people who have not offended before or not been caught.

The simple answer is we go out and do a psychological screening on every person in the United States to pick out the people that are most likely to be involved in any violent crime and put them on a list . That should go over real well Don't you think?

If you absolutely have to have registration and notification it is the legislator's duty to all the citizens of this country to set the laws down in such a way that only the 1% who have the highest possibility of reoffending are placed on that list not a general catch all for anybody who falls underneath the definition of a conviction for a sex crime. But recognized as the list gets smaller the damage to a person's life gets greater and if you put one person on that list who would have never reoffend and that person is murdered by some psychopath in the community or even worse if that person goes out and commits another sex crime because he feels so hopeless and lost and so cut off from the community that he can only see himself was a terrible person. Then where is the blame to be placed for the loss of that person and possibly his new victim, on the community, on the legislators, on the persons designing the risk assessments. before anyone is placed on a list the legislative body had best layout the rules very very carefully using every tool at their disposal and find a very accurate way to determine if a person is highly likely to reoffend because as the Supreme Court has said time and time again it is better to release a guilty person into the public than it is to convict an innocent one. The Supreme Court has even gone so far as to say it is better to release a mentally ill person into the community then to place a Non-mentally ill person into a mental institution.

American jurisprudence is consistent on the subject of punishing innocent people.  The Supreme Court first commented on the issue in 1895, when the majority opinion in Coffin v. United States 140 cited Athenian law, Trajan, Fortescue, Hale, and Blackstone all at once, to underscore the long history of the presumption of innocence, but refused to commit to an actual number.  The Court did not revisit the issue until Henry v. United States (1959), which established that "it is better, so the Fourth Amendment teaches, that the guilty sometimes go free than that citizens be subject to easy arrest." 141

Virtually all of the Supreme Court-level guilty-men jurisprudence was created in the 1970s, starting with In re Winship (1970). 142  The majority opinion in Winship stated, somewhat noncommittally, that "it is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned." 143  Justice Harlan's concurring opinion, though, was much stronger and has been more widely cited.  "I view the requirement of proof beyond a reasonable doubt in a criminal case," Justice Harlan wrote, "as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." 144

Both opinions in Winship established 1guilty man; even though Harlan's concurrence said convicting an innocent man was "far worse" than letting a guilty man go free, the Court recognized in Patterson v. New York (1977) that the risk society bears in protecting the innocent "is not without limits; and Mr. Justice Harlan's aphorism provides little guidance for determining what those limits are." 145  The value 10 guilty men was suggested in Justice Marshall's concurring opinion in Furman v. Georgia (1972), 146 but 10 did not appear in a majority opinion until Justice Blackmun, in Ballew v. Georgia (1978), 147 called it "perhaps not an unreasonable assumption." 148  Ballew's mild language did not overrule Winship, which continued to be cited during the 1980s. 149

The Supreme Court has also declined to extend the presumption against wrongful conviction to the context of civil commitment.  In Addington v. Texas (1979), 150 Chief Justice Burger wrote that the interests of people wrongfully committed to a mental institution would be protected by the "concern of family and friends."  "Moreover," Chief Justice Burger wrote, "it is not true that the release of a genuinely mentally ill person is no worse for the individual than the failure to convict the guilty.  One who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma. . . .  It cannot be said, therefore, that it is much better for a mentally ill person to `go free' than for a mentally normal person to be committed." 151

The Fifth, 152 Eighth, 153 and Eleventh 154 Circuits' rulings have been consistent with those of the Supreme Court.  The Federal, Third, Fourth, Sixth, and Tenth Circuits have apparently never ruled on the issue (though district courts in the Third, 155 Fourth, 156 and Sixth 157 Circuits have dealt with the question).  The Seventh and Ninth Circuits have had dissents and concurrences dealing with the question, 158 but have never addressed it in a majority opinion. 159

Other circuits have gone their own way (presumably unconstitutionally).  The First Circuit ruled once on the issue, establishing 10 guilty men in 1989. 160

In 1829, before the Supreme Court had entered the lists — and even before the creation of the D.C. Circuit — a D.C. court cited Matthew Hale's 5 guilty men .  The court also pointed out that if Hale's opinion had been required, "there can be no doubt that his patriotism would have prompted him to say, that it is better that ten guilty persons should escape punishment, than that any one of those rules of the common law which were adopted for the protection of the personal liberty and safety of the subject or citizen, should be abrogated." 161  5 guilty men or even 10 guilty men , then, for abrogating common law rules.  In the general criminal context, the D.C. Circuit restated this as

"some" guilty men in 1975, 162 and narrowed it down to 10 guilty men in 1976. 163  The D.C. Circuit
also established 1 guilty man for the purpose of allowing ABC to go to court. 164

     The Second Circuit began its jurisprudence with 1 guilty man in 1949, 165 as a way of
preempting liability for public officials.  In 1926, 166 the Second Circuit had tried to adopt the British
rule, from Munster v. Lamb (1883), 167 that infinity guilty men for attorneys sued for slander, but this
was fortunately a dissent.  A 1969 concurrence 168 stated that 99 guilty men, but the first actual
ruling in a squarely criminal case did not come until 1989, 169 which cited Blackstone and set 10
guilty men .  The Second Circuit is also at odds with the Supreme Court on the value of confining the
mentally ill, and granted in 1992 170 that while 10 guilty men may be too high in the context of civil
commitment, but is still greater than one, and is perhaps three or five. 171

140.    Coffin v. United States, 156 U.S. 432, 454; 15 S. Ct. 394, 403; 39 L. Ed. 481, 491 (1895).

    141.    Henry v. United States, 361 U.S. 98, 104, 80 S. Ct. 168, 172 (1959).

    142.    In re Winship, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

    143.    Id. at 364.

    144.    Id. at 372.  Harlan's concurrence has been cited in many cases, including Lego v. Twomey,
404 U.S. 477, 494 (1972) (Brennan, J., dissenting); and Patterson v. New York, 432 U.S. 197, 208
(1977) (White, J.).

    145.    Patterson, 432 U.S. at 208.

    146.    Furman v. Georgia, 408 U.S. 238, 367 n.158, 92 S. Ct. 2726, 2792 n.158, 33 L. Ed. 2d 346
(1972) (Marshall, J. concurring).

    147.    Ballew v. Georgia, 435 U.S. 223 (1978).

    148.    Ballew, 435 U.S. at 234.

    149.    Francis v. Franklin, 471 U.S. 307, 313 (1984); Rose v. Clark, 478 U.S. 570, 106 S. Ct.
3101, 3107, 92 L. Ed. 2d 460 (1986).

    150.    Addington v. Texas, 441 U.S. 418 (1979).

    151.    Addington, 441 U.S. at 428-429.

    152.    Handford v. United States, 249 F.2d 295, 296 (5th Cir. 1957); repeatedly and consistently
reaffirmed in Ginsberg v. United States, 257 F.2d 950, 954 (5th Cir. 1958); Dunn v. United States,
307 F.2d 883, 885 (5th Cir. 1962); Washington v. United States, 327 F.2d 793, 795 (5th Cir. 1964);
Turner v. United States, 415 F.2d 1234, 1236 (5th Cir. 1969); and Hall v. United States, 419 F.2d
582, 588 (5th Cir. 1969).  See also, on the district court level, n = 1 in Barnes v. Mississippi
Department of Corrections, 907 F. Supp. 972, 979 (S.D. Miss. 1995).  Extended to habeas corpus in
Pate v. Holman, 341 F.2d 764, 776 (1965).

    153.    Gulotta v. United States, 113 F.2d 683, 686 (1940).  See also n = 1, Donnell v. Swenson,
258 F. Supp. 317, 330 (Mo. 1966).  But another district court has ruled that n = 100, Smith v.
Armontrout, 632 F. Supp. 503, 515 n.34 (W.D. Mo. 1986).

AR-00000743

154.    United States v. Eason, 920 F.2d 731, 736 (11th Cir. 1990).  However, the rule of In re Rule of Court, 20 F. Cas. 1336, 1337 (N.D. Ga. 1877), that n = "some" for merely being arrested on a criminal charge, may still apply.

155.    United States v. Michalski, 265 F. 839, 840 (W.D. Pa. 1919) (n = "some").

156.    United States v. Smith, 592 F. Supp. 424, 437 (E.D. Va. 1984) (n = 1); Salling v. Bowen, 641 F. Supp. 1046, 1051 (W.D. Va. 1986) (n = "several" for criminal punishment, and n = "several" for being denied Social Security benefits).

157.    In re Fegler, 36 F. Supp. 88, 89 (E.D. Mich. 1940) (n = 10).

158.    United States v. Johnson, 123 F.2d 111, 141 (7th Cir. 1941) (dissenting opinion); United States v. Banks, 687 F.2d 967, 984 (7th Cir. 1982) (concurring and dissenting opinion); McKenzie v. Risley, 842 F.2d 1525, 1545 (9th Cir. 1988) (dissenting opinion); Bunnell v. Sullivan, 947 F.2d 341, 352 (9th Cir. 1991) (en banc) (Kozinski, J., concurring).

159.    But see two Seventh Circuit district court rulings.  A district court in Illinois denied the maxim entirely in United States v. Ragen, 172 F. Supp. 734, 745 (N.D. Ill. 1959): "This `maxim,' in my opinion, is fallacious, since it places the price of ten guilty men on one innocent man, thus admitting that there is a limit over which an innocent man may be unjustly convicted without violating any principles of our philosophy.  Thus, the `maxim' contradicts the `maxim.'" But a district court in Indiana ruled that n = 1 in Dean v. Duckworth, 559 F. Supp. 1331, 1337 (N.D. Ind. 1983).

160.    United States v. Clotida, 892 F.2d 1098, 1105 (1st Cir. 1989).  But see Smith v. Butler, 696 F. Supp. 748, 764-765 (D. Mass. 1988) (n = 1000).

161.    United States v. Watkins, 28 F. Cas. 419, 440 (1829).

162.    United States v. Diggs, 522 F.2d 1310, 1330, 173 U.S. App. D.C. 95, 115 (1975).

163.    United States v. Greer, 538 F.2d 437, 441 (D.C. Cir. 1976).  See also United States v. Herron, 567 F.2d 510, 522, 185 U.S. App. D.C. 403, 415 (D.C. Cir. 1977).

164.    "It is better to risk permitting a `guilty' ABC to defend this case than to risk denying an `innocent' ABC its day in court."  Shepherd v. American Broadcasting Companies, 62 F.3d 1469, 1476 (D.C. Cir. 1995).

165.    Gregoire v. Biddle, 177 F.2d 579, 581 (2nd Cir. 1949).

166.    Yaselli v. Goff, 12 F.2d 396, 402 (1926) (dissenting opinion).

167.    Munster v. Lamb, 11 Q.B.D. 588, 604 (1883).

168.    United States v. Miller, 411 F.2d 825, 833 (2nd Cir. 1969) (concurring opinion).

169.    United States v. Schwimmer, 882 F.2d 22, 27 (2nd Cir. 1989).

170.    Goetz v. Crosson, 967 F.2d 29, 39 (2nd Cir. 1992).

171.    District courts in the Second Circuit have been inconsistent on the point since 1806: United States v. Smith, 27 F. Cas. 1192, 1199 (D. N.Y. 1806) (n = 1); United States v. Allen, 24 F. Cas. 772, 774 (E.D. N.Y. 1868) (n = 1); United States v. Bonanno, 180 F. Supp. 71, 82 (S.D. N.Y. 1960) (n = 1); but see United States v. Fatico, 458 F. Supp. 388, 410-411 (E.D. N.Y. 1978) (n = 1000) and United States v. Sadiq, 783 F. Supp. 98, 101 (E.D. N.Y. 1992) (n = 10).

# Who Really Commits New Sex Crimes?

by Will Bassler • December 29, 2015 • 14 Comments

   In the recent months there have been a number of articles and news sources about politicians and other prominent people involved in sex crimes.  There have also been a significant number involving police officers. This study will focus in part on the offense rate for police officers in comparison to other persons, it will also take a look at the re-offense rate for people on the registry. The Urbana-Champaign Independent Media Center released the following:

*www.ucimc.org/content/national-police-misconduct-statistics-released*

*also see*  http://www.policemisconduct.net/2010-q3-national-police-misconduct-statistical-report/

Working with those numbers, according to the referenced link:
0.08% (1 in 116) officers are cited for misconduct, 13% of those are sex offenses/ sex related.
800,000 estimated police officers in the US (that's one per RSO!)
Now let's crunch some numbers… that makes ~ 6,873 instances of officer misconduct in a 6 month period of which 13% are sex related offenses giving us a grand total of….893 sex offenses committed by police officers during a six month period from April to Sept 2009 or nearly 18 per state! Estimating for the year that would be 1786 sex related offenses for police officers of the 63,000 reported new sex offenses.

That would make about 3% of all new sex offenses are committed by police (1786/63000).
Police officers make up 0.3% of the population in the US (800,000/311,745,000).
Police commit one sex offense per 1,000 officers according to the numbers.
strangers commit less than 2% of all sex offenses. Police officers commit ~3%!

Trying to crunch realistic numbers for sex offenses by profession. Now, according to the AP, only 500 teachers were arrested as sex offenders out of 3.5 million teachers, which makes 0.014% of teachers which committed sex offenses or 0.7% of all new sex offenses were committed by teachers. The latest search was for clergy sex offenders since such a big deal is made about that. The only number we have found that's recent (2009) is 215 victims of sex offenses by clergy.

   Oh yes not forgetting to add in the re-offense rate for people on the registry for new sex crimes The June 2002: Department of Justice: Recidivism of Prisoners Released in 1994 (DOJ-2002) crime from 1994-1997. (DOJ-2002 page 5) it is known that during that time period (1994-1997): Of the released sex offenders 3.5% (339) Were reconvicted for a sex crime over a Three year period So for one year average there was 113 RECONVICTED for a new sex offense. (DOJ-2003[p2]). Now for the (reality) plug-in (113/63000) you get 0.17% Or basically less then 2/10 of 1%. According to the Department of Justice, most child sexual abuse victims are molested by family members (34%) or close acquaintances (59%)  totaling 93% of new sex crimes (Bureau of Justice Statistics, 2000).

AR-00000746

Here's the breakdown thus far, in the Percentage of new sex crimes
Close acquaintances (59%)

Family members (34%)
Police officers 3.0%
Teachers 00.7%
Clergy 00.3%
strangers 2% those who have not been convicted of a sex crime (note: this could include somebody that was met at a party or a street dance and does not necessarily mean an adult) People on the registry/previously convicted 00.17%. that is 17/100s of 1%.

Now remember police officers teachers and clergy can also fall under family members and close acquaintances and there is not a breakdown for every type of professional that is out there. There are many more professions that have these types of crimes such as Coaches, doctors, psychiatrists, therapists and bus drivers just to mention a few.  People which are on the registry are a locked out group and it makes no difference what profession they fall under quite obviously if a person is convicted of a sex-related crime then they are not going to be a police officer, a teacher and probably not a clergy.

Teachers, Clergy and people on the registry commit fewer New sex offenses than the protectors of society, our diligent law enforcement officers. From this information it would seem that one of the most single trusted segments of our society, police officers: are over 14 times more likely to be involved in a new sex crime than people on the registry and teachers are over 3 times likely, followed by clergy which are twice as likely. Maybe before a police officer applies for a position they should be required a sexual Predator evaluation?

Before going any further lets examine the overall recidivism rates for convicted offenders. The Bureau of Justice Statistics conducted the largest recidivism study ever conducted in the United States, tracking prisoners from 15 states. This report examined inmates released from state prisons in 1994 and found that 67% of them were arrested for at least one serious new crime within the first 3 years after release, and fifty-two percent of them were re-convicted of a new crime.  The highest rates of recidivism (re-arrest) were for crimes involving stealing: larceny (75%), burglary (74%), robbery (70%), possessing of selling stolen property (77%) and stealing motor vehicles (79%). Trafficking in illegal weapons was also high at 70%. Recidivism for driving under the influence of alcohol or drugs was 51% and homicide was 41%. In this study, the recidivism rate for rape was 46% and for sexual assault was 41%. Apparently these sex crimes were committed by ex-convicts who had not formerly been convicted of a sex crime, because the same report goes on to say that "within 3 years following their release only 3.5% were reconvicted for another sex crime" and only 2% of the rapists were arrested for another rape within the 3-year study period. Therefore of the 46% of ex-convicts who were re-arrested for rape 44% must NOT have been previously convicted of a sex crime but of another type of crime.

The study involved 272,111 inmates. In this study, there were 27 times more non-sex offender ex-convicts than there were released sex-offenders. The ex-convicts who were not sex offenders actually committed 7 times more NEW sex crimes than did the released sex offenders. This study

showed that 87% of new sex crimes in this study were committed by ex-convicts, NOT by registered citizens (USDOJ 2003.) This study looked at only individuals who have a prior criminal record. When one considers that most sex offenses are committed by those who have no prior criminal record, it is easy to see that the vast majority of new sex crimes are committed by someone other than a registered citizens. (USDOJ 1994)

All these numbers and statistics tend to confuse folks and I recognize there are people who will refuse to believe them at all. So, lets bring this into perspective. The June 2002: Department of Justice: Recidivism of Prisoners Released in 1994 (DOJ-2002) mentioned something most folks have overlooked, and we quote: The fraction of all crimes that released prisoners accounted for was 4.7%: The study (DOJ-2002) cannot measure precisely what fraction of all crimes the former prisoners were responsible for during the 3 years following their release. The closest measure is the fraction of all arrests for the seven serious crimes (murder, rape, robbery, aggravated assault, burglary, larceny, and motor vehicle theft). The number of "arrests" is not the number of "arrest charges" (meaning a person can be charged with multiple crimes) but the number of different days on which a person was arrested. In 13 states (because of missing data Florida and Illinois could not be in this analysis) from 1994 to 1997, 234,358 released prisoners accounted for 140,534 arrests (table 5). During the period in the 13 states, 2,994,868 adults were arrested for the 7 serious crimes according to the FBI.

Therefore, REARRESTS of the released prisoners were 4.7% of all arrests for serious crime from 1994-1997." (DOJ-2002 page 5) Let us try to understand what this is saying, 95.3% of all serious crime was committed by who? New Criminals, not recidivists! Yes, we must acknowledge that, it is possible that some of those "new criminals" had records which go back many years. Like the study said, they cannot be precise! However it is known that during that time period (1994-1997): OF THE RELEASED SEX OFFENDER 24% (2,326) RECONVICTED for non-sex offenses(most were related to the strict conditions that registered citizens are forced to live under), and, 3.5% (339) were RECONVICTED for a sex offense. (DOJ-2003[p2]).

Finally, remember that 04.7% above, well what percentage of those folks are actually RECONVICTED sex offenders? 2,326 + 339 = 2,665 or .08898%. Therefore, RECONVICTION of the released sex offender prisoners was .08898% of all arrests for serious crime and 00.0001% or 1/10,000 of 1% for a new sex crime from 1994-1997. By the Department of Justice: Recidivism of Prisoners Released in 1994(DOJ-2002)REPORT. HIGH RECIDIVISM?????

From the data so far, another way to look at it is if a child is molested the chance that is done by a previous convicted sex offender is around one-ten thousandths (1/10,000) of 1% and the possibility that it is done a friend, family member, or a person in a trust position (teacher, principle, coach, police, therapists, etc.) or a person that has not been caught and is not on the registry is 99.9998%

In a recent story done by Rutgers news service:

http://www.reuters.com/article/2012/01/20/us-army-health-report-idUSTRE80J01C20120120

It was pointed out that US soldiers crimes in the community have almost doubled over the last five years. In just a year of 2011 there were 2811 violent felonies committed by soldiers returning from combat. Of those the top five violent felonies committed by soldiers were aggravated assault, rape, aggravated sexual assault, forcible sodomy and child pornography as well as a high percentage of domestic violence against their spouses and their children when you take into account the fact that there were probably only 300 new sex crimes committed by people on the national sex offender registry In that given year the number of crimes and types of crimes committed by soldiers returning from combat is staggering.

**Data collected from the Nebraska state patrol registry**
NOTE: in the first line of the table 1971 through 1994 , covers a 23 year span, averaging out the 5% for a yearly average. It end up with 2/10 of 1% per year re-offense rate.

***This data clearly shows that 99%+ of the people on the registry. Do not reoffend***
In 16 years the registry has increased in size 776% .
While In 40 years only .00.002% per year of the people listed on the registry reoffended.

| year | re-offense | Not reoffending | re-offense % per Year | Single offense Tab 1 | Indeterminate Tab 2 | Multiple offenses Tab 3 | Added per year | Total on Registry | Registry increase % |
|------|-----------|-----------------|----------------------|---------------------|--------------------|------------------------|---------------|-------------------|---------------------|
| 1971-1994 | 29 | 457 | 5% | 307 | 11 | 168 | N/A | 486 | Base Year |
| 1995 | 11 | 556 | 1% | 67 | 1 | 13 | 81 | 567 | 16% |
| 1996 | 7 | 664 | 1% | 88 | 2 | 14 | 104 | 671 | 18% |
| 1997 | 16 | 789 | 1% | 99 | 2 | 33 | 134 | 805 | 19% |
| 1998 | 13 | 965 | 1% | 152 | 2 | 19 | 173 | 978 | 20% |
| 1999 | 15 | 1136 | 1% | 156 | 3 | 14 | 173 | 1151 | 15% |
| 2000 | 16 | 1326 | 1% | 187 | 1 | 13 | 191 | 1342 | 14% |
| 2001 | 10 | 1531 | 00.6% | 190 | 0 | 9 | 199 | 1541 | 12% |
| 2002 | 25 | 1706 | 1% | 171 | 4 | 15 | 190 | 1731 | 12% |
| 2003 | 18 | 1931 | 1% | 211 | 1 | 6 | 218 | 1949 | 12% |
| 2004 | 24 | 2129 | 1% | 196 | 2 | 6 | 204 | 2153 | 10% |
| 2005 | 15 | 2426 | 00.6% | 209 | 9 | 10 | 228 | 2441 | 10% |

| 2006 | 14 | 2636 | 00.5% | 202 | 3 | 4 | 209 | 2650 | 8% |
| 2007 | 27 | 2808 | 00.9% | 177 | 3 | 5 | 185 | 2835 | 7% |
| 2008 | 23 | 3009 | 00.7% | 189 | 3 | 5 | 197 | 3032 | 7% |
| 2009 | 18 | 3230 | 00.5% | 211 | 2 | 3 | 216 | 3248 | 7% |
| 2010 | 20 | 3526 | 00.5% | 295 | 3 | 2 | 300 | 3546 | 9% |
| 2011 | 32 | 3742 | 00.8% | 220 | 6 | 0 | 226 | 3774 | 6% |
| TOTAL | 333 | 34567 | 00.002% | N/A | N/A | N/A | N/A | 3774 | 94 to 2011 776% |

NOTE: the reason for using yearly re-offense rate percentages is the fact that the registry is very fluid with people being added monthly and in some cases people being removed, monthly. Also note, many studies take a look at the total number of people that reoffend over a multiple year span. Without taking into account the number of people who do not reoffend over that same multiple year span. The number of people in Nebraska that after having been convicted of one sex crime committed another years later total 333 over a 40 year time span. Balancing the equation requires that you also add up all the people that did not reoffend over that 40 year time period. That comes to 34,567 people and that gives you a total re-offense rate of 9/10 of 1 % or a yearly re-offense rate of people on the registry of 2/1000 of 1%.

A number of Ohio studies were looked at to find out exactly how many people on the registry in the state of Ohio were reconvicted for additional sex crimes and it was found that in any given year of the ten-year study that the _highest percentage of people on the registry that were involved in new sex crime was around 3/10 of 1%_ and got down to as low as 4/100 of one percent.

| YEAR | One | Two | Three | Four | Five | Six | Seven | Eight | Nine |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Number on registry | 21750 | 21687 | 21617 | 21684 | 21569 | 21556 | 21545 | 21529 | 21517 |
| Number not Reoffending | 21686 | 21617 | 21584 | 21569 | 21556 | 21545 | 21529 | 21517 | 21513 |
| Number Reoffending | 64 | 69 | 33 | 15 | 13 | 11 | 16 | 12 | 4 |
| Not Reoffending % | 99.71% | 99.69% | 99.85% | 99.94% | 99.94% | 99.95% | 99.93% | 99.95% | 99.99% |
| Reoffnneding % | 0.29% | 0.31% | 0.15% | 0.06% | 0.06% | 0.05% | 0.07% | 0.05% | 0.01% |

Note: Re-offenses in one year, there are more RSO registered than shown above. This data is only for the last ten years (2000-2010). Ohio has been had the registry since 1996. The extra four to five years. There is nearly an additional 5000 RSOs who have been on the registry from 10 to 15 years. They only add about 1 re-offense a year at the most. The re-offense rates for each year after released is based form the information found in ODRC Ten-Year Recidivism Follow-Up Of 1989 Sex Offenders Releases ; By Paul Konicek Ohio Department of Rehabilitation and Corrections, Office of Policy, Bureau of Planning and Evaluation;

**Re-offense time frames**
data collected from the Nebraska state patrol registry
this data indicates the length of time from the first conviction to a second conviction
the numbers in the 1 to 5 year range and may be disproportionately high because some convictions may be from the same crime spree. But prosecuted at a later time thereby may not be considered a re-offense after intervention of first conviction.

| Re-offend after years | re-offenders in prison | re-offenders out of prison | re-offenders |
|---|---|---|---|
| 1 to 5 years | 52 | 49 | 101 |
| 5 to 10 years | 39 | 56 | 95 |
| 10 to 15 years | 44 | 29 | 73 |
| 15 to 20years | 22 | 21 | 43 |
| After 20 years | 15 | 6 | 21 |
| Total percentages | 45% | 55% | 100% |

At the time of this study there were 3774 people on the Nebraska registry

| Re-offend in time span of | Number in prison | Number out of prison | Total reoffending for time span | Yearly % of people on re in time span |
|---|---|---|---|---|
| 1 to 5 years | 52 | 49 | 101 | 00.4% or 4/10 of one per |
| 5 to 10 years | 39 | 56 | 95 | 00.4% or 4/10 of one per |
| 10 to 15 years | 44 | 29 | 73 | 00.2% or 2/10 of one per |
| 15 to 20 years | 22 | 21 | 43 | 00.2% or 2/10 of one per |
| 20 to 50 years | 15 | 6 | 21 | 00.02% or 2/100 of one p |
| Total 1 to 50 years | 172 | 161 | 333 | 00.17% or 17/100 of one |

Many people want to refer to the Department of Justice study done on the 1994 released prisoners. Everybody from both sides of the argument points to this one and the fact that 3.5% of RSOs are reconvicted of a new sex crime. Note that is only for 15 states and during the three year follow-up period there were 339 new convictions for RSOs and that averages out to 113 per year. How many people are on the registry for those 15 states? And what happens if we put the number of 113 per year into the equation? Arizona 14512, Maryland 7269, North Carolina 13554, California 106216, Michigan 47329, Ohio 19448, Delaware 4488, Minnesota 1611, Oregon 23698, Florida 55999, New Jersey 14013, Texas 66587, Illinois 21297, New York 32257, Virginia 18131, **Total 460,909,** making up about 2/3 of the total registry
460,909/113 = 00.0245% = 2/100 of 1 percent So of the total number of people on the registry In those 15 states 2/100 of one percent Were reconvicted in a new sex crime

There have been put forth a couple of different recidivism rates for people on the registry, both very very small but the most important one is yet to be looked at, and that is how many people on the registry are reconvicted of a new sex crime per year, and as far as the recidivism rate for sex offenders are concerned there are around 750,000 people on the registry at the present time. According to the Department of Justice: Recidivism of Prisoners Released in 1994 (DOJ-2002) for the 15 reporting states there were 339 new convictions for people on the registry over a three year period and that averages out to 113 per year and that figures out to an average of 7.5 per state or 377 repeat sex offenses per year for the entire United States, doing the numbers 750,000/377= 00.0005%. <u>That is to say of people on the regestrys re-offenses rate is 5/10,000 of one percent per year or another way to put it is the percentage of people on the registry who **do not reoffend** is 99.9995%</u>

Where is the high recidivism rate that everyone talks about, There is no empirical data to justify the registration and notification laws. **With this information I think that the point has been made!!**

Post navigation

← Sight Crime: The Complexity of Federal Child Pornography & Obscenity Laws
Government Sanctioned Cruelty to over half a Million American Children. →

## 14 comments for "Who Really Commits New Sex Crimes?"

1. Kayt

   *December 30, 2015 at 5:16 am*

   With recidivism in mind, I remember one man who is in his mid-50's and currently in prison for child porn. He had a conviction about 10 years ago and went through trial, jail, etc. Somehow he got out of the lengthy prison term and went back his life. He had a home, a savings account, and a few other belongings.

   About a year later he was re-arrested for child porn but this time it was for a picture shared by someone else and there was a trace in another man's computer that dated back to before his first conviction. I think it was one picture, might have been two, he's been in prison for about 7 years and is due to get out. In the mean time he lost his home, his savings and all of his belongings. He had a pacemaker, didn't want to live but the parole officers talked him out of it JUST BEFORE they re-arrested him. He will be out this summer if plans go right.

   Recidivism studies are not always truthful, it seems.

   My point: Some of the recidivism are charges such as his, they bring up old charges and make them look as though they are new.

   o Paul

      *January 1, 2016 at 6:29 pm*

According to the map from policemisconduct.net, there's a lot of police misconduct in the Las Vegas area. Not implying anything there…just saying. :o) (Note; Las Vegas is one of the worst places for RSO's to visit in the country. We have to register within 24 hours in that jurisdiction, even if we are there for two or three days. If one is on federal supervised release and is an RSO, you ain't going to sin city.)

Maybe it was mentioned in one of the links provided but I'd be curious if the majority of those police officers committed their sex offenses off duty or on patrol. It is awfully hard to convict a cop under any circumstances, let alone when he is on duty. You need corroborating victims (from other crimes) to come forward for any chance of a conviction. Although there are some exceptions. This particular case caught my eye.

http://www.thedailybeast.com/articles/2015/12/10/the-most-horrific-cop-rape-case-you-ve-never-heard-of.html

- Scott

*January 2, 2016 at 4:13 pm*

Not to be smart or anything but seeing as law enforcement gives sex offenders an entitlement as if it were a career, maybe those officers in vegas are afraid sex offenders might take away some part of their job or be an informant. Not that that entitlement is something to be proud of or known by…

## 2. Paul

*January 1, 2016 at 6:32 pm*

By the way, good article Will. We've got to give credit where credit is due. Please keep up the good work.

## 3. Sharon

*January 2, 2016 at 1:27 pm*

Re. RSO registration within 24 hours in Las Vegas (sin city).
Hey, you can choose to not post this comment but me thinks that the LV cops don't want any competition and neither do the prostitutes.

Just saying!

## 4. Paul

*January 6, 2016 at 6:06 pm*

Not related to above article but contribute by taking 5 minutes out of your schedules to tell congress how you feel about International Megan's Law. You opposition to this bill is important. Your votes will show up geographically on the map of the U.S indicating places where there are support and opposition. Let's light up the map!!!!!

https://www.popvox.com/bills/us/114/hr515

5. Viva Las Vegas

*January 6, 2016 at 8:16 pm*

Actually, it is 48 hours of crossing state lines or establishing residency. NRS 179D.460

o Paul

*January 7, 2016 at 3:37 pm*

I thought I had read that it was 24 hours. I guess I stand corrected.

6. Kayt

*January 7, 2016 at 12:57 pm*

The real question is what is the real reason the government is writing the laws? I know things that I'm not saying and I'm betting a lot of other people do too. I am surprised that some people actually seem to be unharmed by what they say, consider: Why Johnny Can't Come Home [Noreen N. Gosch], her book and there are related videos/talks, etc. I know that people don't believe her but I know of one family whose lives were definitely "rearranged" in similar ways, to put it mildly.

When people talk against the government not many people take it seriously UNLESS their lives are affected or someone very close to them have changed lives.

So, to write to congress – why would this help and what would I actually say that makes sense?

7. Kayt

*January 7, 2016 at 5:06 pm*

I wrote another comment but I think my internet had a glitch and it didn't post. The bottom line is what would I write in a letter to congress? Referring to: https://www.popvox.com/bills/us/114/hr515

Emotional arguments won't cut it because they fall on deaf ears. We need logic.

I believe that I'm not the only one who needs a sense of direction on this.

8. Kayt

*January 7, 2016 at 5:08 pm*

My comment seems to have been cut off in my above post: I wanted to say that I believe that I'm not the only one who needs to know what to write in my comments to congress. in the above URL which was: https://www.popvox.com/bills/us/114/hr515

○ ## Paul

*January 8, 2016 at 12:49 pm*

Write what is in your heart, Kayt. No one expects you to be Clarence Darrow.

## 9. Anonymous

*January 11, 2016 at 5:28 am*

I am finding, it seems much easier to target a smaller group than a bigger group. Have you noticed how a ploy from our own government has been playing the same game all the time?? think of the amount of people in numbers to every situation and group or issue. Look at how low the numbers of SOs their are in a community than their are compared to the issue of people with drug or alcohol addiction. One is far more serious than the 2 and i am thinking because drugs and alcohol aren't so much as a physical abuser in some cases, Our government officials have overlooked the matter.

This in itself should be living proof where some of our priorities as a country are. We have failed to realize that Porn itself is a bigger contributor to our Sexual personalities or habits. This issue has been so bad now it is filtering into our children's or teens minds and in some cases result in charges or offenses towards others in their age group or younger. Why aren't they shutting those down?? because while some may not realize it, It is because of 2 reasons. #1 because it is a multi billion dollar industry and #2 Our government is afraid to lose too much revenue and would rather satisfy peoples self gratification.

## 10.     Paul

*January 21, 2016 at 3:02 pm*

I would call people's attention to the latest news from Oklahoma.

http://www.aol.com/article/2016/01/21/former-oklahoma-policeman-sentenced-to-263-years-for-raping-four/21300937/?icid=maing-grid7|maing7|dl1|sec1_lnk3%26pLid%3D1352734765

Comments are closed.

https://sosen.org/blog/2013/11/12/are-gps-ankle-bracelets-harming-the-people-that-are-forced-to-wear-them.html

# Are GPS ankle bracelets harming the people that are forced to wear them?

by Robert Wolf • November 12, 2013 • Comments Offon Are GPS ankle bracelets harming the people that are forced to wear them?

Here is a simple question that may have long-term effects and may bring about lawsuits costing the state governments billions of dollars for their total disregard of human safety.

The question is, quite simply, is the forced use of GPS ankle bracelets that transmit information over cell phone frequencies causing damage to the people that are forced to wear them and did the manufacturers of these devices include FCC warning tags that were disregarded by the people placing these on the people who are required to wear them?

Realize that some countries have gone so far as to ban the use of cell phones around pregnant mothers, and may not be used anywhere close to a child.

Cell Phone Radiation Lawsuits:
Bernstein Liebhard LLP Notes new study finding
cell phone radiation may cause brain tissue damage.

In a press release issued March of this year, Bernstein Liebhard LLP, a nationwide law firm representing clients in cell phone radiation lawsuits, notes that a new study has found that radiation from cell phones may cause damage to brain tissue.

According to a report from the Daily Mail, researchers with Finland's Radiation and Nuclear Safety Authority found that one hour of cell phone radiation can cause cells in blood vessel walls to shrink, allowing potentially harmful substances in the blood to 'leak' into the brain. The two-year study also found that repeated exposure to cell phone radiation could make the blood-brain barrier more permeable, leading to increased brain damage. "**Repeated occurrences of these events on a daily basis, over a long period of time, could become a health hazard due to possible accumulation of brain tissue damage,**" the study authors concluded.*

"**This research is just further evidence that exposure to cell phone radiation can affect the brain in harmful ways. We agree with the study authors that more research on this issue is urgently needed**", says Bernstein Liebhard LLP. The Firm is currently investigating the link between cell phones and brain cancer, and is part of a small consortium of law firms actively representing plaintiffs in cell phone radiation lawsuits.

The U.S. Federal Communications Commission (FCC) recently submitted a proposal to reevaluate cell phone radiation emission standards, something it has not done since 1996. The U.S. Government Accountability Office ("GAO") has criticized the current standards as being outdated, compared to those of international regulatory agencies, and for failing to reflect the most recent research on cell phone radiation.

Remember that classic "this is your brain on drugs" commercial, with the egg frying in a pan? If you soon see a "this is your brain on cell phones" clip, don't say we didn't warn you: cell phone radiation may be slowly sautéing your noodle finds new research published in Proceedings of the National Academy of Sciences.

Using a first-of-its-kind technique for measuring electromagnetic radiation **researchers found the radio frequency field generated by your cell phone causes brain tissue to heat up**. *This proves your brain is absorbing radiation from your cell*, study author David Gultekin, Ph.D., a researcher at the Memorial Sloan-Kettering Cancer Center in New York, tells MensHealth.com.

While Gultekin and his colleagues can't say exactly how much cell phone radiation exposure is safe, the **World Health Organization has classified radio frequency fields as possibly carcinogenic**, meaning exposure may put you at greater risk for brain cancer, the study explains. This is not the first study indicating cell phones could eventually cause serious health problems. Check out our 2010 report: Is Your Life on the Line? However, in the game of Russian roulette you may be playing by surrounding yourself with cellular devices, this is one more bullet, Devra Lee Davis Ph.D., founder of the Environmental Health Trust, tells MensHealth.com

Exposure to Cell Phone Radiation Up-Regulates Apoptosis Genes in Primary Cultures of Neurons and Astrocytes (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2713174/)
"The health effects of cell phone radiation exposure are a growing public concern. This study investigated whether expression of genes related to cell death pathways are dysregulated in primary cultured neurons and astrocytes by exposure to a working GSM (Global System for Mobile Communication) cell phone rated at a frequency of 1900 MHz." –
"Headache has been reported among cell phone users compared to non-users [7]. When rats were exposed to RF/MW radiation to reproduce normal human exposure, the life span and tumorigenicity of rats were unchanged [1, 21] but evidence of oxidative damage was found in brain tissues [19, 29]. RF/MW radiation induced damage can lead to death in single cell organisms [3], inhibit cell proliferation [9], cause DNA damage [11, 32], and alter gene expression in different cell types including brain cells as measured by gene microarrays [6, 14, 15]. "

For more information, try these links:
  ☐ http://news.menshealth.com/cell-phone-safeguards/2011/08/04/
  ☐ http://news.menshealth.com/breaking-cell-phones-could-hurt-your-sperm/2011/08/16/
  ☐ http://www.consumerinjurylawyers.com/legal-news/french-watchdog-group-advises-limited-mobile-phone-use-in-light-of-research-about-cell-phones-causing-cancer
  ☐ http://www.consumerinjurylawyers.com/cell-phones-causing-cancer-international-safety-commission-supports-italian-court-ruling
  ☐ http://www.consumerinjurylawyers.com/+Cell-Phone-Radiation-Breast-Cancer
  ☐ http://dailymail.co.uk/health/article-124179/Radiation-mobiles-lead-brain-damage.html
  ☐ http://iarc.fr/en/media-centre/pr/2011/pdfs/pr208_E.pdf
  ☐ http://pcworld.com/article/257765/fcc_to_review_cell_phone_radiation_standards.html
  ☐ http://gao.gov/products/GAO-12-771

https://sosen.org/blog/2016/08/01/second-look-at-are-gps-ankle-bracelets-harming-people-that-are-forced-to-wear-them.html

# Second look at "Are GPS ankle bracelets harming people that are forced to wear them?"

by Will Bassler • August 1, 2016 • 5 Comments

*The base of this article was posted in November of 2013 here on SOSEN, since then new information has come to light and we have added it to the end of the article.*
Here is a simple question that may have long-term effects and may bring about lawsuits costing the state governments billions of dollars for their total disregard of human safety.

The question is, quite simply, is the forced use of GPS ankle bracelets that transmit information over cell phone frequencies causing damage to the people that are forced to wear them and did the manufacturers of these devices include FCC warning tags that were disregarded by the people placing these on the people who are required to wear them?
Realize that some countries have gone so far as to ban the use of cell phones around pregnant mothers, and may not be used anywhere close to a child.

<p align="center">Cell Phone Radiation Lawsuits:<br>Bernstein Liebhard LLP Notes new study finding<br>cell phone radiation may cause brain tissue damage.</p>

In a press release issued March of this year, Bernstein Liebhard LLP, a nationwide law firm representing clients in cell phone radiation lawsuits, notes that a new study has found that radiation from cell phones may cause damage to brain tissue.

According to a report from the Daily Mail, researchers with Finland's Radiation and Nuclear Safety Authority found that one hour of cell phone radiation can cause cells in blood vessel walls to shrink, allowing potentially harmful substances in the blood to 'leak' into the brain. The two-year study also found that repeated exposure to cell phone radiation could make the blood-brain barrier more permeable, leading to increased brain damage. "**Repeated occurrences of these events on a daily basis, over a long period of time, could become a health hazard due to possible accumulation of brain tissue damage**," the study authors concluded.*

"**This research is just further evidence that exposure to cell phone radiation can affect the brain in harmful ways**. **We agree with the study authors that more research on this issue is urgently needed**", says Bernstein Liebhard LLP. The Firm is currently investigating the link between cell phones and brain cancer, and is part of a small consortium of law firms actively representing plaintiffs in cell phone radiation lawsuits.

The U.S. Federal Communications Commission (FCC) recently submitted a proposal to reevaluate cell phone radiation emission standards, something it has not done since 1996. The U.S. Government Accountability Office ("GAO") has criticized the current standards as being outdated, compared to those of international regulatory agencies, and for failing to reflect the most recent research on cell phone radiation.

Remember that classic "this is your brain on drugs" commercial, with the egg frying in a pan? If you soon see a "this is your brain on cell phones" clip, don't say we didn't warn you: cell phone radiation

AR-00000758

may be slowly sautéing your noodle finds new research published in Proceedings of the National Academy of Sciences.

Using a first-of-its-kind technique for measuring electromagnetic radiation **researchers found the radio frequency field generated by your cell phone causes brain tissue to heat up**. *This proves your brain is absorbing radiation from your cell*, study author David Gultekin, Ph.D., a researcher at the Memorial Sloan-Kettering Cancer Center in New York, tells MensHealth.com.

While Gultekin and his colleagues can't say exactly how much cell phone radiation exposure is safe, the **World Health Organization has classified radio frequency fields as possibly carcinogenic**, meaning exposure may put you at greater risk for brain cancer, the study explains.
This is not the first study indicating cell phones could eventually cause serious health problems. Check out our 2010 report: Is Your Life on the Line? However, in the game of Russian roulette you may be playing by surrounding yourself with cellular devices, this is one more bullet, Devra Lee Davis Ph.D., founder of the Environmental Health Trust, tells MensHealth.com

Exposure to Cell Phone Radiation Up-Regulates Apoptosis Genes in Primary Cultures of Neurons and Astrocytes (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2713174/)

"The health effects of cell phone radiation exposure are a growing public concern. This study investigated whether expression of genes related to cell death pathways are dysregulated in primary cultured neurons and astrocytes by exposure to a working GSM (Global System for Mobile Communication) cell phone rated at a frequency of 1900 MHz." –
"Headache has been reported among cell phone users compared to non-users [7]. When rats were exposed to RF/MW radiation to reproduce normal human exposure, the life span and tumorigenicity of rats were unchanged [1, 21] but evidence of oxidative damage was found in brain tissues [19, 29]. RF/MW radiation induced damage can lead to death in single cell organisms [3], inhibit cell proliferation [9], cause DNA damage [11, 32], and alter gene expression in different cell types including brain cells as measured by gene microarrays [6, 14, 15]. "

For more information, try these links:

- http://news.menshealth.com/cell-phone-safeguards/2011/08/04/
- http://news.menshealth.com/breaking-cell-phones-could-hurt-your-sperm/2011/08/16/
- http://www.consumerinjurylawyers.com/legal-news/french-watchdog-group-advises-limited-mobile-phone-use-in-light-of-research-about-cell-phones-causing-cancer
- http://www.consumerinjurylawyers.com/cell-phones-causing-cancer-international-safety-commission-supports-italian-court-ruling
- http://www.consumerinjurylawyers.com/+Cell-Phone-Radiation-Breast-Cancer
- http://dailymail.co.uk/health/article-124179/Radiation-mobiles-lead-brain-damage.html
- http://iarc.fr/en/media-centre/pr/2011/pdfs/pr208_E.pdf
- http://pcworld.com/article/257765/fcc_to_review_cell_phone_radiation_standards.html
- http://gao.gov/products/GAO-12-771

Updated Info:
The courts have the knowledge that shaming is a form of punishment as defined by the Court cases of People v. Meyer and People v. Lowe, 606 N.E.2d. People v. Molz, 113 N.E.2d, People v. Johnson 528 N.E.2d, State v. Burdin 924 S.W.2d ,People v. Letterlough 655 N.E.2d, Lindsay v. State 606 So. 2D..

One of the unintended consequences of placing GPS on people is the demoralizing effect that it has on them and how they can go into a emotional and mental down spiral because of having to explain why they have something strapped to their ankle.

*"Eighty-nine percent of probation officers surveyed by the Justice Department felt that "offenders' relationships with their significant others changed because of being monitored." Both officers and those monitored observed that the ankle band had a distinct impact on children. As one parent testified, "When it beeps, the kids worry about whether the probation officer is coming to take me to jail. The kids run for it when it beeps." Another noted that his child repeatedly strapped a watch around his ankle "to be like Daddy.""*

So beyond the health risks there is also a risk to mental health of people that are subjected to the unconstitutional invasion into their privacy, our Supreme Court has said that placing a GPS on a person or their property is in fact a violation of constitutional standards.  At the present time one of the ways that the Parole and Probation department is getting away with this is they are forcing a person to sign a waiver. If they don't sign the waiver they will be imprisoned, so they are forcing someone to give up a constitutional right the right to privacy by coercion. The fact is this opens up parole and probation not only to civil rights constitutional tort lawsuits under USC 1983. There is also the possible federal charges being placed against them as individuals under title 18 of the United States codes.

Since this article was originally posted in November of 2013 new information has come out about the detrimental effects of having cell phone radiation. Remember unlike cell phone radiation that someone gets from picking up and using their cell phone for a couple hours a day we are talking about a device that transmits cell phone radiation 24 hours a day seven days a week, so the short and long-term effects may well be a thousandfold more than someone who has a cell phone and uses it. According to the latest research a person is three fold more likely to end up with a brain tumor if they use their cell phone more than 900 hours within their lifetime that means they would reach that 900 hours using their cell phone for 2 1/2 hours a day within one year or in the case of an ankle monitor that is on 24 hours a day, seven days a week they would reach that 900 hours within 38 days of having it strapped on. Obviously having a strap to your ankle you're not looking at brain tumors but in the case of having strapped to your ankle there is a high possibility for skin cancer as well as bone cancer, not to mention the fact that cell phone radiations have been proven to restrict blood flow. Take a look at the articles below that not only look at the danger of cell phone radiation but the effectiveness, reliability and psychological damage to people that have had these things strapped to their ankles.

There is also the old comment of follow the money, take a look at how much money is spent on lobbying our governmental officials as well as campaign contributions that has been done by owners and board members of companies that manufacture these devices, not to mention the other organizations that the same people sat on the boards of directors of who are also doing lobbying and contributing to politicians.

- Many Nations Banning or Limiting Cell Phone Use by Children
- Cellular Phones – Do cell phones cause tumors?
- # Children's Exposure Guidelines to EMF Radio frequencies Updated by ANSES
- Why GPS Doesn't Always Work for Tracking Convicts
- The Quiet Horrors of House Arrest, Electronic Monitoring, and Other Alternative Forms of Incarceration
- Op-Ed: Electronic monitoring of criminal offenders a modern-day scarlet letter

- Tomgram: Maya Schenwar, Prison by Any Other Name
- Why GPS Doesn't Always Work for Tracking Convicts
- Electronic Monitoring: Some Causes for Concern

# Caution: Your GPS Ankle Bracelet Is Listening

- Contemplating the criminal justice tool's role in the rehabilitation process amid the wearable tech boom
- State's GPS monitoring of offenders raises concerns

https://narsol.org/2020/06/pa-supreme-court-sends-commonwealth-v-torsilieri-back-to-local-court/

PA Supreme Court sends Commonwealth v. Torsilieri back to local court

June 20, 2020

Originally published at parsol.org; reprinted in full with permission.

By Josiah . . . The PA Supreme Court (SCOPA) filed their opinions on Com. v. George Torsilieri on June 16 regarding the constitutionality of PA's Sex Offender Registration and Notification Act (SORNA) Revised Subchapter H. Mr. Torsilieri and his attorneys argued that SORNA is based on outdated legislative findings and presented current scientific evidence refuting the accuracy of those findings. The majority opinion was written by Justice Baer with Justices Todd, Dougherty, and Wecht joining in, sending the case back to the Chester County Court of Common Pleas for a thorough evidentiary hearing. Justice Donohue dissented, affirming the trial court's ruling that Subchapter H legislative findings present "an unconstitutional irrebuttable presumption that implicates the constitutional right to reputation." Justice Mundy wrote a separate dissenting opinion, which Chief Justice Saylor joined, holding that the scientific evidence presented by Mr. Torsilieri did not demonstrate that all those on the sex offense registry are unlikely to reoffend. Further, Mundy and Saylor pronounced the evidence presented did not support rendering SORNA unconstitutional.

One of the legislative findings that is being challenged is that those who have been convicted of sexually offending "pose a high risk of committing additional sex offenses," and "protection of the public from this type of offender is a paramount governmental interest." In other words, recidivism rates are high, thus legislators are duty bound to protect the public from this population. Torsilieri primarily argued that Subchapter H violates PA's Constitutional Right to Reputation Clause because of the presumption that EVERYONE who commits a sexual offense is at high risk of re-offending. Torsilieri's argument demonstrated that the notion of high recidivism is in stark contrast to decades of empirical research that clearly demonstrates otherwise. Further, Torsilieri argued that SORNA's reach is over-inclusive as it includes individuals who have committed non-sexual offenses (i.e., unlawful restraint, false imprisonment, interference with custody of children, and kidnapping). Torsilieri also questioned the effectiveness of the registry to reduce recidivism and increase public safety. To support these challenges, three affidavits from nationally respected experts were filed at the post-sentencing hearing.

The Commonwealth neglected to bring any counter expert testimony at the trial court level. Instead, they continued to rely on the previous legislative finding that all those convicted of sexual offenses pose a high risk of reoffending. In violation of the Court's rule of procedure at the SCOPA arguments, the Attorney General (AG) submitted a single study in the Commonwealth's appellate brief, which called in to question the expert testimonies presented by Mr. Torsilieri's attorneys. There are an overwhelming number of empirical studies that indicate sexual offense recidivism rates are lower than all crimes with the exception of murder.

Additionally, the Commonwealth and AG believe that the "courts are not the proper forum for scientists to debate controversies regarding sex offenders and are ill equipped to determine scientific truth," and should automatically refer to the General Assembly's findings where there is no scientific consensus. In other words, the Commonwealth and AG believe the courts have no place overruling the General Assembly's interpretation of scientific findings. Citing Commonwealth v. Hale, Justice Baer countered that the Court does indeed have the power to overrule legislative findings when constitutional rights are in jeopardy. That is to say, if you are going to violate someone's rights, then you better have a solid foundation for doing so. SCOPA is demanding to see current empirical evidence from the General Assembly.

Torsilieri presented persuasive evidence at the trial court. However, SCOPA believes the trial court could have maybe been persuaded to rule in favor of the Commonwealth had they presented their own evidence. The opinion challenges the Commonwealth to provide opposing science to that presented by Torsilieri and further challenges Mr. Torsilieri to provide additional convincing evidence.

The current legislative findings construct SORNA as a collateral consequence and therefore constitutional. Should SCOPA's next opinion rule in favor of Mr. Torsilieri, then the General Assembly's argument that SORNA is constitutional based on the collateral consequence construct will fall. Essentially, the General Assembly will not be able to use these findings in the future, thus forcing them to acknowledge that SORNA is punitive and is in violation of numerous PA and U.S. Constitutional rights.

PARSOL sees this opinion and the upcoming trial court evidentiary hearing as an important battle ground for moving toward rational sex offense laws that will truly be safe and just for all. This is an opportunity to establish policy and law that are constitutionally sound and that actually promote public safety and prevent sexual abuse.

https://narsol.org/2020/06/the-sex-offense-legal-regime-pronounced-a-failure/

"The 'sex offense legal regime' " pronounced a failure

June 23, 2020

By Paul M. Renfro . . . The "sex offense legal regime," which has developed alongside mass incarceration over the last forty years, has failed.

US sex offender registries now list nearly one million people. Federal, state, and local ordinances prohibit convicted sex offenders from living within a certain distance of schools, parks, day care centers, and other spaces where children might congregate. In places like Miami–Dade County, these restrictions have rendered hundreds of individuals effectively homeless. Only by building and inhabiting makeshift encampments in sparsely populated areas can offenders comply with such residency requirements.

Following the passage of an especially punitive county ordinance — still on the books as of 2020 — a veritable refugee camp of registrants appeared under Miami's Dolphin Expressway. Facing eviction and possible arrest, residents of the encampment moved to an underpass before encountering similar resistance and decamping in 2014 for an industrial area near Hialeah, a Miami suburb. In the summer of 2018, city and county officials — under pressure from area residents and business owners — applied the same punitive tactics to disband the encampment, once again displacing and dehumanizing its inhabitants. And the cycle remains unbroken: last June, registrants occupying a makeshift "colony" in Miami's Brownsville neighborhood were forced to vacate.

Such measures might seem sensible to a broad swath of the American public. Indeed, as Judith Levine and Erica Meiners argue, sex offenders' very humanity remains an open question. Yet these sorts of steps misrepresent the scope and nature of sexual harm in the United States, fueling mass incarceration while doing little to actually help survivors. At a time when demands to dismantle the police and unmake mass incarceration are reaching a fever pitch, we must target these myths and directly challenge the sprawling system of sex offender registration that they have produced.

Sex offender registration and surveillance rest on the flawed logic of "stranger danger." By design, they locate sexual threats (especially those facing young people) outside of the idealized, dual-parent home and thus outside of the idealized family unit — even though about three-fourths of child sexual assaults are perpetrated by family members or acquaintances. (Only 18 percent of those who sexually assault children are "complete strangers.")

Registration systems, in particular, deem certain places dangerous (on account of their inhabitants) while marking others as safe — sometimes implicitly and sometimes explicitly, by requiring offenders to live a certain distance away from schools, playgrounds, childcare centers, and other sites. But the vast majority of child sexual assaults go unreported, and many take place in ostensibly safe spaces at the hands of purportedly trustworthy individuals (like coaches, teachers, and priests) who have never been accused or convicted of misconduct and are thus not required to register.

Finally, the category of "sex offender" not only fails to account for the vast range of offenses for which one might be forced to register (from streaking to rape). It also implies an indelible, untreatable predatory impulse that must be vigilantly policed and suppressed, even though those convicted of sexual offenses have lower recidivism rates than those convicted of virtually any other offense. . . .

But sex offender registries do nothing to prevent abuse or reduce harm. Studies have found that sex offender registration protocols and other laws have "no discernible impact on the incidence of sex crimes." In fact, the "sex offense legal regime" actually perpetrates its own violence.

A society cannot legitimately claim to detest sexual violence when it builds and maintains a system that perpetrates such violence. And a society cannot legitimately claim to value the protection of its children when millions of young Americans go hungry and confront abject poverty daily.

Only by dismantling the registry and, in its stead, assembling a more equitable, less punitive society — devoid of the racism, sexism, homophobia, transphobia, and material deprivation that enable sexual violence, immiserate young people, and encourage children to run away from home — can we actually end the phenomena of sexual harm.

Read the full piece here at the Jacobin.

8/9/23, 8:39 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

"Personal Information Included, but to be excluded, are name, address, city, state, etc. Any personally identifiable information to be removed from public view."

The sex offender registry is a draconian set of laws, designed to ensure safety, but lacking in substance. The entire registry is unconstitutional at almost every point of inception, to anyone ordered to comply with this ridiculous policy. Recidivism rates are proven extremely low, if not almost nonexistent. Retroactive penalties are in fact a violation of the ex post facto clause of the U.S. Constitution. As a tax paying citizen of my great country, I feel it is my duty to shame you on your attempts to criminalize ANYONE with a life sentence, that is not in fact allowed by law for the crime committed. Murderers don't have a public list, nor do animal abusers, drunk drivers, etc. IM not trying to minimize the crimes we are discussing here, but the law says that once a person has completed their sentence, the debt to society has been paid. Nowhere in the Constitution does it say that Government has the absolute authority to punish someone for life. The Registry doesn't protect the public. Its been proven ineffective many times. The punishment place on a person with these requirements, are out of control.

**Comment ID**

DOJ-OAG-2020-0003-0208

 **Tracking Number**

1k4-9iqf-8hfg

AR-00000766

Regulations.gov

## Comment Details

**Received Date**

Sep 2, 2020



Your Voice in Federal Decision-Making

| About | Bulk Data Download | Agencies | Learn |
| (/about) | (/bulkdownload) | (/agencies) | (/learn) |

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000767

8/9/23, 8:40 AM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

View More Comments 〔724〕 (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments 〔724〕 (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

| Comment |
| --- |

I really think the best solution for all involved would be invisible fencing and shock collars. I know it sounds crazy, but I think that is the best solution for the morons in charge of coming up with this crap. Every legitimate study on "sex offenders" shows that SORNA is not effective, so why keep doing it? I love that they came up with the SMART acronym, implying that this is an intelligent decision.

**Comment ID**

DOJ-OAG-2020-0003-0209

 **Tracking Number**

1k4-9iug-vzdq

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**

Sep 8, 2020

AR-00000768

Regulations.gov



Your Voice in Federal Decision Making

About    Bulk Data Download      Agencies     Learn

(/about)      (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000769

8/9/23, 8:45 AM                                                                  Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) |     Share ▾ |

---

| Comment |

If you want to continue to violate the ethics,morality, spirit and wording of the constitution and bill of rights of our country this act would definitely do that. If you want to continue to create a more dangerous environment for children and familys by further insuring anyone caught in your drag net is unable to restore their lives this law would definitely do that as well. Even the slowest individual knows that a person with no hope is always the most dangerous person..you can not release a person into society and make them a pariah with no hope of ever reintegrating into the society and expect to make society a safer place.We the American people sincerely would have thought you would be smarter.

| **Comment ID** |
| DOJ-OAG-2020-0003-0210 |

| ⊕  **Tracking Number** |
| 1k4-9iug-jg3s |

| **Comment Details**                              **Submitter Info** |
| **Received Date** |
| Sep 8, 2020 |

AR-00000770



About   Bulk Data Download   Agencies   Learn
(/about)   (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000771

8/9/23, 8:41 AM                                                                 Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

The Registry PROMOTES SO MUCH HATE AND FEAR! It is nearly impossible to have a sustainable career or even get a job at all. We have had to support our son for years because he can't get anyone to hire him although he has applied for countless jobs of all types. He can't even get hired by local grocery stores during a pandemic when so much help is needed! I pray that you will put an end to this registry instead of adding to it. Its really nothing but a SHAMING SYSTEM. Because of the Registry I have to worry about the real possibility of my son becoming homeless when we die and THAT IS A SHAME.

**Comment ID**
DOJ-OAG-2020-0003-0211

◎ **Tracking Number**
1k4-9iuh-rhna

**Comment Details**                                    Submitter Info

**Received Date**
Sep 8, 2020

AR-00000772



About      Bulk Data Download      Agencies      Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000773

8/9/23, 8:42 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

Very few people on the sex registries are of DANGER to the public. Most are not. Only those truly dangerous should even be on it.
The registry as proposed is IMPOSSIBLE to obey, therefore it TRAPS people who even try to follow its requirements. This is ENTRAPMENT and should be banned. Any registry should be SIMPLE to complete for anyone. Name, address, phone number should be adequate. To demand anything more makes people avoid even TRYING TO COMPLY, and therefore is ENTRAPMENT!

**Comment ID**
DOJ-OAG-2020-0003-0212

 **Tracking Number**
1k4-9iui-4o4d

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 8, 2020

AR-00000774



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000775

8/9/23, 8:42 AM                                     Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

"In a prosecution under 18 U.S.C. 2250, paragraph (g)(1) of this section does not in any case relieve a sex offender of the need to establish as an affirmative defense an inability to comply with SORNA because of circumstances beyond his control as provided in 18 U.S.C. 2250(c)"

If I read this right, a person in a jurisdiction that will not register to the degree required by SORNA Can be perpetually liable for arrest and incarceration while waiting for the courts to;
"establish as an affirmative defense an inability to comply with SORNA because of circumstances beyond his control as provided in 18 U.S.C. 2250(c)"

That is beyond belief SCOTUS would accept that.

**Comment ID**
DOJ-OAG-2020-0003-0213

 **Tracking Number**
1k4-9iuj-10r7

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 8, 2020

AR-00000776



About   Bulk Data Download      Agencies    Learn

(/about)          (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000777

8/9/23, 8:43 AM                                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

I am appalled and very disappointed that my Federal Government is looking at such UNINFORMED changes. Other posts go into greater depth about the science that has been learned on this topic over these many years and there is plenty of proof that the system does not work. I certainly hope this is not just political because it sounds good to 'tough on crime'. Well, its time to be SMART on crime and make decisions based on research and data and not fear and political gain. If there is a list, it should contain those most likely to re-offend based on proper evaluation and scientific studies.

**Comment ID**
DOJ-OAG-2020-0003-0214

 **Tracking Number**
keu-d7gr-2hj7

**Comment Details**                                          **Submitter Info**

**Received Date**
Sep 8, 2020

AR-00000778

Regulations.gov



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000779

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

SORNA needs to go away until you can come up with more reasonable laws. Punishing offenders for the rest of their lives is downright cruel. There is so much hysteria regarding "sex offenders" these days. You cannot even tell who is TRULY a sex offender. Teens having sex have ended up on the registry for life. That is not right! These laws have done VERY LITTLE to help anyone from being a "victim" since most offenders are a family member, friend of the family, or someone they already know. The recidivism rate is the lowest next to murder. People who are required to register have a very hard time finding work and supporting their families. They have a hard time finding a place to live. My aunt was 15 and my uncle 22 when they married. They were married 55 years before he passed. In today's society he would have been a RSO. How is that okay? Take your BLINDERS off! Teens and young adults make stupid mistakes. They do not deserve to have to register for the rest of their lives, much-less at all. I read about a 14 yr old boy in New Hampshire who is on the registry for life due to "sexting." How is that okay? THIS NEEDS TO STOP AND STOP NOW!!!!! You are ruining lives!!!! There are around ONE HUNDRED names added to the registry in our state (and other states) EVERY WEEK. E-V-E-R-Y W-E-E-K! Our tax dollars do not need to support this nonsense. Our police departments are overloaded enough as it is with everything else going on in the country. They don't need to be going to make house visits to someone who has already learned their lesson and will never commit another sex crime again, and most likely won't commit ANY crime again. Lord help us! FIX THIS MESS YOU HAVE CREATED PLEASE!!!!

| **Comment ID** |
| DOJ-OAG-2020-0003-0215 |

|  **Tracking Number** |
| 1k4-9iuk-5gth |

AR-00000780

Regulations.gov

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 8, 2020



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000781

8/9/23, 8:44 AM                                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)        Share ⌄

---

Comment

The proposed regulations are counterproductive to those trying to re-enter society by exposing sex offenders to act of vigilantism and public scorn and discrimination and it establishes a "second-class" citizenship that allows for what normally would be illegal discrimination in housing, employment, and education. These rules are unconstitutional, because they continue to hold sex offenders who are released as permanent prionsers to the Federal and State governments and therefore slaves in violation of the 13th Amendment to the US Constitution that outlaws slavery except for a punishment for crimes. SCOTUS said that these registries cannot be punishment, but there is no way the Government can avoid that with life-long registry and a tier system. Michigan is having to re-write its SORA just for those reasons and the Federal Government will face similar suits in Federal Court if it doesn't modify these regulations and adopt a permanent plan where registrants can leave the registry after 10 years of good and proveable behavior. Not to do so would actually make the registrants serve more time than their original sentences, which violates the 8th Amendment. I call on Attorney General Barr to rethink these proposals, review the Michigan case and follow suit to avoid costly litigation and to create a fair a just system where people are protected on bothe sides.

| **Comment ID** |
| --- |
| DOJ-OAG-2020-0003-0216 |

|  **Tracking Number** |
| --- |
| 1k4-9iuk-h0q0 |

AR-00000782

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 8, 2020



About     Bulk Data Download       Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000783

8/9/23, 8:47 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

| Comment |

Pretty simple...these laws are punitive and do not work. All they do is disenfranchise people that committed sex offenses who are trying to rehabilitate themselves and lead a normal life from being able to do so.

People who have committed sex offenses have the lowest rate of recidivism aside from someone who committed murder. Nobody should be subjected to a lifetime on the registry! People make mistakes...why go to these draconian measures on people who have committed sex offenses when the facts, research and studies ALL prove these measures do not improve public safety.

There are already enough laws and regulations of someone who has committed a sex offense. There should be a study and research done in order to understand the facts before more measures are put in place that do more harm than good.

| **Comment ID** |
| DOJ-OAG-2020-0003-0217 |

|  **Tracking Number** |
| 1k4-9iul-un85 |

| **Comment Details** | **Submitter Info** |

**Received Date**

AR-00000784

8/9/23, 8:47 AM                                    Regulations.gov

Sep 8, 2020



About     Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)     |     User Notice (/user-notice)     |
Accessibility Statement (/accessibility)     |     Developers (https://open.gsa.gov/api/regulationsgov/)     |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)     Provide Site Feedback

AR-00000785

8/9/23, 8:40 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001) / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

First they came for the Communists
And I did not speak out
Because I was not a Communist
Then they came for the Socialists
And I did not speak out
Because I was not a Socialist
Then they came for the trade unionists
And I did not speak out
Because I was not a trade unionist
Then they came for the Jews
And I did not speak out
Because I was not a Jew
Then they came for me
And there was no one left
To speak out for me
-Martin Niemöller

Congratulations with this SORNA you have made a good start in equaling or suppasing Hitler and the Nazi 3rd Reicht. All that is missing, but sure to come is the Endgültige Lösung (Final Solution(Execution&Torture of undesirable))

**Comment ID**
DOJ-OAG-2020-0003-0218

AR-00000786

Regulations.gov

 **Tracking Number**

keu-p4af-3br6

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 8, 2020



Your Voice in Federal Decision Making

About      Bulk Data Download      Agencies      Learn

(/about)      (/bulkdownload)      (/agencies)      (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000787

8/9/23, 8:47 AM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

---

| Comment |

My first effort public comment here was not posted for some reason, so I'm reposting. I do not want my name or personal info redacted. I want people to hear what I have to say because Ive done it in person, in the media, and through my website for over 15 years now. I have nothing to hide.

I have been a Registered Person for the past 17 1/2 years. When I first got out of prison in 2003, I did not sign up for anti-registry activism. I simply wanted to become a productive member of society. I have a Bachelors Degree but could only find entry level, minimum wage work after seven months of searching. I could only find a sleeping room in a slum in a dangerous part of town. Still, I made the most of my situation.

These laws are impossible to abide by for those who try hard to follow them to a T. Ohios 1000 foot residency restrictions were arbitrarily enforced. I was forced to move to another part of town because I lived too close to a place called the Life Skills Center, a place where SW Ohioans ages 16-22 (16 is Ohios AOC) can go to get a GED but since it is a school, I was forced to move. After calling 131 different apartments, I finally found a small one-bedroom. Right after I moved in, the city of Cincinnati tried to increase the restrictions but I made them back off some of the proposals.

Ohio also does something the proposed changes wantmake employer info public. That means few employers want to hire you because they must be registered. I lost both post-prison jobs because the registry was a convenient excuse to fire me if I stood up to mistreatment on the job. It is easy to assume I was a lousy worker, but I always received high review scores from the secret shoppers and customers would leave positive feedback on my job. I was a dependable worker. But the moment some coworker got upset with me, he told customers and other coworkers about my background so the complaints started piling up.

I have been on SSI ($803/mo.), food stamps ($16/mo.), and Medicaid/ Medicare since 2006. I am currently in my mid-40s and if I live as long as the expected average American Male, I expect to collect all this for another 35 years. Because Im a Registered Person, my credentials as a college grad means nothing. Thus,

AR-00000788

I havent bothered to look for a job since 2006. Why bother? I long ago stopped trying. Id much rather sit at home and collect a check than struggle to find work only to get rejection notices, register my work, and lose my job the moment some coworker gets upset for some petty reason.

But the employment issue is only part of the problem. These registry changes include retroactive application of the law. I was in Ohio when the state law switched to the Adam Walsh Act (AWA). On December 31, 2007, only about 18% of Ohios registrant population was labeled a Tier 3 under the old risk assessment law. On January 1, 2008, the number of registrants classified a Tier 3 tripled to 54% under the offense-based classification scheme.

There is a reason why 14 years after Bush signed the AWA into law, two-thirds of US states have not adopted the AWA despite facing a cut in Byrne/ JAG funds. This law is costly to everyone involved. States cannot afford to implement the law; Texas found in 2009 it would cost them $39 million just to implement (not maintain) the AWA but only $2 million in Byrne/ JAG cuts if they rejected it. The decision to reject the AWA was a no-brainer.

For the Registrants, our lives are spent struggling to become productive members of society. The only job I have is trying to help other Registered Persons find employment and housing resources they need. Im certainly helping out more returning citizens than empty laws like the Second Chance Act and First Step Act have done, since both exclude those convicted of sex offenses from obtaining any helpful assistance. I have conducted surveys on employment and collected housing leads, but one person alone cannot meet such a huge demand.

At last count by NCMEC, there were close to a million names on this public registry. Many of us are unemployed, homeless, and welfare dependent. Is this what you want? Most registrants are not incarcerated right now. Would you rather we continue to be unemployable and welfare dependent, sitting at home all day playing video games? Or would you rather we clock in at a 9 to 5 and collect a paycheck and pay our taxes and rent?

My research has shown that the AWA increases unemployment rates versus states that reject the AWA. If you support this controversial registry, then you support welfare dependency. I have no desire to work so long as the registry exists, and each year, I get less capable of entering a modern workforce. Will you keep pushing what is obviously bad legislation to appease a misinformed public? If so, then dont expect me to participate in this so-called American Dream.

---

**Comment ID**

DOJ-OAG-2020-0003-0219

---

 **Tracking Number**

1k4-9iuq-8c38

---

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**

Sep 8, 2020

AR-00000789

Regulations.gov



Your Voice in Federal Decision-Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

I have read through the proposed changed to the SORNA regulations, and as the wife of a person on the registry, I have grave concerns on how this will affect the people forced to register and their families. My husband will never be able to get off the registry because when he was a senior in high school he had a girlfriend that was a freshman and they had sexual contact. He thought he was free and clear once he had finished his probation, but then years later, his home state decided to go back and add people like him to their registry. My husband is 47 years old. He has never committed any other crime and he simply wants to live his life and be a productive citizen. However, due to a poor choice made as a teenager almost 30 years ago, my husband and our family will never have a peaceful life.

My husband lost his career in the military. He proudly served his country for over 17 years and would have loved to continue his service, but was kicked out. He has been turned down for multiple jobs that he is more than qualified for and totally over qualified for. He has been rejected for jobs that have no contact with children or vulnerable people, and jobs in which he would be working alone. My husband has debts that he incurred trying to fight his placement on the registry, and he will likely never be able to pay off these debts due to his inability to find quality work. I am required to be the primary provider for our family. If something were to happen to me, our family would suffer greatly financially.

My husband lost friends when he was placed on the registry due to their fears that he is a violent sexual offender; due to laws like this, that do nothing to keep people safer. AG Barr, if putting people on a registry works to stop sex crimes, why are there still sexual offenses committed every day? The truth is that there have been multiple studies that prove that registries do not keep anyone safer, or prevent sex crimes: https://www.criminallegalnews.org/news/2018/may/15/ex-offender-registries-common-sense-or-nonsense/. The truth is that most sex crimes are committed, not by people on the registry, but by people that law enforcement was not previously aware of. In fact, most sex crimes are committed by a person known to the victim, not by a stranger lurking around a park or a school. The re-offense rate for someone on the registry is less than 5%. And furthermore, most of the people on the registry who are arrested again are arrested not for a sexual offense, but due to failing to precisely follow the requirements of their state's registry (like not registering in a timely manner after moving.)

As I said, registries do not keep people safer, and in fact, online registries have been used to endanger and

AR-00000791

harm people on registries and/or their family members. https://www.vice.com/en_us/article/ne9ew7/how-sex-offender-registries-can-result-in-vigilante-murder There are documented cases of registrants being followed, getting threats spray painted on their homes, and receiving threatening phone calls. I personally live in fear due to requirements, such as the proposal listed in which the registrant must provide details for every vehicle that he/she may drive. This information could enable a stranger to follow me and harm me or my kids, and my husband may not even be present. Does AG Barr understand the fear that we live with daily due to personal information about my husband being readily available to the public? I wonder if AG Barr and his family would like to have his name, address, phone number, personal e-mail, etc. posted for public viewing.

I do not deny that there are people who have committed serious crimes. But when those people have completed their punishment, they should be allowed to exit prison and be free to try to rebuild their life. They shouldn't be subjected to additional rules once they have served their time. And the government shouldn't be allowed to change the rules in the middle of the game. There is no other crime in which the offender is kept on a list and is subject to additional punishments after they have served their time. (And yes, I know the courts have said registries are not punishment, but everyone knows they are.)

The government right now is facing funding shortfalls. People are calling for defunding of police forces. It does not seem like the time to enact more regulations that will require funds and enforcement. Wouldn't it be more beneficial to our country to have people that are able to live as productive citizens, to get decent jobs and to pay taxes?

Finally, after seeing registries being challenged in courts recently, I wonder if AG Barr is looking for a way to ensure that these challenges cannot continue to happen, regardless of what studies show regarding safety, recidivism rates, and effectiveness of registries. I hope that these proposed regulations will not be accepted, and people on the registries can begin to rebuild their lives.

---

**Comment ID**

DOJ-OAG-2020-0003-0220

---

 **Tracking Number**

keu-r2h5-y65t

---

**Comment Details**                                                      **Submitter Info**

**Received Date**

Sep 8, 2020



AR-00000792

Regulations.gov

About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000793

8/9/23, 8:45 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 9, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

A new Study by Danielle Arlanda Harris and Jill Levenson finds that our current practices likely and paradoxically increase risk for reoffending by producing traumatic stress that leads to emotional dysregulation.

In recent years, there has been a rapid expansion of increasingly restrictive laws managing the post release behavior and movement of individuals convicted of sexual offenses. In the US, this legislation has led to many barriers for people returning to their community as "registered sex offenders." We consider the often ignored but undeniable traumagenic impact of life on "the list" and conceptualize this experience as Post-Conviction Traumatic Stress. We present a qualitative content analysis of secondary data collected from interviews with over 70 men. Emergent themes were first organized according to the human needs identified in Maslow's hierarchy, and then by the established symptoms of PTSD, and finally in terms of resilient coping versus traumatic coping when basic human needs were unmet. We discuss the unexplored impact of traumatic instability on risk for recidivism and present recommendations for trauma-informed policies and practices with individuals required to register as "sex offenders."
READ THE STUDY
https://floridaactioncommittee.org/wp-content/uploads/2020/09/Life-on-the-List-Harris-and-Levenson-2020.pdf

| **Comment ID** |
| DOJ-OAG-2020-0003-0221 |

|   **Tracking Number** |
| kev-cvej-d1mc |

AR-00000794

Regulations.gov

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 9, 2020



Your Voice in Federal Decision Making

| About | Bulk Data Download | Agencies | Learn |
| --- | --- | --- | --- |
| (/about) | (/bulkdownload) | (/agencies) | (/learn) |

| | Reports | FAQ |
| --- | --- | --- |
| | (https://resources.regulations.gov/public/component/main?main=Reports) | (/faq) |

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000795

Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)      Share ▾

---

Comment

I write in opposition to ANY and ALL new rules or laws regulating and/or enlarging the scope and authority of the Sex Offender Registration and Notification Act ("SORNA"). In fact, I write in total opposition to any form of registration for American citizens who have served their sentence. Our federal government has decided that it is not enough punishment to be labeled a "felon" but has branded Sex Offenders with a life-long stigma of registration. A registration that strips them of the liberties that all other citizens enjoy. A registration that has been proven to NOT make the public safer and actively promotes future crimes being committed against the registered. Our "incarceration" nation cannot decide whether their goal is to punish or rehabilitate. If it is to punish, then being locked in a cage for years if not decades, definitely IS punishment, without adding years of supervised release and registration. It is a violation of the constitution to keep punishing a person AFTER they have served their sentence. To restrict where they can live, where they can work, restricting access to libraries, churches, schools, parks, even their own families. To have to seek permission to change jobs, homes, car, and losing the ability to travel. No other group of people are treated this way. If the goal is rehabilitation, then TREAT them like they have been rehabilitated. One cannot live a different life is he is forever branded as an offender. The registry has led to vigilante activity that has engulfed the "former sex offender's" life and the lives of his family with fear and dread and has even ended in death. The regulations of registry add another layer of hardship to those who finances and job opportunities are limited at best. The copious rules and regulations are designed to ensure failure; all under the guise of "making the public safer". Living outside of prison SHOULD NOT be harder than living IN prison. It benefits all of society for "former sex offenders" to be able to move on from their past and lead productive, normal lives. It is impossible for them to do so when they are labeled forever with their crimes and are forced continually to share that knowledge.

---

Comment ID

DOJ-OAG-2020-0003-0222

AR-00000796

8/9/23, 9:01 AM                                                                    Regulations.gov



**Tracking Number**

1k4-9iv3-x8yx

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 9, 2020



About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/9/23, 8:55 AM                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

Could you please investigate the fake sex crimes prosecutions that have been ongoing for about 20 years in the State of Michigan?
www.SpeakAgainstTheCharges.com details the legal shenanigans of the State AG office, Local Law 'Enforcement' units, and County Courts.

At least require that in order to be on the registry that an actual victim exists.

100s or 1000s in Michigan are on the Registry and no required victim exists.

Fraud on the Court BY the Court officers is such a heinous act.

Please investigate

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0223 |

| ◎ **Tracking Number** |
|---|
| 1k4-9iv7-lu79 |

| **Comment Details** | **Submitter Info** |
|---|---|

AR-00000798

**Received Date**

Sep 9, 2020



About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)      (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/9/23, 8:48 AM                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

I got a CSC 4th degree for tickling a 8 year old little girl I started out on a tier-1 and then after 2011I they move me to a tr3 where I got to be out up for life if I'd a known that back in 2004 I did never even agreed for the plea bargain. I just didn't think it was no big deal but it's a ruin my life now where you people have the laws I can't even go retire in another country where you guys have your passport tomorrow to alert the country that you're coming and they meet you at the plated kick you out far as I'm concerned that's against our constitutional right people would murder you don't notify other countries it's terrible and all I did is tickled a girl I should we take it off that registry years ago it's terrible how you people are screwing people on it all those registry does is make the politicians look good I never dreamed this would ruin my life I could have has

**Comment ID**

DOJ-OAG-2020-0003-0224

 **Tracking Number**

1k4-9iv7-cu6r

Comment Details                          Submitter Info

**Received Date**

Sep 9, 2020

AR-00000800



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000801

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ▾ |

Comment

My offense occurred more than 30 years ago, the requirements that I revisit that mistake in life every month. My offense occurred 6 years before the first SOR was ever enacted. This is not a case where I have notice of the penalty. Of all the SO I met none has returned to crime. I personally suffer the consequences of 30 years ago, and limited in living a normal life.

**Comment ID**

DOJ-OAG-2020-0003-0225

 **Tracking Number**

1k4-9iv8-qniq

| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 9, 2020

AR-00000802

Regulations.gov



Your Voice in Federal Decision Making

About    Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

2/2

AR-00000803

8/9/23, 8:57 AM                                                            Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments  724 (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments  724 (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |
| --- |

In around 1985 a psychiatrist I don't know what his name ,claimed that once sex offender always a sex offender. He came up with this conclusion by studying three individuals that were truly unstable. That was one doctors conclusion. Fast forward in the years tthousands and thousands of studies have been made and documented that shows that a person who has committed sexual crime is very unlikely to commit that same crime. We're talking about thousands of studies compared to that one study. It seems like all these laws and cautions are relating to the one study in 1985. Right now thousands of studies by doctors and psychiatrists show that 97% of people who have committed a sex crime are not going to commit another crime like that. Most people on the registry are good people that made one mistake. Why do we have to pay for one mistake for the rest of our lives. We would like to have the right to live, work , have a marriage and kids like everyone else. We are terribly sorry for the mistake we made and would do anything to have a second chance in life just like anybody else that breaks the law. If people that make these laws take time to study the real danger here they would definitely change the law to wear reasonable punishments Is given. We are far from animals that belong in a cage. We are human beings and we are loved by our family and friends And people that know us. Please do your studying before you lay down this law. All these arguments that we present to you by so many people including doctors and lawyers this show that this law is really punishments and unnecessary. There must be some truth that these studies are true. Thank you

|  **Comment ID** |
| --- |
| DOJ-OAG-2020-0003-0226 |

| ◎  **Tracking Number** |
| --- |
| kev-u7xj-wn0h |

AR-00000804

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 9, 2020



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000805

8/9/23, 9:03 AM                                                   Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

I was under the impression that any law that was made after a conviction was in fact not going to affect the person that was convicted because of ex post facto! And the sora was ruled unconstitutional so why was it even being used some have been on it for 25+ years those people should be removed it isnt keeping the public safe in any way. It is a great tool for law enforcement but other than that I think it has out lived its usefulness any law that is adopted would I think fall under ex post facto. Thanks have a great day.

**Comment ID**

DOJ-OAG-2020-0003-0227

 **Tracking Number**

1k4-9iv8-lxxz

| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 9, 2020

AR-00000806

Regulations.gov



Your Voice in Federal Decision Making

About    Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)


Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000807

8/9/23, 9:02 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments ⟨ 724 ⟩ (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments ⟨ 724 ⟩ (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

I feel that the regestry while good intentioned does not do what is intended and for those of us who got put on there in our juvenile years and have been clean ever since it not only affects us but also our family. I do not think it is possible to classify everyone on one regestry. Because circumstances for each case are different and what may look bad on paper may be mundane in actuality. I personally was an emotionally and socially retarded teen and did stupid things and paid for it with 13 yrs of my life... I am now out and have been for 12 yrs... I am married with 3 kids. There are a lot of statistics that show the recidivism rate is actually very low for certain classification of SO's and it is very hard to determine who is who... I believe that something should be done but please carefully consider who may slip through the cracks but dangerous and innocent...

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0228 |

|  **Tracking Number** |
|---|
| 1k4-9iv8-nzjj |

| **Comment Details** | **Submitter Info** |
|---|---|
| **Received Date** | |
| Sep 9, 2020 | |

AR-00000808



About    Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000809

8/9/23, 9:00 AM                                                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

I would like to point out that only sex crimes are forced to register.. I believe that this is a form of double jeopardy.. The lifetime registration is a huge problem. There is no way to pay for your crime and eventually be able to rejoin society and lead a productive life. People will argue that our victims never get to be normal again so why should the people that committed the crimes..I point out that the victims of murder are dead therefore never get to live again so why are the convicted of murder allowed to live?.. Sounds ridiculous right ? Having a convicted sex offender register for 5-10 years is fair in my opinion. If they commit no more crimes, hold a steady job and are overall productive people let them off the registry and get on with their lives.. furthermore I believe that either all criminals should have to register or none of them. Stop singling out one group and making them pay more than any other...

James T. Golds

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0229 |

|  **Tracking Number** |
|---|
| 1k4-9iv9-qye7 |

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 9, 2020

AR-00000810

Regulations.gov



Your Voice in Federal Decision Making

About (/about)     Bulk Data Download (/bulkdownload)     Agencies (/agencies)     Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)     FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000811

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

Smith V Alaska case is way off point. The Recidivism rate as shown even by the FBI is NOT frighteningly high. Many studies show what should be done with Registries, not scare tactics. Studies have shown that the Registry is not cutting down on sexual assaults and in fact may be raising crime rates. It has caused great harm to families. Some family members do not report that they have been sexually assaulted because they do not want a family member on the Registry. Most sex crimes are committed by a person well known to the victim. Even if a person who is on the registry and they are doing good and complete all terms of the court and no other convictions there is no path off the registry. Even people with no conviction are on Sex Offender Registry. A lifetime on the registry is serving no useful purpose after 10 years and studies back that up. Placing people on the Registry for any number of years without a Risk Assessment for their chance of recidivism is not a valid way to place people on the Registry. And what about the money and lost Law Enforcement time spent on this program with little return value. This money used on the registry could be used for victim treatment and public education. Why is the Department of Justice promoting a Registry that is only used by those elected to office to use as a way to get reelected by saying they are going to make the sex offender Registry even more strict, giving the elected official a chance for some news coverage at no cost to the elected official. Once upon a time, the Registry was considered non-punitive and hence no violation of the ex post facto clause. Not true anymore. Courts have found that it is indeed punitive, so retroactive application violates the constitutional rights of those affected. Why would the Department of Justice support constitutional violations? Are you supposed to uphold the constitution and protect citizens against violations?

**Comment ID**

DOJ-OAG-2020-0003-0230

AR-00000812

 **Tracking Number**

1k4-9iv9-hwg1

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 9, 2020



Your Voice in Federal Decision Making

About | Bulk Data Download | Agencies | Learn

(/about) | (/bulkdownload) | (/agencies) | (/learn)

Reports | FAQ

(https://resources.regulations.gov/public/component/main?main=Reports) | (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000813

8/9/23, 8:48 AM                                                    Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

As a father of five who has not been an any trouble since I caught my csc 3rd degree (which I finished my yta probation when I was 23). Now that I'm 38 I teach my kids that range from 2 to 18 what a lie that was told to me cost me my life. It us unfair that I have to continue being on the registry. I have no criminal record nor am I a monster. Why should I have to continue this? I was 19 and the now woman was 15 she told me she was 18, is this justice? Is this fair?

**Comment ID**
DOJ-OAG-2020-0003-0231

**Tracking Number**
1k4-9iv9-lf4i

|  Comment Details  |  Submitter Info  |
|---|---|

**Received Date**
Sep 9, 2020

AR-00000814



About      Bulk Data Download       Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000815

8/9/23, 9:01 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

Comment

My case of CSC2 was committed in 1991. I have been on the registry since it's inception. I was given 5 years probation but have been in prison since 1991. In the beginning I could get around the public scrutiny in regards to work, but as I moved up in management it became increasingly harder to keep work. When I was an employee I could get by but when I started my own business in 2015 I lost about 6 million dollars every year due to background checks. I have been blocked out, fired and all without the opportunity to get a hearing to get off the registry. I am on this foolish thing for life. I have not even had as much as a parking ticket in 30 years. In 2015 I traveled to Costa Rica to marry a Filipino gal (may 18 2015). When we tried to return the next year they marshalls entered the plane and escorted me off and immediately put me on the next flight to detroit. I have spent over $13,000 in flight that have turned me away. I am now blacklisted in the Philippines, Japan, Costa Rica, Panama City and Mexico. This has caused an extreme problem with my family in the Phillipines who are waiting for me to return so we can get our business up and running. I am also an ordained minister (2006). I am currently working in the town of Ravenna to help build a church here locally.

Your purpose with the SOR has been an utter failure. Your only success has been to allow politicians to use SOR as a running platform. Even that has been a scare tactic.

Suggestions: When a sex offender is put into the system he or she she be assessed at that time. There is no way for me to get off the registry. This is unconstitutional.

I was given 5 years probation from the judge. How many times will I be judged?? This is only a very brief summation of my situation. I have been turned down on my I-130 due to the Adam Walsh Act. We are married and I need my wife to be able to come here to the states. She has been turned down 3 times for a tourist visa. Please help us. We are buried in the bureaucracy. Help.

**Comment ID**

DOJ-OAG-2020-0003-0232

AR-00000816



**Tracking Number**

1k4-9iv9-85w1

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 9, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments  ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

My wife ended her life as a result of our only son being placed on this 'list'.

The issue had nothing to do with rape or inappropriate touching or anyone being told to do anything inappropriate. The case was thrown out by the judge. The racist, hate-fueled prosecutor decided to continue to pursue the issue to the state Supreme Court who kept a single charge alive without reviewing the video footage or asking any questions. My son entered a guilty plea because we were running out of funds and because he thought he could move on with his life.

How wrong he was.

Where's the incentive to do anything? No one will hire him, no one asks any questions, they just assume the worst and pretty much the public-at-large agrees we can discriminate and hate this group with impunity. You're not fixing anything. You're only making things worse- for all kinds of people.

It seems the American way is to just destroy people it labels as a threat even when some of those people pose no threat whatsoever. Where's the people who are trying to understand the behavior of our unsavory citizens? It's very difficult to entertain the idea that America really cares about sexual offenses when there's no significant foray into understanding the behavior of certain groups of people.

And where's the list for all of the other criminals in this Puritanical country? Many of those individuals pose a much more significant threat to a much larger group of people than most of the individuals on the sex offender list.

As a veteran it pains me to think of risking my life for this country- and this is my reward?

My wife was everything to me and my son.

Everything.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0233 |

AR-00000818

Regulations.gov

 **Tracking Number**

kev-xtmc-ft9h

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 9, 2020



About    Bulk Data Download      Agencies    Learn

(/about)        (/bulkdownload)   (/agencies)  (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/9/23, 9:04 AM                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |      Share ▾

---

| Comment |

Hello,

The SOR does not make me feel safer, the registry is a further punishment and in my opinion no one deserves to be punished past the allocated time they have spent in prison. After much research I have learned that the registry helps no one, not the offender nor john q public. Individuals have been killed just because they are on the registry, individuals are kept from attending their children's school functions, jobs are denied, this placing of someone on a register helps no one and hurts all the people who know or are involved with the individual on said register.

We do not place drug user on a register, we do not place drunk drivers on a register, so why do we feel the need to put sex offenders on a register.

Please do not make it any harder for those who have been placed on this sex offender register.

Thank you for your attention to this matter.

| **Comment ID** |
| DOJ-OAG-2020-0003-0234 |

|   **Tracking Number** |
| 1k4-9iva-fqll |

AR-00000820

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 9, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000821

8/9/23, 8:55 AM                                      Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

| Comment |

My name is Jason Redlich and I am adding this comment in the hopes that it will help the DOJ in making their decision on this matter.

I have attached a document to help with understanding my situation. I currently live in Greenville, Michigan and I have been registering on the SOR for 15 years.
There is not a clear and viable path for me to ever get off the registration, and I will have to register every 3 months for the rest of my life in Michigan. My conviction was out in Oregon for having a relationship with my then 17yr old girlfriend. I was 20 at the time. Legal age for consent in Oregon is 18, though I had the parents approval of our relationship, that does not matter. I believe here the legal age for consent it is 16. I was never classified out there or out here and thus I've been put into Tier III. My charges are for Sex Abuse II and Encouraging the delinquency of a minor. I dont currently have a way to be classified to a lower tier nor do I have a direction on how to minimize my life long requirement. I am now 35 years old and it seems it has only gotten harder for me, instead of easier. I have not re-offended in 13 years nor will I. I was young and immature then. Now married and a homeowner here in Greenville, my wife and I would like to put this behind us and move forward. Ive completed 2 years of polygraphs and court mandated psypchological counseling as well as 5 years parole. It has been 15 years since I was convicted. I hope this helps in making your decision, because not everyone on this list is a horrible person. Im not asking to throw the SOR away, just asking for a path to help me get off the registry and live the rest of my life in peace.

Respectfully,
Jason Redlich.

AR-00000822

**Comment ID**

DOJ-OAG-2020-0003-0235

 **Tracking Number**

1k4-9iva-ws4e

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 9, 2020



About          Bulk Data Download        Agencies      Learn

(/about)            (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000823

8/9/23, 9:07 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

```
Share  ▾
```

---

> Comment

My name is Justin ive been on the SOR since 1997 when I was 14 im now 38 and almost 25yrs later and still having to register. Ive been thru a 3yr inpatient program that was a Positive Peer Program where I grew up and learned alot of life skills and the biggest thing Victim Emphaty which is very important to me.
Since being on the registry ive missed out on my kids events at school, sports, and field trips. Ive lost several very good job opportunities also.
My past is my past supposed to be anyway but even till this day not only myself but my kids hear things and have questions but how do you explain that to them or the hurt they have been through from people who hold grudges or just have nothing better to do. So a lifetime registry is completely unfair in alot of cases and completely unjust. Im supposed to be a leader and give back but how do i get that chance when people just assume the worst or prejudice. Thats unfair to a person who has grown up been a role model and dont give up. I know my worth but when my past is used against me or to be negative thats wrong. Please understand and be fair to people who change and don't have a past that repeates because we are not all the same.

**Comment ID**
DOJ-OAG-2020-0003-0236

 **Tracking Number**
1k4-9iva-i4jx

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 9, 2020

AR-00000824



Your Voice in Federal Decision-Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000825

8/9/23, 9:06 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

Share ▾

---

Comment

HELLO MY NAME IS WILLIAM PINCOMB, I GOT CONVICTED IN FEBRUARY OF 1991 FOR 2ND
DEGREE CSC WITH A FEMALE UNDER 12 YEARS OLD . I WAS SENTENCED TO 3 1/2 YEARS TO 15. I
DISCHARGED DECEMBER OF 2006. NO TIME DURING SENTENCING DID MY JUDGE GIVE ME LIFE
ON A REGISTER. MEGAN'S LAW CAME OUT IN 1994 WHILE I WAS IN PRISON,EVERYONE WAS
MADE TO SIGN UP. AT THAT TIME I WAS TOLD, I WOULD BE ON REGISTER UNTIL DECEMBER 2015,
25 YEARS. 2006 AN 2011 AMENDMENTS WHERE ADDED AN YOU WHERE ASSIGNED A TIER WHICH
THEY MADE RETROACTIVELY WHICH WAS WRONG. I WAS 18 GOING ON 19 WHEN I WAS
SENTENCED,I AM 52 NOW ,AN MY LIFE IS RUINED CAUSE OF THIS LAW .MY PARENTS TAUGHT ME,
YOU DO THE CRIME SERVE THE TIME. I DID AN I AM STILL SERVING TIME.CAN SOMEONE TELL ME
WHY? 2015 I WAS DONE WITH THE 25 YEAR TERM TO REGISTER, BUT SOME REASON I AM STILL
ON IT AN CAN NOT LIVE A NORMAL LIFE FROM 2015 TO PRESENT I HAVE FOLLOWED ALL RULES,
HOPING ONE DAY THIS WOULD ALL PASS. PLUS PAYING $50 A YEAR FOR WHAT? WHO IS GOING
TO PAY ME BACK FOR ALL THE MONEY I WAS MADE TO PAY FOR SOMETHING ILLEGALLY DONE
TO ME ? THIS LAW AS DONE NOTHING BUT HURT THE ONES WHO PAID THERE DEBT TO SOCIETY
AN WHAT TO MOVE ON FROM THERE PAST. IT AS HURT JOB MARKET ,HOUSING ,FAMILYS AN
EVENING GOT PEOPLE KILLED.I ADMITTED TO MY WRONG CHOICES,AN DID WHAT MY JUDGE
SENTENCED ME TOO. WHEN WILL I BE A USA CITIZEN?2006 WHEN I DISCHARGED I KNEW I HAD 9
MORE YEARS TO ENDURE ON LIST AN BE REMOVED 2015 BUT NO THE LAW MAKERS MADE
AMENDMENTS IN 2006 AN 2011 EXTENDING MY SENTENCE . WOW, DOUBLE JEOPARDY. WHEN
WILL THIS ALL END ? WHEN I AM DIED. I HAVE NO FAITH IN THE JUSTICE SYSTEM , WHEN WILL
THE LAWS BE EQUAL AMONG CRIMINALS?A SURVEY I DID ONLINE ON CRIMINALS WAS ,WHO
WHERE YOU MORE WORRIED ABOUT LIVING NEXT TO YOU?NUMBER ONE WAS A MURDERER
NUMBER TWO SEX OFFENDER AN SO ON. WHERE IS THE REGISTER FOR MURDERERS?IF THE
MEMBERS NEED HELP OR WANT FURTHER TESTAMORAL FROM HOW THIS LAW RUINS PEOPLE
LIFES , PLEASE CONTACT ME . THANK YOU ALL FOR LETTING ME SHARE. WILLIAM PINCOMB

**Comment ID**

AR-00000826

DOJ-OAG-2020-0003-0237

 **Tracking Number**

1k4-9ivb-k20u

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 9, 2020



Your Voice in Federal Decision Making

About  Bulk Data Download    Agencies    Learn

(/about)     (/bulkdownload)   (/agencies)  (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000827

8/9/23, 9:06 AM                                                                    Regulations.gov

An official website of the United States Government.  🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

Share ▾

---

Comment

I feel the length of the registry is one very important part that needs to be looked at as it has been supported by facts that keeping an offender on the registry long has no benefit. Also the states that have tiered offenders higher then the federal should be able to get everyone in there correct tier. I was convicted of a CSC 3rd with a 15 year old that lied about there age here in Michigan. I served my time because I had done wrong and admitted to my wrong doing. At that time in 2003 I was aware Id be on the register for 25 years and at this point I would only have 8 years left. No with Michigan placing me as a tier 3 I will be on it for life. No one is promised tomorrow but at least with only having 8 years left I would be off to be able to enjoy the grandkids without having this cloud over my head for doing something stupid when I was younger. Please look at the true facts that are out there on how this is affecting offenders and there are no benefits for the system especially for the ones that have not had any more interaction with the law. I feel there is a better way to handle a lot of this other then grouping everyone in the same group. There are so many of us that has done wrong a served our time and will never commit any other crimes. Thank you for your time.

**Comment ID**
DOJ-OAG-2020-0003-0238

 **Tracking Number**
1k4-9ivb-o5uh

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 9, 2020

AR-00000828



About  Bulk Data Download     Agencies    Learn
(/about)         (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000829

8/9/23, 9:05 AM                                           Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

the information about ones employment should be kept private. Cuz that is infringing on the employers right the privacy if he hires a sex offender . That information should not be made public to nobody. Since the employer did not commit the crime he should have his privacy about if he employs a sex offender or not.

**Comment ID**

DOJ-OAG-2020-0003-0239

   **Tracking Number**

1k4-9ivb-sg0f

**Comment Details**                                    **Submitter Info**

**Received Date**

Sep 9, 2020

AR-00000830

Regulations.gov



Your Voice in Federal Decision-Making

About      Bulk Data Download       Agencies      Learn

(/about)         (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000831

8/9/23, 8:59 AM                                       Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

See attached file. Filing my complaint in Nevada District Federal Court, "The in-person appearance
requirement for sex offender registration pursuant NRS 179D.480 is an affirmative disability violating Ex
Post Facto." final version. Search "Warenback" on google to find me

Attachments  1

📄 civil complaint - Google Docs

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0240/attachment_1.pdf)

**Comment ID**
DOJ-OAG-2020-0003-0240

◎ **Tracking Number**
kew-1tn6-rywr

AR-00000832

Regulations.gov

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 9, 2020



About      Bulk Data Download      Agencies      Learn

(/about)      (/bulkdownload)   (/agencies)   (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

Table of Authorities

page no.

US Supreme Court:
*Smith v. Doe*, 538 U.S. 84, 101 (S.Ct 2003)                    1-7
*Snyder v. Does,* 138 S.Ct. 55 (S.Ct 2017)                      4
*Nichols, v. US*, 136 S.Ct. 1113 (S.Ct 2016)                    6


Circuit Court:
*Doe v. Otte,* 259 F.3d 979 (9th Circuit 2001)                  3,6
*Does v. Snyder*, 834 F.3d 696 (6th Circuit 2016)              3,4,5
*Hatton v. Bonner*, 356 F.3d 955 (9th Circuit 2004)            4,5
*Doe v. Harris*, 772 F. 3d 563, (9th Circuit 2014)             8


Federal Law
34 U.S. Code § 20918, Periodic in person verification.         4,6


State law
NRS 179D.480, When offender or sex offender
is required to appear in person                                 2,5,7


Rules:
US Supreme Court rule : "Part III. Jurisdiction
on Writ of Certiorari Rule 10(a)                                5


Other:
Case No.15-2346/2486,,
Brief of Law Professors as Amici Curiae
in support of Plaintiffs-Appellants
Sixth Circuit, for *Does -vs- Snyder* (January 11, 2016)       3


United States Marshals Service FY 2020
Performance Budget, page 63                                     8


*Nevada v. Warenbac*k, C-13-286735-1,
8th Judicial District Court, Clark County,
Nevada, (2013)                                                  1


Constitutional:
US Constitution, Article I, Section 10,
Powers Denied to the States, Clause 1:
No State shall pass any Ex Post Facto law.                      2-6

AR-00000834

Jurisdiction

On December 17, 2013 I was convicted of "pandering of a Child" in the *Nevada v. Warenback*, and required to register as a sex offender. I was released from prison on April 20. 2018 and registered ever since. Because registration is an ongoing occurrence until the year 2043, my claim is not subject to statute of limitations.

I am filing my claim against the State of Nevada through the Attorney General, Aaron Ford, Counsel representing the State of Nevada in official capacity pursuant to 42 U.S. § 1983 (Title 42. The Public Health and Welfare Chapter 21, Civil Rights Subchapter I Generally, §1983. Civil action for deprivation of rights): "Every person who, under color of any statute...of any State...subjects...any citizen of the United States...to the deprivation of any rights...secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity...for redress."

The Federal Law I rely on to protect my liberty interest under State law is: "US Constitution, Article I, Legislative Department, Section 10, Powers Denied to the States, Clause 1. Treaties, Coining Money, Impairing Contracts, Etc.: No State shall pass any Ex Post Facto law.". The State law challenged is NRS 179D.480.

Statement of Claim:

The in-person appearance requirement for sex offender registration
pursuant NRS 179D.480 is an affirmative disability violating Ex Post Facto.

The foundation for this complaint is based on the current landmark controlling US Supreme Court decision in *Smith v. Doe*, 538 U.S. 84, 101 (2003) which states:

**"no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act."**

This is clearly established federal case law.    Wait,    what?   How is it even possible for the highest Court of our country to make such an obvious false statement? This statement comes from : "The Court of Appeals reasoned that the requirement of periodic updates imposed an affirmative disability. In reaching this conclusion, the Court of Appeals was under a misapprehension, albeit one created by the State itself during the argument below, that the offender had to update the registry in person. Id., at 984, n. 4. The State's representation was erroneous. The Alaska statute, on its face, does

AR-00000835

not require these updates to be made in person. And, as respondents conceded at the oral argument before us, the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act. Tr. of Oral Arg. 26–28."

Where "n. 4." is from the lower Court's footnote, *Doe v. Otte,* 259 F.3d 979, 995 (Ninth Circuit, 2001) : "[4] The Alaska statute, on its face, does not clearly specify that these registrations must be made in person at local police stations. However, the government represented at oral argument that periodic in-person registration at local police stations is required by the Act. When specifically asked whether registrants must "go to the police station" for their annual or quarterly registrations, the government answered "under the current law, yes.""

From *Smith* above, "Court of Appeals was under a misapprehension", this misapprehension is referenced from I.D. at 987 :  "II. Ex Post Facto Claim : 1. Affirmative disability or restraint : The Alaska Sex Offender Registration Act imposes an affirmative disability on the plaintiffs. First, its registration provisions impose a significant affirmative disability by subjecting offenders to onerous conditions that in some respects are similar to probation or supervised release. Like Washington's sex offender registration statute, Alaska's requires offenders being released from confinement to register. Alaska Code § 12.63.010(a); Russell, 124 F.3d at 1082. However, unlike the Washington statute, Alaska's requires sex offenders such as the plaintiffs to reregister at police stations four times each year every year of their lives. Alaska Code § 12.63.010(d). Moreover, in order to do so, they must appear in person at a police station on each occasion, and provide, under oath, a wide variety of personal information, including address, anticipated change of address, employer address, vehicle description, and information concerning mental health treatment for any "mental abnormality or personality disorder." § 12.63.010(b)."

An analysis of the above: Case No.15-2346/2486, United States Court of Appeals for The Sixth Circuit, *Does -vs- Snyder,* Brief of Law Professors as Amici Curiae in support of Plaintiffs-Appellants (January 11, 2016), (pdf page 23, page 18 in document) stated : "First, the Court emphasized that the Alaska statute required only calling the police once a year or, in some cases, once a quarter. "The Alaska statute, on its face, does not require these updates to be made in person. And...the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act." Id. The Court noted that the lower court had factually erred in finding that the statute had in-person reporting requirements, but the Court's language strongly suggests that if such requirements *had* existed, they would have constituted affirmative disabilities and

AR-00000836

restraints. The Alaska law is a first-generation registration requirement, imposing comparatively minor burdens: offenders did not need to register in person."

This argument centers around, "the Court's language strongly suggests that if such requirements *had* existed" that supports my claim; "the in-person appearance requirement for sex offender registration is an affirmative disability". This brief was the only concurring reference I could find that "strongly suggests" my claim has merit. This was a submission to *Does v. Snyder*, 834 F.3d 696 (6th circuit, 2016), where the Sixth Circuit called out 538 U.S. 101 4 times at 834 F.3d 700, 703, regarding "in-person", stated : "registrants must appear in person, both initially and for updates, and, if they are "Tier III" offenders, they must do so for life. These are direct restraints on personal conduct." Where "direct restraints" is custody which is punishment which violates Ex Post Facto.

The Court concluded, I.D. at 706 : "As we have explained, this case involves far more than an Ex Post Facto challenge. And as the district court's detailed opinions make evident, Plaintiffs' arguments on these other issues are far from frivolous and involve matters of great public importance. These questions, however, will have to wait for another day because none of the contested provisions may now be applied to the plaintiffs in this lawsuit, and anything we would say on those other matters would be dicta." "Another day" is today, my complaint. The State appealed, denied by the Supreme Court without opinion, *Snyder v. Does,* 138 S.Ct. 55 (2017). This indicated the State's attempt to add further (punitive) rules to registration crossed the threshold of constitutionality.

The Court correctly stated "dicta" because definitive statistical data regarding registrant recidivism (public safety), for example, is required to support terms like "balanced", "not enough", "weighs" (see *Hatton* below), or "not sufficiently punitive", "not an affirmative disability", or "doesn't reach". Typically, the opposition will call out a report, but fails to cite any specific statistic from the report.

As the footnote (n. 4) indicated, the in-person appearance requirement actually did exist, just not on the "face" at the time. ("under the current law, yes."). And 3 years later in 2006, in-person appearance was made Federal law: "34 U.S. Code §20918, Periodic in person verification: A sex offender shall appear in person, allow the jurisdiction to take a current photograph, and verify the information in each registry in which that offender is required to be registered not less frequently than— (1) each year, if the offender is a tier I sex offender; (2) every 6 months, if the offender is a tier II sex offender; and (3) every 3 months, if the offender is a tier III sex offender. (Pub. L. 109–248, title I, §116,

AR-00000837

July 27, 2006, 120 Stat. 595.)" This leaves *Smith v. Doe*, 538 U.S. 84, 101 finding in question, coinciding with the three dissenting opinions in the *Smith* Court.

Providing jurisdiction to this complaint, Nevada law mirrors Federal law: "NRS 179D.480: When offender or sex offender is required to appear in person and provide certain information to local law enforcement agency; duties of Central Repository if offender or sex offender fails to comply. 1. Except as otherwise provided in subsection 3, an offender convicted of a crime against a child or a sex offender shall appear in person in at least one jurisdiction in which the offender or sex offender resides or is a student or worker: (a) Not less frequently than annually, if the offender or sex offender is a Tier I offender; (b) Not less frequently than every 180 days, if the offender or sex offender is a Tier II offender; or (c) Not less frequently than every 90 days, if the offender or sex offender is a Tier III offender, and shall allow the appropriate local law enforcement agency to collect a current set of fingerprints and palm prints, a current photograph and all other information that is relevant to updating the offender or sex offender's record of registration, including, but not limited to, any change in the offender or sex offender's name, occupation, employment, work, volunteer service or driver's license and any change in the license number or description of a motor vehicle registered to or frequently driven by the offender or sex offender. (Added to NRS by 1997, 1658; A 1999, 1304; 2001, 2061; 2007, 2769)".

## Circuit Split

One year after the US Supreme Court's landmark decision, the Ninth Circuit contradicted their previous decision, *Doe v Otte*, in *Hatton v. Bonner*, 356 F.3d 955, 964 (9th Circuit 2004), Stating : "It is true that, unlike the Alaska statute, § 290 requires Petitioner to register in person. Although this fact is important, when balanced against the other facts highlighted above, it is simply not enough to turn § 290 into an affirmative disability or restraint. Thus, this factor weighs in favor of the state court's conclusion that application of § 290 to Petitioner does not violate the Ex Post Facto Clause."

How did this circuit split occur? Although *Hatton* referenced *Smith* 26 times, I claim the Circuit Court abused its discretion by specifically ignoring 538 U.S. 101 because the entire argument here would have had to be addressed, thereby fracturing its decision. Because *Hatton* also splits with *Does v Snyder*, it appears a growing Circuit majority (2:1) is in opposition to *Smith*.

For reference, the above conflict is specifically in the jurisdiction of the US Supreme Court pursuant to : "Part III. Jurisdiction on Writ of Certiorari Rule 10. "(a) A United States court of appeals

AR-00000838

has entered a decision in conflict with the decision of another United States court of appeals on the same important matter". It should be reasonably assumed "another" could also be the same circuit court, as in this case. "Important matter" is referenced in the above circuit decisions; *Does v. Snyder,* "matters of great public importance" and *Hatton* "Although this fact is important".

After 17 years, what would the Supreme Court say if confronted with 538 U.S. 101 in light of 34 U.S. Code § 20918? I claim they would just use the same dicta in *Hatton*, and dilute Ex Post Facto. 4 years ago, in *Nichols, v. US*, 136 S.Ct. 1113,1116, (2016), the Supreme Court called out its previous decision, *Smith v. Doe*, 538 U.S. 84, 89, and references "in-person" 6 times, but predictably fails to mention the error presented here. The issue discussed address changes only. The Supreme Court has not confronted the issue presented here since *Smith*.

 I claim the Supreme Court will never hear any further certiorari petitions on the matter because it would expose the incredible error of the Court, and the substantial implications that would result if corrected, as stated below. I am reminded every six months about it, thus compelled to exercise my First Amendment right to access the Courts, and make a record here.

<center>Conclusion</center>

When I have to appear for registration bi-annually, during that time, I am in custody, although it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in a cumulative violation of my "constitutionally protected interest in liberty", 538 U.S. 112, as the Supreme Court's dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment. Appearance, photo, fingerprints, that is precisely the same as being booked into jail, multiple times a year.

I have to be there, that is restraint, under penalty of a crime. In person is physical, affirmative. Although it would appear brief, one hour of restraint is legally no different than a year in custody. It is not a sliding scale, or something that is balanced against other liberty interests or public safety. Restraint must be measured independently, it is not contextual. Ex Post Facto is absolute, not something negotiable.

<center>6 of 8</center>

AR-00000839

And if the in-person requirement is properly found to violate Ex Post Facto, then the government would argue the critical function of the registry is compromised, even rendered useless without in-person verification. As of December 2018, the registered sex offender population was 917,771 (see footnote 1). By removing in-person registration essentially dissolves the whole registry, and the justification for the registry erodes with it. Another reason the Government will oppose any reform to registration; civil litigation. If anything about registration is properly found to be unconstitutional by the US Supreme Court, the settlement lawsuits would be substantial.

Our country was founded on revolution against oppression. Violating Ex Post Facto is oppression. The Framers intent: No State shall pass any Ex Post Facto law. "Any", specifically means no laws with exceptions that say "balanced", "not enough", "weighs". The Framers stated an absolute, they did not include qualifiers. And all that goes back to the complaint here; I have demonstrated through an absurd error in US Supreme Court law and Circuit Court majority, NRS 179D.480 is unconstitutional, an affirmative disability that violates Ex Post Facto.

<div align="center">Prayer for Relief</div>

Therefore, pursuant to 42 U.S. § 1983, I pray this Honorable Court to grant me (and the other 7354 similarly situated registrants, see footnote 2) an injunction from the imposition of NRS 179D.480. Or, in the alternative, grant a "certified question" on the *Smith* error to present to the 9th Circuit. Also, see footnote 3. for injunctive relief from providing "internet identifiers" in the registration form.

Respectfully Submitted,

Douglas Warenback,            September    , 2020

AR-00000840

Footnote 1:

From the United States Marshals Service FY 2020 Performance Budget, page 63, "NCMEC** reports that eleven years later, in December 2018, the registered sex offender population was 917,771. Despite this 52 percent increase, the USMS has not been allocated additional personnel to combat the prevalence of noncompliant sex offenders....USMS collateral duty DUSMs performed 48 percent fewer investigations in FY 2017 as compared to FY 2014.". I suggest the additional allocation was lacking because the non-compliance crime does not have an actual victim. It is a passive crime, not doing something. Thus, when balanced with other matters, investigating non-compliance is predictably a low priority. Where is the immediate danger to the community? This is another example illustrating the Ex Post Facto law is unconstitutional. **I could not find the NCMEC source for this statistic. Source: https://www.justice.gov/jmd/page/file/1143886/download

Footnote 2:

From http://www.nvsexoffenders.gov/Statistics.aspx, as of 8/31/2020, there were 7355 active cases.

Footnote 3:

See below, "State of Nevada Sex Offender Registration Form", page 3, "internet identifiers". There is no requirement in Nevada statutes that specify I have to fill out that portion of the form. Also, this violates a "constitutionally protected interest in liberty" (1st amendment) pursuant to *Doe v. Harris*, 772 F. 3d 563, (9th Circuit 2014). Therefore, I ask this Honorable to provide injunctive relief to have the "internet identifiers" portion of the form removed; Form source: https://sheriff.douglascountynv.gov/UserFiles/Servers/Server_16087630/File/State%20of%20Nevada%20Sex%20Offender%20Registration%20Form%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.pdf



**State of Nevada**
**Sex Offender Registration Form**

| ☐ Initial Registration | ☐ Tribal Registration | ☐ Student Registration | ☐ Employment Registration | ☐ Visitor Registration |

| Photocopy: | ☐ Driver's License | ☐ ID Card | ☐ Passport | ☐ Professional License |
| | ☐ Finger prints | ☐ Palm Prints | ☐ Photo | |

**REGISTERING AGENCY INFORMATION**
**FOR OFFICIAL USE ONLY**

| Agency Name: | |

:
:

| Length of time at the above employment: | Days: | Months: | Years: |

**INTERNET IDENTIFIERS**

| Screen Name | E-Mail Address | Instant Message Address |
|---|---|---|
| | | |
| | | |
| | | |

**PROFESSIONAL LICENSE INFORMATION**

8 of 8

AR-00000841

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

Get Past your self justification of existence based on a SCOTUS decision years ago on bad/falsified data. Join the current, heck the last century! and understand this, the SORNA nearly guarantees more children will be hurt by the SORNA than EVERY by the offenders on it. How does this statement make any sense you might ask? recidivism rates didn't change one iota with implication of this its all started and remained single digit percentages, before and after, meaning all of the SORNA listed peoples children, and grand children, often bullied out of local school districts, scorned and shunned by the broad swath Red lettering of the SORNA, who's parents cant attend their events, or if they do are hassled for doing so, all the while not one shred of evidence that supports that ANYONE has ben saved, save the fallacious appeals to "common sense" in the face of overwhelming evidence that its not sense at all. Add to this the key success factors for nearly all convicted offenders and even more importantly those of this nature those being Successful reintegration with appropriate friends and family relationships (instead we red letter them and shun any reintegration), successful reentry to the job market, instead we give them that red letter for decades FAR past the EEOC guidelines for employers keeping them black listed often for life, and then the final days of the Obama Administration, we joined only 2 other times in history where countries have branded passports and prenotified other countries, we now stand with Stalin and Hitler in that list, its great company we have aligned our-self with historically. all for zero improvement in the face of things we KNOW works, reduce this list using psychological measures to steal from Warren Buffet, put all your eggs in a small basket and take VERY good care of that basket, limit this to those with compulsory disorders less than 5% of the current list! take the money saved in enforcement and use it for something smart, like educating parents on red flags and warning signs that their child is being groomed, what that looks like what it sounds like, silly things like no one should be showing a greater interest in your child than you do, and if they do, the situation should be watched more closely, you know, useful things that could go a long way in actual prevention, not punitive measures that only destroy the lives of the children and grand children of the offender. Its not 1692 we do not need to burn at the stake. The "witches" you hunt statistically do not exist. The immeasurable shame most offenders life with, is why you see so few comments, everyone is afraid to become a target, they have learned to keep their head in the sand and pray.

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0241



**Tracking Number**

1k4-9ivd-fsqb

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 9, 2020



About   Bulk Data Download   Agencies   Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000843

8/9/23, 9:02 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

I believe there are several things wrong with the registration system that is in place.
One of the first things that comes to mind is. How in my opinion did unjustly continues to persecute a
person that has already served their time either on probation or in jail. No other criminal of any form has to
pay their price more than once. For someone who is on the registry it is a never-ending punishment. For
example a person commits a robbery and let's say spends 2 years in jail and 3 years on parole At the end
of that 5-year period nobody looks at them any differently. A person who commits a sex crime violent or non-
violent perhaps one that had no contact or one that had full contact with a minor. All received the same
punishment with the registry. At the end of whatever sentence they have gotten whether it is a year 5 years
10 years they must then spend an endless amount of time on the registry that is open to the public to
scrutinize. By doing this it creates a lifetime sentence for any offender. Not all offenders are the same. One
that actually has had sex with a minor compared to one that does not I do not believe deserves the same
punishment. Other problems that arise because of the registries are problems finding employment or trying
to continue education so you can get gainful employment. Also housing is a problem for these people as
well. Has any background check automatically makes them ineligible for almost any rental home in any
area. In my mind the continuous persecution of people for a crime is unconstitutional and should not be
allowed at all.
If this system is something that you feel must be allowed then I believe it should be done strictly on a risk
basis and each individual should be analyzed and offered a risk assessment. Their risk assessment should
be a deciding factor and how long it is necessary for them to be up on the list if at all. I believe people with a
low risk to no risk should probably not even be on the registry.
If we are to create a registry for sex offenders we should have one for robbery murder breaking and
entering and any other crime there is. But again this creates a dilemma of trying to get people who have
been rehabilitated back to a normal life. The registry offers no one who's on it a normal life ever again in
their lifetime.each state should not be allowed to create their own rules. The federal government should
step in if they are going to have a list and create a maximum penalty and a minimum penalty and should
also make sure everything is done on a risk assessment done by a professional. This is all willy-nilly and an
attempt to scare the public and has done very well at it. In my opinion the registry should just be ended. The

https://www.regulations.gov/comment/DOJ-OAG-2020-0003-0242                                             1/2

AR-00000844

Regulations.gov

stigma that goes along with it has destroyed lives for people that have already paid the price for a crime that they did. I will say it again I believe this is unconstitutional!

Before we start making broad spread laws we should really consider the impact that it has not only on the individual but the world itself. At the rate it's going everyone in the United States will be on the registry soon.

**Comment ID**

DOJ-OAG-2020-0003-0242

 **Tracking Number**

kew-4uon-hb0t

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 9, 2020



Your Voice in Federal Decision Making

About   Bulk Data Download      Agencies    Learn

(/about)        (/bulkdownload)   (/agencies)  (/learn)

Reports   FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000845

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001) / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

I feel as though the sex offender registries r a waste of time and money. Why? Cuz it is no different than a PPO (personal protection order) that is served on someone. Why do I think this? Cuz when an abuser that physically abuses another woman or man they sometimes ignore the restraining order against them and still commit physical harm to their victim and possibly kill their victim. A piece of paper saying they cant do something is the last thing on that abusers mind before they do the physical harm to their victim. By the time the police get there after the crime is committed it is too late cuz that victim can die and the abuser can kill him or herself. So what Im saying is that the sex offender registry isnt gonna stop an offender from sexually abusing someone if they want to do it bad enough. That registry is the last thing on their mind when they commit the crime. Also, the definition of sex in the dictionary is intercourse between two people so for cases that didnt involve attempted sex or actual sex they shouldnt even be on the sex offender registry. For example: Cases like some indecent exposure for using the bathroom in public or even crimes like those Internet stings that didnt involve real minors. If we r gonna protect kids we need to protect them as well as the elderly and have an elder abuse registry as well as a domestic violence registry for those convicted of elder abuse and domestic violence. Also, have a bully registry for kids that r bullies so other schools r aware of them to help protect other students at schools. We also need a registry for those convicted of selling drugs cuz they could sell drugs to kids and a registry for child abuse offenders too. If we r gonna protect kids we need to do it 1000% across the board along with protecting adults.

**Comment ID**
DOJ-OAG-2020-0003-0243

**Tracking Number**
1k4-9ive-seul

AR-00000846

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 9, 2020



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/9/23, 8:54 AM                                              Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

Its not ok to write rules after the game, Everyone knows this & then to retroactive them on thousands of citizens after a conviction is served, is not ok either, use science and studies, no one deserves to spend a life on the registry there needs to be a time frame for them to be able to get off with good behavior. Please think about the families these rules will apply to the children's of the offenders pay for ever this way is well, These rules are not ok. Why is it that big government keeps trying to hold down the people. Leve this kind of punishment to the courts. This makes no sense to keep adding and adding more punishment year after year when people have served their sentences this is not constitutional or fair . Please rethink this and think of the damage these registries do to millions of people in this country . Use the studies sex offenders are low risk to reoffend they deserve a second chance after serving thir sentences regardless as anyone else has that right .These registries are very disabilitating millions from being equal .

**Comment ID**
DOJ-OAG-2020-0003-0244

 **Tracking Number**
kew-8l44-25a8

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 9, 2020

AR-00000848

Regulations.gov



About  Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000849

8/9/23, 8:57 AM                                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

Comment

SORA is not effective, it does not decrease the rates of repeat offenders. What it does do is put a scarlet letter on people. It affects all areas of their lives. In Michigan the supreme court determined that Sora was unconstitutional and that the registry did nothing to help offenders regain their lives. The registry in Michigan has so many people on it, that it is totally ineffective for people to use it appropriately. Furthermore many low risk people (esposure) are placed on the same list right next to someone with multiple high level crimes. The registry language is vague, and realistically unenforceable at this time.

I do not think the Federal Government should be involved with Sora unless the offense happens on federal property.

States are convicting and placing people on this registry at an alarming rate. Prosecutors will do anything to keep their wins elevated. If you live in Michigan and you pee on a tree and a child happens upon you, you will land yourself on the list! Yes it happens, then this indecent exposure will follow you for at least 15 years if you plead guilty, if not and your convicted for life.

General population should not have access to this information. Folks on the list are discriminated against for any reason you can imagine. Where they live, where they go, and where they can work. I am not saying allow them to work with kids, but this list ruins many lives. People are judged, sentenced and serve their time. Why are we still punishing them once their time is over??? And if you are going to segregate a indecent exposure to a life of being on the list, why not murderers, DUI, or tax evasion???

Our Federal Government needs to look at SORA and figure out a way to get rid of it. If it, SORA, worked a million people would not be on it.

Thanks

AR-00000850

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0245



**Tracking Number**

kew-azht-yi4v

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 10, 2020



About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000851

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ⌄

Comment

The reason why I dont agree with having a sex offender registry is not just because they dont work but also because they r dangerous. Why? Because some people that are on there might be 100% not guilty of their crime but in the eyes of the public they are still a monster or a pedophile without even knowing that the person on there could be not guilty of the crime 100%. Also, people in prison for a sex crime with a victim or for an adult police officer posing as a minor could get extorted, robbed, sexually abused, stabbed, and killed while in prison even if they are 100% not guilty after the court found them guilty. All correctional facilities shouldnt have access to any state Sex offender registry because the staff can let other prisoners in prison know what they are in prison for or another prisoner can call home and ask their friends or family to go on the registry to see if a prisoner is in prison for a sex crime. NONE of the sex offender registries nationwide should allow the public to look anyone up on there for the reasons I mentioned earlier. If there is gonna be one in any state it should be ONLY available to police departments not jail staff, prison staff, or the public. Sometimes a registered sex offender outside of prison can get beat up or killed from vigilantes getting revenge on them and if the sex offender hasnt changed their residing address whoever lives at their former address can be harassed from the vigilantes. There is cases nationwide where sex offenders get neatened up and or killed by vigilantes. So if the registry is suppose to protect the public shouldnt the offender be protected too since they are part of the public too regardless of their crime? The sex offender registries should be abolished nationwide since there is more people on them in each state than there is in the state prisons. When the sex offender goes to prison and gets out then they have to serve another sentence which is by being on the sex offender registry for so many years. It is double punishment and unconstitutional. That is considered as serving two sentences for one crime. Also, if an offender is crime free for so many years should be taken off of the registry automatically without having to petition the court just like when points come off of your driving license automatically without having to go to court for staying crime free.

AR-00000852

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0246

 **Tracking Number**

1k4-9ivh-9ae1

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 10, 2020



About     Bulk Data Download     Agencies     Learn

(/about)          (/bulkdownload)     (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000853

8/9/23, 9:05 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾

---

Comment

Ok I do believe in some form of the registration/ registry. Because I do believe there are some dangerous individuals out there.... I was convicted in 1991... before the registry. I did my time completed all requirements. And had a very low recidivism rate. Came home completed my parole and passed the polygraph tests that were mandatory at the time. I have been upstanding citizen for nearly 27 yrs.... the registration wasn't even thought of yet...I was placed on the registry because I was still in prison when the law came about. Now as far as the registration is concerned..since I have been the registry..all kinds of horrible things have happened...my family had a sign put on there porch by neighbors saying parents of a convicted sex offender...ive been denied jobs to support my family....ive been pulled out of my home I bought infront of( my son) and arrested on trumped up felony charges that were dropped but I was told I couldn't go back and live in a house I bought a year ago to raise my son...over 70 feet. Like I said .I believe in some sort of registry...but this is overkill, and creating more criminals not because they are committing another sex offense..but maybe stealing because they can't find work and housing...I was lucky on both..im a unique situation. All I ask is re look at this proposal, and consider guys like me...ones who have been on the registry since it started. Over 20 yrs of being an upstanding citizen and contributor to my community..give us a path (no matter the tier) off the public registry and only have our information with the police..

| Comment ID |
| DOJ-OAG-2020-0003-0247 |

|  Tracking Number |
| kew-s9sn-65at |

AR-00000854

8/9/23, 9:05 AM                                                    Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 10, 2020



About          Bulk Data Download          Agencies          Learn

(/about)          (/bulkdownload)          (/agencies)          (/learn)

Reports          FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)          (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000855

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

View More Comments    724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

*DOJ DOCKET NOTE: Commenters on DOJ Proposed Rules have the option to provide or not to provide their own Personal Identifying Information (PII) such as their names. However, in order to protect the privacy of persons other than the commenter who may not have given their consent for such PII to be posted on www.regulations.gov, it is DOJ's policy to redact third-party PII from a comment. In such instances, the full, un-redacted comment is available for public inspection in person by contacting the For Further Information Contact identified in the Proposed Rule. Accordingly, although DOJ has considered the entire contents of this commenter's comment, that portion which contains third-party PII has been redacted] [NAME REDACTED] is the public spokesperson for Florida Action Committee, a "sex offenders' rights" activist group. They're sending you comments. [NAME REDACTED]'s family member, whom she apparently feels was punished too harshly, is [NAME REDACTED]. In 2018, when [NAME REDACTED] was 76, he was found guilty of sexually assaulting a child who was under age 12. By February 2020 [NAME REDACTED] was already free. [URL CONTAINING THIRD-PARTY PII REDACTED]

**Comment ID**

DOJ-OAG-2020-0003-0248

◎ **Tracking Number**

1k4-9iv5-s5ig

Comment Details                                              Submitter Info

AR-00000856

**Received Date**

Sep 9, 2020



About      Bulk Data Download        Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000857

8/9/23, 8:50 AM                                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 10, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | | Share ▾ |

---

| Comment |

[***DOJ DOCKET NOTE. THE PERSONAL IDENDITFYING INFORMATION OF THIS COMMENTER
REDACTED AT THE COMMENTER'S REQUEST***]Personal Identifying Information Statistics have shown
that the registry does nothing to stop recidivism. It harms the families of those that are registered by
denying them the ability to live and work in decent areas. Registrants are being punished for the rest of their
lives with no path off the registry. All people on the registry are not dangerous to the public. There are
thousands of juveniles, people who may have done something like urinate in public, or have never touched
a child. It is time for these draconian laws to change! People that do rape and violently abuse others should
be under observation or incarcerated. If a person makes one mistake that is not a violent offense, they
should serve restitution and then be given another chance. Even murderers get second chances. Thank
you

**Comment ID**

DOJ-OAG-2020-0003-0249

 **Tracking Number**

1k4-9ivb-uqze

**Comment Details**

---

**Received Date**

Sep 9, 2020

AR-00000858

Regulations.gov



About   Bulk Data Download     Agencies    Learn

(/about)        (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000859

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

**Comment**

Please consider the following points: Smith V Alaska case is way off point the Recidivism rate as shown even by the FBI is NOT frighteningly high, there are many studies to show what should be done with Registries, not scare tactics. Studies have shown that the Registry is not cutting down on sexual assaults and in fact may be raising crime rates Studies show talk there is harm to families.Most sex crimes are committed by a person well known to the victim. There is no recourse for removal; even if a person who is on the registry and they are doing good and complete all terms of the court and no other convictions they is no path off the registry. EVEN PEOPLE WITH NO CONVICTION PER A SUCCESSFUL SET ASIDE ORDER ARE SUBJECT TO THE SEX OFFENDER REGISTRY!! This makes no sense; no legal conviction yet required registration. The lifetime on the registry is serving no useful purpose after 10 years and studies back that up. Placing people on the Registry for any number of years without a Risk Assessment for a chance of recidivism is not a valid way to place people on the Registry. There is wasted money and lost Law Enforcement time spent on this program with little return value; this money used on the registry could be used for victim treatment and public education. There is seems to be a political agenda; why is the Department of Justice promoting a Registry that is only used by those elected to office to use as a way to get reelected by saying they are going to make the sex offender Registry even more strict, giving the elected official a chance for some news coverage at no cost to the elected official.

| **Comment ID** |
| DOJ-OAG-2020-0003-0250 |

| ⊕ | **Tracking Number** |
|   | 1k4-9ivp-chu0 |

AR-00000860

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 10, 2020



About
Bulk Data Download
Agencies
Learn

(/about)
(/bulkdownload)
(/agencies)
(/learn)

Reports
FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000861

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | | Share ▾ |

---

| Comment |

The registry is unconstitutional and there is no true justice or freedom in America until its abolished. Its a very unforgiving tool used by not only law enforcement but citizens to create a social class of citizens that makes it ok to treat any way they want. Registry is a joke anyone with common sense can understand that its a good idea but it doesn't complete the job it was designed for period. I've been on it for 11 years with no way off of it for a strict liability crime .... so wrong so wrong . We are not all monsters like they want you to think I have a family wife son , daughter I had to live in a hotel for almost 2 years because 2k ft away when I sleep is allegedly keeping people safe. The registry is inhumane period Un American , Im a good man that deserves a second chance like every one else so do alot of others. There is always exptions to tge rules but not the registry Its the only dam thing in America thrre is no way off of it is Unconstitutional, America needs to stop pretending the registry is working and that we know more than other country's, Florida is treating. Those on the registry totally inhumane its time a whole new scheme be but in place this ones broke i was 22 niw 39 Are you the same person from then till now NOOOOO you can be young and dumb get a second chance for anything but not if your on the registry, keep the registry lose all the requirements 2k ft rule ,for life ,

| **Comment ID**
DOJ-OAG-2020-0003-0251 |

| ◎ **Tracking Number**
1k4-9ivp-kzwb |

AR-00000862

Regulations.gov

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 10, 2020



About   Bulk Data Download      Agencies      Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000863

8/9/23, 9:38 AM                                                    Regulations.gov

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

I've always been confused by the sex offender registry. It seems more a political "scare" point for candidates to speak on when dealing election/re-election. Maybe it's a money thing. Whatever the hidden purpose, the claimed purpose is wrong and it's more punitive than safety related.

Simply stated, the reasons a person is required to register vary greatly. However, the perceptions are all the same. If you see a person on the registry, you say Pedophile. That perception is highly inaccurate and is detrimental to all involved. I'm many cases, my safety would be better served if I knew my neighbor had been convicted of home evasion. People commiting crimes of that nature are far more likely to be repeat offenders. Furthermore, how is a person suppose to function in society with his name on a sex registry? I don't know the stats, but it seems to me a person would be more likely to commit some sort of criminal act due to the inability to succeed based on his name being on a list. Not to mention the burden can carry over to family. How does a child function when his parent is on a sex registry from 20+ years ago? The entire concept is draconian. It's sad our political "leaders" use this for election points.

I have a simple solution. Obviously, I do not have a criminal justice background. I do have a pretty good grasp of common sense. I also know, from studies I've read, the registry has had no effect on reducing sex crimes. If their must be a list, and I question the reason there should be, narrow it down to predatory sex crimes. To me those are the most troubling. I'm not really to concerned about an 18 year old who had sex with a 15 year old. I am concerned about a person who spent months, maybe years, grooming a young person for the purpose of sex. Or a guy that watches a women for weeks then breaks into her home and rapes her. The list should be reserved for people we actually need to worry about.

My solutions can be simply applied. On a presentence report it can clearly list "situational, unlikely to reoccur" or "predatory in nature". They may already state these details. Reducing this registry to those who, by statics, are more dangerous and likely to re-offend, would much better serve the public safety that is touted by supporters of the registry.

AR-00000864

Lastly, and I know it's been in court over and over, a law should never be applied to a person retroactively. That's like if guns were outlawed tomorrow and every one turned in there guns, the state went out and prosecuted people who previously owned guns. This point is made even stronger for those who plead guilty or No Contest. Not knowing the full consequences when entering a plea is not a legal plea. It's the courts responsibility, by law, to ensure you are aware of all consequences associated with entering that plea.

Our laws need to be applied equally. To have a separate standard for any group of person's is unconstitutional. A registry, on top of a criminal record, that applies to only specific offenses, is not equal treatment under the law. It's an added penalty that serves no purpose to public safety.

---

**Comment ID**

DOJ-OAG-2020-0003-0252

---

 **Tracking Number**

kew-x7hc-vi1l

---

**Comment Details**                                    **Submitter Info**

**Received Date**

Sep 10, 2020

---



Your Voice in Federal Decision Making

About     Bulk Data Download     Agencies     Learn

(/about)     (/bulkdownload)     (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)     |     User Notice (/user-notice)     |
Accessibility Statement (/accessibility)     |     Developers (https://open.gsa.gov/api/regulationsgov/)     |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)     Provide Site Feedback

AR-00000865

Regulations.gov

AR-00000866

8/9/23, 9:08 AM                                          Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

Share ▾

---

| Comment |
|---|

See attached file(s)

| Attachments  1 |
|---|

📄  SORNA letter

⬇  Download ▾

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0253 |

| ⊚  **Tracking Number** |
|---|
| 1k4-9ivq-cr4u |

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 10, 2020

AR-00000867

Regulations.gov



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |   Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |   FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000868

I am opposed to the new rule proposed by the Justice Department on 08/13/2020 Registration Requirements under the Sex Offenders Notification and Registration Act.  I am opposed to any further tightening of requirements for persons registered under the SORNA.  I am very concerned that we are rapidly expanding the number of people required to register on the SORNA and are creating an entire subclass of "outcast" citizens for whom normal life is impossible even after they have served their sentences (to include probation).  This is especially true in the case of young people under 25, basically college students thru graduate school.  Today young people are bombarded with sexuality from every possible media starting at increasingly younger ages.  Add to this the ease with which individuals can be accused of sexual assault these days and many young men (and women) are finding themselves enmeshed in the snare of the SORNA.  Succinctly, here are the major problems as I see it with SORNA registration requirements as they now stand.

**The requirements for who must register on the SORNA are currently _far_ too broad.**

The first thing that should be done to the SORNA is to narrow the definition as to who belongs on it.  Currently first offenders that have a very low probability of recidivism are automatically included on the SORNA.  The examples of this are almost too numerous to mention:  A teenager who stupidly exposes himself to girls at a party or other social event; a college student who engaged in a drunken "hook-up" at a college party with an equally drunk coed and consent is unclear; or a 24 year old high school teacher who in a moment of vulnerability and bad judgment has sex with one of her 17 year old students.  None of these people are likely to be pathological sex offenders or a danger to the public.  None of their offenses involved extreme violence resulting in injury or acts with minors under the age of consent.  Yet under the current law all of them must register as sex offenders for the balance of their adult lives.  This does nothing to protect the public.  Mandatory first time offender registration on SORNA should be limited to those who conduct egregious crimes of violence and those whose offenses involve minors under the age of consent, with the likely exception of juvenile-only offenders.

**There is no mechanism for judicial discretion for first offenders**

There needs to be some mechanism for Judicial discretion when it comes to sentencing 1st time offenders.  Placement of first time offenders on the SORNA should not be an automatic mandatory requirement for every person convicted of a crime of a sexual nature. In most first time offenses, judges should be given the leeway to decide whether or not to place the offender on the SORNA based upon a mandatory psychological evaluation of the offender and the judge's evaluation of the circumstances of the crime.  Judges should always have the option to place any first-time offender on the SORNA, but they should also have the option to determine that such a measure is unnecessary for all but a very focused sub-set of egregious first offenders (extreme violence, acts against minors, etc.).  There can also be a provision in the law for mandatory placement on the register for any second offense.  By making this change to the current requirements the Justice Department can adhere to the spirit of the Adam Walsh law (registering dangerous offenders) while at the same time offering meaningful rehabilitation to most 1st time offenders who are unlikely to re-offend.

**The pardon process is not timely**

There also needs to be a pardon process that will allow an individual to petition to be removed from the list in a reasonable time.  Currently the requirements of the Adam Walsh act only allow a person to be taken off the SORNA after 15 years and then for only the most minor offenses, other

offenses take even longer 20 and 25 years.  Some states have even more strict laws and don't offer the opportunity for removal until after 25 years.  These time constraints seem arbitrary and not tied to any particular evidence or statistics of recidivism. Placing a person on the SORNA all too often cripples them economically during their prime earning years by making it exceedingly hard to find quality employment or even a place to live.  It also subjects their families to hardships not faced by the families of people convicted of other crimes. The time for allowing pardon application for first offenses should be reduced to 5 five years from completion of sentence (to include probation).  Not every offender should be pardoned and there are those truly violent and predatory offenders who must be closely watched by society.  However, a more timely pardon process would allow the majority of the people currently on the SORNA who have a low risk of recidivism to rejoin society without the stigma of being on the list.

**Foreign Pardons not addressed**.

    The requirements to register on SORNA also make no provision for the acceptance of foreign pardons.  Although the law requires people who are convicted in foreign jurisdictions to register in the United States, it does not recognize the authority of the foreign jurisdictions to pardon them.  Thus a foreigner who has been convicted in a foreign jurisdiction, served his or her sentence, waited the requisite time under law to apply for a pardon, received a pardon and been taken off that jurisdiction's registry must still register in the US when he or she comes to visit relatives even though that person has never set foot in the US during the entire period.  If the US respects the authority of a foreign jurisdiction to convict a person, it should also respect the authority of that jurisdiction to pardon that person.

**There should be a mechanism for temporary registration to allow visits**

    Currently the SORNA makes no provision for a temporary registration mechanism for registrants to visit other states.  This is left to the discretion of the states themselves.  For example Alaska has one, Florida does not.  In Alaska a person registers on the temporary register and their name is removed after they depart.  To be placed on Alaska's permanent registry and individual has to spend over 30 days (cumulative) in one year in Alaska.  In Florida there is not temporary list; a person is required to register within 72 hours, facing arrest for a class C felony if they fail to do so.  Once on the Florida list, a person's first chance of being removed is 25 years.  Thus it is possible that a person who has served their sentence in another state or country to visit Florida and still be carried as a sex offender even after the jurisdiction in which that person committed an offence has pardoned them.  Rules like this have an extraordinarily cruel impact on families and keep loved ones away from critical events in their family (funerals, graduations, weddings) even after they have served their sentences.  All states should be required to maintain a temporary list of visiting registered people.  The fact that a person visits family for a week in a state should not be sufficient reason to place that person on the state's offender registry permanently.

**What actions should be taken by the Justice Department?**

    The following are actions I suggest for the Justice Department in relation to modification of the SORNA

1. Reduce the requirement for mandatory registration of first offenders on the SORNA to those offenders who commit acts of extreme physical violence resulting in injury and those who

offend against minors under the age of consent.  This is more in line with the spirit of the Adam Walsh act.

2. Restore judicial discretion for placing all other first offenders on the registration.  Make an evaluation by a competent psychiatrist/psychologist a prerequisite for that decision along with the judge's knowledge of the individual facts of the case.

3. Establish a mechanism for review the current SORNA registration list in every state.  Start with every individual with a single offense who has been on the registration list for over 5 years and who was not convicted of (a) an act extreme violence that resulted in grievous bodily harm to the victim or (b) an offense involving minors under the age of consent.  If no other criminal offenses have occurred during this time the government should be required to show cause during review as to why the person should not be removed from the list.  Otherwise upon completion of review the individual should be removed from the list.

4. Establish a pardon/administrative removal process that allows individuals to apply for a pardon and removal from the SORNA registration list at 5 years and every 2 years after that.

5. Recognize pardons from foreign jurisdictions.

6. Establish the requirement for a temporary register for visiting registrants who spend less than 30 days aggregate in a particular state during a calendar year.

7. Remove restrictions that keep pardoned first time offenders who were not involved in acts of violence or acts involving minors under the age of consent from certain occupations such as teaching, public safety (lifeguard, police, Fire department) medical fields or joining the military.

The suggestions I have included above will not increase the danger society faces from predatory and violent offenders because it excludes them.  It mandates psychological evaluation for all offenders and always leaves the judge the option of including a first offender on the NSOAR.  However, it also gives the judge the discretion *not to* include 1st offenders unless they committed crimes of egregious violence or offenses against minors under the age of consent.  We should trust our judges.

Enacting the changes I have proposed above will go a long way towards reversing the growth of this burgeoning underclass that the current registration requirements are creating.  It will also relieve the impact on their families – who are innocent victims in all of this.  In addition, it will relieve the local law enforcement of the requirement to track these people and allow them to concentrate on the small minority of people who really should be on the SORNA.  It will save law enforcement man hours and resources.  Most importantly, it will give individuals who have served their sentences and probation a better opportunity to reintegrate into society than they currently have.  It would end the endless administrative punishment that many thousands of first time offenders with little probability of recidivism endure and truly be a step towards rehabilitation.

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

Share ▾

---

Comment

I am the mother of a registered sex offender. He was convicted as a result of a plea bargain, recommended by his attorney, but he did not do the offense. He took the plea because he was afraid that if he took it to a trial, he would get the full sentence rather than a year, which is what his attorney told him would happen. While in prison, he met other so-called offenders who were tricked into the same situation and he met offenders who chose to go to trial and ended up with full sentences when they committed no crime - they believed in the system and the system failed them. I TELL YOU THIS BECAUSE YOU NEED TO UNDERSTAND YOU ARE PUNISHING PEOPLE WHO ARE INNOCENT.

My son lives in my house now that he is on parole. I used to enjoy the community online called Nextdoor, which is an app that allows neighbors to discuss things like who is getting broke into, who is showing up and soliciting the neighborhood, who is having a garage sale and what the local politics are. When my son was released to my home I was kicked off that app. So now that he lives with me I am no longer considered part of my neighborhood and they feel that is somehow protecting the neighbors.

If you have not opened your mind to see that sex offenders are no threat to our neighborhoods, as evidenced in study after study, you are perpetuating a vastly damaging myth in our society. People are preyed upon by someone they know, not someone they don't know. I was one of those victims.

I want my son to be able to move forward in life and not be forced to live a lie. He wants a wife and children and a house in the burbs and a nice car and a vacation once a year. Those things can happen, but the registry makes those things way more challenging than necessary.

Please only allow the police to see a sex offender's record, not the whole damn community. Please reach out to me to testify to anyone if you want support for doing away with the registry.

AR-00000872

8/9/23, 9:08 AM                                                    Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0254

 **Tracking Number**

1k4-9ivr-1g71

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 10, 2020



Your Voice in Federal Decision Making

About        Bulk Data Download        Agencies        Learn

(/about)         (/bulkdownload)      (/agencies)     (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000873

8/9/23, 9:40 AM                                Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

## Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

I am opposed to the new rule proposed by the Justice Department on 08/13/2020 Registration
Requirements under the Sex Offenders Notification and Registration Act. I am opposed to any further
tightening of requirements for persons registered under the SORNA. Current and proposed policies do not
take into consideration an event of youthful indiscretion by college aged individuals who may have engaged
in what started as a consensual encounter.

Nor does the rule consider circumstances such as intoxication of one or both parties to the encounter which
may have been out of character for the participants and unlikely to be repeated. A participant to a drunken
encounter between two persons of similar age which momentarily escalated should not result in the same
restrictions and registration requirements as a violent assault or an assault on a child.

Further, there are no provisions in this proposal for events in other nations while a young adult was studying
abroad or on vacation which later result in a pardon by the foreign court. If the courts of another nation
convict, but later pardon an individual, that individual should not be required to remain on the SORNA
registry as an offender.

Currently the SORNA makes no provision for a temporary registration mechanism for registrants to visit
other states. This is left to the discretion of the states themselves. For example Alaska has one, Florida
does not. In Alaska a person registers on the temporary register and their name is removed after they
depart. To be placed on Alaskas permanent registry and individual has to spend over 30 days (cumulative)
in one year in Alaska. In Florida there is not temporary list; a person is required to register within 72 hours,
facing arrest for a class C felony if they fail to do so. Once on the Florida list, a persons first chance of being
removed is 25 years. Thus it is possible that a person who has served their sentence in another state or
country to visit Florida and still be carried as a sex offender even after the jurisdiction in which that person
committed an offence has pardoned them. Rules like this have an extraordinarily cruel impact on families
and keep loved ones away from critical events in their family (funerals, graduations, weddings) even after
they have served their sentences. All states should be required to maintain a temporary list of visiting
registered people. The fact that a person visits family for a week in a state should not be sufficient reason to
place that person on the states offender registry permanently.

AR-00000874

8/9/23, 9:40 AM                                                                                    Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0255

 **Tracking Number**

1k4-9ivs-eldq

Comment Details                                              Submitter Info

**Received Date**

Sep 10, 2020



About    Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000875

8/9/23, 9:43 AM                                                     Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

Please read the attached proposal.

Attachments  1

📄  PROPOSAL

⬇  Download ▾

**Comment ID**
DOJ-OAG-2020-0003-0256

◎ **Tracking Number**
1k4-9ivx-emtl

| Comment Details | Submitter Info |
|---|---|

AR-00000876

8/9/23, 9:43 AM                                                Regulations.gov

**Received Date**

Sep 10, 2020



Your Voice in Federal Decision Making

About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)     (/agencies)    (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

I propose that sex offenders be permitted to petition the federal district court to determine their proper tier classification under SORNA and/or request declaratory relief terminating their duty to register.  District courts have differing opinions as to whether there is a jurisdictional basis for terminating a sex offender's registration period consistent with SORNA's duration of registration requirements under 34 U.S.C. § 20915.  See e.g., *Wiggins v. United States*, No. 1:18-cv-03492-TWP-DLP (S.D. Ind. Oct. 10, 2019); *United States v. Studeny*, No. CR11-0180-JCC (W.D. Wash. Feb. 22, 2019); but see, *United States v. Melden*, No. 5:04-cr-00136-BR (W.D.N.C. Jan. 12, 2018) (granting motion to terminate sex offender registration under 34 U.S.C. § 20915 even after defendant's supervised release ended).  In *Wiggins* the district court held that 34 U.S.C. § 20915 does not create a private right of action and that 28 U.S.C. § 1331 did not provide a jurisdictional basis for granting the petition because "there was no allegation that [Wiggins] is charged with or threatened to be charged with failing to register as an offender under SORNA or any other federal or state law." *Wiggins* at *4.  However, the following cases demonstrate there is an actual controversy and a credible threat that sex offenders can suffer wrongful prosecution by the government for failing to register under federal law because their qualifying sex offense under State law covers broader conduct[1] than the enumerated offenses under SORNA.  *United States v. Walker*, No. 18-3529 (7th Cir. Jul. 23, 2019) (holding that because the elements of Walker's offense were broader than SORNA's, he was a tier I, not tier III, offender who had fulfilled his 15-year duty to register prior to violating § 2250); see also, *United States v. Montgomery*, No. 19-20448 (5th Cir. Jul. 15, 2020); *United States v. Livestock*, No. 19-CR-182-GKF (N.D. Okla. Apr. 28, 2020); *United States v. Bemis*, No. 8:19-cr-458-T-33AAS (M.D. Fla. Mar. 4, 2020); *United States v. Flint*, No. 17-00141, at *14-15 (W.D. La. Jan. 18, 2018).

Furthermore, 34 U.S.C. § 20915(b) provides that a sex offender's full registration period shall be reduced for having a "clean record" outlined in § 20915(b)(1)(A)-(D); a fact intensive inquiry sufficient to trigger a federal cause of action that creates a remedy under the Declaratory Judgment Act. See, 28 U.S.C. § 2201.

For these reasons, the Attorney General should exercise his authority under 34 U.S.C. § 20912(b) to issue guidelines and regulations to permit sex offenders to petition the federal district court for a determination of their SORNA tier classification and obtain declaratory relief terminating their duty to register.

---

[1] "Congress intended courts to apply a categorical approach to determine whether a conviction qualifies as a sex offense under the sexual contact provision of SORNA." *United States v. Vineyard*, 945 F.3d 1164, 1170 (11th Cir. 2019).  Pursuant to the categorial approach, the court must "focus solely on whether the elements of the crime of conviction sufficiently match the elements of [the predicate crime], while ignoring the particular facts of the case." *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016).  If the elements of the statute of conviction are the same as the Tier III offense, or are defined more narrowly, then the conviction requires a Tier III classification. See *Descamps v. United State*s, 133 S. Ct. 2276, 2283 (2013).  However, if the elements of the statute of conviction "sweep more broadly" than, or cover more conduct than, the referenced federal offense, then the statute of conviction cannot serve as a Tier III predicate offense. Id.; *see also Mathis*, 136 S. Ct. at 2248.

8/9/23, 9:42 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

§ 72.6 violates the First Amendment:

"§ 72.6: Information sex offenders must provide. Sex offenders must provide the following information for inclusion in the sex offender registries of the jurisdictions in which they are required to register: (b) Remote communication identifiers. All designations the sex offender uses for purposes of routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers."

This violates the First Amendment pursuant to controlling 9th Circuit case law:

"Doe v. Harris, 772 F. 3d 563 - Court of Appeals, 9th Circuit 2014, At 568: "Appellees Doe, Roe, and the nonprofit organization California Reform Sex Offender Laws filed a complaint alleging that the CASE Act infringes their freedom of speech in violation of the First Amendment. Appellees filed a motion for a preliminary injunction, which the district court granted. Kamala Harris, the Attorney General of California, and Intervenors, the proponents of the CASE Act, appeal. We hold that the district court did not abuse its discretion by enjoining the CASE Act. Accordingly, we affirm."

For reference: "The Californians Against Sexual Exploitation ("CASE") Act sought to supplement and modernize these reporting obligations by requiring sex offenders to provide "[a] list of any and all Internet identifiers established or used by the person" and "[a] list of any and all Internet service providers used by the person." 290.015(a)(4)-(5)" : "§ 290.015 (a)(4) A list of all Internet identifiers actually used by the person, as required by Section 290.024 (5) A statement in writing, signed by the person, acknowledging that the person is required to register and update the information in paragraph (4), as required by this chapter. California Code, Penal Code - PEN § 290.024 (b) For purposes of this chapter: (1)  "Internet identifier" means any electronic mail address or user name used for instant messaging or social networking that is actually used for direct communication between users on the Internet in a manner that makes the communication not accessible to the general public. "Internet identifier" does not include Internet

AR-00000879

passwords, date of birth, social security number, or PIN number."

At 583: "Nevertheless, the balance of equities favors Appellees, whose First Amendment rights are being chilled."

Federal District Court case law concurring:

White v. Baker, 696 F. Supp. 2d 1289 - Dist. Court, ND Georgia 2010: At 1309 "First, the scope of the Internet Identifiers required to be reported is broader than necessary to address the state's interest", At 1310 "Second, the uses permitted under O.C.G.A. § 42-1-12(o) are too broad.", At 1311 "This section, like the original statute at issue in Shurtleff, is not sufficiently narrowly-tailored to meet the government's compelling interest to protect children.", At 1311 "The prospect that Internet Identifiers, as currently defined, may be released to the community has an obvious chilling effect.", At 1311 "The Internet Identifiers required to be disclosed must be related to the compelling interest sought to be achieved. The scope of the Internet Identifiers which are required to be disclosed and how this information may be used is not sufficiently narrow.", At 1311 "The 2008 Amendment, as written, is not the least restrictive means or an appropriately restricted means to address the state's interest.", At 1311 "The scope of the Internet Identifiers which are required to be disclosed and how this information may be used is not sufficiently narrow.", At 1311 "The prospect that Internet Identifiers, as currently defined, may be released to the community has an obvious chilling effect.", At 1312 "Finally, even if the scope of the internet identifying information is narrowed to a permissible scope, the phrases referenced in § 42-1-12(o) which are discussed in this Opinion and Order and the term "interactive online communication" in the 2008 Amendment are sufficiently ambiguous to raise a question whether the regulation is too vague.[21] In short, the Court finds the 2008 Amendment in the context of § 42-1-12 as a whole, including § 42-1-12(o), has a chilling effect on White's right to anonymous free speech, and thus he is likely to prevail in this case."

Doe v. Snyder, 101 F. Supp. 3d 722 - Dist. Court, ED Michigan 2015: at 728 "It is true that the reporting requirement is tailored inasmuch as the reported Internet identifiers do not prohibit any speech and are not currently available to the public. But, without any evidence presented by Defendants showing that the retroactive application of the reporting requirement increases public safety more than a reporting requirement for 50,000 randomly selected Michiganders who were arrested for non-sex offenses, the court cannot find the retroactive application narrowly tailored — no matter how minimal the burden on the registrants"

---

**Comment ID**

DOJ-OAG-2020-0003-0257

---

 **Tracking Number**

kex-ed9t-zbvb

---

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 10, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000881

8/9/23, 9:40 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

I feel what has been done so far is not a good thing most of have been on the registry fo 20 plus years and were convicted as young kids I my self was 15 and she was 18 I was supposed to be in for 25 years but yet the law changed and put me on for life it has hurt me and my family because I cant do anything without notifying or I can go to my kids school I ha e to report every three months all I want is a second chance at this Im almost 40 now I would like to show that we are capable of being off of this and not reoffending. The reoffending rate is down look at graphs look at us that have been on this for a long time not one of has done anything to hurt people in any bad way look at how this is making our lives miserable. I get it it about money and power but we need to change things up make it better but safer make so we dont have to be on for life look at how some of us are 20 plus years give us a chance come up with a system to allow us to be removed after so many years look at how we can make people better and get people the help they need before the get off the regiersty. I promise you come with a better system and allow people to get back to normal lives you will see an increase in sex offenders better programs better system. I went into a group home when I was 15 and I can tell you that worked for me it helped me understand a lot about me and my thinking it help me cope with life and have a better understanding about what was wrong and write. Its been 24 years I want to be off in 25 so I can spend the rest of my days on this earth not having to go and regerster every three month. I hope you read this carefully and I hope Michigan does the right thing and help us old people that was convicted as a child get off this and never to return back on it. Thank you

| **Comment ID** |
| DOJ-OAG-2020-0003-0258 |

|  **Tracking Number** |
| 1k4-9ivz-8t9y |

AR-00000882

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 10, 2020



About         Bulk Data Download       Agencies      Learn

(/about)         (/bulkdownload)     (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

8/9/23, 9:42 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

| View More Comments    724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments    724  (/docket/DOJ-OAG-2020-0003/comments) |    Share ▾ |

---

| Comment |

Hello, I thought what to include in my statement but from reading most of the educational, scientific and psychological points have been made, so I would like to say that from being around different offenders I understand a need for supervision, it's called parole/probation, I would advise that the office instead understands the effects of it's decisions whether legal or not and begins to understand that the sociopolitical climate is one of reform not expansion, having avenues based on risk assessments and trusting professionals to make informed decisions to allow people a way to regain a sense or normalcy in their lives in completion of a timeframe of registry, I fear this is not only the offices opinion of sex offenders but all criminals which is one that no one is redeemable and will always reoffend. This backward and fear mongering thinking is what trickles down into people being killed on the streets from our public officers that are suppose to protect us. Protection of the public is important but it is three fold, the parents and people to protect themselves using common sense and communication, law enforcement protecting citizens and the courts ensuring justice. Your office should not do the job of people needing to protect themselves.

This attempt to undermine courts abilities to make common sense of these laws undermines our very practice of law in our country.

Some points to make,

Do not make laws out of fear or policies about those laws

Follow science and the people that are dealing first hand with these subjects

Have a better understanding and opinion of the people that you are enforcing policies about

Understand that for any other crime group there is at least a little finality to their criminal choices and understand how an antisocial crime can't be prevented by socially isolating said individuals.

Understand sex offense laws in most states are so broad that most people on registries are of no threat to the populous

Focus the offices time and energy on matters that a majority of the populous is concerned with

Read and understand scientific data, professionals opinions, statistical data, and all information that actually is contradictory to your points

Remove the clear bias from this, assumptions of reoffense continually saying he when there are woman on the registry and the other countless errors of reasoning and respect for people in this situation

AR-00000884

Regulations.gov

The focus of criminal punishment is two fold punishment and rehabilitation allow for an avenue of rehabilitation from this system based on evidence risk assessment and professional evaluation

Understand that the more you push this group toward criminality the more you could be putting people at risk no victim is worth pushing someone to reoffend for a harsher sentence

I'm trying to remain unbiased and objective because I understand the need for the registry but I feel like this office doesn't even understand or know the full information about sexual based offenses.

I would propose a full deconstruction of this law federal and state based on all of the unconstitutional claims made and be replaced with a non public based information network used by state and federal agencies of people that are found to be moderate to high risk, those individuals can then be monitored and the public can actually be protected.

I would propose that if this would not be considered that all felons and people found of commiting misdemeanors be listed and a registry created for all so that the public can be aware of murderers, thiefs, drunk drivers, drug users, domestic batterers, child abusers, embezzlers, tax evaders, and the like as per federal statistical data people are more likely to be subjected to victimization by any one of these groups before a person on a sexual registry.


My personal opinion, it's time that congress and the attorney general's office understand the true nature of what they are doing with this and many other laws and policies governed to felons and sex offenders, I propose research and real informed policy making regarding felons and sex offenders based on rehabilitation and helping people to lead productive lives, when you take away or make harder someones ability to create a life for themselves you make them dangerous, yes they would be caught and put back into the system but at what cost? How many felons are there? How many people in the registry? How many more victims created out of pushing people out of society? Please think about what you are doing talk to people that are in these positions, ex offenders, therapists, specialists, do better please, this is the greatest country in the world should we really be scarlet lettering people based on fear?

Change this change everything and do better, focus on the people that actually need it, focus on bettering this country and not this pessimistic sexist and ignorant policy making, felons deserve to be redeemed if they earn it no one should be defined by their worst decision I hope someone sees

**Comment ID**

DOJ-OAG-2020-0003-0259

 **Tracking Number**

kex-np2k-xvuy

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 10, 2020

2/3

AR-00000885



About    Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports     FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)


Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000886

8/9/23, 9:39 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 11, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

I think the registry is to tight i have been on it for 18 years and have been doing as asked but have had job loss because of it i have kids and they are my world and just becasue i have this charge i get discriminated against i think the registry is to hard and there should be ways for people to get off my charge came from someone being two years younger then me and i habe to register for the rest of my life i think that things need to change and be more fair that one day i can live a life and make a better life for my children. Thank you for your time sincerely richard clark

| **Comment ID** |
| DOJ-OAG-2020-0003-0260 |

|  **Tracking Number** |
| 1k4-9iwc-ymiq |

| **Comment Details** | **Submitter Info** |

**Received Date**
Sep 11, 2020

AR-00000887



About        Bulk Data Download        Agencies        Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000888

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 3, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

Studies have shown that the SORNA is ineffective. Not to mention, it's a "Double Standard (Jeopardy)". Why give a punishment "TWICE"?! NOBODY is thinking about peoples families or whether a Registrant lives or dies. People with Sexual Offenses ACTUALLY have the LOWEST recidivism rate in the United States. NOT all persons charged/convicted of a sexual offense are the same. NOT all cases are the same. All this is is a Witch Hunt by the Walsh family because of what happened to their son Adam. NOT ALL REGISTRANTS ARE THE SAME... WE HAVE FAMILIES AND CHILDREN TOO...

**Comment ID**

DOJ-OAG-2020-0003-0112

**Tracking Number**

1k4-9ir4-clx1

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**

Sep 3, 2020

AR-00000889

Regulations.gov



Your Voice in Federal Decision Making

About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000890

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments  724 (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724 (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

| Comment |

Federal mandate should not drive individual states in how state legislatures adopt their own registry policy, which should be unique to the regional, situational and statistical circumstances to their state(s). Moreover, an underlying threat to deny a state part or all of its entitlement to federal funding to support their registry is inherently un-American in its intent.

The 2006 and 2011 amendments to current SORA law in Michigan was successfully challenged by a unanimous decision on August 16, 2006, by the Federal 6th Circuit Court of Appeals. Yet even today, a second class action is currently pending (slowed down by the pandemic), because Michigan's legislature is hung up on trying to rehash the language in the challenged parts of the statute, rather than adhering to the U.S. and Michigan Constitutions.

This is largely because SORA law in general, has always been based on myth, rather than factual statistics. A large segment of the public has been misled into believing that sex offenders have the highest recidivism rate. In fact, at least in Michigan, it is the lowest (property crime highest).

Sex offender registries do not "protect children;" they cause a stigma to (s)ex-offenders who have successfully completed their sentences. It's an attempt to effectively treat such offenders as outcasts, and punish them indefinitely.

If states continue with useless, potentially harmful registry laws, they at least should not be influenced by federal guidelines, only by the U.S. Constitution and that of their own state(s).

| **Comment ID**
DOJ-OAG-2020-0003-0261 |

AR-00000891

Regulations.gov

 **Tracking Number**

1k4-9iwe-kz41

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 11, 2020



About      Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)      (/agencies)      (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000892

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 PUBLIC SUBMISSION

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)         Share ▾

---

Comment

I formally oppose the proposed changes to under this Proposed Rule for several reasons, truly I do not
believe that the registry should exist to begin with, but IF it MUST, I am only in support of a police-only
viewable/maintained registration.

*Despite child sexual abuse declining by 60% between 1992 and 2010, states and federal government
continue to legislate as if lenient sex offender laws are a national emergency. Laws to get where we
currently are have been password with good intentions, but have been based on myths about sex offenses
and they don't keep people from re-offending. The criteria for sex offender registries are based on two false
assumptions: 1. that sex offenders are uniquely likely to re-offend, and that 2. notifying their employers,
landlords and neighbors of their status will make that outcome less likely.

*Stranger danger is a myth. In reality, strangers carry out only 7% of these crimes. Sexual abuse at the
hands of intimate partners and family members is far more common and there's evidence that strict registry
laws might make victims less likely to report their relatives as abusers, since they might not want the
"permanent banishment" that entails.

*Researchers consistently find that sex offenders are less likely to re-offend than any other criminals. Not
only are they unlikely to re-offend, but registries themselves appear to have no effect whatsoever on
recidivism rates. Numerous studies over the years have found that enacting registries doesn't reduce the
rate of sex crimes and there isn't a drop in the number of abuse victims after enacting harsher
requirements.

*There are already enormous barriers to reintegrating back into society after spending time in prison and
completing parole. Sex offender registries cement those barriers to much longer terms, mostly life.

*People are less likely to re-offend when they have a sense of purpose. Te more you're able to build
relationships and stay in stable housing & employment, the more one is invested in not doing something

AR-00000893

8/9/23, 10:11 AM                                                    Regulations.gov

that will cause them to lose it.

*Notifying neighbors and public information can (and does) encourage vigilantism and abuse towards offenders, their spouses and their children. A recent a example of this happened on May 16, 2020 in Omaha, Nebraska. James Fairbanks went to the home of Mattieo Condoluci, an individual on the Nebraska Sex Offender Registry, and shot him to death.

Once a person is sentenced in court, does their time while incarcerated and then successfully comes off of parole, why is there a need to further follow any individual? If someone TRULY needed to be monitored, wouldn't they still be incarcerated? Or still be on parole? Isn't the whole intention/purpose of a Parole Board evaluation to assess the risk of ANY incarcerated individual before their release?

The length of registration should be based on risk and should be supported by evidence and research on recidivism. There have been countless studies that show that sex-based or sex offense crimes carry the lowest recidivism rate out of ANY crime. We also know that when recidivism does occur in these registered individuals, often times it's not for a similar offense, it's usually from something other such as failure to register or failure to follow the guidelines of SORA and/or SORNA because it's become nearly impossible for even the most educated to understand. Problematically, most registrants suffer from the inability to have a path off of the registry. There is no ability to petition for removal based on an individualized assessment of risk or the passage of specified number of years with no new sex offense.

These changes do not adequately address public safety. These changes also further complicate, rather than simplify the whole idea of SORNA.

As the wife an a registered individual, the public registry and restricting changes made over the years have not only negatively affected my spouse, but myself and our children. Sex offender registries do not prevent crimes. They simply continually punish the citizens who have already paid the price for their crimes. Having your life constrained and restricted even after your sentence is over might be a fact in our current criminal justice system, but that's not the way punishment is supposed to work.

Thank you for your time and consideration in reading my opposition.

**Comment ID**

DOJ-OAG-2020-0003-0262

 **Tracking Number**

key-d6g8-djbi

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 11, 2020

AR-00000894



About    Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000895

Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)   Share ▾

Comment

Waste of resources and fuels violence and divisions
The registry does not work to protect anyone and it places major burdens on families and ex offenders
To see the government continue to press more and more on the sex registry is infuriating
It just shows a disbolical intentions on the part of the federal government towards its populace
The sex offender registry is a government blacklist
Also by the federal government holding up list of of people that they deem as less than the remainder of the Population it's serves as an intentional path for division and anarchy...
Also America exports its ideas of law and justice in the entire world .....and the entire world would crush America given the chance
The registry is supported by people waving papers showing falsified data on all Avenues and registrants don't reoffend enough to even warrent having a bloated registry and All this nonsense .......it only shows the world that America is a country of child molesters and sexual
Perverts hell bent on exporting that culture to the rest of the nations .....also and most importantly the people on the registry have
Already served their criminal sentences and this constant shaming and exclusion is not done
For the protection of children anyone that says that is fooling themselves

**Comment ID**
DOJ-OAG-2020-0003-0263

 **Tracking Number**
key-dqr6-bxpv

AR-00000896

Regulations.gov

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 11, 2020



About   Bulk Data Download     Agencies    Learn

(/about)       (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000897

8/9/23, 9:44 AM                                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |

Share ▾

---

Comment

This proposal needs to be amended to take into account the recent rulings that SORNA is punitive. As such new requirements for sexual offenders can not be applied to those whose offenses occurred before the new requirements were passed into law.

As an example of a recent change in the SORNA requirements that is punitive. SORNA changes have made international travel to most of the world by registered sexual offenders impossible. This is because the US government has given incentives to foreign countries to stop US citizens that are registered as sexual offenders from entering their country. A registered sexual offender can purchase a ticket to for example to Chile. They can give a month of notice of the trip to the local authorities. That information is passed to the federal authorities who send a notice to Chile. Once the person arrives in Chile he is denied entry into the country and sent back on the next flight. Before the change in the SORNA requirements for notice of international travel, travel to most of the world was possible by registered sexual offenders and not denied by foreign governments at the urging of the US government.

**Comment ID**

DOJ-OAG-2020-0003-0264

◎ **Tracking Number**

key-ft78-xn7a

**Comment Details**                                **Submitter Info**

AR-00000898

**Received Date**

Sep 11, 2020



About      Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)      (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/9/23, 9:51 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

Share ▾

Comment

In 2003, on the advice of counsel, I plead Nolo Contendre to one count of accosting a minor (drunken words spoken), and two counts of CSC IV (unwanted touching over the clothing). I was sentenced to 60 days of Work Release in the county jail, three years of probation, and 20 years on Michigan's Sex Offender Registry. Over the ensuing years, my sentence has been added modified and added to ex post facto by SORNA and the State of Michigan. Five years was added to my sentence, along with an annual $50 fine, and the requirement to supply all manner of personal information, none of which I agreed to in my plea agreement with the court. So now, thanks to SORNA, I have to uphold my end of the bargain, but the court does not have to uphold its end of the bargain. This latest effort to fix the broken SORNA misses the mark completely and perpetuates the unconstitutional ex post facto punishments of its predecessor. Where is the provision for relief from these requirements? Where is my due process? Missing, that's where. There is no path off of the registry, and your sentence can be extended with the stroke of a pen.

Having been subject to the ever-changing SORNA requirements for some 17 years, I have lived in fear for my family and myself with no legal recourse for relief. Our personal information an open book for any lunatic on the internet with evil intent. I have been the target of scams, had my property destroyed, and had extreme difficulty landing and holding gainful employment. Nevermind that the registry serves absolutely no useful purpose, backed up by study after study. It's merely a way for legislators and bureaucrats to appear useful and stay relevant. My constitutional rights should not be the price for somebody's re-election talking point.

**Comment ID**
DOJ-OAG-2020-0003-0265

 **Tracking Number**
1k4-9iwg-2w48

AR-00000900

| **Comment Details** | **Submitter Info** |
|---|---|

**Received Date**

Sep 11, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000901

8/9/23, 9:54 AM                                        Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) |    Share ▾ |

---

| Comment |

For a law based on emotions and not science with the ones in charge of implementing it have no idea what is required is a bad law. How many kids and innocent people have to have their lives uprooted all based on fear? Attorney general Barr is way out of line and focus his attention on what's going on in the country. Not the people who have paid their debt to society and have been law abiding for years or decades. Listen to the experts in social science whom have always been against registration and other laws.

**Comment ID**

DOJ-OAG-2020-0003-0266

 **Tracking Number**

key-m1wh-mpar

| **Comment Details** | **Submitter Info** |
| --- | --- |

**Received Date**

Sep 11, 2020

AR-00000902

About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000903

8/9/23, 10:11 AM                                                        Regulations.gov

An official website of the United States Government.  🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

Hello,

I would like to comment on the proposed rule changes to SORNA and more broadly on the value of a sex offender registry altogether. The very idea that we continue to create the false sense of public safety through the use of a registry must be challenged. Many studies have shown that sex offense registries are not leading to greater safety and indeed, are potentially causing more harm and crime due to the excessively onerous nature of their implementations. In Michigan our own Attorney General Dana Nessel has stated, the state Sex Offender Registration Act has gone far beyond its purpose and now imposes burdens that are so punitive in their effect that they negate the States public safety justification. It appears that the same trend is occurring for our nations laws regarding sex offenders.

A press release from the Bureau of Justice Statistics dated Nov. 16, 2003 states that the re-arrest rates for sex offenders is 5% within 3 years of prison release. This is actually NOT frighteningly high as has been quoted erroneously and repeatedly in the public square. In fact, this same press release states, Sex offenders were less likely than non-sex offenders to be rearrested for any offense yet we persist in demanding intrusive and excessive scrutiny of this group of our citizens. Why? We are watching the WRONG people if we are trying to prevent sex offenses from occurring again. Ninety-Five percent of the people on any SO registry will NOT BE committing crimes in the future.

So how is this public policy keeping us safer?

How has the registry proved useful?

What crimes have been proven to have been prevented by the existence of a registry?

What has been the cost of these registries both in economic terms and the harmful impacts on those trying to reintegrate into society?

AR-00000904

How many registrants have been arrested on technical violations and been sent back to prison for actions that the rest of the population would not have been penalized for let alone thrown into jail over?

Why is the federal government propagating the myth of usefulness of SORNA instead of admitting these tools are ineffective?

Why doesnt the US government instead lead the way for states and eliminate SORNA instead of continuing to prop up a failed social policy and inviting states to participate in this charade?

This federal law has helped to create the social equivalent of a leper class with no demonstrable benefits and instead has demonized formerly incarcerated citizens who have already served their sentence and are now trying to move on with their lives. I object to the expansion of these registries and the false pretense of safety they create. I further object to the use of taxpayer money to incentivize adoption of federal SORNA requirements for states.

But I suppose money can buy all sorts of perceived benefits. Look how much safer the world became in 2008 after Jeffrey Epstein was forced to register as a sex offender. Too bad Larry Nassar wasnt on anyones radar as Im sure we could have spared hundreds of his victims had he been on the registry.

**Comment ID**

DOJ-OAG-2020-0003-0267

 **Tracking Number**

1k4-9iwj-esdy

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 11, 2020



AR-00000905

Regulations.gov

About
(/about)

Bulk Data Download
(/bulkdownload)

Agencies
(/agencies)

Learn
(/learn)

Reports
(https://resources.regulations.gov/public/component/main?main=Reports)

FAQ
(/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000906

8/9/23, 9:48 AM                                                   Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |
| --- |

See attached file(s)

| Attachments ( 1 ) |
| --- |

| 📄 SORNA |
| --- |
| ⬇ Download ▾ |

| **Comment ID** |
| --- |
| DOJ-OAG-2020-0003-0268 |

| ◎ **Tracking Number** |
| --- |
| 1k4-9iwk-cjrx |

| **Comment Details** | **Submitter Info** |
| --- | --- |

AR-00000907

8/9/23, 9:48 AM                                                                          Regulations.gov

**Received Date**

Sep 11, 2020



Your Voice in Federal Decision Making

About        Bulk Data Download        Agencies      Learn

(/about)          (/bulkdownload)     (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)


Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000908

I believe that SORNA and its state and local counterparts are mistakenly creating an underclass of
people who are being punished their entire lives.  I am speaking of the many who are swept up in the
overzealous registration requirements that have been enacted over the past decades.  This law meant
well, but research has since shown that it does not do what it set out to do, protect the public and
children.

1.  THERE SHOULD BE NO RETROACTIVE REGISTRATION FOR INDIVIDUALS WHO HAVE NOT RE-
OFFENDED.     Individuals with pre-SORNA convictions who have been living incident free for years
should be exempt from registration.   These people have paid their dues and have not been arrested for
any offenses.  If they are lucky enough to have obtained employment, this registration often results in
loss of the job they were fortunate, as former offenders, to have in the first place.  If they have lived a
crime free life, why go back and ruin the second chance that these people made good on.  It is cruel and
useless.    If they have committed another offense, then of course they should be on a registry.

2.  THERE SHOULD BE JUDICIAL DISCRETION AS TO WHETHER A FIRST OFFENDER IS PLACED ON THE
REGISTRY.   First offenders should not automatically be placed on the public registry.  The judge should
have discretion to either place or not place a first offender on the public registry.  In so many cases, it is
painfully obvious that there will be no re-offending.  In these cases, why must a person's life be ruined -
and it IS ruined - because of one mistake.   I am talking about people who urinated in a park, went
skinny dipping, had a drunken hook up with an equally drunk partner, or maybe sexted or sent a picture
of themselves to someone they shouldn't have.  There should not be an automatic requirement to
register for these people.  We are all entitled to a second chance.

3.  THERE SHOULD BE A NARROWING OF OFFENSES THAT QUALIFY FOR THE REGISTRY.   Only offenses
that were violent in nature or committed against children in any way should be included for the registry.
Offenses for which no prison time was imposed and misdemeanor offenses should also not require
inclusion on the registry.

4.   THERE SHOULD BE A TEMPORARY REGISTRY IN EACH STATE TO ALLOW FAMILY VISITS OF UP TO TWO
WEEKS.  Even if you don't do this for the offender, please do this for their families.    If a registrant lives
in one state and has to be on the registry for 15 years, but visits his/her grandparents or parents in
another state, they may be required to register for life in that state.   This is especially cruel to all
involved.  Not only are most people on the registry no longer likely to offend, they are effectively
prohibited from visiting family if their family lives in a state with even lengthier registration times.
What family would have their child return home for a visit if it meant life on the registry instead of the
lessor period they were already subjected to in their own state?  This should be changed to temporary
registration for the duration of the visit, up to 2 weeks.

5.  THERE NEEDS TO BE A REVIEW PROCESS FOR GETTING PEOPLE OFF THE REGISTRY IF THEY DO NOT
RE-OFFEND.   The law is zealous about registering people who offend, but it has poor options to remove
people from the registry. Just stating that someone has to be on the registry for a mandatory 15 years is
tantamount to ruining the formative years of the lives of young offenders.  Most of their opportunities
in life will have passed them by after 15 years.  I think there should be a review committee, much like a
parole board.  If after the first 5 years they have not re-offended, they ought to be taken off the registry.
IF for some reason they should remain on the registry that does not involve re-offending, then their
registration should be reviewed every couple of years.   We owe it to people who have reformed to

review their cases and offer relief from the registry if there have been no further problems.  People who are now law abiding but left to languish on the registry without re-consideration and a real chance of relief are victims of government zealots.

6.   THE UNITED STATES SHOULD CONSIDER A PRIVATE REGISTRY FOR INDIVIDUALS WHO HAVE GONE 5 OR MORE YEARS WITHOUT RE-OFFENDING AS AN ALTERNATIVE TO COMPLETE REMOVAL FROM THE REGISTRY.   This would still give law enforcement a list and location of former offenders so that they can use it as a "rule out" list when a crime has occurred in the area where a former offender lives.

7.   REMOVE RESIDENCE AND PROXIMITY RESTRICTIONS FROM OFFENDERS WHOSE OFFENSE HAD NOTHING TO DO WITH CHILDREN.    I would immediately remove these restrictions (schools, parks, libraries…) from offenders on the registry who committed offenses in no way related to children.

8.   DO NOT ALLOW LAW ENFORCEMENT TO NOTIFY EMPLOYERS OR LICENSING BOARDS THAT AN OFFENDER IS AMONG THEIR EMPLOYEES OR LICENSEES.   This is a guaranteed to get the person fired. Where our company works, a group of eight staff were marched off the property by police after having worked in the facility's kitchen for years.  These employees initially had background checks that revealed their offenses, but the facility decided to give them a chance.  Then, the state leadership changed, all of a sudden, these criminals were not allowed on our property and lost their jobs when law enforcement authorities made it their business to interfere.  It was disgusting, heart breaking and a useless persecution of people who were making good on their second chance.


I urge you to consider major reforms to SORNA and all registries across the USA.  We owe it to our fellow citizens to keep everyone safe AND allow everyone to pursue their lives in freedom if they do no harm to others.  These two goals are not  mutually exclusive!

8/9/23, 9:53 AM                                                Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

| Comment |
|---|

I would like to comment on these three things:
* Powers of Attorney General
* Delegation of powers to execute vs delegation of powers to legislate
* Power to interpret/judge

Powers of Attorney General
From Wikipedia:
In most common law jurisdictions, the attorney general or attorney-general (sometimes abbreviated AG) is the main legal advisor to the government. The plural is attorneys general.[1] In some jurisdictions, attorneys general also have executive responsibility for law enforcement, prosecutions or even responsibility for legal affairs generally

From this I get that his primary duty is as a defense attorney for the government. I think "executive responsibility in law enforcement" means that he can step in to fill a void when law enforcement either is lacking, or perhaps requests help, or perhaps proactively giving advice for situations. He is an attorney. He can give advice to legislators, whether they ask for it or not. But, I don't believe it is proper, or legal, for legislators to delegate their job to him.

Delegation of powers to execute vs delegation of powers to legislate
In HERMAN AVERY GUNDY, PETITIONER v. UNITED STATES OF AMERICA they looked at the power to delegate in the case of SORNA. Many examples were given where historically legislation delegated powers to commissions or agencies for executing the purpose given to them. This is proper when there is purpose that has an ongoing need of management. Good examples are the Security Exchange Commission, the Federal Communications Commission, the Environmental Protection Agency, and many others. Each of those commissions and agencies can make their rules in the scope of their purpose. These are examples of delegation of powers to execute a purpose given to them.

AR-00000911

An example of a historical delegation of powers which I believe was wrong is when the AG was delegated power "to designate controlled substances on a temporary basisresulting in criminal penalties for unauthorized manufacture, possession, or distribution of such substances." There was a need to designate controlled substances, considering the situation. However, the AG shouldn't have been the one to determine which substances would be controlled. He could have been asked for legal advise and guidance. If legislators would take too long to do their thing, the Attorney General could make recommendation to the President for an executive order. Then the AG could prosecute according to the legislation or executive order.

In short, there shouldn't, MUST NOT, be a conflict of interest. An attorney should not make a rule which he will then prosecute accordingly. He might give advice or input for the development of the law, but not anything that would be equivalent to determining what a law is to be. Delegation of powers in the case of SORNA crosses the line. SORNA should be deemed unconstitutional. Whether the part that delegates the powers can be severed or not may be another issue.

In the case of SORNA, power was given to agencies to execute what the legislation put forth. It is proper to delegate power to the state police, or other agency, to maintain a registry according to the legislation. With that power comes responsibility, which can necessitate them making some rules for themselves to follow. It should be up to them to find ways to comply, perhaps with advice from the AG.

I believe they made a mistake. The lawmaking powers of the AG may have been affirmed in GUNDY, but they should eventually be overturned. In the meantime, I believe SORNA itself, at least the part that delegates legislative powers to the AG, should be abolished. Then GUNDY will be moot.

Power to interpret/judge

The proposed rule goes further than allowing the AG to legislate through delegation where legislators asked him to do so. The rule also interprets other sections of SORNA where any interpretation should have been up to the courts. For example:

Section 72.5 addresses how long sex offenders must register. There are examples given using various scenarios along with interpretation. The problem is that the prosecutor is deciding on what the laws mean, and then his own interpretation is written into the law so he can prosecute according to his own interpretation. My interpretation isn't the same as his.

If a decision is made against an offender, does the appeal court then give consideration to the AG's interpretation that he wrote into the law? Or does the appeal court look to the legislation itself? If the latter, what is the purpose of the AG writing his own interpretation into this rule? Interpretation needs to be left to the courts.

By this rule, the AG is playing part in all three branches of government.
* He is playing the role of legislating through unconstitutional delegation
* He is playing the role of prosecutor.
* He is playing the role of the courts by interpreting what the legislators wrote.

**Comment ID**
DOJ-OAG-2020-0003-0269

Regulations.gov

 **Tracking Number**

1k4-9iwo-xm52

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 11, 2020



About    Bulk Data Download      Agencies    Learn

(/about)      (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000913

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments | 724 | (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments | 724 | (/docket/DOJ-OAG-2020-0003/comments) |

**Share** ▾

| Comment |

TO whom this may concern,

    Hello and thank you for the opportunity to comment on this I am listed as a Sex offender for attempted csc 3 with having sex with a girl i knew who was 15 when i was 18 when i was brought into question they never gave me the persons name just a girl named lizz who i dated who was 17 her dad didnt like me he was a probation officer i also had a friend named lizz who was having issues at home with a step dad who attacked and raped her but her mom did nothing about it it was sad.so when i dropped her off she was mad cause i wouldnt do anything with her her dad found out about the rape by her step dad and i was the target cause my name was mentioned to protect her moms boyfriend . and once the lie started it never ended i was brought in questioned admitted to having sex cause i thought the cops were referring to my girlfriend they never mentioned anything but the girls name the girl had a rape kit done that showed there was no rape no penetration. but yet i was charged told to plead guilty by my attorney and i would get probation and after put all this to rest. after the fact i found out i had to register at the police dept 1 time a year was told it would end after probation again a lie. if i knew all this i would of never pleaded guilty when i brought it up was told it was too late . so here i am 22 years later with the only charges are the attempted csc 3 and update registry and listing vehicles charges which was hard to do since i worked and drove several and the police woulkdnt let me list all of them then i attempted to register another address and was told i could only do one. so a charge for that... my life has been a total disaster from day one i dont drink do drugs or even smoke I cant have a relationship with anyone cause of the stigma put on my family and friends i have two daughters 1 14 1 15 that are growing up fast as great kids and i teach them right from wrong and to fallow the law but they cant live with me cause i am on the sex offenders lists and dont want them to be bullied in school so i lost fiance i had since i was 18 i have been pulled over harassed by police looked at called names and yet i have been a model citizen for years and if i wasnt perscribed ritalin and clonopin when i was younger and got charged i would of known what was going on and been more alert to it . But i have been punished over and over day by day year by year . who ever says that this isnt punishment should

AR-00000914

8/9/23, 9:50 AM                                                    Regulations.gov

come live a week in our shoes and then tell us this i have lost houses jobs and all hope until about a year ago when michigan laws 2006 and 2011 ruled the additional retroactive natures were unconstitutional it gave me life hope to live to survive . while i noticed the suppositve victim is living her life having fun i am in constant danger and exile. how can someone be forced to abide by laws and rules that werent part of there guilty plea. thats got to be unconstitutional its self and has been said to be in several cases . sex offenders have the lowest reciviosidim rate `of any other crime that is a fact and has been proven . Another fact is that the adam walsh does nothing to protect only creates disaster and heart ache for the families of the 800 000 people on the registry. i agree there needs to be some sort of law to protect kids but this isnt one . What happened to libery for all this isnt liberty i did the time for a crime i didnt commit which i have had to accept for 22 years in hopes that one day i could live my life again. then this comes along getting even more strict .. why not make the registry 10 years after probation or parole or while on probation why does it need to be life serious violoent offenders dont need a registry cause they are already locked up and behind bars. trust me once you go threw this its the worst punishment of your life i met a guy the other day killed someone got 15 years gets out can live his life how ever he wants hes forgiven by society he made a mistake a horrible one and yet he has no restrictions no neuce on his neck.You are not taught in school the laws and punnishments if we were all taught that then their would be less crime. My rights are violated cause the right to travel from one place to another is reduced by the adam walsh act free of hinderance .. not to mention the retroactive nature of this act even though you claim this is civil it is in no way civil the restrictions put into place by the states that you allow restrict movements punish you for after the fact as well as the adam walsh act .. i kn ow you guys dont see it that way but the evidence is there in black and white . you wanna in act the adam walsh act it should be done in accordanace with whats right pre 2006 and 2011 shouldnt be partied to this act itcame after their conviction making it in sense double jepoardy judge cleland got it right out if the 6th circuuit of michigan we all make mistakes in life but to punnish someone for life is against god.

---

**Comment ID**

DOJ-OAG-2020-0003-0270

---

 **Tracking Number**

1k4-9ix4-mjgr

---

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 12, 2020



AR-00000915

Regulations.gov

About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000916

8/9/23, 9:50 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

hello i disagree with the adam walsh act and all the new restrictions in michigan no one has had to register since march under a federal ruling yet there have been no casses of registered sex offenders out breaking the law and recommiting crimes most sex offenses are done by people that are known to the victim not a random stranger danger senirio

sex offenders have the lowest recivid rates out of anyone its been proven and my fear is that mpore notification longer registry terms were bring out more vigilantes which like a case on friday were a failure to register sex offender was murdered in his cell by cell mate or the threats and harassment faced every day by people who are not a threat to society but yet are labeled as such

concerened citizen

**Comment ID**
DOJ-OAG-2020-0003-0271

⊙ **Tracking Number**
1k4-9ix5-ygek

**Comment Details**                              **Submitter Info**

AR-00000917

Regulations.gov

**Received Date**

Sep 12, 2020



About   Bulk Data Download      Agencies      Learn

(/about)         (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000918

8/9/23, 9:46 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾   |

---

| Comment |

It is no longer a question of America becoming a police state, we are there now, and these proposed rules
will only plunge us deeper into the abyss.
Once again this country is losing it's moral compass, and attacking it's own citizens in the guise of public
safety. The data is in, this was a sham from the get-go, "frightening and high", debunked. "The New Mexico
State legislature finds that sex offenders pose a significant risk of recidivism", bogus.
We now know the truth that these statements and findings are mistakes, myths, or outright lies. But let's still
take a large group of people and their families and hamstring them for an extended period of time or for the
rest of their lives. Let's have them live in poverty and fear and despair, and simply call it a collateral
consequence. No punishment, no disability, no banishment, no due process, no state created danger, just
the good old government helping out.
You have the majority of the citizens behind you on this, but let's be honest, they don't look at the registry,
they just want revenge, more punishment, someone to hate. Hitler would be proud of the direction this is
going I'm sure.
Make America great by not only pulling these rules, but lend a helping hand to people that truly need it, that
would be truly the Christian way. Show the people that we are still a great and forgiving country.
Thank you, and may God bless you.

| **Comment ID** |
| DOJ-OAG-2020-0003-0272 |

|  **Tracking Number** |
| 1k4-9ixh-s52e |

AR-00000919

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 13, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/9/23, 9:46 AM                                                  Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾   |

---

Comment

Despite popular myth that the majority of states have rejected the AWA, in reality a majority of the states have been unable to substantially implement the AWA despite their desire to do so. There is some commonality among the non-compliant states even though the law enforcement apparatus has touted the benefits of AWA compliance. First, juvenile justice advocates have successfully convinced legislatures that registering juvenile offenders is bad public policy. Second, the AWA has a significant number of pieces that a state must implement to be deemed substantially compliant. Several have been denied due to missing some key components that are essential to achieving that coveted designation. Those states are eagerly wishing to be AWA compliant and will seize this new gift from AG Barr.

The AGs proposal opens the door for the states to become federally compliant without adopting all of the provisions through their legislative processes. A state can simply do it with a blanket amendment to their existing law that a person must comply with all federal registration requirements. For example, rather than a state proscribing how long a person has to register in state law, they could totally eliminate their state reference to how long a person registers and say instead that the person must register consistent with the terms of registration established by the federal AWA. They could state that your reporting frequency will be consistent with the standards required by federal law. In some rare instances, this could benefit the offender because some states require more frequent reporting than actually recommended by the AWA.

The real danger is that legislatures could simply bow out of the legislating business and say that theyre adopting the federal standards. If a state moves that type of proposal through its legislative process, then all of a sudden, de facto, you will have the Adam Walsh Act adopted without your elected officials actually determining and assigning tiering levels. Due to the complexity of figuring out the suggested AWA tiering, most states have gotten it wrong. They often over-tier, and the feds are not going to demand that those over-compliant states reduce their obligations.

This proposal does not create a new jurisdiction for the feds UNLESS THE STATES WANT IT TO. If the state has strong advocates that beat back such changes, it wont change one iota of what is in that states

AR-00000921

Regulations.gov

laws. But My fear is that states will gladly allow the feds to help them achieve AWA compliance. An example would be the 21-day advance notice of international travel which is required by federal law. If your state has not included that in its requirements, there is no federal registrar to file the travel plan with, which means you cannot comply. This limits the feds in their desire to prosecute those who fail to comply. Even before the AGs proposal, the state of West Virginia figured a way to implement this. They sent letters to all registrants in the state and demanded that they come in and sign an acknowledgement of the federal requirement. Most voluntarily signed despite the fact that the law of West Virginia does not require such notice. Now that they have signed, failure to file the required notice of travel can be successfully prosecuted in West Virginia.

This new proposal acknowledges that SORNA provides minimum national standards for sex offender registration, establishing a floor rather than a ceiling for registration programs in states and other jurisdictions. States are free to impose registration requirements binding under their own laws, independent of federal SORNA, including not having a registry at all. Jurisdictions are free to adopt more stringent or extensive registration requirements than those set forth by SORNA. States impose residency restrictions, proximity restrictions, exclusion from school activities, Halloween restrictions none of these are required by AWA. At one point, the proposed regulations state that this change will make it easier for registrants to determine what they are required to do and thus facilitate compliance. They recognize that you still cant force the state to do what its not going to do, but this does give the states an easy way to do something that victims advocates and law enforcement apparatuses will encourage them to do.

It is my firm position that the feds do not AND SHOULD NEVER HAVE jurisdiction to prosecute those who never cross jurisdictional boundaries, which means the Feds should NOT be able to arrest and prosecute anyone at the federal level for violating the terms of a state registry. However, the appalling decision in Willman v. U.S. Attorney General has INCORRECTLY held that there is an independent federal obligation to register. There is no such obligation stated in federal SORNA. This sets the state for massive federal overreach. Registries are STATE matters.

---

**Comment ID**

DOJ-OAG-2020-0003-0273

---

 **Tracking Number**

1k4-9ixp-v0d1

---

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 13, 2020

---

AR-00000922

Regulations.gov



Your Voice in Federal Decision Making

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |
| --- |

Hello and thank you for allowing comments . I.have never been in trouble with the law before but I see the problems that this has had on people it takes me.back to when i was a kid and heard stories from.my grandfather and the nazi concentration camps that people were put in and through. Being marked with a number like a moral lepoard it was sad and horrible to hear sex offenders in sense are marked the same way they are on a list they are limited were they can work live eat sleep all.because most of the stuff.is listed on a list for everyone to see like the numbers put on a wrist for everyone to see. I understand that the intentions of this is to protect children but I havent seen any evidence that it has just the opposite . I have met several sex offenders by chance in my neighborhood listening to.them.get harassed threatened arrested not for breaking the law juat from being on a list like the nazis did to people. One in particular very nice huy 40 years old been on the list since he was 18 for having sex with a girl.when she was 15 the only other trouble he ever had was all.related to reporting and verifying. Apparently the romeo ans juliet act didnt work for him . 22 years grear guy that made a mistake when he was younger but yet pays for it everyday he has lost girlfriemnds his kids come to visit but doesnt stay with him in fear of them.bwing harassed too just like the stories my grandfather told me. He goes to church every sunday i see him their prays and was so.excited a few months ago.when he said blake I.am.finally being removed from.a michigan unconstitutional law . told me.greatest day of his life finally gets his life back then just wednesday seen him at church and he told me about this and i fealt it was my right as a christian and citizen to make a statement

So i.dod my research and want to know.why is there no.process for.someone who is .no longer a threat to be removed wasnt this created to protect people from violent rapist and their children if the people are no longer a threat what is the use except to produce unjust humility shame on them.and their families with no hope..the lord jesus christ set murders rapers free forgave them told them.never to kill.or.murder again and they didnt.We are all.humanbeings who make mistakes . and i.would have to assume the real pedifiles and threats are already locked up somewhere the laws are pretty tough.And after doing more research i found out that sex offenders have the lowest rates to reoffend somewere around leas then 5% yet murders drunk drivers drug addicts are extremely higher I see no list for them .. This is unconstitutional and unjust . one other thing i would like to add what other crime is their were someone can make a mistake and never het a

AR-00000924

chance for rehabilitation or hope for a better life .also wasnt this creates in 2006 how can someone convicted before 2006 still be on a list or being punished if you dont think its punnishment then you have never seen what they go through everyday are we becoming a nazi nation again.

**Comment ID**

DOJ-OAG-2020-0003-0274

 **Tracking Number**

1k4-9ixp-rtid

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 13, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000925

8/9/23, 9:52 AM                                    Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| --- |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |
| --- |

The registry is a complete failure. Its an outdated system that only further fills our jails without rehabilitation for anyone. The systems lack of awareness of our current digital world destroys peoples lifes. If there is this registry there should be one for every crime! Its ridiculous that someone serves more time and has their life forever impacted if they click on the wrong porn link bd actually raping or killing someone. This outdated system must go!

**Comment ID**
DOJ-OAG-2020-0003-0275

 **Tracking Number**
1k4-9ixp-w7ur

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**
Sep 13, 2020

AR-00000926

8/9/23, 9:52 AM                                                Regulations.gov



About     Bulk Data Download       Agencies      Learn
(/about)        (/bulkdownload)    (/agencies)   (/learn)

Reports     FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)     (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000927

8/9/23, 9:47 AM                                                Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

💬 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

| Comment |
|---|

To Whom It Concerns,
I believe this concerns each and everyone of us, SORNA as written is unconstitutional and has caused more harm then good, as in Alaska https://www.alaskasnewssource.com/content/news/Man-charged-for-attacking-sex-offenders-greeted-as-a-hero-by-some-389097252.html this was after Alaska supreme court found SORNA to be unconstitutional https://mustreadalaska.com/ak-supreme-court-sides-with-sex-offenders/ As we know there has been many lower courts to find the same that SORNA violates the constitutions throughout the united states as well as the United States constitution I am concerned that this proposed rule gives the Attorney General the right to make there own rules set there own punishment and prosecute offenders of such rule violations. This gives the Attorney general a blank check to enforce the rules of sorna that violates the constitution of the united states of america Separation of powers, therefore, refers to the division of government responsibilities into distinct branches to limit any one branch from exercising the core functions of another. The intent is to prevent the concentration of power and provide for checks and balances. This proposed rule violates Article 1 of the United States Constitution.. Also the Tier's that are given to offenders without any kind of assessment, then there is the registry it self could not stand the United States, judicial review is the ability of a court to examine and decide if a statute, treaty or administrative regulation contradicts or violates the provisions of existing law, a State Constitution, or ultimately the United States Constitution. We can all pretend to agree these rules, Laws, Regulations are all in the name of public safety, We all know this is not true if it was there would be many many other registry's to promote public safety. And as a human being I believe everyone deserves a opportunity to be a productive member to there society without judgement of past crimes, and the ex post facto laws are there to protect not to interoperate to one's needs, This proposed rule needs to be scrapped and new proposals to bring SORNA and the sex offender registry into the United States, judicial review is the ability of a court to examine and decide if a statute, treaty or administrative regulation contradicts or violates the provisions of existing law, a State Constitution, or ultimately the United States Constitutional guide lines and keep all the power from 1 State agency from having control over determining when it is ok to violate the United States Constitution in so many ways, it is clear where Sorna has done nothing to enhance the safety of even one person. Sorna should be stricken from the registry and all laws Federal and state!

AR-00000928

Regulations.gov

**Comment ID**

DOJ-OAG-2020-0003-0276

 **Tracking Number**

1k4-9ixt-8hkv

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 13, 2020



About    Bulk Data Download    Agencies    Learn

(/about)        (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000929

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

Comment

Hello my name is jeff I am a huge advocate of whats right laws but one thing that bothers me that i can not get behind is the strict nature of the adam walsh act .. I happen to know people ans families effected ans even victims and families who think.it has went too far .. I have been witness to.families destroyed by their family member on the registry who.has been on it for 23 years has commited no crimes except registration and vehicle listings reguired by them. I see them.get harassed in the streets by neighbors kocked out of.houses for something that happened when they were 18 a kid them selfs . its not fair I have heard victims families tell me the stuff they have to go through is ashame bei g punished day after day year after year for something that happened years ago. I am all for protecting children but i dont see how this does that it creates a policy of harassment and banishment like the nazis did to people. I hope ans pray that changes can be made that reflect an offenders risk to others so he or she can reinter society and start their lifes over . as good citizens who made a miatake the crime will still follow them on their record but it will.give them.hope to be better. We are taught to forgive by god. And thats what i hope to see .several.offenders have had risk assesments done and has shown they are not likely to.reoffend but yet they are moral.leapers. i understand the intent was not to punish but that is what it is doing after doing research i have found suggestions i would.like to.share

Hrw.org/reports/2007/us0907/3.htm

A refrence page

Thank you for allowing me feed back

Ps . several states have ruled the act to.be unconstitutional

I feel.it needs changes risk.asseaments no pre 2006 offenders and the ability for change to turn their lifes around instead of being treated like leapers.

AR-00000930

Sincerely concerned citizen

**Comment ID**

DOJ-OAG-2020-0003-0277



**Tracking Number**

1k4-9ixt-7oop

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 13, 2020



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

| Comment |
|---|

To Whom It May Concern,

   The Michigan Sex Offender Registry is a very poor program that does not keep the public more safe, does not encourage restoration or healing for offenders and offended, and is a burden on our society and legal system. If the intent of a public sex offender registry is to minimize risk to the public, then it is unacceptable to have placement on the registry be based on anything other than risk.The ACLU has provided members of the House Judiciary Committee multiple studies on Sex Offender recidivism rates; the placement of offenders on the registry appears to be opposite of what the data would suggest. While monitoring of high-risk individuals is important, that monitoring must be based on risk. Please consider the following when crafting new legislation:

RISK-based placement
Opportunities for removal from the registry based on reduced risk
More local control in the hands of prosecutors and judges to determine placement on a case-by-case basis (as no two cases are the same)

   As a citizen of Michigan and a registered voter, I support legislation that encompasses the above. I strongly object to any legislation that does not use risk to determine placement on the registry.

| **Comment ID** |
|---|
| DOJ-OAG-2020-0003-0278 |

 **Tracking Number**

1k4-9ixu-9w1w

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 13, 2020



About        Bulk Data Download        Agencies        Learn

(/about)        (/bulkdownload)        (/agencies)        (/learn)

Reports        FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

8/9/23, 9:45 AM                                                              Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

I am not a lawyer however I find it concerning that the government would enact something that allows a retroactive implementation to those whom have already completed the requirements of their sentence. If such behavior was repeated, then it makes sense to impose the new requirements on said person.
Many would argue that, in-person appearances for registration at specified periods, is not punitive in nature, however, anything that requires a person to miss work to comply is certainly punitive in that it costs money that may be needed to support themselves or their family. Further, this in no way enhances the public safety that SORNA alleges. It is much more logical, and less impactful, for the in-person appearance IF something has changed and the record needs to be updated.
Further, if the crime was not Federal, what gives the Federal Government the right to impose conditions on a person not convicted under their authority. This is very concerning because it opens a door where the Federal Government could force their way into all aspects of our lives and make the State Government null and void or at best puppets.

**Comment ID**
DOJ-OAG-2020-0003-0279

◎ **Tracking Number**
1k4-9iy1-mvmx

**Comment Details**                                    **Submitter Info**

AR-00000934

**Received Date**

Sep 13, 2020



About (/about)     Bulk Data Download (/bulkdownload)     Agencies (/agencies)     Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)     FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00000935

8/9/23, 9:48 AM                                         Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

The proposed Department of Justice (DOJ) rule that specifies the registration requirements under the Sex Offender Registration and Notification Act (SORNA) will only confuse and exacerbate an already confusing and empirically proven failed social experiment.

Before the proposed DOJ rule, SORNAs requirements have previously been delineated in/as guidelines issued by the Attorney General for implementation of SORNAs requirements by registration jurisdictions, which allowed registrants to have only to know, understand, and comply with local jurisdictions implementations. If the proposed rule is ratified, then local jurisdictions could easily obfuscate local legislative requirements and processing by merely passing a law, which states it will follow federal SORNA law. Or pick and choose a mix by notifying registrants that federal SORNA requirement ABC and XYZ are applicable in local jurisdictions as well as all local standing laws, thus exacerbating an already confusing myriad of regulations and requirements. Moreover, states would then be in the business of enforcing federal law, the local legislative process and public advocacy for/against a particular statue obviated since the state would be deferring to federal law, and significant constitutional due process implications created.

Ratifying the proposed Department of Justice (DOJ) rule is unthinkable, unconstitutional, and nonsensical. The DOJ should be investigating how to reverse this failed social experiment, not doubling down on it! We have 25-years of empirical evidence proved out in study after study that the sex offender registry does not work. Taxpayer resources should be diverted into prevention and restorative justice programs, not into an already failed program. There is no empirical evidence that registries workone. 95% of all new sexual offenses are committed by people not on the registrythe registry does not work. 95% of sexual crimes are by family, friends, acquaintancesstranger danger is a myth. Recidivism for new sexual offenses is between 1% - 5.5%recidivism is dangerously high and frightening is a myth.

Comment ID

AR-00000936

Regulations.gov

DOJ-OAG-2020-0003-0280

 **Tracking Number**

1k4-9iyc-mm0o

**Comment Details**        **Submitter Info**

**Received Date**

Sep 14, 2020



About    Bulk Data Download     Agencies    Learn

(/about)       (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |

Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00000937

An official website of the United States Government.

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)     Share ▾

---

Comment

My name is Lawrence Dubin. I am a Professor of Law Emeritus, University of Detroit Mercy School of Law.
Personal Identify Information is listed in this first paragraph.
These regulations are both harmful and without benefit of public welfare when applied to people with
developmental disabilities, e.g., autism spectrum disorders, etc.
People with developmental disabilities are sexual people who are frequently charged with sex related
crimes that often do not any real physical sexual contact on a victim. These cases can and frequently are
related to illegal images on a computer. The autistic person ends up with serious federal charges without
ever any intent to harm a child, but simply learning about sex about the neurological aspects of autism
make it difficult to learn about sex in the traditional way of social and sexual relationships. You are harming
these people who have neurological impairments from birth with holding them out as sexual predators when
nothing could further from the truth.

I have researched the area of the laws on sex registries and people with developmental disabilities in my
book - Caught in the Web of the Criminal Justice System published by Jessica Kingsley Publishers.

People with developmental disabilities need a procedure for getting off the Registry if they can show that
their criminal act with related to their disability and they pose no danger to the public. It is inhumane to not
have such a rule.

I would like to address with more comments the commission.

Please feel free to contact me: Prof. Larry Dubin. Phone: 248 6721299.
email: ladonlaw@aol.com

---

**Comment ID**

AR-00000938

Regulations.gov



DOJ-OAG-2020-0003-0281

**Tracking Number**

1k4-9ivq-fqua

**Comment Details**                                    **Submitter Info**

**Received Date**

Sep 10, 2020



About         Bulk Data Download       Agencies      Learn

(/about)        (/bulkdownload)      (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 14, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)

Share ▾

---

Comment

The sex offender registry does not protect the public and does not prove anyone is dangerous. Over 40% of people on the registry for life are under the age of 17 or where juveniles when they were charged and sentenced. Kids who are playing doctor, teens having consensual sex, a boy urinating behind a trash bin, a teen sending a suggestive text, or a mom who sends a photo of her kids in the tub, and worse an innocent man on an adult site looking for a causal or real relationship. It is evil to punish these people this way for life. Urinating is an act of nature, not a sex act. Little boys exploring their bodies is normal, and should not be a punishable crime. Two teen falling in love is hormonal not a sex offense. And a grown man on an Adult site who is approached by cops, seduced and sent adult photos should not be considered a sex offender. If these men wanted a minor for sex, they would go to a teen site and find them. If cops sent them a photo of a minor, and the man stayed in the conversation that may be something. But only if a man is on a teen site, seeing a photo of a minor and still engages, should he be accused of a sex crime. States are abusing the laws and setting up people to register to get money from the federal government. Florida is an example. They have 22,000 actually people leaving in Florida on their registry. The other 60,000 are people who passed through on vacation, or were deported, or moved to other states, or died. Yet they are NEVER removed from the registry.

Over 200,000 individuals are on sex offender registries for offenses committed when they were children. Registration can be life-long and can be imposed without any inquiry into the child's individual circumstances or progress in treatment. Some states require community notification in addition to registration and reporting requirements. Many young people face registration as a consequence of developmentally normal behavior, including playing doctor, streaking, sexting, and consensual teen romances.

While some youth commit serious sexual harm and should be held accountable for this conduct, they also need support and effective interventions to change their behavior; the vast majority of youth who act out sexually do not recidivate. A meta-analysis reviewing 107 studies found that across behavior type, over 97% of children charged with sexual offenses never harm sexually again. Moreover, after almost 30 years of placing children on registries, empirical research concludes that the practice does not prevent or reduce

AR-00000940

sexual violence. Rather, placing young people on registries fuels cycles of homelessness, incarceration, and trauma, for both the registrant and survivors.

Although some states have improved youth registration requirements through legislation, the consequence of registration for any period of time is severe. Leading researchers that have studied the impact of registration on young people have empirical data demonstrating the harm caused by registration. Legislative advocacy is needed – in coordination with litigation – to eradicate youth registration. This statutory review demonstrates that regional differences and nuances of state youth registration laws preclude a "one size fits all" approach to reform.

Strategies and research must be based on best practices for both incremental reform and efforts to completely abolish youth registration nationwide. In addition, a federal legislative strategy will be a necessary and fundamental component of these efforts, as many states continue to be constrained by stringent requirements imposed by the Adam Walsh Act. Moreover, states continue to look toward the federal government and changing federal youth registration law would be one way to inspire and lead states to do the same. Most states that require juvenile registration do so without regard to either changing United States Supreme Court caselaw or the emergent research on its effectiveness at promoting public safety or the harm it causes children.

Against this backdrop, the time is now to set a targeted policy reform agenda to roll back these harsh registration laws.

https://jlc.org/sites/default/files/attachments/2020-08/Labeled%20for%20Life%20August%202020.pdf

---

Attachments  ( 17 )

---

📄  State Juvenile Sex Offense Laws Are Wide

⬇ Download ▾

---

📄  *The Precipice*

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0282/attachment_2.pdf)

---

📄  A TV reporter gets results tackling stories not

⬇ Download ▾

---

AR-00000941

Regulations.gov

Abolish the registry

⬇ Download ▾

Am I guilty

⬇ Download ▾

Children of Parents on Sex Offender Registry Are Collateral Damage of Registry

⬇ Download ▾

African Americans disproportionately represented on sex offender registries

⬇ Download ▾

Demolish the registry

⬇ Download ▾

Double Jeapordy The Sex Offender Registry

⬇ Download ▾

You may be a sex offender if-

⬇ Download ▾

Florida Scandal

⬇ Download ▾

AR-00000942

Regulations.gov

📄  Investigation reveals questionable tactics during FL

┌─────────────────────────────────────────────────────────┐
│                    ⬇ Download ▾                          │
└─────────────────────────────────────────────────────────┘

📄  How Florida Police Falsely Arrest

┌─────────────────────────────────────────────────────────┐
│                    ⬇ Download ▾                          │
└─────────────────────────────────────────────────────────┘

📄  Florida becomes the harshest state for sex offenders

┌─────────────────────────────────────────────────────────┐
│                    ⬇ Download ▾                          │
└─────────────────────────────────────────────────────────┘

📄  WOMEN AGAINST REGISTRY

┌─────────────────────────────────────────────────────────┐
│                    ⬇ Download ▾                          │
└─────────────────────────────────────────────────────────┘

📄  WHY SEX OFFENDER REGISTRIES KEEP GROWING EVEN AS SEXUAL
    VIOLENCE RATES FALL

┌─────────────────────────────────────────────────────────┐
│                    ⬇ Download ▾                          │
└─────────────────────────────────────────────────────────┘

📄  When Kids are Accused

┌─────────────────────────────────────────────────────────┐
│   ⬇  Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0282/attachment_19.pdf) │
└─────────────────────────────────────────────────────────┘

**Comment ID**

DOJ-OAG-2020-0003-0282

⊙  **Tracking Number**

kec-38zz-cgnz

**Comment Details**                                    **Submitter Info**

AR-00000943

**Received Date**

Aug 26, 2020



About    Bulk Data Download      Agencies    Learn

(/about)      (/bulkdownload)    (/agencies)    (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

## State Juvenile Sex Offense Laws Are Wide-ranging, Harmful, Report Says

**By** Gabe Stern | **August 14, 2020**

Youth in Minnesota who commit sexual offenses can be held on a registry for, at a minimum, 10 years. In nearby North Dakota, the minimum is 15 years. In South Dakota it's five years.

What qualifies a young person for a sex offense registry varies in those states too, according to a report released today. In Minnesota "all sexual offenses" mean mandatory registration. In North Dakota it's mandatory for felony sexual offenses and discretionary for juvenile misdeameanor sex offenses. In South Dakota sentencing is "generally" mandatory, but with some exceptions.

Across the country, a complicated set of state laws that place youth on sex offender registries creates disparities and confusion over how youth are treated, according to the Juvenile Law Center report. Some youth are placed on the registries for felony sex offenses; others for playing doctor or "sexting." Eight states don't place youth on sex offender registries. Six states require youth to remain on registries for life.

As criminal and juvenile justice reform is discussed across the country, the center is urging the passage of proposals that would reform juvenile sex offender registration laws. For years, it has pushed to eradicate placing youth on sex offender registries entirely, calling for rehabilitative programs rather than sentencing structures that mirror adult punishments.

Now, because "regional differences and nuances of state youth registration laws preclude a 'one size fits all' approach to reform," the center recommends both legislative advocacy and litigation.

There are currently 200,000 people labeled as sex offenders for crimes they committed at a young age, according to the report. While on the registry, youths are four times more likely to report a recent suicide attempt than those nonregistered who commit sexual harm or illegal acts. Just over 50% reported harassment and physical violence as a result of being on the registry; 44% experienced homelessness as a result of housing restrictions that come with placement on the registry.

And the center said the registry does not increase public safety: 3% of children charged with sexual offenses are repeat offenders.

Instead, placing young people on sex offense registries "fuels cycles of homelessness, incarceration, and trauma, for both the registrant and survivors," the report says, particularly among youth of color and LGBTQ+ youth.

### Fees, compliance, records

Several rounds of research by the center found that the cost of being on the registry, the consequences that come with it and the punishment for noncompliant youth also vary greatly by state.

In Rhode Island, registered youth cannot live closer than a certain number of feet from schools. In Missouri, youth can't participate in Halloween festivities.

Discrepancies also lie in how records are sealed, how much it costs for registration and what happens to youth who cannot pay the necessary fees to stay on the list. Twenty-eight of the 42 states require public notification — through police stations or public websites — of registered youth,

"There's so much nuance in the way the states interpret their registration laws and I think that it's very challenging," said Riya Saha Shah, managing director of the center and co-author of the report. "If a person moves from one state to another, they must understand what the registration law requires of them in their new state."

**Federal requirements**

In 2014 the Pennsylvania Supreme Court deemed mandatory lifetime registration unconstitutional for youth after the center challenged the state.

Eighteen other states abide by that same provision, called the Sex Offender Registration and Notification Act (SORNA), which groups young people who commit sex offenses with adults who commit similar offenses. Eighteen states directly adhere to SORNA, and will lose 10% of a federal grant if they do not follow the protocol.

When people with records of juvenile registration move to states with SORNA requirements, they're required to register upon arrival. This applies even if the offense would not put them on a sex offense registry in the state they're moving to.

The "vast majority" of states abide by SORNA requirements even if federal funding is not at stake, the report says.

"Federal and state sex offender registration laws often equate juvenile and adult behavior," the report says. "But there is no demonstrated, empirical relationship between youth sex crimes and adult sex crimes."

AR-00000946

1/13/2020                                        The Precipice



>Users:  login  |  register     > email    > people

CorrectSource **(Marketplace)**  |  Resources  |  News  |  Topics  |  Careers  |  Forums  |  Events  |  **January 12, 2020**

---

Article Tools

Print This Page  |  Comments(27)  |  Suggest a Story

## The Precipice

*By Shelly Stow*
*Published: 10/29/2012*



We either live in a civilized nation or we don't. Our legal and judicial system, based on the time-honored premise that one is innocent until proven guilty in a court of law as drawn from the 5th amendment, either means something or it doesn't. Either our laws are in place to protect the guilty as well as the innocent or they aren't. Our laws and our Constitution either stand for all, or they stand for none.

Once before our country stood balanced on the precipice of injustice becoming the norm, at a time when, in a large portion of the nation, people of color were accorded few if any civil or human rights and were regarded as being, literally, worth less than one of Caucasian ancestry. We managed to draw back from that precipice, but today we stand at yet another, and this one may succeed in destroying us where the other did not.

We have created another monster to fear, another whose life is worth less than any other not in the same classification--the "sex offender." I put it in quotes not to make light of those sexual crimes that cause harm to others but to show that it has become a clearly defined, easily identifiable sub-category of Americans. A "sex offender" is anyone on a sex offender registry for any reason, for crimes great and small, and ranging in age from nine to ninety. Violations of civil and human rights visited upon a sex offender are somehow okay. One would not wear that label were he not deserving of the vilest treatment.

Therefore, when, in Washington state, a hate-crazed vigilante with a gun shot and murdered a man who was on the sex offender registry for consensual teenage sex fifteen years ago, a man who was now a husband and breadwinner and father of two little boys, the "fans" of the killer called him a "hero" on blogs and comment boards and said he should be released from custody so he could continue doing "God's work."

And now that Patrick Drum has received a sentence of life without parole for that murder in Washington, once again the comments on articles are praising his action and defending his murder spree as justified because of who he chose to murder, a "sex offender." One commenter called for his release and an apology from the government.

And, in South Carolina, a man who may or may not have raped a teenager was shot down in the street, and the comment boards overflowed with praise for whoever murdered him. Those making the comments became judge, jury, and executioner, for they pronounced him guilty, passed sentence, and in every way but taking hand to gun, put him to death without a second's hesitation.

Men have murdered entire families, sometimes their own, and been given a fair trial. Men have murdered heads of state and been accorded their rights under the law. Men have committed the most atrocious of war crimes, annihilating thousands upon thousands, and have been treated with basic decency as they faced their accusers in court.

But none of those men were "sex offenders." None of those men lived in twenty-first century America bearing a label that marks them as one who is to be accorded no rights, no decency, no fairness, one who has no right to claim the most basic of all rights, that of innocence until guilt is proven.

The precipice gapes and widens, and its message is this: if our laws do not protect those judged to be the least deserving among us, then they do not protect any of us.

*Shelly Stow is a member of Reform Sex Offender Laws [RSOL] and Texas Voices, the Texas affiliate of National RSOL.*

Other articles by Stow

## MARKETPLACE   search vendors | advanced search

>> search products   go

CorrectSource
Corrections Procurement Directory

### IN CASE YOU MISSED IT

12/09/2019
**Aggressive Cops Or Politicians - Who Is Responsible For Strained Community Relations?**

12/09/2019
**The 21 Years of My Life I Wish I Could Change — Part 2**

12/09/2019
**Down Time: What We Do When We Are Not Doing Corrections**

12/09/2019
**California Prison Reform, Regressing Rehabilitation - Part 1**

AR-00000947

## Comments:

**faizan** on 12/27/2019:
I invite you to the page where see how much we have in common. Wholesale Fashion Rings

---

**faizan** on 12/26/2019:
Amazing, this is great as you want to learn more, I invite to This is my page. แทงบอลสด

---

**tonnyken** on 12/25/2019:
Your feedback helps me a lot, A very meaningful event, I hope everything will go well [URL=https://basketball-legends.online]basketball legends[/URL]

---

**faizan** on 12/24/2019:
Really nice and interesting post. I was looking for this kind of information and enjoyed reading this one. Keep posting. Thanks for sharing. 구글정보이용료

---

**faizan** on 12/24/2019:
I prefer merely excellent resources - you will see these people in: 우리카지노

---

**faizan** on 12/22/2019:
On that website page, you'll see your description, why not read through this. ดูหนังฟรายออนไลน์ hd

---

**faizan** on 12/22/2019:
This is very interesting, but it is necessary to click on this link: 먹튀검증

---

**faizan** on 12/22/2019:
wow this saintly however ,I love your enter plus nice pics might be part personss negative love being defrent mind total poeple , ดูหนังออนไลน์ใหม่ล่าสุด

---

**faizan** on 12/21/2019:
Profit primarily prime quality items -- you can understand them all within: ดูหนังออนไลน์ใหม่ล่าสุด

---

**faizan** on 12/18/2019:
I like to recommend exclusively fine plus efficient information and facts, hence notice it: 안전놀이터

---

**Torsten** on 09/26/2019:
This is such a terrific source that you are giving and you give it away totally free. I like seeing sites that comprehend the worth of giving a top-quality source for free. It is the old what walks around comes around regimen. smore builderall features

---

**Torsten** on 09/20/2019:
I truly thanks for the beneficial details on this wonderful subject and also expect more excellent articles. Thanks a whole lot for enjoying this charming post with me. I am appreciating it significantly! Looking forward to one more excellent post. television antennas reviews

---

**Torsten** on 09/19/2019:
I have perused a few of your messages. I acquired one in all the major supportive information for my examination study. a few a debt of gratefulness is for submitting, maybe we will see substantially extra on this. Does region devise your alarm system to various websites regarding this matter? Hvac electrical services

---

**Torsten** on 09/19/2019:
Villas for rent in Cyprus (Ayia Napa and Protaras) have just been inspected by our professional team at http://www.rentvillacyprus.net and are expecting you and your family to join in the fun! 360 days a year of Cyprus sunshine!!

---

**Alyson Dawson** on 09/13/2019:
That's so nice blog. It's very great fireboy and watergirl

---

**Fred Davis** on 05/13/2019:
Registries can be a slippery slope when one group is singled out homogeneously and who have finished their sentence and this is used to incrementally move toward another politically incorrect group. Gun owners squirmed when their second amendment rights may have been applied to a registry for them.This is a slippery slope indeed. One can stack the Supreme Court with progressives that implement new law with no problem or conscience. Creating a tax to force health law is making law. We have progressives on both sides of the aisle today. A kid is a pre pubescent goat and those young adults should not be applied synonymously with animals to bastardize English to promote egalitarian socialist agendas. It was Lenin who was an advocate of egalitarianism in Russia and no fault divorce and we all know how those precepts turned out with the Bolsheviks and they addressed the first women's congress. This exacerbated the murder of born children as in Pennsylvania here today. Reagan signed no fault divorce and look at the family today. No fault divorce and the elimination of illegitimate children was the beginning of multitudes dying and the eventual decay of the Soviet Union. There is no reason that crime cannot be just and fair at the sentencing level with a jury trial. All men are "created" equal. After that the choices we make determine our blowback or reaping.Common Law and common sense should have priority of position over trial lawyers and activist Courts,

---

**Squeeze** on 05/12/2013:
wiseman While Shelly highlighted some shortcomings in the CJ system, I believe there are some efforts to correct the system. First let us separate the predatory sex offenders from the non-predatory offenders. these are best identified by the mental health proffessionals. While there have been some retribution by general populations against registrants these have been

AR-00000948

relatively a small number of incidents. However that in and of itself does not justify the elimination of the registry. Some states have decided to let the Mental Health community make

those decisions whether a sex offender is no longer a danger to society. Minnisota is a good illustration of that. I personally had 2 serial sex offenders(pedophiles) escape from a mental health facility in Minnisota where they were being held indefinitly after their criminal commitments had been satisfied. They were captured in my city. There were incarcerated in my jail and after completing my background research I discovered they had been multiple noffenders in several states and a province of Canada. They were predatory and no amount of treatment was going to change that. A registry would not have helped locate them as they travelled from place to place. However they never should have been released back ointo society in the first place. Instruments developed over the years would have identified them as predatory, their history of actions like gaining an education to teach school after offending the first time) would have been a big flag that they were planning to gain easy access to children. They were eventually returned to Minnisota but only after my and others efforts to get them back to confinement under MH laws.As a recovering victim of a serial molester when I was a kid in the 60's and 31 years in Law enforcement/Corrections I am saying the registry serves a good purpose but it is not perfect. We must be diligent to protect those who need protecting to the unfortunate eroding of some peoples liberties. Every right we enjoy in our society unfortunately has some downside to it.

----------------------------------------------------------------------

**Fred Davis** on 11/06/2012:
When one leaves God, one views things through the jaundiced perspective of judgment (resentment) rather than discernment. This is what happens when one seeks to be God rather than depending on Him. The only problem with the jaundiced view is that He says that man weighs the action but God discerns the heart. Who can know the heart of man? Where was the vigilante when God created the heavens and the earth? God calls those that judge according to law without mercy and grace whitened sepulchers. The problem with taking law into one's own hands through activist courts and trial lawyers or vigilantism is that the same unjust judge that will yield to the pressures of the people against due process will be the same judge that will be in the same seat when the vigilante's child needs justice. There is something about sowing and reaping. Paying it forward in a wrong way can bring the precipice in view faster. This is a great article! Resenting through judgment the mistakes of others sets one up for judgment from natural law in the future. The former offenders need to be careful of falling into the trap of resenting the vigilantes, lest they take on some of that spirit. Resentment is a two-edged sword, and so is injustice. First they made the black father in the family unit less than a person by law. Then they took away the personhood from young adults and robbed these young adults of their rights using the juvenile justice system to remove their fifth and sixth amendment rights. This happened with good intentions but the road to hell can start there when man out of order or out of priority of position thinks he can fix things that he messed up on his own. This article was so on target as were most of the responses! One must remember that resentment clouds the judgment that should come through unemotional discernment. The resentful heart of the one who judges is revealed. One does not have to do much to watch nations go down when no due process is given for even one group. All one has to do is wait. Then the next generation of children will reap the bitterness and vengeance because of those that hated justice.

----------------------------------------------------------------------

**yellowroselady** on 11/01/2012:
This discussion is very much needed. The issue of sexual abuse has gone on longer than any of us have been alive. And, if many will be honest there is a dirty old uncle or grandpa who has gotten away with some type of sexual offense for years. Why you ask? Just as studies have indicated 95% of these cases happen within the family environment and will never be reported. So, where does that leave us? I think more education and less legislation would be a good place to start. Children and teens need to be empowered as to their safety and ways to self protect. I am in no way saying children are totally responsible for their well-being but, then again parents can't be everywhere with their child. Had you rather be proactive with those 95% of "attempted" offenses or remain reactive after the damage is done? On another note the NCMEC says that "ALL Children Deserve to be Safe" and our organization, Women Against Registry seeks to bring awareness to the collateral damaged experienced by families of registrants who have paid their debt and should be allowed to live their lives. My son was abused by his biological father beginning at the age of 6 and that was not uncovered till he was 22 years old so I have some knowledge about it happening to someone close. I will say that folks can decide to remain a victim or work to get their life back (Oprah Winfrey, Tyler Perry,and numerous others). There are over 760,000 men, women and children registrants across the states and the offenses range from urinating in public all the way to rape. Multiply that number by 2 or 3 family members of the registrant and there are well over 2,500,00 folks struggling to help someone re-integrate. A registry does not protect kids! Vicki Henry Women Against Registry dot com

----------------------------------------------------------------------

**breakingchains** on 10/31/2012:
I think that Ms. Stowe did a fantastic job on the article above. It needs to be brought out that not all SO's are child molesters. I really feel sorry for FRHR, they really need to seek help from a therapist because people like that, hope all SO's are done away with, with out even knowing what they have done is really sad and scary. I feel bad about what happened to FRHR's daughter but that just proves what has been said before, that most molestation accures from inside your own home, NOT From people on the registry. I will say a prayer for GOD to touch your heart and give you some forgiveness and peace. Also for your daughter to find peace in her life from what has been done to her.

----------------------------------------------------------------------

**FRHR** on 10/31/2012:
Don't point fingers at me and call me stupid and mean. My daughter was molested when she was a little girl by my very own brother. She didn't tell me about it until he had been dead for several years. She suffers from depression and other problems. As far as I'm concerned, he took away the good part of her life, and she will never be a happy, normal person. What kind of sick f*** does something like that to a kid, especially his own niece? If I had known about it while it was happening, I can't say I wouldn't have killed him myself even though he was my brother. The laws that punish people like that can't be too harsh. So don't call me names and tell me how bad it is for the poor sex offender. It should be worse.

----------------------------------------------------------------------

**Edie Billings** on 10/31/2012:
Kudos to Ms. Stowe for exposing an ill conceived system that has gone awry. If people like FRHR would look into the "registry" and see who is on there,what they're on for and become aware of the collateral damage this registry causes, maybe he would tone down his harsh

aware of the collateral damage this registry causes, maybe he would tone down his harsh rhetoric.This is beside the fact that 97% of sex crimes are committed by those not on the registry. We need more people like Ms. Stowe, Texas Voices, and others who can educate the public about this injustice. Many thanks for your article.

------------------------------------------------------------------------

**Ngu** on 10/30/2012:
FRHR, it really saddens me to hear you feel that way. I myself have been a rso for 21 years now, since I was 17. Due to a consensual encounter I had with someone I thought was 16. Turns out she lied and was 14. But I'm not some sick person who likes molesting kids, nor was I then. I will say a prayer for you FRHR that one day you will be able to look at all sides of a situation and not be so closed off with hatred! You have a Blessed day!

------------------------------------------------------------------------

**Wisdom of Solomon** on 10/30/2012:
First, I would like to commend Ms. Stow for bring to us this very insightful article. To me it shows that there are people in this world still capable of putting forth sound reasoning and judgement. Her article points out very clearly the dangers we as Americans face when injustice is allowed to prosper and flurish. Sex offender (SO) laws are an abomination, we all know that. Even proponents of SO laws cannot muster a reasoned or principled argument for these laws existence. Emotionally charged catch phrases like "protecting children" are their main weapons to justify SO laws. But a reasonable mind would know that being able to look someone up on a registry (internet) cannot and will not protect anyone--how can it? THINK! In addition, neither will keeping someone 1000 feet from a school or other place where childern gather stop a true and determined individual from abducting a child--how can it? THINK! No, neither of these so called safety measures can or will work. Therefore, SO laws are ENABLING laws. They ENABLE society to discriminate, disenfranchise, brand, scoff, deny, and yes even MURDER, as Ms. Stow points out above, those subject to SO laws. Indeed, SO laws protect no one. On another note, I am particularly ashamed of federal judges who have, out of political necessity, upheld these laws time and time again. These judge know for certain SO laws are unconstitutional but insist on keeping them in place to appease proponents of SO laws. Finally, as to the comments made by FRHR above, I feel very sorry for this individual. He/she has not the capacity for deep intellectual thought but is influenced by the HERD mentality. Therefore, anything that comes forth from the mouth of this person should be overlooked. Thank you.

------------------------------------------------------------------------

**FRHR** on 10/30/2012:
What do I think? I think this is pretty much bleeding-heart liberal crapola designed to make us feel sorry for sick people who molest kids. Why should anyone get bent out of shape if a few of those sickos get offed? Where are the tears and concern for the victims? Until this country gets its priorities straight, we will just keep on destroying innocent kids and coddling those who destroy them.

------------------------------------------------------------------------

**Mary Palmer** on 10/30/2012:
Very well written! The "sex offender" hysteria is certainly the new witch hunt. Unfortunately, the general public just doesn't get it until their loved one is added to the naming and shaming list.

------------------------------------------------------------------------

**rwsmom** on 10/29/2012:
Thank you Ms. Stowe for bringing this situation to light. You are so correct about the stigma that those convicted of sex crimes face. The laws are too vague and do need to be reformed. I applaud you for taking a stand and speaking out about the wrongs of our judicial system and legislation.

------------------------------------------------------------------------

### Login to let us know what you think

User Name: _____

Password: _____

Remember me: ☑

Log in    Forgot password?

advertise . | . privacy policy . | . add URL . | . about us . | . terms/disclaimer . | . contact us . | . join our team . | . help

Use of this web site constitutes acceptance of The Corrections Connection User Agreement
The Corrections Connection © Copyright 1996 - 2020 © . All Rights Reserved | 15 Mill Wharf Plaza Scituate Mass. 02066 (617) 471 4445 Fax: (617) 608 9015

AR-00000950

# A TV reporter gets results tackling stories not always made for TV

### WTSP's Noah Pransky sticks with the story

MIAMI, FL — "Being a creep isn't illegal."

That's one of investigative reporter Noah Pransky's takeaways from his recent work for Gannett-owned WTSP in Tampa. For several months, Pransky has been reporting on shady "To Catch A Predator"-style stings by local cops and the men looking to meet adult women online who got caught up the stings. These men are not sympathetic victims. It's easy to discount their concerns when they feel like they were unfairly or illegally targeted. Some of these men engaged in very graphic conversations online.

Pranksy's work, which I wrote about in August, is getting results. WTSP aired a story last week pointing out that the stings have been curtailed in the Tampa Bay area in recent months, since Pransky first started reporting on them. The arrest numbers are down and the men who have been arrested no longer include young men—18- and 19-year-olds. Wrote Pransky on the station's website:

*A sting conducted by the Pinellas County Sheriff's Office and Clearwater Police Department last weekend netted just 11 arrests, down significantly from the 30-40 arrests most Central Florida stings were netting in recent years. Local attorneys tell 10 News the drop is likely the result of increased attention on the officers' behavior, prompting them to stop boosting arrest totals by bending the rules.*

He also got significant traction from his August story about how the multi-agency sting operations included military police, in an apparent violation of a federal law going back to Reconstruction. Though local police may not have known it, the law has been clear for nearly 150 years: military personnel cannot be used to investigate local crimes. It's actually a pretty central tenet to our civilian-run democracy.

Pinellas County Sheriff Bob Gaultieri recently told Pransky, "We did not have that person from the Air Force participate (in the latest sting), and we won't in any future operations because that's not something that we should have done."

Pransky is a dogged investigative reporter who tackles stories that others overlook. He won a George Polk award this year for his investigation into red light cameras. He found that the state had quietly reduced the time a traffic light had to stay yellow, adding millions in fines that the cameras generated, while potentially making intersections less safe.
And he's taken this issue of the sex stings and run with it.

In addition to the broadcast story he did about how officials seem to be arresting fewer people in the stings, and focusing more tightly on older adults, he wrote a web-only piece last week about how local agencies are dodging his public records requests. The agencies denied his first requests for the conversations between undercover officers and the men they were targeting, arguing a legitimate exemption to the Florida public records law that allows police agencies to protect their investigative files. So Pransky asked for the cases that were no longer under investigation, the conversations with men who refused to go along with the undercover officer once they realized they were talking about sex with a child.

The agencies' response to Pransky's request for records of those conversations, that the records had been destroyed, shows the agencies were not complying with Florida law that requires records be archived, even after the cases are no longer under investigation. This is an important requirement in

Florida. If it weren't in place, agencies could investigate—and harass—anyone they believed might be a law-breaker and then destroy those files once they determined the person had not broken a law.

Public records stories are often difficult for TV. They don't make good video. They make even worse video when the story is about how officials aren't turning over records.

"This is more of a web series than broadcast," Pransky told me, referring to the public records requests he's been filing. "I did both stories at the same time, but only one made air. We pitched the other as a web exclusive."

Good for WTSP for recognizing that stories that don't make good video have a place on the web, and for unleashing Pransky on what his editors had to have known was never going to be a good video story. As news outlets converge their print, web and video operations, this sort of cross-platform reporting is important. And it's not nearly as common from local television stations as it is from newspapers.

*Reflecting on his sex stings reporting, Pransky observed that "talking dirty to an adult" is not against the law. "There are a lot of things that don't pass the muster of social acceptability," he said, but aren't illegal. "In these cases, many times [the police] weren't drawing the line between criminal acts and free speech."*

AR-00000952

**Abolish the registry**
**Stop the Sex Stings**

At this time of reform, please do not forget the hundreds of thousands of people on the sex offense registry who committed a one-time offense, served time in prison, and are working hard to reintegrate back into society as law-abiding citizens despite the many draconian laws that go with the registry in this country. All current research is showing (including the U. S. Department of Justice) that when taken collectively, released inmates that committed a one-time-only sex offense are re-offending (committing another sex offense) at a rate in the single digits.

There is a minority on the registry that continue to re-offend who need to be constantly monitored if not incarcerated, but the vast majority deserve a second chance. Unfortunately, the news media only show the small percentage that do re-offend. They are the ones that bring in the higher ratings. You never see a story on the many success stories out there.

In addition, approximately 90% of future sex crimes will be by people NOT on the registry, and over 90% of victims know their perpetrator. The myth of the stranger danger has been debunked by all the research out there now. The registry is continued punishment for hundreds of thousands of people in this country who are not committing sex offenses.

AR-00000953

Am I guilty?

Please help me make a decision. I'm facing many years in prison for a crime I did not commit and I don't know what to do.

I showed up at a hotel to meet a woman I met online on an adult website. As I stood in the hallway outside her hotel door, I had an "aha moment." I decided to leave. I never saw that woman. I never went inside her room. I never touched her. I never made physical contact with her.

I am not perfect by any means. I should have never solicited an adult woman online for money.

Once I got back into my car to leave, I was swarmed by police. I was arrested. I lost my job. I had my mug shot plastered all over by the mainstream media. I was charged with a serious felony crime but not the crime I committed.

You see, I had been on a website titled, "adultlook.com." People negotiate money for sex on that website. I clicked on an ad supposedly placed by an adult woman. The website said, "must be an adult..." There were several photos of a female posted with the ad. Those photos looked to be a true representation of an adult woman.

I messaged her. She requested a specific amount of money, and I agreed to meet her at her hotel room. When I was on my way, I got a text that read, "I'm almost 16." I replied, "You're only 16?" I never received an answer to that question.

I continued toward the hotel. I thought, how can someone who is not yet 16 rent a room? Don't you have to be 21 or at least 18? Why is she lying? I thought further... I know, when I knock on her door, she'll answer, and I'll have her show me her driver's license. The photos of her online didn't look anything like a young girl to me. The site I met her on was "for adults only." All of these thoughts were racing through my head as I continued to drive.

So, I concluded, I'd just ask her for I.D. But, as you know, I never set foot in her room; never followed through, I left before she ever opened the door.

The entire time I had been communicating with this woman, I was actually talking to an older male police officer. He could have arrested me for misdemeanor solicitation. I'm guilty of that. Instead, he threw out the under-age comment and coerced - entrapped - me into a crime that the law considers to be a serious, indefensible felony. I was being coerced into committing a crime that I did not intend on committing. The idea was not born in MY mind, it was born in the mind of the police officer!

I knocked and dashed, and I left the hotel without making contact. I never touched this person. In fact, I never even talked to a person who, "was almost 16." At all times, I was actually messaging an adult, male police officer who I thought was an adult woman!

How is this anything other than entrapment, especially when I never intended or sought to be with an underage girl?

I have no criminal history. No arrests. No convictions.
I'm a successful, young, legally-immigrated, black medical doctor. The officer who I talked to online is a bald white man. I'm not sure if that makes a difference or not, but with all of the recent chaos, I have to wonder? I am in Minnesota after all...

The judge won't even allow me to tell the jury that I believe I was entrapped. How is that fair? I had no intention of being with anyone other than a consenting adult female. And even then, I didn't step foot into her room.

The government conducted a "forensic examination" of my cell phone. They found **nothing** about sex with minors. Nothing at all – because **I have never sought sexual relations with a minor**. Furthermore, I passed a psycho-sexual exam that shows I never believed the person I was talking to was a minor. I also passed the portion of the exam that proves I'm not sexually attracted to minors.

Should I be a registered sex-offender for the rest of my life and spend several years in prison?

I could accept a criminal charge for seeking sex with an adult in exchange for money (solicitation), because that's what I did. But I'm NOT a pedophile and I can't tolerate being labeled as such. **I did not seek prostitution with a minor as I am charged with.** Why would the police go to such great lengths to make me look like I did something I did not do?

**A person's life shouldn't be ruined because some police officer briefly says he is an underage girl when he had been pretending to be an adult all along, especially if the "mark" doesn't make contact.**

I plan on exposing the corruption in the system as much as I can, and fighting for my innocence by telling the truth during my trial, even if the judge says that I shouldn't. At least then I will know the jury will have heard the facts and not just what the police and prosecutor's want them to hear. I think this is my only hope. But I really want to hear from you.
I believe I am innocent of the crime I have been charged with.

What do you think?



# Children of Parents on Sex Offender Registry Are Collateral Damage of Registry

Jul 2, 2020 |

There is no doubt that people find out about people who are on the sex registry. And that will include friends and acquaintances of their children. It is also true that many registered sex offenders have families and are not threats to society. Hence, the damage to their children is real, because they are ostracized and condemned or shunned because of their parent.

This is a very difficult issue. There are, of course, true human menaces, and the point of the sex offender registry is to protect children and others from potential danger. And yet, at the same time, the registry causes danger, or at least humiliation, to the registrant's children and family and often to the registrant him or herself.

It is curious too. People who are arguably equally or more dangerous, like paroled murderers, home invaders, kidnappers, violent felons, burglars, manslaughterers, robbers, drug dealers, drunk drivers who ran over and killed someone, are on no registry and could live next door to you without your knowing.

All current research (including the U. S. Department of Justice) shows that when taken collectively, those people who have committed a sex crime, been caught, and served time in prison, have a re-offense rate of committing a new sex crime in the single digits. That means over 90% never re-offend (commit a new sex crime). There are hundreds of thousands of registrants in this country who have a one-time-only sex offense and are working hard to reintegrate back into society as law-abiding citizens, inspite of the registry's draconian statutes and ordinances that are stumbling blocks for them. Society is far better off if people are successful in this reintegration process. Treating any type of released inmate as a leper by making housing almost impossible, not giving them a decent paying job, and withholding community/family support is a recipe for failure, forcing some into a life of crime. This is NOT what we want.

Research shows the following: single-digit recidivism rate for a new sex crime, approximately 90% of FUTURE sex crimes will be by people NOT on the registry, and over 90% of victims KNOW their perpetrator. Research has debunked the myths that have been out there for years. People who make their decisions based on evidence-based facts know all of this. Unfortunately, the media only shows the re-offenders as they bring in higher ratings. You never see the hundreds of thousands of registrants who are leading law-abiding lives.

The registry started out in 1992 with around 30 sex offenses. Now it is over 100. Patty Wetterling, who helped jumpstart Congress into starting the registry, has said that the registry has been hijacked. She only intended it to be for people like the man who kidnapped, raped, and killed her son. Very few people on the registry today include people like that man. Some are on the registry today for "mooning" friends in high school, public urination, having consensual sex with a 16-year-old girlfriend while they were 21, juveniles with autism, people with schizophrenia, grandfathers who developed dementia, a 10-year-old boy who pulled down

a girl's pants on the playground after being dared by his buddies to do so, and the list goes on and on. Very few registrants are the type of rapist that Ms. Wetterling and Congress were after in 1992.

And, yes, the collateral damage for the family (particularly the children) is often worse that the crime. I have had several people tell me that what happened to them for years after the crime was far worse than the actual crime itself. They all say if agencies had just come into the home and helped in the situation, they felt their family could have been saved. But with the barbaric statutes in place, the offender is often the bread winner, meaning that the family income dries up. This often forces the children into poverty or foster care. Many of the parents can be helped through restorative justice, thereby helping the children even more.

For those commentators who want to see all of this backed up, start following the Florida Action Committee along with any other group you can find that bases its recommendation on data-driven facts.

### African Americans disproportionately represented on sex offender registries

June 19, 2020
By Sandy . . .

At this time of public outrage and demands for meaningful criminal justice reform, one area in need of serious attention is the racial make-up of our states' sexual offense registries.

In 2018 a study was done that has been largely ignored. It shows conclusively that in every state in the union except one – Michigan – African American citizens are disproportionately represented on Megan's Law registries. The disparity ranges from 1.08 in Texas to 10.99 in Minnesota. Only five states fall between 1 and 1.4. Seventeen states are between 1.5 and 2; twenty-three are between 2 and 4. The outliers on the upper end are Connecticut at 4.32, Washington at 4.26, Oregon at 7.20, and the already mentioned 10.99 in Minnesota. Michigan is 0.82.

These numbers may not seem large, but what do they mean?  They mean that in Texas, African Americans are 1.08 times more likely to be included on the sex offense registry than their white counterparts, and in Minnesota they are 10.99 times more likely to become registered.

What does this mean in terms of actual people?
In Texas, the state with the least disparity, 78.8% of the population, according to the latest Census Bureau figures is white (this number includes Hispanic) with 12.8% being black. The remainder are Asian and other. The percentage of Texas citizens on the sex offense registry, however, shows 76.93% white and 22.59% black.

Looking at a state whose disparity rate falls somewhere in the middle, North Carolina, (1.81) the white population is 70.6%, and the black is 22.2%. The North Carolina Sexual Offense Registry reflects a make- up of 60.97% white and 36.96% black.

Minnesota's numbers are staggering. While the white population of that state is 84.1%, white Minnesotans make up only 54.74% of those on the registry. The black population of Minnesota comprises only 6.8%, yet 38.6% of the state's registry is black.

Recent events have brought to the forefront the need for law enforcement to guard carefully against such things as racial pro  ling and ill treatment of all, especially more frequently targeted people of color. However, this study indicates a deeper and more serious bias, one that reaches into our court system as well as our law enforcement entities. It appears that black males in America are not only at a greater risk for being harmed or killed when stopped by law enforcement; they are also at greater risk of being included on the sex offender list.

It is time for equal justice under the law to actually mean what it says.

https://narsol.org/2020/06/african-americans-disproportionately-represented-on-sex-offender-registries/?no_cache=1

# Guest View: Sex Offender Registry Does No Good, Harms Many and Must Be Abolished!

July 4, 2020

---

*In response to the Frank Report post, <u>Children of Parents on Sex Offender Registry Are Collateral Damage of Registry</u>, numerous people commented. Some were strongly in favor of keeping the sex registry in place to protect children and others.*
*Several others oppose it and want the sex offender registry eliminated and they have given their reasons.  Here are three commenters' views on why it should be abolished:*
**Sarah Fiebig**

All current research (including the U. S. Department of Justice) shows that when taken collectively, those people who have committed a sex crime, been caught, and served time in prison, have a re-offense rate of committing a new sex crime in the single digits.

That means over 90% never reoffend (commit a new sex crime).

There are hundreds of thousands of registrants in this country who have a one-time-only sex offense and are working hard to reintegrate back into society as law-abiding citizens, in spite of the registry's draconian statutes and ordinances that are stumbling blocks for them.

Society is far better off if people are successful in this reintegration process. Treating any type of released inmate as a leper by making housing almost impossible, not giving them a decent paying job, and withholding community/family support is a recipe for failure, forcing some into a life of crime.

This is NOT what we want.

Research shows the following: single-digit recidivism rate for a new sex crime, approximately 90% of FUTURE sex crimes will be by people NOT on the registry, and over 90% of victims KNOW their perpetrator.

Research has debunked the myths that have been out there for years. People who make their decisions based on evidence-based facts know all of this. Unfortunately, the media only shows the reoffenders as they bring in higher ratings. You never see the hundreds of thousands of registrants who are leading law-abiding lives.

The registry started out in 1992 with around 30 sex offenses. Now it is over 1,000,000.

AR-00000960

Patty Wetterling, who helped jumpstart Congress into starting the registry, has said
that the registry has been hijacked. She only intended it to be for people like the
man who kidnapped, raped, and killed her son.

Very few people on the registry today include people like that man. Some are on
the registry today for "mooning" friends in high school, public urination, having
consensual sex with a 16-year-old girlfriend while they were 21, juveniles with
autism, people with schizophrenia, grandfathers who developed dementia, a 10-
year-old boy who pulled down a girl's pants on the playground after being dared by
his buddies to do so, and the list goes on and on. Very few registrants are the type
of rapist that Ms. Wetterling and Congress were after in 1992.

And, yes, the collateral damage for the family (particularly the children) is often
worse that the crime.

I have had several people tell me that what happened to them for years after the
crime was far worse than the actual crime itself. They all say if agencies had just
come into the home and helped in the situation, they felt their family could have
been saved.

But with the barbaric statutes in place, the offender is often the breadwinner,
meaning that the family income dries up. This often forces the children into poverty
or foster care. Many of the parents can be helped through restorative justice,
thereby helping the children even more.

For those commentators who want to see all of this backed up, start following the
Florida Action Committee along with any other group you can find that bases its
recommendation on data-driven facts.

AR-00000961

## Response of NARSOL's Rozek quoted in the Frank Report

That means over 90% never reoffend (commit a new sex crime). . . .

**Sandy Rozek**
I also want to point out that, no matter the offense, the sex offender registry is ineffective at creating a safer society.

The registry has been in effect over two decades; many studies, both academic and governmental, have been done evaluating its effectiveness; it has failed miserably.

It does not predict who will commit new crimes as 95% of new sexual crime is committed by persons not on the registry.

It does not reduce re-offense; re-offense by those punished for an initial crime and then living in the community has held steady at, on average, 5% since long before the registry went into effect and is still at that percentage.

It does not reduce new offenses.

It does not protect children as virtually all sexual crime against children is committed by persons in their lives, their family members, peers, and authority figures, persons who are not on a registry.

Two of the most popular (with the public) restrictions it has produced, residency restrictions and Halloween restriction, have ZERO evidence, based on a plethora of studies, that they make an iota of difference or produce an iota of public safety.

If the registry fails to predict, fails to protect, fails to produce any increase in public safety, but instead goes against everything shown to increase public safety, interferes drastically in rehabilitation, and costs states many millions of dollars that could be spent instead on prevention programs that work and rehabilitation programs that work, WHY should the registry exist?

AR-00000963

**How can the sex offender registry not be double jeopardy?**

It is imposed on a person after they have been punished for committing a different crime.  That person is punished, and imprisoned for committing that crime.  Then a new law is imposed on that person requiring registration of the registry.  That person is punished and restricted for life for a crime they "may commit".  If they violate the registry law at all, they are charged with a felony and punished again with prison, usually a longer sentence than the one for the first crime. In this country we are not supposed to be restricted and punished BEFORE we ever commit a crime.  We are supposed to have the presumption of innocence. Forcing a person to register after they have already paid for their crime is double jeopardy.  No other crime requires a second law, a second punishment, usually for life put upon them AFTER the pay their debt to society.


## The Sex Offender Registry: Vengeful, unconstitutional and due for full repeal

**BY JESSE KELLEY, OPINION CONTRIBUTOR — 03/05/18 08:00 AM EST 389**
**THE VIEWS EXPRESSED BY CONTRIBUTORS ARE THEIR OWN AND NOT THE VIEW OF THE HILL**

The Bureau of Justice Statistics reports that at least 95 percent of all state prisoners will be released from prison at some point. However, convicted sex-offenders almost exclusively face the vengeful, additional punishment of registration under the Sex Offender Registry and Notification Act (SORNA).
Generally, under SORNA, an individual who is required to register as a sex offender must register at least once a year; report any change of address within as little as three days; produce vehicle information, a recent photograph and a DNA sample; and abide by stringent residency restrictions, which can force individuals out of urban areas, away from family and into unemployment.

SORNA violates our nation's founding documents by singling out a specific category of offenders for unfair, unconstitutional punishment. While the Department of Justice cites public safety as its rationale for continuing to enforce the overreaching requirements of SORNA, the program has metastasized, defacing some of our most treasured rights: the right to due process, the right to be free from double jeopardy and the right to avoid cruel and unusual punishment.

The right to due process can be found in the Fifth and 14th Amendments of our Constitution. Due process is commonly understood to include the presumption of innocence, the right to a fair trial and the right to counsel — ideas that ensure a defendant is treated as fairly as possible in our adversarial criminal justice system. It can be "gauged by its aim to safeguard both private and public rights against unfairness."

Despite what some courts have found, the current requirements of SORNA violate due process, specifically the tenet of presumption of innocence, or the idea that a person is innocent until proven guilty. Each state differs in how it implements SORNA, so an individual's length of registration varies by state. For example, all sex offenders in California and South Carolina register for life, regardless of the crimes committed. By demanding post-detention reporting for up to a lifetime, the court is presuming that an individual has the propensity to commit a certain type of crime in the future and therefore must be scrupulously supervised.

Courts have addressed this concern when the individual required to report is a minor. The Pennsylvania Supreme Court ruled that the state's version of SORNA violates juvenile offenders' due process rights

AR-00000964

because the requirements of satisfying SORNA assume that a juvenile will commit some sex offense in the future without giving him or her the opportunity to challenge that assumption. Equity demands assigning this same ruling to adult reporting requirements.

Another element of due process known as "**double jeopardy**" appears in the Fifth Amendment and protects an individual from being prosecuted for the same offense twice. It also bars multiple punishments for the same crime. Individuals convicted of crimes who have faced incarceration and then must begin sex registry-reporting are certainly being punished repeatedly.

SORNA requirements punish ex-offenders by inflicting upon them tangible, secondary punishments, like the inability to qualify for housing and increased difficulties securing employment. These secondary punishments effectively banish ex-offenders to a modern leper colony by not only removing re-entry resources but also by affirmatively ostracizing those attempting to rebuild a life after incarceration.

In addition to violating double jeopardy, repeated punishments violate the Eighth Amendment by imposing cruel and unusual punishment. The government is prohibited from imposing a criminal sentence that is either vindictive or far too harsh for the crime committed. Incarceration is intended to be a punishment and a deterrence, so any subsequent punishment can only be vindictive. After incarceration, an ex-offender's privacy is significantly diminished by the requirement to report one's name, address, photo, employment status and provide a DNA sample.

Last fall, a federal judge found that the Colorado sex offender registry's punitive impact outweighed any value it might have had in protecting the public and concluded that registration violates the prohibition against cruel and unusual punishment. As the judge specifically stated, "This ongoing imposition of a known and uncontrollable risk of public abuse of information from the sex offender registry, in the absence of any link to an objective risk to the public posed by each individual sex offender, has resulted in and continues to threaten [sex offenders] with punishment disproportionate to the offenses they committed."

As Clarence Darrow famously said,

 *"You can only protect your liberties in this world by protecting the other man's freedom. You can only be free if I am free."*

*Protecting the constitutional rights of everyone, even those convicted of sex offenses, is of the upmost importance for protecting our freedom. Therefore, both legislators — by way of developing and amending laws — and judges — via hearing arguments and creating case law — must re-examine SORNA in order to preserve liberty and uphold the Constitution.*

*Jesse Kelley (@Jess Kelley) is a policy analyst and state affairs manager for criminal justice at the R Street Institute, a nonprofit group aimed at promoting limited government in Washington, D.C.*

**YOU MAY BE A SEX OFFENDER IF:**

You ever played doctor as a child

You ever touched another's privates even while playing doctor

Anyone saw you naked in a locker room

You went to the bathroom behind a bush or trash bin or along side a road or highway

You took a photo of your child bathing

You took a photo of yourself or someone else nude or partially nude

You ever "mooned" another person

Your children ever saw you nude

Your children ever saw you having sex

Your children ever saw you touch your spouse in a sexual way

You left a porn magazine lying within view of a child

You accidently downloaded any child porn

Your child walked past your desk while you were watching porn

Your child saw you go to the bathroom

Your child ever took a shower or bath with you

You ever talked with or communicated with a child unknowingly online

You ever talked with or communicated with a child knowingly online and joked about sexual topics

You ever talked to an undercover police officer pretending to be a child even if you thought you were talking to an adult

You ever walked nude or partially nude in front of a window of your own home while someone was standing outside on the sidewalk

You ever had sex with your significant other in a public place like a park, office, or beach

A underage person overheard a sexual conversation between you and another person

AR-00000966

# Florida Scandal

## The truth about internet sting entrapment
## Fla. Stat. ch. 777.201

Entrapment—

(1) A law enforcement officer, a person engaged in cooperation with a law enforcement officer, or a person acting as an agent of a law enforcement officer perpetrates an entrapment if, for the purpose of obtaining evidence of the commission of a crime, he or she induces or encourages and, as a direct result, causes another person to engage in conduct constituting such crime by employing methods of persuasion or inducement which create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.

The Florida Internet Crimes Against Children's Task Force (as well as other agencies in Florida) is alleging that they investigate and prosecute only people that are using the internet to prey on children. However, the truth is they are manufacturing crime and enticing innocent people by going to places on the internet where people are already talking about sex or may even already be actively looking for sex, but not with children. Examples of such activities that constitute the entrapment are:

Placing ads on Craigslist in the ADULT personals section advertising sex.

Setting up fake profiles on dating websites such as OKCupid which is a dating site for ADULTS.

Setting up fake profiles in ADULT chat rooms that are rampant with pornography and sexual conversations.

Violating the terms of use agreements for these websites which violates the Constitutional Rights of the suspects because of the malicious intent of "law enforcement" while using the service.

The people that the "law enforcement" agencies in Florida are arresting are innocent because they were not seeking for minors to have sexual encounters with. It is obvious because the stings are not even being performed in minor oriented websites and "law enforcement" agencies such as the Polk County Sheriff's Office blatantly lie and tell the public that the stings were performed in minor oriented websites just to give the impression of guilt.

The "law enforcement" officials are ONLY using the principle of first contact to assert that these stings do not constitute entrapment but they are sadly mistaken. They incorrectly operate under the assumption that as long as these "criminals" contact them first, they can induce and encourage these individuals any way they want to. The officers are not only portraying themselves as minors, but they are portraying themselves as willing participants in sexual communications encouraging the "illegal" activity. These circumstances DO NOT constitute a violation of the child solicitation statute as stated in Cashatt.

Jeffery L. Cashatt v. State of Florida, 873 So. 2d 430 (2004)

…sexually oriented communication on a computer on-line service which is viewed by a child is not a violation of the statute unless the sender of the communication "knowingly" attempts by the communication to seduce the child.

The fact of the matter is, you cannot seduce the willing. Also, when it comes to sexual communication, what kind of communication do the "law enforcement" officials expect when they visit ADULT chat rooms or place ads advertising for sex, talks about the weather? Finally, what else are these so called "criminals" being bribed with other than sex, maybe money?

*WAKE UP FLORIDA! The statistics alone on child molestation cases prove that there is something wrong with these internet stings. Far too many arrests are being made and far too many of the people being arrested are just average citizens. STOP BEING LIED TO by overzealous "law enforcement" agencies that don't care who they arrest as long as they can make them LOOK guilty*

# Investigation reveals questionable tactics during FL 'sex stings'

*A recent investigation suggests that Florida authorities have targeted men who weren't actively looking for minors during online "sex stings."*

Law enforcement authorities in Florida are prohibited from promoting illegal activity to make people undertake actions that they otherwise might not engage in. Unfortunately, sometimes authorities may still use tactics that approach or constitute entrapment. An ongoing investigation by WTSP News indicates that some of the online stings that are designed to catch people committing sex crimes may employ these questionable techniques.

## Aggressive, misleading measures

The investigation found numerous cases in which Florida authorities approached men who weren't actively looking for young adults or otherwise indicating unlawful intentions. Authorities targeted these men with various tactics, including the following:

- Posting a personal ad for an adult. If a man expressed interest in one of these ads, the undercover agent would admit to being underage and try to persuade the man to maintain contact.
- Directly initiating contact with men while posing as adults. In this setup, the agent would eventually confess to being underage and try to convince the man to continue the conversation.
- Posing as an adult and mentioning the possibility of the man having sex with the agent's "child." Some of the men who were approached in this manner were arrested even after stating that they were not interested in having sex with a minor.

In many of these cases, the targeted men eventually faced solicitation charges or similar accusations, even if they stated outright that they did not want to talk to minors or have relations with them. In some of these cases, judges noted that law enforcement authorities overstepped their bounds by introducing the subject of underage sex or pushing targets to consent to the idea.

## Serious ramifications

WTSP reports that many of the people arrested in these stings were teenagers or men in their twenties. A shocking 97 percent of those arrested had no history of sex crime accusations or convictions. Even more troublingly, the investigation indicates that a number of these men were not making active efforts to find minors or break the law.

Sadly, the consequences of these arrests can be severe. According to WSTP News, charges against the accused are dropped in some cases, and many other cases end in plea deals, rather than harsh sentences. Still, the social stigma associated with arrest records, sex offender registration or even public TV conferences can have lingering consequences for the accused.

## Handling damaging accusations

In October 2014, WTSP News reported that many police agencies had reviewed their policies and started focusing on following established protocols and targeting people who are actively looking for minors. Still, the investigative findings serve as a troubling reminder of the fact that the evidence and methods used to support criminal charges can be questionable.

Anyone who is facing charges that may be based on entrapment or other inappropriate practices should consider contacting a criminal defense attorney. An attorney may be able to offer advice on challenging the charges or otherwise working toward a more favorable resolution.

# How Florida Police Falsely Arrest & Shame Men As Child Sexual Predators, Steal Their Cars... Then Try To Hide The Records

**from the *for-the-children!* dept**

Thu, Jan 15th 2015 8:12am — <u>Mike Masnick</u>

Eric Goldman calls our attention to a rather astounding story out of Florida, involving how various Florida police departments are engaging in what appears to be <u>basically sham "sting" operations online</u> to arrest and shame men as child sexual predators, then steal their cars (sometimes offering to sell them back), and then doing everything possible to hide the records. The whole thing is quite crazy, and I recommend reading the entire thing. It also comes as little surprise that one of the sheriffs deeply involved in this is Polk County Sheriff Grady Judd -- who we've written about a few times before. Back in 2009 we wrote about Judd using Craigslist to find and arrest prostitutes... and then *<u>blaming Craigslist</u>*, the very tool he used to track down the lawbreakers. A year ago, Judd got a lot more attention for his plan to <u>arrest parents</u> of some girls who were accused of bullying another girl into committing suicide (though, eventually <u>charges were dropped</u> and almost <u>no evidence of any bullying</u> was found).

Those past stories fit with the same pattern that WTSP's "10 Investigates" reporter Noah Pransky found in researching these stings. You know the basics of how these stings work, because they appear to be police-led versions of the famed "To Catch A Predator" TV show. But, quite frequently, the actual cases seem to involve the police going after men who were seeking *adult* companions, and then doing everything possible to try to convince them that they're interested in minors:

*In the case of a 27-year-old Cape Coral man, arrested during the Lee County Sheriff's Office (LCSO) sting this past May, deputies arrested him even though he didn't even travel to meet a child for sex. Law enforcement officers responded to the man's legal "casual encounters" Craigslist ad, pretending to be a 14-year-old girl, even though the ad said, "age for all women must be 18+ no one under email me plz."*

*The man repeatedly told the undercover detectives that he was "not OK" with meeting up with an underage girl, but because he didn't immediately end the conversation, he was arrested for utilizing his phone to solicit a sexual act from a child. Detectives went to his house and arrested him as a sexual predator of children.*

*Prosecutors decided there was insufficient evidence to prosecute on either of the accused charges, yet the accusations and man's name remain on LCSO's online press releases and other media outlets' news stories.*

Even in some cases where this cajoling and pushing by the police led someone to say OK, the details seem fairly questionable:

*A 19-year-old man in Orange Co. was accused of soliciting the guardian of a 13-year-old decoy to arrange sex with her. But the evidence proved differently, as the man was merely responding to an innocuous ad from a 26-year-old woman, which was posted by law enforcement. The detective later tried to convince the man to have sex with the woman's*

AR-00000969

*"younger sister," even though he showed little interest.*

*According to notes from the prosecutor, "this is a tough case" because of "entrapment issues." The man chatted with what he believed to be a 26-year-old woman for five days and the "Law Enforcement Officer suggest(ed) sex first on 2nd day." The defendant said several times he wasn't interested in the 13-year-old, even suggesting he bring a younger teenager boy for the girl when the detective kept bringing the teenager into the discussion. The prosecutor also noted the "law enforcement officer again suggests illegal sex 2 more times" but the defendant was non-committal."*

*Ultimately, after hundreds of text messages, the man agreed to sex with both females, and was arrested upon arrival. The state declined to prosecute, but the accusations and man's name remain public record.*

As the report notes, many of these men are cleared or no charges are ever actually brought against them, but they're still publicly shamed in press releases, declaring them child predators. To add insult to injury, the police often steal their cars, using questionable asset seizure laws:

*Sex stings have become especially rich sources for seizures, since almost every man arrested is accused of traveling to seduce, solicit, or entice a child to commit a sexual act...even though no real children are ever involved in the stings. However, the accusations are felonies, meaning law enforcement can seize suspect's vehicles, making it extremely difficult for them to ever get them back without paying thousands of dollars – or more - in cash to the arresting agency.*

*For example, in one January 2014 sting where the Clearwater Police Department (CPD) and Pinellas County Sheriff's Office (PCSO) arrested 35 men in a single weekend, CPD seized 19 cars as their own under Florida's Contraband Forfeiture Act.*

And even when the people are cleared or charges are dropped, they often have to pay up to get their own cars back, if they can get them back at all:

*One 24-year-old man, arrested in the January sting in Clearwater, had to pay $10,000 cash to get his 2014 Lexus returned. And even though all felony charges were later dropped in his case, he will not get the money back for either the negotiated settlement or the fees he paid an attorney to handle the vehicle case.*

Grady Judd's Polk County is also noted as seizing $15,900 from someone and then "negotiating" to give him back half of it and keeping the other half.

And, of course, the police who are engaged in all of this are also lying about the seriousness of "the problem" while doing everything they can to hide the real details from public view. The article quotes Judd again, insisting that men seeking children was a major problem in South Florida, but the actual evidence -- obtained by WTSP -- shows otherwise, with prosecutors quietly admitting that they have *zero cases* actually showing that happening.

*In 2013, a prosecutor declined to pursue "traveler" charges against a man caught in an Osceola Co. sting because the "state tried to find evidence that the crime of solicitation of minor via computer (parent) was taking place...there are no known cases."*

*The prosecutor notes the detective "asked ICAC affiliate + the FBI and was able to come up with about 5 examples Nationwide. None in Central FL."*

*Another Osceola Co. prosecutor in the case of a 21-year-old defendant wrote, "biggest concern was entrapment argument b/c the LE Operation was not really addressing on-going criminal activity…There have been NO documented cases in this area of parents being solicited on-line for sex w/their minor children."*

But WTSP was only able to find this out via accessing court records -- and not via public information requests.

*10 Investigates has pushed to see other records from law enforcement officers responding to legal dating ads on legal dating sites, but almost every request has been refused. Often, public record exemptions are cited, ranging from "active investigation" to "confidential surveillance techniques," but a Lee County Sheriff's Office spokesperson said records from their June sting had already been destroyed by July.*

Similarly, in a related report, WTSP quoted Judd blocking access to such records:

*Judd says the records are exempt from state records laws because all of those men are still "under investigation," for they may surface in future stings. However, that indicates Judd - and other law enforcement leaders around Tampa Bay and Sarasota who have now used the same exemption to withhold records - have active investigations open on hundreds, if not thousands, of men who did nothing more than legally communicate with adults on legal websites.*

That same article notes that of the 1,200 men arrested as "sexual predators," 97% have zero history of sexual crimes -- and further notes how the police have no problem continuing to shame even men who are cleared:

*The state's best-known lawman also showed little concern for due process during a Tuesday press conference to tout arrests since March in predator-style stings. He pointed to 132 mugshots on a giant posterboard and called the men "sexual predators."*

*But when 10 Investigates pointed out some of the men had already been cleared of charges, he said they were still fair game because "we have a very liberal - a very forgiving - criminal justice system."*

*That system may give defendants the benefit of doubt and assume "innocent until proven guilty;" but Judd makes sure the mugshots and stigma of being arrested for a sex crime haunts the men for the rest of their lives.*

That statement is fairly incredible, but it gives you some insight into the mindset of Judd and some others involved in these efforts. These people are guilty no matter what -- and they will do anything to get them arrested, and then even once they are cleared of any charges, the police will continue to treat them as guilty.

None of this is to diminish the very horrific and tragic reality of situations that do involve actual sexual predators. Those people should be investigated and caught if possible. But what's happening in Florida doesn't seem to have anything to do with legitimately going after predators. Instead, it seems like a combination of entrapment, bogus online stings, high profile shaming of innocent people, stealing their property through asset seizure laws and then abusing public records laws to cover up the details.

Filed Under: arrests, florida, grady judd, police, polk county, public records, seizures, sexual predators

## Florida becomes the harshest state for sex offenders

*Florida toughens laws detaining sex offenders indefinitely for crimes they haven't yet committed*

April 5, 2014 10:30AM ET

by **Eliana Salzhauer**  @esalzhauer & **Claire Gordon**  @clairedon  Google+

In Arcadia, a town of 6,000 east of Sarasota, there's a facility wrapped in sky-high barbed wire, where no one can choose to get in or out. This isn't a prison, and its residents aren't serving a sentence. It's the Florida Civil Commitment Center, home to 650 men whom the state fears could molest, assault or rape again if released.

"A lot of people try to take themselves out while they're in there," said David, who spent 4 1/2 years in Arcadia, and asked that we conceal his identity. "I've seen it, blood all over the place, walking down the hall with a razor, cutting themselves up."

**In Florida, it's legal to lock someone up indefinitely for a crime they haven't yet committed.** Called civil commitment, it's similar to forcing a severely mentally ill person into treatment. But this process is reserved for those who were convicted of violent sexual offenses, completed their sentences, but then were judged to still be a risk. Over the past two decades, the practice has spread across the country and is now law in 20 states, plus Washington, D.C. and the federal government.

**This week, the civil commitment process was expanded to include offenders serving time in jail**. And given certain findings, a state attorney is now required to refer a person to civil commitment, and a judge is required to order a person into civil commitment custody. It's part of a bundle of new laws that has made the state the harshest one in the country for sex offenders.

David served nine years in prison for rape. He said the woman was his ex-girlfriend and his drug dealer, that he was framed and then took a plea deal on his lawyer's advice. When his term was finished, the state recommended that they proceed with a civil commitment hearing, and David was driven to Arcadia. When he finally got his trial, 4 1/2 years later, a jury determined that he wasn't a threat, and released him.

David said the experience was worse than prison. "It's like a living death sentence," he said. "You just function from one day to the next."

### Trying future crimes

"The people we've kept at the center are likely to have committed any number of violent, horrible, traumatic offenses against victims," explained Kristin Kanner, head of the county's Sexually Violent Predator Unit. "There is no price, if you've saved one child from being victimized by keeping someone in that program."

Florida's civil commitment law has been on its books for **15 years**, and the idea is older still. By 1960, in response to high-profile sex crime cases, 26 states had statutes allowing for the indefinite civil commitment of "sexual psychopaths," instead of prison time. But they'd almost all been repealed or fallen out of use by the time the first modern civil commitment statute was passed in 1990. Under the current Florida law, at the end of a sexual offender's criminal sentence, they are psychologically evaluated by at least two people for a "mental abnormality" or "personality disorder" that would predispose them to commit another violent sex crime (only one needs to conduct an in-person interview). If judged to be dangerous, they're taken to Arcadia, where they wait their commitment trial. These people are not psychologist but prison counselors.

Since these trials are not based on past crimes, but rather the probability of future ones, they rely heavily on expert witnesses, and a lucrative cottage industry of these experts – who have billed the state a total of $26 million – has built up around predicting the future behavior of convicted sex offenders.

The state is expecting a dramatic increase in the number of sex offenders who will be civilly committed, and they're considering adding a wing to the Arcadia facility, or converting a prison to handle the overflow.

A national study by the Bureau of Justice Statistics found that 5.3 percent of sex offenders were arrested for another sex crime within three years of their release, a much lower recidivism rate than for most other crimes. A 2011 study of sexual offenders in New Jersey found that 5 percent were re-convicted of a new sexual offense within 6 1/2 years. However, those who were considered for civil commitment, but not ultimately committed, had twice the sexual recidivism rate.

Sex offenders are saddled, often for life, with restrictions that make it extremely difficult for them to have stable housing, jobs, families and access to other services. Colletta believes this kind of isolation doesn't make the public safer. "We have made them a ward of the state. We have paid to keep them and **we have not treated them like a human being with an opportunity to come back into society," she said. "I can hate what somebody does. They're still a human being**."

David said Arcadia had no program to help residents readjust back to life on the outside. When he was released, he asked where he should go, and said he was told, "Go buy a tent and live in the woods with the rest of the sex offenders."

Kanner, who directs the county's sexually violent predator program, described civil commitment, and the treatment available, as a "gift," an opportunity for sexual offenders to "make some serious and heartfelt, deep-seated changes in their personalities to live a law-abiding life and not victimize people." David did not feel the program was a gift. He was "angry beyond words" that after serving his sentence he was detained in another facility, and angry that 4 1/2 years passed before he was given a trial. **Of the 650 men in Arcadia, 72 are waiting for such trials.** The program's director said the wait is because of the timeline of the court and state attorney's office, and that mounting a defense takes some time. It wasn't the fault of the sexually violent predator program, she emphasized.

"I saw guys that were in there eight, nine, 10 years and never saw the inside of a courtroom. And if the state has their way about it, they won't," David said. "Everything they're doing, based upon what I know about the law, is violating every constitutional right."

WOMEN AGAINST REGISTRY

## Position Paper on the Sex Offender Registry

Women Against Registry (W.A.R.) is an organization dedicated to the abolition of the sex offender registry. This essay will outline the principal reasons for our stance and why we are resolute in our belief that the registry serves no purpose and is, therefore, a waste of taxpayer's money. Note: we acknowledge that every state operates its own separate registry and that they are sometimes quite different from the registries in other states. For the purpose of this essay, the term "sex offender registry" is a general reference to all registries.

The sex offender registry is ineffective in the prevention of crime, despite the fact that this is one of its primary intentions. Scientific studies have conclusively shown that the registry does not deter crime, it does not decrease the occurrence of sex offenses, and it does not increase public safety. In fact, quite to the contrary, the registry sometimes increases crime because it forces registrants into unemployment, homelessness, and desperation. The registry works to thwart rehabilitation efforts while its supporters fail to recognize recent studies proving that most registrants are at a very low risk of reoffending.

Collateral damage refers to the harm inflicted on the family members of registrants. Collateral damage was almost certainly an unintended consequence of the creation of the registry, but when the sex offender list became available to the public, collateral damage became a very real punishment for those who had not committed a crime. These punishments include verbal abuse, harassment, property damage and physical attack by vigilantes, loss of employment, loss of residence, reprisals for children at school, and public shaming. Sometimes these behaviors are even sanctioned by authorities. The punishing effect of the registry on innocent family members was one of the primary reasons for the formation of Women Against Registry. This cruelty is unconscionable. Fear and ignorance drive the public outcry for increasingly harsh punishment and for the maintenance of the registry, but as we wait for logic and reason to win out, families are being torn apart and lives are being destroyed.

Women Against Registry stands strongly in opposition to all sex offender registries for the reasons outlined in this position paper. But we would like to emphasize that a public registry is especially cruel and invites vigilantism without any benefit whatsoever. The public registry promotes numerous punitive measures against many who have already paid a substantial debt to society.

We believe the registry is a clear violation of the fifth amendment of the United States Constitution and its prohibition against double jeopardy. **We believe that lifetime registration is cruel and unusual punishment, and a violation of the Constitution's eighth amendment. And, in far too many cases, we believe that the placement of individuals on the registry violates the Due Process clauses of the fifth and fourteenth amendments to the Constitution.** Obviously, the vast majority of US courts do not currently agree with our interpretation.

It is logical, smart, and humane to help incarcerated individuals rebuild their lives after their debt to society has been paid. To do this, we could, and should offer them counseling while incarcerated and various forms of help after their release. At the very least, they deserve not to be hindered in their efforts.

AR-00000974

We strongly support the need for public safety however, the current public outrage over the sex offender label is largely misplaced. It is a fallacy to think that all sex offenders fit neatly into a single classification. A disdainful response or a contemptuous look is the normal reaction to almost anyone labelled as a "sex offender" and yet, there are numerous individuals on the registry who are guilty of behavior that many of us would find innocent, silly, stupid, or juvenile; but certainly not criminal.3 Educating the public about this issue would go a long way toward changing the laws in this country. And in fact, education is W.A.R.'s primary modus operandi to achieving its goals.

The Supreme Court of the United States, one of the world's most respected legal bodies, played an enormous role in promoting the fear and ignorance that has now become the bane of every sex offender across this country.

In 2002, Justice Anthony Kennedy, a Supreme Court Justice, erroneously wrote that the recidivism rate for sex offenders is as high as 80%, a number that is "frightening and high."4 This statement has plagued American Jurisprudence since that time with seriously consequential results for those who have fallen under the broad umbrella that is defined as sex crimes. This erroneous statement has been used as justification in more than 100 state and federal sex offender cases. Justice Kennedy's statement was traced to a single source in a Psychology Today magazine, however, multiple scientific studies over the years, have conclusively debunked this statement. Actual recidivism rates vary for many reasons however, all of the studies place the value far below the 80% cited by Justice Kennedy. Numerous studies have reported the re-arrest rate of convicted sex criminals at 5% or less, lower than most other crime categories. Other studies, by individual states reflect similar recidivism rates. Some studies show sex crime and recidivism rates are basically unchanged since the registry began which is yet more evidence of the ineffectiveness of the registry.

Justice Kennedy's pronouncement has, in part, fueled some extreme and unreasonable state legislation that has pushed registrants to the fringes of society. Some states have enacted strict residency restrictions regarding such common facilities as schools, day cares, libraries, museums, parks, swimming pools, and more. Lawmakers are a big part of the problem as they strive to get reelected and to please a fearful public. But just as the system seems so wildly outside the norms of human decency and justice, there are glimmers of hope. There have been recent litigation wins in Alabama, Colorado, Indiana, Michigan, North Carolina, and others.

The financial cost of monitoring sex offenders and maintaining the registry is prohibitively high. We can make that statement with absolute confidence because of the other factors stated in this paper. With the complete ineffectiveness of the registry, the threat to the registrant families, and the many pending and future lawsuits regarding constitutionality, any cost would be prohibitively high. When considering the financial burden of this program, we must also consider the high cost of incarceration and the loss of tax revenue from those in prison and from unemployed registrants.

As of this writing, there are more than 912,000 men, women, and children on the sex offender registry in this country, according to the National Center for Missing and Exploited Children; that equates to some very large expenses and some very large revenue losses. Many law enforcement agencies freely admit that they cannot adequately maintain the registry because of a shortage of money and personnel. The registry is clearly not providing a good return on the investment. This money could be better-spent on so many other programs.

Women Against Registry believes, without any hesitation, reservation, or doubt, that the sex offender registry is detrimental to our society and needs to be abolished. We understand that current public opinion, driven largely by fear and ignorance, creates a tremendous obstacle to the achievement of this goal. In lieu of the immediate sweeping changes we seek, W.A.R. would welcome improvements to the registry such as restricting it to law enforcement use only, the removal of juveniles, and the inclusion of only those at high risk of re-offense as determined by a fair process run by independent professionals.

However, despite any short-term victories in this fight for justice, we will continue to work toward the abolition of the registry because:

1. It is completely ineffective
2. It is the direct cause of deplorable and cruel collateral damage
3. It is unconstitutional
4. In its current form, it is largely the result of fear-mongering and a lack of knowledge about the facts surrounding this issue.
5. It is fiscally irresponsible and wasteful
6. We believe it to be immoral, unethical, and illegal

As a society, aren't we better than this?

1 https://on-vigilantism.blogspot.com/search/label/Vigilantism%20-%20By%20Police
2 https://with-justiceforall.blogspot.com/2017/11/do-sentenced-sex-offenders-deserve.html
3 www.gainesville.com/opinion/20170104/jean-zeeb-column-misleads-about-sex-offenders
4 https://conservancy.umn.edu/bitstream/handle/11299/188087/30_03_495_Ellman.pdf
5 https://www.womenagainstregistry.org/recidivism
6 https://reason.com/2019/02/13/sex-offenders-are-not-second-class-citiz/
7 mediaassets.thedenverchannel.com/document/2017/09/01/millard knight vega v colorado_65483340_ver1.0.pdf
8 https://www.theindianalawyer.com/articles/50120-th-circuit-rules-doc-sex-offender-program-violatesconstitution
9 www.opn.ca6.uscourts.gov/opinions.pdf/16a0207p-06.pdf
10 https://www.supremecourt.gov/opinions/16pdf/15-1194_08ll.pdf

## WHY SEX OFFENDER REGISTRIES KEEP GROWING EVEN AS SEXUAL VIOLENCE RATES FALL

Lists that include out-of-state visitors are inflating the numbers and keeping fear at a boil.
Quentin (not his real name) was convicted eight years ago of child pornography possession in Florida. He served his time and has since moved to another state. But his sentence required his photo and other personal details to appear on Florida's sex offender registry, and there they will stay for the rest of his life, even if he never sets foot in the state again.

The state's registry is padded with thousands of Quentins, people who don't live in Florida. Under a change to state law passed this spring, there will soon be more: Starting July 1, out-of-state registrants who visit for at least three days (down from five) must go to a sheriff's office to have their personal details added to Florida's list. If they don't, they face a third-degree felony.

Rules like that aren't unique—22 other states keep out-of-state visitors on their registries for life, according to a study released last November. It's one reason state lists misrepresent the actual number of people with sex-crime records living in communities. As already-bloated lists keep ballooning, they feed the impression of a growing population of dangerous people who require ever-more-extreme laws to monitor and control.

On May 30, the National Center for Missing & Exploited Children (NCMEC) released its latest nationwide count of names on state sex offender registries. For the first time ever, the total was more than 900,000. NCMEC spokesperson Staca Shehan told The Appeal the organization doesn't share data on growth trends because changes in state laws and other anomalies can make it difficult to accurately compare the data across years. But calculations by William Dobbs of Dobbs Wire, who tracks sex-offender registry developments nationwide, show a 3 percent jump in the nationwide number in the last six months. That's slightly faster than in the past; increases have fluctuated between about 3 and 5 percent annually since 2007. Even if the growth rate returns to that historical average, by 2021 more than a million names will be on registries.

Many of those entries are duplicates like Quentin or represent people who are not actually part of a state's population for some other reason. In a 2014 study in the journal Crime & Delinquency, a research team found that in the 42 states and two territories studied, 19 percent of those on registries were still behind bars, 9 percent lived out of state, and 3 percent had been deported. **Of Florida's 55,000 registrants at the time, more than 31,000 were in one of those three categories**. "It's a concern of ours," Shehan said of problems with the count. She says NCMEC has no way of knowing how often an offender shows up on multiple state lists. "So that means then there's duplicated offenders in our grand total," she said. "And we have no way of knowing how often that happens."

Even if the growth rate returns to that historical average, by 2021 more than a million names will be on registries.

Dobbs, an adviser to the Sex Offense Litigation and Policy Resource Center affiliated with the Mitchell Hamline School of Law in St. Paul, says the inaccuracies are symptoms of a malignant logic at the heart of registries: that people who have served their time should be put on public lists because of the ineffable risk of what they might do in the future. Problems with registries can't be fixed, he says, because the concept itself is a "broken" one. "It turns people into suspects forever—or at least as long as they're on it," he said.
**"The politicians have created this giant naming-and-shaming train and are fueling it with fear."**

One of Quentin's cousins is getting married in October and invited him to be in the wedding in Florida, says Quentin's mother. But to participate in the various events, he would need to stay more than three days—meaning a trip to the local sheriff's office to get a new photo taken and have the address where he's staying and the license plates of any cars he will drive added to Florida's public registry. So Quentin is skipping the wedding.

Even if registry counts are inflated, it's likely that the real number of registrants is rising as state lists scoop up an ever-broader swath of the population. One reason: New state laws governing who must register are typically applied retroactively to cover those who offended before the laws passed. (Retroactive punishment is banned by the U.S. Constitution, but the Supreme Court ruled in 2003 that being placed on a registry doesn't count as punishment. Since then, as evidence has emerged that registration is indeed punitive, the retroactive provisions of state sex-offense laws are being struck down: Several courts have ruled since 2016 that they violate the Constitution's ban.)

Under the Adam Walsh Child Protection and Safety Act, passed in 2006, states have been required to expand their registries to cover people convicted of a broader set of crimes. The number on Wyoming's registry in 2011, for instance, rose to 1,450 from 125 after the state passed legislation compliant with the act that required children and teens to be registered. As other states try to comply by passing new laws, additional categories of people get put on their registries, Shehan says.

And sex-offense laws trigger long registration periods, making entry onto the list mostly a one-way door. In 19 states, sex offender registration lasts for life for adults; in 16 states, it's 15 to 30 years; and in another 14, it's a minimum of 10 years, according to the Restoration of Rights Project run by the Collateral Consequences Resource Center and its partner organizations.

NCMEC's steadily inflating number is catnip for those who traffic in evergreen scare stories. One website advises parents to use the map in deciding where to move. States with high per-capita sex offender populations might not be a good choice, it implies. NCMEC itself may feed those fears with its marketing: On its website, photos of missing kids are adjacent to the link to its sex offender tracking map.

But research shows that sex-offender maps have almost nothing to do with protecting children. Nearly all sexual abuse is perpetrated by someone not on a registry; first-time offenders commit north of 90 percent of new sex crimes, according to studies in New York and Minnesota. Most sexual violence victims know their perpetrators—86 percent in a Bureau of Justice Statistics study published in 2000. And those with a sexual offense on their record have low sex-crime reoffense rates: 12 percent on average, according to a definitive 2014 meta-analysis of 21 other studies. Those same researchers found that reoffense risk declines the longer that someone lives in the community crime-free. For those who hadn't reoffended by 10 years after an initial sexual offense, their risk of committing a new sex crime was 1 to 5 percent—a rate comparable to ex-offenders with no history of sex crime.

Sex-offense laws trigger long registration periods, making entry onto the list mostly a one-way door. All of that might explain why the registry count and sex-crime rates are traveling in opposite directions. Multiple studies show rates of sexual violence falling significantly after the early 1990s. "I care about [the inflated count] from a policy perspective because it keeps people in fear," said Alissa Ackerman, a California State University, Fullerton criminologist who was part of the 2014 Crime & Delinquency research team and has co-authored numerous studies of sexual-offense issues. "It keeps them wanting legislation—you know, we have to do something. … It's maps like this and propaganda like this that keep people feeling that way."

Ackerman says rather than expanding the list, more resources should be focused on sexual-violence prevention programs and on mental health services and treatment for people who have experienced and committed sexual abuse. "That's not where we're putting our money," she said. "These policies don't work—let's focus on something that does work."

Shehan says NCMEC's map isn't intended to scare people. The group's prevention education materials
make clear the danger of sexual abuse committed by a stranger on a registry is small, she says. But she
acknowledges that message could be clearer on the map itself. "We've taken several precautions and
made adaptations to the map in the past," she said. "That's one I can definitely add to the list of
considerations."

ANNALS OF JUSTICE  MARCH 14, 2016 ISSUE

# THE LIST

*When juveniles are found guilty of sexual misconduct, the sex–offender registry can be a life sentence.*



**By Sarah Stillman**

March 7, 2016



AR-00000980

When Kids Are Accused of Sex Crimes | The New Yorker                    https://www.newyorker.com/magazine/2016/03/14/when-kids-a...

6/28/20, 10:31 PM

AR-00000981

8/9/23, 10:18 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 15, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |   Share ▾ |

---

| Comment |

My name is Derek W. Logue, a 43 year old Native American male currently residing in rural Nebraska, and founder of the registry information website OnceFallen.com. I have been a Registered Person since 2003 and will be on this government blacklist for the rest of my life. I am essentially serving a life sentence. Every day my face is on this registry, my life and the lives of my loved ones are in constant danger. Just this year alone, Ive experienced multiple threats and experience constant harassment because of the registry. I have not held a formal job since 2006 and collect welfare to survive. There is no point in trying to become a productive citizen when few companies hire Registered Persons, and even if I can be hired, I can be too easy fired using my label as a convenient excuse. I live off $803 a month SSDI/ SSI, draw $15 a month in food stamps, and Medicaid/Medicare.

I have no desire to look for a job so long as my name is on your government blacklist. I had two jobs but lost them both because the registry became a tool of oppression by my employer to silence any dissent. If I fell out of line, theres a convenient excuse to terminate my employment. At least I have a stable income now and dont have to consider doing something potentially illegal to survive.

For the past 15 years, Ive fought back against these oppressive laws. Victim advocates like Laura Ahearn from Parents For Megans Law and Florida State Senator Lauren Book have tried various methods for silencing me, including filing SLAPP Suits against me. Vigilante groups have disparaged my name and have threatened me; I have over a half-dozen websites dedicated to everything I do. Ive been called many terrible things while being interviewed by the mainstream media. Still, I will continue to speak out because I already feel dead thanks to the Sex Offense Registry.

There are better solutions than this public government blacklist. The registry should be abolished. The government wastes billions on enforcing this useless blacklist that could be better spent on prevention and education. There are positive forms of treatment such as Circles of Support and Accountability. Supporting evidence-based methods would save valuable taxpayer dollars that could go towards other, more important and effective programs like renewable energy, saving the US Postal Service, or maybe even some tax relief

AR-00000982

for the poor.

Id like to think that there are better use of limited financial resources considering we are in the midst of a pandemic and a looming economic crisis on par with the Great Depression. Global warming is making the summers hotter than ever. The trade war has cost the local economy millions here in the Heartland. Yet, here we are wasting time on a worthless feel-good measure that most US States had the good sense to reject in the first place. I doubt states will place this on a list of priorities while they worry about the next fiscal year and start looking for ways to trim the fat from their budgets.

Id love to go out and get a real job again someday and pay taxes, but I cannot do it while the registry exists.

A mere 5000 characters is not sufficient to cover all my thoughts about the controversial Adam Walsh Act, a law rejected by over 30 states 14 years after it passed, I have enclosed a full statement below. I am also submitting my fact pages on the Adam Walsh Act, on Int'l Megan's Law, on various myths used to justify this useless government blacklist, and my Crimes Against Registrants Database, which includes nesrly 200 registrants, loved ones of registrants, and innocent people mistyakes for registrants murdered by vigilantes. These reports are all condemnations of the public registry.

Despite the efforts to silence me, I will fight this oppressive and useless pogrom until my dying breath. But right now, my life is in your hands.



Attachments  9

📄 AWA and IML

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_2.pdf)

📄 StrangerDanger Myth

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_3.pdf)

📄 Myth of Unique Threat of _Sex Offenders_

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_4.pdf)

AR-00000983

Regulations.gov

📄 The Dark Figure of the Underreporting Myth

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_5.pdf)

📄 Recidivism 102_ Once Fallen's Recidivism Chart

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_6.pdf)

📄 Sex Offender Recidivism 101 Fact Guide by Once Fallen

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_7.pdf)

📄 Pedophilia Defined

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_8.pdf)

📄 Raising Awareness Myth of Megan's Law

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_9.pdf)

📄 Derek Logue full statement to DoJ 08172020

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0283/attachment_10.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0283

◎ **Tracking Number**

1k4-9ifu-y4yo

**Comment Details**                                    **Submitter Info**

AR-00000984

**Received Date**

Aug 17, 2020



About     Bulk Data Download          Agencies        Learn

(/about)          (/bulkdownload)    (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback



<----- BACK TO MAIN PAGE ------->

(c) 2007-2020 Derek  W. Logue. No part of this website may be used in any way without expressed written consent of the site owner.

## International Megan's Law: The Epitome of American Arrogance

By: Derek W. Logue of Once Fallen

January 31, 2016, Updated October 30, 2017

### SUMMARY

International Megan's Law (IML) has been languishing in legislation since 2008, but almost eight years later, Megan's Law passed in early 2016. For years, Congressman Chris Smith (R-NJ 4th Dist.) has been pushing this bill under the guise of preventing "child sex tourism" or "sex trafficking." While the laws are allegedly targeting human trafficking, the real goal of International Megan's Law is compelling other nations to adopt a public registry. International Megan's Law is yet another attempt at imposing the American way of life on other nations.

International Megan's Law is also an assault on the right to travel while forced to register as a sex offender. International Megan's Law had proposed various forms of passport restrictions on registrants, including limiting passports to a year or proposing distinctive marks of infamy on registrant passports. Under International Megan's Law, notice of travel must be made 21 days in advance and complete itineraries down to the specific flight info must be given to the registry office; this info is forwarded to the FBI, then to INTERPOL, who notifies the receiving country that a "sex offender" is traveling to their country. To further this end, IML will create a new bureaucratic office, the "Angel Watch Center" (AWC). This law is blatantly a violation of the right to travel and is intended to prevent registered citizens from leaving the US.

### CHRIS SMITH & THE EVOLUTION OF INTERNATIONAL MEGAN'S LAW (IML)

New Jersey Congressman Chris Smith has made "human trafficking" a primary focus. According to his congressional website, he has introduced a number of bills to tackle the issue of human trafficking as far back as 1999 (though only one original act, the "Victims of Trafficking and Violence Protection Act of 2000," was signed into law). [1]  This 2000 Act covered "severe punishment--including up to life imprisonment" for human traffickers and aid for alleged sex trafficking victims; the Act also contained the Violence Against Women Act of 2000,  expanded Megan's Law to ensure notification to the college/ university community when a registered sex offender is enrolled or employed at that institution, as well as "Aimee's Law," which encourages states to keep murderers and sex offenders behind bars longer, holding the state financially accountable if they fail to do so. [2]  This Act has been re-authorized three times, each time expanding the scope of operations.

International Megan's Law of 2008 (H.R. 5722, 110th) was first introduced on April 8, 2008. The original bill had three main provisions, the first being a requirement that registrants intending to travel gave a 21 day notice to their local registry office; the second provision required the Department of Homeland Security (DHS) to establish a program to notify foreign countries of international travel; the third provision would have denied entry into the US of anyone convicted of a sex crime in a foreign court. Failure to register international travel was punishable by up to 10 years in prison. This version of IML never left committee.[3]

International Megan's Law of 2009 (H.R. 1623, 111th) was introduced on March 9, 2009, and greatly expanded the provisions created in the 2008 version. This version of IML expanded the required registrant travel information—name, date of birth, social security number, passport or passport card number and date and place of issuance, basis of criminal conviction, travel itinerary and purpose of the trip, travel companions, and contact information prior to departure and during travel. It would have imposed registration on any sex offender who is a US citizen or an alien lawfully admitted for permanent residence in the United States who resides in a foreign country for more than 21 consecutive days, or who resides in a foreign country for more than 30 days within a 6-month period, to register and keep such registration current at a US diplomatic or consular mission in the residing country. Information gathered while living abroad would have included employer, residence, time registrant will leave that country, vehicle info, and school info. The Immigration and Customs Enforcement (ICE) would have been tasked for determining which registrants are considered "High Risk" under this Act (apparently, under this version, only "High Risk" registrants were to fall under the provisions of IML). An "International Sex Offender Travel Center" was to be established and manned by representatives from ICE, DHS, SMART, FBI, and USMS, INTERPOL, and even the US Coast Guard among other bureaus. Passports would have been valid for only one year, and rescind passports from any US traveler convicted in a foreign court for a sex offense. This bill also never left committee. [4]

International Megan's Law of 2010 (H.R. 5138, 111th) was introduced on April 26, 2010 and passed the House on July 27, 2010, but did not pass the Senate. This bill changed the term "high risk sex offender" to "high interest registered sex offender," increased the registration period from 21 days to 30 days advance notice, added a $25 fee for traveling abroad (payable to ICE), and added email addresses to the list of information collected by the registration office. The registrant would have received a travel notice that provided written proof the registrant has been properly registered before leaving the US. The US consulate would maintain a non-public registry of sex offenders living abroad. Also noteworthy (because it reinforces my theory that IML is an attempt to impose American values on the rest of the world) is that Congress demands "that the President should strongly encourage those foreign countries that have an age of consent to sexual activity below the age of 16 to raise the age of consent to sexual activity to at least the age of 16." [5]

International Megan's Law of 2011 (H.R. 3253, 112th) was introduced Oct. 24, 2011 and died in committee. Under this version, a registrant living abroad would be required to register in person every six months at the designated diplomatic or consular mission where the registrant is residing. The establishment of a registration fee was given to the designated diplomatic or consular mission, though set fee was established, opting instead to allow the consulate to make their own "reasonable" registration fees. (ICE was no longer limited to a $25 fee, as Congress would have given them the power to create their own fees as well.) [6]

AR-00000986

With H.R. 4573 (113th) came a new expanded title – "International Megan's Law to Prevent Demand for Child Sex Trafficking." This version of IML was introduced on May 6, 2014 and passed the House on May 20, 2014 but died in the Senate. The proposed "International Sex Offender Travel Center" was renamed the "Angel Watch Center (AWC)," which was to be controlled by ICE and the Customs and Border Protection (CBP). The US Marshals Service's National Sex Offender Targeting Office would provide the AWC information on travel by child-sex offenders. The previous terms "high risk" and "high interest registered sex offender" were removed from the definitions and replaced with "child-sex offender." [7]  Notably absent from this version of IML from previous versions is the lengthy registration requirements both at home and abroad. The reason for this change was because the SMART Office exercised "[t]he authority under 42 U.S.C. 16914(a)(7) to expand the range of required registration information * * * to provide that registrants must be required to inform their residence jurisdictions of intended travel outside of the United States at least 21 days in advance of such travel." [8]  The one-year passport limit was also removed from the bill.

On January 22, 2015, IML was re-introduced yet again as H.R. 515 (114th), aka "International Megan's Law to Prevent Child Exploitation and Other Sexual Crimes Through Advanced Notification of Traveling Sex Offenders." [9]  When the House passed HR 515 on January 26, 2015, it was essentially the same bill as the previous incarnation which failed to pass during the 113th Congress. On July 27, 2015, Senator Richard Shelby (R-AL 7th Dist.) introduced S. 1867: "International Megan's Law to Prevent Child Exploitation Through Advanced Notification of Traveling Sex Offenders." The Senate Bill differs from the House Bill as it uses the term "covered sex offender" (anyone convicted of a sex crime involving a minor). However, S-1867 is especially bad because it introduced a provision to add a "unique identifier" to passport IDs of registered citizens, meaning "any visual designation affixed to a conspicuous location on the passport or passport card indicating that the individual is a covered sex offender." In addition, the Senate bill also adds "Information relating to intended travel of the sex offender outside the United States, including any anticipated dates and places of departure, arrival, or return, carrier and flight numbers for air travel, destination country and address or other contact information therein, means and purpose of travel, and any other itinerary or other travel-related information required by the Attorney General" to the list of information to be disclosed by the registrant traveler. [10]

Oddly, by the time HR 515 was reviewed by the Senate Committee to be presented to the full Senate on November 17, 2015, the entire text of HR 515 had been stricken and largely replaced with the provisions of S-1867 (with the exceptions of the 'Findings" section, and with a few sentences revised). [11]  On December 17, 2015, the Senate passed their revisions to IML and sent it back to the House for approval. On February 1, 2016, the House approved the changes under a "suspension of the rules." Within a week, it was on the desk of President Obama; on February 8, 2016, it was signed into law. The US State Department officially announced the "unique identifier" on October 30, 2017. The passports will read:

"The bearer was convicted of a sex offense against a minor, and is a covered sex offender pursuant to 22 United States Code Section 212b(c)(l)."  Since endorsements cannot be printed on passport cards, covered sex offenders cannot be issued passport cards. [12]

## PROBLEMS WITH INTERNATIONAL MEGAN'S LAW

The Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Office downplayed the concerns of those whose travel rights would be hindered, if not outright eradicated, by the registration requirements promoted by International Megan's Law when it stated, "However, these supplemental guidelines recognize that there may be circumstances in which requiring 21 days advance notice would be unnecessary or inappropriate, and expressly allow jurisdictions to adopt policies accommodating such situations subject to approval by the SMART Office." [13]  This statement, however, is very vague and confusing – the SMART Office states on one hand that it recognizes the 21 day advance notice originally proposed by IML and adopted by the SMART Office isn't always feasible; on the other hand, states who create rules regarding this unique circumstances must have those rules approved by the SMART Office. The SMART Office fails to offer a single example to assist states adopt such rules.

The SMART Office also claims authority to modify information to be given before traveling internationally, claiming, "Congress in SORNA has authorized the Attorney General to augment or modify SORNA's express requirements in certain areas, including authority to expand the range of required registration information and authority to create discretionary or mandatory exceptions to disclosure of such information." [14]  If that is indeed true, adding new registration requirements to International Megan's Law is unnecessary, and thus little more than a selling point.

The limitation of passports has become the most controversial point for International Megan's Law. From 2009 to 2013, IML contained a provision which would have limited the passports of registered citizens to a single year, as opposed to 10 years for the average US Passport. While 22 U.S. Code § 217a states, "the Secretary of State may limit the validity of a passport to a period of less than ten years in an individual case or on a general basis pursuant to regulation," [15]  the GAO reports, "Although federal law permits certain restrictions on the issuance of passports to individuals, the Secretary of State is not authorized to restrict the issuance of passports to individuals because they are listed in the NSOR. As with any other convicted felon, State lacks the authority to identify such status on these individuals' passports. Federal law permits the Secretary of State to deny or revoke the issuance of passports only in certain circumstances, including, but not limited to, when the individual is subject to a criminal court order, condition of probation, or condition of parole, any of which forbids departure from the United States and the violation of which could result in the issuance of a federal warrant of arrest, including a warrant issued under the Federal Fugitive Felon Act; is over $2,500 delinquent in child support; is delinquent in certain State debts; has an outstanding felony warrant; has an outstanding foreign felony warrant; is subject to an extradition request that has been presented to a foreign country; has been declared legally incompetent; used a passport or crossed an international border to commit an act based on which the individual was subsequently convicted of certain drug trafficking crimes, but only during the period the individual is imprisoned or on parole or supervised release; or used a passport or crossed an international border to commit an act based on which the individual was subsequently convicted under the federal 'sex tourism' statute, but only during the period the individual is imprisoned or on parole or supervised release." [16]  Had IML passed in 2013, then a registrant would have had to pay $140 plus a $25 "Execution Fee" for a passport, or every year, or $1650 to keep a passport for 10 years. Since the State has not been granted authorization as of yet to make such wholesale restrictions, it can be assumed this rule led to the removal of the passport restriction provision.

Since the passport limit was removed, the Senate version of the 2015 International Megan's Law added a scarier proposal—a "unique identifier" to passport IDs of registered citizens (i.e., a visual designation affixed to a conspicuous location on the passport or passport card indicating that the individual is a covered sex offender). This provision has proven so controversial, even the mass media has made the obvious comparisons between the IML "unique identifier" and the marks made by the Nazis on the passports of folks of Jewish descent. David Post of the Washington Post's Volokh Conspiracy writes:

"I remember asking my dad, when he had been talking about the roundup of the Jews and the infamous 'yellow star,' a simple question that deeply puzzled my 7-year-old brain: How did the Germans know who to round up? How did they know who was, and who wasn't, Jewish? My own family wasn't observant in the least — we didn't go to synagogue, or celebrate the Jewish holidays, I didn't go to Hebrew School, etc.; so if they were rounding up all the Jews in Brooklyn, how would they know about us? And I vividly remember his reply: They knew it because in Germany, they recorded your religion on your birth certificate, and

AR-00000987

on all your other important government documents (ID card, passport, etc.). [I'm not sure that that was entirely accurate — but it does capture the substance of the matter***]. And, he reassured me, we — here in the United States — don't allow that sort of thing. I was reminded of all that by a provision in a statute that recently sailed through the House and Senate: "International Megan's Law" (IML for short), ostensibly designed to "prevent child exploitation and other sexual crimes through advanced notification of traveling sex offenders...It is, as far as I can determine, the first time in U.S. history that any such special designation will appear on the passports of any U.S. citizens, and I think it should send at least a small chill down all of our spines." [17]

Post pointed to the website from the US Holocaust Museum's Timeline, posted on their official website:

"On October 5, 1938, the Reich Ministry of the Interior invalidates all German passports held by Jews. Jews must surrender their old passports, which will become valid only after the letter "J" has been stamped on them. The government required Jews to identify themselves in ways that would permanently separate them from the rest of the German population. In an August 1938 law, authorities decreed that by January 1, 1939, Jewish men and women bearing first names of "non-Jewish" origin had to add "Israel" and "Sara," respectively, to their given names. All German Jews were obliged to carry identity cards that indicated their heritage, and, in the autumn of 1938, all Jewish passports were stamped with an identifying red letter "J". As Nazi leaders quickened their war preparations, antisemitic legislation in Germany and Austria paved the way for more radical persecution of Jews."[18]

Lenore Skenazy adds, "Oddly enough, that country won't be alerted if a visitor has served time for, say, mugging old ladies. No one's American passport will be stamped with 'Drug Dealer' or 'Drunk Driver' or even 'First-Degree Murderer Who Used a Pitchfork'! The only people our government intends to brand are the people who committed a sex crime, did their time and are now free. They're American citizens like the rest of us . . . except for the scarlet 'SO.' If there was any proof that branding the passports would actually cut down on sex trafficking, a heinous crime that makes my heart ache, maybe a rational argument could be made for it. But there isn't." [19]

Even if legislators are fine with the repugnant idea of placing marks of infamy on the passports of registered citizens, it should at least consider the possibility that some people could be mistakenly labeled as a sex offender on their passports. In 2013, a Florida man who was declared legally blind was mistakenly labeled as a sex offender on his state-issued Driver's License. But as he visited banks, doctors' offices and pharmacies, he noticed he was being treated rudely by fellow Floridians. It was not until he attempted to visit a military base that the man was informed his Driver's License listed him as a sex offender. (It is a crime for a registered citizen to enter a military base, according to the news story.) The Duval County Tax Collector's Office admitted to News4Jax this was not the first time this happened. The man described his ordeal as "humiliating" and "devastating." [20]

In 2015, a Florida woman's state ID was mistakenly marked "Sexual Predator" in blue letters. In the days before discovering the mistake, she was detained by the police at Disney World and a hotel in Clermont. ohn Phillips, a Jacksonville attorney representing the woman, then suing the state, called the notation on his client's license a "Scarlet Letter" law signed in 2007 by Gov. Charlie Crist. [21]  We can only imagine the damage caused to someone traveling internationally with a mark mistakenly placed on a passport!

Another possible consequence of the "unique identifier" provision is the potential impact on registered citizens living in a handful of states not currently compliant with the federal "Real ID" program. Currently, all domestic flights only require a state ID. However, if your state is not considered "Real ID compliant" by January 22, 2018, then you will be required to show a passport, even for domestic flights, unless that state has been granted an extension. ALL states must be Real ID compliant by October 1, 2020. [22]

As International Megan's Law continues to be tweaked, the law also has also broadened its scope from a limited number of "high risk" offenders to everyone convicted of a sex crime. The responsibility of determining risk would have been left to an agency created from a number of existing bureaucracies. States vastly differ on determining the severity of relatively petty offenses. Phillip Alpert is one such case—he was convicted at age 18 for "distributing child pornography" when he send a nude picture of his 16-year-old girlfriend to some family members and friends after they broke up. As noted by Danielle Viera in the Emory International Law Review, "the current laws in many states require people who urinate in public, teenagers who engage in consensual sex, and young children who expose themselves—individuals who have not committed violent offenses—to register as sex offenders. Subjective 'high risk' determinations coupled with overzealous domestic sex offender laws mean that young adults like Phillip Alpert could find themselves labeled high-risk sex offenders more easily than the drafters of House Bill 5138 may have intended. Upon learning only that Phillip Alpert, a registered sex offender, engaged in the distribution of child pornography, officials at the International Sex Offender Travel Center could conceivably consider him to be a danger to minors all over the world, when that is far from reality." [23]

Also of concern is the impact of International Megan's Law on those convicted of sex crimes as a juvenile. Viera argues, "Applying cookie-cutter registration laws to juveniles does not account for the unique characteristics of their offenses. It is widely accepted that children differ from adults mentally, physically, and emotionally; and thus, the juvenile justice system was created with a focus on rehabilitation. Because of the long-standing view that a child's underdeveloped brain responds positively to treatment, rehabilitation ensures that children are not penalized in the same way as adults. Although House Bill 5138 did not include those offenders who were adjudicated delinquent in juvenile court, it still would have subjected many other juveniles to the same strict requirements as their adult counterparts...Juvenile offenders have "substantially lower recidivism rates" than adults and are less cognitively developed, making them arguably less culpable... a large majority of sex offenders know their victims personally, as seen in cases of child molestation, where the perpetrator and victim are often related. This phenomenon is even more prevalent when the offender is a juvenile...All of these factors make it manifestly unjust to penalize juvenile sex offenders under a one-size-fits-all rubric." [24]

The National Reform Sex Offenders Law (NARSOL) group argues International Megan's Law violates a number of constitutional safeguards, including the 1st (freedom of association) and 14th (Due process) Amendments, as well as the Ex Post Facto clause. "IML creates two classes of American citizens: those who may travel freely, and those who must notify authorities before leaving the country. They have a recognized right to travel freely without interference from their government. IML violates the International Covenant on Civil and Political Rights (1966) by interfering with the free movement of citizens...It punishes registered citizens through loss of freedom of movement, after they have completed their court-ordered punishment. The majority of Registered Citizens have long since exited the criminal justice system and have lived years, even decades, in the community without re-offending...The AWA listing of conviction status in no way reflects a person's actual re-offense risk ; however the Angel Watch Center (AWC) would proffer Registered Citizens' federally protected information to foreign authorities with the clear implication of dangerousness with no opportunity to prove the innocent nature of their travel in advance. Thus, IML would violate due process rights of Registered Citizens traveling internationally." [25]  Interestingly, the International Covenant on Civil and Political rights is among the few international treaties signed, ratified, and enforced by the USA. [26]

Sex Offender Solutions and Education Network (SOSEN) adds the argument that a person's reputation is a liberty interest. "The United States Supreme Court

AR-00000988

has previously recognized that a person's reputation is a protected liberty interest under the federal due process clause. Wisconsin v. Constantineau, 400 U.S. 433 (1971) (hereafter "Constantineau"); Board of Regents v. Roth, 408 U.S. 564 (1972) (hereafter "Roth"). In Constantineau, the State of Wisconsin authorized the posting of a notice prohibiting the sale or gift of liquor to any person who "'by excessive drinking' produces described conditions or exhibits specified traits, such as exposing himself or family 'to want' or becoming 'dangerous to the peace' of the community." On appeal, the Constantineau Court recognized that "[i]t would be naive not to recognize that such 'posting' or characterization of an individual will expose him to public embarrassment and ridicule." 400 U.S. at 436. The Court therefore held that a protectible liberty interest is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him [or her.]" Id. at 437, as well as the Hawaii Supreme Court decision in Hawaii vs. Bani. The acts of these government officials opened them and the agencies that they operate out of to million Dollar lawsuits under U.S.C. 1983 actions, as well as the possibility of them facing federal charges under Title 18, U.S.C., Section 241 Conspiracy Against Rights and Section 242 Deprivation of Rights Under Color of Law." [27]

The "unique identifiers" also force registrants to carry an offensive government message, violating the US Supreme Court's decision in Wooley v. Maynard, 430 U.S. 705 (1977). In a 6-to-3 decision, the Court held that New Hampshire could not constitutionally require citizens to display the state motto ("Live Free or Die") upon their vehicle license plates. Chief Justice Burger, writing for the Majority, found that the statute in question effectively required individuals to "use their private property as a 'mobile billboard' for the State's ideological message." The Court held that the State's interests in requiring the motto did not outweigh free speech principles under the First Amendment, including "the right of individuals to hold a point of view different from the majority and to refuse to foster ... an idea they find morally objectionable." The state's interest in motor vehicle identification could be achieved by "less drastic means," and its interest in fostering state pride was not viewpoint-neutral.

It is hard to claim that the provisions of International Megan's Law (in particular, the two passport provisions) do not constitute a significant hindrance to the registrant's right to travel, especially given the increased restrictions registered citizens have already experienced. According to a 2012 GAO report, Canada, Panama, and The Philippines topped the list of nations in terms of percent of registrants denied entry and total number of denials. Other countries that denied entry to at least one occasion were Costa Rica, South Korea, Brazil, Japan, Great Britain, Mexico, Thailand, and Jamaica [28]. Sri Lanka [29], The Phillipines [30], and Mexico [31].  As the fear of "sex trafficking" spreads, the number of nations expected to systematically deny entry to registered citizens will increase, which is precisely what the US wants.

Even with the increase of sex trafficking panic across the globe, the idea that the US will compel other countries to create and run American-style sex offender registries is downright arrogant. "Criminal law systems across the world vary in such a way that different countries may have different definitions regarding the same offense. Most countries use common criteria to define a sex offender but many do not have the term "sex offense" anywhere in their criminal codes. Sex offender registries differ from country to country as well. Some countries choose not to implement registries; others, such as Norway, use a national criminal registry that is not specific to sex offenses. In Thailand, sex is decriminalized, and although rape is considered a criminal offense, the law is rarely enforced. As recently as 2008, other countries, including Austria, Croatia, and Slovenia, have begun to debate introducing a sex offender registry. Complicating matters further, the age of consent ranges among nations from thirteen to eighteen, making it a crime to have sex with a sixteen-year-old in Ireland, where the age of sexual consent is seventeen, but not in the United Kingdom. The extensive variety that exists in foreign laws hinders the desired effect of a law like House Bill 5138." [32]

## DO THE SEX TRAFFICKING MYTHS JUSTIFY THE NEED OF IML?

New Jersey Congressman Chris Smith relied on fearmongering when he promoted International Megan's Law before the House in January 2015. "It's all about very good vigilance," Smith said in an interview with NJ.com. "It's secrecy that enables all of this. Secrecy is how these people exploit and, unfortunately, we're seeing a growing amount of sex tourism. They hop on planes and go to places for a week or two and abuse little children…"Pedophiles from the U.S. can travel to those countries and pedophiles from those countries can come to the U.S. and abuse our children." During a meeting with a Chris Smith asked a group of stop sex tourism activists from Thailand, "If we told you a convicted pedophile was coming to Bangkok, what would you do?" "We wouldn't let them in," the Thailand activists responded. "The idea behind this is to get Megan's Law stirred up in countries around the world," Smith said. [33]

International Megan's Law has been justified by a number of "findings" by Congress, but the findings are largely unrelated. In International Megan's Law of 2011, Section 2, Findings and declaration of purposes, are a number of findings that compel individuals to associate people on the sex offender registry with sex tourism or sex trafficking. Congress "found" that Megan Kanka was killed by an unknown sex offender; Megan's Law was passed in 1996; sexual exploitation of minors is a global phenomenon; it is estimated that 1.8 million children worldwide are exploited each year through prostitution and pornography; all children are adversely affected by being commercially sexually exploited; child sex tourism is a specific form of child prostitution and is a developing phenomenon; US sex tourists who target children form a significant percentage of child sex tourists in some of the most significant destination countries for child sex tourism; NCMEC states most victims of sex offenders are minors; Media reports indicate that known sex offenders who have committed crimes against children are traveling internationally, and that the criminal background of such individuals may not be known to local law enforcement prior to their arrival;  Between 2003 and 2009, ICE obtained 73 convictions of individuals from the US charged with committing sexual crimes against minors in other countries; the detection and investigation of child sex predators overseas is costly; Such an undercover operation can cost approximately $250,000; Sex offenders are also attempting to enter the US; Foreign governments need to be encouraged to notify the US as well as other countries when a known sex offender is entering our borders; Child sex tourists may travel overseas to commit sexual offenses against minors; Individuals who have been arrested in and deported from a foreign country for sexually exploiting children have used long-term passports to evade return to their country of citizenship where they faced possible charges and instead have moved to a third country where they have continued to exploit and abuse children; In order to protect children, it is essential that United States law enforcement be able to identify high risk child sex offenders in the US who are traveling abroad and child sex offenders from other countries entering the US; Such identification requires cooperative efforts between the US and foreign governments; and "The United States, with its international law enforcement relations, technological and communications capability, and established sex offender registry system, should now take the opportunity to lead the global community in the effort to save thousands of potential child victims by notifying other countries of travel by sex offenders who pose a high risk of exploiting children, maintaining information about sex offenders from the United States who reside overseas, and strongly encouraging other countries to undertake the same measures to protect children around the world."

Congress relies on a very porous argument to justify passing International Megan's law; the findings imply that many (if not all) registered sex offenders with passports are using them to engage in sex tourism and eluding detection while traveling abroad. This is a classic example of "fallacy of the undistributed middle" [34]  (a form of non sequitur) that follows the formula, "If all Y are A, and all Z are A, then all Y are Z." Here, Congress states "If sex tourists/ trafficker are sex offenders, and John Q. Public is a registered sex offender traveling abroad, then John Q. Public is a Sex Tourist/ Trafficker." Megan Kanka's death was not the result of "sex tourism;" this statement is merely added to the findings to appeal to emotion and to attempt to link registered citizens to sex tourism.

AR-00000989

However, even the aforementioned Congressional findings state only 73 convictions for sex tourism over a 7 year period have occurred (10.3 convictions per year). Of course, Congress did not state how many of these 73 convictions were of individuals with prior sex crime arrests. The GAO found that at least 4500 registered citizens had obtained a passport in 2008 alone, and that number "is likely to be understated because of data limitations in the passport and NSOR databases." [35]  Even if every one of the 73 travelers convicted of sex tourism was a registered citizen (which they likely were not), then that is still 0.22% of the total registrants who have obtained passports in 2008. This has not stopped Chris Smith from assuming the 4500 registrant passport applications as a sign that many sex offenders look to prey on victims in foreign countries. [36]

Even the US Department of Justice admits that the number of individuals who travel overseas for "sex tourism" cannot be accurately estimated. They could only make the dubious claim that the demand is "increasing." The US DoJ notes, "the number of reported incidents declined sharply in 2008 (392) and again in 2009 (247)," but claims the reason for the decrease is "most likely reflecting an improved ability of child sex tourists to operate online in a less detectable fashion." The US DoJ claims that sex tourists travel "in secret" and finding evidence and victims is a difficult and costly task, as difficulties in prosecuting sex tourism cases. [37]  These are merely assumptions because there is no way to accurately determine the reason for the decline. However, these are very small numbers to begin with, so even small changes will result in "major increases" or "major declines."

The US DoJ conducted an interview of 168 "child exploitation experts" from the now defunct National Drug Intelligence Center (NDIC) and added it as a supplement to the 2010 child exploitation report. While 35% of NDIC interviewees reported "it is believed that the extent to which U.S. citizens and Resident Aliens are engaging in sex tourism is significant" and 15% "reported that sex tourism is a major vulnerability and there is potential for it to become a huge industry," thus, "deserv[ing] more attention than it has received," 50% reported never investigating a single suspected case of sex tourism, while 25% reported having only "very infrequently" encountered sex tourism cases. [38]  The eAdvocate blog reposted two charts from various NCMEC reports on the amount of reported child sex trafficking; one chart reported only 433 "sex tourism incident reports" for 2008 and the second reported only 392. [39]

Upon analyzing the stats from the US Department of Justice and the testimony for the 2010 version of International Megan's Law, eAdvocate concludes, "Congress doesn't have a shred of evidence that U.S. registrants are causing, or even participating in, sex tourism. So everything said before the U.S. House was hogwash, at least as to implying sex tourism is caused by registrants of U.S. registries. The credibility of speeches made in the U.S. House on July 27, 2010 are definitely questionable, as they pertain to former registered sex offenders of U.S. registries! Now, a few times within the Report is mentioned, that, it is believed that 25% of sex tourism emanates from the United States. Assuming the truth of that statement, it is not coming from registrants of U.S. registries; is it possible these are new sex offenders, never before convicted of a sex crime? Not according to Congress."[40]

The GAO's June 2010 report attempted to justify allowing limits on passports by studying 30 registered citizens who had obtained passports. The US Department of State blasted the GAO report. "We think the report is very misleading. Starting with the title, 'Passports Issued to Thousands of Registered Sex Offenders,' we are concerned that it conveys more 'shock value' than factual accuracy... To be accurate and balanced, the title should read: 'Existing U.S. Law Allows Passports to Be Issued to Registered Sex Offenders, Although GAO Found No Evidence That Sex Offenders Used Their Passports to Travel Abroad to Commit Sex Offenses.'"[41]

"The report appears to suggest, without any foundation, that the Department's issuance of passports to certain Americans facilitated their commission of sex offenses abroad. There are no facts in the report which show that any of the thirty individuals included in the case studies used his passport to travel to a foreign country to commit a sex crime. Rather, it appears that most (if not all) the individuals included in the case studies committed sex crimes either within their own state or after traveling to a neighboring state. There also is no evidence connecting the sex offender to sex crimes overseas following their convictions."[42]

Attempting a counter to the State Department's assertion the report provided no evidence that the subjects of the study obtained passports to engage in sex tourism, the GAO stated, "In our report, we did not state that the issuance of passports to sex offenders in fiscal year 2008 facilitated their commission of sex offenses abroad. This was not part of our objectives for this review. However, our introduction does cite examples from DOJ in which prior sex offenders committed sex crimes overseas. Our investigation did find several cases where the passport recipients traveled to locations known for sex tourism, and one of our 30 cases is currently under indictment related to sex crimes overseas." [43]

The US Department of Justice also makes the dubious claim that "Some reporting indicates that as many as 80 percent of the child sex tourists in Latin America and 25 percent of those in Southeast Asia are U.S. citizens." [44] It cites World Vision, a Christian organization, as a reference. The World Vision FAQ on Child Sex Tourism makes the claim repeated by the US DoJ, but fails to cite any references or the original source material forming the basis of this claim. [45] This is actually quite typical, as statistics are routinely reported with little to no basis in fact.

Elizabeth Nolan Brown, writing for Reason Magazine, calls the War on Sex Trafficking the 'New War on Drugs.' She points out during the rise of the War on Drugs, there were reports of roving bands of drug traffickers kidnapped and coerced numerous teenagers, mostly runaways, into the drug trade, often beating them for not meeting "quotas." As the result of the panic over drugs, "Lawmakers touted harsher penalties for drug offenses. The war on drugs raged. New task forces were created. Civilians were trained how to 'spot' drug traffickers in the wild, and students instructed how to rat out drug-using parents. Politicians spoke of a drug 'epidemic' overtaking America, its urgency obviously grounds for anything we could throw its way." Brown adds, "We know now how that all worked out." Brown finds many similarities between these two wars. "Because of the visceral feelings that the issue of paid sex has always provoked, it's easy for overstatements and false statistics to go unchallenged, winning repetition in congressional hearings and the press. Yet despite all the dire proclamations, there's little evidence of anything approaching an 'epidemic' of sexual slavery." She cited Glenn Kessler, The Washington Post's "Fact Checker" columnist, who began digging into government-promulgated sex-slavery numbers and discovered just how dubious many of them are. "Because sex trafficking is considered horrific, politicians appear willing to cite the flimsiest and most poorly researched statistics—and the media is content to treat the claims as solid facts," Kessler concluded. [46]

The misuse of statistics has occurred even in the face of repeated attempts from chief researchers in the field and the bureaucracies have found no evidence to validate the claims of widespread human trafficking claims. "'PLEASE DO NOT CITE THESE NUMBERS,' wrote Michelle Stransky and David Finkelhor of the respected Crimes Against Children Research Center in 2008. 'The reality is that we do not currently know how many juveniles are involved in prostitution. Scientifically credible estimates do not exist.' A lengthy 2013 report on child sex trafficking from the Justice Department concluded that "no reliable national estimate exists of the incidence or prevalence of commercial sexual exploitation and sex trafficking of minors in the United States." Brown also points out how government bureaucracies continue to use faulty information even when the study is debunked by the study's own authors: "The DHS also asserts that "the average age a child is trafficked into the commercial sex trade is between 11 and 14 years old," sourcing it to the DOJ and the government's NCMEC. Yet none of these federal agencies take responsibility for this stat. When Kessler followed the facts down the rabbit hole, the original source in all cases was...the self-disowned Estes paper, in which interviews with 107 teens doing street-based prostitution in the 1990s determined that their average age of entry into the business

was 13." [47]

No matter how often the sex trafficking panic is proven to be a moral panic by researchers and government agencies, it is drowned out by the victim industry. Brown states, "these new laws aren't organic responses by legislators in the face of an uptick in human trafficking activity or inadequate current statutes. They are in large part the result of a decades-long anti-prostitution crusade from Christian "abolitionists" and anti-sex feminists, pushed along by officials who know a good political opportunity when they see it and by media that never met a moral panic they didn't like. The fire is fueled by federal money, which sends police departments and activist groups into a grant-grubbing frenzy. The anti-trafficking movement is 'just one big federal grant program,' Michael Hudson, a scholar with the conservative Hudson Institute, told the Las Vegas Review-Journal. 'Everybody is more worried about where they're going to get their next grant' than helping victims, Hudson said. Because of the visceral feelings that the issue of paid sex has always provoked, it's easy for overstatements and false statistics to go unchallenged, winning repetition in congressional hearings and the press. Yet despite all the dire proclamations, there's little evidence of anything approaching an 'epidemic' of sexual slavery." [48]

Since the reality is indeed the amount of sex tourism or trafficking by American registered citizens is anecdotal at best, it is hard to justify any cost to implement such a costly system. As reported by eAdvocate in 2010, the Congressional Budget Office estimated the cost of International Megan's Law would have costed the US "$252 million over 2011-2015 to implement IML assuming money is actually appropriated. That amounts to: $252 million/5 years (Difference between 2011 and 2015) or 50.4 million per year. And, if it costs $50,400,000 per year that also means the U.S. would be spending $5,040,000 to capture EACH of the 10 offenders per year committing this type of crime. And, that is $5 million in administrative costs for IML without the costs of investigating the crime in a foreign country, then add the costs of imprisoning the offenders." If passed in 2010, IML would have impacted an estimated 10,000 registered citizens. [49]

Costs alone for the bureaucratic agency what would be created by International Megan's Law was estimated in 2010 to cost "$8 million annually, including salaries, benefits, computer systems, and support costs… costs would increase annually with inflation." "Considering the number of sex offenders who travel internationally, CBO expects that the agency would need to hire 40 to 50 persons to carry out the responsibilities of the International Sex Offender Travel Center, which ICE anticipates would be staffed at all times." [50]

There is not a cost analysis of the controversial "unique identifier" provision, but every registered citizen with a passport would be required to turn in their current passports to receive a new passport with the unique identifier. If the 2008 estimate of 4500 new passports were acquired by registered citizens in 2008 remained steady in subsequent years, then 36,000 registered citizens would be immediately affected just from those obtaining passports between 208 and 2015. It will take millions of dollars just to identify and notify those registrants with passports of the new rules. (As previously noted, the bureaucratic agencies lack the sophistication to accurately estimate how many registered citizens have passports.) More than likely, the government would take the easy way out and wait until a registrant actually travels abroad before springing the rule changes. This means that thousands of registered citizens can make travel plans only to be denied after the plans have been made.

## CONCLUSION

International Megan's Law is an attempt at imposing the American way of thinking on the rest of the world, an act of arrogance that will lead to disastrous results if implemented. IML will attempt to force other nations to create a registry and raise the age of consent to conform to the American standards. This is a blatant violation of international law and a show of contempt for the governments of all nations who do not maintain close ties to the US.

Victim industry advocates have tried to justify International Megan's Law using anecdotal examples, assumptions, unsourced statistics and non sequiturs to attempt to justify this bad piece of legislation. In reality, various government agencies have reported they have found very few examples of actual sex tourism, and even fewer examples of sex tourism from a registered citizen. It is estimated only about 10 convictions a year occur from Americans engaging in sex tourism annually. The GAO, the US Dept. of Justice, ICE, and the now defunct NDIC have all stated they have found few, if any, examples of Americans traveling abroad specifically to engage in sex tourism or sex trafficking. Key researchers studying sex crimes have repeatedly warned their own research or the research of others have been misinterpreted or distorted by those trying to promote human sex trafficking as America's next social panic.

International Megan's Law will be a costly and ineffective measure. It will cost millions just to establish a new bureaucratic agency and to revise the passports of registered citizens. It will cost millions more to enforce the various proposed changes to passports proposed by Congress. Passport limits run afoul of international law, particularly the International Covenant on Civil and Political Rights (1966), by interfering with the free movement of citizens. The ICCPR was signed, ratified, and enforced by the US. In addition, 22 U.S. Code § 217a has been narrowly tailored to limit passports only to those registrants convicted in a court of law for sex tourism, thus nullifying the perceived need to pass IML passport provisions. As previously noted, very few cases of sex tourism/ trafficking are confirmed by government agencies, so the cost of investigating and prosecuting a mere handful of cases do not justify the need for a new bureaucracy, especially if the SMART office is passing IML notification provisions without the authorization of Congress.

The proposal to mark the passports of registered citizens is unprecedented in American history and is offensive enough that even mass media have made parallels between International Megan's Law and Nazi law. In 1938, the Nazi government required all Jews to surrender their passports and have new passports issued with a scarlet "J" stamped on them. If IML passes, registered citizens will be forced to surrender their passports and have new passports issued with a "unique identifier" on them. In addition to the obvious parallel to Nazi law, this practice will obviously lead to travel impediments and denials of entry across the globe for all registrants regardless of offense. This mark of infamy could potentially lead to travel problems domestically as states struggle to fall into compliance with the so-called "REAL ID" system and thus requiring passports to fly within the boundaries of the US. Furthermore, IML could have an effect described as "humiliating" and "devastating" for individuals whose passports may be falsely marked as belonging to a registered citizen and would lead to costly litigation.

While certain provisions of IML imply that these provisions would be limited to "high risk/ interest" registrants, the harsh reality is this law will be applied to every registered citizen regardless of offense, even teens who engaged in consensual relations with other teens. The law is especially difficult for juveniles on the registry, who are assumed to be less likely to reoffend, more amenable to rehabilitation, and far less likely to become a "sex tourist."

Finally, International Megan's Law violates a number of constitutional safeguards, including the 1st (freedom of association) and 14th (Due process) Amendments, as well as the Ex Post Facto clause. In addition, protecting the reputation of American travels and their privacy is of great governmental interest, especially given the realities of much of the world regarding American tourists. Unconsidered in this report was the potential chilling effect IML could have on ALL American tourists as the US gains a reputation for being a country full of "sex traffickers." International Megan's Law will ultimately do far more harm than good, not just in regard to registered citizens, but for the reputation of this nation as well.

AR-00000991

## REFERENCES

1. Human Trafficking: Modern Day Slavery. US Congressman Chris Smith. Web. <http://chrissmith.house.gov/specialfeatures/traffickingspecialfeature.htm>
2. Victims of Trafficking and Violence Protection Act (P.L. 106-386). US Congressman Chris Smith. Web. http://chrissmith.house gov/lawsandresolutions/tvpa.htm
3. See https://www.govtrack.us/congress/bills/110/hr5722
4. See https://www.govtrack.us/congress/bills/111/hr1623
5. See https://www.govtrack.us/congress/bills/111/hr5138
6. https://www.govtrack.us/congress/bills/112/hr3253
7. https://www.govtrack.us/congress/bills/113/hr4573
8. See Federal Register / Vol. 76, No. 7 / Tuesday, January 11, 2011 / Notices, pages 1633-1634. Web. <http://ojp.gov/smart/pdfs/SORNAFinalSuppGuidelines01_11_11.pdf>
9. https://www.govtrack.us/congress/bills/114/hr515
10. https://www.govtrack.us/congress/bills/114/s1867
11. Here is HR 515 as it left the Senate Committee: https://www.govtrack.us/congress/bills/114/hr515/text/rs. Compare it to S-1867: https://www.govtrack.us/congress/bills/114/s1867
12. "Newsroom: Passports and International Megan's Law." US Department of State. Oct. 30, 2017. https://travel.state.gov/content/passports/en/news/passports-international-megans-law.html, Retrieved Oct. 30, 2017
13. Federal Register / Vol. 76, No. 7 / Tuesday, January 11, 2011 / Notices, pages 1633
14. Ibid.
15. https://www.law.cornell.edu/uscode/text/22/217a
16. PASSPORT ISSUANCE: Current Situation Results in Thousands of Passports Issued to Registered Sex Offenders. GAO. June 2010. Web. < http://www.gao.gov/assets/310/305432.pdf> pgs. 4-5
17. Post, David. "The yellow star, the scarlet letter, and 'International Megan's Law'," Washington Post. 6 Jan. 2016. Web. <https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/01/06/the-yellow-star-the-scarlet-letter-and-international-megans-law/>
18. "German Jews' Passports Declared Invalid." US Holocaust Memorial Museum. 2016. Web. <http://www.ushmm.org/learn/timeline-of-events/1933-1938/reich-ministry-of-the-interior-invalidates-all-german-passports-held-by-jew>
19. Skenazy, Lenore. "Labeling sex offenders' passports is overkill." New York Post. NYP Holdings. 6 Jan. 2016. Web. <http://nypost.com/2016/01/06/labeling-sex-offenders-passports-is-overkill/>
20. Micolucci, Vic. "Jacksonville man mistakenly labeled sex offender on Florida ID." News4Jax. Graham Media Group. 9 May 2013. Web. <http://www.news4jax.com/news/local/jacksonville-man-mistakenly-labeled-sex-offender-on-florida-id>
21. Hayes, Christal. "Woman whose drivers license falsely marked her as 'sexual predator' threatens to sue state." Orlando Sentinel. 7 May 2015. Web. <http://www.orlandosentinel.com/news/lake/os-drivers-license-sexual-predator-mistake-20150507-story.html>
22. "REAL ID and You: Rumor Control." Department of Homeland Security. 2016. Web. < http://www.dhs.gov/real-id-and-you-rumor-control#>. To check if your state is Real ID Compliant, visit http://www.dhs.gov/current-status-states-territories. As of January 30, 2016, AL, CO, CT, DE, FL, GA, HI, IN, IA, KS, MD, MS, NE, NV, OH, SD, TN, UT, VT, WV, WI, & WY are Real ID compliant.
23. Viera, Danielle. "Try as They Might, Just Can't Get it Right: Shortcomings of the International Megan's Law of 2010." Emory International Law Review. Vol. 25, Issue 3. Pp. 1540-1541. Web version at <http://law.emory.edu/eilr/content/volume-25/issue-3/comments/shortcomings-international-megans-law-2010.html>
24. Ibid., pgs. 1542
25. "International Megan's Law to Prevent Demand for Child Sex Trafficking: Misguided and Ineffective Policy." National RSOL. Position Paper. Web. <http://nationalrsol.org/wp-content/uploads/2014/12/Position-Paper-International-Megans-Law-HR-515.pdf>
26. See https://en.wikipedia.org/wiki/International_Covenant_on_Civil_and_Political_Rights
27. Bassler, Will. "Amendment to H.R. 515 Is Based On Lies." SOSEN. 28 Jan. 2016. Web. <http://sosen.org/blog/2016/01/28/1478.html>
28. "REGISTERED SEX OFFENDERS: Sharing More Information Will Enable Federal Agencies to Improve Notifications of Sex Offenders' International Travel." GAO. February 2013, p.11. Web. <http://www.gao.gov/assets/660/652194.pdf>
29. "Foreign Child Molesters not allowed into Sri Lanka." Hiru News. Rayynor Silva Holdings. Asia Broadcasting Corporation. 21 March 2013. Web. <http://www.hirunews.lk/55662>
30. Ramirez, Jun. "Manila Bulletin: Sex offenders to be barred from entering Philippines." Travel Impact Newswire. 7 June 2014. Web <https://www.travel-impact-newswire.com/2014/06/manila-bulletin-offenders-to-be-barred-from-entering-philippines/>
31. "'Guardian Angel' Keeps Sex Offenders Out of Vallarta." Banderas News. 9 May 2014. <http://www.banderasnews.com/1405/nb-mexico-guardian-angel-program.htm>
32. Viera, "Shortcomings," Emory Law, pgs. 1543-1544.
33. Davis, Mike. "House passes International Megan's Law, notifies foreign countries of traveling sex offenders." NJ.com. New Jersey On-Line LLC. 27 Jan 2015. Web. <http://www.nj.com/mercer/index.ssf/2015/01/house_passes_international_megans_law_notifies_for.html>
34. https://en.wikipedia.org/wiki/Fallacy_of_the_undistributed_middle
35. GAO, "Passport," Summary page.
36. Davis, "House Passes IML," NJ.com.
37. "The National Strategy for Child Exploitation Prevention and Interdiction." US Dept. of Justice. August 2010. Web. Pgs. 36-37. <http://www.justice.gov/psc/docs/natstrategyreport.pdf>
38. Ibid., pg. D-24.
39. eAdvocate, "International Megans law EXPOSED! Part-2 of the truth about HR 5138." Sex Offender Research & State News. 3 Aug. 2010. Web. < http://sexoffenderresearch.blogspot.com/2010/08/international-megans-law-exposed-part-2.html>
40. Ibid.
41. GAO, "Passport," p.18-19
42. Ibid., p. 20
43. Ibid., p. 11
44. US DoJ, "Nat'l Strategy," p.36
45. "Frequently Asked Questions: Child Sex Tourism." World Vision, Inc. 2016. Web. <http://www.worldvision.org/worldvision/pr.nsf/stable/press_cst_faqs!OpenDocument&Click=>

AR-00000992

46. Brown, Elizabeth Nolan. "The War on Sex Trafficking Is the New War on Drugs." Reason.com. Reason Foundation. Nov. 2015. Web. <https://reason.com/archives/2015/09/30/the-war-on-sex-trafficking-is>

47. Ibid.

48. Ibid.

49. eAdvocate. "International Megans law EXPOSED! Now, hear the truth ..." Sex Offender Research & State News. 30 July 2010. Web. <http://sexoffenderresearch.blogspot.com/2010/07/international-megans-law-exposed-now.html>

50. "H.R. 5138 International Megan's Law of 2010." CONGRESSIONAL BUDGET OFFICE COST ESTIMATE. As ordered reported by the House



**MARK OF THE BEAST**

The USA joins Nazi Germany and the Soviet Union as the only nations in the world to mark the passports of certain citizens as of October 2017:

Source: https://travel.state.gov/content/travel/en/News/passports/passports-and-international-megans-law.html

The IML prohibits the Department of State from issuing a passport to a covered sex offender without a unique identifier, and it allows for the revocation of passports previously issued to these individuals that do not contain the identifier (22 USC 212b).

The identifier is a passport endorsement, currently printed inside the back cover of the passport book, which reads: "The bearer was convicted of a sex offense against a minor, and is a covered sex offender pursuant to 22 United States Code Section 212b(c)(l)."  Since endorsements cannot be printed on passport cards, covered sex offenders cannot be issued passport cards.

AR-00000993



(c) 2007-2016 Derek  W. Logue. No part of this website may be used in any way without expressed written consent of the site owner.

<----- BACK TO INDEX ------->

**This article is the newer version to my original article from 2008. To access the older article, CLICK HERE**

# A Decade of Devastation: Ten Years of the Adam Walsh Act

Derek W. Logue of OnceFallen.com
July 27, 2016; Last update Nov. 14, 2016

**INTRODUCTION**

Ten years after George Bush signed the so-called "Adam Walsh Child Protection and Safety Act" (Adam Walsh Act or AWA for short) into law, the AWA remains a controversial law. In fact, two-thirds of states have yet to come into "substantial compliance" with the AWA, and the states that have adopted AWA provisions have endured many hardships related to the Act. The Act continues to be a largely unfunded mandate, with the cost of implementation still far outweighing the loss of federal Byrne/ JAG funds for failing to comply. In addition, issues with state and tribal sovereignty, inclusion of juveniles on the registry, and retroactivity still plague this controversial piece of public policy. The AWA was promoted as a sort of universal minimum standard, but registration laws in AWA states still vary greatly and are possibly even more confusing. State like Ohio and Nevada continue to act as battlegrounds for the AWA. This article examines the decade-long history and the controversies surrounding the implementation and enforcement of the AWA.

**EVOLUTION OF THE ADAM WALSH ACT**

*Origins of the AWA: 2005*

The bill that became known as the "Adam Walsh Act" began life as a series of separate bills introduced in the Second Quarter of 2005.

On May 18, 2005, Rep. Mark Foley introduced HR 2423 [1], which was given the title, "`Jacob Wetterling, Megan Nicole Kanka, and Pam Lychner Sex Offender Registration and Notification Act," and shortened even further to the "Sex Offender Registration and Notification Act." The House bill would have required all on supervision to be subject to GPS (sec. 104), as well as a creation of a national database for both registered citizens and DNA. The senate Bill (sec. 110) would have required mandatory "sexual predator" hearings under a "board composed of experts in the behavior and treatment of sex offenders, victims' rights advocates, and representatives of law enforcement agencies."

On May 19, 2005, Senator Orrin Hatch introduced S. 1086 [2], which was given the title "`Jacob Wetterling, Megan Nicole Kanka, and Pam Lychner Sex Offender Registration and Notification Act," and shortened even further to the "Sex Offender Registration and Notification Act." Essentially, it was the same bill at HR 2423. As Hatch introduced the bill, he declared we were in "a battle to save our children, their families, and the victims, of repeat sex offenders… We need legislation that will close the gaps in many laws already on the books; integrate and revive the existing laws; and expand covered offenses against children." Hatch declared his bill would "strengthen and unite cities, communities and states in the effort to stop the assault on American children. This bill has a companion bill in the House, sponsored by Congressman MARK FOLEY and Congressman BUD CRAMER. I invite you to join Senator Biden and me as we close the gaping holes that keep our children at risk. " [3]

On May 25, 2005, Rep. Foley rose before the House to recognize "Missing Children's Day," and promote HR 2423. He stated that, "Every day over 2,000 children go missing," and, "There are over 500,000 registered sex offenders in this country, and 150,000 of them are missing. Now we hear that Medicare may be giving them Viagra. How disgusting. How sad. How sick. We have to stop playing Russian roulette with our children. Last week, the gentleman from Alabama (Mr. Cramer), my cochairman, and I, along with Senators Hatch and Biden, introduced the Sex Offender Registration Notification Act. I urge my colleagues in the House to work with the gentleman from Wisconsin (Mr. Sensenbrenner) in passing this important bill." [4]

While HR 2423 progressed no further than the Subcommittee on Crime, Terrorism, and Homeland Security (the last noted action was on June 9, 2005), S.1086 would continue on to the Committee on the Judiciary but would not advance again until October.

On June 30, 2005, Rep. Mark Foley introduced HR 3133, known as the "Sex Offender Registration and Notification Act." [5] This bill dealt simply with registration-related issues, including in-person registration (Sec. 106), but introduced many of the provisions later incorporated into the Adam Walsh Act, including the role of the US Marshals in investigating suspected "Failure To Register" (FTR) cases (Sec. 202), immunity for "good faith" for law enforcement (sec. 114) and the NCMEC (Sec. 122), and the introduction of a "Established a Sex Offender Management Assistance (SOMA)" (Sec. 119). It also added a sentence enhancement for "Use of any controlled substance to facilitate sex offense." (sec. 2249). The same day, Rep. James Sensenbrenner introduced HR 3132, also known as the "Children's Safety Act of 2005." It included many of the recommendations of HR 3133, but HR 3132 added increased penalties for a number of sex offenses (See Titles IV and V) and added provisions for civil commitment (Sec. 511).

While Foley's HR 3133 never left committee, Sensenbrenner's HR 3132 advanced to the Senate floor by September 2005. On September 13, 2005, Rep. Phil Gringley passed H.RES.436 [6] to advance HR 3132 to the Senate Floor. On September 14, 2005, a number of amendments were proposed, mostly mundane suggestions such as name changes, allocation of funds, and study proposals, but two amendments seeking to remove "mandatory minimums" for certain crimes—one by Rep. Bob Inglis  [7] and one by Rep. Bobby Scott. [8] Both amendments failed. Rep. John Coyers added an Amendment, which passed by the relatively narrow margin of 223-199, which "provides for inclusion of gender and crimes committed by and directed against juveniles for coverage under the Hate Crime Statistics Act." [9] Ultimately, the bill passed the Senate 371-52. [10] It was read the next day but no further action occurred on this bill. [11]

AR-00000994

A writer for DailyKos offers an explanation why the bill did not progress further: "H.R. 3132 died in the Senate when Senator Bill Frist (R-TN) removed its equivalent, sister bill S. 1086, from consideration due to attempt by Senator Ted Kennedy (D-MA) to add a hate crime amendment. (S. 1086 also proposed to improve the national program to register and monitor individuals who commit crimes against children or sex offenses)." [12]

On December 8, 2005, Rep. Sensenbrenner introduced HR 4472, then called the "Children's Safety and Violent Crime Reduction Act of 2005." [13] This bill, as introduced, added the provisions of every previously mentioned bills, but also added provisions relating to killing peace officers, witness protection, street gangs, drug trafficking, "illegal aliens," and child pornography. This bill would not see further action until March 8, 2006.

As eAdvocate points out, a number of bills were introduced between the introduction of HR 4472 in December 2005 and the further action taken on March 8, 2006 and eventually "morphed" into the existing text of HR 4472. [14] These bills were:

- H.R.4732 (The "Sergeant Henry Prendes Memorial Act of 2006" [15], introduced Feb. 8, 2006), which provided Federal penalties for killing federally funded public safety officers;
- H.R.4815 (Safe NOW Act of 2006 [16], introduced Feb. 28, 2006), which would have established a National Sex Offender Risk Classification Task Force to create guidelines for the establishment of a risk-based sex offender classification system for use in sex offender registries. Interestingly, this bill would have studied the negative impact of Megan's Law as well as promote risk assessments; but it would have created a 20 member task force that included a representative of the vigilante group "Parents For Megan's Law;"
- H.R.4883 (Justice for Crime Victims' Families Act [17], introduced March 7, 2006), which would have provided resources to improve DNA testing and crime scene investigations, particularly murder; and
- H.R.4905 (Sex Offender Registration and Notification Act [18], introduced March 8, 2006), a continuation of previous, similarly named bills with the same recommendations. (eAdvocate points out the language was harsher than in previous versions of the Foley bills.)

*March 8, 2006: Suspension of the Rules to fast-track HR 4472*

The eAdvocate blog points out a number of key points that is noteworthy to understand the events of March 8, 2006:

- Rep. Sensenbrenner was the Chairman of the House Judiciary Committee, which received HR 4472 for further consideration;
- "Specifically, HR 4815 (HR 271 in 2007) Paul Gillmor's National RSO Classification System and HR 4905 Mark Foley's National RSO Registration Requirements, directly pertain to RSOs nationally. HR 4905 was a complete harsher rewrite of his bill (HR 3133) that was originally within the failed HR 3132;"
- "Mark Foley's HR 4905 was introduced by him, on 3-8-06, only minutes before it was morphed into HR 4472, and then walked into the full House for a floor vote on HR 4472. There is no way possible hundreds of House members had any opportunity to review that bill or what effects it may have on the laws of their respective states;" and
- Sensenbrenner moved to advance the bill under "suspension of the rules." [19]

Most distressing is the concept of bypassing the normal course of creating legislation through "suspension of the rules. "The purpose of considering bills under suspension [of the rules] is to dispose of non-controversial measures expeditiously… A motion to suspend the rules requires a vote of two-thirds of the Members present and voting. No amendments are in order unless submitted with the bill by its manager as part of the motion to suspend the rules. Debate on a bill brought up under suspension of the rules is limited to forty minutes, twenty minutes controlled by a Member who supports the bill and twenty minutes controlled by a Member in opposition, a division that does not always follow party lines." [20]

The following statements are from the "Suspension of the Rules" hearing on March 8, 2006. [21]

Rep. Conyers (who had pushed for a hate crimes bill in Sensenbrenner's previous bill) raised concerns over the bill, stating, "I rise in strong opposition to this legislation and the manner by which it comes before us today. Introduced just over two months ago, this legislation, all 164 pages, has managed to completely circumvent the traditional legislative process. Without the benefit of a single hearing or committee markup, the legislation has somehow found its way here to the floor of the House of Representatives. To make matters worse, it's being considered under suspension of the rules, leaving with reasonable concerns no opportunity to offer modest amendments… the measure under consideration today includes a complex system of categories whereby sex offenders are classified based upon the nature of their offense. They are also routinely forced to verify the accuracy of their registry information based upon this system. This new system of registration and registry verification has never been discussed by members of our committee. While some may certainly welcome such a system, others most likely will not. In either event, a change of this magnitude should not be undertaken without adequate thought, consideration and debate… Over 33 scientific researchers, treatment professionals and child advocates have written in to express their concerns regarding the bill's overly harsh treatment of juveniles."

Rep. Bobby Scott spoke out against this bill, stating, "Madam Speaker, this is a very difficult bill to try to debate because it includes a lot of different bills, everything except the hate crimes bill, which had broad support at least on this side. It includes a variety of slogans and sound bites, many of which have actually been shown to increase crime, disrupt orderly, proportionate, and fair sentencing, it wastes money and violates common sense."

"Among these approaches are trying more juveniles as adults, the mandatory minimums, new death penalties, and habeas corpus restrictions, which is a process by which dozens of innocent people on death row have been able to show their innocence and escape the death penalty because they were innocent of the underlying charges. It also includes a national sex offender registry that includes misdemeanors and juveniles in the same kind of registration as the most serious predatory offenses.

If we are going to be serious about dealing with child sexual abuse, we ought to face the fact that virtually all of the abusers are either related to the child or at least known to the child's family. No studies have shown that these things actually reduce child abuse; and, in fact, anecdotal evidence would suggest that we might be actually increasing crime. Because the people who are the subject of these are unable to get a job, unable to live in any kind of neighborhood, have nothing to lose, the restrictive covenants now restricting where they can live, and all of these things may in fact increase crime. But there are certainly no studies to show that they have reduced by any measurable amounts the amount of child sexual abuse." [22]

Rep. Keller (FL) stated this was a "commonsense" bill that would protect children from "convicted pedophiles," and used the murders of Jessica Lunsford and Sarah Lunde as his appeals to emotion in support of the bill.

AR-00000995

Rep. Frank (MA) spoke out over concerns about the use of the "suspension of the rules" to promote this bill, which he contended contained controversial and hotly contested provisions in previous legislation. (In particular, the Conyers "hate crimes" Amendment passed by a narrow margin during the previous debate over HR 3132). Rep. Frank berated the House for using suspension of the rules, stating, "So today we have the antidote to democracy. We have a bill brought forward that repeats much of what was done before, which adds some other issues that ought to be debated, many of which I support, some of which I might like to see amended, and it prohibits amendments. It is a very important and somewhat controversial piece. And there can be controversy about better ways to do it or worse ways to do it, but it is brought up in an absolutely undemocratic fashion. So to those members of the Iraqi National Assembly who may happen to be observing this, I think there is a very important point we need to make: please don't try this at home. We are trying to instill others in the world to be democratic. The President's inaugural address noted that we are going to bring democracy. Is this what you mean by teaching people to follow democratic procedures, Madam Speaker? The other side brings up a controversial bill, and because it was amended once, make sure you can bring it back again in an unamendable form, put in other aspects, and leave virtually no time for debate. We will have debated this bill under the same rule that we debate naming of post offices…"

"This is a shameful example of the degradation of the democratic process that has befallen this House. What happens is what has happened in the past: things get put in here that cannot be individually examined, they cannot be debated. Members will feel pressured to vote for the overall package. Members, and this is the goal, put a lot of things in here that are very important and very good, many of which I have voted for in the past, many of which I want to vote for. But Members have put in a few other things that are very controversial and do not allow this House to approach looking at things individually and saying an amendment here, yes or no. And then if Members do not buy the whole package, then you got after them. The Republican majority has decided to legislate in the same manner in which you give a pill to a dog: you take something that the dog wants and you stick a couple of pills in it and you ram it down its throat. That is an inappropriate way for this democratic House to proceed."

Rep. Sensenbrenner replied, "Madam Speaker, this is not giving a pill to a dog. What this legislation does is it combines three bills that the House already debated and passed but which got stalled in the other body. What it does is it takes away the poison pills that have caused the essential legislation to be stalled in the other body. And it makes some amendments, some of which have been requested by people on the other side of the aisle such as getting rid of a certain number of mandatory minimum penalties. The purpose of this exercise is to get legislation signed into law and it is important legislation on protecting children from pedophiles, protecting Americans from gangs, and protecting judges from kooks who want to try to do them and their families harm. That is why this procedure is being used today so that we can make a law."

Rep. Harris (FL), like her fellow Floridian Congressman, relied on appeals to emotion while adding the myth of "100,000 to 150,000 missing" sex offenders to drive her point. Rep. Nadler (NY) opposed suspension of the rules because it failed to ban misdemeanor registrants with minor victims from owning firearms, presumably to "so they can use firearms against minors the next time." Nadler was also upset with the removal of Conyer's Hate Crimes amendment, stating, "It is wrong to prostitute the procedures of this House to undo the majority votes on the floor by behind-the-scenes manipulation and then say this is democratic procedure."

Rep. Gillmor (OH) stated, "If a picture is worth a thousand words, than a comprehensive nationwide publicly accessible database is worth at least that many lives. I was pleased that Chairman SENSENBRENNER included provisions from my bill, H.R. 95, that would create a national, comprehensive, and publicly accessible sex offender database into this comprehensive piece of legislation. Additionally, I feel that it is important to have consistency not only with a national registry, but also in how offenders are classified. Currently each State classifies offenders differently according to the risk that they pose to the community. The result is inconsistent and unreliable classifications across state lines. I was pleased that the chairman saw the need to address this issue, and I appreciate him working with me to include a provision to study the merits of a national risk-based classification system that could be integrated into the national sex offender database." Somewhat ironically, Rep. Gillmor's home state of Ohio would be the first to experience the effects of Gillmor's own suggestions.

Rep. Mark Foley responded with his infamous statement that "we protect library books better than we do our children." Rep. Ginny Brown-Waite added, "That is what this bill is all about; it is going after those, as someone once described, pond-scum predators."

Rep. Sensenbrenner then added the elements of fear to the discussion, adding if they failed to pass the bill today, the 100,000 missing sex offenders would never be found, date-rape drugs will be sold on the internet, Federal judges and their families won't be protected from murderers seeking revenge, and gang leaders will continue to roam the streets.

Supplemental letters added to the record for this meeting expressed concerns over the inclusion of juveniles on the registry, with some of the concerns coming from agencies working directly with children.

Despite the amount of opposition, the bill advanced under suspension of the rules. The eAdvocate site points out that barely 20 members were present to vote on the bill on March 8, 2006. The eAdvocate site also states, "The Speaker was not made aware of the the Morphed Bills, which is required, and that the full House had never debated them, nor did they come out of the Judiciary Committee. Rep. Sensenbrenner infers, the Full House reviewed and voted on HR 3132 in September, but ignores that it was virtually rewritten and made harsher (Morphed bills printed is 38 pgs. HR-4472 printed is 77pgs. Means 49% of bill was new, minutes, before it went to the House floor for a vote under suspension of the rules.). Finally, a voice vote was taken, the bill passed, and there is no written record of that voice vote." [23]

Senator Hatch's S. 1086 advanced to the Senate and sent to the House on May 8, 2016, but was "held at the desk" once it reached the Senate.

The Daily Kos report suggests that John Walsh may have played a strong role in advancing HR 4472 through suspension of the rules, knowing the removal then-controversial hate crimes bill would cause problems. "Alarmingly, Foley's comments seemingly indicate that John Walsh has influenced Frist to allow H.R. 4472 on the Senate floor, although S. 1086 lies in legislative limbo. This is where John Walsh begins lying about his true motives behind his support of The Children's Safety Act. His agenda is all about getting the legislation pushed through, one way or another, regardless to constitutionality or collateral consequence to our society as a whole. Sensenbrenner, by hijacking every rule Sesame Street ever taught kids about 'How a Bill is Made', is attempting to circumvent the stalled S. 1086, by repackaging H.R. 3132 as the new H.R. 4472, which includes other broad proposals, relating to gangs and the judges. Sensenbrenner unilaterally disallowed amendments to be added to H.R. 4472 by House Democrats, knowing an attempt to add a hate crime amendment would be made, which would stall The Children's Safety Act in the Senate." [24] Obviously, the suspension of the rules worked to successfully bypass attempts to advance legislation to prevent hate crimes.

*HR 4472 becomes "The Adam Walsh Act"*

On the July 18, 2006 episode of Nancy Grace, Sen. Orrin Hatch stated, "We want to get this bill through this week so that the president can sign it on the 27th of

AR-00000996

April (sic), which was -- would be the 25th anniversary of Adam Walsh's death. And it's named the Adam Walsh Bill." It is also worth noting that the myth of 150,000 missing registrants was used on the show to justify the bill. [25] (Also present on the show were Elizabeth and Ed Smart, who were among the victim industry representatives lobbying to push this bill.)

On July 20, 2006, HR 4472 (known up to this point as the "Children's Safety and Violent Crime Reduction Act of 2006") was laid before the Senate by "unanimous consent." Sen. Orrin Hatch introduced HR 4472, and it was when he introduced it by its new name-- the "Adam Walsh Child Protection and Safety Act of 2006." (Technically, the officially renamed through S.AMDT.4687, sponsored by Sen. William Frist [TN], which was agreed upon by unanimous consent later at the end of the meeting. [26]) After thanking Rep. Mark Foley for "getting this ball rolling and for fighting like a champion on behalf of our children," Sen. Hatch proclaimed the AWA "creates a National Sex Offender Registry with uniform standards for the registration of sex offenders, including a lifetime registration requirement for the most serious offenders. This is critical to sew together the patch-work quilt of 50 different State attempts to identity and keep track of sex offenders..."

"The bottom line here is that sex offenders have run rampant in this country and now Congress and the people are ready to respond with legislation that will curtail the ability of sex offenders to operate freely. It is our hope that programs like NBC Dateline's ``To Catch a Predator'' series will no longer have enough material to fill an hour or even a minute. Now, it seems, they can go to any city in this country and catch dozens of predators willing to go on-line to hunt children."

"Laws regarding registration for sex offenders have not been consistent from State to State now all States will lock arms and present a unified front in the battle to protect children. Web sites that have been weak in the past, due to weak laws and haphazard updating and based on inaccurate information, will now be accurate, updated and useful for finding sex offenders."

"There are more than a half-million registered sex offenders in the United States. Those are the ones we know. Undoubtedly there are more. That number is going to go up. Over 100,000 of those sex offenders are registered but missing. That number is going to go down. We are going to get tough on these people. Some estimate it is as high as 150,000 sex offenders who are not complying. That is killing our children…"

"I want to thank John Walsh, host of ``America's Most Wanted,'' and his wife, Reve--who have waited nearly 25 years for this day. Next Thursday, July 27, 2006, marks 25 years since the abduction and subsequent murder of their son Adam--for whom this bill is named. And on that 25th anniversary the President will sign into law legislation that will help law enforcement do what John has been doing all along--hunt down predators and criminals… And then I would like to pay respect to just some of the victims who really helped with this bill: Elizabeth and Ed and Lois Smart; Linda Walker, the mother of Dru Sjodin; Mark Lunsford; Erin Runnion; Marc Klass; Polly Franks, Patty Wetterling; and last but not least--really, really, we can never thank them enough, John and Reve Walsh." [27]

Sen. Joe Biden added, "The two things of which I am most proud that I have done in 33 years are dealing with this issue in particular and culminating in this legislation, the Adam Walsh Child Protection Safety Act, and the Violence Against Women Act--which, I might add, one of only seven guys who jumped out front in 1994 to get that done was also Orrin Hatch… I might add one more thing. Joe Biden and Orrin Hatch come from different sides of the political spectrum on a lot of things. But I can assure you, not only is this tough, but the civil liberties of Americans are not in jeopardy with this. This is not--this is not--a case where in order to get bad guys we have had to in any way lessen the constitutional protections made available to good guys. So I think it is a proud piece of work."

The rest of the minutes were discussions about the various people for which provisions of the Adam Walsh Act would be named for, like Alexandra Zapp (mentioned once), Jetseta Gage (mentioned 8 times), Dru Sjodin (mentioned 9 times), Molly Bish (mentioned 3 times), and "Masha" (a Russian girl who was still underage at the time and thus her last name withheld). Many of the bill's cosponsors, and those who spoke that day, were influenced specifically by rare, tragic murders in their home states (Jetseta Gage was from Iowa, Sen. Grassley's home state, for example). Also mentioned five times during the minutes was the myth of 100,000 missing registrants (four times, that number was increased to 150,000), which was used to justify the need for a "national registry" (21 mentions), John Walsh (21 mentions), Mark and Jessica Lunsford (9 mentions), "loopholes" (4 mentions), 'To Catch a Predator" (2 mentions), "predators" (54 mentions), and "pedophiles" (3 mentions). Interestingly, neither Megan Kanka nor Megan's Law was mentioned even once during the July 20 minutes.

By July 25, as HR 4472 appeared before the House one last time, all the provisions relating to non-sex crime legislation has disappeared from HR 4472—no mention of violent crimes, immigration )other than preventing registrants from obtaining visas for loved ones from other countries), gang prevention, or violent crime legislation remained. The intent, mentioned numerous times, was to push the legislation to be signed by the President 25 years to the day that Adam Walsh was murdered. Rep. Sensenbrenner again proposed a suspension of the rules.

Rep. Bobby Scott tried one last plea to table the measure for further consideration. He stated, "Mr. Speaker, the crimes committed against the children named in the bill, those not named, and the suffering of their families is a tragedy for all of us, yet this does not release us from the responsibility to legislate on a sound and reasoned basis. I believe the situation is serious and grave enough to warrant a bill that is based on approaches that have been proven to reduce this scourge in our society, not on sound bites that will merely pander to our emotions… Under the provisions of the bill, prom night in the Washington D.C., Virginia, and Maryland area could have nightmarish consequences. And to show how ridiculous it could be, if two teenagers, one 18 and one 17, engage in sexual activity without crossing a State line, you will have, if there is any prosecution at all, it will be a misdemeanor on the part of the 18-year-old. So we have the absurd anomaly of making what is now an infrequently prosecuted misdemeanor into a 10-year mandatory minimum sentence for teens who cross State lines to do it. Imposing a 10-year mandatory prison term on teenagers engaged in consensual sex is not responsible legislating."

"Rather than taking such cases out of the bill, we are told that we should simply trust the prosecutor. Don't trust the Sentencing Commission's discretion to set guidelines designed to reflect what sentence should be based on the facts and circumstances of the case or the background and role of the offender, rather than simply the name of the case, the name of the provision. Don't trust judges to look at the facts and circumstances of the case, the offender's role and background and guidelines to arrive at an appropriate sentence after hearing all of the evidence at trial. Take the discretion away from these officials and trust prosecutors to decide when to ignore law requiring a 10-year mandatory minimum sentence. And trust there are no prosecutors who can be affected by issues such as local political influences..."

"The jury is out as to whether publicly accessible sex offender registers will have any beneficial effect on reducing sex crimes, but the studies that have been done indicate that the registries do not have any effect in reducing sex crimes. And I have seen no study that suggests that the policy of posting the name of juvenile delinquents, as this bill does, on the Internet, serves any constructive purpose. Of course, programs and grants to assist children and to provide the type of sex offender treatment that studies have been shown that can cut recidivism in half are not in this bill. And so, Mr. Speaker, unlike most of my colleagues we will hear from today, I believe that we can do better than this bill to effectively address the scourge of child sexual assault."

AR-00000997

Obviously, the plea fell on deaf ears, as the supporters of the bill once again relied on tragic stories and slogans to push the bill to the president's desk. (Mark Foley's slogan that they track library books better than sex offenders was repeated four times.) Dennis Hastert was thanked for "keeping his word" to get HR 4472 to the President's desk by July 27. The rules were suspended [28] and HR 4472 was sent to the President's desk to be signed as promised.

The influence of John Walsh in pushing this controversial legislation through Congress was made more evident (and disturbing) in a couple of articles released on July 26, when conducting an interview as part of a summer press tour for his trademark TV Show, "America's Most Wanted." Walsh made the following statements during the interview:

- "I said I was kidding when I was talking to the Senate and I said they were talking about electronic monitoring, which is big and unwieldy for the sex offenders, and that some of these guys, no matter what the law in their state was, would have to wear one for 20 years or whatever. I said implant it in their anus and if they go outside the radius, explode it and that would send a big message. It was a joke. Nobody thought it was funny."
- "I'm all for criminals doing their time, all for rehabilitation, all for a second chance." followed almost immediately by "I say put the pedophiles down in the yard. Put them in there. Let them do the time with the rest of the guys. Let them see what it's like to be terrorized by a 250-pound guy."
- Things got more heated, though, when a photographer under FOX's employee elected to get into an extended and rather intense conversation with Walsh about marking sexual offenders. They were on so much on the same page that when Walsh mentioned bracelets for perpetrators, the photographer replied, "Not bracelets, not bracelets. The bracelets bulls***. The bracelets bulls***, John, you know that. It's BS." Walsh then suggested putting embedded GPS chips, to which the photographer said, "I'll say bury it deep inside them, is what I say. I don't care how big it is," which earned Walsh's scary reply, "I love your attitude." The microphone was eventually removed from the photographer, a long-time freelancer for the network. He was later lectured by people both within the TCA and within the network and relieved of his duties. The Walsh session was, not surprisingly, cut short. [29]

The Washington Post added, "Continuing his riveting performance, he said his wife had suggested that when he went to Washington to stump for the Adam Walsh Child Protection and Safety Act, he ask all the congressmen who he thought were holding up the legislation named in honor of his son whether they were child molesters or if they had child porn on their computers. 'I said, 'Reve, I don't really use that tack walking through the halls.' But leave it to the mother of a murdered child to cut to the chase.'" [30]

At 1:19 pm on July 27, 2006, President George W. Bush signed HR 4472 into law (Public Law No: 109-248). Surrounding Bush as he signed the law were John and Reve Walsh, Rep. Sensenbrenner, and Rep. Mark Foley. [31]

The Adam Walsh Act included many elements of the earlier bills, but it was only in the final days of the advancement of HR 4472 that the many of the current provisions of the Act were added. Below is a brief summary of HR 4472 as signed by George W. Bush on July 27, 2006:

- Title I: SORNA, national sex offender registry including both residence and employer/school, community notification, three tiered classification system based on crime rather than risk, giving immunity to law enforcement and NCMEC when acting in "good faith," DNA database, US Marshals given jurisdiction in investigating sex cases (particularly failure to register).
- Title II: Stiffens penalties for sex and related crimes (such as selling date rape drugs), and gives victims greater leeway in criminal cases.
- Title III: Civil commitment for "dangerous sex offenders."
- Title IV: Immigration laws making sex offenses deportable offenses, and bars offenders against minors from obtaining a family-based visa.
- Title V: Stronger record keeping requirements for porn industry to ensure no minors are used in creation of porn, civil forfeiture laws.
- Title VI: Funding for numerous programs, including GPS pilot program, fingerprinting children, and a national child abuse registry.
- Title VII: Increasing penalties for Internet related crimes, funding for increased LE, and expand the civil remedy available to sex crime victims. [32]

The Adam Walsh Act passed on a handful of conjectures: The law was fueled by a series of rare, tragic murders used as anecdotal examples to suggest a widespread epidemic of sexual abuse across the US; the idea was promoted by the myth of 100,000 to 150,000 "missing sex offenders;" and the legislature was heavily influenced by TV, particularly "To Catch a Predator," and by America's Most Wanted host John Walsh. Along the same lines of the 100,000 missing registrant myth, the AWA was also promoted as a 'consistent" or "uniform" standard of registration, "closing loopholes" that they believed allowed a registrant to flee to another state to avoid registration. This mix of myth and media formed the foundation upon which the Adam Walsh Act was built.

**ISSUES AND CONTROVERSIES OF THE ADAM WALSH ACT**

Despite languishing in limbo for roughly a year, the bill that eventually became the Adam Walsh Act is a confusing mess that has made implementation difficult. Despite the threat of losing 10% of their federal funding, only 17 states, 3 US Territories, and 100 (of 566 federally recognized) Native American Tribes have adopted the AWA. [33] Five states – Arizona, Arkansas, California, Texas and Nebraska – had neither complied with SORNA nor applied to use JAG funds to come into compliance, thereby electing to forfeit 10% of their JAG funding as of 2014. [34] There are numerous controversies with this bill, but most of the challenges to the AWA involve a handful of key issues—retroactivity, cost of implementation, state and tribal sovereignty, or placing juveniles on the public registry. The National Conference of State Legislatures' official policy regarding the act condemns the law as "an unfunded mandate," "inflexible" and, "in some cases, not able to be implemented." [35] Also worthy of discussion is the fact that legislators had promoted it as a sort of universal standard to make the laws across all 50 states uniform, but in reality, the AWA has had the opposite effect. The AWA also affects registrants in many ways, including immigration and travel.

*Retroactivity*

"We decided we're not going to go into full compliance. We're going to look at it over the summer, because we've been told to expect some changes to Adam Walsh... If they're off the registry, as far as we're concerned, they've met their requirements. We're not going to go back and punish them a second time." -- Utah Rep. Paul Ray [36]

The Adam Walsh Act itself did not address the retroactivity issue, nor was it decided by legislators; instead, retroactivity was a power HR 4472 granted to the US Attorney General [Sec. 113(b)].

Alberto Gonzales (the US Attorney General) used "Interim Rule" to apply the AWA retroactively. [37] Gonzales published the following in the Federal Register on May 30, 2007: "The applicability of the SORNA requirements is not limited to sex offenders whose predicate sex offense convictions occur following a jurisdiction's implementation of a conforming registration program. Rather, SORNA's requirements apply to all sex offenders, including those whose convictions

AR-00000998

predate the enactment of the Act." He justified the retroactive application on the 2003 SCOTUS decision of Smith v. Doe, which had ruled sex offender registration was not punishment but regulatory and constitutional safeguards thus do not apply. [38]

Gonzales's use of Interim Rule (and the rule itself) was explained in the 9th Circuit Court as follows:

"In issuing the interim rule, the Attorney General declined to comply with the procedural requirements of the APA. 5 U.S.C. § 551 et seq. Under the APA (Administrative Procedure Act), rulemaking is generally required to comply with a three-step process: (1) notice of a proposed rule must be given by publication in the Federal Register, 5 U.S.C. § 553(b); (2) following publication of the proposed rule, 30 days must be provided for public comment; (3) notice of a final rule must be given by publication in the Federal Register, normally accompanied by a response to concerns raised in the public comments, "not less than 30 days before [the rule's] effective date" 5 U.S.C. § 553(d)(3). The APA permits an Agency to promulgate valid regulations without complying with these procedures, however, if it 'for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and comment procedure thereon are impracticable, unnecessary, or contrary to the public interest.' 5 U.S.C. § 553(b)(B).

The Attorney General relied upon the good cause exception in seeking to make the February 28, 2007 interim rule applying SORNA retroactively effective immediately and to render inapplicable the requirements for advance publication, public comment, and Agency response. 72 Fed.Reg. at 8895. In a statement accompanying the interim rule, the Attorney General did not state that notice and comment was 'impracticable' or 'unnecessary,' but solely that it was 'contrary to the public interest.'" [39]

As the result of this Interim Rule, states like Nevada had reached as far back as 1956 to add individuals to the public sex offender registries, [40] ruining the lives of people who committed crimes decades ago but have lived offense free and had productive lives.

The validity was hotly contested. Six Circuits held that the Act's registration requirements do not apply to pre-Act offenders unless and until the Attorney General so specifies. [41] Five Circuits held that they apply from the date of the Act's enactment, and prior to any such specification, at least with respect to pre-Act offenders who had already registered under state law. [42]

Ultimately, the US Supreme Court decided the fate of the Interim Rule by Reynolds v. United States, 565 U.S. ___ (2012). Reynolds, a registrant accused of Failure To Register, moved to dismiss the indictment on the ground that the Act was not applicable to pre-Act offenders during that time of his arrest, arguing that the Attorney General's February 2007 Interim Rule was invalid because it violated the Constitution's "nondelegation" doctrine and the Administrative Procedure Act's notice and comment requirements. In a 7-2 decision (Alito and Ginsburg dissenting), SCOTUS held that the Act does not require pre-Act offenders to register before the Attorney General validly specifies that the Act's registration provisions apply to them. In other words, the High Court ruled that the Attorney General did not "validly" follow protocol when applying SORNA retroactively during Interim Rule.

SCOTUS remanded the case back to the 3rd Circuit; the 3rd Circuit ultimately ruled that the AG violated the Administrative Procedure Act. [43] In 2010, the Attorney General's Office formally declared SORNA retroactive, effective January 28, 2011, along with a lengthy explanation attempting to justify the Gonzales's Interim Rule. [44]

This does not mean the state courts necessarily agree with the law. The Ohio Supreme Court ruled in 2010 that the retroactive application of Ohio's AWA statutes violate separation of powers by requiring the executive branch to reclassify sex offenders already classified by court order. [45] In a subsequent decision, the Ohio Supreme Court ruled that Ohio's version of the AWA was punitive and thus could not be applied retroactively. [46]

The US Supreme Court also covered retroactivity, at least in one particular issue, in Carr v. US. [47] In a 6-3 decision, the Court ruled that the Sex Offender Registration and Notification Act of 2007 makes it a crime for convicted sex offenders to fail to register with local authorities when they move to a new state, but the Act does not apply to sex offenders moved before the Act went into effect.

*Cost of Implementation*

"We couldn't afford the national program. The local law enforcement doesn't have the money, and the state doesn't have the money." -- Sen. John Whitmire, D-Houston, chair of the Texas Senate Criminal Justice Committee [48]

The Adam Walsh Act has proven very expensive to implement. Tina Walker, chief of media relations for California's Emergency Management Agency, said compliance could exceed $30 million and would result in "a less than robust sex offender registration process for the state." California would lose an estimated $3.2 million in JAG funding. [49] The 2010 Texas Senate Criminal Justice Committee Interim Report found that the cost of implementing the AWA provisions $38,771,924, while the penalty for losing 10% of JAG/ Byrne Grant funding for the same period is merely $1,404,571. (For those who don't like doing the math, the cost to implement is 27 times the cost of the penalty.) Texas would save money by not implementing the AWA even if the federal government took away 100% of JAG/ Byrne funding.

"The major cost of the AWA is the result of modifying registration requirements. The most significant change to Texas would be the required registration of offenders with offenses that are not currently included in the list of offense requiring register. An example of this is kidnapping of a child. Currently an individual only has to register if there is an element of sexual intent or if an assessment is done that indicates the individual is a risk for sexual misconduct. AWA does not call for the utilization of risk assessments and relies solely on offense. This would cause the number of people on the registry to increase greatly. The AWA also increases the number of time an offender has to verify their information with law enforcement. The number of times is determined by the tier they are in. There are three tiers; three is the most severe. Another major change is that sex offenders not only have to submit fingerprints and information but also DNA to law enforcement. The length of required registration is also modified by AWA. Tier one people would have to register for fifteen year; tier two for twenty five years; tier three for life." [50]

States were initially only given three years (until July 2009) to adopt the Adam Walsh Act or lose 10% of the Edward Byrne Memorial Justice Assistance Grant (JAG), but the time was extended two years in a row, with a final deadline of July 27, 2011. For jurisdictions that failed to meet the deadline, according to the Bureau of Justice Statistics, the "SORNA penalty is calculated by subtracting 10% from the state government's allocation (60% of the total award), after deducting the mandatory VPT that states are required to send to local governments." (JAG awards to states are split 60/40, with 60% going to the state and 40% going to local governments, with a minimum award of $727,321 for FY 2014; JAG allocations are calculated half by a state's share of its total violent crime, and half by its population. Thus, population alone is not a determining factor in JAG grants)

AR-00000999

In FY 2014, a total of 36 states and U.S. territories were not compliant with SORNA's requirements. As a result, these jurisdictions suffered a combined $6,474,445 reduction to their FY 2014 Byrne JAG award. These jurisdictions were allowed to apply to reallocate the 10% penalty to promote SORNA implementation. Seven states were SORNA noncompliant and did not apply to reallocate the penalty." The total Byrne JAG awards for FY 2014 was $290,928,252. [51]

Ohio, the first state to adopt the Adam Walsh Act, received $8,920,866 for FY 2014. If Ohio had not implemented the AWA, in the five years since JAG funding was cut for the states, Ohio would have lost $4,460,433 going by the FY 2014 rates. (The BJA estimates Ohio will receive $5,740,424 for FY 2016, over $3 million less than 2014. [52] JAG funds vary greatly.) Ohio spent an estimated $10,000,000 just on defending itself against the numerous lawsuits against the AWA. [53] This does not include the other costs associated with the changing laws; one Ohio County reported just the postage alone for the increased community notification letters doubled from $250,000 to $500,000 a year. [54] In addition, the Ohio legislature's fiscal notes on the cost of implementing the AWA found the costs outweighed the potential loss of JAG funds; Installing and implementing software alone would cost $475,000 in the first year, plus $85,000 annually thereafter for maintenance; Certification of treatment programs based on new standards and providing a description of a person on the registry to the state's Bureau of Criminal Identification and Investigation would cost another $100,000 annually; Ohio acknowledged other factors that would increase the cost of implementing SORNA, including salaries and benefits for new personnel, new court and administration costs, and costs to counties and municipalities, which was unable to be quantified. [55] As the result of a FOIL request by a member of Ohio RSOL in 2012, it was discovered that the monthly cost of maintaining the registry (using Watch Systems, a private registry service) was actually $33,250, or $399,000 for the fiscal year, [56] far more than the Ohio legislature projected.

The Commonwealth of Virginia determined that the first year of implementation with SORNA would cost more than $12 million. The first year of implementing SORNA would cost Virginia $12,497,000, plus an annual cost of $8,887,000. Adjusted with a 3.5 percent yearly inflation rate, Virginia would be paying more than $10 million by 2014. If Virginia chose to comply with SORNA, the state would spend $12,097,000 more than it would if it chose not to implement SORNA and forfeit 10 percent of its yearly Byrne grant, a loss totaling approximately $400,000. [57]

The ironically named SMART Office (Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking) has reported that as of 2015, the following jurisdictions applied for reallocation of the funding penalty in 2015 to work solely towards furthering SORNA implementation activities and efforts: Alaska, American Samoa, Arkansas, California, Connecticut, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, Montana, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon, Puerto Rico, Rhode Island, Utah, Vermont, Virginia, Washington, and Wisconsin. [58] Jurisdictions must submit the following to continue to receive the full JAG funding:

1. Substantial Implementation Report from the SMART Office;
2. Plan to Utilize Reallocated Funds. The Substantial Implementation Report details where the jurisdiction deviates, or does not meet, SORNA's requirements; and
3. If the jurisdiction has previously received reallocated funds for SORNA implementation purposes, briefly describe how those funds were used. Describe how the additional reallocation funds will be used to complement previously received reallocation funds. [59]

Prison Legal News reports, "Federal officials have countered that SORNA is less expensive to enforce than most states estimate. U.S. Department of Justice (DOJ) senior analyst Scott Matson noted that one estimate was $18 million for Ohio to implement the Adam Walsh Act, but the actual costs were around $400,000. Linda Baldwin, head of the DOJ office that helps states implement SORNA, said that although some states would have to track more sex offenders under the new standards, state officials often misunderstand the Act's requirements and overstate its burdens." [60] It is difficult not to suggest that an office whose sole existence is promoting the Adam Walsh Act is downplaying the actual cost of implementation of SORNA.

*"An Unfunded Mandate"*

"Particularly in this economy, no state can afford a significant new regulatory unfunded mandate that will change the public-safety approaches that states have already undertaken… it is troubling that states that don't have the resources to accommodate what is a tremendously costly unfunded mandate will have to watch as the very services that our criminal justice systems rely upon are cut even further in a punitive measure for not having enough money to enact new policies. In some states, the money that they risk losing from the Byrne JAG penalty is actually used directly for victims of sexual and domestic violence. States do not want to penalize public safety and victim service dollars because of the complex and unfunded changes that SORNA contemplates." – KS State Rep. Pat Collonton [61]

The National Council of State Legislatures stated, "The provisions of Title II of the Act, the Sex Offender Registry and Notification Act (SORNA) preempt many state laws and create an unfunded mandate for states because there are no appropriations in the Act or in any appropriations bill for implementation." [62] A report from the Washburn Law Journal noted, "The AWA mandates that states completely revamp their law enforcement systems to comply with its requirements, but provides no money to the states to fulfill those requirements. The states, therefore, bear full responsibility to pay for the implementation of the AWA.  Moreover, the states do not receive any additional federal funding even if they do comply with the AWA." [63]

The Heritage Foundation made the bold claim the Adam Walsh Act was "sufficiently funded." They based their conclusions on the fact that four states had succeeded in coming into substantial compliance. They also noted that "the DOJ's SMART Office provided more than $16 million in assistance in 2007 and 2008 and gave $13.1 million in awards to jurisdictions in 2010. The SMART Office has offered grants of $400,000 to jurisdictions seeking to implement SORNA in 2011." (Of course, the same organization denied that states would lose 10% of their Byrne/ JAG funds should they fail to implement SORNA). [64] The Heritage Foundation failed to consider the costs associated with implementing the AWA, and the numbers they quote would not even funded the cost of Texas to fully implement SORNA.

Perhaps it is more appropriate to refer to the Adam Walsh Act as "underfunded" rather than "unfunded." There are some funds towards assisting jurisdictions with AWA compliance, and states penalized for failing to comply can get the 10% Byrne/JAG funds back if they use the funds towards implementing SORNA. However, the funds are minimal and woefully insufficient to SORNA implementation. A NY Law School Law Review report stated,  "Additionally, the SORNA program itself is underfunded, and Congress has failed to allocate consistent funding to underwrite the significant compliance costs incurred by state and local governments, giving a mere $39 million to forty-three states in 2011. State leaders frequently refer to SORNA as an "unfunded mandate" and describe a "disturbing disconnect" in withholding funds that support services to help states meet the federal requirements." [65]

The "Adam Walsh Reauthorization Act of 2016" (S. 2613) would authorize the appropriation of about $81 million annually over the 2017-2018 period for Department of Justice (DOJ) activities related to the registration of sex offenders. Assuming appropriation of the authorized amounts, CBO estimates thatimplementing S. 2613 would cost about $160 million over the 2017-2021 period. Of course, of the $81 million, only $20 million will go towards assisting state and local governments with registering and monitoring sex offenders, with the other $61 million to go to the US Marshals to fund their registrant compliance

AR-00001000

operations. [66] Thus, the AWA will remain woefully underfunded even if S.2613 passes.

*Juveniles on the Registry*

"It's like using an Atom Bomb when a stick of dynamite would do the job... A 19-year-old and his 15-year-old girlfriend have consensual sex...He gets labeled as a sex offender for life. He should be punished for violating the law, but he's not necessarily a predator." -- Cuyahoga County (OH) Common Pleas Judge Michael Donnelly [67]

It is estimated that one out of every four registered citizens were convicted for crimes committed as juveniles, fifteen states list juvenile registrants publicly, and thirteen states have utilized civil commitment for juvenile offenders. [68] However, most states keep juvenile offenders off the public registry lists, and the Adam Walsh Act's demand for inclusion of juveniles as young as 14 on public registries has become one of the primary reasons for failing to adopt the AWA.

"Unlike the requirements of the Jacob Wetterling Act, SORNA does require that certain juveniles register as sex offenders. This requirement applies to juveniles convicted as adults and juveniles adjudicated delinquent in juvenile court, so long as the juvenile is 14 years of age or older and is convicted of an offense similar to or more serious than the federal aggravated sexual assault statute, 18 U.S.C. §2241. In addition to offenses such as forcible rape, this statute covers any offense involving a sex act with a victim under the age of 12. There are no provisions for a risk assessment in the case of juveniles adjudicated delinquent and subject to registration under SORNA. There are no exceptions for intrafamilial cases of sexual abuse. The only exception is the so-called 'Romeo and Juliet' clause, whereby the law makes clear that jurisdictions will not be required to register persons convicted of sex offenses involving 'consensual' sexual activity between a victim who is at least 13 years old and an offender not more than four years older than the victim." [69]

Once again, the SMART Office downplayed the rigidness of the Adam Walsh Act (by ignorance or embarrassment) during an exchange between Linda Baldwin, SMART Office Director, and Virginia Representative Bobby Scott during the March 10, 2009 House Subcommittee on Crime, Terrorism, and Homeland Security on "Sex Offender Registration and Notification Act: Barriers to Timely Compliance by States."

"Mr. SCOTT. More than 4 years senior, consensual sex between a 19 ½-year-old and just a 15-year-old would not require registration; is that what you are saying?
Ms. ROGERS. No.
Mr. SCOTT. No, that is not what you are saying, or, yes, that is what you are saying?
Ms. ROGERS. It would not require Tier III registration as a violent sex offender. It may require registration. It may not. If it is charged as a misdemeanor, it may not require registration.
Mr. SCOTT. Once you get on this list, I mean, you are on the list as a sexual offender. What we have heard is that that can be counterproductive because once you are on a publicly accessible registry, your life is pretty much shot.
Ms. ROGERS. But it also may be a charge that is not even included under SORNA and may not require registration. Not every sex offense is a registrable offense under SORNA.
Mr. SCOTT. Right. We said a ¹⁹½- and a 15-year-old, consensual sex. Does a 19-year-old have to register in a publicly accessible registry of sex offenders? Half the people in the audience are nodding their heads "yes."
Ms. ROGERS. There are a lot of issues that would have to be examined. It would depend on how it is charged in that particular jurisdiction, if it is covered under SORNA, how the case is resolved. What I am telling you is there is a discussion that it would be as a violent sexual offender, and I just need to clarify this.
Mr. SCOTT. However you have to register yourself, you are on a sexual offender register for an offense where there is a 19 ½-yearold high school senior and a 15-year-old. Add up the months. It is more than 4 years. They get caught. Is that something where someone would have to be registered for at least a decade?
Ms. Devillier, do you want to respond?
Ms. DEVILLIER. I would love to, because Louisiana's statute is just that—carnal knowledge. Some States refer to it as "statutory rape." Ours is that we have been told by the SMART office, in our response for substantial compliance, that carnal knowledge statute, which is exactly what you just described, requires Tier II— 25 years of registration without relief.
Mr. SCOTT. Well, I guess there are some of those issues we might have to deal with." [70]

Prison Legal News reported, "Nebraska – has stated a principled opposition to SORNA's lifetime registry requirement for juveniles. State Senator Amanda McGill, a member of the Nebraska legislature's Judiciary Committee, said that SORNA as currently written could force people onto the registry who don't belong there. 'We may be putting resources into people that don't need it,' she said, 'and possibly 'scarlet-lettering' them.'" Nebraska attempted at one point to comply with SORNA by switching from risk-based system to an offense-based system, [71] but is still non-compliant as of 2016.

The California Attorney General's Office cited "serious concerns" with implementing the Adam Walsh Act, including the inclusion of some juvenile offenders. [72] Despite allowing some juveniles to be forced to register, the AWA exceeded California's rules, which kept juveniles off the registry and provided avenues for juveniles to be freed from registration requirements. [73]

States are concerned that placing teens on a public registry will stigmatize them and hamper their chances of moving beyond the offense. "Given juveniles' positive response to treatment and room for cognitive development, the juvenile system has traditionally been regarded as rehabilitative, unlike the adult system, which counts punishment among its goals, [Brooke Burns with the Ohio Public Defender's Office] said. 'The court's finding that registration is punishment opens the door for us to start advocating that juveniles cannot be given a punishment because they're in juvenile court, which in itself is a rehabilitative system…The only penalty that sticks beyond the juvenile system in and of itself is registration,' she said." [74]

The National Council of Criminal Defense Lawyers argues the impact of the Adam Walsh Act on juveniles is worse than on adults:

"Requiring youth to register does not improve public safety and may make it worse. Placement on a registry can be detrimental to a young person's development, making it difficult to progress through school and to participate in appropriate adolescent activities. The Annie E. Casey Foundation's annual Kids Count Data Book keeps tally of 'disconnected' youth (youth who are not working or in school) as a factor in child wellbeing. In other words, the young people who are connected to school or work are generally expected to have better life outcomes. Youth who are labeled 'sex offenders' often experience rejection from peer groups and adults. They are therefore more likely to associate with delinquent or troubled peers and less likely to be attached to social institutions such as schools and churches. Youth who are detached from normative social institutions may be more likely to engage in illegal behavior."

Youth sex offending is different from adult sex offending. Young people are still developing physically and emotionally and are thus highly amenable to change. Research by mental health professionals working with youth who commit sex offenses indicates that the nature and intention of youthful sexual experimentation

AR-00001001

8/17/2020                                           Ten Years of the Adam Walsh Act

is not considered predatory or aggressive.

According to the National Center on Sexual Behavior of Youth, the vast majority of youth sex offenses are manifestations of nonsexual feelings. Youth engage in fewer abusive behaviors over shorter periods of time and engage in less aggressive sexual behavior. Youth rarely eroticize aggression and are rarely aroused by child sex stimuli. Most youth behavior that is categorized as a sex offense is activity that mental health professionals do not label as predatory. Therefore, using an adult registration system for youth does not fit, likely has no public safety benefit, and therefore should not be applied to youth." [75]

Wyoming, a state considered substantially compliant with the Adam Walsh Act, had struggled to follow the policy to register juveniles. The Casper Star-Tribune reported, "Some prosecutors are not charging children with sex crimes to protect them from being added to the registry, which they view as too harsh of a punishment for lesser offenses… As a result, children are being convicted instead of battery or assault, and entering treatment programs for sexual behavior in denial about their problems. 'Right now, it's one size fits all, no matter the crime – whether it's a forcible rape or a touching crime,' said Rep. Sam Krone, R-Cody, a deputy attorney in Park County and a member of the Joint Judiciary Committee." Wyoming considered adjusting the juvenile offender law but expressed reluctance to make changes out of fear of falling out of compliance. [76]

*State and Native American Tribal Sovereignty*

"…[W]e feel like complying is not a good idea in some areas, as it actually makes Arizona law worse… For example, Level One sex offenders don't have to register. A homeless person urinates in an alley. In Arizona, that's a Level One sex offense, but that's not a person who represents a threat to the community. By putting them on the registry, we make police officers focus more time on people who are not a threat and have less time to focus on people who are a threat." – Arizona State Sen. Kyrsten Sinema [77]

The Prison Legal News reported that Arizona cited the state sovereignty issue as grounds to reject the Adam Walsh Act. [78] A state or US Territory failing to adopt AWA merely loses 10% of Byrne/JAG funding. However, Native American Indian Tribes aren't given the freedom to choose to reject AWA guidelines.

Executive Order 13175 was written in part to "to reduce the imposition of unfunded mandates upon Indian tribes." The Order "has recognized the right of Indian tribes to self-government. As domestic dependent nations, Indian tribes exercise inherent sovereign powers over their members and territory." Section 3 of the Order grants Indian tribal governments "the maximum administrative discretion possible," to encourage tribes to adopt their own standards, and " in determining whether to establish Federal standards, consult with tribal officials as to the need for Federal standards and any alternatives that would limit the scope of Federal standards or otherwise preserve the prerogatives and authority of Indian tribes." Section 5 of the Order states no government agency shall "promulgate any regulation that has tribal implications, that imposes substantial direct compliance costs on Indian tribal governments, and that is not required by statute" without fully funding the mandate or consulting with tribal councils early in the process of developing the proposed regulation, as well as providing a tribal summary impact statement in the preamble of the regulation as to be featured in the Federal Register." [79]

Native American tribes were never consulted at any point during the creation and passage of the Adam Walsh Act, a direct violation of Executive Order 13175. The National Congress of American Indians explains: "The federal government failed to consult with tribes prior to enactment of the Adam Walsh Child Protection and Safety Act of 2006 (AWA), and as a result, tribes continue to struggle with the implications of this law… Title I of this act, the Sex Offender Registration and Notification Act 42 U.S.C. 16901 et. seq (SORNA), permitted federally recognized Indian tribes to "opt in" and implement the minimum standards required by SORNA for sex offender registration and notification; however, it arbitrarily excluded from participation tribes that are subject to state jurisdiction under Public Law 83-280 (PL280). Pursuant to SORNA, if the U.S. Attorney General determines that a tribe has not substantially implemented the requirements of SORNA by the implementation deadline of July 27, 2011, and is not likely to become capable of doing so within a reasonable amount of time, the tribe's SORNA responsibilities will be delegated to the state in which the tribe is located. Tribes have several concerns with the way in which the AWA is written and has been implemented, including its unprecedented threat of delegation of tribal regulatory authority to the state, its lack of funding, and its exclusion of tribes in mandatory PL280 states. For the time being, though, Congress seems uninterested in amending the tribal provisions of the AWA. As such, the 190 SORNA tribal jurisdictions have been left with no choice but to comply with the current law." [80]

Once again, the SMART Office fails to accurately explain the law, downplaying the blatant violation of Executive Order 13175: "If the SMART Office determines that a tribe is unable or unwilling to implement SORNA within a reasonable amount of time, the tribe is at risk of having its registration and notification duties delegated to the state(s) in which the territory of the tribe is located. Based on three consultation sessions with tribal leaders and other interested parties, the SMART Office adopted the following delegation procedure, consistent with Executive Order 13175."

"A tribe is subject to delegation in the following circumstances:

   A. Tribe failed to either submit a SORNA substantial implementation package, request additional time to implement, or "opt out" of SORNA responsibilities by the July 27, 2011 statutory deadline for implementation,
   B. Tribe requests and is granted additional time to implement but stops communicating with the SMART Office and/or fails to provide monthly update progress reports,
   C. Tribe fails to submit a substantial implementation package or other required documentation by the extended deadline due date,
   D. Tribe requests additional time to implement but the SMART Office determines that the tribe is not capable of substantial implementation within a reasonable amount of time,
   E. After review of a tribe's substantial implementation package, the SMART Office determines that the Tribe has failed to substantially implement the minimum standards of SORNA, and/or
   F. Tribe fails to continue to operate a functioning sex offender registration and notification program." [81]

In short, if recognized Native American tribal nations refuse to implement the AWA, they risk losing their sovereignty with enforcing their own laws and regulations for their own registered citizens; the state will take over responsibility for registration. Once again, Native Americans are forced into accepting another bad Federal Law in violation of treaties.

Of the 566 federally recognized tribes, only 212 were considered eligible to decide to adopt the Adam Walsh Act by the SMART Office on their own (i.e., tribes whose criminal justice agencies are not being delegated to the state per 18 USC 1162). Of the 212 tribes, 198 chose to retain registry functions, 5 chose to delegate registration power to the state, and 9 did not file a resolution. [82]

*Immigration issues under the Adam Walsh Act*

AR-00001002

The Adam Walsh Act affects registered citizens in ways the average America could not imagine. One alarming but overlooked power contained within the Adam Walsh Act (Title IV) is the power to deport a nonresident because one of their spouses or parents was listed on the sex offender registry. "The Adam Walsh Act amended Section 204(a)(1)(i) of the Immigration and Nationality Act -  the statute governing the petitioning procedure for immediate relatives – to prohibit U.S. citizens and lawful permanent residents who have been convicted of any "specified offense against a minor" from filing a family-based immigrant petition on behalf of any beneficiary, unless the Secretary of Homeland Security (Secretary) determines, in his sole and unreviewable discretion, that the petitioner poses no risk to the beneficiary."

Conviction for any of nine crimes "that by its nature is a sex offense against a minor" (including non-custodian kidnapping, child porn, internet, and solicitation/ prostitution offenses) will be a "disqualifying conviction to bar any U.S. citizen or permanent resident from filing a petition for his/her parent, spouse, children, stepchildren, and siblings.   The bar also applies to petitions for a fiance/ee (K1) and derivative children (K2).   The petitioner has the burden to prove whether or not a prior conviction is a 'specified offense against a minor.'"

If a person has a disqualifying charge, then he can apply for a "no risk" exception as described in the Aytes Memorandum of February 8, 2007 (Aytes Memo). "The Aytes Memo stresses that USCIS may not approve a family-based petition if the petitioner has a conviction for a specified offense against a minor unless USCIS first determines that the petitioner poses no risk to the safety or well-being of the beneficiary (and any derivative beneficiary)  for whom a petition was filed."

"The Aytes Memo listed the following factors that should be considered in the "no risk" analysis: (1) The nature and severity of the petitioner's specified offense (s) against a minor, including all facts and circumstances underlying the offense(s);  (2) The petitioner's criminal history;  (3) The nature, severity, and mitigating circumstances of any arrest(s), conviction(s), or history of alcohol or substance abuse, sexual or child abuse, domestic violence, or other violent or criminal behavior that may pose a risk to the safety or well-being of the principal beneficiary or any derivative beneficiary; (4) The relationship of the petitioner to the principal beneficiary and any derivative beneficiary;  (5) The age and, if relevant, the gender of the beneficiary;  (6) Whether the petitioner and beneficiary will be residing either in the same household or within close proximity to one another; and (7) The degree of rehabilitation or behavior modification that may alleviate any risk posed by the petitioner to the beneficiary, evidenced by the successful completion of appropriate counseling or rehabilitation programs and the significant passage of time between incidence of violent, criminal, or abusive behavior and the submission of the petition."

"In cases where none of the intended beneficiaries are children, the Aytes Memo directs the close examination of the petitioner's specified offense and other past criminal acts (ex: spousal abuse or domestic violence)  to determine whether the petitioner poses any risk to the safety or well-being of the adult beneficiary. However, USCIS uses the "beyond a reasonable doubt" standard in the "no risk' analysis, and in a 2014 decision, the Board of Immigration Appeals ruled that it lacked the authority to review the propriety and USCIS' use of that standard in adjudicating petitions under the Adam Walsh Act." [83]

On May 20, 2014, the Dept. of Homeland Security "DHS got the Board of Immigration Appeals (BIA) to ratify the startling power that the DHS may deport a noncitizen for a crime committed by someone else."

"On May 20, 2014, in the trilogy of decisions that are Matter of Aceijas-Quiroz, Matter of Introcaso, Matter of Jackson and Erandio, the Board answered some of these questions and refused to address others on jurisdictional grounds. Each decision represents a particular pronouncement of law regarding the AWA. As a single piece of work, the story is far more disturbing. In Aceijas-Quiroz the BIA held that it lacked the authority to review any challenges brought against the legal standard used by USCIS—"beyond a reasonable doubt"—when conducting a "no risk' analysis…In Introcaso, the BIA explained that a visa petitioner bore the burden of proving whether or not an offense was a "specified offense against a minor…In Jackson and Erandio the BIA held that the AWA applied to all convictions made by any United States citizen at any time – even those that occurred, as they did in Jackson and Erandio, twenty-five years before the AWA's enactment…The impact of these three decisions will undeniably be devastating for those families caught up in the immigration related provisions of the AWA. It now becomes far more likely that their visa petitions will be denied, without any meaningful opportunity to obtain administrative review of such denials." [84]

The Immigrant Legal Resource Center advises attorneys, "Where the victim is a minor, counsel should attempt to plead to an offense that does not appear in the above list. If that is not possible, counsel should keep the age of the victim out of the reviewable record. However, it is not clear that the inquiry will be limited to the reviewable record and the categorical approach." [85]

So what are your chances of obtaining an exemption under the Aytes Memo? Not very high, according to the USCIS. An article posted at ACSOL on Nov. 13, 2016 noted the USCIS expects to reject over 4000 petitions by 2017. "For years after its enactment, the USCIS has either outright denied or intentionally stalled thousands of family petitions that it determined to fall within its own AWA policy. By 2011, after several years of long delays, the USCIS denied virtually all AWA applications held at the agency for review since 2008. The agency reports that it receives 400-600 AWA application per year and boasts that it has denied 99% of all AWA family petitions received." [86]

*Travel issues under the Adam Walsh Act*

While the Adam Walsh Act did not cover travel, the SMART Office in 2011 exercised "[t]he authority under 42 U.S.C. 16914(a)(7) to expand the range of required registration information * * * to provide that registrants must be required to inform their residence jurisdictions of intended travel outside of the United States at least 21 days in advance of such travel." [87] This rule was adopted by failed versions of International Megan's Law, a law passed in February 2016 and covers travel issues. The SMART Office downplayed the concerns of those whose travel rights  would be hindered, if not outright eradicated, by the travel requirements when it stated, "However, these  supplemental guidelines recognize that there may be circumstances in which requiring 21 days advance notice would be unnecessary or inappropriate, and expressly allow jurisdictions to adopt policies accommodating such situations subject to approval by the SMART Office." [88] This statement, however, is very  vague and confusing – the SMART Office states on one hand that it recognizes the 21 day advance notice originally proposed by IML and adopted by the SMART Office isn't always feasible; on the other hand, states that create rules regarding this unique circumstance must have those rules approved by the SMART Office. The SMART Office fails to offer a single example to assist states adopt such rules. [89]

The case of Carr v. US, 560 US 438 (2010), dealt with failing to register travel that took effect before the AWA's effective date. In a 6-3 decision, Court reasoned that the plain language and legislative history of the statute suggest that it does not apply to conduct that predates its enactment. In Nichols v. US, 578 US _ (2016), in a rare 9-0 decision, held that SORNA requires that sexual offenders notify states to which they move or reside. The Court interpreted the present tense of "reside" in the statute to mean that an offender must currently be living in a U.S. jurisdiction for the requirement to take effect. Therefore, a registered sex offender does not violate SORNA by failing to update his registration when he moves from a U.S. jurisdiction to a non-U.S. jurisdiction.

AR-00001003

The High Court in the Nichols case noted, however, that "Our interpretation of the SORNA provisions at issue in this case in no way means that sex offenders will be able to escape punishment for leaving the United States without notifying the jurisdictions in which they lived while in this country. Congress has recently criminalized the 'knowin[g] fail[ure] to provide information required by [SORNA] relating to intended travel in foreign commerce.' International Megan's Law to Prevent Child Exploitation and Other Sexual Crimes Through Advanced Notification of Traveling Sex Offenders, Pub. L. 114–119, §6(b)(2), 130 Stat. 23, to be codified at 18 U. S. C. §2250(b). Such information includes 'anticipated dates and places of departure, arrival, or return[;] carrier and flight numbers for air travel [;] destination country and address or other contact information therein,' et cetera."

Thus, the current expectation of registrants leaving the US, whether for travel or for permanent relocation, is registering three weeks in advance before leaving the US. Both SCOTUS cases have no real effect on current travel or relocation plans.

*Bail under the Adam Walsh Act*

The Adam Walsh Act interferes with the right to pretrial bail, as noted in report published in the Northwestern University School of Law's Law Journal: "Before the AWA Amendments were passed, a judicial officer exclusively decided, on a case-by-case basis, whether to release a defendant, whether to impose pretrial release conditions, and what pretrial release conditions to impose. The AWA Amendments, in contrast, impose mandatory pretrial release conditions, including electronic monitoring and curfew, on all defendants charged with certain enumerated sexual offenses against children."

"Congress must repeal the AWA Amendments or, in the alternative, revise them so defendants can avoid the imposition of these now mandatory release conditions with rebuttal evidence that the conditions are not necessary to ensure the public's safety. First, the AWA Amendments must be repealed or revised because they are unconstitutional on their face as a violation of the Excessive Bail and Due Process Clauses. Second, the Amendments' imposition of mandatory pretrial release conditions is inconsistent with one of the core principles of federal pretrial release under the BRA—judicially determined individualized bail. Lastly, the Amendments do considerably more harm than good because costly pretrial release conditions are imposed automatically even when they are unnecessary to ensure the public's safety." [90]

As with other provisions of the AWA, the bail revisions were passed "without a stated purpose or any supporting congressional findings." As of 2011, "To date, seventeen federal courts have addressed the constitutionality of the mandatory conditions imposed by the undesignated paragraph of the AWA Amendments. Seven have held that the AWA Amendments violate the Excessive Bail Clause of the Eighth Amendment, eleven have found Fifth Amendment due process violations, three have determined that the Amendments contravene the separation of powers doctrine, and only two of these decisions have been reversed." [91]

*Universal Standard is NOT Universal*

One of the key selling points repeated by proponents of legislators was that the Adam Walsh Act would create a universal standard so registrants wouldn't flee legislation. As noted earlier, Sen. Hatch proclaimed the AWA "creates a National Sex Offender Registry with uniform standards for the registration of sex offenders, including a lifetime registration requirement for the most serious offenders. This is critical to sew together the patch-work quilt of 50 different State attempts to identity and keep track of sex offenders..." [92]

The SMART Office boasts: "Since our inception, we've helped 17 states, 99 tribes, and three territories to substantially implement SORNA's requirements. While not every jurisdiction is SORNA-compliant, many have aspects of the law in place and are on the path to achieving substantial implementation." [93] However, even states considered "substantially compliant" with the Adam Walsh Act vary greatly in practice, since SORNA has been interpreted by the SMART Office as a "comprehensive set of minimum standards." [94] The SMART Office also claims the only true barrier to state compliance with the AWA was states' "opposition to SORNA requirements." [95]

Of the 17 states that are considered "substantially compliant" with the Adam Walsh Act, Alabama, [96] Florida, [97] South Carolina, [98] Tennessee, [99] and Wyoming [100] demand lifetime reporting for all adult offenders. The other 12 states have adopted a three-tiered system. A 2013 GAO reports of 19 jurisdictions that had adopted the AWA by 2013, 18 of them had "allowable" deviations from SORNA (Only Kansas lacked any significant deviations). The 3 US Territories had only one deviation; AL, MD, MI, MO, MS, and SC had the least amount of deviations (3), with SD and TN having the most deviations (9). The number of jurisdictions with allowable deviations also varied across the 14 sections of SORNA requirements, with the highest number of deviations being allowed in the information that is required at registration (14 of 19 jurisdictions), the classification or tiering of offenses (13), application of the requirements retroactively (11), and the offenses that must be included in a jurisdiction's sex offender registry (10). [101]

Of course, these deviations tend to be above and beyond the SORNA compliance threshold (as evidenced by the SORNA-compliant states with minimum lifetime registration). Amy Borror of the Ohio Public Defenders Office explained, "The Guidelines offer that the 'substantial' compliance standard 'contemplate[s] that there is some latitude to approve a jurisdiction's implementation efforts, even if they do not exactly follow in all respects the specifications of SORNA or these Guidelines.' However, the Guidelines also say that the Adam Walsh Act presents a set of 'minimum national standards,' and that the Guidelines 'set a floor, not a ceiling,' for states' registration systems."

These two statements, taken together, imply that a state's implementation efforts do not have to 'follow in all respects' the Adam Walsh Act or the Guidelines, but only if the state chooses to exceed the requirements of the Act or the Guidelines. These two statements seem to define 'substantial' compliance as something at or above 100 percent compliance. That, of course, is an illogical and unfounded definition of 'substantial,' and clearly goes beyond what is required by the Adam Walsh Act. The Guidelines instruct that nothing less than strict compliance will be sufficient, while the Act requires only the substantial implementation of the federal law.

Further, the characterization of the Guidelines as a "floor" is disingenuous. It is akin to Congress declaring that a speed limit of 95 miles per hour is now the floor for speed limits across the nation. States could feel free to exceed that requirement and set the speed limit within their jurisdiction at a higher rate, but 95 miles per hour would be the new national minimum. Ohio and other states, with speed limits ranging from 55 to 75 miles per hour, would be left staring upward at the 95-mile-per-hour floor, wondering how to achieve that level, whether doing so would be worth the effort and cost of implementation, and most importantly, what impact the implementation of this new federal requirement would have on public safety." [102]

Obviously the Adam Walsh Act has failed to render the "patch-work quilt" of sex offender laws less confusing.

What exactly does it take to become "substantially compliant" with the Adam Walsh Act, according to the agency tasked with promoting the Adam Walsh Act, the SMART Office? There are 14 main points that determines the degree of compliance, according to the SMART Office's "Substantial Compliance checklist.

AR-00001004

[103] (Amazingly, the SMART Office states on the form this checklist is not a "definitive guide to SORNA's full implementation requirements. Also note that being "substantially compliant" with the AWA means compliance only with the SORNA rules.) Below is the full SORNA substantial Compliance List as of July 2016:

I. Immediate Transfer of Information: Jurisdictions must make registration info available on where a registrant resides, is an employee, or is a student and each jurisdiction from or to which a change of residence, employment, or student status occurs within 3 business days.

II. Offenses that must be included on the registry: Any sex crime as defined as a registerable offense by federal law or an equivalent state law committed by an adult, juveniles 14 and over tried as adults, or juveniles 14 and over adjudicated for aggravated sexual abuse or the equivalent state law. Below is the full range of registerable sex offenses under SORNA:

    a. SEXUAL ACTS AND SEXUAL CONTACT OFFENSES. These include criminal offenses that have an element involving a sexual act or sexual contact with another. The offenses covered include all sexual offenses whose elements involve: (i) any type or degree of genital, oral, or anal penetration, or (ii) any sexual touching of or contact with a person's body, either directly or through the clothing.

    b. SPECIFIED OFFENSES AGAINST MINORS. A criminal offense against a minor that involves any of the following:

        i. Non-Parental Kidnapping
        ii. Non-Parental false imprisonment
        iii. Solicitation to engage in sexual conduct
        iv. Use in a sexual performance
        v. Solicitation to practice prostitution
        vi. Video voyeurism
        vii. Possession, production, or distribution of child pornography
        viii. Criminal sexual conduct involving a minor
        ix. Use of the internet to facilitate criminal sexual conduct involving a minor
        x. Any conduct that by its nature is a sex offense against a minor

    c. SPECIFIED FEDERAL OFFENSES. These include the following specific offenses:

        i. 18 U.S.C. §1591 (Sex Trafficking of Children)
        ii. 18 U.S.C. §2241 (Aggravated Sexual Abuse)
        iii. 18 U.S.C. §2242 (Sexual Abuse)
        iv. 18 U.S.C. §2243 (Sexual Abuse of a Minor or Ward)
        v. 18 U.S.C. §2244 (Abusive Sexual Contact)
        vi. 18 U.S.C. §2245 (Offenses Resulting in Death)
        vii. 18 U.S.C. §2251 (Sexual Exploitation of Children)
        viii. 18 U.S.C. §2251A (Selling or Buying of Children)
        ix. 18 U.S.C. §2252 (Material Involving the Sexual Exploitation of Minors)
        x. 18 U.S.C. §2252A (Material Containing Child Pornography)
        xi. 18 U.S.C. §2252B (Misleading Domain Names on the Internet)
        xii. 18 U.S.C. §2252C (Misleading Words or Digital Images on the Internet)
        xiii. 18 U.S.C. §2260 (Production of Sexually Explicit Depictions of a Minor for Import in to the United States)
        xiv. 18 U.S.C. §2421 (Transportation of a Minor for Illegal Sexual Activity)
        xv. 18 U.S.C. §2422 (Coercion and Enticement of a Minor for Illegal Sexual Activity
        xvi. 18 U.S.C. §2423 (Transportation of Minors for Illegal Sexual Activity, Travel With the Intent to Engage in Illicit Sexual Conduct with a Minor, Engaging in Illicit Sexual Conduct in Foreign Places))
        xvii. 18 U.S.C. §2424 (Failure to File Factual Statement about an Alien Individual)
        xviii. 18 U.S.C. §2425 (Transmitting Information about a Minor to further Criminal Sexual Conduct)

    d. SPECIFIED MILITARY OFFENSES. These include sex offenses under the Uniform Code of Military Justice, as specified by the Secretary of Defense. These offenses are primarily located at 28 C.F.R. §571.72(b).

    e. ATTEMPTS AND CONSPIRACIES. These include attempts and conspiracies to commit offenses that are otherwise covered by the definition of "sex offenses."

III. Tiering of Offenses: SORNA's idea registration system classifies registered citizens into three tiers based on the official crime.

    a. Tier I Offenses — Convictions that have an element involving a sexual act or sexual contact with another, that are not included in either Tier II or Tier III, including: False Imprisonment of a Minor; Video Voyeurism of a Minor; Possession or Receipt of Child Pornography; The following Federal Offenses: Video Voyeurism of a Minor, 18 U.S.C. Receipt or Possession of Child Pornography, Receipt or Possession of Child Pornography, Misleading Domain Name, Misleading Words or Digital Images, Coercion to Engage in Prostitution, Travel with the Intent to Engage in Illicit Sexual Conduct Engaging in Illicit Conduct in Foreign Places; Arranging, inducing, procuring, or facilitating the travel in interstate commerce of an adult for the purpose of engaging in illicit conduct for financial gain); Filing Factual Statement about Alien Individual, Transmitting Information about a Minor to further Criminal Sexual Conduct; Any comparable military offense specified by the Secretary of Defense under section 115(a)(8) (C)(i) of Public Law 105-119 (10 U.S.C. §951 note)

    b. Tier II Offenses — Convictions that involve: A person previously convicted of a tier I offense whose current sex offense conviction is punishable by more than one year imprisonment: The use of minors in prostitution (to include solicitations); Enticing a minor to engage in criminal sexual activity; A non-forcible Sexual Act with a minor 16 or 17 years old; Sexual contact with a minor 13 or older; The use of a minor in a sexual performance; The production or distribution of child pornography; The following Federal Offenses: Sex Trafficking by Force, Fraud, or Coercion; arranging, inducing, procuring, or facilitating the travel in interstate commerce of an adult for the purpose of engaging in illicit conduct for financial gain; Abusive Sexual Contact, Victim 13 or Older; Sexual Exploitation of Children; Selling or Buying of Children; Sale or Distribution of Child Pornography; Sale or Distribution of Child Pornography; Producing Child Pornography for Import; Transportation for Prostitution; Coercing a Minor to Engage in Prostitution, Transporting a Minor to Engage in Illicit Conduct; Any comparable military offense specified by the Secretary of Defense under section 115(a)(8)(C)(i) of Public Law 105-119 (10 U.S.C. §951 note)

    c. Tier III Offenses — Convictions that involve: A person previously convicted of a tier II offense whose current sex offense conviction is punishable by more than one year imprisonment; Non-parental kidnapping of a minor; Sexual contact with a minor under 13; The following Federal Offenses: Aggravated Sexual Abuse; Sexual Abuse; Sexual Abuse of a Minor or Ward; Abusive Sexual Contact, victim under 13; Any comparable military offense specified by the Secretary of Defense under section 115(a)(8)(C)(i) of Public Law 105-119 (10 U.S.C. §951 note)

IV. Required Registration Information: All records are in a digital format.

    a. Criminal History information, including: Date of all arrests; Date of all convictions; Status of parole, probation, or supervised release; Registration status; Outstanding arrest warrants.

AR-00001005

b. Date of Birth, including: Actual date of birth or Purported date of birth.

c. DNA, including: A DNA sample must be taken, or must have been taken, from the sex offender for purposes of analysis and entry of the resulting DNA profile into the Combined DNA Index System (CODIS); Samples are analyzed and submitted for entry to CODIS.

d. Driver's License or ID Card: A photocopy of a valid driver's license or identification card (to include a tribal identification card) issued to the sex offender by a jurisdiction.

e. Employment Information, including: Employer Name (Business Name); Employer Address; Transient/day labor employment information.

f. Fingerprints: taken and submitted to IAFIS.

g. Internet Identifiers, including: Email addresses; Instant Message addresses/identifiers; any other designations or monikers used for self-identification in Internet communications or postings; all designations used by sex offenders for purposes of routing or self- identification in Internet communications or postings.

h. Name, including: Primary, given name; Nicknames, aliases, pseudonyms generally, regardless of context in which it is used; Ethnic or Tribal names by which they are commonly known.

i. Palm Prints: taken and submitted to the FBI Central Database (Next Generation Identification Program).

j. Passports and Immigration Documents, including: Digitized copies of passports; digitized copies of immigration documents.

k. Phone Numbers, including: Telephone numbers and any other designations used by sex offenders for purposes of routing or self-identification in telephonic communications; Land line telephone numbers; Cell phone telephone numbers.

l. Photograph collected unless appearance has not changed significantly, on the following schedule: Tier I Offender, Once every Year; Tier II Offender, Once every 6 Months; Tier III Offender, Once every 90 Days.

m. Physical Description, including: Physical description of the sex offender; General description of physical appearance or characteristics; Any identifying marks, such as scars or tattoos, etc.

n. Professional Licensing Information: Concerning all licensing of the registrant that authorizes the registrant to engage in an occupation or carry out a trade or business

o. Resident Address, including: Address of each residence at which the sex offender resides or will reside; if no permanent residence, location or description that identifies where the sex offender "habitually lives."

p. School Name and Address.

q. Social Security Number: Valid social security number; Purported social security number(s).

r. Temporary lodging information, including: Identifying information (location) of temporary location(s), Dates of travel.

s. Text of Registration Offense:  The text of the provision of law defining the offense for which the sex offender is registered

t. Vehicle Information of all vehicles owned or operated by the offender, whether for work of personal use, including: License plate number, Registration number or identifier, Land Vehicles, Aircraft, Watercraft, Description of all vehicles identified above and Permanent or frequent location where all vehicles are kept.

V. Where registration is required: Any registrant convicted within the jurisdiction, who complete their sentence of incarceration in the jurisdiction are required to initially register, who reside in the jurisdiction, who are employees in the jurisdiction (employee includes self-employed and labor, including volunteer work), or who are students in the jurisdiction are required to register.

VI. Initial Registration—Timing and Notice: Within 3 days of a registrant establishing residence, employment, or school attendance within the jurisdiction; if incarcerated in the jurisdiction, before the registrant is to be released; within three days of conviction. Duties of a Jurisdiction When An Offender Initially Registers: Inform the sex offender of his or her duties under SORNA, Explain the SORNA duties to registrants, require the sex offender to read and sign a form stating that the duty to register has been explained and that the registrant understands the registration requirement, and ensure that the registrant is registered.

VII. Initial Registration—Retroactive Classes of Offenders: Procedure in place to recapture three categories of sex offenders: Currently incarcerated or under supervision, either for the predicate sex offense or for some other crime; Already registered or subject to a pre-existing sex offender registration requirement under the jurisdiction's law; Reenter the jurisdiction's criminal justice system because of a conviction for some other felony crime (whether or not it is a sex offense). The initial registration of these recaptured offenders must take place within a certain amount of time (from date of implementation of SORNA in the jurisdiction), depending on the tier classification of the sex offender: Tier I Offenders, Within One Year; Tier II Offenders,  Within 6 Months, Tier III Offenders, Within 3 Months.

VIII. Keeping Registration Current: Registrants are required to update any changes to the following:

  a. Residence Jurisdiction —

    i. Immediately appear in-person to update any of the following information: Name, Residence, Employment, School Attendance, Termination of residence

    ii. Immediately update any changes to the following information (an in-person appearance is not required): Email addresses, Instant Message addresses, Any other designations used in internet communications, postings, or telephone communications, Vehicle Information, Temporary Lodging Information; Upon receipt of this information, the jurisdiction must immediately notify the jurisdiction in which the offender will be temporarily staying

    iii. Duties of the Residence Jurisdiction When An Offender Intends to Relocate to Another Country: Immediately notify any other jurisdiction where the sex offender is either registered, or is required to register, of that updated information; Immediately notify the U.S. Marshals Service; Immediately update NCIC/NSOR Information

  b. Employer Jurisdiction — When an offender is employed in a jurisdiction, but neither resides nor attends school there, that offender must immediately appear in-person to update any of the following information: Employment-related information in that jurisdiction, and termination of employment in that jurisdiction.

  c. School Jurisdiction — When an offender attends school in a jurisdiction, but neither resides nor works there, that offender must Immediately appear in-person to update any of the following information: School-related information in that jurisdiction, and termination of school in that jurisdiction.

  d. International Travel:

    i. Duties of the Residence Jurisdiction When An Offender Intends to Travel to Another Country:

      1. Offender must report intent 21 days in advance of travel.

      2. Immediately notify any other jurisdiction where the sex offender is either registered, or is required to register, of that updated information

      3. Immediately notify the U.S. Marshals Service

      4. Immediately update NCIC/NSOR Information

IX. Verification/ Appearance Requirements:

  a. Tier I Offenders must register once a year for 15 years.

  b. Tier II Offenders must register every 6 months for 25 years.

    c. Tier III Offenders must register: Every 3 months for life.

    d. At the sex offender's regularly-scheduled in-person appearance, the following must occur: A current photograph must be allowed to be taken, and the registrant must review the existing registration information for accuracy.

    e. Reduction of registration duties: There are only two classes of registrants that SORNA permits to have a reduced registration period, provided certain requirements are met.  The first is any Tier I offender, and the second is any Tier III offender who is required to register because of a juvenile adjudication.

        i. Tier I Offender — An offender's registration and notification requirement may be terminated if the following conditions are met: The registrant has had ten years with a "clean record"; Not being convicted of any offense for which imprisonment for more than 1 year may be imposed; Not being convicted of any sex offense; Successful (without revocation) completion of any periods of supervised release, probation, and parole; Successful (without revocation) completion of any periods of supervised release, probation, and parole; Successful completion of an appropriate sex offender treatment program certified by a jurisdiction or by the Attorney General. (42 USC §16915(b)(1)).

        ii. Tier III Offender — An offender's registration and notification requirement may be terminated if the following conditions are met: The registrant is required to register based on a juvenile delinquency adjudication for an offense which required Tier III registration; The registrant has had twenty-five years with a "clean record"; Not being convicted of any offense for which imprisonment for more than 1 year may be imposed; Not being convicted of any sex offense; Successful (without revocation) completion of any of supervised release, probation, and parole; Successful completion of an appropriate sex offender treatment program certified by a jurisdiction or by the Attorney General. (42 USC §16915(b)(1)).

    X. Registry Website Requirements

    a. The jurisdiction must participate fully in the National Sex Offender Public Website, including taking the necessary steps to enable all field search capabilities required by NSOPW, including but not limited to: Name; County, City or Town; Zip Code; Geographic Radius;

    b. Links to sex offender safety and education resources;

    c. Instructions on how to seek correction of information that an individual contends is erroneous.

    d. A warning that information on the site "should not be used to unlawfully injure, harass, or commit a crime against any individual named in the registry or residing or working at any reported address…and that any such action could result in civil or criminal penalties."

    e. Website Search-field capability: Name; County, City and/or Town; Zip Code; Geographic Radius.

    f. Items that must be displayed on public registry website: Absconder (when the offender is in violation or cannot be located, the website must note this fact); Criminal History (any other sex offense for which the sex offender has been convicted); Current Offense: the sex offense for which the offender is registered; Employer address; Name,  including all aliases; Photograph (current); Physical description; Resident Address, including any information about where the offender "habitually lives"; School address; Vehicle(s) information, including license plate number(s); and vehicle description(s).

    g. Information That Is NOT Permitted to Be Displayed on Public Websites: Victim Identity, Criminal History (any arrests not resulting in conviction); Social Security Number; Travel and Immigration Document Numbers; Internet Identifiers.

    h. Witness Protection: Jurisdictions are permitted and encouraged to make provision in their laws and procedures to accommodate consideration of the security of such individuals and to honor requests from the United States Marshals Service and other agencies responsible for witness protection in order to ensure that their original identities are not compromised.

    XI. Community Notification

    a. Law Enforcement Notification — Whenever a registrant initially registers in a jurisdiction, or updates their registration information in a jurisdiction, the jurisdiction must immediately notify the specific agencies and monitor the SORNA Exchange Portal for inter-jurisdictional changes; monitor or utilize the SORNA Exchange Portal for inter-jurisdictional change of residence, employment or student status; notify each jurisdiction where the sex offender resides, an employee, or is a student, and each jurisdiction from or to which a change of residence, employment, or student status occurs; update NCIC/NSOR; notify Police Departments; notify Sheriffs' Offices; notify Prosecutor's Offices; notify Probation Agencies; notify any other agencies with criminal investigation, prosecution, or sex offender supervision functions; notify any agency responsible for conducting employment-related background checks under section 3 of the National Child Protection Act of 1993 (42 U.S.C. 5119a)

    b. General Community Notification — Whenever a registrant initially registers in a jurisdiction, or updates their registration information in a jurisdiction, and a jurisdiction follows the procedures General Community Notification — Whenever a sex offender  initially registers in a jurisdiction, or updates their registration information in a jurisdiction, and a jurisdiction follows the procedures outlined below, it will be sufficient to comply with the general community notification portion of SORNA: An automated notification system  is adopted by the jurisdiction that incorporates the following features; any initial registration, and any changes in a sex offender's registration information, are posted to the jurisdiction's public registry website within three business days; An email notification (including a sex offender's identity) is made available to the general public whenever a sex offender commences: Residence, Employment, School attendance, Within a certain zip code or geographic radius.

    XII. Failure To Register—State Penalty: Unless the jurisdiction is a federally recognized Indian tribe, the minimum penalty must be 1 year in prison.

    XIII. When a Registrant Fails To Register: Jurisdictions must inform other jurisdictions of the Failure To Register

    XIV. When a Jurisdiction has information that a Registrant may have absconded:

    a. An effort must be made to determine whether the sex offender has actually absconded.

    b. If no determination can be made, then a law enforcement agency with jurisdiction to investigate the matter must be notified.

    c. If the information indicating the possible absconding came through notice from another jurisdiction or federal authorities, the authorities that provided the notification must be informed that the sex offender has failed to appear and register.

    d. If an absconded sex offender cannot be located, then the jurisdiction must take the following steps:

        i. The information in the registry must be revised to reflect that the sex offender is an absconder or unlocatable;

        ii. A warrant must be sought for the sex offender's arrest, if the legal requirements for doing so are satisfied;

        iii. The United States Marshals Service, which is the lead federal agency for investigating sex offender registration violations, must be notified

        iv. The jurisdiction must update NCIC/NSOR to reflect the sex offender's status as an absconder or unlocatable

        v. The jurisdiction must enter the sex offender into the National Crime Information Center Wanted Person File (assuming issuance of a warrant meeting the requirement for entry into that file)

This laundry list of changes has proven to be a monumental task to many states. In 2009, the National Consortium for Justice Information and Statistics conducted a survey of all 50 states on SORNA compliance. Of the 47 states that responded to the survey, two refused to answer the questions, and 42 of the remaining 45 stated they would need to pass legislation to become compliant with SORNA. Two states were unsure if legislation was needed. One state declared reluctance to pursue SORNA compliance after two previous attempts failed. None of the states that responded were considered compliant at the time of the survey. Juvenile registration (23 states), retroactivity (20 states), cost (7 states) and the structure of SORNA's classification scheme (7 states) were considered the most common barriers to compliance. Other barriers cited included in-person verification, palm print collection, the need for additional staff, Background check logistics, no recourse for the offender to get off the registry, SORNA's definition of "substantial compliance," Conflicts with state constitutions or state

laws, Updating offender information, transforming from a risk-based to a conviction-based assessment, increased verification requirements, and overly restrictive compliance standards. [104]

The 2013 GAO report found of 29 non-SORNA states, the greatest barriers to SORNA compliance was "reconciling compliance between state laws and SORNA (22 of 29 considered it a "major challenge), generating the political will to push for SORNA compliance (21), retroactivity (18), cost (16), juveniles on the registry (16) and applying SORNA's tier structure (16). [105]

Of 17 states in the GAO report that submitted "complete implementation packages" for SMART Office review, most had implemented at least half the requirements. Of the 14 points of implementation, only Point V (Where registration is required) and Point XII (Failure To Register—State Penalty) were fully implemented by all the jurisdictions. Points II (Offenses that must be included on the registry) and X (Registry Website Requirements) were the least successfully adopted points of SORNA compliance among the implementation packages. [106]

The GAO report found that the only real benefit to SORNA compliance was increased data sharing between jurisdictions, but cites negative effects of tier system not considering re-offense risk; increased workloads, and impaired ability of registrants to reintegrate into community.  Larger effects on public safety are largely unstudied. [107]

Ultimately, this bill that had been heralded as a uniform standard is not really uniform, with degrees of deviations allowed by the SMART Office in an attempt to push the AWA for all 50 states. Interestingly, Ohio, the first state to adopt the AWA and congratulated by the SMART Office for "put forth exceptional work and effort in adopting SORNA and enhancing its sex offender registration and notification system," Ohio still has a number of deviations from full SORNA compliance. [108]

*Impact of the AWA on the welfare of registered citizens*

There is little research that has studied the direct impact of the Adam Walsh Act itself on registered citizens; however, there have been studies on the impact on registered citizens and their families. The most notable impact was the 2009 Levenson and Tewksbury study found, "Employment problems experienced by the RSO, and subsequent financial hardships, emerged as the most pressing issue identified by family members. The likelihood of housing disruption was correlated with residential restriction laws; larger buffer distances led to increased frequencies of housing crisis. Family members living with an RSO were more likely to experience threats and harassment by neighbors. Children of RSOs reportedly experienced adverse consequences including stigmatization and differential treatment by teachers and classmates. More than half had experienced ridicule, teasing, depression, anxiety, fear, or anger. Unintended consequences can impact family members' ability to support RSOs in their efforts to avoid recidivism and successfully reintegrate." [109]

A 2016 Jobs and Welfare Survey of 307 registered citizens found registrants living in AWA-compliant states were MORE likely than those living in non-AWA states to report being currently homeless (4.05% AWA vs 2.6% non), being unemployed (47.97% AWA vs 36.36% non), being denied a job (61.86% AWA vs 54.61% non), being harassed at work (53.57% AWA vs 47.66% non), and being forced to rely on public assistance (57.43% AWA vs. 50% non). [110] This study strongly suggests the Adam Walsh Act exacerbates the negative consequences of the public registry. Further studies would be needed to understand the impact of the Adam Walsh Act on registered citizens as compared to existing laws.

*The SMART Office*

The ironically-named "SMART Office" (Sex-offender Monitoring, Apprehending, Registration, and Tracking) is also worthy of mention as it was a bureaucracy created by the Adam Walsh Act (Sec. 146) for the sole purpose of promoting and enforcing the AWA. "In December 2006, the SMART Office officially opened for business when President Bush appointed Laura L. Rogers, a career prosecutor, as the Director…The SMART Mission Statement: To assure that convicted sex offenders are prohibited from preying on citizens through a system of appropriate restrictions, regulations and internment." [111] "Internment" conjures up images of the Japanese Internment camps of World War II, Gitmo/ Guantanamo Bay, Abu Ghraib, or even the Halliburton FEMA camps, but in the US, we already have an existing form of internment, known as "civil commitment," [112] which is promoted in the AWA as the "Jimmy Ryce Civil Commitment Act." Laura Rogers was the figurehead for the SMART Office for a number of years and testified before Congress numerous times, downplaying the difficulties by states to adopt the AWA, claiming states were rebelling against AWA implementation, and feigning ignorance of the tier system placement of juveniles on the public registry under SORNA. Laura worked for a decade as a prosecutor in San Diego, CA, where she boasted she "tried over 120 jury trials as a prosecutor, and have a 92% success rate." [113] However, Rogers is most notable for fumbling her words when questioned about the placement of juveniles on the registry during the March 10, 2009 subcommittee hearing on the Reauthorization of the Adam Walsh Act.

Laura Rogers was eventually replaced by Linda Baldwin. Baldwin's SMART Office Bio states Linda's previous career was "a city planner for the City of New York's Department of Housing Preservation and Development and Department of City Planning," receiving a master's degree in urban planning before going for a law degree. "Prior to joining the New York State Unified Court System, Ms. Baldwin spent eight years in private practice, concentrating in commercial litigation, real estate and zoning law." "As part of her work on the New York State Sex Offense Court Initiative, Ms. Baldwin organized training programs designed to teach and promote best practices for managing the high risk population of sex offenders. Ms. Baldwin led an effort to create the Initiative's Mission Statement and Key Principles, which were designed to guide and promote uniformity among these courts." [114] Based on this bio, it seems Linda Baldwin had little, if any, actual experience in the criminal justice field before taking over duties at the SMART Office. (Interestingly enough, New York opted out of Adam Walsh Act compliance in 2011. [115])

One interesting aspect of the NY Sex Offender Courts is the "Sex Offense Courts depend on successful interaction with stakeholders. Judicial monitoring and community supervision are more effective when the court, probation department, district attorney, defense attorneys and victim service agencies understand each other's role. Accordingly, Sex Offense Courts should become familiar with the whole range of available services in their county, hold regular stakeholder meetings both during the planning process and post-implementation, and, where feasible, collaborate with stakeholders on training programs and other projects." [116] The use of the term "stakeholders," a term associated with business or gambling (or both) is unsettling.

The SMART Office obviously has no vested interest in facts, as facts in favor of rejecting adopted of SORNA have been downplayed as mere rebellion against the laws, and the reports and testimony from the SMART Office sound petty and devoid of fact-finding.

**BATTLEGROUND: OHIO**

"It's a mess created by politicians, and it's going to be a mess for the courts to sort out." – Franklin County Common Pleas Court Judge David E. Cain [117]

AR-00001008

Ohio was the first state considered "substantially compliant" with the Adam Walsh Act. Ohio's version of the AWA (known in Ohio as SB 10) was introduced on February 20, 2007, and passed both the House and Senate an "emergency" measure, effective as of June 30, 2007. [118] There were few dissenting votes against SB 10 (passed 32-1 in the Senate and 94-4 in the House). [119]

At least part of the motivation for passing the Adam Walsh Act was financial. As previously discussed, states failing to adopt SORNA would lose 10% of their Byrne/ JAG law enforcement funds. But Section 126 (c) of the AWA offered states a 10% bonus if they adopted SORNA within a year of the passage of the Federal AWA (which was on July 27, 2006) and a 5% bonus if the implementation was within two years. Ohio's version took effect within the one-year time period. Ohio's Fiscal Notes reported that the US Attorney General announced it would make $25 million available to assist with SORNA implementation, though also noting, "The actual monetary amounts available from any given grant program will depend upon the annual enactment of appropriations. Thus, as of this writing, until these authorized moneys have actually been appropriated, and the application period ensues, it is rather problematic to predict the grants, and related annual monetary amounts, that the state of Ohio and its political subdivisions could be awarded." [120]

The Cleveland Free Times reported, "But the Ohio legislature rushed for nothing. Congress hasn't acted to fund the bonuses in the first place, according to Amy Borror, spokeswoman for the Office of the Ohio Public Defender. 'Congress hasn't actually appropriated any money for that so, as of right now, it's 10 percent of zero,' she explains. 'Even if there were money, even if it were $1 million or $2 million, that pales in comparison to the cost of implementing this.'" [121] There is no evidence that Ohio ever received a bonus for prompt implementation of SORNA, and it was not until September 30, 2009 that Ohio was formally recognized as substantially compliant with the AWA.

As stated earlier, Ohio had estimated the cost of implementing SORNA online registry requirements at $475,000 in one-time expenses and $85,000 in maintenance fees, though in 2012, they were paying $399,000 in registry website fees. It was not until the law began implementation that the true administrative costs of SB 10 would be realized.

Hamilton County, Ohio (Cincinnati Metro area) provides valuable insight into the cost of the Adam Walsh Act at the local level.  "At the local level, the Hamilton County's Sheriff's Department finds this re-classification has increased the sexual predator group (the new Tier III) from 400 in late 2007 to about 1,100 predators with the enactment of Senate Bill 10 on January 1, 2008. Costs for postage for required mailed notifications are expected to rise from $250,000 in 2007 to $500,000 in 2008 if everyone within 1,000 feet of a predator is notified every 90 days. This projected cost does not include increased expenses of printing and staff for increased community notification. Currently the Sheriff's Office has four employees who dedicate much of their time to sex offender registration and notification." [122]

Local 12 Cincinnati reported an increase of labor for the local registry office. "It means more paperwork, more computer work. 'It's tripled. The workload for us has tripled.' And because of all that... Deputy Adam Breeze, Hamilton County Sheriff's Office: 'No free time to do anything else. If we need to look at some files, or write a warrant, or investigate some offenders, it really cracks down on our time, in that aspect, with the tripling of our registration with offenders…' In Hamilton County alone, 600 low level offenders are now high level offenders... same people, no new crime, just a new label." [123] The Buckeye State Sheriffs' Association estimated that the new law had increased sheriffs' workloads by 60 percent. [124]

Statewide, Ohio's registry flipped after implementing SB 10. Under Ohio's old registration scheme, 77% of Ohio registrants were classified as "sexually oriented offenders" (i.e., Tier I), 4% were labeled "habitual sexual offenders" (Tier II), and 18% were labeled "sexual predators" (Tier III). Under SB 10, only 13% of offenders were reclassified into Tier I, 33% were in Tier II, and 54% were in Tier III. [125]

Under the old Ohio registration law, the lowest tier registered for 10 years and the second tier registered for 20 years; under SB 10, registration requirements increased to 15 years for the lowest tier and 25 years for the middle tier. Individuals who were set to get off the registry on July 1, 2007 had their registration periods immediately extended. [126] Registrants received letters from the Ohio Attorney stating their registration duties would continue, even if they were slated to be removed from the registry and despite the fact SB 10 would not be effective until January 1, 2008. [127] Thus, even those not reclassified under SB 10 added to the burden caused by the new law.

Among those who were reclassified under SB 10 was a woman who had a sexual relationship with a prison inmate while working as an Ohio prison guard. The woman pleaded guilty to two counts of "sexual battery" (as inmates cannot legally consent to sex) and, after a psychosexual evaluation that determined she was a low risk to society, was considered a Tier I under the old law. Under SB 10, she was reclassified as a Tier III. [128] Amy Borror testified, "Under Ohio's old law, a person convicted of rape for consensual sex with a person four years and one day his junior might have been classified a sexually oriented offender, if that person had not been found likely to commit another sex crime. Also under Ohio's old law, a person convicted of sexual imposition, a misdemeanor, might have been classified a sexual predator, if a judge found him likely to reoffend. Now, however, Ohio courts are mandated to classify the person convicted of rape as a Tier III offender and the person convicted of sexual imposition as a Tier I offender."

Registered citizens wasted little time in voicing their disapproval of SB 10. The first recognized public demonstration of anti-registry activists was held at the Columbus Statehouse on December 2, 2007. [129]  Soon after SB 10 formally took effect a month later, lawsuits began flooding the courts. [130] Amy Borror testified, "In the 15 months since those reclassification letters were mailed, at least 6,352 petitions challenging the new law's retroactive application have been filed in 78 of Ohio's 88 counties. Ohio courts of appeals have issued decisions in at least 59 cases." [131]

In 2009, the Ohio State Supreme Court accepted the case of State v. Bodyke, [132] and in 2010 the Court ruled that SB 10 violated the "Separation of Powers" doctrine and the act of reclassification by the Attorney General was unconstitutional. What the decision meant was simply that the state legislature violated the Constitution by granting the power to reclassify registered citizens (a judiciary power, specifically appellate courts) to the Attorney General (part of the executive branch). After the Bodyke decision, the lengthy process of reclassifying registered citizens began. Ted Hart, a spokesman for the Attorney General's office, said staff was manually going through all records to determine which defendants had classification hearings under the old law. [133]

Legislators understood this was not a complete condemnation of the retroactive reclassification of registered citizens, so in February 2011, the Ohio House of Representatives introduced HB 77, [134] written to "clarify that SORN Law definitions of sexually oriented offenses, child-victim oriented offenses, tier classifications, public registry-qualified juvenile offender registrants, and related terms include the specified offenses regardless of when they were committed and to provide for court reclassification of offenders and delinquent children who committed their sexually oriented offense or child-victim oriented offense prior to January 1, 2008, and had SORN Law duties based on that offense into one of the tier classifications of the current SORN Law." In other words, the bill would reinstate the SB 10 reclassifications that were stricken under the Bodyke decision.

AR-00001009

However, there was no further action on HB 77, possibly due to a pending Ohio Supreme Court case that was submitted on March 1, 2011, known as State v. Williams. [135] This Ohio Supreme Court reinforced their view that SB 10 should not be applied retroactively. The state was leaning primarily on court decisions that ruled previous incarnations of the public registry were remedial, but the Ohio Supreme Court disagreed and ruled that SB 10 was punitive and thus could not be applied retroactively. [136]

The Williams decision is worthy of more in-depth review than the Bodyke decision, specifically because the state's High Court ruled the Adam Walsh Act was punitive, something many other courts have been reluctant to admit.

The Court noted the State's heavily reliance on the 1998 State v. Cook decision (which ruled the registry was remedial in purpose), but noted that the law had changed twice since the Cook decision, once in 2005 under SB 5, and the second time under SB in 2008. The Court noted that even the changes made under SB 5, which the Courts upheld in State v. Ferguson, [137] contained some punitive elements, with that decision concluding, "Some factors pertaining to the statutory scheme governing sex offenders, however, suggested that the statutory scheme was punitive. First, the procedures for registration and classification of sex offenders were placed within Ohio's criminal code, R.C. Title 29. Second, failure to comply with certain registration requirements subjected a sex offender to criminal prosecution. R.C. 2950.99."

The Court in Williams stated, "Following the enactment of S.B. 10, all doubt has been removed: R.C. Chapter 2950 is punitive. The statutory scheme has changed dramatically since this court described the registration process imposed on sex offenders as an inconvenience 'comparable to renewing a driver's license.' And it has changed markedly since this court concluded in Ferguson that R.C. Chapter 2950 was remedial."

The Court noted the changes of SB 10, as applied to Williams, were as follows:

1. Under the old law, Williams was entitled to a hearing to determine his risk level; under SB 10, he was assigned a Tier II classification without a hearing.
2. Under the old law, courts ruled twice Williams's crime did not require registration.
3. Under the old law, Williams's crime would, at most, have required 10 years registration.
4. Williams was no longer granted an opportunity to challenge his classifications as it was automatic; judicial discretion was abolished; registration periods were extended and registration took place in multiple places.

The court could not state any one regulation that forced SB 10 across the line from regulatory rather than punitive. "Based on these significant changes to the statutory scheme governing sex offenders, we are no longer convinced that R.C. Chapter 2950 is remedial, even though some elements of it remain remedial…No one change compels our conclusion that S.B. 10 is punitive… It is a matter of degree whether a statute is so punitive that its retroactive application is unconstitutional. When we consider all the changes enacted by S.B. 10 in aggregate, we conclude that imposing the current registration requirements on a sex offender whose crime was committed prior to the enactment of S.B. 10 is punitive."

As of July 2016, Ohio registrants convicted before January 1, 2008 are subject to Ohio's older, risk based classification scheme. Those convicted on January 1, 2008 or after are subject to registration under SB 10. In 2015, the Ohio Supreme Court ruled in a 5-2 decision that in-person registration for 25 years was not cruel and unusual punishment, citing, "such sanctions now are the norm...They cannot be said to be shocking to the sense of justice of the community." [138]

## BATTLEGROUND: NEVADA

"We had a really good sex offender law before the Adam Walsh Act… Sometimes you just need to say, 'I'm sorry.' A bad law is a bad law." – Nevada State Senator Richard S. "Tick" Segerblom [139]

As of May 12, 2011, Nevada has been considered "substantially compliant" with the Adam Walsh Act. The GAO reported in 2013 that Nevada, like Ohio, had six deviations from full compliance with the AWA. [140] Like Ohio, Nevada pushed legislation through with no dissenters of note [141] to beat the deadline (possibly motivated by the aforementioned bonus contained within AWA Sec. 126 (c). "In an attempt to comply with SORNA, the Nevada legislature unanimously passed Assembly Bill (A.B.) 579, which Governor Jim Gibbons signed into law in June 2007. The statute was scheduled to go into effect on July 1, 2008, well before SORNA's three-year deadline of July 27, 2009." [142] Unlike Ohio, however, the fight against implementing the AWA is still ongoing.

The ACLU of Nevada won the initial victory against AB 579 in the US District Court of Nevada. [143] This court found, "The application of these laws retroactively is the equivalent a new punishment tacked on to the original sentence—sometimes years after the fact—in violation of the Ex Post Facto and Double Jeopardy Clauses of the U.S. Constitution, as well as the Contracts clauses of the U.S. and Nevada Constitutions. Moreover, because they do not provide any procedural protections from their retroactive application, A.B. 579 and S.B. 471 violate the Due Process Clause of the U.S. Constitution."

The Nevada Law Review reports, "In response to the district court's entry of a permanent injunction, the Nevada legislature passed A.B. 85, which temporarily repealed A.B. 579 and S.B. 417. The legislature formed an advisory committee charged with studying the sex offender registration laws and proposing a solution to the contested legislation." [144]

In 2012, the 9th Circuit Court reversed the District Court decision, holding the retroactive application is "constitutionally sound." [145] The 9th Circuit relied heavily on Smith v. Doe decision as the justification for overturning the US District Court case.

The Nevada Supreme Court had delayed proceedings on a juvenile SORNA case pending the 9th Circuit decision. Sadly, the state's High Court in State v. Eighth Judicial Dist. Court (Logan D.) upheld the registration of juvenile offenders. The state's High Court ruled, "[T]he legislature could have determined that juveniles adjudicated for the enumerated offenses, which represent the most serious of sexual offenses, are at a higher risk to reoffend—and thus pose a greater danger to the public—than juveniles adjudicated for other, less serious offenses. And consistent with the Legislature's presumption since 1911 that children aged 14 and older know the wrongfulness of their actions, it could have also concluded that once a child reaches the age of 14, he or she commits a sex offense with knowledge that it is wrong and therefore poses a greater risk to the public than a younger child who commits the same offense." [146]

The state was slated to enforce SORNA on February 1, 2014, but the Nevada Supreme Court placed a temporary stop on enforcement pending another challenge to the law, citing "issues of arguable merit" were raised by the latest lawsuit, including the overriding of the risk assessment system and retroactively registering individuals for convictions dating as far back as 1956. [147]

While AB 579 was being reviewed for the second time by the courts, the Nevada legislature proposed a handful of bills that would tweak the existing law, and

AR-00001010

one draft bill proposed tossing out AB 579 altogether. Nevada legislators also stated the federal law changed in regard to juvenile registration, allowing states to exercise discretion in the public disclosure of juveniles on the registry, and the legislature planned on changing the laws for juveniles during the next session. [148]

On January 30, 2015, the Nevada legislature introduced SB 99, [149] which would have abolished the changes made by AB 579 and returned Nevada to their prior system of registration. Among the primary concerns of AB 579, as reported in the media, was cost (no one could say if Nevada ever received any funds for adopting the AWA), juveniles on the registry, and the rigid offense-based classification system. [150] It passed unanimously by both the Senate and Assembly, but was vetoed by Governor "because it also eliminated a requirement that certain sex offenders stay at least 500 feet away from schools, parks and other places frequented by children." [151]

On January 22, 2016, the Nevada Supreme Court denied a petition to enforcement of AB 579 while the case is continuing in the courts, putting 4,600 registrants not listed publicly in danger of being publicly disclosed. [152] On June 1, 2016, registrants received notices AB 579 would be enforced beginning July 1. [153]

On June 21, 2016, a last-ditch effort to stop the July 1 enforcement of the law, arguing AB 579 is vague and overbroad in its application, and that the state is applying the law unequally and has no procedures for people to challenge their inclusion on the registry. "One plaintiff, identified as Doe 3, pleaded guilty in 1961 when he was 19 years old in California to a misdemeanor counts of indecent exposure and annoying a minor. He was not required to register as an offender. Now 74 and the father of four adult children, he will be required to register as a Tier 1 offender and be subject to community notification." [154] On June 30, the Nevada Supreme Court rejected an emergency motion to postpone the enforcement of AB 579, allowing the information of nearly all of the state's registrants to be listed publicly. AB 579 raised the number of Tier 3 registrants from 239 people to 3,014; 1,790 people would be added to the list as a Tier 2; names of another 426 of the state's 1,646 lower-level Tier 1 offenders are also due to be published. The category includes people whose crimes involved children, but who were assessed as posing a low risk of re-offending. Their names weren't made public in the past. About 1,300 of the 6,512 names in the sex offender registry aren't due to be published. [155]

On July 1, 2016, the names of thousands of registered citizens went online for 4am until about 8:40am, after a State Supreme Court order stayed the execution of AB 579 James Wright of the Nevada Department of Public Safety stated in the media the agency was implementing the law and he hoped no harm was done during the brief, early morning hours when names were available. A legislative committee had just approved $545,000 for the Criminal History Repository to hire more staff to implement the law and meet the demand of running fingerprints and palm prints every three months for Tier 3 offenders. As of July 2016, implementation is once again placed on hold pending further judicial review, with no one sure of the length of this reprieve. [156]

**SUMMARY**

If the road to hell is paved with good intentions, then Congress provided the asphalt when it steamrolled the Adam Walsh Act through Congress. The bill was first introduced by Congressman Mark Foley in May 2005 and evolved many times over the coming months as numerous proposals were made, added to the bill, and taken out. Congressman James Sensenbrenner staged a coup of sorts by sponsoring his own version of the AWA, fast-tracking the bill through a subcommittee chaired by himself, and utilizing the controversial practice of "suspension of the rules" to weed out hotly contested hate-crime legislation without further legislative input. In July 2006, all proposals not directly related to registered sex offenders or sex crimes were weeded out of the bill, given the formal name of the Adam Walsh Child Protection and Safety Act of 2006, and quickly passed under a second suspension of the rules so it could be on the President's desk in time for July 27, 2006, the 25 year anniversary of Adam Walsh' death.

The bill was passed utilizing a combination of myths about sex crimes and a series of high profile cases occurring in recent years. Specifically, the myth of 100,000 missing sex offenders (sometimes arbitrarily reported as 150,000 by legislators) was used in conjunction with anecdotal examples of registrants who failed to register who committed subsequent crimes to justify the passage of the Adam Walsh Act. The AWA was also sold under the notion that this law would create a "universal" or 'uniform' standard of registration so registrants would not flee across state lines to avoid registration. Television shows like NBC's 'To Catch a Predator" also played a key role in influencing the legislature. A number of high-profile victim advocates also advocated for the AWA, but TV host and advocate John Walsh (references of exploding rectum chips aside) was likely the greatest influence in inspiring legislators to fast-track this bill and name it in honor of Walsh's murdered son.

Ten years later, only 17 states, 3 US Territories, and 100 federally recognized Native American Tribes have adopted the Adam Walsh Act. Five states – Arizona, Arkansas, California, Texas and Nebraska – have elected not to pursue AWA and accept a 10% cut to federal law enforcement funding. Many states have found, however, the cost of implementing and maintaining the type of registry proposed by the AWA far exceeds the 10% loss of Byrne/ JAG funds. Ohio, the first state to adopt the AWA, found the cost of implementation and maintenance of the registry ran beyond the legislative estimates, including almost half a million dollars in annual registry maintenance costs and untold costs on local governments for increased registration and community notification. Ohio also spent over $10 million in court costs defending the law against thousands of lawsuits. Even in 2016, the AWA remains a largely unfunded mandate, with state absorbing practically the entire cost of implementing the law.

Other issues plaguing implementation of the Adam Walsh Act concerns the retroactive application of the law (which had been interpreted to drudge up convictions as far back as 1956) and placing juveniles as young as 14 on the public registry. The rigid, offense-based Tier system is inferior to the risk assessment system utilized in many states, and the AWA scheme lands more registrants on the higher tier levels, increasing overall registry costs. The bill was also condemned for inflexibility, and in many cases, "could not be implemented." The AWA also affects registered citizens in both travel plans and immigration of immediate family members. The issue of state and Native American tribal sovereignty has also complicated implementation of the AWA. The AWA was also sold under the notion of creating a uniform standard (implying the law would be equal across the nation), but AWA states vary greatly in practice.

While there aren't many studies showing the direct impact of the Adam Walsh Act on registered citizens, studies on the impact of the registry itself shows a number of negative and debilitating consequences on registered citizens and their families. Furthermore, a 2016 study found registrants in AWA-compliant states were more likely to report adverse effects of the registry compared to non-AWA states. The ironically-named SMART Office, created to promote the AWA, has downplayed the effects on registered citizens as well as the negative impact of the registry on the states, claiming resistance to the law is simply an act of rebellion. The SMART Office has proven incapable of the task of being a factual organization, as its sole reason to exist is to promote adoption of the AWA. This bureaucracy should be closed for business.

Ohio and Nevada have been two key battleground states for the practical application of the Adam Walsh Act. In Ohio, the AWA changed their classification scheme of their risk-based three-level system to offense-based, tripling the number of registrants placed in the highest tier level, increasing the caseloads of local-level law enforcement by an estimated 60%, and increasing costs for local-level law enforcement for community notification and address verification. Registrants remaining on the lower tiers saw an increase in the amount of time they would have to spend on the registry. This led to over 6,000 lawsuits, and in two separate

AR-00001011

court rulings, the Ohio Supreme Court struck down the retroactive application of the registry as unconstitutional. Ohio spent over $10 million defending the AWA against these lawsuits. Currently, Ohio maintains two sets of laws, the old risk-based scheme for those convicted before 2008, and the AWA scheme for those convicted after January 1, 2008.

Nevada has been a different kind of battleground. Nevada also pushed a law through legislature within a year, much like Ohio, and may also have been influenced by the 10% bonus promised states adopting the Adam Walsh Act guidelines within a year. Unlike Ohio, Nevada has yet to formally enforce the AWA due to a series of lawsuits taking years to decide. For 4 ½ hours on July 1, 2016, the names of registrants previously kept private under Nevada's law were posted online, but a new lawsuit removed the names pending further judicial review. To this date, there is no evidence either state received the 10% bonus promised by the AWA.

Ten years after the Adam Walsh Act passed into law, the AWA has proven to be a costly failure. The fact the law does not actually create a uniform standard alone should be sufficient to prove the ineptitude of this law. The law was hastily passed, with many changes coming just before the bill was implemented. Even states that have tried to adopt AWA have run into problems, since the law is rigid and leaves little room for compromise. In reality, it would take far more money to implement the AWA than the federal government is willing to invest: in 2016, the legislature prosed $20 million in funding for the AWA, but $61 million to the US Marshals for registry compliance checks.

The only viable solution to correcting the problems created by the Adam Walsh Act would be to fully repeal the bill. In this political climate, that seems an unlikely proposal.

## REFERENCES

1. Text and history of HR 2423 at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HR02423:
2. Text and history of S. 1086 at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:s.01086:
3. "STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS -- (Senate - May 19, 2005)." Library of Congress/ Thomas. Web. < http://thomas.loc.gov/cgi-bin/query/F?r109:1:./temp/~r109onol6r:e63014:>
4. "NATIONAL MISSING KIDS DAY -- (House of Representatives - May 25, 2005)." Library of Congress/ Thomas. Web. <http://thomas.loc.gov/cgi-bin/query/D?r109:2:./temp/~r109U71nKB::>
5. Text and history of HR 3133 at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HR03133:
6. Text and History of H. Res. 436 at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:H.RES.436:
7. See H.AMDT.527 (A008) at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HZ00527:
8. See H.AMDT.531 (A012) at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HZ00531:
9. See H.AMDT.544 (A025) at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HZ00544:
10. See http://clerk.house.gov/evs/2005/roll470.xml
11. See http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HR03132:@@@S
12. "What John Walsh WON'T tell you about The Children's Safety Act (H.R. 4472)." Daily Kos. Kos Media LLC. 16 Jun 2006. Web. < http://www.dailykos.com/story/2006/6/16/219432/->
13. Text and history of HR 4472 at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:h.r.04472:
14. eAdvocate. "The Morphism of the Adam Walsh Child Protection and Safety Act of 2006." Sex Offender Reports, Charts & Archive. eAdvocate. April 2006. Web. <http://sexoffender-reports.blogspot.com/2009/06/morphism-of-adam-walsh-child-protection.html>
15. Text and history of HR 4732 at http://thomas.loc.gov/cgi-bin/query/z?c109:H.R.4732:
16. Text and history of HR 4815 at http://thomas.loc.gov/cgi-bin/query/z?c109:H.R.4815:
17. Text and history of HR 4883 at http://thomas.loc.gov/cgi-bin/query/z?c109:H.R.4883:
18. Text and history of HR 4905 at http://thomas.loc.gov/cgi-bin/bdquery/z?d109:HR04905:
19. Supra., eAdvocate, "Morphism."
20. "112th Congress House Floor Procedures Manual, VIII. SUSPENSION OF THE RULES." The Congressional Institute, Inc. Web. < http://conginst.org/112th-congress-house-floor-procedures-manual/viii-suspension-of-the-rules/>
21. Ibid.
22. See http://thomas.loc.gov/cgi-bin/query/C?r109:./temp/~r109NtntU1
23. Supra., eAdvocate. "Morphism"
24. Supra., "What John Walsh WON'T tell…" Daily Kos
25. "NANCY GRACE: Interview With Elizabeth Smart." CNN. Time Warner. TV. 18 July 2006. Transcript found online < http://transcripts.cnn.com/TRANSCRIPTS/0607/18/ng.01.html>*
26. See http://thomas.loc.gov/cgi-bin/bdquery/z?d109:SP04687:
27. See 7/20/06 minutes at http://thomas.loc.gov/cgi-bin/query/C?r109:./temp/~r109vHzDJH
28. See the minutes for 7/25/06 at http://thomas.loc.gov/cgi-bin/query/C?r109:./temp/~r109kIN952
29. Rick Porter, Daniel Feinberg and Brill Bundy, "Notes and News from Summer Press Tour." Palm Beach Sun Sentinel, 25 July 2006. <http://www.sun-sentinel.com/zap-presstournotes,0,5214135.story>
30. de Moraes, Lisa. "Summer Press Tour, Day 16: An Explosive Interview." The Washington Post. 26 July 2006. Web. < http://www.washingtonpost.com/wp-dyn/content/article/2006/07/25/AR2006072501590_pf.html>
31. "President Signs H.R. 4472, the Adam Walsh Child Protection and Safety Act of 2006." The White House. 27 July 2006. Press Release. < https://georgewbush-whitehouse.archives.gov/news/releases/2006/07/20060727-6.html>
32. A longer summary of the bill is found at http://www.oncefallen.com/AdamWalshAct.html
33. Complete list of SORNA-compliant jurisdictions can be found at http://ojp.gov/smart/sorna.htm. As of this writing, the 17 states adopting the AWA are: AL, CO, DE, FL, KS, LA, MD, MI, MS, MO, NV, OH, PA, SC, SD, TN, WY
34. "Some States Refuse to Implement SORNA, Lose Federal Grants." Prison Legal News. 19 Sep. 2014. Web. <https://www.prisonlegalnews.org/news/2014/sep/19/some-states-refuse-implement-sorna-lose-federal-grants/>
35. Fruhwirth, Jesse. "Utah steps up sex-offender law, still short of federal compliance." Daily Herald. Herald Communications. 27 Jan 2008. Web. <http://www.heraldextra.com/news/local/article_eb3322ea-35ef-543c-8df6-485161f16206.html>
36. Ibid.
37. Hull, Tim. "Sex Offender Registration Act Not Fully Retroactive." Courthouse News Service. 28 Dec. 2010. Web. <http://www.courthousenews.com/2010/12/28/32933.htm>

AR-00001012

38. Federal Register / Vol. 72, No. 103 / Wednesday, May 30, 2007 / Notices. Page 30212 <https://www.justice. gov/sites/default/files/olp/docs/oag_sorna_05302007.pdf>

39. United States v. Valverde, 628 F. 3d 1159 (CA9 2010);

40. Juhl, Wesley. "Bill would repeal Adam Walsh sex-offender act in Nevada." Las Vegas Review-Journal. 28 Feb. 2015. Web. <http://www.reviewjournal. com/news/nevada-legislature/bill-would-repeal-adam-walsh-sex-offender-act-nevada>

41. United States v. Johnson, 632 F. 3d 912, 922–927 (CA5 2011); United States v. Valverde, 628 F. 3d 1159, 1162–1164 (CA9 2010); United States v. Cain, 583 F. 3d 408, 414–419 (CA6 2009); United States v. Hatcher, 560 F.3d 222, 226–229 (CA4 2009); United States v. Dixon, 551F. 3d 578, 585 (CA7 2008); United States v. Madera, 528 F. 3d 852, 856–859 (CA11 2008) (per curiam).

42. United States v. Fuller, 627 F. 3d 499, 506 (CA2 2010); United States v. DiTomasso, 621 F. 3d 17, 24 (CA1 2010); United States v. Shenandoah, 595 F. 3d 151, 163 (CA3 2010); United States v. Hinckley, 550 F. 3d 926, 932 (CA10 2008); United States v. May, 535 F. 3d 912, 918–919 (CA8 2008).

43. US v. Reynolds, No. 08-4747 (3rd Cir. 2013)

44. "Office of the Attorney General; Applicability of the Sex Offender Registration and Notification Act." Federal Register. 29 Dec. 2012. Web. < https:// www.federalregister.gov/articles/2010/12/29/2010-32719/office-of-the-attorney-general-applicability-of-the-sex-offender-registration-and-notification-act>

45. State v. Bodyke, 126 Ohio St.3d 266, 2010-Ohio-2424.

46. State v. Williams, 129 Ohio St.3d 344, 2011-Ohio-3374

47. Carr v. United States, 130 S. Ct. 2229, 2232-33 (2010)

48. Renée C. Lee, "Texas won't participate in national sex offender registry." Houston Chronicle, 5 Oct 2012. Web. <http://www.chron.com/news/houston-texas/article/Texas-won-t-participate-in-national-sex-offender-3923910.php>

49. Supra., "Some States Refuse…" Prison Legal News

50. Texas Senate Committee on Criminal Justice Interim Report. 15 Dec. 2010. Web. <http://www.senate.state.tx.us/75r/senate/commit/c590/c590. InterimReport81.pdf>

51. Cooper, Alexia D., Ph.D., and Martin, Kimberly, Ph.D. "Justice Assistance Grant (JAG) Program, 2014." US Dept. of Justice, Bureau of Justice Statistics. Aug. 2014. Web. <http://www.bjs.gov/content/pub/pdf/jagp14.pdf>

52. "Fiscal Year (FY) 2016 State Edward Byrne Memorial Justice Assistance Grant (JAG) Allocations." Office of Justice Programs, Bureau of Justice Assistance. Web. <https://www.bja.gov/Funding/16JAGStateAllocations.pdf>

53. "Complying with Walsh Act costs Ohio $10 million." The Vindicator. Vindy.com. 13 Nov. 2011. Web. <http://www.vindy. com/news/2011/nov/13/complying-with-walsh-act-costs-ohio--mil/?print>

54. "Sex Offenders and Communities." Hamilton County Ohio Regional Planning Commission, April 2008. Web. <http://www.hamiltoncountyohio. gov/hcrpc/pdf/SexOffendersInCommunitiesSpecialReport.pdf>

55. "What will it cost states What will it cost states to comply with the Sex to comply with the Sex Offender Registration and Notification Act?" Justice Policy Institute. Aug 2008. Web. <http://www.justicepolicy.org/images/upload/08-08_FAC_SORNACosts_JJ.pdf>

56. See http://www.oncefallen.com/files/2011_-_12_contractOhioRegisters.pdf

57. Supra., "What will it cost…" Justice Policy Institute.

58. "Newsroom." Office of Justice Programs/ SMART Office. July 2006. Web. <http://ojp.gov/smart/newsroom.htm>

59. "Request for Reallocation of Byrne/JAG Grant Funds." Office of Justice Programs? SMART. Web. <http://ojp.gov/smart/pdfs/reallocationform2014.pdf>

60. "Some States Resist Implementing Adam Walsh Act Requirements." Prison Legal News. 15 Feb. 2012. Web. <https://www.prisonlegalnews. org/news/2012/feb/15/some-states-resist-implementing-adam-walsh-act-requirements/>

61. Statement of Pat Collonton on the "The Reauthorization of the Adam Walsh Act," 15 Feb 2011. Web. <https://judiciary.house. gov/_files/hearings/pdf/Colloton021520011.pdf>

62. National Conference of State Legislatures (NCSL) statement on the AWA. Web. <http://www.ncsl.org/documents/standcomm/sclaw/AdamWalsh.pdf>

63. Farley, Lara Geer. "The Adam Walsh Act: The Scarlet Letter of the Twenty-First Century." Washburn Law Journal. 17 Apr. 2008

64. Stimson, Charles "Cully" and Noronha, Maya. "Get SMART: Complying with Federal Sex Offender Registration Standards." The Heritage Foundation. 12 July 2011. Web. <http://www.heritage.org/research/reports/2011/07/get-smart-complying-with-federal-sex-offender-registration-standards>

65. Wang, Jennifer. "Paying the Piper: The Cost of Compliance with the Federal Sex Offender Registration and Notification Act." New York Law School Law Review. Vol. 59, 2014/15. Web. <http://www.nylslawreview.com/wp-content/uploads/sites/16/2015/06/Volume-59-4.Wang_.pdf>

66. "Adam Walsh Reauthorization Act of 2016 Cost Estimate." Congressional Budget Office. 19 May 2016. Web. <https://www.cbo. gov/sites/default/files/114th-congress-2015-2016/costestimate/s2613.pdf>

67. Editorial Board. "Sex-offender registry requires reboot in Ohio and the nation: editorial." Cleveland.com. Northeast Ohio Media Group LLC. 19 Nov 2015. Web. <http://www.cleveland.com/opinion/index.ssf/2015/11/sex-offender_registry_requires_reboot_in_ohio_and_the_nation_editorial.html>]

68. Levine, Judith and Meiners, Erica. "Don't Just Get Kids Off the Sex Offender Registry. Abolish It." CounterPunch. 8 Apr 2016. Web. <http://www. counterpunch.org/2016/04/08/dont-just-get-kids-off-the-sex-offender-registry-abolish-it/>

69.  Mcpherson, Lori. "Practitioner's Guide to the Adam Walsh Act." NATIONAL CENTER FOR PROSECUTION OF CHILD ABUSE UPDATE,  VOL 20, NOS 9 & 10, 2007

70. "Sex Offender Registration and Notification Act: Barriers to Timely Compliance by States." House Subcommittee on Crime, Terrorism, and Homeland Security. 10 March 2009. Web. <https://judiciary.house.gov/_files/hearings/printers/111th/111-21_47923.PDF> . A video clip of this exchange can be found at "Adam Walsh Act, SORNA Unconstitutional." Citizens For Change, America. Youtube. 15 Oct 2009. Video. < https://www.youtube.com/watch?v=pteugppl-Ko>

71. Supra., "Some States Refuse…" Prison Legal News

72. Campoy, Ana. "States Resist Federal Sex-Offender Registry." Wall Street Journal. Sow Jones & Co. 9 Apr 2011. Web. <http://www.wsj. com/articles/SB10001424052748704587004576245451255268570>

73. "Adam Walsh Act: Statement of Position." CA Sex Offender Management Board. Web. <http://www.casomb.org/docs/Adam%20Walsh%20Position% 20Paper.pdf>

74. Grinberg, Emanuella. "5 years later, states struggle to comply with federal sex offender law." CNN. Turner Broadcasting System, Inc. 28 July 2011. Web. <http://www.cnn.com/2011/CRIME/07/28/sex.offender.adam.walsh.act/>

75. Statement from the National Association of Criminal Defense Lawyers (NACDL). 5 Feb 2011. Web. <http://www.ncjfcj.org/sites/default/files/nacdl.mag_. _0.pdf>

76. Hancock, Laura. "Wyoming lawmakers discuss changes to youth sex offender registry." Casper Star-Tribune. 15 Apr. 2015. Web. <http://trib. com/news/local/crime-and-courts/wyoming-lawmakers-discuss-changes-to-youth-sex-offender-registry/article_e4070540-77fd-52b4-9e6f-ee3e047888c6. html>

77. Liu, Cara. "Legislator: AZ Won't Comply With Federal Sex Offender Database Law." CBS 5 (KPHO Broadcasting Corporation), Phoenix, AZ and Frankly Media. 9 Mar 2011. Web. <http://www.cbs5az.com/story/14817625/legislator-az-wont-comply-with-federal-sex-offender-database-law-3-09-2011>

AR-00001013

8/17/2020                                          Ten Years of the Adam Walsh Act

78. Supra., "Some States Refuse…" Prison Legal News. 2014

79. "Executive Order 13175 - Consultation and Coordination With Indian Tribal Governments" Federal Register: Vol 65, No 218. 9 Nov 2000. Web. <http://www.state.gov/documents/organization/136740.pdf>

80. "Adam Walsh Act." National Congress of American Indians (NCAI). 2016. Web. < http://www.ncai.org/policy-issues/tribal-governance/adam-walsh-act>

81. "Procedure for Delegation of Tribal Sex Offender Registration and Notification Responsibilities." SMART Office. US Dept. of Justice. Web. <http://ojp.gov/smart/pdfs/delegation_procedure.pdf>

82. "Tribal Resolutions Pursuant to the Adam Walsh Child Protection and Safety Act of 2006." SMART Office. Web. <http://ojp.gov/smart/pdfs/tribal_govt_elections.pdf>

83. Vega-Buzon, Aurora. "The Adam Walsh act: Bar to a US citizen or permanent resident to petition family members." 25 Nov 2015. Web. <http://asianjournal.com/immigration/the-adam-walsh-act-bar-to-a-us-citizen-or-permanent-resident-to-petition-family-members/>

84. Kowalski, Daniel. "The BIA's Adam Walsh Act Trilogy: Because We Can." LexisNexis Legal Newsroom. 29 May 2014. Web. <https://www.lexisnexis.com/legalnewsroom/immigration/b/insidenews/archive/2014/05/29/the-bia-39-s-adam-walsh-act-trilogy-because-we-can.aspx>

85. "§ N.13 U.S. Citizens and Permanent Residents Cannot Petition for a Relative If Convicted of Certain Offenses Against Minors – The Adam Walsh Act." Immigrant Legal Resource Center. Jan 2013. Web. <http://www.ilrc.org/files/documents/n.13-adam_walsh_act.pdf>

86. "US DEPARTMENT OF HOMELAND SECURITY'S MALICIOUS IMMIGRATION POLICY HAS DESTROYED AT LEAST 4000 FAMILIES SINCE 2011." Alliance for Constitutional Sex Offense Laws. 13 Nov 2016. Web. <http://all4consolaws.org/2016/11/us-department-of-homeland-securitys-malicious-immigration-policy-has-destroyed-at-least-4000-families-since-2011/>

87. See Federal Register / Vol. 76, No. 7 / Tuesday, January 11, 2011 / Notices, pages 1633-1634. Web. <http://ojp.gov/smart/pdfs/SORNAFinalSuppGuidelines01_11_11.pdf>

88. Ibid.

89. Logue, Derek. "International Megan's Law: The Epitome of American Arrogance." Once Fallen. 31 Jan 2016. Web. <http://www.oncefallen.com/internationalmeganslaw.html>

90. Handler, Michael. "A LAW OF PASSION, NOT OF PRINCIPLE, NOR EVEN PURPOSE: A CALL TO REPEAL OR REVISE THE ADAM WALSH ACT AMENDMENTS TO THE BAIL REFORM ACT OF 1984." Journal of Criminal Law and Criminology. Volume 101, Issue 1. 2011. Web. <http://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7390&context=jclc>

91. Dearinger, Bryan. "THE MANDATORY PRETRIAL RELEASE PROVISION OF THE ADAM WALSH ACT AMENDMENTS: HOW "MANDATORY" IS IT, AND IS IT CONSTITUTIONAL?" St. John's Law Review. Vol. 85:1343.  2011.  [See p.1365 with footnotes]

92. Supra., Orrin Hatch's testimony for Suspension of the Rules, July 20,2007.

93. deBaca, Luis C. "Recognizing a Decade of Progress at SMART." SMART Office. 23 March 2016. Web. <http://ojp.gov/ojpblog/recognizing-smart.htm>

94. "SORNA." SMART Office. Web. < http://ojp.gov/smart/sorna.htm>

95. Frederick, Susan Parnas. 'Clash on Capitol Hill, too." State Legislatures. National Conference of State Legislatures. June 2011. Magazine.  p. 27 <http://www.ncsl.org/Portals/1/Documents/magazine/articles/2011/SL_0611-SexOffender.pdf>

96. AL Code § 15-20A-10 (c) (2) (f) (2013); note that juveniles in Alabama are subject to a Tier system; all adults are registered for life in Alabama.

97. F.S. 943.0435(11); 775.21(6)(l)

98. SC Code of Laws, Sec. 23-3-460

99. Tenn. Code 40-39-207

100. WY Stat § 7-19-304 (2014)

101. SEX OFFENDER REGISTRATION AND NOTIFICATION ACT: Jurisdictions Face Challenges to Implementing the Act, and Stakeholders Report Positive and Negative Effects." Gov't Accountability Office. Feb. 2013. Web. <http://www.gao.gov/assets/660/652032.pdf> Appendix III.

102. Amy Borror Written Testimony. HEARING ON THE SEX OFFENDER REGISTRATION AND NOTIFICATION ACT (SORNA). U.S. HOUSE OF REPRESENTATIVES, COMMITTEE ON THE JUDICIARY, SUBCOMMITTEE ON CRIME, TERRORISM, AND HOMELAND SECURITY. 9 March 2009. Web. <https://judiciary.house.gov/_files/hearings/pdf/Borror090310.pdf>

103. "SEX OFFENDER REGISTRATION AND NOTIFICATION ACT: SUBSTANTIAL IMPLEMENTATION CHECKLIST." SMART Office. Word Document. Can be downloaded at http://ojp.gov/smart/sorna_tools.htm#checklist

104. "SEARCH Survey on State Compliance with the Sex Offender Registration and Notification Act (SORNA)." National Consortium for Justice Information and Statistics. Apr 2009. Web. < http://www.search.org/files/pdf/SORNA-StateComplianceSurvey2009.pdf>

105. Supra., GAO "SORNA" 2013: Appendix V

106. Ibid., Appendix IV

107. Ibid., "What GAO Found"

108. "SORNA Implementation Review: State of Ohio" SMART Office. Sept 2009. Web. <http://www.smart.gov/pdfs/sorna/Ohio.pdf>

109. Levenson, Jill, & Tewksbury, Richard. "Collateral damage: Family members of registered sex offenders." American Journal of Criminal Justice. 2009.

110. Logue, Derek. "The 2016 Once Fallen Job & Welfare Survey." Once Fallen. March 2016. Web. <http://www.oncefallen.com/files/Once_Fallen_Job_and_Welfare_Survey_Results.pdf>

111. Rogers, Laura. "The SMART Office: Open for Business." SMART Office. Web. <http://ojp.gov/smart/pdfs/register.pdf>

112. Logue, Derek. "Civil Commitment: A very uncivil proposal." Once Fallen. 17 May 2009. Web. <http://www.oncefallen.com/civilcommitment.html>

113. "Statement of Laura L. Rogers." Subcommittee on Crime, Terrorism, and Homeland Security. 10 Mar 2009. Web. <https://judiciary.house.gov/_files/hearings/pdf/Rogers090310.pdf>

114. "Linda M. Baldwin, Director." SMART Office. Web. <http://ojp.gov/smart/bio_baldwin.htm>

115. Letter to Linda Baldwin from Risa Sugarman, 23 Aug 2011. Web. <http://nylawyer.nylj.com/adgifs/decisions/100711baldwinnotification.pdf>

116. "Sex Offense Courts." NYCourts.gov. Web. <http://www.nycourts.gov/courts/problem_solving/so/mission_goals.shtml>

117. Supra., Amy Borror Testimony Congressional hearing 2009

118. "Am. Sub. S.B. 10." Ohio Legislative Service Commission. 2007. Web. <http://www.lsc.ohio.gov/analyses127/07-sb10-127.pdf>

119. "Unofficial Votes for Senate Bill 10." Ohio General Assembly Archives 1997-2014. Legislative Information Systems.

120. Sub. SB 10 Fiscal Note & Local Impact Statement. 127 th General Assembly of Ohio. Web. <http://www.lsc.ohio.gov/fiscal/fiscalnotes/127ga/sb0010hr.htm

121. Pierce, Margo. "Sex In The Time Of Hysteria." Cleveland Free Times. 21 Nov 2007. Web. <http://web.archive.org/web/20071203201655/http://www.freetimes.com/stories/15/29/sex-in-the-time-of-hysteria>

122. "Sex Offenders and Communities, Special Report No. 3-10." Hamilton County Regional Planning Commission. Feb. 2008. Web. < https://ccoso.org/sites/default/files/import/SexOffendersInCommunitiesSpecialReport.pdf>

123. Hirsh, Jeff. "High Cost of New Sex Offender Law. Local 12. 12 Feb 2008. Web.

124. "Ohio's tougher sex offender law being met with lawsuits, confusion." Cleveland Plain Dealer. 21 Jan 2008. Newspaper.

125. Supra., Amy Borror Testimony, 2009. p. 2

AR-00001014

126. Harris, Millie and Pettway, Coretta. "Best Practices Tool-Kit: Sex Offender Registration and Notification." Ohio Department of Rehabilitation and Correction, Ohio Institute on Correctional Best Practices. Oct 2007. Web. <http://www.drc.ohio.gov/web/iej_files/SO_RegistrationNotification.pdf>

127. Memo from Ohio Attorney General, June 29, 2007.

128. Supra., "Hysteria," Cleveland Free Times 2007.

129. Zachariah, Holly. "Sex offenders rally against laws." Columbus Dispatch. GateHouse Media.

130. "Sex-offender law could trigger flood of petition filings." The Athens News. 7 Jan 2008. Web. <http://www.athensnews.com/news/local/sex-offender-law-could-trigger-flood-of-petition-filings/article_a9d77ad9-f798-5831-b5ae-5163b1ce567c.html>

131. Supra., Amy Borror Testimony 2009. p. 1

132. State v. Bodyke, 126 Ohio St.3d 266, 2010-Ohio-2424

133. Grieco, Lou. "Sex offender reclassifications will take months." Dayton Daily News. Cox Media Group. 20 July 2010.  Web. <http://www.daytondailynews.com/news/news/crime-law/sex-offender-reclassifications-will-take-months/nNFbB/>

134. See http://archives.legislature.state.oh.us/BillText129/129_HB_77_I_Y.html

135. State v. Williams, 129 Ohio St.3d 344, 2011-Ohio-3374

136. See State v. Cook (1998), 83 Ohio St.3d 404, 418, 700 N.E.2d 570.

137. See State v. Ferguson, 120 Ohio St.3d 7, 2008-Ohio-4824, 896 N.E.2d 110

138. State v. Blankenship, 145 Ohio St.3d 221, 2015-Ohio-4624

139. Juhl, Wesley. "Bill would repeal Adam Walsh sex-offender act in Nevada." Las Vegas Review-Journal. 28 Feb 2015. Web. <http://www.reviewjournal.com/news/nevada-legislature/bill-would-repeal-adam-walsh-sex-offender-act-nevada>

140. Supra. GAO, "SORNA" 2013, Appendix III

141. https://www.leg.state.nv.us/74th/Reports/history.cfm?ID=1169

142. Buntin, Stephanie. "THE HIGH PRICE OF MISGUIDED LEGISLATION: NEVADA'S NEED FOR PRACTICAL SEX OFFENDER LAWS." Nevada Law Journal. Vol. 11:770, Summer 2011. Web. <http://scholars.law.unlv.edu/cgi/viewcontent.cgi?article=1177&context=nlj>

143. ACLU of Nev. v. Cortez Masto, 719 F. Supp. 2d 1258, 1259 (D. Nev. 2008)

144. Supra., Buntin, NV Law Journal 2011

145. American Civil Liberties Union of Nevada v. Masto, 670 F. 3d 1046 (9th Cir 2012)

146. State v. Eighth Judicial Dist. Court (Logan D.), 129 Nev. ___, 306 P.3d 369 (2013)

147. Chereb, Sandra. "Nevada Supreme Court halts sex-offender law." Elko Daily Free Press. 4 Feb 2014. Web. <http://elkodaily.com/news/nevada-supreme-court-halts-sex-offender-law/article_00f8dc6-8e21-11e3-9823-0019bb2963f4.html>

148. Amaro, Yesenia. "Lawmakers consider amending sex offender law." Las Vegas Review-Journal. 24 July 2014. Web. <http://www.reviewjournal.com/news/nevada/lawmakers-consider-amending-sex-offender-law>

149. See https://www.leg.state.nv.us/Session/78th2015/Reports/history.cfm?ID=214

150. Supra., Juhl, "Repeal," Las Vegas Review Journal 2015

151. Whaley, Sean. "Lawyer for 24 sex offenders says Nevada registration law is unconstitutional." Las Vegas Review-Journal. 5 Oct. 2015. Web. <http://www.reviewjournal.com/news/las-vegas/lawyer-24-sex-offenders-says-nevada-registration-law-unconstitutional>

152. Chereb, Sandra. "Ruling approves stricter sex offender registration." Las Vegas Review-Journal. 23 Jan 2016. Web. <http://www.reviewjournal.com/news/nevada/ruling-approves-stricter-sex-offender-registration>

153. Ritter, Ken. "Names of 5,200 Nevada sex offenders to be posted Friday." Elko Daily Street Press. 30 June 2016. Web. <http://elkodaily.com/news/state-and-regional/names-of-nevada-sex-offenders-to-be-posted-friday/article_3be92c8b-9ef4-5b13-b154-7f6bb1e9562f.html>

154. Chereb, Sandra. "Amended lawsuit challenges Nevada law governing registration of sex offenders." Las Vegas Review-Journal. 22 June 2016. Web. <http://www.reviewjournal.com/crime/sex-crimes/amended-lawsuit-challenges-nevada-law-governing-registration-sex-offenders>

155. Supra., Ritter, "Names of 5200," Elko Daily Street Press

156. Chereb, Sandra. "Nevada Supreme Court stops sex offender law from being implemented." Las Vegas Review-Journal. 1 July 2016. Web. <http://www.reviewjournal.com/news/nevada/nevada-supreme-court-stops-sex-offender-law-being-implemented>

AR-00001015



<u>&lt;----- BACK TO INDEX -------</u>

(c) 2007-2019 Derek Logue Once Fallen. No part of this website may be reproduced without expressed written consent of Once Fallen

**STRANGER DANGER IS OBSOLETE:**
MOST SEX CRIMES ARE COMMITTED BY SOMEONE THE VICTIM KNOWS, IN THEIR OWN HOMES, AND THE PERPETRATOR MOST LIKELY HAS NO PRIOR RECORD
Derek W. Logue of OnceFallen.com
Created 18 June 2019

*"...the FBI (in the 1950s) distributed a poster that epitomized this attitude. It showed a man, with his hat pulled down, lurking behind a tree with a bag of candy in his hands. He was waiting for the sweet little girl walking home from school alone."* – Ken Lanning, former FBI Profiler and expert on child abductions  [1]

The concept of the 'Stranger Danger' has been around longer than many of us have been alive. The 1931 German Film "M" featured a whistling child-killer who lured children away with candy.[2]  Today, we know that the concept of Stranger Danger is an outmoded approach. Even the National Center of Missing and Exploited Children, once the primary purveyors of this mantra, now admit the Stranger Danger mantra is outdated and no longer teach it.[3]

If people in America were truly serious about sexual abuse prevention, they should start with the most basic questions:

1. Where does most sexual abuse take place?
2. Who is most likely to commit a sexual offense?
3. Are people listed on the public sex offender registry truly the most likely to commit a sex crime?

The answers to all three questions are as follows:

1. Most sexual offenses occur at home.
2. Most perpetrators of sex crimes are known to the victim as family, friends, or acquaintances.
3. The vast majority of sex crime arrests are of people with no prior sex offense records.

**MOST SEX CRIMES OCCUR AT HOME**

The2011 report on Crime in Texas reported around three-fourths of sex crimes took place in a residence/ home. Despite recent focus on churches and college campuses as places where rampant abuse occurs, few of the reported incidents occurred at either location.

Below is the full numbers rearranged from most- to least-common places for sexual offenses to occur:

Location of Sex Crimes, from 2011 Crime in Texas (Locations, Number of Incidents, and Percent) [4]

- Residence/Home: 15,099 (74.8%)
- Other/Unknown: 1,767 (8.8%)
- Highway/ Road/ Alley: 803 (4%)
- Hotel/ Motel: 572 (2.8%)
- Parking Lot/ Garage: 462 (2.3%)
- School/ College: 441 (2.2%)
- Field/ Woods: 352 (1.7%)
- Commercial/ Office Bldg.: 135 (0.7%)
- Bar/ Night Club: 120 (0.6%)
- Drug Store/ Dr Office/ Hospital: 114 (0.6%)
- Lake/ Waterway: 83 (0.4%)
- Gov't/ Public Bldg.: 74 (0.4%)
- Church/ Temple/ Synagogue: 55 (0.3%)

AR-00001016

- Convenience Store: 35 (0.2%)
- Jail/ Prison: 22 (0.1%)
- Construction Site: 21 (0.1%)
- TOTAL: 20,155

A 2000 US Department of Justice Report found similar results:

"Most (70%) of the sexual assaults reported to law enforcement occurred in the residence of the victim, the offender, or the residence of another individual. Less than two-thirds of forcible rapes (64%) occur in a residence compared with three-quarters of other sexual assaults: forcible sodomy (74%), sexual assault with an object (76%), and forcible fondling (74%). Sexual assaults against females were less likely to occur in a residence than were those against male victims (69% versus 77%)."

"Young victims were generally more likely to be victimized in a residence than were older victims (table 4). The age of the victim was strongly related to where the assault occurred. Seventy-seven percent of sexual assaults with juvenile victims occurred in a residence compared with 55% of adult victimizations. Older juveniles were more likely than younger juveniles to be victimized in a location other than a residence. While just 16% of the sexual assaults of youth below the age of 12 occurred in a place other than a residence, 31% of the victimizations of youth ages 12 through 17 occurred in such locations. The most common non-resident locations for sexual assaults of juveniles were roadways, fields/woods, schools, and hotels/motels. For adults the most likely locations after a residence included roadways, fields/woods, hotels/motels, parking lots, and commercial/office buildings."

"When a juvenile female was the victim of a sexual assault, the incident was almost as likely to occur in a residence as when a juvenile male was the victim. Seventy-six percent of juvenile female victims of sexual assault were victimized in their home or in another residence compared with 80% of juvenile male victims. The proportion of victimizations that occurred in residences was also similar for female and male victims under age 12 (85% versus 83%) and for female and male victims ages 12 through 17 (69% versus 72%)." [5]

**MOST SEX CRIMES ARE COMMITTED BY A FAMILY MEMBER, FRIEND, OR ACQUAINTANCE, NOT A STRANGER**

Before you can understand the scope of Stranger Danger, you have to clear up any confusion between a missing person and a "stereotypical kidnapping." The National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children (NISMART) studies are the largest studies on missing children in America. There are three NISMART studies, the first published in 1990, the second in 2002, and the third in 2011. It must be noted that even the NISMART estimates are often based on a very small sample size.

Americans have been trained to fear the "stereotypical kidnapping," defined by the NISMART studies as, "A nonfamily abduction in which a slight acquaintance or stranger moves a child (age 0–17) at least 20 feet or holds the child at least 1 hour, and in which one or more of the following circumstances occurs: The child is detained overnight, transported at least 50 miles, held for ransom, abducted with intent to keep the child permanently, or killed."[6]  These are the kinds of cases that make headlines and inspire movies and TV shows, but in reality, stereotypical kidnappings are an extremely rare occurrence.

According to a 2011 US Department of Justice report comparing the NISMART-1 (1997) and NISMART-3 (2011) studies, there have been no major changes to the overall estimate of stereotypical kidnappings in the US. The NISMART-1 estimated 115 stereotypical kidnappings while the NISART-3 estimated 105 stereotypical kidnappings. Perhaps more importantly, only 50 of the stereotypical kidnappings in the NISMART-1 and 63 of the estimated stereotypical kidnappings in the NISMART-3 involved "sexual assault or exploitation."[7]

The researchers still warned that the NISMART numbers are hard to accurately depict because they were studying extremely rare events: "NISMART–2 determined that stereotypical kidnappings were quite rare. An estimated 115 incidents occurred nationwide in 1997, although the confidence interval for this estimate was wide relative to the size of the estimate itself, which is common for estimates of rare phenomena."[8]

These numbers make up only a small proportion of missing children cases. In the NISMART-2 study, there were 797,500 missing child reports; they also estimated that adding children missing from caretakers but not reported missing meant roughly 1,315,600 children went missing at some point during the year studied by the NISMART-2 (1999). The study divided the missing person estimates as follows:

- Runaways/ "Thrownaways" (i.e., abandoned or kicked out of their homes): 357,600 (45%)
- Missing benign explanation: 340,500 (43%)

AR-00001017

- Missing involuntary, lost, or injured: 61,900 (8%)
- Family abduction: 56,500 (7%)
- Non-family abduction, including "stereotypical kidnappings: 12,100 (2%) [9]

Non-family abductions are defined as "A nonfamily abduction occurs when a nonfamily perpetrator takes a child by the use of physical force or threat of bodily harm or detains a child for at least 1 hour in an isolated place by the use of physical force or threat of bodily harm without lawful authority or parental permission; or when a child who is younger than 15 years old or is mentally incompetent, without lawful authority or parental permission, is taken or detained by or voluntarily accompanies a nonfamily perpetrator who conceals the child's whereabouts, demands ransom, or expresses the intention to keep the child permanently." Of those, 40 had been stereotypically missing or killed/went permanently missing.[10]  But non-family abductions include a variety of events that were not considered to be what we think of as a kidnapping, like perhaps a teen who leaves on her own accord with a boyfriend a few years older than her, or enlists the aid of a person not fully acquainted with her to hide her whereabouts.

Stereotypical kidnappings comprise about 0.00012% or about 1 out of every 7970 missing person reports. To further put things into perspective, In 1999, there were 71.9 million children (anyone under age 18) in America; the chances of a child enduring a stereotypical kidnapping in America in 1999 was 1 in 719,000. In 2011, 63 of the USA's 73.9 million children were stereotypically kidnapped for sexual purposes, or one of every 1,173,016 children. These are incredibly small numbers. In 2011, only 8 children were killed following a "stereotypical kidnapping." By contrast, a 2010 report stated 77 children died from choking on food such as hot dogs.[11]  More children died at the hands of Oscar Meyer than they did at the hands of a "stereotypical kidnapper"!

We've only discussed kidnappings up to this point. Many other studies have also concluded that victims and perpetrators of sexual offenses are often known to each other. The 2000 Dept. of Justice report stated:

"About one-quarter (27%) of all offenders were family members of their victims (table 6). The offenders of young victims were more likely than the offenders of older victims to be family members. Almost half (49%) of the offenders of victims under age 6 were family members, compared with 42% of the offenders who sexually assaulted youth ages 6 through 11, and 24% of offenders who sexually assaulted juveniles ages 12 through 17. Overall, just 12% of the offenders who sexually assaulted adults were family members of the victims, compared with 34% of the offenders of juvenile victims."

"Except for victims under age 6, most sexual assault offenders were not family members but were otherwise known to the victim. Sixty percent of all sexual assault offenders were classified by law enforcement as acquaintances of the victim. Just 14% of offenders were strangers to their victims. Strangers were a greater proportion of the offenders of adult victims (27%) than juvenile victims (7%). The youngest juveniles were least likely to have an offender who was a stranger. Just 3% of the offenders in the sexual assaults of children under age 6 were strangers, compared with 5% of the offenders of youth ages 6 through 12, and 10% of offenders of juveniles ages 12 through 17."

"In general, the victim-offender relationships were similar for male and female victims; however, there were differences in the offender profiles for victims under age 12. Compared with young male victims, a greater proportion of female victims under age 12 was assaulted by family members. For male victims under age 12, 40% of offenders were family members compared with 47% of the offenders of females under age 12."[12]

Among sex crimes against juveniles, family members and acquaintances pose by far the biggest threat to the safety of children. Furthermore, about one out of every three sex crime against a juvenile was committed by another juvenile.

Table 2: Sexual Assaults by Family Members, Acquaintances and Strangers [13]

| AGE | 0-17 | 0-5 | 6-11 | 12-14 | 15-17 | Male | Female |
|------|------|------|------|-------|-------|------|--------|
| Family | 39% | 60% | 53% | 28% | 21% | 45% | 38% |
| Acquaintance | 57% | 39% | 45% | 68% | 73% | 52% | 58% |
| Stranger | 4% | 1% | 2% | 5% | 6% | 2% | 4% |

AR-00001018

Speaking of Juvenile Offenders, the Dept. of Justice concluded in 2000, "In general, the detailed age profile of offenders in sexual assault crimes shows that the single age with the greatest number of offenders from the perspective of law enforcement was age 14. [14]

The Center for Sex Offender Management's year 2000 myth vs. facts sheet also concluded most sex crimes are committed by someone known to the victims:

"Myth: 'Most sexual assaults are committed by strangers.'
Fact: Most sexual assaults are committed by someone known to the victim or the victim's family, regardless of whether the victim is a child or an adult."

"Adult Victims: Statistics indicate that the majority of women who have been raped know their assailant. A 1998 National Violence Against Women Survey revealed that among those women who reported being raped, 76% were victimized by a current or former husband, live-in partner, or date (Tjaden and Thoennes, 1998). Also, a Bureau of Justice Statistics study found that nearly 9 out of 10 rape or sexual assault victimizations involved a single offender with whom the victim had a prior relationship as a family member, intimate, or acquaintance (Greenfeld, 1997)."

"Child Victims: Approximately 60% of boys and 80% of girls who are sexually victimized are abused by someone known to the child or the child's family (Lieb, Quinsey, and Berliner, 1998). Relatives, friends, baby-sitters, persons in positions of authority over the child, or persons who supervise children are more likely than strangers to commit a sexual assault." [15]

Using data extrapolated from the Dept. of Justice's "Inmates in State Correctional Facilities, 1997," eAdvocate found the following facts:

- Only 6.7% of victims under 18 and 34.4% of victims over 18 were victimized by strangers.
- Victims under 18: Strangers committed 6.7% of crimes; Family Member, 46.5%; Acquaintances/ friends, 46.8%
- Victims over 18: Strangers committed 34.4% of crimes; Family member, 10.6%; Acquaintances/ friends, 55.0% [15]

The 2011 Crime in Texas report also concluded the victims were "unknown" or "strangers" to the perpetrators in 15.9% of cases involving female victims and 1.5% in cases involving males.[17]

While we tend to focus attention on certain occupations, no occupation is immune. For example, one study found 1,475 cases where 1075 sworn law enforcement officers employed in 795 non-federal agencies were arrested for sexual offenses from 2005-2011, noting that 192 of the arrested officers had multiple cases on file. About half of the cases involved a child.[18]  A crunching of numbers by a SOSEN statistician found that police officers were more likely to be involved in a sexual offense than a teacher, clergyman, or a person currently on the public sex offense registry.[19]  In a media frenzy similar to that of the priest abuse claims, the Atlanta Journal-Constitution found more than 3100 doctors were accused of sexual misconduct, 2400 of which directly involved patients, adding, "those numbers represent only a fraction of the doctors who had sexual violations since Jan. 1, 1999. Many violations never came to the attention of state regulators. In other cases, public board orders — i.e., public documents issued by a state agency that discipline a doctor — weren't posted on violations that did result in sanctions. So while the vast majority of the nation's 900,000 licensed physicians don't sexually abuse patients, no one knows the extent of the problem." [20]

In a supplemental report, "The Atlanta Journal-Constitution has uncovered 450 cases of doctors who were brought before medical regulators or courts for sexual misconduct or sex crimes in 2016 and 2017. In nearly half of those cases, the AJC found, the doctors remain licensed to practice medicine, no matter whether the victims were patients or employees, adults or children. Even some doctors criminally convicted are back in practice, demonstrating that a system that forgives doctors — first exposed by the AJC in 2016 — has not changed."[21]  There were around 940,000 practicing physicians in America; thus there is a 1 in 2089 chance your doctor has committed a sexual offense that was reported. But that also means there is a 2088 in 2089 chance your doctor has not been charged with a sexual offense.

**MOST SEX CRIMES ARE COMMITTED BY SOMEONE WITH NO PRIOR RECORD**

A 2008 survey of New York's sex offense rates in the 10 years before and after the passage of that state's public registry found the following:

"The current study also found that 95.9% of all arrests for any RSO, 95.9% of all arrests for rape, and 94.1% of all arrests for child molestation were of first-time sex offenders. Thus, as none of these offenders had any prior convictions for sexual offenses, none of them were on the sex offender registry (or would have been on the registry had it existed) at the time of their offenses. This finding casts doubts on the ability of sex offender registration and notification laws, as well as residency and occupational restriction laws, to

AR-00001019

actually reduce sexual offending. That is, these laws were specifically designed to limit the ability of convicted sex offenders to re-offend by limiting their opportunities to do so, and it appears that only a small portion of sexual offending (i.e., 4-5%) might be influenced by these legislative measures."[22]

In the landmark 2003 recidivism study, the Department of Justice noted that of the 9,691 males tracked in the study, only 1,347 (13.9%) had a prior conviction for a violent sex offense, and only 446 men (4.6%) had a prior sex crime conviction against a minor. It is also worth noting, however, that for every person previously convicted of a sexual offense in the DoJ study (517 total), six released prisoners with no prior sex offense record had been arrested (3228 total). [23]

Even the NISMART studies failed to find correlation between people previously connected to a prior sex offense and the feared albeit extremely rare "stereotypical kidnappings." The 2011 study found less than five cases where the perpetrator had a prior arrest for a sex crime against children, although 15 cases were of people whose backgrounds were unknown.[24]

**DISCUSSION**

Most sex crimes occur in the home by someone the victim knows, and the offender is more likely than not to lack any prior sex offense arrest record. In many cases, the perpetrator is a family member or someone closest to the family. We have been trained to fear the "stereotypical kidnapping" largely in part due to media and victim advocacy, but in reality, stereotypical kidnappings are far from stereotypical. Most missing children weren't kidnapped; most missing children ran away from home, were kicked out of their own homes, or were missing for benign reasons.

It seems almost surreal to discuss an antiquated mode of thinking in the year of this writing, but Stranger Danger has been taught for generations. The media continues to focus on sex crime panics. Celebrity victim advocates like John Walsh and Nancy Grace (and even fictional shows like Law and Order: SVU) continue to saturate the airwaves with the notion that Stranger Danger is more prevalent than in the days of our ancestors.

It was primarily out of the belief in stranger danger that the registry was devised. We wanted to stop what we believed to be an epidemic of child abductions, fueled by John Walsh's personal crusade. Walsh famously testified before Congress that this country is "littered with mutilated, decapitated, raped, strangled children."[25]

We are a generation removed from the Satanic Ritual Abuse panics, but we now have new sex offense panics to fear and exploit. The 2010s focused primarily on campus rape fears and sexual harassment panics (aka the #MeToo Movement). We've even seen a return of the widespread abuse claims Catholic Church from the 1990. However, as noted in this report, sex crimes can come from all walks of life. Of course, the intent here is not to focus on any one group of people. Pointing out sex crime results in multiple professions does not mean that any one profession necessarily has more sexual offenders within their ranks than others. In the case of doctors, the Atlanta Journal-Constitution chose to present the information in an alarmist fashion.

An honest discussion on sex crime prevention begins with the most basic facts. Turning our attention to the rare tragedy of the so-called "stereotypical kidnapping" takes resources and focus away from the more common problems such as intra-familial sexual abuse. Even victim advocates agree that Stranger Danger is no longer the right way to teach sexual abuse prevention.

**REFERENCES**

1. Kenneth V. Lanning, "Child Molesters: A Behavioral Analysis," National Center for Missing and Exploited Children, 2001, p. 13
2. You can usually find the film for free online on Youtube. The following link is just one of many:  https://www.youtube.com/watch?v=nM0w1dTNAH0
3. "Experts warn against teaching the phrase 'stranger danger'." ABC News. 31 March 2017. Accessed 17 June 2019 at https://abcnews.go.com/Lifestyle/experts-warn-teaching-phrase-stranger-danger/story?id=46427626
4. "SEXUAL ASSAULT." 2011 Crime in Texas. Chapter 7. Accessed 17 June 2019 at http://www.dps.texas.gov/crimereports/11/citCh7.pdf
5. Howard N. Snyder, Ph.D., "Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics." National Center for Juvenile Justice, July 2000. Accessed 17 June 2019 at https://www.bjs.gov/content/pub/pdf/saycrle.pdf
6. "Child Victims of Stereotypical Kidnappings Known to Law Enforcement in 2011." US Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention. June 2016. Accessed on 17 June 2019 at https://www.ojjdp.gov/pubs/249249.pdf
7. Ibid., p.4
8. Ibid., p. 3

AR-00001020

9. Andrea J. Sedlak, David Finkelhor, Heather Hammer, and Dana J. Schultz. "National Estimates of Missing Children: An Overview." US Department of Justice, Office of Juvenile Justice and Delinquency Prevention. October 2002. Accessed 17 June 2019 at https://www.ncjrs.gov/pdffiles1/ojjdp/196465.pdf

10. Ibid., p. 4, 11

11. Liz Szabo. "Pediatricians call for a choke-proof hot dog." USA Today. 22 Feb 2010. Accessed on 17 June 2019 at https://usatoday30.usatoday.com/news/health/2010-02-22-1Achoke22_ST_N.htm

12. Supra.,DoJ 2000, p.10

13. "Juvenile Offenders and Victims: 2014 NATIONAL REPORT." National Center for Juvenile Justice. Dec. 2014. Accessed 18 June 2019 at https://www.ojjdp.gov/ojstatbb/nr2014/downloads/NR2014.pdf , page 46

14. Supra, DoJ 2000, p.8

15. "Myths and Facts About Sex Offenders." Center For Sex Offender Management. Aug. 2000. Accessed 18 June 2019 at https://ccoso.org/sites/default/files/import/mythsfacts.pdf

16. eAdvocate. "Department of Justice: Victim Offender Relationship Chart." Sex Offender Reports and Charts. 2015. Accessed 18 June 2019 at http://sexoffender-reports.blogspot.com/2015/02/department-of-justice-victim-offender.html , see also http://www.oocities.org/voicism/index-charts.html#chta

17. Supra, Crime in TX, p. 50

18. Philip Matthew Stinson, Sr., J.D, Ph.D., John Liederbach, Ph.D., Steven P. Lab, Ph.D., Steven L. Brewer, Jr., Ph.D. "Police Integrity Lost: A Study of Law Enforcement Officers Arrested." National Criminal Justice Reference Service, Office of Justice Programs. April 2016. Accessed 18 June 2019 at https://www.ncjrs.gov/pdffiles1/nij/grants/249850.pdf

19. Will Bassler. "Who Really Commits New Sex Crimes?" SOSEN.org. 29 Dec. 2015. Accessed 18 June 2019 at https://sosen.org/blog/2015/12/29/who-really-commits-new-sex-crimes.html

20. Lois Norder, Jeff Ernsthausen, Danny Robbins. "Why sexual misconduct is difficult to uncover." Atlanta Journal-Constitution. 2016. Accessed 18 June 2019 at http://doctors.ajc.com/sex_abuse_numbers/?ecmp=doctorssexabuse_microsite_nav

21. Carrie Teegardin and Danny Robbins. "Still Forgiven." Atlanta Journal-Constitution. Accessed 18 June 2019 at http://doctors.ajc.com/still_forgiven/?ecmp=doctorssexabuse_microsite_nav

22. Sandler, Jeffrey & J. Freeman, Naomi & Socia, Kelly. (2008). Does a Watched Pot Boil? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law. Psychology, Public Policy, and Law. 14. 284-302. 10.1037/a0013881.

23. Patrick A. Langan, Ph.D., Erica L. Schmitt, and Matthew R. Durose. "Recidivism of Sex Offenders Released from Prison in 1994." US Dept of Justice, Bureau of Justice Statistics. Nov 2003. Accessed 8 June 2019 at https://www.bjs.gov/content/pub/pdf/rsorp94.pdf

24. Supra, Stereotypical Kidnappings 2011, p.7

25. John Edward Gill, "Missing Children: How politics helped start the scandal." FatherMag.org, 2000. Accessed August 31, 2010 at http://www.fathermag.com/006/missing-children/abduction_3.shtml

AR-00001021



<u>‹----- BACK TO INDEX -------</u>

(c) 2007-2019 Derek Logue Once Fallen. No part of this website may be reproduced without expressed written consent of Once Fallen

**SHINING A FALSE LIGHT**
The US Department of Justice and the Misleading Claim of "Sex Offenders are X Times More Likely To Be Rearrested"
Derek W. Logue of OnceFallen.com
Created: 11 June 2019

On May 30, 2019, the US Department of Justice released a report entitled "Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14),"[1] a study that followed prisoners throughout the nine years after their release in 2005, comparing prisoners whose most serious offense was rape or sexual assault to other prisoners. The report is the third of a series of DoJ studies on recidivism rates of people convicted of sexual offenses. The report has numerous positive results that solidify what we already know about people convicted of sexual offenses:

- Those convicted of sex offenses were less likely than other released prisoners to be arrested during the 9 years following release
- The longer those convicted of sex offenses went without being arrested after release, the less likely they were to be arrested during the 9-year follow-up period.
- The majority of arrests for a specific type of crime did not involve those who had been in prison for the same type of offense.
- At the end of the 9-year follow-up period, males convicted of sexual offenses had a lower cumulative arrest percentage than all male prisoners.
- The number of people previously convicted of sexual offenses were rearrested at an average annual rate of less than 1% per year.

This biggest problem with the Department of Justice report is the press release, entitled, "RELEASED SEX OFFENDERS WERE THREE TIMES AS LIKELY AS OTHER RELEASED PRISONERS TO BE RE-ARRESTED FOR A SEX OFFENSE."[2] This statistic was cherry-picked from the various statistics discussed in the article specifically because it elicits the most negative response from the average reader. This statement is nonsensical because people not previously convicted of a sexual offense cannot be "rearrested" for a sexual offense.

In some states, a "false light" statement is a defamatory statement when you take even a statement based in truth and distort that truth by presenting that statement in a way that promotes a falsehood. Or, to put another way, "false light concerns untrue implications rather than directly false statements."[3] This statement is dangerous specifically because it paints an erroneous picture of people convicted of sex crimes as being a particularly unique danger to society. Justice Anthony Kennedy wrote in McKune v Lile, "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault."[4] This statement was later used in Smith v. Doe, the landmark decision that declared the public sex offense registry was merely a regulatory measure. There are a few caveats to this narrative to put this statement into perspective:

1. Overall, arrests for sexual offenses among prisoners of any type are extremely low.
2. People convicted of sexual offenses commit less subsequent sexual offenses than other offenders convicted of similar crimes (such as a burglar committing subsequent burglaries or a drug offender committing subsequent drug offenses.)
3. When using the total number of released prisoners as opposed to percentages of offense types, more people convicted of non-sexual crimes will be arrested for a sexual offense than those convicted of sexual offenses.
4. Later studies fail to show reconviction rates, a superior standard for determining recidivism rates than rearrest rates.

**THE BUREAU OF JUSTICE STATISTICS (BJS) REPORTS**

As of May 2019, there are currently three recidivism studies released by the US Department of Justice's Bureau of Justice Statistics. The first of the three studies was cited by Justice Kennedy in McKune v Lile and later in Smith v Doe. These three studies are not of the same group and thus not a continual study; each study overs a separate group of released inmates:

1. Study 1: "Recidivism of Sex Offenders Released from Prison in 1994"[5]: Released in November 2003, this study covered recidivism rates both re-arrest and reconviction rates over a three-year period. Of all the recidivism studies published over the

AR-00001022

past two decades, this study is among the most often cited.

2. Study 2, "Recidivism of Prisoners Released in 2005: Patterns from 2005 to 2010."[6] Published in April 2014, this report covers re-arrest and reconviction rates over a five-year period. However, the statistic covering sex offense rearrests are found not in the main article, but in a supplemental report.[7]

3. Study 3, "Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14)[8] : The most recent of the three BJS recidivism, published May 2019, articles covers re-arrest records over 9 years. Interestingly, the study only briefly mentions reconviction rates but does not offer hard numbers specific to sexual offense-related arrests.

These reports discuss both overall recidivism (arrests for any type of crime, which may include parole/ probation violations) and sex offense-specific recidivism. Many current articles refer to subsequent arrests/ convictions for any crime as "recidivism" and subsequent arrests/ convictions for sex offenses as "re-offense." Casual readers tend to get confused when reading recidivism studies because the two terms are used interchangeably in discussions about the likelihood a person previously convicted of a sexual offense may commit a subsequent sexual offense.

Please note that each of the three studies follow a different group of prisoners each time. The intent with this report is to show a clear pattern of low re-offense rates among those previously convicted of sexual offenses.

**RE-OFFENSE RATES FOR THOSE PREVIOUSLY CONVICTED OF SEX CRIMES IS EXTREMELY LOW**

Re-arrest and reconviction rates for those previously convicted of a sexual offense are extremely low. Even after nine years, none of the three studies reported cumulative rates in the double digits.

Table 1: Overall Re-Arrest Rates for Prisoners Previously Convicted of Sexual Offenses (Asterisks denote estimates based on percentages given)

| DOJ/ BJS Studies | Study 1 (3 years) | Study 2 (5 years) | Study 3 (9 years) |
|---|---|---|---|
| Re-Arrested | 5.3% | 5.6% | 7.7% |
| Reconvicted | 3.5% | 3.1* | 3.8%* |

Study 1 listed both re-arrest rates and reconvicted rates while Studies 2 and 3 do not specifically list reconviction rates. Thus, reconviction rates were devised by dividing the re-arrest rates by the percentage of overall reconvictions. There is a clear and consistent pattern where only about half of re-arrests led to a reconviction. Even so, recidivism rates are very low when adjusted into an average annual rate:

Table 2: Annual Average Re-Arrest Rates for Prisoners Previously Convicted of Sexual Offenses

| Adjusted BJS numbers | Study 1 (3 years) | Study 2 (5 years) | Study 3 (9 years) |
|---|---|---|---|
| Re-Arrested | 1.76% | 1.12% | 1.1% |
| Reconvicted | 1.16% | 0.62% | 0.54% |

These studies have used misleading language to imply that people convicted of sexual offenses are an ever-increasing threat to the public. Study 3 states, "The cumulative arrest percentage among released sex offenders increased 18 percentage points when the follow-up period was extended from 3 to 9 years. About half (49%) of prisoners released after serving time for rape or sexual assault were arrested within 3 years, while 62% were arrested within 6 years.") This statement refers to overall arrest rates rather than arrests for sexual offenses.)

In truth, this statement has confirmed other studies that have consistently stated that the likelihood a person convicted of a sexual offense lowers over time. To put a different way, overall re-arrest rates for any crime type including technical violations were 49% in the three years after release; only 13% were arrested between three and six years following release, and only 5% were arrested between six and nine years after release.

For sexual offense-specific re-offense, Table 5 from Study 3 proclaims 4.4% of people previously convicted of sexual offenses were rearrested a subsequent sexual offense within the first three years, and 7.7% after 9 years. After three years, 1.2% of released

AR-00001023

prisoners not previously convicted of a sexual offense were arrested for a sexual offense after three years, and 2.6% were arrested for a sex offense after nine years.

Table 3: Re-arrest rates by year in the BJS 9-year study

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| SOs | 1.9% | 1.6% | 0.9% | 0.7% | 0.8% | 0.4% | 0.6% | 0.7% | 0.1% |
| Non-SOs | 0.5% | 0.4% | 0.3% | 0.4% | 0.3% | 0.2% | 0.2% | 0.2% | 0.2% |

Since Study 3 noted only half of the rearrests lead to a conviction,[9]  the reconviction rates, if consistent with the re-offense rate pattern in Study 3, would look like this:

Table 4: Estimated re-conviction rates in the BJS 9-year study

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|---|
| SOs | 0.95% | 0.8% | 0.45% | 0.35% | 0.4% | 0.2% | 0.3% | 0.35% | 0.05% |
| Non-SOs | 0.25% | 0.2% | 0.15% | 0.2% | 0.15% | 0.1% | 0.1% | 0.1% | 0.1% |

There is another problem with this study that must be pointed out. Study 3 only used the number of released prisoners that were currently in jail on a sexual offense; they did not count among the numbers a person with a prior offense but was currently incarcerated for any other crime type:

"Among the 25,948 prisoners released in 2005 whose most serious commitment offense was not rape or sexual assault but who had at least one prior arrest for rape or sexual assault, 6.7% were arrested for rape or sexual assault during the 9 years following release (not shown in tables). Of those prisoners released after serving time for offenses other than rape or sexual assault who had no prior arrests for rape or sexual assault, 2.0% were arrested for rape or sexual assault during the 9-year follow-up period. Overall, a combined total of 46,144 prisoners released in 2005 either had been serving time for rape or sexual assault (20,195) or had been serving time for another type offense but had previously been arrested for rape or sexual assault (25,948). Of these 46,144 released prisoners, 7.2% were arrested for rape or sexual assault during the 9 years following release."[10]

That would mean the cumulative reconviction rate over a 9 year period for anyone previously convicted of a rape or sexual assault is actually about 3.6%, so the chances of a person previously convicted of a sexual offense after being free nine years being convicted of a subsequent rape/sexual assault is actually 0.046%.

The finding of a decrease in recidivism the longer a former prisoner has been free is consistent between the BJS studies and similar recidivism studies. A 2009 NY Recidivism study found that sex offence recidivism rates after 1 year were 2%, 3% after five years, 6% after 5 years, and 8% after 8 years.[11] A 2008 California study found a 2.21% recidivism after 1 year of release, 2.94% recidivism after 2 years of release: 3.3% recidivism after 5 years of release, and 3.38% after 10 years of release. The study concluded, "The total of sexual recidivists is lower than some might have believed. Most re-offenses and parole violations occur in the initial period of reentry after release. Sex offenders are more likely to commit some other type of offense than to commit a new sex offense."[12] A 2014 Harris and Hanson study found that for every five year increment a person classified as a "high risk" to re-offend is free, the rate of re-offense is reduced by half; in time, even those deemed a "high risk" held a risk of re-offense no higher than a prisoner released for a non-sexual offense.[13]

By dividing 7.7% from 2.6%, we get the BJS proclamation that "sex offenders are three times more likely to re-offend." (When citing the Study 1, the claim is "four times more likely.") This statistic is nonsensical. As noted by the Washington Post fact-checkers:

"Sex offenders have a relatively low rate of committing the same sex crime after being released from prison. Yet policymakers often base policies on re-arrest rates or the fear that sex offenders are more likely than other convicted criminals to commit the same crime after release… When you dig into the data, it's clear Alito has fallen for an apples-and-oranges comparison — one that unfairly compares sex offenders to non-sex offenders."[14]

AR-00001024

**OVERESTIMATING THREAT LEVELS POSED BY THOSE CONVICTED OF SEXUAL OFFENSES**

This misleading statistic implies there is some unique threat of sexual crimes caused by people previously convicted of a sexual offense. Interestingly, the latest study does not often provide exact numbers but percentages, making pinpoint accuracy of the statistics rather difficult. However, whether shown by hard numbers or percentages, sex crime convictions represent only a small portion of the total number of released prisoners in the studies.

Table 5: Total number of arrests for subsequent sexual offenses (Asterisks denote estimations based on percentages given)

| BJS Studies | SOs in Study | Non-SOs in Study | SOs Arrested | Non-SOs Arrested |
|---|---|---|---|---|
| Study 1 (2003) | 9,641 | 262,420 | 517 | 3,228 |
| Study 2 (2014) | n/a | n/a | n/a | n/a |
| Study 3 (2019) | 3,488* | 67,966 | 453* | 1,767* |

A look at actual numbers rather than percentages turns the narrative of "sex offenders" being "three times more likely to be re-arrested." In Study 1, about six times as many released prisoners without a prior sex offense were arrested within three years of release for a sex crime compared to those with a previous sex offense record. In study 3, about four times as many released prisoners without a prior sex offense were arrested within nine years of release for a sex crime compared to those with a previous sex offense record.

To put this in perspective, a 2008 study of arrests in New York State found that "over 95% of all sexual offense arrests were committed by first-time offenders, casting doubt on the ability of laws that target repeat offenders to meaningfully reduce sexual offending."[15] Incidentally, people serving time for rape and sexual assault comprised only about 5% of the 401,288 inmates released from the 30 states studied in Study 3.[16]

All prisoners convicted of a crime have some degree of specialization, meaning a person convicted of robbery might be more likely to commit a subsequent robbery than a non-robber, a drug offender might recommit a drug offense, etc. Because the focus has been on people convicted of sex offenses, society believes "sex offenders" have a uniquely high rate of specialization, hence the sex crime-specific study. However, all offenders types specialize, and all but homicide offenders were rearrested their specific crime type at higher levels than people previously convicted of sexual offenses.

Five year re-arrest rates for the same offense types by prisoners released in 2005:

- Homicide: 2.1%
- Rape/ Sexual assault: 5.6%
- Robbery: 13.1%
- Burglary: 23.2%
- Fraud/ Forgery: 29.7%
- Assault: 34.4%
- Larceny/ Motor Vehicle Theft: 41.4%
- Drug Offenders: 51.2%
- "Public Order Offenses": 59.6% [17]

The findings that people convicted of sexual offenses are less likely to commit the same crime as other offense types are consistent with other studies. A 4-year follow-up of Michigan parolees found that only 2.46% of people convicted of sex crimes committed a subsequent sex offense; 10.56% of burglary offenders committed a new burglary; 6.42% of drug offenders committed a new drug offense; 5.17% of robbers committed a new robbery offense. [18]

Furthermore, people convicted of sex crimes had a lower rate of overall arrests than any other crime type other than homicide:

Five-year overall re-arrest rate for any crime by type of offender:

- Homicide: 51.2%

AR-00001025

- Rape/ Sexual Assault: 60.1%
- Public Order: 73.6%
- Drug: 76.9%
- Robbery: 77%
- Fraud/ Forgery: 77%
- Assault: 77.1%
- Burglary: 81.8%
- Larceny/ motor vehicle theft: 84.1% [19]

## CONCLUSION

Why did the later report remove the hard numbers and only commented on reconviction rates in passing? Why did the BJS write a headline focusing on an intentionally misleading and pointless statistic? Why did the BJS not highlight the extremely low reconviction rates of people previously convicted of sex crimes? We can only speculate on motives. At the least, the BJS has engaged in misrepresentation of the BJS's own statistics.

If there is any doubt that the SMART Office has a vested interest in propagating this myth, then their reply to the Washington Post article should remove that doubt. In defending this misleading claim, the SMART Office responded:

"The author asserted that Justice Alito's statement on rearrest rates was a 'misconception of sex offender recidivism.' The data actually show that his statement is true, and more recent data on sex offender recidivism confirms higher rates of recidivism for certain types of sex offenders. Further, Justice Alito's assertion, 'Repeat sex offenders pose an especially grave risk to children,' is valid for two reasons: 1) sex offenders who target boys and girls have higher rates of recidivism than other sex offenders and 2) we as a society have a particular responsibility to protect children from sexual assault."[20]

The SMART Office used two other studies showing higher re-arrest rates, including a multinational study that does not accurately portray American re-offense rates and mixes re-arrest rates and reconviction rates. The second statement made by SMART about society's need to protect children from sexual assault has no bearing on the statistics but shows the intent of the SMART Office as promoting a high recidivism rate to support a personal agenda.

To review this critique of the "unique threat" myth:

1. People convicted of sex crimes commit subsequent sexual offenses at an extremely low rate, i.e., less than 1% are reconvicted annually.
2. If you look at the number of released prisoners who subsequently commit a sex offense, chances are the offender has no previous sex crime conviction.
3. People convicted of sex crimes engage in a subsequent sex crime less often than a person convicted of a particular non-sexual offense commits a subsequent sexual offense, such as a burglar engaging in a subsequent burglary.
4. The 2019 BJS study omitted reconviction rates, a superior standard to re-arrest rates. This leads the reader into believing sex crime rates are higher than average.

The Washington Post said it best:

"The reference to sex offender rearrest trends in Alito's opinion is quite misleading. It measures the likelihood of sex offenders to be arrested for sex crimes after release from prison, and compares it to the likelihood of non-sex offenders to be arrested for sex crimes after release. This makes it seem like recidivism among sex offenders to be a uniquely bad problem, but it is an apples-to-oranges comparison."

"This opinion cites previous opinions that use outdated data going back to the 1980s — more than 30 years ago. Moreover, it obscures the fact according to 2005 data, the percentage of sex offenders getting rearrested for the same crime is low compared to non-sex offenders, with the exception of people convicted of homicide. It does the public no service when the Supreme Court justices make a misleading characterization like this. We award Three Pinocchios."[21]

## REFERENCES

1. Mariel Alper, Ph.D.,and Matthew R. Durose. "Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14)." BJS.gov. May 2019.  Accessed 8 June 2019 At https://www.bjs.gov/content/pub/pdf/rsorsp9yfu0514.pdf
2. "RELEASED SEX OFFENDERS WERE THREE TIMES AS LIKELY AS OTHER RELEASED PRISONERS TO BE RE-ARRESTED FOR A SEX OFFENSE." US Dept. of Justice Press Release. 30 May 2019. Accessed 6 June 2019 at https://ojp.

AR-00001026

gov/newsroom/pressreleases/2019/ojp-news-05292019-a.pdf

3. "False Light." Digital Media Law. Accessed 8 June 2019 at http://www.dmlp.org/legal-guide/false-light

4. MCKUNE V. LILE, 536 U.S. 24 (2002)

5. Patrick A. Langan, Ph.D., Erica L. Schmitt, and Matthew R. Durose. "Recidivism of Sex Offenders Released from Prison in 1994." US Dept of Justice, Bureau of Justice Statistics. Nov 2003. Accessed 8 June 2019 at https://www.bjs.gov/content/pub/pdf/rsorp94.pdf

6. Matthew R. Durose, Alexia D. Cooper, Ph.D., and Howard N. Snyder, Ph.D. "Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010." US Dept of Justice, Bureau of Justice Statistics. April 2014. Accessed 8 June 2019 at https://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf

7. "Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010: Supplemental Tables: Most serious commitment offense and types of post-release arrest charges of prisoners released in 30 states in 2005." BJS.gov. Dec 2016. Accessed 9 June 2019 at https://www.bjs.gov/content/pub/pdf/rprts05p0510_st.pdf

8. Supra., Note 1

9. BJS 2019 "Highlights". This is consistent with other findings presented by the BJS. See "FAQ Detail: What is the probability of conviction for felony defendants?: BJS.gov, accessed 11 June 2019 at https://www.bjs.gov/index.cfm?ty=qa&iid=403. "Among felony defendants whose cases were adjudicated within the one-year tracking period (89% of cases), 68% were convicted. This includes a 59% felony conviction rate with the remainder receiving misdemeanor convictions. Felony conviction rates were highest for defendants originally charged with motor vehicle theft (74%), a driving-related offense (73%), murder (70%), burglary (69%), or drug trafficking (67%). They were lowest for defendants originally charged with assault (45%)."

10. BJS 2019, p.5

11. New York State Division of Probation and Correctional Alternatives. "Research Bulletin: Sex Offender Populations, Recidivism and Actuarial Assessment." 2009. <https://web.archive.org/web/20110724103338/http://theparson.net/so/NYsomgmtbulletinmay2007.pdf>

12. California Dept. of Corrections. "Recidivism of Paroled Sex Offenders- A 10 year study [Chart]." 2009. Found online at <http://www.defenseforsvp.com/Resources/Cal_gov/CASOMB_RECIDIVISM_STUDY_10_YEAR_w-Graph.pdf>

13. R. Karl Hanson, Andrew J. R. Harris, Leslie Helmus and David Thornton. "High-Risk Sex Offenders May Not Be High Risk Forever." J Interpers Violence, 2014 29: 2792 originally published online 24 March 2014. pgs.2796-2801

14. Michelle Ye Hee Lee. "Justice Alito's misleading claim about sex offender rearrests." Washington Post. 21 June 2017. Accessed 10 June 2019 at https://www.washingtonpost.com/news/fact-checker/wp/2017/06/21/justice-alitos-misleading-claim-about-sex-offender-rearrests/

15. Sandler, Jeffrey & J. Freeman, Naomi & Socia, Kelly. (2008). Does a Watched Pot Boil? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law. Psychology, Public Policy, and Law. 14. 284-302. 10.1037/a0013881.

16. BJS 2019, p.3

17. Supra., "2005-2010 Supplemental tables", Table 2.

18. Michigan Dept. of Corrections (2000). Recidivism Statistics: from Annually Published Michigan Dept. of Corrections, Statistical Reports (Parole Board) Cumulative Parole Board Statistics for Parolees 1990 through 2000.

19. Supra, "2005-2010 Supplemental tables", Table 2.

20. "Response from SMART/DOJ, June 23, 2017." Accessed on 11 June 2019 at https://docs.google.com/document/d/1q3M0m_0hhySzmC4pqw0j2y0432O7mK780iNxclHdU3o/edit

21. Supra., Note 14

AR-00001027



<----- BACK TO INDEX -------

(c) 2007-2019 Derek W. Logue. No part of this website may be used in any way without expressed written consent of the site owner.

# The Myth of the "Dark Figure" of Underreporting

Derek W. Logue of OnceFallen.com
Created 24 May 2019

## INTRODUCTION

Underreporting is an appeal to ignorance; quite frankly, no one can accurately estimate the number of undetected sex crimes (or any crime). Because there is no way to prove a definitive crime rate, the door remains open for the initiated to perceive even the most outlandish claims of high rates of reoffending as factual. This article examines the myth of underreporting in great detail and the difficulties in debunking these outlandish claims of underreporting. This article concludes that our level of sex crime underreporting is grossly over-reported.

## THE "DARK FIGURE OF CRIME" AND THE FALLACY IT CREATES

To the average person the term "dark figure of crime" likely invokes some scary movie imagery (like a shadow stalking a damsel in distress), but in criminology terms, it is merely a fancy way of saying all crimes that are neither reported nor recorded by law enforcement agencies (unreported crime). Belgian mathematician and sociologist Adolphe Quetelet was the credited with coining the term in 1832.[1]  It is generally accepted that some crimes go unreported, but since unreported actions are unreported, we can only speculate just how often crimes go unreported.

Trying to come up with this so-called "dark figure" opens the door to the logical fallacy "Ad ignorantiam" (argument/ appeal to ignorance). Ad Ignorantium defined is "the assumption of a conclusion or fact based primarily on lack of evidence to the contrary. Usually best described by, 'absence of evidence is not evidence of absence.'" "X is true because you cannot prove that X is false, or X is false because you cannot prove that X is true."[2]  Thus, when a victim advocate group makes the bold claim that "sex offender recidivism is higher than reported because most sex crimes go unreported," they are fully aware that there is no way to prove or disprove that assertion. It is a common tactic to attempt to discredit the long history of finding extremely low re-offense rates among people convicted of sex crimes.

Because there is no way to accurately study the amount of unreported crime, the best we can do is reliance on assumptions and estimations. Many of the studies critiqued in this work rely on tactics such as self-reports of victims and offenders, complex statistical schematics used by "sports-betters, gamblers, and even weather forecasters"[3] , and controversial tactics like the polygraph to reach their results.

Even the dubiously-named "SMART Office" has to admit that there are great difficulties associated with making assumptions about the link between underreporting and people listed on the sex offense registry:

"Drawing firm conclusions about the extent of sex offender recidivism can be difficult due to a number of factors. First, although there is universal agreement that the observed recidivism rates of sex offenders are underestimates of actual reoffending, the magnitude of the gap between observed and actual reoffending remains subject to debate. As a result, conclusions about the extent of sex offender recidivism and the propensity of sex offenders to reoffend over the life course inherently involve some uncertainty. Second, measurement variation across studies often produces disparate findings that can be difficult to interpret. Comparing and corroborating findings can be difficult for the same reason. Third, short follow-up periods and small sample sizes limit the generalization of certain findings. Drawing a firm conclusion about the propensity of specific subgroups of sex offenders to reoffend over the life course is particularly difficult, as sample sizes often fall to unrepresentative levels as follow-up periods grow longer."[4]

To study this issue in detail, we must begin by looking at the largest national study on underreported crimes, the National Crime Victimization Survey.

## THE NATIONAL CRIME VICTIMIZATION SURVEY (NCVS)

AR-00001028

The largest attempt at determining the amount of underreporting is the National Crime Victimization Survey. "The Bureau of Justice Statistics' (BJS) National Crime Victimization Survey (NCVS) is the nation's primary source of information on criminal victimization. Each year, data are obtained from a nationally representative sample of about 135,000 households, composed of nearly 225,000 persons, on the frequency, characteristics, and consequences of criminal victimization in the United States. The NCVS collects information on nonfatal personal crimes (i.e., rape or sexual assault, robbery, aggravated and simple assault, and personal larceny) and household property crimes (i.e., burglary, motor vehicle theft, and other theft) both reported and not reported to police…For each victimization incident, the NCVS collects information about the offender (e.g., age, race and Hispanic origin, sex, and victim-offender relationship), characteristics of the crime (e.g., time and place of occurrence, use of weapons, nature of injury, and economic consequences), whether the crime was reported to police, reasons the crime was or was not reported, and victim experiences with the criminal justice system."[5]

The following questions are asked in the NCVS survey[6]  (noting that because the focus is on sex crime reporting only questions related to sex crimes are mentioned):

41a. (Other than any incidents already mentioned,) has anyone attacked or threatened you in any of these ways - (Exclude telephone threats) - Read each category.

(a) With any weapon, for instance, a gun or knife -
(b) With anything like a baseball bat, frying pan, scissors, or stick -
(c) By something thrown, such as a rock or bottle -
(d) Include any grabbing, punching, or choking,
(e) Any rape, attempted rape or other type of sexual attack -
(f) Any face to face threats - OR
(g) Any attack or threat or use of force by anyone at all? Please mention it even if you are not certain it was a crime.

43a. Incidents involving forced or unwanted sexual acts are often difficult to talk about. (Other than any incidents already mentioned,) have you been forced or coerced to engage in unwanted sexual activity by - Read each category.

(a) Someone you didn't know -
(b) A casual acquaintance - OR
(c) Someone you know well
Did any incidents of this type happen to you?
44a. During the last 6 months, (other than any incidents already mentioned,) did you call the police to report something that happened to YOU which you thought was a crime?

"Respondents who answers affirmatively to any of the short-cue screening items are subsequently administered a crime incident report (CIR)… For instance, a separate screening question cues respondents to think of attacks or threats that took place in specific locations, such as at home, work, or school. Respondents who recall a sexual victimization that occurred at home, work, or school and answer affirmatively would be administered a CIR even if they did not respond affirmatively to the screening question targeting sexual violence…Although the CIR does not ask respondents if psychological coercion was used, one screening question targeted to rape and sexual violence asks respondents if force or coercion was used to initiate unwanted sexual activity."[7]

Despite being the largest defined study on attempting to determine a true crime rate of America (the NCVS has a larger number than even the Nielsen TV viewer studies), there are some caveats to accepting the numbers given by the NCVS.

*Sample sizes for sex offenses are incredibly small*

The NCVS understands its own limitations, as noted in the 2010 NCVS:

"While the change in the rape or sexual assault rate from 2009 to 2010 is significantly different at the 90%-confidence level, care should be taken in interpreting this change because the estimates of rape/sexual assault are based on a small number of cases reported to the survey. Therefore, small absolute changes and fluctuations in the rates of victimization can result in large year-to-year percentage change estimates. For 2010, the estimate of rape or sexual assault is based on 57 unweighted cases compared to 36 unweighted cases in 2009. The measurement of rape or sexual assault represents one of the most serious challenges in the field of victimization research." In 2010, there were 57 "unreported cases" out of sample size of nearly 71000 people: In 2010, 40974 households and 73283 individuals age 12 and older were interviewed for the NCVS. Each household was interviewed twice during the year. The response rate was 92.3% of households and 87.5% of eligible individuals."[8]

AR-00001029

In other words, underreporting rates (and sex crime rates in general) in the NCVS can change drastically by just a few reports.

Since 2000, the underreporting rates have dropped to a low in 2010 and then risen in the 2010s, but since these numbers are influenced by roughly 100 or so annually reported in the NCVS, the NCVS repeatedly warns us to use caution in interpreting these numbers:

- 2003 NCVS: 67.3% of rapes and attempted rapes (attempts included verbal threats of sexual violence) and 53.2% of sexual assaults go unreported (Note: Between 2003-2005, sex assaults/ rapes were consolidated)
- 2005 NCVS: 61.7% of rapes/ sexual assaults and attempts go unreported
- 2006 NCVS: 58.6% went unreported
- 2007 NCVS: 58.4% went unreported
- 2008 NCVS: 58.6% went unreported
- 2009 NCVS: 44.6% went unreported
- 2010 NCVS: 50% went unreported
- 2011 NCVS: 73% went unreported
- 2012 NCVS: 72% went unreported
- 2013 NCVS: 65.2% went unreported
- 2014 NCVS: 66.4% went unreported
- 2015 NVCS: 67.5% went unreported
- 2016 NCVS: 76.8% went unreported
- 2017 NCVS: 59.6% went unreported

One possibility for the increases could likely be traced to recent controversies like the high-profile trials of Jerry Sandusky[9]  and Larry Nassar, the "#MeToo Movement", the claims of widespread rape on college campuses, the revival of decades-old sex abuse accusations against the Catholic Church, the 2016 Presidential Election, and the appointment of Brett Kavanaugh to the US Supreme Court. The constant bombardment of these headlines could have increased the belief of underreporting throughout the 2010s. At the least, it could influence the answers to NCVS questions.

*Definition of Rape, Sexual Assault, and "Attempts" are ambiguous*

The NCVS defines rape as, "Forced sexual intercourse including both psychological coercion and physical force. Forced sexual intercourse means vaginal, anal, or oral penetration by the offender(s). This category also includes incidents where the penetration is from a foreign object, such as a bottle. Includes attempted rape, male and female victims, and both heterosexual and same sex rape. Attempted rape includes verbal threats of rape." Sexual assault is defined as, "A wide range of victimizations, separate from rape or attempted rape. These crimes include attacks or attempted attacks generally involving unwanted sexual contact between victim and offender. Sexual assaults may or may not involve force and include such things as grabbing or fondling. Sexual assault also includes verbal threats."[10]

In the NCVS, both the definition of attempted sexual assault and attempted rape includes "unwanted sexual contact" and "verbal threats". In this age of "#MeToo" and other feminist-centered awareness events, we must ask ourselves what a modern person (particularly one of the feminist or other victim-centric persuasion) might think qualifies as an "attempt." Consider the statement posted on the Simple Justice criminal defense blog from 2018, in response to a white paper from National Sexual Violence Resource Center and Urban Institute:

"It's now official; 'stare rape' is sexual violence, as is flirting, asking personal questions and the attempted touching of a non-sexual body part, such as, I guess, hand-shaking. Not only will this be sufficient cause for termination, if not public castigation, but it will be included in an empirical analysis of the prevalence of sexual violence. Was I a witness to sexual violence on the subway? It's all according to how one defines it. Is it a crime to stare? What constitutes a stare from a look, or a leer? Many such offenses are popularly defined by the sensibilities of the victim, whether it made her feel uncomfortable, but this provides no clue to the "perpetrator" of stare rape that he's looked beyond the point of acceptability to that particular "survivor" and should have averted his eyes."[11]  To some, it may seem like a silly notion that merely looking at a woman too long is on par with physical rape, but in 2008, there was a serious attempt to push to criminalize looking at a child too long in the state of Maine.[12]

Cathy Young, a critic of modern feminism, wrote, "Forty years ago, feminist reformers successfully challenged the discriminatory treatment of rape complainants, from the requirement of physical resistance to condemnations of a woman's "unchaste character." Feminist advocacy also deserves credit for clarifying that forced sex is always rape, even in a relationship. (I am talking here about being forced by physical violence, restraint or threats, or being subjected to sexual acts while physically helpless.) But the anti-rape activism that emerged in the 1990s and has surged on college campuses and on the Internet in recent years goes far beyond that. Today, it not only embraces an absolutist version of "no means no," in which any hint of reluctance must halt further attempts at

AR-00001030

sexual intimacy; the movement also insists that only a clear (and sober) 'yes' means yes…"

"Meanwhile, there is little regard for the preferences of people who like intuitive give-and-take rather than requests and directions. Sensual, playful or raunchy bedroom talk is very different from compulsory questions checking for a clear signal that you're not crossing a line. Reluctance to engage in frank sexual communication is treated solely as a puritanical hang-up rather than a valid desire to preserve some spontaneity or dignity. And the wrong kind of communication, such as persuading an initially hesitant partner, is equated with sexual assault. Despite its scorn for reticence, the new sexual revolution has a deep puritanical streak. Consensual sex is viewed as always under control, the result of a rational, fully autonomous choice. In this vision, there is either unequivocal 'enthusiastic consent' or reluctant submission. In real life, though, there are many other possibilities… It is time to rethink this crusade, which criminalizes bad or uncomfortable sex, thereby trivializing actual sexual violence."[13]

There is a battle to pass laws to make deceiving a woman in order to get her to sleep with you is a sexual offense.[14]  Many women believe having sex while intoxicated equates to rape because she cannot consent while intoxicated.[15]  A campus poster generated controversy when it made an anti-rape poster with a smiling heterosexual couple smiling and drinking alcohol; the tagline was, "Jake was drunk. Josie was drunk. Jake and Josie Hooked Up. Josie could not consent. The next day JAKE was charged with RAPE."[16]  Four states (CA, IL, NY, CT) have passed an "affirmative consent law," a.k.a., a "Yes Means Yes law,[17]  a rather vague standard of law that stipulates "silence or lack of resistance" does not in itself demonstrate consent. Some women believe consent can be pulled due to a regretful sexual encounter.[18]

Because what constitutes an "attempt" is quite vague within the NCVS, it is open to interpretation. It is not difficult to imagine that in our current climate (as illustrated in the above examples) that the very definition of rape or sexual assault in itself is vague. Because these instances were never reported, these incidents reported to the NCVS are not reviewed by law enforcement agencies. The only standard is a follow-up "crime incident report" conducted by BJS researchers.

The current NCVS does not adequately cover the demographics of the perpetrators of the crimes reported. Even if they did, the prior criminal record of the alleged perpetrator would likely be unknown. The NCVS is virtually useless as a tool to determine the level of unreported re-offenses by registered persons. Furthermore, the NCVS only covers crimes against anyone over 12 years of age, so sex crimes against anyone under 12 is not covered in the report.

*Children under 12 are not covered in the NCVS*

In an attempt to rectify certain issues with the NCVS, the DOJ conducted a study called "Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics" in 2000. Since the NCVS only relates to victims 12+ years of age, the study relied on the FBI's National Incident-Based Reporting System (NIBRS).  While there is no feasible way to survey children on unreported sex crimes, this study offers up another X factor to further complicate the issue: the number of sexual assaults committed by juveniles who are likely not a registered sex offender. The study found that juveniles made up 23.2% of total sex crimes against children: 40% of offenders of children under age 6 and 39% of offenders against children ages 7-11 were juveniles; and the single age with the greatest number of offenders is 14 (p. 8).[19]

*The NCVS does not cover false allegations*

Victim advocates like to incorporate claims of "low rates of false reports" to minimize the impact of false allegations because it fits into their "sexual abuse as an epidemic" narrative. As stated in one prominent victim advocacy group:

"The prevalence of false reporting is low — between 2% and 10%. For example, a study of eight U.S. communities, which included 2,059 cases of sexual assault, found a 7.1% rate of false reports. A study of 136 sexual assault cases in Boston found a 5.9% rate of false reports. Researchers studied 812 reports of sexual assault from 2000-2003 and found a 2.1% rate of false reports."[20]

Assuming this was true, we can reasonably conclude that between 2% and 10% of unreported incidents were falsely reported to the NCVS and between 2% and 10% of registered persons that are currently on the public are falsely accused. However, there are also many studies that contradict the narrative of low levels of false rape claims.[21]

**WHY UNDERREPORT?**

Underreporting studies often fail to bother to ask why crimes, including sex crimes, are not reported in the first place. Of course, we will never know if the event crosses the threshold into being a crime since it was not reported, much less investigated, by trained law enforcement. Since sexual offenses are seen as on par with murder in American society, then it seems unusual for such serious offenses to go unreported.

AR-00001031

The Harris and Hanson's 2004 recidivism report cited a Besserer and Trainor (2000) study that "showed that sexual assault had the highest percentage of incidents that were not reported to police (78%). When respondents were asked why they did not report sexual victimization to the police, 59% of the respondents stated that the "incident was not important enough" to report. Consequently, readers may wonder what counts as a sexual assault. The Besserer and Trainor (2000) victimization study used a very broad definition of sexual assault. They counted all attempts at forced sexual activity, all unwanted sexual touching, grabbing, kissing, and fondling, as well as threats of sexual assault (Jennifer Tuffs, personal communication, January 15, 2003). Their broad definition undoubtedly included some behaviours that do not conform to the popular image of a sexual offence."[22]

At one time the NCVS also published a supplement to the annual reports entitled "Statistical Tables" which contained numerous statistics not included in the annual reports. The most recent of these Statistical Tables covered the year 2008. Table 104 covers "Percent distribution of reasons for not reporting victimizations to the police, by victim-offender relationship and type of crime," offers various reasons for failing to report an incident. The following answers were given as reasons for non-reporting, noting that the answers were different when the incident involved a stranger and a non-stranger. The answers given in the 2005 Statistical Tables are offered as a comparison:

- 2008 NCVS Stat Table 104: Percent distribution of reasons for not reporting victimizations to the police, by victim-offender relationship and type of crime (Noting that estimates are based on less than 10 sample cases for each answer given; also note that multiple reasons were given so the numbers won't add to 100%)
  - Stranger: Reported to another official (47.9%); Offender Unsuccessful (38.8%); Private/ Personal Matter (13.3%)
  - Non-Stranger: Private/ Personal Matter (25.1%); Fear of Reprisal (14.8%); Reported to another official (10.8%); Offender unsuccessful (8.8%); Police inefficient/ biased/ ineffective (5.5%); Police won't wantto be bothered (3.2%); Lack of Proof (3%)[23]
- 2005 NCVS Stat Table 104:  Percent of reasons for not reporting victimizations to the police, by victim-offender relationship and type of crime (Noting that estimates are based on less than 10 sample cases for each answer given; also note that multiple reasons were given so the numbers won't add to 100%)
  - Stranger: Reported to another official (49.6%), Police don't want to be bothered (19.9%), Offender unsuccessful (12.7%), Fear of reprisal (11%), and Police inefficient, ineffective, or biased (6.9%).
  - Non-stranger: Other Reasons (47%), Private or personal matter (31.1%), Police don't want to be bothered (10.8%), Report to another  official (5.1%), Police ineffective, inefficient, biased (2.8%), and Too incontinent, time consuming (2.4%)[24]

While the Statistical Charts may offer a glimpse into the various reasons for failing to report an incident, it is important to remember that each answer came from a very small sample. The NCVS is a survey of roughly 70k to 100k households annually, yet the statistics on reasons for failing to report is derived from sample sizes of about 10 people or less.

We have placed an emphasis on sex crimes, but Researcher Debra Patkin states that under-reporting for crime in general is under-reported; citing the 1999 NCVS, Patkin notes 64% of overall crime goes unreported.[25]

We may never know if an incident would have been considered a crime, but based on the studies on reasons for underreporting, we can conclude that many people, even the subjects of these studies, felt many unreported incidences do not rise to the level to criminal activity. Why we emphasize sex crimes in America is worthy of entire volumes of work, but like any other irrational fear—Ebola, terrorism, Communism—the actual danger to America is extremely small. Fear of the unknown is perhaps the greatest of fears, and if so, that is why the underreporting myth remains underreported. But that alone is not the reason. Because fear sells, there are plenty of charlatans, hucksters, and snake-oil peddlers willing to peddle this fear to Americans for profit.

**FALSE ASSUMPTIONS TYING RECIDIVISM WITH UNDERREPORTING: A CRITIQUE OF THE SMART OFFICE REPORT AND THE 2018 SCURICH AND JOHN STUDY**

Proponents of the myth of underreporting rely on the following sequence of statements:

    A. Sex Crimes are underreported
    B. Some people convicted of sex crimes and placed on the registry do reoffend
    C. Therefore, "sex offenders" are the cause of underreporting

This assumption is a non sequitur. Proponents never consider the fact that most sex crimes are not committed by those on the registry; in one major study, it was found that around 95% of sex crime arrests were of people with no prior sex offense record. [26]  It has also been an established fact that those convicted of sexual offenses commit subsequent sexual offenses at less than 1% annually.[27]

This assumption relies upon the closely-tied myth of "high re-offense rates" to make the jump from underreporting in general to the assumption must unequivocally the result of "registered sex offenders." Because people simply don't want to believe that sex crimes have an extremely low re-offense rate, confirmation bias sets in.

In the SMART Office report, Roger Przybylski makes his case by citing similar studies of general underreporting by stating, "Due to the frequency with which sex crimes are not reported to police, the disparity between the number of sex offenses reported and those solved by arrest and the disproportionate attrition of certain sex offenses and sex offenders within the criminal justice system, researchers widely agree that observed recidivism rates are underestimates of the true reoffense rates of sex offenders."[28] Przybylski's statement is a textbook non sequitur:

> A. Sex crimes in general are underreported,
> B. Not every sex offense claim leads to arrest,
> C. We pay attention to certain types of victims and offenders more than others,
> D. Therefore, reoffending by those convicted of sex crimes is grossly underreported.

The job of the SMART Office is to promote the federal Adam Walsh Act, so bias should be expected. But Przybylski is not an outlier when it comes to making such assumptions; in 2019, Nicholas Scurich (University of California, Irvine) and Richard S. John (University of Southern California) published a report entitled "The Dark Figure of Sexual Recidivism", in which they proclaim, "Virtually all of the studies define recidivism as a new legal charge or conviction for a sexual crime, and these studies tend to find recidivism rates of the order of 5–15% after 5 years and 10–25% after 10+ years. It is uncontroversial that such a definition of recidivism underestimates the true rate of sexual recidivism because most sexual crime is not reported to legal authorities, a principle known as the "dark figure of crime."[29]

The Scurich and John report can be construed as an exercise in confirmation bias; Richard S. John is associate professor of psychology and a research associate at the Center for Risk and Economic Analysis of Terrorism Events (CREATE) at the University of Southern California. His research focuses on normative and descriptive models of human judgment and decision making and methodological issues in application of decision and probabilistic risk analysis (PRA). He has consulted on a number of large projects involving expert elicitation, including analysis of nuclear power plant risks (NUREG 1150) and analysis of cost and schedule risk for tritium supply alternatives.

Nicholas Scurich, PhD, is "a tenured professor of Psychology and Criminology at the University of California, Irvine. In 2017 he joined TAG ("Threat Assessment Group") as a consultant and lecturer in workplace misconduct mitigation. Dr. Scurich's focus on misconduct risk assessment has included scientific studies of how to assess the risk of misconduct, how to deter dangerous behavior, how to make scientifically informed decisions about risky individuals, and how to communicate risk information. He frequently consults for the Department of Homeland Security on issues related to risk assessment and security. For example, he has worked with the TSA to help develop novel approaches to allocating security resources and screening of airline passengers based on risk."

The report states, "To estimate the magnitude of the dark figure of sexual recidivism, this paper uses a probabilistic simulation approach in conjunction with a.) victim self-report survey data about the rate of reporting sexual crime to legal authorities, b.) offender self-report data about the number of victims per offender, and c.) different assumptions about the chances of being convicted of a new sexual offense once it is reported. Under any configuration of assumptions, the dark figure is substantial, and as a consequence, the disparity between recidivism defined as a new legal charge or conviction for a sex crime and recidivism defined as actually committing a new sexual crime is large. These findings call into question the utility of recidivism studies that rely exclusively on official crime statistics to define sexual recidivism, and highlight the need for additional, long-term studies that use a variety of different measures to assess whether or not sexual recidivism has occurred."

As with the SMART Office report, Scurich and John rely upon a reliance of underreporting in general as the foundation of the argument. Scurich and John cements the non sequitur with an appeal to authority on page 5 by claiming it is "uncontroversial that longer follow-up periods will result in more sexual offenses and thus a higher rate of sexual recidivism." As the fallacies go, if authorities believe there that there is higher recidivism, and we believe underreporting is true, then you must come to the conclusion that sex offenses by those convicted of sexual offenses must be far higher than observed. There is no way to prove or disprove the conclusion, so the average reader assumes this statement to be true.

Both the SMART Office report and Scurich and John report relied heavily on a number of controversial reports that have been called into controversy over the years:

1. The 1997 Prentky study[30] : Made the controversial claim that after 25 years sex offenders' recidivism is 52% for child molesters and 39% for rapists. However, these numbers were not a true re-offense rate, but a "survival/ failure rate", i.e., "the

AR-00001033

estimated probability that child molesters would 'survive' in the community without being charged, convicted, or imprisoned for a sexual offense over the 25-year study period." Prentky himself warned against misusing the stats, primarily because the study involved recidivists who were civilly committed between 1959 and 1985, meaning this was not representative of everyone on the sex offense registry. It is worth noting that even the SMART Office report recognized the limitations of the report, nor does it claim rates presented in the report as an accurate number.[31]

2. The 2004 Langevin Study[32] : A fatally flawed study using a sample from a single civil commitment center, Langevin's study purged people without rearrests after 15 years, and it expanded the definition of recidivist to include crimes committed before subjects were to be included in the study. In an earlier report of the same data set, Langevin and Fedoroff (2000) reported that they were able to obtain follow-up criminal history records for 378 (54%) of the first 700 cases assessed at Dr. Langevin's clinic between 1969 and 1974. In the 2004 report, the offenders lacking criminal history records in 1994 and 1999 were eliminated from the sample. Such a decision would retain recidivists and eliminate non-recidivists. More than half the individuals in the sample were already recidivists by Langevin's definition at the time of their evaluations, thus ensuring at least a 50 percent recidivism rate. Even the SMART Office report does not cite Langevin's study.

3. The 2000 Ahlmeyer study[33] : Both studies also use this study, which relied on polygraphs and self-reports. Polygraphs are inadmissible in court but utilized as intimidation tools. The Ahlmeyer study consisted of 60 adult male sexual offender (35 inmates and 25 parolees), which concluded that more incidents and victims were reported, but a second test reported low numbers though they concluded 80% were "deceptive." But it is worth noting that polygraph studies have relied on self-reporting by the subjects and been conducted in settings where incentives were offered to subjects for cooperation. (the controversial 2007 Butner study is the most egregious examples of this.)

4. The Gene Abel 1987 study[34] : Both the SMART Office and the Scurich and John articles cite Gene Abel's work. Abel's primary report covered "paraphilias." Paraphilia means any act considered deviant by societal norms, which should not be confused with pedophilia; it seems Scurich and John failed to notice the difference. Abel's study had a number of problems – few offenders were voluntary (which would compel false admissions), inclusion of non-criminal paraphilias such as consensual homosexual relations, and Abel lists an estimated number of acts and victims over a lifetime. Abel states the study suggested paraphiliacs, "through coercion or varying degrees of compliance, repeated acts are carried out with the same victims or partners".

The Abel study that actually debunks the Scurich and John report; Scurich and John use reports studying the subclass of particularly high-risk offenders to justify their claims of high levels of recidivism while the Abel study illustrates exactly why that is problematic. Abel provides a Mean and Median estimate of acts and number of victims. The Mean is the sum of all the numbers in the set divided by the amount of numbers in the set. The Median is the middle point of a number set, in which half the numbers are above the median and half are below. Scurich and John cited the highest number possible found in the Abel study, the mean number of estimated number of lifetime acts by those with male victims, listed in the Abel study as 281.7, but the researchers fail to mention the mean number, which is 10.1, far lower than the scarier number. Since half of those in the Abel study committed LESS than 10.1 paraphilic acts while the average (mean) number of acts was assumed to be 281.7, then there must be a small group of people that have grossly inflated the average. These small subgroups are the subjects of Langevin, Prentky, and the Ahlmeyer studies, the studies that incidentally give grossly inflated estimates of recidivism.

Scurich and John used studies relying on estimates to come up with a number to validate their own estimates. The duo used advanced statistical models such as Poisson distribution in order to amaze readers, but at the core is an estimate based upon what they personally feel it should be, specifically a high number. There is no discussion on the probability of false reporting of sex crimes, or of the vast discrepancy between rearrest and reconviction rates in the Scurich and John study (the SMART Office report also fails). But perhaps most importantly, The Scurich and John study suffers from a fatal design flaw in using estimates of underreporting in general to underreporting by registered persons.

The SMART Office report concludes, "While the magnitude of the difference between observed and actual reoffending needs to be better understood, there is universal agreement in the scientific community that the observed recidivism rates of sex offenders are underestimates of actual reoffending."[35]  It cites the 2004 Harris and Hanson study [36]  to claim elevated recidivism levels, but the study is a multinational study so the results are not valid for understanding American recidivism. (In Canada, the age of consent was raised from 14 to 16 in 2008 [37] , while the age of consent in America is between 16 and 18, thus some sexual acts legal in Canada before 2008 were illegal in America.) However, the SMART Office study does not cite the Langevin or Prentky rates as true recidivism rates.

Scurich and John cite the Langevin and Prentky rates as accurate in their opinion, even arguing against the condemnation of the controversial Langevin study. Scurich and John attempt to shield their fallacies by making the following disclaimer:

"We do not endorse any specific sexual recidivism rate as the 'correct' one…there is no single, universal recidivism rate that describes all varieties of sexual offenders." If this statement is true, then this research paper cannot even make any actual claims on sex crime re-offense at all. Yet, in the very next sentence, Scurich and John do just that, proclaiming, "By parity of reason, sweeping

AR-00001034

proclamations that '…only a minority of sex offenders recidivate' (Calkins et al., 2014, p. 449)" are inapposite." [38]

By parity of reason, the same sweeping proclamation that "the majority of sex crimes are vastly unreported" is equally inapposite. Despite the rhetoric and use of lofty speech, these two reports are no closer to the truth than the average citizen and rely of logical fallacies and confirmation biases.

## CONCLUSION

Because there is no way to effectively evaluate unreported incidents even with the National Crime Victimization sample size of 70k to 100k, victim advocate groups have been free to make unfounded claims of widespread underreporting. But the few studies that have tried to address underreporting suggest that most unreported incidents were seen even by survey takers as incidents that either was not a crime or was considered not worth reporting for various reasons.

The dominant narrative about underreporting can be debunked by dispelling logical fallacies proponents of the underreporting myth employ. Proponents of the underreporting myth state there is no way to dispel their statements; in reality, there is also no way to verify their statements are true. The primary tactic of proponents of the underreporting myth relies on biases against those on the registry to lead people to their desired results. Proponents must rely on controversial studies like the Prentky, Langevin, Ahlmeyer, and Abel studies, i.e., a few studies that have claims of high levels of re-offense among people convicted of sex crimes.

To combat the myth of underreporting, you must be aware of arguments utilizing a number of logical fallacies. Any narrative minimizing false allegations and reports relying on tactics like polygraphs or self-reporting from people who are in a setting where rewards for cooperation are given should be challenged. Such narratives are meant to lead people into accepting the belief of widespread underreporting of sex crimes. Proponents of the underreporting myth often have vested interests in spreading suggestions of underreporting at epidemic levels. Most importantly, remember that few studies have studies the topic of sex offense underreporting, but fewer have given the reasons for underreporting.

## REFERENCES

1. Aljumily, Refat, Quantitative Criminology: Bayesian Statistics for Measuring the 'Dark Figure' of Crime (July 4, 2017). Online at SSRN: https://ssrn.com/abstract=2999280 or http://dx.doi.org/10.2139/ssrn.2999280
2. "Argument from Ignorance." Logically Fallacious. Online at https://www.logicallyfallacious.com/tools/lp/Bo/LogicalFallacies/56/Argument-from-Ignorance
3. See TCR Staff, "Measuring the 'Dark Figure' of Crime." The Crime Report. 28 July 2017. Online at https://thecrimereport.org/2017/07/28/measuring-the-dark-figure-of-crime/
4. Roger Przybylski. "Chapter 5: Adult Sex Offender Recidivism." SOMAPI. Online at https://www.smart.gov/SOMAPI/sec1/ch5_recidivism.html
5. "Data Collection: National Crime Victimization Survey (NCVS)." BJS.gov. Online at https://www.bjs.gov/index.cfm?ty=dcdetail&iid=245
6. A sample of the survey form is at https://www.bjs.gov/content/pub/pdf/ncvs15_bsq.pdf
7. "CRIMINAL VICTIMIZATION, 2017." BJS. Dec. 2018. p.20. Online at https://www.bjs.gov/content/pub/pdf/cv17.pdf
8. "Criminal Victimization, 2010." BJS, Sept 2011. p.14. Online at https://www.bjs.gov/content/pub/pdf/cv10.pdf
9. See Tony Gonzalez. "Study: Sexual assaults greatly underreported." USA Today. 19 Nov 2013. Online at https://www.usatoday.com/story/news/nation/2013/11/19/study-sexual-assaults-greatly-underreported-/3648197/ , "The Nashville Sexual Assault Center, for example, reported an increase in the number of people stepping forward to report sexual abuse, attributed in part to intense media coverage of former Penn State University assistant football coach Jerry Sandusky, convicted of 45 counts of child sex abuse involving 10 boys."
10. "Rape and Sexual Assault." Bureau of Justice Statistics. Online at https://www.bjs.gov/index.cfm?ty=tp&tid=317#terms_def
11. S.H.G. "Stare Rape Is Now Official, Honestly." Simple Justice: A Criminal Defense Blog. 26 Dec. 2018. Online at https://blog.simplejustice.us/2018/12/26/stare-rape-is-now-official-honestly/
12. Dave Choate. "Bill Toughens Law on Visual Sexual Aggression Against Children in Maine." Seacoast Online. 6Apr 2008. Online at https://www.seacoastonline.com/apps/pbcs.dll/article?AID=/20080406/NEWS/804060343/-1/NEWS01/
13. Cathy Young. "Feminists want us to define these ugly sexual encounters as rape. Don't let them." Washington Post. 20 May 2015. Online at https://www.washingtonpost.com/posteverything/wp/2015/05/20/feminists-want-us-to-define-these-ugly-sexual-encounters-as-rape-dont-let-them/
14. Caitlin Nolan. "Rape by Fraud: Inside the Fight to Criminalize Lying About Who You Are to Sleep With Someone." Inside Edition. 12 Dec. 2018. Online at https://www.insideedition.com/rape-fraud-inside-the-fight-criminalize-lying-about-who-you-are-sleep-someone-49020
15. Cydney Adams. "Can drunk sex ever be consensual?" CBS News, 26 Apr 2019. Online at https://www.cbsnews.com/news/can-drunk-sex-ever-be-consensual-cbsn-originals/

AR-00001035

16. Ashe Schow. "Ever had drunk sex? That's rape, according to this university." Washington Examiner. 22 July 2015.  Online at https://www.washingtonexaminer.com/ever-had-drunk-sex-thats-rape-according-to-this-university

17. From affirmativeconsent.com, published 2017. Online at  http://affirmativeconsent.com/affirmative-consent-laws-state-by-state/

18. "Girl Thinks If You Regret Having Sex It Means You've Been Raped, Gets A Perfect Lesson On Consent." Bored Panda. 2018. Online at https://www.boredpanda.com/rape-consent-explanation-leannicole/

19. "Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics." US Dept. of Justice. 2000. Online at https://www.bjs.gov/content/pub/pdf/saycrle.pdf

20. See "Get Statistics." National Sexual Violence Resource Center. 2018. Online at https://www.nsvrc.org/statistics

21. See Derek Logue, "False Allegations." OnceFallen, 12 Dec 2009. Online at http://www.oncefallen.com/falseallegations.html

22. Andrew J. R. Harris and R. Karl Hanson. "Sex Offender Recidivism: A Simple Question." Public Safety and Emergency Preparedness Canada. Online at https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/sx-ffndr-rcdvsm/index-en.aspx

23. "Criminal Victimization in the United States, 2008 - Statistical Tables." Bureau of Justice Statistics. 2010. Online at https://www.bjs.gov/content/pub/pdf/cvus08.pdf

24. "Criminal Victimization in the United States, 2005 - Statistical Tables." Bureau of Justice Statistics. 2006. Online at https://www.bjs.gov/content/pub/pdf/cvus05.pdf

25. Patkin, Debra. "Megan's law and the misconception of sex offender recidivism." 2008. <http://works.bepress.com/cgi/viewcontent.cgi?article=1000&context=debra_patkin>

26. See Jeffrey C. Sandler, Naomi J. Freeman, and Kelly M. Socia. "DOES A WATCHED POT BOIL? A Time-Series Analysis of New York State's
Sex Offender Registration and Notification Law." Psychology Public Policy and Law 14(4):284-302 • November 2008. Online at https://www.researchgate.net/publication/232505213_Does_a_Watched_Pot_Boil_A_Time-Series_Analysis_of_New_York_State's_Sex_Offender_Registration_and_Notification_Law

27. Derek Logue. "Recidivism: The Great Lie of "Frightening and High". Once Fallen. 8 Aug 2018. Online at  http://www.oncefallen.com/Recidivism101.html

28. Supra., Przybylski

29. Scurich, Nicholas and John, Richard S., The Dark Figure of Sexual Recidivism (February 4, 2019). UC Irvine School of Law Research Paper No. 2019-09. Available at SSRN: https://ssrn.com/abstract=3328831

30. Prentky, R. A., Knight, R. A., & Lee, A. F. S." Child sexual molestation: Research issues." Research Report, National Institute of Justice, Washington, DC. June 1997Online at https://www.ncjrs.gov/pdffiles/163390.pdf

31. Supra., Przybylski

32. Ron Langevin, Suzanne Curnoe, Paul Fedoroff, Renee, Mara Langevin, Cheryl Peever, Rick Pettica, and Shameen Sandhu. "Lifetime Sex Offender Recidivism: A 25-Year Follow-Up Study." Canadian Journal of Criminology and Criminal Justice, Vol. 46, No. 5. DOI: 10.3138/cjccj.46.5.531 (2004)

33. Sean Ahlmeyer, Peggy Heil, Bonita McKee, & Kim English. "The Impact of Polygraphy on Admissions of Victims and Offenses in Adult Sexual Offenders." Sexual Abuse: A Journal of Research and Treatment. April 2000, Volume 12, Issue 2, pp 123–138

34. Gene Abel et al., "Self-Reported Sex Crimes of Non-Incarcerated Paraphiliacs," Journal of Interpersonal Violence (1987), pp. 3-25

35. Supra., Przybylski

36. Hanson, R.K. & Morton-Bourgon, K.. "Predictors of Sexual Recidivism: An Updated Meta-Analysis." Ottawa, ON: Public Safety and Emergency Preparedness Canada. 2004.

37. Canada's age of consent raised by 2 years". CBC News. 1 May 2008. Online at https://www.cbc.ca/news/canada/canada-s-age-of-consent-raised-by-2-years-1.754941

38. Supra., Scurich and John, "Dark Figure"

AR-00001036



<----- BACK TO INDEX -------

(c) 2007-2016 Derek  W. Logue. No part of this website may be used in any way without expressed written consent of the site owner.

# Recidivism 102—Sexual Recidivism Stats by Various Studies – Compiled by Once Fallen

This report is a supplement to Once Fallen's Recidivism 101 article. This chart only consists of raw data contained within the reports.

Recidivism is not as easy to define as people assume. We obviously think of a sex offender recommitting a sex crime, but some studies may include technical violations, Failure to Register, or non-sex offenses in recidivism numbers. There are a number of studies out there, and all use different standards. For the sake of simplicity, I am focusing on two of the most common standards—Re-arrest rates and reconviction rates. Even within this narrow definition, however, there is no universal standard by which these studies follow. Many studies after 2003 have tried emulating the US Department of Justice survey, but not all follow the pattern.

Some studies may be repeated here because they break down rates into shorter and longer periods, or some studies may be follow-ups to earlier recidivism studies. Most studies are limited to between 3 years and 5 years (which is fine since most recidivists commit new crimes within the first three years of release). Some studies used inmates released during multiple years, further complicating recidivism rates; The Minnesota-B study used 2007 as the cutoff date regardless of whether the sample was released in 2002 or 1990. That means some people were in the sample longer than others. Some recidivism data may overlap; some studies, for example, may use the same state recidivism data that was collected in another study.

Unlike other attempts to summarize recidivism studies, I have limited this chart to American re-offense studies. There are a number of reasons for choosing only American studies, but primarily because policy issues in the USA tend to regulate far more sexual activity than in other countries, even those with sex offender registry laws like Canada or the UK.

Under re-arrest and re-conviction rate headings, the numbers in parentheses are actual number of recidivists when listed in the study. Unfortunately not all studies gave the actual numbers, just the percentages who reoffended.

A number of studies here are excluded primarily because they did not cover re-arrest/ reconviction rates, are studies from other countries, or were too vague to determine the numbers needed here. This is thus not exhaustive, but is comprehensive of those American Recidivism studies with re-arrest or reconviction stats.

Other similar reports can be found in the following places:

- Chris Dornin, "Facts and Fiction about Sex Offenders." Corrections.com, May 22, 2010. http://www.corrections.com/news/article/24500-facts-and-fiction-about-sex-offenders
- Sam Caldwell. "Recidivism.me: Sex Offender Recidivism Analysis." 2010. http://recidivism.me/
- Advocates For Change, "Sex Offense Issues: A Comprehensive Study of Reoffense Rates."
- "Statistics: Do Your Own Homework." Sex Offender Issues. http://sexoffenderissues.blogspot.com/p/studies.html

| Study Location | Study Date | Years of Subject Release | Sample Size | Followup Period | SO Rearrest Rate | SO Reconviction Rate |
|---|---|---|---|---|---|---|
| Ohio [1] | 1996 | 1989 | 826 | 5 | ---- | 5.3% (44*) |
| New York [2] | 1996 | 1986 | 556 | 9 | ---- | 6% (34*) |
| Iowa [3] | 2000 | 1995-1996 | 434 | 4.3 | ---- | 3.2% (14) |
| Ohio [4] | 2001 | 1989 | 879 | 10 | ---- | 8% (70) |
| US Dept. of Justice [5] | 2003 | 1994 | 9641 | 3 | 5.3% (517) | 3.5% (339) |
| Washington [6] | 2005 | 1994 | 4091 | 5 | ---- | 2.7% (111) |
| US (Rutgers U.) [7] | 2005 | 1986 | 917 | 3.5 | 4.5% | ---- |
| Michigan [8] | 2006 | 1990-2000 | 4762 | 4 | ---- | 2.46 (117) |
| Alaska [9] | 2007 | 1999 | ---- | 3 | 3% | ---- |
| Indiana [10] | 2007 | 2002-2004 | 2502 | 3 | ---- | 2.3% (60*) |
| Arizona [11] | 2007 | 1984-1998 | 3205 | 6.85 Average | ---- | 5.5% |
| Minnesota [12] | 2007 | 1990-2002 | 3166 | 3 | 7% | 6% |
| Minnesota [13] | 2007 | 1990-2002 | 3166 | 8.4 | 12% | 10% |
| California [14] | 2008 | 1997 | 3577 | 10 | ---- | 3.38% (121) |
| Alaska [15] | 2009 | 2001 | 232 | 3 | 3.4% | ---- |
| Delaware [16] | 2009 | 2001 | 88 | 3 | 3.8% | ---- |

AR-00001037

| Illinois [17] | 2009 | 2001 | 499 | 3 | 2.4% | ---- |
|---|---|---|---|---|---|---|
| Iowa [18] | 2009 | 2001 | 205 | 3 | 3.9% | ---- |
| New Mexico [19] | 2009 | 2001 | 112 | 3 | 1.8% | ---- |
| South Carolina [20] | 2009 | 2001 | 300 | 3 | 4% | ---- |
| Utah [21] | 2009 | 2001 | 203 | 3 | 9% | ---- |
| Arizona [22] | 2009 | 2001 | 290 | 3 | 2.4% (7) | 0.7% (2) |
| Maine [23] | 2010 | 2004-2006 | 910 | 3 | 3.8% (35) | ---- |
| New Jersey [24] | 2011 | 1990-1994 | 247 | 8 | 13% | ---- |
| New Jersey [25] | 2011 | 1996-2000 | 248 | 8 | 9.7% | ---- |
| Connecticut [26] | 2012 | 2005 | 746 | 5 | 3.6% (27) | 2.7% (20) |
| Florida [27] | 2012 | 99,00,04,05 | 477 | 5 | 5.2% (22) | ---- |
| Florida [28] | 2012 | 1999-2000 | 241 | 10 | 13.7% (33) | ---- |
| FL/NJ/MN/SC [29] | 2012 | 1990-2005 | 1751 | 5 | 5.1% (90) | ---- |
| FL/NJ/MN/SC [30] | 2012 | 1990-2005 | 1469 | 10 | 13.7% (153) | ---- |
| Nebraska Pre-AWA [31] | 2013 | 1997-2008 | 2816 | 2 | ---- | 1.7% (48) |
| Nebraska AWA [32] | 2013 | 2009 | 209 | 2 | ---- | 2.6% (6) |
| Connecticut [33] | 2013 | 2004-2009 | 223 | 3 | ---- | 1.3% (2) |
| Michigan [34] | 2014 | 2007-2010 | 4109 | 3 | ---- | 0.8% (32) |
| BJS Multi-State [35] | 2014 | 2005-2010 | 20,422 | 5 | 5.6% | |
| California [36] | 2016 | Ca. 2010 | 1626 | 5 | 4.8% (78) | |
| BJS Multi-State [37] | 2019 | 2005-2014 | 9 | 7.2% | 3.6%** | |

*Indiana, NY state and Ohio studies used reincarceration as the recidivism standard. Recidivism rates can include sex-related technical violations, but these numbers do not reflect technical violations.

**The 2019 BJS study omitted actual numbers in favor of percentages, only adding that only half of arrests led to a conviction; in addition, the BJS omitted inmates released who had not been currently incarcerated for a sexual offense but had a sex offense in their criminal history, inflating the rearrest numbers to 7.7%. This is discussed in full detail in the OnceFallen article on the "**UNIQUE THREAT MYTH**"

## References:

1. Ohio Department of Rehabilitation and Correction. "Five Year Recidivism Follow-Up Of Sex Offender Releases." August 1996
2. New York State Department of Correctional Services, Division of Program Planning, Research and Evaluation. "Profile and Follow-up of Sex Offenders released in 1986." July 1996
3. Iowa Department of Human Rights, Division of Criminal and Juvenile Justice Planning and Statistical Analysis Center. "THE IOWA SEX OFFENDER REGISTRY AND RECIDIVISM." December 2000. http://www.humanrights.iowa.gov/cjjp/images/pdf/01_pub/SexOffenderReport.pdf
4. Ohio Department of Rehabilitation and Correction, "Ten Year Recidivism Follow-up of 1989 Sex Offender Releases." April 2001. http://www.drc.state.oh.us/web/Reports/Ten_Year_Recidivism.pdf.
5. US Department of Justice, "Recidivism of Sex Offenders Released into the Community in 1994." Nov. 2003
6. Washington State Institute for Public Policy. "SEX OFFENDER SENTENCING IN WASHINGTON STATE: RECIDIVISM RATES." August 26, 2005.
7. Michelle L. Meloy, "The Sex Offender Next Door: An Analysis of Recidivism, Risk Factors, and Deterrence of Sex Offenders on Probation." Criminal Justice Policy Review, Volume 16, Number 2, June 2005.  p. 211-236
8. eAdvocate, "CHART: Michigan Recidivism Rates: All released sex offenders -vs- non-sex offenders." May 5, 2009. Information was extrapolated from Annual Michigan Department of Corrections, Statistical Report, Parole Board Charts D2 and D2a, years 1990 through 2000. Technical violations not included. The Statistical reports for years 1998 to current can be found under the "Publications and information" section of the Michigan Dept. of Corrections website, http://www.michigan.gov/corrections/0,4551,7-119-1441---,00.html.
9. Alaska Judicial Council. "Criminal Recidivism in Alaska." January 2007. This study does not break down the number or registrants nor the exact number rearrested in the study. This was a study a all criminals, not just registered citizens
10. Indiana Dept. of Correction. "Recidivism Rates Compared 2005-2007." May 2007. http://www.in.gov/idoc/files/05_07RecidivismRpt.pdf.
11. Arizona Dept. of Corrections. "Sex Offender Recidivism." 2007.  http://www.rsova.info/reports/az_sorecidivism1984-1998.pdf ;
12. Minnesota Dept. of Corrections, "Sex Offender Recidivism in Minnesota." April 2007.

AR-00001038

13. Ibid. I added this stat because it was in the study. The MInn. DOC points out overall rearrest and reconviction rates lowered as a result of increased supervision and treatment of sex offenders. I'd also like to add the year average came from people followed between three and sixteen years.

14. California Sex Offender Management Board. "RECIDIVISM OF PAROLED SEX OFFENDERS—TEN (10) YEAR STUDY." June 2008

15. Stan Orchowsky and Janice Iwama. "Improving State Criminal History Records: Recidivism of Sex Offenders Released in 2001." Justice Research and Statistics Association, November 2009. Table 5, p. 17. http://www.jrsa.org/projects/sex-offender-final-report.pdf

16. Ibid.

17. Ibid.

18. Ibid.

19. Ibid.

20. Ibid.

21. Ibid.

22. Arizona Criminal Justice Commission. "Recidivism of Sex Offenders Released from the Arizona Department of Corrections in 2001." February 2009

23. USM Muskie School of Public Service, Maine Statistical Analysis Center, "SEXUAL ASSAULT TRENDS AND SEX OFFENDER RECIDIVISM IN MAINE." October 2010. This study divided sex offenders into two groups—341 released from prison and 569 RSOs on probation. The recidivism rates were the same between the two groups (3.8% and 3.9%, respectively). Thus, combining the total numbers does not influence the results.

24. Richard Tewksbury, Wesley G. Jennings and Kristen M. Zgoba. "A longitudinal examination of sex offender recidivism prior to and following the implementation of SORN." Behav. Sci. Law 30: 308–328 (2012)

25. Ibid.

26. State of Connecticut, Office of Policy and Management, Criminal Justice Policy & Planning Division. "Recidivism among sex offenders in Connecticut." February 15, 2012

27. Jill S. Levenson, Ph.D. & Ryan T. Shields, M.S. "SEX OFFENDER RISK AND RECIDIVISM IN FLORIDA." 2012

28. Ibid. Because Levenson and Shields randomly selected 250 registrants from 1999-2000 and 250 registrants from 2004-2005 to conduct the study, they could combine five year recidivism rates for both groups but could only get 10 year rates from the 1999-2000 group of 250.

29. Kristen M. Zgoba, Michael Miner, Raymond Knight, Elizabeth Letourneau, Jill Levenson, David Thornton. "A Multi-State Recidivism Study Using Static-99R and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act." November 2012. Table 7, p.20

30. Ibid.

31. Consortium for Crime and Justice Research, U. of Nebraska – Omaha. "Nebraska Sex Offender Registry Study." July 31, 2013. Table 5, p.20

32. Ibid. Table 6, p.21

33. Vermont Center for Justice Research. "SEXUAL CRIMES AGAINST CHILDREN: A STUDY OF OFFENDER RECIDIVISM." January, 2013.

34. Barbara Levine & Elsie Kettunen. "Paroling people who committed serious crimes: What is the actual risk?" Citizens Alliance on Prisons & Public Spending, Dec. 1, 2014

35. "Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010: Supplemental Tables: Most serious commitment offense and types of post-release arrest charges of prisoners released in 30 states in 2005." US Dept. of Justice, Dec. 2016.

36. Seung C. Lee, Alejandro Restrepo, Annie Satariano, & R. Karl Hanson. "The Predictive Validity of Static-99R for Sexual Offenders in California: 2016 Update." State Authorized Risk Assessment Tool for Sex Offenders (CA) Committee. Gov't Report. July 13, 2016. http://www.saratso.org/docs/ThePredictiveValidity_of_Static-99R_forSexualOffenders_inCalifornia-2016v1.pdf

37. Mariel Alper, Ph.D.,and Matthew R. Durose. "Recidivism of Sex Offenders Released from State Prison: A 9-Year Follow-Up (2005-14)." BJS.gov. May 2019.  Accessed 8 June 2019 At https://www.bjs.gov/content/pub/pdf/rsorsp9yfu0514.pdf

AR-00001039



<----- BACK TO INDEX ------

(c) 2007-2018 Derek W. Logue. No part of this website may be used in any way without expressed written consent of the site owner.

## Recidivism: The Great Lie of "Frightening and High"

Derek W. Logue of OnceFallen.com
Created 15 January 2018, Last Update 13 August 2018

"*In so many instances these individuals should never ever be allowed out for a second chance, they're ticking time bombs, its not a questions if they are re-offend, it's a question of when they re-offend.*" – Lauren Book, Current FL State Senator and victim industry advocate [1]

"*There is a 90 percent likelihood of recidivism for sexual crimes against children. Ninety percent. That is the standard. That is their record. That is the likelihood. Ninety percent.*" – Disgraced former Florida senator Mark Foley [2]

"*It is a common misconception even today that those who commit crimes are arrogantly breaking the law and deriving a fiendish pleasure from getting away with it. Many people in discussing an offender will assume a hostility not too far removed from the original hostility of the person committing the crime. Thus the old idea of revenge is continued and the possibility of understanding the criminal is kept at a minimum.*" -- David Abrahamsen [3]

### INTRODUCTION

Laws targeting people convicted of sexually-based offenses were justified primarily by a myth that "once a sex offender, always a sex offender," and that a vast majority of those listed on the public registry will inevitably reoffend.  Media personalities, politicians, and victim advocates will repeat this myth. Even the US Supreme Court has propagated this myth. The myth of high offense rates fuel draconian legislation.

What is recidivism? People demand an easy answer to a complex question. Anti-registry advocates recognize the importance of answering this question:  "So it is important that these two issues related to re-offense rate that must be dealt with. The first one is; of the people that are on the registry, what is the percentage that are involved in new sexually related crimes, and the second question is, what is the percentage of the people on the registry that are involved in a new sexually related crime in comparison to the ordinary citizen who have never been convicted of a sexually related crime? If in either case, there is a high re-offense rate for people on the registry, than the justification for the law could exist, if not than the justification evaporates." [4]

This paper is intended to cover this myth and the latest studies that debunk this most dangerous of myths.

### A BRIEF HISTORY OF RECIDIVISM

While a lot of emphasis on recidivism rates in recent months have centered around the "Frightening and High" claims of Justice Kennedy in Smith v Doe, it is important to realize that views on perceived recidivism rates have fluctuated wildly over the past century and a half.

In his book, "Moral Panic: Changing Concepts of the Child Molester in Modern America," Historian Phillip Jenkins notes that the word "recidivism" first entered the English vernacular in the 1880s. [5]  It was not until 1894 that child sexual abuse was considered a primary type of sex crime. [6]  The modern era reflects the moral panic of the 1930s to early 1950s, commonly known to researchers as the "Sexual Psychopath era." (It is worth noting the origin of this phrase can be traced back to the 1886 German book "Psychopathia Sexualis" by Richard von Krafft-Ebing.)

Even during the height of the "Sexual Psychopath era," there was no evidence of high re-offense rates among those convicted of sex crimes. The (New York City) Mayor's Committee Reports on the Study of Sex Offenses, published in 1944, found that only 40 out of 555 (7%) of people convicted of sex crimes in 1930 were rearrested between 1930-1941.[7]  Paul Tappan's NJ commission found that "sex offenders have one of the lowest rates as 'repeaters' of all types of crime…Among serious crimes homicide alone has a lower rate of recidivism."[8]

During the Treatment-oriented era of the late 1950s to the mid-1970s, the viewpoint of the "sex offender changed from an incurable threat. The term "child molester" was coined as a term to denote a petty offender, one who did not use violence or force; the term "pedophile" fell out of favor, and the system saw most offenders as amenable to treatment, and recidivism studies continued to fid extremely low recidivism rates.[9]  However, by the 1980s, the modern era of sex abuse panic began; renewed interest in sexual abuse coincided with the rise of Moral Conservatism as well as the Feminist Movement. It became the one issue feminists and conservatives could agree upon.[10]  It is here where our modern narrative on recidivism picks up.

### "FRIGHTENING AND HIGH"

The myth of "frightening and high" recidivism has gained a lot of attention in recent months following the oral arguments for Packingham v North Carolina, 582 US __ (2017). The NY Times reported the State's lawyer, Robert C. Montgomery, stated, "This court has recognized that they have a high rate of recidivism and are very likely to do this again." The Times NY stated the term "frightening and high" has been "exceptionally influential. It has appeared in more than 100 lower-court opinions, and it has helped justify laws that effectively banish registered sex offenders from many aspects of everyday life."[11]

This term "frightening and high" was cited by Justice Anthony M. Kennedy as he was writing for the Majority in Smith v Doe, 538 US 84 (2003), which in

AR-00001040

turn was a citation in McKune v Lile, 536 US 24 (2002). McKune, in turn cited the 1988 US Dept. of Justice report "A Practitioner's Guide to Treating the Incarcerated Male Sex Offender"[12] , which in turn cited a 1986 Psychology Today article[13].  Before addressing the origin of this catchphrase, we should examine the actual statements posted in the two US Supreme Court decisions.

Justice Kennedy's words from McKune v. Lile:

"*Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism. See U.S. Dept. of Justice, Nat. Institute of Corrections, A Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii (1988) ("[T]he rate of recidivism of treated sex offenders is fairly consistently estimated to be around 15%," whereas the rate of recidivism of untreated offenders has been estimated to be as high as 80%. "Even if both of these figures are exaggerated, there would still be a significant difference between treated and untreated individuals")... The critical first step in the Kansas Sexual Abuse Treatment Program (SATP), therefore, is acceptance of responsibility for past offenses. This gives inmates a basis to understand why they are being punished and to identify the traits that cause such a frightening and high risk of recidivism.*"

Here is the passage recited in Smith v Doe mere months after the McKune decision:

"*Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class. The risk of recidivism posed by sex offenders is "frightening and high." McKune v. Lile, 536 U.S. 24, 34 (2002); see also id., at 33 ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault" (citing U.S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders 27 (1997); U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997))*."[14]

Returning to the original source of the frightening and high claim, Ira Ellman, professor at Arizona State University's Sandra Day O'Connor College of Law, wrote a scathing critique of this dubious claim, including breaking down the origin of the frightening and high claim:

"*McKune provides just one citation for its much-quoted statement: a 1988 Justice Department 'Practitioner's Manual'. That reference likely came from the amicus brief supporting Kansas filed by the Solicitor General, then Ted Olson, which also cites it. This Practitioner's Guide itself provides but one source for the claim, but it's no scientific study. It's a 1986 article from Psychology Today, a mass market magazine aimed at a lay audience, which had this sentence: "Most untreated sex offenders released from prison go on to commit more offenses–indeed, as many as 80% do." Freeman-Longo, R., & Wall, R, Changing a lifetime of sexual crime, Psychology Today (1986). That sentence is a bare assertion with no supporting reference. Nor did its author have the scientific credentials needed to qualify at trial as an expert on recidivism.  He was a counselor, not a scholar, and the article containing the sentence isn't about recidivism statistics. It's about a counseling program for sex offenders he then ran in an Oregon prison. His unsupported assertion about the recidivism rate for untreated sex offenders was offered to contrast with his equally unsupported assertion about the lower recidivism rate for those who complete his program.*"[15]

In response to Professor Ellman's study, the David Post of the Washington Post wrote:

"*It appears to be an unfortunate, but crystal-clear, illustration of the cognitive bias that leads people — even Supreme Court justices — to believe statements that confirm preconceived beliefs without demanding any actual evidence in support. What the court really should have said — the only statement that would have been consistent with the facts before it — was:*

'*The author of some article published in Psychology Today thinks that the recidivism rate is frightening and high, possibly as high as 80%.*'

*Not quite as impressive that way, and an awfully thin reed on which to rest the crushing burdens that these prohibitions and restrictions impose.*"[16]

Yes, it is entirely possible that Justice Kennedy engaged in confirmation bias. He chose to ignore much of the research cited in the 1988 study. The NY Times describes this 1988 Practitioner's guide as, "a compendium of papers from outside experts, is 231 pages long, and it contains lots of statistics on sex offender recidivism rates. Many of them were in the single digits, some a little higher. Only one source claimed an 80 percent rate, and the guide itself said that number might be exaggerated."[17]  On page 65 of the Practitioner's guide, numerous studies written by various treatment programs show long term sex crime re-offense rates for treated offenders between 0%-30% and untreated offenders between 10%-37%, though it should be noted that these were all studies from hospitals with intensive treatment programs. In other words, they were programs for offenders deemed high risk and not indicative of the re-offense rates of the entire class of people convicted of sex crimes.

The general public believes that roughly three-fourths of those convicted of sex crimes will reoffend.[18]  The belief system has become cyclical—the public believes recidivism is high because of "experts" like media personalities and courts, and these personalities in turn believe recidivism is high because the general public believes it. It is imperative to address this most dangerous of myth due to the impact it has on public policy. As Reason magazine reports, "These numbers matter because fear of recidivism is at the heart of the harsh and sweeping policies aimed at sex offenders, including mandatory minimum sentences, indefinite civil confinement after prison, lifelong registration, residence and presence restrictions, occupational bans, and stigmatizing passports. The risk that sex offenders will commit new crimes is relevant not only in justifying these measures on policy grounds but in resolving constitutional issues such as whether registration and all the burdens associated with it should be viewed as punishment or as regulations promoting public safety."[19]

**RECIDIVISM: NOT A UNIVERSAL STANDARD**

The problem with recidivism numbers is that it is the application is that there really is no universal standard for defining it. Every study varies greatly, which influences numbers. Time frame, definition of actions that are considered reoffending, and other factors play key roles in recidivism. However, society demands a simplistic answer to a complicated question. As time has gone on, even those within the sex offender legal reform movement has evolved their understanding of recidivism.

For example, the largest study and the most cited study is the 2003 US Dept. of Justice study what cited a rearrest rate of 5.3% and a reconviction rate of 3.5%after 3 years.[20]  Over the years, many legal reformists recite the rearrest rate as the official recidivism rate. Many have even simply stated recidivism

AR-00001041

rate is just 5%. However, this is one study, and few individuals have even mentioned the large discrepancy (40%) between the rearrest rate and reconviction rate, nor is an explanation offered in the study itself.

The simplest definition of recidivism is the rate at which an offender will commit another crime. However, studies vary greatly on what constitutes "recidivism." Harris and Hanson's 2004 survey of available recidivism studies, found a variety of factors that greatly influence the final numbers of each study:

1. How the word "recidivism" is defined; re-conviction rates, re-arrest rates, informal reports to child agencies, self-reporting, violations of conditional release, or simply being questioned by police. The broader the definition, the higher the number, obviously.
2. Follow-up period: The longer the follow-up period, obviously the higher the number. However, the longer the individual remains offense free, the less likely the offender will be to re-offend
3. Diversity among sex offenders: Certain classes of offenders have differing re-offense rates
4. Determining the percentage of crimes that go unreported to the police. This is usually achieved by victimization surveys. One major problem, however, is the definition of "sexual assault." The researchers noted a study by Besserer and Trainor (2000) study, noting that study used "a very broad definition of sexual assault," including all unwanted forms of sexual touching and threats, and possibly "behaviors not conforming to the popular image of a sexual offense." The researchers noted that 59% of the respondents of this study stated the reason they did not report was because they felt the "incident was not important enough" to report. "Consequently, readers may wonder what counts as a sexual assault."[21]

The 1988 Practitioner's guide recognized the problem with defining recidivism. To the researchers in the report, the term "re-offense" was suggested as the term for rearrest or reconviction for a sexually based offense. They suggested that rearrest is the more liberal of the two rates but could compensate for possible underreporting.[22]  Most studies today use either rearrest rate, reconviction rates, or both. To reiterate, recidivism is generally used to define rearrest or reconviction for any offense, which could include supervision violations, whereas re-offense is typically used to measure the rate at which a previous convicted offender commits the same type of offense.

Some earlier reports referred to "sex specific" recidivism and "general" recidivism,[23]  but it is perhaps less confusing to use a separate term for re-offense rates, since people imply the rate at which someone convicted of a sex crime commits a subsequent sex crime as opposed to the rate at which someone convicted of a sex crime breaks any law or supervision rule.

Having a universal definition will help accurately reflect re-offense rates in America; using numbers from foreign nations or from old studies that largely lacked peer review and accurate record-keeping will not reflect current rates among registered citizens in the US. The reason for settling on a universal standard finds its basis in scientific research. Ellman recognized the differences between American re-offense rates and the re-offense rates in foreign countries, noting foreign recidivism rates would be different "without the distinctly harsh American system of long sentences and post-release restrictions."[24]  A 1989 meta-analysis of numerous studies also limited recidivism to North America, noting there are "myriad factors affecting the reporting of sex offenses, arrest and conviction rates, and re-offense records, which are likely to cause recidivism rates to be different in other countries." This study also noted the "methodological weaknesses and lack of uniformity," noting many previous studies on the era focused only on "a specific type of offender (e.g., pedophiles) or a specific treatment approach (e.g., hormonal treatments)." But even this 1989 study admitted to including unpublished studies, studies that only used as little as 10 subjects, and studies that were "without screening for scientific merit."[25]

Thus, for the sake of uniformity, this report will largely limit relevant studies written within the past 20 years in America and only those using rearrest and/or reconviction rates for determining re-offense (i.e., sex offense-specific recidivism). However, it is my belief that reconviction rates should be the gold standard, citing the discrepancy between rearrest and reconviction and the fallacy of assuming high rates of underreporting.

It is important to note there are indeed many ways to measure recidivism, and each form of measurement has drawbacks. Below are many of the types of measures you might find in various studies and the potential fallacy of reliance on particular measure:

1. Self-Reporting: Studies that have relied on self-reporting might find high numbers of reoffending, but self-reports often come from programs where inmates are rewarded by giving the desired answers. A recent example of this came from the debunked Butner study, which made the bold claim that 85% of inmates who were arrested for CP charges had also committed hands-on offenses that have gone undetected. One US District Court rejected that study, finding it "highly coercive," "not peer reviewed," and suffering from "methodological flaws."[26]
2. Rearrest Rates: The drawback to relying on rearrest rates is the probability that a person is arrested but not convicted of an actual re-offense. The landmark 2003 US Department of Justice study reported a 5.3% rearrest rate after 3 years, but only a 3.5% reconviction rate in that same period. That is a very large discrepancy the study failed to address.
3. Reconviction rates: In my personal opinion, reconviction rates offer the best standard for measuring re-offense because of the added filter of a court process. However, since the majority of cases are decided by pleas (even innocent people who plead guilty), that fact can still overestimate the results.
4. Re-incarceration rates: Since many people are placed on parole/ supervision upon release, many also return to prison for technical violations that may be sexual in nature (such as viewing adult porn) but not necessarily a sexual offense. The Ohio 10 year recidivism study released in 2001 broke down recidivism by type and found only 8% were recommitted for a re-offense while 3% were recommitted to prison on sex-related technical violations.[27]

While my personal viewpoint is that reconviction rates give the best indication of re-offense rates, most studies rely upon re-offense rates, so both rates are shared here.

One solution to clear up confusion with seeming fluctuating numbers would be to create an annual rate from these numbers. For example, we use annual rates to determine the average number of fatalities caused by lightning strikes [28] or the murder rate in a metropolitan area like Cincinnati.[29]  It makes sense from a practical standpoint, as many agencies are prone to cherry-picking the numbers that best align with their philosophy and goals.

**RECIDIVISM STUDIES**

Now that we have limited our look at re-offense to American studies from the past 20 years and only considering rearrest and reconviction for subsequent sex offenses, it is time to look at a number of studies meeting this criteria. (Since some studies show both rates, some studies will be repeated.)[30]

AR-00001042

*Reconviction Rates*

1. New York (1996): 34 of 556 SOs (6%) were reconvicted within 9 years of release.[31]
2. Iowa (2000): 14 of 434 (3.2%) were reconvicted within 4.3 years of release [32]
3. Ohio (2001): 70 of 879 (8%) were reconvicted after 10 years [33]
4. US Dept. of Justice/ Federal (2003): 339 of 9641 (3.5%) were reconvicted after 3 years [34]
5. Washington State (2005): 111 of 4091 (2.7%) reconvicted after 5 years [35]
6. Minnesota (2007): 10% of 3166 reconvicted after 8.4 years [36]
7. California (2008): 121 of 3577 (3.4%) reconvicted after 10 years [37]
8. Arizona (2009): 2 of 290 (0.7%) reconvicted after 3 years [38]
9. Connecticut (2012): 20 of 746 (2.7%) reconvicted after 5 years [39]
10. Nebraska Pre-AWA (2013): 48 of 2816 (1.7%) reconvicted after 2 years [40]
11. Nebraska post-AWA (2013): 6 of 209 (2.6%) reconvicted after 2 years [41]
12. Michigan (2014): 32 of 4109 (0.8%) reconvicted after 3 years [42]

*Rearrest Rates*

1. US Dept. of Justice (2003): 517 of 9641 (5.3%) rearrested after 3 years [43]
2. Rutgers U. (2005): 4.5% of 917 rearrested after 3.5 years [44]
3. Alaska (2007): 3% rearrested after 3 years [45]
4. Multistate Study (2009): After 3 years, each state in the study varied in rearrest rates:
   - Delaware: 3.8%
   - Illinois: 2.4%
   - Iowa: 3.9%
   - New Mexico: 1.8%
   - South Carolina: 4%
   - Utah: 9% [47]
5. New Jersey (2011): 13% of 274 pre-SOR SOs rearrested within 8 years; 9.7% of 248 post-SOR SOs rearrested within 8 years [47]
6. Florida/ New Jersey/ Minnesota/ South Carolina (2012): 153 of 1469 (13.7%) rearrested after 10 years [48]
7. US Department of Justice/ Federal (2014): 5.6% rearrested after 5 years [49]
8. California (2016): 78 of 1626 (4.8%) rearrested after 5 years [50]

Based on the numbers from this list, it is reasonable to assert that dozens of state, federal and University studies have found re-offense rates to be extremely low, with nearly all studies showing long term re-offense rates in the single digits. However, some continue to be unsatisfied with the results of the numerous studies. There is one major problem with citing the numbers of these studies, namely each study varies in the number of years. (It should also be noted that the US Dept. of Justice study was limited to child sex offenders and rapists, i.e., "hands on offenders," and only of those released from prison.) Again, this stresses the importance of a universal annual rate standard.

Below are the aforementioned studies adjusted into an Average Annual Rate:

*Average Annual Rate: Reconviction*

1. New York (1996): 0.66%
2. Iowa (2000): 0.74%
3. Ohio (2001): 0.8%
4. US Dept. of Justice/ Federal (2003): 1.16%
5. Washington State (2005): 0.54%
6. Minnesota (2007): 1.19%
7. California (2008): 0.34%
8. Arizona (2009): 0.23%
9. Connecticut (2012): 0.54%
10. Nebraska Pre-AWA (2013): 0.85% [51]
11. Nebraska post-AWA (2013): 1.3% [52]
12. Michigan (2014): 0.26%

*Average Annual Rate: Rearrest Rates*

1. US Dept. of Justice (2003): 1.77%
2. Rutgers U. (2005): 1.29%
3. Alaska (2007): 1%
4. Multistate Study (2009):
   - Delaware: 1.27%
   - Illinois: 0.8%
   - Iowa: 1.3%
   - New Mexico: 0.6%
   - South Carolina: 1.34%
   - Utah: 3%
5. New Jersey (2011): 1.63% pre-SOR SOs; 1.21% post-SOR SOs
6. Florida/ New Jersey/ Minnesota/ South Carolina (2012): 1.37%
7. US Department of Justice/ Federal (2014): 1.12%

AR-00001043

   8. California (2016): 0.96%

When adjusted into a yearly average, the annual re-arrest/reconviction rates hover at a mere 1% rate for the majority of studies. It is no small wonder many organizations and possibly some researchers show reluctance to adopt this universal standard.

**REOFFENSE FACTORS**

There is one key caveat in discussing recidivism studies—each study assigns overall risk to an individual whose risk factors may be higher or lower. A number of factors influence the likelihood of reoffending, such as the length of time since an offender's release, the type of offense committed, whether or not the offender received treatment, and whether or not the offender has multiple convictions on his record. It is also important to address the underreporting myth and a misleading statement that comes from the US Department of Justice study.

*The Recidivism Curve: Reoffense risk lowers the longer one has been free from incarceration*

Recidivism studies function the same way—you take a pool of offenders and follow them for a set amount of time (generally a number of years), and count how many are accused or convicted of another sex crime after sentencing or release from prison. It sounds simple enough, but the problem with determining averages is a higher number raises the average. Cumulative totals break the law of gravity—what goes up never goes down. Cumulative totals give imperfect numbers that assign a universal number that may be too high for low-risk individuals.

The Ohio DRC found that "Sex offenders who returned for a new sex related offense did so within a few years of release.  Of all the sex offenders who came back to an Ohio prison for a new sex offense, one half did so within two years, and two-thirds within three years." [53]

A 2009 NY Recidivism study found that sex offence recidivism rates after 1 year were 2%, 3% after five years, 6% after 5 years, and 8% after 8 years. [54] A 2008 California study found a 2.21% recidivism after 1 year of release, 2.94% recidivism after 2 years of release: 3.3% recidivism after 5 years of release, and 3.38% after 10 years of release. The study concluded, "The total of sexual recidivists is lower than some might have believed. Most re-offenses and parole violations occur in the initial period of reentry after release. Sex offenders are more likely to commit some other type of offense than to commit a new sex offense." [55]

Researchers Karl Hanson and Andrew Harris noted, "Another factor to consider is the length of the follow-up period.  As the follow-up period increases, the cumulative number of recidivists can only increase.  It is important to remember, however, that an increase in the number of recidivists is not the same as an increase in the yearly rate of recidivism.  For all crimes (and almost all behaviours) the likelihood that the behaviour will reappear decreases the longer the person has abstained from that behaviour.  The recidivism rate within the first two years after release from prison is much higher than the recidivism rate between years 10 and 12 after release from prison."[56]  Harris and Hanson found that the 5 year recidivism rate for offenders who have been out  of prison five years was 7%; among offenders out 10 years, 5%; and among offenders out 15 years, 4%. [57]

As previously noted, the Harris and Hanson study's results for overall recidivism study was not used to determine American re-offense rates because the Harris and Hanson study included foreign recidivism data. However, many advocate groups quote this study, at least seemingly in part because it gives a higher number than American studies. The Harris and Hanson study offered recidivism rates for 5 year increments, with an overall cumulative recidivism rate after 14% after 5 years, 20% after 10 years, and 24% after 15 years. Put another way, in the first five years, overall re-offense rates were 14%, but between years 5-10, 6% of the cumulative total reoffended, and between 10-15 years, only 5% reoffended, which validates the study's proclamation that "an increase in the number of recidivists is not the same as an increase in the yearly rate of recidivism.

Harris and Hanson conducted a follow-up study in 2014, categorizing subjects by perceived risk levels based upon actuarial risk-assessment test (specifically, the Static-99R). "As can be seen from Figure 1, the risk of reoffending was highest in the first few years following release, and declined thereafter. This pattern was particularly strong for the high-risk offenders. During the first year after release, 7% reoffended, and during the first five years after release, a total of 22% reoffended... No high-risk sexual offender in this sample reoffended after 16 years offense-free (126 high-risk cases started year 17, of which 61 were followed for 5 years or more). … Whereas the 10-year sexual recidivism rate of the high-risk offenders from time of release was 28.8%, the rate declined to 12.5% for those who remained offense-free for 5 years, then 6.2% for those who remained offense free for 10 years... A 10-year sexual recidivism rate of 6.2% for the high-risk group (10 years offense-free) was less than the expected rate of moderate risk offenders from time-at-release (10.4%)… Inspection of Table 2 indicates that the expected recidivism rates were approximately cut in half for each 5 years that the offender was sexual offense-free in the community. For example, the 5-year sexual recidivism rate of the high-risk groups was 22.0% at release, 8.6% after 5 years, and 4.2% after 10 years offense-free. The same pattern applied to the moderate risk offenders (and the full sample). In contrast, the recidivism rates for the low-risk offenders were consistently low (1%-5%), and did not change meaningfully based on years offense-free. For example, the 10-year sexual recidivism rate for the low-risk offenders was 3.1% from time of release and 3.4% for those who remained offense-free in the community for 10 years." [58]

The 2014 Hanson et al. study concluded, "The purpose of this study was to examine the extent to which high-risk sexual offenders remain high risk over time. As has been found for general offenders and violent offenders, the risk of sexual recidivism was highest in the first few years after release, and then decreased the longer they remained offense-free in the community. The decline in hazard rates was greatest for sexual offenders who had been identified as high risk at time of release. For low-risk offenders, time free had little influence: their risk was consistently low (1%-5%). The same relative risk reductions were observed for subgroups categorized by age at release, treatment involvement, country, and victim type. The current findings indicate static risk factors (e.g., prior offenses, victim characteristics) are valid, but time-dependent, markers for risk-relevant propensities. If high-risk sexual offenders do not reoffend when given the opportunity to do so, then there is clear evidence that they are not as high risk as initially perceived. The current study found that, on average, their recidivism risk was cut in half for each 5 years that they remained offense-free in the community." [59]

The 2014 Hanson et al. study found that in time, the recidivism risk posed by most offenders becomes equal with that of-non-sexual offenders released from prison, and recidivism risk is generally cut in half for each five-year increment an offender is free in the community: "Although the moral consequences of sexual offending may last forever, the current results suggest that sexual offenders who remain offense-free could eventually cross a 'redemption' threshold in terms of recidivism risk, such that their current risk for a sexual crime becomes indistinguishable from the risk presented by nonsexual offenders. Previous large sample studies have found that the likelihood of an "out of the blue" sexual offense committed by offenders with no history of sexual crime is 1% to 3%: 1.1% after 4 years (Duwe, 2012); 1.3% after 3 years (Langan, Schmitt, & Durose, 2003); 3.2% after 4.5 years (Wormith, Hogg, & Guzzo, 2012). In

comparison, only 2 of 100 moderate-risk sexual offenders in the current study committed a new sexual offense during a 5-year followup period if they were able to remain 10 years offense-free in the community. The high-risk offenders in the current sample, however, never fully resembled nonsexual offenders. Although their recidivism rates declined substantially when they were 10 years offense-free, the 5-year recidivism rate of the initially high-risk offenders (4.2%) was still higher than the expected rate for nonsexual offenders (1%-3%)." [60]

The bottom line is that even for those registrants labeled a "high risk," recidivism dramatically decreases, and that recidivism decreases dramatically within the first three to five years of release. Many researchers agree that emphasis on rehabilitation should focus on the first three years of release.

*Offense Types do play a role in recidivism, but beware of stat manipulation*

While the Harris and Hanson study is not useful to determine American reoffense rates, it is still useful for showing recidivism differences between specific offense types, implying a need to divide recidivism rates by offender type. In order from, least likely to re-offend to most likely to re-offend (in parentheses, recidivism rates after 5 years, 10 years, and 15 years):

1.   Extended Incest Child Molesters (6%, 9%, 13%)
2.   "Girl Victim" Child Molesters (9%, 13%, 16%)
3.   Rapists (14%, 21%, 24%)
4.   "Boy Victim" Child Molesters (23%, 28%, 35%)

Also worth noting, the Harris and Hanson study also found that one time offenders (10%, 15%, 19%) reoffended lower than those who had two or more prior convictions (25%, 32%, 37%). [61]

A 2005 study by Seto and Eke found that those convicted of child pornography offenses alone reoffended at a lower rate than an offender arrested for both CP offenses and other sex crimes. They also found a 6% CP recidivism rate with a 4% rate for a contact sexual offense among 201 subjects of varying periods with an average follow-up period of about 2.6 years. "Child pornography offenders who had ever committed a contact sexual offense were the most likely to reoffend. These group differences could be detected even though the overall rate of sexual recidivism was low (4%). Only one of the offenders with only child pornography offenses committed a contact sexual offense in the follow-up period." [62]

A Marshall and Barbaree 1990 study found an even greater discrepancy between those sex offenders with the lowest recidivism rates (Incest offenders, 4% -10%) and those with the highest (Exhibitionists, 41%-71%). [63]

Breaking the general "sex offender" group into specific offense categories could be seen as integral for risk management.

*The Myth and Misrepresentation of "Unique Risk" and the "Degree of Specialization"*

"Sex offenders are four times more likely to re-offend sexually than non-sex offenders" is a mantra that proponents of sex offender legislation love to quote often, even influencing the outcome of the McKune v Lile case. The 2003 US Dept. of Justice study notes 5.3% of sex offenders released in 1994 were arrested for a new sex offense in 3 years, while 1.3% of all non-sex offenders were arrested for a sex crime. There are two issues with this line of logic.

First of all, specialization is no more common for sex offenders than any other type of offender; thieves are more likely to steal, drug offenders are more likely to commit drug crimes, et cetera. Furthermore, strong evidence suggests people convicted of sexual offenses actually specialize at a lower rate than most other offenses. The 2000 Michigan Parole Board study shows people convicted of sexual offenses committed subsequent sexual offenses (2.46%) at a lower rate than forgers committing forgery (6.86%), burglars committing burglary (10.56%), robbers committing robbery (5.17%), drug offenders committing drug crimes (6.42%),  and larcenists committing larceny (12.65%). [64]

"Langan and Levin found that 2.5% of rapists were rearrested for rape within three years of release from prison and the DOJ found that 3.3% of child molesters were arrested for another sex crime against a child during that same period. In contrast, during that same three year period, Langan and Levin found that 13.4% of robbers were rearrested for robbery; twenty-two percent of assailants were rearrested for assault; 23.4% of burglars were rearrested for burglary; 33.9% of thieves were rearrested for larceny/theft; 11.5% of car thieves were rearrested for the same; and 41.2% of drug offenders were rearrested for a drug crime. The only released offenders who had a lower specialized recidivism rate than rapists and child molesters were those who had been convicted of homicide. Just 1.2% of offenders were rearrested for homicide within three years after release from prison"[65]

Secondly, the statement takes places emphasis on people convicted of recidivist sexual offenses, while failing to address the fact people convicted of sexual offenses commit only a small percentage of sex crimes that occur every year. Going by number of offenders rather than percentages, The 2003 US Dept. of Justice study found that 517 sex offenders committed a new sex crime, while 3,228 non-sex offenders committed sex crimes, roughly six times the number of sex offenders committing sex crimes. Consider also the following statistic from the US Dept. of Justice (1997) study which found 86% (about 6 of 7) of inmates in prison on sex crimes were first time offenders; only 14% had previous sex crimes.[66]  Thus, this misleading statement convolutes the bigger picture and is a nonsensical stat promoted simply to increase fear of people convicted of sexual offenses.

*The Underreporting Myth*

One of the most prevailing myths tied to recidivism as a way to downgrade the dozens of studies concluding re-offense rates among those convicted of sexual offenses as low is the opinion that large amount of recidivism goes undetected. This myth persistently pops up in conversations about recidivism despite a lack of evidence of any connection between recidivism rates and reporting. The statement is a red herring designed to connect the two assumptions together to make the receiver of the message assume a high number of unreported sex crimes must be the result of registered sex offenders, in turn justifying stricter sanctions. Because there is no true way of proving or disproving the amount of unreported sex crimes, victim industry advocates can proclaim astronomical claims of 90% or more undetected crim4es without worrying about expert rebuttals.

The 2004 Hanson and Harris study discussed the difficulty in addressing underreporting long before the explosion of sexual misconduct claims in the latter half of the 2010s:

"The Besserer and Trainor (2000) study showed that sexual assault had the highest percentage of incidents that were not reported to police (78%).  When respondents were asked why they did not report sexual victimization to the police, 59% of the respondents stated that the "incident was not important enough" to report.  Consequently, readers may wonder what counts as a sexual assault. The Besserer and Trainor (2000) victimization study used a very broad definition of sexual assault.  They counted all attempts at forced sexual activity, all unwanted sexual touching, grabbing, kissing, and fondling, as well as threats of sexual assault (Jennifer Tuffs, personal communication, January 15, 2003). Their broad definition undoubtedly included some behaviours that do not conform to the popular image of a sexual offence. All unwanted sexual advances are wrong, possibly criminal, and have the potential to do psychological harm to the victim.  As a society, however, we need to decide whether we wish to count an unwanted touch on the buttocks as an unreported sexual crime.  Coming to an agreement on what constitutes a sexual crime will be a difficult task."[67]

The US Department of Justice conducts the "National Crime Victimization Survey" (NCVS) biennially, which measures various crime statistics, whether reported or not. The NCVS studies estimates of non-reporting and the reasons for non-reporting. The 2003 NCVS found that 67.3% of rapes and attempted rapes (attempts included verbal threats of sexual violence) and 53.2% of sexual assaults go unreported (Table 91). The NCVS found numerous reasons for lack of reporting; the reasons are as follows: Private/ Personal matter (17.1%), Offender unsuccessful (11.4%), Fear of reprisal (11.2%), Lack of proof (10.6%), Police would not want to be bothered (7.4%), Reported to another official (7.1%), Not aware crime occurred until later (4.9%), Not important enough (3.7%), Police inefficient, ineffective, biased (3.7%), Too inconvenient, time consuming (3.7%), No way to ID (2.8%), and "Other reasons" (18%). [68]

One major influence in the decision to report a crime is victim-offender relationship.  The 2005 NCVS [69] Table 104 illustrates this major difference between non-reporting with a stranger offender and an offender known to him. Among the top reasons for non-reporting when a stranger is involved: Reported to another official (49.6%), Police don't want to be bothered  (19.9%), Offender unsuccessful (12.7%), Fear of reprisal (11%), and Police inefficient, ineffective, or biased (6.9%). Among the top reasons for non-reporting when a non-stranger is involved: Other Reasons (47%), Private or personal matter (31.1%), Police don't want to be bothered (10.8%), Report to another official (5.1%), Police ineffective, inefficient, biased (2.8%), and Too incontinent, time consuming (2.4%).

The NCVS defines sexual assault as "A wide range of victimizations, separate from rape or attempted rape. These crimes include attacks or attempted attacks generally involving unwanted sexual contact between victim and offender. Sexual assaults may or may not involve force and include such things as grabbing or fondling. Sexual assault also includes verbal threats." Rape is defined as "Forced sexual intercourse including both psychological coercion as well as physical force. Forced sexual intercourse means vaginal, anal or oral penetration by the offender(s). This category also includes incidents where the penetration is from a foreign object such as a bottle. Includes attempted rapes, male as well as female victims and both heterosexual and homosexual rape. Attempted rape includes verbal threats of rape."

The NCVS is very thorough, but there are a few problems. Firstly, it combines actual crimes with threats of crimes in many places; Table 1 of the NCVS divides reported rapes (72,240) and attempted rape (44,650), but combines sexual assault with attempt (81,950). Secondly, the reports are limited to crimes involving people age 12 and older, no children.  Thirdly, the phrase "verbal threats" is a rather vague term. Still, the NCVS is the most likely source for under-reporting estimates. That being said, there are many reasons why certain crimes go unreported.

In an attempt to rectify certain issues with the NCVS, the DOJ conducted a study called "Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics" in 2000. [70]  Since the NCVS only relates to victims 12+ years of age, the study relied on the FBI's National Incident-Based Reporting System (NIBRS).  While there is no feasible way to survey children on unreported sex crimes, this study offers up another X factor to further complicate the issue: the number of sexual assaults committed by juveniles who are likely not a registered sex offender. The study found that juveniles made up 23.2% of total sex crimes against children: 40% of children under age 6 and 39% of offenders against children ages 7-11 were juveniles; and the single age with the greatest number of offenders is 14 (p. 8).

The unreported numbers reported in the NCVS had been steadily declining over the first decade of the new millennium, yet is rising in the 2010s. No adequate explanation or assumption is offered in the NCVS reports. It could be speculated that increased exposure to awareness campaigns such as the campus sexual assault stories, #MeToo and sex trafficking stories that have dominated the airwaves during the 2010s have influenced these numbers, but there are no studies that have studied this phenomenon, so the impact of these campaigns on the number of unreported reports cannot be full determined (remember: correlation is not causation). The numbers from the NCVS below should be taken only with extreme caution given the nature of our ever-changing definitions of sexual assault.

- 2003 NCVS: 67.3% of rapes and attempted rapes (attempts included verbal threats of sexual violence) and 53.2% of sexual assaults go unreported
- Between 2003-2005, sex assaults/ rapes were consolidated
- 2005 NCVS: 61.7% of rapes/ sexual assaults go unreported
- 2010 NCVS: 50% of rapes/ sexual assaults go unreported [71]
- 2014 NCVS: 66.4% of rapes/ sexual assaults go unreported [72]
- 2016 NCVS: 77% of rapes/ sexual assaults go unreported [73]

Researcher Debra Patkin states that under-reporting for crime in general is under-reported; citing the 1999 NCVS, Patkin notes 64% of overall crime goes unreported [74]. Thus, the idea that sex crimes go reported at a uniquely higher rate than other crimes is another myth.

In short, it is rather difficult to sufficiently determine just how many factors impact the ability to estimate exactly how many crimes go unreported. On one hand, there are a number of sex crimes going unreported. On the other hand, what are the reasons for the under-reporting? Also, how do we even determine a base number to use to determine the total number of actual sex crimes being committed by people old enough to be sexual recidivists?  Do we count verbal threats as bona fide sex crimes or not? In fairness, what about the number of false allegations? A number of recent exonerations of convicted rapists as a result of DNA evidence immediately come to mind. And sadly, sex crimes are typically he-said-she-said events. Even if we could somehow come up with a formula that accurately portrays the amount of unreported crimes in general, how can we truly determine the number of registered citizens that have committed these acts? In reality, this line of thinking merely serves to attempt to downplay an undesired result, namely, people convicted of sexual offenses have a lower recidivism than other offenders.

AR-00001046

*The Impact of Megan's Law on Recidivism*

Proponents of Megan's Law argue the low re-offense rates are the result of the impact of Megan's Law, but no studies have reached such a conclusion. A 2008 study found no significant changes in sex crime rates in the 10 years prior to and after the enforcement of Megan's Law in New York State in 1997. "[R]esults of the analyses indicate that the 1996 enactment of SORA (and thus the beginning of the registry) had no significant impact on rates of total sexual offending, rape, or child molestation, whether viewed as a whole or in terms of offenses committed by first-time sex offenders or those committed by previously convicted sex offenders (i.e., repeat offenders)."[75]  It is important to note that a number of researchers warn Megan's Law might actually contribute to recidivism through the stress and ostracism it creates. Psychologist John Q. LaFond points out a Washington state study that found notification laws do not prevent crime; instead, it leads to quicker  arrest times, either by the constant scrutiny, or by disrupting employment, housing, and support for the sex offender, causing stress and increasing the likelihood of recidivism.[76]

"As former offenders are denied opportunities to reintegrate into society and stigmatized, they lose hope. Stigmatized offenders are more likely to recidivate than reintegrated offenders, as the resistance to recidivate diminishes among offenders who are ostracized. On the other hand, a 'pro-social identity,' including concrete recognition of their reform, is integral to reducing recidivism."[77]

"Employment problems experienced by the RSO, and subsequent financial hardships, emerged as the most pressing issue identified by family  members. The likelihood of housing disruption was correlated with residential restriction laws; larger buffer distances led to increased frequencies of housing crisis. Family members living with an RSO were more likely to experience threats and harassment by neighbors. Children of RSOs reportedly experienced adverse consequences including stigmatization and differential treatment by teachers and classmates. More than half had experienced ridicule, teasing, depression, anxiety, fear, or anger. Unintended consequences can impact family members' ability to support RSOs in their efforts to avoid recidivism and successfully reintegrate."[78]

There is one other important issue to consider in discussions about disruptions to stable lives of former offenders-- Failure To Register (FTR). Often, registrants arrested for failure to register can exacerbate the myth of recidivism since news reports often highlight the relatively few arrested during a "compliance check" operation. [79] A 2018 report published on The Appeal found that more than three times as many registrants were arrested for an FTR than for suspicion of committing a sex crime in Franklin Co., PA in 2016. [80] . A 2010 study found FTR had not influence on sex crime rates whatsoever: "With respect to failure to register (FTR) as a sex offender, no significant differences were found between the sexual recidivism rates of registered offenders with FTR charges and those without FTR charges (11% vs. 9%, respectively). There was no significant difference in the proportion of sexual recidivists and nonrecidivists with registration violations (12% and 10%, respectively). Failure to register did not predict sexual recidivism, and survival  analyses revealed no significant difference in time to recidivism when comparing those who failed to register (M = 2.9 years) with compliant registrants (M = 2.8 years)." [81]

**OUTRAGEOUS CLAIMS: Addressing the controversial Langevin and Prentky Studies**

Two influential studies stand out as having the most outlandish recidivism claims, the 1997 Pentky study, which claims child molesters have a recidivism rate of 52%, and the 2004 Langevin study, which makes a bold claim that "sex offenders" have a 90%-94% recidivism rate. Oftentimes these studies are used by victim industry advocates and lawmakers when promoting draconian sex crime legislation.

*The Prentky Study: Outdated, Limited Data*

The 1997 Prentky study made the controversial claim that after 25 years sex offenders' recidivism is 52% for child molesters and 39% for rapists.[82]  Prentky's findings were cited in amici briefs filed in favor of the registry during the Smith v Doe hearings. However, there were a number of issues with this study. First, eAdvocate points out Prentky himself offered a warning against applying his study to determine long-term recidivism in a subsequent study: "We would like to conclude with two important caveats. The obvious, marked heterogeneity of sexual offenders precludes automatic generalization of the rates reported here to other samples." Prentky's warning, however, was not in the study that first mentions this study, but in a later study in the series.[83]

The study involved recidivists who were civilly committed between 1959 and 1985. "It was also the case that Prentky's sample of molesters were highly likely to recidivate because they were convicted of many more sex offenses (N=4.6) than a more typical sample of incarcerated sex offenders, about 90% of whom have been convicted of only one sex offense."[84]

One thing that critics have failed to point out is that the 52% number is not the actual re-offense rate, but an estimate called the survival or failure rate, "i.e., the estimated probability that child molesters would 'survive' in the community without being charged, convicted, or imprisoned for a sexual offense over the 25-year study period."[85]  The actual re-offense rates of the previously-committed repeat offenders were actually similar to the findings by the later Harris and Hanson study. It should be noted the actual length of the study period varied by subject, since each subject was released over a 25-year span. Overall, 32% of those in the study were rearrested with an average length of 3.64 years before re-arrest, and a 25% reconviction rate with an average time frame of 3.98 years before reconviction.[86]  In terms of actual numbers, 78 out 115 subjects were never charged with any offense, 8 were charged but not convicted, and 29 were convicted of a subsequent sex crime.[87]  Like many other recidivism studies, most offenses occurred within the first few years of release.

Even the SMART Office recognizes the Prentky study's flaws: "Prentky and colleagues acknowledged that generalizing the recidivism rates found in the study to other samples of sex offenders was problematic due to the 'marked heterogeneity of sex offenders,' but they also suggested that the 'crucial point to be gleaned from this study is the potential variability of the rates' and not the specific rates themselves."[88]

In short, the Prentky Study is merely an estimated rate of success of a group of recidivists based upon a complex but convoluted formula. The actual rates of failure by the hard numbers don't support the 52% estimate for the small number of repeat offenders, much less people labeled "sex offenders" as a collective unit. Even Prentky warns the results are not indicative of those on the registry in general.

*The Langevin Study: The Study Purged Non-Recidivists from the Results*

There is one major similarity between the Prentky Study and the Langevin study,[89] particularly the reliance on data from a single civil commitment center as well as the 25-year follow-up period. However, Langevin's study differs in two ways—it purged people without rearrests after 15 years, and it expanded the

AR-00001047

definition of recidivist to include crimes committed before subjects were to be included in the study.

Writing for Corrections.com, Chris Dornin found that Langevin's unusual methodology led to unusual results: "Langevin reported a 61.1 percent sex crime recidivism rate, including 51.1 percent for incest. The researchers also tabulated confessions the offenders made during counseling and new arrests that failed to bring convictions. Adding those presumed crimes to actual convictions increased the overall sexual recidivism rate to 88.3 percent, including 84.2 percent for incest. Measured this way, molesters of young children outside their own family had an even higher rate, 94.1 sex crime recidivism over 25 years. To this writer's knowledge, that is the highest reported rate in any of the hundreds of existing recidivism studies. It underlies much of the widespread belief that all sex offenders are incurable and unrepentant." [90]

Non-recidivist records were purged from the Langevin study's final tally. Karl Hanson, noting his understanding of the difficulty of maintaining records after 15 years, added, "It appears that the way in which Langevin, Curnoe, Fedoroff, Bennett, Langevin, Peever, Pettica, and Sandhu (2004) dealt with missing data inflated the observed recidivism rates of their sample. In an earlier report of the same data set, Langevin and Fedoroff (2000) reported that they were able to obtain follow-up criminal history records for 378 (54%) of the first 700 cases assessed at Dr Langevin's clinic between 1969 and 1974. In the 2004 report, the offenders lacking criminal history records in 1994 and 1999 were eliminated from the sample. Such a decision would retain recidivists and eliminate non-recidivists. The RCMP policies for retaining criminal history records have changed through the years, but they have always been more inclined to keep the records of active offenders (recidivists) than to keep those of inactive offenders (non-recidivists). In 1993, for example, the purge policy was that all convictions would be removed from the RCMP database if the offender (a) died, (b) was pardoned, or (c) attained age 70 and had no criminal activity for 10 years, or if (d) there was no recorded criminal activity for 15 years, provided that the offender was not the subject of a current investigation (Purge Unit, RCMP 1993). Given that the follow-up period in Langevin's study was more than 15 years, all of the inactive (non-recidivist) offenders should have been deleted from the RCMP database. By selecting offenders from the 1960s with active criminal history records in the 1990s, researchers should expect to find recidivism rates close to 100%" [91]

Hanson also noted that Langevin "used an unusual definition of recidivism that includes both prior offences and…future offences (the usual definition of recidivism)…. In the 378 cases with follow-up information, 139 (36.8%) had subsequent convictions for sexual offences. This figure is very similar to the long-term sexual recidivism rate (35.1%) found for another group of sexual offenders (child molesters) from Ontario in the 1960s and 1970s followed using RCMP records (Hanson, Scott, and Steffy 1995)." [92]

Indeed, Langevin's definition to recidivism included crimes committed BEFORE the study began, which is different than every study before or after this study was published. "In a rebuttal entitled "Results by Design: The Artefactual Construction of High Recidivism Rates for Sex Offenders," Webster said more than half the individuals in the sample were already recidivists by Langevin's definition at the time of their evaluations, thus ensuring at least a 50 percent recidivism rate. In the rest of the literature on criminology and in the popular press, recidivism generally means a new crime committed after release from prison." [93]

A 2006 study also condemned the Langevin study as fatally flawed: "A detailed analysis of the study demonstrates that this unusually high level is uninterpretable because the offenders whose criminal careers were followed are unlikely to be representative of sex offenders in general. Furthermore, the measure of recidivism used in the study not only distorts the normal meaning of recidivism but also artefactually creates an inflated - and consequently meaningless - recidivism rate." [94]

The Langevin study relied on a flawed definition of recidivism and purging non-recidivists (or at least a lack of any evidence of recidivism) to come up with a meaningless study.

**LOW RECIDIVISM SUPPRESSION ATTEMPT**

A 2018 study by Tamara Rice Lave and Franklin E. Zimring found the California Department of Mental Health suppressed a study by Dr. Jesis Padilla showing just 6.5% of untreated sexually violent predators were arrested for a new contact sex crime within 4.8 years of release from a locked mental facility (1.35% average annual rate). "A person with a score of six on the Static-99 was estimated as having a 36% chance of being convicted of a new sexually violent offense within five years of release, a 44% chance of being convicted of a new sexually violent offense within ten years of release, and a 53% chance of being convicted of a new sexually violent offense within fifteen years of release.136 That means that the released SVPs performed much better than expected based on their Static-99 score. The difference is that much more striking considering that Padilla used arrests to measure recidivism, and the creators of the Static-99 used convictions. Since many arrests do not end up in a conviction, the disparity would have been even greater if they had both used arrests as their basis of measurement." [95]

Lave and Zimring found that efforts to censor Padilla began when  Jon de Morales, the new head of the Sex Offender Commitment Program, accused Padilla and Russell of illegally accessing criminal history from a particular database called CELTS. The doctor was cleared of any wrongdoing after a 6 month investigation in 2007. After Morales took over the Atascadero civil commitment program, Morales shut down Padilla's study, forced Padilla to turn over all files, then had the files destroyed.

"Padilla and Russell attempted to continue the study. They were told that because they were doing basic research and not program evaluation, they would have to reapply. They submitted a new proposal to Atascadero, but were told to go through DMH. They sent the proposal to DMH, but DMH said they could not evaluate the proposal because they did not have a human subjects committee. They then sent the proposal to the Health and Human Services committee which oversaw DMH. Padilla received a call from the Head of Human Subjects who told him that it was program evaluation and not basic research. They then went back to DMH, but DMH said they had to go through Atascadero. They were now eighteen months into the process, and it took Atascadero a few more months to respond.Finally, on March 13, 2008, Morales sent them a memorandum informing them that they could not conduct the recidivism study because they would need "legislation or approval from the Department of Mental Health" to access the CLETS, and "[n]either ASH nor DMH would permit 'volunteers' to conduct this research." At first, the Department of State Hospitals (DSH) denied having any info on Padilla's study; only after Lave and Zimring shared Padilla's documents did DSH make a serious attempt to find the study files. Upon receiving them, Padilla confirmed someone tampered with the files. [96]

Lave and Zimring concluded they have no definitive answer as to why the study was suppressed. "The only explanation we have comes from Jon De Morales's June 8, 2007 memorandum in which he writes, 'to conduct research of this type, one would need to follow Special Order 288 and gain separate approval

AR-00001048

from the DOJ to have access to criminal Offender records.' We are dubious of this explanation for two reasons. First, we reviewed Special Order No. 228, and it does not say anything about the special approval Morales claimed was necessary. Second, just one month before, the independent investigation had determined that Padilla and Russell did nothing wrong in accessing these records, even without the special approval supposedly necessary." However, one legitimate reason why the study was suppressed  was because recidivism rates were far lower than expected (6.5% after 5 years, far lower than the 36% estimated by the STATIC-99), a fact that surprised even Padilla. "Perhaps higher-ups at DMH had not initially paid attention to the study because they did not expect the results," Lave and Zimring added. "Once Padilla testified, DMH may have realized the study had to be stopped because it threatened the legitimacy of the entire SVP program. As explained earlier, the only constitutionally acceptable rationale for SVP commitment is that offenders are so dangerous that they must be locked away, and this study showed otherwise. If the SVP law were to be declared unconstitutional, it would threaten the $147.3 million annual budget DMH (and now Department of State Hospitals) receives for the civil commitment program. People have done far worse than bury a study for a hundred million dollars." [97]

Lave and Zimring argues the study is important because if it can be proven that most civilly committed sexual offenders do not re-offend, it may dispel the belief that civil commitment is a necessary institution. "[I]f SVP laws were to be declared unconstitutional, it would have a tremendous financial impact on the institutions used to house and treat SVPs." Indeed, $288.8 million in taxpayer funds were at stake in this industry. [98]

**MORE REGISTERED PERSONS RETURN TO PRISON FOR FAILURE TO REGISTER THAN FOR SEX OFFENSE RECIDIVISM**

For most of this article, the focus has been on sex-specific re-offenses rather than for overall recidivism rates. Unfortunately, the general public does not understand the difference, thanks in part to the ignorance of mainstream media and legislatures. When people think "recidivism," they think about the number of those convicted of sex offenses committing another sex crime, not being returned to prison for any offense type. They will often confuse rates for any crime type (recidivism) and sex-specific (reoffense) rates and assume people convicted of sexual offenses are a unique threat to society.

In reality, sex crime recidivism is the least likely reason a person convicted of a sex offense returns to incarceration.

According to the 2014 California Dept. of Corrections and Rehabilitation Outcome Evaluation Report, 5522 (65.2%) of the 8471 persons convicted of sex offenses released from the CDRC in the 2009-2010 Fiscal Year were returned to prison within 3 years of release. But of those 5522 returns:

- 5074 (91.9%) returned on a parole violation;
- 294 (5.3%) returned on a new non-sex crime;
- 109 (2%) returned for a "Failure To Register" Offense; and
- 45 (0.8%) returned for a new sex offense [99]

Taking those not arrested into account, only 0.5% of persons convicted of sex offenses (45 of 8471) were returned to prison for a new sex offense within 3 years of release.

Later recidivism rates published by the California CDRC removes "parole violations" in the data and uses re-conviction rates instead of re-incarceration rates, but the end result still shows sex crime convictions are lower than arrests for Failure To Register cases. Of the 3,298 offenders convicted for sex offenses released in the 2014-2015 Fiscal Year, 1040 (31.5%) were re-convicted of a crime. Of those 1040 re-convictions:

- 399 (38.4%) were convicted of a misdemeanor non-sex crime (38.4 percent or 399 offenders);
- 379 (36.4%) were convicted of a felony non-sex offense;
- 198 (19.0%) were convicted for a Failure To Register offense;
- 44 (4.2%) were convicted of a felony sex offense; and
- 20 (1.9%) were convicted of a misdemeanor sex offense. [100]

Taking those not arrested into account, only 1.9% of persons convicted of sex offenses (64 of 3298) were re-convicted a new sex offense within 3 years of release.

**CONCLUSION**

Trying to come up with a simple, yet conclusive, hard number for such a complex subject as re-offense rates for those convicted of sexual offenses is difficult. There should be a universal standard, however, and the evidence presented here suggests a superior method of presenting a true recidivism rate should be an average annual percentage rate based upon reconviction rates. Dividing the recidivism rate by the number of years in the numerous, recent, and existing studies that focused on reconviction rates show an average recidivism rate of roughly 1% per annum. One caveat in settling on a single number for determining recidivism is that it does not take into account the factors that influence an individual recidivism rate, such as length of time since the last offense/ release from corrections, the offense type, and the number of prior offenses may influence the overall rates. In addition, it is important to remember many recidivists will commit their offenses within the first three years or so after release.

Criticism of this method will undoubtedly come from agencies that rely on Predator Panic for funding; many rely on a combination of myths (more likely to reoffend, underreporting) and studies that promote their beliefs that all people who are convicted of sexual offenses reoffend (such as the Prentky and Langevin studies). However, each approach is the result of skewed numbers arising primarily from assumptions. The hard numbers simply do not support the assumption that those convicted of sex crimes pose a unique threat to society.

It is reasonable to conclude that dozens of state, federal, university, and even international studies have consistently concluded that recidivism among those convicted of sex crimes are extremely low. This conclusion invalidates the belief that a unique and draconian series of laws are necessary in our society.

**REFERENCES**

1. Jones, Brittany. "Petition gains support for 'Cherish Law.'" ABC 27 WTXL. Raycom Media. 3 Sept. 2013. Web. < http://www.wtxl. com/news/petition-gains-support-for-cherish-law/article_d6793758-14e5-11e3-b07f-0019bb30f31a.html>

AR-00001049

2. Sullum, Jacob. "Perverted Justice." Reason.com. 14 June 2011. Web. <http://reason.com/archives/2011/06/14/perverted-justice/singlepage>

3. Abrahamsen, David. "Family Tension, Basic Cause of Criminal Behavior." Basic Cause of Criminal Behavior, 40 J. Crim. L. & Criminology 330 (1949-1950). Journal.

4. Bassler, Will. "So Why are the Reconviction Rates So Important?" SOSEN.org. 26 June 2017. Web. <http://sosen.org/blog/2017/06/26/so-why-are-the-reconviction-rates-so-important-2.html>

5. Jenkins, Philip. Moral Panic: Changing Concepts of the Child Molester in Modern America. Vail-Ballou Press. 1998. p39-40

6. Ibid., p.15

7. "The (New York City) Mayor's Committee Reports on the Study of Sex Offenses." Journal of Criminal Law and Criminology (1931-1951) Vol. 34, No. 5 (Jan. - Feb., 1944), pp. 324-327. Journal.

8. Tappan, Paul. "New Jersey Commission on the Habitual Sex Offender." Tenton Publishing. 1950. Book.

9. Supra., Jenkins, p.98-100

10. Ibid., p.120-126

11. Liptak, Adam. "Did the Supreme Court Base a Ruling on a Myth?" NY Times. 6 Mar 2017. Web. <https://www.nytimes.com/2017/03/06/us/politics/supreme-court-repeat-sex-offenders.html?_r=0>

12. Brown, Raymond C. and Moore, John E. "A Practitioner's Guide to Treating the Incarcerated Male Sex Offender:Breaking the Cycle of Sexual Abuse.." US Dept. of Justice. 1988. Web. <https://www.ncjrs.gov/pdffiles1/Digitization/123683NCJRS.pdf>

13. Freeman-Longo, R., & Wall, R, Changing a lifetime of sexual crime, Psychology Today (1996) Magazine.

14. Note that there is a second myth here that must be addressed, the "much more likely to reoffend" myth. This statement will also be addressed in this report.

15. Ira Ellman. "The Supreme Court's Crucial Mistake About Sex Crime Statistics." Casetext. July 25, 2015. Web. <https://casetext.com/posts/the-supreme-courts-crucial-mistake-about-sex-crime-statistics>

16. Post, David. "The Volokh Conspiracy: More fuel for the movement to reform sex offender laws." Washington Post. 18 Aug. 2015. Web. <https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/08/18/more-fuel-for-the-movement-to-reform-sex-offender-laws/>

17. Supra., Liptak, "Based on Myth"

18. Levenson, J.S., Branon, Y. N., Fortney, T., and Baker, J. " Public Perceptions About Sex Offenders and Community Protection Policies." Analyses of Social Issues and Public Policy, Vol. 7, No. 1., 1-25. 2007. Web. <http://www.sexual-offender-treatment.org/index.php?id=55&type=123>

19. Sullum, Jacob. "The Lingering Impact of Justice Kennedy's Trumpesque Claim About Sex Offenders." Reason.com. 8 March 2017. Web. < http://reason.com/blog/2017/03/08/justice-kennedys-trumpesque-claim-about>

20. US Department of Justice, "Recidivism of Sex Offenders Released into the Community in 1994." Nov. 2003.

21. Harris, Andrew JR and Hanson, Karl. "Sex Offender Recidivism: A Simple Question." Public Safety and Emergency Preparedness Canada. 2004. Web. <https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/sx-ffndr-rcdvsm/sx-ffndr-rcdvsm-eng.pdf>

22. Ibid., Brown & Moore 1988, p. 66

23. See Logue, Derek. "The Complexities of Sex Offender Recidivism." Once Fallen. 2008. Web. <http://www.oncefallen.com/Recidivism101.html>

24. Ibid., Ellman.

25. Furby, Lita, Weinrott, Mark, and Blackshaw, Lyn. "Sex Offender Recidivism: A Review." Psyhological Bulletin, Vol. 105, No. 1,3-30. 1989.

26. United States v. Johnson, 588 F. Supp. 2d 997 (S.D. Iowa 2008)

27. "Ten Year Recidivism Follow-up of 1989 Sex Offender Releases." Ohio Department of Rehabilitation and Correction. April 2001. http://www.drc.state.oh.us/web/Reports/Ten_Year_Recidivism.pdf.

28. "How Dangerous is Lightning?" National Weather Service. 2017. Web. <http://origin-www.nws.noaa.gov/om/lightning/odds.shtml>. For the record, between 1987-2016, there was an average of 47 annual fatalities, though between 2007-2016, that number is reduced to 30.

29. Knight, Cameron. "Cincinnati homicide rate on roller coaster pattern." Cincinnati.com. USA Today Network. 3 Jan. 2017. Web. <http://www.cincinnati.com/story/news/crime/2017/01/03/cincinnati-homicide-rate-roller-coaster-pattern/96118630/>. Note the murder rate stays consistently in the 60-70 range though fluctuates in small numbers.

30. Note: A more complete recidivism study summary can be found at http://www.oncefallen.com/recidivismchart.html; for the sake of brevity, not all studies listed on the Once Fallen recidivism chart are listed here.

31. "Profile and Follow-up of Sex Offenders released in 1986." New York State Department of Correctional Services, Division of Program Planning, Research and Evaluation.  July 1996

32. "THE IOWA SEX OFFENDER REGISTRY AND RECIDIVISM." Iowa Department of Human Rights, Division of Criminal and Juvenile Justice Planning and Statistical Analysis Center.  December 2000. Web. <http://www.humanrights.iowa.gov/cjjp/images/pdf/01_pub/SexOffenderReport.pdf>

33. Supra, Ohio DRC 2001

34. Supra. US DoJ

35. eAdvocate, "CHART: Michigan Recidivism Rates: All released sex offenders -vs- non-sex offenders." May 5, 2009. Information was extrapolated from Annual Michigan Department of Corrections, Statistical Report, Parole Board Charts D2 and D2a, years 1990 through 2000. Technical violations not included. The Statistical reports for years 1998 to current can be found under the "Publications and information" section of the Michigan Dept. of Corrections website, http://www.michigan.gov/corrections/0,4551,7-119-1441---,00.html.

36. "Sex Offender Recidivism in Minnesota." Minnesota Dept. of Corrections. April 2007

37. "RECIDIVISM OF PAROLED SEX OFFENDERS—TEN (10) YEAR STUDY. California Sex Offender Management Board.  June 2008

38. "Recidivism of Sex Offenders Released from the Arizona Department of Corrections in 2001." Arizona Criminal Justice Commission. February 2009

39. "Recidivism among sex offenders in Connecticut." State of Connecticut, Office of Policy and Management, Criminal Justice Policy & Planning Division. February 15, 2012

40. "Nebraska Sex Offender Registry Study." Consortium for Crime and Justice Research, U. of Nebraska – Omaha. July 31, 2013. Table 5, p.20. It is important to note that the study also found a 1 year pre-AWA re-offense rate of 18 of 2899 (0.6%), as well as a 5 year average of 162 of 2832 (5.7%) in a 5 year study of 4 states

41. Ibid., Table 6; It is important to note the study also found a 1 year AWA re-offense rate of 4 of 230 (1.7%)

42. Barbara Levine & Elsie Kettunen. "Paroling people who committed serious crimes: What is the actual risk?"  Citizens Alliance on Prisons & Public Spending, Dec. 1, 2014

43. Supra, US DoJ

44. Michelle L. Meloy, "The Sex Offender Next Door: An Analysis of Recidivism, Risk Factors, and Deterrence of Sex Offenders on Probation." Criminal Justice Policy Review, Volume 16, Number 2, June 2005.  p. 211-236

AR-00001050

45. Alaska Judicial Council. "Criminal Recidivism in Alaska." January 2007. This study does not break down the number or registrants nor offer the exact number rearrested in the study.

46. Stan Orchowsky and Janice Iwama. "Improving State Criminal History Records: Recidivism of Sex Offenders Released in 2001." Justice Research and Statistics Association, November 2009. Table 5, p. 17. http://www.jrsa.org/projects/sex-offender-final-report.pdf

47. Richard Tewksbury, Wesley G. Jennings and Kristen M. Zgoba. "A longitudinal examination of sex offender recidivism prior to and following the implementation of SORN." Behav. Sci. Law 30: 308–328 (2012)

48. Kristen M. Zgoba, Michael Miner, Raymond Knight, Elizabeth Letourneau, Jill Levenson, David Thornton. "A Multi-State Recidivism Study Using Static-99R and Static-2002 Risk Scores and Tier Guidelines from the Adam Walsh Act." November 2012.  Table 7, p.20

49. "Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010: Supplemental Tables: Most serious commitment offense and types of post-release arrest charges of prisoners released in 30 states in 2005." US Dept. of Justice. Dec. 2016.

50. Seung C. Lee, Alejandro Restrepo, Annie Satariano, & R. Karl Hanson. "The Predictive Validity of Static-99R for Sexual Offenders in California: 2016 Update." State Authorized Risk Assessment Tool for Sex Offenders (CA) Committee. Gov't Report. July 13, 2016. http://www.saratso.org/docs/ThePredictiveValidity_of_Static-99R_forSexualOffenders_inCalifornia-2016v1.pdf

51. Notice a discrepancy between the annual average rate and the one year rate in the UNO study.  It is important to note that the study also found a 1 year pre-Adam Walsh Act re-offense rate of 18 of 2809 (0.6%) and a 1 year AWA re-offense rate of 4 of 230 (1.7%) in the study. The second year numbers deviate somewhat from the first year numbers. though the minor differences in the 1 year rate and the average annual rate are insignificant. The average annual rate should be different from a 1 year study result since the average annual rate is an average from a number of years. Thus, the one year recidivism rate for Nebraska was 0.6% for pre-AWA registrants, while the average annual rate from 2 years of data is 0.85%. Both numbers are statistically correct.

52. See note 50 as this result was from the same study

53. Supra., Ohio DRC 2001, Executive Summary

54. New York State Division of Probation and Correctional Alternatives. "Research Bulletin: Sex Offender Populations, Recidivism and Actuarial Assessment." 2009. <https://web.archive.org/web/20110724103338/http://theparson.net/so/NYsomgmtbulletinmay2007.pdf>

55. California Dept. of Corrections. "Recidivism of Paroled Sex Offenders- A 10 year study [Chart]." 2009. Found online at <http://www.defenseforsvp.com/Resources/Cal_gov/CASOMB_RECIDIVISM_STUDY_10_YEAR_w-Graph.pdf>

56. Hanson, Karl and Harris, Andrew. "Sex Offender Recidivism: A Simple Question." Public Safety and Emergency Preparedness Canada. March  2004. Found online at < https://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/sx-ffndr-rcdvsm/index-en.aspx>, p.1

57. Ibid., p.8, Table 2

58. R. Karl Hanson, Andrew J. R. Harris, Leslie Helmus and David Thornton. "High-Risk Sex Offenders May Not Be High Risk Forever." J Interpers Violence, 2014 29: 2792 originally published online 24 March 2014. pgs.2796-2801

59. Ibid., pgs.2801, 2805

60. Ibid., pgs. 2806-2807

61. Supra., Harris & Hanson 2004, p.8 Table 2

62. Michael C. Seto and Angela W. Eke. "The Criminal Histories and Later Offending of Child Pornography Offenders." Sexual Abuse: A Journal of Research and Treatment, Vol. 17, No. 2, April 2005.

63. Marshall, W.L. & Barbaree, H.E. (1990). Outcomes of comprehensive cognitive-behavioral treatment programs. In  W.L. Marshall, D.R. Laws, and H. E. Barbaree (Eds.), Handbook of sexual assault: Issues, theories, and treatment of the offender (pp. 363-385). New York: Plenum.

64. Michigan Dept. of Corrections (2000). Recidivism Statistics: from Annually Published Michigan Dept. of  Corrections, Statistical Reports (Parole Board) Cumulative Parole Board Statistics for Parolees 1990 through 2000. http://sexoffender-reports.blogspot.com/2009/05/chart-michigan-recidivism-rates-all.html

65. Lave, Tamara Rice and Zimring, Frank E. "Assessing the Real Risk of Sexually Violent Predators: Doctor Padilla's Dangerous Data." American Criminal Law Review, Vol. 55, 2018. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3202538, Retrieved 13 Aug 2018. p.719

66. US Department of Justice, "Recidivism of Sex Offenders Released into the Community in 1994."

67. Supra, Hanson & Harris 2004, p.2

68. "Criminal Victimization Statistical Tables, 2003. "US Sept. of Justice. 2004. Web. <https://www.bjs.gov/content/pub/pdf/cvus03.pdf>

69. "Criminal Victimization Statistical Tables, 2005. "US Sept. of Justice. 2006. Web. <https://www.bjs.gov/content/pub/pdf/cvus05.pdf>

70. "Sexual Assault of Young Children as Reported to Law Enforcement: Victim, Incident, and Offender Characteristics." US Dept. of Justice. 2000. Web. <https://www.bjs.gov/content/pub/pdf/saycrle.pdf>

71. "Criminal Victimization, 2010. "US Sept. of Justice. 2011. Web. <https://www.bjs.gov/content/pub/pdf/cv10.pdf>

72. "Criminal Victimization, 2014. "US Sept. of Justice. 2015. Web. <https://www.bjs.gov/content/pub/pdf/cv14.pdf>

73. "Criminal Victimization, 2016. "US Sept. of Justice. 2017. Web. <https://www.bjs.gov/content/pub/pdf/cv16.pdf>

74. Patkin, Debra. "Megan's law and the misconception of sex offender recidivism." 2008. <http://works.bepress.com/cgi/viewcontent.cgi?article=1000&context=debra_patkin>

75. Sandler, Jeffrey C., Freeman, Naomi J., and Socia, Kelly M. "DOES A WATCHED POT BOIL? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law." Psychology Public Policy and Law · November 2008. Web. < https://www.csaprimaryprevention.org/files/Does_a_Watched_Pot_Boil_A_Time-Series_Analysis_of_.pdf>

76. John Q. LaFond, "Preventing Sexual Violence." APA. Book.  2005

77. Hollida Wakefield, "The Vilification of Sex Offenders: Do Laws Targeting Sex Offenders Increase Recidivism and Sexual Violence?" Journal of Sex Offender Civil Commitment: Science and the Law, 2006, p. 141-149

78. Levenson, J. S., & Tewksbury, R. (2009). "Collateral damage: Family members of registered sex offenders." American Journal of Criminal Justice

79. See, for example, Tana Weingartner, "Twenty arrested during sex offender compliance sweep," WVXU, May 28, 203, http://www.wvxu.org/post/twenty-arrested-during-sex-offender-compliance-sweep#stream/0, Retrieved Aug. 5, 2018; and "Deputies check addresses on hundreds of Hamilton Co. sex offenders," WLWT, May 28, 2013, https://www.wlwt.com/article/deputies-check-addresses-on-hundreds-of-hamilton-co-sex-offenders-1/3531896, Retrieved Aug. 5, 2018. In both articles, the spotlight was on 20 arrests, in particular, one arrest involving a gun collection by a parolee. Pictures of the gun collection were prominently displayed. The officers referred to the operation as "spring cleaning." In reality, none were arrested for a new sex crime.

80. Joshua Vaughn, "FAILURE-TO-COMPLY ARRESTS REVEAL FLAWS IN SEX OFFENDER REGISTRIES." The Appeal,  Aug. 1, 2018. https://theappeal.org/skyrocketing-charges-for-failing-to-comply-with-sex-offender-registries-reveal-their-flaws/,  Retrieved Aug. 5, 2018

81. Elizabeth J. Letourneau, Ph.D., Jill S. Levenson, Ph.D., Dipankar Bandyopadhyay, Ph.D., Debajyoti Sinha, Ph.D., Kevin S. Armstrong. "Evaluating the Effectiveness of Sex Offender Registration and Notification Policies for Reducing Sexual Violence against Women." Sept. 2010. https://www.ncjrs.

AR-00001051

gov/pdffiles1/nij/grants/231989.pdf, Retrieved Aug. 5, 2018.

82. Prentky, R. A., Knight, R. A., & Lee, A. F. S. (1997, June). Child sexual molestation: Research issues. Research Report, National Institute of Justice, Washington, D.C. Web. <https://www.ncjrs.gov/pdffiles/163390.pdf>

83. eAdvocate. "Special Report: Misquoting of Prentky's 1997 Long Term Recidivism Study: Affecting a MAJOR US Supreme Court Decision." Truths, Authority and Factoids. June 2005. Web. <https://truths-authority-factoids.blogspot.com/2015/08/special-report-misquoting-of-prentkys.html>; See also Prentky, R. A., Lee, A. F. S., Knight, R. A., & Cerce, D. (1997 Dec). Recidivism rates among child molesters and rapists: A methodological analysis. Law and Human Behavior, 21, 656-657

84. Richard Wollert, Ph.D. "An Analysis of the Argument That Clinicians Under-predict Sexual Violence in Civil Commitment Cases." Behav Sci  Law. 2001;19(1):171-84. Found online at <http://www.richardwollert.com/BSLarticle.html>

85. Supra, Prentky 1997 "Research Issues." p.11

86. Ibid., p.12

87. Ibid., p.14, Exhibit 5

88. Roger Przybylski. "Chapter 5: Adult Sex Offender Recidivism." SMART Office. SOMAPI. 2018. Web. <https://www.smart. gov/SOMAPI/sec1/ch5_recidivism.html>

89. Ron Langevin, Suzanne Curnoe, Paul Fedoroff, Renee, Mara Langevin, Cheryl Peever, Rick Pettica, and Shameen Sandhu. "Lifetime Sex Offender Recidivism: A 25-Year Follow-Up Study." Canadian Journal of Criminology and Criminal Justice, Vol. 46, No. 5. DOI: 10.3138/cjccj.46.5.531 (2004)

90. Dornin, Chris. "Facts and Fiction about Sex Offenders." Corrections.com. 22 May 2010.   Web. <http://www.corrections.com/news/article/24500-facts-and-fiction-about-sex-offenders>

91. Hanson, Karl. "Long-Term Follow-Up Studies Are Difficult: Comment on Langevin et al. (2004)." Canadian Journal of Criminology and Criminal Justice, Jan 2006. DOI: 10.3138/cjccj.48.1.103 <https://www.researchgate.net/publication/269449195_Long-Term_Follow-Up_Studies_Are_Difficult_Comment_on_Langevin_et_al_2004>.

92. Ibid.

93. Supra., Dornin 2010

94. Webster, Cheryl Marie, Gartner, Rosemary, and Doob, Anthony. "Results by Design: The Artefactual Construction of High Recidivism Rates for Sex Offenders."  CAN J CRIMINOL CRIM JUSTICE. 48. 79-93. 10.1353/ccj   2006.0013 Web. <https://www.researchgate. net/publication/240747161_Results_by_Design_The_Artefactual_Construction_of_High_Recidivism_Rates_for_Sex_Offenders>

95. Lave and Zimrng, "Padilla", p.723

96. Ibid., p.724-725

97. Ibid., p.727

98. Ibid., p.737-738

99. "2014 Outcome Evaluation Report." California Dept. of Correction and Rehabilitation, Office of Research. July 2015. Pages 29-30. Accessed 8 July 2020 at http://web.archive.org/web/20160325093504/https://www.cdcr.ca. gov/Adult_Research_Branch/Research_Documents/2014_Outcome_Evaluation_Report_7-6-2015.pdf

100. "APPENDIX TO THE RECIDIVISM REPORT FOR OFFENDERS RELEASED FROM THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION IN FISCAL YEAR 2014-15." California Dept. of Correction and Rehabilitation, Office of Research. January 2020. Pages 34-35. Accessed 8 July 2020 at https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/01/Appendix-to-the-Recidivism-Report-for-Offenders-Released-in-Fiscal-Year-2014-15.pdf

AR-00001052



<----- BACK TO INDEX -------

(c) 2007-2019 Derek W. Logue. No part of this website may be used in any way without expressed written consent of the site owner.

## REGISTERED CITIZENS vs PEDOPHILES vs "SEX OFFENDERS": UNDERSTANDING THE DIFFERENCES

Derek W. Logue of OnceFallen.com
Published 14 July 2019

INTRODUCTION

The mainstream media and American society as a whole tends to use the terms "sex offender" and "pedophile" interchangeably. At times, news reports use the erroneous term "convicted pedophile." This article examines the differences between people diagnosed with pedophilia and people convicted of a sexual offense. People can be forced to register without having a clinical diagnosis of pedophilia, and a clinically diagnosed pedophile is not listed on the public sex offense registry if he or she has not omitted a sexual offense.

SEMANTICS MATTERS

The major premise needs to be stated repeatedly: "Pedophile" is a clinical term, "Sex Offender" is a legal term. You cannot be convicted of "pedophilia" but you can be convicted of a sex offense. There is no such thing as a "convicted pedophile." You can be a pedophile without committing a sex offense. You can commit a sex offense and not be a pedophile.

In order to understand the differences, we must begin with a proper definition of each term.

*"Sex Offender"*

The definition of the term "sex offender" is pretty straightforward—"A person who has been found guilty of one or more sex crimes."[1]

This means anyone convicted of adult rape, a prostitute or person paying for prostitution,[2]  a teenager engaging in various sexual acts with a teenager,[3]  a public urinator,[4]  a teenager engaging in sexting,[5]  or someone who viewed a nude picture of someone ages 16 or 17 (even if it is legal to engage in sexual intercourse with the person in the picture)[6]  can be classified as "sex offender" without engaging in sexual activity involving a prepubescent minor.

According to a 2009 US Department of Justice study, about a third of sex crimes committed against juveniles were committed by other juveniles; Roughly 6% of the juvenile offenders age 16 or 17 committed an offense against someone under the age of 12. Also, the single age in which we find the most people accused of committing a sexual offence is age 14[7]  Thus, at least 94% of juvenile offenders would not even be allowed to be clinically diagnosed as a pedophile under the DSM-V because the diagnoses requires the person to be "at least 16 years old, and at least 5 years older than the child in the first category. However, this does not include an individual in late adolescence involved in an ongoing sexual relationship with a 12- or 13-year-old."

Many current classifications used on those who have committed a sexual offense against a minor are based on the classical typology of "situational/ regressed" versus "fixated/ preferential" offender types. Those who commit sexual offenses into minors can fall into a continuum between the two types rather than be pigeon-holed into one of the two main types.

According to Lanning:

"The situational-type child molester does not usually have compulsive-paraphilic sexual preferences including a preference for children. He may, however, engage in sex with children for varied and sometimes complex reasons. For such a child molester, sex with children may range from a 'once-in-a-lifetime' act to a long-term pattern of behavior. The more long-term the pattern, the further down the continuum he may move." (Lanning describes certain subtypes based on primary motivations based on feelings of inadequacy, regression (poor social skills), or being morally indiscriminate.)

AR-00001053

"Preferential-type child molesters have definite sexual inclinations. For many those inclinations or preferences include children, and they are the ones it would be most appropriate to refer to as pedophiles… Within this category at least four major patterns of behavior emerge of seduction, introverted, sadistic, and diverse."[8]

The point is that a number of people accused of a sexual offense, even a sexual offense against minors, could not meet the clinical diagnosis for pedophilia.

*Pedophilia*

What is a pedophile? Pedophilia is currently classified as a mental disorder. According to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), in order for pedophilic disorder to be diagnosed, the following criteria must be met:

•      Recurrent, intense sexual fantasies, urges, or behaviors involving sexual activity with a prepubescent child (generally age 13 years or younger) for a period of at least 6 months.
•      These sexual urges have been acted on or have caused significant distress or impairment in social, occupational, or other important areas of functioning.
•      The person is at least 16 years old, and at least 5 years older than the child in the first category. However, this does not include an individual in late adolescence involved in an ongoing sexual relationship with a 12- or 13-year-old.
•      Additionally, a diagnosis of pedophilic disorder should specify whether the individual is exclusively attracted to children or not, the gender that the individual is attracted to, and whether the sexual urges are limited to incest.[9]

The Mayo Clinic states the following:

"Pedophilia is a clinical diagnosis usually made by a psychiatrist or psychologist. It is not a criminal or legal term, such as forcible sexual offense, which is a legal term often used in criminal statistics.[10]

WebMD, citing sexologist Ray Blanchard, PhD, adjunct psychiatry professor at the University of Toronto, states the following:

"What is a pedophile?"

"A pedophile is a person who has a sustained sexual orientation toward children, generally aged 13 or younger, Blanchard says. Not all pedophiles are child molesters (or vice versa). 'Child molesters are defined by their acts; pedophiles are defined by their desires,' Blanchard says. 'Some pedophiles refrain from sexually approaching any child for their entire lives.' But it's not clear how common that is."[11]

Writing for the National Center for Missing and Exploited Children, FBI Profiler Ken Lanning writes:

"Although the use of the term child molester has been commonplace for a long time, publicity and awareness concerning sexual victimization of children has resulted in more frequent use of the term pedophile. One problem is the fact the term pedophile has both a less precise lay definition and a more precise diagnostic definition…"

"Technically being labeled a pedophile is a psychiatric diagnosis that can be made only by qualified psychologists or psychiatrists. For many, therefore, the word is a diagnostic term, not a legal one…"

"There is still confusion, even among professionals, with regard to the terms child molester and pedophile. For many the terms have become synonymous. For them the word pedophile is just a fancy term for a child molester. The public, the media, and many child-abuse professionals frequently use the terms interchangeably and simplistically refer to all those who sexually victimize children as pedophiles. There is no single or uniform definition for the word pedophile…."

"Labeling all child molesters as pedophiles is, however, confusing. There are clear differences between the types of individuals who sexually abuse children, and law-enforcement officers handling these cases need to understand that and make such distinctions when appropriate. For me, not all pedophiles are child molesters. A person suffering from any paraphilia can legally engage in it simply by fantasizing and masturbating. A child molester is an individual who sexually molests children. A pedophile might have a sexual preference for children and fantasize about having sex with them, but if he does not act on that preference or those fantasies with a child, he is not a child molester…"

"In addition not all child molesters are pedophiles. In my experience, many child molesters are not pedophiles. A pedophile is an individual who prefers to have sex with children. A person who prefers to have sex with an adult partner may, for any number of reasons, decide to have sex with a child. Such reasons might include simple availability, opportunity, curiosity, or a desire to hurt a

loved one of the molested child. The erotic imagery and sexual fantasies of such individuals are not necessarily recurrent, intense, and focused on children; therefore, these people are not pedophiles…"

"Many child molesters are, in fact, pedophiles, and many pedophiles are child molesters. But they are not necessarily one and the same. Often it may be unclear whether the term is being applied with its diagnostic or some other definition. Most investigators are not qualified to apply the term with its diagnostic meaning. In addition labeling all child molesters as pedophiles is potentially confusing and counterproductive. Not everyone using the Internet to facilitate having sex with children or trafficking in child pornography is a pedophile. To avoid confusion with a mental-health diagnosis and possible challenges in court use of the term pedophile by law enforcement and prosecutors should be kept to a minimum. Distinctions between the types of child molesters, however, can have important and valuable implications for the law-enforcement investigation of sexual exploitation of children."[12]

These quotes are merely a cross-section of the general consensus view among clinical professionals and experts in sex crimes there are differences between pedophiles and those labeled by society as "sex offenders." Furthermore, they understand there are differences between a pedophile and someone who commits an offense involving a minor.

*Paraphilias*

Not to be confused with pedophilia, a paraphilia is "a condition in which a person's sexual arousal and gratification depend on fantasizing about and engaging in sexual behavior that is atypical and extreme. A paraphilia is considered a disorder when it causes distress or threatens to harm someone else. A paraphilia can revolve around a particular object (children, animals, underwear) or a particular behavior (inflicting pain, exposing oneself) but is distinguished by a preoccupation with the object or behavior to the point of being dependent on that object or behavior for sexual gratification."
"Paraphilias include sexual behaviors society may view as distasteful, unusual, or abnormal. The most common are pedophilia (sexual focus on children), exhibitionism (exposure of genitals to strangers), voyeurism (observing private activities of unaware victims) and frotteurism (touching or rubbing against a nonconsenting person). Fetishism (use of inanimate objects), sexual masochism (being humiliated or forced to suffer), sexual sadism (inflicting humiliation or suffering) and transvestic disorder (sexually arousing cross-dressing) are much less common. There is also a category of paraphilias—known as Other Specified Paraphilic Disorders—which encompasses behaviors not covered by the already named diagnoses, such as those involving dead people, urine, feces, enemas, or obscene phone calls."[13]

It is important to understand the difference because pedophilia and paraphilia sound the same but is not; all pedophiles are paraphiliacs but not all paraphiliacs are pedophiles. A prime example of this is the use of Gene Abel's 1986 report "Self-Reported Sex Crimes of Non-Incarcerated Paraphiliacs." The report title is confusing because not all paraphilias are criminal; at the time, homosexuality, transvestitism and transsexualism were considered paraphilias, the subjects were all called "sex offenders," and those they engaged with were considered "victims." Subjects averaged at least two different paraphilia diagnoses, thus the numbers overlap. What is overlooked by those citing this study was that even though self-reports overestimate risk, half of those engaged in acts against female children had only one victim, meaning that overall, committing sex offenses against children do not necessarily mean offenders exhibit a lifelong pattern of risk.[14]

PREVALENCE OF PEDOPHILIA IN REGISTRANTS AND IN SOCIETY AS A WHOLE

The good news is the fixated offenders are relatively rare and that situational offenders are amenable to treatment. There is an overall consensus that those in the situational category are more treatable. Dr. Robert Weiss states, "Typically, regressed/situational child sex offenders and sexually addicted sex offenders are the groups most amenable to treatment. As long as these individuals are willing to admit to their offense(s) and are fully assessed for concurrent addictions/mental health disorders, the right treatment can be extremely helpful.[15]  Michael Hersen notes, "Treatment response has been shown to be quite different within subgroups of offenders. For example, situational offenders against a single girl have proven to have a more positive response to treatment than predatory homosexual pedophiles or rapists."[16]  Dr. Barry Maletzky also lists situational offenders (including most categories of child molesters) as the least likely to reoffend and predatory offenders (including those diagnosed as pedophiles) as more likely to reoffend.[17]

"The majority of fixated child sexual abusers are individuals who sexually assault male children who are not related; regressed child sexual abusers often consist of incest offenders or offenders who sexually assault female adolescents."[18]

Okami and Goldberg's 1992 study writes, "Only a small portion of convicted sex offenders against minors are actually preferentially attracted to children. In spite of this fact, studies typically use the word 'pedophile' interchangeably with terms such as 'child molester,' 'sex offender,' 'abuser,' and 'rapist.'"[19]

Among those convicted of sexual offenses, very few offenders could even meet the most basic criteria of clinical pedophilia. Few

AR-00001055

studies give reliable numbers. The State of Montana estimate in 2011 stated 4% of the population of those convicted of sex offenses were classified as pedophiles.[20]  But that is a single, obscure study.

People want to know how many people in society as a whole suffer from pedophilia. There is no way to know for sure. Dr. Michael Seto once wrote a book that estimated that as much as 5% of the population could be attracted to pre-pubescent children, but lowered the estimate in later research to between 1% of the general population. Dr. James Cantor estimates the number is closer to 0.5%. But, as Cantor has stated, "Because paedophilia is so secretive and so few people are willing to admit it, there is no meaningful way to get a reliable estimate."[21]

CAUTION IN STATISTICAL EVALUATIONS ARE NECESSARY

We have to be cautious in our approach to the issue. Current statistics are incomplete at best and can be misrepresented to suit a personal agenda.

One example of this is from a site called "The Primary Prevention of Child Sexual Abuse" that is run by a self-professed pedophile activist known by the online persona TNF_13.[22]  Interestingly, his conclusion that "90.64-96.2% of pedophiles do not molest children, even after underreporting is accounted for" is based upon the same faulty logic that ensnares anti-pedophilia researchers. There are a couple of glaring errors with this report:

1. TNF_13 states, "We know that juveniles are the victims of approximately 66% of sex offenses, which means we can estimate that 66% of sex offenders have crimes against juveniles, or .17292% of the population." As stated earlier in this report, about a third of sex offenses involve juvenile offenders, of which only about 6% could even meet the base criteria for a pedophilia diagnosis. Despite recognizing earlier in his report that pedophilia can only be diagnosed in people ages 16 or above, he neglects to break these numbers down to reflect this fact.
2. In declaring that "roughly a third of sexual abusers are pedophilic," TNF_13 relies on a single study that utilized penile plethysmographs (a test that lacks any uniform standard) and subjects were largely referred to by courts.[23]  (This test also found that those who merely looked at child pornography on the internet and had no contact with children scored higher on this "pedophilia test" than those with contact offenses.)

The problem with publishing estimated numbers as merely "illustration" is that people want a hard number so estimations tend to be used and abused. While TNF_13 uses a personal estimation to conclude few pedophiles offend, other studies have used equally misrepresented numbers to state the opposite of this report's conclusion.

A second example came from a statement by the Pope (which may have been misreported by the interviewer) in 2014 that suggested 2% of the clergy are "paedophiles." The group "Survivors Network of Those Abused by Priests," claims that number is closer to 5.6%. [24]  In reality, both numbers are inaccurate because they overestimate this number. Both likely used a 2002 John Jay College of Criminal Justice report that found roughly 4.2% of Catholic priests had been "plausibly" accused of abuse, though the report also included adolescents. Historian Philip Jenkins stated that would lower the number to about 1%-2%. Interestingly, 40% of these allegations in the 52-year study were from 1975-1980, the advent of the child sexual abuse panic.[25]

But "plausible" does not mean that the crime actually occurred. There is no way of knowing without a criminal investigation. Second, this report has established that even a sexual offense against a minor does not necessarily mean the perpetrator is a "pedophile." As reported by Psychology Today:

"In summary, the report states that clergy sexual abuse of minors in the American Catholic Church is a historical problem with the vast majority of cases occurring from the mid 1960's to the mid 1980's. You might find surprising that 94% of all cases occurred before 1990 and that 70% of clergy offenders were ordained as priests before 1970. . They conclude that these numbers, as well as the style and type of abuse is fairly consistent with other large organizations (think public schools, boy scouts, and so forth) with men who had unsupervised and unlimited access to minors during the last half century (and most especially during the 1960's and 1970's)."

"The report concludes that the vast majority of clergy sex offenders are not pedophiles at all but were situational generalists violating whoever they had access to. Pedophiles, by definition, seek sexual gratification from pre-pubescent children of one gender and target this age and gender group (especially while under stress). Clergy sexual offenders in the Church were more likely to be targeting whoever was around them (and they had unsupervised access to) regardless of age and gender."

"The researchers conclude that there is no causative relationship between either celibacy or homosexuality and the sexual victimization of children in the Church. Therefore, being celibate or being gay did not increase the risk of violating children. So, blaming the clergy abuse crisis in the Catholic Church on gay men or celibacy is unfounded."

AR-00001056

"Overall, the profile presented by the John Jay researchers (who, by the way, are non-Catholics working in a secular state run university) of the typical clergy sex offender in the Catholic Church is certainly quite different than the stereotype typically presented in the press during the past decade."[26]

WHY SEMANTICS MATTERS

If we want a key understanding of the issue of sexual abuse prevention, we have to start with an accurate definition. Ken Lanning writes, "In written and spoken communication definitions are crucial to understanding…The important point, then, is not that these terms have or should have only one definition but people using the terms should communicate their definitions, whatever they might be, and then consistently use those definitions. Failure to consistently use a definition is often a bigger problem than defining a term. Many will define a child as anyone younger than 18 years old but then make recommendations such as 'never leave your children unattended,' which clearly does not apply to all children meeting that definition."[27]  Using the term in the proper context helps address the issue properly.

We need to understand the difference between people convicted of a sex offense and a "pedophile" because strategies aimed at pedophiles will not over non-sexual motivations for abuse. Dr. David Finkelhor explained to Vice Magazine, "'It is very important for the public to understand that most child molesters are not pedophiles,' Finkelhor told me over the phone. '[Many people] have the impression, when you talk about someone being a pedophile, that they have a permanent and unalterable sexual interest in children and, therefore, they are going to be dangerous under any circumstances and under any form of management—and that's not true,' he says, adding that pedophiles constitute a minority of those who sexually abuse children, or who are child molesters. While pedophiles are, specifically, primarily attracted to prepubescent children, the majority of child molesters need not be. But why, then, would they abuse kids? The reasons are myriad, according to Finkelhor."[28]

ACCUSATIONS OF NORMALIZING PEDOPHILIA

Unfortunately, attempting any fact-driven dialogue or even a dialogue that questions the dominant paradigm is met with fierce resistance. If you are going to talk about pedophilia in any manner that does not conclude with a blanket statement about the inherent evil of those given the label and the need to be eradicated, you are likely to face an accusation of "normalizing pedophilia." There's no set definition of this term but it is generally bandied about when a dissenting opinion on society's blind hatred for pedophilia is discussed.

For example, In 2014, Margo Kaplan, assistant professor at Rutgers School of Law, Camden, wrote an op-ed in the New York Times declaring Pedophilia was a disorder, not a crime. She writes:

"By some estimates, 1 percent of the male population continues, long after puberty, to find themselves attracted to prepubescent children. These people are living with pedophilia, a sexual attraction to prepubescents that often constitutes a mental illness. Unfortunately, our laws are failing them and, consequently, ignoring opportunities to prevent child abuse…"

"Part of this failure stems from the misconception that pedophilia is the same as child molestation. One can live with pedophilia and not act on it. Sites like Virtuous Pedophiles provide support for pedophiles who do not molest children and believe that sex with children is wrong. It is not that these individuals are "inactive" or "nonpracticing" pedophiles, but rather that pedophilia is a status and not an act. In fact, research shows, about half of all child molesters are not sexually attracted to their victims."

"A second misconception is that pedophilia is a choice. Recent research, while often limited to sex offenders — because of the stigma of pedophilia — suggests that the disorder may have neurological origins…"

"Our current law is inconsistent and irrational. For example, federal law and 20 states allow courts to issue a civil order committing a sex offender, particularly one with a diagnosis of pedophilia, to a mental health facility immediately after the completion of his sentence — under standards that are much more lax than for ordinary "civil commitment" for people with mental illness. And yet, when it comes to public policies that might help people with pedophilia to come forward and seek treatment before they offend, the law omits pedophilia from protection."

"The Americans With Disabilities Act of 1990 and Section 504 of the Rehabilitation Act of 1973 prohibit discrimination against otherwise qualified individuals with mental disabilities, in areas such as employment, education and medical care. Congress, however, explicitly excluded pedophilia from protection under these two crucial laws."

"It's time to revisit these categorical exclusions. Without legal protection, a pedophile cannot risk seeking treatment or disclosing his status to anyone for support. He could lose his job, and future job prospects, if he is seen at a group-therapy session, asks for a

AR-00001057

reasonable accommodation to take medication or see a psychiatrist, or requests a limit in his interaction with children. Isolating individuals from appropriate employment and treatment only increases their risk of committing a crime."

"There's no question that the extension of civil rights protections to people with pedophilia must be weighed against the health and safety needs of others, especially kids. It stands to reason that a pedophile should not be hired as a grade-school teacher. But both the A.D.A. and the Rehabilitation Act contain exemptions for people who are 'not otherwise qualified' for a job or who pose 'a direct threat to the health and safety of others' that can't be eliminated by a reasonable accommodation…"

"A pedophile should be held responsible for his conduct — but not for the underlying attraction. Arguing for the rights of scorned and misunderstood groups is never popular, particularly when they are associated with real harm. But the fact that pedophilia is so despised is precisely why our responses to it, in criminal justice and mental health, have been so inconsistent and counterproductive. Acknowledging that pedophiles have a mental disorder, and removing the obstacles to their coming forward and seeking help, is not only the right thing to do, but it would also advance efforts to protect children from harm."[29]

It did not take long for the online backlash to begin. The NY Times reported, "The article caused a stir, attracting over 1,200 reader comments. Many of these responses were rejected by our moderation staff, particularly for vicious attacks against both the author and commenters who expressed some measure of sympathy for pedophiles…When comments were closed on Tuesday afternoon, 993 of the 1,237 comments submitted were published. Reader reaction to the Op-Ed essay was mostly negative, but a wide range of views was expressed. Ms. Kaplan said that was also the case in her email inbox, which, unlike the Times moderation platform, does not have a profanity filter."[30]

Kaplan herself told PhillyMag, "I am getting more emails of support than I ever expected. I'm shocked. I expected to get maybe 95% negative emails, but I've gotten so many positive ones. The online comments, though, are pretty uniformly negative, and a lot of people haven't even read the article." When asked where the positive emails were coming from, Kaplan responded, "A lot of people I don't even know. There's a former prosecutor, a judge, a nurse. Individuals with family members who have pedophilia."[31]

Other media outlets, primarily right-leaning news outlets, responded with fear-mongering and outrage.

Fox News wrote, "Should you have to hire pedophiles and rent them rooms? ... The world Kaplan envisions is one in which pedophiles don't need to hide their disorder any longer and can legally insist that, say, a school system assign them to custodial duty at a high school, rather than a grammar school; or that the military create reasonable housing accommodations for them on base to keep them far from any playground; or that a corporation that provides day care for employees not assign them to tasks near the children who attend it. Presumably, a hotel that decided to install a kiddie pool would have to allow laundry personnel with pedophilia not to collect towels from areas where little boys and girls are playing in bathing suits…"

"Well, guess what. Well-focused shame still has a place, even in the halls of law and medicine. The need to hide impulses, like the impulse to rape children and feeling guilty about it, and taking it upon oneself to control the impulse or go to jail for giving into it, can be part of a reasoned legal and public health strategy to prevent it. Being shunned should be a decent heads-up that it's time to get help and stay away from temptation – or else. The correct response to someone who declares he is a pedophile and asks for a room at your hotel, preferably away from little kids, is to tell that person that there are no rooms available for him and to get lost."[32]

CNS News writes, "Here's a tidbit of information The New York Times left out of the bio of a professor who argued pedophilia is 'not a crime' in a recent Op-Ed - she's also a President Obama supporter.[33]

The Daily Caller argued that the proposal to give people diagnosed with pedophilia reasonable protections under the law "a loss for the 99 percent of non-pedophile American citizens and voters, because it would eliminate their longstanding civil right to simply and cheaply exclude pedophiles from mainstream society or from jobs near children."[34]

"CHICKEN LITTLE" REPORTING

The term "Normalizing Pedophilia" goes beyond the use of the "P-Word" as a mere insult because it represents a Chicken Little mentality (i.e., "The Sky Is Falling!"). The message is a slippery slope—if we allow a particular unpopular thing to happen, then it will lead to the "acceptance of pedophilia."

For example, when Congress debated a new version of the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act in 2009, those who opposed this hate crimes bill, which added sexual orientation or perceived gender identity as falling under the targets of hate crime laws, labeled the bill the "Pedophile Protection Act." Congressman Steve King (R-Iowa) told The Hill the hate crime bill amounted to a "pedophile protection act," and is meant to create "thought crimes" and protect "sexual idiosyncrasies."[35]  In an interview with Rep. King, Sean Hannity asks, "Is it safe to say that Democrats were willing to protect pedophiles but not offer the

same protection to servicemen and women?" to which King replied, "Absolutely true."[36]  The bill passed despite the efforts of the Republican dissenters, yet no one has been prosecuted under the law for hate crimes against registered persons or people accused of "pedophilia."

A 2019 "Chicken Little" article in The Federalist proclaims the following over-the-top professions:

- Equating Sex Ed with Pedophilia: "Activists for normalizing pedophilia are on the move. Public acceptance of adult sex with children is the next domino poised to fall in identity politics. It's being sustained, among other things, by the rapid sexualization of children in the media and in K-12 education…
- Comparing Transgendered issues to Pedophilia: Unveiling pedophilia as 'just fine' will likely be an ambush if we aren't prepared. It promises to be as swift as the 'transgender tipping point' campaign that shrewdly coincided with the Supreme Court's Obergefell decision in 2015. It will be accompanied by a defiant campaign to paint any resistance as a relic of outdated morality that oppresses the rights of an identity group and the civil rights of any children caught in it…
- Schools AND Transgendered folks are injecting folks with pedophilia: Our public schools, with the backing of the highly politicized American Academy of Pediatrics, are also now in the business of nudging any young child to get injections of puberty blockers if he or she claims to be transgender. Some states are now threatening to take away custody from any parent who is not on board with that. K-12 classrooms are becoming labs in which kids are being programmed to serve such agendas…
- Mass Media and Academia are in on the act, too: There are two main avenues to legalizing adult sexual relations with pre-pubescent children: 1) to designate it as a sexual orientation; and 2) to lower—or abolish—the age of consent for sexual activity. Both efforts are on track by pedophilia advocates, especially in academia and in the mass media…
- The Media published an unpopular voice, therefore they are normalizing pedophilia: There has also been a rash of publishing in popular magazines. The idea of the "virtuous pedophile" was unveiled in Todd Nickerson's Salon article "I'm a Pedophile, but not a Monster." Salon actually removed the article, although it's still archived on the internet. Nickerson says he would never act on his urge and never has. He also has a website called "Virtuous Pedophile," ostensibly for helping celibate pedophiles resist their urges…
- Because A, then C: The other turning point in legalizing pedophilia would come with repeated claims in public discourse that prepubescent kids can enjoy and consent to sexual relationships with adults. Furthermore, denying children this avenue of expression with adults, the argument goes, violates their civil rights…
- Equality Laws equal pedophile rights: Just about all of today's so-called "anti-discrimination" laws include sexual orientation and gender identity (SOGI) classifications. Once pedophilia is classified as a sexual orientation, then it's protected under that umbrella, which covers all areas of life: employment, education, medicine, housing, business, military, even the parish life of churches, family life, and much more.

The Federalist article's Chicken Little article ends with, "For those just waking up, we're not in Kansas anymore. We're on a speeding train through the Twilight Zone. And the hyper-suggestibility of most folks in this age of internet-induced mass delusion will get us there even faster."[37]  It is an interesting statement from an article engaging in a delusion.

The Beverly LaHaye Institute (published on the website "Concerned Women of America," a fundamentalist Protestant organization) published a report linking a 2011 symposium held by the treatment organization B4U-ACT (calling a "pro-pedophile group") with efforts to "normalize child rape" and the removal of homosexuality as a mental disorder from the DSM in 1973. The CWA report argues the removal of homosexuality as a mental disorder (and later discussions about gender identity) has created a blueprint for "pedophiles" to gain "acceptance." It criticizes B4U-ACT for stating people suffering from sexual attraction to minors can overcome the struggles and contribute to society, adding, "If homosexuality can be arbitrarily removed, what will prevent the APA from arbitrarily removing pedophilia?"[38]  Based upon the tone of the article, the CWA seemed more concerned with linking gay rights with pedophilia and maintaining stereotypes than looking at the subjects in an objective manner.

SUPPRESSING UNPOPULAR VIEWPOINTS

While Americans are allowed to express a number of unpopular viewpoints thanks to the US Constitution, that has not prevented people from attempting to suppress that viewpoint. The dominant paradigm is that pedophilia is an inherent evil because everyone who commits a sexual offense against a minor dooms the child to a lifetime of suffering from which there can be no recovery. (Again, people combine the status of having a mental condition with a crime.) The act of discussing pedophilia in even a neutral way or in any way that does not conclude in total condemnation leads to accusations of "normalizing" or "promoting" pedophilia and public outrage.

Many people seem to forget an opinion or a mere discussion about a subject does not mean there is a blind acceptance of that viewpoint. If we discuss the events of a historical event, such as why the Nazis rose to power and how they were able to pull off the Holocaust, it is not an acceptance of the practices of Nazis, but an attempt to understand the subject.

AR-00001059

In her book "Harmful to Minors: The perils of protecting children from sex," Judith Levine pinpoints two sources of political articulation of sexual fears in our current society:

- Feminism: Exposing widespread rape and domestic violence
- "Religious Right:" Women and children need special attention[39]

Below are a few controversies in recent years in which people questioning the victim narrative have been silenced or attacked by those accusing researchers of being "pro-pedophile." It must be noted that between the two main sources of modern Predator Panic noted by Levine, most feminist-driven discussions like the campus rape controversy and the #MeToo Movement do not focus as much on children as on women, whereas politically right-leaning groups focus more often on children. Thus, conservatives, particularly religious fundamentalists, are often at the center of many of the recent controversies.

*The Rind Study Controversy*

In 1997, psychology professor Bruce Rind from Temple University and doctoral student Philip Tromovitch from the University of Pennsylvania published a study finding that the general consensus associating CSA with intense, pervasive harm and long-term maladjustment was incorrect; not every victim of abuse was scarred for life, according to this study.[40]  Public reaction to this peer-reviewed study was negative but mostly quiet until it was picked up by Laura Schlessinger's radio show, followed largely by conservative crowds. Other conservative groups soon joined the fray, like the "Family Research Council" (a fundamentalist Protestant activist group) and the "Leadership Council on Mental Health, Justice, and the Media" (a group that defended the "repressed memory" myth).[41]  The American Psychological Association backtracked from defense of the peer-reviewed study in a publicly published letter sent to Representative Tom DeLay.[42]  A number of states passed resolutions condemning the study; the106th Congress unanimously passed HRC. 107, a resolution condemning the study; HRC 107 was sponsored by Rep. Matt Salmon (R-AZ) and cosponsored by 46 Republican congressmen (including later disgraced Rep. Mark Foley) and one Democrat.[43]

*Judith Levine's Book "Harmful To Minors"*

Judith Levine's 2002 book reviewing various American sex education practices and sex offense laws was also subject to backlash because Levine questioned abstinence-only education and drew a similar conclusion to the Rind study. Even before the book was published, the work inspired controversy, largely among conservative-leaning media commentators and activist groups.[44]  Minnesota politician Tim Pawlenty (who was running for governor at the time) called the book "trash"; anonymous emails and phone calls to the publisher told them to "burn in hell."[45]  Robert Knight, director of Concerned Women for America's Culture and Family Institute, called the book "every child molester's dream—and every parent's nightmare."[46]  Laura Schlessinger stated several times the book was another attempt to legitimatize adult sexual abuse of children.[47]

The NY Times write, "In response, the University of Minnesota Press has agreed to set up an extraordinary two-month review of the way its press acquires and reviews books, to be conducted by people from other academic presses… A number of civil libertarian groups signed a letter written by the National Coalition Against Censorship saying that the move undermines academic freedom and 'invites future attempts at intellectual blackmail'… he book does not, in fact, endorse pedophilia. What Ms. Levine does argue is that the fear of pedophilia is overblown and that the age of consent should be lowered in certain circumstances."[48]  Despite the controversy, the book won an LA Times Book Award and the publishers were commended.[49]

*The Amazon.com "Pedophile Book"*

Amazon.com opened its Kindle store in 2007, allowing people to self-publish their books in electronic format. Self-publishing an eBook takes "less than 5 minutes and your book appears on Kindle stores worldwide within 24-48 hours."[50]  One such book was "The Pedophile's Guide to Love and Pleasure: A Child-Lover's Code of Conduct" by Philip Greaves. In the week preceding the media blitz, Greaves had reportedly only sold a single copy of the Ebook.[51]

Backlash was swift and severe once the book made headlines. Techcrunch wrote, "Amazon customers are letting their feelings be known about such a book. Of the 59 customers reviews of the product, 58 give it the minimum 1 star (while one joker gave it 5 stars). And it looks like just about all of them are from today, and they're all basically either calling for a boycott of Amazon for carrying such a book, or for Amazon to remove it immediately. A few of them say they've called or email Amazon and that the company has said it's looking into it… Another comment says that over 100 negative reviews have been deleted so far, but they keep coming in. This could get very ugly…. It is currently the 158,221st best-selling Kindle book in the store. That is terrifying."[52]

Initially, Amazon defended the sale of the eBook. Amazon issued a statement that will no doubt fuel the outraged comments multiplying on the "Pedophile's Guide" Amazon page. "Amazon believes it is censorship not to sell certain books simply because we

or others believe their message is objectionable," it reads. "Amazon does not support or promote hatred or criminal acts, however, we do support the right of every individual to make their own purchasing decisions." As a private company, Amazon has the right to sell whatever it wants as long as it's legal, and as such, offers books that cater to Holocaust deniers and other hate groups, as well as graphic dog fighting and cock fighting videos. Adult (legal) pornography, while available in book and magazine form, is not permitted in the Kindle e-reader store. This is possibly because of its iTunes partnership with the notoriously porn-free Apple which removed both "Ulysses" and the "Kama Sutra" from its own book store.[53]

Less than 24 hours later, the eBook was removed from the Amazon Kindle store. In the 24 hours since the controversy began, sales of the book skyrocketed, and landed at #96 on Amazon's Top 100 list. By the time the eBook was removed from Amazon, over 3000 reviews had been posted.[54]  Not content with getting one eBook removed, the online witch hunters sought out all other obscure books that seemingly promote pedophilia and threatened boycotts until the books were removed.[55]

Controversial Polk County FL sheriff Grady Judd bought a printed copy of the book in order to arrest the author (who was a Colorado resident) on charges of "distribution of obscene material depicting minors engaged in conduct harmful to minors." Sheriff Grady Judd told ABC News, "My goal is for him to eat processed turkey in the Polk County Jail on Christmas."[56]  Ultimately, Greaves pleaded no contest to the charges and was allowed to return to Colorado, serve 2 years of probation, and avoided sex offense registration.[57]

*Susan Clancy's "The Trauma Myth"*

Susan Clancy already received backlash from taking on the repressed memory myth in a previous book, so she was expecting her 2010 book similar backlash. Clancy was not attempting to rationalize sex between minors and adults, but was calling for an approach to the effects of sexual abuse that was based on evidence over opinion. As Clancy told Salon in 2010:

"The title refers to the fact that although sexual abuse is usually portrayed by professionals and the media as a traumatic experience for the victims when it happens — meaning frightening, overwhelming, painful — it rarely is. Most victims do not understand they are being victimized, because they are too young to understand sex, the perpetrators are almost always people they know and trust, and violence or penetration rarely occurs. 'Confusion' is the most frequently reported word when victims are asked to describe what the experience was like. Confusion is a far cry from trauma... If you really want to help people, if you're really trying to prevent and treat a social problem, you have to describe the problem truthfully. For 30 years we've been working on preventing sexual abuse. But we've skirted around what sexual abuse really is."[58]

Reason Magazine adds, "To be clear, she does not suggest that sexual molestation isn't traumatizing—just that it traumatizes victims in a different way than was commonly understood. But when she began putting this out there, it was not taken well by her peers in the psychology community or by feminist activists. Clancy was accused of victim blaming and of being a 'friend of pedophiles.' At the very least, critics asked, why did it matter? If the new trauma paradigm had mobilized mass attention and opened Uncle Sam's pocketbook for research studies, child abuse hotlines, training programs, and awareness campaigns, then why quibble over the psychological particulars? The answer, to Clancy, is simple: 'To truly help victims, our theories need to be based on the empirical knowledge—and not on assumptions, politics, and lies.' As she interviewed more and more survivors of childhood sex abuse, Clancy realized that misinformation about trauma was further victimizing them and causing even more psychological harm."[59]

While Clancy attempted to clarify her position repeatedly, she still became a pariah in lay and academic circles. The press "crucified" her as a "friend of pedophiles," colleagues boycotted her talks, and advisers suggested that continuing on her trajectory would rule out an academic career. The book was bashed in online reviews. The NY Times reporter laments, "Science is sometimes no match for conviction, and often, evidently, good writing is not either."[60]

*"Pedophile Apologists"*

The subtitle of a 2018 ARC Digital article asks, "Is it all right to use the scholarship of sexual abusers? What happens when the scholarship itself is in the service of sexual deviancy?" The author attacks the writings of Thomas O'Carroll, a British citizen with two prior sex crime convictions. The article states the artilcle is "amateurish" and "an exemplar of motivated reasoning." The reporter focuses on O'Carroll's background instead, adding, "At 73 years old, O'Carroll has long been a bogeyman for both the left and the right — not to mention the children he has violated. To the right, he's the perfect condensed symbol for the Sexual Revolution's true telos — the nihilistic destructuring of human relations. To the left, he's an albatross, a useful idiot for conservatives intent on establishing a link between homosexuality and pedophilia. He's also a testament to the degraded standards of interdisciplinary scholarship."

A writer for The Amrican Conservative writes, "Try to wrap your mind around the fact that a peer-reviewed academic quarterly has just published this convicted pedophile's philosophical argument for legalizing the rape of children. The reader who sent me Lee's

AR-00001061

column added:

There's apparently a whole community of pedophiles on Twitter. They call themselves "MAPs" (minor-attracted persons). Many of them euphemistically refer to themselves as protectors of children and anti-abuse activists. Some like to use the label "NOMAP" (NO="non-offending). The same people will also note their "aoa" (age of attraction) in their profile. It's utterly surreal that the great and good at Twitter are scouring the platform of anti-trans content but are perfectly content with tolerating pedophile community-building…many (most?) of these people also identify as trans, queer, or gay."[61]

The paper in question, "Childhood 'Innocence' is Not Ideal: Virtue Ethics and Child–Adult Sex,"[62]  states the intent of the paper as follows:

"This response challenges Malón's virtue ethics, as applied to child–adult sexual relationships, in three ways: (1) by contesting the view that sex is an exceptional aspect of morality, to which a virtue approach needs to be applied; (2) by contesting the view that virtue ethics succeed, where other arguments fail, against the moral admissibility of child–adult sexual relations; (3) by proposing that, far from necessarily condemning child–adult sexual relationships as falling unacceptably short of virtuous ideals, a virtue ethics approach is capable of seeing such relationships as instantiating an ideal, or at least constituting one element of such an instantiation."

As with the "Pedophile Book," critics feel O'Carroll cannot even be allowed to express an unpopular viewpoint, especially when the viewpoint comes from a suspect class. In this instance, O'Carroll was twice-convicted of a sexual offense and is questioning the belief that all adult-minor interactions can be argued from a philosophy/ ethics standpoint. But while the popular viewpoint is silencing a person advocating for sex between adults and minors is virtually universal, there is a little apprehension about publishing (or censoring) individuals that identify themselves as NOMAPs ("Non-Offending Minor Attracted Person, i.e., a person suffering from pedophilia but vows not to engage in sexual abuse of children).

Salon.com had published an article by a self-professed NOMAP in September 2015 entitled, "I'm a pedophile, but not a monster." [63]  The article discussed Nickerson's struggles with the condition of pedophilia and his gratitude for "Virtuous Pedophiles," an online community dedicated to a life free from abusing children. A TheCut.com article questioning Salon's subsequent removal of the article opined, "No reasonable reader could construe this as pro-pedophilia. Nickerson is explicitly saying his condition has hampered his life immensely and that he is simply hoping to scratch out a decent existence without hurting anybody. That's the entire point of the article — nowhere does he defend sexual contact between adults and minors. Why, then, was his article deleted? It sounds like Salon won't ever provide an explanation…  Unfortunately, by deleting this article, originally with no explanation, and then with a bland, corporate-PR one, Salon is sending the signal that it did something wrong by publishing it in the first place. It's ceding ground to the many people who have endlessly and thoughtlessly parroted the pro-pedophile charge. Society should want articles like this published. Articles like this, in the long run, help keep children safe from pedophiles."[64]

Dr. James Cantor believes that allowing pedophiles to have a voice has educational and prevention value. "Without somebody like Ender providing that kind of image, the only kinds of images that these other pedophiles see are the ones who commit offenses," Cantor told VICE. "That doesn't help anybody. If anything, it's making it worse."[65]  A reporter from VICE followed members of Virtuous Pedophiles over the course of a year and despite initial nervousness, discovered those suffering from pedophilia were the same as people not suffering from pedophilia.  "On the way over, the reality of what I was doing began to sink in and I started to feel nervous. However, after meeting Gary and being welcomed into his life for the week, I grew so comfortable that my perception of him came to be defined less and less by his sexual proclivity. This turned out to be the case with the others, too. From what I saw, they were regular people trying to get on with life in much the same way that anyone else does, all while having to tackle a burden that they did not choose to bare."[66]  There point made is that there is no better way to understand the issue of pedophilia than to talk with those struggling with the feelings and choosing not to act on it.

*PizzaGate and QAnon*

Debunked conspiracies like the Satanic Ritual Abuse scares of the 1980s have been revived thanks to the Internet. The two conspiracy theories "PizzaGate" and the writings of a person (or persons) posting as simply "Q" have revived the once-debunked notion that high-ranking members of the government are running an underground pedophile ring.

The PizzaGate conspiracy theory began when 4chan and Reddit users scoured hacked personal emails from Hillary Clinton's campaign chairman, John Podesta. Among the emails were a series of emails describing dinner plans between John and his brother Tony, a lobbyist. Since 4chan users used the term "cheese pizza" as a euphemism for child porn (CP), and because apparently adults must not like pizza, the conspiracy theorists concluded the emails were secret codes for a clandestine pedophile ring. These conspiracy theorists spread rumors of kill rooms, underground tunnels, Satanism and even cannibalism emerged in fabricated stories and on social media. This theory reached its peak when Edgar M. Welch entered Comet Ping Pong, a local eatery owned by an associate the Podesta brothers, armed with an assault rifle with the intent of finding the underground bunkers mentioned in the

AR-00001062

conspiracy.[67]

James Alefantis and his restaurant, Comet Ping Pong in Washington, D.C., faced a number of threats by those believing in PizzaGate. Rolling Stone reports, "The home addresses and phone numbers of Alefantis and his employees were published online. Comet would receive 150 menacing calls in a single day, Alefantis says, so he unplugged the phone. People reviewed Comet on Yelp and said there were chopped-up baby parts in their food... Strangers filmed his house and questioned his neighbors, he says. Any person or organization connected to him also got sucked in. A non-profit art gallery whose board he chaired received angry calls. Any trace of Alefantis' life found in public records or social media — an old home address, an event he had attended — was used against him. The FBI dismissed the threats. Threats only tapered off after legal pressure forced promoters of PizzaGate (like Alex Jones) to back off.[68]

In keeping with the conservative nature of the PizzaGate conspiracy believers, a sequel of sorts known as "QAnon" formed in late 2017. As with PizzaGate, QAnon started on 4chan. The NY Times gives readers the "short version" of QAnon:

"Q claims to be a government insider exposing an entrenched, international bureaucracy that is secretly plotting all sorts of nefarious schemes against the Trump administration and its supporters. The character uses lingo that implies that he or she has a military or intelligence background. It's a stew of various, but connecting, conspiracy theories that generally hold Mr. Trump as a conquistador battling a cabal of anti-American saboteurs who have taken over government, industry, media and various other institutions of public life in a plan to … well, the overarching goals of the nefarious actors are not clear."[69]

Arc Digital describes QAnon this way:

"For those fortunate enough not to know, QAnon purports that a government insider with "Q level clearance" (a high level security clearance) is leaking clues about a hidden, epic battle between President Trump and his allies on one side, and the deep state and a satanic cabal of pedophiles on the other.
This person (or people), who claims to be close to President Trump, is known as 'Q.' Q leaves "breadcrumbs" of top secret information on the fringe message boards 4chan and 8chan. The messages are cryptic, but followers eagerly decipher them, finding hints of the apocalyptic, behind-the-scenes battle Trump's waging against the secret pedophiles…"

"Pizzagate and QAnon's theories have these five elements in common:"

1. "Originated with a 'government insider' on 4chan" (PizzaGate began with posts by "FBI Anon")
2. "Fixated on child abuse and pedophilia"
3. "Secret codes used by the evil conspirators"
4. "Satanic panic"
5. "Promised punishment of hated elites"[70]

With the July 2019 arrest of billionaire Jeffrey Epstein (on the same charges in which he was convicted in 2005), conspiracy theorists see it as "vindication." Since Epstein was convicted in 2008 for soliciting a teenage prostitute, the ongoing civil suits, and the 2019 arrests are for the same incidents, there is no new information not already known to the public. Also, what is problematic for the current social climate driven by partisan politics is both Donald Trump and Bill Clinton are linked to Epstein (QAnon is a pro-Trump conspiracy theory). Other prominent people are linked to Epstein, from high-profile attorneys like Alan Dershowitz to Hollywood stars like Woody Allen to TV personalities like Katie Couric.[71]

The Epstein arrest has revived the QAnon conspiracy, which seemed to be on the decline in the weeks prior to the arrest. Other QAnon theories never came to pass and it seemed QAnon was fizzling out. As noted on VICE, "There have been 73 'Q Drops' since the beginning of May and there was a significant lull in June, leading some to speculate that the release of the Mueller report had been the final nail in the coffin for the movement, whose slogan is "trust the plan." But Epstein's arrest seems to have reenergized QAnon: Since Epstein's arrest over the weekend, there have been 52 Q Drops."[72]

Conspiracy theories are nothing new. As noted in The Atlantic, "Fears of systematic, underground child abuse have run through popular conspiracy theories for centuries. One of the oldest anti-Semitic canards held that Jews were murdering Christian children and using their blood to bake matzo. More recently, in the 1980s, America was gripped by the "Satanic panic," as parents became convinced that their day-care centers were filled with Satanists ritualistically abusing their children… Anna Merlan, the author of Republic of Lies, says allegations of pedophilia are central to some of the most widely circulated conspiracy theories on the internet today. She attributes this in part to the simple horror of the crime. 'If someone is abusing children, there is no worse thing to be,' Merlan said. Conspiracists tend to weave their narratives in ways that conveniently implicate their political enemies while sparing their allies. But, Merlan added, 'conspiracy theories aren't based on nothing'—and with every new #MeToo allegation, convictions deepen among the true believers."[73]  PizzaGate/ QAnon feels like a culmination of decades of not just accepting conspiracy theories, but of

AR-00001063

society suppressing theories that offer a viewpoint that is contrary to popular opinion.

CONCLUSION

The definition of "pedophile" and "sex offender" continue to be erroneously used interchangeably. The use of the term "Pedophile" has evolved into an insult and a device for instilling fear in American society.  Experts in the field of sexual abuse prevention warn against misuse of the two terms. In order to discuss sexual abuse prevention, we must adopt an honest approach to both.

"Sex Offender" is a legal term used to denote someone convicted of a sex offense, but that term is also used as an insult. (Also, the term "sex offend-ER" is an adjective, not a noun, thus describing a person by a single action.) Registered Persons can be convicted of a variety of crimes that could include serious offenses like rape or child molestation, but in some cases, juvenile sexting, public urination, or prostitution cases can land a person on the public sex offense registry. Very few people convicted of sexual offenses meet the criteria for a clinical diagnosis for pedophilia.

Pedophilia is a diagnosis given by a medical professional, not a legal authority. As such, nobody in America can be "convicted" of "pedophilia." There is no state, federal, or territorial criminal statute called "pedophilia." Not every sex crime against a minor can be attributed to "pedophiles" because roughly a third of sex crimes against juveniles are committed by other juveniles, and many acts of molestation are conducted by "situational" offenders, i.e., those without a primary attraction to children. In addition, a person can have clinical diagnosis of pedophilia without ever acting out sexually with a minor.

Defining the terms and stating differences these facts is not "normalizing" either "child rape" or "pedophilia" any more than honest discussions about past events like the Holocaust or American Slavery is an endorsement of either act. The mere act of creating proper definitions is neutral and does not imply blind support of the action. Definition is merely the human way to understand the issue through the use of labels. But improperly using the labels can lead to a host of other problems.

Unfortunately, there is a very visible effort to silence any effort to come to an understanding by use of the vague but scary-sounding term "normalizing pedophilia." Because there are too few honest discussions about sexual abuse and those who engage in it, the most absurd theories proliferate, including wild conspiracy theories about underground child sex rings, such as with the PizzaGate/ QAnon theories.

An honest solution to a problem requires an honest approach, and the honest approach begins with an honest definition.

REFERENCES

1. "Sex Offender." Dictionary.com. Accessed 10 July 2019 at https://www.dictionary.com/browse/sex-offender
2. Chanakya Sethi. "The Ridiculous Laws That Put People on the Sex Offender List." Slate. 12 Aug 2014. Accessed 10 July 2019 at https://slate.com/news-and-politics/2014/08/mapped-sex-offender-registry-laws-on-statutory-rape-public-urination-and-prostitution.html
3. AP. "States vary on dealing with youth sex offenders." The Oklahomian. 7 May 2010. Accessed 10 July 2019 at https://oklahoman.com/article/3459434/states-vary-on-dealing-with-youth-sex-offenders
4. Corey Levitan and Bettman/ Corbis. "You Might Be a Sex Offender and Not Even Know It!" Men's Health. 19 May 2015. Accessed 10 July 2019 at https://www.menshealth.com/trending-news/a19541024/you-might-be-sex-offender-and-not-know-it/
5. Dana Rybak. "'Sexting': From bad judgment to a registered sex offender." Campbell Law Observer. 9 July 2013. Accessed 10 July 2019 at http://campbelllawobserver.com/sexting-from-bad-judgment-to-a-registered-sex-offender/
6. "High school teen faces 10 years in prison for sexting female classmate." Michigan Chronicle. 28 Feb 2017. Accessed 10 July 2019 at https://michiganchronicle.com/2017/02/28/high-school-teen-faces-10-years-in-prison-for-sexting-female-classmate/
7. David Finkelhor, Richard Ormrod, and Mark Chaffin. "Juveniles Who Commit Sex Offenses Against Minors." Office of Justice Programs, Juvenile Justice Bulletin. December 2009. Accessed 10 July 2019 at https://www.ncjrs.gov/pdffiles1/ojjdp/227763.pdf
8. Supra, Lanning.
9. "Pedophilia." Psychology Today. Updated 22 Feb 2019. Accessed 10 July 2019 at https://www.psychologytoday.com/us/conditions/pedophilia
10. Hall, Richard J. and Richard Chandler Hall. "A profile of pedophilia: definition, characteristics of offenders, recidivism, treatment outcomes, and forensic issues." Mayo Clinic proceedings 82 4 (2007): 457-71 .
11. "What Is Pedophilia?" WebMD. Accessed 10 July 2019 at https://www.webmd.com/mental-health/features/explaining-pedophilia#1
12. Ken Lanning. "Child Molesters: A Behavioral Analysis for Professional Investigating the Sexual Exploitation of Children." National Ctr for Missing and Exploited Children. 2010. Accessed on 10 July 2019 at http://www.missingkids.

AR-00001064

com/content/dam/missingkids/pdfs/publications/nc70.pdf,  pgs. 19-20, 29-30

13. "Paraphilias." Psychology Today. 26 Mar 2019. Accessed 13 July 2019 at https://www.psychologytoday.com/us/conditions/paraphilias

14. Abel, Gene & Becker, Judith & Mittelman, Mary & CUNNINGHAM-RATHNER, JERRY & Rouleau, Joanne-Lucine & Murphy, William. (1987). Self-Reported Sex Crimes of Nonincarcerated Paraphiliacs. Journal of Interpersonal Violence - J INTERPERS VIOLENCE. 2. 3-25. 10.1177/088626087002001001.

15. Robert Weiss PhD, MSW. "Effective (and Ineffective) Treatments for Sexual Offenders." Psych Central. 9 June 2015. Accessed 10 July 2019 at https://blogs.psychcentral.com/sex/2013/05/effective-and-ineffective-treatments-for-sexual-offenders/

16. Michel Hersen. "Encyclopedia of Behavior Modification and Cognitive Behavior Therapy. Volume I: Adult Clinical Applications." Sage Publications. January 2005. p.414

17. Dr. Barry Maletzky. "Sexual Abuse and the Sexual Offender: Common Man or Monster? (The Forensic Psychotherapy Monograph Series) 1st Edition." Routledge, 21 July 2016. Tables 2 and 3

18. Priest, R., & Smith, A. (1992). Counseling adult sexual offenders: Unique challenges and treatment paradigms. Journal of Counseling & Development, 71, 27–32.

19. Okami, P. & Goldberg, A., "Personality Correlates of Pedophilia: Are They Reliable Indicators?", Journal of Sex Research, Vol. 29, No. 3, 1992, pp. 297-328.

20. Facts, Figures and Estimates Regarding Treatment for Incarcerated Sex Offenders in Montana (01/06/2011)

21. Wesley Stephenson. "How many men are paedophiles?" BBC. 30 July 2014. Accessed 13 July 2019 at https://www.bbc.com/news/magazine-28526106

22. "Estimating the Prevalence of Abusers Among Pedophiles." The Primary Prevention of Child Sexual Abuse. Accessed 14 July 2019 at https://www.csaprimaryprevention.org/prevalence-of-abusers-among-pedophiles.html

23. Michael Seto, James Cantor, and Ray Blanchard. "Child Pornography Offenses Are A Valid Diagnostic Indicator Of Pedophilia." Journal of Abnormal Psychology, 2006. Vol. 115, No. 3, 610-615

24. Lucy Wescott. "VATICAN PUSHES BACK AFTER REPORT THAT POPE SAID 2 PERCENT OF CATHOLIC CLERGY ARE PEDOPHILES." Newsweek. 14 July 2014. Accessed 14 July 2019 at https://www.newsweek.com/vatican-pushes-back-after-pope-francis-claims-2-percent-catholic-clergy-are-258729

25. Supra, BBC 2014

26. Thomas G Plante. "The New John Jay Report on Clergy Abuse in the Catholic Church." 18 May 2011. Accessed 14 July 2019 at https://www.psychologytoday.com/us/blog/do-the-right-thing/201105/the-new-john-jay-report-clergy-abuse-in-the-catholic-church

27. Supra, Lanning, p.13-14

28. Diana Tourjée. "Most Child Sex Abusers Are Not Pedophiles, Expert Says." Vice.com. 4 Apr 2016. Accessed 13 July 2019 at https://www.vice.com/en_us/article/mgmzwn/most-child-sex-abusers-are-not-pedophiles-expert-says

29. Margo Kaplan. "Pedophilia: A Disorder, Not a Crime." NY Times. 5 Oct. 2014. Accessed 13 July 2019 at https://www.nytimes.com/2014/10/06/opinion/pedophilia-a-disorder-not-a-crime.html

30. Marie Tae McDermott. "Discussion of Pedophilia Turns Heated." NT Times. 13 Oct 2014. Accessed 13 July 2019 at https://www.nytimes.com/times-insider/2014/10/13/discussion-of-pedophilia-turns-heated/

31. Victor Fiorillo. "Q&A: Rutgers Law Prof Who Says Pedophilia Is Not a Crime." PhillyMag. 6 Oct 2014. Accessed 13 July 2019 at https://www.phillymag.com/news/2014/10/06/pedophilia-not-a-crime-rutgers-margo-kaplan/?fbclid=IwAR3mHYS_5FaCd-6jkCIZkL3O-MF5vjKmYGEL9WSjjIsTtENHW4oB0w7yPek

32. "It makes no sense to view pedophilia as a 'disability.'" Fox News. 7 Oct. 2014. Accessed 13 July 2019 at https://www.foxnews.com/opinion/it-makes-no-sense-to-view-pedophilia-as-a-disability

33. Katie Yoder. "Obama Donor Argues Pedophilia 'Not a Crime' in NYT Op-Ed." CNS News. 7 Oct 2014. Accessed 13 July 2019 at https://www.cnsnews.com/mrctv-blog/katie-yoder/obama-donor-argues-pedophilia-not-crime-nyt-op-ed

34. Neil Munro. "Pedophilia Deserves Civil Rights, Says New York Times' Op-Ed." Daily Caller. 6 Oct 2014. Accessed 13 July 2019 at https://dailycaller.com/2014/10/06/pedophilia-deserves-civil-rights-says-new-york-times-op-ed/

35. Michael O'Brien. "Rep. Steve King slams hate crimes bill as protecting 'sexual idiosyncrasies." The Hill. 10 Oct 2009. Accessed 13 July 2019 at https://thehill.com/blogs/blog-briefing-room/news/62451-rep-steve-king-slams-hate-crimes-bill-as-protecting-sexual-idiosyncrasies

36. Jason Linkins. "Democrats Accused Of Using Hate Crime Bill To Protect Pedophiles (VIDEO)." HuffPost. 6 June 2009. Accessed 13 July 2019 at https://www.huffpost.com/entry/democrats-accused-of-usin_n_198167

37. Stella Morabito. "The Pedophile Project: Your 7-Year-Old Is Next On The Sexual Revolution's Hit Parade." The Federalist. 21 Feb 2019. Accessed 13 July 2019 at https://thefederalist.com/2019/02/21/pedophile-project-7-year-old-next-sexual-revolutions-hit-parade/

38. Brenda Zurita. "Who in Their Right Mind Would Normalize Pedophilia?" Beverly LaHaye Institute. Concerned Women of America. Aug 2014. Accessed 14 July 2019 at http://concernedwomen.org/wp-content/uploads/2014/08/BLI_Normalization-of-Pedophilia.pdf

AR-00001065

39. Judith Levine. Harmful to Minors: The Perils of Protecting Children From Sex. 2002. ISBN 0-8166-4006-8 [hardcover], ISBN 1-56025-516-1 [paperback]

40. Rind, B; Tromovitch P Bauserman R (1998). "A Meta-Analytic Examination of Assumed Properties of Child Sexual Abuse Using College Samples" (PDF). Psychological Bulletin. 124 (1): 22–53. doi:10.1037/0033-2909.124.1.22. PMID 9670820.

41. Lilienfeld, SO (2002). "When Worlds Collide: Social Science, Politics and the Rind et al. (1998) Child Abuse Meta-Analysis" (PDF). The American Psychologist. 57 (3): 177–187. doi:10.1037/0003-066x.57.3.176. PMID 11905116

42. Raymond D. Fowler. "APA Letter to the Honorable Rep. Tom Delay." APA. 9 June 1999.

43. "H.Con.Res.107 - Expressing the sense of Congress rejecting the conclusions of a recent article published by the American Psychological Association that suggests that sexual relationships between adults and children might be positive for children. 106th Congress (1999-2000). Accessed 14 July 2019 at https://www.congress.gov/bill/106th-congress/house-concurrent-resolution/107/cosponsors

44. Bootie Cosgrove-Mather. "Furor Over Youth Sex Book." CBS News. 4 Apr 2002. Accessed 14 July 2019 at https://www.cbsnews.com/news/furor-over-youth-sex-book/

45. Sarah White. "Title: Beyond panic, controversy & taboo: Levine's enlightened look at kids & sex." Fifth Estate #359, Winter 2002–2003. Accessed 14 July 2019 at https://theanarchistlibrary.org/library/sarah-white-beyond-panic-controversy-taboo-levine-s-enlightened-look-at-kids-sex

46. "Reject Academic Cover for Child Molesters, CFI Says." Concerned Women for America. 28 March 2002. Accessed on 14 July 2019 at https://web.archive.org/web/20051102092521/http://www.cwfa.org/articledisplay.asp?id=1162&department=MEDIA&categoryid=family

47. Jason Collum. "Harmful to whom?" AFA Journal. June 2002. Accessed 14 July 2019 at https://afajournal.org/past-issues/2002/june/harmful-to-whom/

48. Robert F. Worth. "Renegade View On Child Sex Causes a Storm." NY Times. 13 April 2002. Accessed 14 July 2019 at https://www.nytimes.com/2002/04/13/books/renegade-view-on-child-sex-causes-a-storm.html

49. J. Michael Kennedy. "Levine Wins Times Award for Powerful 'Harmful to Minors.'" LA Times. 27 Apr 2003. Accessed 14 July 2019 at https://www.latimes.com/archives/la-xpm-2003-apr-27-me-bookwinners27-story.html

50. "Self-publish eBooks and paperbacks for free with Kindle Direct Publishing, and reach millions of readers on Amazon." Amazon.com. Accessed 14 July 2019 at https://kdp.amazon.com/en_US/

51. "Author Of Pedophile Book Says He Has Sold One Copy Of Creepy Title." The Smoking Gun. 10 Nov 2010. Accessed 14 July 2019 at http://www.thesmokingun.com/buster/amazon/author-pedophile-book-says-he-has-sold-one-copy-creepy-title

52. MG Siegler. "The 158,221st Best-Selling Kindle Book: The Pedophile's Guide To Love And Pleasure." 10 Nov 2010. Accessed 14 July 2019 at https://www.amazon.com/Pedophiles-Guide-Love-Pleasure-ebook/dp/B0049U4CF6/ref=cm_cr_pr_product_top

53. Helen AS Popkin. "Amazon defends 'Pedophile's Guide.'" NBC News. 10 Nov 2010. Accessed 14 July 2019 at http://www.nbcnews.com/id/40112145/ns/technology_and_science-digital_home/t/amazon-defends-pedophiles-guide/#.XStUJOhKjIV

54. Ki Mae Heussner. "Amazon Removes Pedophilia Book From Store." ABC News. 11 Nov 2010. Accessed 14 July 2019 at https://abcnews.go.com/Technology/amazon-removes-pedophilia-book-store/story?id=12119035

55. Nick Bilton. "Amazon Under Attack for Sale of Pedophile Book." NY Times. 11 Nov 2010. Accessed 14 July 2019 at https://bits.blogs.nytimes.com/2010/11/11/amazon-under-attack-for-sale-of-pedophile-book/

56. Ki Mae Heussner. "Author of 'Pedophile's Guide' Arrested on Obscenity Charges." 20 Dec 2010. Accessed 14 July 2019 at https://abcnews.go.com/Technology/author-pedophiles-guide-arrested-obscenity-charges/story?id=12440853

57. Aletse Mellado. "Author of pedophilia book pleads no contest, gets probation." CNN. 7 Apr 2011. Accessed 14 July 2019 at http://www.cnn.com/2011/CRIME/04/07/florida.obscenity.arrest/

58. Thomas Rogers. "'The Trauma Myth': The child betrayed." Salon. 19 Jan 2010. Accessed 14 July 2019 at https://www.salon.com/2010/01/19/trauma_myth_interview/

59. Elizabeth Nolan Brown. "Bad Science Behind Campus-Rape Guidance Echoes '80s Trauma Myths." Reason.com. 12 Sept 2017. Accessed 14 July 2019 at https://reason.com/2017/09/12/neurobiology-of-trauma/

60. Abigail Zuger. "Abusing Not Only Children, but Also Science." NY Times. 25 Jan 2010. Accessed 14 July 2019 at https://www.nytimes.com/2010/01/26/health/26zuger.html

61. Rod Dreher. "Making Pedophilia Respectable." The American Conservative. 5 Dec 2018. Accessed 14 July 2019 at https://www.theamericanconservative.com/dreher/thomas-ocarroll-mainstreaming-pedophilia/

62. Thomas O'Carroll. "Childhood 'Innocence' is Not Ideal: Virtue Ethics and Child–Adult Sex." Sexuality & Culture (2018) 22: 1230–1262, https://doi.org/10.1007/s12119-018-9519-1

63. Todd Nickerson. "I'm a pedophile, but not a monster." Salon. 21 Sept. 2015. Accessed 14 July 2019 at  http://archive.is/ttVNy

64. Jesse Singal. "Salon Shouldn't Have Unpublished Its Article by a Pedophile Author." The Cut. 22 Feb 2017. Accessed 14 July 2019 at https://www.thecut.com/2017/02/salon-shouldnt-have-unpublished-its-pedophilia-article.html

65. Jackson Weaver. "Social Media Sites Can't Decide How to Handle 'Non-Offending' Pedophiles." Vice. 8 Feb 2018. Accessed 14 July 2019 at https://www.vice.com/en_ca/article/zmwn43/social-media-sites-cant-decide-how-to-handle-non-offending-pedophiles

AR-00001066

66. Alexander McBride Wilson. "I Spent a Year Living With 'Non-Offending' Pedophiles." Vice. 3 May 2017. Accessed 14 July 2019 at https://www.vice.com/en_ca/article/av39jz/i-spent-a-year-with-non-offending-paedophiles

67. Gregor Aisch, Jon Huang, and Cecilia Kang. "Dissecting the #PizzaGate Conspiracy Theories." NY Times. 10 Dec 2016. Accessed 14 July 2019 at https://www.nytimes.com/interactive/2016/12/10/business/media/pizzagate.html

68. Andy Kroll. "John Podesta Is Ready to Talk About Pizzagate." Rollong Stone. 9 Dec 2018. Accessed 14 July 2019 at https://www.rollingstone.com/politics/politics-features/john-podesta-pizzagate-766489/

69. Justin Bank, Liam Stack and Daniel Victor. "What Is QAnon: Explaining the Internet Conspiracy Theory That Showed Up at a Trump Rally." NY Times. 1 Aug 2018. Accessed 14 July 2019 at https://www.nytimes.com/2018/08/01/us/politics/what-is-qanon.html

70. Travis View. "The Insane QAnon Conspiracy Theory Is A Big Budget Sequel To Pizzagate." Arc Digital. 17 Aug 2018. Accessed 14 July 2019 at https://arcdigital.media/the-insane-qanon-conspiracy-theory-is-a-big-budget-sequel-to-pizzagate-145abb34bdc2

71. Matthew Walther. "The Jeffrey Epstein case is why people believe in Pizzagate." The Week. 8 July 2019. Accessed 14 July 2019 at https://theweek.com/articles/851426/jeffrey-epstein-case-why-people-believe-pizzagate

72. Tess Owen. "https://news.vice.com/en_us/article/a3xmgg/the-epstein-scandal-is-giving-qanon-everything-pizzagate-couldn't." Vice.com. 10 July 2019. Accessed 14 July 2019 at https://news.vice.com/en_us/article/a3xmgg/the-epstein-scandal-is-giving-qanon-everything-pizzagate-couldn't

73. McKay Coppins. "How the Epstein Case Explains the Rise of Conspiracy Theorists." The Atlantic. 12 July 2019. Accessed 14 July 2019 at https://www.theatlantic.com/politics/archive/2019/07/epstein-conspiracy-theories/593605/

AR-00001067



<----- BACK TO INDEX -------

(c) 2007-2019 Derek Logue Once Fallen. No part of this website may be reproduced without expressed written consent of Once Fallen

**THE "RAISING AWARENESS" MYTH:**
Debunking "If It Saves Just One Child" and Other Justifications for the Public Registry
Derek W. Logue of OnceFallen.com
Published 23 June 2019

"*The purpose of the law was to provide an awareness to parents. It was put there for parents to know where the offenders are living. Five million people have gone to the state web site. It's doing what it was supposed to do. We never said it was going to stop them from reoffending or wandering to another town.*" -- Maureen Kanka, in a telephone interview with The Star-Ledger.[1]

Megan's Law was sold to the public on the notion that public knowledge of the residences of individuals previously convicted of sexual offenses would decrease the likelihood of being a victim of a sexual offense. However, most sex crimes occur in the home by someone the victim knows, and the offender is more likely than not to lack any prior sex offense arrest record.[2] Maureen Kanka's claims of not knowing a person who served time for a sexual offense is debatable.[3] The public registry likely would not have saved Adam Walsh or Jacob Wetterling.

Despite the fact the existence of the public sex offense registry would likely have had no impact whatsoever on the cases that inspired the registry, this registry has been promoted as a panacea. Proponents of the registry have justified the registry by touting the claims it raises awareness. The mantra that the registry increases vigilance is often accompanied by the mantra, "If it saves just on child, then the registry is worth it."

This article examines the notion that the public sex offense registry "raises awareness" and the claims of child protection.

**THE "RAISING AWARENESS" CLAIM**

The news media runs public registry advertorials regularly, commonly accompanied by ominous-sounding headlines warning of some kind of unique threat to the public or in relation to a compliance check as well as a link to the local or national registry (or, at times, to a private registry like Family Watchdog).

The central argument regarding the raising awareness claim should be whether the public sex offense registry is actually used as intended. Evidence of exposure to the registry is sporadic, but the existing studies have found that the registry is not as popular as registry proponents and the media like to portray.

Perhaps the most damning story regarding the registry in recent memory came from a CNN 2011 interview with the mother of one of the accusers of former Penn State assistant Jerry Sandusky. The mother told CNN that her son asked her to help him navigate the public registry to see if Sandusky was on the list because he "acts weird." He was not on the registry at that time because like most sex crime arrests, Sandusky had no prior record.[4]

In the wake of the high-profile murder case of Jessica Lunsford, a joint poll by CNN, USA Today, and Gallup found that only 38% of individuals were even aware their state even maintains a public registry. Even though 94% of those polled favored registries, only 23% have ever checked the registry, while 34% stated concerns over harassment and vigilantism as a result of the registry. Sadly, the poll also found that 65% of those polled believed people on the registry "cannot be rehabilitated." The pollsters also opined that, "More limited access to the Internet could be dampening the ability of people from lower income households to review their local registry, but even those in higher income households exhibit a low rate of checking."[5]

A 2008 survey of 1,821 Nebraska residents found that 89.8% were aware of the existence of the public sex offense registry, but only 34.8% had accessed the registry. Women were more likely to use the registry (42% to 27%) and homes with children are more likely to use the registry than homes without children (46% to 25%). Of those who viewed the registry, 78.7% have checked more than once; 28.9% checked the registry more than five times; 88% of those accessing the registry felt "safer" after viewing the registry, albeit only "somewhat" or "a little safer." Few respondents offered reasons for not checking the registry, though most who

AR-00001068

did offer a response felt it was the responsibility of others to notify them. The registry was utilized more for business/ employment reasons than personal interests or safety. About 41% of females and 32% of males took some kind of preventive measure after viewing the registry; the most common measure was telling others about the registry. One respondent reported evicting a tenant from her apartment rental as the result of the registry.[6]

A 2009 survey found, "Michigan residents were questioned about their utilization of the sex offender registry and whether they believed any sex offenders lived in their community. The authors found that few respondents had looked at the registry. Reasons respondents provided for nonuse included lack of interest in the registry, living in a "safe" area, and not having children. Although it was found that registry use was related to awareness of offenders in the community, after viewing the registry, nearly half of the survey participants still believed no offenders lived in the community."[7]

A 2013 report on the use of the Texas state sex offense registry found that 73.6% were familiar with sex offender registries, 7% were unsure of their familiarity, 19.6% unfamiliar with registry. Among those familiar with the registry, 40.9% had accessed it for themselves, 17.8% had accessed it for someone else, and 30.2% had not accessed it at all. People discovered the registry existed primarily by word of mouth (35.9%), internet search (22.4%), and television (13.2%). Of those who looked at the registry, 18.8% accessed it once, 24.6% twice, and 38.1% had used it three to five times. When respondents were asked about their reasons for accessing the registry, nearly 40% of respondents accessed it because they were curious, 18% because they were worried for their safety and about 12% because they were concerned about young children's safety. Using these numbers, 13% of the poll takers looked at the registry out of fear, while 17.3% did so out of curiosity. Barely two out of five people have used the registry, and only about one in eight viewed the registry out of safety concerns, while about 1 in 6 did so out of curiosity. [8]

The 2013 Texas study noted, "The existing research has indicated that few people access the registry, individuals who have been victims of sex crimes are more likely to utilize the registry, but few individuals took preventative action after accessing the registry." [9] The Texas study found similar results, with more victims of sex crimes than those that have not experienced sex crimes have viewed the public registry. Interestingly, victims of identity theft were the crime victims most likely to utilize the public registry. "Victims and respondents who knew a victim of a sex crime used the registry more often. Over 62% of both groups of respondents who had been a victim and those who knew a victim of a sex crime and were familiar with the registry utilized the registry three or more times, while only 40% of both non-victims and those who did not a victim of a sex crime used the registry this often. Victims were also more likely to take protective action as a result of what they learned from the registry than non-victims. Over 72% of victims familiar with the registry took at least one protective action in comparison to 59% of non-victims."[10]

"Respondents who were familiar with the registry and had not utilized it were asked about their reasons for not accessing the registry. The most common reason respondents gave was not knowing what to do with the information/believing there was nothing they could do (11.7%), and the least common response was not being interested (4%)." [11]

The Texas study found that the registry increases fear among those who accessed the registry, leading to some registry viewers to take "preventive measures":

"While 17.4% of respondents who had accessed a sex offender registry reported taking no protective measures, the majority reported at least one protective measure as a result of accessing the registry. The most commonly reported protective measures include locking doors regularly (19.4%) and advising others about registered sex offenders living in the neighborhood (20.7%)… Another commonly reported measure was not walking alone in the neighborhood (15.4%)."[12]

The researchers warned, however, to use caution in using the results because those polled were university students.

A 2013 YouGov poll of 1196 people found half of respondents have checked the public sex offense registry. "Women and parents are among the most likely to have checked whether sex offenders live in their neighborhood – 66% of parents with kids have checked the register, compared with 46% of adults without children under 18. 54% of women and 47% of men say they have checked for offenders…62% of the population thinks it is very important that the information is publicly available – 71% of women and 52% of men strongly support making sex offender homes public information. Men are more likely to feel that it is not important to make people's homes on the Sex Offenders Registry public – 10% of men compared with 4% of women." About 44% believed the registry was inaccurate; only 19% believe the registry is up-to-date. About 27% believe those on the registry should not live within 10 miles of a school, 19% feel they should live wherever they want so long as they are registered, and 6% should be able to live wherever they want even if they aren't registered. Regarding reactions to the registry, 35% felt "shocked", 27% felt "worried", 18% felt "safe", and 11% felt "relieved"; Southerners were most likely to feel shocked, while Midwesterners were most likely to feel safe.[13]  Of course, the article accompanying the report failed to mention that 23% of respondents felt "impartial" and 8% had no opinion or were unsure.

Simply looking at the registry does not necessarily mean they are being utilized. Many states or private registry companies offer some

AR-00001069

form of email alert services, but are often unused. When the state of Florida proposed cutting e-mail notification alerts in 2008 due to budget cuts, it was noted only 44,000 of the state's 16 million residents (or 0.275%) signed up for the program, or roughly one signee per registrant.[14]  In 2019, only about 1300 of South Carolina's 5 million residents (0.00026% of the population) utilize the email program run by SC's State Law Enforcement Division. The same advertorial also noted in Louisiana, 84,367 (of 4.66 million); use an email alert service In Arkansas, more than 8,500 (of 3 million) have signed up; In Colorado, around 5,400 (of 5.6 million) people take advantage of that state's instant notification.[15]

A 2015 survey of law enforcement officials, many of whom worked with registry units, found that 66.8% of law enforcement officials had responded at least a moderate-level concern the information on the registry are subject to misunderstanding or misinterpretation; 62.5% reported at least a moderate concern that the registries give a false sense of security; 45.6% expressed a at least a moderate concern that the registry promotes unnecessary fear; and 35.5% expressed at least a moderate concern about harassment of registrants.[16]

While the studies utilized different focus groups, there is a general consensus that despite the oversaturation of advertising for the registry at least half to two-thirds of Americans do not bother to look at the public sex offense registry. Of those who utilize the registry, curiosity or business was more important than safety reasons. Of those who have looked at the registry, few use the registry regularly. However, exposure to the registry has been associated with negative emotions, yet a large number of people stated they either did not alter their lives in any way or talked to someone else at best. Based on the studies listed, the registry obviously caters to a small subset of Americans that seem more prone to fear advertising. There has yet to be a study focusing on this subset of people, but it is possible this subset is prone to the fear-focused advertorials utilized by the media.

## PUBLICIZING THE REGISTRY HAS NOT LED TO A DECREASE OF SEX CRIMES

A 2008 study on New York's on sex crime rates on the 10 years before and after the state public sex offense registry was made public concluded there was no discernable difference in the sex crime rates after the registries became public:

"The present study used 252 months of arrest data and univariate ARIMA time series analyses to evaluate the impact of New York State's SORA. More specifically, the study proposed the general question of whether there are differences in sexual offense arrest rates before and after the enactment of SORA, as well as the two specific questions of: (a) whether registration and notification laws are decreasing re-arrest rates for convicted sex offenders, or (b) whether registration and notification laws are deterring nonregistered offenders from committing registerable sexual offenses. According to the analyses, all three of these questions are answered negatively. That is, results of the analyses indicate that the 1996 enactment of SORA (and thus the beginning of the registry) had no significant impact on rates of total sexual offending, rape, or child molestation, whether viewed as a whole or in terms of offenses committed by first-time sex offenders or those committed by previously convicted sex offenders (i.e., repeat offenders)… The current study also found that 95.9% of all arrests for any RSO, 95.9% of all arrests for rape, and 94.1% of all arrests for child molestation were of first-time sex offenders. Thus, as none of these offenders had any prior convictions for sexual offenses, none of them were on the sex offender registry (or would have been on the registry had it existed) at the time of their offenses."[17]

A 2008 New Jersey study that studied sex offense rates for 10 years preceding and following the passage of Megan's Law also concluded Megan's Law has no effect on community tenure (i.e., time to first re-arrest) and showed Megan's Law had no demonstrable effect in reducing sexual re-offenses. Megan's Law has no effect on the type of sexual re-offense or first time sexual offense (still largely child molestation/incest). Megan's Law has no effect on reducing the number of victims involved in sexual offenses [18]

A 2010 study of the South Carolina Sex Offense Registry concluded, "[T]here was no significant decline in the six year period after 1999, which was the year that South Carolina implemented its online sex offender registry, indicating that online notification did not influence general deterrence of adult sex crimes. Across a mean follow-up of 8.4 years, 490 (8%) of registered sex offenders had new sex crime charges and 299 (4%) offenders had new sex crime convictions."[19]

A 2010 study of the Iowa Registry for the 10 years preceding and following the passage of the public sex offense registry also came to the conclusion the registry has had no impact on sex crime rates.  "The results of this study suggest that SORN has not reduced the rate of sex offender recidivism, nor has it led to a decrease in the number of offenses committed by recidivating sex offenders. Among a 10-year cohort of Iowa sex offenders, not only is the sexual recidivism rate virtually identical prior to and following the implementation of SORN, but so too is the distribution of sex offenders into trajectory groups essentially identical."[20]

A 2011 study also failed to find any correlation between the public registry and any decrease in sex crime recidivism:

"The data in these three data sets do not strongly support the effectiveness of sex offender registries. The national panel data do not

show a significant decrease in the rate of rape or the arrest rate for sexual abuse after implementation of a registry or access to the registry via the Internet. The BJS data that tracked individual sex offenders after their release in 1994 do not show that registration had a significantly negative effect on recidivism. And the D.C. crime data do not show that knowing the locations of sex offenders by census block can help predict the locations of sexual abuse. This pattern of non-effectiveness across the data sets does not support the conclusion that sex offender registries are successful in meeting their objectives of increasing public safety and lowering recidivism rates."[21]

The general consensus is the registry has virtually no impact on sexual offenses. It is hard to justify the continued support of a program that has not even proven effective in over two decades of existence. Perhaps it is this reason victim advocates and registry proponents tend to use the mantra of "If it saves just one child" as a Hail Mary measure to justify the registry.

**THE REGISTRY DESTROYS MORE CHILDREN THAN IT SAVES. IS THE REGISTRY TRULY WORTH IT?**

One of the most common justifications people with little knowledge of the complexity of registration laws is the mantra "If it saves one child, then it is worth it." That mythical one child is not any child, but a select child from American society. At the least, the children that have been punished for sexual offenses are not saved by the registry even though juveniles are viewed by a general consensus of researchers they are highly amenable to treatment.

According to the Bureau of Justice Statistics, "Juvenile sex offenders comprise more than one-quarter (25.8 percent) of all sex offenders and more than one-third (35.6 percent) of sex offenders against juvenile victims… Known juvenile offenders who commit sex offenses against minors span a variety of ages. Five percent are younger than 9 years, and 16 percent are younger than 12 years. The rate rises sharply around age 12 and plateaus after age 14. As a proportion of the total, 38 percent are between ages 12 and 14, and 46 percent are between ages 15 and 17. The vast majority (93 percent) are male."[22]

The 2009 Juvenile Justice Bulletin states that "juvenile sex offenders account for only 3.1 percent of all juvenile offenders and 7.4 percent of all violent juvenile offenders. If other jurisdictions in the country were assumed to be the same as the NIBRS jurisdictions, one would extrapolate approximately 89,000 juvenile sex offenders known to police throughout the United States in 2004.[23]

The 2013 Human Rights Watch Report found that "Throughout the United States, children as young as nine years old who are adjudicated delinquent may be subject to sex offender registration laws. For example, in Delaware in 2011, there were approximately 639 children on the sex offender registry, 55 of whom were under the age of 12. In 2010, Michigan counted a total of 3,563 youth offenders adjudicated delinquent on its registry, a figure that does not include Michigan's youth offenders convicted in adult court. In 2010, Michigan's youngest registered sex offenders were nine years old. A 2009 Department of Justice study, which focused only on sex crimes committed by children in which other children were the victims, found that one out of eight youth sex offenders committing crimes against other children was younger than 12."[24]

As of May 2011, at least 37 states have statutory law requiring sex offender registration of some juveniles adjudicated delinquent for qualifying offenses: Alabama, Arizona, Arkansas, California, Colorado, Delaware, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, Wisconsin, and Wyoming.[25] Massachusetts allows children as young as age 7 to be placed on the sex offender registry; Arizona, Arkansas, Colorado, Kansas, Minnesota, and Texas allow children as young as age 8 to be placed on the registry; and North Carolina allows children as young as 11 to be placed on the registry.[26]

The Adam Walsh Act Section 111(8) states that juveniles ages 14 and over qualify for the public registry under federal guidelines.

Juvenile registrants have faced vigilante threats and attacks as the direct result of being on the registry. Among the 296 cases examined for a 2013 Human Rights Watch report, 154 (52 percent) youth offenders experienced violence or threats of violence against themselves or family members that they directly attributed to their registration.[27]

If the reader of this report cannot sympathize with a juvenile accused of a sexual offense regardless of the ethics of registering a child on a public pillory for potentially the rest of his or her life, then consider the impact the registry has on children with no criminal record. A 2009 survey by Levenson and Tewksbury found, "Most family members of RSOs (86%) reported that SORN has caused stress in their lives, 77% often felt a sense of isolation, and 49% often felt afraid for their own safety due to public disclosure of the sex offender's status. Half had lost friends or a close relationship as a result of community notification, and 66% said that shame and embarrassment often kept them from engaging in community activities. These adverse consequences of SORN were correlated with increased stress levels in RSO family members. Lower income was empirically associated with increased stress levels, as were feelings of isolation, fear for one's safety, shame interfering with social activities, and having to move." About 30% of study respondents answered that "A person who lives with me (who is NOT a RSO) has been threatened, harassed, assaulted, injured, or

AR-00001071

suffered property damage because someone found out through Megan's Law that my family member is a sex offender."[28]

A 2014 study reported a number of personal examples of the impact the public registry had on children of registered persons:

"One of the most common themes to emerge was how children of registered sex offenders are shunned by their friends and friends' parents. A 44year-old male wrote that "[p]arents don't want their children to play with my children." Another father from Texas reported that his children were not "invited for play dates or birthday parties" and a 41-year-old mother from Wisconsin claimed that her "children suffer the most…they lose friends." Another mother stated, "People pick on my children. They make jokes about me being an easy lay to my teenage sons."[29]

The 2015 book "Protecting Our Kids? How sex offender laws are failing us" by Emily Horowitz[30] shares many stories of collateral damage to the families of registered persons, including the daughter of a registrant named Sarah. When the PO stops at her house to check on her father, they arrive in a car clearly marked "Sex Offender Treatment Program," and leave a sign on the door proclaiming the residence as belonging to a "sex offender." Sarah's father cannot take Sarah to the mall or church, and the entire family's internet use is subject to a warrantless search at any time.[31]

## CONCLUSION

Proponents of the public sex offense registry have used the mantra of "If it saves just one child, it is worth it" for years, but even anecdotal evidence that the registry has prevented sexual abuse of any kind has proven to be hard to find. A review of major victim advocacy groups for this study could not find any evidence of the registry being used in a manner that would suggest it has projected more than an anecdotal example of protection from abuse. Furthermore, there has yet to be a published report where a sweep of registrants following a missing person report led to the discovery of the missing person at the residence of a known registrant. There is ample evidence, however, that the registry has harmed children, either by placing juveniles on registries or as the collateral consequences for living in the residence of a loved one currently on the registry.  This is why Reason Magazine proclaimed in 2018: "This is what our sex offender laws have done: Today, your child is more likely to end up on the registry than to be molested by someone on it."[32]

There is little evidence to support that the argument that the registry truly "raises awareness." At least half to two-thirds of Americans have never looked at the registry, and only a small proportion of those who have ever looked at the registry use it regularly. Of those who use the registry, most look at it either out of curiosity or as a business screening tool rather than out of fear of personal safety. The media has played a primary role in promoting registries, and those who view media advertorials for registries often experience varying degrees of fear and shock from exposure to the registry. However, many people that view the registry change their behaviors in response to registry exposure other than to talk to others about it. It seems plausible these talks would be more gossip-related than safety-related when taking why people tend to view registries. For a small subset of those who have viewed the registry, it could be more accurately stated exposure to the public registry raises FEAR rather than awareness.

If the registry truly raised awareness, it should have been reflected by some marked decrease in sexual abuse by registered persons, but there is no research that can find even a modest decrease in recidivism rates or of sex crime rates in general. Thus, the myth that sex offender registries raise public awareness is debunked.

## REFERENCES

1. Susan K. Livio. "Maureen Kanka defends Megan's Law despite report saying it fails to deter pedophiles." NJ.com. 6 Feb. 2009. Accessed 21 June 2019 at https://www.nj.com/news/2009/02/despite_new_report_on_megans_l.html
2. Derek Logue. "Stranger Danger is Obsolete." OnceFallen.com. 18 June 2019. Accessed 21 June 2019 at http://www.oncefallen.com/stranger_danger.html
3. Tim O'Brien. "Would Megan's Law Have Saved Megan?" New Jersey Law Journal, July 8, 1996, VOL. CXLV, NO. 2, INDEX 109. Reprinted at http://www.oncefallen.com/meganslaw1996.html
4. "Two police departments say Penn State coach never filed report." CNN. 17 Nov 2011. Accessed 22 June 2019 at https://www.cnn.com/2011/11/16/us/pennsylvania-sandusky-case/index.html
5. Lydia Saad, "Sex Offender Registries are Underutilized by the Public." Gallup. 9 June 2005. Accessed 22 June 2019 at https://news.gallup.com/poll/16705/sex-offender-registries-underutilized-public.aspx
6. Anderson, A. L., & Sample, L. L. (2008). Public Awareness and Action Resulting From Sex Offender Community Notification Laws. Criminal Justice Policy Review, 19(4), 371-396.
7. Kernsmith, P. D., Comartin, E., Craun, S. W., & Kernsmith, R. M. (2009). The Relationship Between Sex Offender Registry Utilization and Awareness. Sexual Abuse: A Journal of Research and Treatment, 21(2), 181-193.
8. Nicole Wilkes & Leana A. Bouffard. "Familiarity with and Uses of Sex Offender Registries." Crime Victims' Institute, College of Criminal Justice, Sam Houston State University. June 2013. Accessed 22 June 2019 at  http://dev.cjcenter.org/_files/cvi/cvi.

AR-00001072

pdf

9. Citing the Anderson and Sample study noted in reference #5 and the Kemsmith et al. study noted in reference #6

10. Supra, Wilkes and Bouffard, p. 3

11. Ibid.,p.2

12. Ibid.

13. Kate Palmer. "Half of Americans have checked the Sex Offender Registry." YouGov. 14 Aug 2013. Accessed 22 June 2019 at https://today.yougov.com/topics/lifestyle/articles-reports/2013/08/14/half-americans-have-checked-sex-offenders-register

14. Whitney Ray, "Amber Alerts and Sexual Offender Registry May Be Cut by FDLE." WJHG 7. 13 Nov 2008. Accessed 10 Feb. 2009 at http://www.wjhg.com/news/headlines/34417494.html, Retrieved Feb. 10, 2009

15. Ashley Blackstone. "SLED sends sex offender alerts. Do you get them?" ABC 4 Chareston SC. 31 Jan. 2019. Accessed 22 June 2019 at https://abcnews4.com/news/local/sled-sends-sex-offender-alerts-do-you-get-them

16. Andrew J. Harris, Chris Lobanov-Rostovsky, Jill S. Levenson. "Law Enforcement Perspectives on Sex Offender Registration and Notification Preliminary Survey Results." Sept 2015. Lowell, MA: U. of Mass. Lowell

17. Sandler, Jeffrey & J. Freeman, Naomi & Socia, Kelly. (2008). Does a Watched Pot Boil? A Time-Series Analysis of New York State's Sex Offender Registration and Notification Law. Psychology, Public Policy, and Law. 14. 284-302. 10.1037 /a0013881.

18. Kristen Zgoba, Ph.D.; Philip Witt, Ph.D.; Melissa Dalessandro, M.S.W.; Bonita Veysey, Ph.D. "Megan's Law: Assessing the Practical and Monetary Efficacy." Report to the US Dept. of Justice. Dec. 2008.

19. Elizabeth J. Letourneau, Ph.D., Jill S. Levenson, Ph.D., Dipankar Bandyopadhyay, Ph.D., Debajyoti Sinha, Ph.D., Kevin S. Armstrong. "Evaluating the Effectiveness of Sex Offender Registration and Notification Policies for Reducing Sexual Violence against Women." Final Report for National Institute of Justice. Sept. 2010. Accessed 22 June 22, 2019 at https://www.ncjrs.gov/pdffiles1/nij/grants/231989.pdf

20. Richard Tewksbury and Wesley G. Jennings. "ASSESSING THE IMPACT OF SEX OFFENDER REGISTRATION AND COMMUNITY NOTIFICATION ON SEX-OFFENDING TRAJECTORIES." Criminal Justice and Behavior, Vo. 37 No. 5, May 2010. P.570-582

21. Amanda Y. Agan. "Sex Offender Registries: Fear without Function?" The Journal of Law & Economics , Vol. 54, No. 1 (February 2011), pp. 207-239

22. David Finkelhor, Richard Ormrod, and Mark Chaffin. "Juveniles Who Commit Sex Offenses Against Minors." Office of Justice Programs, Juvenile Justice Bulletin. December 2009.

23. Ibid., p.4

24. "Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the US." Human Rights Watch. May 2013. Accessed 22 June 2019 at http://njjn.org/uploads/digital-library/Raised-on-the-Registry-HRW-5.13.pdf , p. 33

25. "Juvenile Sex Offender Registration and SORNA." National Conference of State Legislatures. May 2011. Accessed 22 June 2019 at http://www.ncsl.org/research/civil-and-criminal-justice/juvenile-sex-offender-registration-and-sorna.aspx

26. Debra Lee Cochrane and M. Alexis Kennedy. "Attitudes Towards Megan's Law and Juvenile Sex Offenders." Justice Policy Journal. Vol. 7, No. 1, Spring 2010. Accessed 22 June 2019 at http://www.cjcj.org/uploads/cjcj/documents/attitudes_towards.pdf

27. Supra, HRW 2013. p.56

28. Levenson, J. S., & Tewksbury, R. (2009). Collateral damage: Family members of registered sex offenders. American Journal of Criminal Justice. Available online: http://dx.doi.org/10.1007/s12103-008-9055-x

29. Erika Davis Frenzel, Kendra N. Bowen, Jason D. Spraitz, James H. Bowers, and Shannon Phaneuf. "Understanding collateral consequences of registry laws: An examination of the perceptions of sex offender registrants." Justice Policy Journal. Volume 11, Number 2 (Fall 2014)

30. Emily Horowitz. Protecting Our Kids? How sex offender laws are failing us. Santa Barbara CA, ABC-CLIO. 2015.

31. Ibid., p.55-56

32. Lenore Skenazy. "There Are Too Many Kids on the Sex Offender Registry." Reason Magazine. May 2018. Accessed 22 June 22, 2019 at https://reason.com/2018/04/09/there-are-too-many-kids-on-the/

AR-00001073

From: Derek W. Logue of OnceFallen.com
2211 County Road 400, Tobias NE 68453
(513) 238-2873
iamthefallen1@yahoo.com

To: Regulations Docket Clerk
Office of Legal Policy
U.S. Department of Justice
950 Pennsylvania Avenue NW, Room 4234
Washington, DC 20530

Re: Docket No. OAG 157

Statement from Derek W. Logue of OnceFallen.com on the US DoJ proposed changes to the "Registration Requirements Under the Sex Offender Registration and Notification Act"

My name is Derek W. Logue, a 43 year old Native American male currently residing in rural Nebraska, and founder of the registry information website OnceFallen.com. I have been a Registered Person since 2003 and will be on this government blacklist for the rest of my life. I am essentially serving a life sentence. Every day my face is on this registry, my life and the lives of my loved ones are in constant danger. Just this year alone, I've experienced multiple threats and experience constant harassment because of the registry. I have not held a formal job since 2006 and collect welfare to survive. There is no point in trying to become a productive citizen when few companies hire Registered Persons, and even if I can be hired, I can be too easy fired using my label as a convenient excuse. I live off $803 a month SSDI/SSI, draw $15 a month in food stamps, and Medicaid/Medicare.

I have no desire to look for a job so long as my name is on your government blacklist. I had two jobs but lost them both because the registry became a tool of oppression by my employer to silence any dissent. If I fell out of line, there's a convenient excuse to terminate my employment. At least I have a stable income now and don't have to consider doing something potentially illegal to survive.

I'm not alone in this struggle; A 2016 Jobs and Welfare Survey of 307 registered citizens found registrants living in AWA-compliant states were MORE likely than those living in non-AWA states to report being currently homeless (4.05% AWA vs 2.6% non), being unemployed (47.97% AWA vs 36.36% non), being denied a job (61.86% AWA vs 54.61% non), being harassed at work (53.57% AWA vs 47.66% non), and being forced to rely on public assistance (57.43% AWA vs. 50% non). This study strongly suggests the Adam Walsh Act exacerbates the negative consequences of the public registry. Further studies would be needed to understand the impact of the Adam Walsh Act on registered citizens as compared to existing laws.

For the past 15 years, I've fought back against these oppressive laws. Victim advocates like Laura Ahearn from Parents For Megan's Law and Florida State Senator Lauren Book have tried various methods for silencing me, including filing SLAPP Suits against me. Vigilante groups have disparaged my name and have threatened me; I have over a half-dozen websites dedicated to everything I do. I've been called many

terrible things while being interviewed by the mainstream media. Still, I will continue to speak out because I already feel dead thanks to the Sex Offense Registry.

The Registry is a Weapon of Mass Destruction

On May 14, 2020, Omaha resident James Fairbanks, armed with a gun and information from both the Nebraska Sex Offense Registry and a Facebook group, broke into Matteio Condoluci's home and murdered him in cold blood. Fairbanks has tried to blame the murder on his victim by claiming he looked too long at a child. This is but one of dozens of murders committed against registered persons since the federal sex offense registry law was established as part of the Omnibus Crime Bill of 1994. The misuse of the registry as a weapon of vengeance, however, is as old as the very concept of the registry.

The modern sex offense registry originated in 1931 when Los Angeles County Prosecutor proposed a "convict registry" of people convicted of drug crimes or other offenses tied to organized crime. As fears of the likes of famous gangsters Al Capone and Baby Face Nelson gave way to fears of "Sexual Psychopaths" during the 1930s and 1940s, sex offenses became the focus of LA's criminal registry. By 1947, the citywide registry became the first statewide registry in the United States.

Even in the early days of the sex offense registry, the registry was utilized as a weapon. During the 1950s, it was used to harass homosexuals engaging in consensual sex, charging them with "sexual perversion." In 1953, only about 150 rapists and 44 "other sex offenses" like molestation were included on the registry; over 2200 registered persons were homosexuals. Among those placed on the sex offense registry for "sexual perversion" was Bayard Rustin, who becam one of the leaders of the Civil Rights Movement of the 1960s. However, it took a decade after Ruskin's conviction to be restored within the Civil Rights Movement.

Sexual Psychopath fears were replaced in part by the fear of violent inner-city minorities. The 1964, Kitty Genocese, a white 28-year-old was raped and murdered by a black man, which helped spark racial tensions in New York City and solidify the widely believed myth of the "black rapist." Later that year, Barry Goldwater became the first Presidential candidate to run his campaign on the "War on Crime" platform; although his bid failed, Goldwater's "War on Crime" would be taken up would be perfected by President Johnson.

As the Cold War and Civil Rights era fears waned, America once again returned to Sex Offender panic in the form of fears of child abductions and Satanic Ritual Abuse. Americans became afraid to leave their homes, and victim advocates like John Walsh were testifying before Congress that America was "littered with mutilated, decapitated, raped, and strangled children." By the time research discovered that what we believed about Satanic Ritual Abuse and "stereotypical kidnappings" to be false, the belief that Satanic underground pedophile networks fueled demands for stricter penalties for anyone convicted of a sex offense.

After Jacob Wetterling's abduction, a law enforcement officer gave Patty Wetterling the idea to advocate for a national registry. Washington had made headlines not long after Jacob's disappearance by creating a modern sex offense registry. In the year before the Jacob Wetterling Act established a national registry,

Joseph Gallardo was scheduled to move to a home near Lynnwood, WA after his release. The Snohomish County Sheriff's Office wrongfully claimed Gallardo murdered children and was sexually sadistic. Neighbors protested in front of the home and later set the house on fire, forcing Gallardo to flee to New Mexico to stay with a relative. After arriving in the small town of Deming, NM, a protest there forced both brothers to leave town. A Snohomish County Deputy Sheriff told reporters he planned on calling the Sheriff of the next county where Gallardo moved. Despite the story of extreme vigilante violence making national news, the Wetterling Act was passed with virtually opposition.

The internet has made access and abuse of publicly registry information extremely easy. Most states list every registered person in their state. There is no differentiation between a teen who engaged in a sexual relationship with a classmate and a teen who forcefully raped a classmate.

Here are a few key points to consider:

1. Most sex crimes occur at home by someone known to the victim, usually a family member or someone close to the family. The registry was designed with "stranger danger" in mind.

2. Most sex crimes are committed by first time offenders, not a Registered Person. This fact predates the advent of a national public registry and is not proven to be influenced by the registry.

3. Sex offense recidivism has been extremely low even before the advent of the national public registry. The registry has not been proven to reduce re-offense. Numerous studies using actual numbers of US arrests or convictions have proven re-offense rates are extremely low.

4. The registry is not often utilized as a public safety tool; on the contrary, it has been used for primarily salacious reasons, including the use by vigilantes to engage in murders, assaults, vandalism, and harassment. OnceFallen has documented nearly 200 murders of people directly tied to the public registry. Here are a few examples:

Stephen A. Marshall murdered two registered persons in Maine in 2006; one of his victims was William Elliott, who at age 19 had sex with a girlfriend two weeks before her 16th birthday.

In 2005, Michael Anthony Mullen used the registry to select his victims; he posed as an FBI agent to enter the home of two registered persons to kill them. While serving time in prison, he shared a cell with career criminal Patrick Drum, who would go on to murder two registered persons in 2012 using public registry information to choose his victims.

In 2013, a self-professed Neo-Nazi couple, Jeremy and Christine Moody, used the registry to murder a registered person and his wife; The Moodys had written a White Supremacist Manifesto (sold on Lulu.com) proclaiming, "The only cure for child abusers and molesters is to have every member of their immediate family killed."

Murderers of registrants are heralded as heroes even after committing other heinous offenses. In 2014, Jay Maynor murdered a registered person connected with his family; within days, his family started a

AR-00001076

GoFundMe petition and a Biker Rally to raise funds for Maynor's release and legal defense fund, receiving thousands of dollars in the process. But just minutes before Maynor murdered the registrant, he shot into a gas station where a children's birthday party was being held because he was angry with his daughter's boyfriend; one bullet hit only a few feet from one of the children in attendance. Even Jeremy and Christine Moody received support despite their direct ties to hate groups.

I have enclosed my Crimes Against Registrants Database (CARD) as evidence the registry has been used as a weapon of hatred. And these are merely the crimes that have been reported by the media; other surveys of Registered Persons have found nearly have been victimized by vigilante violence.

The registry has never been proven to protect the public; in fact, there is evidence the registry and the laws fueled by the registry may actually increase the likelihood of recidivism. So why are we spending millions on this bloated, useless, ineffective registry? What purpose does it truly serve? The registry has merely propagated the same tired myths that have been thoroughly debunked years ago. We are now seeing a resurgence of these same tired myths; the QAnon conspiracy theory is in part a revival of the Satanic Panic myths of the 1980s.

The Adam Walsh Act is a Recipe for Disaster

The Adam Walsh Act (AWA) was a culmination of various bad public policies. There is a very reason that only a third of the states have adopted this controversial law in the 14 years since it was signed. This law is a complex mess.

There are numerous problems with the law, including:

1. The AWA utilizes an offense-based classification scheme. In Ohio, the number of Registered Persons listed as a Tier III (the so-called "high risk" category) tripled from 18% to 54% between 12/31/2007 and 1/1/2008. There were no new charges, just a change in the classification scheme.

2. The AWA does not differentiate between a 16 year old who engaged in consensual sex with a classmate and a 16 year old who raped a classmate. Both are given the same classification under the AWA.

3. The AWA costs millions more to implement and enforce than most existing state laws; Texas refused to adopt the AWA because they found that it would cost them $39 just to implement the law (not including maintenance) while only costing $2 million to pay the fee for not adopting the law. The AWA only awards about $20 million annually in various grants to state, territories, and Indigenous nations to adopt AWA guidelines. Native tribes have been faced with an ultimatum to adopt the registry or lose tribal sovereignty.

4. Despite the SMART Office claims, the AWA still requires states to place juveniles as young as 14 on the public registry.

5. The AWA is obviously a form of punishment and is thus unconstitutionally applied retroactively. In State v. Williams, 129 Ohio St.3d 344, 2011-Ohio-3374, The Ohio Supreme Court ruled, "Based on these significant changes to the statutory scheme governing sex offenders, we are no longer convinced that R.C. Chapter 2950 is remedial, even though some elements of it remain remedial…No one change compels our conclusion that S.B. 10 is punitive… It is a matter of degree whether a statute is so punitive that its retroactive application is unconstitutional. When we consider all the changes enacted by S.B. 10 in aggregate, we conclude that imposing the current registration requirements on a sex offender whose crime was committed prior to the enactment of S.B. 10 is punitive." (SB 10 was Ohio's version of the AWA.) Similar rulings have been made in Millard v. Rankin, 265 F.Supp.3d 1211 (U.S. Dist., Colorado 2017), Does v. Snyder, 834 F.3d 699 (6th Cir. 2016), and Commonwealth v. Muniz, 164 A.3d 1189 (Pa. 2017).

6. The right to travel and to marry a foreign spouse has been impeded by the AWA policies: No thanks to the controversial passport marks of infamy (a policy used previously only by Soviet Russia and Nazi Germany), Registered Persons are routinely denied international travel for legitimate business or recreation. Furthermore, AWA is routinely used to deny Registered Persons the right to bring their families into the country to live no matter where they are from, according to the USCIS. An article posted at ACSOL on Nov. 13, 2016 noted the USCIS expects to reject over 4000 petitions by 2017. "For years after its enactment, the USCIS has either outright denied or intentionally stalled thousands of family petitions that it determined to fall within its own AWA policy. By 2011, after several years of long delays, the USCIS denied virtually all AWA applications held at the agency for review since 2008. The agency reports that it receives 400-600 AWA application per year and boosts that it has denied 99% of all AWA family petitions received."

The SMART Office should be abolished

The SMART Office is a worthless bureaucracy with a sordid history that exemplifies the incompetence of the past three administrations on matters of sex offense treatment and rehabilitation. The SMART Office once had in their mission statement their intent was to place Registered Persons into a series of "restrictions, regulations and INTERNMENT." In the past, the SMART Office has been staffed by people who are not experts in the field. Ex-Director Linda Baldwin was a city planner and real estate attorney with little experience in criminal law.

The SMART Office is rife with biased individuals with a vested interest in promoting sex offense myths. I met many of them in person at last year's SMART Office symposium in Chicago. There was a severe animus and a gamut of misinformation presented by speakers at the symposium and by attendees there. Perhaps one of the most offensive moments during my participation at the SMART Office was one of the slides shown during a presentation on "Using Analytical Data to Assist With 'Sex Offender' Based Operations." The slide used a fictitious address of "666 Dead Sex Offender Lane." This was yet another subtle, passive-aggressive swipe at Registered Persons. I also met a tribal elder from a Montana Indian tribe who bragged that his people banish Registrants from his nation.

One of the workshops during the Symposium discussed the use of DNA to solve a 1988 rape/ murder case of April Tinsley. The killer had no prior adult arrest record (but had a juvenile sex offense arrest), and lacked records in the DNA and fingerprint databases. The investigator used the term "pervert" a few times

throughout the lecture and engaged in some typical police chest-thumping., like bragging how he would have "taken him down" if the suspect entered a nearby park. (It is also worth noting the presenter described a minor who found and a note taunting the police as a "victim.") This case had 1300 suspects, but was only able to eliminate 900 cases due to jail records or DNA.

The SMART Office also publishes a biased online report called the "Sex Offender Management Assessment and Planning Initiative (SOMAPI)." The report includes studies from three controversial researchers—Gene Abel, Robert Prentky, and Sean Ahlmeyer.

The SMART Office cited Abel's 1987 primary report covering "paraphilias." Paraphilia means any act considered deviant by societal norms, which should not be confused with pedophilia; it seems Scurich and John failed to notice the difference. Abel's study had a number of problems –few offenders were voluntary (which would compel false admissions), inclusion of non-criminal paraphilias such as consensual homosexual relations, and Abel lists an estimated number of acts and victims over a lifetime. Abel states the study suggested paraphiliacs, "through coercion or varying degrees of compliance, repeated acts are carried out with the same victims or partners." Abel provides a Mean and Median estimate of acts and number of victims. The Mean is the sum of all the numbers in the set divided by the amount of numbers in the set. The Median is the middle point of a number set, in which half the numbers are above the median and half are below. Scurich and John cited the highest number possible found in the Abel study, the mean number of estimated number of lifetime acts by those with male victims, listed in the Abel study as 281.7, but the researchers fail to mention the mean number, which is 10.1, far lower than the scarier number. Since half of those in the Abel study committed LESS than 10.1 paraphilic acts while the average (mean) number of acts was assumed to be 281.7, then there must be a small group of people that have grossly inflated the average. (Note 6)

The SOMAPI report also cites the 1997 Prentky study, which made the controversial claim that after 25 years sex offenders' recidivism is 52% for child molesters and 39% for rapists. However, these numbers were not a true re-offense rate, but a "survival/ failure rate", i.e., "the estimated probability that child molesters would 'survive' in the community without being charged, convicted, or imprisoned for a sexual offense over the 25-year study period." Prentky himself warned against misusing the stats, primarily because the study involved recidivists who were civilly committed between 1959 and 1985, meaning this was not representative of everyone on the sex offense registry. It is worth noting that even the SMART Office report recognized the limitations of the report, nor does it claim rates presented in the report as an accurate number. (Note 7)

The SOMAPI report also cited Sean Ahlmeyer's 2000 study which relied on polygraphs and self-reports. Polygraphs are inadmissible in court but utilized as intimidation tools. The Ahlmeyer study consisted of 60 adult male sexual offender (35 inmates and 25 parolees), which concluded that more incidents and victims were reported, but a second test reported low numbers though they concluded 80% were "deceptive." But it is worth noting that polygraph studies in general have relied on self-reporting by the subjects and been conducted in settings where incentives were offered to subjects for cooperation. (the controversial 2007 Butner study is the most egregious examples of this.) (Note 8)

The SOMAPI report concludes, "While the magnitude of the difference between observed and actual reoffending needs to be better understood, there is universal agreement in the scientific community that the observed recidivism rates of sex offenders are underestimates of actual reoffending." It cites the 2004 Harris and Hanson study (Note 9) to claim elevated recidivism levels, but the study is a multinational study so the results are not valid for understanding American recidivism. (For example, the age of consent in Canada was raised from 14 to 16 in 2008, while the age of consent in America is between 16 and 18, thus some sexual acts legal in Canada before 2008 were illegal in America.) While the SMART Office study does not cite the Langevin or Prentky rates as true recidivism rates, it uses them as justification for propagating the myth of widespread underreporting.

The SMART Office has also defended a misleading statistic that claims "sex offenders are 4 times more likely to reoffend than non-sex offenders," a claim cited by Supreme Court Justice Alito in upholding the use of public registries. The SMART Office tried to defend the myth by citing the Hanson multinational study (that mixes rearrests and conviction rates) and appealed to emotions about having a "duty" to protect children.

In debunking this false light statement, the Washington Post stated, "The reference to sex offender rearrest trends in Alito's opinion is quite misleading. It measures the likelihood of sex offenders to be arrested for sex crimes after release from prison, and compares it to the likelihood of non-sex offenders to be arrested for sex crimes after release. This makes it seem like recidivism among sex offenders to be a uniquely bad problem, but it is an apples-to-oranges comparison."

"This opinion cites previous opinions that use outdated data going back to the 1980s — more than 30 years ago. Moreover, it obscures the fact according to 2005 data, the percentage of sex offenders getting rearrested for the same crime is low compared to non-sex offenders, with the exception of people convicted of homicide. It does the public no service when the Supreme Court justices make a misleading characterization like this. We award Three Pinocchios."

The AWA needs to be abolished

The public sex offense registry has destroyed lives for over a quarter of a century and needs to be abolished. At the very least, the Adam Walsh Act should be repealed. The AWA has not created the universal standard it claims to create. Many states considered AWA compliant have wildly varied rules. Even the SMART Office finds deviations from the AWA in states they consider "substantially compliant." Delaware was AWA compliant, then fell off the list, then was considered AWA compliant again. States like Ohio which ruled against the AWA's retroactive application are still considered AWA compliant.

Since the AWA is not a universal standard, the laws are as confusing as ever. A registrant moving from Alabama (a state where everyone registers for life) moves to Ohio (with a 3-Tiered system) and is automatically considered a "Tier 3" without a fair trial. I know this because it happened to me. While Alabama does not consider me a high risk, Ohio declared me so simply because of my lifetime status from Alabama, and Nebraska categorized me as a Level 3 because Ohio did the same.

There are better solutions than this public government blacklist. The registry should be abolished. The government wastes billions on enforcing this useless blacklist that could be better spent on prevention and education. There are positive forms of treatment such as Circles of Support and Accountability. Supporting evidence-based methods would save valuable taxpayer dollars that could go towards other, more important and effective programs like renewable energy, saving the US Postal Service, or maybe even some tax relief for the poor.

I'd like to think that there are better use of limited financial resources considering we are in the midst of a pandemic and a looming economic crisis on par with the Great Depression. Global warming is making the summers hotter than ever. The trade war has cost the local economy millions here in the Heartland. Yet, here we are wasting time on a worthless feel-good measure that most US States had the good sense to reject in the first place. I doubt states will place this on a list of priorities while they worry about the next fiscal year and start looking for ways to trim the fat from their budgets.

I'd love to go out and get a real job again someday and pay taxes, but I cannot do it while the registry exists. My life is in your hands.

--Derek W. Logue of OnceFallen.com

Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 15, 2020

| View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

After reading through this lengthy, complex document, as the parent of a registered citizen, and therefore with some knowledge of sex offenses, the punishment of them, and registries I feel compelled to make a number of points to oppose the adoption of the rules laid out here:

For the ordinary registrant and his or her family members, this document is difficult to access (do the writers assume all registrants, especially those just being released from prison, will have computer access or even know what to look for?) and difficult to understand. New and long-term registrants want to comply and re-build their lives, yet a constantly changing landscape of registry requirements makes this very difficult, for some nearly impossible. I often wish that the legislators who wrote SORNA or those who produced this document had to live as registrants, if only for a month, so they would understand the reality of being a registered citizen.

If the idea of these changes is to make it appear that they will simplify registries that is false. What these changes do seem intended to do, is to federalize aspects of registries (even though almost all sex-related crime is charged and punished at the state level) and allow states to claim compliance with SORNA even though they have made none of the compliance changes. Again I stress the point that simple clear rules at the state level are what is necessary for registrants to rehabilitate themselves and become productive members of society.

SORNA and these proposed changes work from two mistaken and pernicious assumptions: that registrants are highly like to re-offend (they are not) and that public knowledge of who registered citizens are enhances public safety (it does not). The DOJ and many studies at the state level have shown that recidivism is rare. It is rare, indeed, for a registered citizen to be convicted of another sexual offense, and there is NO EVIDENCE at all that public registries lead to a decrease in sex offenses. Across the nation, states are spending millions of dollars to enforce a surveillance system (based on the idea that future crime is predictable) that serves no public safety purpose and causes great harm. What a huge waste of taxpayer dollars.

What public registries actually do is make the lives of registered citizens and their families--who themselves have committed no crimes--unstable, stressful, and anxiety ridden with constant fear of vigilante violence, loss of housing and/or employment, and often less well off, even poverty stricken, because

AR-00001082

Regulations.gov

registrants have such a difficult time finding and keeping housing and employment.

Despite court decisions stating that registries are not punishment, they most certainly are a punishment, and for those who must register for a lifetime punishment (despite the overwhelming evidence that as time goes on, the likelihood of any kind of re-offense declines significantly) that will never end, despite an individuals having served his or her time.

In addition to punishment, public registries seem designed to facilitate shunning and banishment. Despite having done time and therefore paid his/her debt to society, the registrant will likely endure a lifetime of difficulty, despite the fact that for many, their offenses are years, even decades old, and the likelihood of re-offense is near zero.

SORNA and regulations tied to it should encourage registration only with law enforcement, no one should be subject to lifetime registration, and all current tiers should be shorter with a pathway to come off a registry after compliance. The problems of vigilantism will only become worse as conspiratorial groups like Q-Anon spread misinformation and make people, who have already paid a price for their illegal actions, targets.

It is entirely possible to oppose sexual abuse in all its forms and also oppose endless punishment and targeting of people who show they can and will rehabilitate themselves.

---

**Comment ID**

DOJ-OAG-2020-0003-0284

---

 **Tracking Number**

1k4-9iyh-eg93

---

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 14, 2020

---



Your Voice in Federal Decision Making

About          Bulk Data Download          Agencies          Learn

(/about)          (/bulkdownload)          (/agencies)          (/learn)

Reports          FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)          (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00001084

8/9/23, 10:23 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 15, 2020

| View More Comments   724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments   724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

The SORNA as it exists is already too broad. It does not provide a way for people on the registry to show that they've reformed and continues to open them up to harassment and punishment after they have served their time. In addition, the tiered system does not take into account or adjust for the realities of the internet. As is, many people arrested, especially in Net Nanny cases, do not pose any risk to their communities and regularly have social or mental handicaps that show they would not harm a person or child in real life.

Already, people who commit sex crimes have the lowest recidivism rate of the crimes. The registry infringes on people's right to privacy because in the view of dangers of recommitting, other crimes such as assault, murder, and robbery would be better served as having a public registry than sex offenses.

For the registry to in fact be effective, rather than make it broader, it needs to be more focused. Have it recognized that people can commit a crime and then be reformed. Have it recognized that seeking treatment is proof of accountability. Have it recognized that people who commit crimes where there is no name able victim are less likely to have committed a crime than others, especially after treatment is sought.

Stop wasting tax dollars on a program that doesn't work, and is overburdened and pushes too much on to the plates of our already overworked police officers. Change it so that it is effective and comprehensive and allows for people to find a path back to contributing to their communities without being ostracized.

| **Comment ID**
DOJ-OAG-2020-0003-0285 |

AR-00001085

Regulations.gov

 **Tracking Number**

kf2-vul4-y8v7

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**

Sep 14, 2020



Your Voice in Federal Decision-Making

About          Bulk Data Download          Agencies          Learn

(/about)          (/bulkdownload)          (/agencies)          (/learn)

Reports          FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)          (/faq)

Privacy & Security Notice (/privacy-notice)     |     User Notice (/user-notice)     |
Accessibility Statement (/accessibility)     |     Developers (https://open.gsa.gov/api/regulationsgov/)     |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)     Provide Site Feedback

8/9/23, 10:24 AM                                          Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 15, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

Comment

My husband is a registered sex offender and the registry has caused severe harm to our family. The difficulty finding work and housing, the unending social stigma, the mental and emotional cost all constitute draconian and pointless punishment past the initial sentence and render a somewhat normal life out of reach for him and many other registrants. The value of the registry to the judicial system and the safety of the community is highly questionable at best, and the over-broad scope of it renders it meaningless, sclerotic, and unjust. Lives are being ruined and the community is no safer for it. Any increase, extension, expansion, or bolstering of the already over-blown registry system will be unspeakably damaging to thousands of families like ours while providing no real benefit to the community outside of the cynical politicians that seek to make their careers on the backs on men like my husband, who made one low-tier mistake in the midst of severe PTSD from his time serving our country in the Army. I strongly discourage and expansion or increased empowerment to the registry, and urge all involved to consider whether the registry ought exist at all in its current form, being as it is already a testament to poor jurisprudence and a tool of a proto-police state.

**Comment ID**
DOJ-OAG-2020-0003-0286

 **Tracking Number**
kf2-xc3h-u7f3

Comment Details                              Submitter Info

AR-00001087

Regulations.gov

**Received Date**

Sep 14, 2020



About     Bulk Data Download      Agencies     Learn

(/about)        (/bulkdownload)   (/agencies)   (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00001088

8/9/23, 10:21 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 15, 2020

View More Comments   724   (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments   724   (/docket/DOJ-OAG-2020-0003/comments)     Share ⌄

Comment

Thank you for giving everyone the opportunity to comment. I my self am labeled a sex offender for attempted csc 3 when i was 18 and the girl was 15 in michigan that is considered a tier three offender even though i have commited no other crimes and have had a risk assessment done that showed i was unlikely to recommit ever. but yet i have to register for life . i have two daughters and its very difficult to raise them cause i cant attend their sporting events or play with them at the play ground i made a mistake i was a dumb kid in the wrong place at the wrong time . i tried to get removed under romeo and juliet act but was the first person to try it with my judge and he denied me on the basis he said he didnt know if he had the authority to remove me now i have no chance to re try. i understand the idea of the adam walsh act to protect children from violent offenders but what makes me violent 22 years with no crimes since i was 18 and according to the state registries who over tier people i cant be removed ever lifetime registry I have zero interests in breaking any laws trying to be a viable member of society but everything i try the registry gets in the way i realize i will always have the felony but most employers will forgive you but they wont if you are on the registry cause the states make you list your place of employment business owners wont hire you cause they dont want their business address listed . so you are stuck with no hope no chance to be a member of society people look at me and my kids weird cause all they see is a tier 111 ofender which says is a violent offender under the adam walsh act . i have never been violent my entire life.

My only sanctuary is being able to go to church a non judgemental place. I understand that the adam walsh act and sorna registry will never go away i get that but please give us a chance to show that we can make honest citizens and great tax payers give us a chance. well at least the ones like me .I think the facts and the studies show that there needs to be a risk assessment done allow sex offenders to get a risk assessment done and if it shows they are not a risk or a threat to society give them the chance and opportunity to be removed and prove that they are actually good people who made a mistake. There have been several studies and court cases that have shown that if a sex offender doesnt reoffend with in 10 years he never will.so why cant the registry term be 10 years for everyone and life for violent or repeat sex

AR-00001089

offenders. I am sure that with john wlshs help and other members of congress at the time this was created their was still hurt for the awful thing that happened to his son but all sex offenders are not the same his son was murdered by someone he didnt know 95% of sex crimes are commited by people the victim know. I am sure that it was created as a tool to protect but it just pools everyone together even if they are no threat or risk. Why cant their be a risk assesment done . I had one done zero risk to reoffend so why am i still punished 22 years later. drunk drivers who kill people cause damage kids adults burgulars murders drug attics who steal and cause harm to others all have a chance in life sex offenders dont. the constitution states all people are created equal white black brown sex offenders burgulars but that doesnt seem to be the case. We have all came along way since 2006 I think its time for reform . Loosen up let the ones on the registry prove they are not bad .. So our families doint have to deal with the pain and suffering and vigilaness we do everyday.

---

**Comment ID**

DOJ-OAG-2020-0003-0287

---

 **Tracking Number**

1k4-9iym-mhfz

---

**Comment Details**                                                    Submitter Info

**Received Date**

Sep 14, 2020

---



AR-00001090

Regulations.gov

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00001091

8/9/23, 10:20 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 15, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |

---

| Comment |

I was convicted in 1996, released in 1999, with ten year registration requirement. Then, in 2006, a new law was passed and applied retroactively that requires me to register for life. How is this NOT considered punitive, as the main goal of parolees is to successfully complete the guidelines of their post-release conditions and live free. But given this, I hate the implications these restrictions have had and continue to have on me and my family. A few years back, my wife was confronted my another female member in our community who placed my information, from the sex offender registry, at the local bus stop where the neighborhood kids, including my own kids, caught the school bus. How is this supposed to be considered a productive means to keep the public safe when my family is being/has been targeted? Is it considered Justice? Or, is there another motive this new proposal is leading up to?

| **Comment ID**
| DOJ-OAG-2020-0003-0288 |

 | **Tracking Number**
| 1k4-9iym-nedz |

| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 14, 2020

AR-00001092



About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00001093

8/9/23, 10:21 AM                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 15, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)    Share ▾

---

Comment

https://www.bjs.gov/content/pub/pdf/rsorsp9yfu0514.pdf

Just a link about the statistics of sex offenders and the pain it causes

**Comment ID**

DOJ-OAG-2020-0003-0289

 **Tracking Number**

1k4-9iyr-mjxt

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Sep 14, 2020

AR-00001094

8/9/23, 10:21 AM                                              Regulations.gov



Your Voice in Federal Decision-Making

About        Bulk Data Download        Agencies        Learn
(/about)        (/bulkdownload)        (/agencies)        (/learn)

                                                       Reports        FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)        (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

                                                       Support (/support)    Provide Site Feedback

AR-00001095

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 16, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

| Comment |
|---|

Partial Response. PLEASE SEE ATTACHED FILE FOR FULL RESPONSE

I would ask the Justice Department to put this proposed rule on hold until they conscientiously look at the large body of wonderful scientific research and evidence AGAINST taking such actions. The effects of this proposed rule would be cost exorbitant to enforce and devastating, not only for registrants, but their entire extended families! More importantly, when you stretch limited resources over large, broad areas, they become less effective and easily distracted from the real hot spots of concern.

A large, massive imposed solution not only impairs capable and reformed individuals, but is incredibly expensive, time consuming, increasingly difficult to enforce, and distracts resources from more obvious and effective solutions.

Recently our family participated in a missing person search which ended with the tragic discovery of a murdered young woman, that we believe could have been prevented had the police been able to immediately focus their resources on the likely perpetrator rather than interviewing dozens of low risk offenders who resided in the general area. In her case, timing was critical and despite important and valuable leads that were available, they were watered down and distracted by masses of individuals that each had to be excluded as potential perpetrators.

Rather than imposing aggressive and enhanced restrictions and reporting requirements on the ever-growing and undifferentiated list of hundreds of thousands of individuals, it would be far wiser to direct those funds and resources to more productive and selective areas based on valid risk stratification. Research shows that the huge cost of money and resources to expand and manage the registry does very little to secure the public safety and ultimately distracts from more effective strategies to monitor and limit those select individuals that represent true risk to society.

I propose the Justice Department impose national risk stratification requirements for all states, and require

AR-00001096

Regulations.gov

registrants with minimal risks to be down graded or even cleaned from the massive registry with restrictions reduced or removed, where reasonable, so they can become productive and contributing members of society rather than a propagating drain on the system and its resources.

SORNAs stated objective is to effectively track and locate sex offenders in the community, in order to provide for the public safety. This is sold on political persuasions that outwardly seem progressive, but are unfortunately based on popular, generally unfounded, primeval assumptions and attitudes. Not a single, valid, body of evidence or scientific research has ever shown the effectiveness of the registry, or for that matter, that it provides safety to anyone! On the contrary, there are volumes of well designed research and expert opinion that show just the opposite!

I am not opposed to any honest and cost-effective action to reduce or prevent sexual abuse or exploitation of any individual, but the assumptive and poorly calculated effects of the registry are ultimately destructive and unrecoverable. Importantly, the registry fails, in principle to separate those who are true predators, and a risk to society, from those who are not. Even worse, because of sensationalism and assumptions associated with sexual crimes, local governments, and the general population at large, view ALL sexual registrants as sexual predators and abhorrent rapists! As a result, the registry has evolved into a legal endorsement of misinformation and community vigilantism, destroying many, many lives, not protecting them! With its far reaching and inclusive provisions, truth be known, every single one of us, at some point in our lives, could have fallen victim to the registry! Maybe the point is that we all should, or eventually will !!

We now have well over 1 million individuals on the sex offender registry, most for a lifetime. The majority are for non-violent, and more importantly, non-predatory infractions. A great number include consensual relationships, sexting between minors, or the simple possession of a pornographic depiction on a personal electronic device, often acquired during the unfortunate click of an internet link on a trolling website! Some are for ridiculous charges such as voiding on the side of the road, or mooning in public. Even an autistic 8 year old was placed on the registry for repeatedly hugging a female classmate. A 14 year old was added for having a partially naked picture of herself on her own phone, discovered by police looking at volunteered evidence for a completely unrelated crime! Indeed, 27% of people on the registry were put on as minors and now carry that burden for life! In the full sense of the term, these are NOT pedophiles and are not a risk to the general public! Do we really want to aggressively restrict all these with your new proposed rules?

---

Attachments  ( 1 )

---

📄  Comments on FR Doc 2020-15804

⬇  Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0290/attachment_1.pdf)

---

**Comment ID**

DOJ-OAG-2020-0003-0290

---

◎  **Tracking Number**

1k4-9iz3-2813

|  | |
| :---: | :---: |
| **Comment Details** | **Submitter Info** |

**Received Date**

Sep 15, 2020



About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00001098

*Comments on FR Doc 2020-15804*

I would ask the Justice Department to put this proposed rule on hold until they conscientiously look at the large body of wonderful scientific research and evidence AGAINST taking such actions.  The effects of this proposed rule would be cost exorbitant to enforce and devastating, not only for registrants, but their entire extended families!  More importantly, when you stretch limited resources over large, broad areas, they become less effective and easily distracted from the real hot spots of concern.

A large, massive imposed solution not only impairs capable and reformed individuals, but is incredibly expensive, time consuming, increasingly difficult to enforce, and distracts resources from more obvious and effective solutions.

Recently our family participated in a missing person search which ended with the tragic discovery of a murdered young woman, that we and others believe, could have been prevented had the police been able to immediately focus their resources on the likely perpetrator rather than interviewing dozens and dozens of low risk "offenders" who resided in the general area. In her case, timing was critical and despite important and valuable leads that were available, they were watered down and distracted by masses of individuals that each had to be excluded as potential perpetrators.

Rather than imposing aggressive and enhanced restrictions and reporting requirements on the ever-growing and undifferentiated list of hundreds of thousands of individuals, it would be far wiser to direct those funds and resources to more productive and selective areas based on valid risk stratification.  Research shows that the huge cost of both money and resources to expand and manage the registry does very little to secure the public safety and ultimately distracts from more effective strategies to precisely monitor and limit those select individuals that represent true risk to society.

I propose the Justice Department impose national risk stratification requirements for all states, and require registrants with minimal risks to be "down graded" or even cleaned from the massive registry with restrictions reduced or removed, where reasonable, so they can become productive and contributing members of society rather than a propagating drain on the "system" and it's resources.

SORNA's stated objective is to "effectively track and locate sex offenders in the community," in order to "provide for the public safety."   This is sold on political persuasions that outwardly seem progressive, but are unfortunately based on popular, generally unfounded, primeval assumptions and attitudes.  Not a single, valid, body of evidence or scientific research has ever shown the effectiveness of the registry, or for that matter, that it provides safety to anyone!   On the contrary, there are volumes of well designed research and expert opinion that show just the opposite!

I am not opposed to any honest and cost-effective action to reduce or prevent sexual abuse or exploitation of any individual, but the assumptive and poorly calculated effects of the registry are ultimately destructive and unrecoverable.  Importantly, the registry fails, in principle to separate those who are true predators, and a risk to society, from those who are not.  Even worse, because of sensationalism and assumptions associated with sexual crimes, local governments, and the general population at large, view ALL sexual registrants

*Comments on FR Doc 2020-15804*

as sexual predators and abhorrent rapists!   As a result, the registry has evolved into a "legal endorsement" of misinformation and community vigilantism, destroying many, many lives, not protecting them!   With it's far reaching and inclusive provisions, truth be known, every single one of us, at some point in our lives, could have fallen victim to the registry!  Maybe the point is that we all should, or eventually will !!

We now have well over 1 million individuals on the sex offender registry, most for a lifetime.  The majority are for non-violent, and more importantly, non-predatory infractions.   A great number include consensual relationships or sexting between minors, or more commonly, the simple possession of a pornographic depiction on a personal electronic device, often acquired during the unfortunate click of an internet link on a trolling website!   Many are caught in fabricated and confabulated sting operations created by local police to look "tough on crime" and acquire additional federal funding and grants.  Intent is no defense and simply "possessing" is conviction.  Some are for ridiculous charges such as voiding on the side of the road, or mooning in public.  Many are perpetuated from an angry parent or partner over an unapproved "first love", or misguided teenage curiosity. Even an autistic 8 year old was placed on the registry for repeatedly "hugging" a female classmate.  A 14 year old was added for having a partially naked picture of herself on her own phone, discovered by police looking at volunteered evidence for a completely unrelated crime!  To anyone with a vestigial sense of rationality, it seems we have gone far astray and deluded from the original intent of the sex offender registry.   Indeed, 27% of people on the registry were put on as minors and now carry that burden for life!  In the full sense of the term, these are NOT pedophiles and are not a risk to the general public!   Do we really want to aggressively restrict all these with your new proposed rules?

Realistically, many may not even be guilty at all!, but were "forced" to take plea deals to avoid the potential of lifetime sentencing that would invariably be imposed under mandatory minimum guidelines, should they lack the insurmountable funds needed for a realistic defense, or otherwise fail in their pursuit for a fair and honest trial by some technicality or public bias.  In fact, 97% of individuals on the registry entered into plea deals because they had no other realistic alternative.

In the name of justice reform, we recognize many societal failings of the past and perceive the greater benefit of improving and reform, and then re-inculcating back into society.  We recognize humanity for what it is, our individual lack of perfection and our predisposition for mistakes.  All of us!   But fortunately, for most, the mistake is not the definitive end, but rather the natural process of learning, progression and improvement.  Regrettably, some are not interested and are not willing to make any effort, but for those who are, the means to improvement should not be the end!  For the competent and capable, an effective solution can not simply rely on bigger padlocks and stronger chains!    What are we really trying to accomplish??  IF we want to make a real and meaningful difference, we must focus on healing the disease and saving souls rather than the blanket destruction of those we perceive as worthless and less valued than ourselves, for therein is pride and the setup for the ultimate destruction of a civilized society.

The opportunity to have a "second chance" and fully integrate back into society is available to virtually every other malefactor who has served their time, including murderers and violent criminals.   But for registrants, this is not usually the case, as many states lack stratification

*Comments on FR Doc 2020-15804*

and mark them for life, with no means of recovery or reform, regardless of their infraction. This approach is further calcified by this proposed rule.

As a society in general, it has been politically popular to lump all registrants as aggressive pedophiles, even though by far, most are not.  As a group they are completely marginalized and rejected by society, labeled with a scarlet letter, and tossed to "vigilantic" wolves.  Their whereabouts are continuously tracked and publicly published, untrue of any other criminal. They can not have an email address, job, account, phone, car, identification, or any other contact without stringent federal requirements to divulge every move they make. They are repeatedly rejected from reasonable housing, expelled from jobs, and often prohibited from higher education and foreign travel.  They are cut off and restricted from any "normal" aspect of life or the pursuit of inherent happiness.   They are in totality and categorically, rejected.   In general, they can not participate, ever, in normal family activities and events at the park or school, even if they have completed counseling and formal intervention with risk mitigation. They are reprobate and non-reformable in the baseless public eye, and further endorsed by the registry, even though their recidivism rate is below that of any other crime short of murder!

Research and expert opinion consistently declare that these publicly conceived biases and conclusions are baseless and unsupported!   If we were to error on such egregious assumptions, then who will free the unjustly imprisoned and provide for an honest and accurate accounting?  Is that not the role of the JUSTICE DEPARTMENT, as it's name implies??  Because of the abhorrent nature of sexual crimes, of course we want to do all we can to protect potential victims, but we now know that only a very small percentage of individuals on the registry actually represent any realistic threat to the public or society.  So is it OK to trash hundreds of thousands for the sake of a few?  We have got to find a course that actually works, that identifies and treats the real underlying issues, and secures the public. With the current reckless and misguided proposals, we completely miss the actual problem! If we don't figure this out, we will ultimately place millions on the registry while the problem continues unchecked and unabated, blossoming further out of control and having little positive effect on desired outcomes.

We know of many things that could impact a difference, and I believe we could stop child pornography almost instantly, but we have to accurately define the problem and examine evidence based solutions directed at the roots, not the symptoms.  We only make the problem worse if we get distracted chasing down the wrong path, beating up the secondary victims instead of focusing on the true instigators and perpetrators, ultimately leaving nothing but a wake of family destruction behind, which is not beneficial to society.   It may well be that our current volumes of rules, regulations and institutions are actually the bigger threat to our society and public safety.   I ask again, what are we doing??   When we consider to take action such as this proposed rule, we must weigh the costs to society as much as we do the perceived benefits and honestly consider if it will even accomplish what we are trying to achieve.  We should not take action to simply powder our emotions or because logically it sounds good, makes us feel better, stronger or even more empowered.  We have to dive deep and figure out the ramifications, lest karma catch us in our own snare.   I get it.  We want to stop sexual trafficking, and restrict the movement of aggressive and unreformed pedophiles, but that is NOT the million plus on the registry!   In fact, the serious offenders we are trying to target are not even on the registry!!  We are petting ourselves, pretending to have accomplished something great while the problem remains largely unchecked.   In the

*Comments on FR Doc 2020-15804*

meantime, we are burning and destroying our hope for the future in hundreds of thousands of affected individuals and their intimately entwined families and future progeny, all with justified, but not fully considered, collateral damage.

If we act amiss, and pursue a course of extremism, then what becomes our our legacy and what kind of world have we created for our posterity?  Can we stand at some future point and rationalize and excuse ourselves by justifying mob mentality and emotional pubic ignorance which move contrary to the facts and evidence?  These registrants ARE our brothers and sisters, wives, husbands and children.  Morally, we are also accountable for them, and even perhaps more particularly if they are downtrodden and unable to voice or stand for themselves.  Like you and me, many made careless mistakes and are good souls with limitless potential and amazing talent, often reformed, anxious and willing to rightfully contribute to our society in a meaningful and positive way.  Yet, if we lock them in a virtual cage, throw away the key, and keep poking sticks at them, what do we expect to achieve as an end result?  When I was young, we called these people with contemptuous disrespect for others, "Bullies."

Where we have greater power and influence, we also carry greater responsibility. It becomes imperative therefore, to be cautious, accurate, and thoughtful, without simply reacting emotionally or on political popularity. It is often a fine line we are called upon to walk. I know you are rightfully sincere in your honest efforts to advocate for what is "best" for society.  But when we are swayed and driven by primeval passions, baseless stereotypes, populists assumptions, or preconceived notions rather than sound thinking and good evidence, it is easy to get off course.  If anything, the federal Department of Justice is entrusted to separate out the emotion and balance out the extremes, to temper the path with more rational prudence and governance, and serve ALL the people, not throw "fuel on the fire!"  Let us use our influence, supported by volumes of wonderful research, valid science and critical evidence, to correct the wrongs, fix the misalignments, adjust our course and defend the liberties and justice for all.   Then our legacy will stand without future retribution!

With the consequences so high, and if we are not sure, it would be far better to hold off than unknowingly serve and advocate further destruction that can never be restored or fully restituted.  You may move on, but your posterity will surely carry that weight!   As much as we abhor predatory behavior, it is important that we not shift from defending the vulnerable to becoming predatory ourselves, from saving lives, to "justifiably" destroying them.

I hope you will be wise and thoughtful, weighing the heavy responsibility to afford impartial justice under the law, for both the powerful as well as the marginalized.   There are so many broken souls you know not of!  You have the power to help relieve the unseen heavy burdens, the tearful eyes, the broken hearts and hopeless suffering of truly thousands upon thousands who are now trying to do the right thing!   I petition you to not pile it on further!  Use your influence to protect ALL people, and bring some degree of morality and decency back to our convoluted and ensnaring legal system that seems to have run amuck with excessive power and dominance.

Let's clean up the registry, streamline it's purpose, stratify the real risk offenders and refocus our efforts until it becomes meaningful again.  Listen to our pleas.  See clearly through the clouds of distractive bias.  Like those we expect to reform, we must learn from the past. Let

*Comments on FR Doc 2020-15804*

us not endorse redressed snares, be party to modern "Witch Trials" or re-advocate for a new "Scarlet Letter."  We are better than that.   Let's fix this destructive mess.  Once we have our "house in order", then your rules may have benefit and real purpose!

I stand as a witness and in testimony to your actions and interpretations, but it can not be said you were never told or did not know.


*"Beware that, when fighting monsters, you yourself do not become a monster."*  *— Friedrich W. Nietzsche*

8/9/23, 10:28 AM                                                    Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 16, 2020

Share ▾

---

Comment

PERSONAL IDENTIFYING INFORMATION

See attached file(s)

Dear Sir or Madam,

I am attaching a copy of a letter I wrote and sent to the U.S. Sentencing Commission on July 14, 2015. Nothing has noticeably changed since then, in fact, conditions are only worse. Due to COVID-19, my family and I have been unable to make our "once a year" visit from North Carolina to New Jersey to see my brother at Fort Dix Correctional Institution in New Jersey. I fear that when we are able to visit again, my parents will be too physically compromised or possibly deceased and obviously unable to do so. Our mother has had two more back surgeries since his incarceration and our father has Parkinson's disease. Both of their conditions are debilitating.

I would also like to add that our prison systems operate under the guise of punishment and rehabilitation, but we have found this to be untrue. I would liken prison to a human zoo. What rehab programs there are seem woefully insufficient, even if someone (like my brother) desires to change and once again become a productive member of society. Once locked up, prisoners, especially of a 'perverse' wrongdoing wear a figurative "Scarlet Letter" and are characterized as the lowest of the low. I do not say these things to excuse his actions, but there should be individual consideration given to each case. The federal mandatory minimums are oppressive, especially to first time, non-violent offenders.

I would like to add that I think hypocrisy runs amok in our society. While we loathe the depraved actions/crimes of those we see as morally bankrupt and mentally twisted, we praise certain television shows and movies and even our own cultural practices. Yes, we should have self-control and know right from wrong, but why should we also be subject to a deluge of lewd images and conversation,etc.? My goodness, there are even children's toys that have recently been in the news as being "sexual"! Why do we expose ourselves and our children to these abominations and then expect people to not be affected in any way? I would argue that anyone over 50 years old agrees that "the envelope" has been opened further and further

AR-00001104

Regulations.gov

when it comes to indecency in our society. Yes, I know, we can't regulate morality. What do we do then? Dear Sir or Madam, please, I implore you, what do we do?

In closing, I am not a lawyer and legalese is not my forte. I would just humbly ask that revisions be made to some of the sentencing laws. My brother ( fed. id #58814-056) deserves a second chance, sooner rather than later. Please consider shortening his sentence so he can be Willie again instead of a number in the prison system. I know he can be a productive, law abiding member of society again. I would love to have him back with our family to enjoy whatever time we have left with our parents and assist in their care.

Thank you for welcoming my comments. I appreciate the opportunity to share.

Lisa
North Carolina

---

Attachments ( 1 )

sentencing commission

⬇ Download ▾

**Comment ID**
DOJ-OAG-2020-0003-0291

**Tracking Number**
1k4-9iz5-j8gc

| Comment Details | Submitter Info |
| --- | --- |

**Received Date**
Sep 15, 2020



AR-00001105

Regulations.gov

About      Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)    (/agencies)    (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

AR-00001106

July 14, 2015

United States Sentencing Commission
One Columbus Circle, NE, Suite 2-500
South Lobby
Attention:  Public Affairs – Priorities Comment
Washington, DC  20002-8002

Dear Sir and/or Madam:

I am the sister of Willie R. Godfrey, III, inmate #98665.  He was sentenced this past Thursday,
July 9, to receive 125 months imprisonment followed by a 10 year term of supervised release.
His crime was receiving and possessing child pornography, in violation of Title 18, United States
Code, Section 2252.  He did not produce child pornography, nor has he ever committed a hands-
on offense.  In fact, he has never committed any crime before.  He is currently being held at
Piedmont Regional Jail in Virginia.  We just heard from him today because he had been on
suicide watch for the past four days.   This is happening just as I read online in *The Washington
Post* that President Obama commuted the sentences of 46 drug offenders on Monday.  It said this
is part of his effort to reform the criminal justice system.  Incarceration is costly and the prisons
are overcrowded, which I suppose is why my brother is being held in the Piedmont Regional Jail.
I suppose they are waiting for a "spot" to open in a prison which I hope and pray will be an
effective deterrent for him as well as rehabilitate him to return to society.  I also hope and pray
the environment will be humane.  My brother, being a non-violent offender, will not fair well
otherwise, I'm afraid.  He has a shoulder that is prone to recurrent dislocation as well as one leg
that is shorter than the other, sequelae of a previous motor vehicle accident.  I'll speak more of
him later, but my main purpose in writing this is in response to the USSC's request for public
comments on priority policy issues for the amendment cycle ending May 1, 2016.

I respectfully ask that the USSC consider the following in the upcoming amendment cycle
ending May 1, 2016:

1) The sentences are too long and disproportionate to the crime committed. Citing from a *Child
Pornography and Sex Offenses* presentation dated 9-19-14, in a section titled *Selected Findings
of the Commission's 2013 Child Pornography Report*, the average sentence lengths increased
from 54 months in 2004 to 95 months in 2010.  Now look at where we are today.  I sincerely
believe this to be true in my brother's case.  He is a first time offender convicted using harsh
mandatory sentencing guidelines. There is hardly need for a defense lawyer or judge.  My
brother's defense lawyers told him they would do all they could, but with mandatory minimum
guidelines there wasn't much they could do. Their request for downward departure was denied
even though I believe it contained relevant mitigating information.  I surmise that the sentencing
guidelines make no room for individual differences among offenders, but elect to lump them into
a "if you've seen one, you've seen them all" category. Has the increase in sentence lengths made
any difference?  Even the judge at sentencing pretty much had "his hands tied".  This is despite
the fact that my brother pled guilty, was cooperative, remorseful, and even paid $12,500 in
restitution fees to be divided among three victims that he only "viewed" on his computer.  And,
as I said before, has no criminal history.

2)  There should be sentencing alternatives that would benefit society and the prisoner more than
an excessive and needless amount of time in prison.  This is obviously monetarily costly to

July 14, 2015

United States Sentencing Commission
One Columbus Circle, NE, Suite 2-500
South Lobby
Attention:  Public Affairs – Priorities Comment
Washington, DC  20002-8002

taxpayers, but on another level it is costly to the inmate and the inmate's family.  My brother's life is already essentially ruined.  A lengthier sentence certainly cannot shame him anymore than he is. He lost his profession (he surrendered his pharmacy license to the state of North Carolina), his income of course, his home, some friends, his dignity, and other things to which he himself would have to speak to. Granted, he should lose some privileges.  He would agree with you.  He deeply regrets what he did, and he will spend the rest of his life attempting to atone for it, whether inside or outside of prison. As I stated before, there is also a cost for the inmate's family.  No, I'm not worried about people judging me.  I could care less.  I love my brother.  One problem is, our parents are aging.  Of course, any one of us could die while he is in prison.  We will not physically be together for a long time, enjoying one another's company and the healing that the love and comfort of that could provide my brother *and* us.

3) It is said that incarcerating these offenders "protects the public".  I would argue that these offenders are not a direct threat to the public because these are not hands-on offenses.  While their viewing of the child pornography is akin to condoning the activity, I would say the bigger threats to society are the perpetrators of abuse who are actually committing and/or filming the abuse and making it available on the internet.  How many of those involved in my brother's case will be convicted or pay restitution to any victim. My brother was first arrested at the state level.  At the time Federal Marshalls picked him up, he had already been on house arrest for 8 months.  He was living with our parents, abiding by the release conditions set forth by the judge here in North Carolina.  The conditions included instructions forbidding access to the computer or a cell phone, and other outlined conditions.  My parents' home was subject to a search at any time, no warrant needed.  With any violation, my brother could be taken back into custody  He was also required to participate in therapy with a psychologist.  He willingly did so.  He had just been able to open up to the psychologist about sexual abuse he suffered as a child by a family member.  This is something he revealed to us after his arrest.  No, it wasn't an excuse he made up.  He had not been able to tell anyone before.  We actually have an aunt that was abused by a family member when she too was a young girl.  My brother had just begun to uncover the cause of what fueled 44 years of failed relationships, feelings of worthlessness, and mistrust of people, along with many other emotional and mental issues.  Should he have sought help earlier?  Why certainly.  But why would he?  He didn't know if he would be believed.  He was ashamed.  This is a common thread of victims of abuse.  Combine this shame with his shame of viewing child pornography and what would most people in his situation do?  Yes, in 8 months he took leaps forward, and now he has been condemned to 10 years of setback.  There is no pity for him in the legal system.  He is only seen as a perpetrator, not a victim himself.  My brother has already suffered most of his life, since he was a little boy.  He is being punished more for the sexual perversion of his offense than it being a truly violent criminal act.  What he really needs is therapy and rehabilitation.  Had it not been for the sexual abuse he suffered and exposure to pornography when he was younger, he may not have ever committed this crime.  Yes, he is still ultimately responsible, but again, the sentence is too harsh.

July 14, 2015

United States Sentencing Commission
One Columbus Circle, NE, Suite 2-500
South Lobby
Attention:  Public Affairs – Priorities Comment
Washington, DC  20002-8002

4) These offenses should not be classified as "violent". I must reiterate that my brother did not commit any hands-on offense. Many, many people view adult pornography.  Even though the participation of those involved in its production is of their own free will, could it not be argued that viewing adult pornography can lead to criminal activity such as abduction and rape?  Are we going to now arrest and imprison everyone who views adult pornography as well?  Even though they don't go on to commit a violent crime?  I don't say this to downplay the seriousness of child pornography.  The young victims are re-victimized each time the image is viewed and/or shared. As a mother, yes, I am disgusted, but classifying these offenders in the same category as murderers and terrorists is ridiculous. My brother had been viewing child pornography for a lengthy amount of time.  I would think if he were actually motivated to be a hands-on offender, he would have already attempted and/or committed such an offense. I watch nearly every episode of *48 Hours*, but I have no desire to kill anyone.  I believe his actions are a result of the sexual abuse and exposure to adult pornography he experienced as a young child.  These guidelines punish a person who are themselves a victim.  How sad.

5) Those convicted of a child pornography crime should not be excluded from programs that allow them to shorten their sentence terms. It should be exactly the opposite. Those making an obvious effort to rehabilitate themselves should be rewarded for that. As I stated earlier, my brother was already receiving therapy before his case became federal. I believe he had wanted that for a long time, but shame kept him hidden.  It kept him from seeking help for something he knew society despised.

My brother used to be described as a graduate of UNC-Chapel Hill, a gifted pharmacist, a hard worker, a wonderful contributing member of society.  Now, he is a sex offender.  He has already lost his reputation, his profession, his income, his ability to make a difference in the health of patients, as well as some family and friends who will probably never speak to him again.  I can tell you this though:  His immediate family supports him.  We don't condone his actions, but we love him.  He is still a human being of worth.  To me, he is still my brother.  To my parents, he is still their son. To my daughters, he is still their uncle.   He deserves a second chance and he deserves a second chance before 10 long years pass.  I *beg* you to consider making recommendations to congress in this area.

I understand that this is an especially difficult and emotional issue for the USSC.  Anything involving the health and safety of our children is, however, I sincerely hope that in your role you will look at all data and research in this area when making recommendations to congress. Regardless of the crime committed, each person deserves fair treatment, one sufficient for judgment but lenient enough for mercy as well, when appropriate.

July 14, 2015

United States Sentencing Commission
One Columbus Circle, NE, Suite 2-500
South Lobby
Attention:  Public Affairs – Priorities Comment
Washington, DC  20002-8002

Respectfully,


Lisa G. Finley
921 Horseshoe Road
Elizabeth City, NC  27909
Sister of inmate Willie R. Godfrey, III, Inmate #98665

CC:  Justice Department, Office of the Pardon Attorney
        Deputy Attorney General, Sally Quillian Yates
        Clemency Project 2014

8/9/23, 10:29 AM                                             Regulations.gov

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 16, 2020

View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments)          Share ▾

---

Comment

I am not in favor of creating unnecessary restrictions for people required to register. The requirements are already so difficult that it severely interferes with people's ability to (re)integrate into society.

**Comment ID**
DOJ-OAG-2020-0003-0292

 **Tracking Number**
kf4-9icc-p55g

| Comment Details | Submitter Info |
|---|---|

**Received Date**
Sep 15, 2020

AR-00001111

Regulations.gov



Your Voice in Federal Decision-Making

About       Bulk Data Download       Agencies       Learn
(/about)        (/bulkdownload)     (/agencies)    (/learn)

Reports     FAQ
(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00001112

8/9/23, 10:32 AM                                                                                  Regulations.gov

An official website of the United States Government. 

Docket (/docket/DOJ-OAG-2020-0003)
  / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)   / Comment



**PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Sep 16, 2020

View More Comments ( 724 ) (/document/DOJ-OAG-2020-0003-0001/comment)

View Related Comments ( 724 ) (/docket/DOJ-OAG-2020-0003/comments)        Share ▾

---

Comment

72.7 Violates ex post facto,

See attached civil complaint filed in Us District Court on the matter. Also attached is the unfiled (yet to file) amended version of my complaint.

72.7
How sex offenders must register and keep the registration current.

(b) Periodic in-person verification.

A sex offender must >>appear in person<< , allow the jurisdiction to take a current photograph, and verify the information in each registry in which the offender is required to register. In carrying out the required verification of information in each registry, the sex offender must correct any information that has changed or is otherwise inaccurate and must report any new registration information. A sex offender must >>appear in person<< for these purposes not less frequently than

(1) Each year, if the offender is a tier I sex offender;
(2) Every six months, if the offender is a tier II sex offender; and
(3) Every three months, if the offender is a tier III sex offender.

(c) Reporting of initiation and changes concerning name, residence, employment, and school attendance.

A sex offender who enters a jurisdiction to reside, or who resides in a jurisdiction and changes his name or his place of residence in the jurisdiction, must appear in person in that jurisdiction and register or update the registration within three business days. A sex offender who commences employment or school attendance in a jurisdiction, or who changes employer, school attended, or place of employment or school attendance in a jurisdiction, must >>appear in person<< in that jurisdiction and register or update the registration within

AR-00001113

three business days.

Search "warenback" to find me.

Attachments  2

 filed complaint

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0293/attachment_1.pdf)

 amended civil complaint - Google Docs

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0293/attachment_2.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0293

 **Tracking Number**

1k4-9iz6-ch50

**Comment Details**                                    **Submitter Info**

**Received Date**

Sep 15, 2020



Regulations.gov

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)   FAQ (/faq)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   Developers (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

AR-00001115



UNITED STATES DISTRICT COURT

for the

District of Nevada

Las Vegas Division

FILED ___ ENTERED ___ RECEIVED ___ SERVED ON COUNSEL/PARTIES OF RECORD

SEP 11 2020

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

| | |
|---|---|
| Douglas Harry Warenback <br> _Plaintiff(s)_ <br><br> -v- <br><br> Aaron Ford, Attorney General, State of Nevada <br> _Defendant(s)_ | **2:20-cv-01682-KJD-VCF** <br><br> Jury Trial: _(check one)_ ☐ Yes  X No |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Non–Prisoner Complaint)

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Douglas Warenback |
| Address | ▮▮▮▮▮▮▮ |
| | Henderson          NV          89015 |
| | _City          State          Zip Code_ |
| County | Clark |
| Telephone Number | ▮▮▮ |

1 of 4

AR-00001116

| | |
|---|---|
| E-Mail Address | douglaswarenback@gmail.com |
| Plaintiffs, similarly situated: | |
| Names | All registered sex offenders, past and present, similarly situated |
| Address | State of Nevada, past and present |

| | |
|---|---|
| Defendant | |
| Name | Aaron Ford |
| Job or Title *(if known)* | Attorney General for the State of Nevada |
| Address | 100 North Carson Street |

| City | State | Zip Code |
|---|---|---|
| Carson City | NV | 89701-4717 |

Telephone Number   775-400-0340

☐  Individual capacity     X  Official capacity

---

**II.    Basis for Jurisdiction**

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."

A.    Bringing suit against:

    X   State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

US Constitution Article I, Section 10, Clause 1. "No State shall pass any ex post facto Law."

C.    Plaintiffs suing under *Bivens*, Not a Bivens claim.

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law.

The Attorney General of Nevada, Aaron Ford, is counsel for the State of Nevada, who protects the interests of the State, its peoples and laws. The law which the Attorney General is protecting, under the color of law in this complaint is NRS 179D.480; section 1. "sex offender shall appear in person in at least one jurisdiction in which the offender or sex offender reside".

AR-00001117

**III.   Statement of Claim**

     Note: the form states, "<u>Do not cite any cases or statutes</u>." This is impossible because my claim is based entirely on case law and statute. I assume this form rule is based on filing pro-se. By trying to conform to the form rule, the defendant will definitely (anyways) file a motion to dismiss or for summary judgment for "failure to state a claim". Cited case law and statues are necessary to "state and support my claim(s)". See attached for my statement of claim.

A.    Where did the events giving rise to your claim(s) occur?
     Las Vegas, Nevada

B.    What date and approximate time did the events giving rise to your claim(s) occur?

     Released from prison 8/20/2018, subject to Sex offender registration. It is an ongoing claim until the year 2043.

C.    What are the facts underlying your claim(s)?

     See attached claim.

**IV.   Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

See attached claim.

**V.   Relief**

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

     See attached claim. From release from prison on April 20, 2018 to mid april 2020 I was homeless and had to register every 30 days for a total of 24 appearances. A move to a residence required 3 more appearances, for a total of 27 appearances to date. Other than the relief stated in my claim I am asking for $100 per appearance for a total of $2700.

**VI.   Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a

AR-00001118

nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.     For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        September 2020

Signature of Plaintiff

Printed Name of Plaintiff        Douglas Warenback

4 of 4

AR-00001119

## Table of Authorities

|  | page no. |
|---|---|
| **US Supreme Court:** |  |
| *Smith v. Doe*, 538 U.S. 84, 101 (S.Ct 2003) | 1-7 |
| *Snyder v. Does*, 138 S.Ct. 55 (S.Ct 2017) | 4 |
| *Nichols, v. US*, 136 S.Ct. 1113 (S.Ct 2016) | 6 |
|  |  |
| **Circuit Court:** |  |
| *Doe v. Otte*, 259 F.3d 979 (9th Circuit 2001) | 3,6 |
| *Does v. Snyder*, 834 F.3d 696 (6th Circuit 2016) | 3,4,5 |
| *Hatton v. Bonner*, 356 F.3d 955 (9th Circuit 2004) | 4,5 |
| *Doe v. Harris*, 772 F. 3d 563, (9th Circuit 2014) | 8 |
|  |  |
| **Federal Law** |  |
| 34 U.S. Code § 20918, Periodic in person verification. | 4,6 |
|  |  |
| **State law** |  |
| NRS 179D.480, When offender or sex offender |  |
| is required to appear in person | 2,5,7 |
|  |  |
| **Rules:** |  |
| US Supreme Court rule : "Part III. Jurisdiction |  |
| on Writ of Certiorari Rule 10(a) | 5 |
|  |  |
| **Other:** |  |
| Case No.15-2346/2486,, |  |
| Brief of Law Professors as Amici Curiae |  |
| in support of Plaintiffs-Appellants |  |
| Sixth Circuit, for *Does -vs- Snyder* (January 11, 2016) | 3 |
|  |  |
| United States Marshals Service FY 2020 |  |
| Performance Budget, page 63 | 8 |
|  |  |
| *Nevada v. Warenback*, C-13-286735-1, |  |
| 8th Judicial District Court, Clark County, |  |
| Nevada, (2013) | 1 |
|  |  |
| **Constitutional:** |  |
| US Constitution, Article I, Section 10, |  |
| Powers Denied to the States, Clause 1: |  |
| No State shall pass any Ex Post Facto law. | 2-6 |

AR-00001120

### Jurisdiction

On December 17, 2013 I was convicted of "pandering of a Child" in the *Nevada v. Warenback*, and required to register as a sex offender. I was released from prison on April 20. 2018 and registered ever since. Because registration is an ongoing occurrence until the year 2043, my claim is not subject to statute of limitations.

I am filing my claim against the State of Nevada through the Attorney General, Aaron Ford, Counsel representing the State of Nevada in official capacity pursuant to 42 U.S. § 1983 (Title 42. The Public Health and Welfare Chapter 21, Civil Rights Subchapter I Generally, § 1983. Civil action for deprivation of rights): "Every person who, under color of any statute...of any State...subjects...any citizen of the United States...to the deprivation of any rights...secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity...for redress."

The Federal Law I rely on to protect my liberty interest under State law is: "US Constitution, Article I, Legislative Department, Section 10, Powers Denied to the States, Clause 1. Treaties, Coining Money, Impairing Contracts, Etc.: No State shall pass any Ex Post Facto law.". **The State law challenged is NRS 179D.480.**

### Statement of Claim:

The in-person appearance requirement for sex offender registration pursuant NRS 179D.480 is an affirmative disability violating Ex Post Facto.

The foundation for this complaint is based on the current landmark controlling US Supreme Court decision in *Smith v. Doe*, 538 U.S. 84, 101 (2003) which states:

## "no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act."

This is clearly established federal case law.    Wait,    what?   How is it even possible for the highest Court of our country to make such an obvious false statement? This statement comes from : "The Court of Appeals reasoned that the requirement of periodic updates imposed an affirmative disability. In reaching this conclusion, the Court of Appeals was under a misapprehension, albeit one created by the State itself during the argument below, that the offender had to update the registry in person. Id., at 984, n. 4. The State's representation was erroneous. The Alaska statute, on its face, does

AR-00001121

not require these updates to be made in person. And, as respondents conceded at the oral argument before us, the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act. Tr. of Oral Arg. 26–28."

Where "n. 4." is from the lower Court's footnote, *Doe v. Otte*, 259 F.3d 979, 995 (Ninth Circuit, 2001) : "[4] The Alaska statute, on its face, does not clearly specify that these registrations must be made in person at local police stations. However, the government represented at oral argument that periodic in-person registration at local police stations is required by the Act. When specifically asked whether registrants must 'go to the police station' for their annual or quarterly registrations, the government answered 'under the current law, yes.'".

From *Smith* above, "Court of Appeals was under a misapprehension", this misapprehension is referenced from I.D. at 987 :  "II. Ex Post Facto Claim : 1. Affirmative disability or restraint : The Alaska Sex Offender Registration Act imposes an affirmative disability on the plaintiffs. First, its registration provisions impose a significant affirmative disability by subjecting offenders to onerous conditions that in some respects are similar to probation or supervised release. Like Washington's sex offender registration statute, Alaska's requires offenders being released from confinement to register. Alaska Code § 12.63.010(a); Russell, 124 F.3d at 1082. However, unlike the Washington statute, Alaska's requires sex offenders such as the plaintiffs to reregister at police stations four times each year every year of their lives. Alaska Code § 12.63.010(d). Moreover, in order to do so, they must appear in person at a police station on each occasion, and provide, under oath, a wide variety of personal information, including address, anticipated change of address, employer address, vehicle description, and information concerning mental health treatment for any 'mental abnormality or personality disorder.' § 12.63.010(b)."

An analysis of the above: Case No.15-2346/2486, United States Court of Appeals for The Sixth Circuit, *Does -vs- Snyder*, Brief of Law Professors as Amici Curiae in support of Plaintiffs-Appellants (January 11, 2016), (pdf page 23, page 18 in document) stated : "First, the Court emphasized that the Alaska statute required only calling the police once a year or, in some cases, once a quarter. "The Alaska statute, on its face, does not require these updates to be made in person. And...the record contains no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act." Id. The Court noted that the lower court had factually erred in finding that the statute had in-person reporting requirements, but the Court's language strongly suggests that if such requirements *had* existed, they would have constituted affirmative disabilities and

AR-00001122

restraints. The Alaska law is a first-generation registration requirement, imposing comparatively minor burdens: offenders did not need to register in person."

This argument centers around, "the Court's language strongly suggests that if such requirements *had* existed" that supports my claim; "the in-person appearance requirement for sex offender registration is an affirmative disability". This brief was the only concurring reference I could find that "strongly suggests" my claim has merit. This was a submission to *Does v. Snyder*, 834 F.3d 696 (6th circuit, 2016), where the Sixth Circuit called out 538 U.S. 101 4 times at 834 F.3d 700, 703, regarding "in-person", stated : "registrants must appear in person, both initially and for updates, and, if they are 'Tier III' offenders, they must do so for life. These are direct restraints on personal conduct." Where "direct restraints" is custody which is punishment which violates Ex Post Facto.

The Court concluded, I.D. at 706 : "As we have explained, this case involves far more than an Ex Post Facto challenge. And as the district court's detailed opinions make evident, Plaintiffs' arguments on these other issues are far from frivolous and involve matters of great public importance. These questions, however, will have to wait for another day because none of the contested provisions may now be applied to the plaintiffs in this lawsuit, and anything we would say on those other matters would be dicta." "Another day" is today, my complaint. The State appealed, denied by the Supreme Court without opinion, *Snyder v. Does*, 138 S.Ct. 55 (2017). This indicated the State's attempt to add further (punitive) rules to registration crossed the threshold of constitutionality.

The Court correctly stated "dicta" because definitive statistical data regarding registrant recidivism (public safety), for example, is required to support terms like "balanced", "not enough", "weighs" (see *Hatton* below), or "not sufficiently punitive", "not an affirmative disability", or "doesn't reach". Typically, the opposition will call out a report, but fails to cite any specific statistic from the report.

As the footnote (n. 4) indicated, the in-person appearance requirement actually did exist, just not on the "face" at the time. ("under the current law, yes."). And 3 years later in 2006, in-person appearance was made Federal law: "34 U.S. Code §20918, Periodic in person verification: A sex offender shall appear in person, allow the jurisdiction to take a current photograph, and verify the information in each registry in which that offender is required to be registered not less frequently than— (1) each year, if the offender is a tier I sex offender; (2) every 6 months, if the offender is a tier II sex offender; and (3) every 3 months, if the offender is a tier III sex offender. (Pub. L. 109–248, title I, §116,

4 of 8

AR-00001123

July 27, 2006, 120 Stat. 595.)" This leaves *Smith v. Doe*, 538 U.S. 84, 101 finding in question, coinciding with the three dissenting opinions in the *Smith* Court.

Providing jurisdiction to this complaint, Nevada law mirrors Federal law: "NRS 179D.480: When offender or sex offender is required to appear in person and provide certain information to local law enforcement agency; duties of Central Repository if offender or sex offender fails to comply. 1. Except as otherwise provided in subsection 3, an offender convicted of a crime against a child or a sex offender shall appear in person in at least one jurisdiction in which the offender or sex offender resides or is a student or worker: (a) Not less frequently than annually, if the offender or sex offender is a Tier I offender; (b) Not less frequently than every 180 days, if the offender or sex offender is a Tier II offender; or (c) Not less frequently than every 90 days, if the offender or sex offender is a Tier III offender, and shall allow the appropriate local law enforcement agency to collect a current set of fingerprints and palm prints, a current photograph and all other information that is relevant to updating the offender or sex offender's record of registration, including, but not limited to, any change in the offender or sex offender's name, occupation, employment, work, volunteer service or driver's license and any change in the license number or description of a motor vehicle registered to or frequently driven by the offender or sex offender. (Added to NRS by 1997, 1658; A 1999, 1304; 2001, 2061; 2007, 2769)".

## Circuit Split

One year after the US Supreme Court's landmark decision, the Ninth Circuit contradicted their previous decision, *Doe v Otte*, in *Hatton v. Bonner*, 356 F.3d 955, 964 (9th Circuit 2004), Stating : "It is true that, unlike the Alaska statute, § 290 requires Petitioner to register in person. Although this fact is important, when balanced against the other facts highlighted above, it is simply not enough to turn § 290 into an affirmative disability or restraint. Thus, this factor weighs in favor of the state court's conclusion that application of § 290 to Petitioner does not violate the Ex Post Facto Clause."

How did this circuit split occur? Although *Hatton* referenced *Smith* 26 times, I claim the Circuit Court abused its discretion by specifically ignoring 538 U.S. 101 because the entire argument here would have had to be addressed, thereby fracturing its decision. Because *Hatton* also splits with *Does v Snyder*, it appears a growing Circuit majority (2:1) is in opposition to *Smith*.

For reference, the above conflict is specifically in the jurisdiction of the US Supreme Court pursuant to : "Part III. Jurisdiction on Writ of Certiorari Rule 10. "(a) A United States court of appeals

AR-00001124

has entered a decision in conflict with the decision of another United States court of appeals on the same important matter". It should be reasonably assumed "another" could also be the same circuit court, as in this case. "Important matter" is referenced in the above circuit decisions; *Does v. Snyder,* "matters of great public importance" and *Hatton* "Although this fact is important".

After 17 years, what would the Supreme Court say if confronted with 538 U.S. 101 in light of 34 U.S. Code § 20918? I claim they would just use the same dicta in *Hatton,* and dilute Ex Post Facto. 4 years ago, in *Nichols, v. US,* 136 S.Ct. 1113,1116, (2016), the Supreme Court called out its previous decision, *Smith v. Doe,* 538 U.S. 84, 89, and references "in-person" 6 times, but predictably fails to mention the error presented here. The issue discussed address changes only. The Supreme Court has not confronted the issue presented here since *Smith.*

I claim the Supreme Court will never hear any further certiorari petitions on the matter because it would expose the incredible error of the Court, and the substantial implications that would result if corrected, as stated below. I am reminded every six months about it, thus compelled to exercise my First Amendment right to access the Courts, and make a record here.

### Conclusion

When I have to appear for registration bi-annually, during that time, I am in custody, although it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in a cumulative violation of my "constitutionally protected interest in liberty", 538 U.S. 112, as the Supreme Court's dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment. Appearance, photo, fingerprints, that is precisely the same as being booked into jail, multiple times a year.

I have to be there, that is restraint, under penalty of a crime. In person is physical, affirmative. Although it would appear brief, one hour of restraint is legally no different than a year in custody. It is not a sliding scale, or something that is balanced against other liberty interests or public safety. Restraint must be measured independently, it is not contextual. Ex Post Facto is absolute, not something negotiable.

AR-00001125

And if the in-person requirement is properly found to violate Ex Post Facto, then the government would argue the critical function of the registry is compromised, even rendered useless without in-person verification. As of December 2018, the registered sex offender population was 917,771 (see footnote 1). By removing in-person registration essentially dissolves the whole registry, and the justification for the registry erodes with it. Another reason the Government will oppose any reform to registration; civil litigation. If anything about registration is properly found to be unconstitutional by the US Supreme Court, the settlement lawsuits would be substantial.

Our country was founded on revolution against oppression. Violating Ex Post Facto is oppression. The Framers intent: No State shall pass any Ex Post Facto law. "Any", specifically means no laws with exceptions that say "balanced", "not enough", "weighs". The Framers stated an absolute, they did not include qualifiers. And all that goes back to the complaint here; I have demonstrated through an absurd error in US Supreme Court law and Circuit Court majority, NRS 179D.480 is unconstitutional, an affirmative disability that violates Ex Post Facto.

## Prayer for Relief

Therefore, pursuant to 42 U.S. § 1983, I pray this Honorable Court to grant me (and the other 7354 similarly situated registrants, see footnote 2) an injunction from the imposition of NRS 179D.480. Or, in the alternative, grant a "certified question" on the *Smith* error to present to the 9th Circuit. Also, see footnote 3. for injunctive relief from providing "internet identifiers" in the registration form.

Respectfully Submitted,

Douglas Warenback,          September 6 , 2020

AR-00001126

Footnote 1:

From the United States Marshals Service FY 2020 Performance Budget, page 63, "NCMEC** reports that eleven years later, in December 2018, the registered sex offender population was 917,771. Despite this 52 percent increase, the USMS has not been allocated additional personnel to combat the prevalence of noncompliant sex offenders....USMS collateral duty DUSMs performed 48 percent fewer investigations in FY 2017 as compared to FY 2014.". I suggest the additional allocation was lacking because the non-compliance crime does not have an actual victim. It is a passive crime, not doing something. Thus, when balanced with other matters, investigating non-compliance is predictably a low priority. Where is the immediate danger to the community? This is another example illustrating the Ex Post Facto law is unconstitutional. **I could not find the NCMEC source for this statistic. Source: https://www.justice.gov/jmd/page/file/1143886/download

Footnote 2:

From http://www.nvsexoffenders.gov/Statistics.aspx, as of 8/31/2020, there were 7355 active cases.

Footnote 3:

See below, "State of Nevada Sex Offender Registration Form", page 3, "internet identifiers". There is no requirement in Nevada statutes that specify I have to fill out that portion of the form. Also, this violates a "constitutionally protected interest in liberty" (1st amendment) pursuant to *Doe v. Harris*, 772 F. 3d 563, (9th Circuit 2014). Therefore, I ask this Honorable to provide injunctive relief to have the "internet identifiers" portion of the form removed; Form source: https://sheriff.douglascountynv.gov/UserFiles/Servers/Server_16087630/File/State%20of%20Nevad a%20Sex%20Offender%20Registration%20Form%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.pdf



**8 of 8**

AR-00001127

Amended Complaint      October xx,2020

## Table of Authorities

|  | page no. |
|---|---|
| US Supreme Court: | |
| *Smith v. Doe*, 538 U.S. 84, 101 (S.Ct 2003) | 1-7 |
| *Snyder v. Does,* 138 S.Ct. 55 (S.Ct 2017) | 4 |
| *Nichols, v. US*, 136 S.Ct. 1113 (S.Ct 2016) | 6 |
| | |
| Circuit Court: | |
| *Doe v. Otte,* 259 F.3d 979 (9th Circuit 2001) | 3,6 |
| *Does v. Snyder*, 834 F.3d 696 (6th Circuit 2016) | 3,4,5 |
| *Hatton v. Bonner*, 356 F.3d 955 (9th Circuit 2004) | 4,5 |
| *Doe v. Harris*, 772 F. 3d 563, (9th Circuit 2014) | 9 |
| *Nevada v. Masto*, 670 F. 3d 1046, 1056 | 6 |
| | |
| Federal Law | |
| 34 U.S. Code §20918, Periodic in person verification. | 4,6 |
| | |
| State law | |
| NRS 179D.480, When offender or sex offender | |
| is required to appear in person | 2,5,7,8 |
| | |
| Rules: | |
| US Supreme Court rule : "Part III. Jurisdiction | |
| on Writ of Certiorari Rule 10(a) | 5 |
| | |
| Other: | |
| Case No.15-2346/2486,, | |
| Brief of Law Professors as Amici Curiae | |
| in support of Plaintiffs-Appellants | |
| Sixth Circuit, for *Does -vs- Snyder* (January 11, 2016) | 3 |
| | |
| United States Marshals Service FY 2020 | |
| Performance Budget, page 63 | 8 |
| | |
| *Nevada v. Warenbac*k, C-13-286735-1, | |
| 8th Judicial District Court, Clark County, | |
| Nevada, (2013) | 1 |
| | |
| Constitutional: | |
| US Constitution, Article I, Section 10, | |
| Powers Denied to the States, Clause 1: | |
| No State shall pass any Ex Post Facto law. | 2-6 |

AR-00001128

Jurisdiction

On December 17, 2013 I was convicted of "pandering of a Child" in the *Nevada v. Warenback*, and required to register as a sex offender. I was released from prison on April 20. 2018 and registered ever since. Because registration is an ongoing occurrence until the year 2043, my claim is not subject to statute of limitations.

I am filing my claim against the State of Nevada through the Attorney General, Aaron Ford, Counsel representing the State of Nevada in official capacity pursuant to 42 U.S. § 1983 (Title 42. The Public Health and Welfare Chapter 21, Civil Rights Subchapter I Generally, §1983. Civil action for deprivation of rights): "Every person who, under color of any statute...of any State...subjects...any citizen of the United States...to the deprivation of any rights...secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity...for redress."

The Federal Law I rely on to protect my liberty interest under State law is: "US Constitution, Article I, Legislative Department, Section 10, Powers Denied to the States, Clause 1. Treaties, Coining Money, Impairing Contracts, Etc.: No State shall pass any Ex Post Facto law.". The State law challenged is NRS 179D.480.

Statement of Claim:

The in-person appearance requirement for sex offender registration
pursuant NRS 179D.480 is an affirmative disability violating Ex Post Facto.

The foundation for this complaint is based on the current landmark controlling US Supreme Court decision in *Smith v. Doe*, 538 U.S. 84, 101 (2003) which states:

**"no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act."**

This is clearly established federal case law.     Wait,     what?   How is it even possible for the highest Court of our country to make such an obvious false statement? This statement comes from : "The Court of Appeals reasoned that the requirement of periodic updates imposed an affirmative disability. In reaching this conclusion, the *Court of Appeals was under a misapprehension*, albeit one created by the State itself during the argument below, that the offender had to update the registry in

AR-00001129

person. Id., at 984, n. 4. The State's representation was erroneous. The Alaska statute, *on its face, does not require these updates to be made in person*. And, as respondents conceded at the oral argument before us, the record contains *no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act*. Tr. of Oral Arg. 26–28." (italics added for emphasis)

Where "n. 4." is from the lower Court's footnote, *Doe v. Otte,* 259 F.3d 979, 995 (Ninth Circuit, 2001) : "[4] The Alaska statute, on its face, does not clearly specify that these registrations must be made in person at local police stations. However, *the government represented at oral argument that periodic in-person registration at local police stations is required by the Act*. When specifically asked whether registrants must "go to the police station" for their annual or quarterly registrations, the government answered *"under the current law, yes.""*.

From *Smith* above, "Court of Appeals was under a misapprehension", this misapprehension is referenced from I.D. at 987 : "II. Ex Post Facto Claim : 1. Affirmative disability or restraint : The Alaska *Sex Offender Registration Act imposes an affirmative disability on the plaintiffs.* First, its *registration provisions impose a significant affirmative disability* by subjecting offenders to onerous conditions that in some respects are similar to probation or supervised release. Like Washington's sex offender registration statute, Alaska's requires offenders being released from confinement to register. Alaska Code § 12.63.010(a); Russell, 124 F.3d at 1082. However, unlike the Washington statute, Alaska's requires sex offenders such as the plaintiffs to reregister at police stations four times each year every year of their lives. Alaska Code § 12.63.010(d). Moreover, in order to do so, *they must appear in person at a police station* on each occasion, and provide, under oath, a wide variety of personal information, including address, anticipated change of address, employer address, vehicle description, and information concerning mental health treatment for any "mental abnormality or personality disorder." § 12.63.010(b)."

An analysis of the above: Case No.15-2346/2486, United States Court of Appeals for The Sixth Circuit, *Does -vs- Snyder*, Brief of Law Professors as Amici Curiae in support of Plaintiffs-Appellants (January 11, 2016), (pdf page 23, page 18 in document) stated : "First, the Court emphasized that the Alaska statute required only calling the police once a year or, in some cases, once a quarter. "The Alaska statute, on its face, does not require these updates to be made in person. And...the record contains *no indication that an in-person appearance requirement has been imposed on any sex offender subject to the Act*." Id. The Court noted that the lower court had factually erred in finding that the statute had in-person reporting requirements, but *the Court's language strongly suggests that if such requirements **had** existed, they would have constituted affirmative disabilities and restraints.* The Alaska

AR-00001130

law is a first-generation registration requirement, imposing comparatively minor burdens: offenders did not need to register in person."

This argument centers around, "the Court's language strongly suggests that if such requirements *had* existed" that supports my claim; "the in-person appearance requirement for sex offender registration is an affirmative disability". This brief was the only concurring reference I could find that "strongly suggests" my claim has merit. This was a submission to *Does v. Snyder*, 834 F.3d 696 (6th circuit, 2016), where the Sixth Circuit called out 538 U.S. 101 4 times at 834 F.3d 700, 703, regarding "in-person", stated : "*registrants must appear in person*, both initially and for updates, and, if they are "Tier III" offenders, they must do so for life. These are *direct restraints on personal conduct*." Where "direct restraints" is custody which is punishment which violates Ex Post Facto.

The Court concluded, I.D. at 706 : "As we have explained, this case *involves far more than an Ex Post Facto challenge*. And as the district court's detailed opinions make evident, Plaintiffs' arguments on these other *issues are far from frivolous* and involve *matters of great public importance*. These questions, however, will have to *wait for another day* because none of the contested provisions may now be applied to the plaintiffs in this lawsuit, and anything we would say on those other matters would be dicta." "Another day" is today, my complaint. The State appealed, denied by the Supreme Court without opinion, *Snyder v. Does,* 138 S.Ct. 55 (2017). This indicated the State's attempt to add further (punitive) rules to registration crossed the threshold of constitutionality.

The Court correctly stated "dicta" because definitive statistical data regarding registrant recidivism (public safety), for example, is required to support terms like "balanced", "not enough", "weighs" (see *Hatton* below), or "not sufficiently punitive", "not an affirmative disability", or "doesn't reach". Typically, the opposition will call out a report, but fails to cite any specific statistic from the report.

As the footnote (n. 4) indicated, the in-person appearance requirement actually did exist, just not on the "face" at the time. ("under the current law, yes."). And 3 years later in 2006, in-person appearance was made Federal law: "34 U.S. Code §20918, *Periodic in person verificatio*n: *A sex offender shall appear in person*, allow the jurisdiction to *take a current photograph*, and verify the information in each registry in which that offender is required to be registered not less frequently than— (1) each year, if the offender is a tier I sex offender; (2) every 6 months, if the offender is a tier II sex offender; and (3) every 3 months, if the offender is a tier III sex offender. (Pub. L. 109–248, title I, §116, July 27, 2006, 120

AR-00001131

Stat. 595.)" The in-person requirement under law is now on the face which then leaves *Smith v. Doe*, 538 U.S. 84, 101 finding in question, and creating unsettled case law, coinciding with the three dissenting opinions in the *Smith* Court (538 U.S. 112).

Providing jurisdiction to this complaint, Nevada law mirrors Federal law: "NRS 179D.480: When offender or sex offender is *required to appear in person* and provide certain information to local law enforcement agency; duties of Central Repository if offender or sex offender fails to comply. 1. Except as otherwise provided in subsection 3, an offender convicted of a crime against a child or a sex offender shall appear in person in at least one jurisdiction in which the offender or sex offender resides or is a student or worker: (a) Not less frequently than annually, if the offender or sex offender is a Tier I offender; (b) Not less frequently than every 180 days, if the offender or sex offender is a Tier II offender; or (c) Not less frequently than every 90 days, if the offender or sex offender is a Tier III offender, and shall allow the appropriate local law enforcement agency to collect a *current set of fingerprints and palm prints, a current photograph* and all other information that is relevant to updating the offender or sex offender's record of registration, including, but not limited to, any change in the offender or sex offender's name, occupation, employment, work, volunteer service or driver's license and any change in the license number or description of a motor vehicle registered to or frequently driven by the offender or sex offender. (Added to NRS by 1997, 1658; A 1999, 1304; 2001, 2061; 2007, 2769)".

### Circuit Split

One year after the US Supreme Court's landmark decision, the Ninth Circuit contradicted their previous decision, *Doe v Otte*, in *Hatton v. Bonner*, 356 F.3d 955, 964 (9th Circuit 2004), Stating : "It is true that, unlike the Alaska statute, § 290 *requires Petitioner to register in person. Although this fact is important*, when *balanced against* the other facts highlighted above, it is simply *not enough* to turn § 290 into an affirmative disability or restraint. Thus, this factor *weighs in favor* of the state court's conclusion that application of § 290 to Petitioner *does not violate the Ex Post Facto* Clause."

How did this circuit split occur? Although *Hatton* referenced *Smith* 26 times, I claim the Circuit Court abused its discretion by specifically ignoring 538 U.S. 101 because the entire argument here would have had to be addressed, thereby fracturing its decision. Because *Hatton* also splits with *Does v Snyder*, it appears a growing Circuit majority (2:1) is in opposition to *Smith*.

AR-00001132

8 Years later after *Hatton*, the 9th Circuit attempts to answer to their split in *Nevada v. Masto*, 670 F. 3d 1046, 1056 (2012), "Plaintiffs focus on the fact that AB 579 requires registrants to appear in person to update their registration information. *See* AB 579 § 40. For the highest level offenders, this duty to appear is imposed "[n]ot less frequently than every 90 days." *Id.* § 40(c). Plaintiffs point out that in *Smith*, the Supreme Court reversed our holding that Alaska's law imposed an affirmative disability, in part because *we had mistakenly concluded that it required in-person registration.* See *Smith*, 538 U.S. at 101, 123 S.Ct. 1140. *However, the Court's resolution of our factual error did not amount to a holding that in person registration necessarily constitutes an affirmative disability*. We recognized as much in *Hatton,* 356 F.3d at 964, where we held that the in-person registration requirement in a California law, when "balanced against the other facts ... [was] simply not enough to turn [the law at issue] into an affirmative disability or restraint."".

"We had mistakenly concluded", "factual error", there was no mistake or factual error; Alaska's law: "under the current law, yes" as stated above. "Did not amount" conflicts with Amici "strongly suggests" from above. The 9th Circuit's credibility is in question when in *Otte*, the Court goes from "registration provisions impose a significant affirmative disability" to, *Hatton*, "not enough to turn [the law at issue] into an affirmative disability", a polar opposite opinion: "significant" versus "not enough". This kind of opposing opinion, 3-3 justices split, from the same Court goes to the core of the issue that affects nearly a million registants (see footnote 1) and further explains exactly how the 6-3 dissenting opinion, 538 U.S. 112, in the *Smith* Court occured. It is dangerous unsettled case law.

For reference, the above conflict is specifically in the jurisdiction of the US Supreme Court pursuant to : "Part III. Jurisdiction on Writ of Certiorari Rule 10. "(a) A United States court of appeals has entered a decision in *conflict* with the decision of *another* United States court of appeals on the same *important matter*". It should be reasonably assumed "another" could also be the same circuit court, as in this case. "Important matter" is referenced in the above circuit decisions; *Does v. Snyder,* "matters of great public importance" and *Hatton* "Although this fact is important".

After 17 years, what would the Supreme Court say if confronted with 538 U.S. 101 in light of 34 U.S. Code § 20918? I claim they would just use the same dicta in *Hatton*, and dilute Ex Post Facto. 4 years ago, in *Nichols, v. US*, 136 S.Ct. 1113,1116, (2016), the Supreme Court called out its previous decision, *Smith v. Doe*, 538 U.S. 84, 89, and references "in-person" 6 times, but predictably fails to mention the error presented here. The issue discussed address changes only. The Supreme Court has not confronted the issue presented here since *Smith*.

AR-00001133

I claim the Supreme Court will never hear any further certiorari petitions on the matter because it would expose the incredible error of the Court, and the substantial implications that would result if corrected, as stated below. I am reminded every six months about it, thus compelled to exercise my First Amendment right to access the Courts, and make a record here.

Conclusion

When I have to appear for registration bi-annually, during that time, I am in custody, although it may be a 1-3 hour wait process, multiplied by 2 times a year, times 25 years, that's 50-150 hours (2-6 days) of custody. (not including the additional times required to appear for changes in employment, automobile, etc.) This results in a cumulative violation of my "constitutionally protected interest in liberty", 538 U.S. 112, as the Supreme Court's dissenting opinion stated. Because 2-6 days is spread out over a longer period of time, suddenly it's not considered a violation of liberty? 2-6+ days of custody is punishment. Appearance, photo, fingerprints, that is precisely the same as being booked into jail, multiple times a year.

I have to be there, that is restraint, under penalty of a crime. In person is physical, affirmative. Although it would appear brief, one hour of restraint is legally no different than a year in custody. It is not a sliding scale, or something that is balanced against other liberty interests or public safety. Restraint must be measured independently, it is not contextual. Ex Post Facto is absolute, not something negotiable.

And if the in-person requirement is properly found to violate Ex Post Facto, then the government would argue the critical function of the registry is compromised, even rendered useless without in-person verification. As of December 2018, the registered sex offender population was 917,771 (see footnote 1). By removing in-person registration essentially dissolves the whole registry, and the justification for the registry erodes with it. Another reason the Government will oppose any reform to registration; civil litigation. If anything about registration is properly found to be unconstitutional by the US Supreme Court, the settlement lawsuits would be substantial.

Our country was founded on revolution against oppression. Violating Ex Post Facto is oppression. The Framers intent: No State shall pass any Ex Post Facto law. "Any", specifically means no laws with exceptions that say "balanced", "not enough", "weighs". The Framers stated

AR-00001134

an absolute, they did not include qualifiers. And all that goes back to the complaint here; I have demonstrated through an absurd error in US Supreme Court law and Circuit Court majority, NRS 179D.480 is unconstitutional, an affirmative disability that violates Ex Post Facto.

Prayer for Relief

Therefore, pursuant to 42 U.S. § 1983, I pray this Honorable Court to grant me (and the other 7354 similarly situated registrants, see footnote 2) an injunction from the imposition of NRS 179D.480. Or, in the alternative, grant a "certified question" on the *Smith* error, to present to the 9th Circuit again, for eventual appeal to the US Supreme Court to settle the law.

Also, see footnote 3. for injunctive relief from providing "internet identifiers" in the registration form.

Respectfully Submitted,

Douglas Warenback,          October    , 2020

Footnote 1:
From the United States Marshals Service FY 2020 Performance Budget, page 63, "NCMEC** reports that eleven years later, in December 2018, the registered sex offender population was 917,771. Despite this 52 percent increase, the USMS has not been allocated additional personnel to combat the prevalence of noncompliant sex offenders....USMS collateral duty DUSMs performed 48 percent fewer investigations in FY 2017 as compared to FY 2014.". I suggest the additional allocation was lacking because the non-compliance crime does not have an actual victim. It is a passive crime, not doing something. Thus, when balanced with other matters, investigating non-compliance is predictably a low priority. Where is the immediate danger to the community? This is another example illustrating the Ex Post Facto law is unconstitutional. **I could not find the NCMEC source for this statistic. Source: https://www.justice.gov/jmd/page/file/1143886/download

Footnote 2:
From http://www.nvsexoffenders.gov/Statistics.aspx, as of 8/31/2020, there were 7355 active cases.

Amended Complaint          October xx.2020          page 8 of 9

AR-00001135

Footnote 3:

See below, "State of Nevada Sex Offender Registration Form", page 3, "internet identifiers". There is no requirement in Nevada statutes that specify I have to fill out that portion of the form. Also, this violates a "constitutionally protected interest in liberty" (1st amendment) pursuant to *Doe v. Harris*, 772 F. 3d 563, (9th Circuit 2014). Therefore, I ask this Honorable to provide injunctive relief to have the "internet identifiers" portion of the form removed; Form source: https://sheriff.douglascountynv.gov/UserFiles/Servers/Server_16087630/File/State%20of%20Nevada%20Sex%20Offender%20Registration%20Form%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.pdf

**State of Nevada**
**Sex Offender Registration Form**

| ☐ Initial Registration | ☐ Tribal Registration | ☐ Student Registration | ☐ Employment Registration | ☐ Visitor Registration |
|---|---|---|---|---|
| **Photocopy:** | ☐ Driver's License | ☐ ID Card | ☐ Passport | ☐ Professional License |
| | ☐ Finger prints | ☐ Palm Prints | ☐ Photo | |

**REGISTERING AGENCY INFORMATION**
**FOR OFFICIAL USE ONLY**

| Agency Name: | |
|---|---|

⋮
⋮

| Length of time at the above employment: | Days: | Months: | Years: |
|---|---|---|---|

**INTERNET IDENTIFIERS**

| Screen Name | E-Mail Address | Instant Message Address |
|---|---|---|
| | | |
| | | |
| | | |

**PROFESSIONAL LICENSE INFORMATION**

Amended Complaint          October xx.2020          page 9 of 9

AR-00001136