Jeanie Mezger | 15474 Corby Street | Omaha NE 68116 **Docket No. OAG 157**

When I see new SORNA rules proposed that carry a felony penalty, rules that will add to the registry laws that protect no one, rules that put registry families at risk, I have to wonder what the motives behind those rules are. Are they based on malice toward registrants? Surely you aren't falling for the common fear of registrant-as-boogieman when there is so much data available (I know other comments provided links to relevant studies) showing that registrants are largely law-abiding people.

As we've all heard from Maya Angelou, "When you know better, do better." And that is exactly what registrants have done. They have been held accountable for their crimes and now they are *doing better*. For six years, I have moderated a support group for people on the registry and for their family members. In that time, I have met dozens of people on the registry and not a single one has been returned to prison for a sex offense. Attorney General Barr, again:

> The power to…"strike at citizens, not with mere individual strength, but with all the force of government itself" must be carefully calibrated and closely supervised. Left unchecked, it has the potential to inflict far more harm than it prevents.

Adding rules that will not affect community safety but will reduce the stability of registrant families in that community, *inflict far more harm than they prevent*.

At Hillsdale, Attorney General Barr said,

> We should want a fair system with clear rules that the people can understand. It does not serve the ends of justice to advocate for fuzzy and manipulable criminal prohibitions that maximize our options as prosecutors. Preventing that sort of pro-prosecutor uncertainty is what the ancient rule of lenity is all about. That rule should likewise inform how we at the Justice Department think about the criminal law.

The barriers to a stable life erected by the registry are the result of *fuzzy and manipulable criminal prohibitions* that are registry laws. "Manipulable" is exactly the way you have treated SORNA in these proposed rule changes.

You have even proposed ways for states to come into SORNA compliance with minimal, if any, involvement of state legislatures. Manipulable, indeed.

The biggest question about the proposed rule changes is *What problem are you trying to solve?* You aren't trying to prevent more sex crimes, no matter how often you refer to devious things that registrants "may" do in the document explaining the changes.

**The next arrest for a sex offense in your community will most likely be of someone not on the registry.** Changing the SORNA rules will not change that fact.

Sincerely,

*Jeanie Mezger*

Jeanie Mezger



FRANK MOLINA
# TS151-067
FEDERAL SATELLITE LOW-ELKTON
P.O. BOX 10
LISBON, OH 44432

INSPECTED 28

REGULATIONS DOCKET CLERK INSPECTED 26
OFFICE OF LEGAL POLICY
U.S. DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVENUE NW ROOM 4234
WASHINGTON, DC 20530

X-RAYED
OCT 19 2020
POD MAILROOM

CLEVELAND OH  440
9 OCT 2020  PM 8  L

AR-00002420

DEAR SIR OR MA'AM:

MY NAME IS FRANK MOLINA AND I AM A SEX OFFENDER CURRENTLY SERVING A SENTENCE IN A FEDERAL PRISON. I AM WRITING IN REGARDS TO THE NEW ADAM WALSH ACT PROPOSAL — DOCKET OAG 157. THE PROPOSAL IS EXTREMELY DANGEROUS AND INEFFECTIVE ON MANY LEVELS.

THE CONCEPT OF THE AWA AND EVEN THE SORNA ITSELF HAS HARMED SOCIETY RATHER THAN HELPED, AND HAS COMPLETELY FAILED THE CHILDREN IT'S SUPPOSED TO BE PROTECTING.

I'M CONSTANTLY HAVING TO LIVE IN FEAR OF VIGILANTES HARRASING ME, OR TRYING TO TAKE MY LIFE. AND THE PUNISHMENTS INCURRED FROM SUPERVISION AND OTHER RELATED POLICIES ARE COUNTERPRODUCTIVE IN RESTRUCTURING OUR LIVES. EITHER WE HAVE A CRIMINAL JUSTICE SYSTEM THAT ALLOWS PEOPLE TO PAY THEIR DEBTS TO SOCIETY OR WE DON'T. IT'S THAT SIMPLE.

THE SORNA AS WELL AS THE AWA WAS NEVER A GOOD START NOR WAS IT A STEP IN THE RIGHT DIRECTION. IT HAS ENCOURAGED CORRUPTION, VIGILANTISM, AND SET A STANDARD THAT WE METER OUT JUSTICE ON OTHERS BECAUSE OF WHAT THEY MIGHT BE CAPABLE OF. IT HAS ALSO ENCOURAGED NOT ONLY IGNORANT MOB RULE, BUT HAS ENCOURAGED A NAZI-GERMANY-LIKE EXISTENCE WHERE PEOPLE ARE FORCED TO REGISTER THEIR PRESENCE WITH LOCAL GOVERNMENT.

WHAT WE NEED IS TO ABOLISH BOTH THE SORNA AND THE AWA ON THE GROUNDS THAT THEY ARE FAILURES AT PROTECTING SOCIETY AND PERSONAL LIBERTY, WHILE MAKING NEW LAWS THAT TRULY PROTECT OUR CHILDREN WHILE ALSO ACCEPTING THAT RISK IS A PART OF PARENTHOOD.

WE NEED HARSHER PENALTIES FOR ALL CHILD RAPISTS AND PEOPLE WHO PRODUCE

AR-00002421

ACTUAL CHILD PORNOGRAPHY, WHILE OFFERING ALTERNATIVES TO PROSECUTION FOR NON-CONTACT AND NON-PRODUCTION OFFENSES.

AMERICAN SOCIETY HAS ADOPTED THE IDIOTIC MENTALITY — THANKS TO SORNA AND THE AWA — THAT WE CAN LITERALY SHIELD OUR CHILDREN FROM THE WORLD. THIS MENTALITY IS A DELUSION. THE COLD, HARD FACTS OF LIFE DICTATE THAT YOU CANNOT PREPARE A CHILD FOR SOCIETY AS AN ADULT WHILE AT THE SAME TIME ALWAYS PROTECTING HIM OR HER.

RESPECTFULLY SUBMITTED,

*Frank Molina*

FRANK MOLINA



AR-00002423



E M I L I E   P A L L O S   G R A P H I C   D E S I G N

658 Arden Avenue
Glendale, California 91202
Phone (818) 242-9055
E-mail studio@emiliepallosdesign.com
www.emiliepallosdesign.com

Oct. 12, 2020

Ref. # Docket No.
OAG 157

Regulations Docket Clerk, Office of Legal Policy
U.S. Department of Justice
950 Pennsylvania Avenue NW, Room 4234
Washington, DC 20530

Dear Attorney General Barr and Regulations Docket Clerk,

Thank you for your leadership on behalf of all Americans.

I am writing to you about proposed changes to Sex Offender Registration and Notification Act (SORNA) and to express my objection to those changes. First, states should continue to be allowed to enforce the current law without additional federal oversight.

A close family friend is listed on the Registry and is classified as Tier 2 in California. Our friend received extensive rehabilitation and counseling and has led a Christ-centered life since his conviction and probation in 2004. He re-registers as a sex offender as required by law every year. His photo is taken and home address and phone number are published on the internet. He has committed no further crimes, but has been subject to harassment, ridicule and exclusion for years. He lives with a scarlet letter every day.

Registration itself **does** constitute punishment.

The SORNA law does not need to be "strengthened" by adding to the already extensive requirements. Our friend should not be required to provide his email addresses, website passwords and other personal info or register more than once a year. He is a free man with a clean record since his 2004 release. He is not a threat.

Our friend is a professional man with a college education and career in the arts. Securing employment has been a major challenge despite his talent and excellent work ethic. He takes full responsibility for what he did in 2004, but being branded a "sex offender" for 16 years has clearly been punishment. He deserves a chance to make a living and find a safe place to live.

Proposed additions to SORNA are troubling for many reasons. First, rehabilitation works. Counselors and medical professionals verify this fact. The recidivism rate for sex offenders is considerably lower than for other crimes. Our friend should be able to travel freely to any state for business or vacation without having to inform the authorities for a visit or more than 48 hours (in certain states), especially after 16 years and a clean record.

The US needs a commitment to rehabilitation, not continual punishment. SORNA's intent is to discourage sex offenders from re-offending. But in reality, most new sexual offenses are committed by those with a clean record who are not listed on the Registry.

My family and I strongly object to these proposed changes, and to SORNA itself. Everyone deserves a second chance.

Thank you for your consideration of this important civil liberties matter.

Sincerely,

Emilie Pallos

Emilie Pallos

AR-00002424



Victor Pallos
658 Arden Ave.
Glendale, CA 91202

f#
vet No.
157

SANTA CLARITA CA 913
13 OCT 2020PM 1 L

REFERRED
MAIL REFERRAL UNIT

OCT 2 2 2020

READER #3

Regulations Docket
Office of Legal Policy
U.S. Dept. of Justice
950 Pennsylvania Ave, NW, Room 4234
Washington, DC 20530

20530-

AR-00002425

October 10, 2020

Reference # Docket No. OAG 157

Dear Attorney General Barr and Regulations Docket Clerk,

Regarding proposed changes to the federal Sex Offender Registration and Notification Act (SORNA),
**I am writing to strongly express my opposition.**

I am also writing because a good friend of my family may, after more than 20 years with a spotless record
and contributing significantly to what is good in our community, stands to suffer further for the rest of his
life – if your proposed revisions are enacted.

Our friend is listed on the Registry and is classified as Tier 2 in California. Through the years, he has
received extensive rehabilitation and counseling and has led a Christian-centered life since his conviction
and probation in 2004. He is a college-educated, professional person in the performing arts who has
shared his time and talents with countless thousands of people.

Meanwhile, he re-registers as a sex offender every year as mandated by law. His photo is taken; his home
address and phone number are published on the internet. He lives with a scarlet letter every day. He has
long paid for his misdeed.

**He is not a threat to our society. Enacting these proposed changes to SORNA would only make him
suffer even further indignities. What he deserves now is greater freedom – a second chance at leading
a normal life.**

Thank you for considering my opinion regarding this critical civil liberties and humanitarian issue.

Sincerely,

Vic Pallos

658 Arden Ave.
Glendale, CA 91202

PO Box 483
Lawrence,
PA. 15055

PITTSBURGH PA 150
2 OCT 2020 PM 2 L

Regulations Docket Clerk
Office of Legal Policy
US Department of Justice
950 PA Avenue   NW Room 4234
Washington, DC 20530

X-RAYED
OCT 0 8 2020
DOJ MAILROOM

INSPECTED 21

INSPECTED 28

20530—

Regulations Docket Clerk
Office of Legal Policy
US Department of Justice
950 PA Ave NW Room 4234
Washington, DC 20530

Docket# OAG 157

 The proposal by the AG creates conditions that could impose federal regulations on states that have their own ideas about how to best create and maintain SO Registries.

 State governments know their own populations better than the federal government therefor know what is better for their own individual states.

This proposed rule change needs to be removed because it is an attack on States' Rights.

The rule change pushes States into a corner and coerces them to give up their own rules in lieu of SORNA's one-size-fits-all scheme because they fear losing JAG funding.

 SORNA violates our nation's founding documents by singling out a specific category of offenders, individuals, for unfair and unconstitutional punishment.
SORNA is unnecessary, draconian and unconstitutional.

 Mind you there is no registry for any other offender: murders, embezzlers, violent persons, etc....

SORNA does nothing to keep the public safe, is not a public safety purpose.
 It appears to be designed to make life even harder for anyone required to be on the registry along with their family.
SORNA is destructive, negative and vengeful punishment.

We should be focusing on positivity, education, compassion, inclusivity and second chances not destroying a person's life even further, harming their chances for employment, housing and safety.

We as Americans should be working to eliminate the SO registry and SORNA not further divide and exclude people from society. Not add more laws and regulations.

We should be spending money on educating the public about sex offenses not wasting money on ineffective and unconstitutional registries and SORNA.
 We should make the public aware that 99% of sex offenses are within the family not stranger danger!

EDUCATION IS THE KEY NOT MORE RULES AND LAWS, NOT SORNA AND THE SO REGISTRY.

Thank you,
Susan Patnesky
PO Box 483
Lawrence, PA 15055





PEORIA IL 616

06 OCT 2020 P 2 1

Energy Awareness

X-RAYED

OCT 13 2020

DOJ MAILROOM

Regulations Docket Clerk,
Office of Legal Policy,
US Department of Justice
950 Pennsylvania Ave NW, Room 4234
Washington, DC 20530

INSPECTED 28

AR-00002429

re Docket # OAG 157

Despite the fairly narrow scope of the proposed changes to the requirements under SORNA, I oppose this proposal, as it represents an expansion, albeit a small one, of SORNA authority. Studies have consistently shown that the recidivism rate of sex offenders is in fact quite low — around 5%. Thus, most sex crimes are committed by first-time offenders, who are of course NOT on the registry. Thus the registry does nearly nothing to protect the public, but rather acts as a distraction. Instead of expanding SORNA, the DOJ should put resources into treatment and prevention programs that WORK.

1ARK   RESLER
,5252-060
S- etite Low Elkton
< 10
Ohio 44432

CLEVELAND OH   440
9 OCT 2020  PM 3  L



REGULATIONS DOCKET CLERK
OFFICE OF LEGAL POLICY   ONP 4241
US DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVENUE NW Room 4234
WASHINGTON DC 20530

X-RAYED
OCT 16 2020
DOJ MAILROOM   INSPECTED 28

INSPECTED 26

20530-

AR-00002431

In my opinion, the sex offender registry should be abolished. Once an offender is released from prison and off probation, no further monitoring should occur. It further penalizes offenders by the publics knowledge and can lead to violent crimes against an offender who has already paid for his crime. After the violent crime against Judge Esther Salas from the 2nd circuit in New Jersey, she wanted all personal information erased from public records for safety reasons. How does the registry protect ex-offenders from vigilante justice if all information is posted about them online. If a person is convicted of murder and sentenced to 25 years, after they get off of probation, they are not required to register any information and don't have to worry about reporting their movements to any one. You think for some one who simply clicked a mouse and saw a crime that someone else committed would not be punished so severly or for such a long amount of time. It's the same as looking up President Kennedys assination or the murder of George Floyd that was shown on TV. Should every one who saw those videos go to prison and be put on a public list up to the rest of their life? I hope SORNA goes through some common sense changes, or goes away permanently. Thank you for your time.

Mark L Risler

NAME _Chad Sortes_
REG.# _22634-040_
**Federal Correctional Institution Elkton**
P. O. BOX 10
Lisbon, OH 44432

CLEVELAND OH   440
8 OCT 2020  PM 2  L

Energy Awar

4241

REGULATIONS DOCUMENT CLERK
OFFICE OF LEGAL POLICY
US DEPARTMENT OF JUSTICE
950 PENNSYLVANIA AVE NW
ROOM 4234
WASHINGTON, DC 20530

INSPECTED 28

INSPECTED 28

X-RAYED
OCT 1 9 2020
BOP MAILROOM

20530-

AR-00002433

PAGE 1

This is covering Docket No. OAG 157.  Please do not post my PERSONAL IDENTIFYING INFORMATION online "Chad Sopjes / 22634-040 / FCI Elkton / PO Box 10 / Lisbon, OH 44432-0010"

The average intelligent person defines commerce as Merriam-Webster does as being "the buying and selling of commodities," with commodities being items of value  It is stated, and confirmed in U.S. vs. George 625 F3d 1124, 9th Cir 2010, that the legislative authority to issue guidelines and regulations in implementing and interpreting this law can be delegated to the AG because it is permissible for the legislative branch to delegate this authority in non-punitive matters governing interstate commerce.  What begs to question is how these regulations govern interstate commerce?  This regulation doesn't force anyone to buy or sell anything, nor does it restrict anyone from buying or selling anything.  Is it then to be taken that this law governs the purchase and sale of sex offenders as slaves?  So the law has nothing to do with commerce.  Since the law is designed to make it exceedingly difficult for only a registered offender to find a place to live and a place to work as well as posting their information publically to make them targets for physical and emotional assault with no recourse for defense because often the officers charged with upholding the law are participating in this abuse.  Because only a select few offenders are singled out for this extra punishment I would argue that this is clearly a punitive regulation beyond a shadow of a doubt.  This seems to violate both the clauses that must be met for the delegation of legislative authority.

As SORNA makes it difficult finding a job and housing upon a registrant's release from prison, it also often alienates them from their family and friends who want to distance themselves from the negative stigma associated with someone who is registered.  Criminal Justice experts agree that a PERSON leaving prison has a much higher success rate if they have family and a good support system.  Having a law that is intentionally designed to run counter to that by minimizing an individual's ability to gain a credible life back, actively hindering rehabilitation and reintegration by making them seem less than human, seems asinine.  Especially as there is no credible evidence that there has been any benefit realized since the law's original establishment.

The idea that the law need to be retroactive because all of the pre-SORNA sex offenders are a massive and IMMEDIATE threat is preposterous.  If even the smallest shred of logic is used it will be seen that at a minimum for those offenders it was 14 or more years ago.  If they're such an immediate and massive threat to public safety than why haven't they already re-offended and been put back in prison?  Yet they haven't done anything because they simply aren't a threat at all.  There is no factual basis for the hate and fear that is being pushed.

Multiple times it is stated that the SORNA restrictions are in place to make prosecution easier, in the name of public safety.  Ignoring for the moment that there are much larger credible threats to public safety, think about the reason such language is used.  It is to impress on the public that 100% of those registered are guilty even before they ever commit another crime (most of them never do).  It's the same reason that most of the examples use crimes against a minor to invoke a visceral hate reaction in the public, even though the FBI-UCR National Crime Victimization Survey reveals that less than 23% of offenders are guilty of crimes against someone under 18.  This language is used to instill an unmerited fear in the public.  The great majority of crimes physically committed against a minor are committed by a family member, not some stranger down the street.

SORNA purports to be based on the Adam Walsh case.  That was the politically motivated murder of a child, no sex involved.  Yet Bureau of Justice statistics show that less than 1% of registered offenders are child killers.  In fact, recently a St. Louis, MO woman was found guilty of murdering someone else's 3 month old baby.  After 120 day in jail she is serving 5 years probation with no mandate to register.  So she doesn't have to register even though she committed the crime this law is supposed to be based on.  This law is a farce, based on lies.  Those same BoJ statistics show that less than 3% of those registered offenders are predators.  (That would be those dangerous offenders this regulation is trying to lead you to believe compromise nearly 100% of registrants, they want you to believe the complete opposite of the truth.)  Less than 4% of them re-offend. (and most of those are forgetting to register a move, job change, phone number, etc is the appropriate time frame, not a new crime against a victim.)  Yet the inflammatory language would have you believe most registrants are an immediate, massive threat to your safety.  Either, they never were a large threat, or the program works.  Ask yourself, if the registration works to drop re-offense levels to below 4% then why aren't drug offenders registered, they have a larger than 50% re-offense rate?  Same with drunk drivers, why aren't they registered?  If the program works SO well, why hasn't it been applied to other crimes?  Your children are much more likely to buy drugs from the stranger down the street than to be sexually victimized by the stranger down the street, so why can't you see where the drug offender lives?  You are much more likely to be hit by a drunk driver than you are to be raped, so why can't you see online where the drunk lives and where he drinks?  On the other hand, if the program isn't what causes these people to not re-offend, then why should their lives continue to be a matter of public record?  Sex offenses have in

PAGE 2

fact not seen a significant decrease since the implementation of SORNA, there is nothing to suggest that SORNA increases the public's safety at all.  On the other hand, assaults against registered offenders are much higher now than they were before, so SORNA is definitely detrimental to the safety of some.  So why not let offenders be on a list that only law enforcement can access when needed? (In fact such a list already exists for all crimes.) That would serve the same purported public safety purpose and be much less detrimental to the public, as it would be easier for the offenders to get a job and begin paying taxes instead of living off the taxes you pay.   Most registered offenders want nothing more than to be left alone to work and pay taxes which they can do easier without the negative stigma of public registration.

Lastly, please consider how these regulations could easily affect you.  As many teens from the age of 13 and older are busy sexting each other and sending naked pictures of themselves to their girlfriends and boyfriends this regulation potentially affects most families.  Obviously you don't want to believe that your child would do such a thing, hold on to that fantasy and consider how you feel about the fact that 3 or 4 out of every 5 of your child's friends are guilty of violating 18 U.S.C. 2250 (production, distribution and possession of child pornography).  Yes, that's right, they're sending it to each other, not some stranger down the street, it's still the same crime.  How would you feel if most of your child's friends were on the registry?  How would you feel when you find out your child has to be on the sex offender registry for 15 years, 25 years, or even their entire lifetime?  All of this before they've even gotten their first high school report card.  Do you think your child and their friends are evil abominations?  Because they are doing the same thing as many people on the registry did.  You shouldn't judge people you don't know, do you want others judging your children that way?  Yet the sole purpose of these regulations is to get you to pre-judge people that way.

CHAD

AR-00002435

n Wells 11160-028
ral Correctional Institution
Box 5000
in, IL 61555

PEORIA IL 616

06 OCT 2020 PM 2 T

Energy Awareness

USA

X-RAYED

OCT 13 2020

DOJ MAILROOM

Regulation Docket Clerk
Office of Legal Policy
U.S. Department of Justice   INSPECTED 26
950 Pennsylvania AVE NW
Washington, DC 20530

INSPECTED 28

et # OAG157

AR-00002436

Docket No. OAG157   monday, ~~September~~ October 5th

10/05/2020

Regulations Docket Clerk, Office of Legal Policy

Expansion of the federal registry laws is a terrible proposal. The registry is a failed system. The fact that our federal government is trying to expand federal regulations on the sex offender registry in which many states are already out of compliance is, in my opinion, simply ridiculous.

Only five percent of sex-crimes are committed by someone with a prior conviction. This means that ninety-five percent of sex-crimes are committed by persons not on the registry. This costly system does next-to-nothing to protect the public. I stand strongly opposed to this proposal.

Shawn Wentz 16856-046
FCI Englewood
9595 W Quincy Ave
Littleton, Co 80123

DENVER CO  802

8 SEP 2020   PM 7  L

X-RAYED
SEP 23 2020
DOJ MAILROOM

INSPECTED 28

Main 4509

David J Karp, Senior Counsel
Office of public policy
US Department of Justice
Washington, DC 20004

INSPECTED 26

20004$9999

AR-00002438

Dear David J Karp, Senior Counsel,                    September 3, 2020

I was notified that you are planning on making some changes to SORNA on October 12th and that I could write you for more information since it directly applies to me. I do not have internet access or phone access. Could you please be so kind to send me the information in the mail?

My address is:

    Shawn Wentz 16856-046
    FCI Englewood
    9595 W Quincy Ave
    Littleton, Co 80123

Thank you very much for your time.

        Very Sincerely,
        Shawn Wentz

AR-00002439



) Yad
170 S 2930 E
Holwood Heights
UT 84121

SALT LAKE CITY UT 840
6 OCT 2020 · PM 2

Energy Awareness Month
FOREVER / USA

X-RAYED

OCT 13 2020
DOJ MAILROOM

INSPECTED 26

INSPECTED 28

20530—

AR-00002440

Hon. William Barr, US Attorney General
Attn: Regulation Docket Clerk
U.S. Department of Justice, Office of Legal Policy
950 Pennsylvania Avenue NW, Room 4234
Washington, DC 20530

Re: **Docket No. OAG 157**
Proposed Rule Interpreting Registration
Requirements Under SORNA

Dear Honorable Barr,

This public comment is being submitted in response to Reference Docket No. OAG 157. Proposed rule interpreting Registration Requirements Under Sorna.

As family members of a person who is required to register we feel it is important that you understand that the registry is not something that impacts a family every six months or a year when they are required to report. It is challenge that they face every single day of their lives.

As a family we have found that the most critical issue is the inability for someone charged with a **non-contact, non-production** offense to be able to move forward with their life. Research overwhelming demonstrates that the recidivism rate **for non-contact** offenders is extremely low. It also favors strong family support systems.

The registry makes it difficult if not impossible to financially and emotionally fully support and engage with one's family.  The legislation which initiated the need to register was driven by the desire to protect children yet the children of registrants continue to suffer despite research that shows that the registry is not effective in stopping abuse.

We ask that you review carefully the terms of registration, the length of registration with critical attention to mechanism to remove those that have served their sentence, remained offense free and have demonstrated complete abidance to following laws.

In the words of a **non-contact, non-production offender**, *"I admitted my guilt, lost everything, and served my time, I was twenty-four years old at sentencing, I am now forty-five, a husband and father with two children, why am I still being punished?" "Why must my children be outcasts." "Must the punishment go on the entire rest of my life."* Please carefully consider your impact on the lives of American Citizens and the many children you seek to protect.

Sincerely,

Kenneth Yard
Nancy Yard
Kenneth and Nancy Yard

AR-00002441

Docket No. OAG157

Regulations Docket Clerk, Office of Legal Policy

I stand against any expansion to the current
Sex offender registry laws as they stand today.
The fact that it has become a public registry
is in direct violation to the Constitutional rights
of anyone who is forced to register. The original
intent of the registry was solely for Law enforcement
an NOT to be a public list. The list continues to
devolve into a "hit" list for vigilante purposes.
This has dangerously taken us from the rule of
law and made it a rule of mob. The list for
law enforcement serves its purpose, any extension of
it to a largely uneducated public creates a very
dangerous situation for the individual and thier families.
Registration is required after one has served the
prescribed sentence by our Justice system – making
this individual submit to a public list is cruel and unusual
as well as highly dangerous. It promotes a class
discrimination that should NOT be tolerated in this
nation. The mere fact that any sex crime results
in someone being forced to register – given the wide
range of crimes means that this mandate has far
exceeded its scope and should be abolished before
further expansion continues to erode civil and Constitutional
rights of otherwise law abiding citizens.

> Thank you.

AR-00002442



U.S. POSTAGE
$2.20
FCM LG ENV
9272751
10/13/20
06 2S
11486244

**USPS FIRST-CLASS MAIL®**

7.00 oz

X-RAYED
NOV 02 2020
DOJ MAILROOM

SHIP TO:
Washington DC 20530

(420) 20530

PLACE THIS LABEL TO THE LEFT OF THE POSTAGE

**USPS TRACKING® NUMBER**

9500 1065 7666 0287 2612 01

X-RAYED
NOV 02 2020
DOJ MAILROOM

LAW OFFICE OF JANICE M. BELLUCCI
1215 K Street, 17th Floor
Sacramento, CA 95814

Regulations Docket Clerk
Office of Legal Policy
U.S. Department of Justice
Pennsylvania Avenue NW, Room 4234
Washington, D.C. 20530

Re: Docket No. OAG 157

DOJ-FASS
racking No: 9500106576660287261601

LA
145 # - MAIN - 1 - 1145
uilding:     MAIN
oom:
ept:
eceived On: 10/20/2020 10:31:49am
oute:

AR-00002443

**COMMENTS OF THE ALLIANCE FOR CONSTITUTIONAL SEX OFFENSE LAWS, INC.**

**AND AFFILIATED SCHOLARS AND PRACTITIONERS**

**IN RESPONSE TO PROPOSED RULEMAKING – <u>Docket No. OAG 157</u>**

**October 12, 2020**

Comment to Proposed Rule entitled
"Registration Requirements Under the Sex Offender
Registration Notification Act," (SORNA)
34 U.S.C. § 20901 and 18 U.S.C. § 2250.
<u>**Docket No. OAG 157**</u>; AG Order No. 4759–2020
Agency: U.S. Department of Justice
Document No. 2020-15804
RIN 1105-AB52
85 F.R. 49332-49355

On August 13, 2020, the U.S. Department of Justice ("Department") issued its Notice of Proposed Rulemaking, Docket No. OAG 157, for the purpose of amending regulations implementing the Sex Offender Registration and Notification Act (SORNA), P.L. 109–248, 34 U.S.C. § 20901 *et seq.* and 18 U.S.C. § 2250 (the "Proposed Rule").

The Alliance for Constitutional Sex Offense Laws, Inc. (ACSOL), a national non-profit organization, as well as the affiliated practitioners and scholars identified below, thank the Department for its work on the Proposed Rule, including its detailed Section-by-Section Analysis. In these comments, ACSOL respectfully requests that the Department reconsider or revise specific provisions of the Proposed Rule for the reasons summarized below.

INTRODUCTION

SORNA contains two distinct mandates serving two distinct federal purposes: (1) to induce states to adopt federal standards for sex offender registries, and (2) to prevent individual registrants from evading state registration laws by traveling to another state. We believe the Proposed Rule often conflates these two purposes. As a result, the Proposed Rule fails to achieve the clarity that is the Department's purpose in proposing it. *See* 85 F.R. 49333 (The Proposed Rule seeks to "provide[] a concise and comprehensive statement of what sex offenders [herein, "registrants"] must do to comply with SORNA's requirements.").

Since SORNA's adoption the Department has appropriately focused federal prosecutions for failure to register on absconding registrants. This traditional policy was consistent with the Congressional purpose in enacting the portion of SORNA creating the federal registration offense. The traditional policy also sensibly focused federal prosecutorial resources on cases that posed the greatest difficulty for state-level enforcement, and also insulated federal prosecutions from plausible claims that they exceeded the federal jurisdiction allowed under both SORNA and the Constitution. The Proposed Rule needlessly suggests a change in prosecutorial policy that would, if followed, undermine all of the advantages of the Department's traditional practice.

1

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS*
*IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

In the comments that follow this introduction, we highlight the particular instances in which this needless conflation of SORNA's mandates arises, and suggest how the Proposed Rule can be recast to avoid it. In this introduction we provide a background understanding of SORNA that informs all of our comments. Finally, our comments also address several other difficulties with the Proposed Rule.

Notably, the Proposed Rule does not directly address SORNA's first mandate, which is set forth in Subdivision (a) of 34 U.S.C. § 20912. That mandate requires states to "maintain jurisdiction-wide sex offender registr[ies] conforming to the requirements of this title." Although the federal government may not "commandeer" state resources to pursue federal policies, it can, under the Spending Clause, condition grants of federal funds on compliance with them. *United States v. Richardson*, 754 F.3d 1143 (9th Cir. 2014). The Office of Sex Offender Sentencing, Monitoring, Apprehending, and Tracking (SMART Office) within the DOJ administers the federal standards. It finds just 18 states are currently in substantial compliance with them.
*See* https://smart.ojp.gov/sorna/substantially-implemented. Noncompliant states may be penalized by a ten percent reduction in the funds they would otherwise be allocated under the Edward Byrne Memorial Justice Assistance Grant Program, 42 U.S.C. § 20927.

The Proposed Rule addresses SORNA's second mandate, set forth in 34 U.S.C. § 20913. That mandate requires an individual convicted of a sex offense to register, and keep his registration current, in each state in which the individual resides, is employed, or is a student. 34 U.S.C. § 20914 sets out the information that each registrant shall provide to the registering agency, and authorizes the Attorney General to supplement this statutory list with "any other information" he chooses to require. It also authorizes the Attorney General to specify the "time and manner" in which individual registrants provide and update the required information. Finally, knowingly failing to register as required in these sections is a federal crime under 18 U.S.C. § 2250 for an individual convicted of federal or tribal sexual offenses, and for a state offense if the individual "travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country."

As explained in *Carr v. United States*, 560 U.S. 438, 446 (2010), an individual whose registration obligation is based upon a state conviction does not violate 18 U.S.C. § 2250 unless the three elements of the offense occur in the required sequence: the individual first becomes a person required to register under 34 U.S.C. § 20913, then travels in interstate commerce, and then fails register or update the registration. If that sequence were not required, a state offender who failed to register in the state of conviction could be prosecuted under § 2250 even though he had not left the state after his conviction, "an illogical result given the absence of any obvious federal interest in punishing such state offenders." *Id.* Congress, the Court concluded, clearly did not intend "to subject any unregistered state sex offender who has ever traveled in interstate commerce to federal prosecution under § 2250." *Id.* at 452.

*Carr's* understanding of the limited reach of § 2250 is consistent with the Congressional motivation in enacting it, as evidenced by its legislative history (detailed below in Comment I(B)(3)). That is, SORNA's goal was not to replace state-level enforcement of sex offender registries with federal prosecutions, as federal registration laws have "expressly relied on state-

AR-00002445

level enforcement" since their inception. *Id.* The goal was much narrower: to fill a gap that state
laws alone could not achieve—to catch individuals who seek to evade their registration
obligations by leaving their state of conviction and not registering at their destination. "The act
of travel by a convicted sex offender may serve as a jurisdictional predicate for § 2250, but it is
also . . . the very conduct at which Congress took aim." *Carr*, 560 U.S. at 454.

As this passage from *Carr* suggests, this understanding of the purpose of the federal registration
obligation reflects the federal government's limited jurisdictional authority over state-level
offenders. The federal government does not have general police powers, *United States v. Lopez*,
514 U.S. 549, 566 (1995), and may not criminalize conduct in the absence of a specific
constitutionally recognized federal interest in reaching that conduct. The Commerce Clause
power to regulate conduct with a multistate impact on commercial activity does not "obliterate
the Constitution's distinction between national and local authority." *United States v. Morrison*,
529 U.S. 598, 615 (2000). The Court in *Morrison* therefore rejected the claim that Congress may
regulate noneconomic, violent criminal conduct just because it has some effect on interstate
commerce "in the aggregate." Reiterating that the Constitution requires "a distinction between
what is truly national and what is truly local," the Court observed that it could "think of no better
example of the police power, which the Founders denied the National Government and reposed
in the States, than the suppression of violent crime and vindication of its victims." *Id.* at 617-
618. The federal power can extend to violent crime only when there is a clear nexus in the
particular case between the crime and the interstate component required for federal jurisdiction.
*Lopez*, 514 U.S. at 561.

The Constitutional limits on federal power are thus aligned with the Congressional purpose in
enacting 18 U.S.C. § 2250: to provide an added tool with which to punish and therefore deter
registrants from absconding to another state to evade their registration obligations. A registrant
who moves to another state and does not register falls within both the Congressional purpose and
the Congressional power. His move to a second state is, as *Carr* observed, "the very conduct at
which Congress took aim." The required nexus between the criminal conduct and the interstate
travel is clear.

In contrast is the registrant who travels from New Jersey to New York for the afternoon to visit
his mother, but then a year later fails to renew his New Jersey registration. In the latter case,
there is no nexus between the interstate travel and the failure to register, and thus no federal
jurisdiction. Nor is there any reason for federal involvement. New Jersey's authority and ability
to police this individual's failure to register is entirely unaffected by the registrant's afternoon
trip a year earlier. This is not the kind of case to which Congress ever intended to apply federal
resources. There is nevertheless confusion about this point. The Proposed Rule could and
should end this confusion, but as written the Proposed Rule exacerbates it.

In the pages that follow we identify particular examples of this confusion and offer suggestions
for revising the Proposed Rule to eliminate it. We first offer, however, two observations that
apply generally to this question.

AR-00002446

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS
IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

First, the mistaken conflation of SORNA's two distinct purposes (*i.e.*, to encourage states to
adopt federal registry standards, and to deal with absconding registrants) accounts for much of
the confusion.  The federal crime created to serve the second purpose cannot be employed in
service of the first.  Hundreds of thousands of registrants live in one of the 32 states that are not
compliant with federal standards.  Their home state may place registrants in different tiers than
called for under the federal standards, or they may relieve some registrants of their registration
obligation earlier than the federal standards allow.  State registration schemes may not require
registrants to report every item the federal standards require (*e.g.*, many state registration
schemes do not require the disclosure of remote-communication identifiers), and may not require
registrants to update their registration information as frequently as do the federal standards.  The
federal government may condition a state's receipt of federal funds on its conforming to the
federal standards, but it cannot prosecute individual registrants who comply with the relevant
state laws for failing to meet federal registration standards their state has chosen to reject.  For a
person whose registration obligation is based upon a state law conviction, there is no nexus
between interstate activity and their noncompliance with federal rules.  The matter is less certain
for those whose registration obligation is based upon a federal conviction.  The federal
government may require their registration, but it remains problematic to prosecute such
registrants for failing to comply with federal standards their state has not adopted.  The
regulations do recognize an "impossibility" defense that may apply in some such cases, but as
explained in Comment IV, the examples provided are both confusing and too narrow.  It would
be far simpler, and certainly clearer, for Department to adopt a unitary policy declining to
prosecute in such cases.  More importantly, such a policy would be consistent with the
Congressional purpose in enacting Section 2250: to deter evasion of the registration obligation
through interstate travel.

Second, although we do not have access to the data that would speak directly to the question, it
appears that Department has in fact followed such a policy in the past.  The TracFed database
maintained by Syracuse University shows for the eleven months thus far reported for fiscal year
2020, there have been a total of 428 convictions nationwide under § 2250.  That is 18 percent
fewer than the number last year, 23 percent fewer than five years ago, and 46 percent fewer than
ten years ago.  Federal prosecutions are rare and becoming more so, given that nearly one million
Americans are currently required to register.  A small sample of the press releases issued by U.S.
Attorney's offices in connection with § 2250 prosecutions suggests that every case involved a
registrant who had moved across state lines and failed to register at his or her new residence.
Our impression is therefore that DOJ has, for the most part, in fact followed the very policy that
our comments urge should be made explicit in the regulations.  We cannot exclude the possibility
of particular instances in particular U.S. Attorney's offices in which prosecutions were brought
against individuals who were compliant with state law registration laws applicable to them, or
who, while not fully compliant, had not traveled interstate to evade their registration obligation.
But the existence of a few such prosecutions in selected U.S. Attorney's offices only adds to the
need for Department to adopt an explicit policy excluding them.  In his comments last month at
Hillsdale College, Attorney General Barr recently emphasized the importance of the Department
ensuring a consistent national policy, especially in the exercise of prosecutorial discretion. "It

4

AR-00002447

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS*
*IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

does not serve the ends of justice to advocate for fuzzy and manipulable criminal prohibitions
that maximize our options as prosecutors. Preventing that sort of pro-prosecutor uncertainty is
what the ancient rule of lenity is all about. That rule should likewise inform how we at the
Justice Department think about the criminal law."

There is no better example of the need to follow this approach than in Department's policy for
choosing cases in which to bring charges under § 2250. We believe the Proposed Rule should be
revised to make clear and overt the Department's traditional but silent policy of reserving such
prosecutions for cases in which the defendant has traveled across state lines for the purpose of
evading his registration obligation.

In light of the above, as well as additional concerns regarding the Proposed Rule, we urge the
Department to revise the Proposed Rule consistent with the following comments.

## SUMMARY OF INDIVIDUAL COMMENTS

**Comments I and II** (pp. 8-1) discuss the issues mentioned above.  To reduce misunderstanding,
the Proposed Rule should state clearly that a registrant's duty to act under SORNA is triggered
solely by interstate travel or other "circumstance supporting federal jurisdiction" and that
Congress and the Department lack Commerce Clause authority to require registrants to do
anything without that jurisdictional prerequisite.  The Department should also clarify that it does
not seek to impose liability where there is no nexus between interstate travel and a particular
reporting requirement.  Critically, if the Department contends that registrants have a duty to
comply with SORNA's mandates when circumstances supporting federal jurisdiction are absent,
the Proposed Rule will exceed the Department's authority under SORNA by regulating purely
intrastate affairs.

**Comment III** (pp. 20-23) recommends that the Department withdraw § 72.7(d), which mandates
reporting of intended "departure from" or "termination of" residence in a state prior to interstate
travel or other basis for federal jurisdiction, because § 72.7(d) exceeds the scope of Congress'
authority under SORNA for the reasons articulated in *Nichols v. U.S.*, 136 S.Ct. 1113 (2016).

**Comment IV** (pp. 23-27) addresses the Department's attempt to explain in the commentary to §
72.7(g) how the Proposed Rule would work when the jurisdiction's registration law differs from
proposed federal requirements.  The explanations offered in the commentary are not nearly
adequate to resolve the confusion.  This is a serious issue affecting hundreds of thousands of
people.  The Department acknowledges that a registrant's compliance with SORNA is a "two-
party transaction" that depends upon his state's "acceptance" of the information provided by the
Registrant.  85 F.R. 49336-37.  However, the content of § 72.7(g) ignores this reality—as well as
the Department's own historic practices—by suggesting that a registrant can still be prosecuted
under SORNA when his or her state does not accept information required under SORNA.  We
are not certain the Department has the authority to do this.  But if it does, the Proposed Rule
should clarify, consistent with the Department's traditional practice, that a registrant who

5

AR-00002448

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS*
*IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

complies with his state's registration requirements and has not traveled interstate to evade registration will not be prosecuted.

**Comment V** (pp. 27-29) explains why the Department's interpretation of the affirmative Defense of 18 U.S.C. § 2250(c), as expressed in § 72.7(g) and 72.8 of the Proposed Rule, violates the Due Process Clause of the Fifth Amendment by relieving prosecutors of their duty to prove a "knowing" SORNA violation.

**Comment VI** (pp. 29-31) urges the Department to substantially revise § 72.6(b), which requires the reporting of "remote communication identifiers," to narrow its scope, define vague terms, and restrict public access to the registrant's identifiers. As presently proposed, the section violates the First Amendment for the reasons articulated in *Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) and other cases.

**Section VII** (p. 31) observes that § 72.8 omits SORNA's express requirement that liability under 18 U.S.C. § 2250(a)(2)(B) requires proof of "travel in interstate or foreign commerce, or enter or leave, or reside in, Indian country," and requests the inclusion of this element.

**Comment VIII** (pp. 32-33) addresses § 72.6 of the Proposed Rule. Several parts of this section use vague and imprecise language that, while perhaps appropriate when defining "minimum national standards" for states in connection with SORNA's first purpose, is untenable in guidelines for individual registrants in connection with SORNA's second purpose. An example of vagueness and imprecision is found in § 72.6(c)(1) which requires registrants to report unspecified "information . . . with whatever definiteness is possible under the circumstances." The Department should review this section to be sure that the proposed requirements are understandable to an ordinary person and provide fair notice to registrants of the conduct that may trigger criminal prosecution.

**Comment IX** (p. 33-34) urges revising § 72.5(c) to clarify that the reduction in the duration of the registration obligation SORNA adopts for tiers 1 and 3 is automatic under the circumstances specified by the statutory language.

**Section X** (pp. 34-36) argues that the Proposed Rule should be revised to include a federalism assessment and other requirements imposed by executive order 13132 and the Unfunded Mandates Reform Act.

///

///

///

6

AR-00002449

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS
IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

IDENTITIES OF COMMENTING PARTIES

These comments are jointly offered by the following:

**Alliance for Constitutional Sex Offense Laws, Inc. (ACSOL)**
A California Non-Profit Corporation
c/o Janice M. Bellucci
1215 K Street, 17th Floor
Sacramento, CA 95814
E-mail: jmbellucci@aol.com

**Adele Nicholas**
Attorney at Law
Chicago, IL

**Amber Vlangas**
Restorative Action Alliance, Inc.
New York

**Chance X. Oberstein**
Attorney at Law
President, ACSOL
Laguna Hills, CA

**Guy Hamilton-Smith**
ACSOL Board of Directors

**Ira Mark Ellman**
Charles J. Merriam Distinguished Professor
of Law and Affiliate Professor of
Psychology, Emeritus
Sandra Day O'Connor College of Law
Arizona State University

**Janice M. Bellucci**
Attorney at Law
Executive Director, ACSOL
Sacramento, CA

**Jill K. Sanders, Esq.**
Restorative Action Alliance, Inc.
Katonah, New York

**Richard Gladden**
Attorney at Law
Denton, TX

**Tara Ellman, MBA**
Research Consultant
Berkeley, CA

7

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS*
*IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

## COMMENTS TO PROPOSED RULE

ACSOL respectfully requests that the Department revise the Proposed Rule as outlined in the following 10 comments:

I.  **The Proposed Rule Fails to Distinguish Between Duties Imposed Upon *States* Consistent with the Spending Clause, and the More Limited Duties that May Be Imposed Upon *Individual Registrants* Consistent with the Commerce Clause**

In crafting the Proposed Rule, the Department sought to "provide[] a concise and comprehensive statement of what sex offenders must do to comply with SORNA's requirements." 85 F.R. 49333. The Department also stated that, "[b]y providing a comprehensive articulation of SORNA's registration requirements in regulations addressed to sex offenders," the Proposed Rule "will provide a more secure basis for prosecution of sex offenders who engage in knowing violations of any of SORNA's requirements." 85 F.R. 49334.

However, the Proposed Rule undermines both goals by failing to clarify individual registrants' precise duties under SORNA. The Proposed Rule creates confusion regarding the particular acts or omissions that create liability under SORNA. This confusion stems principally from the Proposed Rule's failure to distinguish between two separate jurisdictional spheres: (1) the duties that SORNA and the Department have imposed upon states and other non-federal jurisdictions pursuant to the Spending Clause, and (2) the separate (and more limited) set of duties that may lawfully be imposed upon individual registrants under the Commerce Clause. In fact, the Proposed Rule seems to conflate the requirements imposed upon states with those imposed upon registrants, leaving the impression that registrants may be prosecuted if they do not provide all of the information that SORNA desires states to collect as a condition, under the Spending Clause, of that state's SORNA compliance. This impression, whether intended or accidental, will cause many registrants (and perhaps prosecutors) to erroneously believe that registrants are subject to the myriad individual requirements expressed in the Proposed Rule, when the Department lacks authority, under the Commerce Clause, to impose such requirements upon registrants.

A.  **The requirements that SORNA imposes upon states are distinct from those imposed upon registrants because of the distinct jurisdictional grounds for each set of requirements**

As acknowledged in the "Overview" to the Proposed Rule,

> SORNA has a dual character, **[1]** imposing registration obligations on sex offenders as a matter of Federal law that are federally enforceable under circumstances supporting federal jurisdiction, *see* 18 U.S.C. 2250, *and [2]* providing minimum national standards that non-federal jurisdictions are expected to incorporate in their sex offender registration and notification programs, subject to a reduction of federal funding for those that fail to do so, *see* 34 U.S.C. 20912(a), 20926-27.

8

AR-00002451

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS
IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

85 F.R. 49333 (emphasis added).

Consistent with SORNA's "dual character," the Department promulgated guidelines in 2008 that
apply only to states, which prescribe the "minimum national standards" that those states must
adopt in order to become SORNA compliant and avoid a loss of federal funding. *See* 73 F.R.
38044 ("These Guidelines are issued to provide guidance and assistance to covered
jurisdictions—the 50 States, the District of Columbia, the principal U.S. territories, and Indian
tribal governments—in implementing the SORNA standards in their registration and notification
programs.") (hereinafter, the "2008 SORNA Guidelines").

Because the 2008 SORNA Guidelines impose no duties directly upon individual registrants,
individual registrants cannot be federally liable under 18 U.S.C. § 2250 for failing to provide
their jurisdictions with information required by the 2008 SORNA Guidelines. *U.S. v. Belaire*,
480 Fed. Appx. 284, 287-88 (5th Cir. 2012); *U.S. v. Ward*, 2014 U.S. Dist. LEXIS 160392, at
*20-*21 (N.D. Fla. Nov. 14, 2014).

ACSOL understands that the present Proposed Rule—issued 12 years after the 2008 SORNA
Guidelines—is the Department's effort to define and prescribe the requirements to be imposed
directly upon individual registrants. However, the basis for imposing requirements upon
individual registrants is not and cannot be the same as the basis for the requirements imposed
upon states. This limitation upon the Department's regulatory authority over individual
registrants is reflected in the 2008 SORNA Guidelines themselves, which state the following
under the heading "Enforcement of Registration Requirements":

> SORNA enacted 18 U.S.C. 2250, a new federal failure-to-register offense, which
> provides federal criminal penalties . . . for sex offenders required to register under
> SORNA who knowingly fail to register or update a registration as required *where
> circumstances supporting federal jurisdiction exist, such as interstate or
> international travel by a sex offender, or conviction of a federal sex offense for
> which registration is required.*

73 F.R. 38069 (emphasis added). In other words, an individual registrant cannot be subject to
regulation under SORNA absent "circumstances supporting federal jurisdiction," such as a
federal sex offense conviction or, for registrants with state or foreign convictions, "interstate or
international travel"—a clear reference to the limits of Congressional and regulatory authority
under the Commerce Clause.

The limited federal jurisdiction under the Commerce Clause is a critical consideration in the
discussion of the Proposed Rule because, without a proper basis for jurisdiction under the
Commerce Clause, the Department may not require anything of an individual registrant. As the
Fifth Circuit observed in connection with registrants convicted under state law,

> [W]ithout § 2250, [§ 20913] lacks federal criminal enforcement, and without [§
> 20913], § 2250 has no substance....[because] neither [§ 20913] nor any other
> provision of SORNA creates any federal penalty for failing to register while

AR-00002452

> remaining within a state: *a sex offender who does not travel in interstate
> commerce may ignore SORNA's registration requirements without fear of federal
> criminal consequences.*"

*U.S. v. Whaley*, 577 F.3d 254, 259–60 (5th Cir. 2009) (emphasis added).

### B. Neither Congress nor the Department may regulate individual registrants absent "circumstances supporting federal jurisdiction," such as interstate travel, consistent with the Commerce Clause

The Fifth Circuit's ruling reflects the constitutional limits on Congressional and regulatory authority over individual registrants under SORNA. Specifically, the Commerce Clause requires not only interstate travel as a condition of SORNA liability, but also that the alleged SORNA violation have a "nexus" to that interstate travel. As explained below, the requirements for interstate travel and a "nexus" to the SORNA violation are confirmed by the plain text of SORNA, the Supreme Court's interpretations of SORNA, the Department's prior regulations implementing SORNA, and the basics of Commerce Clause jurisprudence.

#### 1. The plain text of SORNA

For registrants whose offenses arise under state or foreign law, SORNA itself requires interstate travel as a condition for liability under SORNA. *See* 18 U.S.C. § 2250(a)(2)(B) ("Whoever . . . is required to register under [SORNA]; . . . *travels in interstate or foreign commerce*, or enters or leaves, or resides in, Indian country; and . . . knowingly fails to register or update a registration as required by [SORNA]; shall be fined under this title or imprisoned not more than 10 years, or both.") (emphasis added).

#### 2. Supreme Court Interpretations of SORNA

Consistent with the statutory text, the Supreme Court has declared that there is no "federal interest" in prosecuting registrants absent "a nexus between a defendant's interstate travel and his failure to register as a sex offender." *Carr v. U.S.*, 560 U.S. 438, 446 (2010) (emphasis added). The Supreme Court has also declared that such a prosecution would be "illogical." *Id.*

Specifically, in *Carr v. United States*, the Court observed that § 2250 has "three elements," and that "the statute's three elements must be satisfied in sequence." This "sequential reading" of § 2250

> helps to ensure a nexus between a defendant's interstate travel and his failure to
> register as a sex offender. Persons convicted of sex offenses under state law who
> fail to register in their State of conviction would otherwise be subject to federal
> prosecution under § 2250 even if they had not left the State after being convicted
> —an illogical result given the absence of any obvious federal interest in punishing
> such state offenders.

AR-00002453

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS*
*IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

*Id.* at 446 (emphasis added). Thus, under the Supreme Court's interpretation of § 2250 in *Carr*, Congress intended § 2250 to apply only to "persons required to register under SORNA over whom the Federal Government has a direct supervisory interest," or to persons "who threaten the efficacy of [SORNA's] statutory scheme by traveling in interstate commerce." Notably, the Supreme Court echoed this interpretation of § 2250(a) in *Reynolds v. United States*, 565 U.S. 432 (2012), wherein the Court interpreted the phrase "whoever… is required to register under [SORNA]," as stated in § 2250(a), to be limited to "federal sex offender[s]" or "nonfederal sex offender[s] who trave[l] in interstate commerce." *Id.* at 435.

### 3. SORNA's Legislative History and the Department's Prior Rulemaking

SORNA's legislative history, as well as the Department's prior rulemaking, confirm that "interstate travel by a state sex offender" is a "predicate[]for federal enforcement of the SORNA registration requirements." 72 F.R. at 8895. These sources further confirm that Congress attempted to secure *intrastate* registration of registrants only indirectly, through a *state-imposed* duty on registrants incentivized by its Spending Clause powers, because it cannot directly regulate registrants under the Commerce Clause.

The duty to register, as originally enacted in 1994 under the Jacob Wetterling Act, imposed upon registrants only a duty to register under state law. Pursuant to its Spending Clause powers, Congress provided that enforcement of the state-law duty to register was confined exclusively to state-court jurisdiction. 42 U.S.C. §14071(c). With regard to the subsequent enactment of SORNA in 2006, legislative history reveals Congress' purpose was to close a perceived "loophole" which permitted persons convicted of a sex offense under state law to go "missing" by relocating from one state to another by traveling in interstate commerce. Evidence of this latter Congressional intent includes, but is not limited to, the legislative statements which follow:

- Representative Brown-Waite of Florida, a U.S. House sponsor of legislation which became SORNA, argued that "Congress has a duty to act and to protect our children nationwide, because these predators move from state to state."[1]

- Representative Coble of North Carolina voiced concern that there was "little to no infrastructure … to ensure registration when sex offenders move from one State to another or when a sex offender enters another State to go to work or to enroll in a school."[2]

---

[1] House Bills on Sexual Crimes Against Children: Hearing on H.R. 764, H.R. 95, H.R. 1505, H.R. 2423, H.R. 244, H.R. 2796, and H.R. 2797, Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 109th Cong. (June 9, 2005), page 13.

[2] House Bills on Sexual Crimes Against Children: Hearing on H.R. 764, H.R. 95, H.R. 1505, H.R. 2423, H.R. 244, H.R. 2796, and H.R. 2797, Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 109th Cong. (June 9, 2005), page 2.

AR-00002454

- Representative Sensenbrenner of Wisconsin, Chairman of the House Judiciary Committee, and a principal co-author of what became SORNA, explained that "[i]n order to address the problem of missing sex offenders, that is those who fail to comply with moving from one State to another, sex offenders will now face Federal prosecution."[3]

In addition to the foregoing statements by Members of Congress, on March 8, 2006, during debate on the floor of the House, a letter expressing the views of the United States Judicial Conference was entered into the record. With regard to what would later become § 2250, the Judicial Conference noted:

> Another section would make it a federal crime for a person to knowingly fail to register as required under the Sex Offender Registration and Notification Act if the person is either a sex offender based upon a federal conviction or is a sex offender based on a state conviction who thereafter travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country.[4]

### 4. The Department's Prior Regulations Under SORNA

In at least four publications issued under the Department's regulatory authority to implement SORNA, the Department has consistently stated, in substantially similar form, that:

> SORNA directly imposes registration obligations on sex offenders as a matter of federal law and provides for federal enforcement of these obligations under circumstances supporting federal jurisdiction. These obligations include registration, and keeping the registration current, in each jurisdiction in which a sex offender resides, is an employee, or is a student, with related provisions concerning such matters as the time for registration, the information to be provided by the registrant, and keeping the information up to date.
>
> ****
>
> Because circumstances supporting federal jurisdiction—such as conviction for a federal sex offense as the basis for registration, or interstate travel by a state sex offender who then fails to register in the destination state—are required predicates for federal enforcement of the SORNA registration requirements, creation of these requirements for sex offenders is within the constitutional authority of the Federal Government.

72 F.R. 8894, 8895 (Interim Rule).[5]

---

[3] 151 Cong. Rec. 20,207 (debate on Children's Safety Act of 2005, H.R. 3132) (Sept. 14, 2005).

[4] 152 Cong. Rec. 2254, 2983 (March 8, 2006).

[5] *See also National Guidelines for Sex Offender Registration and Notification*, 73 F.R. 38030, 38069 (July 2, 2008) (Final Guidelines) (limiting enforcement of Section 2250 to "circumstances

AR-00002455

### 5. The Commerce Clause

The above-described limitations on the Department's authority to regulate registrants directly stems from the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, which likewise precludes Congress and the Department from regulating activity where federal jurisdiction is absent. The Supreme Court has placed into three categories the circumstances which permit a valid exercise of Commerce Clause powers by Congress:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Third, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*United States v. Lopez*, 514 U.S. 549, 558 (1995) (internal citations omitted).

The <u>status</u> of a person who has been convicted of a sex offense in violation of state law, even when the state's laws define a "sex offense" in the same manner as does SORNA, does not involve "the use of the channels of interstate commerce" or "regulation or protection" of any "instrumentalities of interstate commerce."[6]

---

supporting federal jurisdiction... such as interstate or international travel by a sex offender, or conviction of a federal sex offense for which registration is required"); *Applicability of the Sex Offender Registration and Notification Act*, 75 F.R. 81849, 81850 (Dec. 29, 2010) (Final Rule); and *Supplemental Guidelines for Sex Offender Registration and Notification*, 76 F. R. 1630, 1638 (Jan. 11, 2011) (Final Guidelines).

[6] While the Supreme Court has ruled Congress may constitutionally "anticipate the effects on commerce of an economic activity," see, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012) (Roberts, C.J.), the Court has "never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce." *Ibid.* In other words, Congress has the "power to regulate 'class[es] of activities,' not classes of individuals, apart from any activity in which they are engaged." *Id.* at 556. A person's status as a registrant, of course, does not alone establish that the person is engaged (or will engage) in interstate commerce. Just as "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce," *United States v. Lopez*, 514 U.S. 549, 567 (1995), a person's mere status as a state sex offender "is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." For this reason, as a matter of statutory interpretation, it must be presumed Congress did not intend to impose on registrants with convictions under state law an "intrastate" federal duty to comply with SORNA in the absence of interstate commerce. *See also Gonzales v. Raich*, 545 U.S. 1, 23 (2005).

13

AR-00002456

Under these circumstances the only valid federal interest which could plausibly support federal regulation under the Commerce Clause would be a claim under the third category described above. That is, imposition of the duty upon registrants to comply with SORNA would be authorized under the Commerce Clause only if the registrant's "intrastate" activities "threaten the efficacy" of a valid regulation of interstate commerce. In *United States v. Morrison*, the Supreme Court clarified the legal framework for analyzing assertions of Congressional power under the "third category" of powers under the Commerce Clause, *i.e.*, activities which are entirely "intrastate," but which nonetheless "substantially affect interstate commerce." In this context, the Court directed consideration of the following inquiries:

1)   Whether the activity sought to be regulated involves "economic" activity;

2)   Whether the statute seeking to regulate an intrastate activity contains an "express jurisdictional element" which limits the statute's reach to a discrete set of activities that additionally have an explicit connection with or effect on interstate commerce;

3)   Whether the literal, textual terms of the statute which seeks to regulate an intrastate activity, or the statute's legislative history, contains "an express congressional finding" regarding the effects of the intrastate activity upon interstate commerce; and

4)   Whether the linkage, if any, between the intrastate activity sought to be regulated, and the activity's "substantial effect on interstate commerce," is attenuated.

*United States v. Morrison*, 529 U.S. 598, 610-12 (2000).

The federal regulation of individual registrants under § 20913(a), unconstrained by § 2250(a)'s interstate travel requirement, would fail to satisfy any of the four criteria stated above. First, a person's status acquired by having previously been convicted of a sex offense in violation of state law does not qualify as an "activity," much less an "economic" activity, within the meaning of the Commerce Clause. Second, unlike § 2250(a), § 20913(a) does not contain an "express jurisdictional element" which limits its reach to a discrete set of activities that additionally have an explicit connection with or effect upon interstate commerce. Third, neither the plain language of § 20913(a) nor its legislative history contain "an express congressional finding" regarding the adverse commercial effects which would result if persons with only a prior state-law conviction for a sex offense remain unregulated by an intrastate federal duty to register under § 20913(a). Fourth, while a person remains within a state there is no "linkage" between that person's status as a registrant under state law, and any "substantial effect on interstate commerce."

///

///

///

14

AR-00002457

COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS
IN RESPONSE TO PROPOSED RULEMAKING
DOCKET NO. OAG 157

### C. The Proposed Rule—and each discrete requirement therein—should be revised to qualify that registrants need only comply when "circumstances supporting federal jurisdiction" are present

Despite the above-described, acknowledged limits on federal jurisdiction over individual registrants, the Proposed Rule omits any mention of the fact that "circumstances supporting federal jurisdiction" are a prerequisite to any lawful federal regulation of individual registrants, consistent with the Commerce Clause. That is, although the Department's introduction to the Proposed Rule states that "circumstances supporting federal jurisdiction" are a prerequisite to "enforcement" of, and "liability" under, SORNA, *see, e.g.*, 85 F.R. 49333, 49336, 49350, the federal jurisdictional prerequisite is nowhere mentioned in the text of the Proposed Rule itself as a condition of the Department's authority to regulate individual registrants, nor is the prerequisite acknowledged as a condition of an individual registrant's duty to act in response to federal authority.

This omission could erroneously imply, and thereby falsely communicate to registrants and prosecutors, that the Proposed Rule requires individual registrants to comply with each discrete requirement of the Proposed Rule—including those that mirror the requirements for jurisdictions per the 2008 SORNA Guidelines—even when no "circumstance supporting federal jurisdiction" is present. Indeed, the Proposed Rule seems to suggest that the Department may have intentionally confused the scope of its authority over individual registrants in an effort to achieve voluntary compliance with registration requirements that the Department has no statutory or constitutional authority to impose. Attorney General Barr recently cautioned the Department against such overreach, noting:

> In exercising our prosecutorial discretion, one area in which I think the Department of Justice has some work to do is recalibrating how we interpret criminal statutes. In recent years, the Justice Department has sometimes acted more like a trade association for federal prosecutors than the administrator of a fair system of justice based on clear and sensible legal rules. In case after case, we have advanced and defended hyper-aggressive extensions of the criminal law. This is wrong and we must stop doing it.

> The rule of law requires that the law be clear, that it be communicated to the public, and that we respect its limits. We are the Department of Justice, not the Department of Prosecution.

> We should want a fair system with clear rules that the people can understand. It does not serve the ends of justice to advocate for fuzzy and manipulable criminal prohibitions that maximize our options as prosecutors. Preventing that sort of pro-prosecutor uncertainty is what the ancient rule of lenity is all about. That rule

15

AR-00002458

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS*
*IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

> should likewise inform how we at the Justice Department think about the criminal law.[7]

Accordingly, in order to avoid ambiguity or illegality, the Proposed Rule should plainly disclaim any attempt to regulate intrastate activity, or any activity that lacks a nexus to interstate travel. Several of the comments that follow are directed to achieving this clarification.

## II. The Proposed Rule Lacks a Clear Statement that a Registrant's Duty to Act Under SORNA Arises Only When the Registrant Travels Interstate and that Travel Has a 'Nexus' to the Alleged SORNA Violation

The authorities discussed above demonstrate that SORNA imposes no duty upon individual registrants unless they travel interstate and there is a nexus between that travel and the SORNA requirement at issue. *Carr*, 560 U.S. at 446. The nexus requirement is reflected in SORNA's statutory purpose. That is, in enacting SORNA, Congress did not intend to dictate the information that each individual registrant throughout the country must report to each state, under threat of federal prosecution, irrespective of federal jurisdiction limitations. Instead, Congress had a much narrower focus and target, namely absconders who "move to another state, fail to register there, [] thus leav[ing] the public unprotected." *United States v. Dixon*, 551 F.3d 578, 582 (7th Cir. 2008), *citing* H.R. Rep. No. 218, 109th Cong., 1st Sess. 23-24, 26 (2005), *rev'd on other grounds by Carr v. U.S.*, 560 U.S. 438 (2010).

As currently written, however, the Proposed Rule creates ambiguity regarding the critical questions of (1) whether a registrant has a duty to act under SORNA before interstate travel occurs, and (2) what can be required of registrants who travel interstate. The necessity of this clarification in the Proposed Rule is illustrated by the following factual scenarios involving hypothetical registrants. The failure to provide clarity will confuse registrants and invite selective and groundless prosecutions—the opposite of the stated objective of the Proposed Rule.

### A. Factual scenarios common to registrants illustrate the need to clarify when the federal duty to act under SORNA arises

Consider the following four factual scenario involving registrants:

- **Registrant A** changes his residence from California to Nevada and fails to register in Nevada, his new state of residence. Registrant A is alleged to have violated SORNA by failing to register in Nevada.

/ / /

/ / /

---

[7] Remarks by Attorney General William P. Barr at Hillsdale College Constitution Day Event, Sept. 16, 2020, available at https://www.justice.gov/opa/speech/remarks-attorney-general-william-p-barr-hillsdale-college-constitution-day-event

AR-00002459

- **Registrant B** resides in California. In 2021, he visits his mother for 2 days in Nevada, and returns to California. In 2022, Registrant B neglects to renew his registration in California. Registrant B is alleged to have violated SORNA by failing to renew his registration in California in 2022.

- **Registrant C** resides in New Jersey, but works at various locations in New York and Connecticut and travels among those three states weekly. Registrant D is alleged to have violated SORNA by failing to report all of the information required by the Proposed Rule in each of those three states.

- **Registrant D** resides in California. In 2021, he neglects to properly update his registration in California as required by California law. In 2022, Registrant C visits his mother for 2 days in Nevada, and returns to California. Registrant C is alleged to have violated SORNA by failing to update his registration in California in 2021.

- **Registrant E** resides in California and does not travel interstate. In 2021, he neglects to register his boat with his local registering agency. The boat is kept at home. Registrant E is alleged to have violated SORNA by failing to report information regarding his boat as required by § 72.6(f) of the Proposed Rule.

In the case of **Registrant A,** the violation of SORNA is evident. As explained above, Registrant A's scenario is the scenario targeted by SORNA's authors. A circumstance supporting federal jurisdiction (*i.e.*, interstate travel) is present. Also present is a nexus between that interstate travel and the alleged violation of SORNA. Finally, the interstate travel preceded the SORNA violation.

In contrast, the circumstances of **Registrations B, C, D, and E** represent distinct, yet commonplace, situations in which there should be no liability under SORNA, but which the Proposed Rule fails to clarify.

**Registrant B** traveled interstate prior to the alleged SORNA violation, but there is no nexus between the travel and the alleged SORNA violation. Without clarification that a duty to comply with SORNA arises only when interstate travel occurs and there is a nexus between that travel and the provision of SORNA at issue, registrants such as Registrant B who travel across state lines will wrongly believe that their incidental interstate travel triggers a duty to comply with all of the Proposed Rule's reporting requirements indefinitely, even if the requirements have no nexus to the interstate travel.

**Registrant C** travels interstate each week for work, because he resides in New Jersey but works in New York and Connecticut. Registrant C is representative of thousands of registrants who live in regions of the country where interstate travel is common. However, divorcing the prerequisite of interstate travel from a requirement that such interstate travel have a nexus to the alleged SORNA violation will produce confusion and fear, and chill these registrants' basic life activities, because they will wrongly believe that merely traveling across state lines will subject

AR-00002460

them to federal prosecution in multiple states for failing to report all of the information required by the Proposed Rule in each of those states.

**Registrant D** traveled interstate only after the alleged SORNA violation, and that travel had no nexus to the SORNA violation. Under a proper interpretation of the Commerce Clause, Registrant D should not be liable under SORNA, because any duty he had to comply with SORNA did not arise until after he crossed a state line. Thus, Registrant C's SORNA violation predated his interstate travel, and thus did not trigger any duty under SORNA. Absent clarification in the Proposed Rule, registrants will wrongly believe that interstate travel will permit the Department to reach back years into the past and bring federal charges under SORNA for any failure to comply with state law, and/or the Proposed Rule, prior to that interstate travel.

Finally, **Registrant E** did not travel interstate, and there is no other basis for federal jurisdiction in connection with the alleged SORNA violation. The alleged SORNA violation is for strictly intrastate activity. Yet, because the Proposed Rule fails to clarify that individual registrants are not subject to a duty to act under SORNA unless and until they travel interstate, registrants such as Registrant E will wrongly believe they are immediately and forever in violation of all of the Proposed Rule's reporting requirements that their state does not facilitate, even when they have taken no action that subjects them to federal jurisdiction.

In sum, the Department should clarify that the Proposed Rule's target is the same as Congress': absconders who attempt to evade a registration requirement by moving from one state to another in interstate commerce, like Registrant A, above. Further, consistent with the jurisdictional limits on Congress and the Department, the Proposed Rule should clarify that it does not seek to impose liability in the cases of Registrants B, C, D, or E, where there is no nexus between interstate travel and a particular reporting requirement of the Proposed Rule.

### B. A lack of clarity in the Proposed Rule threatens arbitrary and selective enforcement

The consequences of the Proposed Rule's ambiguity regarding when a federal duty under SORNA arises are dire because the ambiguity will invite selective and arbitrary enforcement. For example, prosecutors may erroneously believe that the Proposed Rule, if formally issued, provides a basis for liability even in the absence of interstate travel or a nexus to the alleged SORNA violation. Prosecutors made a similar error in connection with the 2008 SORNA Guidelines when they prosecuted individual registrants for their failure to follow those Guidelines, even though the 2008 SORNA Guidelines were written exclusively for states. Some prosecutions were successful in the District Court, and later reversed on appeal. In the interim, the affected registrants' lives were often devasted. *Cf. U.S. v. Belaire*, 480 Fed. Appx. 284, 287-88 (5th Cir. 2012) (reversing conviction under 2008 SORNA Guidelines); *U.S. v. Ward*, 2014 U.S. Dist. LEXIS 160392, at *20-*21 (N.D. Fla. Nov. 14, 2014) (dismissing indictment under 2008 SORNA Guidelines).

///

18

AR-00002461

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS
IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

In addition, in light of the relative rarity of federal failure-to-register prosecutions, the Proposed
Rule will exacerbate the risk of selective and inconsistent enforcement with little benefit to
public safety. According to the U.S. Sentencing Commission, the Attorney General has obtained
only 4,582 convictions for SORNA violations nationwide during the 13-year period between FY
2007 and FY 2019. Yet, of this total, 97.5% (4,466) of those convicted of failure to register
committed no new sex offense "while in failure to register status," confirming that the risk to the
public of persons in violation of SORNA's requirement is low. Given that the Proposed Rule
treats major and minor SORNA violations alike, maintaining ambiguity regarding the
Department's authority to impose the myriad information reporting requirements of the Proposed
Rule will invite a waste of federal resources.

The threatened waste of resources is exacerbated by the fact that prosecutions under SORNA are
already selective and inconsistent, as demonstrated by the Sentencing Commission data. For
example, in FY 2019, only 5 people were convicted of SORNA violations in California, the state
with the largest registry, whereas 46 were convicted in Texas.

Attorney General Barr recently cautioned that:

> The essence of the rule of law is that whatever rule you apply in one case must be
> the same rule you would apply to similar cases. Treating each person equally
> before the law includes how the Department enforces the law.
> ….
>
> We must strive for consistency. And that is yet another reason why centralized
> senior leadership exists—to harmonize the disparate views of our many
> prosecutors into a consistent policy for the Department. As Justice Jackson
> explained, "we must proceed in all districts with that uniformity of policy which
> is necessary to the prestige of federal law."[8]

Absent confirmation that federal jurisdiction is a prerequisite to any duty under SORNA, the
Proposed Rule will provide even greater incentives for arbitrary and selective prosecution,
providing the opposite of "a concise and comprehensive statement of what sex offenders must do
to comply with SORNA's requirements," or a [] secure basis for prosecution of sex offenders
who engage in knowing violations of any of SORNA's requirements." 85 F.R. 49333-34.

///

///

///

///

---

[8] Remarks by Attorney General William P. Barr at Hillsdale College Constitution Day Event,
Sept. 16, 2020, available at https://www.justice.gov/opa/speech/remarks-attorney-general-
william-p-barr-hillsdale-college-constitution-day-event

AR-00002462

III.   **Sections 72.7(d) and (g) of the Proposed Rule, Containing Requirements to Report a 'Departure from a Jurisdiction' and 'Termination' of Residence, Exceed the Scope of Legislative Authority Conferred by Congress under 34 U.S.C. § 20914(a) and (c)**

Section 72.7(d) of the Proposed Rule exceeds the scope of authority under SORNA as confirmed by the U.S. Supreme Court in *Nichols v. US.* That is, Section 72.7(d) will unconstitutionally add additional reporting requirements neither found in nor authorized by SORNA.

**A. The Supreme Court has already ruled that SORNA does not require 'departure' or 'termination' information such as that required by § 72.7(d)**

Section 72.7(d) provides:

(1)    A sex offender residing in a jurisdiction must inform that jurisdiction (by whatever means the jurisdiction allows) if the sex offender will be commencing residence, employment, or school attendance in another jurisdiction or outside of the United States. The sex offender must so inform the jurisdiction in which he is residing prior to any termination of residence in that jurisdiction and prior to commencing residence, employment, or school attendance in the other jurisdiction or outside of the United States[; and that].

(2)    A sex offender who will be terminating residence, employment, or school attendance in a jurisdiction must so inform that jurisdiction (by whatever means the jurisdiction allows) prior to the termination of residence, employment, or school attendance in the jurisdiction.

Yet, the Department admits that the information required by proposed § 72.7(d) is not required by SORNA, *see* 85 F.R. 49346, 49347, and further acknowledges that § 72.7(d) is in tension with the U.S. Supreme Court's decision in *Nichols v. United States*, 136 S. Ct. 1113 (2016) to the extent that §72.7(d) would be applied to intended travel in interstate commerce. Specifically, the Department observes "§72.7(d) [would] resolv[e] certain potential problems in the operation of SORNA's registration system following the Supreme Court's decision in *Nichols v. United States*." In other words, the statutory limits on the Department's authority articulated in *Nichols* are a "problem," that the Proposed Rule intends to solve by proposing a basis for the federal regulation of Registrants—despite confirmation in *Nichols* that no such basis for regulation exists.

*Nichols* involved an inquiry into the intent of Congress when it enacted 34 U.S.C. § 20913(c). The text of § 20913(c) provided then, as it does now, that:

A sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to subsection (a) and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry.

AR-00002463

> That jurisdiction shall immediately provide that information to all other
> jurisdictions in which the offender is required to register.

In *Nichols* the Supreme Court ruled that under SORNA "the State a sex offender leaves—that is,
the State where he formerly resided" does not "qualif[y] as an 'involved' jurisdiction" under
former § 16913 (currently codified at 34 U.S.C.§ 20913). The Court also observed that
SORNA's immediate statutory predecessor, the Jacob Wetterling Act as amended in 1998,
directed states to require registrants to "report the change of address to the responsible agency *in
the state the person is leaving*" (emphasis in original), but that this provision of the Wetterling
Act was repealed by SORNA in 2006 and replaced by § 20913(c) as quoted above.

The Court also noted that, a short time before its decision in *Nichols*, Congress enacted a statute
known as "International Megan's Law" ("IML"). The IML for the first time required registrants
to report information to U.S. authorities prior to their departure to a foreign country. Similar to
its conclusion that Congress "could have chosen" but did not choose "to retain the language in
the amended Wetterling Act" in SORNA and thereby require registrants to report their intention
to depart to another state prior to departure, the Court's reference to the IML in *Nichols* indicates
a conclusion by the Court, at least implicitly, that when Congress enacted SORNA it consciously
chose to omit the requirement now proposed by the Department in § 72.7(d) and enforced by
§72.7(g).

On the basis of each of the foregoing observations, the Court in *Nichols* ruled that "SORNA's
plain text—in particular, § [20]913(a)'s consistent use of the present tense—therefore did not
require Nichols to update his registration" in the state from which he departed "once he no longer
resided there." Since the Supreme Court rendered its decision in *Nichols*, Congress has not
legislatively abrogated the Supreme Court's interpretation of SORNA in this respect.

Notably, the Department, in its interim rule of 2007, determined a "State sex offender" commits
an offense under § 2250(a) or breaches his "federal" duty to register under SORNA, only if, after
interstate travel, he "then fails to register in the destination state"—not after he has failed to
register in the state from whence he traveled. In other words, "travel in interstate commerce" is a
"predicate" for "federal enforcement of the SORNA registration requirements." If § 20913(a)
and § 2250(a) are read *in pari materia*, the federal regulation of individual registrants under §
20913(a), rendered enforceable by § 2250(a), must be construed to mean § 20913(a), to the
extent it concerns a "federal" duty, only imposes a duty on a "state offender" who, after interstate
travel, fails to register in the state of his "destination."

Section 72.7(d) of the Proposed Rule, and its enforcement provision, §72.7 (g), contradict the
sound reasoning of the 2007 interim rule, as well as the ruling in *Nichols*, by imposing a new
federal duty on persons who have a sex offense conviction to "update" their registration
information while still residing in a state from which they intend to depart. Among other things,
the practical effect of § 72.7 (d) and (g) would be that, for the first, time registrants would be
subjected to federal prosecution under 18 U.S.C. §2250(a) immediately upon crossing a state
border and engaging in commerce, due to a failure to "update" their registration information

AR-00002464

while still residing in the state from which they departed.  This new federal duty would apply
regardless of whether, as required by § 20913(c), a sex offender: (1) "appear[ed] in person" in
"at least 1 jurisdiction involved pursuant to subsection (a)"; and (2) did so "not later than 3
business days after" his interstate travel; and then (3) timely informed the "involved jurisdiction"
(the state of his destination), as defined by *Nichols*, of "all changes in the information required"
by "the sex offender registry" after his interstate travel.

Because both § 72.7 (d) and (g) would exceed the scope of legislative authority delegated to the
Department by Congress under § 20914(a) and (c), and because Congress is not vested with an
enumerated power under the U.S. Constitution to impose upon a registrant the intrastate federal
duties that § 72.7 (d) and (g) seeks to require, both § 72.7 (d) and (g) cannot lawfully or
constitutionally be adopted by the Attorney General.

### B.  The Department's proposed basis for issuing § 72.7(d) was rejected by the U.S. Supreme Court in the *Nichols* and *Gundy* cases

The Department claims authority to promulgate § 72.7 (d) and (g) on three grounds: (1) the
requirement that registrants report addresses where they "will reside;" (2) the requirement to
report "any other information required by the Attorney General;" and (3) the requirement to
provide information "in conformity with any time and manner requirements prescribed by the
Attorney General."  85 F.R. 49345-48.  However, these arguments are based on a contention that
was presented to, and squarely rejected by, the Supreme Court in *Nichols*.  In *Nichols*, the Court
observed:

> [T]he Government points out that among the pieces of information a sex offender
> must provide as part of his registration is "[t]he address of each residence at
> which the sex offender resides or will reside." § [20]914(a)(3). The use of the
> future tense, says the Government, shows that SORNA contemplates the
> possibility of an offender's updating his registration before actually moving. But §
> [20]914(a) merely lists the pieces of information that a sex offender must provide
> if and when he updates his registration; it says nothing about whether the offender
> has an obligation to update his registration in the first place.

*Nichols*, 136 S. Ct. at 1118.

As in *Nichols*, determination of whether the Department's final approval of § 72.7(d) and (g)
would exceed the scope of the authority delegated by Congress depends primarily on a
recognized legal distinction that exists between (1) "whether" a requirement should apply, and
(2) "how" a requirement should be applied.  As explained below, the former delegation of
authority, if exercised by the Department, would be unconstitutional, while the second delegation
of authority would not.

///

AR-00002465

For example, in *Gundy v. United States*, 139 S. Ct. 2116 (2019), the petitioner contended 34
U.S.C. §20913(d) unconstitutionally delegated legislative authority in a manner that allowed the
Attorney General "to do whatever he wants." When sustaining §20913(d) against this challenge,
the Court in *Gundy*, as a matter of statutory interpretation, narrowly interpreted the phrase
"specify the applicability" in §20913(d) to mean the Attorney General had only been empowered
to determine "how" a requirement imposed by Congress would be applied. Consistent with the
"constitutional avoidance" doctrine of statutory interpretation, the Court further ruled that
§20913(d) did not empower the Attorney General to determine "whether" to impose a
requirement. It was by this means that the Court avoided what otherwise would have presented
a "grave" constitutional question. *Gundy*, 139 S. Ct. at 2141,

Section 72.7(d), as proposed, answers the "whether" question already decided by the U.S.
Supreme Court in *Nichols* (*i.e.*, Congress did not intend to impose an intrastate pre-departure
requirement in SORNA), and it transparently decides, contrary to the Supreme Court's decision
in *Nichols*, that the Department retains authority to impose a new federal duty because, in its
view, Congress erred as a matter of policy when it consciously chose not to close what the
Department considers unsatisfactory "loopholes" within SORNA. Section 72.7(d) thus is not a
regulatory act which merely specifies "how" a requirement otherwise imposed by Congress will
be applied by the Attorney General. Rather, § 72.7(d) constitutes an unlawful and
unconstitutional attempt to assume legislative authority that has never been delegated to the
Department by Congress or by the U.S. Constitution. For these reasons, § 72.7(d) and its
enforcement provision, § 72.7(g), are an *ultra vires* act and should be withdrawn from the
Proposed Rule.

IV.     **The Proposed Rule Should Clarify that § 72.7(g) is a Safe Harbor that Absolves
        Registrants of a Duty to Report Information Required by SORNA When State Law
        or the Local Agency Does Not Require that Information**

Section 72.7(g) addresses circumstances in which a particular registrant's state law registration
requirements differ from the requirements of SORNA in one or more of the following ways:
(1) the state no longer requires that person to register; (2) the state does not require, or collect,
the information called for by SORNA; or (3) the state has more lenient time and manner
requirements for reporting than SORNA. Section 72.7(g) is, presumably, an attempt to
incorporate the affirmative defense of § 2250(c) into the discrete reporting requirements set forth
in § 72.7(a)-(f). Yet, as currently written, § 72.7(g) creates unnecessary confusion regarding the
nature of a registrant's duty under SORNA in these commonplace situations and should be
clarified to confirm that registrants will not be prosecuted under SORNA when the state in which
they reside does not facilitate compliance with SORNA's mandates.

Since SORNA's enactment, federal courts have consistently found that an individual registrant's
compliance with state registration requirements satisfies SORNA's federal requirements. *E.g.*,
*U.S. v. Paul*, 718 Fed. Appx. 360, 363 (6th Cir. 2017) ("In practice, sex offenders register
according to the requirements of their state of residence; that registration also satisfies

AR-00002466

SORNA."); *U.S. v. Heth*, 2008 U.S. Dist. LEXIS 108437, at *20-21 (W.D. Tex. Sept. 30, 2008) ("When a sex offender 'knowingly' fails to register or update registration 'as required by [SORNA]' it simply means the sex offender failed 'to comply with the requirements of a [State's] registry.'").

Further, the Department's own discussion of the Proposed Rule acknowledges the "two-party" nature of registration, and specifically acknowledges that compliance with SORNA is contingent upon an individual state's "acceptance" of any information offered by a registrant. 85 F.R. 49336-37. In other words, a registrant cannot comply with SORNA unless his local registering agency "accepts" the information required by SORNA. Consistent with this reality, the Department has generally brought prosecutions for failure to register under § 2250(a) only when the registrant has crossed a state line in an attempt to avoid registering in his state of residence. The Department has not prosecuted registrants who are properly registered with their local agency because those registrants did not also provide all of the information that SORNA requires on the timeline that SORNA requires it. To prosecute a registrant under the latter scenario would be to saddle registrants with obligations that belong to state and local government.

Section 72.7 of the Proposed Rule, however, is not consistent on with this reality, or with the Department's history of prosecution under SORNA. On the one hand, § 72.7(g)(1) provides that a registrant does not violate SORNA when his jurisdiction does not facilitate all of SORNA's reporting requirements, provided that he comes into compliance with SORNA if his jurisdiction later does facilitate SORNA's reporting requirements and the registrant receives due notice of that change. Yet, on the other hand, § 72.7(g)(2) implies that a registrant can still be prosecuted for violating SORNA when his jurisdiction does not facilitate all of SORNA's reporting requirements. Section 72.7(g)(2) further implies that a registrant can escape liability under SORNA only by proving that it was impossible for him to force his jurisdiction to facilitate SORNA's reporting requirements. In addition, the commentary to the Proposed Rule appears to contemplate that a Registrant's duty to comply with SORNA endures even if his state does not accept the information required by SORNA, or does not require the same information that SORNA requires. The Department's commentary states "Notwithstanding the absence of a parallel state law, the registration authorities in the state may be willing to register the sex offender because Federal law (*i.e.*, SORNA) requires him to register. If the state registration authorities are willing to register the sex offender, he is not relieved of the duty to register merely because state law does not track the Federal law registration requirement." 85 F.R. 49336 (internal citation omitted).

This contradictory mandate is not consistent with the nature of federal jurisdiction or the realities of the registration process that the Department acknowledges.

///

///

///

24

AR-00002467

COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS
IN RESPONSE TO PROPOSED RULEMAKING
DOCKET NO. OAG 157

### A. The Proposed Rule contains no guidance regarding how a registering agency's 'willingness' to accept SORNA's registration information is to be ascertained

The Proposed Rule provides no guidance about how a local agency's "willingness" to facilitate SORNA compliance is to be ascertained, consistent with the defense articulated by the Department in § 72.7(g). Registrants cannot by expected to query and cajole registering agencies, or individual registration officials within those agencies, regarding their "willingness" to accept the dozens of discrete informational disclosures required by the Proposed Rule, within the strict time and manner parameters of the Proposed Rule.

For example, consider a registrant who resides in California, where the deadline to register a new residence is five working days, i.e., two working days longer than SORNA's 3-day deadline. Registration in California is frequently done by appointments that are either negotiated with, or dictated by, the registration official. Is a California registrant who registers four working days after changing his residence subject to liability under SORNA unless he proves that he attempted to ascertain his local registration agent's "willingness" to make an earlier appointment? Must the registrant appear at his local registering agency within three business days and demand to be registered on a shorter time frame than state law allows the local agency to observe? Similarly, must a registrant attempt to force his local registering agency to accept information that state law does not require, may possess no means to collect, and may not wish to have, such as information regarding vacations lasting more than 7 days (§ 72.6(c)(2)), or the registrant's usernames and passwords for perhaps dozens of online retailers, social media sites, news websites, and other online services (§ 72.6(b))? To require registrants to prove that they attempted all of these acts, and to further prove the "unwillingness" of their local registering agency to accept them, is equivalent to impressing individual registrants into the service of the Department's effort to secure universal SORNA compliance by state and local government, which SORNA does not require of registrants.

### B. Section 72.7(g) is particularly unworkable for registrants who have been relieved of any duty to register under their state's law

As noted above, the inability of registrants to control the states in which they reside and their local registering agencies is particularly acute when the state has affirmatively relived that registrant of a duty to register under state law, whether through the expiration of tier-defined registration periods or through post-conviction relief. In these situations, state law provides no legal basis for processing that person's registration or performing the necessary second "step" of "accepting" the information required in SORNA's scheme.

Consider the example of registrants residing in the states of Indiana or Maryland. Courts in both jurisdictions have held that their respective state constitutions prohibit the registration of certain persons. *See Wallace v. State*, 905 N.E.2d 371 (Ind. 2009); *Dep't of Pub. Safety & Corr. Servs. v. Doe*, 439 Md. 201, 94 A.3d 791 (Md. 2013). In addition, courts in Indiana and Maryland have held that their respective state registration agencies are prohibited from accepting the registrations of such persons, *even if SORNA requires their continued registration as a matter of*

25

AR-00002468

*federal law.* In fact, the Maryland Court of Appeals (the court of highest jurisdiction in Maryland) expressly ruled that, "[a]lthough . . . SORNA creates a direct obligation on sex offender to register in their home state, independent of that state's implementation of SORNA, *the state need not accept the registration if doing so would be contrary to state law.*" *Doe*, 439 Md. at 232, 94 A.2d 809 (emphasis added). *See also Andrews v. State*, 978 N.E.2d 494 (Ind. Ct. App. 2012), *transfer denied*, 985 N.E.2d 339 (Ind. 2013); *State v. Hough*, 978 N.E.2d 505 (Ind. Ct. App. 2012). The Proposed Rule should make clear that registrants in Indiana or Maryland (or in other states with similar rules, whether judicial, administrative or legislative) can rely upon these rules and are not required to make repeated fruitless attempts to register with their local registering agency.

A related issue arises whenever state law allows registrants a path off the registry that is not recognized by SORNA. ACSOL estimates that there are hundreds of thousands of persons who have been removed from their state's registries through means such as the expiration of a tiered registration period shorter than that required for SORNA compliance, or through a post-conviction relief process such as a Certificate of Rehabilitation. In California, the number of registrants eligible for removal from the registry will increase dramatically in 2021 when the state shifts to a tiered registry from the current lifetime registration system. *See* Cal. Pen. Code § 290(d), eff. July 1, 2021. Thousands of California registrants placed in Tier 1 or Tier 2 for old convictions will become eligible for removal from the registry because they are now beyond the minimal registration period imposed for that tier; yet, some of these registrants would still be required to register if California's new system met SORNA requirements—*i.e.*, California requires a twenty-year registration period for those placed in Tier 2, while SORNA requires 25 years. 34 U.S.C. § 20915(a)(2). Others will fall into a higher tier under SORNA than under California law. Registrants who have consistently complied with the registration rules of California and successfully petition for removal from the registry under California's new law may nonetheless be put in fear of a federal prosecution because California has chosen a tiering system different than SORNA's.[9]

The prosecution of such individuals would, however, be inconsistent with the Congressional purpose in creating the federal crime of failure to register, which was to target individuals who travel interstate in order to evade their registration obligations. Indeed, as discussed above, it is likely, under the Court's analysis of federal criminal jurisdiction in *Morrison*, 529 U.S. 598

---

[9] A discrete example in California is the large proportion of registrants convicted under the "broad and amorphous" provisions of section 288(a) of the Penal Code. *See People v. Martinez* 11 Cal. 4th 434, 442-44 (1995). Because the conduct covered by Section 288(a) can differ in severity, California's tiered registry law assigns persons convicted of this offense to Tier 2, with a minimum 20-year registration term, and an annual update requirement. Yet, according to the latest "Implementation Review" from the Department's SMART Office, California will be SORNA compliant only if it assigns Section 288(a) to Tier 3, and imposes both a lifetime registration obligation with a quarterly update requirement upon registrants with that conviction. U.S. Dept. of Justice, Office of Justice Programs, SMART Office, *SORNA Substantial Implementation Review of State of Cal.*, at p. 19 (Jan. 2016).

AR-00002469

(2000), that the Commerce Clause would not support federal jurisdiction where there is no nexus between the interstate travel and the technical registration violation. Perhaps for that reason, as well as a rational allocation of prosecutorial resources, federal prosecutions for failure to register have to date focused exclusively on persons who move interstate and do not register in their destination, and whose travel is plausibly seen as having the purpose of evading the registration requirements.

The Proposed Rule should recognize this policy explicitly, so that individuals who have always complied with their state's registration requirements wherever they have lived or worked are not put in fear of federal prosecution unless they repeatedly attempt to persuade their local authorities to accept registrations those authorities do not require and may not accept.

## V.    The Department's Interpretation of the Affirmative Defense of § 2250(c) Violates the Due Process Clause of the Fifth Amendment

The Department's interpretation of the affirmative defense of 18 U.S.C. § 2250(a), as reflected in its commentary to § 72.7(g) and 72.8, suggests that the Proposed Rule intends to maximize the potential liability of registrants by absolving the government of its obligation to prove the registrant's knowledge of the SORNA registration requirement. In turn, the Proposed Rule effectively places upon individual registrants a duty to prove their lack of knowledge, which is inconsistent with the basic requirements of criminal liability.

The comments to the Proposed Rule state that criminal liability under § 2250(a) does not require proof of a registrant's "knowledge" that a registration requirement "is imposed by SORNA" itself. 85 F.R. 49332, 49350. Those comments acknowledge, however, that criminal liability may not be established under §2250(a) unless the person is factually "aware of an obligation" to register "from some source." *Id.* Under the Proposed Rule, the factual "knowledge" element of an offense which violates §2250(a), which necessarily must be proven for conviction, could be satisfied when a federal prosecutor proves the registrant was notified by authorities in the state in which he resides that he was required to register under "state law." *Id.* Similarly, the "knowledge" element could be satisfied if a federal prosecutor proves at trial that the registrant was notified by authorities that he was required by "federal law" to provide notice prior to his departure from a state.

All states have adopted laws which require registration, and many states have adopted laws that contain some, but not all, of the reporting requirements set forth in the Proposed Rule. However, a "state-law" reporting requirement is inadequate and ineffective to prove, as a matter of fact, that a registrant has received notice of a "federal duty" sufficient to impose liability under § 2250(a). For example, notice of a state-law duty would rarely, if ever, be given to a registrant by state authorities when the state will not (or legally cannot) register that individual. Notice of a state-law duty to register also will not provide a registrant with notice of the particular reporting requirements contained in the Proposed Rule when the state's own reporting requirements differ from those in the Proposed Rule, or contain no parallel reporting requirement at all.

27

AR-00002470

These realities impose serious impediments to any finding of liability for failure to comply with
the reporting requirements of the Proposed Rule. The factual "knowledge" of "a duty to
register," which forms a statutory element that must be proven for conviction under §2250(a),
requires knowledge by an accused of a fact that is true. This elemental requirement for criminal
liability under §2250(a) is independent of, and as an evidentiary matter would ordinarily be
raised at trial prior to, an accused registrant's presentation of evidence to support the affirmative
defense recognized under §2250(c). However, as misconstrued by the Department's
commentary, the affirmative defense recognized in §2250(c) would nonetheless categorically
shift the burden to an accused to prove that "uncontrollable circumstances" existed which
shielded him from criminal liability, regardless of the cause or nature of the "uncontrollable
circumstance." Unlike other circumstances wherein the affirmative defense could plausibly be
raised, when an "uncontrollable circumstance" is caused by the refusal or legal inability of state
officials to register a person under state law, the procedural effect of shifting the burden to the
accused to prove he had "knowledge" of the fact that he was not required or allowed to register
(or provide information) would be constitutionally problematic. The proof necessary to establish
the affirmative defense in these circumstances would unavoidably involve elements that
prosecutors must prove—*i.e.*, whether the accused person had "knowledge" of the "fact" of a
duty to comply with SORNA.

By shifting the burden of proof to an accused in this way, the affirmative defense under §2250(c)
would unconstitutionally relieve a federal prosecutor of his burden to prove a fact necessary for
conviction (*i.e.*, that the defendant "knew" he was required to register under SORNA). In other
words, under these circumstances, the Proposed Rule would unconstitutionally require an
accused registrant to "negate" an element of the crime which the government must prove in order
to convict. Thus, an accused registrant's criminal liability, and not merely mitigation of an
offense otherwise proven by the prosecution, would depend on the person's ability to disprove
his factual "knowledge" of the federal duty to comply with SORNA. This burden-shifting would
violate the Due Process Clause of the Fifth Amendment to the U.S. Constitution. *Smith v. United
States*, 568 U.S. 106, 110 (2013) (The government "is foreclosed from shifting the burden of
proof to the defendant…when an affirmative defense does negate an element of the crime.").[10]

---

[10] The interpretation of §2250(c) adopted by the proposed rule would also depart from a principle
that has traditionally justified shifting to an accused the burden of proving an affirmative
defense. Whether "uncontrollable circumstances" existed at the time of an accused person's
alleged offense, based on the fact that a state's authorities would not (or legally could not) under
state law impose SORNA's requirements, is not information that would be "peculiarly" in the
possession of the person. 2 J. Strong, MCCORMICK ON EVIDENCE §337, p. 415 (5th ed. 1999)
("[W]here the facts with regard to an issue lie peculiarly in the knowledge of a party, that party
has the burden of proving the issue"). Rather, the fact that such "uncontrollable circumstances"
existed at the time of a person's alleged offense would be equally available to any federal
prosecutor before the person's arrest or indictment. And, given this publicly available
knowledge, which would fairly be imputed to federal law enforcement authorities, probable

28

To remedy this constitutional defect in the Proposed Rule, §§ 72.7(g) and 72.8, as well as the
Department's comments thereto, should expressly state that in a prosecution under § 2250(a), no
"affirmative defense" need be asserted by a defendant unless and until the prosecutor first
establishes a prima facie case that the defendant had "knowledge" of an actual (and not a
speculative) duty to register in the destination state.

## VI.  Section 72.6(b), Concerning 'Remote Communication Identifiers,' Violates the First Amendment

Section 72.6(b) of the Proposed Rule, requiring the reporting of "Remote Communication
Identifiers," requires significant revision and limitation lest it run afoul of the First Amendment
for reasons of (1) ambiguity, and (2) infringement of the right to anonymous speech, as
articulated in *Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) and other cases.

Section 72.6(b) of the Proposed Rule requires the reporting of "All designations the sex offender
uses for purposes of routing or self-identification in internet or telephonic communications or
postings, including email addresses and telephone numbers." Any new information must be
provided to the registering agency within "3 business days." § 72.7(e). Critically, § 72.7(b)
neither defines any of its terms, nor limits the use to which the reported information may be put,
or the persons to whom it may be disclosed.

The U.S. Supreme Court has recognized the right of registrants to participate in social media and
other Internet activities on the same terms as non-registrants. *Packingham v. North Carolina*,
137 S. Ct. 1730, 1736-37 (2017) (striking down statute proscribing registrants' participation in
social media forums because "social media users employ these websites to engage in a wide
array of protected First Amendment activity on topics as diverse as human thought."). *See also
Harris*, 772 F.3d at 570 ("[S]peech by sex offenders who have completed their terms of
probation or parole enjoys the full protection of the First Amendment.") Accordingly, in *Doe v.
Harris*, the Ninth Circuit enjoined a California statute that required registrants to report "internet
identifiers," defined as "an electronic mail address, user name, screen name, or similar identifier
used for the purpose of Internet forum discussions, Internet chat room discussions, instant
messaging, social networking, or similar Internet communication." *Id.* at 568-69. As explained
immediately below, the First Amendment grounds upon which the Ninth Circuit enjoined the
California statute apply with equal if not greater force to § 72.6(b) of the Proposed Rule.

### A.  Ambiguities in § 72.6(b) of the Proposed Rule Unlawfully Chill Speech

In *Harris*, the Ninth Circuit ruled that the California statute's definition of "internet identifiers"
contained "ambiguities" and did not "make clear what sex offenders are required to report." 772
F.3d at 578. Such ambiguities violate the First Amendment because "uncertainty surrounding
what registrants must report—and the resultant potential chilling effect" "may lead registered sex

---

cause to arrest or indict a person for violation of §2250(a) under these circumstances would be
lacking.

29

offenders either to overreport their activity or underuse the Internet to avoid the difficult
questions in understanding what, precisely, they must report." *Id.* at 579. Further, "uncertainty"
concerning the precise nature of the internet identifiers that must be reported "undermines the
likelihood that the [Act] has been carefully tailored to the [State's] goal of protecting minors and
other victims," as the First Amendment requires. *Id.*, *quoting Reno v. ACLU*, 521 U.S. 844, 871
(1997).

Notably, Section 72.6(b) of the Proposed Rule is even more vague and ambiguous than the
statute enjoined in *Harris*, and therefore chills more speech. For example, § 72.6(b) of the
Proposed Rule employs the vague terms "designations," "routing" and "self-identification," and
fails to provide examples of such information. Registrants cannot reasonably be expected to
know the definition of "routing," or when their online identifiers are implicated in "routing"
communications. As in *Harris*, this ambiguity "may lead registered sex offenders either to
overreport their activity or underuse the Internet to avoid the difficult questions in understanding
what, precisely, they must report." *Harris*, 772 F.3d at 579.

In addition, the statute enjoined in *Harris* required only the reporting of communications *used in
conversational contexts*, *i.e.*, "identifier[s] used for the purpose of Internet forum discussions,
Internet chat room discussions, instant messaging, social networking, or similar Internet
communication." The examples provided were "electronic mail address, username, screen name,
or similar identifier." In contrast, § 72.6(b) of the Proposed Rule is not limited to particular
Internet communications, or to Internet communications in conversational contexts, but instead
broadly encompasses all "communications" over the Internet. The Proposed Rule is therefore
overbroad in that it encompasses Internet communications which have no possibility of
facilitating contact with potential victims, such as those with online retailers or IT help desks.
Such overbreadth serves no public safety purpose and is insufficiently tailored to withstand First
Amendment scrutiny. *Harris*, 772 F.3d at 579; *White v. Baker*, 696 F. Supp. 2d 1289 1310
(N.D.Ga. 2010) (enjoining state's internet identifier requirement where "the scope of the internet
identifying information required to be reported is not limited to identifiers used in the type of
internet communications that enable sexual predators to entice children.").

    **B.**    **The Proposed Rule Lacks the Required Safeguards on Public Disclosure of
'Remote Communications Identifiers'**

Separately, the proposed rule also violates registrants' right to communicate and participate
anonymously on the Internet. The First Amendment protects "an author's decision to remain
anonymous." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). This right is
burdened, and anonymous speech "chilled," when a reporting requirement "too freely allows law
enforcement to disclose sex offenders' Internet identifying information to the public." *Harris*,
772 F.3d at 579-80. For this reason, internet reporting requirements must contain "[]sufficient
safeguards preventing the public release of the information sex offenders do report." *Id.* at 578-
79. The absence of such safeguards "burdens registered sex offenders' ability to engage in
anonymous online speech." *Id.*

AR-00002473

The Ninth Circuit in *Harris* enjoined a statute that contained a single, inadequate limitation on
the disclosure of a registrant's internet identifiers, *i.e.*, the disclosure must be "necessary to
ensure the public safety." The Ninth Circuit ruled that "'Public safety'—like 'public interest'—
is much too broad a concept to serve as an effective constraint on law enforcement decisions that
may infringe First Amendment rights." *Harris*, 772 F.3d 580. Therefore, to withstand First
Amendment scrutiny, a reporting requirement must contain guidelines sufficient to "constrain"
public disclosure of the information, and avoid burdening or chilling anonymous speech. *Id.* at
580-81. *See also White v. Baker*, 696 F. Supp. 2d 1289, 1311 (N.D.Ga. 2010) (allowing public
disclosure of registrants' internet identifiers "to protect the public" insufficiently protected
anonymous speech because "a person in law enforcement might determine that Internet
Identifiers for offenders ought to be released so that the public can search for and monitor
communications which an offender intends to be anonymous."). *Cf. Doe v. Shurtleff*, 628 F.3d
1217, 1224 (10th Cir. 2010) (internet identifier reporting statute did not chill speech because
authorized disclosure was "for limited law-enforcement purposes" and otherwise subject to
safeguards).

Section 72.6(b) of the Proposed Rule violates this First Amendment standard because it contains
no guidelines or limitations regarding the use to which a registrant's "remote communication
identifiers" may be put, or the persons to whom they may be disclosed. The risk that a
registrant's remote communications identifiers could be disclosed is compounded by the fact that
registrants are directed to report the information to local law enforcement for inclusion in state
and federal databases. This reporting process necessarily involves multiple law enforcement
agencies, each of which could independently distribute that information publicly. Disturbingly,
the 2008 SORNA Guidelines affirmatively "encourages" states to make remote communication
identifiers public, and failed to discuss any First Amendment limitations on such public
disclosure. *See* 73 F.R. 38059-60 ("Jurisdictions are accordingly permitted and encouraged to
provide public access to remote communication address information included in the sex offender
registries, in the form described above, *i.e.*, a function that allows checking whether specified
addresses are included in the registries as the addresses of sex offenders.") Section 72.6(b)
therefore prevents an even greater threat to the anonymous speech rights of registrants than the
statute enjoined in *Harris*, and must be revised to include the guidelines and limitations
necessary to avoid chilling anonymous and other protected speech.

## VII.    Section 72.8 Omits SORNA's Express Requirement that Liability Under SORNA
Requires the Government to Prove a Basis for Federal Jurisdiction

For registrants with convictions under state or foreign law, 18 U.S.C. § 2250(a)(2)(B) contains,
as an element of liability for a violation of SORNA, that the registrant "travel in interstate or
foreign commerce, or enter or leave, or reside in, Indian country." Yet, § 72.8 of the Proposed
Rule contains no such requirement, thereby failing to conform with the statute and perpetuating
the Proposed Rule's untenable ambiguity regarding when a registrant's federal duty under
SORNA arises (*see* Comment II, above), as well as the registrant's liability for violations of

31

AR-00002474

SORNA. Accordingly, § 72.8 should be revised to include this mandatory jurisdictional predicate for liability under SORNA.

### VIII.  Many Provisions of § 72.6 Suffer from Vagueness that Will Prevent Compliance, Limit Liability, and Encourage Arbitrary and Selective Enforcement

Many provisions of Proposed Rule § 72.6 suffer from vagueness that will prevent compliance, foreclose liability if prosecutions are attempted, and encourage arbitrary and selective enforcement.

Under the Due Process clause, statutes are facially unconstitutional and "void for vagueness" when they either "fail to provide the kind of notice that will enable ordinary people to understand what conduct [they] prohibit," or they "authorize and even encourage arbitrary and discriminatory enforcement." *E.g., City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Skilling v. U.S.*, 561 U.S. 358, 402 (2010). In the case of SORNA, "[the] vagueness review is even more exacting" because "[the] statute subjects transgressors to criminal penalties." *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000). The following examples from the Proposed Rule suffer from unconstitutional vagueness:

**Section 72.6(b)**, requiring the reporting of "remote communication identifiers." The rule mandates the reporting of all "designations" used for the purpose of "routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers." As discussed more fully in Comment VI, above, the vagueness of the terms "designations," "routing," and "self-identification" is exacerbated by the fact that this list is demonstrative rather than definite, preventing individual registrants from knowing what they must report.

**Section 72.6(c)(1), (c)(3)**. In the case of registrants with no present or expected residence address, subdivision (c)(1) mandates the reporting of "information regarding where the sex offender resides or will reside with whatever definiteness is possible under the circumstances." A similar requirement under subdivision (c)(3) applies to employment information for registrants who have "no fixed place of employment." In addition to failing to specify the "information" required under these provisions, the additional requirement that such "information" be as definite as "possible under the circumstances" appears to require the consideration of an individual registrant's particular life circumstances at the time, and/or the particular practices of the individual law enforcement agency. A registrant cannot possibly tailor his reporting to the contextually dependent standard of "possible under the circumstances." *Cf. Forbes*, 236 F.3d at 1013 (dearth of notice and guidelines for distinguishing between "routine" and "experimental" medical treatment was void for vagueness). In fact, such vagueness provides no objective measure at all, thereby inviting arbitrary enforcement in violation of the Due Process Clause. *Cf. Kolender v. Lawson*, 461 U.S. 352, 356-60 (1983) (loitering statute containing exception for individuals who provide "credible and reliable" identification to law enforcement was unconstitutionally vague); *Morales*, 527 U.S. at 61-64 (ordinance that forbade loitering with "no apparent purpose" was unconstitutionally vague because it contained no

AR-00002475

standards for enforcement and allowed law enforcement to pick and choose opportunities for
enforcement).

**Section 72.6(c)(2)** requires the reporting of "information" concerning any "place" the
registrant "is staying when away from his residence for seven or more days, including the
identity of the place and the period of time the sex offender is staying there." In addition to
failing to specify the "information" required under this provision, the imprecise word "staying"
could imply places at which the registrant does not spend the night, as well as any place the
registrants spends significant amounts of time, again failing to provide fair notice of what is
required to comply. *Morales*, 527 U.S. at 56. Further, § 72.6(c)(2) provides no guidance for
registrants who return sooner than seven days, such as whether and to whom this must be
reported.

**Section 72.5(c)** provides for the automatic reduction in the duration of the registration
requirement for certain registrants in Tiers 1 and 3 of SORNA who maintain a "clean record,"
pursuant to 34 U.S.C. § 20915(c). Yet, the Proposed Rule does not specify what constitutes a
"clean record." Registrants are entitled to a clear statement in the Proposed Rule regarding the
"clean record" that entitles them to the automatic reduction in the registration period, so they
may conduct themselves accordingly, know when their registration term ends, and avoid
clogging the federal courts with actions seeking clarification of their rights under 34 U.S.C. §
20915(c).

In sum, these vague provisions, as well as others in the Proposed Rule, confound the stated
objective of "providing a concise and comprehensive statement of what sex offenders must do to
comply with SORNA's requirements." 85 F.R. 49333. In fact, these vague provisions illustrate
the fundamental deficiency in the Proposed Rule articulated in Comment I, above, which is the
apparent grafting of language and concepts from the 2008 SORNA Guidelines intended for states
into the present Proposed Rule, which is intended for individual registrants. While vague criteria
such as "information," "under the circumstances," or "clean record" may be appropriate in a set
of "minimum national standards" intended for states (which have discretion to fill in the gaps left
by the federal guidelines), such vague criteria are not appropriate in a set of guidelines
purporting to establish the parameters of criminal liability for individual registrants.
Accordingly, these and other vague provisions of the Proposed Rule should be revised to provide
constitutionally sufficient specificity and notice to individual registrants.

## IX.   Section 72.5(c) of the Proposed Rule Should Clarify That the Reduction in SORNA
Tiers 1 and 3 is Automatic

Section 72.5(c) of the Proposed Rule does not expressly state what action, if any, individual
registrants must take in order to avail themselves of the "clean record" reduction described in 34
USC 20915(b), whereby the registration period for certain Tier 1 registrants is reduced from 15
to 10 years, and the registration period for certain Tier 3 registrants is reduced from lifetime to
25 years. As a result, § 72.5(c) will confuse registrants and courts regarding the operation of this
provision. *See, e.g.*, *United States v. Templin*, 354 F. Supp. 3d 1181 (D. Mont. 2019) (federal

AR-00002476

district court granting defendant's request to avail themselves of the clean record reduction) and *United States v. Klemovitch-Rhoads*, No. 1:05-cr-00027-LMB (E.D. Va. 2019) (holding that the court lacked jurisdiction to address the defendant's request to avail themselves of the clean record reduction).

Again, the Proposed Rule seems to be using language intended for state guidelines and misapplying that language directly to registrants who must conform their conduct to the rule under threat of prosecution. To avoid ambiguity, and because the language in both the statute and the Proposed Rule is mandatory, § 72.5(c) should operate automatically as opposed to requiring any action on the part of the individual registrant. Indeed, there is no action by the registrant that could be required under the statute. Automatic operation of this provision pursuant to the Proposed Rule would also work to the benefit of judicial economy, as otherwise already overtaxed federal court dockets would be burdened by people seeking to avail themselves of a provision that could otherwise operate automatically.

X.     **The Proposed Rule Should be Revised to Include a Federalism Assessment and Other Requirements Imposed by Executive Order 13132 and the Unfunded Mandates Reform Act (UMRA)**

The Proposed Rule concludes that it "does not have sufficient federalism implications to warrant the preparation of a federalism assessment" as required by Section 6 of Executive Order 13132 ("E.O. 13132"). 85 F.R. 49352. This conclusory finding is not supported by E.O. 13132, the Fundamental Federalism Principles articulated in Section 2 thereof, or the practical impact of the requirements that this rule imposes on state and local governments.

E.O. 13132 prohibits the DOJ from issuing any rule "[1] that has federalism implications, [2] that imposes substantial direct compliance costs on state and local governments, and [3] that is not required by statute," unless the agency issues a federalism assessment in connection with the rules, or funds the costs incurred by the state. E.O. 13132 § 6(b). The Proposed Rule satisfies none of these three criteria:

[1] A rule "has federalism implications" when it "has substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government." *Id.* § 1(a). E.O. 13132, Section 2, articulates several "Fundamental Federalism Principles" that, when implicated by a proposed rule, reveal "federalism implications." As explained below, the following "Fundamental Federalism Principles" are implicated by the proposed rule:

- "issues that are not national in scope or significance are most appropriately addressed by the level of government closest to the people";

- "One-size-fits-all approaches to public policy problems can inhibit the creation of effective solutions to those problems";

AR-00002477

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS
IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

- "Acts of the national government . . . that exceed the enumerated powers of that government under the Constitution violate the principle of federalism"; and

- "The national government should be deferential to the State when taking action that affects the policymaking discretion of the states . . . ."

First, sex offender registration is a local issue that is not national in scope. As the Proposed Rule's Overview acknowledges, there is no federal registry; in fact, all registration happens at the state and local levels. Further, the vast majority of registrable sex offenses are state offenses, and even persons convicted of federal, military, or foreign offenses register with state and local governments rather than federal authorities. Significantly, the people intended to be protected by the registries live within the state, and therefore the state governments are the closest to such people and their concerns.

Second, the rule imposes a one-size-fits-all solution on all registrants in the nation. In fact, that is the acknowledged purpose of the rule. What's more, the rule effectively usurps states' prerogative concerning the registration of sex offenders within their jurisdictions by imposing a mandate on individual registrants that can vastly exceed any mandate imposed by their state governments, but can only be fulfilled by the participation of their state and local governments.

Third, as articulated elsewhere in these Comments, the Proposed Rule exceeds Congress's authority under the Commerce Clause by purporting to regulate registrants with state convictions, and by regulating registrants in connection with activities that have no substantial impact on interstate commerce.

Fourth, the Proposed Rule imposes myriad costly requirements upon states in a roundabout way. That is, although the rule does not explicitly impose any express requirements upon states, it nevertheless accomplishes the same by impressing individual registrants to act as agents of the federal government who, in order to avoid federal prosecution, must demand that their states adopt SORNA-compliant registration standards. For example, a registrant on Tier 3 of SORNA must update his registration in person every 3 months, even when many states, such as California, require only annual updates. Nevertheless, in order to facilitate his or her compliance with the rule, the registrant must visit his local registering agency four times more often than state law requires. The local registering agency must collect the information and report the same to the state's department of justice. The registrant must likewise tap state and local resources to accomplish perhaps dozens of additional requirements expressed in the rule, even when state law does not require the same.

[2]  The Proposed Rule imposes substantial direct costs upon state and local governments for these same reasons, implicating both E.O. 13132 and the UMRA. That is, state and local governments must allocate substantial resources to facilitate individual registrants' attempts to comply with SORNA, which in some cases will be many times the amount needed to facilitate a registrant's compliance with state law. These factors likewise mean that the Proposed Rule are likely to impose costs upon state and local governments in the aggregate of $100 million or

35

AR-00002478

*COMMENTS OF ACSOL AND AFFILIATED SCHOLARS AND PRACTITIONERS*
*IN RESPONSE TO PROPOSED RULEMAKING*
DOCKET NO. OAG 157

more, as well as uniquely affect small governments, such as the local registering agencies who
will suffer the influx of registrants who seek to comply with the mandates of this Proposed Rule.

[3]  The requirements imposed by the Proposed Rule upon states are not required by statute,
because SORNA does not expressly require the states to collect any information.  SORNA
merely conditions the receipt of certain federal funds on states' voluntarily becoming compliant.
Yet, the Proposed Rule makes state and local governments' cooperation part of an individual
registrant's requirements, under threat of federal prosecution, thereby effectively requiring states
to comply with the rule in order to protect their residents.

Accordingly, as required by both E.O. 13132 and the UMRA, the Proposed Rule should be
revised and recirculated for public comment with the required federalism assessment and other
action under the UMRA.

CONCLUSION

Once again, ACSOL thanks the Department for its work on the Proposed Rule, and hopes that
the Department will consider and accept these comments in a subsequent revision to the
Proposed Rule.

///

AR-00002479

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Nov 9, 2020

| View More Comments  (724)  (/document/DOJ-OAG-2020-0003-0001/comment) |
|---|

| View Related Comments  (724)  (/docket/DOJ-OAG-2020-0003/comments) | Share ▾ |
|---|---|

---

| Comment |
|---|

Over 24 years ago, I made a decision that would for ever change my life as well as many others. Since that time, I have done everything humanly possible to better myself. While serving my time (which I never ever violated even once and took full responsibility for my actions since the night I was arrested ) I met the most amazing person who has believed in me for who Iam, and not the label that was placed upon me. We have currently been married for 20 years and looking forward to many more to come. Not only is she a special person, she has been one of the most important people in my kids life, which I could never thank her enough. Because of her involvement in that life, I have two incredible kids. A very extremely talented son 28 and an incredibly beautiful daughter 25, who I could not be more proud of. I never realized that stupid decision I made over 22 years ago would have affected them nearly as much as it has through the years and it eats at my soul daily. I see the daily stress that the continuing rule changes and regulation put on my Mom and Dad. Unfortunately, my father passed last year, however, my Mom is one my biggest fan and I love her deeply. To know that my mistake has caused her so much worry and pain is unbearable at times. I truly believe the stress of it all is overwhelming on her and those I love. You see my bad judgement has hindered me from truly living life. With all the new rules and regulations always changing it is nearly impossible to function doing things with my family ( not to mention grand kids ) such as; Disney Vacations ( which we use to be annual passholders ), Cruise Vacations, Camping or just vacations in general. Not only has it changed my life, it has been extremely life changing and hard on many of those who I love so deeply. In closing with out writing you a book, I would appreciate the opportunity to have many of my Rights back as an American citizen so I can protect my family and be able to enjoy and make memories with those I have let down. I very strongly believe there should be a federal standard to go by and not allowing the states to destroy who they wish to punish. There are Predators and Offenders, however they are all grouped together making those of us who have made a consensual mistake predator monsters. There needs to be a larger distinction between the two. Also continuing to search throughout the internet to see the laws of many states while on vacation is unrealistic at best. There needs to be a light at the end of the tunnel after many years. I have accepted responsibility and learned from my mistake. Now I believe the federal government should do their part and allow someone freedom from their past. THIS SHOULD NOT BE A LIFE SENTENCE! [**DOJ DOCKET NOTE: Commenters on DOJ Proposed Rules have the option to provide or not to provide their own Personal Identifying Information (PII) such as their names. However, in order to protect the privacy of persons other than the commenter who may not have given their consent for such PII to be posted on www.regulations.gov, it is DOJ's policy to redact third-party PII from a comment (including attachments). In such

AR-00002480

instances, the full, un-redacted comment is available for public inspection in person by contacting the For Further Information Contact identified in the Proposed Rule. Accordingly, although DOJ has considered the entire contents of this commenter's comment, that portion which contains third-party PII has been redacted.***]

**Comment ID**

DOJ-OAG-2020-0003-0723

 **Tracking Number**

kf5-pfid-dblj

**Comment Details**                                    Submitter Info

**Received Date**

Sep 16, 2020



About      Bulk Data Download      Agencies      Learn

(/about)          (/bulkdownload)      (/agencies)      (/learn)

Reports      FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)      (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

NCJRS Abstract - National Criminal Justice Reference Service



https://www.ncjrs.gov/App/Publications/Abstract.aspx?id=264128



## PUBLICATIONS

**Stay Informed**
Register with NCJRS to receive NCJRS's biweekly e-newsletter JUSTINFO and additional periodic emails from NCJRS and the NCJRS federal sponsors that highlight the latest research published or sponsored by the Office of Justice Programs.



### NCJRS Abstract

The document referenced below is part of the NCJRS Virtual Library collection. To conduct further searches of the collection, visit the **Virtual Library** . See the **Obtain Documents** page for direction on how to access resources online, via mail, through interlibrary loans, or in a local library.

1 record(s) found

| | |
|---|---|
| **NCJ Number:** | 241966   [FIND IN A LIBRARY] |
| **Title:** | Taking Stock of 20 Years of Sex Offender Laws and Research: An Examination of Whether Sex Offender Legislation has Helped or Hindered Our Efforts |
| **URL(s):** | HTML |
| **Journal:** | *Journal of Crime and Justice*  Volume:35  Issue:3  Dated:November 2012  Pages:335-355 |
| **Author(s):** | Laura M. Ragusa-Salerno; Kristen M. Zgoba |
| **Date Published:** | November 2012 |
| **Annotation:** | This study examined the effectiveness of a variety of sexual offender laws passed between the two decades of 1990 and 2010. |

**Abstract:** The present study adds to the existing empirical literature on sex offending by examining the effectiveness of a variety of sexual offender laws passed between the two decades of 1990 and 2010. This study used a sample of 1,129 sexual offenders released from New Jersey State correctional facilities during these two decades of legislative focus. Specific attention is paid to the four common themes of the legislation, including sexual offender registration and notification, civil commitment, residence restrictions, and risk designation. When each law is analyzed using its specific purpose and application process, and then compared to a sample of sex offense cases, it becomes apparent that the laws do not apply to a wide percentage of sex offense cases. The researchers conclude that the laws have little preventive capability. The implications of this finding are discussed. Abstract published by arrangement with Taylor and Francis.

| | |
|---|---|
| **Main Term(s):** | Criminology |
| **Index Term(s):** | Legislation; NIJ grant-related documents; Recidivism; Sex offenders |
| **Sponsoring Agency:** | National Institute of Justice (NIJ) Washington, DC 20531 |
| **Page Count:** | 21 |
| **Format:** | Article |
| **Type:** | Report (Study/Research) |
| **Language:** | English |
| **Country:** | United States of America |

To cite this abstract, use the following link:
**http://www.ncjrs.gov/App/publications/abstract.aspx?ID=264128**

*A link to the full-text document is provided whenever possible. For documents not available online, a link to the publisher's website is provided. Tell us how you use the NCJRS Library and Abstracts Database - send us your **feedback** .

**Office of Justice Programs**
- Bureau of Justice Assistance
- Bureau of Justice Statistics
- National Institute of Justice
- Office for Victims of Crime

- Office of Juvenile Justice and Delinquency Prevention
- Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking

Contact Us | Feedback | Site Map
Freedom of Information Act | Privacy Statement | Legal Policies and Disclaimers
USA.gov | CrimeSolutions
Department of Justice | Office of Justice Programs

AR-00002482

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
 / Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Nov 9, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |

| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |    Share ▾ |

---

Comment

The Justice Department has done a lot of their own research on this matter and they know exactly how inefficient and unconstitutional the registration is yet they continue it and in fact propose to make it worse for those on the registry. Even if we comment here there is a good chance we ARE NOT BEING HEARD!.

I would like people in Congress, the Justice Department, The FBI, the Presidency, and all of law enforcement to have to experience even for one day the hours and injustices to those on the registry. How can our own law makers who are supposed to protect our rights and our freedom so blindly create a system that is so destructive to our citizens and their families. Everyone deserves a second chance. The recidivism rate for sex offenders is very, very low. Almost half of those on the registry did not even have a victim but were set up in a sex sting, often done unlawfully and unethically. The feds pay law enforcement to arrest and convict people in the name of stopping sex trafficking, yet almost none of those caught up in the stings are charged or convicted of sex trafficking but end up on the registry for life anyway. Children or those put on the registry as a child make up almost half of the registry. How is that fair? That is abuse far worse than any other abuse there is. More children are apt to end up on the registry than be molested. Children and families of those on the registry are bullied, tortured, and sometimes murdered, due to no fault of their own. So how are these laws protecting anyone?

Research proves the registry is ineffective, that most abused children are abused by someone they know not by a stranger on the registry, and that counseling, integration back into society, and forgiveness are much more effective than punishing these people for a crime they have not yet committed and most likely will not. The recidivism rate is VERY low.

I am sitting here right now watching a man physically, mentally, and psychologically abuse his young child. Where is the registration for that?

Please read these documents as some of them are important research. Please consider demolishing the registry.

AR-00002483

Attachments  16

 When facts aren't facts_ A look at the effectiveness of sexual offender registries _ Closer Look _ cumberlink.com

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_1.pdf)

 _Stranger Danger_ to children vastly overstated _ Boing Boing

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_2.pdf)

 Fact

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_3.pdf)

 NCJRS Abstract - National Criminal Justice Reference Service

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_4.pdf)

 adultsexoffendermanagement

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_5.pdf)

 Who are Sex Offenders Justice Department

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_6.pdf)

📄 Bureau of Justice Statistics Press Release

⬇ Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_7.pdf)

📄

National Criminal Justice Reference Service

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_8.pdf)

 _Stranger Danger to children vastly overstated

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_9.pdf)

 Why the Innocent Plead Guilty

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_10.pdf)

 How to prevent child sexual abuse

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_11.pdf)

 Registration Tracking of Sex Offenders Drives Mass Incarceration Numbers and Costs

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_12.pdf)

 When facts aren't facts A look at the effectiveness of sexual offender registries

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_13.pdf)

 Articles and Studies NARSOL

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_14.pdf)

 Court Decisions

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_15.pdf)

No Place to Call Home Rethinking Residency Restrictions for Sex Offenders - No Place to Call Home Rethinking Residency Restrictions for Sex

 Download  (https://downloads.regulations.gov/DOJ-OAG-2020-0003-0724/attachment_16.pdf)

**Comment ID**

DOJ-OAG-2020-0003-0724

 **Tracking Number**

kg4-98ho-isyq

**Comment Details**                                                 **Submitter Info**

**Received Date**

Oct 10, 2020



About    Bulk Data Download    Agencies    Learn

(/about)         (/bulkdownload)   (/agencies)  (/learn)

Reports    FAQ

(https://resources.regulations.gov/public/component/main?main=Reports)   (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)   Provide Site Feedback

https://cumberlink.com/news/local/closer_look/when-facts-arent-facts-a-look-at-the-effectiveness-of-sexual-offender-registries/article_01b3ec77-053f-5a8f-8436-5cab0a2090c6.html

FEATURED   TOP STORY

# When facts aren't facts: A look at the effectiveness of sexual offender registries

Joshua Vaughn The Sentinel
Mar 26, 2016

SALE! Subscribe for $1/mo.



Sexual offender registries were passed under the assumption that offenders are likely to commit more crimes, yet studies now show only a small portion are likely to re-offend.

Jason Malmont, The Sentinel

The passages of sexual offender registries have grabbed headlines as steps toward public safety against unchanging "predators" who are being released back into society.

The registry laws themselves have cost billions of dollars and generally are passed with overwhelming support.

But do they work?

"These kind of laws have a limited usefulness, which is they make it difficult for offenders to keep their anonymity but that's about it," said Kristen Houser, chief public information officer for the Pennsylvania Coalition Against Rape.

AR-00002487

The laws, commonly referred to as Megan's Law registries, require that sexual offenders have their photograph, address and other personally identifiable information posted to a public registry after the offender is released from prison.

They also are usually passed under the premise of public safety following a high profile event, using the notion that sexual offenders are highly likely to commit more offenses when they are released.

"I think there are very few things that scare parents more than being concerned that somebody is going to sexually assault or kidnap and kill their child," Houser said. "It is a terrifying thought."

## Recidivism

An update to Pennsylvania's 1996 registry law in 2011 included that the "Legislature found that ... sexual offenders pose a high risk of committing additional sexual offences, and protection from this type of offender is a paramount government interest."

"If you ask people how often sex offenders will commit a new offense when released into the community, people tend to think it's upwards of 75 percent," said University of Massachusetts Professor Jason Rydberg, who focuses on the study of sexual offenders and policy.

However, overwhelming research has shown that sexual offenders, as a whole, are some of the least likely groups to commit new crimes, Rydberg said.

Rydberg said one major study found that only about 5 percent of sexual offenders committed a new sexual crime within five years. The U.S. Department of Justice places the re-offense rate for sexual offenders as low as 3 to 10 percent, and a study

AR-00002488

conducted by Karl Hanson found that out of 8,000 offenders that were tracked,
none who remained offense-free for 15 years were likely to reoffend after.

To put the threat posed by sexual offenders committing new offenses in perspective,
a 2014 study found that roughly 3 percent of felons with no known history of sexual
offenses committed one within roughly five years.

"People tend to be skeptical that sex offenders are amenable to treatment, and this is
related to supporting punitive policies against them," Rydberg said. "With this issue
too, research combining dozens of studies and tens of thousands of sex offenders
finds that certain types of treatment are effective at reducing the likelihood of sexual
recidivism."

## Passage of bills

Patrick Cawley, executive director and counsel for the Pennsylvania Senate
Judiciary Committee, said the assertion that outlined the state's need for the law
likely came from evidence presented during a committee hearing, but that he was
unable to find any supporting data that was used.

AR-00002489

There were no committee hearings for the 2011 registry update bill, according to the Pennsylvania Senate Library, yet it received unanimous approval from the judicial committee and full legislature before being signed by then Gov. Tom Corbett.

The legislature's finding that sexual offenders are likely to reoffend and thus pose a great threat to society has also been refuted by the Pennsylvania Supreme Court.

In 2014, the court ruled that a provision of the law that placed juvenile offenders older than the age of 14 on the registry for 25 years was unconstitutional.

The decision was made in large part because of evidence that showed juvenile offenders reoffend at a rate of only 2 to 7 percent.

The court objected to the premise that all sexual offenders pose a great risk saying that the imposition of the sexual offender registry on juveniles was an "irrebuttable presumption" that was based on a fact that was "not universally true," Arizona State University professor of Law Ira Ellman wrote in his article "Frightening and High."

In part, Pennsylvania's update, which added more than 2,000 offenders to the registry, according to Pennsylvania State Police Trooper Adam Reed, was passed so the state would become compliant with the federal Sexual Offender Registry and Notification Act.

## Support Local Journalism

Your membership makes our reporting possible.

SALE! Subscribe for $1/mo.

Failure to come into compliance with the law would have cost the state a portion of its federal grant money.

AR-00002490

SORNA was sponsored by Congressman Jim Sensenbrenner, who has the statement on his website "Convicted sex offenders often evade current state registration requirements and go on to commit additional offenses" on his website about his support for the legislation.

Given more than a week to prepare, staff for Sensenbrenner was unable to provide any data or evidence used to support that statement.

"While they have good goals, which is public safety, what we've found is they have collateral consequences," Rydberg said.

## Registries

Rydberg said registration laws have been found not to significantly reduce sex crimes, and have made it more difficult for offenders to acclimate back into society, which in turn makes it more likely that they will end up in prison for a non-sexual offense.

Registry laws can also lead to a false sense of security for members of the community.

AR-00002491

"The public is often mislead that if they check the registry and nobody lives in their neighborhood or nobody lives near their child's school or whatever, that they're safe," Houser said. "These are not laws that are going to actually produce safety. We need to be focused on prevention in vastly different ways."

Most victims of sexual violence – roughly 80 percent, according to Reed – know the person who committed the offense prior to the offense occurring.

"The vast majority of sex offenders are never going to be listed on a registry, period," Houser said.

Houser also raised concerns about the cost of the registry laws and their enforcement, saying money spent on these laws could go to more effective prevention programs.

"There are substantial costs ... and I'm not going to say it's not worth it but I am going to say that investing dollars into sexual abuse prevention and support programs for victims is probably not nearly as large of a budget item for the state government," she said.

The Congressional Budget Office put a $1.2 billion price tag on the original SORNA law, with updates costing the federal government hundreds of millions more.

The bulk of Pennsylvania's cost comes with the employment of six uniformed troopers and 21 civilians for the Megan's Law division, according to Reed.

AR-00002492

"If the goal of these various strategies is to reduce recidivism, then these policies have a high potential to be counter-productive," Rydberg said. "Over the past 20 years, a vast amount of research has developed knowledge on the correctional strategies that are the most effective at reducing recidivism, as well as those that are ineffective."

## Solutions?

So, if the registries and post-release policies are not working, what can be done to provide public assurance that sexual offenders are not going to reoffend?

First, Rydberg said, the policies need to focus on the offenders seen as the most likely to reoffend.

Pennsylvania currently evaluates all sex offenders when they are convicted to determine which individuals present the most threat. Theses offenders are deemed sexually violent predators. This evaluation, however, is only used to potentially increase registry requirements.

All other offenders are classified based on the offense for which they were convicted and subjected to registry requirements based on that classification alone.

Sexually violent predators make up less than 10 percent of the state registry.

"A general trend here is that treatment focused strategies are much more effective at reducing recidivism than punitive focused strategies and it turns out that punitive-focused strategies actually make offenders worse," Rydberg said.

AR-00002493

He said effective treatment looks to get to the root cause of the behavior and change it through methods such as cognitive behavioral therapy.

"(These laws) sound good. It makes people feel good. It's an easy sell in terms of votes," Houser said. "Nobody wants to say 'sex offenders deserve anonymity.' You're not going to get up and say that … There's limited usefulness to the laws but I do not think it's the panacea or silver bullet that people would like to think that they are."

## Be the first to know

Get local news delivered to your inbox.

| Email Address | Sign up! |

I understand and agree that registration on or use of this site constitutes agreement to its user agreement and privacy policy.

## Related to this story

### Listed: A closer look at sex offender registries
Updated Jan 23, 2017



### Court: Tougher sex offender reporting can't be retroactive; ruling involves Cumberland County case
Jul 20, 2017



### Cumberland County DA Freed to request U.S. Supreme Court review of sex offender decision
Updated Sep 5, 2017

AR-00002494



### Pennsylvania court upholds 'sexually violent predator' laws

Mar 26, 2020



AR-00002495

 **MENU**



## "Stranger Danger" to children vastly overstated

**GLENN FLEISHMAN** / **5:00 AM TUE FEB 24, 2015**

Oft-cited stats about child abduction puts kidnappers behind every bush. But the numbers are old and frequently mangled, distorting our understanding of genuine risks to children.

As a parent of two young children, it's my job to keep them healthy, safe, and happy. But I'm not at all worried they're going to be snatched off the street. Why? Because oft-spread claims that that 800,000 children are reported missing each year—with 300,000 children estimated to be sexually trafficked—are outdated or simply wrong.

### Abduction Rates Overstated and Outdated

The commonly cited "800,000" number is from a 2002 study of 1999 data. This information is widely misstated, and the data hasn't been updated in the era of ubiquitous mobile access and Amber Alerts. The National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children (NISMART) surveyed about 16,000 adults, examined a subset of law-enforcement agencies (roughly 25% of the total), and a sampling of juvenile facilities, including detention and treatment centers. No comprehensive study or survey of this scope has since been conducted in America.

The report has two "big" numbers. The 800,000 figure refers to the number of children reported lost to law enforcement or missing children's agencies, and was considered a much more reliable count. A second number, 1.3 million children, was based on estimates and interpolations, and counts when caretakers didn't know where kids were for more than a brief period. In 1999, there were 72 million minors in America; there are about 74 million today.

AR-00002496

But despite the report's clear tone and explanation, and even a well-written FAQ at the National Center for Missing & Exploited Children, these top-level numbers are typically cited as the rate at which children are plucked unsuspecting by strangers on their way to and from school or in other environments.

In fact, the true risk from people children don't know or who are "slight acquaintances" is extremely slim. As with most crime and violence, children are exposed to the greatest risk either because of family members or their own choices.

Even though the report is 13 years old and covering 16-year-old data, it's worth walking through its numbers, because they are the ones you'll see cited even now in newspaper stories, magazine articles and cable TV segments. (If you add some of the numbers below, you'll see some total percentages above 100 because some kids fit multiple categories in a single year.)

About the half of missing children — reported or otherwise — are runaways (their choice) or throwaways (kicked out without a place to go). These kids are at high risk of violence and various forms of exploitation, although the latter risk is overstated, as I'll get to in a later article.

Most of the rest of the reports and estimates fall into "benign explanation" (43% of reported), in which the child isn't missing, but a caretaker thought they were. Another good-sized chunk, 8% of reported, are kids who were lost or injured — not intentionally missing and no other party was responsible. The number of custodial violations, in which a family member takes a child away without permission (involving force if aged 15 to 17), is nearly 120,000 (9%) from the survey estimates and 57,000 of the reported cases (7%).

That leaves the category that one should ostensibly actually worry about: nonfamily abductions, in the terms of the study. Nonfamily abductions include those who the child knows, like a former but non-related domestic partner of a parent, a teacher, a neighbor, and so on, as well as strangers. The definition includes taking a child of any age without permission for more than an hour through a threat of violence or actual harm. For kids 15 or younger, harm or threats aren't required, but an intent of concealing the child's whereabouts, holding the kid for ransom, or expressing "the intention to keep the child permanently" is necessary.

The study found 12,000 children reported missing in this category (2%) and 33,000 from the broader estimate (3%). The larger 33,000 figure represents about 5 children out of 10,000, although both figures need additional scrutiny. (The report doesn't look at harm caused during abduction, such as sexual assault or other injuries.)

Stereotypical kidnapping, however, is a more a strictly typed subset, and it's the bogeyman in every parents' dreams. The report categorizes it as:

> ...when a stranger or slight acquaintance perpetrates a nonfamily abduction in which the child is detained overnight, transported at least 50 miles, held for ransom, abducted with intent to keep the child permanently, or killed.

Of nonfamily abductions, just 115 children (90 reported) in 1999 were estimated to fit a stereotypical kidnapping by a stranger or slight acquaintance. Forty of those were killed. That's 1 child out of every 750,000 kidnapped, and 1 out of about every 2 million killed.

AR-00002497

Of all children reported missing (whether the estimate or based on reports), 99.8% were returned home or located; the remaining number were virtually all runaways.

Family, through noncustodial abduction or kicking a child out; a child's own action as a runaway, for whatever cause and for whatever duration; and accidents are most of these reports. All of these problems can be mitigated by various means, but none of them fit into our picture of not letting a kid walk down the street because she or he will be snatched.

## Every 40 Seconds, a Statistic Is Misused

You wouldn't know any of this from reading typical parental advice regarding stranger danger. *Parents* magazine **offers a rundown of abduction danger** that states, "Every 40 seconds in the United States, a child becomes missing or is abducted."

This is seemingly accurate, but the lead in is, "The first step in protecting your child from potential abductors is to know what you're dealing with." Given that a sliver of the problem are classical abductors, it's hard to see how this helps.

*Parents* magazine notes:

> Only about one child out of each 10,000 missing children reported to the local police is not found alive. However, about 20 percent of the children reported to the National Center for Missing and Exploited Children in nonfamily abductions are not found alive.

The first number appears to be accurate, but only 1 in 100 children are reported missing each year. Further, the 20% figure isn't sourced, and the center doesn't claim that number. Rather, in its FAQ it points to a 1997 report (mislabeled as from 2006) that doesn't quite claim that, either. And by the definition of the NISMART study cited earlier, the rate of death relates to stereotypical kidnappings, not the broader nonfamily abduction. Thus the rates are presented in a fashion that is horribly overstated.

Lenore Skenazy has made an accidental career out of the remarkable idea that kids can make good decisions on their own most of the times, and that parents and children shouldn't live in fear. Called the "world's worst mom" after **writing about** letting her then 9-year-old son take the subway in New York City a short distance home by herself, she now wears this as a badge of honor. **A reality TV show with that name** just launched on January 22 on the Discovery Life Channel.

Skenazy says that an instinct of overcaution has been instilled in us. "We can't really go by instinct anymore, because our instinct has been corrupted by our media culture," she says. Because terrible stories about children are constantly in front of us, it inflates the perceived risk.

She calls the current attitude "worst first thinking": thinking up the worst-case scenario as the knee-jerk response to any situation, rather than a reasonable evaluation of the actual risk. "We're not allowed to make any distinctions between likely and unlikely."

There's also plenty of urban myth, that picks up where the media ends, or that media amplifies. Joel Best, a professor of sociology and criminology at the University of Delaware, **has been tracking since 1985** the myth of "Halloween Sadism": reports that people poison Halloween candy or put

AR-00002498

pins or razor blades in items handed out. It has, essentially, no basis — he has found no substantiated case — but persists, nonetheless.

## Thought Crime

People send Skenazy their stories and media clippings of law-enforcement overreactions, some of which bubble up to national coverage. (Skenazy writes for the libertarian publication *Reason*.) She cites **an appeals court decision** in January 2014 in New Jersey which upheld the conviction of a mother for leaving her 19-month-old child asleep in a car for 5 to 10 minutes while she shopped.

The judge writing for the appeals panel cited a variety of potential risks: "... on a hot day, the temperature inside a motor vehicle can quickly spike to dangerously high levels, just as it may rapidly and precipitously dip on a cold night."

But the day wasn't hot, it wasn't night, and the child was never in danger. The decision left open the potential for any parent to be criminally charged and convicted for leaving a child in a car up to the age of 17, as the appeals court provided no cut-off date nor other parameters. It also thought because the task wasn't urgent, that more imaginary danger should have been considered. "Because she wasn't fantasizing, she was guilty," says Skenazy.

Many states have laws that mandate the age at which a child may be left alone at home or in a car (and the duration, among other factors), or provide such broad guidance that even if it's within the law, a child could be put in foster care and a parent arrested.

**In Texas**, leaving a child under seven without someone 14 or over in a car for over five minutes, is a Class C misdemeanor ($500 fine, no jail time). Texas has no rules about the age at which a kid can be left at home alone, but its definition of "neglectful supervision" includes not just "bodily injury" but "substantial risk of immediate harm to the child." This leaves an awful lot of latitude for enforcement, which we've seen in practice errs towards worst first thinking.

Skenazy says there's secondary effect, too. Parents who might otherwise make sensible choices about their kids' capabilities must also factor in the worst first thinking of neighbors and strangers. "They imagine that the authorities are using that criteria when they are making a decision about your parenting," and that results in calls to protective services and the police for behavior that isn't dangerous or unreasonable.

While the legal side remains tricky, Skenazy says parents' attitudes can be changed. For her TV show, producers received submissions from 2,000 families and picked the most-anxious 13, including a mother who still spoon fed her older child and an 8-year-old only allowed to stand on a skateboard on his front lawn. Another couple accompanied their children next door to the kids' grandparents.

She spent a few afternoons with the kids without their parents, and they bloomed. But even better, "It changes the parents utterly, completely, and forever, once the kids do something on their own. What looked like bone-deep fear, that even I — I wondered why am I here and not a psychiatrist? It's socially imposed." This gives her hope.

*In the second part of this two-article series, I will address the misuse of statistics around child and adult sex trafficking.*

Photo: **Shutterstock**

AR-00002499

SHARE / TWEET / 89 COMMENTS

CHILDREN / POLITICS / RIGHTS / RISK / SAFETY / STATISTICS

GET THE BOING BOING NEWSLETTER

email address

☐ Ok to Email?        Subscribe

## Attendees at Trump's Pos Party have to sign contract agreeing they might get Covid there

NBC News correspondent Kelly O' Donnell posted the waiver that attendees to Trump's forthcoming events have to agree to. It absolves Trump's campaign of responsibility if you get Covid at them, a likelihood given that the president and many of his aides were recently diagnosed and are not out of the woods.

**READ THE REST**

## Huge Pew poll puts Biden ahead by double digits and it's the best news Trump's had in days

AR-00002500

A large-sample poll from respected pollster Pew Research shows Joe Biden trouncing Donald Trump by more than 10 points. But this is a relatively slim lead compared to other recent polls, says the New York Times' Nate Cohn, such is the dire state of Trump's campaign. If this strikes you as comical or ridiculous, the...

**READ THE REST**

## Second presidential debate to be virtual; Trump says he won't turn up.

Following Donald Trump's Covid diagnosis, the nonpartisan Commission on Presidential Debates has announced that his second face-off with Joe

AR-00002501

Biden would be virtual. Trump, however, says that he won't turn up. "I'm not
going to waste my time on a virtual debate" with Biden, Trump told Fox
News, moments after the Commission on Presidential Debates...

**READ THE REST**

## All these Funko Pops collectibles are on sale right now

If you've never heard of Funko Pops...well, you need to get out more. Over
the past 10 years, Funko has swept into the world of collectibles and taken
over the place, all thanks to their ultra-cute, ultra-chaseable not-quite-
action-figures, not-quite-dolls known as Funko Pops. From film and TV
characters to comic heroes and animation stars, to...

**READ THE REST**

## Here are 20 amazing offers for 10.10 Day that are on sale for an extra 20 percent off

AR-00002502

About a decade ago, e-commerce giant Alibaba supercharged an entire day
on the Chinese calendar. November 11 became known as Singles Day, a
celebration of being single, back in the 90s, but when Alibaba turned the
date into a chance for singles to buy cool stuff for themselves at Black
Friday level prices, the new...

**READ THE REST**

## Get this bundle of masterclasses on web development for just $35

In the wake of the COVID-19 pandemic, America's workforce has radically
changed — and likely, for good. Now, almost 40 percent of Americans,

AR-00002503

almost 59 million workers, are freelancers.  And they aren't all just barely
scraping by. Many are thriving. In fact, there are many freelancers making
$80,000 or more a year working for themselves....

**READ THE REST**

Read the rules you agree to by using this website          **Mark Frauenfelder**
in our **Terms of Service**.                               **David Pescovitz**
                                                           **Xeni Jardin**
                                                           **Rob Beschizza**
                                                           **Carla Sinclair**
We are a participant in the Amazon Services LLC            Editors
Associates Program, an affiliate advertising
program designed to provide a means for us to              **Jason Weisberger**
earn fees by linking to Amazon.com and affiliated          Publisher
sites.

Boing Boing uses cookies and analytics trackers,          **Ken Snider**
and is supported by advertising, merchandise              Sysadmin
sales and affiliate links. Read about what we do
with the data we gather in our **Privacy Policy**.         **About Us**
                                                           **Contact Us**
Who will be eaten first? Our forum rules are               **Advertise**
detailed in the **Community Guidelines**.                  **Forums**
                                                           **Shop**
Boing Boing is published under **a Creative**              **Report a Bad Ad**
**Commons license** except where otherwise noted.          **Shop Support**

AR-00002504

## Fact-checking registered sex offender information

By Sandy . . . WFMJ21 has reported on how the Trumbull County Sheriff's Department has conducted a random, county-wide check on its residents who are on Ohio's sex offense registry.

Perhaps inspired by the current political climate, I would like to respond to this piece in the way of fact-checking.

"Hundreds of sex offenders live among us across the valley." False. Quite possibly thousands of sex offenders live across the valley. The number is unknown because between 95 and 96% of sexual crime being committed is by those who are unknown to law enforcement. A correct statement would be hundreds of persons required to register as sexual offenders live among us across the valley.

Several paragraphs, either explicitly or implicitly, say that these law enforcement sweeps are what keep those on the registry from reoffending. This too is false. A plethora of studies have been done showing that sex offender registries and their resulting law enforcement activity are ineffective as a public safety tool. This is true in jurisdictions where little to no checking on registrants is done as well as in Trumbull County.

"Deputies say their biggest fear is that an offender out of prison could re-offend." Perhaps if deputies knew the statistics and the facts about child sexual offending, they would realize that their "biggest fear" is misplaced. The rate of reoffense for registrants across the board averages 5.3% according to the most comprehensive governmental study done of this nature, and additional studies show this figure has held steady for many years, both before registries were implemented and after.

"[Deputy] Molinatto would like to think that enforcement is helping to drive down the total number of offenders in the county." What does this mean? Drive persons on the registry from the county? That is what it sounds like, and that sounds suspiciously like an attempt at banning.

WFMJ reports, "The unit sees a variety of cases that sometimes can involve someone a parent thought they could trust." This gets only one Pinocchio. A change from "sometimes can involve" to "almost always does involve" tells a more accurate story. The statistics on this correlate nicely with those showing that 95-96% of offenders are not on the registry. The stereotypical stranger hiding behind the bushes waiting to grab a child from the park has been totally debunked. Child sex offenders are family members, peers, and authority figures, and these crimes are almost always committed indoors, often in the victims' homes. This chart, compiled from FBI figures on juvenile justice, shows the reality of who child sex offenders are.

Sheriff Monroe's narrative about child's toys and coloring books being a tip-off that a registered person is reoffending furthers the impression to the reading public that everyone on the registry is a child sex offender out to get their children. How many of those identified as "sex offenders" are on the registry because they were 18 years old with 15-year-old girlfriends or boyfriends? How many are young adults whose convictions are the result of a

AR-00002505

teenager lying about her – or possibly his — age? How many were actually innocent and are victims of either mistaken identity or malicious lying? How many had an adult victim and no predisposition whatsoever to children?

And how many of the coloring books and toys belong to the children or grandchildren of the registrant?

From beginning to end, this piece shows a serious need for the Trumbull County Sheriff's Department and WFMJ to do some research into the topics of sexual offenders and the sex offender registry. Then they can provide their reading public with facts that can help them protect their children from harm.

AR-00002506

NCJRS Abstract - National Criminal Justice Reference Service    https://www.ncjrs.gov/App/Publications/Abstract.aspx?id=264128





# PUBLICATIONS

**Stay Informed**
**Register with NCJRS** to receive NCJRS's biweekly e-newsletter JUSTINFO and additional periodic emails from NCJRS and the NCJRS federal sponsors that highlight the latest research published or sponsored by the Office of Justice Programs.



## NCJRS Abstract

The document referenced below is part of the NCJRS Virtual Library collection. To conduct further searches of the collection, visit the **Virtual Library** . See the **Obtain Documents** page for direction on how to access resources online, via mail, through interlibrary loans, or in a local library.

1 record(s) found

| | |
|---|---|
| **NCJ Number:** | 241966   FIND IN A LIBRARY |
| **Title:** | Taking Stock of 20 Years of Sex Offender Laws and Research: An Examination of Whether Sex Offender Legislation has Helped or Hindered Our Efforts |
| **URL(s):** | HTML |
| **Journal:** | *Journal of Crime and Justice*  Volume:35  Issue:3  Dated:November 2012  Pages:335-355 |
| **Author(s):** | Laura M. Ragusa-Salerno; Kristen M. Zgoba |
| **Date Published:** | November 2012 |
| **Annotation:** | This study examined the effectiveness of a variety of sexual offender laws passed between the two decades of 1990 and 2010. |
| **Abstract:** | The present study adds to the existing empirical literature on sex offending by examining the effectiveness of a variety of sexual offender laws passed between the two decades of 1990 and 2010. This study used a sample of 1,129 sexual offenders released from New Jersey State correctional facilities during these two decades of legislative focus. Specific attention is paid to the four common themes of the legislation, including sexual offender registration and notification, civil commitment, residence restrictions, and risk designation. When each law is analyzed using its specific purpose and application process, and then compared to a sample of sex offense cases, it becomes apparent that the laws do not apply to a wide percentage of sex offense cases. The researchers conclude that the laws have little preventive capability. The implications of this finding are discussed. Abstract published by arrangement with Taylor and Francis. |
| **Main Term(s):** | Criminology |
| **Index Term(s):** | Legislation; NIJ grant-related documents; Recidivism; Sex offenders |
| **Sponsoring Agency:** | National Institute of Justice (NIJ) Washington, DC 20531 |
| **Page Count:** | 21 |
| **Format:** | Article |
| **Type:** | Report (Study/Research) |
| **Language:** | English |
| **Country:** | United States of America |

**To cite this abstract, use the following link:**
  **http://www.ncjrs.gov/App/publications/abstract.aspx?ID=264128**

*A link to the full-text document is provided whenever possible. For documents not available online, a link to the publisher's website is provided. Tell us how you use the NCJRS Library and Abstracts Database - send us your **feedback** .

---

**Office of Justice Programs**
- Bureau of Justice Assistance
- Bureau of Justice Statistics
- National Institute of Justice
- Office for Victims of Crime
- Office of Juvenile Justice and Delinquency Prevention
- Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking

Contact Us | Feedback | Site Map
Freedom of Information Act | Privacy Statement | Legal Policies and Disclaimers
USA.gov | CrimeSolutions
Department of Justice | Office of Justice Programs

AR-00002507

who_are_the_offenders-jpg.jpg (JPEG Image, 2101 × 1288 pixel...          https://narsol.org/wp-content/uploads/2019/07/who_are_the_of...



10/10/20, 3:16 PM

AR-00002508

ADVANCE FOR RELEASE AT 4:30 P.M. EST

SUNDAY, NOVEMBER 16, 2003

**Bureau of Justice Statistics**
**Contact: Stu Smith 202-307-0784**
**After hours: 301-983-9354**

# 5 PERCENT OF SEX OFFENDERS REARRESTED FOR ANOTHER SEX CRIME WITHIN 3 YEARS OF PRISON RELEASE

WASHINGTON, D.C.—Within 3 years following their 1994 state prison release, 5.3 percent of sex offenders (men who had committed rape or sexual assault) were rearrested for another sex crime, the Justice Department's Bureau of Justice Statistics (BJS) announced today. If all crimes are included, 43 percent of sex offenders were rearrested for various offenses.

Sex offenders were less likely than non-sex offenders to be rearrested for any offense—43 percent of sex offenders versus 68 percent of non-sex offenders. But sex offenders were about four times more likely than non-sex offenders to be arrested for another sex crime after their discharge from prison—5.3 percent of sex offenders versus 1.3 percent of non-sex offenders.

Sex offenders with the highest rate of rearrest for another sex offense were those who had a history of prior arrests for various crimes. While 3.3 percent of sex offenders with one prior arrest were arrested for another sex crime after their release, that percentage more than doubled (7.4 percent) for those with 16 or more prior arrests for different types of crimes. Of the released sex offenders who allegedly committed another sex crime, 40 percent perpetrated the new offense within a year or less from their prison discharge.

Of the almost 9,700 sex offenders released in 1994, nearly 4,300 were identified as child molesters. An estimated 3.3 percent of the 4,300 released child molesters were rearrested for another sex crime against a child within 3 years. Most of the children they were alleged to have molested after leaving prison were age 13 or younger.

Other BJS surveys have shown that 70 percent of all men in prison for a sex crime were men whose victim was a child. In almost half of the child-victim cases, the child was the prisoner's own son or daughter or other relative.

The average sentence imposed on the 9,700 sex offenders was 8 years and, on average, 3 1/2 years of those 8 years were actually served prior to release. The average sentence imposed on the 4,300 child molesters was approximately 7 years and, on average, child molesters were released after serving 3 of the 7 years.

Of the released sex offenders, 3.5 percent were reconvicted for a sex crime within the 3-year follow-up period, 24 percent were reconvicted for any new offense and 38.6 percent were returned to prison, either because they received another prison sentence or because of a parole violation.

Of the 9,700 sex offenders, 67 percent were white males and 32 percent were black males. The percentage rearrested for another sex crime after their release was 5.3 percent of white males and 5.6 percent of black males.

Half of the 9,700 sex offenders were over the age of 35 when released. Recidivism studies typically find that the older the prisoner when released, the lower the rate of recidivism. However, although this study did find the lowest rearrest for a sex crime (3.3 percent) did belong to the oldest sex offenders -- 45 years old and older -- other age group comparisons were inconsistent. The percentage rearrested for another sex crime after their release was 6.1 percent of those ages 18-24, 5.5 percent of those ages 25-29, 5.8 percent of those ages 30-34, 6.1 percent of those ages 35-39, 5.6 percent of those ages 40-44 and 3.3 percent of those ages 45 or older.

For 85 percent of those sex offenders who were arrested for another sex crime, the arrest occurred in the same state that released them. For the remaining 15 percent, the arrest was in a different state.

The data are from a study that documented levels of recidivism among all 272,111 men and women released from state prisons in 15 states in 1994. The 272,111 included 9,691 male sex offenders. The 9,691 are two-thirds of all the male sex offenders released from state prisons in the United States in 1994. The study represents the largest followup ever conducted of convicted sex offenders following discharge from prison and provides the most comprehensive assessment of their behavior after release. The report, "Recidivism of Sex Offenders Released from Prison in 1994" (NCJ-198281), was written by BJS statisticians Patrick A. Langan, Erica L. Schmitt and Matthew R. Durose. Single copies may be obtained by calling the BJS Clearinghouse at 1-800-851-3420. Following publication this document can be accessed at:

http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=1136

For additional information about Bureau of Justice Statistics reports and programs, please visit the BJS Web site at:

http://bjs.ojp.usdoj.gov/

The Office of Justice Programs (OJP) provides federal leadership in developing the nation's capacity to prevent and control crime, administer justice, and assist crime victims. OJP is headed by an Assistant Attorney General and comprises 5 component bureaus and 2 offices: the Bureau of Justice Assistance, the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, and the Office for Victims of Crime, as well as the Executive Office for Weed and Seed and the Office of the Police Corps and Law Enforcement Education. Information about OJP programs, publications, and conferences is available on the OJP Web site, www.ojp.usdoj.gov.

# # #

BJS03123

AR-00002509

NCJRS Abstract- National Criminal Justice Reference Service

https://www.ncjrs.gov/App/Publications/Abstract.aspx?id=264128





## PUBLICATIONS

**Stay Informed**
**Register with NCJRS** to receive NCJRS's biweekly e-newsletter JUSTINFO and additional periodic emails from NCJRS and the NCJRS federal sponsors that highlight the latest research published or sponsored by the Office of Justice Programs.



### NCJRS Abstract

The document referenced below is part of the NCJRS Virtual Library collection. To conduct further searches of the collection, visit the **Virtual Library** . See the **Obtain Documents** page for direction on how to access resources online, via mail, through interlibrary loans, or in a local library.

1 record(s) found

**NCJ Number:** 241966   FIND IN A LIBRARY

**Title:** Taking Stock of 20 Years of Sex Offender Laws and Research: An Examination of Whether Sex Offender Legislation has Helped or Hindered Our Efforts

**URL(s):** HTML

**Journal:** *Journal of Crime and Justice*  Volume:35  Issue:3  Dated:November 2012  Pages:335-355

**Author(s):** Laura M. Ragusa-Salerno; Kristen M. Zgoba

**Date Published:** November 2012

**Annotation:** This study examined the effectiveness of a variety of sexual offender laws passed between the two decades of 1990 and 2010.

**Abstract:** The present study adds to the existing empirical literature on sex offending by examining the effectiveness of a variety of sexual offender laws passed between the two decades of 1990 and 2010. This study used a sample of 1,129 sexual offenders released from New Jersey State correctional facilities during these two decades of legislative focus. Specific attention is paid to the four common themes of the legislation, including sexual offender registration and notification, civil commitment, residence restrictions, and risk designation. When each law is analyzed using its specific purpose and application process, and then compared to a sample of sex offense cases, it becomes apparent that the laws do not apply to a wide percentage of sex offense cases. The researchers conclude that the laws have little preventive capability. The implications of this finding are discussed. Abstract published by arrangement with Taylor and Francis.

**Main Term(s):** Criminology

**Index Term(s):** Legislation; NIJ grant-related documents; Recidivism; Sex offenders

**Sponsoring Agency:** National Institute of Justice (NIJ)
Washington, DC 20531

**Page Count:** 21

**Format:** Article

**Type:** Report (Study/Research)

**Language:** English

**Country:** United States of America

To cite this abstract, use the following link:
 **http://www.ncjrs.gov/App/publications/abstract.aspx?ID=264128**

*A link to the full-text document is provided whenever possible. For documents not available online, a link to the publisher's website is provided. Tell us how you use the NCJRS Library and Abstracts Database - send us your **feedback** .

**Office of Justice Programs**
- Bureau of Justice Assistance
- Bureau of Justice Statistics
- National Institute of Justice
- Office for Victims of Crime

- Office of Juvenile Justice and Delinquency Prevention
- Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking

Contact Us | Feedback | Site Map
Freedom of Information Act | Privacy Statement | Legal Policies and Disclaimers
USA.gov | CrimeSolutions
Department of Justice | Office of Justice Programs

AR-00002510





## "Stranger Danger" to children vastly overstated

**GLENN FLEISHMAN** / **5:00 AM TUE FEB 24, 2015**

Oft-cited stats about child abduction puts kidnappers behind every bush. But the numbers are old and frequently mangled, distorting our understanding of genuine risks to children.

As a parent of two young children, it's my job to keep them healthy, safe, and happy. But I'm not at all worried they're going to be snatched off the street. Why? Because oft-spread claims that that 800,000 children are reported missing each year—with 300,000 children estimated to be sexually trafficked—are outdated or simply wrong.

### Abduction Rates Overstated and Outdated

The commonly cited "800,000" number is from a **2002 study** of 1999 data. This information is widely misstated, and the data hasn't been updated in the era of ubiquitous mobile access and Amber Alerts. The National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children (NISMART) surveyed about 16,000 adults, examined a subset of law-enforcement agencies (roughly 25% of the total), and a sampling of juvenile facilities, including detention and treatment centers. No comprehensive study or survey of this scope has since been conducted in America.

The report has two "big" numbers. The 800,000 figure refers to the number of children reported lost to law enforcement or missing children's agencies, and was considered a much more reliable count. A second number, 1.3 million children, was based on estimates and interpolations, and counts when caretakers didn't know where kids were for more than a brief period. In 1999, there were **72 million minors** in America; there are about 74 million today.

AR-00002511

But despite the report's clear tone and explanation, and even a well-written FAQ at the National Center for Missing & Exploited Children, these top-level numbers are typically cited as the rate at which children are plucked unsuspecting by strangers on their way to and from school or in other environments.

In fact, the true risk from people children don't know or who are "slight acquaintances" is extremely slim. As with most crime and violence, children are exposed to the greatest risk either because of family members or their own choices.

Even though the report is 13 years old and covering 16-year-old data, it's worth walking through its numbers, because they are the ones you'll see cited even now in newspaper stories, magazine articles and cable TV segments. (If you add some of the numbers below, you'll see some total percentages above 100 because some kids fit multiple categories in a single year.)

About the half of missing children — reported or otherwise — are runaways (their choice) or throwaways (kicked out without a place to go). These kids are at high risk of violence and various forms of exploitation, although the latter risk is overstated, as I'll get to in a later article.

Most of the rest of the reports and estimates fall into "benign explanation" (43% of reported), in which the child isn't missing, but a caretaker thought they were. Another good-sized chunk, 8% of reported, are kids who were lost or injured — not intentionally missing and no other party was responsible. The number of custodial violations, in which a family member takes a child away without permission (involving force if aged 15 to 17), is nearly 120,000 (9%) from the survey estimates and 57,000 of the reported cases (7%).

That leaves the category that one should ostensibly actually worry about: nonfamily abductions, in the terms of the study. Nonfamily abductions include those who the child knows, like a former but non-related domestic partner of a parent, a teacher, a neighbor, and so on, as well as strangers. The definition includes taking a child of any age without permission for more than an hour through a threat of violence or actual harm. For kids 15 or younger, harm or threats aren't required, but an intent of concealing the child's whereabouts, holding the kid for ransom, or expressing "the intention to keep the child permanently" is necessary.

The study found 12,000 children reported missing in this category (2%) and 33,000 from the broader estimate (3%). The larger 33,000 figure represents about 5 children out of 10,000, although both figures need additional scrutiny. (The report doesn't look at harm caused during abduction, such as sexual assault or other injuries.)

Stereotypical kidnapping, however, is a more a strictly typed subset, and it's the bogeyman in every parents' dreams. The report categorizes it as:

> ...when a stranger or slight acquaintance perpetrates a nonfamily abduction in which the child is detained overnight, transported at least 50 miles, held for ransom, abducted with intent to keep the child permanently, or killed.

Of nonfamily abductions, just 115 children (90 reported) in 1999 were estimated to fit a stereotypical kidnapping by a stranger or slight acquaintance. Forty of those were killed. That's 1 child out of every 750,000 kidnapped, and 1 out of about every 2 million killed.

AR-00002512

Of all children reported missing (whether the estimate or based on reports), 99.8% were returned home or located; the remaining number were virtually all runaways.

Family, through noncustodial abduction or kicking a child out; a child's own action as a runaway, for whatever cause and for whatever duration; and accidents are most of these reports. All of these problems can be mitigated by various means, but none of them fit into our picture of not letting a kid walk down the street because she or he will be snatched.

## Every 40 Seconds, a Statistic Is Misused

You wouldn't know any of this from reading typical parental advice regarding stranger danger. *Parents* magazine **offers a rundown of abduction danger** that states, "Every 40 seconds in the United States, a child becomes missing or is abducted."

This is seemingly accurate, but the lead in is, "The first step in protecting your child from potential abductors is to know what you're dealing with." Given that a sliver of the problem are classical abductors, it's hard to see how this helps.

*Parents* magazine notes:

> Only about one child out of each 10,000 missing children reported to the local police is not found alive. However, about 20 percent of the children reported to the National Center for Missing and Exploited Children in nonfamily abductions are not found alive.

The first number appears to be accurate, but only 1 in 100 children are reported missing each year. Further, the 20% figure isn't sourced, and the center doesn't claim that number. Rather, in its FAQ it points to a 1997 report (mislabeled as from 2006) that doesn't quite claim that, either. And by the definition of the NISMART study cited earlier, the rate of death relates to stereotypical kidnappings, not the broader nonfamily abduction. Thus the rates are presented in a fashion that is horribly overstated.

Lenore Skenazy has made an accidental career out of the remarkable idea that kids can make good decisions on their own most of the times, and that parents and children shouldn't live in fear. Called the "world's worst mom" after **writing about** letting her then 9-year-old son take the subway in New York City a short distance home by herself, she now wears this as a badge of honor. **A reality TV show with that name** just launched on January 22 on the Discovery Life Channel.

Skenazy says that an instinct of overcaution has been instilled in us. "We can't really go by instinct anymore, because our instinct has been corrupted by our media culture," she says. Because terrible stories about children are constantly in front of us, it inflates the perceived risk.

She calls the current attitude "worst first thinking": thinking up the worst-case scenario as the knee-jerk response to any situation, rather than a reasonable evaluation of the actual risk. "We're not allowed to make any distinctions between likely and unlikely."

There's also plenty of urban myth, that picks up where the media ends, or that media amplifies. Joel Best, a professor of sociology and criminology at the University of Delaware, **has been tracking since 1985** the myth of "Halloween Sadism": reports that people poison Halloween candy or put

AR-00002513

pins or razor blades in items handed out. It has, essentially, no basis — he
has found no substantiated case — but persists, nonetheless.

## Thought Crime

People send Skenazy their stories and media clippings of law-enforcement
overreactions, some of which bubble up to national coverage. (Skenazy
writes for the libertarian publication *Reason*.) She cites **an appeals court
decision** in January 2014 in New Jersey which upheld the conviction of a
mother for leaving her 19-month-old child asleep in a car for 5 to 10
minutes while she shopped.

The judge writing for the appeals panel cited a variety of potential risks: "...
on a hot day, the temperature inside a motor vehicle can quickly spike to
dangerously high levels, just as it may rapidly and precipitously dip on a
cold night."

But the day wasn't hot, it wasn't night, and the child was never in danger.
The decision left open the potential for any parent to be criminally charged
and convicted for leaving a child in a car up to the age of 17, as the appeals
court provided no cut-off date nor other parameters. It also thought because
the task wasn't urgent, that more imaginary danger should have been
considered. "Because she wasn't fantasizing, she was guilty," says Skenazy.

Many states have laws that mandate the age at which a child may be left
alone at home or in a car (and the duration, among other factors), or
provide such broad guidance that even if it's within the law, a child could be
put in foster care and a parent arrested.

**In Texas**, leaving a child under seven without someone 14 or over in a car
for over five minutes, is a Class C misdemeanor ($500 fine, no jail time).
Texas has no rules about the age at which a kid can be left at home alone,
but its definition of "neglectful supervision" includes not just "bodily injury"
but "substantial risk of immediate harm to the child." This leaves an awful
lot of latitude for enforcement, which we've seen in practice errs towards
worst first thinking.

Skenazy says there's secondary effect, too. Parents who might otherwise
make sensible choices about their kids' capabilities must also factor in the
worst first thinking of neighbors and strangers. "They imagine that the
authorities are using that criteria when they are making a decision about
your parenting," and that results in calls to protective services and the police
for behavior that isn't dangerous or unreasonable.

While the legal side remains tricky, Skenazy says parents' attitudes can be
changed. For her TV show, producers received submissions from 2,000
families and picked the most-anxious 13, including a mother who still spoon
fed her older child and an 8-year-old only allowed to stand on a skateboard
on his front lawn. Another couple accompanied their children next door to
the kids' grandparents.

She spent a few afternoons with the kids without their parents, and they
bloomed. But even better, "It changes the parents utterly, completely, and
forever, once the kids do something on their own. What looked like bone-
deep fear, that even I — I wondered why am I here and not a psychiatrist?
It's socially imposed." This gives her hope.

*In the second part of this two-article series, I will address the misuse of statistics
around child and adult sex trafficking.*

Photo: **Shutterstock**

AR-00002514

SHARE / TWEET / 89 COMMENTS

CHILDREN / POLITICS / RIGHTS / RISK / SAFETY / STATISTICS

GET THE BOING BOING NEWSLETTER

email address

☐ Ok to Email?    Subscribe

## Attendees at Trump's Pos Party have to sign contract agreeing they might get Covid there

NBC News correspondent Kelly O' Donnell posted the waiver that attendees to Trump's forthcoming events have to agree to. It absolves Trump's campaign of responsibility if you get Covid at them, a likelihood given that the president and many of his aides were recently diagnosed and are not out of the woods.

**READ THE REST**

## Huge Pew poll puts Biden ahead by double digits and it's the best news Trump's had in days

AR-00002515

A large-sample poll from respected pollster Pew Research shows Joe Biden trouncing Donald Trump by more than 10 points. But this is a relatively slim lead compared to other recent polls, says the New York Times' Nate Cohn, such is the dire state of Trump's campaign. If this strikes you as comical or ridiculous, the...

**READ THE REST**

## Second presidential debate to be virtual; Trump says he won't turn up.

Following Donald Trump's Covid diagnosis, the nonpartisan Commission on Presidential Debates has announced that his second face-off with Joe

AR-00002516

Biden would be virtual. Trump, however, says that he won't turn up. "I'm not
going to waste my time on a virtual debate" with Biden, Trump told Fox
News, moments after the Commission on Presidential Debates...

**READ THE REST**

## All these Funko Pops collectibles are on sale right now

If you've never heard of Funko Pops...well, you need to get out more. Over
the past 10 years, Funko has swept into the world of collectibles and taken
over the place, all thanks to their ultra-cute, ultra-chaseable not-quite-
action-figures, not-quite-dolls known as Funko Pops. From film and TV
characters to comic heroes and animation stars, to...

**READ THE REST**

## Here are 20 amazing offers for 10.10 Day that are on sale for an extra 20 percent off

AR-00002517

About a decade ago, e-commerce giant Alibaba supercharged an entire day
on the Chinese calendar. November 11 became known as Singles Day, a
celebration of being single, back in the 90s, but when Alibaba turned the
date into a chance for singles to buy cool stuff for themselves at Black
Friday level prices, the new...

**READ THE REST**

## Get this bundle of masterclasses on web development for just $35

In the wake of the COVID-19 pandemic, America's workforce has radically
changed — and likely, for good. Now, almost 40 percent of Americans,

AR-00002518

almost 59 million workers, are freelancers.  And they aren't all just barely
scraping by. Many are thriving. In fact, there are many freelancers making
$80,000 or more a year working for themselves....

**READ THE REST**

Read the rules you agree to by using this website
in our **Terms of Service**.

We are a participant in the Amazon Services LLC
Associates Program, an affiliate advertising
program designed to provide a means for us to
earn fees by linking to Amazon.com and affiliated
sites.

Boing Boing uses cookies and analytics trackers,
and is supported by advertising, merchandise
sales and affiliate links. Read about what we do
with the data we gather in our **Privacy Policy**.

Who will be eaten first? Our forum rules are
detailed in the **Community Guidelines**.

Boing Boing is published under **a Creative
Commons license** except where otherwise noted.

**Mark Frauenfelder**
**David Pescovitz**
**Xeni Jardin**
**Rob Beschizza**
**Carla Sinclair**
Editors

**Jason Weisberger**
Publisher

**Ken Snider**
Sysadmin

**About Us**
**Contact Us**
**Advertise**
**Forums**
**Shop**
**Report a Bad Ad**
**Shop Support**

AR-00002519

# 'Why the Innocent Plead Guilty': An Exchange

**Nancy Gertner**, **Bruce Brower**, and **Paul Shechtman**, reply by **Jed S. Rakoff**
JANUARY 8, 2015 ISSUE

**In response to:**

**Why Innocent People Plead Guilty** from the November 20, 2014 issue

*To the Editors*:



*'The Two Lawyers'; painting by Honoré Daumier*

Judge Jed S. Rakoff's article "Why Innocent People Plead Guilty" [*NYR*, November 20, 2014] is spot on, but doesn't go far enough. True, we have a federal plea system, not a trial system. True, to call the process "plea bargaining" is a cruel misnomer. There is nothing here remotely like fair bargaining between equal parties with equal resources or equal information. The prosecutors' power—as Judge Rakoff describes—is extraordinary, far surpassing that of prosecutors of years past, and in most cases, far surpassing the judge's. Judge John Gleeson, a federal judge of the Eastern District of New York, made this clear during a case involving a charge for which there is a mandatory minimum sentence.[1] As a result of the prosecutor's decision to charge the defendant with an offense for which there is a mandatory minimum sentence, no judging was going on about the sentence. The prosecutor sentenced the defendant, not the judge, with far less transparency and no appeal.

Indeed, there were times during my seventeen-year tenure on the federal bench in Massachusetts that inquiring of a defendant as to the voluntariness of his guilty plea felt like a Kabuki ritual. "Has anyone coerced you to plead guilty," I would ask, and I felt like adding, "like thumbscrews or waterboarding? Anything less than that—a threatened tripling of your sentence should you go to trial, for example—doesn't count."

It is true too, in view of such threats of long terms in prison, that there is a strong possibility that the innocent may plead guilty. It may well be a rational calculation, given the penalty of going to trial, for there is clearly such a penalty. The prosecutor typically induces a plea by offering a "carrot," the lesser charge, and at the same time a gigantic "stick." It is not simply that he may well tack on additional charges enabling mandatory or even consecutive punishments, should the defendant go to trial. He also can threaten that he will introduce evidence of uncharged conduct at the sentencing, or even evidence of counts for which the defendant was acquitted, so long as the defendant is convicted of something. No other common law country in the world enables the prosecutor to seek a sentence based on criminal conduct never charged, never subject to adversary process, never vetted by a grand jury or a jury, or worse, charges for which the defendant was acquitted.

AR-00002520

Under the Federal Sentencing Guidelines introduced in 1984, such alleged conduct by the defendant can "count" toward a higher sentence, as evidence of additional "loss" in a white-collar case or quantity in a drug case. It can substantially increase the sentence, an effect unheard of in other, nonfederal jurisdictions, and indeed, unheard of before the passage of the guidelines. (Prior to the guidelines a judge could have considered uncharged or even acquitted conduct generally, but it did not have the same serious consequences in the post–mandatory minimum, post-guideline era in which a specific quantity of drugs or a specific amount of criminally obtained money, or both, almost exclusively drive the sentence.)

Whatever we call them, the prosecutor's tactics impose very serious penalties for going to trial, for choosing to have a jury decide your fate, or even for challenging unconstitutional conduct. In fact, the guidelines encourage rushing to the prosecutor to plea bargain as soon as possible, before your codefendants do.

I retired from the bench in September 2011, after seventeen years. Prior to that, I had been a criminal defense lawyer. I am back in practice (among other activities like teaching and writing). I can see how the defense of federal criminal cases has changed. Do you risk challenging this unconstitutional system when it may mean that the more compliant—perhaps more culpable—defendants get a better deal? Do you risk litigating the case in the face of the trial penalty that could well double or triple a defendant's sentence?

Remember Aaron Swartz, the twenty-six-year-old Internet prodigy accused of wire fraud and violations of the Computer Fraud and Abuse Act who committed suicide after being offered a choice between a plea of guilty with a six-month sentence or a trial in which he risked a seven-year sentence under the guidelines if found guilty. Then there is the case of Kevin Ring, a lobbyist for Jack Abramoff, who was convicted at trial. Abramoff, the conceded ringleader, pled guilty and got four years. Offered a deal with no prison time if he cooperated, Ring refused, taking the case to trial. After a trial finding him guilty, the prosecutor urged a seventeen-to-twenty-two-year sentence, which the sentencing judge acknowledged could well have a "chilling effect" on the exercise of the right to a jury trial. Indeed, it is not just the innocent who may well plead guilty. It is also possible that claims of prosecutorial or police misconduct will not be litigated because of a rush to plead guilty.

The remedy Judge Rakoff proposes would help, namely, a review process before a magistrate judge. But the magistrate judge is not appointed for life; his tenure is limited to a term and dependent upon the decision of the federal district court he serves. How free will he be to probe the plea deal? How much information would he have? Often he is a former prosecutor—although as Judge Rakoff's judicial record suggests, that background does not predict a tilt toward the prosecutor.

Still, I am skeptical that anything will change unless there are changes in the structure of punishment, including the previously mentioned mandatory minimums and guidelines, as well as the ability of prosecutors to refer to uncharged or acquitted conduct at sentencing. I am skeptical that anything will meaningfully change until we reduce the weapons that the prosecutor brings to the bargaining table. I am skeptical unless the courts frankly characterize enhanced trial sentences for what they are, an improper penalty for going to trial, a substantial burden on the rights the Constitution provides. Without these changes, I fear that even review by the magistrate judge will become a Kabuki ritual.

AR-00002521

Judge Nancy Gertner
Harvard Law School
Cambridge, Massachusetts

***To the Editors***:

Jed S. Rakoff does an excellent job, first, of differentiating between criminal justice as conceived by most citizens and the plea system that dominates criminal courts throughout the US, and second, of describing how the current system unfairly leads innocent defendants to plead guilty. But his suggested solutions, of involving judges in the plea-bargaining process, or of using magistrates to oversee the process before the results are presented in court, are halfway measures that face two problems. The fundamental difference between criminal justice as the Founders intended it and criminal justice as currently practiced is that in the first, two opposing sides present a case before an independent decision maker (judge or jury) who operates with no bargaining interest, whereas in the current system, there is still bargaining instead of an independent judgment regarding guilt. Judge Rakoff's solution also maintains the bargaining, and while it may make the procedures fair by equalizing the power of prosecutors and defense attorneys, it would still lead innocent yet rational defendants to plead guilty.

That is the first problem. The second problem is purely economic. For a number of years, I led workshops in ethics and philosophy of law for local and state judges around the country. I always raised ethical problems with plea bargaining and I always received the same response: "I have too many cases to avoid plea bargaining." Of the hundred or so judges with whom I discussed the issue, only a couple had dockets of less than seven hundred, while many had a backlog of more than a thousand cases. We now try less than 10 percent of criminal cases. If we were to try every criminal case, we would need six or seven times the number of criminal judges we now have, along with new courtrooms and staff. Judge Rakoff's solution would not require as much, but involving judges or magistrates in every plea bargain would surely require two or more likely three times the number of judges or magistrates now on the bench. The public is unlikely to approve a doubling or tripling of court expenses.

I have no perfect solution, but it is very clear that if we eliminated excessively long sentences, legalized drug use, and decriminalized other drug offenses (along with some other crimes, such as shoplifting), we would give judges more time to try the important cases and allow plea bargaining only for cases involving short sentences or no felony record. The money we would save from reduced incarceration could then be used to increase the number of judges and courtrooms.

Bruce Brower
Associate Professor and
Chair of Philosophy
Tulane University
New Orleans, Louisiana

***To the Editors***:

Judge Jed S. Rakoff's article "Why Innocent People Plead Guilty" is accurate in its basic description of the failings of our criminal justice system: mandatory minimum sentences (indeed harsh sentencing laws generally) are used to coerce guilty pleas; defense lawyers are often at a distinct informational disadvantage; prosecutors, not judges, decide sentences in a high proportion of cases; and trials have all but vanished.

AR-00002522

Judge Rakoff's prescription is more judicial involvement in the plea-bargaining process. After arrest or indictment, a magistrate judge would meet separately with the parties, assess the strengths and weaknesses of the case, and make a recommendation—"dismiss the case…proceed to trial…or…enter into a plea bargain along lines the magistrate might suggest." The proceedings before the magistrate would be sealed, and "no party would be required to follow the magistrate's suggestions."

This dog won't hunt. Consider this simple case. A defendant is stopped at the airport after his conduct raises suspicion. A lawful search of the suitcase he is carrying reveals a pound of heroin hidden in a secret compartment. The defendant tells the arresting officer that an acquaintance asked him to bring the suitcase to New York and that he had no knowledge of the hidden compartment or its contents.

What happens before the magistrate in Judge Rakoff's proposed procedure? Does the defendant testify? Does the magistrate cross-examine him? Is the prosecutor obliged to provide the magistrate with materials that might impeach the defendant's credibility? Why would a prosecutor give the defendant a preview of her case? If the defendant exercises his constitutional right and declines to testify, how can the magistrate assess the strength of the case? Does "sealed" mean sealed? What if the magistrate learns that the defendant has changed his story at trial? Can the defendant (and prosecution witnesses) lie to the magistrate with impunity?

These questions—and one could raise many more—show that the proposal is almost certainly unworkable. There is, however, a more fundamental problem. As many criminal procedure scholars have observed, one reason that trials are so rare is that they have become so expensive. With the proliferation of defendants' rights, even a misdemeanor trial that once took a day can now take a week. Which is why in New York City, where I practice, there are none.

Sadly, simplifying our criminal justice system so that trials are fair and efficient is on no one's agenda. (As Judge Rakoff correctly notes, we also lack the political will to eliminate harsh sentences that make going to trial so perilous for so many defendants.) But adding more procedure is not the solution to our problems. Nonbinding reviews by magistrates would be a leap in the wrong direction.

Paul Shechtman
Zuckerman Spaeder, LLP
Adjunct Professor, Columbia Law School
New York City

**Jed S. Rakoff** *replies*:

It is gratifying that people as diverse as a former federal judge (Nancy Gertner), a former New York state director of criminal justice (Paul Shechtman), and a chair of a major university's philosophy department (Bruce Brower) all agree with my assessment of why the current criminal justice system unfairly coerces guilty pleas and effectively transfers sentencing power from judges to prosecutors. While they also seem to agree with me that eliminating mandatory minimum sentences and other harsh sentencing laws is the most direct solution, the writer with the most familiarity with the political process, Mr. Shechtman, acknowledges that, as I argued, this is unlikely to occur in the foreseeable future. A politician perceived as "soft on crime" is a politician who had better start looking for another job.

AR-00002523

The letter writers, however, are more skeptical that my fallback proposal—allowing judges to participate in the plea-bargaining process—is likely to be effective. I share their concerns that there are potential pitfalls in my proposal, which is why I suggested that it first be tried as a modest pilot project. Clearly, like most reforms in our criminal justice system, it would place some additional (though I think modest) demands on judicial resources. Nonetheless, I think that there are good reasons to think it would work.

First, an essentially analogous program that has proven very effective already exists in civil cases in the form of nonbinding mediation. In my own judicial district, for example, civil litigants regularly meet with magistrate judges or court-appointed mediators shortly after a case is filed and, in separate, confidential presentations to the mediator, describe their respective evidence and positions. The mediator then meets again with the parties separately and, based on what the mediator now knows about the underlying factual and legal positions, points out to the respective parties the pitfalls they each face.

As every mediator will tell you, it is not that the parties have been wholly unaware of these pitfalls in the past that makes mediation effective, but rather that the parties have never taken these shortcomings seriously because they were never previously described with the forcefulness and objectivity that a mediator brings. Duly shaken, the parties are now open to a settlement proposal from the mediator that they would have previously rejected out of hand. The result is that, in the overwhelming majority of cases, the mediator succeeds in settling the case voluntarily. In my proposed program, a judge or magistrate would, in effect, conduct a criminal case mediation. I do not agree with Judge Gertner that magistrate judges, appointed by the tenured judges in their district, would lack the will or independence necessary to serve as successful criminal mediators, and I think Mr. Shechtman's concern that the parties would be unwilling to share their proof with their adversaries is eliminated, as in all mediations, by having the parties meet separately with the mediator and present their proof on a confidential basis.

Prosecutors, in particular, would find their factual and legal contentions subject to a scrutiny wholly absent from current pretrial practice. In many cases, this would lead them to accept a recommended plea bargain far less onerous than those now obtained through their raw exercise of power. In some cases, they might even come to question whether they have charged the real culprit and whether, instead, the case should be dismissed. And in all cases, at a minimum, some modest degree of judicial scrutiny would be exercised over the only part of our criminal justice system that currently matters: the plea bargaining process.

Second, a program in some respects similar to what I recommend has, in fact, been in place in Connecticut for some years, where a judge is permitted to engage in fact-based plea bargaining as long as he or she does not preside over the subsequent trial if the plea bargaining fails. Contrary to Mr. Shechtman's assertion, it appears that these "dogs" do "hunt," at least in the wilds of Bridgeport and New Haven, without excessive demands on judicial resources and with considerable success. Thus, a 2006 survey of Connecticut prosecutors, defense lawyers, and judges found a broad consensus that the enhanced judicial role in the plea-bargaining process had increased the fairness and legitimacy of the process and provided a much-needed check on prosecutorial overreach.[2]

Third, in any event, I respectfully submit that the only real way to find out if my proposal would work effectively in a jurisdiction like the federal courts is to try it out on a pilot basis. It is all too easy to conjure up supposed flaws in an experiment that has not

AR-00002524

been tried: But how can a problem as deep-seated as this one ever be solved without some modest attempt at innovation?

---

1   See "Unjust Mandatory Minimums," *The New York Times*, February 18, 2013. ↩

2   *American Journal of Comparative Law* ↩

© 1963–2020 NYREV, Inc. All rights reserved.

AR-00002525

# How to prevent child sexual abuse: Know the myths and realities

For parents, knowledge is power. Myths about sex offenders abound — here are the fac

**ELIZABETH JEGLIC** - **CYNTHIA CALKINS**

FEBRUARY 4, 2018 11:30PM (UTC)

*Excerpted with permission from Protecting Your Child from Sexual Abuse by Elizabeth Jeglic, PHD and Cynthia Calkins, PHD. Copyright 2018 by Skyhorse Publishing, Inc. Available for purchase on Amazon, Barnes & Noble, and Indiebound.*

How would you describe a sex offender? In all likelihood, you would describe a monster — someone who lurks behind bushes and rapes unsuspecting women or abuses children. And that is how sex offenders are portrayed in the media. For most of us, much of what we know about sex offenders comes from movies, TV shows and news stories. However, those stories are often sensationalized portrayals — or cases that are the exception to the rule — rather than the norm. While cases like these do exist, they remain statistically rare, in that they happen very infrequently. In this article, we are going to review the myths and realities of sex offenders and sex offending behavior. It is important that, as parents, you know the true facts — knowledge is power. We have set up this article in a myth versus fact format, as myths about sex offenders abound, and it is important to separate myth from reality.

\* \* \*

**Myth: Most sex offenses are committed by strangers.**
**Fact: The large majority of sex offenders are known to the victim.**
This is perhaps one of the most dangerous and most important myths about sexual offending. Most people imagine sex offenders as strangers lurking in the bushes or driving white vans. This is categorically untrue. The vast majority of sex offenders are known to their victim. Fewer than 10 percent of children are assaulted by a stranger. One study found:

- 34 percent of children were assaulted by a family member,
- 59 percent of children were assaulted by an acquaintance, and
- 7 percent of children were assaulted by a stranger.

This knowledge is incredibly important because it shows that many of us are scared of the wrong people. This is what we call the *stranger danger* phenomenon. It is the belief that sex crimes are predominantly committed by strangers when, in reality, they are most often committed by those who are known to us and to our children. What is even scarier is that many of our laws and policies are based on this stranger danger myth. As a consequence of the stranger danger myth, we no longer let our children walk to their friends' houses or the park by themselves—but we readily drop them off for playdates or leave them with family members, babysitters, and community leaders, often without so much as a second thought about their safety and security.

\* \* \*

**Myth: All sex offenders will reoffend.**
**Fact: Only a small percent of released sex offenders will reoffend sexually.**
There is a common belief that all sex offenders will reoffend, and thus the majority of our sexual violence prevention policies are based on this assumption. In reality, however, sex offenders have the lowest reoffense rates of all types of offenders. Over a three-year period, the Bureau of Justice Statistics found that only 5 percent of released sex offenders committed another sex crime.

The most comprehensive study to date used a sample of almost 20,000 released sex offenders, and researchers found that over a period of five to six years:
- 3.7 percent of all types of sex offenders reoffended sexually and
- 2.4 percent of all child molesters reoffended sexually.

While these rates are not zero, they are not 100 percent either. Given that there is no psychological profile of a sex offender (see next myth), it is easiest to focus on those who have already committed a sexual offense, since there is an increased likelihood they will do it again if they have done it once before. But as we see from the statistics, most sex offenders will not reoffend sexually.

An important study was done in New York State where researchers examined all the new sex crimes that took place over a twenty-year period. They found that only 5 percent of all new sex crimes were committed by someone who had previously committed a sex offense. That means 95 percent of the sex offenders were unknown to authorities before their crime occurred.

This New York study has important implications for sexual violence prevention. Our current sex offender laws and policies focus almost exclusively on already detected sex offenders—the ones who commit 5 percent of the new sex crimes—and very few resources are dedicated to prevent the abuse caused by the other 95 percent. These policies are already very costly, and there is not much money dedicated to prevention.

In other words, the lion's share of the resources go to preventing only a small part of the overall offenses. These laws can also give us a false sense of security: by focusing on a tiny sect of the population known to have committed crimes, we ignore less obvious, but in fact much larger, risks.

* * *

**Myth: There is a specific type of a person who becomes a sex offender.**
**Fact: There is no sex offender profile, and we still do not know what makes some people commit sexual offenses.**

Profiling shows on television make it look like it is easy to figure out who committed a crime because of certain personality and behavioral characteristics (i.e., a profile) associated with criminal offenses. There has been a lot of research done to try and determine a sex offender profile, but what the research has in fact shown is that there is no specific profile for those who commit sexual offenses. In general, those who are

AR-00002527

involved in the criminal justice system tend to be less educated and have lower incomes, but this is not the case for sex offenders, as neither socioeconomic status nor level of education are risk factors for sexual offending behavior. Sex offenders come from all strata of society—they can be unemployed, but they can also be lawyers, doctors, educators, and members of the clergy. Some people assume that those who have been abused themselves are at much higher risk of committing sexual abuse. But the evidence here is thin. One important study showed that only physical abuse and neglect—and not childhood sexual abuse—predicted future sexual offending behavior.

* * *

**Myth: Sex offenders are "sick."**
**Fact: The majority of sex offenders do not have a serious mental illness.**
One way that we rationalize to ourselves that people could do such heinous acts is to think that there is something wrong with them or that they are sick or mentally ill. While there is some truth to that myth—in that sex offenders do have a higher rate of serious mental illness, including disorders such as schizophrenia and bipolar disorder, than the general population—the large majority of sex offenders are not seriously mentally ill. One study found that 24 percent of all sex offenders had been hospitalized for a psychiatric problem as compared to 5 percent of the general population. This means that while the rates of mental illness are higher among sex offenders, more than 75 percent of them do not have a serious mental illness. It is thus difficult to understand how and why someone would commit a sex crime—and that is precisely what researchers are trying to figure out.

**Myth: Only men commit sexual offenses.**
**Fact: While it is true that most sex offenses are committed by men, women also commit sex offenses.**

Many may find it hard to imagine that women commit sex offenses, but they do. Official sexual abuse data indicates that females perpetrate between 4 to 10 percent of all reported sexual assaults.10 It has been suggested that the rates of sexual abuse committed by women are in fact higher, but go unreported. We have all watched with interest cases such as that of Mary Kay Letourneau, the Washington State school teacher who was incarcerated for sexually abusing her twelve-year-old student (and who later married that student upon her release from prison), but most female-perpetrated sex crimes take place in the context of caregiving activities. Therefore, it is sometimes more confusing for the child to know whether he or she has been victimized, and even if they feel that anything has happened at all, so much so that they do not report it. One of the reasons female sex offenders go undetected or unreported is due to our social beliefs that men cannot be sexually assaulted by women or that women are nurturers and thus would not hurt a child. While the vast majority of women do not harm children, there are some that do. Data from the Centers for Disease Control and Prevention (CDC) reported that women perpetrated half of the non-penetration sexual abuse reported by men.

* * *

**Myth: Only adults commit sex offenses.**
**Fact: About one-third of all sex crimes against children are committed by someone under the age of eighteen.**

This includes what we more traditionally think of as date rape among adolescents, but it also includes young people who offend against children under the age of twelve and whose offense behaviors mirror that of child molesters as opposed to rapists. About one in eight youth who commit sexual offenses are under the age of twelve.

The research shows that youth who commit sexual offenses are different from adults who commit sexual offenses. While most adult sex offenders act alone, about 15 percent of all youth who commit sexual offenses do so in groups. About 12 percent of these offenses take place at school. Further, they are more likely to offend against those known to or related to them. Finally, when youthful offenders target victims under twelve, they are more likely to offend against boys.

Youth who commit sexual offenses are more likely to be male, and only 7 percent of all reported cases are females. However, girls who commit sexual offenses tend to be younger than boys—31 percent of girls are under the age of twelve when they commit their offense.

* * *

**Myth: Youth who commit sexual offense go on to become adult sex offenders.**
**Fact: The majority of youth who commit sexual offenses do not commit another sexual offense in adulthood.**

The good news is that youth who commit sex crimes before the age of eighteen rarely go on to become adult sex offenders. It is estimated that between 7 and 13 percent of those who commit a sexual offense as a minor will commit another offense over a five-year period. The number that will commit another sex offense once they reach adulthood is even less: estimates put it at fewer than 10 percent.

* * *

**Myth: Most sex crimes take place in public areas like parks.**
**Fact: Most sex crimes against children take place in private settings.**

There has been a lot of debate in parenting forums about "free-range parenting," which entails—in part—letting children hang out in the neighborhood and go to parks unsupervised. While this was normal behavior in our youth, in more recent years cultural norms have changed. Parents have actually been investigated, and sometimes charged with neglect, for leaving their children in parks by themselves. One reason for this strong reaction is the fear that children who are unsupervised in the community will fall prey to a sexual predator. In one of our own studies, we found that only about half of one percent (0.5 percent) of all the sexual offenses in a sample of nearly 1,500 sexual offenses took place in a public location, such as a park or a school, and were perpetrated by a stranger against a child victim. In another one of our studies, we found

AR-00002529

that 75 percent of individuals who committed a sexual offense met their victims in private (typically residential) settings. This also ties in with the research on who is a sex offender. As we talked about before, we are often worried about our children getting snatched from the street and the playground, but most offenders get to know their victims in more intimate settings because they are family, friends, and community members. Thus, the laws created to keep sex offenders away from areas in which children hang out do little to keep them safer, because this is not where the crimes are occurring.

* * *

**Myth: Most sex offenders were abused as children.**
**Fact: The link between childhood abuse and perpetration is far from clear.**

Most individuals who are sexually abused in childhood do not perpetrate offenses against others. In fact, only a small minority of them do. While the general public often assumes that childhood trauma and abuse can lead to sexual offending, researchers are not certain about the connection. What's clear is that there are many pathways to committing abuse. Sexual abuse may certainly play a role for some offenders, but it has not been isolated as an important causal factor. In fact, research shows that childhood neglect puts people at greater risk of committing abuse than childhood sexual abuse does.

* * *

**Myth: Sex offenders are incurable.**
**Fact: Most sex offenders will not commit another sex offense once they have been identified.**

There is a considerable body of research showing that the risk for sex offending decreases across the lifespan, such that as those who have committed sexual offenses get older, the likelihood that they will commit new sex crimes decreases.

This also ties in to the question as to whether sex offenders can be treated. Most known sex offenders will receive some treatment either in prison or once they return to the community. There is a lot of debate about whether sex offender treatment works, and the jury is still out on this question. The most recent meta-analytic study (a big study that combines the findings of all existing studies to date) looking at whether sex offender treatment works found that offenders who attend sexual offender group treatment programs are less likely to reoffend than offenders who are not offered treatment (10.1 percent treated versus 13.7 percent untreated). While this difference may be small, the consequences of sexual abuse are so large that even a small reduction is meaningful. Will those who have committed sex offenses always have urges to offend? We have yet to answer that question. What we do know, however, is that this may not matter. Research shows that there are quite a few people in our society who have deviant and often illegal sexual thoughts and desires, but who do not act on them. Further still, we know that some sex offenders do not have deviant or illegal thoughts or fantasies, yet

AR-00002530

they commit sexual crimes nonetheless. Results from studies that look at treatment effectiveness look promising, and it seems better to continue to develop and test our treatment approaches rather than simply assuming that offenders cannot be helped.

\* \* \*

**Take Home Message**

Now that you have all these facts, what do you do with this knowledge? As mentioned at the beginning of the article, knowledge is power. Some of this knowledge may have been new to you, and perhaps your own personal sexual prevention efforts may have been misguided. This information is not meant to scare you—rather, we aim to give you the resources to better target your prevention strategies. Some of this knowledge may make you more afraid (that anyone can be a sex offender); or, it may make you more comfortable letting your children out in the world. For example, knowing that most sex offenders are family and acquaintances may help you to be more vigilant of the people you leave your children with. On the other hand, knowing that few sex offenders are strangers and that sex offenses don't often happen in public spaces, it may be safer than you thought to let your child play outside or in the local park.

Some of this knowledge is overwhelming, and as parents, we get that. Anytime we let children out of our sight, there are dangers, both sexual and otherwise, from the world around them. However, we hope that by knowing the facts, we will all be better equipped to send our children out in the world aware of the risks, but also aware of what can be done to mitigate some of those risks.

# ELIZABETH JEGLIC

# Registration, Tracking of Sex Offenders Drives Mass Incarceration Numbers and Costs

Loaded on MAY 5, 2017 by Rick Anderson (/news/author/rick-anderson/) published in Prison Legal News May, 2017 (/news/issue/28/5/), page 1

Filed under: Sex Offender Registration (/search/?selected_facets=tags:Sex%20Offender%20Registration), Sex Offenders (Discrimination) (/search/?selected_facets=tags:Sex%20Offenders%20%28Discrimination%29), Sex Offender Residence (/search/?selected_facets=tags:Sex%20Offender%20Residence), Sex Offender Registration and Notification Act (/search/?selected_facets=tags:Sex%20Offender%20Registration%20and%20Notification%20Act). Location: United States of America (/search/?selected_facets=locations:998).

**by Rick Anderson**

The September 1988 rape and murder of 29-year-old Diane Ballasiotes in Seattle, Washington, followed by the 1989 rape and sexual mutilation of a 7-year-old Tacoma boy, were the seedlings of today's nationwide sex offender registry laws – a 50-state network that tracks over 805,000 registrants and whose usefulness as a crime-prevention tool has been questioned and criticized.

Other cases from that same era – including the widely-reported 1989 kidnapping, sexual assault and murder of 11-year-old Jacob Wetterling in Minnesota, which was solved only late last year – led to a series of 1990-2000 state and federal statutes that established central registries for sex offenders, as well as residency restrictions and civil commitment laws.

Attorneys and advocates for change wonder how many of the nation's more than 805,000 registered sex offenders are in prison or jail on any given day just for violating registration requirements – which are technical violations rather than sex crimes, and did not even exist before 1990. And how much does that, and registry enforcement efforts, add to the rising costs of tracking and monitoring sex offenders? In Palm Beach County, Florida, one officer said 20 deputies are assigned full time to check on sex offenders and confirm their residences.

After a quarter-century, are sexual predator laws and nationwide sex offender registries delivering the benefits they promised? Or have we overreacted to the threat of "stranger danger" with throw-away-the-key excesses, damn the cost?

As even pro-registry crusader Patty Wetterling (Jacob's mother) has said, wondering if things have gone too far: "We've cast such a broad net that we're catching a lot of juveniles who did something stupid or different types of offenders who just screwed up. Should they never be given a chance to turn their lives around?"

Americans generally express belief that the registry system, which has federal oversight, helps to protect them, their families and their children from sexual predators. In reality, however, researchers and officers of the court such as Eric Tennen, a Boston criminal defense attorney who specializes in sexual assault cases, say registries fail to achieve their professed goals.

For starters, according to Tennen, "because of the myth that sex offenders reoffend at very high rates, many people believe that most sex offenses are committed by repeat offenders. In fact, up to 95 percent of all sexual offenses are committed by first time offenders," who obviously are not required to register until *after* they're caught.

Research has found that sex offenders have lower average recidivism rates in comparison to other offenders, though they are more likely to commit another sex offense than non-sex offenders (just as drug offenders are more likely to commit another drug-related crime, thieves are more likely to commit more thefts, etc.). According to an often-cited 2003 study published by the Department of Justice that examined recidivism rates of 9,691 sex offenders released from prison, the three-year arrest recidivism rate for sex-related crimes was 5.3 percent while the overall recidivism rate for any crime was 43 percent. As many sex crimes are not reported, however, resulting in incomplete data, recidivism rates for sex offenders are often questioned.

AR-00002532

Eli Lehrer — president and co-founder of the R Street Institute, a Washington, D.C. think tank – said that while the registries are intended to track predatory strangers who could reoffend, studies show that roughly 90 percent of sex offenders know their victims. "Random kidnappers, like the man who took Jacob Wetterling, are quite rare," he explained. By most estimates, about a third of victims are family members of their abusers and most of the rest are victimized by someone their parents know.

Pedophiles, Lehrer noted, seldom kidnap their victims despite suggestions to the contrary in movies and novels. "The Polly Klass Foundation estimates that fewer than 100 children are kidnapped by strangers each year in the manner that Jacob Wetterling was," Lehrer wrote in a recent study entitled "Rethinking Sex-Offender Registries," published in the quarterly journal *National Affairs*.

"Many of these 'stranger kidnappings' involve children who were sitting in the back seats of stolen vehicles or interrupted another crime in progress. Parents wanting to protect their own children should worry much more about their own friends and relatives than random strangers."

Fifty-three-year-old Danny James Heinrich, who killed Jacob Wetterling, was an exception. But he became the poster boy for child sex predators. His highly-publicized case helped inflame the belief that strangers were the ones children should fear most rather than people they were close to. Further, Heinrich had gotten away with his crime – until he confessed in 2016, almost 27 years later.

On an ill-fated October night in 1989, he appeared out of the darkness, wearing a mask and pointing a gun as three kids passed by on bicycles and scooters.

They were returning from a Sunday night trip to the neighborhood store in St. Joseph, Minnesota, a town of about 7,000 an hour northwest of Minneapolis. Established in the 1800s, the community adopted the name of its gothic Catholic church, whose steeple looms over the central Minnesota countryside.

Jacob Wetterling, his brother and a friend were first told to lie face-down in a ditch, then to turn over, and were asked their ages. The gunman told the brother and friend to start running and not to stop or they'd be shot. He then disappeared into the night with Jacob.

A massive search followed, to no avail. Neither the abductor nor Jacob's remains were found. Police told the boy's mother, Patty Wetterling, that they really didn't know where to start looking for suspects. It would help, they said, if they had a list of local sexual predators to question.

Within two years they did, after Patty led a campaign that resulted in the state legislature passing a law to register sex offenders in Minnesota.

California had approved the forerunner of such laws in 1947, requiring sex offenders to provide their residential addresses to police. While Patty Wetterling was crusading in Minnesota, Ida Ballasiotes was winding up a campaign in honor of her daughter, seeking similar legislation in Washington state.

"It was the particulars that made Diane Ballasiotes' death especially disturbing," reporter Barry Siegel recounted in a 1990 *Los Angeles Times* story. "She'd left her job at a downtown Seattle advertising agency one evening at 5:30 and just disappeared. The missing-person posters her friends nailed everywhere described her as 5 feet-5 inches, 110 pounds, 29 years old, with curly shoulder-length auburn hair. Last seen, the poster said, leaving the 1st and Yesler area of Pioneer Square, heading toward the 3rd and Yesler U-Park garage, dressed in a navy skirt and tennis sweater. A Park Department employee had found the body a week later, while looking for garbage being dumped in another part of town, along Cheasty Boulevard South."

Her killer, Gene Raymond Kane, Jr., 33, was later caught. He had attacked two other women 13 years previously, did a stretch in prison and was sent to a work release facility in Seattle in 1988. He had been there just two months when he murdered Ballasiotes. Convicted in 1989, he returned to prison with a life sentence. Ballasiotes' family received a $260,000 settlement from the Washington Department of Corrections, which had failed to properly monitor Kane while he was on work release.

AR-00002533

Diane Ballasiotes' murder, standing alone, would not have resulted in calls for a new law, Siegel noted. Even when a group called Friends of Diane began staging rallies and circulating petitions, the response by state officials was muted. Then came two more violent sexual assaults.

"First, in December of 1988, a man broke into the apartment of a 23-year-old Pierce County woman, removed a light bulb and lay in wait in her darkened bedroom," Siegel wrote. "When she returned, he tied her to the bed, raped her and slashed her with a knife. The assailant was Gary Minnix, who'd been charged with four vicious knife-related rapes in 1986 and linked by Seattle police to 22 other such cases."

But mentally retarded and with an IQ as low as 48, Minnix was incompetent to stand trial. He ended up at Western State Hospital for the mentally ill. Since he was not a convicted criminal, he received weekend furloughs – and was on his sixth weekend leave when he assaulted the woman.

"Then," Siegel recounted in the *Times*, "five months later, in May of 1989, a 7-year-old boy riding his bike near his Tacoma home was dragged into the nearby woods, raped, choked nearly to death and sexually mutilated. Before leaving him semi-conscious in the dirt, Earl K. Shriner cut off the boy's penis."

Shriner had a lengthy record of assaults on children, dating back to his involvement in the murder of a schoolmate when he was 16. Mentally retarded, he had spent his youth in juvenile facilities, schools for the disabled and a mental institution.

He had previously kidnapped and assaulted two teenagers and was imprisoned 10 years for that crime, Siegal reported. Shriner was denied parole and served his entire sentence. By law the state couldn't commit a dangerous person who wasn't mentally ill, so he was released – then later raped and mutilated the little boy in Tacoma, Ryan Hade, who survived the attack.

In July 1989, Ida Ballasiotes' support group, Friends of Diane, and a second organization, the Tennis Shoe Brigade, marched on the state legislature in Olympia, unfurling a list of crimes by sex offenders and demanding new laws to protect women and children.

In response, Governor Booth Gardner, a Democrat, neutralized the debate by appointing a trusted public servant to head a task force review: Republican King County prosecutor Norm Maleng, who had been Gardner's losing opponent in the last gubernatorial race.

Public hearings were held, 150 victims spoke about the need for a new law, and the task force – which included Ida Ballasiotes (who went on to become a five-term Republican state legislator) and Helen Harlow (Ryan Hade's mother) – wrote the nation's first sexual predator registration bill. It was passed into law on July 1, 1990.

The statute increased prison sentences for sex crimes, created a civil commitment procedure to confine offenders in secure treatment centers until they are "cured," allowed police to notify the public when sex offenders were released, expanded treatment for victims and juvenile offenders, and created a central registry – including photographs and fingerprints – of released sex offenders.

Minnesota passed a similar law in 1991, and other states began to follow. In 1994, President Bill Clinton extended sex offender-related restrictions nationwide. He signed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act that would eventually require every state to create registries to track offenders by name, age, addresses and other relevant details. Under subsequent statutes, that data was expanded to include Social Security number, employer's address, vehicle license plate and vehicle description. Much of that information – except Social Security numbers – is accessible by the public via the Internet.

"From now on," Clinton said, "every state in the country will be required by law to tell a community when a dangerous sexual predator enters its midst. We respect people's rights, but today America proclaims there is no greater right than a parent's right to raise a child in safety and love."

AR-00002534

Two years later, Megan's Law – named after 7-year-old Megan Kanka, who was raped and murdered in July 1994 by her neighbor, Jesse Timmendequas, a repeat sex offender – was enacted in New Jersey. The statute turned sex offender registry information into public records that any citizen could access to learn if, for example, an offender lived nearby. President Clinton subsequently signed a federal version of the law, extending mandatory registration requirements to all states.

Timmendequas was initially sentenced to death; he is now serving life in prison after New Jersey abolished capital punishment.

Sex offender-related legislation continued to pile up. The Pam Lychner Sex Offender Tracking and Identification Act of 1996 was named for a Houston real estate agent who was the victim of a 1990 attempted rape; her assailant received 20 years but became eligible for early release. Lychner (who would later die in the 1996 explosion of TWA Flight 800 over Long Island) lobbied for longer sentences and stiffer registration rules for sex offenders. The Lychner statute established a national database (the National Sex Offender Registry, or NSOR) to track offenders, oversee and verify their registrations, and improve victim notification procedures.

The 1997 Jacob Wetterling Improvements Act added new amendments that revised the law's definitions to determine when a convicted sex offender has become a sexually violent predator, and further expanded notification and registration requirements.

After that came the 2000 Campus Sex Crimes Prevention Act, requiring higher education workers and students to notify their institutions if they were registered sex offenders; the 2003 Prosecutorial Remedies and Other Tools to end the Exploitation of Children (PROTECT) Act, which directed the Department of Justice to launch a website linking to all state sex offender registry sites; and the 2006 Adam Walsh Child Protection and Safety Act, also known as the Sex Offender Registration and Notification Act (SORNA).

Named for the 6-year-old son of John Walsh, who was abducted and murdered in Florida in 1981, the law was the result of Walsh's dogged efforts to impose new standards of justice in such cases. Walsh, who later became an anti-crime activist and then a TV personality, helping to capture lawbreakers with his popular show "America's Most Wanted," successfully lobbied for tougher treatment of sex offenders, and the Adam Walsh Act established the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking (SMART).

The legislation, signed by President George W. Bush, was intended to close loopholes contained in earlier laws and increase the supervision of sex offenders. "Plain and simple, this legislation, I can say with certainty, will save children's lives," said then-Senator Joe Biden, a sponsor of the bill.

But there was disagreement as to the effect of some of this legislation and, for that matter, dissention among some of the proponents. A 2013 story in the Minneapolis weekly, *City Pages*, written by Jennifer Blyer, recounted a divide that first became apparent during the 1996 signing of Megan's Law.

Among those at the signing ceremony were Megan's parents, Rich and Maureen Kanka; Marc Klaas, the father of Polly Klaas, a 12-year-old California girl who was abducted and murdered in 1993; Patty Wetterling; and John Walsh.

The mood was victorious, until a reporter asked if they thought the law was constitutional. Walsh then stepped forward.

"This is letting parents know that the fox is in the henhouse," he said. "We're sick of seeing these people get all the rights and our children and the parents not getting any rights. Believe me, I've hunted these people for nine years now. They're predators, they prey upon children – that's their business. We deserve to know these people are in our neighborhoods!"

But Patty Wetterling looked dismayed. "She interjected, explaining gently that Megan's Law was the equivalent of warning children about a dog in their neighborhood that's known to bite, and adding that it was not about revenge but ultimately just one piece in a large puzzle whose goal was a safe society," Blyer reported.

AR-00002535

Wetterling attended another press conference a few years later for another law – the Adam Walsh Act – that would impose additional regulations on sex offenders, including establishing civil commitment procedures, expanding registration to juvenile offenders as young as 14 and applying registry requirements retroactively.

"By then, sex offender restrictions had mushroomed in a way that was starting to trouble Wetterling," Blyer wrote. "In the years since her son's abduction, she had devoted her life to children's safety. But the more she learned about the nature of child sexual abuse, the more she felt that these laws simply didn't address the root of the problem, and actually made it worse in ways that were hard for most people to grasp."

When reporters spoke with Wetterling at the press conference, she admitted being troubled about some of the legislation's provisions.

"I do have a little bit of concern about it being retroactive," she said, "and that it's now going to register juveniles."

By 2013, Wetterling had grown weary of the retributive nature of the Adam Walsh Act and similar laws.

"We have an intolerance for sexual violence, which I agree with," she told Blyer. "People want a singular solution, and the solution that's been sold over the years is lock 'em up and throw away the key....

"I have a tremendous amount of respect for what John and Reve Walsh have done, and I used to sit down with Marc Klaas to have a drink or six. We've undergone a shared experience, and I'm never going to tell a parent the way they're dealing with it is wrong or the way I'm dealing with it is right.

"I just think some of this really angry, punitive stuff is letting the bad guys win. They're building a world that isn't caring and believing in one another. That's not who I am."

Jennifer Wang, writing in the *New York Law School Law Review*, of which she is the publication's former editor, sensed a similar trend as the country's mood shifted towards harsher penalties for sex offenders.

"Since the mid-1970s, anxiety over child sexual abuse has continued to mount to the point where Americans now 'live in a culture of child abuse,'" she wrote, citing various scholarly and media sources. "Due to this upsurge of 'moral panic,' many have argued that sex offender laws have been passed rather hurriedly and, at times, rely insufficiently on empirical evidence. Still, these laws easily garnered the overwhelming support of the public, comprised of citizens who, understandably, hope to protect society's women and children from sex crimes."

Wang added that "Due to an increased and intense media coverage of sex crimes, 'the public came to believe there was an epidemic of sexual offending,' and thus associated sexual offenses with violence and murder. In the 1990s, the public developed a 'renewed awareness and hatred for sex offenders,' evidenced by enactment of extensive new protections targeting pedophiles who prey on children over the Internet."

At the time, some states began pushing for their own hard-line, signature sex offender legislation. In California, for one, Governor Arnold Schwarzenegger signed Chelsea's Law in 2010. Spurred by the San Diego murder of 17-year-old Chelsea King by a convicted sex offender, the statute established a new one-strike, life-without-parole penalty for certain child-sex predators and other penalties for sex crimes committed against minors by use of force, violence, duress, menace or fear.

The law also extended parole periods for registered offenders and added GPS monitoring for those convicted of felony sex crimes involving physical contact with children, along with a prohibition against loitering in parks where children congregate.

Because Chelsea's Law focused on more violent offenders, the legislation had widespread support. A review found that more than 330 defendants were charged statewide in 2015 under various aspects of the statute, including a former teacher who molested four boys and was sentenced to

AR-00002536

125 years.

Ex-state Assemblyman Nathan Fletcher, who authored the law, said 1,025 people had been charged and convicted since 2010 – 38 of whom received prison sentences of 25 years to life. At a press conference announcing the impact of the law, he said he was "pleased to [stand] here and say definitively that it continues to protect children."

News reports did not mention the cost of the statute and the added expense of long-term penalties imposed on defendants charged under Chelsea's Law. But original budget projections from 2010 estimated the legislation would cost $1 million to implement, increase to $9 million to operate by 2020, and within ten more years would reach $54 million.

Critic and criminal defense attorney Gretchen Von Helms called that a misallocation of funds. "Throwing more laws at this problem is probably just going to cost a lot of money and not work out very well," she told San Diego's KNSD-TV.

According to Parents for Megan's Law, as of 2016 there were more than 805,000 registered sex offenders in the United States; other nations have their own registry systems, including Canada, Australia and the UK. About a third of U.S. registrants are considered at low risk to reoffend, and roughly 15 percent fall in the category of sexually violent predators. Almost all are male, with an average age of 45 and one sex offense conviction.

The long, relentless registration of sex offenders that effectively began with Ida Ballasiotes' grassroots crusade in Washington state exploded into the public belief that abduction and murder by strangers was emblematic of child sex assaults.

And as Patty Wetterling will tell you, the law named after her son produced a startling result. On November 21, 2016, Danny Heinrich apologized to Patty and her husband, Jerry Wetterling, for molesting and killing their son, even though he was never convicted of those crimes.

Heinrich was actually a suspect early in the initial 1989 investigation, but had maintained his innocence. Patty never let the unsolved case get too far from the public's memory, however, and on the 25th anniversary of Jacob's death, cold case detectives, using modern DNA technology, decided to take another look at Heinrich and other suspects. They found his DNA on a sweatshirt belonging to a boy who was sexually assaulted nine months prior to Jacob's abduction and murder.

After serving a search warrant at Heinrich's home, investigators discovered a collection of child pornography and he was arrested. In August 2016, after continued questioning, he confessed to the earlier sex assault and to killing Jacob. In court, he told the chilling story of the abduction and how his young victim had asked him, "What did I do wrong?"

He ended up shooting Jacob twice in the head, spooked, he said, after a police car – with siren and emergency lights on – passed nearby.

Minnesota prosecutors agreed not to charge him with the murder if he would reveal where Jacob's remains were buried, which he did. "I am truly sorry for my evil acts that I have done against victims and their family, and the shame I brought on myself and my family," Heinrich said in court. He was sentenced to 20 years on federal child porn charges; however, once he nears his release date, authorities can petition to have him civilly committed as a sexual predator and held indefinitely.

"There was a little sense of accomplishment, we got answers," Jerry Wetterling told KSTP-TV, "but it was overridden by this huge sadness, that, okay, this is for real, Jake's not coming home."

Nonetheless, the case had helped launch a cottage industry of sex offender registration and tracking that has since grown into a global governmental enterprise: Sex offenders are required to register and report their whereabouts, and in the process reveal their personal information and criminal convictions to anyone who wants to check online registries. The number of registered sex offenders has grown from around 541,000 in 2006 to just over 805,000 a decade later, and will continue to increase as new offenders are added to those already required to register.

AR-00002537

In August 2016, Luis C. deBaca, director of the Justice Department's SMART office, established by the Adam Walsh Act, praised the registry system and his office's progress on its tenth anniversary.

"We've come a long way," he said, "in meeting the complex challenges of sex offender management and building a comprehensive sex offender registration and notification system." He described how, as legislation grew from the Jacob Wetterling law to the Adam Walsh Act, "the national standards for sex offender registration and notification were strengthened, and sex offenders were no longer able to evade registration requirements or the consequences of registration violations."

Even so, it's still a work in progress, he added. All states have some form of sex offender registries but they're not uniform nor fully implemented. In fact, as of April 2017, only 17 states had "substantially implemented" SORNA requirements according to the SMART office.

"While not every jurisdiction is SORNA-compliant," deBaca acknowledged, "many have aspects of the law in place and are on the path to achieving substantial implementation."

To a degree, Eli Lehrer, president ofthe R Street Institute, agreed. "The registries have, in an important sense, worked: Patty Wetterling's successful crusade correlated with improvements in public safety."

There has been a 30 percent drop in reported rapes from 1995 to today, Lehrer noted. And while the U.S. population has grown about 13 percent from 1999 to 2013, the number of child sex abuse cases tumbled from 88,000 to 61,000 during that period.

"While these numbers and any others associated with sex crimes are probably best considered as relative measures since so many sexual offenses go unreported," Lehrer said, "they reflect a significant drop in the offenses that registries are intended to prevent."

However, in a study recently completed for *National Affairs*, he took a closer look at sex offender registration and discovered a more nuanced and disturbing story.

His report, entitled "Rethinking Sex-Offender Registries," concluded that today's registries don't work as well as they could, are too inclusive, overly restrictive and end up hurting some of the people they're intended to help.

"Life on a registry imposes many burdens on those required to take part," Lehrer wrote. "Individuals included on registries must inform police or other public-safety officials of their places of residence and work. Failure to register in a timely fashion can result in additional felony charges. They must obtain permission to move and, often, to travel. Most have their names posted in publicly accessible Internet databases. A number of states – including Florida, Oklahoma, Tennessee, and Nevada – require some classes of sex offender to have special state ID cards or driver's licenses identifying them as such."

Additionally, many jurisdictions forbid sex offenders from living near schools, daycare centers and playgrounds due to residency restrictions, while others are barred from homeless shelters. Positions that bring sex offenders into regular contact with children – nearly all jobs at schools, for example – are also off-limits, he observed.

"In many places, people on registries cannot patronize sexually oriented businesses, own firearms, and even hand out candy on Halloween," Lehrer noted. Laws to impose other penalties on registered sex offenders – restricting them from visiting parks or barring them from living with their own children – also have widespread public support.

"Indeed, it appears that no proposed sex-offender registration law has ever failed a free-standing, regular-order floor vote in any state legislature. No state that has passed a sex-offender registration law has ever repealed it, and no law has ever been weakened in a substantial way – even when stories emerge of serious consequences for former offenders."

In California, for example, 20 percent of sex offenders have no place to live as a result of residency restrictions – a fact that evokes little public sympathy or calls for reform, despite the fact that forcing sex offenders into homelessness makes them more difficult to monitor and less

AR-00002538

likely to successfully reintegrate into society, putting them at increased risk of recidivism.

In short, Lehrer wrote, "few new public policies have become so widespread so quickly or attracted such unanimous support from across the political spectrum. The reason for this is obvious: All parents are horrified by the thought of their children being snatched from them and sexually abused. Sexually oriented crimes committed against children are, for deep-seated cultural and perhaps innately human reasons, considered particularly grave violations of human dignity."

Unfortunately, "virtually no well-controlled study shows *any* quantifiable benefit from the practice of notifying communities of sex offenders living in their midst," Lehrer concluded.

There are several reasons for that finding. For one, most child sex offenses do not involve strangers but rather family members or friends or associates; that is, the danger is usually not from outsiders – registered sex offenders who live nearby – but from within families and their social circles. Additionally, registries give people a false sense of security; they identify *known* sex offenders who are required to register, but not other offenders who have not yet been convicted of a sex crime and are thus unknown.

Many registries are also riddled with errors, and include listings for sex offenders who no longer live in the state or are incarcerated or deceased.

And, of course, not all sex offenders are equally dangerous. The catch-all nature of registries mean they include numerous offenders who pose no threat to children, or to anyone else – such as people convicted of statutory rape for having consensual sex with an underage girlfriend, or who have patronized prostitutes, or been convicted of indecent exposure or other crimes that do not involve physical contact. In some cases, juveniles who send nude pictures of themselves to their friends – sexting – are being charged with production and distribution of child pornography.

Additionally, registries put sex offenders at risk of vigilante justice, since people who want to harass or harm them can easily obtain their residential addresses, photos and other personal information through online registries. There are numerous examples where sex offenders have been assaulted or killed, or their homes vandalized or torched. In some cases, innocent victims are targeted under the mistaken belief they are sex offenders; for example, because they live at an address where a sex offender previously resided and the registry has not been updated.

Further, studies of sex offender registries indicate that neighborhoods are negatively affected in the form of lower real-estate values – as much as four percent lower when the public becomes aware an offender is living in their community.

Then there is the price tag for taxpayers. States have been wrestling with implementation of SORNA for around a decade, with some choosing to go all in while others look for wiggle room to avoid the substantial costs of compliance.

Funding issues have led to the fractured implementation process. Government figures pegged SORNA implementation launch costs in California, for example, at $66 million. In Texas the price tag was projected to top $44 million initially, and in New York it was more than $35 million. Nationwide, launch expenses alone add up to an estimated $550 million – not including ongoing compliance costs.

The total cost of establishing sex offender registries, tracking offenders and enforcing registry violations is unknown, but obviously substantial.

Jennifer Wang, in a 2014 survey of the SORNA statute, said the law requires significant new spending, including the cost of additional personnel as well as new software installation and maintenance. Then there are the added expenses of more jail and prison space for offenders who violate registry requirements, increased court and administrative costs, and additional law enforcement spending.

AR-00002539

Consequently, many states found it was cheaper not to implement the law and instead take a comparably small statutory penalty through the loss of certain federal funds due to non-compliance.

"Notably," said Wang, "in every state, the first year costs of SORNA implementation outweigh the cost of losing ten percent of the state's Byrne funding," which are justice-assistance grants given to states by the Department of Justice. "In California, the Sex Offender Management Board recommended that the state legislature, governor, and citizens elect not to comply with the [Adam Walsh Act], emphasizing the 'substantial' and 'unreimbursed' costs associated with the law," she wrote.

Additionally, Wang learned the SORNA program itself is underfunded, and Congress has failed to allocate consistent funding to underwrite the significant compliance costs incurred by state and local governments. State lawmakers frequently refer to SORNA as an "unfunded mandate," and describe a "disturbing disconnect" with respect to withholding Byrne grant funds, which support services that would help states meet federal requirements for sex offender registries.

A June 2016 report in the *Journal of Sociology & Social Welfare* addressed the fiscal considerations of registration about which, the authors said, "law enforcement agents and others have expressed concerns" due to cost and workforce demands.

"Resources spent on policies that overextend their reach while failing to enhance public safety take funding away from other rehabilitation and reintegration programs as well as from victim services and prevention initiatives," the study found. The report recommended a "paradigm shift toward empirically-based sex offender management systems which could prove more cost-efficient than current policies."

The Justice Policy Institute (JPI), a D.C.-based think tank that specializes in criminal justice reform, found that most of the federal resources available to states would be devoted to the administrative maintenance of the registry and to notification, rather than targeting known dangerous sex offenders. "Registries and notification have not been proven to protect communities from sexual offenses," a JPI study found, "and may even distract from more effective approaches."

Researcher Eli Lehrer said that while there are anecdotal examples of community notification helping to catch individual sexual predators, "it's not clear that any sex offender who re-offended has ever been caught by neighbors solely because of public notification of his presence. In other words, the biggest quantifiable cost of sex-offender notification [lowering property values] appears to be borne by the neighbors it is intended to help, with no measurable improvement in public safety."

Some states require registration for those convicted of prostitution-related offenses or urinating in public. Teens convicted of having consensual sex with other teens must register in 29 states, and 40 states require juvenile offenders to register. Nicole Pittman, director of the Center on Youth Registration Reform, a project of Impact Justice, a California-based research organization, has cited examples of juveniles being placed on registries for minor offenses ranging from indecent exposure to "playing doctor."

Conversely, Lehrer pointed to Phillip Garrido, a sex offender who kidnapped and held Jaycee Dugard in his backyard for 18 years and sexually abused her repeatedly, as an example of someone the system allowed to slip through the cracks.

"He was on a sex-offender registry for prior incidents of molestation and kidnapping. His home was visited by parole officers and social workers numerous times. But, overtaxed by the need to monitor California's more than 83,000 registered sex offenders, officials never performed the thorough search of his house that would have located Dugard," Lehrer wrote.

Ending sex offender registries would be unwise and unpopular, he stated, but policymakers need to make "sensible improvements," such as exempting low-risk offenders and most juveniles from registration requirements.

AR-00002540

Rachel Marshall, a public defender in Oakland, California, said her clients would rather go to jail than have to register as sex offenders. In a July 5, 2016 article published on Vox.com, she wrote: "When I first became a public defender, I believed the worst punishment that my clients would face would be time in jail. Since then, I've learned that incarceration is not the only – and perhaps not the worst – punishment the criminal justice system can impose. The registration requirements imposed on those convicted of sex offenses are unfairly harsh and punitive, though few recognize them as such."

That was likely welcome news for victims of sex crimes, as was a 2003 U.S. Supreme Court decision that held registration laws were not punitive measures but rather administrative methods to protect public safety. The landmark case, *Smith v. Doe*, 538 U.S. 84 (2003), was based on a challenge to Alaska's sex offender registry law. The Court voted 6 to 3 in holding that the law passed constitutional muster. Justice John P. Stevens, who wrote the dissent, argued that registries "constitute a severe deprivation of the offender's liberty."

But does the public understand, Marshall asked, that "our current sex offender registration laws apply an unbending and inhumane one-size-fits-all approach that does not prevent future sex crimes and in fact makes us all less safe?"

No one disputes that violent crimes such as rape, child molestation and sexual assault are serious and should be the focus of registries. But, Marshall said, "there are also offenses like peeing in public, which can qualify as indecent exposure. Similarly, grabbing someone's butt or masturbating in one's own car also qualify as sex registerable offenses, even though they are punishable as misdemeanors. We may not want to legalize those behaviors, but forcing someone to be labeled a sex offender for life over a misdemeanor that is only punishable at its maximum by six months in county jail is excessive."

Other systemic flaws, she wrote, include harsh penalties for failure to comply with registration requirements. "Failing to register is itself a crime – frequently a felony – meaning the punishment for failing to register can be more severe than the punishment for the actual offense. In Georgia, for example, failing to register is a felony carrying a sentence anywhere from a year to *30* years in prison. Yet the registration laws are notoriously complex in ways that make compliance all but impossible for many who are required to register."

As far back as 2007, a year after the Adam Walsh Act became law, a Human Rights Watch report found that registries do not prevent sex offenders from committing future sex-related crimes, and that the best way to prevent crimes – particularly sex crimes – is to promote stability and security for past offenders, Marshall noted.

Worse yet, "Ripping that all away by incarcerating them for failing to register only leaves the public at risk," she concluded, something that even prosecutors are beginning to understand.

In 2016, a California bill to expand residency restrictions for sex offenders was defeated after a group that included the Alameda County District Attorney and the state Attorney General's office opposed it, arguing that such restrictions "actually increase the risk of sexual recidivism."

"We know that the proven methods of protecting public safety involve moving away from monitoring and shaming those who have committed past offenses, and focusing on ways to prevent sex crimes on the front-end, and on meaningful reentry programs that assist people coming out of prison to get jobs, housing, and support," Marshall said. "They may not provide the quick-fix satisfaction that politicians love to sell – but they are the only thing proven to work."

The recent study in the *Journal of Sociology & Social Welfare* – authored by three scholars, Jill Levenson, Melissa Grady and George Leibowitz – is regularly cited by critics as offering sensible solutions to needed registry reforms. As they observed in a synopsis of their findings, "Sex offender registries, though popular, bring with them enormous fiscal costs and unintended consequences for offenders and communities."

Improvements to registries, they argued, would "mediate the stigma resulting from the sex offender label and reduce barriers to offender reintegration." Consequently, they urged the implementation of five broad reforms: Juveniles should not be subjected to sex offender

AR-00002541

registration; registration durations should be guided by risk assessment research; procedures for relief and removal from registries should be available; discretion should be returned to judges; and sex offender residency restrictions should be abolished.

While crimes such as rape and child sexual abuse are terrible, policymakers are slowly starting to realize that imposing registration requirements on all sex offenders, often regardless of the severity of their crimes or mitigating factors, is a terrible – and costly – response that may in fact create more problems than it solves.

*Special thanks to Melanie Abbott, who assisted in providing research for this article.*

*[Editor's note: The printed edition of PLN incorrectly refers to Melanie Abbott as Melissa Abbott. We apologize for this error.]*

AR-00002542

https://cumberlink.com/news/local/closer_look/when-facts-arent-facts-a-look-at-the-effectiveness-of-sexual-offender-registries/article_01b3ec77-053f-5a8f-8436-5cab0a2090c6.html

FEATURED   TOP STORY

# When facts aren't facts: A look at the effectiveness of sexual offender registries

Joshua Vaughn The Sentinel
Mar 26, 2016

SALE! Subscribe for $1/mo.



Sexual offender registries were passed under the assumption that offenders are likely to commit more crimes, yet studies now show only a small portion are likely to re-offend.

Jason Malmont, The Sentinel

The passages of sexual offender registries have grabbed headlines as steps toward public safety against unchanging "predators" who are being released back into society.

The registry laws themselves have cost billions of dollars and generally are passed with overwhelming support.

But do they work?

"These kind of laws have a limited usefulness, which is they make it difficult for offenders to keep their anonymity but that's about it," said Kristen Houser, chief public information officer for the Pennsylvania Coalition Against Rape.

AR-00002543

The laws, commonly referred to as Megan's Law registries, require that sexual offenders have their photograph, address and other personally identifiable information posted to a public registry after the offender is released from prison.

They also are usually passed under the premise of public safety following a high profile event, using the notion that sexual offenders are highly likely to commit more offenses when they are released.

"I think there are very few things that scare parents more than being concerned that somebody is going to sexually assault or kidnap and kill their child," Houser said. "It is a terrifying thought."

## Recidivism

An update to Pennsylvania's 1996 registry law in 2011 included that the "Legislature found that ... sexual offenders pose a high risk of committing additional sexual offences, and protection from this type of offender is a paramount government interest."

"If you ask people how often sex offenders will commit a new offense when released into the community, people tend to think it's upwards of 75 percent," said University of Massachusetts Professor Jason Rydberg, who focuses on the study of sexual offenders and policy.

However, overwhelming research has shown that sexual offenders, as a whole, are some of the least likely groups to commit new crimes, Rydberg said.

Rydberg said one major study found that only about 5 percent of sexual offenders committed a new sexual crime within five years. The U.S. Department of Justice places the re-offense rate for sexual offenders as low as 3 to 10 percent, and a study

AR-00002544

conducted by Karl Hanson found that out of 8,000 offenders that were tracked,
none who remained offense-free for 15 years were likely to reoffend after.

To put the threat posed by sexual offenders committing new offenses in perspective,
a 2014 study found that roughly 3 percent of felons with no known history of sexual
offenses committed one within roughly five years.

"People tend to be skeptical that sex offenders are amenable to treatment, and this is
related to supporting punitive policies against them," Rydberg said. "With this issue
too, research combining dozens of studies and tens of thousands of sex offenders
finds that certain types of treatment are effective at reducing the likelihood of sexual
recidivism."

## Passage of bills

Patrick Cawley, executive director and counsel for the Pennsylvania Senate
Judiciary Committee, said the assertion that outlined the state's need for the law
likely came from evidence presented during a committee hearing, but that he was
unable to find any supporting data that was used.

AR-00002545

There were no committee hearings for the 2011 registry update bill, according to the Pennsylvania Senate Library, yet it received unanimous approval from the judicial committee and full legislature before being signed by then Gov. Tom Corbett.

The legislature's finding that sexual offenders are likely to reoffend and thus pose a great threat to society has also been refuted by the Pennsylvania Supreme Court.

In 2014, the court ruled that a provision of the law that placed juvenile offenders older than the age of 14 on the registry for 25 years was unconstitutional.

The decision was made in large part because of evidence that showed juvenile offenders reoffend at a rate of only 2 to 7 percent.

The court objected to the premise that all sexual offenders pose a great risk saying that the imposition of the sexual offender registry on juveniles was an "irrebuttable presumption" that was based on a fact that was "not universally true," Arizona State University professor of Law Ira Ellman wrote in his article "Frightening and High."

In part, Pennsylvania's update, which added more than 2,000 offenders to the registry, according to Pennsylvania State Police Trooper Adam Reed, was passed so the state would become compliant with the federal Sexual Offender Registry and Notification Act.

## Support Local Journalism

Your membership makes our reporting possible.

SALE! Subscribe for $1/mo.

Failure to come into compliance with the law would have cost the state a portion of its federal grant money.

AR-00002546

SORNA was sponsored by Congressman Jim Sensenbrenner, who has the statement on his website "Convicted sex offenders often evade current state registration requirements and go on to commit additional offenses" on his website about his support for the legislation.

Given more than a week to prepare, staff for Sensenbrenner was unable to provide any data or evidence used to support that statement.

"While they have good goals, which is public safety, what we've found is they have collateral consequences," Rydberg said.

## Registries

Rydberg said registration laws have been found not to significantly reduce sex crimes, and have made it more difficult for offenders to acclimate back into society, which in turn makes it more likely that they will end up in prison for a non-sexual offense.

Registry laws can also lead to a false sense of security for members of the community.

AR-00002547

"The public is often mislead that if they check the registry and nobody lives in their neighborhood or nobody lives near their child's school or whatever, that they're safe," Houser said. "These are not laws that are going to actually produce safety. We need to be focused on prevention in vastly different ways."

Most victims of sexual violence – roughly 80 percent, according to Reed – know the person who committed the offense prior to the offense occurring.

"The vast majority of sex offenders are never going to be listed on a registry, period," Houser said.

Houser also raised concerns about the cost of the registry laws and their enforcement, saying money spent on these laws could go to more effective prevention programs.

"There are substantial costs ... and I'm not going to say it's not worth it but I am going to say that investing dollars into sexual abuse prevention and support programs for victims is probably not nearly as large of a budget item for the state government," she said.

The Congressional Budget Office put a $1.2 billion price tag on the original SORNA law, with updates costing the federal government hundreds of millions more.

The bulk of Pennsylvania's cost comes with the employment of six uniformed troopers and 21 civilians for the Megan's Law division, according to Reed.

AR-00002548

"If the goal of these various strategies is to reduce recidivism, then these policies have a high potential to be counter-productive," Rydberg said. "Over the past 20 years, a vast amount of research has developed knowledge on the correctional strategies that are the most effective at reducing recidivism, as well as those that are ineffective."

## Solutions?

So, if the registries and post-release policies are not working, what can be done to provide public assurance that sexual offenders are not going to reoffend?

First, Rydberg said, the policies need to focus on the offenders seen as the most likely to reoffend.

Pennsylvania currently evaluates all sex offenders when they are convicted to determine which individuals present the most threat. Theses offenders are deemed sexually violent predators. This evaluation, however, is only used to potentially increase registry requirements.

All other offenders are classified based on the offense for which they were convicted and subjected to registry requirements based on that classification alone.

Sexually violent predators make up less than 10 percent of the state registry.

"A general trend here is that treatment focused strategies are much more effective at reducing recidivism than punitive focused strategies and it turns out that punitive-focused strategies actually make offenders worse," Rydberg said.

AR-00002549

He said effective treatment looks to get to the root cause of the behavior and change it through methods such as cognitive behavioral therapy.

"(These laws) sound good. It makes people feel good. It's an easy sell in terms of votes," Houser said. "Nobody wants to say 'sex offenders deserve anonymity.' You're not going to get up and say that ... There's limited usefulness to the laws but I do not think it's the panacea or silver bullet that people would like to think that they are."

## Be the first to know

Get local news delivered to your inbox.

| Email Address | Sign up! |

I understand and agree that registration on or use of this site constitutes agreement to its user agreement and privacy policy.

## Related to this story

### Listed: A closer look at sex offender registries
Updated Jan 23, 2017



### Court: Tougher sex offender reporting can't be retroactive; ruling involves Cumberland County case
Jul 20, 2017



### Cumberland County DA Freed to request U.S. Supreme Court review of sex offender decision
Updated Sep 5, 2017

AR-00002550



## Pennsylvania court upholds 'sexually violent predator' laws

Mar 26, 2020



AR-00002551

HOME    ABOUT·    RESOURCES·    MEDIA·    GET INVOLVED·    THE DIGEST·    DONATE    JOIN    SUPPORT US WITH AMAZON

## Court Decisions

This list of state and federal cases consists of those deemed most significant to the effort at reform. You are invited to submit additional cases for consideration. NARSOL is most concerned about listing final dispositions from a state's highest appellate court or any substantial decisions rendered by a federal Circuit court. Lower level cases (cases in federal District courts or state courts of intermediate appeal) are less attractive for this list because of the high probability of a pending appeal. Nevertheless, if you know about a case that you believe is worthy of being added to this list, please send a link or pdf of the opinion to our legal team for appropriate review.



## Important Supreme Court decisions

*Packingham v. North Carolina* (2017)

*Commwlth of PA v. Muniz* (2017)

*Grady v. North Carolina* (2015)

*U.S. v. Comstock* (2010)

*Carr v. U.S.* (2010)

*Smith v. Doe* (2003)

*Connecticut Dept. of Public Safety v. Doe* (2003)

*McKune v. Lile* (2002)

*Seling v. Young* (2001)

## U.S. Court of Appeals and Federal Court decisions

U.S. Dist. Ct., E.Dist.of KY, *Doe v. KY* (2017)

10th Circuit, *U.S.A. v. Haymond* (OK) (2017)

U.S. Dist.Ct., Dist.of CO, *Millard v. Rankin* (2017)

4th Circuit, *Doe v. Cooper* (NC)(2016)

7th Circuit, *Velenti v. Hartford City, IN* (2016)

2nd District, *TX City of Krum v. Rice* (2016)

6th Circuit, *Does v. MI* (2016) related: ACLU FAQS

## Various state court decisions



AR-00002552



*Doe v. New Hampshire* (NH 2015)

*Taylor v. San Diego Co.* (CA 2015)

*Doe v. Maryland DPSCS* (MD 2013)

*Doe v. Williams* (ME 2013)

*Minor v. Nevada* (NV SORNA Decision 2013)

*Starkey v. Oklahoma* (OK 2013)

*United States v. Kebodeaux* (2013)

*Maryland v. Doe* (MD 2013)

*Doe v. Nebraska* (NE 2012)

*Doe v. DPSCS* (MD 2011)

*State v. Williams* (OH 2011)

*State v. Bodyke* (OH 2010)

| Contact Us | Operations | Headquarters | Categories |
|---|---|---|---|
| Contact Us by Email or Phone | Post Office Box 36123<br>Albuquerque, NM 87176 | Post Office Box 25423<br>Raleigh, NC 27611 | Select Category ▾ |

| Disclaimer & Use | Privacy Statement | User Agreement | NARSOL By-laws |
|---|---|---|---|

NARSOL © 2020

AR-00002553

An official website of the United States Government. 🇺🇸

Docket (/docket/DOJ-OAG-2020-0003)
/ Document (DOJ-OAG-2020-0003-0001) (/document/DOJ-OAG-2020-0003-0001)  / Comment

 **PUBLIC SUBMISSION**

# Comment on FR Doc # 2020-15804

Posted by the **Department of Justice** on Nov 9, 2020

| View More Comments  724  (/document/DOJ-OAG-2020-0003-0001/comment) |
| View Related Comments  724  (/docket/DOJ-OAG-2020-0003/comments) |  Share ⌄ |

---

Comment

SORNA and the public registry does not make communities safer. SORNA labels and punishes registrants for life with no pathway off. Loss of hope is a dangerous thing. People who sex offend have done so in SECRET. Secrets cause trauma.. Secrets cause people to hide their behaviors. This is dangerous. People who sex offend benefit from treatment that allows them to explore and face the truth.. in compassionate ways.... not punitive and punishing ways as the norm currently. There is proof that those treated compassionately with appropriate and reasonable consequences recidivate much less.They are more motivated to remain offense free since they have more to lose. In order to take responsibility for ones actions.. self shaming must be removed so that appropriate guilt can motivate one to positive behavior change. Compassionate consequences have better therapeutic outcomes and lower recidivism rates than the current criminal justice ineffective philosophies and techniques used. Currently,these so called counselors contracted though probation are not neutral. They are biased and they are breaking any type of confidentiality with the probation officers who supervise them which reduces the counseling relationship trust levels. This probation linked treatment service is like the fox guarding the hen house. The registrant does not stand a chance of recovery with such a biased system. Law enforcement frequently practice shaming and bullying and threats to get the truth out. They often fail at helping the registrant uncover hidden truths in themselves. The registrant may go deeper into denial and the therapy may actually prevent them from recovering and accepting responsibility. So after years prison, doing time. losing their family, job and self esteem..finding it difficuklt to find employemnt due to the SO label and after years of punitive bullying probation officers .like Jon Tabierski and Alicia Payne with the Buffalo US federal probation office...now you subject registrants to even more punishment, ridicule, shaming and alienation by naming them on a public registry?!! and even worse community notification.?!!. which drives them further underground.. more hiding more secrets.. more chance of recidivism. I am blessed and fortunate that Ron has a circle of support and another compassionate therapist who is helping understand the core reasons and motivations for his past unhealthy behavior.(no thanks to US probation) and he will never recidivate. Not all registrants have such luck. or the courage to go public with his story and to have the full support of my neighbors friends and family.. At least we can neutralize some of the name calling and damage and harm that some ( not all)in probation are doing .. This does not make for a healthy community . These practices only exacerbate the motivation to recidivate.for those unlucky enough to no t have public support or consequence based compassionate therapy treatment.. When all hope to redeem oneself is taken away , the negative result is increased return to criminal behavior. It is self perpetuating. The current registry and community notification is SHAME driven. Shame drives people to HIDE

AR-00002554

their behavior.. Public shame causes people to feel ostracized, isolated and more prone to negative influences and negative unchecked behavior. Punitive supervision such as many in the US federal probation careers.. shames registrants and they do so with no public awareness or public oversight. If the registry has to be public then it should include a registrants strenghts and treatment and clean record .. and if the registry must exist then the law enforcement and probation must have public transparency and consequences for immoral and harmful probation practices. WE must reduce sexual harm in a different approach form what we have done in the past. none of this will be effective if probation and criminal justice staff can secretly shame, punish and bully behind closed doors as so often happens. This type of strategy prevents the registrant from facing his or her actions and accepting full responsibility and making amends to whom they have offended. The probation and criminal justice actions should be transparent to the public to keep them more accountable and there should be an oversight committee that intervenes when shaming and counterproductive techniques are used that are counterproductive to offender recovery. Once this occurs then we can have a reasonable and fair effective registry. The registry should act as a detourant not a lifelong punishment. A clear pathway off the registry to an offense free life. Better more effective cmapassionater consequence based tretment programs...More community involvement, more behavioral change specialists instead of probation and more public oversight of probationary actions We will see a huge reduction in sexual harm if we pursue this mindset. [***DOJ DOCKET NOTE: Commenters on DOJ Proposed Rules have the option to provide or not to provide their own Personal Identifying Information (PII) such as their names. However, in order to protect the privacy of persons other than the commenter who may not have given their consent for such PII to be posted on www.regulations.gov, it is DOJ's policy to redact third-party PII from a comment (including attachments). In such instances, the full, un-redacted comment is available for public inspection in person by contacting the For Further Information Contact identified in the Proposed Rule. Accordingly, one of the attachments submitted along with this comment that also contained third-party PII has been redacted from the version posted on www.regulations.gov.]

---

Attachments  3

---

📄 W.A.R. Making our communities safer by Reforming the Registry for sex offenders

⬇ Download ▾

---

📄 BIOSOCIAL THEORY Biosocial theory is what guides us

⬇ Download ▾

---

📄 HOW DO I SELF MEDICATE

⬇ Download ▾

---

**Comment ID**

DOJ-OAG-2020-0003-0725

 **Tracking Number**

1k4-9jhe-a5z0

| Comment Details | Submitter Info |
|---|---|

**Received Date**

Oct 12, 2020



Your Voice in Federal Decision Making

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)

Reports (https://resources.regulations.gov/public/component/main?main=Reports)    FAQ (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    Developers (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)    Provide Site Feedback

**W.A.R. Making our communities safer by Reforming the Registry for sex offenders-**

 **J. Ables  member of W.A.R.**

*Who are we and why are we here- **EDUCATION/LEGISLATION/LITIGATION**

***W.A.R.** Women against the Registry – The registry and housing restrictions destroys families

Other groups we are associated with:

 **FAMM** Families against mandatory minimums,

**CAUTION CLICK** ( national campaign for reform)

**ACSOL –**National Alliance for constitutional sex offense laws

*Do Sex Offender Registries make us Less safe- evidence that community notification increases recidivism

SHAME and BLAME of community notification and housing restrictions cause registrants to isolate more, reduces the positive effect that family can have increases isolation and being ostracized, effects employment, increases secrecy, which can counterproductively  lead to more recidivism

*One size does NOT fit all according to the SMART office report on typologies

*The Registry costs more than the amount of money that the states get for complying with SMART

* 7 ways to treat and reduce harmful behavior

*Public opinion changes over time due to research, education, treatment data and sharing personal stories in a public forum

*IF THERE IS EFFECTIVE TREATMENT THEN THERE IS RECOVERY- the registry punishes for life whether a person has been treated, recovered and remains behavior free

*There needs to be a 'pathway off the registry' to truly make communities safer

*Recidivism data is contradictory and comes from many sources.. some reliable and some not

*Until science produces more reliable, valid recidivism studies based on typologies and specific treatment outcomes related to typology, past and some present recidivism data is flawed

*There is growing evidence that TREATMENT reduces  recidivism more than registry housing restrictions and community notification-

There is also evidence that COMMUNITY SUPPORT for offender recovery decreases recidivism and increases healthier lifestyle which is safer for communities

*RECIDIVISM SMART office findings

*TREATMENT

National Reentry Resource center initiatives

*More effective solutions to reduce recidivism after incarceration

*CIRCLES OF SUPPORT csg Justice center

*THE GOOD LIVES MODEL FOR OFFENDER REHABILITATION

*Legislation for Registry reform

*Litigation for registry reform


Future meetings with W.A.R.

To : Raise awareness

     Educate

    To be aware of current legislation

    To study current Litigation

AR-00002558

BIOSOCIAL THEORY Biosocial theory is what guides us as we conduct DBT. DBT was created for use with adults with Borderline Personality Disorder by Marsha Linehan, PhD. Dr. Linehan noticed that the available treatment options for these clients were very limited, as such, she put her time and effort into searching for a treatment option that could provide relief to these clients and their families.

Borderline Personality Disorder is diagnosed when an individual meets the criteria in the DSM-IV (the manual that all mental health professionals use for diagnosis). These criteria are: 1) emotional vulnerability- a pattern of difficulty regulating emotions, high sensitivity to external events, high emotional intensity, slow return to personal emotional baseline, including a feeling of being emotionally vulnerable, and "mood swings."

AR-00002559

- 2) self-invalidation/self-doubt- confusion about your sense of self, this includes a tendency to tell yourself that your perceptions (thoughts, feelings, beliefs and behaviors about) of events are incorrect. This can include feelings of shame, selfdoubt and self-hatred.

- 3) interpersonal difficulties- specifically this is related to problems in family, friendships (or a lack of), dating relationships and at school. This might include frequent arguments with others, difficulties maintaining friendships, intense fears that you will be abandoned, or fears that others will forget you if you are not constantly present.

- 5) recurrent suicidal threats, ideation or self-harm Maicrial adapted from Linehan (19H7). rogniuve-aehaviorcil Treatment ofBorderline Personality Disorder.

AR-00002562

# HOW DO I SELF ………MEDICATE….

# let me count the ways

# BY

# J.ABLES

After 40 years of experience, training and research

## WHAT THE HECK IS SELF MEDICATING???

## MY DEFINITION MAY SURPRISE YOU

All humans self medicate

We all have a range of ways that move us from being sadness to happiness

Or from apathy to motivation

AR-00002563

Page 1

Or that move us from anxiety to calm

Or from fear to peace

For many of us.. this is an unconscious effort and for some of us .. it is a matter or life and death

How do we move ourselves from boredom to  interest

How do we move ourselves from apathy to caring

How do we move ourselves from guilt to taking responsibility

How do we move ourselves from wanting to give it all up to feeling life is worth living

Everyone medicates somehow

Be it the CEO who is overworked and stretched beyond functiioning

Or the heroin addict who wants to rid themselves of emotional pain and feel nothing as relief

WE all do it


WHAT IS THE DEFINITION OF SELF MEDICATING


Self medicating is  defined as : anything that we use to move our functioning from one place to another to relieve our personal discomfort, dis-ease, distress or suffering .

Self medicating can INCLUDE  HEALTHY MOVEMENT  OR IT CAN BE UNHEALTHY MOVEMENT

OR IT CAN BE A COMBINATION OF THE TWO. '

Either way.. humans all self medicate to move themselves from a place of discomfort to one of comfort.

The SOURCE  of self medication can be good for our overall health  or the SOURCE can be bad for our overall health.

2

 The EFFECT of the self medicationg can produce relief that is healthy or the effect of the self medicating can be unhealthy and increase dis-ease.

AR-00002564

Page 2

In a lifetime, we all have a range of 'functioning' to underfunctioning to thriving.

Most people without a mentalhealth disorder do have a range OF FUNCTIONING that is affected by their own unique set of circumstances ( Nurture- influence from family, community etc ) and ( nature-genetics, neurology, organic brain damage, health etc) A person without a mental heal;th disorder have a range thst may dip below normal fundtiononig but never dip as low as NOT functioning (at work ,at home, in relationships, at school in health)

And most people WITH a mental heal;th disorder also have a RANGE of FUNCTIONING that may be different than a person without a mental health dioprder.  A person with a mental health condition may have a much larger range between their own normal and their own own disfunctioniong when the disease is not treated or undertreated. Their lows could dip into non functioning at a job, at home, in relationships, and at their worst, the dis-ease can effect their basix needs like eating, sleep , shelter and safety. The range may even include death.

Functional medicine is more hopeful. These conditions are temporary and can change and improve based on treatment and health forms. of self medication

ALL FUNCTIONING OR DISFUNCTIONING IS TEMPORARY AND CAN IMPROVE WITH TREASMENT AND HEALTHY SELF MEDICATING..


If someone has cancer.. we know that a persons functioning poorly is a  temporary condition  that can change. If john has cancer, we do not identify John by his disfunction. We do not say .. Oh John IS cANCer.. we say John HAS cancer. So why do we define people with mental heralth conditions that affect their functioning temporarily as defined by their condition?

We say " Oh there is John he IS SCHIZOPHRENic. NOT he HAS Schizophrenia.. This type of thinking error is  mostly influenced by the OLD medical miodel of permanent conditions which affect you as dysfunctional for life.

Medicine used to define disease as something wrong with you and the medical model would diagnose the p-art that was wrong with you without lookling at the whole picture of how this part affected your overall functioning.


For example.. you break your back,  The medical model will focus on fixing what is broken .. you will get surgery,, you wioll get rehab but this process takes months.. now your physical functioning affects your

Page 3

mental health functioning..you cannot work, you cant pay bills , you become depressed, you become apathetic, you wife and you fight a lot, your children start failing in school. , you become depressed, you become apathetic.. you cannot sleep .. The orthopedic surgeon ( medical model) fixed your broken back) He has done his job. He is not trained to look at and diagnose or treat your overall functioning..

Medical model – OLD

Functional medicine- NEW

Functional mediciane explores youer entire fynctuioning and sees your functioning  on  a range not just a part. Functional medicine's foundation is that dis-ease is temporary and not permanent. A heart condition may be a permanent cpnditiopn but your heart condition can be managed and you can be functional and even thriving if you learn how to 'self medicate' in heal;thy ways

I ask these questions

HOW

WHY

Who

What where

And most importantly we must understand that to be human we MUST keep MEDICATing in order to live healthy lives. So if every9one does it , where is the line between health and dis-ease.


I propose that by exploring this idea and having a deep understanding of how we each personally operate to 'medicate ourselves/ to move ourselves from dis-ease to health, that we will live lives that not only survive times of stress , we will find stability in times iof stress , be able to feel our  joy in times of liove and absolutely live a life where we can THRIVE.

Page 4

Chpter 1  HOW

HOW do humans self medicate

Basic needs

Air,Water Food, shelter, safety,health and our higher needs:  accomplishment,companionship, spiritiual connection, love,


Maslow says if we meet all these needs we have self actualized.

Different cultures have similar ideas.. attaining freedom from suffering, self fulfillment, becoming a valued contributor to the greater community, and then there are levels that we may never attain in our lifetime that may be reserved for greater beings like saints or prophets, or martyrs or even higher.. people who achieve nirvana, peace,

Most of us wil never achieve nirvana but we CAN experience periods of intense joy and peace in our

Lives                                                                                              3

 If our basic needs aren't met we look outside to our environment to fix them (nature)

Or if the environment does not provide, we look to ourselves   inside. (nurture)

At one time Science tried to debate which influenced us more nature or nurture.

In the 1950s , the general thought of the times was to   blame over bearing Mothers (nurture) for their children's schizophrenuia) and disregarded nature ( genetics and personal biology)

As science and technology became more advanced, scientists looked to genetics and brain funcitonoing to explain dis-ease or lack of functioning for mental health conditions

Everyone has their own unique balance of outside and inside, depending on our God given genetics and

environmernt,


Ill start by defining what I mean by : genetics and biological (nature) organic brain dysfunctioning, neurological, traumatic brain injuries.. How does genetics affect our functioning?

AR-00002567

Page 5

The definition of environment (nurture) the environment around us ( family, community, culture, socio political influence,,) How dies envirionmnent affect our funstuioning

How we learn to self medicate is based upon the mixture of genetics and environmrny

AR-00002568

Page 6

THE HEART OF TGE QUESTION that  ALL OF YOU ARE MOST LIKELY ASKING AT THIS POINT IS

What ways DO PEOPLE SELF MEDICATE?


Let me count the ways..


Excercizing

Smoking

Love relationships

Sex

Shopping

Eating

Drinking

Working

Sleeping

Talking

Running

Hiding

Psychiatric medicines


6

Skateboarding

Drawing

Having affairs

Yelling

AR-00002569

Crying

Avoiding

Confronting

Writing

Laughing

Analyzing

Meditating

Talking to friends

Walking

Social media

Computers

Math

Reading



Home / SORNA / Current Law / All Implementation Documents

Implementation Documents

# SORNA: Information Required for Notice of International Travel 🔗

Title I of the Adam Walsh Child Protection and Safety Act of 2006, the Sex Offender Registration and Notification Act (SORNA), requires that registered sex offenders inform registry officials of any intended travel outside of the United States at least 21 days prior to the start of that travel. Pursuant to the National Guidelines for Sex Offender Registration and Notification, information about such intended travel is specifically required to be transmitted to the U.S. Marshals Service.

To substantially implement SORNA, jurisdictions must notify the U.S. Marshals Service's National Sex Offender Targeting Center (USMS-NSOTC) with the information below regarding a registered sex offender's intended international travel. Jurisdictions are strongly encouraged to make this notification by way of the Notification of International Travel of Sex Offender form on the SORNA Exchange Portal, which is available free of charge to all registration jurisdictions. As an alternative, jurisdictions may directly submit the Notification of International Travel form to USMS-NSOTC by email at IOD.NSOTC@usdoj.gov, with a subject line of "Sex Offender Travel Notification." When a notification of international travel is received, USMS-NSOTC will provide the notification information to INTERPOL Washington, who will then communicate it to law enforcement partners at the intended foreign travel destination(s).

Jurisdictions should send the following traveler information to USMS-NSOTC:

**Identifying Information:**

AR-00002571

- Full name (last, first, middle)
- Alias(es) (if applicable)
- Date of birth
- Sex
- FBI number (for domestic law enforcement use only)
- Citizenship
- Passport number and country

**Travel information:**

- Purpose(s) of travel (business, vacation, military, relocation, deportation, other [specify])
  - Means of travel (air, bus, car, ship, train, other [specify])
- U.S. departure date and location
- U.S. return date and location

**Criminal Record:**

- Date and city, state or jurisdiction of conviction(s)
- Offense(s) of conviction requiring registration
- Victim information: age/gender/relationship
- Registration jurisdiction(s) (name of state, tribe or territory)

**Other:**

- Itinerary details (when available), including the name of the airport/train station/port, the flight/train/ship number, the time of departure, the time of arrival and information about any intermediate stops, including any cities/towns within countries and points of arrival/departure from each country
- Contact information within destination country
- Foreign travel visa information
- Notifying agency and contact information

Digital copies or photocopies of all pertinent travel documents should be made at the time a sex offender provides advance notice of international travel. If such documents are not available, the jurisdiction should collect identifying information regarding those documents (for example, a passport number and country of issuance in lieu of a physical copy of a passport). As appropriate, any new or updated registration information received from an offender (such as a passport number) should be included in the National Sex Offender Registry.

In addition and at their discretion, jurisdictions are free to directly notify other appropriate law enforcement agencies of an offender's intended international travel by whatever means the jurisdiction deems necessary.

*To download all of the documents, click <u>here</u>.*



**U.S. DEPARTMENT OF JUSTICE**
OFFICE OF JUSTICE PROGRAMS

AR-00002573

🇺🇸 An official website of the United States government, Department of Justice.   Here's how you know



**Home** / **Topics**

# Tracking Individuals Who Commit Sex Offenses: Federal Law, Resources Have Led to Marked Improvement of State Registries, But More Work Is Needed

A 2006 federal law drove all states to keep better track of those convicted of sex offenses through enhanced technology and consistent practices, but some states are falling short of standards.

**November 13, 2020**

Communities want to know when convicted people convicted of sex offenses are living in their midst. For a quarter century, federal law has guaranteed communities the right to know. In 1994, Congress mandated that all states develop registries of those committing sex offenses. Two years later, Megan's Law provided that information on those committing sexual offenses must be made public.

In the ensuing decade, laws addressing and registries for those who commit sex offenses sprang up in all states — but not always with the full impact intended. In some instances, technology deficits limited information sharing across registries and jurisdictions, a synergy vital to track people convicted of sex offenses who move to other jurisdictions. Resource shortfalls strained states' abilities to keep up with the growing volume of individuals required to register their presence, and with new types of identifying data for them. Jurisdictional inconsistency left a patchwork of programs, evidencing a need for national norms.

In 2006, Congress passed the Adam Walsh Child Protection and Safety Act (AWA). The AWA authorized the creation of a new Justice Department office, the Office of Sex Offender

AR-00002574

Sentencing, Monitoring, Apprehending, Registering, and Tracking, known as the SMART Office, within the Office of Justice Programs. Title I of the AWA is the Sex Offender Registration and Notification Act (SORNA), enacted to redress those state-level asymmetries and deficiencies by creating comprehensive national standards for the registration of those committing sex offenses. The SMART Office oversees the implementation of SORNA.

The enactment of SORNA:

- Broadened federal requirements for "sex offender registration and notification" (SORN) systems in states and other jurisdictions.
- Expanded interstate enforcement through the U.S. Marshals Service.
- Improved federally run information systems to both enhance information exchange between jurisdictions and expand public access to registrant information.

Recent research supported by the National Institute of Justice, in collaboration with the SMART Office, measured the states' progress implementing SORNA, particularly in the areas of standards implementation and information sharing within and between states and with the federal government.

The research concluded that, overall, substantive improvements to the states' SORN policies have brought disparate systems into closer alignment. According to the study, collectively those efforts have:

- Produced greater consistency in data elements across systems. Common data elements reported by jurisdictions are court records (including supplemental conviction offense information such as victim age), address histories, and arrest information.
- Captured more registrant information, with more registrant locations and activities.
- Strengthened registration requirements related to time frames for updating data, content verification frequency, length of registration, and noncompliance penalties.
- Promoted more uniformity and consistency in public registry website information.

At the same time, a number of states were found to have fallen short in several areas, due in part to the rising number of registrations, from fewer than 600,000 in 2006 to over 900,000 in 2018. Three areas in particular were identified as posing ongoing challenges:

- Resource and capacity needs in light of both the growing registrant population and expanded program demands.
- State-level systemic barriers to implementation of some SORNA standards.
- Demands from the field for dynamic and integrated information systems.

AR-00002575

In the end, the researchers reported many states have run into barriers preventing them from substantially implementing all SORNA standards, due to resource constraints, incompatible state or local laws, a lack of requisite legislative will, or a combination of factors.

# Broad Progress on Key Measures 🔗

## Meeting SORN Policy Standards 🔗

The researchers found broad progress by the states in elevating their SORN policies to federal requirements. They examined each existing state policy against SORNA requirements in 14 substantive standards categories. A "standard determination" then established whether, for each SORNA requirement, the state policy complied with that requirement.

At least half the states met implementation thresholds for 13 of the 14 SORNA standard areas; 75% of the states met the thresholds for at least nine areas; and 92% of the states met them for at least half of the SORNA areas.

## Enhancing Information Sharing 🔗

The researchers found that state registries of individuals convicted of sex offenses have significantly evolved since SORNA's 2006 enactment. "While many state representatives [for the study] described challenges associated with the introduction of new systems and the continuous expansion in the volume of registry data and activity, stakeholders with historical perspectives generally viewed their SORN systems as more robust, reliable, and effective than they were prior to SORNA's passage," the study report stated, noting advances in the following areas:

- **Technology**. Of the 10 states involved in a case-study segment of the SORNA research, all have transitioned to more robust registry platforms, or invested in redesigned management systems, or both. All have enhanced their interface with the Dru Sjodin National Sex Offender Public Website and the FBI's National Sex Offender Registry.
- **Operations.** SORNA implementation has spurred more consistent practices for managing the relocation of people convicted of sex offenses, as well as improved quality and consistency of information, within and across jurisdictions.
- **Culture.** A "culture of information sharing" has emerged among all states in the sample, with constructive, established relationships among jurisdictions.
- **State investment.** Investment in technology and operational improvements varied across states, but investments were independent of those states' respective levels of

AR-00002576

compliance with SORNA standards.

## Federal Support ⌘

The study underscored multiple ways the federal SMART Office and the U.S. Marshals Service have advanced state SORN initiatives. SMART provides grant support and technical assistance to jurisdictions, and functions as an enforcer of SORNA standards in the states. The research team found that many state stakeholders regarded SMART's general approach as collaborative. The study found that SMART partnered with jurisdictions in advancing standards implementation consistent with each state's unique circumstances. Regional and national training events staged by SMART, as well as the U.S. Marshals Service, fostered a cross-jurisdictional community of practice, the study report said.

Technology advances under the auspices of SMART include the Dru Sjodin National Sex Offender Public Website, the Sex Offender Registration Tool, and the SORNA Exchange Portal.

# Areas for Improvement ⌘

The SORN registrant population has risen steadily. Growth pressures are greatest in more populous states, the study found. SORN systems have also faced accelerated growth in the volume of administrative transactions, the researchers said. Further, stakeholders have reported a surge in operational activities such as interjurisdictional data exchange, enhanced compliance efforts, address verification, and tracking of absconders — individuals who are required to register or update their information but fail to do so.

State and local law enforcement must balance these areas of demand for SORN resources with other public safety priorities, the researchers said. State SORN systems depend on supportive federal policies.

## Implementation of Some SORNA Standards Constrained ⌘

Although three-quarters of all standard determinations met federal implementation thresholds, state progress toward implementation "has slowed considerably, and is likely approaching a point of stasis," the study report cautioned. Most points of divergence with standards were the result of fixed barriers, such as legal barriers, legislative resistance, inconsistency between SORNA standards and state systems, and cost concerns. The researchers concluded that 14 years after SORNA's enactment, many states have "reached an

impasse" on further implementation that likely will require the attention of federal policymakers to resolve.

The researchers found significant variation in states' SORN policies and systems. Thus, despite SORNA's success in promoting consistency across systems, it has not proven to be a one-size-fits-all solution, the report said.

Successful state implementation of SORNA standards has tended to be modest and incremental. More extensive state policy changes have been far more difficult. The research report noted that other challenging areas were registration requirements related to juvenile offenses; difficulty classifying people convicted of sex offenses; difficulty providing registration relief in appropriate cases; failure to meet public website requirements of SORNA (24 states had not met the standard); and difficulty applying SORNA requirements to certain offenses that predated registration statutes.

## Continuing Data Access and Exchanges Challenges 🔗

Despite considerable SORN technology investments by the states since SORNA's 2006 passage, stakeholders identified persistent information-sharing challenges. Many were linked to interjurisdictional transfer activity, the report noted.

# Conclusion 🔗

Although study participants identified a need for federal resource infusions tailored to operational needs, there is a way forward. The research team identified core policy enhancement needs, including:

- Advancement of the critical role of federal resources supporting state and interstate efforts, including SMART grant support and support for absconder enforcement by the U.S. Marshals Service.
- A specific need for federal investments in technology meeting operational needs. Participants noted that amid growing resource demands, integrating disparate state SORN systems requires federal leadership in promoting shared technological solutions.
- Refinement of SORNA standards calibrated to advance interjurisdictional consistency while recognizing limits to standardization in different states.
- Enhancement of the cross-jurisdictional SORN community of practice that has emerged with support of the SMART Office and the U.S. Marshals Service.

## About This Article 🔗

The research described in this article was funded by NIJ grant 2014-AW-BX-K003, awarded to University of Massachusetts Lowell. The article is based on the report "Information Sharing and the Role of Sex Offender Registration and Notification" (2020), by Andrew J. Harris (principal investigator), Kimberly Kras (co-investigator), and Christopher Lobanov-Rostovsky (co-investigator). The team also produced an executive summary.

**Cite this Article**

National Institute of Justice, "Tracking Individuals Who Commit Sex Offenses: Federal Law, Resources Have Led to Marked Improvement of State Registries, But More Work Is Needed ," November 13, 2020, nij.ojp.gov: https://nij.ojp.gov/topics/articles/tracking-individuals-who-commit-sex-offenses-federal-law-resources-have-led-marked

**Read More About:**

Sex Offender Registration and Notification Act (SORNA)     U.S. Marshals Service

Federal     Dru Sjodin National Sex Offender Public Website (NSOPW)

Sex offender registration     SORNA Exchange Portal     Standards     Megan's Law

Technical assistance (TA)     Sex offenses     Inmates/offenders     Sex offenders

Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART)

Sex offender management     Evaluation     Program evaluation

Social and Behavioral Science

*Date Published: November 13, 2020*

## Related Publications

Information Sharing and the Role of Sex Offender Registration and Notification, Final Technical Report

Information Sharing and the Role of Sex Offender Registration and Notification, Executive Report

## Related Awards

Information Sharing and the Role of Sex Offender Registration and Notification



**U.S. DEPARTMENT OF JUSTICE**
OFFICE OF JUSTICE PROGRAMS

**69856**   **Federal Register** / Vol. 86, No. 233 / Wednesday, December 8, 2021 / Rules and Regulations

## DEPARTMENT OF JUSTICE

**28 CFR Part 72**

**[Docket No. OAG 157; AG Order No. 5244–2021]**

**RIN 1105–AB52**

## Registration Requirements Under the Sex Offender Registration and Notification Act

**AGENCY:** Office of the Attorney General, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** The Department of Justice is adopting a rule that specifies the registration requirements under the Sex Offender Registration and Notification Act ("SORNA"). The rule in part reflects express requirements of SORNA and in part reflects the exercise of authorities SORNA grants to the Attorney General to interpret and implement SORNA's requirements. SORNA's requirements have previously been delineated in guidelines issued by the Attorney General for implementation of SORNA's requirements by registration jurisdictions.

**DATES:** This rule is effective January 7, 2022.

**FOR FURTHER INFORMATION CONTACT:** David J. Karp, Senior Counsel, Office of Legal Policy, U.S. Department of Justice, Washington, DC, 202–514–3273.

**SUPPLEMENTARY INFORMATION:** This rule finalizes a proposed rule, Registration Requirements Under the Sex Offender Registration and Notification Act (OAG 157; RIN 1105–AB52) (published August 13, 2020, at 85 FR 49332).

### Overview

The Sex Offender Registration and Notification Act ("SORNA"), which is title I of the Adam Walsh Child Protection and Safety Act of 2006, Public Law 109–248, 34 U.S.C. 20901 *et seq.,* establishes national standards for sex offender registration and notification in the United States. SORNA has a dual character, imposing registration obligations on sex offenders as a matter of Federal law that are federally enforceable under circumstances supporting Federal jurisdiction, *see* 18 U.S.C. 2250, and providing minimum national standards that non-Federal jurisdictions are expected to incorporate in their sex offender registration and notification programs, subject to a reduction of Federal funding for those that fail to do so, *see* 34 U.S.C. 20912(a), 20926–27.

The Justice Department's Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and

Tracking ("SMART Office") administers the national standards for sex offender registration and notification under SORNA and assists all jurisdictions in implementing the SORNA standards in their programs. *See id.* 20945. As provided by SORNA, the Department of Justice also (i) prosecutes SORNA violations by sex offenders committed under circumstances supporting Federal jurisdiction, *see* 18 U.S.C. 2250; (ii) assists in the enforcement of sex offender registration requirements through the activities of the U.S. Marshals Service, *see* 34 U.S.C. 20941; (iii) operates, through the Federal Bureau of Investigation, the National Sex Offender Registry, which compiles the information obtained through the sex offender registration programs of the states and other registration jurisdictions and makes it available on a nationwide basis for law enforcement purposes, *see id.* 20921; and (iv) operates the Dru Sjodin National Sex Offender Public website, *www.nsopw.gov,* which provides public access through a single national site to the information about sex offenders posted on the public sex offender websites of the various registration jurisdictions, *see id.* 20922.

SORNA generally directs the Attorney General to "issue guidelines and regulations to interpret and implement [SORNA]." *Id.* 20912(b). SORNA also authorizes the Attorney General to take more specific actions in certain contexts.

One such provision is 34 U.S.C. 20913. That section states in subsection (b) that sex offenders are generally to register initially before release from imprisonment, or within three business days of sentencing if not sentenced to imprisonment, but it provides further in subsection (d) that the Attorney General has "the authority to specify the applicability of the requirements of [SORNA] to sex offenders convicted before the enactment of [SORNA] or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)." As discussed below in connection with 28 CFR 72.3, section 20913(d) is not a constitutionally impermissible delegation of legislative authority. Rather, it enables the Attorney General to effectuate the legislative intent that SORNA apply to all sex offenders, regardless of when they were convicted.

Another relevant provision lists several types of information that sex offenders must provide for inclusion in sex offender registries, and states that

sex offenders must also provide "[a]ny other information required by the Attorney General." *Id.* 20914(a)(8). This provision as well is not an impermissible delegation of legislative authority, but rather is instrumental to the Attorney General's effectuating the legislative objective to "protect the public from sex offenders and offenders against children" by "establish[ing] a comprehensive national system for the registration of those offenders." *Id.* 20901; *see* 73 FR at 38054–57; 76 FR at 1637. The Attorney General's exercise of the authority under section 20914(a)(8) is limited to requiring additional information that furthers the legislative public safety objective or the implementation or enforcement of SORNA's provisions. How that has been done is explained below in connection with 28 CFR 72.6 and 72.7.

The Attorney General has exercised these authorities in previous rulemakings and issuances of guidelines under SORNA, as detailed in the rulemaking history and section-by-section analysis below, and the interpretations and policy decisions in this rule follow those already adopted in existing SORNA-related documents. The present rule provides a concise and comprehensive statement of what sex offenders must do to comply with SORNA's requirements.

In addition to SORNA's original provisions, described above, this rulemaking draws on and implements provisions of the International Megan's Law to Prevent Child Exploitation and Other Sexual Crimes Through Advanced Notification of Traveling Sex Offenders ("International Megan's Law"), Public Law 114–119. Section 6 of International Megan's Law amended SORNA by (i) redesignating, in 34 U.S.C. 20914(a), former paragraph (7) as paragraph (8) and adding a new paragraph (7) that requires a sex offender to provide for inclusion in the sex offender registry information relating to intended travel outside the United States, including several specified types of information "and any other itinerary or other travel-related information required by the Attorney General"; (ii) adding a new subsection (c) to 34 U.S.C. 20914 that requires sex offenders to provide and update registration information required by SORNA "in conformity with any time and manner requirements prescribed by the Attorney General"; and (iii) adding a new subsection (b) to SORNA's criminal provision, 18 U.S.C. 2250, that specifically reaches international travel reporting violations.

This rulemaking is not innovative in terms of policy. Many of the requirements it articulates reflect

express SORNA requirements. These include, inter alia, statutory specifications about (i) where and when sex offenders must register; (ii) several categories of required registration information; (iii) how long sex offenders must continue to register, including different registration periods for sex offenders in different tiers and lifetime registration for those in the highest tier; and (iv) a requirement to appear periodically to verify the registration information. *See* 34 U.S.C. 20911(2)–(4), 20913, 20914(a)(1)–(7), 20915, 20918.

Other features of the rule reflect exercises of the Attorney General's powers to implement SORNA's requirements. These include additional specifications regarding information sex offenders must provide, how and when they must report certain changes in registration information, and the time and manner for complying with SORNA's registration requirements by sex offenders who cannot comply with SORNA's normal registration procedures. On these matters, however, the rule embodies the same policies as those appearing in the previously issued SORNA guidelines and prior rulemakings under SORNA.

The rule also makes no change in what registration jurisdictions need to do to substantially implement SORNA in their registration programs, a matter that will continue to be governed by the previously issued guidelines for SORNA implementation.

While this rule does not make new policy, as discussed above, it is expected to have a number of benefits. The rule will facilitate enforcement of SORNA's registration requirements through prosecution of noncompliant sex offenders under 18 U.S.C. 2250. By providing a comprehensive articulation of SORNA's registration requirements in regulations addressed to sex offenders, it will provide a more secure basis for prosecution of sex offenders who engage in knowing violations of any of SORNA's requirements. It will also resolve a number of specific concerns that have arisen in past litigation or could be expected to arise in future litigation, if not clarified and resolved by this rule. For example, as discussed below, the amendment of § 72.3 in the rule will ensure that its application of SORNA's requirements to sex offenders with pre-SORNA convictions is given effect consistently, resolving an issue resulting from the decision in *United States* v. *DeJarnette,* 741 F.3d 971 (9th Cir. 2013).

Beyond the benefits to effective enforcement of SORNA's requirements, the rule will benefit sex offenders by providing a clear and comprehensive statement of their registration obligations under SORNA. This statement will make it easier for sex offenders to determine what they are required to do and thus facilitate compliance.

By facilitating the enforcement of, and compliance with, SORNA's registration requirements, the rule will further SORNA's public safety objectives. *See* 34 U.S.C. 20901. More consistent adherence to these requirements will enable registration and law enforcement authorities to better track and monitor released sex offenders in the community and enhance the basis for public notification regarding registered sex offenders that SORNA requires. *See id.* 20920, 20923.

Effective September 1, 2017, the provisions of SORNA, formerly appearing at 42 U.S.C. 16901 *et seq.,* were recodified in a new title 34 of the United States Code, and now appear at 34 U.S.C. 20901 *et seq. See http:// uscode.house.gov/editorial reclassification/t34/index.html.* United States Code citations of SORNA provisions in this rule accordingly differ from the corresponding citations in earlier sources and documents.

**Rulemaking History**

This rule is the tenth document the Attorney General has published pursuant to the statutory directive to the Attorney General to issue guidelines and regulations to interpret and implement SORNA. *See* 34 U.S.C. 20912(b). The previous SORNA-related documents are as follows:

(1) Interim rule entitled, ''Applicability of the Sex Offender Registration and Notification Act,'' published at 72 FR 8894 (Feb. 28, 2007). The interim rule solicited public comments, and the comment period ended on April 30, 2007. The interim rule added a new part 72 to title 28 of the Code of Federal Regulations, entitled ''Sex Offender Registration and Notification.'' The interim rule provided that ''[t]he requirements of the Sex Offender Registration and Notification Act apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act.'' 28 CFR 72.3.

(2) Proposed guidelines, published at 72 FR 30210 (May 30, 2007), whose general purpose was to provide guidance and assistance to registration jurisdictions in implementing the SORNA standards in their sex offender registration and notification programs. The proposed guidelines solicited public comment, and the comment period ended on August 1, 2007.

(3) Final guidelines for registration jurisdictions regarding SORNA implementation entitled, ''The National Guidelines for Sex Offender Registration and Notification'' (the ''SORNA Guidelines''), published at 73 FR 38030 (July 2, 2008).

(4) Proposed supplemental guidelines for SORNA implementation, published at 75 FR 27362 (May 14, 2010), whose general purpose was to address certain issues arising in SORNA implementation that required that some aspects of the SORNA Guidelines be augmented or modified. The proposed supplemental guidelines solicited public comment, and the comment period closed on July 13, 2010.

(5) Final rule entitled, ''Applicability of the Sex Offender Registration and Notification Act,'' published at 75 FR 81849 (Dec. 29, 2010). This rule finalized the February 28, 2007, interim rule providing for SORNA's applicability to all sex offenders, including those with pre-SORNA convictions.

(6) Final supplemental guidelines for SORNA implementation entitled, ''Supplemental Guidelines for Sex Offender Registration and Notification'' (the ''SORNA Supplemental Guidelines''), published at 76 FR 1630 (Jan. 11, 2011).

(7) Proposed supplemental guidelines, published at 81 FR 21397 (Apr. 11, 2016), whose general purpose was to afford registration jurisdictions greater flexibility in their efforts to substantially implement SORNA's juvenile registration requirement. These proposed supplemental guidelines solicited public comment, and the comment period closed on June 10, 2016.

(8) Final supplemental guidelines regarding substantial implementation of SORNA's juvenile registration requirement entitled, ''Supplemental Guidelines for Juvenile Registration Under the Sex Offender Registration and Notification Act,'' published at 81 FR 50552 (Aug. 1, 2016).

(9) Proposed rule entitled, ''Registration Requirements Under the Sex Offender Registration and Notification Act,'' published at 85 FR 49332 (Aug. 13, 2020). The proposed rule solicited public comments and the comment period closed on October 13, 2020.

**Summary of Comments**

The Department of Justice received over 700 comments on this rulemaking from individuals and organizations. Most of the comments amounted to general criticisms of sex offender registration or SORNA. Some of the

comments proposed specific changes to the provisions of the proposed rule. Having carefully considered all comments, the Department of Justice has concluded that the regulations in this rulemaking should be promulgated without change from the proposed rule, except for amendment of § 72.8(a)(1)(i)–(ii) to specify the circumstances in which SORNA violations may result in Federal criminal liability. The ensuing discussion summarizes the principal issues that were raised in the public comments.

*General Comments*

Most of the comments received amounted to general criticisms of sex offender registration or associated public notification requirements. Comments of this nature generally argued that sex offender registration is of little or no value in protecting public safety and that any value it may have is outweighed by adverse effects on sex offenders and their families. Some comments in this class proposed that sex offender registration be restricted, if not entirely eliminated, such as by narrowly limiting the sex offenders or sex offenses for which registration is required, ending disclosure of information about sex offenders to the general public, setting shorter registration periods, or providing broader means for terminating registration. Some of these comments criticized requirements in this rule that track express statutory requirements, including the statutory requirements relating to the jurisdictions in which sex offenders must register, the information sex offenders must provide, the duration of registration periods, and reporting and verification of certain information through in-person appearances. *See* 34 U.S.C. 20913–16, 20918.

These comments could not be accepted in this rulemaking because the Attorney General has no authority to repeal the requirements enacted by Congress in SORNA or the sex offender registration laws of non-Federal jurisdictions. This rule interprets and implements SORNA, as directed by 34 U.S.C. 20912(b). The Attorney General's regulatory authority under SORNA does not include second-guessing the underlying legislative policy judgments or nullifying the measures that Congress has adopted in the law. *See* 73 FR at 38036.

Some comments criticized the rule's specification of registration requirements which, wholly or in part, do not appear expressly in SORNA. The matters criticized included requirements to provide information about actual and purported dates of birth and Social Security numbers, temporary lodging away from residence, passports and immigration documents, and professional licenses. In addition to comments criticizing the extent of the information required by the rule, some comments in this class criticized requirements adopted by the Attorney General to keep registration information up to date. These include requirements to report in advance departure from a jurisdiction, the requirement to report within three business days changes relating to remote communication identifiers, temporary lodging, and vehicle information, and the requirement to report international travel at least 21 days in advance.

The Attorney General has adopted these measures in the exercise of powers that SORNA provides to interpret and implement SORNA, specify required registration information, and prescribe time-and-manner requirements for providing and updating the information. *See* 34 U.S.C. 20912(b), 20914(a)(7)–(8), (c). Each of these measures is justified as a means of furthering SORNA's objective of protecting the public from sex offenders and offenders against children by establishing a comprehensive national registration system, *see id.* 20901, or as a means of implementing or enforcing SORNA's provisions. The specific reasons for the various requirements are explained in the section-by-section analysis below. The comments received provided no persuasive grounds to abrogate or modify these requirements.

Some comments argued that SORNA or this rule are unconstitutional on various grounds, such as the prohibitions of cruel and unusual punishment, double jeopardy, and ex post facto laws, the right to travel, and the requirement of due process. Claims of this nature are familiar to the Department of Justice, having been raised in litigative challenges to SORNA and rejected by the Federal courts. *See, e.g., Willman* v. *Att'y Gen.,* 972 F.3d 819, 824–27 (6th Cir. 2020). The comments provided no persuasive reason to believe that any aspect of SORNA or this rule is unconstitutional.

Some comments objected to the application of SORNA's requirements to sex offenders whose offenses or convictions predate SORNA, as provided in § 72.3 in this rule. Section 72.3 is necessary to implement Congress's intent that SORNA apply to all sex offenders, regardless of when they were convicted. *See Reynolds* v. *United States,* 565 U.S. 432, 442–45 (2012); *id.* at 448–49 & n. (Scalia, J., dissenting) (agreeing that Congress intended for SORNA to apply to all sex offenders); *Gundy* v. *United States,* 139 S. Ct. 2116, 2123–30 (2019) (plurality opinion). The section-by-section analysis below provides further explanation of the provisions and rationale of § 72.3.

Some comments objected to substantive restrictions imposed on sex offenders in some jurisdictions, such as restrictions on where they can live, prohibitions of proximity to schools or children, or exclusion from some types of employment. These comments are not germane to this rule, which articulates SORNA's registration requirements for sex offenders, because SORNA's requirements are informational in nature and do not restrict where sex offenders can go or what they can do. *See* 73 FR at 38032. A similar response applies to comments that were critical of requirements under other laws that identification documents, such as passports and drivers' licenses, include notations identifying the holders as sex offenders. These comments are misdirected in relation to this rule because SORNA does not impose such requirements, and, where they are prescribed by other laws, the Attorney General has no authority to rescind or modify them by rulemaking.

Some comments criticized public disclosure of information about sex offenders, arguing that access to information in the sex offender registries should be limited to law enforcement or otherwise narrowly restricted. These comments concern the scope of disclosure of sex offender information by registration jurisdictions and, as such, are not germane to this rule, which concerns SORNA's registration requirements for sex offenders. Disclosure of sex offender information is separately addressed in statutory provisions that are not implicated by this rulemaking and in the SORNA Guidelines and Supplemental Guidelines. *See* 34 U.S.C. 20916(c), 20920, 20922–23; 73 FR at 38042, 38058–61; 76 FR at 1632–33, 1636–37.

Some comments supported issuance of this rule. The benefits perceived by these commenters included protecting public safety, clarifying SORNA's registration requirements for sex offenders, and promoting compliance with those requirements.

*A Comment Proposing 10 Changes in the Rule*

A lengthy comment proposed 10 specific changes in the rule:

(i) The comment proposed that the rule and each discrete requirement therein should be revised to say that registrants need only comply when

circumstances supporting Federal jurisdiction are present. Section 72.8(a)(1)(i)–(ii) in the final rule reproduces the required jurisdictional circumstances under 18 U.S.C. 2250, making clear the conditions that must be satisfied to support Federal criminal liability for SORNA violations. It would be misleading or incorrect to state that sex offenders need not comply with the requirements set forth in this rule in a broader sense, absent grounds supporting Federal jurisdiction, because those requirements are widely paralleled in the sex offender registration laws of the states and other non-Federal jurisdictions. *See* National Institute of Justice, *Tracking Sex Offenders: Federal Law, Resources Have Led to Marked Improvement of State Registries, But More Work Is Needed* (Nov. 13, 2020) ("At least half the states met implementation thresholds for 13 of the 14 SORNA standard areas; 75% of the states met the thresholds for at least nine areas; and 92% of the states met them for at least half of the SORNA areas."). Sex offenders accordingly may be subject to criminal penalties under state law for violating these requirements, regardless of whether grounds for Federal jurisdiction exist. While § 72.8(a)(1)(i)–(ii) has been revised in the final rule to state explicitly the scope of Federal jurisdiction to prosecute SORNA violations under 18 U.S.C. 2250, the comment was not persuasive that the jurisdictional limitation should be referenced repeatedly throughout the rule, since the statement in § 72.8(a)(1)(i)–(ii) is clear.

(ii) The comment proposed that the rule incorporate a clear statement that a registrant's duty to act under SORNA arises only when the registrant travels interstate and that travel has a nexus to the alleged SORNA violation. In referring to a registrant's "duty" to act, the comment apparently meant amenability to Federal prosecution under 18 U.S.C. 2250 in case of a violation. The proposed change is legally incorrect. The grounds of Federal jurisdiction under section 2250 include grounds other than interstate travel, such as conviction for a Federal sex offense or travel in foreign commerce, and section 2250 specifies no required "nexus" between interstate travel and the charged SORNA violation beyond the temporal sequencing implied by the provision's language and structure. *See Carr* v. *United States*, 560 U.S. 438, 446 (2010).

(iii) The comment argued, based on the Supreme Court's decision in *Nichols* v. *United States*, 136 S. Ct. 1113 (2016), that the rule's requirements to report

departure from a jurisdiction and termination of residence in a jurisdiction under § 72.7(d) and (g) exceed the Attorney General's powers under 34 U.S.C. 20914(a) and (c). Adopting these requirements is within the Attorney General's powers under SORNA, and consistent with the *Nichols* decision, as explained in the section-by-section analysis below.

(iv) The comment proposed that the rule state that § 72.7(g) absolves registrants of a duty to report information required by SORNA when state law or the local agency does not require that information. The proposed statement is legally incorrect because SORNA's requirements exist independently of state law requirements, *see Willman*, 972 F.3d at 821–24, and it is not needed to avoid unfairness to sex offenders based on differences between SORNA's requirements and state law requirements. Section 72.8(a)(1)(iii) in this rule explains that sex offenders are not held liable under 18 U.S.C. 2250 for violation of registration requirements of which they are unaware, and noncompliance with SORNA may be excused where compliance is prevented by circumstances beyond their control, such as a jurisdiction's failure to carry out a necessary complementary role. These principles apply to all requirements under SORNA, including the requirement of § 72.6 to provide specified types of information for inclusion in the registry. Hence, a sex offender is not held liable for failing to provide a type of information if he is unaware of a requirement to provide that information, as may be the case if a jurisdiction does not request that information in its registration forms, and failure to provide any type of information may be excused if a jurisdiction will not accept that information for inclusion in its registry.

(v) The comment asserted that the interpretation of the affirmative defense of 18 U.S.C. 2250(c), in the analysis statement's discussion of §§ 72.7(g) and 72.8, violates due process because it shifts the burden of proof to defendants. However, § 72.8(a)(1)(iii) explains that liability under 18 U.S.C. 2250(a)–(b) is conditioned on the defendant's being aware of the requirement he is charged with violating. The regulation and the accompanying analysis do not impose on the defendant a burden of proving that he lacked such awareness. Section 72.8(a)(2) states that there is an affirmative defense to liability for noncompliance with SORNA in certain circumstances, pursuant to 18 U.S.C. 2250(c). The regulation and the accompanying discussion do not change

the burden of proof on this defense, which Congress has expressly made an "affirmative defense." *Id.*

(vi) The comment asserted that § 72.6(b), requiring the reporting of remote communication identifiers, violates the First Amendment on grounds of ambiguity and because, the comment claimed, it infringes on the right to anonymous speech unless accompanied by restrictions on public disclosure of the identifiers. The rule's specification of covered identifiers is similar to a statutory definition in 34 U.S.C. 20916(e)(2) and sufficiently definite. The conditions for disclosure of sex offender information by registration jurisdictions are beyond the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA. Separate statutory provisions and the SORNA Guidelines and SORNA Supplemental Guidelines specify those conditions, which include restrictions on the disclosure of remote communication identifiers. *See* 34 U.S.C. 20916(c); 73 FR at 38059–60; 76 FR at 1633, 1637.

(vii) The comment asserted that § 72.8 is deficient because it does not expressly refer to the required jurisdictional predicates under 18 U.S.C. 2250. As formulated in this final rule, § 72.8 sets forth those jurisdictional predicates.

(viii) The comment asserted that the rule is impermissibly vague in a number of respects, including its definition of remote communication identifiers, the requirement that sex offenders lacking fixed residence addresses or places of employment report the relevant locations with whatever definiteness is possible under the circumstances, the requirement that sex offenders report information concerning places they are staying when away from their residences for seven or more days, and the meaning of a "clean record" that may reduce the registration period for certain sex offenders. However, the specification of covered remote communication identifiers in § 72.6(b) is similar to a statutory definition in 34 U.S.C. 20916(e)(2) and sufficiently definite. Where sex offenders do not have definite places of residence or employment, the information they provide under § 72.6(c)(1) and (c)(3) as to where they are living or working must be of a less definite nature, and it is reasonable to require that the information be provided with whatever definiteness is possible under the circumstances. The matter is further explained in the section-by-section analysis below and in 73 FR at 38056. The information required by § 72.6(c)(2)

is "temporary lodging information" and a related provision, § 72.7(e), requires sex offenders to report this information to their residence jurisdictions within three business days. The two provisions adequately convey that a sex offender, within three business days of returning to his residence, must report to the residence jurisdiction the places he has lodged while away from his residence for seven or more days. Section 72.5(c) refers to a "clean record" as described in 34 U.S.C. 20915(b)(1), so the meaning set forth in that statutory provision applies.

(ix) The comment proposed that § 72.5(c) should clarify that clean record reductions for tier I offenders and (juvenile delinquent) tier III offenders are automatic. Section 72.5(c) states that satisfaction of the clean record requirement reduces the registration period for the affected classes of sex offenders. The conditions a sex offender must satisfy to effect such a reduction are those specified in the applicable statute: "(A) not being convicted of any offense for which imprisonment for more than 1 year may be imposed; (B) not being convicted of any sex offense; (C) successfully completing any periods of supervised release, probation, and parole; and (D) successfully completing of [sic] an appropriate sex offender treatment program certified by a jurisdiction or by the Attorney General." 34 U.S.C. 20915(b)(1).

(x) The comment stated that the rule should be revised to include a federalism assessment and other requirements under Executive Order 13132 and the Unfunded Mandates Reform Act. However, the relevant regulatory certifications below are correct as they are. This rule satisfies the requirements of Executive Order 13132 and the Unfunded Mandates Reform Act.

*A Comment Proposing 13 Changes or Sets of Changes in the Rule*

Another comment proposed the following changes in the rule:

(i) The comment argued that § 72.5, relating to the duration of the registration period under SORNA, should be changed in various ways. It first argued that § 72.5 as drafted conflicts with a provision of the Fair Credit Reporting Act, which, the comment asserted, states that arrests and convictions may only be reported on background checks for seven years after release from prison. The reference is apparently to 15 U.S.C. 1681c, which generally "prohibits [consumer] reporting agencies from disclosing any arrest record or other adverse item more than seven years old but permits them

to report 'records of convictions of crimes' no matter how long ago they occurred." *Aldaco* v. *RentGrow, Inc.,* 921 F.3d 685, 687 (7th Cir. 2019) (quoting 15 U.S.C. 1681c(a)). Section 72.5 describes the duration of registration required by SORNA. *See* 34 U.S.C. 20915. It does not affect what may be included in consumer reports and does not conflict with the Fair Credit Reporting Act. The comment also stated that § 72.5 should be changed to establish standardized procedures for determining sex offenders' tiers, how long each offender will remain on the registry, and what restrictions can be placed on registrants in compliance with their constitutional rights, and should create a way for tier II offenders to petition for early removal from the registry. The procedures for registration jurisdictions to determine sex offenders' tiers are outside the scope of this rulemaking, but the SORNA Guidelines provide related guidance. *See* 73 FR at 38052–54. The duration of registration under SORNA is governed by statutory criteria, *see* 34 U.S.C. 20915, and cannot be changed by rulemaking. The statutes include no provision for reducing the registration periods of tier II offenders. *Id.* Assessing what restrictions can constitutionally be placed on sex offenders, such as restrictions on where sex offenders may live or work, is outside the scope of this rulemaking, which concerns SORNA's registration requirements for sex offenders.

(ii) The comment criticized § 72.6(b), relating to remote communication identifiers, as likely violating the First Amendment and overly vague. The comment provided no persuasive reason to believe that § 72.6(b) is unconstitutional. The description of covered remote communication identifiers in § 72.6(b) is similar to a statutory definition appearing in 34 U.S.C. 20916(e)(2) and sufficiently definite.

(iii) The comment claimed that § 72.6(c)(2)'s requirement to report temporary lodging information violates a constitutional right to travel because, the comment asserted, most places of lodging will not knowingly allow sex offenders to stay at their locations if a sex offender's travel plans are disclosed to them. The rule requires sex offenders to report temporary lodging information within three business days, not in advance, and it requires reporting of the information to the sex offender's residence jurisdiction, not the premises where he intends to stay. *See* § 72.7(e). The comment provided no persuasive reason to believe that this requirement violates any constitutional right.

(iv) The comment proposed to eliminate § 72.6(c)(3), on the ground that disclosure of sex offenders' employment information will adversely affect the employers and adversely affect the sex offenders' ability to obtain employment. Section 72.6 only requires sex offenders to provide employment information to registration jurisdictions. It does not address the public disclosure of such information and, more broadly, the conditions for disclosure of information about sex offenders are outside the scope of this rulemaking. The SORNA Guidelines separately address the disclosure of sex offender information, including employment information. *See* 73 FR at 38042–43, 38059.

(v) The comment claimed that § 72.6(c)(4)'s requirement to provide school attendance information violates a right to attend public schools without hindrance from the government and a First Amendment right of free association because, the comment asserted, most colleges and universities will not allow registered sex offenders to enroll. However, SORNA requires school attendance information, *see* 34 U.S.C. 20914(a)(5), and that requirement cannot be abrogated by rulemaking. Section 72.6(c)(4) requires sex offenders to provide school attendance information for inclusion in the registries. It does not require or encourage schools to deny enrollment to registered sex offenders, and any schools that have such a policy would potentially deny admission to registered sex offenders regardless of whether SORNA or this rule requires sex offenders to provide school attendance information for inclusion in the registries. The comment provided no persuasive reason to believe that this requirement violates any provision of the Constitution.

(vi) With respect to § 72.6(d), which requires reporting of international travel information, the comment stated that the U.S. government should be prohibited from providing travel plans to foreign nations. Congress made a contrary judgment in International Megan's Law, whose purposes include, as stated in its title, "[t]o protect children and others from sexual abuse and exploitation, including sex trafficking and sex tourism, by providing advance notice of intended travel by registered sex offenders outside the United States to the government of the country of destination". Public Law 114–119; *see Doe* v. *Kerry,* Case No. 16–cv–0654–PJH, 2016 WL 5339804 (N.D. Cal. Sept. 23, 2016), *appeal dismissed,* No. 16–17100, 2017 WL 5514566 (9th Cir. 2017)

(explaining the background and purposes of International Megan's Law and rejecting a constitutional challenge).

(vii) The comment claimed that § 72.6(g)'s requirement to disclose professional licenses violates a right to engage in commerce because states may revoke such licenses if notified that the licensee is a registered sex offender. The rule does not require states to revoke professional licenses issued to registered sex offenders. Whether and to what extent criminal histories including sex offenses should be disqualifying for professional licenses, such as licenses to teach children or to be care providers for persons in vulnerable populations, are matters for the states' judgment. The comment provided no persuasive reason to believe that requiring sex offenders to report professional licenses is unconstitutional.

(viii) With respect to § 72.8, the comment asserted that the jurisdictional predicate of travel in interstate or foreign commerce in 18 U.S.C. 2250 should be interpreted to apply only on the basis of business-related travel. There is no basis for such a restriction; it would depart from the interpretation of travel in interstate or foreign commerce in other federal laws; and it would conflict with SORNA's objective of reliably tracking sex offenders as they relocate among jurisdictions or travel abroad.

(ix) With respect to § 72.6(c)(3), which requires sex offenders to report the names and addresses of places of employment, the comment argued that this information should not be made public. The matter is outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA, not the conditions for disclosure of sex offender information by registration jurisdictions. The SORNA Guidelines address the latter issue, including disclosure of employment information. *See* 73 FR at 38042–43, 38059.

(x) The comment took issue with the regulatory certification below relating to Executive Orders 12866 and 13563. The comment assumed that the requirements in this rule are new requirements and hence will result in increased costs for sex offenders and registration jurisdictions. The premise is incorrect. As the regulatory certification explains, there are no new costs for registration jurisdictions because their requirements under SORNA continue to be those articulated in the previously issued SORNA Guidelines and SORNA Supplemental Guidelines. Likewise, for sex offenders, the requirements articulated in the rule either appear expressly in SORNA or have previously

been articulated by the Attorney General in the SORNA Guidelines and SORNA Supplemental Guidelines. This rule will not change the registration procedures of the registration jurisdictions or make those procedures more time-consuming or expensive. There is accordingly no reason to change the relevant regulatory certification.

(xi) The comment took issue with the regulatory certification below relating to Executive Order 13132 (Federalism), claiming that this rule will have a significant impact on the relationship between the states and the Federal government by creating Federal criminal penalties for sex offenders who violate SORNA's requirements and by creating funding reductions for states that do not implement SORNA's requirements in their registration programs. The premise of this comment is incorrect because the relevant Federal criminal penalties and funding incentive have existed since SORNA's enactment in 2006. *See* 18 U.S.C. 2250; 34 U.S.C. 20927.

(xii) The comment took issue with the regulatory certification relating to subtitle E of title II of the Small Business Regulatory Enforcement Fairness Act of 1996 (the "Congressional Review Act"), assuming that the rule will result in novel requirements to provide and disclose sex offenders' employment information with adverse effects on sex offenders and their employers. The assumption is incorrect because the requirements relating to employment information have existed for many years in SORNA and the SORNA Guidelines. *See* 34 U.S.C. 20914(a)(4); 73 FR 38042–43, 38059.

(xiii) With respect to § 72.6(c)(2), the comment stated that the rule must forbid a sex offender's home jurisdiction from routinely notifying a jurisdiction to which a registrant plans to travel or notifying a place of lodging that a registrant plans to stay there. The comment argues that such notification violates a constitutional right to travel because the destination jurisdictions may impose unwanted requirements and restrictions on sex offenders if it is known they are coming and the temporary lodging providers may not allow registered sex offenders to stay on their properties. However, the rule requires sex offenders to report temporary lodging information within three business days, not in advance. *See* § 72.7(e). If the residence jurisdiction knows about the sex offender's travel plans in advance anyway, and conveys the information to the destination jurisdiction or persons therein, no persuasive reason appears to believe that doing so is unconstitutional. Be that

as it may, this rule concerns the registration requirements for sex offenders under SORNA, and the conditions for disclosure of information about sex offenders by registration jurisdictions, including temporary lodging information, are outside of its scope. The SORNA Guidelines separately address the conditions for such disclosure. *See* 73 FR at 38058–61.

*A Comment Proposing 24 Changes in the Rule*

Another comment proposed 24 changes in the rule:

(i) With respect to § 72.1, the comment stated that subsection (b) should be revised to allow states to adopt requirements less stringent than SORNA without fear of losing federal funds, or alternatively, clarify the existing rule that states may adopt registration requirements that are substantially similar to SORNA. The matter is outside the scope of this rulemaking, which is concerned with the registration requirements for sex offenders under SORNA, not the requirements for registration jurisdictions. The funding reduction or reallocation for jurisdictions that do not substantially implement SORNA is a statutory matter and cannot be abrogated by rulemaking. *See* 34 U.S.C. 20927. The SORNA Guidelines and SORNA Supplemental Guidelines explain the substantial implementation requirement and the funding incentive. *See* 73 FR at 38047–48; 76 FR at 1638–39.

(ii) With respect to § 72.3, the comment proposed removing the application of SORNA based on pre-SORNA offenses, or specifying that SORNA does not apply to sex offenders not already required to register prior to SORNA's enactment. That conflicts with Congress's intent that SORNA apply to all sex offenders, regardless of when they were convicted, as discussed above and in the section-by-section analysis below.

(iii) With respect to § 72.5, the comment proposed clarifying that classification of sex offenders should be based upon the risk posed by offenses as represented by tier levels, and revising subsection (c) to allow reductions for all levels consistent with scientific research or recidivism risk. SORNA specifies the criteria for its tier classifications and the conditions for reducing registration periods. *See* 34 U.S.C. 20911(2)–(4); 20915. These matters are determined by statute and cannot be changed by rulemaking.

(iv) With respect to § 72.6(b), relating to remote communication identifiers, the comment proposed clarifying that IP

addresses are not required and proposed stating that requiring telephone numbers of "known associates" is a violation of privacy laws. Section 72.6(b) requires that sex offenders provide the designations they use for purposes of routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers. The specification of required information, which is similar to a statutory definition appearing in 34 U.S.C. 20916(e)(2), is sufficiently clear as drafted, and does not require sex offenders to provide IP addresses or the telephone numbers of "known associates."

(v) With respect to § 72.6(c), relating to provision of information concerning residence, temporary lodging, employment, and school attendance, the comment proposed providing grace periods for registration to reflect that loss of housing and employment can occur without warning and that it may take time to locate a replacement. SORNA and the rule generally allow three business days to report changes in residence, employment, and school attendance, or temporary lodging information. *See* § 72.7(c), (e). There is no need to stipulate a "grace period" for sex offenders who have nothing within the scope of § 72.6(c) to report, as may be the case with a sex offender who has just lost his residence or job and has no expectation about where he will be living or working in the future.

(vi) The comment proposed eliminating § 72.6(c)(2), relating to temporary lodging information, or alternatively, specifying that this information is not part of the public record and may not be promulgated by third-party sites without penalty. The section-by-section analysis below explains the justification for requiring temporary lodging information. The conditions for public disclosure of information about sex offenders by registration jurisdictions, including temporary lodging information, are outside the scope of this rulemaking, which is concerned with the registration requirements for sex offenders under SORNA. The SORNA Guidelines separately address disclosure of sex offender information by registration jurisdictions and do not require registration jurisdictions to disclose sex offenders' temporary lodging information on the public sex offender websites. *See* 73 FR at 38059. The Attorney General has no authority to create penalties for third-party sites that disclose sex offenders' temporary lodging information.

(vii) With respect to § 72.6(c)(3), relating to employment information, the comment proposed defining place of employment. Section 72.6(c)(3) is sufficiently clear as drafted, requiring the name and address of any place where a sex offender is or will be an employee or, for sex offenders who are or will be employed but with no fixed place of employment, other information describing where the sex offender works or will work with whatever definiteness is possible under the circumstances. In referring to place of employment, the language of § 72.6(c)(3) tracks the statutory requirement that sex offenders provide "[t]he name and address of any place where the sex offender is an employee or will be an employee," 34 U.S.C. 20914(a)(4).

(viii) With respect to § 72.6(c)(1), the comment proposed defining residence, specifically asking how a person registers a residence address if he is transient or homeless. The comment identified no lack of clarity in § 72.6(c)(1) that would require further definition. A person who has no residence address cannot, of course, report a residence address. For such situations, § 72.6(c)(1) provides that "if the sex offender has no present or expected residence address," then the sex offender must provide "other information describing where the sex offender resides or will reside with whatever definiteness is possible under the circumstances."

(ix) With respect to § 72.6(d) and (e), relating to information about international travel and passports and immigration documents, the comment proposed that the rule prohibit this information from becoming part of the public record. The conditions for public disclosure by registration jurisdictions of information about sex offenders, including information about their international travel and their passports and immigration documents, are outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA. Disclosure of sex offender information is addressed in statutes not implicated by this rulemaking and in the SORNA Guidelines and SORNA Supplemental Guidelines, which do not require inclusion of international travel, passport, and immigration document information on the public sex offender websites. *See* 73 FR at 38059.

(x) With respect to § 72.6(f), relating to vehicle information, the comment asked for evidence that watercraft and aircraft have been used in the commission of sexual offenses to justify the collection of information about such vehicles. As the section-by-section analysis below explains, vehicle information may be useful to help prevent flight, facilitate investigation, or effect an apprehension if a sex offender commits new offenses or violates registration requirements. This rationale applies to watercraft and aircraft, as well as land vehicles, whether or not the particular vehicles are used in committing sex offenses.

(xi) The comment proposed to specify in § 72.6(g), relating to information about professional licenses, that professional licensing shall not be denied based on conviction for a sexual offense unless it has a relationship to the responsibilities of the job. SORNA imposes no professional or occupational disqualifications on sex offenders, and the matter is outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA. The Attorney General has no authority to prohibit or restrict any professional or occupational disqualifications for sex offenders that states may adopt.

(xii) The comment said that § 72.6 should be revised because SORNA does not require public disclosure of certain types of information about sex offenders, mentioning specifically employer name, information about tier I sex offenders (not convicted of a specified offense against a minor), and non-sexual offenses. The requirements and exceptions for public disclosure of information about sex offenders by registration jurisdictions are outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA, and they are not within the subject matter of § 72.6, which identifies types of information sex offenders must provide for inclusion in the registries. Public disclosure of sex offender information is separately addressed in statutes not germane to this rulemaking and in the SORNA Guidelines and SORNA Supplemental Guidelines, which do not require registration jurisdictions to include on their public sex offender websites the types of information referenced in this part of the comment. *See* 73 FR at 38059.

(xiii) The comment said that the regulations should require accurate information (about sex offenders), provide penalties for inaccurate information or for use of the information to harm the family of the person required to register, and discourage third-party dissemination of information. These matters are outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA. SORNA independently directs registration jurisdictions to "include instructions on

how to seek correction of information that an individual contends is erroneous'' on their public sex offender websites. 34 U.S.C. 20920(e). It further directs that these websites ''shall include a warning that information on the site should not be used to unlawfully injure, harass, or commit a crime against any individual named in the registry or residing or working at any reported address,'' and that ''[t]he warning shall note that any such action could result in civil or criminal penalties.'' *Id.* § 20920(f).

(xiv) With respect to § 72.7(b), regarding periodic in-person verification of registration information, the comment proposed providing an alternative to in-person verification in instances of natural disasters. The in-person verification requirement is statutory, *see* 34 U.S.C. 20918, and cannot be changed by rulemaking. However, § 72.8(a)(2) in this rule explains that noncompliance with SORNA's requirements (including its in-person appearance requirements) may be excused if compliance is prevented by circumstances beyond the sex offender's control, circumstances that could include the exigencies presented in natural disasters.

(xv) With respect to § 72.8, regarding criminal liability under 18 U.S.C. 2250, the comment proposed (a) providing that the penalty for state violations shall be governed by state law, (b) providing a defense for individuals compliant with state law, and (c) providing a defense for persons with out-of-state convictions who fail to register through good-faith belief that registration is not required. These proposed changes are in part legally incorrect and in part already covered. Congress enacted SORNA's criminal provision to provide Federal criminal penalties for both state and Federal sex offenders who violate SORNA's requirements under circumstances supporting Federal jurisdiction. *See* 18 U.S.C. 2250(a)–(b); 34 U.S.C. 20911(1), (5)–(8). SORNA's requirements apply to both state and Federal sex offenders regardless of whether they are paralleled in state law registration requirements. *See Willman,* 972 F.3d at 821–24 and § 72.3 in this rule. As provided in § 72.8(a)(1)(iii), sex offenders are not subject to liability under 18 U.S.C. 2250 for violating registration requirements of which they are unaware, a limitation that applies regardless of whether their convictions are in-state or out-of-state.

(xvi) The comment proposed establishing that these regulations are not intended to replace the legislative process. With respect to the Federal legislative process, this rule interprets and implements Congress's decisions in

SORNA, *see* 34 U.S.C. 20912(b), and does not supplant or replace them. Rather, the many comments proposing that this rule abrogate SORNA's requirements seek the replacement of the Federal legislative process with inconsistent rulemaking. The Attorney General's actions in this rulemaking are not exercises of Federal legislative power barred by the non-delegation doctrine, as explained in the section-by-section analysis below. With respect to state legislative processes, the Attorney General has no authority over what state legislatures choose to do and cannot replace their processes by rulemaking.

(xvii) The comment proposed providing that (state) judicial precedents apply in the case of any rules that conflict with state supreme court decisions. State judicial decisions finding state registration laws to be in conflict with the state constitution do not affect the validity of the corresponding requirements under SORNA. However, SORNA allows such decisions to be taken into account in determining whether states have substantially implemented SORNA's requirements in their registration programs. *See* 34 U.S.C. 20927(b).

(xviii) The comment proposed clarification of the process for classification of out-of-state offenders. The process by which states classify out-of-state offenders is outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA. The SORNA Guidelines provide guidance to the states and other registration jurisdictions regarding the application of SORNA's tiering criteria to all sex offenders, including out-of-state offenders. *See* 73 FR at 8052–54.

(xix) The comment proposed discouraging the inclusion of non-essential information in the public sex offender websites. The matter is outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA. Other provisions of SORNA and the SORNA Guidelines and SORNA Supplemental Guidelines address the types of information that should or should not be included on the public websites, or whose inclusion or exclusion is within the discretion of the registration jurisdictions. *See* 34 U.S.C. 20920; 73 FR at 38058–61; 76 FR at 1636–37.

(xx) The comment proposed encouraging states to provide penalties for vigilantism. All states already have criminal penalties for unlawful violence against persons, including sex offenders, whether by vigilantes or others, and the Department of Justice rejects and condemns all unlawful violence against

persons, including sex offenders. SORNA's standards provide that public sex offender websites ''shall include a warning that information on the site should not be used to unlawfully injure, harass, or commit a crime against any individual named in the registry or residing or working at any reported address'' and ''note that any such action could result in civil or criminal penalties.'' 34 U.S.C. 20920(f).

(xxi) The comment proposed encouraging states to use risk assessment and other proven methods for the identification, treatment, and termination of low-risk offenders. The criteria for classification of sex offenders and early termination of registration are statutory and cannot be changed by rulemaking. *See* 34 U.S.C. 20911(2)–(4), 20915. Assessment of sex offenders for purposes of treatment is outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA.

(xxii) The comment proposed discouraging states from utilizing residency restrictions or other proximity restrictions. SORNA does not prescribe or encourage residency or other proximity restrictions, and the matter is outside the scope of this rulemaking, which concerns the registration requirements for sex offenders under SORNA.

(xxiii) The comment proposed discouraging states from lifetime registration for all, and instead recommending adoption of SORNA's tiered registration periods as provided in § 72.5. SORNA's requirements generally constitute a floor rather than a ceiling for state registration programs. *See* 73 FR at 38032–35, 38046. Whether registration jurisdictions choose to adopt more stringent registration requirements than SORNA's minimum national standards, including longer registration periods, is a matter within their discretion. *See id.* Recommending that states go no further than SORNA's requirements is not necessary for the purposes of this rulemaking, which articulates the registration requirements for sex offenders under SORNA, and the comment was not persuasive that the rule should incorporate such a recommendation. In responding to public comments of a similar nature, the SORNA Guidelines noted that ''many jurisdictions have adopted durational requirements for registration that . . . may . . . exceed the . . . SORNA minimum . . . such as making lifetime registration the norm in relation to registrants generally.'' 73 FR at 38034. Consequently, ''taking the SORNA standards as a ceiling . . . would require many jurisdictions to reduce or

eliminate requirements that they were free to adopt . . . and currently apply," which "is not plausibly the objective of a law (SORNA) enacted with the general purpose of strengthening sex offender registration and notification in the United States." *Id.*

(xxiv) The comment proposed providing that International Megan's Law, residency restrictions, and other regulatory measures only apply for the duration of registration. International Megan's Law added the international travel reporting requirements of SORNA and related authorities, appearing in 34 U.S.C. 20914(a)(7), (c) and implemented by §§ 72.6(d), 72.7(f) of this rule. In common with the other requirements under SORNA appearing in this rule, those requirements continue to apply until the end of the SORNA registration period. Whether registration jurisdictions choose to impose such requirements for longer periods than the registration periods prescribed by SORNA is within their discretion. *See* 73 FR at 38046. Residency restrictions, where they exist, are based on the laws of the jurisdictions that choose to adopt them. SORNA does not require such restrictions, the Attorney General has no authority to specify their duration, and they are outside the scope of this rulemaking.

*A Comment Proposing Five Changes in the Rule*

Another comment proposed five changes in the rule:

(i) The comment stated that the Attorney General should disclose all "ex parte contacts" with United States Attorneys because, the comment asserted, some parts of the rule (such as § 72.3) appear to be targeting common defenses raised by sex offenders accused of failing to register and hence may be the product of litigation strategy rather than reasoned rulemaking. The comment reflects a false opposition between addressing issues that have arisen in litigation and reasoned rulemaking. This rulemaking carries out a statutory directive to the Attorney General to issue regulations to interpret and implement SORNA, *see* 34 U.S.C. 20912(b), in furtherance of SORNA's objective of protecting the public from sex offenders by establishing a comprehensive national system for their registration, *see id.* 20901. In carrying out this responsibility, the Attorney General reasonably resolves issues and problems that have arisen in SORNA implementation, including those arising in the enforcement of SORNA by means of the criminal provision Congress has enacted for that purpose, 18 U.S.C. 2250.

(ii) The comment said that the rule, for fair notice reasons, should specify that other uncodified legislative rules imposing registration duties on sex offenders under SORNA are abrogated. The comment did not identify "legislative rules" outside of these regulations that it was referring to or provide a persuasive reason for declaring that such rules are abrogated. This rule encompasses all current regulations issued by the Attorney General under SORNA. The other SORNA-related final documents the Attorney General has published in the **Federal Register**, listed in the "rulemaking history" section above, are guidelines that provide guidance and assistance to registration jurisdictions in implementing SORNA. Section 72.8(a)(1)(iii) in this rule moots fair notice concerns by explaining that sex offenders are not held liable under 18 U.S.C. 2250 for violating registration requirements of which they are unaware.

(iii) The comment said that the Attorney General, for Tenth Amendment and fair notice reasons, should specify that states are permitted to impose less stringent registration requirements than SORNA's standards and that registrants fully comply with SORNA by complying with state registration laws even if the state has not implemented SORNA. However, this rule articulates SORNA's registration requirements for sex offenders; it does not compel states to do anything. States are afforded a funding incentive to substantially implement SORNA's requirements in their registration programs, a statutory condition that cannot be abrogated by rulemaking. *See* 34 U.S.C. 20927. Section 72.8(a)(1)(iii) in this rule moots fair notice concerns by explaining that sex offenders are not held liable under 18 U.S.C. 2250 for violating requirements of which they are unaware, and § 72.8(a)(2) further explains that noncompliance with SORNA may be excused where compliance was prevented by a state's failure to carry out a necessary complementary role. The notion that sex offenders need only comply with SORNA's registration requirements where state law imposes the same requirements is incorrect as a matter of law. *See Willman,* 972 F.3d at 821–24.

(iv) Section 72.5(b) in the rule states that the registration period of a sex offender sentenced to imprisonment begins to run when he is released from custody. The comment asserted to the contrary that a sex offender's registration period begins to run when the registrant is convicted, for three

reasons. First, the comment argued that there is no reason to suspend the running of the registration period during the sex offender's initial confinement. This argument is question-begging because it assumes that the registration period is already running before the sex offender is released. Second, the comment asserted that § 72.5(b)'s interpretation of SORNA is implausible because it would mean that a sex offender must initially register before the registration period has begun, given the requirement of 34 U.S.C. 20913(b)(1) that a sex offender initially register before completing his sentence of imprisonment. However, SORNA logically requires that a sex offender be advised of his registration obligations and initially registered shortly before his release from custody, *see* 34 U.S.C. 20919(a), because that is the point at which he is about to be released into the community and the post-release tracking and notification functions of sex offender registration are initially implicated. *See* 73 FR at 38062–63. Third, the comment asserted that running the registration period from conviction provides a readily ascertainable starting date and is consistent with Congress's decision to base sex offenders' registration duties on the crimes for which they have been convicted. Running the registration period from release likewise provides a definite starting point that is consistent with SORNA's tiering criteria for sex offenders and the associated registration periods. *See* 34 U.S.C. 20911(2)–(4), 20915. The section-by-section analysis below provides further explanation regarding the commencement of sex offenders' registration periods under SORNA and why the starting point is release from custody for an imprisoned offender.

(v) The comment argued that § 72.7(f) violates a constitutional right to travel by requiring sex offenders to report intended international travel at least 21 days in advance because, the comment asserted, it makes registrants liable for felony convictions every time they travel without providing 21 days' notice. It further asserted that Congress's failure to incorporate the 21-day notice requirement into International Megan's Law evinces a congressional judgment that the requirement is unnecessary and unduly burdensome, and that advance notice of less than 21 days may afford Federal authorities adequate time to notify destination countries. However, the Attorney General initially adopted the 21-day advance notice requirement in the SORNA Supplemental Guidelines, reflecting the judgment of

the responsible Federal agencies concerning the time needed for effective notification regarding international travel by sex offenders, but recognizing that exceptions to that requirement may be necessary and appropriate in certain circumstances. *See* 76 FR at 1637–38. This rule follows the same approach, generally requiring 21-day advance notice, but allowing later notice when a sex offender does not anticipate a trip abroad that far in advance. *See* §§ 72.6(d), 72.7(f), 72.8(a)(2) Ex. 3, and the accompanying discussion in the section-by-section analysis below. The analysis explains that ''[t]he 21-day advance notice requirement is designed to provide relevant agencies . . . sufficient lead time for any investigation or inquiry that may be warranted relating to the sex offender's international travel, and for notification of U.S. and foreign authorities in destination countries, prior to the sex offender's arrival in a destination country.'' In SORNA, as amended by International Megan's Law, Congress empowered the Attorney General to prescribe ''time and manner requirements'' in conformity with which sex offenders must ''provide and update information . . . relating to intended travel outside the United States,'' 34 U.S.C. 20914(c), which Congress would not logically have done if it deemed unnecessary and unduly burdensome the 21-day advance notice requirement that the Attorney General had already adopted in the SORNA Supplemental Guidelines. The comment provided no persuasive reason to believe that any constitutional right is violated by these aspects of the rule, which are within the scope of the express authority Congress has given the Attorney General to prescribe timing requirements for reporting international travel.

*A Comment Alleging Four Inconsistencies With SORNA*

A comment argued that this rule is inconsistent with SORNA in four respects.

(i) The comment claimed that § 72.3, providing in part that sex offenders must comply with SORNA's requirements regardless of whether a jurisdiction has substantially implemented those requirements, is inconsistent with SORNA because Congress did not intend to punish sex offenders for jurisdictions' failures to implement SORNA. However, § 72.3 accurately states the law. *See Willman,* 972 F.3d at 821–24. Section 72.8(a)(1)(iii) explains that sex offenders are not held liable for violating requirements under SORNA of which

they are unaware, and § 72.8(a)(2) explains that failure to comply with SORNA's requirements may be excused where compliance is prevented by a jurisdiction's failure to carry out a necessary complementary role. There is accordingly no punishment of sex offenders based on jurisdictions' shortcomings.

(ii) The comment claimed that §§ 72.7(d) and 72.6(c), in requiring departure-notification by sex offenders in certain circumstances, conflict with 34 U.S.C. 20913(c), as interpreted by the Supreme Court in *Nichols,* 136 S. Ct. at 1117–19. However, as the section-by-section analysis below explains, the departure-notification provisions of the rule are premised on powers of the Attorney General under other provisions of SORNA and are consistent with *Nichols.*

(iii) The comment claimed that § 72.7(c) is inconsistent with SORNA in requiring that a sex offender must report changes in residence, employment, and school attendance in the jurisdictions in which they occur, because 34 U.S.C. 20913(c) only requires that a sex offender appear in person and report the change ''in at least 1 jurisdiction involved'' without further specification. However, the section-by-section analysis below explains that the specification of the relevant jurisdiction is within the Attorney General's authority under 34 U.S.C. 20912(b) and 34 U.S.C. 20914(c) to interpret and implement SORNA and to prescribe the manner in which sex offenders must provide and update information required by SORNA. The analysis also explains the justification for this specification based on the purposes of SORNA's in-person appearance requirements.

(iv) The comment proposed amending § 72.7(e) and (f), which require sex offenders to report to the residence jurisdiction information relating to remote communication identifiers, temporary lodging, vehicles, and international travel. Specifically, the comment said that sex offenders should be permitted to report such changes to any ''involved jurisdiction,'' as referenced in 34 U.S.C. 20913(c). In support of the proposed amendment, the comment argued that, for example, it could be nearly impossible for an offender who works long hours at a job in State A, but lives in State B, to report the required information in State B during normal business hours without having to miss work. However, § 72.7(e) and (f) do not require the reporting of information through in-person appearances, but rather allow reporting

by whatever means the jurisdiction allows, such as an email or phone call.

*Other Comments*

Other comments proposed additional changes to this rule, beyond those discussed above, but did not provide persuasive reasons for such changes. The proposals put forward by one or more commenters included the following:

A comment proposed that § 72.6(c)(2)'s requirement that a sex offender report temporary lodging when away from his residence for seven or more days should be changed to require such reporting only when the sex offender is away from his residence for 14 or more days. The reasons given by the comment were that vacation time is generally two weeks and, for families on opposite coasts, it is impossible to drive across the country, visit, and drive back within seven days. However, § 72.6(c)(2) does not prohibit sex offenders from traveling away from their residences for any amount of time. It just requires them to report to the residence jurisdiction within three business days lodging away from their residences for seven or more days. *See* § 72.7(e).

A comment objected to the requirement of § 72.6(f) that sex offenders provide information as to where any vehicle owned or operated by the sex offender is habitually parked, docked, or otherwise kept, on the ground that innocent people should not get dragged onto the registry because they allow a registered sex offender to visit. However, the referenced provision in § 72.6(f) does not require sex offenders to report the identities or addresses of people they visit. It just requires reporting where they habitually keep their vehicles. As the section-by-section analysis below explains, this information may be useful to help prevent flight, facilitate investigation, or effect an apprehension if a sex offender commits new offenses or violates registration requirements.

A comment objected that the rule would burden sex offenders who telework or telelearn with employers or schools in remote jurisdictions by requiring them to travel to those jurisdictions to register or report changes. However, § 72.4 in the rule requires a sex offender to register and keep the registration current in each jurisdiction in which the offender resides, is an employee, or is a student, and § 72.7(c) requires a sex offender to report a change in residence, employment, or school attendance through in-person appearance in the relevant jurisdiction. These provisions implement statutory requirements

appearing in 34 U.S.C. 20913(a), (c). They do not expand the range of jurisdictions in which sex offenders are required to register or report changes beyond those identified in the statute. In particular, §§ 72.4 and 72.7(c) do not require a sex offender to register or appear in a jurisdiction in which he has a telework or teleleaming connection but no physical presence. *See* 73 FR at 38062. Nor do they require a sex offender to register in a jurisdiction in which he has some work-related presence but in which he does not regularly work or have a fixed place of employment. *See id.*

A comment requested clarification regarding (i) the state offenses for which SORNA requires registration and (ii) whether SORNA requires sex offenders to register in states whose own laws do not require registration by those offenders. Regarding the first question, SORNA identifies the types of offenses, including state offenses, for which it requires registration, *see* 34 U.S.C. 20911(1), (5)–(8), and the SORNA Guidelines provide further explanation, *see* 73 FR at 38050–52. If a sex offender does not know that he is required to register because he is unaware that the offense for which he was convicted gave rise to a duty to register, then he is not held liable under 18 U.S.C. 2250, which only penalizes violations of known registration obligations, as explained in § 72.8(a)(1)(iii) in this rule. Regarding the second question, SORNA's registration requirements are independent of state law registration requirements, *see Willman*, 972 F.3d at 821–24, but a sex offender's noncompliance with SORNA may be excused where compliance is prevented by a state's failure to carry out a necessary complementary role, as explained in § 72.8(a)(2) in this rule.

A comment proposed that the rule clarify Federal prosecutorial priorities with respect to SORNA violations in jurisdictions that have not implemented SORNA, suggesting that Federal prosecution be limited or forgone where the jurisdiction's laws do not impose the same requirements. However, as § 72.8(a)(1)(iii) in this rule explains, sex offenders are not held liable under 18 U.S.C. 2250 for violation of registration requirements of which they are unaware, and as, § 72.8(a)(2) explains, noncompliance with SORNA may be excused where compliance is prevented by circumstances beyond their control, such as a jurisdiction's failure to carry out a necessary complementary role. The comment was not persuasive that the Department of Justice should adopt a policy of not prosecuting sex offenders for violating known registration

obligations under SORNA, where nothing prevented those offenders from complying, just because the registration jurisdiction had not implemented some aspects of SORNA in its registration program. Federal prosecutorial priorities are usually not established by regulation, and addressing prosecutorial priorities is not necessary for purposes of this rulemaking, which articulates sex offenders' registration requirements under SORNA.

A comment asserted that § 72.3's application of SORNA's requirements to all sex offenders, regardless of when they were convicted, may violate due process because, at the state level, courts may determine whether particular sex offenders are required to register. Section 72.3 addresses the general scope of SORNA's application, not whether particular sex offenders are required to register under state law, and raises no due process issue.

A comment proposed adding to § 72.5 a provision requiring that a sex offender be removed from the sex offender registry if he receives a pardon, and that the offense be expunged from all court and law enforcement records. However, only pardons on the ground of innocence terminate registration obligations under SORNA, *see* 73 FR at 38050, and the Attorney General has no authority to require registration jurisdictions to expunge the records of sex offenders who are pardoned in those jurisdictions.

A comment asserted that § 72.6(g), which requires sex offenders to report professional licenses, is vague and not required by SORNA. Section 72.6 is sufficiently definite, requiring sex offenders to provide information concerning licensing that authorizes them to engage in an occupation or carry out a trade or business. Adopting this requirement is an exercise of the Attorney General's authority under 34 U.S.C. 20914(a)(8) to require sex offenders to provide other information, beyond that expressly described in the statute. The section-by-section analysis below explains that information concerning professional licenses may be helpful in locating a registered sex offender if he absconds, may provide a basis for notifying the responsible licensing authority if the offender's conviction of a sex offense may affect his eligibility for the license, and may be useful in crosschecking the accuracy and completeness of other information the offender is required to provide, *e.g.*, if the sex offender is licensed to engage in a certain occupation but does not provide name and address information for a place of employment as required by 34 U.S.C. 20914(a)(4).

A comment proposed generally replacing SORNA's in-person reporting requirements with reporting through remote communication technology. SORNA's requirements to report or verify certain information through in-person appearances are statutory and cannot be abrogated by rulemaking. *See* 34 U.S.C. 20913(c), 20918.

A comment proposed expanding the language in the rule about circumstances that may excuse noncompliance with SORNA's requirements to include public health emergencies and natural disasters. However, § 72.8(a)(2) in the rule makes clear that any uncontrollable circumstances preventing compliance with SORNA, regardless of their character, may excuse noncompliance under the conditions stated in 18 U.S.C. 2250(c).

A comment proposed encouraging registration jurisdictions to conform their registration regulations to SORNA to achieve uniformity across jurisdictions. Jurisdictions are encouraged to conform their registration requirements to SORNA's minimum national standards by the funding incentive of 34 U.S.C. 20927 and the extensive guidance and assistance that the Department of Justice provides to SORNA implementation through the SMART Office. *See* 76 FR at 1638. As § 72.1 in this rule notes, the adoption of more extensive or stringent requirements is within the discretion of the registration jurisdictions. The matter is explained in the section-by-section analysis below and in the SORNA Guidelines, *see* 73 FR at 38032–35, 38046. Making recommendations regarding jurisdictions' adoption of measures not required by SORNA is outside the scope of this rulemaking, which articulates SORNA's registration requirements for sex offenders.

**Section-by-Section Analysis**

The present rule expands part 72 of title 28 of the Code of Federal Regulations to provide a full statement of the registration requirements for sex offenders under SORNA. It revises the statement of purpose and definitional sections in 28 CFR 72.1 and 72.2. It maintains the existing provision in 28 CFR 72.3 stating that SORNA's requirements apply to all sex offenders, regardless of when they were convicted, and incorporates additional language in § 72.3 to reinforce that point. It also adds to part 72 provisions—§§ 72.4 through 72.8—articulating where sex offenders must register, how long they must register, what information they must provide, how they must register and keep their registrations current to

satisfy SORNA's requirements, and the liability they face for violations, following SORNA's express requirements and the prior articulation of standards for these matters in the SORNA Guidelines and the SORNA Supplemental Guidelines.

*Section 72.1—Purpose*

Section 72.1(a) states part 72's purpose to specify SORNA's registration requirements and their scope of application. It further notes that the Attorney General has the authority pursuant to provisions of SORNA to specify these requirements and their applicability as provided in part 72.

Section 72.1(b) states that part 72 does not preempt or limit any obligations of or requirements relating to sex offenders under other laws, rules, or policies. It further notes that states and other governmental entities may prescribe requirements, with which sex offenders must comply, that are more extensive or stringent than those prescribed by SORNA. This reflects the fact that SORNA provides minimum national standards for sex offender registration. It is intended to establish a floor rather than a ceiling for the registration programs of states and other jurisdictions, which can prescribe registration requirements binding on sex offenders under their own laws independent of SORNA. Jurisdictions accordingly are free to adopt more stringent or extensive registration requirements for sex offenders than those set forth in this part, including more stringent or extensive requirements regarding where, when, and how long sex offenders must register, what information they must provide, and what they must do to keep their registrations current. *See* 73 FR at 38032–35, 38046.

*Section 72.2—Definitions*

Section 72.2 states that terms used in part 72 have the same meaning as in SORNA. Hence, for example, references in the part to registration "jurisdictions" mean the 50 states, the District of Columbia, the five principal U.S. territories, and Indian tribes qualifying under 34 U.S.C. 20929. *See id.* 20911(10); 73 FR at 38045, 38048. Likewise, where the part uses such terms as sex offender (and tiers thereof), sex offense, convicted or conviction, sex offender registry, student, employee or employment, and reside or residence, the meaning is the same as in SORNA. *See* 34 U.S.C. 20911(1)–(9), (11)–(13); 73 FR at 38050–57, 38061–62.

*Section 72.3—Applicability of the Sex Offender Registration and Notification Act*

Section 72.3 carries forward in substance current 28 CFR 72.3, which states that SORNA's requirements apply to all sex offenders, including those whose sex offense convictions predate SORNA's enactment. This section was initially adopted on February 28, 2007, and amended on December 29, 2010. The section and its rationale are explained further in the interim and final rulemakings that adopted it. *See* 72 FR 8894; 75 FR 81849.

Section 72.3, and its modification by this rulemaking, are constitutionally sound. In *Smith* v. *Doe*, 538 U.S. 84 (2003), the Supreme Court upheld the retroactive application of sex offender registration requirements against an ex post facto challenge, in reviewing a state registration system whose major features paralleled SORNA's in many ways. The commonalities between SORNA and the state registration program upheld in *Smith* include required registration before release from imprisonment; provision of name, address, employment, vehicle, and other registration information; continued registration and periodic verification of registration information for at least 15 years; lifetime registration and quarterly verification for certain registrants convicted of aggravated or multiple sex offenses; and public internet posting of information about registrants. *See id.* at 90–91. The Federal courts have consistently rejected ex post facto challenges to SORNA itself. *See, e.g., United States* v. *Felts*, 674 F.3d 599, 605–06 (6th Cir. 2012).

Section 72.3 also is not premised on any constitutionally impermissible delegation of legislative authority to the executive branch of government. Congress intended that SORNA apply to all sex offenders, regardless of when they were convicted. *See Reynolds,* 565 U.S. at 442–45; *id.* at 448–49 & n. (Scalia, J., dissenting) (agreeing that Congress intended for SORNA to apply to all sex offenders). Congress authorized the Attorney General to specify the applicability of SORNA's requirements to sex offenders with pre-SORNA and pre-SORNA-implementation convictions, *see* 34 U.S.C. 20913(d), in order to effectuate that intent while enabling the Attorney General to address transitional issues presented in integrating the existing sex offender population into SORNA's comprehensive nationwide registration system. *See Reynolds,* 565 U.S. at 440–42; 72 FR at 8895–97; 73 FR at 38035–36, 38046, 38063–64; 75 FR at 81850–

52. In adopting § 72.3, the Attorney General implemented the relevant legislative policy—that SORNA's requirements should apply to all sex offenders—to the maximum, having found no reason to delay or qualify its implementation. Consequently, as an articulation of a legislative policy embodied in SORNA, the issuance of § 72.3 pursuant to 34 U.S.C. 20913(d) involved no exercise of legislative authority and did not contravene the non-delegation doctrine. *See Gundy,* 139 S. Ct. at 2123–30 (plurality opinion); *id.* at 2130–31 (Alito, J., concurring in the judgment); *id.,* Brief for the United States at 22–38.

Moreover, regardless of any question concerning the validity of 34 U.S.C. 20913(d), § 72.3 is adequately supported on the basis of the Attorney General's authority to issue guidelines and regulations to interpret and implement SORNA, appearing in 34 U.S.C. 20912(b). In § 72.3, the Attorney General interpreted SORNA as intended by Congress to apply to all sex offenders regardless of when they were convicted—an interpretation endorsed by the Supreme Court, *see Reynolds,* 565 U.S. at 440–45; *see also Gundy,* 139 S. Ct. at 2123–31—and he implemented that legislative policy by embodying it in a clearly stated rule.

The same considerations apply to the amended version of § 72.3 adopted here, which effectuates more reliably the legislative policy judgment that SORNA's requirements should apply to all sex offenders by restating the current rule with additional specificity, but which involves no change in substance. In comparison with the current formulation of § 72.3, this rule adds a second sentence stating that (i) all sex offenders must comply with all requirements of SORNA, regardless of when they were convicted; (ii) this is so regardless of whether a registration jurisdiction has substantially implemented SORNA or any particular SORNA requirement; and (iii) this is so regardless of whether a particular requirement or class of sex offenders is mentioned in examples in the rules or guidelines issued by the Attorney General.

The first part of the added sentence reiterates § 72.3's specification of SORNA's applicability to all sex offenders in the form of an affirmative direction to sex offenders, and it states explicitly that all of SORNA's requirements so apply.

The added sentence further states that the registration duties SORNA prescribes for sex offenders are not conditional on registration jurisdictions' having adopted SORNA's requirements

in their own registration laws or policies. For example, SORNA requires sex offenders to register in the states (and other registration jurisdictions) in which they reside, work, or attend school. *See* 34 U.S.C. 20913(a). All of the states have sex offender registration programs, which were initially established long before the enactment of SORNA. Hence, sex offenders are able to register in these existing state programs. The fact that a particular state has not modified its registration program at this time to incorporate the full range of SORNA requirements does not prevent a sex offender required to register by SORNA from registering in the state or excuse a failure to do so. *See, e.g., Felts,* 674 F.3d at 603–05.

The same principle applies in situations in which a jurisdiction's law does not track or incorporate a particular SORNA requirement affecting a sex offender. Consider a situation of this nature in which SORNA requires a sex offender to register but the law of the state in which he resides does not. This may occur, for example, because state law does not require registration based on the particular sex offense for which the offender was convicted, or because state law requires registration by sex offenders for shorter periods of time than SORNA, or because state law does not apply its registration requirements "retroactively" as broadly as § 72.3 applies SORNA's requirements to sex offenders with pre-SORNA convictions. Notwithstanding the absence of a parallel state law, the registration authorities in the state may be willing to register the sex offender because Federal law (*i.e.,* SORNA) requires him to register. *Cf. Doe* v. *Keathley,* 290 S.W.3d 719 (Mo. 2009) (state constitutional prohibition of retrospective laws does not preclude registration based on SORNA). If the state registration authorities are willing to register the sex offender, he is not relieved of the duty to register merely because state law does not track the Federal law registration requirement.

Hence, sex offenders can be held liable for violating any requirement stated in this rule, regardless of when they were convicted, and regardless of whether the jurisdiction in which the violation occurs has adopted the requirement in its own law. This does not mean, however, that SORNA unfairly holds sex offenders liable for failing to comply with its requirements, where the requirement is unknown to the sex offender or impossible for him to carry out. *Cf. Felts,* 674 F.3d at 605 (noting concern). Federal enforcement of SORNA's requirements occurs primarily through SORNA's criminal provision, 18 U.S.C. 2250. That provision makes it a Federal crime for a person required to register by SORNA to knowingly fail to register or update a registration as required by SORNA under circumstances supporting Federal jurisdiction, such as conviction of a Federal sex offense or interstate or foreign travel. As discussed below, section 2250 holds sex offenders liable only for violations of known registration obligations, and it excuses failures to comply with SORNA under certain conditions if the noncompliance results from circumstances beyond the sex offenders' control.

Consider first the concern that sex offenders may lack notice regarding registration obligations. Under the procedures prescribed by SORNA, and under standard procedures that have generally been adopted by registration jurisdictions whether or not they have implemented SORNA's requirements, the registration of sex offenders normally involves (i) informing sex offenders of their registration duties, (ii) obtaining from sex offenders signed acknowledgments confirming receipt of that information, and (iii) having sex offenders provide the required registration information. *See* 34 U.S.C. 20919(a); 73 FR at 38062–63.

Registration procedures of this nature inform sex offenders of what they must do, and the acknowledgments obtained from them provide evidence that they were so informed. *See* 76 FR at 1638. If a jurisdiction that registers a sex offender has not fully revised its processes for conformity to SORNA, then it may not tell the sex offender about some of the registration requirements imposed by SORNA, such as those that the jurisdiction has not incorporated in its own laws. If the jurisdiction fails to inform a sex offender about some of SORNA's registration requirements, the sex offender then does not know about some of his registration obligations under SORNA based on the information received from the jurisdiction, and may not learn of them from other sources. In such cases, the possibility of liability under 18 U.S.C. 2250 continues to be limited to cases in which a sex offender "knowingly fails to register or update a registration as required by [SORNA]." The limitation to "knowing[]" violations provides a safeguard against liability based on unwitting violations of SORNA requirements of which a sex offender was not aware. Section 72.8(a)(1)(iii) of this rule, and the accompanying discussion below, provide further explanation about the limitation of liability under 18 U.S.C. 2250 to cases involving violation of known registration obligations.

The second concern about fairness involves situations in which a sex offender has failed to do something SORNA requires because it is impossible for him to do so. For example, as noted above, a jurisdiction with laws that do not require registration based on the particular offense for which a sex offender was convicted may nevertheless be willing to register him in light of his Federal law (SORNA) registration obligation. But alternatively, the jurisdiction's law or practice may constrain its registration personnel to register only sex offenders whom its own laws require to register. In such a case, it is impossible for the sex offender to register in that jurisdiction, though subject to a registration duty under SORNA. This is so because registration is by its nature a two-party transaction, involving a sex offender's providing information about where he resides and other matters as required, and acceptance of that information by the jurisdiction for inclusion in the sex offender registry. If the jurisdiction is unwilling to carry out its side of the transaction, then the sex offender cannot register.

Concerns of this nature are also addressed in SORNA's criminal provision, 18 U.S.C. 2250. Subsection (c) of section 2250 provides an affirmative defense to liability for SORNA violations if "(1) uncontrollable circumstances prevented the individual from complying; (2) the individual did not contribute to the creation of such circumstances in reckless disregard of the requirement to comply; and (3) the individual complied as soon as such circumstances ceased to exist." A registration jurisdiction's law or practice that precludes registration of a sex offender, as described above, is a circumstance that the sex offender cannot control and to which he did not contribute, so he cannot be held liable for failure to register with that jurisdiction as SORNA requires.

The defense in section 2250(c) comes with the proviso that the defendant must comply with SORNA "as soon as [the preventing] circumstances cease[] to exist." For example, consider the case posed above of a jurisdiction that refuses to register sex offenders based on a particular offense for which SORNA requires registration, so that a sex offender residing in the jurisdiction who was convicted of that offense cannot register there. Suppose that the jurisdiction later progresses in its implementation of SORNA and becomes willing to register offenders who have been convicted for that sex offense. In

light of the proviso, the sex offender's obligation to register revives once the jurisdiction becomes willing to register him. That is fair, because the circumstance preventing his compliance with the SORNA registration requirement no longer exists.

Section 72.8(a)(2) of this rule, and the accompanying discussion below, provide further explanation about the contours of the impossibility defense under 18 U.S.C. 2250(c).

Returning to the text of § 72.3, the added sentence states at the end that sex offenders must comply with SORNA's requirements "regardless of whether any particular requirement or class of sex offenders is mentioned in examples in this regulation or in other regulations or guidelines issued by the Attorney General." In conjunction with the earlier statement in the provision that all sex offenders must comply with all SORNA requirements, the added language responds to a judicial decision that did not give full effect to the current regulation.

Section 72.3, as currently formulated, states that SORNA's "requirements . . . apply to all sex offenders," exercising the Attorney General's "authority to specify the applicability of the requirements of [SORNA] to sex offenders convicted before the enactment of [SORNA] or its implementation in a particular jurisdiction." 34 U.S.C. 20913(d); *see Reynolds,* 565 U.S. at 441–45 (explaining Congress's decision to give the Attorney General authority to apply SORNA's requirements to sex offenders with pre-SORNA convictions). Nevertheless, in *United States* v. *DeJarnette,* 741 F.3d 971 (9th Cir. 2013), the court believed that the Attorney General had not made all of SORNA's requirements applicable to all sex offenders. The case concerned the applicability of SORNA's requirement that a sex offender register initially in the jurisdiction in which he is convicted, if it differs from his residence jurisdiction, *see* 34 U.S.C. 20913(a) (second sentence), where the sex offender's conviction predated SORNA's enactment. Notwithstanding 28 CFR 72.3, the court concluded that the Attorney General had not made this SORNA requirement applicable to sex offenders with pre-SORNA convictions, if they were already subject to state law registration requirements. *DeJarnette,* 741 F.3d at 982. The decision was largely premised on the fact that the particular SORNA requirement at issue was not mentioned in relation to that particular class of sex offenders in the examples of sex offenders subject to SORNA's requirements in 28 CFR 72.3

and the SORNA Guidelines. *DeJarnette,* 741 F.3d at 976–80.

The sentence added to § 72.3 by this rulemaking will foreclose future decisions of this nature and ensure that § 72.3's application of SORNA's requirements to all sex offenders is given effect consistently.

The rule includes one further change in § 72.3, affecting the first example in the provision. The example as currently formulated describes a sex offender convicted in 1990 and released following imprisonment in 2007, and says that the sex offender is subject to SORNA's requirements. In *Reynolds,* the Supreme Court held that SORNA's requirements did not apply to sex offenders with pre-SORNA convictions prior to the Attorney General's exercise of the authority under 34 U.S.C. 20913(d) to specify SORNA's applicability to those offenders. 565 U.S. at 434–35. It follows that SORNA's requirements did not apply to such sex offenders before the Attorney General's original issuance of 28 CFR 72.3 on February 28, 2007. Example 1 in § 72.3 might be misunderstood as suggesting the contrary, *i.e.,* that a sex offender with a pre-SORNA conviction released from imprisonment at any time in 2007 was immediately subject to SORNA's requirements. Hence, to avoid any possible inconsistency or apparent inconsistency with the Supreme Court's decision in *Reynolds,* the rule changes the example by substituting a later year for 2007.

### Section 72.4—Where Sex Offenders Must Register

Section 72.4 tracks SORNA's express requirement that a sex offender must register and keep the registration current in each jurisdiction in which the sex offender resides, is an employee, or is a student, and must also initially register in the jurisdiction in which the offender was convicted if that jurisdiction differs from the jurisdiction of residence. *See* 34 U.S.C. 20913(a); 73 FR at 38061–62.

### Section 72.5—How Long Sex Offenders Must Register

Section 72.5 sets out SORNA's requirements regarding the duration of registration. SORNA classifies sex offenders into three "tiers," based on the nature and seriousness of their sex offenses and their histories of recidivism. *See* 34 U.S.C. 20911(2)–(4); 73 FR at 38052–54. The tier in which a sex offender falls affects how long the offender must continue to register under SORNA. The required registration periods are generally 15 years for a tier I sex offender, 25 years for a tier II sex offender, and life for a tier III sex

offender. *See* 34 U.S.C. 20915(a); 73 FR at 38068. Paragraph (a) in § 72.5 reproduces these requirements.

Paragraph (a) of § 72.5 provides an exception "when the sex offender is in custody or civilly committed," incorporating in substance an express proviso appearing in SORNA, 34 U.S.C. 20915(a). The exception and proviso mean that SORNA does not require a sex offender to carry out its processes for registering or updating registrations during subsequent periods of confinement, *e.g.,* when imprisoned because of conviction for some other offense following his release from imprisonment for the sex offense. This reflects that "the SORNA procedures for keeping up the registration . . . generally presuppose the case of a sex offender who is free in the community" and that "[w]here a sex offender is confined, the public is protected against the risk of his reoffending in a more direct way, and more certain means are available for tracking his whereabouts." 73 FR at 38068. However, registration jurisdictions may see incremental value in requiring sex offenders to carry out their processes for registering and updating registrations during subsequent confinement and are free to do so, though SORNA does not require it.

The proviso relating to custody or civil commitment does not pertain to or limit SORNA's requirement that initial registration is to occur while the sex offender is still imprisoned following conviction for the predicate sex offense. *See* 34 U.S.C. 20913(b)(1), 20919(a). Rather, as indicated above, it affects a sex offender's registration obligations under SORNA if he is later reincarcerated after his release. The proviso relating to custody or civil commitment also does not mean that the running of the SORNA registration period is suspended during such subsequent confinement, and does not otherwise affect the commencement or duration of a sex offender's registration period under SORNA.

For example, consider a sex offender, released in 2010 from imprisonment for a sex offense conviction, whom SORNA requires to register for 25 years as a tier II sex offender, and suppose the sex offender is subsequently convicted during the registration period for committing a robbery and imprisoned for three years for the latter offense. SORNA's registration requirement for that sex offender terminates in 2035, although he was incarcerated for three years of the 25-year SORNA registration period. Sex offenders should keep in mind, however, that their registration jurisdictions are free to impose more

extensive requirements than SORNA, including longer registration periods. Hence, the basic registration period under the law of a jurisdiction in which such a sex offender is registered may be longer than 25 years. And even if the basic registration period under the jurisdiction's law is the same as the 25 years required by SORNA, the jurisdiction may choose not to credit the three years the sex offender spent in prison for the robbery towards the running of the registration period under state law. *See* 73 FR at 38032–35, 38046, 38068. Expiration of the SORNA registration period accordingly does not obviate the need for sex offenders to check with registration jurisdictions whether they remain subject to registration requirements under the jurisdictions' laws.

As provided in paragraph (b) of § 72.5, the registration period under SORNA begins to run upon release from imprisonment following a sex offense conviction, or at the time of sentencing for a sex offense where imprisonment does not ensue. *See* 73 FR at 38068. The sex offender's release from imprisonment, which marks the start of the registration period for an incarcerated sex offender, may occur later than the end of the sentence imposed for the sex offense itself. For example, suppose that a sex offender is convicted for a fatal sexual assault upon a victim, resulting in a sentence of three years of imprisonment for the sexual assault and a concurrent or consecutive sentence of 25 years of imprisonment for murder. Or consider a case in which a sex offender is sentenced to three years of imprisonment for a sexual assault and at a later time he is sentenced to 25 years of imprisonment for an unrelated murder, while still imprisoned for the sex offense. Or suppose that a sex offender is already serving a 25-year prison term for an unrelated murder, when he is sentenced to three years of imprisonment for a sexual assault. In all such cases, the registration period under SORNA starts to run when the sex offender actually completes his imprisonment and is released. It does not start to run while the sex offender is still imprisoned but has completed the portion of the sentence attributable to the sex offense.

This conclusion follows from the general design and specific requirements of SORNA's registration procedures. SORNA provides that incarcerated sex offenders must initially register "before completing a sentence of imprisonment with respect to the [registration] offense." 34 U.S.C. 20913(b)(1). SORNA further states that the correlative responsibilities of

registration officials in effecting the initial registration are to be carried out "shortly before release of the sex offender from custody." *Id.* 20919(a); *see* 73 FR at 38063 (explaining requirement to register shortly before release from custody). Thereafter, sex offenders must "keep the registration[s] current" for specified periods of time, depending on their "tier[s]." 34 U.S.C. 20915(a). In light of these provisions, the registration period is logically understood as being framed at the start by the release from custody and at the end by the termination of the specified time period.

Considering specifically cases in which a sex offender is serving an aggregate prison term for multiple crimes, 34 U.S.C. 20913(b)(1) requires registration "before completing a sentence of imprisonment *with respect to* the offense giving rise to the registration requirement." (Emphasis added). It does not require registration "before completing a sentence of imprisonment *for* the offense giving rise to the registration requirement." The broader "with respect to" language is best understood to mean that the relevant prison term under section 20913(b)(1) is not the specific sentence imposed for the predicate sex offense alone, but rather is the full related sentence of imprisonment, including any prison time imposed for other crimes. The corresponding language in section 20919(a) supports this understanding, requiring initial registration of the sex offender "shortly before release of the sex offender from custody." This language does not signify that initial registration is to occur when the sex offender is about to complete the portion of an aggregate sentence attributable specifically to the sex offense, though the sex offender will remain in custody because he is serving additional time for another offense or offenses. Rather, by its terms, section 20919(a) contemplates that initial registration will occur shortly before the sex offender is actually released, and section 20913(b)(1) must be understood in the same way, because section 20913(b)(1) and section 20919(a) describe the same transaction (initial registration) from different perspectives.

For example, consider the case of a sex offender convicted and sentenced for a fatal sexual assault, resulting in a three-year prison term for the sexual assault and a concurrent or consecutive 25-year sentence for murder. Suppose that the sexual assault involved was a sexual contact offense against an adult victim, resulting in the classification of the sex offender as a tier I sex offender and a registration period of 15 years. *See*

34 U.S.C. 20911(2)–(4), 20915(a)(1). If the registration period started to run at the end of the first three years of the sex offender's incarceration, then the 15-year registration period would expire long before the sex offender's release, because of the extension of his imprisonment by the murder sentence. This result would be at odds with section 20919(a)'s direction that sex offenders are to be initially registered "shortly before release . . . from custody," because the sex offender's registration obligation under SORNA would be a thing of the past by that time, and also with the requirements under sections 20913 and 20915(a)(1) that the sex offender register and keep the registration current for 15 years, because his registration period would be over before he registered in the first place.

In addition to the inconsistency with the statutory provisions discussed above, starting the running of the registration period upon the conclusion of the portion of a sentence attributable to the registration offense would result in arbitrary differences in registration requirements, depending on fortuities in the structuring of criminal sentences or their descriptions in judgments. For example, considering again the case of a fatal sexual assault, suppose that the resulting sentence involves a three-year prison term for the sexual assault, followed by a consecutive 25-year prison term for murder. As discussed above, the assumed 15-year registration period for the sexual assault would then run out long before the sex offender's release, and he would never have to register at all. But suppose the sentence is cast instead as a 25-year prison term for murder, followed by a consecutive three-year prison term for the sexual assault. The completion of the prison term for the sexual assault would then coincide with the sex offender's release from prison, and he would have to register and keep the registration current for 15 years. Because the ordering of the sexual assault and murder sentences has no relevance to the public safety purposes served by sex offender registration, the discrepancy between the two cases as to resulting registration requirements would be irrational. For this reason as well, the registration period under SORNA starts to run when the sex offender is actually released, and not at an earlier time upon completion of the portion of an aggregate sentence specifically attributable to the predicate sex offense.

By way of comparison, an offender's term of post-imprisonment supervised release for a sex offense does not start to run until he is released from prison,

including in cases in which the offender's release is delayed by his serving additional prison time for another offense or offenses. This is not unfair or illogical; it rationally reflects the nature of supervision as a measure designed for overseeing and managing offenders following their release. While sex offender registration differs from supervision in being a non-punitive, civil regulatory measure, *see, e.g., Smith,* 538 U.S. at 92–106; *Felts,* 674 F.3d at 605–06, it is likewise concerned with the post-release treatment of sex offenders in the community. Hence, as with periods of supervision, it is rational for an offender's registration period for a sex offense to begin to run when he is released from prison, including in cases in which the offender's release is delayed by his serving additional prison time for other criminal conduct. This reflects the nature of registration as a measure designed for tracking and monitoring sex offenders following their release.

The principle that the registration period under SORNA commences on release also applies to cases in which the sex offender is not imprisoned for the sex offense per se but is imprisoned because of conviction for another offense. For example, suppose that a sex offender is convicted of sexually assaulting and robbing a victim, resulting in a sentence of probation for the sexual assault and a sentence of five years of imprisonment for the robbery. Considering the relevant statutory provisions, section 20913(b)(2) makes applicable an alternative time for initial registration—three business days after sentencing—only "if the sex offender is not sentenced to a term of imprisonment." Correspondingly, section 20919(a) provides for initial registration immediately after sentencing, rather than shortly before release from custody, only "if the sex offender is not in custody." These provisions, by their terms, do not apply to a sex offender who remains in custody, though on the basis of an offense other than the predicate sex offense. Hence, cases of this nature must fall under the requirement of sections 20913(b)(1) and 20919(a) to effect initial registration shortly before the sex offender's release, and the consequences are the same as in the cases discussed above involving aggregate prison terms for the registration offense and other crimes. Where the sex offender receives a non-incarcerative sentence for the registration offense and a prison term for another offense, the registration period starts upon the sex offender's release, so that once registered and out

in the community he must keep the registration current for the full registration period specified in 34 U.S.C. 20915, and not just for a truncated period reduced by his incarceration for another offense.

In terms of underlying policy, registration is by definition concerned with tracking sex offenders in the community following their release. *See* 73 FR at 38044–45. The tiers and the associated registration periods under SORNA reflect categorical legislative judgments as to how long sex offenders should be tracked following release for public safety purposes. These judgments do not come into play until the sex offender is released. When that happens may be affected by many factors—such as the length of the prison term the sex offender receives for the sex offense; whether the sex offender makes parole (in a state system having parole) or gets good-conduct credit; whether the jurisdiction adopts an early release program because of prison crowding; and whether the sex offender gets additional prison time because of sentencing for other offenses, related or unrelated to the sex offense.

Whatever the reasons may be, it is logical to start a post-release tracking regime—*i.e.,* registration—when the sex offender is actually released. Initial registration is to occur "shortly before" that, as 34 U.S.C. 20919(a) requires, "in light of the underlying objectives of ensuring that sex offenders have their registration obligations in mind when they are released, and avoiding situations in which registration information changes significantly between the time the initial registration procedures are carried out and the time the offender is released." 73 FR at 38063.

Hence, the registration period under SORNA starts to run when a sex offender is released from imprisonment, and not at an earlier time when the specific sentence for the registration offense has been served, if the two times differ. This follows from the features of the statutory provisions discussed above, from the absurdities entailed by a different interpretation, and from the basic character of registration as a post-release tracking measure. To the extent that there might be any uncertainty or argument to the contrary, the Attorney General in this rule exercises his authority under 34 U.S.C. 20912(b) to interpret and implement SORNA's provisions affecting the duration of registration in the manner stated.

Paragraph (c) in § 72.5 sets out SORNA's reduction of its registration period for certain sex offenders who maintain a "clean record" in accordance

with statutory standards. The specific "clean record" conditions are that the sex offender not be convicted of any felony or any sex offense, successfully complete any period of supervision, and successfully complete an appropriate sex offender treatment program (certified by a registration jurisdiction or the Attorney General). The SORNA registration period is reduced by five years for a tier I sex offender who maintains a clean record for 10 years, and reduced to the period for which the clean record is maintained for a tier III sex offender required to register on the basis of a juvenile delinquency adjudication who maintains a clean record for 25 years. *See* 34 U.S.C. 20915(a), (b); 73 FR at 38068–69.

*Section 72.6—Information Sex Offenders Must Provide*

Section 72.6 sets out the registration information sex offenders must provide. Much of the specified information is expressly required by SORNA, *see* 34 U.S.C. 20914(a)(1)–(7), and the remainder reflects SORNA's direction that sex offenders must provide "[a]ny other information required by the Attorney General," *id.* 20914(a)(8).

In general terms, the required information comprises (i) name, birth date, and Social Security number; (ii) remote communication identifiers (including email addresses and telephone numbers); (iii) information about places of residence, non-residential lodging, employment, and school attendance; (iv) international travel; (v) passports and immigration documents; (vi) vehicle information; and (vii) professional licenses. By providing basic information about who a sex offender is, where he is, how he gets around, and what he is authorized to do, these requirements implement SORNA and further its public safety objectives.

Paragraph (a)(1) of § 72.6 requires that a sex offender provide his name, including any alias, which is an express SORNA requirement. *See* 34 U.S.C. 20914(a)(1); 73 FR at 38055.E0.

Paragraph (a)(2) of § 72.6 requires a sex offender to provide date of birth information, a requirement the Attorney General has adopted in the SORNA Guidelines and this rule because date of birth information is regularly utilized as part of an individual's basic identification information and hence is of value in helping to identify, track, and locate registered sex offenders. The paragraph requires that any date that the sex offender uses as his or her purported date of birth must be provided, in addition to the actual date of birth, because sex offenders may, for example,

provide false date of birth information in seeking employment that would provide access to children or other potential victims. *See* 73 FR at 38057.

Paragraph (a)(3) of § 72.6 requires that a sex offender provide his Social Security number, which is an express SORNA requirement. *See* 34 U.S.C. 20914(a)(2). The paragraph further requires provision of any number that a sex offender uses as his purported Social Security number. The Attorney General has adopted the latter requirement—already appearing in the SORNA Guidelines in 2008—because sex offenders may, for example, attempt to use false Social Security numbers in seeking employment that would provide access to children or other potential victims. *See* 73 FR at 38055.

Paragraph (b) of § 72.6 requires a sex offender to provide all remote communication identifiers that he uses in internet or telephonic communications or postings, including email addresses and telephone numbers. A provision of the Keeping the internet Devoid of Sexual Predators Act of 2008 (KIDS Act), Public Law 110–400, directed the Attorney General to use the authority under paragraph (7) of 34 U.S.C. 20914(a) [now designated paragraph (8)] to require sex offenders to provide internet identifiers. The Attorney General has previously exercised that authority to require the specified information in the SORNA Guidelines. *See* 34 U.S.C. 20916(a); 73 FR at 38055; 76 FR at 1637. The Attorney General has exercised the same authority to require telephone numbers—a requirement also already appearing in the SORNA Guidelines—for a number of reasons, including facilitating communication between registration personnel and sex offenders, and addressing the potential use of telephonic communication by sex offenders in efforts to contact or lure potential victims. *See* 73 FR at 38055.

Paragraph (c)(1) of § 72.6 requires a sex offender to provide residence address information or other residence location information if the sex offender lacks a residence address. Providing residence address information is an express SORNA requirement. *See* 34 U.S.C. 20914(a)(3). In the SORNA Guidelines, and now in this rule, the Attorney General has adopted the requirement to provide other residence location information for sex offenders who do not have residence addresses, such as homeless sex offenders or sex offenders living in rural areas that lack street addresses, because having this type of location information serves the same public safety purposes as knowing the whereabouts of sex offenders with

definite residence addresses. *See* 73 FR at 38055–56, 38061–62.

Paragraph (c)(2) of § 72.6 requires a sex offender to provide information about temporary lodging while away from his residence for seven or more days. In the SORNA Guidelines, and now in this rule, the Attorney General has adopted this requirement because sex offenders may reoffend at locations away from the places in which they have a permanent or long-term presence, and indeed could be encouraged to do so to the extent that information about their places of residence is available to the authorities but information is lacking concerning their temporary lodgings elsewhere. The benefits of having this information include facilitating the successful investigation of crimes committed by sex offenders while away from their normal places of residence and discouraging sex offenders from committing crimes in such circumstances. *See* 73 FR at 38056.

Paragraph (c)(3) of § 72.6 requires a sex offender to provide employer name and address information, or other employment location information if the sex offender lacks a fixed place of employment. Providing employer name and address information is an express SORNA requirement. *See* 34 U.S.C. 20914(a)(4). The Attorney General has adopted, in the SORNA Guidelines and this rule, the requirement to provide other employment location information for sex offenders who work but do not have fixed places of employment—*e.g.,* a long-haul trucker whose "workplace" is roads and highways throughout the country, a self-employed handyman who works out of his home and does repair or home improvement work at other people's homes, or a person who frequents sites that contractors visit to obtain day labor and works for any contractor who hires him on a given day. The Attorney General has adopted this requirement because knowing where such sex offenders are in the course of employment serves the same public safety purposes as knowing the whereabouts of sex offenders who work at fixed locations. *See* 73 FR at 38056, 38062.

Paragraph (c)(4) of § 72.6 requires a sex offender to provide the name and address of any place where the sex offender is or will be a student, an express SORNA requirement. *See* 34 U.S.C. 20914(a)(5); 73 FR at 38056–57, 38062.

Paragraph (d) of § 72.6 requires a sex offender to provide information about intended travel outside of the United States. This is an express SORNA requirement, added by International

Megan's Law. *See* 34 U.S.C. 20914(a)(7); Public Law 114–119, sec. 6(a)(1). A related provision in § 72.7(f) of this rule requires sex offenders to report international travel information at least 21 days in advance. Exercising the general authority under paragraph (8) of 34 U.S.C. 20914(a) [then designated paragraph (7)] to expand the required range of registration information, the Attorney General initially adopted these requirements in the SORNA Supplemental Guidelines, *see* 76 FR at 1637–38, even before the enactment of International Megan's Law, for a number of reasons:

(i) Realizing SORNA's public safety objectives requires that registered sex offenders be effectively tracked as they leave and return to the United States, and that other sex offenders who enter the United States be identified, so that domestic registration and law enforcement authorities know about the sex offenders' presence in the United States and can ensure that they register while here as SORNA requires. To that end, SORNA directs the Attorney General to establish and maintain a system for informing relevant registration jurisdictions about persons entering the United States whom SORNA requires to register. *See* 34 U.S.C. 20930. Sections 72.6(d) and 72.7(f) of this rule are part of that system, requiring registered sex offenders to inform their registration jurisdictions about travel abroad, including information that encompasses both their departure from and return to the United States. Beyond this direct benefit, learning about sex offenders' entry into the United States may depend on notice from the authorities of the countries they come from—authorities who may expect reciprocal notice about sex offenders traveling to their countries from the United States. Having U.S. sex offenders inform their registration jurisdictions of travel abroad provides information that is used by U.S. authorities, including the U.S. Marshals Service and INTERPOL Washington-U.S. National Central Bureau, to notify the authorities in the destination countries about sex offenders traveling to their areas. These foreign authorities may in return advise U.S. authorities about sex offenders traveling to the United States from their countries, facilitating the notification of domestic registration jurisdictions about the sex offenders' presence that section 20930 contemplates. *See* 73 FR at 38066; 76 FR at 1637.

(ii) Sex offenders traveling abroad may remain subject in some respects to U.S. jurisdiction, *e.g.,* because a sex offender intends to go to an overseas

U.S. military base or to work as or for a U.S. military contractor in another country. In such cases, the intended travel of the sex offender may implicate the same public safety concerns in relation to communities abroad for which the United States has responsibility as it does in relation to communities within the United States. *See* 73 FR at 38067; 76 FR at 1637–38.

(iii) More broadly, for a sex offender disposed to reoffend, it may be attractive to travel to foreign countries where law enforcement is weaker (or perceived to be weaker), where sexually trafficked children or other vulnerable victims may be more readily available, and where the registration and notification measures to which the sex offender is subject in the United States are inoperative. The United States does not wish to export the public safety threat posed by its sex offenders to other countries. Requiring sex offenders in the United States to inform their registration jurisdictions about international travel provides a basis for notifying foreign authorities in the destination countries, which helps to reduce the resulting risks. If these sex offenders do reoffend in other countries, the resulting human harm to victims is no less because it occurs in a foreign country, and the United States' image and foreign relations interests may be adversely affected as well. Sex offenders from the United States who commit sex offenses in other countries may be subject to prosecution under various Federal laws, which reflect the United States' policy of, and commitment to, combating the commission of crimes of sexual abuse and exploitation internationally as well as domestically. *See, e.g.,* 18 U.S.C. 1591, 2251(c), 2260, 2423. Consistent tracking of international travel by sex offenders helps to deter and prevent such crimes, and to facilitate their investigation if they occur.

Beyond creating a general requirement to report travel outside of the United States at least 21 days in advance, the SORNA Supplemental Guidelines authorized the requirement of more definite information about international travel plans. 76 FR at 1638 (additional directions may be issued by the SMART Office "concerning the information to be required in sex offenders' reports of intended international travel, such as information concerning expected itinerary, departure and return dates, and means and purpose of travel"); *see* Notice of International Travel, *https:// smart.ojp.gov/sorna/notice-international-travel* (providing such directions). Section 72.6(d) in this rule specifically directs sex offenders

traveling abroad to report information regarding any anticipated itinerary, dates and places of departure, arrival, or return, carrier and flight numbers for air travel, destination countries and address or contact information therein, and means and purpose of travel. More detailed information of this type is needed because notice only that a sex offender intends to travel somewhere outside of the United States at some time three weeks or more in the future would be inadequate to realize the objectives of international tracking of sex offenders—objectives that include, as discussed above, notification as appropriate of U.S. and foreign authorities in destination countries for public safety purposes, preventing and detecting the offenders' commission of sex offenses in other countries, and reliably tracking sex offenders as they leave and enter the United States for purposes of enforcing registration requirements. Requiring the specified information concerning international travel is justified by its value in furthering these objectives. *See* 73 FR at 38066–67; 76 FR at 1634, 1637–38.

Congress endorsed these objectives and the stated conclusion in International Megan's Law, whose purposes include "[t]o protect children and others from sexual abuse and exploitation, including sex trafficking and sex tourism, by providing advance notice of intended travel by registered sex offenders outside the United States to the government of the country of destination [and] requesting foreign governments to notify the United States when a known sex offender is seeking to enter the United States." Public Law 114–119; *see* 162 Cong. Rec. H390–94 (Feb. 1, 2016) (explanation in House floor debate on passage). As noted above, the measures adopted by International Megan's Law in support of its international notification system include an express requirement that sex offenders report intended international travel, making this requirement a permanent feature of SORNA that exists independently of regulatory action. *See* 34 U.S.C. 20914(a)(7); Public Law 114–119, sec. 6(a)(1).

Section 72.6(d) in this rule follows the new SORNA travel information provision added by International Megan's Law, which states that sex offenders must provide "[i]nformation relating to intended travel of the sex offender outside the United States, including any anticipated dates and places of departure, arrival, or return, carrier and flight numbers for air travel, destination country and address or other contact information therein, means and purpose of travel, and any other

itinerary or other travel-related information required by the Attorney General." 34 U.S.C. 20914(a)(7). A sex offender must report all anticipated information in these categories in relation to both the United States and destination countries as the language of § 72.6(d) makes clear. For example, a sex offender who is leaving the United States must report any anticipated date and place of departure from the United States, and also any anticipated date and place of return to the United States if the sex offender expects to return. Likewise, with respect to each foreign country to be visited, the sex offender must report any anticipated date and place of arrival in that country and any anticipated date and place of departure from that country.

Paragraph (e) of § 72.6 requires a sex offender to provide information concerning any passport or passports he has, and concerning documents establishing his immigration status if he is an alien. The passports referenced in the paragraph include passports of all types and nationalities, not just U.S. passports. Where the sex offender has multiple passports, as may occur, for example, in cases involving dual citizenship, the paragraph's reference to "each passport" the sex offender has means that the sex offender must report all of his passports. The Attorney General has included information about passports and immigration documents as required registration information in the SORNA Guidelines and in this rule because having this type of information in the registries serves various purposes. These include locating and apprehending registrants who may attempt to leave the United States after committing new sex offenses or registration violations, facilitating the tracking and identification of registrants who leave the United States but later reenter while still required to register, *see* 34 U.S.C. 20930, and crosschecking the accuracy and completeness of other types of information that registrants are required to provide—*e.g.,* if immigration documents show that an alien registrant is in the United States on a student visa but the registrant fails to provide school attendance information as required by 34 U.S.C. 20914(a)(5). *See* 73 FR at 38056.

Paragraph (f) of § 72.6 requires a sex offender to provide information concerning any vehicle owned or operated by the sex offender, information concerning the license plate number or other registration number or identifier for the vehicle, and information as to where the vehicle is habitually kept. In part, the paragraph reflects the express SORNA requirement

in 34 U.S.C. 20914(a)(6) that a sex offender provide ''[t]he license plate number and a description of any vehicle owned or operated by the sex offender.'' This includes, in addition to vehicles registered to the sex offender, any vehicle that the sex offender regularly drives, either for personal use or in the course of employment. *See* 73 FR at 38057. The remainder of the paragraph reflects the Attorney General's requirement (previously adopted in the SORNA Guidelines) of additional vehicle-related information that serves similar purposes or may be useful to help prevent flight, facilitate investigation, or effect an apprehension if the sex offender commits new offenses or violates registration requirements. *See id.*

Paragraph (g) of § 72.6 requires a sex offender to provide information concerning all licensing of the offender that authorizes him to engage in an occupation or carry out a trade or business. The Attorney General has adopted this requirement, initially in the SORNA Guidelines and now in this rule, because information of this type (i) may be helpful in locating a registered sex offender if he absconds, (ii) may provide a basis for notifying the responsible licensing authority if the offender's conviction of a sex offense may affect his eligibility for the license, and (iii) may be useful in crosschecking the accuracy and completeness of other information the offender is required to provide—*e.g.,* if the sex offender is licensed to engage in a certain occupation but does not provide name or place of employment information as required by 34 U.S.C. 20914(a)(4) for such an occupation. *See* 73 FR at 38056.

*Section 72.7—How Sex Offenders Must Register and Keep the Registration Current*

SORNA requires sex offenders to register and keep the registrations current in jurisdictions in which they reside, work, or attend school. Section 72.7 sets out the procedures for doing so, addressing the timing requirements for registering and updating registrations, the jurisdictions to which changes in registration information must be reported, and the means for reporting such changes. In general terms, the section requires (i) initial registration before release from imprisonment, or within three business days after sentencing if the sex offender is not imprisoned; (ii) periodic in-person appearances to verify and update the registration information; (iii) reporting of changes in name, residence, employment, or school attendance; (iv) reporting of intended departure or

termination of residence, employment, or school attendance in a jurisdiction; (v) reporting of changes relating to remote communication identifiers, temporary lodging information, and vehicle information; (vi) reporting of international travel; and (vii) compliance with a jurisdiction's rules if a sex offender has not complied with the normal time and manner specifications for carrying out a SORNA requirement.

The requirements articulated in this section in part appear expressly in SORNA and in part reflect exercises of the powers SORNA confers on the Attorney General to further specify its requirements. The authorities relied on include the following:

SORNA directs the Attorney General to issue rules and guidelines to ''interpret and implement'' its provisions, which include the basic requirement that each sex offender must ''register . . . and keep the registration current.'' 34 U.S.C. 20912(b), 20913(a). Previously in the SORNA Guidelines, *see* 73 FR at 38062–67, and now in this rule, the Attorney General interprets his authority to ''interpret and implement'' SORNA as including the authority to articulate a comprehensive, gap-free set of procedural requirements for registering and updating registrations. Authority of this nature is needed to implement SORNA in conformity with the legislative objective of protecting the public from sex offenders by establishing a comprehensive national system for their registration. 34 U.S.C. 20901. Beyond the public safety need, this understanding of section 20912(b) ''takes Congress to have filled potential lacunae'' in SORNA in a manner consistent with fair notice concerns, empowering the Attorney General to eliminate any ''vagueness and uncertainty'' regarding how sex offenders are to comply with SORNA's registration requirements. *Reynolds,* 565 U.S. at 441–42.

The Attorney General's authority to interpret and implement SORNA includes in particular the authority to adopt additional specifications regarding the time and manner in which its requirements must be carried out. For example, SORNA expressly requires that sex offenders must appear in person to report changes of name, residence, employment, and student status within three business days of such changes. 34 U.S.C. 20913(c). But SORNA does not expressly require the reporting within a particular timeframe of changes relating to other types of registration information that also bear directly and importantly on the identification, tracking, and location of sex offenders. These include

remote communication identifiers (such as email addresses), temporary lodging information, international travel information, and vehicle information, as described in § 72.6(b), (c)(2), (d), and (f) of this rule. Absent a requirement that changes in these types of information be reported promptly, the information in the registries about these matters could become seriously out of date, which would in turn impair SORNA's basic objective of effectively tracking and locating sex offenders in the community following their release. *See* 73 FR at 38044–45, 38066–67. The Attorney General accordingly has adopted definite timing requirements for reporting changes in these types of information, previously in the guidelines for SORNA implementation, and now in § 72.7(e)–(f) in this rule.

Adopting such rules reflects an exercise of the Attorney General's authority to ''interpret and implement'' SORNA, 34 U.S.C. 20912(b), and more specifically to interpret and implement SORNA's requirement that sex offenders must ''keep the registration current,'' *id.* 20913(a). While the heading of subsection (c) of section 20913 is ''[k]eeping the registration current,'' the heading only signifies that the subsection sets out an updating rule for the most basic types of registration information. It does not signify that nothing more can be required to keep the registration current. The contrary is evident from section 20915(a), which specifies the duration of required registration under SORNA. Section 20915(a) uses the same terminology, stating that a sex offender ''shall keep the registration current'' for the relevant period of time. Obviously, in providing that a sex offender must ''keep the registration current'' for a specified period, section 20915(a) defines the period of time during which a sex offender must continue to comply with all of SORNA's requirements, given the absence of any other provision in SORNA specifying how long sex offenders must comply with its various requirements. Among other consequences, this means that sex offenders must appear in person periodically to verify and update their registration information, as required by section 20918, for the specified period of time—not just that they must report changes in name, residence, employment, and school attendance, as provided in section 20913(c), for the specified period of time. That consideration alone demonstrates that section 20913(c) does not exhaust SORNA's requirements for ''keep[ing] the registration current.''

Regarding other matters, such as changes in registration information relating to remote communication identifiers, temporary lodging, vehicles, and international travel, the Attorney General has understood the authority to interpret and implement SORNA's requirement to keep the registration current as including the authority to adopt specific time and manner requirements for the reporting of such changes. Congress ratified this understanding in the KIDS Act. In that Act, Congress provided that (i) "[t]he Attorney General, using the authority provided in [34 U.S.C. 20914(a)(8)], shall require that each sex offender provide to the sex offender registry those internet identifiers the sex offender uses or will use" and (ii) "[t]he Attorney General, using the authority provided in [34 U.S.C. 20912(b)], shall specify the time and manner for keeping current information required to be provided under this section." 34 U.S.C. 20916(a)–(b). Notably, Congress did not find it necessary to make new grants of authority to the Attorney General for these purposes and instead directed the Attorney General to utilize the pre-existing authorities under SORNA to require internet identifier information and specify the time and manner for keeping it current. This confirms that the section 20912(b) authority includes the authority to adopt additional time and manner requirements in the rules and guidelines the Attorney General issues.

SORNA directs sex offenders to provide for inclusion in the sex offender registry several expressly described types of registration information and, in addition, "[a]ny other information required by the Attorney General." *Id.* 20914(a)(8). The section 20914(a)(8) authority underlies the specification of required types of registration information in § 72.6 in this rule beyond those expressly set forth in section 20914(a)(1)–(7). The section 20914(a)(8) authority also provides an additional, independent legal basis for various requirements in § 72.7, including a number of timing rules it incorporates.

In relation to some types of required registration information under this rule, which may be based wholly or in part on the exercise of the Attorney General's authority under section 20914(a)(8), a timing requirement is inherent in the nature of the information that must be reported. This is true of the requirement under § 72.7(d) to report if a sex offender will be commencing residence, employment, or school attendance elsewhere or will be terminating residence, employment, or school attendance in a jurisdiction. It is

likewise true of the requirement under § 72.7(f) to report intended international travel. Because these provisions constitute requirements to report present intentions regarding expected future actions, the information they require necessarily must be reported in advance of the expected actions.

Section 20914(a)(8) also provides an additional, independent legal basis for more specific timeframe requirements appearing in § 72.7 of this rule. One of these requirements is that intended international travel is to be reported at least 21 days in advance of the travel, as provided in § 72.7(f). In substance, this is a requirement that a sex offender report to the residence jurisdiction an intention to travel outside of the United States at some time 21 days or more in the future. Viewing the expected timing of the travel as an aspect of the required information, it is within the Attorney General's authority under 34 U.S.C. 20914(a)(8) to require sex offenders to provide "[a]ny other information"—and following the adoption of section 20914(a)(7) by International Megan's Law, within the Attorney General's more specific authority under the latter provision to require "any other . . . travel-related information." Essentially the same point applies to the rule's specification that sex offenders must report within three business days changes relating to certain types of registration information the Attorney General has required. Section 72.7(e) directs reporting of changes in information within that timeframe relating to remote communication identifiers, temporary lodging, and vehicles. Viewed as requirements to report the information that certain actions or occurrences have taken place within the preceding three business days, these requirements are within the Attorney General's authority under 34 U.S.C. 20914(a)(8).

Turning to another SORNA provision supporting time and manner requirements, 34 U.S.C. 20913(d) authorizes the Attorney General to specify the applicability of SORNA's requirements to sex offenders convicted before the enactment of SORNA or its implementation in a particular jurisdiction "and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b)." The cross-referenced "subsection (b)" is the SORNA provision that requires sex offenders to register initially before release from imprisonment, or within three business days of sentencing if the sex offender is not imprisoned. As discussed below in connection with

§ 72.7(a)(2) of this rule, sex offenders released from Federal or military custody and sex offenders convicted in foreign countries generally are unable to register prior to release. The section 20913(d) authority to prescribe registration rules for sex offenders "unable to comply with subsection (b)" accordingly provides one of the legal bases for the alternative timing rules in § 72.7(a)(2), which direct registration by sex offenders in the affected classes within three business days of entering a jurisdiction following release.

The authorities described above— under 34 U.S.C. 20912(b), 20913(d), and 20914(a)(8)—provided the basis for the Attorney General's adoption of time and manner specifications for complying with SORNA's registration requirements in previously issued guidelines under SORNA. More recently, International Megan's Law added an express, general grant of authority to the Attorney General to make such specifications. The relevant provision is 34 U.S.C. 20914(c), which reads as follows: "(c) TIME AND MANNER.—A sex offender shall provide and update information required under subsection (a), including information relating to intended travel outside the United States required under paragraph (7) of that subsection, in conformity with any time and manner requirements prescribed by the Attorney General."

The cross-referenced "subsection (a)" is SORNA's list of all the registration information that sex offenders must provide. Hence, the new section 20914(c) requires sex offenders to comply with the Attorney General's directions regarding the time and manner for providing and updating all registration information required by SORNA. In addition to empowering the Attorney General to specify the time and manner for reporting particular types of registration information, this provision enables the Attorney General to specify the time and manner for registration. This is so because registration on the part of a sex offender consists of providing required registration information to the registration jurisdiction for inclusion in the sex offender registry. Given that the Attorney General has the authority under section 20914(c) to specify the time and manner for a sex offender's provision of each required type of registration information, it follows that the Attorney General has the authority under section 20914(c) to specify the time and manner for a sex offender's provision of the required types of information collectively, which constitutes registration under SORNA.

Paragraph (a)—Initial Registration

Paragraph (a)(1) of § 72.7 tracks SORNA's general rule that a sex offender must initially register—that is, register for the first time based on a sex offense conviction—before release from imprisonment, or within three business days of sentencing in case of a non-incarcerative sentence. *See* 34 U.S.C. 20913(b) (initial registration by sex offenders); *id.* 20919(a) (complementary duties of registration officials); 73 FR at 38062–65 (related explanation in guidelines).

Paragraph (a)(2)(i) of § 72.7 addresses the situation of sex offenders who are released from Federal or military custody or sentenced for a Federal or military sex offense. There is no separate Federal registration program for such offenders. Hence, Federal authorities cannot register these offenders prior to their release from custody or near the time of sentencing. This is in contrast to the authorities of the SORNA registration jurisdictions—the states, the District of Columbia, the five principal U.S. territories, and qualifying Indian tribes—who may register their sex offenders prior to release or near sentencing as provided in 34 U.S.C. 20913(b), 20919(a). SORNA instead enacted special provisions under which Federal correctional and supervision authorities (i) are required to inform Federal (including military) offenders with sex offense convictions that they must register as required by SORNA and (ii) must notify the (non-Federal) jurisdictions in which the sex offenders will reside following release or sentencing so that these jurisdictions can integrate the sex offenders into their registration programs. *See* 18 U.S.C. 4042(c); Public Law 105–119, sec. 115(a)(8)(C), as amended by Public Law 109–248, sec. 141(i) (10 U.S.C. 951 note); 73 FR at 38064; *see also* 18 U.S.C. 3563(a)(8); *id.* 3583(d) (third sentence); *id.* 4209(a) (second sentence (mandatory Federal supervision condition to comply with SORNA); 34 U.S.C 20931 (requiring the Secretary of Defense to provide to the Attorney General military sex offender information for inclusion in the National Sex Offender Registry and National Sex Offender Public website).

The timing rule adopted for such situations is that sex offenders released from Federal or military custody or convicted of Federal or military sex offenses but not sentenced to imprisonment must register within three business days of entering or remaining in a jurisdiction to reside, *see* 73 FR at 38064, which parallels SORNA's normal timeframe for registering or updating a

registration following changes of residence, *see* 34 U.S.C. 20913(c). Section 72.7(a)(2)(i) refers to a sex offender entering ''or remaining'' in a jurisdiction to reside because, for example, a Federal sex offender released from a Federal prison located in a state may remain in that state to reside, rather than relocating to some other state. In such a case, the three-business-day period for registering with the state runs from the time of the sex offender's release.

In terms of legal authority, the requirement of § 72.7(a)(2)(i) is supported by the Attorney General's authority to interpret and implement SORNA's requirement to register in the jurisdiction of residence, 34 U.S.C. 20912(b), 20913(a); the Attorney General's authority under section 20913(d) to prescribe rules for the registration of sex offenders who are unable to comply with section 20913(b)'s timing rule for initial registration; and the Attorney General's authority under section 20914(c) to adopt time and manner specifications for providing and updating registration information, which includes the authority to adopt time and manner specifications for registration as discussed above. Viewing a sex offender's being released from Federal or military custody and taking up residence in a jurisdiction as a change of residence, this requirement is also supportable as a direct application of section 20913(c).

Paragraph (a)(2)(ii) of § 72.7 addresses the situation of persons required to register on the basis of foreign sex offense convictions. Registration by the convicting state is not an available option under SORNA in such cases because foreign states are not registration jurisdictions under SORNA. *See* 34 U.S.C. 20911(10). Also, there may be no domestic jurisdiction in which SORNA requires such offenders to register—if they are not residing, working, or attending school in the United States at the time they are released from custody or sentenced in the foreign country—but SORNA's requirements will apply if they travel or return to the United States. The rule adopted for foreign conviction situations is that the sex offender must register within three business days of entering a domestic jurisdiction to reside, work, or attend school, *see* 73 FR at 38050–51, 38064–65, which parallels SORNA's normal timeframe for registering or updating a registration following changes of residence, employment, or student status, *see* 34 U.S.C. 20913(c).

In terms of legal authority, this requirement is supported by the Attorney General's authority to interpret and implement SORNA's requirement to register in jurisdictions of residence, employment, and school attendance, 34 U.S.C. 20912(b), 20913(a); the Attorney General's authority under section 20913(d) to prescribe rules for the registration of sex offenders who are unable to comply with section 20913(b)'s timing rule for initial registration; and the Attorney General's authority under section 20914(c) to adopt time and manner specifications for providing and updating registration information, which includes the authority to adopt time and manner specifications for registration as discussed above. Insofar as a sex offender's travel or return to the United States following a foreign conviction involves a change of residence, employment, or student status, this requirement is also supportable as a direct application of section 20913(c).

Paragraph (b)—Periodic In-Person Verification

Paragraph (b) of § 72.7 sets out the express requirement of 34 U.S.C. 20918 that sex offenders periodically appear in person in the jurisdictions in which they are required to register, allow the jurisdictions to take current photographs, and verify their registration information, with the frequency of the required appearances determined by their tiering. *See* 73 FR at 38067–68.

The second sentence of paragraph (b), exercising the Attorney General's authority under 34 U.S.C. 20912(b), interprets and implements section 20918's requirement of verifying the information in each registry to include correcting any information that is out of date or inaccurate and reporting any new registration information. With respect to most types of registration information, other provisions of § 72.7 require reporting of changes within shorter timeframes than the intervals between periodic in-person appearances for verification. Hence, a sex offender who has complied with SORNA's requirements is likely to have reported changes in most types of registration information prior to his next verification appearance. But § 72.7 does not specially address the time and manner for reporting changes in some types of registration information. *See* § 72.6(a)(2)–(3), (e), (g) (requiring as well information concerning actual and purported dates of birth and Social Security numbers, passports and immigration documents, and professional licenses). Sex offenders can

keep their registrations current with respect to the latter categories of information by reporting any changes in their periodic verifications. *See* 73 FR at 38067–68.

Paragraph (c)—Reporting of Initiation and Changes Concerning Name, Residence, Employment, and School Attendance

Paragraph (c) of § 72.7 is based on SORNA's express requirement that ''[a] sex offender shall, not later than 3 business days after each change of name, residence, employment, or student status, appear in person in at least 1 jurisdiction involved pursuant to [34 U.S.C. 20913(a)] and inform that jurisdiction of all changes in the information required for that offender in the sex offender registry.'' 34 U.S.C. 20913(c); *see* 73 FR at 38065–66.

While SORNA provides a definite timeframe for reporting these changes (within three business days), specifies a means of reporting (through in-person appearance), and requires reporting of a change in ''at least 1 jurisdiction,'' it does not specify the particular jurisdiction in which each kind of change—*i.e.*, change in name, residence, employment, or school attendance—is to be reported. As discussed earlier, the Attorney General's authority under 34 U.S.C. 20912(b) to interpret and implement SORNA includes the authority to further specify the manner in which changes in registration information are to be reported where there are such gaps or ambiguities in SORNA's statutory provisions. In addition, the Attorney General now has express authority under 34 U.S.C. 20914(c) to prescribe the manner in which all required registration information is to be provided and updated. Exercising those authorities in paragraph (c) in § 72.7, the Attorney General interprets and implements the requirement of section 20913(c), and prescribes the manner in which sex offenders must provide and update information about name, residence, employment, or student status, by specifying the particular jurisdiction in which a sex offender must appear to report the changes section 20913(c) describes—in the residence jurisdiction to report a change of name or residence, in the employment jurisdiction to report a change of employment, and in the jurisdiction of school attendance to report a change in school attendance. *See* 73 FR at 38065.

For example, suppose that a sex offender resides in state A and commutes to work in State B. Pursuant to 34 U.S.C. 20913(a), the sex offender must register in both states—in State A

as his residence state, and in State B as his employment state. Suppose that the sex offender changes his place of residence in State A and continues to work at the same place in State B. Logically, the sex offender should carry out his in-person appearance in State A to report his change of residence in State A, rather than in State B, where his contact with the latter state (employment) has not changed. Conversely, varying the example, suppose that the sex offender changes his place of employment from one employer to another in State B, but continues to reside in the same place in State A. The sex offender should carry out his in-person appearance in state B to report his change of employment in State B, rather than in State A, where his contact with the latter state (residence) has not changed.

These conclusions follow from the underlying policies of SORNA's in-person appearance requirements, which aim to provide opportunities for face to face encounters between sex offenders and persons responsible for their registrations in the local areas in which they will be present. Such encounters may help law enforcement personnel to familiarize themselves with the sex offenders in their areas, thereby facilitating the effective discharge of their protective and investigative functions in relation to those sex offenders, and helping to ensure that their responsibilities to track those offenders are taken seriously and carried out consistently. Likewise, from the perspective of sex offenders, face to face encounters with officers responsible for their monitoring in the local areas where they are present may help to impress on them that their identities, locations, and past criminal conduct are known to the authorities in those areas. Hence, there is a reduced likelihood of their avoiding detection and apprehension if they reoffend, and this may help them to resist the temptation to reoffend. *See* 73 FR at 38065, 38067.

These policies are furthered by sex offenders appearing in person to report changes in residence, employment, and school attendance in the jurisdictions in which the changes occur, rather than in other jurisdictions where they may be required to register, but within whose borders there has been no change in the location of the sex offender. Section 72.7(c) in the rule accordingly provides that changes in the most basic types of location information—residence, employment, school attendance—are to be reported through in-person appearances in the jurisdictions in which they occur. Section 72.7(c) also provides definiteness regarding the

reporting of name changes under 34 U.S.C. 20913(c), providing that such changes are to be reported in the residence jurisdiction, as the jurisdiction in which a sex offender is likely to have his most substantial presence and contacts.

Paragraph (d)—Reporting of Departure and Termination Concerning Residence, Employment, and School Attendance

Paragraph (d) of § 72.7 requires sex offenders to inform the jurisdictions in which they reside if they will be commencing residence, employment, or school attendance in another jurisdiction or outside of the United States, and to inform the relevant jurisdictions if they will be terminating residence, employment, or school attendance in a jurisdiction. The Attorney General has previously articulated these requirements in the SORNA Guidelines. *See* 73 FR at 38065–67. These requirements are not part of the requirement under 34 U.S.C. 20913(c) to report certain changes through in-person appearances and they may be reported by any means allowed by registration jurisdictions in their discretion. *See* 73 FR at 38067.

Paragraph (d)(1) of § 72.7, relating to notice about intended commencement of residence, employment, or school attendance outside of a jurisdiction, and paragraph (d)(2), relating to notice about termination of residence, employment, or school attendance in a jurisdiction, are complementary, each applying in certain situations that may be outside the scope of the other. For example, § 72.7(d)(1) requires a sex offender to inform his residence jurisdiction if he will be starting a job in another jurisdiction, even if he will continue to reside where he has resided and will not be terminating any existing connection to the residence jurisdiction. Section 72.7(d)(2) requires a sex offender to inform a jurisdiction of his intended termination of residence, employment, or school attendance in that jurisdiction ''even if there is no ascertainable or expected future place of residence, employment, or school attendance for the sex offender.'' 73 FR at 38066.

Regarding the underlying legal authority for § 72.7(d), its informational requirements overlap with types of information 34 U.S.C. 20914(a) expressly requires sex offenders to provide, which include information as to where a sex offender ''will reside,'' ''will be an employee,'' or ''will be a student.'' *Id.* 20914(a)(3)–(5). To the extent § 72.7(d) goes beyond the registration information that SORNA expressly requires, it is a straightforward exercise of the Attorney

General's authority under 34 U.S.C. 20914(a)(8) to require any additional registration information.

Even before the enactment of International Megan's Law, the Attorney General's implementation authority under 34 U.S.C. 20912(b) was understood to include the authority to specify time and manner requirements for providing and updating registration information, as discussed above. Currently, section 20914(c) confers express authority on the Attorney General to adopt the time and manner requirements set forth in § 72.7(d)—*i.e.,* that (i) intended commencement of residence, employment, or school attendance in another jurisdiction or outside the United States is to be reported to the residence jurisdiction (by whatever means it allows) prior to any termination of residence in that jurisdiction and prior to commencing residence, employment, or school attendance in the other jurisdiction or outside of the United States; and (ii) intended termination of residence, employment, or school attendance in a jurisdiction is to be reported to the jurisdiction (by whatever means it allows) prior to the termination of residence, employment, or school attendance in the jurisdiction. Section 72.7(d)'s requirement that the intended actions or changes are to be reported prior to the termination of residence, employment, or school attendance in the relevant jurisdiction ensures that the reporting requirement applies while the sex offender is still subject to the requirement to register and keep the registration current in the jurisdiction pursuant to 34 U.S.C. 20913(a). This approach avoids any question about the validity of requiring a sex offender to provide or update information in a jurisdiction in which he is no longer required to register under SORNA.

The exercise of the authorities described above in § 72.7(d) furthers SORNA's objective of creating a ''comprehensive national system for the registration of [sex] offenders,'' 34 U.S.C. 20901, which reliably tracks sex offenders as they move away from and into registration jurisdictions. A sex offender's departure from a jurisdiction in which he is registered may eventually be discovered—*e.g.,* because he fails to appear for the next periodic verification of his registration, *see id.* 20918—even if he does not affirmatively notify the jurisdiction that he is leaving. But considerable time may elapse before that happens, leaving a cold trail for law enforcement efforts to locate the sex offender, if he does not register in the destination jurisdiction as SORNA requires.

For example, for a sex offender who decides to change his residence from one state to another, § 72.7(d) requires the sex offender to inform the state he is leaving prior to his departure, and § 72.7(c) requires him to inform the destination state within three business days of his arrival there. Under SORNA's procedures for information sharing among registration jurisdictions, the state of origin in such a case directly notifies the identified destination state. *See* 34 U.S.C. 20921(b), 20923(b)(3); 73 FR at 38065; 76 FR at 1638. If the sex offender then fails to appear and register as expected in the destination state, appropriate follow-up ensues, which may include investigative efforts by state and local law enforcement and the U.S. Marshals Service to locate the sex offender, issuance of a warrant for his arrest, and entry of information into national law enforcement databases reflecting the sex offender's status as an absconder or unlocatable. *See* 34 U.S.C. 20924; 73 FR at 38069. In the context of this system, the requirement of § 72.7(d) for a sex offender to notify the residence jurisdiction concerning his departure is an important element. It helps to ensure that agencies and officials responsible for sex offender registration and its enforcement are promptly made aware of major changes in the location of sex offenders, and thereby reduces the risk that sex offenders will disappear in the interstices between jurisdictions.

In so doing, § 72.7(d) resolves certain potential problems in the operation of SORNA's registration system following the Supreme Court's decision in *Nichols* v. *United States,* 136 S. Ct. 1113 (2016), and a similar earlier decision by the Eighth Circuit Court of Appeals, *United States* v. *Lunsford,* 725 F.3d 859 (8th Cir. 2013). *Nichols* involved a sex offender who abandoned his residence in Kansas and relocated to the Philippines, without informing the Kansas registration authorities of his departure. The issue in the case was whether Nichols had violated 34 U.S.C. 20913(c), which requires a sex offender ''not later than three business days after each change of name, residence, employment, or student status'' to ''appear in person in at least 1 jurisdiction involved pursuant to subsection (a) and inform that jurisdiction of all changes'' in the required registration information.

The Court noted that subsection (a) of section 20913 mentions three jurisdictions as possibly ''involved''— ''where the offender resides, where the offender is an employee, and where the offender is a student''— which would not include the state of Kansas after Nichols had moved to the Philippines.

*Nichols,* 136 S. Ct. at 1117 (quoting 34 U.S.C. 20913(a)). The Court further noted that section 20913(c) requires appearance and registration within three business days *after* a change of residence, and Nichols could not have appeared in Kansas after he left the state. *Id.* at 1117–18. The Court accordingly concluded that Nichols' failure to inform Kansas of his departure was not a violation of section 20913(c), since Kansas was no longer an ''involved'' jurisdiction in which section 20913(c) may require a sex offender to report changes in residence. *Id.* at 1118.

Applying the same reasoning to the domestic context, if a sex offender terminates his residence in a state and thereafter takes up residence in another state, he cannot violate section 20913(c) by failing to inform the state he is leaving. For, following the termination of residence in that state, it is no longer a ''jurisdiction involved'' for purposes of section 20913(c).

There is no comparable problem, however, with § 72.7(d)'s requirement that a sex offender inform a jurisdiction in which he resides of his intended departure from the jurisdiction, because § 72.7(d) does not depend on the requirements of section 20913(c). Rather, § 72.7(d) is grounded in the requirement of section 20914(a) that sex offenders provide certain information, including ''[a]ny other information required by the Attorney General,'' and the requirement of section 20914(c) that they report the required information in the ''time and manner . . . prescribed by the Attorney General.''

The Attorney General's exercise of his authorities under section 20914(a) and 20914(c) to require sex offenders to inform their registration jurisdictions that they will be going elsewhere in no way conflicts with *Nichols'* conclusion that section 20913(c) does not require such pre-departure notice of intended relocation. Section 20914(a)(8) says that sex offenders must provide ''[a]ny other information required by the Attorney General.'' The statute does not say that sex offenders must provide ''[a]ny other information required by the Attorney General, *except for information about intended departure from the jurisdiction.*'' *Nichols'* interpretation of section 20913(c) provides no basis for reading such an unstated limitation into section 20914(a)(8). Likewise, *Nichols* provides no basis for reading unstated limitations into the Attorney General's authority—now expressly granted by section 20914(c)—to prescribe time and manner requirements for providing and updating registration information, which adequately supports § 72.7(d)'s

requirement that a sex offender inform the jurisdiction in which he resides about intended departure prior to any termination of residence and before going elsewhere.

The Attorney General's adoption of the § 72.7(d) is also consistent with the Supreme Court's analysis of particular arguments and issues in *Nichols*. The salient points are as follows:

First, the Court in *Nichols* noted that the predecessor Federal sex offender registration law (the "Wetterling Act") required a sex offender to "report the change of address to the responsible agency in the State the person is leaving," while SORNA contains no comparable provision that expressly requires sex offenders to notify jurisdictions they are leaving. 136 S. Ct. at 1118 (quoting 42 U.S.C. 14071(b)(5) (2000)). However, SORNA does not attempt to articulate all the particulars of its registration requirements for sex offenders, instead authorizing the Attorney General to complete the regulatory scheme through interpretation and implementation of SORNA. *See, e.g.,* 34 U.S.C. 20912(b), 20913(d), 20914(a)(8), 20914(c). Given the extent of the Attorney General's powers under SORNA, it was not necessary for Congress to include an express provision in SORNA requiring sex offenders to notify jurisdictions they are leaving. Nor can there be any doubt that requiring such notification is now within the terms of the Attorney General's powers under SORNA, as discussed above. Indeed, 34 U.S.C. 20923(b)(3)—which provides that a jurisdiction's officials are to inform each jurisdiction "from or to which a change of residence, employment, or student status occurs"—contemplates the Attorney General's adoption of requirements like those appearing in § 72.7(d). For if sex offenders were not required to advise the jurisdictions they leave of their departure and destination, those jurisdictions could not inform the jurisdictions "to which" sex offenders relocate.

Second, the Court in *Nichols* rejected an argument that a jurisdiction necessarily remains "involved" for purposes of section 20913(c) if the sex offender continues to appear on the jurisdiction's registry as a current resident. The Court responded that section 20913(a) gives jurisdictions where the offender resides, is an employee, or is a student as the only possibilities for an "involved" jurisdiction, and does not include a jurisdiction "where the offender appears on a registry." 136 S. Ct. at 1118. The Court said "[w]e decline the . . .

invitation to add an extra clause to the text of § [20]913(a).'' *Id.* In contrast, § 72.7(d) in this rule does not require the addition of an extra clause to section 20913(a). It involves the exercise of the Attorney General's authorities under SORNA to include the information described in § 72.7(d) in the information that a sex offender must provide to the jurisdictions described in the actual clauses of section 20913(a)—*i.e.,* those in which he resides, is an employee, or is a student.

Third, the Court rejected an argument that Nichols was required to inform Kansas of his intended departure based on 34 U.S.C. 20914(a)(3)'s direction to sex offenders to provide information about where they "will reside." The Court noted that "§ [20]914(a) merely lists the pieces of information that a sex offender must provide if and when he updates his registration; it says nothing about whether the offender has an obligation to update his registration in the first place." 136 S. Ct. at 1118. In context, the Court's point was that section 20914(a)(3) just specifies a type of information sex offenders must provide, and does not say when they must provide it, so section 20914(a)(3) does not in itself require sex offenders to provide change of residence information in advance when they leave a jurisdiction. For example, without more, section 20914(a)(3) might be taken to entail that sex offenders must advise where they "will reside" when initially registering before release from imprisonment, *see* 34 U.S.C. 20913(b)(1), but not necessarily that they give advance notice to their registration jurisdictions of expected future residence on subsequent relocations.

However, this understanding of section 20914(a)(3) does not imply any limitation on the Attorney General's authority to require a sex offender to "update his registration in the first place," *Nichols,* 136 S. Ct. at 1118, on the basis of 34 U.S.C. 20914(c), which directs that "[a] sex offender shall provide and update information required under subsection (a) . . . in conformity with any time and manner requirements prescribed by the Attorney General." Nor does it imply any limitation on the Attorney General's authority under SORNA to require sex offenders to report the full range of information described in § 72.7(d). In § 72.7(d), as discussed above, the Attorney General exercises these authorities to require sex offenders to inform jurisdictions of intended departure and expected future residence prior to any termination of residence in a jurisdiction.

Finally, the Court in *Nichols* rejected an argument that Nichols had to notify Kansas of his departure on the theory that he engaged in two changes of residence—the first when he abandoned his residence in Kansas, and the second when he checked into a hotel in the Philippines. 136 S. Ct. at 1118–19. Section 72.7(d) in this rule, however, does not assume any such multiplicity in changes of residence. Rather, it establishes a freestanding requirement to inform registration jurisdictions in advance of termination of residence and commencement of intended future residence.

At the end of the *Nichols* decision, the Court noted that—considering the International Megan's Law amendments to SORNA—"[o]ur interpretation of the SORNA provisions at issue in this case in no way means that sex offenders will be able to escape punishment for leaving the United States without notifying the jurisdictions in which they lived while in this country." 136 S. Ct. at 1119. The Court noted the addition of a new subsection (b) to 18 U.S.C. 2250, which "criminalized the 'knowin[g] fail[ure] to provide information required by [SORNA] relating to intended travel in foreign commerce,' " and the addition of 34 U.S.C. 20914(a)(7), which requires sex offenders to provide information about intended international travel. 136 S. Ct. at 1119 (brackets in original) (quoting 18 U.S.C. 2250(b)(2)). The Court concluded: "We are thus reassured that our holding today is not likely to create 'loopholes and deficiencies' in SORNA's nationwide sex-offender registration scheme." *Id.* (quoting *United States* v. *Kebodeaux,* 570 U.S. 387, 399 (2013)).

Section 72.7(d) in this rule similarly helps to ensure that the interpretation of 34 U.S.C. 20913(c) in *Nichols* and *Lunsford* does not create "loopholes and deficiencies" in the operation of SORNA's tracking system, in relation to both domestic and international relocations. For example, consider a sex offender who terminates his residence in a state without informing the state. Suppose the sex offender is later found elsewhere in the United States, but he cannot be shown to have taken up residence—or to have been employed or a student—in another jurisdiction after leaving the original state of residence. In light of *Nichols,* section 20913(c) does not require the sex offender to report his relocation to the original state because it is no longer an "involved" jurisdiction after he leaves, and there may be no other relevant jurisdiction in which he must report the change, *i.e.,* one in which he presently resides, is employed, or is a student. However,

with § 72.7(d) in effect, a sex offender in this circumstance will have violated 34 U.S.C. 20914(a) and (c)'s requirements to provide registration information, including "[a]ny other information" prescribed by the Attorney General, in the time and manner prescribed by the Attorney General. At a minimum, in the case described, the sex offender would have failed to provide the information that he is terminating his residence in the original state of residence prior to his termination of residence in that state, contravening § 72.7(d).

Hence, § 72.7(d) provides an additional safeguard against registered sex offenders simply disappearing without informing anyone about their relocation. The consequences for noncompliant sex offenders include potential prosecution by registration jurisdictions, which have been encouraged to adopt departure notification requirements similar to § 72.7(d) in their registration laws by the Attorney General's prior articulation of those requirements in the SORNA Guidelines. *See* 73 FR at 38065–66. The consequences of noncompliance with § 72.7(d) will also include potential Federal prosecution under 18 U.S.C. 2250 for violations committed under circumstances supporting Federal jurisdiction.

Sex offenders must comply both with the requirements of § 72.7(c) and with the requirements of § 72.7(d). For example, suppose a sex offender changes residence from State A to State B. It is not sufficient if (i) the sex offender complies with § 72.7(d) by telling State A that he is leaving and going to State B, but (ii) he fails to appear in State B and register there as required by § 72.7(c), and then (iii) he attempts to excuse his failure to comply with § 72.7(c) on the ground that State A could have told State B about his relocation. Likewise, it is not sufficient if the sex offender in such a case (i) complies with § 72.7(c) by registering in State B, but (ii) he fails to inform State A about the intended relocation prior to his departure, and then (iii) he attempts to excuse his failure to comply with § 72.7(d) on the ground that State B could have told State A about his relocation. As discussed above, appearance and registration by sex offenders in jurisdictions in which they commence residence, employment, or school attendance, as required by § 72.7(c), and notification by sex offenders to jurisdictions in which they terminate residence, employment, or school attendance, as required by § 72.7(d), both serve important purposes in SORNA's registration system as articulated in this rule and the

previously issued SORNA guidelines. Compliance with both requirements is necessary to the seamless and effective operation of that system for the reasons explained above.

Paragraph (e)—Reporting of Changes in Information Relating to Remote Communication Identifiers, Temporary Lodging, and Vehicles

Paragraph (e) requires sex offenders to report to their residence jurisdictions within three business days changes in remote communication identifier information, temporary lodging information, and vehicle information. In terms of legal authority, as discussed earlier, these requirements are supportable on the basis of the Attorney General's authority to interpret and implement SORNA's requirement to keep the registration current, the Attorney General's authority to expand the information that sex offenders must provide to registration jurisdictions, and the Attorney General's authority to prescribe the time and manner for providing and updating registration information. *See* 34 U.S.C. 20912(b), 20913(a), 20914(a)(8), (c), 20916(b); 73 FR at 38066; 76 FR at 1637. (The SORNA Guidelines state that such changes are to be reported "immediately" and explain at an earlier point that "immediately" in the context of SORNA's timing requirements means within three business days, *see* 73 FR at 38060, 38066.) SORNA does not require that these changes be reported through in-person appearances and they may be reported by any means allowed by registration jurisdictions in their discretion. *See id.* at 38067.

Paragraph (f)—Reporting of International Travel

Paragraph (f) of § 72.7 requires sex offenders to report intended travel outside of the United States to their residence jurisdictions. The expected travel must be reported at least 21 days in advance and, if applicable, prior to any termination of residence in the jurisdiction. Reporting of information about intended international travel is an express SORNA requirement following SORNA's amendment by International Megan's Law. *See* 34 U.S.C. 20914(a)(7); Public Law 114–119, sec. 6(a). The underlying reasons for requiring reporting of international travel are explained above in connection with § 72.6(d) of this rule.

The 21-day advance notice requirement is designed to provide relevant agencies, including the U.S. Marshals Service and INTERPOL Washington-U.S. National Central Bureau, sufficient lead time for any

investigation or inquiry that may be warranted relating to the sex offender's international travel, and for notification of U.S. and foreign authorities in destination countries, prior to the sex offender's arrival in a destination country. The requirement that the intended international travel be reported prior to any termination of residence in the jurisdiction— potentially an issue in cases in which the sex offender is terminating his U.S. residence and relocating to a foreign country—ensures that a SORNA violation has occurred in case of noncompliance while the sex offender is still residing in the jurisdiction and hence required by 34 U.S.C. 20913(a) to register and keep the registration current in that jurisdiction. The requirement to report intended international travel at least 21 days in advance applies in relation to all international travel, including both cases in which the sex offender is temporarily traveling abroad while maintaining a domestic residence and cases in which the sex offender is terminating his residence in the particular jurisdiction or the United States.

The rule recognizes, however, that reporting of intended international travel 21 days in advance is not possible in some circumstances. Section 72.8(a)(2) of the rule generally addresses situations in which sex offenders cannot comply with SORNA requirements because of circumstances beyond their control, and it specifically addresses inability to comply with the timeframe for reporting of international travel in Example 3 in that provision.

In terms of legal authority, the requirement to report intended international travel to the residence jurisdiction at least 21 days in advance and prior to any termination of residence is supportable as an exercise of the express authority of the Attorney General under 34 U.S.C. 20914(c), which states in part that "[a] sex offender shall provide and update . . . information relating to intended travel outside the United States . . . in conformity with any time and manner requirements prescribed by the Attorney General." As discussed above, the international travel reporting requirement, including its associated timeframe requirement, is also supportable on the basis of other SORNA authorities of the Attorney General, which were relied on in SORNA guidelines preceding the addition of 34 U.S.C. 20914(a)(7), (c) by International Megan's Law. These authorities include the Attorney General's authority under 34 U.S.C. 20914(a)(8) to expand the range of

required registration information and the Attorney General's authority under 34 U.S.C. 20912(b) to issue rules to interpret and implement SORNA's requirement to keep the registration current.

Paragraph (g)—Compliance With Jurisdictions' Requirements for Registering and Keeping the Registration Current

Paragraph (g) of § 72.7 requires sex offenders to register and keep the registration current in conformity with the time and manner requirements of their registration jurisdictions, where they have not done so in the time and manner normally required under SORNA.

SORNA generally requires sex offenders to register initially before release from imprisonment or within three business days of sentencing, but it recognizes that sex offenders may be unable to comply with these requirements in some circumstances. The difficulty can arise in cases in which a jurisdiction has no provision for registering certain sex offenders as required by SORNA at the time of their release—or even no registration program at all at that time—but the jurisdiction can register them later as it progresses in its implementation of SORNA's requirements. The SORNA Guidelines provide guidance to registration jurisdictions about integrating previously excluded sex offenders into their registration programs in such circumstances and ensuring that these sex offenders fully comply with SORNA's requirements. *See* 73 FR at 38063–64; *see also Smith*, 538 U.S. 84 (application of new sex offender registration requirements to previously convicted sex offenders does not violate the constitutional prohibition on ex post facto laws).

Because the normal timeframe for initial registration under SORNA may be past in these situations, SORNA authorizes the Attorney General to prescribe rules for registration. Specifically, 34 U.S.C. 20913(d) gives the Attorney General the authority to specify the applicability of SORNA's requirements to sex offenders with pre-SORNA or pre-SORNA-implementation convictions, ''and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with'' SORNA's initial registration requirements. More broadly, as discussed above, the Attorney General's general authority under 34 U.S.C. 20912(b) to interpret and implement SORNA includes the authority to fill gaps in SORNA's time and manner

requirements for registering and keeping the registration current, and 34 U.S.C. 20914(c) expressly requires sex offenders to provide and update registration information required by SORNA in the time and manner prescribed by the Attorney General.

In section 72.7(g) in this rule, the Attorney General exercises his authorities under 34 U.S.C. 20912(b), 20913(d), and 20914(c) to require sex offenders to register and keep their registrations current in the time and manner specified by their registration jurisdictions, where the sex offenders have not registered or kept the registrations up to date in the time and manner normally required by SORNA as articulated in the earlier portions of § 72.7. This requirement complements the directions to registration jurisdictions in the SORNA Guidelines about integrating previously excluded sex offenders and previously omitted SORNA requirements into their registration programs, with suitable timeframes and procedures, as the jurisdictions progress with SORNA implementation. *See* 73 FR at 38063–64. Of course sex offenders are independently required by the laws of their registration jurisdictions to comply with the jurisdictions' time and manner specifications for registering and updating their registrations. The effect of § 72.7(g) is to adopt the jurisdictions' time and manner specifications as SORNA requirements in the situations it covers.

Section 72.7(g)(1) includes four examples. The first example concerns a situation in which a state does not register sex offenders before release, but a sex offender can register soon after release in conformity with the state's procedures. The second example concerns a situation in which a jurisdiction does not register certain sex offenders at all at the time of their release or entry into the jurisdiction, but a sex offender in the excluded class becomes able to register at a later time and is directed by the jurisdiction to do so after it extends its registration requirements.

As the Supreme Court noted in *Reynolds*, SORNA, in section 20913(b), ''says that a sex offender must register before completing his prison term, but the provision says nothing about when a pre-Act offender who completed his prison term pre-Act must register. . . . Pre-Act offenders . . . might, on their own, reach different conclusions about whether, or how, the new registration requirements applied to them. A ruling from the Attorney General [under section 20913(d)], however, could diminish or eliminate those

uncertainties. . . .'' 565 U.S. at 441–42. In § 72.7(g), the Attorney General exercises his authorities under sections 20912(b), 20913(d), and 20914(c) to ''eliminate those uncertainties'' in conformity with Congress's intent concerning the filling of ''potential lacunae'' in SORNA, 565 U.S. at 441–42. Section 72.7(g) fills the gaps in such cases by adopting the timing rules and procedures of the relevant registration jurisdictions. This applies in relation to sex offenders who do not register initially in conformity with SORNA because they were convicted and released before SORNA's enactment, as described by the Court in *Reynolds*, and in relation to all other sex offenders who do not register in accordance with the normal time and manner requirements under SORNA, *e.g.*, because of shortfalls in a jurisdictions' registration requirements that may later be corrected or that allow registration in some variant way.

The third example in § 72.7(g)(1) concerns a sex offender in a jurisdiction that initially has no procedure for sex offenders to periodically update registrations through verification appearances as required by SORNA, but the jurisdiction later directs the sex offender to do so after it incorporates this aspect of SORNA into its registration program. Since the periodic verification appearances required by 34 U.S.C. 20918 fall under SORNA's requirement to keep the registration current and involve updating the registration information required by SORNA, it is within the Attorney General's authority under 34 U.S.C. 20912(b) and 20914(c) to specify the time and manner for the verifications where SORNA's verification requirement or normal timeframes for verifications have not been followed. Section 72.7(g)(1) directs sex offenders to comply with the jurisdiction's requirements for periodic verification in such situations.

The fourth example in § 72.7(g)(1) concerns a sex offender who does not provide particular information within the time required by SORNA because a jurisdiction's informational requirements fall short of SORNA's requirements but are later brought into line. The example illustrates the point by reference to email addresses. As provided in § 72.6(b), sex offenders must include this information when they register and, as provided in § 72.7(e), they must report any subsequent changes within three business days. Where the normal reporting time is past when a jurisdiction decides to include a type of information in its sex offender registry,

§ 72.7(g)(1) requires sex offenders to comply with the jurisdiction's directions to provide the information at a later time.

Section 72.7(g)(2) provides that, in a prosecution under 18 U.S.C. 2250, § 72.7(g)(1) does not relieve a sex offender of the need to show an inability to comply with SORNA as an affirmative defense to liability. The situations described in § 72.7(g)(1), which may involve noncompliance with SORNA's requirements because of deficits in registration jurisdictions' requirements or procedures, overlap with situations in which a sex offender may have a defense under 18 U.S.C. 2250(c) because he was prevented from complying with SORNA by circumstances beyond his control. However, the purpose and effect of § 72.7(g)(1) are to hold sex offenders to compliance with the registration rules and procedures of registration jurisdictions in the situations it covers. Section 72.7(g) does not, in any case, relieve sex offenders of the obligation to comply fully with SORNA if able to do so or shift the burden of proof to the government to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA. Rather, the defense under 18 U.S.C. 2250(c) is an affirmative defense, as that provision explicitly provides, and as §§ 72.7(g)(2) and 72.8(a)(2) in this rule reiterate.

### Section 72.8—Liability for Violations

Section 72.8 of the rule explains the liability of sex offenders for SORNA violations and limitations on that potential liability.

#### Paragraph (a)(1)—Offense

SORNA's criminal provision, 18 U.S.C. 2250, provides criminal liability for sex offenders based on SORNA violations.

Section 72.8(a)(1)(i) in the rule refers to potential criminal liability under 18 U.S.C. 2250(a). Section 2250(a) authorizes imprisonment for up to 10 years based on a knowing failure to register or update a registration as required by SORNA. Federal criminal liability may result under this provision when the violation occurs under circumstances supporting Federal jurisdiction as specified in the statute. These jurisdictional circumstances include (i) violation of SORNA by sex offenders convicted of sex offenses under Federal (including military) law, the law of the District of Columbia, Indian tribal law, or the law of a U.S. territory or possession; and (ii) travel in interstate or foreign commerce or

entering, leaving, or residing in Indian country. Section 2250(a) reaches all types of SORNA violations, including failure to register or keep the registration current in each jurisdiction of residence, employment, or school attendance, as required by 34 U.S.C. 20913; failure to provide or update registration information required by 34 U.S.C. 20914; or failure to appear periodically and verify the registration information, as required by 34 U.S.C. 20918.

Section 72.8(a)(1)(ii) in the rule refers to potential criminal liability under 18 U.S.C. 2250(b), which was added by International Megan's Law. See Public Law 114–119, sec. 6(b). Section 2250(b) defines an offense that specifically reaches violations of SORNA's international travel reporting requirement. The provision authorizes imprisonment for up to 10 years for a sex offender who (i) knowingly fails to provide information required by SORNA relating to intended travel in foreign commerce and (ii) "engages or attempts to engage in the intended travel in foreign commerce." The jurisdictional language in section 2250(b) reaches cases in which the contemplated travel is not carried out, in addition to those in which the sex offender does travel abroad. For example, consider a sex offender who (i) purchases a plane ticket to a foreign destination but (ii) fails to report the intended international travel as required by SORNA and (iii) does not actually leave the country because the unreported travel is detected by the authorities who arrest him at the airport. The attempted travel in foreign commerce provides a sufficient jurisdictional basis for Federal prosecution under section 2250(b).

Section 72.8(a)(1)(iii) in the rule explains the condition for liability under 18 U.S.C. 2250(a)–(b) that the defendant "knowingly" fail to comply with a SORNA requirement. The "knowingly" limitation ensures that sex offenders are not held liable under section 2250 for violations of registration requirements they did not know about. However, this does not require knowledge that the requirement is imposed by SORNA. State sex offenders, for example, are likely to be instructed in the registration process regarding many of the registration requirements appearing in SORNA, which are widely paralleled in state registration laws, such as the need to report changes in residence, employment, internet identifiers, and vehicle information; the need to report intended international travel; and the need to appear periodically to update

and verify registration information. The acknowledgment forms obtained from sex offenders in registration often provide a means of establishing their knowledge of the registration requirements in later prosecutions for violations. See 76 FR at 1634–35, 1638. But sex offenders may not be informed that the registration requirements they are subject to are imposed by a particular Federal law, SORNA. This does not impugn the fairness or propriety of holding sex offenders liable under 18 U.S.C. 2250 for knowingly violating a registration requirement that is in fact imposed by SORNA, so long as they are aware of an obligation from some source to comply with the requirement. See, e.g., United States v. Elkins, 683 F.3d 1039, 1050 (9th Cir. 2012); United States v. Whaley, 577 F.3d 254, 261–62 (5th Cir. 2009). Section 72.8(a)(1)(iii) makes these points about 18 U.S.C. 2250's knowledge requirement in the rule.

#### Paragraph (a)(2)—Defense

Subsection (c) of 18 U.S.C. 2250 provides an affirmative defense to liability under certain conditions where uncontrollable circumstances prevented a sex offender from complying with SORNA, so long as the sex offender complied as soon as the preventing circumstances ceased. Section 72.8(a)(2) in the rule reproduces this affirmative defense provision and provides examples of its operation.

Registration is a reciprocal process, involving the provision of registration information by sex offenders, and the registration jurisdiction's acceptance of the information for inclusion in the sex offender registry. The circumstances preventing compliance with SORNA under section 2250(c) accordingly may be a registration jurisdiction's failure or refusal to carry out the reciprocal role needed to effect registration, or the updating of a registration, as required by SORNA.

Example 1 in § 72.8(a)(2) illustrates this type of situation, describing a case in which a sex offender cannot appear and report an inter-jurisdictional change of residence within three business days because the office with which he needs to register will not meet with him for a week. The case implicates both 34 U.S.C. 20913(a)'s requirement that a sex offender register in each jurisdiction in which he resides and 34 U.S.C. 20913(c)'s requirement that sex offenders report changes of residence within three business days. These provisions' net effect is that a sex offender establishing residence in a new jurisdiction must register there but with a three-business-day grace period. In the

case described, 18 U.S.C. 2250(c) would excuse the failure to report within the three-business-day timeframe. However, the inability to meet section 20913(c)'s specific timeframe does not obviate the need to comply with section 20913(a)'s requirement to register in each state of residence. Nothing prevents the sex offender from complying with this registration requirement once the office is willing to meet with him, so he will need to appear and carry out the registration at the appointed time in order to have the benefit of the 18 U.S.C. 2250(c) defense.

Example 2 in § 72.8(a)(2) also illustrates a situation in which the circumstance preventing compliance with SORNA is a failure by the registration jurisdiction to carry out a necessary reciprocal role. The specific situation described in the example is a state's refusal to register sex offenders based on the offense for which the sex offender was convicted. For example, SORNA requires registration based on conviction for child pornography possession offenses, *see* 34 U.S.C. 20911(7)(G), but some states that have not fully implemented SORNA's requirements in their registration programs may be unwilling to register a sex offender on the basis of such an offense. Section 2250(c)'s excuse of the failure to register terminates if that state subsequently becomes willing to register the sex offender, because the circumstance preventing compliance with SORNA no longer exists. However, liability based on a continuing failure by the sex offender to comply with SORNA in such a case—following a change in state policy or practice allowing compliance—depends on the sex offender's becoming aware of the change since, as discussed above, 18 U.S.C. 2250 does not impose liability for violation of unknown registration obligations. *Cf.* 73 FR at 38063–64 (direction to registration jurisdictions to instruct sex offenders about new or additional registration duties in connection with SORNA implementation).

Example 3 in § 72.8(a)(2) describes a situation in which the circumstance preventing compliance with SORNA relates to the situation of the sex offender rather than the registration jurisdiction. The second sentence of § 72.7(f) in the rule requires in part that a sex offender report intended international travel 21 days in advance, which he cannot do if he does not anticipate a trip abroad that far in advance. In such a case, as described in the example, 18 U.S.C. 2250(c) would excuse a sex offender's failure to report the travel 21 days in advance. *Cf.* 76 FR

at 1638 ("[R]equiring 21 days advance notice may occasionally be unnecessary or inappropriate. For example, a sex offender may need to travel abroad unexpectedly because of a family or work emergency."). However, inability to comply with the 21-day timeframe in a particular case does not prevent a sex offender from otherwise complying with SORNA's requirements to inform the residence jurisdiction about intended international travel, appearing in 34 U.S.C. 20914(a)(7) and in §§ 72.6(d) and 72.7(f) in this rule. Hence, once the intention to travel exists, the sex offender must inform the registration jurisdiction to avoid liability under 18 U.S.C. 2250.

Paragraph (b)—Supervision Condition

Section 72.8(b) recounts that, for sex offenders convicted of Federal offenses, compliance with SORNA is a mandatory condition of probation and supervised release. *See* 18 U.S.C. 3563(a)(8), 3583(d) (third sentence). Violation of this condition may result in revocation of release. *See* 18 U.S.C. 3565(a)(2), 3583(e)(3). Section 72.8(b) also notes that compliance with SORNA is a mandatory condition of parole for sex offenders convicted of Federal offenses, *see* 18 U.S.C. 4209(a) (second sentence), a requirement of narrow application given the abolition of parole in Federal cases, except for offenses committed before November 1, 1987.

**Regulatory Flexibility Act**

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and by approving it certifies that this regulation will not have a significant economic impact on a substantial number of small entities for the purposes of that Act because the regulation only articulates SORNA's registration requirements for sex offenders.

**Executive Orders 12866 and 13563—Regulatory Planning and Review**

This regulation has been drafted and reviewed in accordance with Executive Order 12866, "Regulatory Planning and Review," section 1(b), Principles of Regulation, and Executive Order 13563, "Improving Regulation and Regulatory Review." The regulation expands part 72 of title 28 of the Code of Federal Regulations to provide a concise and comprehensive statement of what sex offenders must do to comply with SORNA's requirements, following express requirements appearing in SORNA and previous exercises of authority SORNA grants to the Attorney General to interpret and implement

SORNA. The justification of these requirements as means of furthering SORNA's objectives is explained in the preamble to this regulation and in previous SORNA-related documents, including the rulemaking entitled "Applicability of the Sex Offender Registration and Notification Act," 75 FR 81849 (final rule), 72 FR 8894 (interim rule); the SORNA Guidelines, 73 FR 38030; and the SORNA Supplemental Guidelines, 76 FR 1630. The Office of Management and Budget has determined that this rule is a "significant regulatory action" under Executive Order 12866, section 3(f), and accordingly this rule has been reviewed by the Office of Management and Budget.

The Department of Justice expects that the rule will not entail new costs and will result in a number of benefits. For registration jurisdictions, there are no new costs because their requirements under SORNA continue to be those articulated in the previously issued SORNA guidelines. Likewise, for sex offenders, the requirements articulated in the rule either appear expressly in SORNA or have previously been articulated by the Attorney General in the SORNA guidelines. The procedures by which sex offenders register will continue to depend on the registration processes of the jurisdictions that register them, which will not be made more time-consuming or expensive or otherwise changed by this rule.

In terms of benefits, the rule will provide in one place a clear, concise, and comprehensive statement of sex offenders' registration requirements under SORNA. This will reduce any expenditure by sex offenders of time or money required for inquiry with state or Federal authorities or others to resolve uncertainties, or required in attempting to comply with perceived registration requirements under SORNA that go beyond the requirements the Attorney General has actually specified. The clarity provided by this rule will make it easier for sex offenders to determine what SORNA requires them to do and thereby facilitate compliance with SORNA.

There are also expected benefits for the government. As the preamble explains, the rule's comprehensive articulation of SORNA's registration requirements in regulations addressed to sex offenders will provide a secure basis for Federal prosecution of knowing violations of any of SORNA's requirements. It will resolve specific problems that have arisen in past litigation or can be expected to arise in future litigation if not clarified and resolved by this rule, thereby avoiding

the expenditure of litigation resources on these matters. As discussed in the preamble, previously or potentially litigated matters this rule elucidates include such issues as the starting point and duration of registration periods under SORNA, the applicability of SORNA's requirements to all sex offenders regardless of when they were convicted, the particular jurisdictions in which sex offenders are required to report changes in registration information, the requirement that relocating sex offenders notify a registration jurisdiction prior to departure, the time frame for reporting intended international travel, the mens rea (state of mind) requirement for violation of SORNA's criminal provision (18 U.S.C. 2250), and the contours of the impossibility defense under that provision.

As explained in the existing SORNA guidelines, SORNA aims to prevent the commission of sex offenses, and to bring the perpetrators of such offenses to justice more speedily and reliably, by enabling the authorities to better identify, track, and monitor released sex offenders and by informing the public regarding the presence of released sex offenders in the community. *See* 73 FR at 38044–45. Hence, by facilitating the enforcement of, and compliance with, SORNA's registration requirements, and enhancing the basis for public notification, the rule is expected to further SORNA's public safety objectives and reduce the time and resources required in achieving these objectives.

**Executive Order 13132—Federalism**

This regulation will not have substantial direct effects on the states, on the relationship between the national Government and the states, or on the distribution of power and responsibilities among the various levels of government. There has been substantial consultation with state officials regarding the interpretation and implementation of SORNA. The previously issued SORNA Guidelines and SORNA Supplemental Guidelines articulate the requirements for implementation of the SORNA standards by states and other jurisdictions in their sex offender registration and notification programs, requirements that are not changed by this regulation's provision of a separate statement of the registration obligations of sex offenders under SORNA. Therefore, in accordance with Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism assessment.

**Executive Order 12988—Civil Justice Reform**

This regulation meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988.

**Unfunded Mandates Reform Act of 1995**

This rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. This rule adds provisions to part 72 of title 28 of the Code of Federal Regulations that articulate SORNA's registration requirements for sex offenders, including where, when, and how long sex offenders must register, what information they must provide, and how they must keep their registrations current. The Attorney General has previously addressed these matters and has resolved them in the same way in the SORNA Guidelines, appearing at 73 FR 38030, and in the SORNA Supplemental Guidelines, appearing at 76 FR 1630. Those previously issued sets of guidelines determine what state, local, and tribal jurisdictions must do to achieve substantial implementation of the SORNA standards in their registration programs. Reiteration of some of these requirements in a concise set of directions to sex offenders in this rule will not change what jurisdictions need to do to implement SORNA or affect their costs in doing so.

**Congressional Review Act**

This rule is not a ''major rule'' as defined by the Congressional Review Act, 5 U.S.C. 804(2). The Department of Justice will submit the report required by 5 U.S.C. 801 to each House of Congress and the Comptroller General.

**List of Subjects in 28 CFR Part 72**

Crime, Information, Law enforcement, Prisoners, Prisons, Probation and parole, Records.

Accordingly, for the reasons stated in the preamble, amend chapter I of title 28 of the Code of Federal Regulations by revising part 72 to read as follows:

**PART 72—SEX OFFENDER REGISTRATION AND NOTIFICATION**

Sec.
72.1  Purpose.
72.2  Definitions.
72.3  Applicability of the Sex Offender Registration and Notification Act.
72.4  Where sex offenders must register.
72.5  How long sex offenders must register.
72.6  Information sex offenders must provide.
72.7  How sex offenders must register and keep the registration current.
72.8  Liability for violations.

**Authority:** 34 U.S.C. 20901–45; Pub. L. 109–248, 120 Stat. 587; Pub. L. 114–119, 130 Stat. 15.

**§72.1  Purpose.**

(a) This part specifies the registration requirements of the Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. 20901 *et seq.*, and the scope of those requirements' application. The Attorney General has the authority to specify the requirements of SORNA and their applicability as provided in this part pursuant to provisions of SORNA, including 34 U.S.C. 20912(b), 20913(d), and 20914(a)(8), (c).

(b) This part does not preempt or limit any obligations of or requirements relating to sex offenders under other Federal laws, rules, or policies, or under the laws, rules, or policies of registration jurisdictions or other entities. States and other governmental entities may prescribe registration requirements and other requirements, with which sex offenders must comply, that are more extensive or stringent than those prescribed by SORNA.

**§72.2  Definitions.**

All terms used in this part have the same meaning as in SORNA.

**§72.3  Applicability of the Sex Offender Registration and Notification Act.**

The requirements of SORNA apply to all sex offenders. All sex offenders must comply with all requirements of that Act, regardless of when the conviction of the offense for which registration is required occurred (including if the conviction occurred before the enactment of that Act), regardless of whether a jurisdiction in which registration is required has substantially implemented that Act's requirements or has implemented any particular requirement of that Act, and regardless of whether any particular requirement or class of sex offenders is mentioned in examples in this regulation or in other regulations or guidelines issued by the Attorney General.

*Example 1 to §72.3.* A sex offender is federally convicted of aggravated sexual abuse under 18 U.S.C. 2241 in 1990 and is released following imprisonment in 2009. The sex offender is subject to the requirements of SORNA and could be held criminally liable under 18 U.S.C. 2250 for failing to register or keep the registration current in any jurisdiction

in which the sex offender resides, is an employee, or is a student.

*Example 2 to § 72.3.* A sex offender is convicted by a state jurisdiction in 1997 for molesting a child and is released following imprisonment in 2000. The sex offender initially registers as required but relocates to another state in 2009 and fails to register in the new state of residence. The sex offender has violated the requirement under SORNA to register in any jurisdiction in which he resides, and could be held criminally liable under 18 U.S.C. 2250 for the violation because he traveled in interstate commerce.

### § 72.4   Where sex offenders must register.

A sex offender must register, and keep the registration current, in each jurisdiction in which the offender resides, is an employee, or is a student. For initial registration purposes only, a sex offender must also register in the jurisdiction in which convicted if that jurisdiction is different from the jurisdiction of residence.

### § 72.5   How long sex offenders must register.

(a) *Duration.* A sex offender has a continuing obligation to register and keep the registration current (except when the sex offender is in custody or civilly committed) for the following periods of time:

(1) 15 years, if the offender is a tier I sex offender;

(2) 25 years, if the offender is a tier II sex offender; and

(3) The life of the offender, if the offender is a tier III sex offender.

(b) *Commencement.* The registration period begins to run:

(1) When a sex offender is released from imprisonment following conviction for the offense giving rise to the registration requirement, including in cases in which the term of imprisonment is based wholly or in part on the sex offender's conviction for another offense; or

(2) If the sex offender is not sentenced to imprisonment, when the sex offender is sentenced for the offense giving rise to the registration requirement.

(c) *Reduction.* If a tier I sex offender has maintained for 10 years a clean record, as described in 34 U.S.C. 20915(b)(1), the period for which the sex offender must register and keep the registration current under paragraph (a) of this section is reduced by 5 years. If a tier III sex offender required to register on the basis of a juvenile delinquency adjudication has maintained a clean record, as described in 34 U.S.C. 20915(b)(1), for 25 years, the period for which the sex offender must register

and keep the registration current under paragraph (a) of this section is reduced to the period for which the clean record has been maintained.

### § 72.6   Information sex offenders must provide.

Sex offenders must provide the following information for inclusion in the sex offender registries of the jurisdictions in which they are required to register:

(a) *Name, date of birth, and Social Security number.* (1) The name of the sex offender, including any alias used by the sex offender.

(2) The sex offender's date of birth and any date that the sex offender uses as his purported date of birth.

(3) The Social Security number of the sex offender and any number that the sex offender uses as his purported Social Security number.

(b) *Remote communication identifiers.* All designations the sex offender uses for purposes of routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers.

(c) *Residence, temporary lodging, employment, and school attendance.* (1) The address of each residence at which the sex offender resides or will reside or, if the sex offender has no present or expected residence address, other information describing where the sex offender resides or will reside with whatever definiteness is possible under the circumstances.

(2) Information about any place in which the sex offender is staying when away from his residence for seven or more days, including the identity of the place and the period of time the sex offender is staying there.

(3) The name and address of any place where the sex offender is or will be an employee or, if the sex offender is or will be employed but with no fixed place of employment, other information describing where the sex offender works or will work with whatever definiteness is possible under the circumstances.

(4) The name and address of any place where the sex offender is a student or will be a student.

(d) *International travel.* Information relating to intended travel outside the United States, including any anticipated itinerary, dates and places of departure from, arrival in, or return to the United States and each country visited, carrier and flight numbers for air travel, destination country or countries and address or other contact information therein, and means and purpose of travel.

(e) *Passports and immigration documents.* Information about each

passport the sex offender has and, if the sex offender is an alien, information about any document or documents establishing the sex offender's immigration status, including passport or immigration document type and number.

(f) *Vehicle information.* The license plate number and a description of any vehicle owned or operated by the sex offender, including watercraft and aircraft in addition to land vehicles. If a vehicle has no license plate but has some other type of registration number or identifier, then the registration number or identifier must be provided. Information must also be provided as to where any vehicle owned or operated by the sex offender is habitually parked, docked, or otherwise kept.

(g) *Professional licenses.* Information concerning all licensing of the sex offender that authorizes the sex offender to engage in an occupation or carry out a trade or business.

### § 72.7   How sex offenders must register and keep the registration current.

(a) *Initial registration*—(1) *In general.* Except as provided in paragraph (a)(2) of this section, a sex offender must register before release from imprisonment following conviction for the offense giving rise to the registration requirement, or, if the sex offender is not sentenced to imprisonment, within three business days after being sentenced for that offense.

(2) *Special rules for certain cases.* The following special requirements apply:

(i) *Federal and military offenders.* A sex offender who is released from Federal or military custody, or who is convicted for a Federal or military sex offense but not sentenced to imprisonment, must register within three business days of entering or remaining in a jurisdiction to reside following the release or sentencing.

(ii) *Foreign convictions.* A sex offender required to register on the basis of a conviction in a foreign country must register within three business days of entering any jurisdiction in the United States to reside, work, or attend school.

(b) *Periodic in-person verification.* A sex offender must appear in person, allow the jurisdiction to take a current photograph, and verify the information in each registry in which the offender is required to register. In carrying out the required verification of information in each registry, the sex offender must correct any information that has changed or is otherwise inaccurate and must report any new registration information. A sex offender must appear

AR-00002610

in person for these purposes not less frequently than—

(1) Each year, if the offender is a tier I sex offender;

(2) Every six months, if the offender is a tier II sex offender; and

(3) Every three months, if the offender is a tier III sex offender.

(c) *Reporting of initiation and changes concerning name, residence, employment, and school attendance.* A sex offender who enters a jurisdiction to reside, or who resides in a jurisdiction and changes his name or his place of residence in the jurisdiction, must appear in person in that jurisdiction and register or update the registration within three business days. A sex offender who commences employment or school attendance in a jurisdiction, or who changes employer, school attended, or place of employment or school attendance in a jurisdiction, must appear in person in that jurisdiction and register or update the registration within three business days.

(d) *Reporting of departure and termination concerning residence, employment, and school attendance.* (1) A sex offender residing in a jurisdiction must inform that jurisdiction (by whatever means the jurisdiction allows) if the sex offender will be commencing residence, employment, or school attendance in another jurisdiction or outside of the United States. The sex offender must so inform the jurisdiction in which he is residing prior to any termination of residence in that jurisdiction and prior to commencing residence, employment, or school attendance in the other jurisdiction or outside of the United States.

(2) A sex offender who will be terminating residence, employment, or school attendance in a jurisdiction must so inform that jurisdiction (by whatever means the jurisdiction allows) prior to the termination of residence, employment, or school attendance in the jurisdiction.

(e) *Reporting of changes in information relating to remote communication identifiers, temporary lodging, and vehicles.* A sex offender must report within three business days to his residence jurisdiction (by whatever means the jurisdiction allows) any change in remote communication identifier information, as described in § 72.6(b), temporary lodging information, as described in § 72.6(c)(2), and any change in vehicle information, as described in § 72.6(f).

(f) *Reporting of international travel.* A sex offender must report intended travel outside the United States, including the information described in § 72.6(d), to his residence jurisdiction (by whatever

means the jurisdiction allows). The sex offender must report the travel information to the jurisdiction at least 21 days in advance of the intended travel and, if the sex offender is terminating his residence in the jurisdiction, prior to his termination of residence in the jurisdiction.

(g) *Compliance with jurisdictions' requirements for registering and keeping the registration current.* (1) A sex offender who does not comply with a requirement of SORNA in conformity with the time and manner specifications of paragraphs (a) through (f) of this section must comply with the requirement in conformity with any applicable time and manner specifications of a jurisdiction in which the offender is required to register.

*Example 1 to paragraph (g)(1).* A sex offender convicted in a state does not initially register before release from imprisonment, as required by 34 U.S.C. 20913(b)(1) and paragraph (a)(1) of this section, because the state has no procedure for pre-release registration of sex offenders. Instead, the state informs sex offenders that they must go to a local police station within seven days of release to register. The sex offender must comply with the state's requirements for initial registration, *i.e.,* the offender must report to the police station to register within seven days of release.

*Example 2 to paragraph (g)(1).* A sex offender does not register when he is released from custody, or does not register upon entering a jurisdiction to reside as required by 34 U.S.C. 20913(c) and paragraph (c) of this section, because the jurisdiction, at the time, does not register sex offenders based on the offense for which he was convicted. The jurisdiction later sends the sex offender a notice advising that it has extended its registration requirements to include sex offenders like him and directing him to report to a specified agency within 90 days to register. The sex offender must report to the agency to register within the specified timeframe.

*Example 3 to paragraph (g)(1).* A sex offender registers as required when released from imprisonment or upon entering a jurisdiction to reside, but the jurisdiction has no procedure for sex offenders to appear periodically in person to update and verify the registration information as required by 34 U.S.C. 20918 and paragraph (b) of this section. The jurisdiction later sends the sex offender a notice advising that it has adopted a periodic verification requirement and directing the sex offender to appear at a designated time and place for an initial update meeting.

The sex offender must appear and update the registration as directed.

*Example 4 to paragraph (g)(1).* A sex offender does not report his email address to the jurisdiction in which he resides when he initially registers, or within three business days of a change as required by paragraph (e) of this section, because email addresses are not among the information the jurisdiction accepts for inclusion in its registry. The jurisdiction later notifies the sex offender that it has extended the registration information it collects to include email addresses and directs him to send a reply within a specified time that provides his current email address. The sex offender must comply with this direction.

(2) In a prosecution under 18 U.S.C. 2250, paragraph (g)(1) of this section does not in any case relieve a sex offender of the need to establish as an affirmative defense an inability to comply with SORNA because of circumstances beyond his control as provided in 18 U.S.C. 2250(c) and § 72.8(a)(2).

### § 72.8   Liability for violations.

(a) *Criminal liability*—(1) *Offense.* (i) A sex offender may be liable to criminal penalties under 18 U.S.C. 2250(a) if the sex offender—

(A) Is required to register under SORNA;

(B)(*1*) Is a sex offender as defined for the purposes of SORNA by reason of a conviction under Federal law (including the Uniform Code of Military Justice), the law of the District of Columbia, Indian tribal law, or the law of any territory or possession of the United States; or

(*2*) Travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country; and

(C) Knowingly fails to register or update a registration as required by SORNA.

(ii) A sex offender may be liable to criminal penalties under 18 U.S.C. 2250(b) if the sex offender—

(A) Is required to register under SORNA;

(B) Knowingly fails to provide information required by SORNA relating to intended travel in foreign commerce; and

(C) Engages or attempts to engage in the intended travel in foreign commerce.

(iii) As a condition of liability under 18 U.S.C. 2250(a)–(b) for failing to comply with a requirement of SORNA, a sex offender must have been aware of the requirement he is charged with violating, but need not have been aware

that the requirement is imposed by SORNA.

(2) *Defense.* A sex offender may have an affirmative defense to liability, as provided in 18 U.S.C. 2250(c), if uncontrollable circumstances prevented the sex offender from complying with SORNA, where the sex offender did not contribute to the creation of those circumstances in reckless disregard of the requirement to comply and complied as soon as the circumstances preventing compliance ceased to exist.

*Example 1 to paragraph (a)(2).* A sex offender changes residence from one jurisdiction to another, bringing into play SORNA's requirement to register in each jurisdiction where the sex offender resides and SORNA's requirement to appear in person and report changes of residence within three business days. *See* 34 U.S.C. 20913(a), (c). The sex offender attempts to comply with these requirements by contacting the local sheriff's office, which is responsible for sex offender registration in the destination jurisdiction. The sheriff's office advises that it cannot schedule an appointment for him to register within three business days but that he should come by in a week. The sex offender would have a defense to liability if he appeared at the sheriff's office at the appointed time and registered as required. The sex offender's temporary inability to register and inability to report the change of residence within three business days in the new residence jurisdiction was due to a circumstance beyond his control—the sheriff office's refusal to meet with him until a week had passed—and he complied with the requirement to register as soon as the circumstance preventing compliance ceased to exist.

*Example 2 to paragraph (a)(2).* A sex offender cannot register in a state in which he resides because its registration authorities will not register offenders on the basis of the offense for which the sex offender was convicted. The sex offender would have a defense to liability because the state's unwillingness to register sex offenders like him is a circumstance beyond his control. However, if the sex offender failed to register after becoming aware of a change in state policy or practice allowing his registration, the 18 U.S.C. 2250(c) defense would no longer apply, because in such a case the circumstance preventing compliance with the registration requirement would no longer exist.

*Example 3 to paragraph (a)(2).* A sex offender needs to travel to a foreign country on short notice—less than 21 days—because of an unforeseeable family or work emergency. The sex offender would have a defense to liability for failing to report the intended travel 21 days in advance, as required by § 72.7(f), because it is impossible to report an intention to travel outside the United States before the intention exists. However, if the sex offender failed to inform the registration jurisdiction (albeit on short notice) once he intended to travel, 18 U.S.C. 2250(c) would not excuse that failure, because the preventing circumstance—absence of an intent to travel abroad—would no longer exist.

(b) *Supervision condition.* For a sex offender convicted of a Federal offense, compliance with SORNA is a mandatory condition of probation, supervised release, and parole. The release of such an offender who does not comply with SORNA may be revoked.

Dated: November 29, 2021.

**Merrick B. Garland,**

*Attorney General.*

[FR Doc. 2021–26420 Filed 12–7–21; 8:45 am]

**BILLING CODE 4410–18–P**