JEREMY TALCOTT
Cal. Bar No. 311490
Pacific Legal Foundation
3217 Topaz Lane
Fullerton, CA 92831
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
JTalcott@pacificlegal.org

MOLLY E. NIXON*
N.Y. Bar No. 5023940
STEVEN M. SIMPSON
Cal. Bar No. 336430
ALLISON D. DANIEL*
Ohio Bar No. 0096186
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
MNixon@pacificlegal.org
SSimpson@pacificlegal.org
ADaniel@pacificlegal.org

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE #1, et al., | Case No. 5:22-cv-00855-JGB-SP |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| U.S. DEPARTMENT OF JUSTICE, et al., | Hearing Date: March 10, 2025 |
| Defendants. | Hearing Time: 9:00 a.m. |
| | Courtroom: Riverside, Courtroom 1 |
| | Before: Honorable Jesus G. Bernal |
| | United States District Judge |

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................ii

INTRODUCTION ...........................................................................................................1

BACKGROUND .............................................................................................................2

    I.   Legal Background ............................................................................................2

          A.  SORNA.................................................................................................2

          B.  DOJ's Implementing Regulations ....................................................3

    II.   Factual Background ........................................................................................5

STANDARD OF REVIEW .............................................................................................8

ARGUMENT ..................................................................................................................9

    I.   SORNA's delegation of legislative authority is unconstitutional ..................9

          A.  SORNA violates the non-delegation doctrine's intelligible principle standard..............................................................................9

          B.  SORNA impermissibly delegates criminal lawmaking authority to the Attorney General ...................................................................... 13

    II.  The Rule violates Plaintiffs' due process rights by creating a presumption of guilt and requiring criminal defendants to prove impossibility ................... 16

    III. The Rule's remote communication identifiers provision chills free expression and anonymous speech in violation of the First Amendment................................... 19

          A.  The Rule chills protected speech ............................................. 20

          B.  The Rule is not narrowly tailored to serve a significant government interest ..................................................................... 22

    IV.   The Rule's interpretation of "sex offender" violates the APA............................ 24

          A.  The Rule conflicts with SORNA's definition and approach ....................... 24

          B.  The Rule's interpretation of SORNA is arbitrary and capricious.......................................................................... 28

CONCLUSION............................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ................................................................ 10, 15

*Americans for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021) ........................................................ 20, 22–23

*Aposhian v. Wilkinson,*
989 F.3d 890 (10th Cir. 2021) ................................................. 15

*Ashcroft v. Free Speech Coal.,*
535 U.S. 234 (2002) ..................................................................... 19

*Bayview Hunters Point Cmty. Advocates v.*
*Metro. Transp. Comm'n,*
366 F.3d 692 (9th Cir. 2004) .................................................... 19

*Carr v. United States,*
560 U.S. 438 (2010) ............................................................... 25–26

*Citizens United v. FEC,*
558 U.S. 310 (2010) ..................................................................... 20

*Crandon v. United States,*
494 U.S. 152 (1990) ..................................................................... 27

*Defs. of Wildlife v. Zinke,*
856 F.3d 1248 (9th Cir. 2017) .................................................. 28

*Dep't of Transp. v. Ass'n of Amer. R.R.s,*
575 U.S. 43 (2015) ....................................................................... 10

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014) .............................................. 20–23

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg.*
*& Const. Trades Council,*
485 U.S. 568 (1988) ..................................................................... 27

ii

*Frlekin v. Apple, Inc.*,
　979 F.3d 639 (9th Cir. 2020) ........................................................................ 8

*Grayned v. City of Rockford*,
　408 U.S. 104 (1972) .............................................................................. 12–13

*Gundy v. United States*,
　588 U.S. 128 (2019) ..........................................................9, 12, 14, 16, 29

*Horton v. Or. Health & Sci. Univ.*,
　376 P.3d 998 (Or. 2016) .......................................................................... 18

*J.W. Hampton, Jr., & Co. v. United States*,
　276 U.S. 394 (1928) ............................................................................... 10

*Kolender v. Lawson*,
　461 U.S. 352 (1983) ............................................................................... 14

*Lamont v. Postmaster Gen.*,
　381 U.S. 301 (1965) ............................................................................... 21

*Liparota v. United States*,
　471 U.S. 419 (1985) ............................................................................... 14

*Loper Bright Enters. v. Raimondo*,
　144 S. Ct. 2244 (2024) ..................................................................... 24, 26

*McIntyre v. Ohio Elections Comm'n*,
　514 U.S. 334 (1995) ............................................................................... 22

*Mullaney v. Wilbur*,
　421 U.S. 684 (1975) ............................................................................... 16

*Nat'l Pork Producers Council v. Ross*,
　598 U.S. 356 (2023) ............................................................................... 10

*Nebraska Press Ass'n v. Stuart*,
　427 U.S. 539 (1976) ............................................................................... 12

*Packingham v. North Carolina*,
　582 U.S. 98 (2017) ............................................................................ 1, 20

*Panama Refining Co. v. Ryan*,
　293 U.S. 388 (1935) ......................................................................... 10, 15

*Patterson v. New York,*
    432 U.S. 197 (1977) ................................................................................. 16

*Reynolds v. United States,*
    565 U.S. 432 (2012) ................................................................................... 9

*Rodriguez v. United States,*
    480 U.S. 522 (1987) ................................................................................. 10

*Scholl v. Mnuchin,*
    494 F. Supp. 3d 661 (N.D. Cal. 2020) ....................................................... 8

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ................................................................................. 14

*Smith v. Doe,*
    538 U.S. 84 (2003) ................................................................................... 24

*Smith v. United States,*
    568 U.S. 106 (2013) ........................................................................... 16, 18

*Standen v. Whitley,*
    994 F.2d 1417 (9th Cir. 1993) .................................................................. 27

*Touby v. United States,*
    500 U.S. 160 (1991) ................................................................................. 14

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail,*
    *and Transp. Workers v. Fed. R.R. Admin.,*
    988 F.3d 1170 (9th Cir. 2021) .................................................................. 28

*United States v. Apel,*
    571 U.S. 359 (2014) ................................................................................. 26

*United States v. Apfelbaum,*
    445 U.S. 115 (1980) ................................................................................. 16

*United States v. Bass,*
    404 U.S. 336 (1971) ................................................................................. 13

*United States v. Grimaud,*
    220 U.S. 506 (1911) ................................................................................. 14

*United States v. Hudson & Goodwin,*
    11 U.S. 32 (1812) ..................................................................................... 13

*United States v. Kozminski,*
    487 U.S. 931 (1988) .................................................................................. 13

*United States v. Melgar-Diaz,*
    2 F.4th 1263 (9th Cir. 2021) .................................................................... 15

*United States v. Morton Salt Co.,*
    338 U.S. 632 (1950) .................................................................................. 24

*United States v. Motamedi,*
    No. 20-10364, 2022 WL 101951
    (9th Cir. Jan. 11, 2022) ............................................................................ 15

*United States v. Mulverhill,*
    833 F.3d 925 (8th Cir. 2016) ..................................................................... 5

*United States v. Nichols,*
    784 F.3d 666 (10th Cir. 2015) .................................................................. 13

*United States v. Pheasant,*
    No. 3:21-CR-00024-RCJ-CLB, 2023 WL 3095959,
    (D. Nev. Apr. 26, 2023) ...................................................................... 15–16

*United States v. United Verde Copper Co.,*
    196 U.S. 207 (1905) .................................................................................. 27

*White v. Baker,*
    696 F. Supp. 2d 1289 (N.D. Ga. 2010) ................................................... 21

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .................................................................................... 9

*Willman v. Att'y General of the United States,*
    972 F.3d 819 (6th Cir. 2020) ................................................................... 19

*In re Winship,*
    397 U.S. 358 (1970) .................................................................................. 16

**United States Constitution**

U.S. Const. art. I, § 1 ...................................................................................... 9

U.S. Const. amend. 1 ....................................................................1,19, 20, 22–23

## Statutes

5 U.S.C. § 706 ................................................................................. 8, 24, 30

18 U.S.C. 2250 ......................................................................... 2–3, 9,16–20

28 U.S.C. § 2201(a) ................................................................................. 8

34 U.S.C. § 20901 ........................................................................... 2, 9–10

34 U.S.C. § 20911 ......................................................................... 2, 24, 26

34 U.S.C. § 20912 .................................................................... 2–3, 10, 30

34 U.S.C. § 20913 ....................................................................... 2–3, 9, 12

34 U.S.C. § 20914 ................................................................2–3, 11–12, 30

34 U.S.C. § 20915 ................................................................................. 2

34 U.S.C. § 20916 ...................................................................... 2, 21–22

34 U.S.C. § 20921 ................................................................................. 2

Cal. Penal Code § 243.4 ........................................................................ 5

Cal. Penal Code § 288 ........................................................................ 6–7

Cal. Penal Code § 290.5 ..................................................................... 6–7

Cal. Penal Code § 1203.4 ...........................................................5–6, 8, 24–27

Cal. Penal Code § 4852.01 .................................................................... 5

Fla. Statute § 800.04 ............................................................................ 7

International Megan's Law to Prevent Child Exploitation and Other Secual
   Crimes Through Advanced Notification of Traveling Sex Offenders
   Pub. L. No. 114-119, 130 Stat. 23 (Feb. 8, 2016).......................... 5, 11

Keeping the Internet Devoid of Sexual Predators Act
   Pub. L. No. 110-400, 122 Stat. 4224 (Oct. 13, 2008) .................. 11, 22

Sex Offender Registration and Notification Act
    Pub L. No. 109-248, 120 Stat. 587 (July 27, 2006)................................................ *passim*

**Regulations**

28 C.F.R. § 72.2 ............................................................................................................. 3

28 C.F.R. § 72.3 ............................................................................................................. 3

28 C.F.R. § 72.6(g) ....................................................................................................... 12

28 C.F.R. § 72.7(d) ....................................................................................................... 12

28 C.F.R. § 72.7(g) ......................................................................................................... 4

28 C.F.R. § 72.7(g)(1) ............................................................................................... 4, 17

28 C.F.R. § 72.7(g)(2) ..................................................................................................... 4

28 C.F.R. § 72.8(a)(2) ..................................................................................................... 4

73 Fed. Reg. 38,030 ............................................................................................ 4, 24–25

75 Fed. Reg. 81,849 ....................................................................................................... 3

76 Fed. Reg. 1630 ......................................................................................................... 22

86 Fed. Reg. 69,856 ............................................................................................... passim

**Other Authorities**

2 J. Strong, McCormick on Evidence § 337 (5th ed. 1999) ................................................. 18

Bamzai, Aditya, *Delegation and Interpretive Discretion: Gundy, Kisor, and the
    Formation and Future of Administrative Law*,
    133 Harv. L. Rev. 164 (2019) ........................................................................................ 14

Barkow, Rachel E., *Separation of Powers & the Criminal Law*,
    58 Stan L. Rev. 989 (2006) ......................................................................................... 13

Black's Law Dictionary 912 (6th ed. 1990) ......................................................................... 19

The California Restoration of Rights & Record Relief,
    https://ccresourcecenter.org/state-restoration-profiles/california-restoration-
    of-rights-pardon-expungement-sealing/ ......................................................................... 25

Collateral Consequences Resource Centers, Restoration of Rights Project,
    https://ccresourcecenter.org/restoration-about/ ............................................................. 25

Fed. R. Civ. P. 56(a) ................................................................................................ 8

Scalia, Antonin, *The Rule of Law As A Law of Rules*,
    56 U. Chi. L. Rev. 1175 (1989) ......................................................................... 13

*Sex Offender Sentencing, Monitoring, Apprehending, Registering, and
    Tracking, SORNA Implementation Status*,
    https://smart.ojp.gov/sorna/sorna-implementation-status ................................... 2

U.S. Department of Justice, *SORNA Substantial Implementation Review State
    of California* (April 2024),
    https://smart.ojp.gov/california-hny.pdf ............................................................. 5

U.S. Department of Justice, *SORNA Substantial Implementation Review State
    of Florida* (May 2010),
    https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/
    document/florida.pdf ......................................................................................... 7

## INTRODUCTION

The John Doe Plaintiffs in this case were all previously convicted of a sex offense under state laws, but the State of California has terminated each of their obligations to register as a sex offender. Indeed, the John Doe Plaintiffs, and many others, *cannot* register in California. According to the Department of Justice, this makes them presumptively guilty of a federal crime. That fundamental unfairness led this Court to conclude that DOJ's December 2021 Final Rule, *Registration Requirements Under the Sex Offender Registration and Notification Act*, 86 Fed. Reg. 69,856 (Dec. 8, 2021) (the Rule), violated Plaintiffs' due process rights. That decision was correct and the Court should reaffirm it on summary judgment. But it is not the only problem with the Rule.

First, the authorizing statute, the Sex Offender Registration and Notification Act (SORNA), improperly delegates to the Attorney General wide authority to impose substantial registration obligations on individuals, like the John Doe Plaintiffs. That delegation does not pass constitutional muster because it does not adequately constrain the nation's chief prosecutor in creating the criminal laws that he also enforces.

Second, the Rule's mandate that sex offenders[1] provide the government with their "remote communication identifiers" (encompassing, at a minimum, the internet accounts most Americans use for their day-to-day communication) chills free expression and anonymous speech in violation of the First Amendment.

Finally, the Rule adopts without analysis a DOJ interpretation of the statutory term "sex offender" that is in conflict with SORNA and is arbitrary and capricious in failing to consider and exclude from registration obligations those individuals whose state convictions and registration obligations have been terminated.

---

[1] Plaintiffs use the term "sex offender(s)" in this brief because that is the term Congress chose to refer to individuals with prior sex offense convictions subject to SORNA. But many of the individuals in that category have, like the John Doe Plaintiffs, "served their sentence and are no longer subject to the supervision of the criminal justice system." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

The Court should set aside the Rule and declare unconstitutional SORNA's delegations of criminal lawmaking authority to the Attorney General.

## BACKGROUND

### I.  Legal Background

#### A.  SORNA

In enacting SORNA, Congress sought to establish a national system for registration of individuals convicted of sex offenses. 34 U.S.C. § 20901. It did so through two principle means: (1) establishing national registration requirements for jurisdictions and incentivizing those jurisdictions to comply by withholding 10% of a non-compliant jurisdiction's Edward Byrne Memorial Grant funding, 34 U.S.C. §§ 20912–20914, and (2) requiring sex offenders to register in compliance with SORNA and making it a criminal offense to fail to do so. *Id.* §§ 20913–20916; 18 U.S.C. § 2250. SORNA defines a "sex offender" as "an individual who was convicted of a sex offense." 34 U.S.C. § 20911(1). For purposes relevant here, "jurisdictions" refers to "[s]tate[s]." *Id.* § 20911(10).

SORNA required the Attorney General to create a national database, *id.* at § 20921, but authority for maintaining the registries and registering sex offenders stayed with the states. SORNA requires sex offenders to register certain identifying information with each state in which they reside, work, or study. *Id.* § 20913(a). Sex offenders must also "keep the registration current" with the state. *Id.* The criminal offense for failure to register, however, obliges sex offenders to comply with a federal obligation under SORNA. As of October 2024, DOJ determined that only 18 states have substantially implemented SORNA.[2] 18 U.S.C. § 2250, which subjects violators to fines and up to 10 years in prison, provides an affirmative defense if uncontrollable circumstances prevented a defendant from complying and the defendant did not contribute to the creation of those circumstances and complied as soon as

---

[2] Department of Justice's Office of Sex Offender Sentencing, *Monitoring, Apprehending, Registering, and Tracking, SORNA Implementation Status*, https://smart.ojp.gov/sorna/sorna-implementation-status (last accessed Nov. 16, 2024).

2

they ceased. 18 U.S.C. § 2250(c).

SORNA delegates significant authority to the Attorney General, providing that the "Attorney General shall issue guidelines and regulations to interpret and implement [SORNA]," 34 U.S.C. § 20912(b), and that, in addition to certain specified information, states must collect from registrants and provide in the registration record "[a]ny other information required by the Attorney General." *Id.* § 20914(a)(8) & (b)(8).

### B. DOJ's Implementing Regulations

Before 2021, DOJ had implemented SORNA through the issuance of several guidelines as well as a 2010 rule finalizing an interim rule on SORNA's applicability to sex offenders with convictions that pre-dated SORNA's enactment. *See* 75 Fed. Reg. 81,849 (Dec. 29, 2010). The 2021 Rule purports to "not make new policy" but "expands" 28 C.F.R. § 72.3 to "provide a full statement of the registration requirements for sex offenders under SORNA." 86 Fed. Reg. at 69,857. It also adds provisions "articulating . . . what information [sex offenders] must provide, how they must register and keep their registrations current to satisfy SORNA's requirements, and the liability they face for violations, following SORNA's express requirements and the prior articulation of standards for these matters in the SORNA Guidelines and the SORNA Supplemental Guidelines." *Id.* at 69,866–67.

Most relevant to this case, the Attorney General invoked his authority under 34 U.S.C. §§ 20912(b), 20913(d), and 20914(a)(7), (a)(8), and (b) to create more burdensome registration requirements and to specify who must register at all. *See* 86 Fed. Reg. at 69,856. The additional information a registrant must provide includes his or her date of birth, temporary lodging information, the registrant's "remote communication identifiers" (including telephone numbers), all passport and immigration information, information about where the registrant's vehicles are kept, and all professional licenses held by the registrant. *Id.* at 69,885. The registrant must appear "in-person" at least yearly to verify all information. *Id.* at 69,885–86.

And while the Rule creates 28 C.F.R. § 72.2, which provides that "[a]ll terms used in this part have the same meaning as in SORNA," *id.* at 69,884, it also references and incorporates prior interpretations made in its Office of Sex Offender Sentencing, Monitoring,

Apprehending, Registering and Tracking, National Guidelines, 73 Fed. Reg. 38,030, 38,050 (July 2, 2008) (SMART Guidelines). 86 Fed. Reg. at 69,866. The SMART Guidelines took the position that "an adult sex offender is 'convicted' for SORNA purposes if the sex offender remains subject to penal consequences based on the conviction, however it may be styled." 73 Fed. Reg. at 38,050. They asserted that "nominal changes or terminological variations that do not relieve a conviction of substantive effect," such as a procedure "under which the convictions of such sex offenders may nominally be 'vacated' or 'set aside,' but the sex offender is nevertheless required to serve what amounts to a criminal sentence for the offense" do not "negate the SORNA requirements." *Id.*

The Rule restates the statutory criminal offense closely. It specifies that "a sex offender must have been aware of the requirement he is charged with violating, but need not have been aware that the requirement is imposed by SORNA." 86 Fed. Reg. at 69,886–87. And it includes new Section 72.7(g)(1), which says in relevant part that a registrant "who does not comply with a requirement of SORNA in conformity with the time and manner specifications of [the Rule] must comply with the requirement in conformity with any applicable time and manner specifications of a jurisdiction in which the offender is required to register." 86 Fed. Reg. at 69,886. But "Section 72.7(g) does not, in any case, relieve sex offenders of the obligation to comply fully with SORNA if able to do so" nor does it "shift the burden of proof to the government to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA." *Id.* at 69,882; *see also id.* at 69,886 (§ 72.7(g)(2)).

The Rule dismisses concerns about individuals who live in noncompliant states by pointing to the affirmative defense in Section 72.8(a)(2), under which the onus is on a defendant to prove that "uncontrollable circumstances prevented the sex offender from complying with SORNA, where the sex offender did not contribute to the creation of those circumstances in reckless disregard of the requirement to comply and complied as soon as the circumstances preventing compliance ceased to exist." *Id.* at 69,887, 69,868.

4

## II.  Factual Background

In 2005, John Doe #2 entered a nolo contendere plea in California on one felony count of sexual battery under California Penal Code 243.4(a).[3] Declaration of John Doe #2 (Doe #2 Decl.) ¶ 3. He served 30 days in jail and three years of probation, after which his offense was reduced to a misdemeanor in 2008. *Id.* ¶ 4. Since then, he has worked to help others avoid criminal conduct. *Id.* ¶ 7. John Doe #2 obtained a master's degree in social work and works full time as a therapist. *Id.*

In 2012, John Doe #2's nolo contendere plea was "set aside and vacated[,]" a plea of not guilty was entered, and the complaint against him was dismissed pursuant to California Penal Code Section 1203.4. *Id.* ¶ 6, Ex. A. The court's order nevertheless specified that John Doe #2 was still required to register as a sex offender and could not possess guns or ammunition.[4] *Id.,* Ex. A. In 2016, John Doe #2 received a Certificate of Rehabilitation pursuant to California Penal Code § 4852.01, which specified that he was no longer required to register as a sex offender. *Id.* ¶ 7, Exs. B & C. It appears that DOJ would currently consider a felony violation of California Penal Code 243.4(a) a Tier III offense, requiring lifetime registration.[5]

John Doe # 2 has refrained from certain speech online out of fear that an otherwise anonymous internet identifier could become publicly attached to his name were it included in

---

[3] John Doe #1 voluntarily dismissed his claims on August 5, 2024, through a Joint Stipulation wherein the Defendants agreed that John Doe #1's registration period under SORNA had expired. ECF No. 128.

[4] In 2006, John Doe #2 successfully petitioned to have his name excluded from the public Megan's Law website in California. Doe #2 Decl. ¶ 5.

[5] *See* U.S. Department of Justice, *SORNA Substantial Implementation Review State of California – Revised* 23 (April 2024), https://smart.ojp.gov/california-hny.pdf (last accessed Nov. 16, 2024). There is significant ambiguity in DOJ's SORNA tiering, which is based on the elements of the state law crime as compared to the elements of certain federal crimes. *See, e.g.*, *United States v. Mulverhill*, 833 F.3d 925, 929–30 (8th Cir. 2016) (noting the "difficulty" of determining whether SORNA required a circumstantial or a categorical approach to tiering while determining that it "need not wade into the quagmire"); *see also* Declaration of Janice Bellucci (Bellucci Decl.) ¶ 18.

his registration, as required by the Rule. Doe #2 Decl. ¶ 17. Moreover, if California were to comply with the Rule and require John Doe #2 to register, he would lose his license to practice therapy (and thus, his current employment). *Id.* ¶ 15.

In 1997, John Doe #3 pled no contest in California to a charge under California Penal Code § 288(a) of lewd and lascivious acts with a child under the age of 14. Declaration of John Doe #3 (Doe #3 Decl.) ¶ 3. He was sentenced to six years in prison but only served two years, after he discovered an error in his sentencing. *Id.* In 2012, he pled no contest to a misdemeanor charge of failure to register, having registered mid-year after a move but then failing to re-register again near his birthday. *Id.* ¶ 4. That 2012 misdemeanor was set aside under California Penal Code Section 1203.4 in 2015. *Id.* In 2022, a California court granted John Doe #3's petition to terminate sex offender registration, *id.* ¶ 5, Exs. C & D, pursuant to California Penal Code § 290.5, which provides in relevant part that "[a] person who is required to register pursuant to Section 290 . . . may file a petition . . . for termination from the sex offender registry . . . following the expiration of the person's mandated minimum registration period." Cal. Pen. Code § 290.5(a)(1).

After his California registration obligation was terminated, John Doe #3 learned that he may have a separate federal obligation. *Id.* ¶ 6. His attorney contacted DOJ to determine if the federal requirement concluded when the state registry obligation was terminated. *Id.* He was told little more than that sex offenders have an independent duty to register under SORNA. *Id.*, Ex E. The attorney has repeatedly contacted the San Luis Obispo County Sheriff's Offices' Sexual Assault Felony Enforcement division and has been told that that office is aware of no California agency that offers registration to comply with federal law after the California obligation is terminated. *Id.*, Ex. F. Like John Doe #2, John Doe #3 has refrained from online speech out of concern that he may someday be required to provide California with his internet identifiers should California choose to comply with SORNA. *Id.* ¶ 14. It appears that DOJ would currently consider John Doe #3's conviction a Tier II offense, requiring registration for a

6

minimum of 25 years.[6]

John Doe #4 pled no contest in Florida to a felony sex offense under Florida Statute § 800.04 in 1996. Declaration of John Doe #4 (Doe #4 Decl.) ¶ 3. He initially received probation, but a probation violation resulted in a prison sentence of five years. *Id.* ¶ 4. He was released in February 2002 and moved shortly thereafter. *Id.* ¶ 5. John Doe #4's petition for removal from Florida's Sexual Offender Registry was granted by a Florida court in 2022, *id.* ¶ 6, Ex. B, and his petition pursuant to California Penal Code § 290.5 to be removed from the California registry was granted in 2023. *Id.* ¶ 6, Ex. C. He has refrained from speaking anonymously online about certain matters out of concern that he may someday be required to provide California with his internet identifiers should California choose to comply with SORNA. *Id.* ¶ 16. It appears that DOJ would consider Florida Statute § 800.04 a Tier III offense.[7]

The Alliance for Constitutional Sex Offense Laws (ACSOL) is a nonprofit organization "dedicated to protecting the Constitution by restoring the civil rights of people required to register as a sex offender as well as their families." Bellucci Decl. ¶ 6. ACSOL is based in California and has more than 100,000 California registrants among its membership. *Id.* ¶¶ 7–8. One of ACSOL's central purposes is limiting unlawful registration requirements for its membership in order to help its members live law-abiding and productive lives. *Id.* ¶ 9. ACSOL's membership includes individuals convicted of a sex offense and required to register as sex offenders under California or federal law, as well as individuals who have been relieved from registration in California. *Id.* ¶¶ 11–12. These members are required to comply with the Rule, even though California does not provide avenues for them to provide all of the required information to California authorities, and many cannot register at all under California law. *Id.*

---

[6] *See* 2024 SORNA Substantial Implementation Review State of California – Revised at 22; *but see* Bellucci Decl. Ex. A (U.S. Department of Justice, *SORNA Substantial Implementation Review, State of California* 18–19 (Jan. 2016) (listing Cal. Penal Code § 288 as a Tier III offense)).

[7] *See* U.S. Department of Justice, *SORNA Substantial Implementation Review State of Florida* at 3 (May 2010), https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/florida.pdf (last accessed Nov. 16, 2024).

ACSOL members are thus presumed to be in noncompliance with SORNA. *Id.* ¶ 12. ACSOL also includes members who have had their sex offense convictions set aside pursuant to California Penal Code Section 1203.4. *Id.* Many ACSOL members, and the John Doe Plaintiffs, aspire to travel interstate. *Id.* ¶ 14; Doe #2 Decl. ¶ 9; Doe #3 Decl. ¶ 7; Doe #4 Decl. ¶ 8.

ACSOL's membership includes individuals whose speech has been curtailed. Bellucci Decl. ¶ 16. These members wish to engage in protected anonymous speech on the internet through the use of anonymous remote communication identifiers and wish to preserve their privacy to avoid adverse publicity. *Id.* They hope to comment about issues of public concern, but the Rule orders these ACSOL members to disclose their remote communication identifiers when they register. *Id.* In non-compliance with the Rule, California does not currently collect remote identifier information, but ACSOL members have refrained from speaking on matters of public concern using their anonymous identifiers because they fear that this information could become public and there will be negative consequences to their reputation, privacy, and the safety of their families. *Id.* ¶ 17.

**STANDARD OF REVIEW**

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020). Under the APA, a court must hold unlawful and set aside agency action, findings, and conclusions, if they are arbitrary or capricious, 5 U.S.C. § 706(2)(A); contrary to any constitutional right, *id.* § 706(2)(B); or in excess of statutory authority, *id.* § 706(2)(C).

When summary judgment is sought in an action that is based on an administrative record, the motion serves as the mechanism for deciding as a matter of law whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 673 (N.D. Cal. 2020). The court may also issue a declaration clarifying a party's rights. *Id.* at 692; 28 U.S.C. § 2201(a).

**ARGUMENT**

**I.  SORNA's delegation of legislative authority is unconstitutional.**

The Constitution vests "all legislative Powers" in Congress alone, U.S. Const. art. I, § 1, and "permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). The Constitution's separation of powers reflects the Founders' deliberate choice to divide federal authority among three distinct branches to safeguard liberty. As James Madison explained, the "accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47 (J. Madison) at 324–26 (J. Cooke ed. 1961).

Yet SORNA delegates to the Attorney General—the nation's chief prosecutor—the power to write his own criminal code governing the lives of hundreds of thousands of Americans. With an unguided directive to "protect the public," 34 U.S.C. § 20901, Congress has authorized DOJ to determine the scope and substance of obligations that could send the John Doe Plaintiffs to federal prison for up to ten years. 18 U.S.C. § 2250(a). When the same official who writes the criminal laws is also charged with enforcing them, the structural protections that the Founders viewed as essential to liberty are fatally compromised. While courts have afforded agencies some latitude to fill in regulatory details, the power to define federal crimes cannot be delegated away to the executive branch.[8]

**A.  SORNA violates the non-delegation doctrine's intelligible principle standard.**

The Supreme Court's nondelegation doctrine generally asks whether Congress has

---

[8] In *Gundy v. United States*, the Supreme Court addressed a non-delegation challenge only to 34 U.S.C. § 20913(d). 588 U.S. 128 (2019). The Court avoided the delegation question entirely, however, with a plurality holding that the Court had already adopted a narrow reading of § 20913(d) in a previous case. *Id.* at 136–38 (citing *Reynolds v. United States*, 565 U.S. 432, 442–43 (2012)). Accordingly, four justices concluded that "because § 20913(d) does not give the Attorney General anything like the 'unguided' and 'unchecked' authority that Gundy says" there was no need to wade into any difficult delegation questions. *Id.* at 136. They noted, however, that if the statute had granted the discretion Gundy had argued, "we would face a nondelegation question." *Id.*

provided an "intelligible principle" to guide agency discretion—i.e., a governing law to which the Executive must conform. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928). "Though worded broadly, the test rested on a narrow foundation." *Dep't of Transp. v. Ass'n of Amer. R.R.s*, 575 U.S. 43, 78 (2015) (Thomas, J., concurring). Into the early 20th century, most delegations conditioned the President's action upon the occurrence of a specified event or the determination of specified facts. *Id.* at 78–82. By contrast, in *Panama Refining Co. v. Ryan*, the Supreme Court stressed that the National Industrial Recovery Act did "not require any finding by the President as a condition of his action" but rather gave "to the President an unlimited authority to determine the policy and to lay down the prohibition, or not to lay it down, as he may see fit." 293 U.S. 388, 415 (1935).[9] Delegating that policymaking authority violates the constitution because the weighing of "competing values" is "the very essence of legislative choice." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (emphasizing that it is the role of lawmakers to weigh "competing . . . incommensurable" values).[10]

SORNA exceeds constitutional bounds by granting the Attorney General the legislative authority to create and define new criminal registration requirements. Through 34 U.S.C. § 20912(b), Congress empowered the Attorney General to "issue guidelines and regulations to interpret and implement" SORNA's provisions. The statute's purported purpose—to "establish[ ] a comprehensive national system" for registration "to protect the public," 34 U.S.C. § 20901—provides no objective or meaningful constraint limiting the Attorney General's

---

[9] *Panama Refin.* and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), also rejected the government's argument that an intelligible principle could be inferred from a statute's general statement of policy. Instead, the Court affirmed that an intelligible principle must be rooted in statutory text rather than self-serving claims about the general purposes of the statute. *Panama Refin.*, 293 U.S. at 417–18; *Schechter*, 295 U.S. at 541–42.

[10] Plaintiffs believe the delegations in SORNA cannot survive an intelligible principle test analysis. To the extent Supreme Court or Ninth Circuit precedent is understood to require upholding SORNA under that test, however, Plaintiffs reserve the right to argue that such precedent should be reconsidered.

1    exercise of discretion to create new registration requirements backed by criminal penalties.[11]

2        Congress also authorized the Attorney General to demand "[a]ny other information"

3    from registrants beyond specific requirements enumerated in the statute, allowing DOJ to

4    unilaterally expand the elements of a federal crime simply by requiring new categories of

5    information that registrants must provide under threat of imprisonment. *Id.* § 20914(a)(8). The

6    statutory text places no boundaries on what information the Attorney General can demand. *Id.*

7    While subsection (a)(8) follows seven more specific information requirements, the interpretive

8    canons of *noscitur a sociis* and *ejusdem generis* (*see* MPI Order at 41) do not limit the potential

9    scope of (a)(8) because it cannot reasonably be read as limited by the scope of what comes

10   before it. That is made clear by the text of what is now subsection (a)(7), which Congress

11   added through the International Megan's Law to Prevent Child Exploitation and Other Sexual

12   Crimes Through Advanced Notification of Traveling Sex Offenders, and which lists specific

13   travel-related information required and concludes with "any other itinerary or other travel-

14   related information required by the Attorney General." Pub. L. No. 114-119, 130 Stat. 23 (Feb.

15   8, 2016). Similar limiting language could easily have been included in (or added to) subsection

16   (a)(8) but was not.

17       Indeed, Congress itself did not see the scope of (a)(8) as being so limited, because just

18   two years after SORNA was enacted, Congress passed the Keeping the Internet Devoid of

19   Sexual Predators Act of 2008, which directed the Attorney General to require the reporting of

20   "those Internet identifiers the sex offender uses *or will use* of any type" "using the authority

21   provided in section 114(a)(7) [now (a)(8)] of" SORNA. Pub. L. No. 110-400, 122 Stat. 4224

22   (Oct. 13, 2008), § 2(a) (emphasis added). Not only was that information not similar to the other

23

---

24   [11] The Court previously identified this purpose as the intelligible principle guiding DOJ. ECF

25   No. 55 (MPI Order) at 40–41 (noting even then that it did not "provide much direction at all"). If that is an intelligible principle, Congress could presumably direct the executive branch to

26   develop comprehensive regulations to protect people, water, and air, and call it a day. That

27   cannot be all that the Constitution's separation of powers requires.

28

information already specified in Section 20914(a), but Congress apparently viewed the delegated authority as broad enough to contemplate even a prior restraint on speech, "the most serious and the least tolerable infringement on First Amendment rights" and one that comes "with a 'heavy presumption' against its constitutional validity." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976).

Consistent with the text, DOJ has interpreted (a)(8) broadly, requiring, for example, professional license information not required by SORNA, 28 C.F.R. § 72.6(g), and requiring sex offenders to provide their current jurisdictions with any plans to leave in advance, *id.* § 72.7(d). The latter is actually in direct conflict with SORNA, which specifies in 34 U.S.C. § 20913(c) that sex offenders need only inform one "involved" jurisdiction within three business days *after* a change of residence, employment, or student status. Perhaps recognizing that conflict with the text and in search of broader authority, DOJ grounds its basis for this non-SORNA requirement as "a straightforward exercise of [its] authority under 34 U.S.C. § 20914(a)(8)." 86 Fed. Reg. at 69,877–78.

This open-ended delegation allows the Attorney General to continuously create new registration obligations without any statutory guidance as to their scope or substance. It is, in fact, the type of legislative delegation that the Supreme Court determined it was *not* faced with in *Gundy v. United States*, 588 U.S. 128 (2019), where it rejected a non-delegation argument. There, the Supreme Court emphasized the distinction between determining "*whether* to" do something—a policy judgment—and "*how* to" do something, which may sometimes be permissibly delegated to an agency. *Id.* at 144. The SORNA delegations Plaintiffs challenge here are "whether" questions and, thus, must fail. [12]

---

[12] This Court has recognized that "DOJ appears to have been engaging in more than a narrow exercise in statutory interpretation, but also engaging in some degree of *policy* judgment [in which it] . . . weighed choices as to how SORNA should interact with state registration schemes . . . ." ECF No. 76 (MTD Order) at 17 (emphasis added). It is these policy decisions that are at the heart of the Supreme Court's reluctance to allow Congress to abdicate its legislative role in the criminal context. Vague criminal statutes, for example, are prohibited in part because they "impermissibly delegate[ ] basic policy matters to policemen." *Grayned v. City of Rockford*,

**B.**    **SORNA impermissibly delegates criminal lawmaking authority to the Attorney General.**

The Framers recognized that with "criminal subjects," Congress should "leave as little as possible to the discretion of those who are to apply and to execute the law." James Madison, The Report of 1800, *Founders Online*, National Archives. Accordingly, the separation of legislative and executive power takes on heightened importance in the criminal law context, where individual liberty hangs in the balance. *Cf.* Antonin Scalia, *The Rule of Law As A Law of Rules*, 56 U. Chi. L. Rev. 1175, 1180 (1989) (stating that judges' "most significant roles, in our system, are to protect the individual criminal defendant . . . and to preserve the checks and balances within our constitutional system that are precisely designed to inhibit swift and complete accomplishment of th[e] popular will."). For that reason, "[t]he inefficiency associated with the separation of powers serves a valuable function, and, in the context of criminal law, no other mechanism provides a substitute." Rachel E. Barkow, *Separation of Powers & the Criminal Law*, 58 Stan. L. Rev. 989, 1031 (2006); *see also United States v. Nichols*, 784 F.3d 666, 670 (10th Cir. 2015) (Gorsuch, J., dissenting from denial of rehearing en banc) (same).

The Supreme Court has long recognized that criminal laws must emanate from Congress, not the executive branch. *See United States v. Hudson & Goodwin*, 11 U.S. 32, 34 (1812) (stating that "the legislative authority of the Union must first make an act a crime"). As the Court has explained, "because of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971); *see also United States v. Kozminski*, 487 U.S. 931, 949 (1988) (rejecting a government interpretation that "would delegate to prosecutors and juries the *inherently legislative task* of determining what type of coercive activities are so morally reprehensible that they should be punished as crimes." (emphasis added)).

Accordingly, "[t]he definition of the elements of a criminal offense is entrusted to the

_____

408 U.S. 104, 108–09 (1972).

legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424 (1985). This principle reflects criminal law's foundational requirement that Congress define federal crimes with specificity, rather than leaving the elements to executive discretion. *See Sessions v. Dimaya*, 584 U.S. 148, 156 (2018) (noting that void-for-vagueness "doctrine is a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not"); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) ("[T]he more important aspect of the [void for] vagueness doctrine 'is not actual notice . . . but the requirement that a legislature establish minimal guidelines to govern law enforcement.'" (citation omitted); *cf. United States v. Grimaud*, 220 U.S. 506, 516–17 (1911) (noting that while administrative officials may "make regulations" to implement statutes, Congress must "declare what shall be crimes").[13]

The Supreme Court has suggested, in fact, that "something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions." *Touby v. United States*, 500 U.S. 160, 165–66 (1991). Indeed, the two cases in which the Court sustained delegation challenges involved criminal

---

[13] The *Grimaud* court ultimately determined, in the context of a regulation requiring permits for stock grazing on forest reserves, that "Congress was merely conferring administrative functions upon an agent" in authorizing the Secretary of the Interior to make regulations that were punishable by fine or imprisonment and emphasized that when promulgating rules governing access to and use of forest reserves, the Secretary was engaged in a fact-finding mission. 220 U.S. at 516.

One article on SORNA and non-delegation proposed that the *Grimaud* "Court's reasoning suggested that a distinction between 'rights' and 'privileges' was relevant to the nondelegation doctrine." Aditya Bamzai, *Delegation and Interpretive Discretion: Gundy, Kisor, and the Formation and Future of Administrative Law*, 133 Harv. L. Rev. 164, 180 (2019). Bamzai went on: "Delegations that affect *private* rights—**like the criminal prohibitions at issue in SORNA**—ought to be written with more specificity than those that affect privileges alone. In the latter context [like *Grimaud*]—where *public* interests are more at issue—it makes sense to give administrators a broader range of possible discretion." *Id.* at 182 n.116 (bold emphasis added).

penalties. In *Panama Refining*, the Supreme Court struck down a section of the National Industrial Recovery Act permitting the executive branch to regulate interstate oil transportation without clear criteria. The Court determined that this provision failed to constrain the President's authority based on specific facts or require any findings as a precondition to regulatory action, "[a]nd disobedience to his order is made a crime punishable by fine and imprisonment." 293 U.S. at 415. The Court warned that upholding such a delegation would essentially nullify any constraints on Congress's ability to delegate its legislative authority. *Id.* at 430. And in *Schechter Poultry* the Supreme Court found that a statute allowing an agency to establish rules for "fair competition" among businesses lacked an intelligible principle to guide agency enforcement. 295 U.S. at 535–42. The Court said the statute supplied "no standards for any trade, industry, or activity," thereby granting the President nearly unrestricted discretion in approving or creating codes that effectively acted as laws governing national trade and industry. *Id.* And "[v]iolations of the provisions of the codes are punishable as crimes." *Id.* at 529.

The need for heightened scrutiny of criminal lawmaking delegations finds support in a recent district court analysis. In *United States v. Pheasant*, which involved criminal charges stemming from alleged violations of Bureau of Land Management regulations, the court observed that "[a]llowing Executive agencies to create the very crimes they are tasked with enforcing effectively turns them into 'the expositor, executor, and interpreter of criminal laws.'" No. 3:21-CR-00024-RCJ-CLB, 2023 WL 3095959, at *6 (D. Nev. Apr. 26, 2023), *appeal argued*, No. 23-991 (9th Cir. Oct. 10, 2024) (quoting *Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir. 2021)).[14] There, federal prosecutors charged the defendant with violating regulations promulgated under a statute that allowed the Secretary of Interior to issue any regulations

---

[14] *United States v. Melgar-Diaz*, 2 F.4th 1263 (9th Cir. 2021), is not to the contrary. The court recognized that the executive had "independent authority" over the subject matter at issue there and so the normal delegation limits did not necessarily apply. *Id.* at 1268. And the Ninth Circuit has more recently acknowledged that neither it nor the Supreme Court has firmly decided whether more specificity is required for criminal statutes. *United States v. Motamedi*, No. 20-10364, 2022 WL 101951, at *2 (9th Cir. Jan. 11, 2022).

"necessary" for the "management, use, and protection" of public lands. The *Pheasant* court rejected the delegation, noting that when Congress provides no "limiting language" to "cabin" an agency's authority to define crimes, it effectively gives that agency "unfettered legislative authority." 2023 WL 3095959, at *7.

Under SORNA, the Attorney General first determines what conduct is prohibited and then prosecutes citizens for violations. This is precisely the kind of core legislative power that cannot be delegated to executive officials. *See Gundy*, 588 U.S. at 149 (Gorsuch, J., dissenting) (warning against letting "the nation's chief prosecutor . . . write his own criminal code"). The mere directive to "protect the public" through a registration system cannot suffice to empower DOJ to continuously expand the elements of the federal crimes it prosecutes.

## II.    The Rule violates Plaintiffs' due process rights by creating a presumption of guilt and requiring criminal defendants to prove impossibility.

The Supreme Court has "explicitly h[e]ld that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The government cannot "shift[ ] the burden of proof to the defendant" to prove a "critical fact in dispute." *Mullaney v. Wilbur*, 421 U.S. 684, 701 (1975); *see also Smith v. United States*, 568 U.S. 106, 110 (2013) (noting that the government is "foreclosed from shifting the burden of proof to the defendant . . . 'when an affirmative defense *does* negate an element of the crime'" (citation omitted)). The government impermissibly avoids its burden if it forces defendants "to negative any facts of the crime which the State is to prove in order to convict." *Patterson v. New York*, 432 U.S. 197, 207 (1977).

Criminal law requires "a culpable *mens rea* and a criminal *actus reus* . . . for an offense to occur." *United States v. Apfelbaum*, 445 U.S. 115, 131 n.13 (1980). The *actus reus* is thus a critical fact for which the burden cannot be shifted. The Court has already held that "the practical effect of the Rule, in conjunction with 18 U.S.C. § 2250, has done exactly what is forbidden by the Constitution: 'to declare an individual guilty or presumptively guilty of a crime.'" MPI Order at 29 (quoting *Patterson*, 432 U.S. at 210). Plaintiffs do not restate the

Court's due process analysis here in its entirety but ask the Court to reaffirm it. *See id.* at 22–31.

18 U.S.C. § 2250(a) provides in relevant part that "[w]hoever is required to register under [SORNA] . . . travels in interstate or foreign commerce . . . and knowingly fails to register or update a registration as required by [SORNA] . . . shall be fined under this title or imprisoned not more than 10 years, or both." The Court recognized that the *actus reus* here is the failure to register "as required," and the *mens rea* is the knowledge of the registration requirement. MPI Order at 23. The Rule states that "a sex offender must have been aware of the requirement he is charged with violating, but need not have been aware that the requirement is imposed by SORNA." 86 Fed. Reg. at 69,886–87.

SORNA provides that "it is an affirmative defense that (1) uncontrollable circumstances prevented the individual from complying," if "(2) the individual did not contribute to the creation of such circumstances in reckless disregard of the requirement to comply; and (3) the individual complied as soon as such circumstances ceased to exist." 18 U.S.C. § 2250(c). The Rule provides that an individual out of compliance with SORNA "must comply . . . in conformity with any applicable time and manner specifications of a jurisdiction in which the offender is required to register," 86 Fed. Reg. at 69,886 (§ 72.7(g)(1)), but then emphasizes that "[i]n a prosecution under 18 U.S.C. 2250, paragraph (g)(1) . . . does not in any case relieve a sex offender of the need to establish as an affirmative defense an inability to comply with SORNA because of circumstances beyond his control . . . ." *Id.*

The effect of the Rule, then, is to presume that defendants voluntarily failed to register—the *actus reus*—until they prove otherwise. The Court previously found it "difficult to conclude that the 'critical fact in dispute' in this case "is something other than a defendant's failure to register 'as required.'" MPI Order at 30. And unless the defendant can prove that his act was involuntary, a jury will presume guilt on that critical question in a prosecution under SORNA.[15]

---

[15] A state's refusal to register an individual or accept additional information is, moreover, a

Plaintiffs cannot register or provide the required information because California does not accept registrations from those individuals whose state law obligations have been terminated. *See, e.g.*, Doe #3 Decl. Ex. F; Bellucci Decl. ¶ 15. The Rule explicitly contemplates this situation, acknowledging that it may be "impossible for the sex offender to register" because a "jurisdiction is unwilling to carry out its side of the" registration. 86 Fed. Reg. at 69,868. Nevertheless, DOJ takes the position that the "affirmative defense" should allay potential defendants' "concern[s]." *Id.*[16] As the Court observed, DOJ "is careful to send as clear a message as possible: the Government will strictly enforce the litany of registration requirements and, in every circumstance, hold a registrant to his burden of demonstrating impossibility if he fails to abide by them." MPI Order at 24. DOJ "disavows any obligation or burden 'to establish that a registration jurisdiction's procedures would have allowed a sex offender to register or keep the registration current in conformity with SORNA' before prosecuting the individual for failure to do what it acknowledges is impossible." *Id.* at 29 (quoting rule 86 Fed. Reg. at 69,867).

Courts have long held that the law cannot punish the impossible. *See, e.g.*, *Horton v.*

---

poor fit for the type of "uncontrollable circumstances" appropriate for an affirmative defense under 18 U.S.C. § 2250 because the state's position on these questions is not "peculiarly in the knowledge of," especially, individuals with prior sex offense convictions who are no longer required to register in their states. *See* 2 J. Strong, McCormick on Evidence § 337, p. 415 (5th ed. 1999) ("Where the facts with regard to an issue lie peculiarly in the knowledge of a party, that party has the burden of proving the issue."); *see also Smith v. United States*, 568 U.S. 106, 112–13 (2013) (same).

[16] The Rule also provides that "[n]otwithstanding the absence of a parallel state law, the registration authorities in the state *may be willing* to register the sex offender because Federal law (i.e., SORNA) requires him to register." 86 Fed. Reg. at 69,868 (emphasis added). DOJ goes on: "If the state registration authorities are *willing* to register the sex offender, he is not relieved of the duty to register merely because state law does not track the Federal law registration requirement." *Id.* (emphasis added). But the Rule provides no guidance on how a registrant is supposed to determine whether his jurisdiction is "willing." Plaintiffs and others like them are left wondering whether and how often they must call to see if registration policy has changed. *See* ECF No. 86 (2021 Rule Administrative Record) at AR-00002117 (comment of Plaintiff ACSOL).

*Or. Health & Sci. Univ.*, 376 P.3d 998, 205 (Or. 2016) (quoting Lord Coke in *Dr. Bonham's Case* (1610) 8 Co. Rep. 113b, 118a, that "when an Act of Parliament is . . . impossible to be performed, the common law will controul it, and adjudge such Act to be void."); *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 699 (9th Cir. 2004) (citing Black's Law Dictionary 912 (6th ed. 1990) ("Lex non cogit ad impossibilia: The law does not compel the doing of impossibilities.")). "[W]hether a defendant registered 'as required,' and accordingly whether it was possible for him to do so, is an essential element of the offense codified at 18 U.S.C. § 2250." MPI Order at 30. This Court has correctly held that "the Government [may not] attempt to imprison California registrants like Plaintiffs for up to a decade for failing to do the impossible, unless *they*, not the Government, prove impossibility[.]" *Id.* at 22. The Court should affirm on summary judgment that the Rule violates due process.[17]

### III.    The Rule's remote communication identifiers provision chills free expression and anonymous speech in violation of the First Amendment

The First Amendment commands that "Congress shall make no law . . . abridging the freedom of speech" and, accordingly, the "Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). The Supreme Court has recognized that "[w]hile in the past there may have been difficulty in identifying the most important

---

[17] DOJ attempted to dismiss Plaintiffs' due process concerns because SORNA punishes only those who "knowingly" fail to register. ECF No. 50 at 20. The Court correctly rejected that argument. MPI Order at 26–28 (citing the Sixth Circuit's conclusion in *Willman v. Att'y General of the United States* that a "person of ordinary intelligence would know if he had been convicted of a sex offense . . . ." 972 F.3d 819, 827 (6th Cir. 2020)). And DOJ's assertion that "knowingly" includes voluntariness also fails because 18 U.S.C. § 2250 punishes those who *know* of their registration obligation but then fail—intentionally or not—to register. Had Congress meant to punish only those who *intended* to fail, Congress would not have included a defense of impossibility. Perhaps most relevant here, knowledge is not at issue for the John Doe Plaintiffs, who, having filed this action, would likely be found to have knowledge of SORNA's requirements.

places . . . for the exchange of views, today the answer is clear. It is cyberspace . . . and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). In analyzing a state law that prohibited registered sex offenders from accessing certain social networking sites, the Court applied intermediate scrutiny, which requires a law to be "narrowly tailored to serve a significant governmental interest." *Id.* at 105–06.[18] "In other words, the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.*

In *Doe v. Harris*, the Ninth Circuit struck down a California statute that raised the same constitutional concerns Plaintiffs assert here, specifically that the Rule imposes a substantial burden, chilling Plaintiffs' exercise of protected speech and their ability to engage in legitimate, anonymous online speech.[19] 772 F.3d 563 (9th Cir. 2014). *Harris*, which emphasized that sex offenders who have completed their sentences enjoy the full protection of the First Amendment, *id.* at 570, confirmed that "a law may burden speech . . . even if it stops short of prohibiting it." *Id.* at 572. "Indeed," the court observed, "the 'distinction between laws burdening and laws banning speech is but a matter of degree.'" *Id.* (citations omitted).

### A. The Rule chills protected speech

While not identical, the burdens imposed by the Rule are substantially analogous to those identified in *Harris*. For instance, the Rule requires Plaintiffs to report any changes in

---

[18] The *Packingham* Court did not analyze the North Carolina law under strict scrutiny because it found that the law failed even intermediate scrutiny. 582 U.S. at 105. Plaintiffs believe the Rule similarly cannot survive an intermediate scrutiny analysis but reserve the right to argue that strict scrutiny or exacting scrutiny, *see Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 607–08 (2021), should be applied because the Rule impermissibly burdens speech from some speakers but not others. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010); *but see Doe v. Harris*, 772 F.3d 563, 575–76 (9th Cir. 2014).

[19] California has yet to comply with this portion of the Rule, but Plaintiffs have refrained from speaking because SORNA conditions part of California's federal funding on its compliance and because, as shown above, DOJ apparently considers Plaintiffs among those subject to SORNA's registration requirements and their criminal liability requires "registration as required by [SORNA]." 18 U.S.C. § 2250(a); Doe #2 Decl. ¶ 17, Doe #3 Decl. ¶ 14, Doe #4 Decl. ¶ 13, Bellucci Decl. ¶ 17.

their remote communication identifiers within three days of the changes being made. 86 Fed. Reg. at 69,886. *Harris*'s analysis of California's 24-hour reporting requirement rested on the Supreme Court's decision in *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965), which held that a law requiring that recipients of certain mail request in writing that it be delivered was an "impermissible affirmative obligation and was almost certain to have a deterrent effect." 772 F.3d at 573 (cleaned up). Whether 24 hours or three days, the Rule's reporting requirement is obviously an affirmative obligation and, as such, will deter speech. *Cf. White v. Baker*, 696 F. Supp. 2d 1289 (N.D. Ga. 2010) (enjoining law that required the reporting of updates to sex offenders' internet identifiers within 72 hours). And, as in *Harris*, the Rule's "affirmative obligation" to report online activity before or immediately after engaging in speech is especially egregious because failure to meet the obligation "carries with it the threat of criminal sanctions." 772 F.3d at 573.

The Rule's requirements are also vaguer than the California statute at issue in *Harris*, where the District Court had adopted the parties' agreed-upon narrowing constructions, particularly that the term "Internet identifier" included only those identifiers individuals "actually use to engage in 'interactive communication' on a website, and not identifiers they use solely to purchase products or read content online." *Id.* at 569. The Rule is even less clear, describing "remote communication identifiers" as "[a]ll designations the sex offender uses for purposes of routing or self-identification in internet or telephonic communications or postings, including email addresses and telephone numbers." 86 Fed. Reg. at 69,885 (24 C.F.R. § 72.6(b)).[20] This Court has already noted that it is unclear whether the Rule covers, for example, online chats with customer service representatives, MPI Order at 33, and registrants cannot be expected to know whether their "designations" are used "for purposes of routing." 86 Fed. Reg. at 69,885; *see also* Doe #2 Decl. ¶ 17, Doe #3 Decl. ¶ 14, Doe #4 Decl. ¶ 13, Bellucci Decl. ¶ 16. As in *Harris*, "narrowly construed or not, the ambiguities in the [Rule] may lead registered

---

[20] SORNA itself defines "internet identifiers" to mean "electronic mail addresses and other designations used for self-identification or routing in Internet communication or posting." 34 U.S.C. § 20916(e)(2).

sex offenders either to overreport their activity or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report." 772 F.3d at 579.

Finally, the Rule impermissibly burdens anonymous speech. "[A]n author's decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 355 (1995); *see also Harris*, 772 F.3d at 574. Here, a separate statute, the Keeping the Internet Devoid of Sexual Predators Act, Pub. L. No. 110-400, directed the Attorney General to exempt from public disclosure registrants' internet identifiers on public registry websites. 34 U.S.C. § 20916(c). But the Rule explicitly references (86 Fed. Reg. at 69,859) the 2011 Guidelines recognizing "the discretion of jurisdictions to include on their public Web sites functions by which members of the public can ascertain whether a specified e-mail address or other Internet identifier is reported as that of a registered sex offender" as well as states' discretion "to disclose Internet identifier information to any one by means other than public Web site posting." 76 Fed. Reg. 1630, 1637 (Jan. 11, 2011). As in *Harris*, Plaintiffs' "fear of disclosure in and of itself chills their speech. If their identity is exposed, their speech, even on topics of public importance, could subject them to harassment, retaliation, and intimidation." 772 F.3d at 581.[21] And, wholly apart from the fear of wider disclosure, the fact that the reporting requirement would render Plaintiffs' internet speech no longer anonymous to the government itself has a chilling effect. Doe #2 Decl. ¶ 17, Doe #3 Decl. ¶ 14, Doe #4 Decl. ¶ 13, Bellucci Decl. ¶ 17.

**B.    The Rule is not narrowly tailored to serve a significant government interest.**

This Court previously identified a possible "substantial government interest in preventing sex offenders from using the internet to exploit vulnerable individuals." MPI Order

---

[21] Plaintiffs' speech-chilling concern regarding disclosure beyond law enforcement is far from hypothetical. *See, e.g.*, *Americans for Prosperity Found.*, 594 U.S. at 604 (noting that the district court had found the California Attorney General's office was unable to ensure the confidentiality of non-profit donors' identities, justifying potential donors' reasonable fear of disclosure).

at 36. And *Harris* found that California had a substantial interest in protecting vulnerable individuals from sex offenders' use of the internet to facilitate exploitation. 772 F.3d at 577.[22] But, as in *Harris*, the Rule here burdens substantially more speech than necessary to further such an interest. *Id.* Moreover, "[i]n the First Amendment context," the Supreme Court has recognized that "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (striking down California law requiring disclosure of anonymous donors to non-profits).

Here, the Rule burdens "a substantial amount of . . . speech [that] is clearly protected under the First Amendment." *Harris*, 772 F.3d at 573 (finding that "just as the Act burdens sending child pornography and soliciting sex with minors, it also burdens blogging about political topics and posting comments to online news articles"); *see also* MPI Order at 36 (observing that disclosure of a *New York Times* website username for posting anonymous comments was unlikely to help the government protect children).

Lastly, the Rule's requirements are made all the more overbroad by the fact that they apply to all people convicted of a sex offense, "regardless of their offense, their history of recidivism (or lack thereof), or any other relevant circumstance," *Harris*, 772 F.3d at 582, such as whether the internet was used in connection with the predicate sex offense. The lack of tailoring is further highlighted by the fact that Plaintiffs here have either had their convictions set aside or had their reporting obligations terminated, or both. The Rule's remote communication identifier reporting requirement burdens substantially more speech than necessary to serve the federal government's limited interest here and must be set aside.

---

[22] Although the Ninth Circuit found that the CASE Act's lengthy description of its purpose to protect Californians from crime evinced a significant government interest undergirding the law, the Rule contains no such description. *Harris*, 772 F.3d at 577. Instead, DOJ's hazy rationale entails an unstated "number of reasons" justifying past phone number reporting requirements, including that they "facilitat[e] communication between registration personnel and sex offenders, and address[ ] the potential use of telephonic communication by sex offenders in efforts to contact or lure potential victims." 86 Fed. Reg. at 69,872.

**IV.    The Rule's interpretation of "sex offender" violates the APA**

The APA was enacted "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950). When interpreting the meaning of a statute, even an ambiguous one, under the APA, "there is a best reading . . . the reading the court would have reached if no agency were involved." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) (cleaned up).

**A.    The Rule conflicts with SORNA's definition and approach.**

SORNA defines "sex offender" to mean "an individual who was convicted of a sex offense." 34 U.S.C. § 20911(1). The term "convicted" is defined only in the sense that it "includes adjudicated delinquent as a juvenile" in certain circumstances. *Id.* § 20911(8).

The Rule provides that all terms used in Part 72 have the same meaning as in SORNA. 86 Fed. Reg. at 69,884. But DOJ interpreted the scope of "convicted" in its 2008 SMART Guidelines and the Rule explicitly incorporates that understanding. *See* 86 Fed. Reg. at 69,866 (stating that "only pardons on the ground of innocence terminate registration obligations under SORNA" and relying on the SMART Guidelines). The SMART Guidelines initially conclude that "registration . . . is normally not required under the SORNA standards if the predicate conviction is reversed, vacated, or set aside," but that "nominal changes or terminological variations that do not relieve a conviction of substantive effect [do not] negate the SORNA requirements." 73 Fed. Reg. at 38,050. The SMART Guidelines state DOJ's position in brief: "an adult sex offender is 'convicted' for SORNA purposes if the sex offender remains subject to penal consequences based on the conviction, however it may be styled." *Id.*[23]

---

[23] As the Court observed, DOJ has never provided a definition of "penal consequences," but it is presumably something different than collateral consequences. MTD Order at 17. DOJ's position that SORNA's requirements apply because California Penal Code § 1203.4 does not necessarily remove an individual's registration requirement in California is all the more puzzling given the Rule's reliance on *Smith v. Doe*, 538 U.S. 84 (2003), which held that registration requirements are *not* penal, to assert that the Rule does not violate the prohibition on ex post facto laws. *See* 86 Fed. Reg. at 69,881.

Accordingly, the Rule would appear to include John Doe #2 within SORNA's registration obligations despite the fact that his nolo contendere plea was "set aside and vacated" in 2012 under California Penal Code § 1203.4, Doe #2 Decl. Ex. A at DOE00011, and his registration obligation terminated in 2016.[24] *Id.* at DOE00012. Indeed, that is precisely the position that DOJ has taken in this litigation. ECF No. 56 at 17 ("[I]f . . . an offender remains subject to negative legal consequences from his conviction, then the fact of the past conviction still has legal significance under SORNA. In other words, the person was convicted.").[25]

This interpretation is not the best reading of the statutory text. SORNA's regulatory scheme relies on state law to supply the predicate convictions for its registration requirements. *See Carr v. United States*, 560 U.S. 438, 452–53 (2010) ("[T]he federal sex-offender registration laws have, from their inception, expressly relied on state-level enforcement . . . . In enacting SORNA, Congress preserved this basic allocation of enforcement responsibilities."). Absent indications to the contrary, it follows that SORNA similarly looks to

---

[24] In its Order denying Defendants' Motion to Dismiss, the Court suggested the parties provide an accounting of the legal consequences of relief under Section 1203.4 and a Certificate of Rehabilitation and suggested the parties engage the California Department of Justice to produce an official statement. MTD Order at 19 n.7. The California Department of Justice was unable to provide any such information, *see* Decl. of Molly Nixon at ¶ 3, Ex. A, but Plaintiffs note that the Collateral Consequences Resource Center's Restoration of Right Project provides "detailed state-by-state analyses of the law and practice in each U.S. jurisdiction relating to restoration of rights and status following arrest or conviction," originally published and now updated by former United States Pardon Attorney Margaret Love. Collateral Consequences Resource Centers, Restoration of Rights Project, https://ccresourcecenter.org/restoration-about/ (last accessed Nov. 16, 2024). The California Restoration of Rights & Record Relief analysis can be found at https://ccresourcecenter.org/state-restoration-profiles/california-restoration-of-rights-pardon-expungement-sealing/ (last accessed Nov. 16, 2024) and states that "California's primary form of relief for convictions is a set-aside and sealing under Cal. Penal Code § 1203.4, known colloquially as an expungement."

[25] DOJ's own understanding of the scope of "convicted" appears to continue shifting, from remaining "substantive effect" (73 Fed. Reg. at 38,050) to "penal consequences" (*id.*) to "negative legal consequences." ECF No. 56 at 17. This ongoing flexibility suggests DOJ is aware that its position is not clearly within the meaning of the statutory text.

state mechanisms to define relief from state conviction and associated registration requirements.[26] Indeed, SORNA defines a "sex offender registry" as "a registry of sex offenders . . . *maintained by a jurisdiction*." 34 U.S.C. § 20911(9) (emphasis added). It makes no sense to have state law define the predicate sex offender convictions and provide for the establishment and maintenance of the registries, but not to inform the understanding of who is *not* a "sex offender" under SORNA. It would also be irrational for Congress to have intended DOJ, in implementing SORNA, to take a blanket approach that directly conflicts with the many and varied state mechanisms providing for conviction and sex offense registration relief.[27] Such an assumption would conflate Congress's dual purposes in enacting SORNA: incentivizing states to meet national registry standards (under the spending clause) and imposing a federal registration obligation (under the commerce clause), by adopting an interpretation of "sex offender" that renders individuals criminally liable for their states' lack of compliance, which Congress did not compel.[28]

---

[26] In fact, Congress appears to have rejected DOJ's approach. The Supreme Court has observed that "[p]re-SORNA law also exposed to federal criminal liability any person whose State had not established a minimally sufficient sexual offender registration program and who was thus required to register with the [FBI]. SORNA does not include a similar FBI registration requirement, presumably because, by the time of the statute's enactment, every State had enacted some type of registration system." *Carr*, 560 U.S. at 453 n.7 (cleaned up). By eliminating those FBI registration provisions in SORNA, Congress returned more control to the states to enforce their own state registry laws. Applying DOJ's interpretation would effectively undo that decision without providing registrants the FBI compliance option available pre-SORNA.

[27] Even if the Court finds the statute to be ambiguous as to the meaning of "was convicted," DOJ's shifting position merits no deference here. The Court's previous decisions expressing doubt about this claim (but reserving a final decision) were decided before the Supreme Court's opinion in *Loper Bright. See also United States v. Apel*, 571 U.S. 359, 369 (2014) ("[W]e have never held that the Government's reading of a criminal statute is entitled to any deference."). Whether John Doe #2's Section 1203.4 set aside, coupled with the termination of his registration obligations, meets DOJ's platonic ideal of "expungement" is irrelevant to the statute's cooperative federalism structure, which by its nature incorporates differing state approaches.

[28] The Court previously noted that Congress has included exemptions for predicate convictions

Plaintiffs request that the Court reexamine their argument that a conviction set aside—and a nolo contendere plea withdrawn—under § 1203.4 render a "conviction" something necessarily different as a matter of plain meaning. *See* ECF No. 71 at 5–9; ECF No. 44-1 at 20–22; *cf. Standen v. Whitley*, 994 F.2d 1417, 1422 (9th Cir. 1993) ("Legally, [a] plea no longer ha[s] the effect of a conviction after [a court] ha[s] permitted its withdrawal."). But given the ambiguity of California courts' approaches to the meaning of § 1203.4, the Court should apply the rule of lenity to reject DOJ's one-size-fits-all construction.[29] *Cf. Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring) ("[T]o give persuasive effect to the Government's expansive . . . interpretation . . . would turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity.").

Finally, just as the rule of lenity counsels construing any ambiguity in a criminal law against the government, so too the canon of constitutional avoidance requires construing any ambiguity in SORNA to avoid constitutional questions, such as the due process violation highlighted above. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").[30]

---

that were expunged in other statutes. MPI Order at 45. But that cuts the other way. That Congress did *not* specify the exclusion of expunged convictions in SORNA would render the statute absurd if read broadly, as it would apply even to those who had been found to be wrongfully convicted. The fact that such individuals were not explicitly excluded supports the interpretation that Congress intended state laws to do the work of providing for and defining conviction relief.

[29] By way of an example of this ambiguity, the version of Cal. Penal Code § 1203.4 in effect at the time John Doe #2 received relief explicitly used the word "expunged." Cal. Penal Code § 1203.4(d) (2012).

[30] *See also United States v. United Verde Copper Co.*, 196 U.S. 207, 215 (1905) ("If [the agency's rule] is valid, the Secretary of the Interior has power to abridge or enlarge the statute at will. If he can define one term, he can another. If he can abridge, he can enlarge. Such power is not regulation: it is legislation. The power of legislation was certainly not intended to be conferred upon the Secretary.").

**B.     The Rule's interpretation of SORNA is also arbitrary and capricious.[31]**

In assessing whether a rule is arbitrary and capricious, a court looks at whether the agency "examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made." *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, and Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1182 (9th Cir. 2021). An agency action is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem" or if the agency "offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1257 (9th Cir. 2017) (citation omitted).

Nothing in the Administrative Record for the 2021 Rule explains DOJ's reliance on its 2008 decision to construe the statutory term "sex offender" so as to sweep in individuals who are no longer considered convicted under state law and who do not have to register in their states. And the 2008 SMART Guidelines themselves provide no "satisfactory explanation." *Transp. Div.*, 988 F.3d at 1182. The Administrative Record does, however, show that DOJ "entirely failed to consider an important aspect of the problem." *Defs. of Wildlife*, 856 F.3d at 1257. Specifically, why a regime that relies on state law for (a) the predicate sex offense convictions that require registration and (b) the administration of the registration programs, would nevertheless ignore state law's understanding of those convictions and registration requirements.[32] Even if the Court finds that relief under California law does not necessarily

---

[31] Plaintiffs assert both that DOJ's interpretation of "conviction" is *ultra vires* because it is in conflict with the meaning of the term in SORNA, and that the Rule's interpretation is arbitrary and capricious because DOJ has not provided any rationale for its decision to include convictions that were set aside under state law. *See* MTD Order at 16.

[32] This dereliction was not due to lack of notice. California commented on the proposed 2008 guidelines, asking whether individuals who had received Certificates of Rehabilitation would be required to re-register. ECF No. 125 (Notice of Lodging of 2008 SMART Guidelines supplemental record) at 2008-0000754; *see also* Comment of National Association of Criminal Defense Lawyers at 2008-0000706–708 ("Many states, either constitutionally or via legislative

---

remove individuals like John Doe #2 from the scope of SORNA's definition of "sex offender," DOJ's failure "to consider an important aspect of the problem"—states that set-aside convictions and remove individuals from their registries, as with John Doe #2 and other ACSOL members in California—requires setting aside the Rule.[33]

In its Order denying Defendants' Partial Motion to Dismiss the Court said it shared the concern that DOJ never showed its work on the concept of predicate convictions or fully explained what it means, and predicted that the "administrative record would likely provide valuable clarification." MTD Order at 16.[34] The Court stated that it will need to "assess the reasonableness of DOJ's statutory interpretation, the sufficiency of DOJ's stated reasoning, and the decision-making process it employed to arrive at its conclusions." *Id.* at 17. But the record for the 2021 Rule provides no clarification or reasoning and the record DOJ provided

---

enactment, have procedures that permit the annulment or expungement of criminal convictions for reasons other than actual innocence. . . . SORNA does not require that former offenders who are pardoned or whose convictions are annulled or expunged be included with those who must register. The proposed regulations violate fundamental notions of federalism and are well beyond the authority granted to the Attorney General to promulgate such regulations.").

[33] The Court has characterized DOJ's position in part as resting on a basis that "it need not concern itself with the peculiarities of state law." ECF No. 76 at 16. That comports with Plaintiffs' reading of DOJ's Rule and Defendants' filings in this case (not to mention DOJ's confusing approach to its implementation reviews, *see* Bellucci Decl. ¶ 18), but it is inconsistent with SORNA, which by its nature is very much reliant on the peculiarities of state law. DOJ may prefer to ignore that fact, but it cannot do so consistently with the APA.

[34] The Court raised several specific questions, including why SORNA's phrase "was convicted" turns on whether a person "remains subject to penal consequences." MTD Order at 17. The *Gundy* Court found that the use of the past tense "served to bring in the hundreds of thousands of persons previously found guilty of a sex offense, and thought to pose a current threat to the public," particularly those who were "missing" or had "slipped the system." 588 U.S. at 143. DOJ's interpretation bizarrely sweeps in those prior sex offenders whose states have determined they are *not* a current threat. Indeed, individuals like John Doe #2, who has gone through the effort of obtaining a set aside of his conviction and removal of his registration obligation, are the opposite of those who have "slipped the system."

29

for the 2008 SMART Guidelines also sheds no light. DOJ has neither articulated a satisfactory explanation nor considered an important aspect of the problem. Accordingly, the Rule is arbitrary and capricious and should be set aside.

## CONCLUSION

For the reasons above, the Court should enter an order declaring unlawful 34 U.S.C. §§ 20912 and 20914 and setting aside the Rule pursuant to 5 U.S.C. § 706.

DATED: November 18, 2024.

Respectfully submitted,

/s/ Molly E. Nixon
MOLLY E. NIXON*
N.Y. Bar No. 5023940
STEVEN SIMPSON
Cal. Bar No. 336430
ALLISON D. DANIEL*
Ohio Bar No. 0096186
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
MNixon@pacificlegal.org
SSimpson@pacificlegal.org
ADaniel@pacificlegal.org

* Admitted pro hac vice

JEREMY TALCOTT
Cal. Bar No. 311490
Pacific Legal Foundation
3217 Topaz Lane
Fullerton, CA 92831
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
JTalcott@pacificlegal.org

1

## **CERTIFICATE OF SERVICE**

2        I certify that on this day, November 18, 2024, I served copies of the foregoing on

3   counsel of record for all Defendants using the Court's CM/ECF system.

4

5                        By /s/ Jeremy Talcott

6                           JEREMY TALCOTT

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28